## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| JEFFREY HARRIS, WILLIE BERNARD MACK, DEMETRIUS PARHAM and HENRY TARVER, | ) ) ) | |
| | ) | CIVIL ACTION NO.: |
| Plaintiffs, | ) | 2:06-CV-00875-ID-CSC |
| | ) | |
| vs. | ) | |
| | ) | |
| MID STATE LAND & TIMBER COMPANY, INC., D/B/A SEDGEFIELDS PLANTATION, | ) ) ) | |
| | ) | |
| Defendant. | | |

## DEFENDANT MID STATE LAND & TIMBER COMPANY, INC.'S MEMORANDUM OF LAW IN SUPPORT OF SUMMARY JUDGMENT AS TO PLAINTIFF ROY LEE'S CLAIMS

COMES NOW Defendant Mid State Land & Timber Company, Inc. (hereafter referred to as "Mid State" or "Defendant"), pursuant to Rule 56 of the Federal Rules of Civil Procedure, and submits this Memorandum of Law in Support of Defendant's Motion for Summary Judgment as to Plaintiff Roy Lee's claims ("Lee") filed herewith.

## I. INTRODUCTION

Defendant Mid State owned Sedgefields Plantation ("Sedgefields") until its sale in May 2006. (Affidavit of David Carroll ("Carroll Aff."), attached hereto as

1

Exhibit A, at ¶ 2).  Sedgefields was developed by the Maytag family in the early 1930s and has a rich tradition for quality quail hunting. (*Id.*)  Indeed, Sedgefields continues to host the National Amateur Free For All Championship for bird dogs. (*Id.*)  Despite its fabled quail hunting past and its continued association with national field trials, for several years, the Sedgefields property had not been properly cultivated and managed for wild quail covies, resulting in a reduction of its wild quail population.  (*Id.* at ¶ 3.)

In an effort to remedy this problem, Mid State hired Joel Norman ("Norman") from the Mill Pond Plantation in Thomasville, Georgia, an area renowned around the world for superior quail hunting, to cultivate and manage the land for wild quail habitation and return Sedgefields to its former prominence as a top rated quail hunting plantation. (*Id.* at ¶ 3.)  Defendant paid Norman $70,000 to leave Mill Pond and come to Sedgefields.  (Deposition of Joel Norman ("Norman Dep."), pertinent portions of which are attached hereto as Exhibit B, at 50:2-5.) Prior to coming to Sedgefields, Norman had twenty-seven years of bird dog training and handling experience and twenty-four years of experience working on quail hunting plantations, the last seven years of which he was the plantation manager. (Norman Dep. at 37:1 to 41:23.)   In addition to his work experience, Norman has a two-year associate degree in wild life management.  (Norman Dep. at 19:15-19; Application of Joel

2

Norman ("Norman App."), attached hereto as Exhibit C.)  Lee, on the other hand, has no education in wild life management, no experience in bird dog training, and  no prior quail hunting experience until he was hired as a Field Laborer at Sedgefields in September 2000 at $6.00 per hour.  (Deposition of Roy Lee ("Lee Dep."),[1] attached hereto as Exhibit D, at 16:1-10; Declaration of Roy Lee ("Lee Decl."), attached hereto as Exhibit E; Application of Roy Lee ("Lee App."), attached hereto as Exhibit F.) While Defendant admits that Lee was trained in quail hunting while he worked at Sedgefields and that he, for a short time during the off-season, managed both quail and deer operations at Sedgefields, Lee's qualifications–as to quail hunting and plantation management–pale in comparison to Norman's educational background and work experience. (Lee Dep. 46:15-22, 47:14-23; Deposition of David Carroll ("Carroll Dep."),  pertinent portions of which are attached hereto as Exhibit G, at 97:13 to 98:7.)

## II.  STATEMENT OF FACTS

Lee was employed by Mid State from September 2000 until May 19, 2006, when all of Mid State's employees were terminated upon the sale of Sedgefields Plantation to Tolleson Land & Timber. (Lee Dep. at 15:5-12.)   Prior to coming to

---

[1] There were two depositions of Roy Lee.  The first deposition, taken on October 11, 2006, will be referred to as "Lee Dep." and the second deposition, taken on January 18, 2007, will be referred to as "Lee Dep. II."

work for Defendant, Lee had no experience whatsoever with quail hunting, no managerial experience in hunting operations, and no education in wildlife management. (Lee Dep. at 16:1-10; Lee Decl.; Lee App.) Lee had no experience with bird dog training. (Lee Dep. II, attached hereto as Exhibit I, at 32:11 to 32:14.) Lee does not have a college degree. (Resume of Roy Lee ("Lee Resume"), attached hereto as Exhibit H.)

Despite Lee's lack of credentials, when Defendant was shorthanded and without a plantation manager in February through April of 2005, Lee, who was then earning $12.00 per hour, was selected to temporarily oversee Defendant's quail and deer hunting operations. (Lee Dep. at 46:15-22, 47:14-23; Carroll Dep. at 97:13 to 98:7; Lee Dep. II at 71:15 to 71:18 and 72:4 to 72:9.) During that time frame, quail season was over, deer season was over, and Lee's duties involved primarily maintenance activities. (Carroll Dep. at 97:13 to 98:7.) Lee was paid a salary of over $41,000 by Defendant starting in January 2006 when he was in charge of solely the deer hunting activities. (Lee Dep. at 73:9-10; Plaintiffs' First Amended Complaint ("Am. Compl.").)

In the summer of 2005, Mid State advertised for an individual with experience in quail hunting and horse and dog handling to manage Defendant's quail operations. (Norman Dep. at 47:11-23.) Defendant hoped to hire a Quail Operations Manager

who could restore the wild quail population and Sedgefields's reputation as one of the best hunting facilities in the country. (Carroll Aff. at ¶ 2.) With twenty-plus years experience in quail hunting operations and bird dog training, plus seven years experience as a plantation manager for a thirty-three hundred acre plantation in Georgia, Norman more than satisfied Defendant's requirements for a Quail Operations Manager. (Norman Dep. at 37:1 to 41:23.)    Additionally, with his experience in wild quail operations, Norman was able to institute a wild quail recovery program at Mid State. (Norman Dep. at 69:16 to 70:21.)  In his deposition, Norman testified that he needed to be paid $70,000 to be "lured away" from his position of plantation manager in his hometown in Georgia.  (Norman Dep. at 50:2-5.)  In September 2005, Norman was hired by Defendant to manage quail operations at his requested salary of $70,000.  (Norman Dep. at 50:2-5, 72:6.)

Unlike Lee, Norman has an associate degree in wildlife technology.  (Norman Dep. at 19:15-19; Norman App.)    In contrast to Lee, who did not have any prior personal quail hunting experience or bird dog training experience, Norman, prior to coming to work for Defendant, had twenty-seven years experience in bird dog training and handling for quail hunts, twenty-four years of experience working on quail hunting plantations, and approximately seven years experience managing a thirty-three hundred acre plantation in Georgia and supervising up to twenty

plantation employees. (Norman Dep. at 37:1 to 41:23; Norman App.) Norman was experienced in cultivating and maintaining a wild quail population and handled this aspect of quail operations for his former employer. (Norman Dep. at 39:21 to 41:23.)

On November 2, 2006, Lee joined Plaintiffs Jeffrey Harris, Willie Mack, Demetrius Parham, and Henry Tarver in this action against Mid State by filing a claim for wage discrimination in violation of 42 U.S.C. § 1981. In his Complaint, Lee claims that he was paid less than Norman, a white employee, because of his race. (Am. Compl.)

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Even though claims of employment discrimination often present fact-intensive issues, "the summary judgment rule applies in job discrimination cases just as in other cases." *Chapman v. AI Transport*, 229 F.3d 1012, 1026 (11th Cir. 2000) (en banc).

# IV.  ARGUMENT

A.    Lee cannot establish a prima facie case of wage discrimination.[2]

In his Complaint, Lee asserts a claim of intentional wage discrimination in violation of 42 U.S.C. § 1981, alleging that, because of his race,  he was paid less than another manager, Joel Norman, a white male.  (Am. Compl. ¶¶ 18, 20, 23.) However, since Lee is not similarly situated to Norman, who has exponentially more education, quail hunting experience, dog training and handling experience, and plantation management experience than Lee, Lee cannot establish prima facie case of wage discrimination.

"To state a prima facie case of intentional discrimination in compensation, a plaintiff must establish that (1) [he] belongs to a [protected class]; (2) [he] received lower wages; (3) similarly situated comparators outside the protected class received higher compensation; and (4) [he] was qualified to receive the higher wage." *Cooper v. Southern Co.*, 390 F.3d 695, 735 (11th Cir. 2004).  As the court in *Jackson v. Bellsouth Telecomm.*, 372 F.3d 1250, 1273 (11th Cir. 2004), made clear, "[w]hen comparing similarly situated individuals to raise an inference of discriminatory

---

[2] Lee does not allege, nor can he allege, any direct evidence of wage discrimination.  As such, he must proceed under the familiar *McDonnell-Douglas* burden-shifting framework. *Cooper v. Southern Co.*, 390 F.3d 695, 723-24 (11th Cir. 2004). Accordingly, to survive summary judgment, Lee must raise an inference of discrimination by establishing a prima facie case of wage discrimination. *Id.* at 724, Fn 16.

motivation, the individuals must be similarly situated in all relevant respects besides the [protected trait], since different treatment of *dissimilarly* situated persons does not violate civil rights laws." (Emphasis original). Summary judgment for the employer is appropriate when a plaintiff fails to identify a comparator whose education and experience are substantially similar to his own. *See, e.g.*, *Cooper*, 390 F.3d at 745 (affirming summary judgment for employer on plaintiff's compensation claim because "[Plaintiff] has not established that the proposed comparators had similar levels of experience or education"); *Beard v. 84 Lumber Co.*, No. 06-12220, 2006 WL 2946883, *4 (11th Cir. Oct. 17, 2006) (affirming summary judgment in wage disparity case based on plaintiff's failure to identify a similarly-situated comparator) (table); *Mack v. ST Mobile Aerospace Engineering, Inc.*, No. 05-14695, 2006 WL 2129661, *13 (11th Cir. July 31, 2006) (affirming summary judgment for employer because employee's comparators possessed specialized training and experience that employee did not, and thus employee was not similarly situated to his alleged comparators) (unpublished).

In this case, Lee argues, unpersuasively, that he is similarly situated to Norman. However, a review of the evidence in this case reveals that Lee's education, quail hunting experience, bird dog training experience, and plantation management

8

experience pale in comparison to Norman's.[3]  For example, Lee never worked on a plantation before joining Sedgefields.  (Lee Dep. at 16:1-10; Lee Decl.; Lee App.) Norman, on the other hand, had twenty-four years of experience working on quail hunting plantations, the last seven of which he managed a thirty-three hundred acre plantation in Georgia and supervised twenty plantation employees. (Norman Dep. at 37:1 to 41:23; Norman App.)

Furthermore, Lee had no prior experience with quail hunting or quail hunting operations before joining Sedgefields, whereas Norman had twenty-plus years of experience working in quail hunting operations on a plantation.  (Lee Dep. at 16:1-10; Lee Decl.; Lee App.; Norman Dep. at 37:1 to 41:23.)   Norman had twenty-seven years of experience in bird dog training and handling; Lee, on the other hand, has no bird dog training experience and was taught how to "handle" the bird dogs after he was hired by Mid State.  (Norman App.; Lee Dep. II at 32:11 to 32:14.) Moreover, Lee has no college education, whereas Norman has an associate's degree in wildlife management. (Lee Resume; Norman Dep. at 19:15-19; Norman App.)   Norman's education along with his quail operations experience helped him to implement a much-needed wild quail recovery program at Mid State.  (Norman Dep. at 69:16 to

_____

[3] It is self-evident that the quail hunting operations manager and deer hunting operations manager positions are dissimilar and have different qualifications, duties, and responsibilities.  See Carroll Aff. at ¶ 5

70:21.)

As these undisputed facts make clear, Lee lacks the education and job-specific experience that Norman possesses. As such, Lee is not similarly situated to Norman and thus, Lee cannot establish a prima facie case of wage discrimination. Accordingly, for this reason alone, Lee's wage discrimination claim is due to be dismissed.

B.     All employment decisions regarding Lee were based upon legitimate, non-discriminatory considerations, which Lee cannot demonstrate are pretextual.

Even assuming that Lee can establish a prima facie case, which he cannot, Defendant has proffered a legitimate, non-discriminatory justification for the difference in Lee's and Norman's pay–that Norman had considerably more education, quail hunting operations experience, and plantation management experience than Lee. *See, e.g.*, *Brooks v. County Comm'n of Jefferson County, Alabama*, 446 F.3d 1160, 1163 (11th Cir. 2006) (concluding that superior qualifications and firsthand experience were sufficient legitimate, non-discriminatory reasons for failure to promote plaintiff); *Patt v. Family Health Systems, Inc.*, 280 F.3d 749, 753 (7th Cir. 2002) ("Years of service and prior experience are legitimate, non-discriminatory reasons for a wage disparity."). Given Mid State's goals of restoring the wild quail population and returning Sedgefields to its former glory, Mid State, like any other reasonable employer, was willing to pay the salary Norman demanded to get his

10

experience and achieve these goals.

To survive summary judgment, Lee must prove that Mid State's proffered explanation is a pretext for discrimination by coming "forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000). If the employee does not offer sufficient evidence showing that each and every proffered reason is pretextual, then summary judgment is appropriate. *Id.* at 1037. Moreover, "[a] plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. *Rouse v. City of Orange Beach*, *AL*, No.00-0025-BH-C, 2001 WL 530441, *5 (S.D. Ala. 2001). Rather, if "the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Id.*, citing *Alexander v. Fulton County, Ga.,* 207 F.3d 1303, 1341 (11th Cir. 2000) (Title VII case) ("[I]t is not the court's role to second-guess the wisdom of an employer's decisions as long as the decisions are not racially motivated.").

In this case, Lee cannot prove that Mid State's legitimate, non-discriminatory

explanation for the difference in salary between Norman and Lee was a pretext for discrimination. As the evidence indicates, Mid State reasonably believed that Norman's combination of experience and education made him a great fit for the Quail Operations Manager position and that Norman could, among other things, remedy Sedgefields dwindling quail population. (Carroll Aff. at ¶ 4.) Mid State knew that Norman could not be "lured away" from his position with Mill Pond for less than an annual salary of $70,000. (Norman Dep. at 50:2-5.) Mid State honestly believed that Norman would be an asset to Sedgefields Plantation and for that reason Mid State agreed to pay Norman the salary he requested. (Norman Dep. at 50:2-5.) Lee cannot demonstrate that Mid State's belief was not honestly held. Accordingly, summary judgment is due to be granted as to Lee's claims. *Cooper*, 390 F.3d at 725 ("If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim."); *Chapman*, 229 F.3d at 1037 (same).

# V.  CONCLUSION

WHEREFORE, PREMISES CONSIDERED, Defendant Mid State Land & Timber Company, Inc. respectfully requests this Court enter summary judgment in favor of Defendant and against Plaintiff Roy Lee as to all claims asserted in Lee's Complaint.  Further, as there is no just reason for delay, Defendant respectfully requests that this Court render a judgment in favor of this Defendant as to Plaintiff Roy Lee a final judgment pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.

Respectfully submitted,


 /s/ Carter H. Dukes
Carter H. Dukes
Kimberly W. Geisler
Attorneys for Defendant
Mid State Land & Timber Company, Inc.


**OF COUNSEL:**
HUCKABY SCOTT & DUKES, P.C.
2100 Third Avenue North
Suite 700
Birmingham, Alabama 35203
(205) 251-2300

13

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

> Jerry D. Roberson, Esq.
> Roberson & Roberson
> 3765 Kinross Drive
> P.O. Box 380487
> Birmingham, Alabama 35238-0487

> Albert H. Adams, Jr., Esq.
> Irby Law Firm, LLC
> Post Office Box 910
> Eufaula, Alabama 36072

DONE this the 19th day of February, 2007.

/s/ Carter H. Dukes
Of Counsel

39309

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| **JEFFREY HARRIS,** | ) |
| **WILLIE BERNARD MACK,** | ) |
| **DEMETRIUS PARHAM and** | ) |
| **HENRY TARVER,** | ) |
| | ) **CIVIL ACTION NO.:** |
| **Plaintiffs,** | ) **2:06-CV-00875-ID-CSC** |
| | ) |
| **vs.** | ) |
| | ) |
| **MID STATE LAND & TIMBER** | ) |
| **COMPANY, INC., D/B/A** | ) |
| **SEDGEFIELDS PLANTATION,** | ) |
| | ) |
| **Defendant.** | |

### AFFIDAVIT OF DAVID CARROLL

| | |
|---|---|
| STATE OF ALABAMA | ) |
| | : |
| COUNTY OF BULLOCK | ) |

Before me, the undersigned notary public in and for said county and state, personally appeared David Carroll, who being known to me and who being first duly sworn, deposes oath and states as follows:

1.    My name is David Carroll. I am over the age of nineteen years and am suffering from no legal disability. I am currently the general manager for Sedgefields Plantation (Sedgefields") which is owned by Tolleson Land & Timber. I was previously employed by Mid State Land & Timber Company, Inc. ("Mid State") from April 2005 through May 19, 2006 as the general manager for Sedgefields before the plantation was purchased by Tolleson. This affidavit is based upon my personal knowledge.

2.    Mid State owned, until its sale in May 19, 2006, Sedgefields. It is my understanding that Sedgefields was developed by the Maytag family in the early 1930's and has a rich tradition for quality quail hunting. As a testament to this tradition, Sedgefields continues to host the National Amateur Free For All Championship for bird dogs.

3.    Despite its fabled quail hunting past and its continued association with National Field Trials, the Sedgefields property for several years prior to my employment at Sedgefields had not been properly cultivated and managed for wild quail covies, resulting in a reduction in its wild quail population and creating a lack-luster quail hunting experience. It is my understanding from speaking with people who had previously hunted the property that Mid State was utilizing "put and take birds" for its quail hunts for several years prior to my arrival. That is, Mid State was putting pen raised birds in the fields at pre-determined locations to be hunted later that day. Hunting "put and take" birds does not create as much of an enjoyable quail hunting experience as hunting pre-released birds (i.e. birds that have been released months in advance) or birds from preexisting wild covies. Mid State, prior to my arrival, had begun to lose its luster as a renown quail hunting destination.

4.    To remedy this problem, Mid State sought to hire as a quail operations manager someone with significant experience in quail hunting operations, dog training and handling, and land cultivation for wild quail covies. I was in charge of finding a quail operations manager for Mid State and was responsible for the hiring of Joel Norman ("Norman") as the quail operations manager for Sedgefields. Mid State hired Norman from the Mill Pond Plantation in Thomasville, Georgia, an area renown around the world for superior quail hunting, to cultivate and manage the land at Sedgefields for wild quail habitation and to return Sedgefields to its former prominence as a top rate quail hunting destination. Norman told me that it would take $70,000 to leave Mill Pond and to come to Sedgefields. We hoped that Norman's quail hunting customers from Mill Pond would

follow him to Sedgefields and increase our customer base. I recommended to Mid State that Mid State pay Norman $70,000. Prior to coming to Sedgefields, Norman had twenty-seven years of bird dog training and handling experience and twenty-four years of experience of working on quail hunting operations, the last seven years of which he was the plantation manager. In addition to his work experience, Norman had a two year associate degree in wildlife management.

5.    While Roy Lee ("Lee") was a good employee, he did not have the quail hunting experience, the bird dog training and handling experience, the wildlife management and cultivation experience, or education that I was looking for in a quail operations manager. I thought that Norman was more qualified for the quail hunting operations manager position than Lee. Further, it was a priority for Sedgefields to rejuvenate its quail hunting tradition. Sedgefields did not have with deer hunting the long tradition and reputation that it had in quail hunting, and the deer operations at Sedgefields did not need the overhaul that the quail hunting operations required at that time. The quail operations manager position and the deer operations manager position require different qualifications and experiences and have different job duties and responsibilities.

FURTHER AFFIANT SAITH NOT.

Executed this _7th_ day of _February_, 2007.

_____
David Carroll

STATE OF ALABAMA          )
                                                 :
COUNTY OF BULLOCK       )

I, the undersigned authority, a Notary Public in and for said County in said State, hereby certify that David Carroll whose name is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that being informed of the contents of the said instrument, _____ executed the same voluntarily on the day the same bears date.

GIVEN under my hand and seal this _7_ day of _Feb_, 2007.

[NOTARIAL SEAL]

_____
Notary Public

Print Name _Denise Pierce_

My Commission Expires: _9/20/08_

American Court Reporting
toll-free (877) 320-1050

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


CIVIL ACTION NUMBER

2:06-CV-00405-ID-SRW


NORRIS FOSTER,

    Plaintiff,

vs.

MID STATE LAND & TIMBER COMPANY, INC.,
d/b/a SEDGEFIELDS PLANTATION,

    Defendant.



THE VIDEOTAPED

DEPOSITION TESTIMONY OF:

JOEL NORMAN


September 8, 2006

9:11

    a.m.


COURT REPORTER:

Gwendolyn P. Timbie, CSR

COPY

Page 19

1          Q       Where did you attend college?

2          A       Abraham Baldwin Agriculture

3     College, Tifton.

4          Q       Okay.  And did you -- is that

5     a junior college?

6          A       It -- it is, yes.  About the

7     same thing.

8          Q       I mean, it -- they have

9     two-year degrees?

10         A       Two-year degrees.  And you --

11    or you can take your first two years there

12    and move on, you know.

13         Q       Okay.

14         A       It's also -- transfer.

15         Q       And so you got an associate

16    degree, a two-year degree --

17         A       That's right.

18         Q       -- in wildlife technology --

19         A       That's right.

20         Q       -- is that correct?  When did

21    you finish that college?

22         A       I think my -- I actually may

23    have received my diploma in '86, but I had

**American Court Reporting**
**toll-free (877) 320-1050**

Page 37

1    salary?

2         A     Yes, sir.

3         Q     How much was the salary?

4         A     I don't remember.

5         Q     Do they have any black

6    employees there?

7         A     Yes, sir.

8         Q     All right.  And who -- who

9    would you say would have been in charge of

10   that?

11        A     A guy by the name of Jesse

12   Jackson.

13        Q     Was he white or black?

14        A     He was white.

15        Q     Is he still living?  Do you

16   know?

17        A     I think so.

18        Q     Do you ever talk to him?

19        A     Not in the last couple of

20   years.

21        Q     All right.  Why did you leave

22   there in '84?

23·       A     I had an opportunity to work

**www.AmericanCourtReporting.com**
**September 8, 2006**

Page 38

1    in my hometown, on a -- on a plantation

2    there.

3         Q    At Millpond?

4         A    At Millpond.

5         Q    Who owns Millpond Plantation?

6         A    It's now owned by the

7    Sedgewick -- Sedgewick family.

8         Q    Well, when you worked there,

9    who owned it?

10        A    The Sedgewick family owned it

11   for the last year.  The Perry family owned

12   it for the years prior to that.  They're

13   all first cousins.  I mean, it's all in

14   the same family, basically.  But...

15        Q    Okay.  Now, what was your job

16   at Millpond?

17        A    Well, for the first -- I don't

18   know.  First period, it was just a dog

19   trainer.  Title was a dog trainer, but I

20   did have a -- the responsibility of

21   looking after the quail woods.  In the --

22   the last, approximately, six years, I was

23   the manager and the dog trainer.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 39

1       Q      Last six years, you were

2    manager?

3       A       Manager and dog trainer, with

4    the exception of -- the last year, I

5    brought in a -- a guy to -- to take the

6    dog -- the actual hunts out, and started

7    training him and getting him ready to do

8    that.   I had too much responsibility.

9       Q     Okay.  Well, as -- as a

10   manager at Millpond, did you hire and fire

11   employees?

12      A      Yes, sir.

13      Q      And you -- you worked there as

14   a manager for six or seven years; right?

15      A      That's right.

16      Q      So I -- how many employees did

17   you have?

18      A       It -- it varied from -- from

19   eight to twenty.  Seasonal.  We had some

20   seasonal help, and it fluctuated some.

21      Q      Did -- did they have any other

22   aspect to their operation other than the

23   quail hunting?  Did they farm or

Page 40

1    anything?

2        A    We -- just a little bit.  Not

3    a lot.  Just -- we -- we did a little bit

4    once or twice.

5        Q    How many acres did they have?

6        A    The property that I was

7    responsible for was thirty-three hundred,

8    plus another -- approximately a thousand

9    that was neighbor's property -- family

10   property that we managed quail on.

11       Q    Did y'all set birds out?

12       A    No, sir.

13       Q    It was a -- it was a wild

14   quail?

15       A    All wild quail.

16       Q    Okay.  So you have to manage

17   that population --

18       A    Yes, sir.

19       Q    -- is that right?  Is that

20   what you're talking about, managing the

21   quail woods?

22       A    Yes, sir.

23       Q    How do you do that?

Page 41

1        A      Well, it's -- that's not

2   easy.  That's not a question I can answer

3   just in a few minutes.  Do you want to

4   hear it?

5        Q      Well, I -- do you -- do you

6   feed them?

7        A      We do feed them.

8        Q      Okay.

9        A      You do feed them.

10       Q      Okay.

11       A      You feed them.  You burn

12  properly.  You -- you manicure the woods.

13  You trap -- you have it trapped.

14       Q      Do you provide cover for them?

15       A      We do.

16       Q      And --

17       A      That's -- that's included in

18  burning properly.

19       Q      Okay.  And -- and so it's a

20  year-round process --

21       A      Yes, sir.

22       Q      -- of making conditions

23  optimum for their population.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 47

1    was your hometown and your wife is from

2    there, why would you leave Millpond

3    Plantation?

4        A    Money.

5        Q    Well, how much money were you

6    making as a manager at Millpond?

7        A    Fifty thousand dollars a year.

8        Q    And somebody -- how did you

9    get in touch with Mid State Land and

10   Timber?

11       A    There was an ad in the paper,

12   and --

13       Q    What paper?

14       A    Thomasville Times-Enterprise.

15       Q    What did it say?

16       A    His -- something along the

17   lines of historical Sedgefields Plantation

18   is looking for someone with experience

19   with quail -- with equine -- equine and --

20   and dogs.  I don't remember exactly.  But

21   responsible for the dogs and the horses

22   and the hunting.

23       Q    Did it list a salary?

**www.AmericanCourtReporting.com**
**September 8, 2006**

Page 48

```
1         A      No, sir.

2         Q      Did -- who did you call?

3         A      I think I called and might

4    have spoke with David.

5         Q      David Carroll?

6         A      But I'm not sure.  I may have

7    got Denise first.  I don't remember, but I

8    eventually talked to David.

9         Q      Okay.  And what did he tell

10   you about it?

11        A      He just kind of -- I don't

12   remember exactly.  But he did tell me that

13   he would like for me -- I told -- but he

14   asked me some questions.  And I told him

15   what I was doing and a little bit about my

16   experience.  And he asked me to come over

17   and -- and talk to him.

18        Q      Come over for an interview;

19   right?

20        A      Yes, sir.

21        Q      Did you do that?

22        A      I did.

23        Q      Did you know how much the job
```

**American Court Reporting**
**toll-free (877) 320-1050**

Page 49

1   paid?

2       A    No.

3       Q    Okay.

4       A    Didn't even know what the

5   place looked like.

6       Q    All right.  You came over.

7   Was it -- when would you have come over?

8   In September when you filled out this

9   application?

10      A    I'm pretty sure it was -- it

11  may have been -- no.  It was probably in

12  August.  No.  Actually, it was in July,

13  wasn't it?  I was fixing to go to South

14  Dakota.  It was in July.

15      Q    Okay.  And who did you meet

16  with?

17      A    David.

18      Q    Anybody else?

19      A    Not that I recall.

20      Q    Did you ever talk to

21  Mr. Broadhead?

22      A    No, sir.

23      Q    So who hired you?

Page 50

```
 1          A      David.

 2          Q      And how much were you

 3   making -- take to lure you away from your

 4   hometown in Thomasville, Georgia?

 5          A      Seventy thousand dollars.

 6          Q      Seventy thousand dollars.

 7   Plus what?  A truck?

 8          A      All the benefits that I was

 9   receiving, basically, in Thomasville.

10   Truck.

11          Q      Okay.  Does --

12          A      Insurance, house.

13          Q      Does Mid States provide you

14   with a vehicle?

15          A      They do.

16          Q      What kind of vehicle?

17          A      It's a Chevrolet -- four-wheel

18   drive, Chevrolet truck.

19          Q      What year?

20          A      I'm not -- I'm not for sure.

21   I would probably say an '04 or somewhere

22   along in there.  I'm not sure.

23          Q      Air conditioned?
```

**American Court Reporting**
**toll-free (877) 320-1050**

Page 69

1    these people have him assigned to do.

2         Q     In fact, Roy Lee was doing

3    your job before you were hired, wasn't he?

4         A     No, sir.

5         Q     He wasn't?

6         A     No, sir.

7         Q     He wasn't taking people on

8    quail hunts?

9         A     He was putting birds out and

10   going and getting them and taking them

11   right back and shooting them, but he

12   wasn't doing what I do.

13        Q     Oh.  What is it that you do

14   that Roy wasn't doing?

15        A     Well, I'm not totally familiar

16   with everything Roy did.  But we have a

17   wild -- we have a wild quail recovery

18   program in place.  That wasn't being

19   done.

20        Q     What does that mean?  Tell me

21   what you mean about a "wild quail recovery

22   program."

23        A     Well, we're -- we're managing

**American Court Reporting**
**toll-free (877) 320-1050**

Page 70

1    for wild quail on some of the property,

2    and we -- and we initiate an early release

3    program -- quail program on -- on another

4    portion of the property.

5        Q    What is an "early release

6    program"?  Is that where you set --

7        A    Set them out --

8        Q    -- your birds out?

9        A    -- a couple of months before

10    hunting season and try to carry them

11    through the hunting season.  Basically,

12    just trying to manage that population of

13    released birds.

14        Q    Now, that ain't setting them

15    out to shoot them, is it?

16        A    It is releasing them --

17    pre-releasing them months prior to hunting

18    them, to -- to simulate wild-bird type

19    hunting.  Different kind of dog.  Dog

20    steady to winging shot, not -- not dogs

21    flushing birds for you.

22        Q    Anything else you say you're

23    doing that Roy Lee didn't do?

Page 72

1    that was a guide?

2         A     I was the only person that was

3    a guide.

4         Q     Okay.  So when Norris

5    Foster -- and you worked with Norris from

6    the time of your hiring in September until

7    he was fired on December the 29th;

8    correct?

9         A     Pretty much.  The -- the first

10   few weeks was sort of a -- trying to

11   figure out who-could-help-who deal.  So I

12   can't remember exactly when he became

13   strictly to my crew, you know.

14        Q     Okay.  Well, what I'm saying

15   is, your time there at Sedgefields only

16   overlapped from September to the end of

17   December; isn't that fair?  From the time

18   of your hiring --

19        A     That's right, yes.  Yes.  Yes.

20        Q     -- until December?

21        A     That's right.

22        Q     So that's four months, isn't

23   it?  September, October, November, and

# The Peble Corp.

## EMPLOYMENT APPLICATION

*PLEASE PRINT ANSWERS TO THE FOLLOWING QUESTIONS CAREFULLY AND IN INK. TO BE CONSIDERED FOR EMPLOYMENT, ALL ITEMS MUST BE COMPLETED, INCLUDING SIGNATURE. THIS APPLICATION IS VALID FOR 30 DAYS. IF YOU WISH TO BE CONSIDERED FOR EMPLOYMENT AFTER THIS APPLICATION EXPIRES, THEN YOU MUST RE-APPLY.*

NAME _Joel S. Norman Jr._      TELEPHONE NUMBER

ADDRESS _22137 Highway 29 N._      Home # _(334) 738- 5379_

CITY _Union Springs_ STATE _AL_   ZIP _36089_      Daytime # (    )    -

SOCIAL SECURITY NUMBER _252 - 86 - 2861_

**EMPLOYMENT INTERESTS:**

Type of work desired _____

Full Time _✓_     Part Time _____     Temporary _____

Starting pay expected _____     Date Available to start _____

**IF APPLICABLE:**

Are you willing to travel? _____ If yes, what percentage of the time _____

Would you be willing to relocate? _yes_

Would you object to:  Irregular work hours  ☐ YES  ☑ NO   Night work  ☐ YES  ☑ NO

Swing or fluctuating shift work  ☐ YES  ☑ NO

**SPECIAL SKILLS - COMPLETE IF APPLICABLE TO THE POSITION FOR WHICH YOU ARE APPLYING:**

Skill _Bird Dog Training + Handling_ Experience _27 yrs_

Skill _Plantation Mng_ Experience _7 yrs_

Skill _____ Experience _____

Please discuss other specialized skills you feel are pertinent to the job for which you are applying _____

**UNITED STATES MILITARY SERVICE STATUS:**

Past Military Service - FROM _____ TO _____

Branch _____ Rank on discharge _____ Present Status _____

List duties and special training

CONFIDENTIAL
DEFENDANT'S PROD.      0078

**EDUCATION:**

| | NAME OF SCHOOL AND LOCATION | MAJOR AREA OF STUDY and/or DEGREE RECEIVED |
|---|---|---|
| High School | TCCHS Thomasville, GA | High School Diploma |
| Jr. College, College, or University | Abraham Baldwin Agricultural College Tifton, GA | Associate Degree in Wildlife Technology |
| Technical or Trade Schools | | |

Honors and Scholarships _____

Grade Average (approx.)   High School _____ College _____ Other _____

**General Information:**

Are you legally authorized to work in the United States?   ☑ YES   ☐ NO  If not, what is your present status and

do you have a work visa? _____

Have you ever been convicted of a crime?   ☐ YES   ☑ NO  If yes, please explain. Give dates, charge, penalty assessed or disposition.  Conviction will not necessarily bar employment.  Consideration will be given to the nature of the crime, age at the time of offense, rehabilitation and the position for which you are applying.

_____

_____

Have you ever been discharged from a job?   ☐ YES   ☑ NO  If yes, please explain _____

_____

_____

_____

Have you ever been bonded?   ☐ Yes   ☑ NO   If yes, when and in what job. _____

_____

_____

_____

CONFIDENTIAL
DEFENDANT'S PROD.     0079

Do you have a valid, active driver's license?  ☑ YES  ☐ NO  Issuing State _____ G A _____

Drivers License # __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__ Class of License _____ C _____

low long have you been a resident of this City __20__ State __GA__

How long at your present address? __20__ Give previous address if less than one year at present

address _____

Are you over the age of 18?  ☑ YES  ☐ NO  If hired can you provide proof of age?  ☑ YES  ☐ NO

**EMPLOYMENT DATA:**

Have you ever been employed by this company before?  ☐ YES  ☑ NO  If yes, please give dates of

employment, position employed, and reason for leaving _____

_____

_____

Please list all jobs (if not listed above), beginning with your present or last employer and working backwards
to earlier positions. Account for all periods, including unemployment, self-employment, and military service.
If additional space is needed, please list on a separate page or on the back of this form.

#1 DATES - From __Aug 1984__ to __Sept 2005__

  Company Name, City, and State __Millpond Plantation, Thomasville, GA__

  Supervisor's Name/Title _____SALARY - Start_____End_____

  Phone # _____ May we contact?_____Final position with the company _____

  Reason for leaving?_____

#2 DATES - From __Aug 1982__ to __Aug 1984__

  Company Name, City, and State __Gillionville Plantation, Albany, GA__

  Supervisor's Name/Title                              SALARY - Start_____End_____

  Phone #_____ May we contact?_____ Final position with the company_____

  Reason for leaving?_____

#3 DATES - From_____to_____

  Company Name, City, and State_____

  Supervisor's Name/Title_____SALARY - Start_____End_____

  Phone #_____May we contact?_____Final position with the company_____

  Reason for leaving?_____

CONFIDENTIAL
DEFENDANT'S PROD.        0080

#4 DATES - From_____to_____

Company Name, City, and State_____

Supervisor's Name/Title _____ SALARY - Start _____End_____

Phone #_____ May we contact?_____Final position with the company_____

Reason for leaving?_____

#5 DATES - From_____to_____

Company Name, City, and State_____

Supervisor's Name/Title_____ SALARY - Start _____End_____

Phone #_____May we contact?_____Final position with the company_____

Reason for leaving?_____

PERSONAL REFERENCES (Not Former Employers or Relatives)

| Name and Occupation | Address | Phone Number |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

The Peble Corp. is an Equal Opportunity Employer which endeavors, pursuant to all applicable Federal and State Laws, to give every applicant for employment, and every ~mployee, equal consideration in all matters relating to employment, without regard *ace, color, sex, age, religion, national origin, citizenship and disability.

By my signature below, I certify the facts set forth in this application for employment are true and complete to the best of my knowledge and belief, and I agree you may investigate my statements. I agree to permit all past employers to give any information concerning me and release them from liability in furnishing such information. I understand that my employment and, if employed, my continued employment, is conditional upon my participating in and clearing such security examinations or

investigations as may be deemed advisable by the company. I agree to participate in such examinations and investigations when requested to do so by the company, and agree that the company shall be held harmless and free from liability in connection with any security examination or investigation in which I may be involved.

I understand, if employed, false statements on this application shall result in disciplinary action up to and including discharge. Also if employed, I understand that it is the company's policy that all employees who do not have a written employment contract with the company for a specific, fixed term of employment are employed at the company's will. I understand that I would be subject to termination at any time, for any reason, with or without cause or notice.

_____
Applicant's Signature

9 - 1 - 0 5
_____
Date Signed

CONFIDENTIAL
DEFENDANT'S PROD.    0081

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                   NORTHERN DIVISION

4

5

6     NORRIS FOSTER,

7          Plaintiff,

8     vs.                CASE NO. 206-cv-00405-IDSRW

9     MID STATE LAND AND TIMBER

10    COMPANY, INCORPORATED,

11    d/b/a SEDGEFIELDS PLANTATION,

12          Defendant.

13

14       *    *    *    *    *    *    *    *

15       The videotaped deposition of **ROY LEE**

16    was taken before Cornelia J. Baker,

17    Certified Court Reporter and Certified

18    Shorthand Reporter, as Commissioner, on

19    Wednesday, October 11, 2006, commencing at

20    approximately 12:33 p.m., in the law

21    office of John Waters, Union Springs,

22    Alabama, pursuant to the stipulations set

23    forth herein.

1    **A.**  No, I don't.  It's more black, I know,

2         than white, so . . .

3    **Q.**  Okay.

4    **A.**  I wouldn't know how many.

5    **Q.**  All right.  Now, you started working at

6         Mid States in the year 2000.  And now, do

7         you work for Tollison's?

8    **A.**  Yes, I do.

9    **Q.**  In the same job you had at Mid States?

10   **A.**  Yes.

11   **Q.**  And that job is farm manager?

12   **A.**  Yes.

13   **Q.**  Okay.  Now, before you went to work at --

14        how old are you, Roy?

15   **A.**  Forty-seven.

16   **Q.**  Before you went to work at Mid States, did

17        you work?

18   **A.**  Before I went to work?

19   **Q.**  Yeah.

20   **A.**  At Mid States?

21   **Q.**  Yes.

22   **A.**  Yes.

23   **Q.**  Where did you work?

1    **A.** Beaulieu of America.

2    **Q.** What kind of business is that?

3    **A.** Yarn division.

4    **Q.** Yarn?

5    **A.** Uh-huh (affirmative response).

6    **Q.** Textile industry?

7    **A.** Right.

8    **Q.** How long did you work for Beaulieu?

9    **A.** Probably eighteen, nineteen years.

10   **Q.** And what position when you left there,

11       were you?

12   **A.** Supervisor.

13   **Q.** Is that also in management?

14   **A.** Right.

15   **Q.** How many people did you supervise?

16   **A.** Thirty-two.

17   **Q.** Did you work -- where was your job?  Where

18       did you work for them?

19   **A.** What you mean?

20   **Q.** At Beaulieu they've got -- don't they have

21       a plant or . . .

22   **A.** Yeah, they have a plant.

23   **Q.** In Eufaula?

 1    were the -- where y'all didn't have a

 2    general manager?

 3  **A.**  Yes.

 4  **Q.**  Do you know how long that was, that period

 5    of time was?

 6  **A.**  Donna Davidson was the manager after they

 7    fired Byron Davidson.

 8  **Q.**  Okay.

 9  **A.**  Donna stayed there until the last day --

10    if I'm not mistaken, she stayed there

11    until the last day of deer season.  The

12    last day, yeah.

13  **Q.**  Which year?

14  **A.**  That would be in -- which year?

15  **Q.**  Yes, sir.  Is that '05?

16  **A.**  I believe -- I don't think it was '05.

17  **Q.**  Okay.

18  **A.**  I can't recall what year that was, but I

19    do know it's before David came.

20  **Q.**  Okay.  There was a gap, and you don't know

21    the date, but there was a gap from Donna

22    leaving --

23  **A.**  Uh-huh (affirmative response).

1   **Q.** -- until David was hired --

2   **A.** Right.

3   **Q.** -- is that -- is that right?

4   **A.** That's right.

5   **Q.** Y'all didn't have a manager?

6   **A.** Right.

7   **Q.** Was that for a year or more?  Or do you

8       know?

9   **A.** It wasn't quite a year, I don't think.  I

10      don't think it was quite a year.  No, it

11      wasn't quite a year.

12  **Q.** Okay.

13  **A.** It was close, but not quite a year.

14  **Q.** Well, my question that I'm trying to ask

15      is:  Was there ever a period of time where

16      you were doing both jobs, that is running

17      both the deer hunting and the quail

18      hunting?

19  **A.** Well, I did the deers and quails when

20      Donna was there.

21  **Q.** Okay.

22  **A.** So I did it after she left.  I did the

23      deers while she was there, because Byron

1  **A.** I think I make $20 and a quarter, I

2     believe, an hour.

3  **Q.** Do you know what that is annually?

4  **A.** That's something like $600 -- before

5     takeout?  Before taxes?

6  **Q.** No.  After -- yeah, before taxes, what

7     that is annually.

8  **A.** That's about $800 every two weeks.

9  **Q.** Is it about $41,000 a year?

10 **A.** It's close, yeah.

11 **Q.** And do you live on the property at

12    Sedgefields?

13 **A.** No.

14 **Q.** But they do provide you with a vehicle, a

15    truck?

16 **A.** Right.

17 **Q.** And the gas, too?

18 **A.** Right.

19 **Q.** Do they have a gas pump on the property?

20 **A.** Yes.

21 **Q.** And a tank, and you can just fill up when

22    you're out there?

23 **A.** Yeah, you can, yeah.

Declaration

My name is Roy Chester Lee. I am over the age of 19 yrs and am suffering from no legal disability. I started working at Sedfields sometime in 2000, earning $6.50/hr. Before working at Sedfields, I worked at Columbus Mills. Before working at sedgefields, I had experience working with horses, tractors, and deer hunting. I did not have any prior experience with Quail hunting. I was trained as to quail hunting at sedgefields by Hunter McDuffie. I later managed the quail hunts and deer hunts.

I later got a raise to $10.00/hr and helped run Sedgefields during a time when there were several managers. Sometimes I was the only one to manage Sedgefields for months at a time. I asked to be put on salary and Mid State would not do it. Mid State later put on a salary earning $40,000 a year.

I have personal knowledge of some of Norris Foster's por work performance issues during the first time he worked at Sedgefields. These issues include saying that he fixed the plumbing in the barn when he did not and stealing traps, dog feed, and birds.

In 2005, I hired Norris Foster back

CONFIDENTIAL
DEFENDANT'S PRO

## DECLARATION

at Sedgfields at 6.50 hr. I did not have any problems with Norris Foster at this time and I told him that if he stole anything again I would fire him immediately. I told him you know whats in your record and he said "yes." When Joel Norman began working at Sedgfields, Norris Foster worked under him. Norris complained about Joel and Joel complained about Norris. However, I did not personally observe any performance issue involving Norris Foster. I have never heard anyone use a racial slur. The only thing that I have observed that might be discrimination as to me is my pay difference with Joel Norman because I was doing both jobs for a period of time before Joel Norman started working at Sedgfields. I have not complained to my new employer about this pay difference.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1st day of August, 2006

# The Peble Corp.

## EMPLOYMENT APPLICATION

*PLEASE PRINT ANSWERS TO THE FOLLOWING QUESTIONS CAREFULLY AND IN INK. TO BE CONSIDERED FOR EMPLOYMENT, ALL ITEMS MUST BE COMPLETED, INCLUDING SIGNATURE. THIS APPLICATION IS VALID FOR 30 DAYS. IF YOU WISH TO BE CONSIDERED FOR EMPLOYMENT AFTER THIS APPLICATION EXPIRES, THEN YOU MUST RE-APPLY.*

NAME _Roy Chester Lee_ ___ TELEPHONE NUMBER

ADDRESS _REDACT_ ___ Home # ( REDACT

CITY _REDACT_ STATE _AL_ ZIP ___ Daytime # REDACT

SOCIAL SECURITY NUMBER _REDACT_

### EMPLOYMENT INTERESTS:

Type of work desired _Horse/Dog Trainer / Hunting Guide or Tractor_

Full Time __X__ Part Time _____ Temporary _____

Starting pay expected _$6.00 per Hour_ Date Available to start _Any time_

---

**IF APPLICABLE:**

Are you willing to travel? _____ If yes, what percentage of the time _____

Would you be willing to relocate? _____

---

Would you object to:  Irregular work hours  ☐ YES  ☒ NO    Night work  ☐ YES  ☒ NO

Swing or fluctuating shift work  ☐ YES  ☒ NO

**SPECIAL SKILLS - COMPLETE IF APPLICABLE TO THE POSITION FOR WHICH YOU ARE APPLYING:**

Skill _Horse Training_ Experience _9 years_

Skill _License forklift Operator_ Experience _23 years_

Skill _Dog Trainer_ Experience _13 years_

Please discuss other specialized skills you feel are pertinent to the job for which you are applying _____

---

### UNITED STATES MILITARY SERVICE STATUS:

Past Military Service - FROM _____ , 19 ___ TO _____ , 19 ___

Branch _____ Rank on discharge _____ Present Status _____

List duties and special training

CONFIDENTIAL
DEFENDANT'S PROD

**EDUCATION:**

| | NAME OF SCHOOL AND LOCATION | MAJOR AREA OF STUDY and/or DEGREE RECEIVED |
|---|---|---|
| High School | Bullock County High School UnionSprings, AL | Science, Math, History |
| Jr. College, College, or University | | |
| Technical or Trade Schools | | |

Honors and Scholarships _____

Grade Average (approx.)   High School _____ X _____   College _____ Other _____

**General Information:**

Are you legally authorized to work in the United States?  ☒ YES   ☐ NO  If not, what is your present status and

do you have a work visa? _____

Have you ever been convicted of a crime?  ☐ YES   ☒ NO  If yes, please explain. Give dates, charge, penalty assessed or disposition.  Conviction will not necessarily bar employment.  Consideration will be given to the nature of the crime, age at the time of offense, rehabilitation and the position for which you are applying.

_____

_____

Have you ever been discharged from a job?  ☐ YES   ☒ NO  If yes, please explain _____

_____

_____

_____

Have you ever been bonded?  ☐ Yes   ☒ NO   If yes, when and in what job. _____

_____

_____

_____

CONFIDENTIAL DEFENDANT'S PROD

Do you have a valid, active driver's license?  ☒ YES  ☐ NO  Issuing State _____

Drivers License        REDACT        _____ Class of License _____

How long have you been a resident of this City _*41 years*_ State _*41 years*_

How long at your present address? _*40 years*_ Give previous address if less than one year at present

address _____

Are you over the age of 18?  ☒ YES  ☐ NO  If hired can you provide proof of age?  ☐ YES  ☐ NO

**EMPLOYMENT DATA:**

Have you ever been employed by this company before?  ☐ YES  ☒ NO  If yes, please give dates of

employment, position employed, and reason for leaving _____

_____

_____

Please list all jobs (if not listed above), beginning with your present or last employer and working backwards
to earlier positions. Account for all periods, including unemployment, self-employment, and military service.
If additional space is needed, please list on a separate page or on the back of this form.

#1 DATES - From _July 9, 1978_ to _July 14, 00_

    Company Name, City, and State _Beaulieu of America_

    Supervisor's Name/Title _Lawrence Penn_ SALARY - Start *9.70 End _13.26 per h_

    Phone # _738-4600_ May we contact? _yes_ Final position with the company _Supervisor Trainee_

    Reason for leaving? _Plant Closed_

DATES - From _Summer 75/76_ to _to Summer 1977_

    Company Name, City, and State _Welsh Company of the South_

    Supervisor's Name/Title _M. Driggers_ SALARY - Start _____ End _____

    Phone # _____ May we contact? _____ Final position with the company _Assembly Worker_

    Reason for leaving? _Plant Closed_

#3 DATES - From _____ to _____

    Company Name, City, and State _Chris Caldwell Logging Company_

    Supervisor's Name/Title _Chris Caldwell / Deceased_ SALARY - Start _____ End _____

    Phone # _____ May we contact? _____ Final position with the company _Truck Driver,_
    _Skidder / Tractor_
    _Operator_

CONFIDENTIAL
DEFENDANT'S PROD

#4 DATES - From_____ to_____

Company Name, City, and State_____

Supervisor's Name/Title_____SALARY - Start_____End_____

Phone #_____May we contact?_____Final position with the company_____

Reason for leaving?_____

#5 DATES - From_____ to_____

Company Name, City, and State_____

Supervisor's Name/Title_____SALARY - Start_____End_____

Phone #_____May we contact?_____Final position with the company_____

Reason for leaving?_____

## PERSONAL REFERENCES (Not Former Employers or Relatives)

| Name and Occupation | Address | Phone Number |
|---|---|---|
| Hill + Hill Grocery Milton Hill - Owner | Hwy. 82 E. Miday, Alabama 36053 | 529-3700 |
| Bill Davis Grocery Bill Davis - Owner | Rt. 2 Midway, Alabama | 529-9859 |
| Sherman Bowens Grocery Sherman Bowens - Owner | Rt. 2 Midway, Alabama 36053 | 529-3327 |

The Pablo Corp. is an Equal Opportunity Employer which endeavors, pursuant to all applicable Federal and State Laws, to give every applicant for employment, and every employee, equal consideration in all matters relating to employment, without regard race, color, sex, age, religion, national origin, citizenship and disability.

my signature below, I certify the facts set forth in this application for employment are true and complete to the best of my knowledge and belief, and I agree you may investigate my statements. I agree to permit all past employers to give any information concerning me and release them from liability in furnishing such information. I understand that my employment and, if employed, my continued employment, is conditional upon my participating in and clearing such security examinations or

investigations as may be deemed advisable by the company. I agree to participate in such examinations and investigations when requested to do so by the company, and agree that the company shall be held harmless and free from liability in connection with any security examination or investigation in which I may be involved.

I understand, if employed, false statements on this application shall result in disciplinary action up to and including discharge. Also if employed, I understand that it is the company's policy that all employees who do not have a written employment contract with the company for a specific, fixed term of employment are employed at the company's will. I understand that I would be subject to termination at any time, for any reason, with or without cause or notice.

_Ron Chester Lee_
Applicant's Signature

_August 10, 2000_
Date Signed

0176    CONFIDENTIAL DEFENDANT'S PROD

**American Court Reporting**
**toll-free (877) 320-1050**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


CIVIL ACTION NUMBER

2:06-CV-00405-ID-SRW


NORRIS FOSTER,

        Plaintiff,

vs.

MID STATE LAND & TIMBER COMPANY, INC.,
d/b/a SEDGEFIELDS PLANTATION,

        Defendant.



THE VIDEOTAPED

DEPOSITION TESTIMONY OF:

DAVID CARROLL


September 8, 2006

1:29

        p.m.


COURT REPORTER:

Gwendolyn P. Timbie, CSR

COPY

**American Court Reporting**
**toll-free (877) 320-1050**

Page 97

1      Q     Okay.  And, in fact, Roy --

2    before Joel was hired, Roy was doing both

3    jobs.  And when I say "both jobs," he was

4    running the deer and the quail, wasn't

5    he?

6      A     I will -- I would say this in

7    an answer:  In that when I was hired, I

8    was told that Ms. Davidson, who was the

9    general manager, and her husband, who was

10   working there, was -- he and her husband

11   was, more or less, in charge of -- over

12   the deer hunting and stuff.

13       The time that, quote, unquote, Roy

14   was in charge of all of it was a time when

15   we weren't actively participating in all

16   -- in any of those activities that were

17   ongoing.  Quail season was over with.

18   Deer season was over with.  And for that

19   time frame that he was, quote, unquote, in

20   charge of the plantation, it was,

21   basically, summertime maintenance and

22   things of that nature.  Not to discredit

23   his -- what Roy does for me.  He's a very

**American Court Reporting**
**toll-free (877) 320-1050**

Page 98

1    valuable employee.

2         Q    Okay.  Well, that -- you're

3    saying that Roy was never over both of the

4    hunting operations during the season; is

5    that --

6         A    Not to my -- not to my

7    knowledge.

8         Q    I mean, that -- but in

9    fairness to that statement -- and I don't

10   disagree with what you say.  But in

11   fairness, you weren't there during the

12   hunting season --

13        A    That's correct.

14        Q    -- prior to that?

15        A    That is correct.

16        Q    So --

17        A    Yeah.

18        Q    Is that fair?

19        A    That is fair.

20        Q    Okay.  Now, did -- was there

21   ever any issue, that you were made aware

22   of, about the -- the employees getting off

23   early at homecoming?

Roy Chester
7375
 Hwy. 51 South
Midway, Alabama 36053
(334) 529-3965

**Objective:**          Horse/ Dog Trainer/ Hunting Guide

                        Beaullieu of America
**Experience:**         Supervisor: Lawrence Penn
                        Hicks Ind. Park
                        Union Springs, Alabama 36089
                        Job Title: Supervisor Trainee
                        Date Hired : 7/ 9 / 90
                        Job End : 7 / 14 /  00  Plant  closed
                        (334) 738 – 4600

                        Welsh Company of The South
                        Supervisor : M. Driggers
                        Welsh Street
                        Union Springs, Alabama 36089
                        Job Title : Assembly Line Worker
                        Summer worker : 1975 / 76 / 77
                        Plant : Closed

                        Chris Caldwell Logging Company
                        Supervisor : Chris Caldwell / Deceased
                        Midway, Alabama 36053
                        Job Title : Truck Driver / Skidder / Tractor  Operator

Edcaton:

                        Bullock County High School
                        Sardis Road
                        Union Springs, Alabama
                        (334 ) 738 – 2198

                        Sparks State Technnical College
                        Eufaula, Alabama
                        CPR  Training Course / 1998
                        Computer Operator / 1998

0177   CONFIDENTIAL
DEFENDANT'S PROD

Training:              Machine Overhauling
                       License Fork Lift Operator
                       Machine Technician
                       Supervisor Trainee / 3 years


References:            Lawrence Penn
                       Plant Manager
                       Union Springs, AL 36089
                       (334) 738-4759 (H)
                       (334) 738-4600 (W)

                       Kathy Gilmore
                       Human Resources Manager
                       115 Industrial Park
                       Eufaula, AL 36027
                       (334) 687-2091 ext. 221

                       Milton Hill
                       Hill & Hill Grocery
                       Hwy. 82 E.
                       Midway, AL 36053
                       (334) 529-9859

0178   CONFIDENTIAL
       DEFENDANT'S PROD

# FREEDOM COURT REPORTING

Page 1

1      IN THE UNITED STATES DISTRICT COURT

2      FOR THE MIDDLE DISTRICT OF ALABAMA

3              NORTHERN DIVISION

4

5    CASE NUMBER:  2:06-CV-875-ID

6    JEFFREY HARRIS, et al.,              **ORIGINAL**

7            Plaintiffs,

8            vs.

9    MID STATE LAND & TIMBER CO., INC.,

10   d/b/a SEDGEFIELDS PLANTATION,

11           Defendant.

12

13          S T I P U L A T I O N

14          IT IS STIPULATED AND AGREED by and

15   between the parties through their respective

16   counsel, that the deposition of Roy Lee may

17   be taken before Angela Smith, RPR, CRR, at

18   the offices of John W. Waters, Jr., at 214

19   North Prairie Street, Union Springs, Alabama

20   36089, on the 18th day of January, 2007.

21

22          DEPOSITION OF ROY LEE

23

# FREEDOM COURT REPORTING

Page 32

1        A.      Correct.

2        Q.      Okay.  Did you apply for

3    anywhere else, trying to make some more

4    money, or were you . . .

5        A.      No.  When I came to apply at

6    Sedgefields, guy named Bo Jack.  I don't

7    know Bo Jack's last name.  He was telling me

8    about the job.  And Norris was telling me

9    about the job, Norris Foster.  So I came up

10   and I applied for a job.

11               I told them that was I good at

12   horses, training, working with dogs.  I had

13   coon dogs.  I could train coon dogs, but not

14   birds.

15       Q.      Yeah.

16       A.      But I know how to work dogs.

17   So I started from there.  They hired me the

18   next day.

19       Q.      Okay.  They don't do any coon

20   hunting at Sedgefields, do they?

21       A.      No.

22       Q.      I understand you're a good

23   coon hunter, though.

# FREEDOM COURT REPORTING

Page 71

1  Mr. Carroll comes onboard as plantation

2  manager; is that right?

3      A.    I don't know exact date, but I

4  know he come aboard.

5      Q.    Does that sound about right?

6      A.    Correct.

7      Q.    Okay.  No reason to dispute

8  that?

9      A.    No reason to dispute it.

10     Q.    Then in September of 2005,

11  that's when Mr. Norman comes onboard.  Does

12  that sound about right to you?

13     A.    I don't know his exact date,

14  but I know he come aboard after David.

15     Q.    Okay.  And so, y'all didn't

16  have any quail hunts in 2005, until after

17  Joel Norman came onboard?

18     A.    Correct.

19     Q.    Okay.

20     A.    Correct.

21     Q.    And I'm just limiting it to

22  2005.

23     A.    Okay.  That's the time David

# FREEDOM COURT REPORTING

Page 72

1    started.

2         Q.    That's right.

3         A.    Correct.

4         Q.    So the -- So Sedgefields was

5    without a plantation manager from January

6    31, 2005, when Donna Davidson left, through

7    the time in which -- or until the time in

8    which Mr. Carroll came in April of 2005?

9         A.    Correct.

10        Q.    All right.

11              MR. DUKES:   Let's take a

12   break.

13                    (Recess taken.)

14                    (Defendant's Exhibit 20

15                     was marked for

16                     identification purposes.)

17        Q.    I'm going to show you a

18   document that I will identify as Defendant's

19   Exhibit 20.   And I know -- I don't think any

20   of that is your handwriting, is it?

21        A.    No.

22        Q.    You see over on the left-hand

23   side they've got some dates and what you