IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

2007 APR -5  A 11: 30

CLK
DISTRICT COURT
DISTRICT ALA

JEFFREY HARRIS, WILLIE            )
BERNARD MACK, DEMETRIUS           )
PARHAM and HENRY TARVER,          )
                                  )    CIVIL ACTION NO.:
    Plaintiffs,                   )    2:06-CV-00875-ID-CSC
                                  )
vs.                               )
                                  )
MID STATE LAND & TIMBER           )
COMPANY, INC., D/B/A              )
SEDGEFIELDS PLANTATION,           )
                                  )
    Defendant.                    )

## DEFENDANT MID STATE LAND & TIMBER COMPANY, INC.'S MEMORANDUM OF LAW IN SUPPORT OF SUMMARY JUDGMENT

COMES NOW Defendant Mid State Land & Timber Company, Inc., formerly d/b/a Sedgefields Plantation (hereafter referred to as "Mid State" or "Defendant"), pursuant to Rule 56 of the Federal Rules of Civil Procedure, and submits this Memorandum of Law in Support of Defendant's Motion for Summary Judgment as to the claims of Plaintiffs Jeffrey Harris ("Harris"), Willie Bernard Mack ("Mack"), Demetrius Parham ("Parham"), and Henry Tarver ("Tarver") (collectively "Plaintiffs").

## I. INTRODUCTION

Plaintiffs are all black males and former employees of Mid State.  In their

Complaint, Plaintiffs assert claims of race discrimination. Plaintiffs all claim that they were paid less than white employees. However, it is undisputed that Mack, Parham, and Tarver did not possess the same skills, perform the same duties, or meet the same needs of Mid State as their alleged white comparators. Although Harris claims to possess similar skills, those skills were not identified in his application where requested and he admits that he never informed David Carroll ("Mr. Carroll"), the decision maker with regard to pay, that he possessed these similar skills and he never utilized those skills in connection with his employment at Mid State.

In addition to their pay claim, Harris and Mack also assert a claim based upon Mid State's allegedly "discriminatory practice" of requiring them to clean the barn. The work assignment claims of Harris and Mack are not cognizable under the law of this Circuit.[1] Specifically, there is no evidence that either the assignment of cleaning responsibilities or the increase in cleaning responsibilities in connection with the start of hunting season in late September impacted these Plaintiffs' position, pay, hours, schedule, or other benefits of employment.[2] Although Harris and Mack appear to

---

[1] Parham and Tarver have abandoned their claims based on work assignments. (Deposition of Demetrius Parham ("Parham Dep."), attached hereto as Exhibit A, at 45:3-12; Deposition of Henry Tarver ("Tarver Dep."), attached hereto as Exhibit B, at 57:5 through 58:10.)

[2] In fact, Mack and Harris, like all of the other black field laborers, received raises on January 1, 2006, during the hunting season.

2

argue that it was discrimination for Mid State not to reassign their cleaning responsibilities to white employees who were hired later, after hunting season began, their work assignments do not qualify as adverse employment actions under the law of this Circuit, and even if they did, it is legitimate for these Plaintiffs' work load to increase in connection with hunting season and for Mid State not to lighten its current employees' existing work loads simply because new employees are hired to perform different and additional work.

## II. STATEMENT OF FACTS

A.    Background on Mid State.

Sedgefields Plantation ("Sedgefields") was an approximately 13,000 acre parcel of property outside of Union Springs, Alabama.  (Deposition of David Carroll ("Carroll Dep."), pertinent portions of which are attached hereto as Exhibit C, at 18:17-21.) Mid State owned Sedgefields Plantation ("Sedgefields") from 1997 until May 19, 2006, when Mid State sold Sedgefields to Tolleson Land and Timber. (Affidavit of David Carroll ("Carroll Aff."), attached hereto as Exhibit D, ¶ 2.) While Sedgefields was under the management of Mid State, the property was used primarily for quail and deer hunting operations, with the added benefit of marketable timber. (Carroll Dep. at 19:7 through 23:7.)

In April 2005, Mid State hired Mr. Carroll to manage Sedgefields.  (Carroll

Dep. at 8:11-16.) Mr. Carroll was charged with improving the property, grooming it properly, and helping Mid State to uncover "a diamond in the rough." (Carroll Dep. at 23:12 through 24:4.)  During the initial months of his employment, Carroll primarily utilized the existing staff[3] while he assessed the more than twenty square miles of property to ascertain what needed to be done with the property. (Second Affidavit of David Carroll ("Carroll Aff. II"), attached hereto as Exhibit E, ¶ 3.) After he had evaluated the property and assessed Mid State's needs, in September 2005, Carroll hired Joel Norman ("Mr. Norman"), the manager of Mill Pond Plantation in Thomasville, Georgia, an area renowned around the world for superior quail hunting. (Carroll Aff. ¶ 4.)  Mr. Norman was hired to cultivate and manage the land at Sedgefields for wild quail habitation in hopes of returning Sedgefields to its former prominence as a top rated quail hunting plantation.[4] (Carroll Aff. ¶ 4.)

B.    Harris's Employment and Claims.

Harris began working for Mid State on September 6, 2005 and continued to

---

[3] Carroll did make one hire shortly after he was hired. (Carroll Aff. II ¶ 3.) In May 2005, Carroll hired Corey Balkcam ("Balkcam"), at the request of Lee, to meet an immediate need for assistance with mowing the fields and performing ground maintenance in the coming summer months. (Carroll Aff. II ¶ 3.) Balkcam worked a couple of weeks and then quit. (Carroll Aff. II ¶ 3.)

[4] The hiring of Mr. Norman and Mr. Norman's qualifications are discussed in detail in Mid State's Memorandum of Law in Support of Plaintiff Roy Lee's Claims, filed February 19, 2007.

work for Mid State until December 30, 2005,[5] when he allegedly injured his back, became unable to work, and never returned to his job at Mid State. (Deposition of Jeffrey Harris ("Harris Dep."), attached hereto as Exhibit F, at 37:12-21; 40:19-21.) Harris applied for a position with Mid State because of the recommendation of Norris Foster ("Foster"). (Harris Dep. at 47:6 through 48:1.) On Foster's recommendation, Harris met with Mr. Carroll concerning a position with Mid State. (Harris Dep. at 48:2-21.)

In the space on Mid State's employment application for listing employment skills, Harris does not mention any welding experience, experience with skidder operation, or trapping experience. (Harris Dep. at 51:1-18; Application of Jeffrey Harris ("Harris App."), attached hereto as Exhibit G, at 1.) Harris also indicates on his application for employment that he "would  object" to irregular or night time hours. (Harris App. at 1.) Other than the information provided on his application, Harris admits that he did not inform Mr. Carroll about any special skills he possessed either during the interview or after he was hired. (Harris Dep. at 56:13 through 57:13.) Nor is Harris aware of anyone else informing Mr. Carroll that he possessed any skills other than those noted on his application for employment. (Harris Dep. at

---

[5] Harris allegedly suffered an on-the-job injury the day after Plaintiff Norris Foster's employment was terminated. (Foster Compl.) Norris Foster is a plaintiff in *Foster v. Mid State Land & Timber Co.*, In the United States District Court for the Middle District of Alabama, Northern Division, Civil Action No. 2:06-CV-00405-ID-SRW.

61:15 through 62:3.) Mr. Carroll hired Harris and set his pay at $7.00. (Harris Dep. at 49:10-23; 66:14-20.) Harris testified that he does not have any complaints about Mr. Carroll and believes Mr. Carroll treated him fairly. (Harris Dep. at 109:23 through 110:2.)

On the day he started to work, Harris met with Roy Lee ("Lee"), his then supervisor and now his co-plaintiff, to discuss his responsibilities. (Harris Dep. at 55:9 through 56:5.) Lee informed Harris that he would be mowing grass "most of the time, until hunting season start." (Harris Dep. at 55:19 through 56:1.) After hunting season began, Harris was told he "would be helping with some kind of hunts, in some kind of way." (Harris Dep. at 56:2-5.)

On or about September 19, 2005, Mid State hired Mr. Norman to work as the quail operations manager. (Second Deposition of Roy Lee ("Lee Dep. II"),[6] attached hereto as Exhibit H, at 93:2-10; Second Amended Complaint (Harris) ¶ 13.) Shortly after Mr. Norman was hired, the only white laborer on staff, William "Brother Man" Beckwith, was terminated and Mid State began its preparations for the hunting season with a crew of all black laborers (Foster, Harris, Parham, and Mack). (Harris Dep. at 110:19 through 111:4; 117:3-17; Carroll Aff. II ¶ 2.) In connection with hunting

---

[6] There were two depositions of Roy Lee. The first deposition, taken on October 11, 2006, will be referred to as "Lee Dep." and the second deposition, taken on January 18, 2007, will be referred to as "Lee Dep. II."

season, horses are moved from the pasture to the barn. (Harris Dep. at 120:20 through 122:1; Carroll Aff. II ¶ 2.) The more the horses use the barn, the more work it takes to clean the barn. (Harris Dep. at 121:12 through 122:1.) According to Harris, he, Foster, Mack, Parham, and Tarver were responsible for cleaning the barn in September 2005.[7] (Harris Dep. at 116:7-21.)

Two months after hunting season began, on or about November 21, 2005, Mid State hired Joseph May ("May") and William Hubbard ("Hubbard"), both of whom are white. (Harris Dep. at 107:1-11.) Harris claims that he showed May and Hubbard how to chop fields and told them what areas to chop. (Harris Dep. at 118:2-11.) Although Harris's job duties included chopping fields, he had previously been reprimanded on more than one occasion for scraping trees, which can lead to disease, while attempting to clear designated areas.[8] (Harris Dep. 123:5 through 127:23.) Harris complains that May and Hubbard were assigned the responsibility of chopping while he and Foster continued cleaning the barn. (Harris Dep. at 81:6-17.) In addition to chopping, Harris acknowledges that May performed trapping for Mid State and

---

[7] Although Harris says that Tarver cleaned the barn, Tarver does not claim that he ever cleaned the barn. (Tarver Dep. at 42:18 through 43:9.) Parham does not believe that any of his assignments were discriminatory. (Parham Dep. at 45:3-12.)

[8] Plaintiff Mack also testified that he observed Harris (and Foster) nick trees and heard Mr. Norman counsel them about "hitting trees" and the importance of trying to "cut the pattern." (Deposition of Willie Mack ("Mack Dep."), attached hereto as Exhibit I, at 78:7 through 79:7; 87:5-11.) Mack also testified that he and Mr. Norman would look into the woods sometimes and observe Harris and Foster "sitting down." (Mack Dep. at 80:2-9.)

7

Hubbard operated the skidder and concedes that he did not perform either of those tasks for Mid State. (Harris Dep. at 107:12 through 108:8; 108:9-15.)

In addition to his complaints about pay and job assignments, Harris believes it was discriminatory for Mid State to eliminate weekly hot lunches and prohibit laborers from using the ice cooler located inside the lodge. (Harris Dep. at 85:7 through 87:19.) Harris concedes, however, that hot lunches were eliminated for all workers and all outdoor workers were denied access to the indoor ice cooler. (Harris Dep. at 86:6-22; 87:9-11.) Harris also claims that Mid State's policy against using a company vehicle to drive into town to buy lunch, which was instituted after Mr. Norman was hired, was racially discriminatory. (Harris Dep. at 87:20 through 88:14.) In support of this claim of discrimination, Harris claims that he saw two white employees with McDonald's bags after the policy went into effect; however, Harris admits that the white employees were sent into town for company business, not just to buy lunch, and concedes that Mr. Norman "probably didn't saw them" with their McDonald's sacks. (Harris Dep. at 90:5-15; 91:17-21.)

C.    Mack's Employment and Claims.

Mack was hired to work for Mid State by Lee in March 2004. (Declaration of Willie Bernard Mack ("Mack Decl."), attached hereto as Exhibit J, at 1; Mack Dep. at 73:3.) Mack was hired to work as a general laborer and his duties included

8

maintaining the grounds, preparing for hunts, and feeding the fish. (Mack Decl. at 1.) Mack's duties never changed during the time he worked for Mid State. (Mack Decl. at 1.) At the time he was hired, Mack informed Lee that he was earning $6.50 per hour with his current employer. (Mack Dep. at 45:22 through 46:10.) Mid State set Mack's starting wage at $6.50 per hour. (*Id.*) In January 2005, Mack received a raise to $7.50 per hour and then to $8.00 per hour in January 2006. (Carroll Aff. II ¶ 4.)

Mack complains that he was discriminated against as to his pay and duties. Mack believes that he was paid less than Anthony Dickey ("Dickey"), Beckwith, Hamm, Hubbard and May because of his race.[9] (Mack Dep. at 170:16-20.) Mack also believes that he should not have been required to clean the barn everyday beginning sometime in late 2005.[10] (Mack Dep. at 144:12 through 146:10.) Although Mack asserts a claim of discrimination not retaliation,[11] he testified that his unfavorable job assignment was "punishment" or "like something for spite," because Mr. Norman

---

[9] Mack also believes that he was impermissibly paid less than the black employees who worked indoors. (Mack Decl. at 2-3; Mack Dep. at 178:21 through 179:12.)

[10] Plaintiffs contradict themselves as to who cleaned the barn and when. Mack testified that he cleaned the barn everyday alone (Mack Dep. at 148:15-18, 158:7-10) which contradicts Harris's and Foster's testimony that they were required to clean the barn because of discrimination.

[11] The "conduct" that would presumably form the basis for any retaliation claim – demanding the supervisor either provide the checks or disclose their location immediately – would not be protected conduct under any federal discrimination statute.

treated him like a "champ"[12] until the day that he drove Foster and Harris to find Mr. Norman out to the field so they could demand their paychecks.[13] (Mack Dep. at 76:7 through 78:23; 157:15 through 158:10.)

D.    Parham's Employment and Claims.

Parham was hired by Lee to work as a laborer in July 2004. (Parham Dep. at 25:12 through 26:8.) Parham's pay was set at $6.50 per hour. (Parham Dep. at 27:3-10.) Six months later, Parham received a raise to $6.75 per hour and then received a raise to $7.50 per hour in January 2006. (Parham Dep. at 33:12-22.) Parham's duties involved primarily grounds and property maintenance. (Parham Dep. at 75:20 through 76:6.)

During his employment, Parham testified that he never personally observed any employee being treated differently because of race. (Parham Dep. at 44:15-21; Declaration of Demetrius Parham ("Parham Decl."), attached hereto as Exhibit K.)

---

[12] Mr. Norman trained Mack to drive the large tractor. (Mack Dep. at 68:15-21.) Before Mr. Norman arrived, Mack "never got a chance to operate the big tractor." (Mack Dep. at 88:10 through 89:7.) Before Mack's "problems started with [Foster] and [Harris]," Mack talked with Mr. Norman about how Mr. Norman planned to "turned the bird program around and bring it on the uprise" and told Mr. Norman that he was "down with that" and "willing to learn." (Mack Dep. at 76:7-18.)

[13] Pay checks were usually placed on the time clock. (Mack Dep. at 77:2-8.) Apparently, when the checks were not in their usual place, Foster and Harris set out to find Mr. Norman and demand their checks. (Mack Dep. at 77:9-23.) Because Foster did not have a license, Mack drove him and Harris "to wherever [Mr. Norman] was in the field" so they could ask "where was our checks." (Mack Dep. at 77:9-23.)

Parham did not hear any racial slurs or racial comments while he worked at Sedgefields. (Parham Dep. at 58:1-4.) Parham testified that Mr. Carroll treated him fairly and that he did not have any problems with Mr. Norman. (Parham Dep. at 57:21-23; 59-4-7.)

Parham's sole complaint against Mid State concerns his pay. (Parham Dep. at 45:3-12; Parham Decl.) Parham complains that he was paid less than Dickey, a white college student who returned to work at Mid State after Parham started working in 2004. (Parham Dep. at 48:5-17.) Parham admits that he has no knowledge of the duties Dickey performed for Mid State during his first stint of employment. (Parham Dep. at 53:6-15.) In fact, Parham testified that he did not know anything about Dickey's education, work experience, skills, or relationship with Mid State. (Parham Dep. at 53:16 through 54:7.)

Parham also complains that he was paid less than Beckwith, Hubbard, and May. (Parham Dep. at 56:7-14; 56:22 through 57:6.) At the same time, Parham admits that Beckwith also worked as a night watchman (Parham Dep. at 56:7-14) and concedes that, unlike Hubbard, he could not operate any heavy equipment other than a tractor. (Parham Dep. at 29:3-6). Unlike May, Parham's duties did not include trapping or mechanical work. (Parham Decl.)

E.    Tarver's Employment and Claims.

11

Tarver was hired by Mr. Carroll to work for Mid State in June 2005. (Tarver Dep. at 38:14 through 39:4.) Although he represented that he was providing true and accurate information on his application, in his deposition, Tarver admitted that he lied about his education and past convictions on his application for employment. (Tarver Dep. at 48:3-22.) Tarver was hired to work as an outside laborer, mainly cutting grass and weed eating, and paid a starting wage of $7.00 per hour. (Tarver Dep. at 42:15-21; 44:9-15.) In January 2006, Tarver received a raise to $7.50 per hour. (Tarver Dep. at 44:9-15.)

Tarver's only claim of discrimination is as to his pay. (Tarver Dep. at 57:5 through 58:10.) Tarver believes that he was paid less than Beckwith, Hubbard, May, and Hamm because of his race. (Tarver Dep. at 60:13 through 61:4.) Tarver admits that Beckwith also worked as a night watchman and concedes that he knows nothing about the skills, work experience, education or references of May, Hubbard or Hamm. (Tarver Dep. at 62:3 through 63:1.) Tarver testified that, other than labor skills (which consisted of mowing and using the weed eater), he did not have any special skills to bring to Mid State. (Tarver Dep. at 63:16-22.)

F.    Plaintiffs' Alleged Comparators.

Plaintiffs all allege that they were paid less than Beckwith, Hubbard, and May, all of whom are white, because of race discrimination. Tarver, Harris, and Mack

allege that Hamm was also paid more than them because of race. In fact, Beckwith, Hubbard, May, and Hamm were paid $8.00 per hour because they all possessed skills and were able to fill needed positions at the time they were hired to work at Sedgefields. (Carroll Dep. at 137:15-19; 141:18 through 142:6.)

May had experience trapping predatory animals that could endanger the bird population as well as previous work experience as a mechanic.[14] (Harris Dep. at 107:12-15; Mack Dep. at 107:11 through 108:2; Carroll Dep. at 137:15 through 138:17.) At the time May was hired, Mid State did not have an employee on staff knowledgeable in trapping or with experience as a mechanic. (Carroll Dep. at 138:8-17.) When Hubbard was hired, Mid State had recently purchased a skidder, and Hubbard was a proficient skidder operator.[15] (Carroll Dep. at 138:18 through 139:18.) Hamm was an experienced welder and could make repairs to "just about any type of equipment."[16] (Carroll Dep. at 139:22 through 141:17; Mack Dep. at 139:10-19.)

---

[14] Although Harris testified that he had trapping experience, he admits that he never informed Mr. Carroll that he had such experience. (Harris Dep. at 107:16 through 108:8.) Mack testified that no trapping was done until May was hired. (Mack Dep. at 107:5 through 108:2.)

[15] Harris did not have any experience as a skidder operator. (Harris Dep. at 108:9-15.) Mack testified that he had no prior experience operating a skidder and was taught by Hubbard. (Mack Dep. at 117:17 though 118:11.)

[16] Harris testified that he learned welding in his high school shop class (Harris Dep. at 30:1-7), but admits that he never told Mr. Carroll that he had any previous experience in welding. (Harris Dep. 57:10-13; 61:15 through 62:3.) Mack testified that he "cannot weld to no caliber." (Mack Dep. at 139:13-19.) Tarver testified that, other than his labor skills (mowing grass and operating the weed eater), he had no other special skills to bring to Mid State. (Tarver Dep. at 63:16-22.)

Beckwith was hired to work not only as a laborer but also as a night watchman, which required him to work after hours and remain "on call" if needed by Mid State.[17] (Carroll Dep. at 109: 6-23; 145:8 through 146:17.)

Mack and Parham also contend that they are similarly situated to Dickey, a college student who worked for Mid State in 2004.[18] (Mack Dep. at 170:16-18; Parham Dep. at 45:13 through 46:8.) Dickey is the son of an outdoor power equipment supplier and had a personal friendship with a Mid State manager at the time he was hired. (Declaration of Anthony Dickey ("Dickey Decl."), attached hereto as Exhibit L, at 1; Affidavit of Denise Pierce ("Pierce Aff."), attached hereto as Exhibit M, ¶ 2.) When he was hired, Dickey had experience maintaining and repairing the equipment his father sold and was able, through his connections, to secure favorable pricing for Mid State on some equipment. (Dickey Decl.; Pierce Aff. ¶ 2.) In addition, because of his education and his experience working with and around his father, Dickey was articulate in his dealings with clients. (Pierce Aff. ¶ 2.) Based upon these skills and a desire to keep Dickey as an employee while he furthered

---

[17] None of the Plaintiffs worked as a night watchman. (Harris Dep. at 106:18-20; Mack Decl. at 1; Parham Decl. (listing duties); Tarver Dep. at 42:15 through 43:9.) Harris's claim that he "would have" is belied by his representations on his application that he "would object" to irregular or night work hours. (Harris Dep. at 106:18-23; Harris App. at 1.)

[18] Dickey's employment with Mid State ended prior to the hiring of Foster, Tarver, and Harris.

his education, Mid State paid Dickey $8.50 per hour to work as a hunting guide, laborer, and mechanic. (Dickey Decl.; Pierce Aff. ¶ 2.)

None of the white employees at Sedgefields who were hired in late 2005 received a raise in 2006. (Carroll Aff. II ¶ 4. ) On the other hand, all of the black employees did: on January 1, 2006, Mack received a raise to $8.00 per hour, Harris to $7.50 per hour, Parham to $7.50 per hour, and Tarver to $7.50 per hour. (*Id.* ¶ 4.) On May 19, 2006, Mid State sold Sedgefields to Tolleson resulting in the termination of the employment of all of Mid State's employees at Sedgefields. (Affidavit of David Carroll, attached hereto as Exhibit O, filed in support of Defendant's Emergency Motion for Independent Examination, ¶ 2.)

## III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Even though claims of employment discrimination often present fact-intensive issues, "the summary judgment rule applies in job discrimination cases just as in other cases." *Chapman v. AI Transport*, 229 F.3d 1012, 1026 (11th Cir. 2000) (en banc).

## IV. ARGUMENT

15

A.    Plaintiffs can neither establish a prima facie case of wage discrimination nor refute the legitimate, non-discriminatory reasons for the alleged disparities.

1.    Plaintiffs cannot establish a prima facie case of wage discrimination.[19]

"To state a prima facie case of intentional discrimination in compensation, a plaintiff must establish that (1) [he] belongs to a [protected class]; (2) [he] received lower wages; (3) similarly situated comparators outside the protected class received higher compensation; and (4) [he] was qualified to receive the higher wage." *Cooper v. Southern Co.*, 390 F.3d 695, 735 (11th Cir. 2004). As the court in *Jackson v. Bellsouth Telecomm.*, 372 F.3d 1250, 1273 (11th Cir. 2004), made clear, "[w]hen comparing similarly situated individuals to raise an inference of discriminatory motivation, the individuals must be similarly situated in all relevant respects besides the [protected trait], since different treatment of *dissimilarly* situated persons does not violate civil rights laws." (Emphasis original). Summary judgment for the employer

---

[19] In their depositions, Harris and Mack mention some discriminatory remarks allegedly made by Mr. Norman over the course of their employment. (Harris Dep. at 79:7 through 80:9; Mack Dep. at 93:16 through 94:7.) Although Mr. Norman denies ever making these statements, even accepting these allegations as true, the statements do not qualify as direct evidence under the law of this Circuit. Mr. Norman was not the decision maker with regard to any of the employment decisions at issue. As a matter of law, "remarks by non-decision makers or remarks unrelated to the decision-making process itself are not direct evidence of discrimination." *Bass v. Bd. of County Comm'rs, Orange County, Fla.*, 256 F.3d 1095, 1105 (11th Cir. 2001). Furthermore, all the Plaintiffs testified that Mr. Carroll, the decision maker with regard to compensation, was fair to them. (Harris Dep. at 109:23 through 110:2; Mack Decl. at 2; Parham Dep. at 57:21-23; Tarver Dep. at 43:16-19.) In the words of Mack, Mr. Carroll is a "one hundred percent good person." (Mack Dep. at 75:13-21.)

is appropriate when a plaintiff fails to identify a comparator whose experience is substantially similar to his own. *See, e.g.*, *Cooper*, 390 F.3d at 745 (affirming summary judgment for employer on plaintiff's compensation claim because "[Plaintiff] has not established that the proposed comparators had similar levels of experience or education"); *Beard v. 84 Lumber Co.*, No. 06-12220, 2006 WL 2946883, *4 (11th Cir. Oct. 17, 2006) (affirming summary judgment in wage disparity case based on plaintiff's failure to identify a similarly-situated comparator) (table); *Mack v. ST Mobile Aerospace Engineering, Inc.*, No. 05-14695, 2006 WL 2129661 (11th Cir. July 31, 2006) (affirming summary judgment for employer because employee's comparators possessed specialized training and experience that employee did not, and thus employee was not similarly situated to his alleged comparators). In addition to possessing the same skills and experience, to be considered valid comparators, the individuals identified must perform the "same type of tasks." *Cooper*, 390 F.3d at 735.

In this case, Harris claims that he is similarly situated to Beckwith, Hubbard, and May, all of whom are white males. (Harris Dep. at 106:2-13.) Mack alleges that he was unlawfully paid less than Dickey, Beckwith, Hubbard, Hamm, and May. (Mack Dep. at 170:16-21.) Parham claims that he is similarly situated to Dickey, Beckwith, Hubbard and May. (Parham Dep. at 45:13 through 46:8; 56:7-14; 56:22

through 57:6.) Tarver claims he is similarly situated to Beckwith, Hubbard, Hamm, and May. (Tarver Dep. at 60:8 through 61:3.) As set out in detail below, there are clear and distinct differences between Plaintiffs and their supposed comparators. Accordingly, the individuals identified are not proper comparators under the law of this Circuit.

Unlike any of the Plaintiffs, Beckwith worked not only as a laborer during the day but also as a night watchman.[20] As a night watchman, Beckwith worked after hours and remained "on call" if needed by Mid State. (Carroll Dep. at 109: 6-23; 145:8 through 146:17.) Beckwith's after hours duties included making sure the facility was locked up and insuring there was no one on the property. (Carroll Dep. at 109: 6-23; 145:8 through 146:17.) Plaintiffs did not have night watchman responsibilities, were not required to work after hours, and did not have to remain on call for Mid State.[21] (Harris Dep. at 106:18-20; Mack Decl. at 1 (listing all of his duties); Parham Decl. (listing duties); Tarver Dep. at 42:15 through 43:9 (listing duties).) Because Plaintiffs did not perform the same tasks as Beckwith, Beckwith is

---

[20] Also unlike any of the plaintiffs, Beckwith had a friendship with Mr. Carroll and Mr. Carroll's family. (Mack Dep. at 116:17-23.)

[21] Harris concedes that he did not work as a night watchman, but claims that he "would have" done so. (Harris Dep. at 106:18-23.) Harris's claim that he "would have" worked as a night watchman is belied by his application wherein he indicates that he "would object" to irregular or night hours. (Harris App.) In any event, Harris has not alleged any claim based on Mid State's failure to offer him the night watchman position, the time to amend the pleadings has long past, and Harris cannot now create a claim in response to summary judgment.

not a proper comparator.[22]

Hubbard, May, and Hamm also all differ from Plaintiffs in the skills they possessed, the work they performed for Mid State, and the needs of Mid State they were able to meet at the time they were hired. (Carroll Dep. at 137:15-19; 141:18 through 142:6.) May possessed trapping skills and had previous experience as a mechanic.[23] (Deposition of Norris Foster ("Foster Dep."), pertinent portions attached hereto as Exhibit N, at 110:20 through 111:10; Carroll Dep. at 137:15 through 138:17.) Hubbard is a proficient skidder operator who could operate Mid State's

---

[22] Mack also supposes that Beckwith was treated more favorably because of his personal relationship with Mr. Carroll and Mr. Carroll's father. (Mack Dep. at 116:17-23.) Even assuming this is true, discrimination based on personal relationships is not actionable. *See Phillips v. Hibbett Sporting Goods, Inc.*, 329 F. Supp. 2d 1280, 1291 n. 8 (M.D. Ala. 2004) ("If [Plaintiff's] speculation is correct, then her case challenges the "fairness" of employment decisions based on friendship rather than the legality of employment decisions motivated by racial preference. . . . Put another way, even if a jury believed [Plaintiff's] speculation, Bundrick's decision to promote his friends would not support a claim of race or sex discrimination."); *Darden v. Housing Authority of Baltimore*, No. PWG-06-216, 2006 WL 3231964, *5 (D. Md. Nov. 7, 2006) (rejecting plaintiff's wage discrimination claim and holding that "these 'isms' [nepotism and favoritism] are not prohibited by Title VII or §1981 to the extent they are unrelated to race, color, religion, sex, or national origin").

[23] After Mr. Norman was hired to improve quail operations, Mid State went to "pre-releasing" the birds well in advance of hunting season with the hope that birds would remain on the property and increase the wild covey population. (Mack Dep. at 101:17 through 107:10 (describing how the hunting changed after Mr. Norman took over quail operations).) When birds were released months in advance, it became critical to control the predator population so birds would survive for hunting during the season. (Mack Dep. at 106:16 through 107:14.) Unlike May, Mack, Parham, and Tarver did not do any trapping work for Mid State. (Mack Dep. at 107:11 through 108:2; Tarver Dep. at 42:15 through 43:8; 63:16-22 (indicating he had no other skills beyond those related to mowing grass and weed eating to bring to Mid State); Parham Decl. (listing duties).) Although Harris claims to have experience with trapping, he did not communicate to Mr. Carroll that he possessed this skill and never performed any trapping work for Mid State. (Harris Dep. at 107:16-21; 108:4-8.)

recently purchased skidder.[24] (Carroll Dep. at 138:18 through 139:18.) Hamm is an experienced welder who could make repairs to "just about any type of equipment."[25] (Carroll Dep. at 139:22 through 141:17.) None of the Plaintiffs possessed or utilized these skills to benefit Mid State. Because Hubbard, May, and Hamm possessed these different skills and performed different duties uniquely tailored to those skills, they are not proper comparators.

In addition to Beckwith, May, Hubbard, and Hamm, Mack and Parham also claim that they are similarly situated to Dickey, a college student who worked for Mid State in 2004. (Pierce Aff.¶ 2.) They are not. Dickey is the son of an outdoor power equipment supplier and was able, through his relationship, to assist Mid State in securing favorable pricing on needed equipment. (Pierce Aff. ¶ 2; Dickey Decl. at 1.) Unlike Mack and Parham, Dickey had experience maintaining and repairing the equipment, like mowers and weed eaters, that his father sold or that was similar to

---

[24] Mack testified that he had no experience with a skidder until he was trained by Hubbard. (Mack Dep. at 56:2-17.) Harris, Parham, and Tarver have no experience with a skidder. (Harris Dep. at 108:9-15; Parham Dep. at 29:3-6; Tarver Dep. at 63:16-22 (indicating he had no other skills beyond those related to mowing grass to bring to Mid State).)

[25] Harris testified that he learned welding in his high school shop class (Harris Dep. at 30:1-7), but admits that he never told Mr. Carroll that he had any previous experience in welding. (Harris Dep. at 57:10-13; 61:15 through 62:3.) Mack concedes that he "cannot weld to no caliber." (Mack Dep. at 139:10-19.) Tarver also testified that he has no welding experience. (Tarver Dep. at 63:16-22 (indicating he had no other skills beyond those related to mowing grass and weedeating to bring to Mid State).) Parham admits that he has no welding experience and does not claim that Hamm is a comparator. (Parham Dep. at 28:23 through 29:1.)

what his father sold. (Pierce Aff. ¶ 2; Dickey Decl. at 1.) In addition, because of his education and his experience working with and around his father, Dickey was articulate in his dealings with clients. (Pierce Aff. ¶ 2.) As a result, Dickey was hired to work as a hunting guide, laborer, and mechanic. (Pierce Aff. ¶ 2.) Mack and Parham did not have this connection, these skills, or these responsibilities. Accordingly, they are not similarly-situated to Dickey.

> 2.    Even if Plaintiffs could establish a prima facie case with regard to their compensation (and they cannot), they cannot rebut the legitimate nondiscriminatory reasons for the differences in pay.

Mr. Carroll testified that he determined compensation based upon the needs of the plantation at the time and an individual's ability to meet those needs. (Carroll Dep. at 137:15-19; 141:21 through 142:6; Carroll Aff. II ¶ 3.) At the time May was hired, Mid State did not have an employee on staff knowledgeable in trapping or with experience as a mechanic, and May had experience in both of those areas.[26] (Carroll Dep. at 138:8-17.) When Hubbard was hired, Mid State had recently purchased a skidder, and Hubbard was a proficient skidder operator. (Carroll Dep. at 138:18 through 139:18.) Hamm had experience in welding that enabled him to repair equipment on the plantation and build items that Mid State needed for its operations.

---

[26] With the implementation of the wild quail program by Mr. Norman in late September 2005, it became very important to eliminate quail predators. (Mack Dep. at 102:21 through 107:4.) An experienced trapper can capture and remove nuisance predators that could endanger the quail program. (Carroll Dep. at 138:2-7.)

(Carroll Dep. at 139:22 through 141:9.) Beckwith was willing to work after hours as a night watchman. (Carroll Dep. at 109: 6-23; 145:8 through 146:17.)

Dickey was a college student commuting to school who was rehired by Mid State in 2004. (Dickey Decl.; Pierce Aff. ¶ 2.) Dickey is the son of an outdoor power equipment supplier and, through his relationship, was able to secure favorable pricing for Mid State on some equipment. (Dickey Decl.; Pierce Aff. ¶ 2.) Dickey also had experience as a mechanic and could maintain and repair the equipment Mid State had previously purchased. (Dickey Decl.; Pierce Aff. ¶ 2.) Additionally, Dickey was educated and articulate so Mid State could rely heavily on Dickey to deal with clients. (Pierce Aff. ¶ 2.) Based upon Dickey's skills and connection, as well as Mid State's desire to keep him as an employee while he was in college, Mid State paid Dickey $8.50 per hour to work as a hunting guide, laborer, and mechanic. (Pierce Aff. ¶ 2.)

It is reasonable and legitimate to base compensation upon the contributions an employee makes to the employer and the skills the employee possesses. It is also acceptable under the law to reward relationships and connections that are independent of race. *Neal v. Roche*, 349 F.3d 1246, 1251 (10th Cir. 2003) ("[A]n employer's actions based on loyalty to a friend or relative . . . are not considered 'discriminatory,' even where they benefit the nonprotected friend or relative at the expense of a more qualified protected person."). Plaintiffs cannot demonstrate that Mid State's reasons

for its compensation decisions are pretext for discriminatory motive.

B.   Harris's and Mack's claims based upon their work assignments fail as a matter
     of law.

     1.   Harris and Mack cannot demonstrate that they suffered an adverse
          employment action.

     To sustain a claim of discrimination, Harris and Mack must demonstrate that

they suffered an adverse employment action.  An adverse employment action is "a

*significant change* in employment status, such as hiring, firing, failing to promote,

reassignment with significantly different responsibilities, or a decision causing a

significant change in benefits."[27]  *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232,

1239 (11th Cir. 2001) (citation omitted) (emphasis added).  To sustain a claim under

Title VII's discrimination clause, "the employer's action must impact the terms,

conditions, or privileges of the plaintiff's job in a real and demonstrable way." *Davis*,

245 F.3d at 1239.

     The Eleventh Circuit has cautioned that "applying the adverse action

_____

[27] *Davis* remains the law for claims of disparate treatment claims after *Burlington Northern & Santa Fe Ry. Co. v. White*, --- U.S. ----, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006), which established the standard for actionable claims of retaliation. *See Wallace v. Georgia Dept. of Transp.*, No. 06-13345, 2006 WL 3626967, *1 (11th Cir. Dec. 13, 2006) ("We reject Wallace's argument that *Burlington Northern* applies to his substantive disparate treatment claim. The Supreme Court made clear in that case that the standard defining an adverse employment action in the context of retaliation claim does not apply to a core Title VII discrimination claim. Therefore, with regard to what constitutes an adverse employment action in the context of a disparate treatment claim, *Davis* still controls.") (internal citation omitted) (unpublished).

requirement carefully is especially important when the plaintiff's claim is predicated on his disagreement with his employer's reassignment of job tasks." *Id.* at 1244 ("[w]ork assignment claims strike at the very heart of an employer's business judgment and expertise because they challenge an employer's ability to allocate its assets in response to shifting and competing market priorities"). Without evidence of tangible harm, courts are reluctant to hold that work assignments amount to an adverse employment action. *Id.* at 1244-45 (citing *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1557 (D.C. Cir. 1997)) ("agreeing with other circuits [which] have held that changes in assignments or work-related duties do not ordinarily constitute adverse employment decisions if unaccompanied by a decrease in salary or work hour changes"). Similarly, "increased workloads are not adverse employment actions but rather an ordinary tribulation of the workplace for which employees should expect to take responsibility." *McGuire v. Miami-Dade County*, 418 F. Supp. 2d 1354, 1360 (S.D. Fla. 2006) (internal quotations omitted); *accord Simmons v. Mobile Infirmary Med. Ctr.*, 391 F. Supp. 2d 1124, 1135 (S.D. Ala. 2005) ("alleged increase in [plaintiff's] workload" found not an adverse employment action); *MacLean v. City of St. Petersburg*, 194 F. Supp. 2d 1290, 1299 (M.D. Fla. 2002) ("the Court finds that the additional workload placed on Plaintiff was not an adverse employment action"); *Geer v. Macro Warehousing, Inc.*, 179 F. Supp. 2d 1332, 1341 (M.D. Ala. 2001) ("the

threshold for Title VII must involve employment action that does more than further strain an employee's workload") (De Ment, J.).

As an initial matter, Harris admits that he was told by Lee on his first day of employment that he would have different responsibilities during hunting season. (Harris Dep. at 55:9 through 56:5.) Mack testified that his duties with Mid State remained the same throughout his employment. (Mack Decl. at 1.) Thus, there is not even a "change" or "reassignment" upon which to base their claims. Simply put, Harris and Mack cannot claim that it is "adverse" for Mid State to require them to perform the jobs that they were hired to perform.

Even overlooking this deficiency, these claims nonetheless fail because there is no evidence that either the initial assignment of cleaning responsibilities or the increase in cleaning responsibilities during hunting season adversely impacted the terms and conditions of Harris's or Mack's employment in a "real and demonstrable way." Indeed, Harris and Mack cannot show that their assignments had *any* affect on their position, pay, hours, schedule, or other benefits of employment, much less demonstrate there was a real and significant negative impact. *See, e.g., Davis v. U.S. Postmaster Gen.*, No. 05-14911, 2006 WL 2087569,*1 (11th Cir. July 26, 2006) (holding district court properly granted summary judgment based on failure to establish an "adverse employment action" where the plaintiff alleged, among other things, that he was (1)

reassigned to work on different machines; (2) required to work alone; (3) not allowed

to work with other African-Americans; (4) refused assistance when he requested it; (5)

monitored excessively; (6) given difficult work assignments; (7) moved between work

operations; (8) subjected to frequent changes in his job responsibilities; and (9) "talked

down" to in a demeaning manner) (unpublished).  To the contrary, in January 2006,

Mack and Harris both received a raise.  (Carroll Aff. II ¶ 4.)  Absent evidence that the

assignments rise to the level of an adverse employment action, summary judgment is

due to be granted as to Harris's and Mack's work assignment claims.

    2.    Even assuming these Plaintiffs can establish a prima facie case (and they cannot), they cannot rebut the legitimate, nondiscriminatory reasons for their work assignments and the increase in cleaning responsibilities.

Mack and Harris were hired as laborers at a hunting camp.  It is undisputed their

duties included preparing for hunts and maintaining the grounds and facilities.  It is

also undisputed that beginning in late September or early October, horses were brought

to the barn in preparation for hunting season.[28]  When the horses were placed in the

barn, the barn had to be cleaned and the more the barn was used, the more cleaning was

required.  In late September and early October,[29] Plaintiffs, all of whom are black, were

_____

[28] For a detailed discussion of Mid State's use of the barn throughout the year, see the Memorandum of Law in Support of Summary Judgment as to Plaintiff Norris Foster's Claims, filed in Civil Action No. 2:06-CV-00405-ID-SRW, at 7-9.

[29] According to Harris, Beckwith was terminated in late September and did not have an opportunity, or much of an opportunity, to clean the barn. (Harris Dep. at 110:19 through 111:4;

the only laborers on staff and the only employees available to clean the barn.[30]

May and Hubbard were not hired until November 21, 2005, two months after hunting season began and after Plaintiffs had been satisfactorily cleaning the barn for two months. (Lee Dep. II at 102:18 through 104:18; Foster Dep. at 110:7-10.) Hamm was not hired until January 2006, after hunting season had ended. (Carroll Dep. at 113:4-9.) As set forth in detail herein, May, Hubbard, and Hamm all possessed skills that Plaintiffs lacked and Mr. Carroll hired them for the skills they possessed and the needed contributions they could make to Sedgefields.

Mr. Carroll testified that he needed "upwards of twenty people" to do what he felt "needed to be done" at Sedgefields. (Carroll Dep. at 115:3-7.) In connection with the wild quail program that Mr. Norman was implementing, Mid State began trapping for the first time and needed to add an employee who could trap predatory animals that could endanger the quail population. (Mack Dep. at 102:21 through 107:4.) After Mid State purchased a skidder in the fall of 2005, Mid State needed an employee who could operate that piece of equipment proficiently. (Carroll Dep. at 138:18-7.) To maximize use of the property for hunting, Mid State needed a drag built to pull through wooded

---

117:3-17.) Mack testified that, when he was employed, Beckwith (a/k/a "Brother Man") was the "only guy" who performed the duties that the black employees performed. (Mack Dep. at 133:18-22; 135:5-10.)

[30] Plaintiffs have not argued, nor could they, that the office workers or plantation managers should have cleaned the barn in their stead.

areas to prepare and maintain roads. (Carroll Dep. at 139:22 through 140:7.) Hubbard, May, and Hamm were hired with these projects and responsibilities in mind.

Simply put, Mid State was improving in the fall of 2005 and not simply maintaining the status quo as it had in recent months and years. Additional employees were being hired to meet specific needs, perform new jobs, and improve a larger area of the property – not to reduce the work load of the existing employees and assume duties that existing employees were already performing satisfactorily. Mid State reasonably allowed Plaintiffs to continue working as they had been while the new hires took on the other work that needed to be done at Sedgefields. Mack and Harris cannot demonstrate that the reasons for the initial distribution of work, the increase in cleaning responsibilities, or Mid State's failure to reassign or redistribute cleaning responsibilities are pretext for discrimination. Accordingly, summary judgment is due to be granted as to these job assignment claims.

## V. CONCLUSION

WHEREFORE, PREMISES CONSIDERED, Defendant Mid State Land & Timber Company, Inc. respectfully requests this Court enter summary judgment in favor of Defendant and against Plaintiffs Jeffrey Harris, Willie Bernard Mack, Demetrius Parham, and Henry Tarver as to all claims asserted in the Complaint.

Respectfully submitted,

28

_____
Carter H. Dukes
Kimberly W. Geisler
Attorneys for Defendant
Mid State Land & Timber Company, Inc.

**OF COUNSEL:**
HUCKABY SCOTT & DUKES, P.C.
2100 Third Avenue North
Suite 700
Birmingham, Alabama 35203
(205) 251-2300

29

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon counsel of record by placing a copy of same in the United States mail, first class postage prepaid and addressed as follows:

> Jerry D. Roberson, Esq.
> Roberson & Roberson
> 8 Office Park Circle
> Suite 150
> Birmingham, Alabama 35223
>
> Albert H. Adams, Jr., Esq.
> Irby Law Firm, LLC
> Post Office Box 910
> Eufaula, Alabama 36072

DONE this the 4th day of April, 2007.

Of Counsel

40059.1

30



**FREEDOM COURT REPORTING**

Page 1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF ALABAMA

3    NORTHERN DIVISION

4

5    CASE NUMBER:  2:06-CV-875-ID

6    JEFFREY HARRIS, et al.,            COPY

7         Plaintiffs,

8         vs.

9    MID STATE LAND & TIMBER CO., INC.,

10   d/b/a SEDGEFIELDS PLANTATION,

11        Defendant.

12

13        S T I P U L A T I O N

14        IT IS STIPULATED AND AGREED by and

15   between the parties through their respective

16   counsel, that the deposition of Demetrius

17   Parham may be taken before Angela Smith,

18   RPR, CRR, at the offices of John W. Waters,

19   Jr., at 214 North Prairie Street, Union

20   Springs, Alabama 36089, on the 16th and 17th

21   days of January, 2007.

22

23        DEPOSITION OF DEMETRIUS PARHAM

## FREEDOM COURT REPORTING

Page 25

1      A.    Yes.

2      Q.    They took you back?

3      A.    Yes.

4      Q.    All right.  Still working part

5 time?

6      A.    Yes.

7      Q.    All right.  How long did you

8 work this time?

9      A.    I'd say about another month.

10     Q.    Okay.

11     A.    Then I came to Sedgefields.

12     Q.    Okay.  How did you find out

13 about the job at Sedgefields?

14     A.    Rochester.

15     Q.    Roy Lee?

16     A.    Yes.

17     Q.    What did Mr. Lee tell you?

18     A.    Told me he would -- Told me to

19 come out here and put an application in.  So

20 I put an application in.

21     Q.    Okay.  When was that?

22     A.    July 4th -- No.  July 5th.

23     Q.    I don't even --

# FREEDOM COURT REPORTING

1          MR. ROBERSON:  2005 or 2004?

2     Q.     2005?

3     A.     2004.

4     Q.     And what kind of job were you

5  applying for?

6     A.     Laborer.

7     Q.     Okay.  And who hired you?

8     A.     Rochester.

9     Q.     Okay.  And he -- Did he set

10  salary, as far as you know?

11     A.     No.  The other guy set my

12  salary.

13     Q.     Who is the other guy?

14     A.     Byron Davidson.

15     Q.     Okay.  Who is he?

16     A.     And Donna Davidson.

17     Q.     Okay.  Did you have any

18  discussions with them about your salary?

19     A.     No.

20     Q.     Okay.  They just set the

21  salary and you took it?

22     A.     Yes.

23     Q.     Okay.  Did you ever say

## FREEDOM COURT REPORTING

Page 27

1  anything to them about it?

2        A.      No.

3        Q.      Okay.  What was your salary

4  when you were hired?

5        A.      They started me at six dollars

6  and fifty cents.

7        Q.      Six-fifty an hour?

8        A.      Yes.

9        Q.      Full time?

10       A.      Yes.

11       Q.      And what did you start out

12 doing as a laborer?

13       A.      I would weed, cutting grass.

14       Q.      Did you ever have any

15 discussions with Mr. Lee about your pay,

16 rate of pay?

17       A.      What year was that?

18       Q.      In 2004.

19       A.      No.

20       Q.      Did you have any in 2005?

21       A.      No.

22       Q.      Okay.  Did you work any odd

23 jobs up to this point that you haven't told

# FREEDOM COURT REPORTING

Page 28

1  me about?

2       A.     That's about it.

3       Q.     Did you work on anybody's

4  farm, or do anything like that, help anybody

5  out on the side?

6       A.     No.

7       Q.     Okay.  So, what did you do at

8  Wayne's?

9       A.     I was in the cleanup crew.

10       Q.     Cleanup crew.  So, for the

11  City of Midway, you cut grass; right?

12       A.     Yes.

13       Q.     McDonald's, janitorial work

14  and making biscuits for a week?

15       A.     Yes.

16       Q.     Wayne's, cleanup crew?

17       A.     Yes.

18       Q.     Midway -- Going back to

19  Midway, cutting grass again.  And then

20  Sedgefields, where you were cutting grass;

21  is that right?

22       A.     That's right.

23       Q.     Did you have any welding

## FREEDOM COURT REPORTING

Page 29

1   experience?

2       A.      No.

3       Q.      Any heavy-equipment

4   experience?

5       A.      I'm a tractor driver, that's

6   it.

7       Q.      When did you start driving a

8   tractor?

9       A.      City of Midway.

10      Q.      Okay.  And who was your

11  supervisor out at Mid State, Roy Lee?

12      A.      Yes.

13      Q.      Did that ever change during

14  your employment with Mid State?

15      A.      No.

16                      (Defendant's Exhibit 10

17                      was marked for

18                      identification purposes.)

19      Q.      I'm going to show you a

20  document that I will identify as Defendant's

21  Exhibit 10.

22                      I forgot to ask about aunts

23  and uncles, didn't I?  Do you have any aunts

# FREEDOM COURT REPORTING

Page 33

1          A.      I put down grass, yes.

2          Q.      Okay.  And the starting pay

3    expected, you said six-fifty an hour?

4          A.      No.  That's what he said, he

5    was going to start me off with six-fifty.

6          Q.      So, you just wrote that down?

7          A.      That's what he said, he was

8    going to start me off with six-fifty.

9          Q.      So, you went ahead and wrote

10   it down, is what I'm saying?

11         A.      Yes, yes.

12         Q.      All right.  And that would

13   have been back in July of 2004; right?

14         A.      Right.  Yes.

15         Q.      And then you got a raise to

16   six-seventy-five an hour on January 1, 2005;

17   right?

18         A.      Yes.

19         Q.      Then on January 1, 2006, you

20   got another raise to seven-fifty an hour; is

21   that right?

22         A.      Yes.

23         Q.      Have you ever been convicted

# FREEDOM COURT REPORTING

Page 44

1   under penalty of perjury, that everything

2   contained in Defendant's Exhibit 11 is true

3   and correct?

4          A.      Yes.

5          Q.      Was I nice to you when we

6   spoke?

7          A.      Yes.

8          Q.      Okay.   And did I force you to

9   sign anything?

10         A.      No.

11         Q.      And is everything still true

12  and correct that's contained in Defendant's

13  Exhibit 11?

14         A.      Yes.

15         Q.      Okay.   In this affidavit, you

16  say you have not personally observed Norris

17  Foster being treated differently because of

18  his race.   Have you observed anyone else

19  associated with Sedgefields being treated

20  differently because of their race?

21         A.      No.

22         Q.      In this lawsuit, you claim

23  that you were discriminated against on the

## FREEDOM COURT REPORTING

Page 45

1    basis of your race; is that correct?

2          A.    Yes.

3          Q.    And I take it from this

4    affidavit -- Excuse me, this declaration,

5    that the only claim that you make as to race

6    discrimination against Mid State is as to

7    your rate of pay; is that correct?

8          A.    Yes.

9          Q.    You don't believe that Mid

10   State discriminated against you in any other

11   way, do you?

12         A.    No.

13         Q.    Okay.  What is the basis for

14   your belief that you were discriminated

15   against as to your race with regards to the

16   rate of pay?

17         A.    First off, they start me off

18   with six-fifty an hour.  And before, when

19   another guy that got hired after me, his

20   name was Anthony, they start him at eight

21   dollars.  He came back off of -- came back

22   to work, and it was a holiday, I didn't get

23   holiday pay.  He came and got holiday pay

# FREEDOM COURT REPORTING

Page 46

1   the same day he came back.

2                   MR. ROBERSON:  Who is Anthony?

3                   THE WITNESS:  He's from

4   Auburn.

5          Q.      Anthony.  What's Anthony's

6   last name?

7          A.      I forgot his last name.  They

8   call him Anthony.

9          Q.      And when was Anthony hired?

10          A.      About two days -- Two months

11  after I got hired.

12          Q.      Okay.

13          A.      And before Mr. Carroll came

14  there, and Mr. Joel came there.

15          Q.      Okay.

16          A.      It was under Byron Davis and

17  Donna Davis.

18          Q.      Okay.  And how long did

19  Anthony work there?

20          A.      Through the whole season, deer

21  season.

22          Q.      Okay.  So, when would that be?

23          A.      I got there in 2004.

## FREEDOM COURT REPORTING

Page 48

1   husband, she was the plant manager.

2          Q.       And did this Anthony fellow,

3   did he work for Byron?

4          A.       Yes.

5          Q.       Okay.  And what did Anthony

6   do?

7          A.       Well, he came cut -- Bush Hog,

8   stuff like that, and deer hunt.

9          Q.       Well, tell me everything that

10  you know that he did out at Sedgefields.

11         A.       That's about it.

12         Q.       He Bush Hogged and helped with

13  the deer hunts?

14         A.       Yes.

15         Q.       How did he help with the deer

16  hunts?

17         A.       He would take clients out and

18  put them in the stands and clean the deer.

19         Q.       And Mr. Davidson told you that

20  he was paying him eight dollars an hour?

21         A.       Yes.

22         Q.       Okay.  When did Mr. Davidson

23  tell you that?

## FREEDOM COURT REPORTING

Page 53

1      Q.      Okay.  And Mr. Lee is the one

2  that --

3      A.      Hired me.

4      Q.      -- hired you?

5      A.      Yes.

6      Q.      And you say that this Anthony

7  fellow came in in August of 2004; right?

8      A.      Yes.

9      Q.      I'm asking -- And then you

10  said he had worked there before.  Do you

11  know when he worked there before?

12      A.      Not before, no.

13      Q.      Do you know how long he had

14  worked there before?

15      A.      No, I haven't.

16      Q.      Do you know what kind of work

17  he did when he was there before?

18      A.      No.

19      Q.      Do you know anything about his

20  education?

21      A.      No.

22      Q.      Do you know anything about his

23  work experience, prior work experience?

# FREEDOM COURT REPORTING

Page 54

1      A.      No.

2      Q.      Do you know anything about his

3  references?

4      A.      No, I don't.

5      Q.      Do you know anything about any

6  special skills that he might have?

7      A.      No, I don't.

8      Q.      Okay.  And you said something

9  about holiday pay, that he received holiday

10 pay.  What do you mean by that?

11     A.      Like a -- Say, like, Martin

12 Luther King birthday or Christmas, put it

13 like that.

14     Q.      And what holiday did he

15 receive pay for?

16     A.      I can't remember what the

17 holiday was, but he used to clock in on the

18 time clock every day.

19     Q.      Okay.

20     A.      And I see his name when they

21 wrote the thing on there.

22     Q.      You saw his name when you --

23     A.      I saw the holiday paid

# FREEDOM COURT REPORTING

Page 56

1    Q.      And do you know who wrote

2  holiday pay on his time sheet?

3    A.      I reckon the secretary wrote

4  it down.

5    Q.      And who would have that been?

6    A.      Ms. Denise Pierce.

7    Q.      Okay.  Are there any other

8  white employees who you feel like were paid

9  more than you for the same work?

10    A.      Yes.  Brother Man.

11    Q.      Okay.  And Brother Man was a

12  -- also worked as a night watchman, did he

13  not?

14    A.      Yes.

15    Q.      Do you know anything about

16  Brother Man's background?

17    A.      No, I don't.

18    Q.      Okay.  Do you know of any

19  connection that Brother Man may have with

20  Mr. Carroll?

21    A.      No, I don't.

22    Q.      Okay.  Are there any other

23  white employees who you believe were treated

# FREEDOM COURT REPORTING

Page 57

1    differently than you with respect to pay?

2          A.      Yes.  Will Hubbard.

3          Q.      Okay.

4          A.      Joseph May.

5          Q.      Anybody else?

6          A.      That's about it.

7          Q.      Okay.  What about black

8    employees of Mid State, were there any black

9    employees who were treated better than you,

10   with respect to pay?

11         A.      No.

12         Q.      Okay.  Did you ever complain

13   to anyone about your rate of pay?

14         A.      No.

15         Q.      Did you ever complain to

16   Mr. Lee about things at work?

17         A.      No.

18         Q.      Did you ever complain to

19   Mr. Carroll about things at work?

20         A.      No.

21         Q.      Did Mr. Carroll treat you

22   fairly?

23         A.      Yes.

# FREEDOM COURT REPORTING

Page 58

1    Q.    And you never heard a racist

2  comment or slur while you worked at Mid

3  State, did you?

4    A.    No.

5    Q.    Have you heard black employees

6  use the "N" word?  And you know what I mean

7  by that, don't you?

8    A.    Yes.

9    Q.    Okay.  Have you ever heard any

10  black employees use the "N" word?

11    A.    No, I haven't.

12    Q.    What about Norris Foster?  In

13  his deposition, he claimed he used the "N"

14  word?

15    A.    If he did, I wasn't there when

16  he said it.

17    Q.    Okay.  You've never heard any

18  employee out at Mid State use the "N" word?

19    A.    No.

20    Q.    And if I -- I apologize for

21  repeating myself a little bit here, but I

22  think you testified you were hired by

23  Mr. Lee, worked under Mr. Lee, and never

## FREEDOM COURT REPORTING

Page 59

1  worked for Mr. Norman; is that right?

2         A.    Yes.  I worked for Mr. Norman

3  about two days.

4         Q.    Okay.  Did you have any

5  problems in those two days you worked for

6  Mr. Norman?

7         A.    No.

8         Q.    Okay.  Other than issues

9  concerning pay, have you seen any black

10  employees at Mid State being treated

11  differently than the white employees?

12         A.    No.

13         Q.    Who have you spoken to

14  concerning your claims that you've made in

15  this lawsuit?

16               MR. ROBERSON:  Besides your

17  lawyer.

18         Q.    Other than your lawyer.  And I

19  don't want to know any conversation you've

20  had with your lawyer.

21         A.    No one.

22         Q.    Okay.  Have you talked to your

23  wife?

# FREEDOM COURT REPORTING

Page 75

1          Q.       Your legal name is Parhams; is

2    that correct?

3          A.       Yes.

4          Q.       Okay.  What did you do to

5    prepare for your deposition today,

6    Mr. Parhams?

7          A.       What did I do?

8          Q.       Yes, sir.

9          A.       Got a good night's sleep.

10          Q.       Okay.  What about yesterday?

11          A.       Same thing.

12          Q.       Same thing.  Did you look at

13    any documents?

14          A.       No.

15          Q.       Did anybody tell you, before

16    you filed this lawsuit, that Joel Norman was

17    making statements that they considered to be

18    racist?

19          A.       Not that I know of.

20          Q.       And when you were working out

21    at Sedgefields, when Mid State owned it, you

22    would be out cutting the grass most of the

23    time; right?

## FREEDOM COURT REPORTING

Page 76

1        A.       Yes.

2        Q.       And doing general labor work,

3   helping with the shrubbery and so forth

4   around the lodge and so forth; is that

5   right?

6        A.       Yes.

7        Q.       And people would be -- Other

8   workers would be coming in and out, would

9   they not, from time to time?

10       A.       Yes.

11       Q.       In fact, I think there's been

12   some testimony that, at least at one point

13   in time, y'all used to have lunch together,

14   all the employees would have lunch together;

15   is that right?

16       A.       Yes.

17       Q.       And then that was stopped at

18   some point.  Do you recall when that was

19   stopped?

20       A.       No, I don't.

21       Q.       Was it right around when the

22   hunting season began?

23       A.       Might have been.



## FREEDOM COURT REPORTING

Page 1

1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE MIDDLE DISTRICT OF ALABAMA

3              NORTHERN DIVISION

4

5   CASE NUMBER:  2:06-CV-875-ID

6   JEFFREY HARRIS, et al.,

7              Plaintiffs,                    **COPY**

8              vs.

9   MID STATE LAND & TIMBER CO., INC.,

10  d/b/a SEDGEFIELDS PLANTATION,

11             Defendant.

12

13        S T I P U L A T I O N

14             IT IS STIPULATED AND AGREED by and

15  between the parties through their respective

16  counsel, that the deposition of Henry Tarver

17  may be taken before Angela Smith, RPR, CRR,

18  at the offices of John W. Waters, Jr., at

19  214 North Prairie Street, Union Springs,

20  Alabama 36089, on the 16th day of January,

21  2007.

22

23        DEPOSITION OF HENRY TARVER

# FREEDOM COURT REPORTING

Page 38

1    three weeks and go back.

2            Q.      Okay.  To go coon hunting with

3    Roy?

4            A.      Go coon hunting.

5            Q.      Any other kind of hunting?

6            A.      I did a little deer hunting.

7    I did rabbit hunting.  I didn't do much of

8    that.

9            Q.      Where would y'all hunt?

10           A.      Where at?

11           Q.      Yes, sir.

12           A.      Well, we had places to hunt

13   at.  We have spots that people let you hunt.

14           Q.      What did Roy Lee tell you when

15   he came to you about a job?

16           A.      He come to me and asked me.

17   He just said that they needed somebody to

18   work up there.  And go up there and check

19   with David Carroll.  He told me where the

20   office was.

21           Q.      Okay.

22           A.      And I went and checked with

23   him.  And he hired me.

# FREEDOM COURT REPORTING

Page 39

1    Q.    Okay.  I've got your hire date

2  as June 7, 2005; is that about right?

3    A.    I guess that's about right.  I

4  guess that's about right.

5    Q.    Okay.  And did Mr. Lee tell

6  you what kind of job that you would -- they

7  were looking for?

8    A.    Yeah.  He told me what kind of

9  job it was, and what it was going to be

10  like, too.

11    Q.    Okay.  What did he say?

12    A.    He told me -- When he hired --

13  When he got me, he told me, he said he

14  wanted somebody to stay on the plantation.

15  And I went on with that right there.  But

16  when I did get there, they changed it.  I

17  could stay up home.  I didn't have to stay

18  up there.  I was going to stay there if they

19  had kept it up, but they changed it.

20    Q.    Okay.  So, Roy Lee told you

21  that he was looking for someone to stay up

22  on the property?

23    A.    Yes.  Stay up there on the

## FREEDOM COURT REPORTING

Page 42

1    think we said anything about pay.

2         Q.      So, you didn't even know what

3    you would be earning?

4         A.      No.  Until I got the check, I

5    didn't even knew.

6         Q.      Okay.  Did you say anything to

7    Mr. Carroll after you got the check about --

8         A.      About the pay?

9         Q.      Yes.

10        A.      No.  I took the pay.

11        Q.      Did you say:  I need to get

12   paid more than that?

13        A.      No.  I took the pay and went

14   on to work.

15        Q.      Okay.  And you're working as

16   an outside laborer; is that right?

17        A.      Yeah.  Working on the farm.

18        Q.      And mainly cutting grass; is

19   that right?

20        A.      Mainly cutting grass and

21   Weedeating and so on and so forth.

22        Q.      Okay.  And Mr. Lee was your

23   supervisor?

## FREEDOM COURT REPORTING

Page 43

1    A.        Supervisor, right.

2    Q.        Okay.  And when Mr. Norman

3    came on, you still worked with Mr. Lee?

4    A.        Still worked with Mr. Lee.

5    Q.        Okay.  Did your job duties

6    ever change while you were out there?

7    A.        No.  When I went there, that's

8    what I was doing.  When I left, that's what

9    I was doing, same thing.

10   Q.        Okay.  Did you ever have any

11   conversations with Mr. Carroll about pay or

12   your job duties or anything like that?

13   A.        Never talked to him about

14   that.  Just speak to him and go ahead.  We

15   never talked no pay.

16   Q.        Did you ever have any problems

17   with Mr. Carroll?

18   A.        No.  I ain't got no problems

19   with him.

20             (Defendant's Exhibit 9 was

21             marked for identification

22             purposes.)

23   Q.        I'm going to show you a

# FREEDOM COURT REPORTING

Page 44

1  document that I will identify as Defendant's

2  Exhibit 9.  And after you've had a chance to

3  look at it, just let me know.

4          And the first page of

5  Defendant's Exhibit 9, I understand, you

6  know, isn't anything that you submitted, but

7  it's, I believe to be, a document from

8  Mid-State, just for their records.

9          It shows you being hired on

10  June 7, 2005, as an outside laborer at seven

11  dollars an hour.  And then on January 1,

12  2006, getting a raise to seven-fifty an

13  hour; is that correct?

14      A.      That's right.  That's what we

15  did.

16      Q.      Okay.  And it has:  In case of

17  an emergency, notify Ruby Miles, who is your

18  sister.

19      A.      That's right.

20      Q.      And then the next page is the

21  employment start -- is the beginning of the

22  employment application.  What part of this

23  is in your handwriting?

# FREEDOM COURT REPORTING

Page 48

1  number?

2       A.    No.

3       Q.    High school, it says:  Enon

4  Junior High, Midway.  Maybe you didn't make

5  it all the way to junior high, did you?

6       A.    No, I didn't.

7       Q.    Grade average, high school, it

8  says:  B.  You didn't really make it to high

9  school either.  You didn't have a B average

10  in high school?

11       A.    No, I didn't.

12       Q.    Have you ever been convicted

13  of a crime?  It says:  No.  Is that correct?

14       A.    I been to jail a couple of

15  times.

16       Q.    Okay.  Why don't you tell me

17  about that.

18       A.    Well, I been to jail about

19  twice.  I did a little cutting.

20       Q.    Okay.

21       A.    I did a heap of gambling.  So

22  I went in for that.  So that's about it.

23       Q.    All right.  Well, let's talk

# FREEDOM COURT REPORTING

Page 57

1        A.        Uh-huh.  That's right.

2        Q.        Have you ever filed a charge

3   of discrimination with the EEOC?

4        A.        No, I haven't.

5        Q.        Okay.  It's your claim that

6   you were discriminated against by Mid-State

7   with regards to your race; is that correct?

8        A.        That's right.

9        Q.        How do you believe that you

10   were discriminated against by Mid-State?

11        A.        Because they paid the white

12   more than they paid me.

13        Q.        Okay.  How else do you believe

14   that you were discriminated against on the

15   basis of your race?

16        A.        Being humiliated behind that

17   out there.

18        Q.        Being humiliated with regards

19   to the pay?

20        A.        Yeah.  I mean, you know, when

21   they get more than me and you doing the same

22   thing.

23        Q.        Okay.  I'm not asking you

## FREEDOM COURT REPORTING

Page 58

1  about how you were damaged or what damages

2  you may have sustained, I'm just asking you

3  how do you believe that Mid-State

4  discriminated against you?  And you've told

5  me as to pay, paying white people more than

6  you.

7       A.      Uh-huh.

8       Q.      How else do you believe

9  Mid-State discriminated against you?

10       A.      That's about it.

11       Q.      Okay.  You didn't work under

12  Joel Norman, did you?

13       A.      No, I didn't.

14       Q.      You heard Mr. Harris testify

15  about statements that he heard Mr. Norman

16  make?

17       A.      Uh-huh.

18       Q.      You didn't hear any of those,

19  did you?

20       A.      I didn't hear him saying that,

21  but I've heard the same thing that he said,

22  and I heard it from different times from the

23  time he said it, that he did use them kind

## FREEDOM COURT REPORTING

Page 60

1  June 7, 2005, through May 19, 2006?

2          A.      You just asked me that.

3          Q.      Okay.  I can't remember the

4  answer.

5                  MR. ROBERSON:  No.

6          Q.      The answer was no?

7          A.      No.

8          Q.      Okay.  ~~What white people do~~

9  ~~you claim were paid more than you,~~ that

10  ~~shouldn't have been?~~

11          A.      Brother Man and --

12                  MR. DUKES:  Don't show him.

13          Q.      Who else, other than Brother

14  Man?

15          A.      ~~Will and Chad, and that~~ crew

16  ~~what come in there behind me.~~  That's the

17  only one I know about.  I don't know about

18  the ones that was there before me.

19          Q.      Brother Man, Will Hubbard.

20  How about Joseph May?

21          A.      Yeah.  He come since me.

22          Q.      Okay.  And Chance Hamm?

23          A.      ~~Yeah.~~  All that crew come

## FREEDOM COURT REPORTING

Page 61

1   since me.

2        Q.     Okay.   They were all hired

3   after you; right?

4        A.     All hired after me.

5        Q.     Brother Man was hired to do

6   some night watchman work, too, was he not?

7        A.     He was the one that was in the

8   trailer, yeah.

9        Q.     Will Hubbard had some heavy

10  equipment experience with dozers and

11  skidders; right?  If you know, if you don't

12  know --

13       A.     I don't know.

14       Q.     Okay.  I have Joseph Mays and

15  Will Hubbard being hired on November 21,

16  2005, does that sound right to you?

17       A.     It was after me.  I don't know

18  what date and time it was.

19       Q.     Okay.  And that Joseph Mays

20  quit on December 29, 2005.  Does that sound

21  right to you?

22       A.     I guess so.

23       Q.     Do you know what Joseph Mays'

## FREEDOM COURT REPORTING

Page 62

1  education was?

2          A.      No, I don't.

3          Q.      Let me ask this for -- I guess

4  for Brother Man, Joseph Mays, Will Hubbard,

5  and Chance Hamm, do you know what their

6  education was?

7          A.      No, I don't.

8          Q.      Do you know what their work

9  experience was prior to coming to Mid-State?

10          A.      No, I don't.

11          Q.      Do you know what kind of

12  special skills they may have had?

13          A.      No, I don't.

14          Q.      Okay.  And Chance was hired on

15  June 12, 2006, was he not?

16                  MR. ROBERSON:  Do you mean

17  January?

18          Q.      I'm sorry.  January 12, 2006.

19  Does that sound right to you?

20          A.      I guess so.

21          Q.      Okay.  Do you know anything

22  about their references?

23          A.      No, I don't know nothing about

# FREEDOM COURT REPORTING

1  no references.

2      Q.      Did you ever complain to

3  anybody about the fact that those

4  individuals were paid more than you?

5      A.      No, I haven't.

6      Q.      Okay.  Did you ever complain

7  to Mr. Carroll about anything during the

8  time you worked out there?

9      A.      No.

10     Q.      Okay.  Did you smoke marijuana

11  the whole -- I understand you're saying you

12  never smoked it on the job.  But from June

13  7, 2005, through May 19, 2006, during that

14  time, would you smoke it at home?

15     A.      Yeah.

16     Q.      Okay.  What kind of special

17  skills did you bring to Mid-State, other

18  than your labor skills?

19     A.      They didn't ask me about that.

20     Q.      Well, do you have any other

21  skills?

22     A.      No.

23     Q.      Do you know of any black



**American Court Reporting**
**toll-free (877) 320-1050**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


CIVIL ACTION NUMBER

2:06-CV-00405-ID-SRW


NORRIS FOSTER,

Plaintiff,

vs.

MID STATE LAND & TIMBER COMPANY, INC.,
d/b/a SEDGEFIELDS PLANTATION,

Defendant.



THE VIDEOTAPED

DEPOSITION TESTIMONY OF:

DAVID CARROLL


September 8, 2006

1:29                    p.m.


COURT REPORTER:

Gwendolyn P. Timbie, CSR

**www.AmericanCourtReporting.com**
**September 8, 2006**



Page 8

1    EXAMINATION BY MR. ROBERSON:

2         Q    Mr. Carroll, my name is Jerry

3    Roberson, and I represent Norris Foster.

4    Do you understand we're here today about

5    his race discrimination claim?

6         A    Yes.

7         Q    And are you employed -- or

8    were you formerly employed with Mid States

9    Land and Timber?

10        A    Yes.

11        Q    In what capacity?

12        A    I was hired as the general

13   manager.

14        Q    When were you hired, sir?

15        A    I was hired during the month

16   of March -- uh -- or early April of 2005.

17        Q    Do you know who you replaced,

18   who was the former manager?

19        A    I'm told a lady named Donna

20   Davidson was general manager before I was

21   hired.

22        Q    And do you know where

23   Ms. Davidson is?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 18

1           A       No.  Actually, it probably

2       would -- it would be a benefit to them,

3       because the type of clients that I have

4       would -- may be people that would

5       eventually sell them wood.

6           Q       Okay.  And so the time I want

7       to talk to you about is from when you

8       worked -- worked at -- at Mid State Land

9       and Timber Company until it was

10      purchased.  Okay.

11          And we're talking about at the

12      plantation here in -- in Union Springs,

13      Alabama; correct?

14          A       Yes, sir.

15          Q       Now, I don't hunt, so you've

16      got to help me out, if you will.

17          How many acres was Sedgefields

18      Plantation here?

19          A       I believe it called for twelve

20      thousand seven hundred and eighty-seven

21      acres.

22          Q       So it's almost thirteen

23      thousand acres?

**www.AmericanCourtReporting.com**
**September 8, 2006**

Page 19

1       A     Close.

2       Q     When you -- when you were

3 working there, when --

4       A     That --

5       Q     -- Mid State had it?

6       A     That is correct.

7       Q     And what kind of operation is

8 it; that is, besides -- they do hunting

9 there; correct?

10      A     That is correct.

11      Q     Do they also raise or grow

12 timber on the property?

13      A     That would be a -- a natural

14 benefit of owning the property, yes.  They

15 grow timber.

16      Q     Okay.  Did you have any duties

17 associated with the timber management of

18 -- of -- at Sedgefields?

19      A     I do.

20      Q     What are those?

21      A     It just -- a general manager.

22 My duties would be not only to look after

23 the wildlife portion and the hunting

Page 20

1  portion of it, but oversee any of the

2  timber management aspects of it -- whether

3  we would be thinning wood, whether we

4  would be planting trees, marking lines.

5  Anything of that nature.

6       Q     So by owning that much

7  property, there are trees on it; right?

8       A     That is correct.

9       Q     And what kind of trees?

10       A     Predominantly, in certain

11  areas, it's planted pines, which you're

12  saying that they grow for, basically, a

13  product --

14       Q     To harvest?

15       A     To harvest.  There are pine

16  hardwood stands, and there are hardwood

17  stands on the property.

18       Q     Okay.  And it's your job to

19  make sure that that -- to optimize the

20  recovery from having those resources;

21  correct?

22       A     My job, when I was interviewed

23  and hired by Mid State Land and Timber,

Page 21

1   was to not only see about timber and --

2   and -- I wasn't really given the

3   instructions to maximize timber production

4   on every square acre of the property,

5   because, obviously, some of that property

6   we use for --

7        Q    Hunting?

8        A    Hunting.

9        Q    Sure.

10       A    And other aspects.  But a

11  common-sense answer would be, where --

12  where timber was a priority, we would grow

13  as much timber as possible.  Where hunting

14  was a priority, we would make that the

15  most -- the most available.

16       Q    Okay.  And -- and I may -- I

17  don't want to misstate anything, but,

18  approximately, how many acres did you hunt

19  on at -- at -- at Mid States?

20       A    Well, it depends on what type

21  of hunting you describe.

22       Q    Okay.

23       A    If -- if we're deer hunting,

**American Court Reporting**
**toll-free (877) 320-1050**

Page 22

1    we can cover, basically, the whole

2    thirteen thousand acres.  We may not hunt

3    every square foot, but there would be

4    hunters in each parcel.

5         Q    Yeah.  Okay.

6         A    If we're -- if we're up and

7    bird hunting, quail hunting, about half

8    that, about sixty-five hundred acres.

9         Q    Okay.  And -- and I take it

10   from your answer that you don't deer hunt

11   in the same areas that bird hunts are

12   going on, at the same time --

13        A    That is correct.

14        Q    -- correct?

15        A    That is correct.

16        Q    That -- that wouldn't be a --

17   from a common sense standpoint, very safe

18   to do, would it?

19        A    Exactly.

20        Q    Okay.  But -- but you can deer

21   hunt on the entire property; right?

22        A    Yes.

23        Q    As long as you're not doing

**American Court Reporting**
**toll-free (877) 320-1050**

Page 23

1    the bird hunting on any part of it --

2        A    Yes.

3        Q    -- correct?

4        A    That's correct.

5        Q    And then a portion -- the more

6    open lands, you can bird hunt on; correct?

7        A    Yes.

8        Q    I mean, they probably have

9    some thickets and stuff where you can't

10    bird hunt; isn't that fair?

11        A    Yes.

12        Q    Okay.  Now -- and the -- the

13    -- do you have any job responsibilities

14    in -- insofar as the revenue stream from

15    the operations?

16        A    In my initial interview with

17    Ms. Howell, I was asked to be as

18    productive as possible, given the current

19    circumstances of the plantation.

20        Q    Okay.  What are the current

21    circumstances?

22        A    The circumstances were that

23    the property was not groomed the way

Page 24

1    it want -- they wanted it to be -- the

2    home office wanted it to be.  So it was --

3    it -- for a phrase that I would use, it

4    was a "diamond in the rough."

5         Q    Okay.  Well, I'm going to show

6    you what we previously -- and you were

7    here for Mr. Norman's deposition; correct?

8         A    I was.

9         Q    You actually were here for

10   Mr. Foster's deposition yesterday;

11   correct?

12        A    I was, yes.

13        Q    So you've heard all the

14   testimony in this case; correct?

15        A    Yes.

16        Q    All right.  And, then, I'm

17   going to show you what we marked as

18   Plaintiff's Exhibit 3 to Mr. Norman's

19   deposition.

20        Is that the organizational chart for

21   Sedgefields as of March of 2006?

22        A    I believe that would be

23   correct, yes.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 109

1    A    Well, I hired -- Jeffrey

2    Harris would have been before him, and --

3    Q    Okay.

4    A    -- William Beckwith would have

5    been before him.

6    Q    Okay.  You hired William

7    Beckwith?

8    A    I did.

9    Q    As a night watchman?

10    A    I hired him for -- to be a

11    general laborer, as the rest of the crew

12    was.  In addition to that, he was to be a

13    night watchman.

14    Q    Did he work during the day,

15    then?

16    A    He did.

17    Q    Okay.  I'm sorry.  I'm --

18    looking at his personnel file, I thought

19    he was hired to be the night watchman.

20    A    No.  He was a -- he was a

21    laborer during the day, like everybody

22    else, and he was a night watchman during

23    -- after hours.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 113

1    Q    Okay.  In November; correct?

2    A    I think that's correct.  In

3    November.

4    Q    And -- and Chance Ham was

5    hired in January?

6    A    Later on in January, yes.

7    Q    Okay.  Now, have you hired

8    anybody since then?

9    A    No.

10    Q    Well, when did Henry Tarver

11    start work there?

12    A    Oh, I'm sorry.  You are --

13    you're correct about that.  I'm not sure

14    exactly what day Henry was hired.  It was

15    some time during the fall.

16    Q    Was he a general laborer?

17    A    No.  No.  I take that back.

18    It might have been early or late summer.

19    Q    2006?  2006?

20    A    No.  '05.

21    Q    Oh, okay.

22    A    I'm sorry.

23    Q    Well, how did -- how did Henry

**www.AmericanCourtReporting.com**
**September 8, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 115

1   different things.

2        Q    Oh.

3        A    I mean, I -- I needed, in my

4   estimation, upwards of twenty people to do

5   what needed to be done, but they -- they

6   weren't about to let me have that kind of

7   staff at this time.

8        Q    Was Sedgefields a profitable

9   place to work?  I mean, are y'all making

10  more money than --

11       A    No.

12            MR. DUKES:  Object to the

13  form.  Are you talking about did Mid State

14  make money as Sedgefields?

15            MR. ROBERSON:  Yeah.  Yeah.

16       A    No.  We didn't make -- we

17  didn't make profit.

18       Q    You didn't?  Why was that?

19       A    More expenses than income.

20       Q    No.  But -- I'm not trying to

21  be funny.  I know you're not either.  But,

22  I mean, are hunting operations just

23  inherently unprofitable or --

**www.AmericanCourtReporting.com**
**September 8, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 137

1   years -- eight to ten years, okay, as a --

2   as a laborer -- general laborer, driving a

3   tractor, being in the -- part of the

4   hunting crew.  Before Mid States owned it,

5   you know -- and they bought it in '99 --

6   he -- he worked on the property.  Okay.

7          Assuming that to be true, how can

8   you hire a white male, who doesn't have

9   any hunting experience, at a higher hourly

10  rate than Norris Foster, who's had six

11  years of military service, years of

12  experience around dogs and in hunting --

13  hunting camps?  How can you do that and be

14  fair to Norris Foster?

15         A     If I hired an individual and

16  paid him a higher wage than somebody else,

17  the wage I paid him was -- was based on

18  his proficiency in doing something that we

19  needed done here at the plantation.

20         Q     Okay.  What was that?

21         A     For instance, Adam May was

22  somebody who -- who was good at trapping

23  and a mechanic.  I didn't have either one

**American Court Reporting**
**toll-free (877) 320-1050**

Page 138

1       of those at that time.

2              Q      What is "trapping"?

3              A      Trapping?

4              Q      Uh-huh.

5              A      Is trapping and removing

6       nuisance predators to a quail program:

7       bobcats, fox, things of that nature.

8              Q      Okay.  Okay.  So you say you

9       paid Adam -- I mean, Joseph Mays more

10      money than Norris Foster because he could

11      trap and he was a mechanic?

12             A      I didn't pay him, not in

13      reference to Norris, anything.  I paid him

14      a rate that I thought was fair for what

15      his specialties were and what he could do

16      for the plantation that I didn't have at

17      that time.

18             Q      Okay.  Why did you pay Will

19      Hubbard eight dollars an hour?

20             A      Will Hubbard was paid what he

21      was paid because he had specialties in

22      working heavy equipment.  My understanding

23      is, he worked at McDonald Construction

**American Court Reporting**
**toll-free (877) 320-1050**

Page 139

1    before he came to work here and that he

2    was working with skidders and large

3    equipment.  We had just purchased a

4    skidder.  I needed somebody that could

5    operate that piece of equipment

6    proficiently, and he was the one that I

7    hired.

8        Q      You -- you bought a skidder?

9        A      I did.

10        Q      And Will Hubbard drove it?

11        A      He drove it a lot.

12        Q      Okay.  Could anybody else

13    drive it?

14        A      Joel drives it some.

15        Q      Is any -- who -- Will Hubbard

16    doesn't work there now.  Is -- who's

17    driving it now?

18        A      Joel.

19        Q      Anybody else?

20        A      For all I know, Chance may get

21    on it every now and then.

22        Q      Okay.  What about Chance Ham?

23        A      Chance had specialties in

**American Court Reporting**
**toll-free (877) 320-1050**

Page 140

1    welding.  And that's -- we needed that.

2    We had pieces of equipment that we needed

3    repairing, and I had pieces of equipment

4    such as Joel mentioned -- the drag that I

5    needed built.  And he brought to the -- to

6    the plantation skills that I didn't have

7    in anybody else.

8         Q    What kind of welding does

9    Chance do?

10        A    Well, as Joel described, he

11   repairs just about any type of equipment.

12   I'm sorry.

13        Q    What kind of welding do you

14   call it?

15        A    Wire welding is what Joel

16   mentioned.

17        Q    Okay.  Do you have to have any

18   kind of training to do wire welding?

19        A    Training?  Certainly.

20        Q    Can you -- have you ever --

21        A    As far --

22        Q    -- wire welded?

23        A    I have.  Only because --

**www.AmericanCourtReporting.com**
**September 8, 2006**

Page 141

1　　　　Q　　Anybody can do it, can't

2　they?

3　　　　A　　No.　Only because Chance

4　stayed there with me and showed me how to

5　do it.

6　　　　Q　　Oh, okay.

7　　　　A　　It's not something you'll pick

8　up and just do at the drop of a hat and do

9　a good job of it.

10　　　　Q　　All right.　Has Norris Foster

11　welded pieces of equipment before?

12　　　　A　　Not to my knowledge.

13　　　　Q　　Made repairs using a welder?

14　Has he done that?

15　　　　A　　Who?

16　　　　Q　　Norris.

17　　　　A　　Not to my knowledge.

18　　　　Q　　Okay.　Okay.　So -- so you

19　claim that all these three guys had

20　specialties?

21　　　　A　　They had things that they were

22　proficient at that I needed, if you want

23　to call it a "specialty."　Some --

Page 142

1    something that they could do that I didn't

2    have a person here that was good at doing

3    it, and I needed to add people to my

4    staff.  And -- so I chose those people at

5    that time because they had those qualities

6    that I needed.

7         Q    Did you list every reason --

8    have we discussed every reason that they

9    were paid more than Norris Foster?

10        A    I mean, I -- I didn't set

11   Norris' pay rate.

12        Q    Well, who repaired the

13   equipment before Chance was hired?

14        A    Well, most all of it was done

15   by Roy Lee, with the help of his folks.

16   But Roy Lee was the one that was in charge

17   of it.  As a matter of fact, we mentioned

18   operating heavy equipment.  To my

19   knowledge, the only person here that

20   operated any heavy equipment was Roy Lee.

21   His crew was with him, but he was always

22   running -- running the equipment.

23        Q    Could -- have you ever seen

Page 145

1   we were talking about that didn't have a

2   driver's license?

3          A       Turned out he didn't have a

4   driver's license.

5          Q       And he was stealing gas?

6          A       That's correct.  He was fired

7   for it.

8          Q       He was hired as a general

9   laborer, wasn't he?

10         A       And a night watchman.

11         Q       And a night watchman.  Okay.

12  You were going to pay him more; that is,

13  you were going to provide him with a place

14  to live, weren't you?

15         A       I was going to compensate him

16  for the extra work that he was going to do

17  for me.

18         Q       What special skills did he

19  have, Brother Man?

20         A       For being a night watchman and

21  being available to do those things for me.

22         Q       Okay.  Does that require a

23  special skill?

Page 146

1           A       It requires being here after

2       hours.

3           Q       Okay.  So he didn't have any

4       special skills, did he?  And you paid him

5       eight dollars an hour as a general

6       laborer; correct?

7               MR. DUKES:  Object to the

8       form.

9           A       I didn't pay him eight dollars

10      an hour for general labor.  I paid him

11      compensation for general labor and for

12      being a night watchman.

13          Q       Oh, you're saying you're

14      paying him more because he was a night

15      watchman?

16          A       I was paying him a different

17      rate because of what he was doing for me.

18          Q       Okay.  Did you ever give

19      Norris -- after you fired Mr. Beckwith,

20      Brother Man, did you ever give Norris an

21      opportunity to make eight dollars an hour

22      as a night watchman?

23          A       No, I didn't.



## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| JEFFREY HARRIS, | ) | |
| WILLIE BERNARD MACK, | ) | |
| DEMETRIUS PARHAM and | ) | |
| HENRY TARVER, | ) | |
| | ) | **CIVIL ACTION NO.:** |
| **Plaintiffs,** | ) | **2:06-CV-00875-ID-CSC** |
| | ) | |
| vs. | ) | |
| | ) | |
| MID STATE LAND & TIMBER | ) | |
| COMPANY, INC., D/B/A | ) | |
| SEDGEFIELDS PLANTATION, | ) | |
| | ) | |
| **Defendant.** | | |

### AFFIDAVIT OF DAVID CARROLL

| | |
|---|---|
| STATE OF ALABAMA | ) |
| | : |
| COUNTY OF BULLOCK | ) |

Before me, the undersigned notary public in and for said county and state, personally appeared David Carroll, who being known to me and who being first duly sworn, deposes oath and states as follows:

1.    My name is David Carroll. I am over the age of nineteen years and am suffering from no legal disability. I am currently the general manager for Sedgefields Plantation (Sedgefields") which is owned by Tolleson Land & Timber. I was previously employed by Mid State Land & Timber Company, Inc. ("Mid State") from April 2005 through May 19, 2006 as the general manager for Sedgefields before the plantation was purchased by Tolleson. This affidavit is based upon my personal knowledge.

2.     Mid State owned, until its sale in May 19, 2006, Sedgefields.  It is my understanding that Sedgefields was developed by the Maytag family in the early 1930's and has a rich tradition for quality quail hunting.  As a testament to this tradition, Sedgefields continues to host the National Amateur Free For All Championship for bird dogs.

3.     Despite its fabled quail hunting past and its continued association with National Field Trials, the Sedgefields property for several years prior to my employment at Sedgefields had not been properly cultivated and managed for wild quail covies, resulting in a reduction in its wild quail population and creating a lack-luster quail hunting experience.  It is my understanding from speaking with people who had previously hunted the property that Mid State was utilizing "put and take birds" for its quail hunts for several years prior to my arrival.  That is, Mid State was putting pen raised birds in the fields at pre-determined locations to be hunted later that day.  Hunting "put and take" birds does not create as much of an enjoyable quail hunting experience as hunting pre-released birds (i.e. birds that have been released months in advance) or birds from preexisting wild covies.  Mid State, prior to my arrival, had begun to lose its luster as a renown quail hunting destination.

4.     To remedy this problem, Mid State sought to hire as a quail operations manager someone with significant experience in quail hunting operations, dog training and handling, and land cultivation for wild quail covies.  I was in charge of finding a quail operations manager for Mid State and was responsible for the hiring of Joel Norman ("Norman") as the quail operations manager for Sedgefields.  Mid State hired Norman from the Mill Pond Plantation in Thomasville, Georgia, an area renown around the world for superior quail hunting, to cultivate and manage the land at Sedgefields for wild quail habitation and to return Sedgefields to its former prominence as a top rate quail hunting destination.  Norman told me that it would take $70,000 to leave Mill Pond and to come to Sedgefields.  We hoped that Norman's quail hunting customers from Mill Pond would

follow him to Sedgefields and increase our customer base. I recommended to Mid State that Mid State pay Norman $70,000. Prior to coming to Sedgefields, Norman had twenty-seven years of bird dog training and handling experience and twenty-four years of experience of working on quail hunting operations, the last seven years of which he was the plantation manager. In addition to his work experience, Norman had a two year associate degree in wildlife management.

5.      While Roy Lee ("Lee") was a good employee, he did not have the quail hunting experience, the bird dog training and handling experience, the wildlife management and cultivation experience, or education that I was looking for in a quail operations manager. I thought that Norman was more qualified for the quail hunting operations manager position than Lee. Further, it was a priority for Sedgefields to rejuvenate its quail hunting tradition. Sedgefields did not have with deer hunting the long tradition and reputation that it had in quail hunting, and the deer operations at Sedgefields did not need the overhaul that the quail hunting operations required at that time. The quail operations manager position and the deer operations manager position require different qualifications and experiences and have different job duties and responsibilities.

FURTHER AFFIANT SAITH NOT.

Executed this ⁷ᵗʰ day of February, 2007.

_____
David Carroll

STATE OF ALABAMA          )
                          :
COUNTY OF BULLOCK         )

I, the undersigned authority, a Notary Public in and for said County in said State, hereby certify that David Carroll whose name is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that being informed of the contents of the said instrument, ____ executed the same voluntarily on the day the same bears date.

GIVEN under my hand and seal this 7 day of Feb , 2007.

[NOTARIAL SEAL]

_____
Notary Public

Print Name Denise Pierce

My Commission Expires: 9/20/08



IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JEFFREY HARRIS,<br>WILLIE BERNARD MACK,<br>DEMETRIUS PARHAM and<br>HENRY TARVER,<br><br>    Plaintiffs,<br><br>vs.<br><br>MID STATE LAND & TIMBER<br>COMPANY, INC., D/B/A<br>SEDGEFIELDS PLANTATION,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION NO.:<br>2:06-CV-00875-ID-CSC |

## SECOND AFFIDAVIT OF DAVID CARROLL

STATE OF ALABAMA    )
                       :
COUNTY OF BULLOCK    )

    Before me, the undersigned notary public in and for said county and state, personally appeared David Carroll, who being known to me and who being first duly sworn, deposes oath and states as follows:

    1.    My name is David Carroll. I am over the age of nineteen years and am suffering from no legal disability. I am currently the general manager for Sedgefields Plantation ("Sedgefields") which is owned by Tolleson Land & Timber. I was previously employed by Mid State Land & Timber Company, Inc. ("Mid State") from April 2005 through May 19, 2006 as the general manager for Sedgefields before the plantation was purchased by Tolleson. This affidavit is based upon my personal knowledge.

    2.    Horses were brought back to the barn in preparation for hunting season in late

September or early October 2005. Other than myself, Joel Norman, the quail operations manager, and Denise Pierce, the office manager, there were no other white employees at Sedgefields from September 27, 2005, when William Beckwith was terminated, until November 21, 2005.

3.    When I was hired to work for Mid State in April 2005, my first months were spent assessing the more twenty square miles of property to ascertain what needed to be done with the property. While making this assessment, I utilized the existing staff and did not make any new hires except for my hiring of Corey Balkcam. Mr. Balkcam was hired in May 2005, at the request of Roy Lee, to meet the immediate need for assistance with mowing the fields and handling ground maintenance in the coming summer months. I based my hiring decisions for Mid State upon what I believed to be Mid State's immediate needs at the time and an individual's ability to meet those needs. Mr. Balkcam worked a couple of weeks and then quit. After Mr. Balkcam quit, I hired Henry Tarver in June 2005 to perform ground maintenance. William "Brother Man" Beckwith was hired on July 25, 2005 to work as a laborer and night watchman. On September 6, 2005, I hired Jeffrey Harris. Shortly thereafter, on September 19, 2005, Joel Norman was hired to be the quail operations manager. A week or so after Mr. Norman was hired, I terminated the employment of Mr. Beckwith. On or about November 21, 2005, I hired Joseph May and Will Hubbard. Norris Foster was terminated on December 28, 2005. On December 29, 2005, Mr. May voluntarily quit and Mr. Harris was injured and never returned to work at Sedgefields. Chance Hamm was hired in January 2006 to work at Sedgefields. After Mr. Hamm's hiring in January 2006, Mid State did not hire any new employees for Sedgefields.

4.    None of the white employees at Sedgefields who were hired in late 2005 received a pay raise in 2006. All of the black employees received a raise on January 1, 2006, including Willie "BB" Mack who received a raise to $8.00 per hour (from his previous rate of $7.50 per hour) and Jeffrey Harris, Henry Tarver, and Demetrius Parham who received raises to $7.50 per hour.

5.    Mid State has never retained an employee who, like Norris Foster, failed to perform assigned tasks, failed to follow directives about performance, ignored the procedures and policies concerning tips, and displayed a negative attitude.

FURTHER AFFIANT SAITH NOT.

Executed this 3 rd day of _April_, 2007.

_____
David Carroll

STATE OF ALABAMA          )
                          :
COUNTY OF BULLOCK         )

I, the undersigned authority, a Notary Public in and for said County in said State, hereby certify that David Carroll whose name is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that being informed of the contents of the said instrument, _____ executed the same voluntarily on the day the same bears date.

GIVEN under my hand and seal this 3nd day of _April_, 2007.

[NOTARIAL SEAL]

_____
Notary Public

Print Name _Ronda G. Keiser_

My Commission Expires: _____

NOTARY PUBLIC STATE OF ALABAMA AT LA
MY COMMISSION EXPIRES: Apr 30, 2
BONDED THRU NOTARY PUBLIC UNDERWRI

40459



## FREEDOM COURT REPORTING

Page 1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF ALABAMA

3    NORTHERN DIVISION

4

5    CASE NUMBER: 2:06-CV-875-ID

6    JEFFREY HARRIS, et al.,    **ORIGINAL**

7            Plaintiffs,

8            vs.

9    MID STATE LAND & TIMBER CO., INC.,

10    d/b/a SEDGEFIELDS PLANTATION,

11            Defendant.

12

13    S T I P U L A T I O N

14    IT IS STIPULATED AND AGREED by and

15  between the parties through their respective

16  counsel, that the deposition of Jeffrey

17  Harris may be taken before Angela Smith,

18  RPR, CRR, at the offices of John W. Waters,

19  Jr., at 214 North Prairie Street, Union

20  Springs, Alabama 36089, on the 16th day of

21  January, 2007.

22

23    DEPOSITION OF JEFFREY HARRIS

# FREEDOM COURT REPORTING

Page 30

1      Q.      Have you ever done any other

2   kind of welding, other than wire welding?

3      A.      Yes.  Arc-welding.  That's how

4   I learned.

5      Q.      Okay.  You learned arc welding

6   in shop class?

7      A.      In shop class, right.

8      Q.      And then, where did you learn

9   how to do wire welding?

10      A.      At the grass farm.

11      Q.      Okay.  And someone just taught

12   you?

13      A.      Well, yeah.

14      Q.      Who taught you?

15      A.      His name is Seale Campbell.

16      Q.      Okay.  What kind of mechanic

17   work?

18      A.      Well, I worked on, like, small

19   things on tractors.  And mostly that mower

20   maintenance and hay stackers and hay balers,

21   anything that had to do with cutting that

22   grass, reel mowers.  Do you know what a reel

23   mower is?

## FREEDOM COURT REPORTING

Page 37

1    Q.    In other words, worker's comp

2  insurer is not paying for your current

3  medical treatment?

4    A.    Right.

5    Q.    Okay.  And when did you settle

6  that worker's comp case?

7    A.    I can't remember the exact

8  dates, but it was sometime in late 2002 or

9  early 2003.

10    Q.    Okay.  What was your next job

11  after Winn Dixie?

12    A.    At Mid State Land and Timber.

13    Q.    Okay.  And when did you start

14  working there?

15    A.    I believe it was, like,

16  September.

17    Q.    September 6, 2005?

18    A.    Something like that.

19    Q.    And then you got hurt again,

20  like, December 30, 2005; is that right?

21    A.    Yes.

22    Q.    And you filed a worker's comp

23  claim with regards to that injury; correct?

## FREEDOM COURT REPORTING

1      Q.      Okay.  When did that stop?

2      A.      Maybe two months ago, three.

3      Q.      Okay.  I don't know anything

4  about worker's comp.  I know a little bit

5  about a Volkman machine, but I don't know

6  anything about workman's comp.  Why did it

7  stop?

8      A.      Well, one of the doctors that

9  I was going to see released me back to

10 preinjury status.

11     Q.      Okay.

12     A.      Basically saying that there, I

13 guess, wasn't nothing else he could do for

14 me.

15     Q.      Okay.  And who was that?

16     A.      Dr. Pirofsky.

17     Q.      Where is he located?

18     A.      In Montgomery.

19     Q.      Have you worked anywhere since

20 December 30, 2005?

21     A.      No.

22     Q.      Have you been drawing -- Since

23 your worker's comp stopped, have you been

# FREEDOM COURT REPORTING

1    A.    For a bird hunt.

2    Q.    -- for a bird hunt?

3    A.    Yeah.  Okay.

4    Q.    Is that right?

5    A.    Yes.

6    Q.    All right.  So, Norris told

7  you that Mid State was looking for someone

8  to drive a tractor; is that right?

9    A.    Yes, yes.

10    Q.    What did you do next to follow

11  up on that?

12    A.    I -- What did I do first?  I

13  asked him -- He told me that Roy Lee was

14  doing the hiring.

15    Q.    Uh-huh.

16    A.    But I talked to Roy Lee, and

17  Roy Lee told me to talk with David.

18    Q.    Okay.  David Carroll?

19    A.    Yes.

20    Q.    Did Norris say:  Man, this is

21  a good job or something like that?

22    A.    Yeah.  Norris said he enjoyed

23  the job, you know what I'm saying?  He said

# FREEDOM COURT REPORTING

Page 48

1    I would enjoy it.

2         Q.    And did you go up and see

3    David?

4         A.    Yes.

5         Q.    And what did you tell David

6    when you came in the door?

7         A.    Well, I told David that, you

8    know, I was looking for a job.  You know, I

9    was a good man.  I would do exactly what

10   they needed done, you know what I'm saying?

11   I figured it was just only tractor work at

12   first, like cutting grass and stuff.  So I,

13   you know, went on and took the job.

14        Q.    Okay.  Is that what David said

15   he was looking for?

16        A.    Well, he really didn't tell me

17   what exactly he was looking for, you know

18   what I'm saying?

19        Q.    Okay.

20        A.    I guess they was just looking

21   for someone, you know, to work.

22        Q.    Okay.  But you understood the

23   job would be to drive a tractor?

# FREEDOM COURT REPORTING

Page 49

1      A.      Yes.

2      Q.      Okay.  And did you fill out an

3  application?

4      A.      Yes, I did.

5      Q.      And when did Mr. Carroll offer

6  you the job after you spoke with him?

7      A.      I think it was, like, two to

8  three days later, he gave me a call and told

9  me to come on in.

10     Q.      Did y'all ever talk about pay?

11     A.      If we did, it wasn't, you

12  know, stressed out about it.  You know what

13  I'm saying?  We talked about it a little

14  bit.  And whatever it was, I accepted it,

15  you know what I'm saying, if we did talk

16  about it.

17     Q.      Okay.  You don't even remember

18  if you talked about it?

19     A.      Right.  I don't really

20  remember if we talked about that.

21     Q.      But at some point, a number

22  came up and you said:  Okay?

23     A.      Yeah.  And I went on and

# FREEDOM COURT REPORTING

Page 51

1      Q.      Okay.  Now, the second page,

2   which begins -- which is Document Number 58,

3   is everything in there, is that your

4   handwriting?

5      A.      Yeah.  Yes.

6      Q.      Okay.  And when did you

7   complete the application, when you -- did

8   you complete it when you first came to speak

9   with Mr. Carroll?

10     A.      I'm not sure.

11     Q.      Okay.  Or did you take it home

12   with you?  Do you remember?

13     A.      No, I don't.

14     Q.      Okay.  But you had plenty of

15   time to complete the application?

16     A.      Yeah.

17     Q.      Okay.

18     A.      I would say.

19     Q.      All right.  You have here some

20   military experience.

21     A.      Yep.

22     Q.      Did you work in the -- Were

23   you in the National Guard?

# FREEDOM COURT REPORTING

Page 55

1  this right here (indicating).

2       Q.       Right.

3       A.       I didn't write that.

4       Q.       Okay.  But, I mean, is it true

5  and correct, to the best of your knowledge

6  and belief, even though you didn't write it?

7  Is there anything wrong on it?

8       A.       No.  Everything is correct.

9       Q.       Okay.  When you first started

10 working at Mid State on September 6, 2005,

11 who did you report to?

12      A.       Roy, and Mr. Carroll.

13      Q.       Mr. who?

14      A.       Mr. Carroll.

15      Q.       Oh, okay.  And did they give

16 you an assignment at that point, tell you

17 what you would be doing?

18      A.       Well, Roy did.

19      Q.       Okay.  What did Mr. Lee tell

20 you?

21      A.       Well, he basically told me I

22 was going to be mowing grass, cutting around

23 there with the Weed Eater, most of the time,

## FREEDOM COURT REPORTING

Page 56

1    until hunting season start.

2         Q.    And then what would you be

3    doing?

4         A.    I would be helping with some

5    kind of hunts, in some kind of way.

6         Q.    Okay.

7         A.    Which I remind you, I didn't

8    know anything about that until I talked to

9    Roy, about hunting and all of that.

10         Q.    You didn't know that was going

11    to be part of the job?

12         A.    Right.  I didn't.

13         Q.    Okay.  Let me go back to when

14    you were talking with Mr. Carroll.  How long

15    did that conversation take place, when you

16    first spoke with Mr. Carroll about, you

17    know, working at Mid State?

18         A.    Anywhere from ten to fifteen

19    minutes.

20         Q.    And what did you tell him

21    about your -- You said you're a hard worker,

22    good worker?

23         A.    Yeah.  Basically.

## FREEDOM COURT REPORTING

Page 57

1    Q.      Anything else?

2    A.      Well, he asked me about the

3    marijuana possession.

4    Q.      Okay.

5    A.      And I told him I was through

6    with that and it was behind me and in the

7    past, you know what I'm saying?  He said:

8    Well, I'll give you a call in a couple of

9    days.

10    Q.      Okay.  Did you tell him

11    anything about any special skills that you

12    had?

13    A.      No, I didn't.

14    Q.      Okay.  Did you ever tell him

15    about any special skills that you had?

16    A.      Well, I told Joel and Roy.

17    Q.      Okay.  What did you tell Joel

18    and Roy about any special skills you had?

19    A.      Well, I told Joel I could weld

20    and fix, you know, on most of those outside

21    equipment that they had over there,

22    especially the Bush Hogs and stuff like

23    that, because I had worked with that

# FREEDOM COURT REPORTING

Page 61

1    Lee, you know, about those skills that you

2    had.

3         A.    I ain't going to be able to

4    remember exactly how we put it, because it

5    wasn't a thing like he was asking me did I

6    know how to do it, it was just, you know,

7    friendly conversation as we would speak.

8         Q.    Okay.  And what did Roy say in

9    response?

10         A.    He said that was good, and

11    we'll try to -- you know, what I'm saying?

12    If we have something, you know, that you can

13    do, we'll let you try it out and see what's

14    going on.

15         Q.    Okay.  Did you have any other

16    conversations with Roy about any special

17    skills or other skills that you had?

18         A.    No.

19         Q.    Okay.  Do you know if -- Do

20    you have any personal knowledge -- Or do you

21    have any knowledge, firsthand or secondhand,

22    whether Roy Lee or Joel Norman communicated

23    any of those conversations that you had with

## FREEDOM COURT REPORTING

Page 62

1    them, to Mr. Carroll?

2         A.     No, I don't have anything that

3    would tell me that.

4         Q.     Okay.  All right.  When you

5    started working as a tractor driver at

6    Sedgefields, you started working with

7    Mr. Lee; is that correct?

8         A.     Yeah.

9         Q.     And what were you doing?

10        A.     We were mowing grass and

11   Weedeating.

12        Q.     Okay.

13        A.     Fix a fence every now and

14   then.  Little stuff like that.

15        Q.     You weren't chopping fields at

16   that time?

17        A.     No.

18        Q.     Okay.  When did Mr. Norman get

19   hired on, if you recall, at Mid State?

20        A.     I'm not sure, but it probably

21   like a month, maybe two months or a month

22   and a half after I got there.

23        Q.     Okay.

## FREEDOM COURT REPORTING

Page 66

1  Mr. Norman until the time that you were

2  injured, did they ever change?  You said

3  they changed, you know, when Mr. Norman

4  came, that you were taking care of the

5  horses, cleaning the wagons, getting things

6  ready for the hunts, chopping the fields.

7          A.      Right.

8          Q.      Did those job duties ever

9  change?

10         A.      No.

11                         (Defendant's Exhibit 2 was

12                         marked for identification

13                         purposes.)

14         Q.      Okay.  Let me show you a

15  document that I'll identify as Defendant's

16  Exhibit 2, which is a three-page document.

17  If you'll take a look at that and let me

18  know when you're through.

19         A.      I was hired at seven dollars,

20  not seven-twenty-five.

21                         (Off-the-Record discussion

22                         was held.)

23         A.      Where it says:  Initially I

# FREEDOM COURT REPORTING

Page 79

1       A.    What you talking about, like

2  this (indicating)?

3       Q.    Yes, sir.

4       A.    No.  Not with everybody's name

5  on it.  I seen some stuff where they sent to

6  me with my name on it.

7       Q.    Okay.  You believe that you

8  were discriminated against on the basis of

9  your race; is that correct?

10      A.    Yes.

11      Q.    Tell me everything that serves

12 as the basis for that belief.

13      A.    Well, I heard Joel say when we

14 was trying to get off for Homecoming that,

15 you know, he threatened my job, he told me

16 he was going to get some white boys or

17 either some Mexicans, some people that

18 wanted to work.  Those are his exact words.

19      Q.    Okay.

20      A.    I overheard him saying he

21 wanted to replace the black crew, with

22 whites.  I overheard that.  And he told me

23 to my face that he had never seen a black

# FREEDOM COURT REPORTING

Page 80

1    man so concerned with his -- about money,

2    concerned with my tips, when I asked him for

3    my tips.

4          Q.      Okay.

5          A.      Said he worked on several

6    plantations where they had black people, but

7    no black guides.  And he's worked with black

8    people and he don't see what our problem is,

9    you know, stuff like that.

10          Q.      Okay.  How else do you believe

11   that you were discriminated against based on

12   -- what serves the basis for your belief

13   that you were discriminated against on the

14   basis of your race?

15          A:      Well, I'm an experienced, you

16   know, person in that field, as far as

17   tractors and feeding dogs and feeding

18   horses.  And I felt like my experience

19   should have overshadowed Will Hubbard and

20   Joseph Mays, being that they was only kids.

21                  Not to put nobody else down,

22   but, you know --

23          Q.      Sure.  You're talking about as

# FREEDOM COURT REPORTING

Page 81

1    to pay?

2          A.      Right.

3          Q.      Okay.

4          A.      I don't care what you pay

5    them, but pay me right, too.

6          Q.      How -- Let me ask the question

7    this way.  How else do you believe that you

8    were discriminated against on the basis of

9    your race?

10          A.      And then after we taught them

11    how to drive them tractors, me and Norris

12    was shoveling horse -- you know what I mean.

13          MR. ROBERSON:  Manure.

14          A.      Right.  I didn't want to say

15    that on the Record, but you know what was

16    going on.  And that's basically what I did

17    every day.

18          Q.      Okay.  How else do you believe

19    you were discriminated against on the basis

20    of your race?

21          A.      The things he told -- Yeah.

22    He told us that we couldn't go to town in

23    the truck.  Told me and BB we couldn't go

# FREEDOM COURT REPORTING

1    that later. Okay? I just want to know what

2    you know. Okay?

3         A.      Uh-huh.

4         Q.      What you've seen or heard.

5    Okay?

6         A.      Right.

7         Q.      Hot lunches. Now, tell me

8    about the hot lunches, what the problem was

9    there.

10        A.      Once a week, everybody on the

11   farm, well, I don't know if Mr. Carroll was

12   involved, or how they did it, but we paid --

13             THE WITNESS: What it was,

14   five, six dollars?

15             MR. TARVER: Five, five or

16   six.

17             MR. ROBERSON: You all can't

18   have no help from the studio.

19        A.      Five dollars, I'm going to say

20   five dollars, you know what I'm saying,

21   every week, and the girls went to town, the

22   cooks, and got us something to eat, prepared

23   us hot a lunch once a week, on a Thursday or

# FREEDOM COURT REPORTING

Page 86

1   a Friday.  You know, whenever the work was

2   slowed down for that week, you know, we had

3   a hot lunch.

4            Q.      Okay.

5            A.      He took that completely away.

6            Q.      Okay.  Who participated in

7   that hot lunch?

8            A.      As far as I know, everyone.

9            Q.      Okay.

10           A.      Everybody ate.  I don't know

11   about the money passing hands, but everybody

12   came and ate.

13           Q.      Okay.  All right.  And when

14   you mean everybody --

15           A.      I mean David, I mean Denise, I

16   mean, anybody.  Anybody that was there, they

17   came and ate.

18           Q.      Okay.  And Mr. Norman cut that

19   -- Or Joel Norman cut that out?

20           A.      Yeah.  Well, I don't know if

21   he stopped it his self, but when he got

22   there, that stopped.

23           Q.      Okay.  Now, the ice cooler,

## FREEDOM COURT REPORTING

1    you said that I think Mr. Norman said you

2    couldn't go to the lodge --

3         A.    -- to get ice.

4         Q.    Okay.

5         A.    That's where the ice machine

6    was.

7         Q.    Right there in the kitchen?

8         A.    Yeah.

9         Q.    And who did he stop from

10   getting ice, all the field laborers?

11        A.    Yeah.

12        Q.    Okay.  And when did he stop

13   that?

14        A.    I can't tell you the exact

15   date.

16        Q.    Well, I mean was it -- how

17   soon after he got there?

18        A.    It was right after he got

19   there, two or three weeks, maybe a month.

20        Q.    Okay.  All right.  Now, going

21   to town in a truck, when did Mr. Norman stop

22   -- Did you used to go into town for lunch in

23   the company truck?

## FREEDOM COURT REPORTING

Page 88

1    A.    Yeah.  Not all the time, but

2  if, you know, we didn't bring a lunch or

3  something like that, me and BB would go to

4  town and get us something to eat and come

5  back.

6    Q.    Okay.  Would you clock out to

7  do that?

8    A.    Yes.

9    Q.    Okay.  And when did Mr. Norman

10  put a stop to that practice?

11    A.    Like I said, about a month,

12  month and a half, all that stuff, you know,

13  started right around the same time, where he

14  went to doing all that.

15    Q.    About a month and a half after

16  he got there?

17    A.    About a month, maybe sooner.

18    Q.    Okay.

19    A.    I'm not quite sure.

20    Q.    Okay.  Are you okay?

21    A.    Yeah.

22    Q.    Do you need to take a break

23  and walk around?

# FREEDOM COURT REPORTING

Page 90

1    and doing.

2         Q.      Uh-huh.  And you never talked

3    to Joseph or Will about it?

4         A.      No.

5         Q.      Okay.  Did you talk -- Do you

6    know why -- Did they go into town for any

7    other reason, to your knowledge?

8         A.      They probably went to get

9    parts, too, also.

10        Q.      Okay.

11        A.      You know, something of that

12   nature.  Probably one of them needed to pay

13   a bill.  I'm not sure the real reason why

14   they went, but I know they come back with

15   McDonald's sacks, so that's lunch, to me.

16        Q.      Did Joel Norman see them with

17   the McDonald's sack?

18        A.      Well, I don't know if he seen

19   them, but he sent them.  Do you understand

20   where I'm coming from?

21        Q.      To get him lunch, too?

22        A.      No.  He sent them wherever

23   they had to to, I guess, you know what I'm

## FREEDOM COURT REPORTING

Page 91

1  saying?  Because they wouldn't just jump in

2  the truck to go anywhere.  He probably sent

3  them.

4      Q.    Do you know if Mr. Norman knew

5  that they stopped and got lunch?

6      A.    Yeah.

7      Q.    How do you know that?

8      A.    I'm quite sure.

9      Q.    How are you quite about that?

10     A.    Because we all sat down right

11 up under that tree and ate lunch together.

12 And everybody would come back, you know,

13 right before lunch.  You know, everybody had

14 to meet at that time clock.

15     Q.    Okay.

16     A.    So he knew.

17     Q.    Was he there and saw them with

18 it?

19     A.    Well, he probably didn't saw

20 them with it, but he was right next door, in

21 the house, do you know what I'm saying?

22     Q.    So, you suspect that he would

23 have seen them?

## FREEDOM COURT REPORTING

Page 106

1   A.     No.

2   Q.     Okay. ~~The next category I~~

3   ~~have is pay. And I think you said that you~~

4   ~~should have been paid the same or more, I~~

5   ~~guess, than Will Hubbard and Joseph Mays;~~ is

6   ~~that correct?~~

7   A.     ~~Yes, that's correct.~~

8   ~~Q.     Is there any other white~~

9   ~~person that you believe that you should have~~

10  ~~been paid the same as or more than,~~ that

11  ~~worked at Sedgefields, or Mid-State~~?

12  ~~A.     Yeah. Bill Beckwith, Brother~~

13  ~~Man.~~

14  Q.     Brother Man. Okay. Brother

15  Man worked as a laborer and a night

16  watchman, did he not?

17  A.     Yes.

18  Q.     You didn't do any night

19  watchman work, did you?

20  A.     No. But I would have. I

21  stayed, like, ten miles from Sedgefields, so

22  it wouldn't have been a problem for me to do

23  that.

# FREEDOM COURT REPORTING

1    Q.    Okay. Joseph Mays, he was

2   hired a little over two and a half months

3   after you, is that right, and same with Will

4   Hubbard?

5    A.    Will and Joseph, they were

6   hired around about the same time, yeah, I'll

7   say that.

8    Q.    I have November 21, 2005. Do

9   you have any reason to dispute that hire

10   date for both of those individuals?

11    A.    No, I don't.

12    Q.    Joseph Mays, I understand,

13   worked -- did some trapping; is that

14   correct?

15    A.    Yes.

16    Q.    Do you have any trapping

17   experience?

18    A.    Yes.

19    Q.    Okay. Have you ever done any

20   trapping at Mid State?

21    A.    No.

22    Q.    Okay. What kind of trapping

23   experience do you have?

# FREEDOM COURT REPORTING

Page 108

1    A.    Well, I trapped foxes, I

2  trapped coons, possums, trying to get them

3  off my granddaddy's land, all kind of stuff.

4    Q.    Did you ever tell anybody

5  about your trapping experience?

6    A.    No.  See, that wasn't designed

7  to what I was coming to work there for, you

8  know.

9    Q.    Okay.  Will Hubbard, I

10  understand, had some equipment -- heavy

11  equipment experience with skidders.  Did you

12  ever do any work with any skidders?

13    A.    Me?

14    Q.    Yeah.

15    A.    No.

16    Q.    Okay.  Do you know if any of

17  those fellows, Joseph Mays or Will Hubbard,

18  got a pay raise on January 1, 2006?

19    A.    I don't know.  I don't know.

20    Q.    Okay.  Do you know anything

21  about Joseph's or Will Hubbard's -- Joseph

22  Mays' or Will Hubbard's education?

23    A.    Not really.  No more than what

# FREEDOM COURT REPORTING

Page 109

1  I've heard.

2        Q.      Do you know anything about

3  their prior work experience?

4        A.      No more than what I've heard.

5        Q.      Okay.  Who told you what

6  you've heard?

7        A.      Well, I think -- Which one his

8  name?  Will told me, said he worked

9  somewhere.  I ain't familiar with what he

10  said.  He said he did some work with some

11  horses, you know, for some people that --

12  You know, he did work with horses.

13        Q.      Okay.  Do you have any

14  personal knowledge about any special skills

15  that they may have?

16        A.      No.

17        Q.      Okay.  I think it was BB who

18  told me, when I spoke to him, that

19  Mr. Carroll treated him well.  And I don't

20  mean to mischaracterize any deposition

21  testimony, but -- Well, anyway, from what I

22  understand, people who I spoke with, no one

23  had a gripe with Mr. Carroll.  Do you have

# FREEDOM COURT REPORTING

Page 110

1  any gripes with Mr. Carroll?

2          A.      No, I don't.

3          Q.      Okay.  Did he always treat you

4  fairly, as far as you knew?

5          A.      Yes, as far as I know.

6          Q.      Okay.  Now, when you were

7  working for Mr. Norman, I think you said

8  your job duties --

9                          (Off-the-Record discussion

10                          was held.)

11         Q.      You were working with the

12  horses, cleaning the wagons, chopping

13  fields, and getting ready for the hunting

14  season?

15         A.      And every other week, feeding

16  dogs.

17         Q.      And feeding the dogs?

18         A.      Uh-huh.

19         Q.      And then when -- When did --

20  I'm not much of a hunter.  Okay?  When did

21  the hunting season begin at Mid State that

22  year, if you recall?

23         A.      If I'm not mistaken, I think

# FREEDOM COURT REPORTING

1    it's October, end of September, October.

2         Q.      Okay.  So, there was a lot to

3    do to get the place ready for hunting?

4         A.      Yeah.

5         Q.      And if Mr. Carroll says the

6    date is October 15th, would you have any --

7    do you have any reason to dispute that date?

8         A.      No, I don't.

9         Q.      Okay.

10        A.      Seems like that's about right.

11        Q.      So, on October 15th, did you

12   go out on the first hunt?

13        A.      Yes.

14        Q.      Okay.  And what were your

15   duties on the hunt?

16        A.      I dressed those mules up and

17   get them ready, and get the wagon ready for

18   the guests.  And, basically, I stay on that

19   wagon until everything is over.

20        Q.      Okay.  When was the last hunt

21   in 2005, do you recall?

22        A.      I don't recall that.

23        Q.      Mr. Carroll says about the

## FREEDOM COURT REPORTING

Page 116

1    Q.    Okay.  You weren't doing that

2    on the weekends, though, were you?  My point

3    is, you'd do it two to three times a week,

4    probably?

5    A.    I'm trying to think, have I

6    done it on the weekends.  No.

7    Q.    My point is, you would

8    completely clean it out, I think is what

9    you're telling me, two to three times a

10    week?

11    A.    Yes.

12    Q.    And before Joseph and Will got

13    there, it was you, BB and Norris that did

14    that?

15    A.    And Norris, yeah.

16    Q.    Okay.

17    A.    Them guys -- That one help

18    too, Demetrius done help us clean the stall

19    out and so has Doc.

20    Q.    Okay.  Mr. Tarver?

21    A.    Yeah.

22    Q.    Okay.  And then what about

23    Brother Man, did he ever help any?

# FREEDOM COURT REPORTING

Page 117

1      A.      No.

2      Q.      Okay.

3      A.      Brother Man didn't do nothing.

4  Not a blooming thing.

5      Q.      He got fired, didn't he?

6      A.      I think so.

7      Q.      In fact, he got fired right

8  around or soon after you put the --

9      A.      Joel got there.

10      Q.      -- Joel got there and y'all

11  put the horses in the stalls -- in the barn?

12      A.      Yeah.

13      Q.      Okay.  So, he really didn't

14  have an opportunity to clean out the barn,

15  or he didn't have much of an opportunity;

16  right?

17      A.      Right, right.

18      Q.      After you left, do you know

19  who cleaned out the barn?  You and Norris

20  were gone, do you know who cleaned out the

21  barn?

22      A.      No.  I have an idea, though.

23      MR. ROBERSON:  Just answer

## FREEDOM COURT REPORTING

Page 118

1   what you know.

2          Q.      After Will and Joseph started

3   working at Mid State, did you ever chop

4   fields?

5          A.      After they got hired?

6          Q.      Yeah.   Chop fields or do any

7   mowing work?

8          A.      Yeah.   Yes.

9          Q.      Okay.

10         A.      I had to teach them how to

11  chop and what to chop.

12                        (Defendant's Exhibit 4 was

13                         marked for identification

14                         purposes.)

15         Q.      I'm going to show you a

16  document that I will identify as Defendant's

17  Exhibit 4.   I'll give you a chance to look

18  at that, and when you're through, let me

19  know.

20         A.      Let me see that pen so I can

21  circle something --

22         Q.      Well, I don't know if -- If

23  tipping continues to be a problem at the

### 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

**FREEDOM COURT REPORTING**

Page 120

1    came up to you and said -- And I think you

2    talked about a two-day hunt and said:  Hey,

3    I've got you taken care of.

4         A.    Right.

5         Q.    Then you went to Mr. Norman

6    and asked for your tip money and he got mad

7    at you and said something about --

8         A.    Right.  This was before.

9         Q.    Okay.  Did you ever see

10   Mr. Foster, after this memo went out, you

11   know, rub his thumb and, what is this, your

12   forefinger, first thing, whatever, together,

13   and acting like he was wanting a tip from a

14   customer?

15        A.    No.

16             MR. DUKES:  I've got to take a

17   break now.

18             MR. ROBERSON:  Sure.

19                  (Recess taken.)

20        Q.    When you first start bringing

21   the horses into the barn at Mid State,

22   that's right around the time when the hunts

23   start; is that right?

## FREEDOM COURT REPORTING

1      A.      Yes.

2      Q.      Okay.  And while it's warm

3   outside, even during the hunt, sometimes you

4   keep the horses outside; is that correct?

5      A.      Yes.

6      Q.      And you only bring the horses

7   in maybe if it's bad weather?

8      A.      Yes.

9      Q.      Or if there's a hunt the next

10  day and get them rested?

11     A.      Yes.

12     Q.      And so, if they're staying

13  outside, obviously, there's not as much to

14  clean up; is that right?

15     A.      Not as much, yes.

16     Q.      And when they're staying

17  inside, there's more to clean up; is that

18  right?

19     A.      Yes.

20     Q.      And as the year progresses;

21  that is, gets later in the season, the

22  horses are kept more in the barn so there's

23  more to clean up; is that right?

# FREEDOM COURT REPORTING

Page 122

1          A.      Yes.

2          Q.      Do you know of any black

3    employees at Mid State who were similarly

4    situated to you that were treated better?

5          A.      That's similarly situated to

6    me?

7          Q.      Yeah.

8          A.      Now, what's that mean?

9          Q.      Any employee at your same

10   level, or did things similar to you that was

11   treated better than you?

12         A.      No.

13         Q.      Okay.  Do you know of any

14   former employees, black employees at Mid

15   State, who did the same thing you did, but

16   may have been paid more than you?

17         A.      No, I don't.

18         Q.      Do you know of any black

19   employees at Mid State, who did different

20   things, other than Roy Lee, who were paid

21   more than you?

22         A.      No.

23         Q.      Did you ever have any

## FREEDOM COURT REPORTING

Page 123

1   performance issues during your work at Mid

2   State?

3          A.      Performance issues?  Now,

4   you're asking me --

5          Q.      Did you ever get disciplined?

6          A.      Yes.

7          Q.      Okay.  And what were you

8   disciplined for?

9          A.      For scraping up the sides of a

10  few trees.

11                 MR. DUKES:  Off the Record.

12                 (Off-the-Record discussion

13                 was held.)

14         Q.      All right.  Let me get back on

15  the Record.  Try to explain to the jury what

16  you mean by chopping a field for quail

17  hunts.

18         A.      Okay.  You chopped fields so

19  you'll be able to see that bird -- that dog,

20  you know, point that bird.  Basically,

21  that's what it's for.  And to limit the

22  cover, but and also leave some cover for

23  them.

## FREEDOM COURT REPORTING

Page 124

1          Q.      It also gives you a place to

2     walk; right?

3          A.      Right.

4          Q.      Where you don't have to be

5     walking through the sedge?

6          A.      Right.

7          Q.      Or briar bushes or whatever it

8     be in the field; is that right?

9          A.      Right.

10         Q.      When you're chopping, you're

11    chopping these lanes through the fields;

12    right?

13         A.      Yes.

14         Q.      And sometimes the fields

15    aren't just perfect, wide-open fields,

16    there's trees in them; is that correct?

17         A.      Yes, there are.

18         Q.      And when you say you got in

19    trouble for scraping trees, that means --

20         A.      I wasn't in trouble, he just

21    talked to me about it.

22         Q.      He talked to me about it.

23    That means you were driving a tractor with a

# FREEDOM COURT REPORTING

Page 125

1  chopper on the -- What do you call it, on

2  the back?

3          A.      A roller chopper.

4          Q.      A roller chopper on the back?

5          A.      Yeah.  And the corner of the

6  chopper would nick the tree and probably

7  knock off a size probably half the size of

8  this piece of paper, something like that.

9          Q.      Okay.  And why does that --

10  Why does that bother somebody, that you're

11  nicking trees?

12          A.      Well, he said that, which is

13  -- and it's true.  He said that the trees

14  could contract a disease from that.

15          Q.      Right.  And diseased trees

16  will attract, what, pine beetles?

17          A.      I'm not knowing what they

18  would attract, but diseased trees, I would

19  think, would pass on disease to other trees.

20          Q.      Okay.  So, it's best not to

21  chop -- or nick, excuse me, not to nick the

22  trees?

23          A.      Yes.

# FREEDOM COURT REPORTING

1     Q.    And Mr. Norman got on to you?

2     A.    No.

3     Q.    Who got on to you?

4     A.    Mr. David.

5     Q.    Okay. When did he get on to

6 you?

7     A.    I can't remember when exactly

8 it was, but --

9     Q.    In September, October?

10     A.    When did them hunts start, in

11 October?

12     Q.    You agreed with me that

13 October 15 sounded like the right date.

14     A.    Somewhere right along in

15 there, because we was chopping a little

16 before, trying to get ready. So, you know,

17 a little bit before that, before that first

18 hunt.

19     Q.    When do you have to -- When

20 can you stop chopping, roller chopping?

21     A.    When can you stop?

22     Q.    Yeah. When does the sedge

23 stop growing so there's no need to chop

## FREEDOM COURT REPORTING

Page 127

1  anymore, to your knowledge?

2          A.      It doesn't.

3          Q.      It just grows year round?

4          A.      Yeah.  Unless you burn it all

5  off or something like that.

6          Q.      How many times did Mr. Carroll

7  talk to you about nicking trees?

8          A.      Twice.

9          Q.      Okay.  And how far apart were

10  those talks?

11          A.      Maybe three weeks to a month.

12          Q.      Okay.  The first one being in

13  October?

14          A.      Yeah.  Before that first hunt

15  and, you know, little bit after.  Maybe a

16  month interim in between.

17          Q.      So, sometime the first half of

18  October, and then the second time, first

19  half of November, sometime in there?

20          A.      No.  A little bit before

21  October he talked to me the first time, and

22  a little bit in the middle of October was

23  probably the second time.



RECEIVED
SEP 12 2005

# The Peble Corp.

## EMPLOYMENT APPLICATION

*PLEASE PRINT ANSWERS TO THE FOLLOWING QUESTIONS CAREFULLY AND IN INK.  TO BE CONSIDERED FOR EMPLOYMENT, ALL ITEMS MUST BE COMPLETED, INCLUDING SIGNATURE.  THIS APPLICATION IS VALID FOR 30 DAYS.  IF YOU WISH TO BE CONSIDERED FOR EMPLOYMENT AFTER THIS APPLICATION EXPIRES, THEN YOU MUST RE-APPLY.*

NAME Jeffrey Harris                                    TELEPHONE NUMBER

ADDRESS 242 Orchid Ln                        Home # (334) 738-2502

CITY Pitt Patrick  STATE Al  ZIP 36089       Daytime # (    ) -

SOCIAL SECURITY NUMBER 064 -58 -9666

EMPLOYMENT INTERESTS:

Type of work desired Animal Care (feeding & watering) Tractor Operator

Full Time ✓        Part Time_____        Temporary_____

Starting pay expected_____        Date Available to start 8 26 05

---

**IF APPLICABLE:**

Are you willing to travel? Yes  If yes, what percentage of the time 80%

Would you be willing to relocate? No

---

Would you object to:  Irregular work hours ☑ YES  ☐ NO  Night work ☑ YES  ☐ NO

Swing or fluctuating shift work ☑ YES  ☐ NO

SPECIAL SKILLS - COMPLETE IF APPLICABLE TO THE POSITION FOR WHICH YOU ARE APPLYING:

Skill Forklift                        Experience 6 yrs

Skill Bush hog                    Experience 8 yrs

Skill Bush hog maintanace     Experience 3 yrs

Please discuss other specialized skills you feel are pertinent to the job for which you are applying_____

hunting

UNITED STATES MILITARY SERVICE STATUS:

Past Military Service - FROM 1985        TO 1986

Branch National gaurd  Rank on discharge E1        Present Status Same

Last duties and special training

Ammonition Clerk

CONFIDENTIAL
DEFENDANT'S PROD.        0058

**EDUCATION:**

|  | NAME OF SCHOOL AND LOCATION | MAJOR AREA OF STUDY and/or DEGREE RECEIVED |
|---|---|---|
| High School | Bullock co High shooll Sardis Rd | |
| Jr. College, College, or University | None | |
| Technical or Trade Schools | None | |

Honors and Scholarships _None_

Grade Average (approx.) High School _C_ College _____ Other _____

**General Information:**

Are you legally authorized to work in the United States? ☑ YES ☐ NO If not, what is your present status and do you have a work visa? _____

Have you ever been convicted of a crime? ☑ YES ☐ NO If yes, please explain. Give dates, charge, penalty assessed or disposition. Conviction will not necessarily bar employment. Consideration will be given to the nature of the crime, age at the time of offense, rehabilitation and the position for which you are applying.

_Possesion of Mariganas, Misdemeanor 1994 fine paid Rehab 1 yr_

Have you ever been discharged from a job? ☐ YES ☑ NO If yes, please explain _____

Have you ever been bonded? ☐ Yes ☑ NO If yes, when and in what job. _____

CONFIDENTIAL DEFENDANT'S PROD.    0059

Do you have a valid, active driver's license? ☑ YES ☐ NO  Issuing State _A_

Drivers License # _528 7965_ _____ Class of License _Dm_

How long have you been a resident of this City _25 yrs_ _____ State _Al._

How long at your present address? _5yrs_ _____ Give previous address if less than one year at present

address _____

Are you over the age of 18? ☑ YES ☐ NO  If hired can you provide proof of age? ☑ YES ☐ NO

**EMPLOYMENT DATA:**

Have you ever been employed by this company before? ☐ YES ☑ NO   If yes, please give dates of

employment, position employed, and reason for leaving _____

_____

_____

Please list all jobs (if not listed above), beginning with your present or last employer and working backwards
to earlier positions.  Account for all periods, including unemployment, self-employment, and military service.
If additional space is needed, please list on a separate page or on the back of this form.

#1 DATES - From _1999_ _____ to _2001_

    Company Name, City, and State _Winn Dixie  mont._

    Supervisor's Name/Title _Terry_ _____ SALARY - Start _9.50_ End _11.25_

    Phone # _N/A_ _____ May we contact? _Yes_ Final position with the company _loader_

    Reason for leaving? _2 Back Surgerys_

#2 DATES - From _1993_ _____ to _1999_

    Company Name, City, and State _Mr turf  Banks Al._

    Supervisor's Name/Title _Rob Cameron_ _____ SALARY - Start _4.50_ End _8.50_

    Phone # _____ May we contact? _Yes_ Final position with the company _Mower maintance_

    Reason for leaving? _Financial_

#3 DATES - From _1987_ _____ to _1993_

    Company Name, City, and State _National Industries_

    Supervisor's Name/Title _Wendy bronson_ _____ SALARY - Start _4.25_ End _4.75_

    _moved to mexico_

    Phone # _N/A_ _____ May we contact? _Yes_ Final position with the company _Stock man_

    Reason for leaving? _Financial_

CONFIDENTIAL
DEFENDANT'S PROD.    0060

#4 DATES - From_____to_____

Company Name, City, and State_____

Supervisor's Name/Title _____ SALARY - Start _____ End _____

Phone #_____ May we contact?_____Final position with the company_____

Reason for leaving?_____

#5 DATES - From_____to_____

Company Name, City, and State_____

Supervisor's Name/Title _____ SALARY - Start _____ End _____

Phone #_____ May we contact?_____Final position with the company_____

Reason for leaving?_____

PERSONAL REFERENCES (Not Former Employers or Relatives)

| Name and Occupation | Address | Phone Number |
|---|---|---|
| Henry Himmons | Rt 2 Box 9nn Union Springs Al | 334-738-4547 |
| Natan Williams | Adams Ridge | 334-738-5998 |
| | | |

The Peble Corp. is an Equal Opportunity Employer which endeavors, pursuant to all applicable Federal and State Laws, to give every applicant for employment, and every employee, equal consideration in all matters relating to employment, without regard to race, color, sex, age, religion, national origin, citizenship and disability.

..ny signature below, I certify the facts set forth in this application for employment are true and complete to the best of my knowledge and belief, and I agree you may investigate my statements. I agree to permit all past employers to give any information concerning me and release them from liability in furnishing such information. I understand that my employment and, if employed, my continued employment, is conditional upon my participating in and clearing such security examinations or

investigations as may be deemed advisable by the company. I agree to participate in such examinations and investigations when requested to do so by the company, and agree that the company shall be held harmless and free from liability in connection with any security examination or investigation in which I may be involved.

I understand, if employed, false statements on this application shall result in disciplinary action up to and including discharge. Also if employed, I understand that it is the company's policy that all employees who do not have a written employment contract with the company for a specific, fixed term of employment are employed at the company's will. I understand that I would be subject to termination at any time, for any reason, with or without cause or notice.

_____
Applicant's Signature

8-30-05
_____
Date Signed

CONFIDENTIAL
DEFENDANT'S PROD.    0061

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

☆ part · time

Correct
Address



CONFIDENTIAL
DEFENDANT'S PROD.    0062



# FREEDOM COURT REPORTING

1       IN THE UNITED STATES DISTRICT COURT

2       FOR THE MIDDLE DISTRICT OF ALABAMA

3              NORTHERN DIVISION

4

5    CASE NUMBER:  2:06-CV-875-ID

6    JEFFREY HARRIS, et al.,                **COPY**

7            Plaintiffs,

8            vs.

9    MID STATE LAND & TIMBER CO., INC.,

10   d/b/a SEDGEFIELDS PLANTATION,

11           Defendant.

12

13           S T I P U L A T I O N

14       IT IS STIPULATED AND AGREED by and

15   between the parties through their respective

16   counsel, that the deposition of Roy Lee may

17   be taken before Angela Smith, RPR, CRR, at

18   the offices of John W. Waters, Jr., at 214

19   North Prairie Street, Union Springs, Alabama

20   36089, on the 18th day of January, 2007.

21

22           DEPOSITION OF ROY LEE

23

## FREEDOM COURT REPORTING

Page 93

1  in the other horses?

2         A.       No.  When Joel Norman was

3  hired, we pulled the horses off the big

4  pasture and brought them up.

5         Q.       Okay.  And I've got his hire

6  date -- I think it was sometime a little bit

7  later in September of 2005; is that about

8  right?

9         A.       The same month, the 19th, a

10 week or two later.

11        Q.       Okay.  And that's when y'all

12 started bringing the horses in from the

13 pasture?

14        A.       Right.  The rest of them.

15 Because four was already up there.

16        Q.       Okay.  The rest of the horses?

17        A.       Correct.

18        Q.       So, when the rest of the

19 horses -- Well, who was cleaning out the

20 barn --

21        A.       With the four horses up there?

22        Q.       -- with the four horses up

23 there?

# FREEDOM COURT REPORTING

Page 102

1      MR. ADAMS:  You've got Norris,

2  Roy, Denise, Demetrius, BB, Katie Mae Woods,

3  Brenda Tarver, Henry Tarver, then Brother

4  Man and Beckwith, and then Jeffrey Harris

5  and then Joel Norman and then David Carroll.

6      THE WITNESS:  Correct.

7      Q.      So, when Norman is hired,

8  you've got twelve people working out at

9  Sedgefields; is that right?

10      A.      Correct.

11      Q.      Brother Man is fired shortly

12  after Norman gets there; is that about

13  right?

14      A.      Correct.  Correct.

15      Q.      So, you're back down to

16  eleven; is that right?

17      A.      Correct.

18      Q.      And then Joseph Mays and Will

19  Hubbard are hired on November 21, 2005.  Do

20  you have any reason to dispute that date?

21      A.      Correct.  I do.

22      Q.      Oh, you do dispute that?

23      A.      I do dispute that, because,

# FREEDOM COURT REPORTING

Page 103

1    see, when Will Hubbard and Joseph Mays was

2    hired, they was hired -- they told me they

3    wasn't.

4         I come to David at the field

5    trial after they hired, I said:  Who is the

6    guys that Norman was interviewing up there?

7    He said:  Those are some guys he might want

8    to let them work on the weekend.  But, also,

9    David, you told me that Sara Hall wasn't

10   doing no hiring right then at that time, she

11   wouldn't let you hire.

12        So me knowing them two guys --

13   I was at the office when they pulled up.

14   They said:  Well, Roy -- They didn't know my

15   name, they saw it on my shirt, they said:

16   We come after paperwork.  I said:  Some

17   paperwork?  I said:  Are you come looking

18   for application?  They said:  No.

19        I said:  What you need?  They

20   said:  We come to sign up.  We already got

21   the job.  I said:  Really?  I said:  Oh, I

22   thought they wasn't hiring.  I said:  But I

23   don't know, I'll call Denise.

# FREEDOM COURT REPORTING

1           So I called Denise and told

2   her.  She said:  Well, tell them I'll meet

3   them down there.  I left it like that there.

4           Q.    Okay.  I understand --

5           A.      I don't know the exact date

6   they was hired, I really don't.

7           Q.    Okay.

8           A.      My understanding, we wasn't

9   supposed to be hiring anybody.

10           Q.    I understand.  You don't have

11   any reason to dispute, do you?  -- I mean,

12   you don't know when they started getting

13   paid, do you?

14           A.      Who?

15           Q.    Will Hubbard and Adam or

16   Joseph Mays.

17           A.      Whatever David say.  I don't

18   know.

19           Q.    Okay.  All right.  Are you a

20   good coon hunter?

21           A.      I think so.

22           Q.    Why are you a good coon

23   Hunter?

I

# FREEDOM COURT REPORTING

Page 1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF ALABAMA

3              NORTHERN DIVISION

4

5    CASE NUMBER:  2:06-CV-875-ID

6    JEFFREY HARRIS, et al.,                    COPY

7              Plaintiffs,

8              vs.

9    MID STATE LAND & TIMBER CO., INC.,

10   d/b/a SEDGEFIELDS PLANTATION,

11             Defendant.

12

13              S T I P U L A T I O N

14             IT IS STIPULATED AND AGREED by and

15   between the parties through their respective

16   counsel, that the deposition of Willie Mack

17   may be taken before Angela Smith, RPR, CRR,

18   at the offices of John W. Waters, Jr., at

19   214 North Prairie Street, Union Springs,

20   Alabama 36089, on the 17th day of January,

21   2007.

22

23              DEPOSITION OF WILLIE MACK

1      But I was -- At Wilson Oil,

2  see, I was working in the commercial

3  department, whereas, I was helping them, you

4  know, do bathrooms in service stations and

5  maintenance and stuff like that.  So he said

6  the same thing would, like, kind of be going

7  on out there.  That's what he said.  He knew

8  I was doing this.

9      Q.     Who is he?

10     A.     Roy.  Roy knew that I was

11 doing this prior to me coming to

12 Sedgefields.  He knew I was doing this type

13 of work.

14     Q.     Roy said that you would --

15 that they give raises if you do good work?

16     A.     Like that (indicating).

17     Q.     And did Roy -- Did you and

18 Roy, before you went out there to apply for

19 a job, talk about what your starting pay

20 would be?

21     A.     No idea.

22     Q.     Okay.  I see that you started

23 at six dollars and fifty cents an hour.

## FREEDOM COURT REPORTING

Page 46

1  When did -- Did anybody tell you that was

2  going to be your starting salary, or is that

3  just what was on your first paycheck?

4          A.      I remember somebody asking me,

5  said:  What did you make at your last job?

6  I told them, I said:  Six-fifty what I'm

7  currently making.  I hadn't been at Bonnie's

8  very long.  And I started -- It was either

9  six or six-fifty an hour, that's what they

10  started me off with at the plant farm.

11          Q.      Okay.  How soon after you went

12  out and applied for the position were you

13  told that you were hired?

14          A.      Within that same day.

15          Q.      Okay.  So, you went out and

16  spoke with Ms. Pierce and Ms. Davidson and

17  they said:  You got a job?

18          A.      Yes.

19                  (Defendant's Exhibit 15-B

20                  was marked for

21                  identification purposes.)

22          Q.      And I note in Defendant's

23  Exhibit 15, your application, I think we've

# FREEDOM COURT REPORTING

Page 56

1    the skidder.

2          Q.      When was the first time you

3    operated the skidder?

4          A.      At Sedgefields.

5          Q.      I mean, they bought that not

6    too long ago, did they not?

7          A.      Yes.

8          Q.      So, it would have been after

9    the time that they bought the skidder?

10         A.      I got it after they got it at

11   Sedgefields, Will Hubbard.

12         Q.      Okay.  Will Hubbard trained

13   you how to use the skidder?

14         A.      Yes.

15         Q.      Was Will pretty good at

16   operating the skidder?

17         A.      Yes.  The biggest thing about

18   what we were doing, was not -- try your best

19   not to scrub against trees.  And we put in a

20   roller chopper with it.

21         Q.      Okay.

22         A.      Roller chopper situation, like

23   the checkerboard.

## FREEDOM COURT REPORTING

Page 68

1      Q.      When did you start Bush -- Did

2   you ever -- Do you Bush Hog today?

3      A.      Run that by me again.  Yes, I

4   run the Bush Hog now.

5      Q.      When did you start Bush

6   Hogging?

7      A.      The fields?

8      Q.      Yes, sir.

9      A.      When Joel got there.

10     Q.      Okay.  In September?

11     A.      Of this year?

12     Q.      No.  Of 2005.  I'm sorry.

13  That's when you started Bush Hogging?

14     A.      Correct.

15     Q.      And who trained you on how to

16  use a Bush Hog, drive the tractor with the

17  Bush Hog?

18     A.      Joel got on there one day, he

19  told me these words, he said:  If you can

20  drive a little tractor, you can drive a big

21  tractor.

22     Q.      Okay.  Up until that time, you

23  were driving a little tractor; is that

# FREEDOM COURT REPORTING

1                              was marked for

2                              identification purposes.)

3        Q.       Okay.  I'm going to show you a

4   document that I will identify as Defendant's

5   Exhibit 15.  It's a three-page document.

6   And it's Defendant Production Numbers 180

7   through 182.  If you'll look over that,

8   Mr. Mack, and tell me when you're through.

9        A.       I'm finished.

10        Q.       Okay.  Do you remember when

11   you met with me?

12        A.       Yeah.

13        Q.       And this was prior to you

14   filing the lawsuit; right?

15        A.       This was before I filed a

16   lawsuit.

17        Q.       Yes, sir.

18        A.       Exactly right.

19        Q.       And was I polite to you?

20        A.       Very.

21        Q.       Okay.  And you told me the

22   truth, didn't you, when we spoke?

23        A.       Yes, I did.

# FREEDOM COURT REPORTING

Page 75

1       Q.      Okay.

2       A.      It look like, to me, that this

3  paper is written, but it's fixed up in a

4  way.  You know, not everything that I said

5  is here.

6       Q.      Okay.  I didn't put down

7  everything we talked about, did I?

8       A.      Yeah.  Because everything -- I

9  didn't say it was all good.

10      Q.      Okay.

11      A.      I didn't say -- Everything

12  that we talked about is not on this paper.

13      Q.      Okay.  Well, I put down, I

14  think, some of the things that -- You know,

15  the fact that you thought you should be paid

16  more, and that you thought that Mr. Norman

17  was asking you to do some harder work; is

18  that right?

19      A.      Yes.  And about Mr. Carroll,

20  one hundred percent good person, I'm saying

21  that now.

22      Q.      Okay.

23      A.      And Joel, at the time, when I

# FREEDOM COURT REPORTING

Page 76

1  worked for him, he was respectful.  At first

2  it started out being a respectful guy at

3  first.

4          Q.      When did he not become

5  respectful?

6          A.      Well --

7          Q.      I mean, I think you said at

8  first he treated you like a champ; is that

9  correct?

10         A.      I had rode to lunch with him.

11  We'll talk, we knew, I got to follow

12  instructions, we trying to get something

13  going.  He was telling me about that the

14  program at Sedgefields, he was there to try

15  to turn the bird program around and bring it

16  on the uprise.  I told him I was down with

17  that.  That I was new in it, but I'm willing

18  to learn.  That was my words, I told Joel.

19              But my problems started with

20  Norris and Jeff.  So I don't be there with

21  Jeffrey and Norris all the time.  But one

22  particular day -- We get paid on Thursdays,

23  every two weeks.  It hard to make get

Page 77

1    through two weeks, though.

2              They asked me:  We asked Joel

3    where our checks was.  We looked in the --

4    They usually be in the time clock.  When

5    they wasn't in the time clock, it was on a

6    Thursday, I don't know whether they called

7    David or whether or not, but they said that

8    Joel had the checks.

9              So I drive the truck.  See,

10   Norris don't have a license, I am the

11   driver.  I was told by Roy:  Don't let

12   Norris and them drive the truck, they don't

13   have a license, but wherever you need to go

14   and stuff, take them around.

15             So by me being the guy with

16   the license, I went to wherever Joel was in

17   the field.  Norris and Jeff asked Joel where

18   was our checks.  And he said that they was

19   in his truck or something up to his house --

20   up at his house.  And I don't know whether

21   -- I can't remember exactly, but every since

22   then, things wasn't the same between me and

23   him.

# FREEDOM COURT REPORTING

Page 78

1    Q.    Okay.

2    A.    On his behalf, not mine.

3    Q.    Right.  And in fairness to me,

4  though, don't I describe that in your

5  declaration?

6    A.    Yeah.

7    Q.    But you say also that he did

8  -- that Mr. Norman wasn't happy with the way

9  that Mr. Harris and Mr. Foster were cutting

10 the fields or chopping the fields; is that

11 right?

12   A.    Okay.  Me and Joel was

13 together, I'm helping him with dogs.  He'll

14 pull up to them and they will be talking, he

15 will be telling them on how to drive -- you

16 know, don't be hitting trees, and the

17 pattern -- try to cut the pattern, you know,

18 that's what I hear him telling them about.

19   Q.    Okay.

20   A.    That he was dissatisfied, you

21 know:  Be careful and don't hit

22 Mr. Broadhead's trees.  You know, stuff like

23 make sure the tractor blowed out, because

## FREEDOM COURT REPORTING

Page 79

1    they were bad about the tractor being hot,

2    running hot, maybe because of the straw or

3    whatever in the radiator, all that good

4    stuff.   I will be present when he'll be

5    talking to them.   I'm sitting in the truck.

6    See, me and him together be working dogs,

7    them two was on the tractor all the time.

8         Q.     Okay.  And what did Mr. Harris

9    and Mr. Foster say in response?

10        A.      Talking about what did they

11   say?

12        Q.     Yes, sir.  When he's saying:

13   You need to stop nicking the trees, you need

14   to make sure that you're, you know, doing

15   straight lines, I guess, when you're

16   chopping, chopping lanes, and that you need

17   to make sure that the tractor doesn't run

18   hot by removing stuff away from the in-flow,

19   I guess; is that right?

20        A.      Yeah.  I never hear them talk,

21   you know, back.

22        Q.     Okay.

23        A.      But they would get mad -- This

# FREEDOM COURT REPORTING

Page 80

1   is where the little beef stuff come in at.

2   If you be in the woods and you assign

3   somebody to drive a tractor, me and him

4   might be riding on the same little road, we

5   going somewhere to take the dogs or we have

6   a horse trailer hooked up with two horses on

7   it and the dogs, and he'll look in the woods

8   sometimes and he'll see Norris and Jeff

9   sitting down.

10          So by me now riding actually

11  driving a tractor, I can't rightfully say

12  whether these cats, you know, not doing

13  their work or whether they taking a break.

14  Sometimes a guy be on a break.  It's hilly

15  and it's dangerous, you've got to be

16  careful.  There's stumps and all that good

17  stuff.  It ain't no -- like this table.

18          But I know that he have told

19  me, he said:  Do you see them guys out there

20  sitting down?  My response is nothing.  I'm

21  not their boss.  I say:  I'm not their boss,

22  and I can't stay in the woods in twelve

23  hours and watch nobody.

## FREEDOM COURT REPORTING

Page 87

1    Q.      And he admitted that he nicked

2  trees?

3    A.      Yes, he did.  He told Joel

4  that he wasn't trying to.

5    Q.      And you personally observed,

6  when you were out on the fields, that some

7  of the trees had been nicked by Mr. Foster

8  and Mr. Harris; is that true?

9    A.      Uh-huh.

10   Q.      Is that a yes?

11   A.      Yes.

12   Q.      Okay.  When Mr. Norman came to

13 Sedgefields, Norris Foster and Jeff Harris

14 were the ones driving the tractors; is that

15 right?

16   A.      To my knowledge.

17   Q.      Okay.  And at some point,

18 Mr. Norman began to train you on how to

19 operate a tractor; is that right?

20   A.      Yes.  But -- Yes, yes.

21   Q.      Mr. Foster did not like that?

22   A.      Well, the chopping was done on

23 two Kubota tractors.  And Norris, at one

## FREEDOM COURT REPORTING

Page 88

1  point in time, was driving a John Deere,

2  which was air conditioned and he was doing

3  different stuff.  I don't know whether he

4  was cutting fire lanes around the place or

5  whatever.  But the tractor was serving a

6  different purpose.

7           This particular tractor, he

8  wasn't doing no chopping on it.  They don't

9  chop with this tractor.  So I can't say what

10 tools it was.  But Joel took me out on the

11 field where it was like straw, sage, what

12 you would call it.

13      Q.     Uh-huh.

14      A.      He told me this, he showed me

15 the operations on the tractor, he told me,

16 he said:  If you can drive one of them

17 little tractors down there, man, you can

18 drive a big tractor.

19           So he had the Bush Hog hooked

20 up behind it, he was in the seat.  I'm

21 sitting behind him.  He showed me, made a

22 loop, and told me to stay inside there like

23 a giant lawn mower.

## FREEDOM COURT REPORTING

Page 89

1       And then I kind of went around

2   a couple of times, I kind of got the feel of

3   it, and I kind of thanked the good Lord, you

4   know, I've been doing pretty good on it ever

5   since.  He done that.  Before that, I ain't

6   never got a chance to operate the big

7   tractor.

8       Q.      Okay.  Is that after you took

9   -- In this declaration you signed, I may

10  have gotten it out of order, I want to make

11  sure I've got it in the right order.  Him

12  training you on the tractor, was that after

13  you took Harris and Foster down there for

14  the paycheck?

15      A.      After.  Because, see, look,

16  Norris, one point in time, me and -- Jeffrey

17  and myself were on the Kubotas.  I rode a

18  chopper with Jeff.  Because I can remember

19  as plain as day, he told me:  How you get a

20  point, visualize a tree, look down the

21  field, if you see a tree way down there like

22  that, and I get on that pattern, if I stop

23  or something in the way and try and stay on

# FREEDOM COURT REPORTING

Page 93

1    know.

2           Q.       That's fine.  Have you ever

3    heard whether he took a day off to get a

4    driver's license?

5           A.       I don't think he was

6    successful in getting the license.

7           Q.       Okay.  Did you ever -- You

8    heard some of the things that Mr. Harris

9    said that he overheard Mr. Norman say.  Did

10   you overhear any of those things when you

11   were working around him?

12          A.       Smart remarks and stuff?

13          Q.       Yeah.

14          A.       Yeah, I have heard a few

15   things.

16          Q.       You say you never heard anyone

17   use a racial slur?

18          A.       No.  Not the "N" word.

19          Q.       But did you hear anything from

20   Mr. Norman that you thought was offensive?

21          A.       Yes.

22          Q.       Okay.  That's fine.  What did

23   you hear?

# FREEDOM COURT REPORTING

Page 94

1        A.        I was in the barn, shoveling

2   out -- you know, cleaning the horse manure

3   and stuff.  So Joel came in there, he said:

4   We need to get rid of everything -- He said:

5   We need to get rid of all the black horses,

6   really everything black.  I heard him say

7   that.

8        Q.        Okay.  When was this?

9        A.        The day, I can't tell you.

10  But, like I say, I'm in the barn, cleaning

11  out the barn.  He drive up in there.  You

12  know, then, like I say, he had a bad

13  experience on a horse that Norris was

14  operating prior, I don't know whether he was

15  making the horse have bad habits, or

16  whatever the case may be, but he wasn't

17  ridable.  I haven't rode him yet.

18                 Couple of them wasn't

19  functionable for people.  You know, like a

20  client, you come there to the plantation and

21  you got a horse and throw somebody, that's a

22  big problem, you understand me?

23        Q.        Right.  Mr. Norman wanted to

## FREEDOM COURT REPORTING

Page 101

1  he was saying that he was hired by the

2  Broadheads to turn the program around.

3      Q.      Uh-huh.

4      A.      You know, to make it on the

5  uprise, to bring it up.  That's what he was

6  telling me about.

7      Q.      Okay.  Did he tell you how he

8  was going to do that?

9      A.      Well --

10     Q.      You said you were down with

11  it, I remember.

12     A.      Yeah.  I told him that I was

13  down with whatever he needed to do to bring

14  it up.  I need a job, and he's the head.

15  And all I need to do is listen to him and

16  learn from him.  That's what I told him.

17     Q.      Okay.  And how did he do it

18  differently than Mr. Lee?

19     A.      Well, when Roy was operating

20  birds, we would have a put and take bird.

21  We would go to the place -- He would go to

22  wherever the bird lay.  Name is Shepherd or

23  something, we get the birds in the box.  And

## FREEDOM COURT REPORTING

Page 102

1  prior to the hunt, we'll go out and place

2  the birds.

3        Q.     Couple of hours before the

4  hunt?

5        A.     Yes.  Place the birds, release

6  them.  Take a scoop of feed, put down there

7  so they can stay.  Tie a little ribbon on

8  the tree or somewhere, run off real quick

9  and go to another spot.  That's the way he

10  was doing it before the hunt.

11        Q.     Right.  Now, that's the only

12  kind of quail hunting that you knew about,

13  isn't it?

14        A.     That's the only kind -- I know

15  about wild birds and all that, but that's

16  what we were doing.

17        Q.     Okay.  That's what y'all were

18  doing when you were working at Sedgefields

19  before Mr. Norman got there?

20        A.     Yes, sir.

21        Q.     Okay.  All right.  Now, how

22  did Mr. Norman do it differently?

23        A.     I helped Joel put out birds on

## FREEDOM COURT REPORTING

Page 103

1    the four-wheeler and a mule, something like

2    -- an animal mule, but a --

3         Q.      I understand.  A utility

4    vehicle?

5         A.      Yes, sir.  We were putting the

6    birds out.  And then, you know, they'll be

7    out on the plantation, then he got a feeding

8    process he do to hold them there, you know,

9    like a feed trail that he'll turn birds

10   loose ever often.  And then he's got a

11   feeding pattern that he'll keep them instead

12   of like feeding them every day.  Hoping they

13   stay and raise there.  I'm thinking.  Now,

14   that's just me talking.

15        Q.      Is this called a prerelease?

16   Do you call this prerelease?

17        A.      Huh?  I don't know what they

18   call it.

19        Q.      Okay.  So, he would release

20   the birds -- I assume, at the very first of

21   2005, since the hunting season was right on

22   you, he would release the birds days, weeks

23   or months in advance of the hunt?

**FREEDOM COURT REPORTING**

Page 104

1      A.      Yes.  The birds will be out

2   there.  It wasn't like if you were coming

3   for a hunt or me.  It wasn't like nobody was

4   putting the birds there before you get

5   there.  The birds were out there and they

6   would be taken care of.

7      Q.      Yeah.  You didn't know where

8   the birds are when you went to hunt?

9      A.      Uh-huh.

10      Q.      And I assume the birds, under

11   Mr. Norman, they were a little wilder than

12   the birds that you had when Mr. Lee was

13   doing it, because they had been out in the

14   wild a little bit longer?

15      A.      Yes.

16      Q.      Flew a little faster, maybe?

17      A.      Yes.  And more hard to find.

18   Because, you know, a bigger area, you got

19   predators eating up birds, and birds running

20   in the hardwood bottom, you know, places to

21   hide.  It was more difficult to find.

22      Q.      Yeah.  I've never done any of

23   that hunting, quail hunting.  And I think I

## FREEDOM COURT REPORTING

Page 105

1    understand what's going on.  Now, when

2    Mr. Lee was doing it, and I'm not saying

3    there's anything wrong with this way,

4    because there are certain benefits to it, if

5    you release the birds a couple of hours

6    before the hunt, you know you're going to

7    have birds there to kill; right?

8          A.      Yes, sir.

9          Q.      And if you take a group and

10   let's say you can kill sixteen birds, if you

11   -- you know you're going to kill sixteen

12   birds when you get on the hunt because you

13   just put them out there; is that right?

14         A.      Yes, sir.

15         Q.      Now, if you prerelease the

16   birds weeks, months in advance, you may not

17   kill as many as you thought -- you're not

18   guaranteed to kill them?

19         A.      That's right.  And they ain't

20   guaranteed to be in the spot where you

21   released them.

22         Q.      That's right.  And you get to

23   watch the dogs work, do you not, more,

# FREEDOM COURT REPORTING

Page 106

1   because the dogs aren't just going to where

2   you dropped them off, they're actually

3   having to work and find the birds?

4          A.       Have to find them, yes, sir.

5          Q.       And you have an opportunity to

6   come up on wild coveys when you prerelease

7   more often than not; is that right?

8          A.       That's correct.

9          Q.       And hopefully maybe you'll get

10  some quails that will stay for the next

11  year?

12         A.       And raise.

13         Q.       That's right.  And even have

14  more wild coveys; is that right?

15         A.       You're exactly right.

16         Q.       Now, the problem, and you

17  identified it, is when you prerelease,

18  you'll have hawks and you'll have raccoons,

19  bobcats, predators that will come and eat

20  all your quail, or eat a lot of them; right?

21         A.       Exactly right.

22         Q.       Because you're leaving them

23  out there for weeks, months in advance.  So,

## FREEDOM COURT REPORTING

Page 107

1    is it necessary that you try to trap those

2    predators to make sure that you have some

3    birds out there when you go to hunt?

4         A.     I agree.

5         Q.     Okay.  And is that what y'all

6    started doing more of when Mr. Norman got

7    there, trying to set traps and trap some of

8    those predators, or do you know?

9         A.     Before Joel got there, I

10   hadn't seen anyone trapping.

11        Q.     Okay.  Then after Mr. Norman

12   got there, did y'all start trapping for

13   predators?

14        A.     Yes.  Not me personally, but I

15   know people that trap.

16        Q.     Who came and trapped on the

17   property?

18        A.     What his name?  Give me a

19   second.  Adam.

20        Q.     Joseph Mays or Adam Mays?

21        A.     Joseph Mays, I think, he would

22   trap them.

23        Q.     Was he a good trapper, as far

Page 108

1    as you know?

2         A.        I say he was.  I don't

3    actually know.  See, I be everywhere.  I

4    wasn't there to see what he catch every

5    time.  A lot of times -- We got a trapper

6    there, Stephen Phelps.  I see animals when I

7    run up on him that he caught, but I'm not

8    there when he catch them.  I'm not there

9    every time when he catch them.

10                        (Off-the-Record discussion

11                        was held.)

12        Q.        All right.  Going back to

13   Defendant's Exhibit 15, is there anything

14   about the way that you were treated that I

15   did not include in this declaration that you

16   feel like needs to be included?

17        A.        Talking about on this right

18   here?

19        Q.        Yes, sir.  You said earlier

20   that, you know, I didn't put everything

21   down.  And I admit that, you know, we talked

22   -- we talked for a good bit and I didn't

23   write everything down.  And if there's

## FREEDOM COURT REPORTING

Page 116

1  think he has spoken to?

2          A.      Yeah.  Because he owe Roy

3  twenty dollars.  So Roy said:  When you see

4  Brother Man, you tell Brother Man to bring

5  my twenty dollars.  So I know he ain't seen

6  Roy.  But I haven't seen him, other than

7  David had told me -- gave me a message that

8  he wanted me to help him do some work at

9  Auburn.  I haven't seen Brother Man since.

10                      (Off-the-Record discussion

11                      was held.)

12          Q.      Do you know anything about how

13  David Carroll may know Brother Man?  How he

14  may have come to know Brother Man?

15          A.      Talking about how do they know

16  one another?

17          Q.      Yeah.  Before Brother Man came

18  to work at Sedgefields?

19          A.      Brother Man, he told me that

20  him and David were good friends.  He speak

21  highly of David.  He said that he knew

22  David's father, or something about a father

23  deal.  Somebody knew somebody's father, if

## FREEDOM COURT REPORTING

Page 117

1  I'm not mistaken.  I can't say, but I know

2  he might have been his friend or a friend of

3  his father's, or something like that.

4          Q.      Okay.  Do you know if your

5  lawyers, anybody associated with your

6  lawyers, has spoken with Brother Man?

7          A.      Not to my knowledge.

8                  MR. DUKES:  This is a good

9  time to take a little break.

10                    (Recess taken.)

11          Q.      Now, before you came to

12  Sedgefields, did you have any welding

13  experience?

14          A.      Only time I touched a welder

15  with a rod in vocational agri business in

16  high school.

17          Q.      Okay.  And your heavy

18  equipment experience you learned at

19  Sedgefields.  And that's what you testified

20  about earlier; is that right?

21          A.      I learned how to operate the

22  skidder, pulling the choppers, while at

23  Sedgefields.

## FREEDOM COURT REPORTING

1       Q.    Okay.  And they got the

2 skidder --

3       A.    It wasn't there first.

4 Skidder come after me.

5       Q.    And Will taught you how to use

6 the skidder; is that right?

7       A.    He said you can drive.  I got

8 on there and I have drove it, operate it.

9       Q.    Okay.  Did Will show you how

10 to operate it?

11       A.    Yes.

12       Q.    Okay.  Now, you've filed a

13 lawsuit against Mid State Land and Timber?

14       A.    Yes, I have.

15       Q.    Claiming that you were

16 discriminated against on the basis of your

17 race; is that correct?

18       A.    Pay.

19       Q.    Okay.  But you believe that

20 you were discriminated against because of

21 your race being black; is that right?

22       A.    If I was --

23       Q.    I'm going to ask you -- My

## FREEDOM COURT REPORTING

Page 133

1      A.      Sir?

2      Q.      Other than when you'd ride

3  with Roy, did you see anybody else take a

4  company truck and go into town and get

5  lunch, after Mr. Norman, or whoever said it,

6  said they didn't want anybody taking the

7  company truck and going into town for lunch?

8      A.      No, I haven't seen them.  I

9  haven't.

10      Q.      Okay.  Now, I understand you

11  believe that you were discriminated against

12  as to your pay, that you weren't paid as

13  much as you think you should have been paid.

14  How else do you believe that you have been

15  discriminated against, if anything?

16      A.      You said not on the basis of

17  pay?

18      Q.      Right.  I'm going to go into

19  pay in just a second.

20      A.      By duties.  Brother Man is the

21  only guy that I seen of not black that cut

22  majority -- Anthony didn't stay on the mower

23  much.  Most boys that come in there white

## FREEDOM COURT REPORTING

Page 135

1   him myself, personal.

2          Q.     Mr. Carroll didn't approve of

3   that, did he?

4          A.     No.

5          Q.     Okay.  So, Brother Man was the

6   only white laborer that you said you saw out

7   cutting grass like everybody else, out on a

8   tractor; is that right?

9          A.     (Witness nods head in the

10  affirmative.)

11         Q.     The other white employees, and

12  I assume what you mean by that --

13         A.     I have seen Chance cutting

14  around the dog kennels.  But I'm saying

15  major cutting, when I mention cut, by the

16  time you cut at the lodge and you go to the

17  field trials to cut, this has grown up.  By

18  the time you get the field trials up, the

19  cedar house is back up.  By the time you get

20  that done, the grass is all the way up.

21  This is all growing until it's deep.  Do you

22  see?

23         Q.     Uh-huh.

## FREEDOM COURT REPORTING

Page 139

1   testified he did some trapping.  He wasn't

2   there very long, was he?

3          A.      No.

4          Q.      Week or two weeks or so; is

5   that right?

6          A.      (Witness nods head in the

7   affirmative.)

8          Q.      Is that yes?

9          A.      Yes.

10         Q.      Okay.  And then Chance Hamm,

11  he did some welding, didn't he?

12         A.      He weld.

13         Q.      Okay.  And was he doing some

14  welding while you were doing your other job

15  duties?

16         A.      I don't have a problem about

17  Chance.  Chance will do what he's basically

18  asked.  He can weld.  I cannot weld to no

19  caliber.  I can't.  No sense in me lying.

20         Q.      You know you get paid the same

21  as he does?

22         A.      Well, I hadn't been there -- I

23  really did know or didn't know, or whatever.

# FREEDOM COURT REPORTING

Page 144

1    take place?

2         A.    Whatever date -- Whatever time

3    that he came down here.  He had a hunt.  He

4    had scheduled a hunt.

5         Q.    It was a bird hunt?

6         A.    Exactly.  Jeffrey Harris was

7    listening to me talk to him.

8         Q.    So, it would have been in

9    2005, before Mr. Harris left?

10        A.    Yes.  Jeffrey was on the spot

11   when I talked to Matt.

12        Q.    All right.  Have you told me

13   everything that you believe supports your

14   claim that you were discriminated against on

15   the basis of your race with regards to your

16   duties?

17        A.    When I first -- Joel kind of

18   cut me off, and then I was put in the horse

19   barn.  I got a little paper saying:  Do the

20   horse barn every day, clean the horse barn

21   and stall before coming to the lodge every

22   day.

23              A horse is not going to mess

1  up a stall every day. You check after the

2  horse left in there overnight, you know, or

3  two or three days, then it might be where

4  you might have to clean, you know, a

5  majority of the shavings out.

6          But if a horse going to come

7  in and you feed him and come out, all you

8  got to do is get the shovel and whatever

9  manure in there, it's going to be small.

10  Just go around, like, on a routine basis and

11  get it. Maybe if the stall was out of

12  control, maybe you can get that one, you

13  know, something like that. But, basically,

14  do that every day. Even Chance asked me, a

15  new person, he asked me, said: Man, you do

16  this every day? I say: Every day.

17          Q.      When did you start doing that

18  every day?

19          A.      After the incident popped off

20  with Norris. You know, I had told you I

21  went with -- drove Norris and them on the

22  tractor to where Joel was. We were asking

23  about our paychecks.

# FREEDOM COURT REPORTING

Page 146

1    Q.    Okay.  I thought Mr. Harris

2  and Mr. Norris had testified that they

3  cleaned it out two or three times a week.

4    A.    I was cleaning it out by

5  myself.  Roy can vouch for that.  Maybe they

6  was doing that when I was somewhere else.

7  But I got a paper.  And I got a paper at

8  home saying that I clean horse stalls and

9  barns daily before coming to lodge.  So I

10  always stop up there and do that.

11    Q.    I hadn't gotten that paper.

12    A.    Well, I got a paper.  I just

13  got to look it up.

14    Q.    Okay.  What other documents do

15  you have at home that relate to your

16  employment at Mid State?  Do you have any

17  other documents besides that?

18    A.    What, something negative?

19    Q.    No.  Anything.

20    A.    Pertaining to what?

21    Q.    To your employment at Mid

22  State.

23    A.    I got everything.  I mean, be

## FREEDOM COURT REPORTING

Page 148

1    I had been with Joel doing the dogs, and the

2    horse a little bit -- he would get me

3    together, I want to do it my way, I said:

4    I'm willing to learn anything.  Next thing I

5    looked up, Will came in the barn and he was

6    saddling up a horse.  I said:  Who we got

7    here, a new guy?  Joel said:  No, we ain't

8    fixing to hire nobody.  And the next thing I

9    know, Will was on the roster.

10           Q.      Okay.

11           A.      I asked.  I was lied to.  I

12   said:  Introduce us to the new guy.  Those

13   were my words.  He said he ain't hired

14   nobody.

15           Q.      So, when you were assigned to

16   clean the stalls in the barn, were you doing

17   it by yourself?

18           A.      Yeah.  By myself.

19           Q.      And you've heard me talk about

20   this with other people, other deponents, the

21   horses, for the most part, are kept outside

22   in the summertime; is that right?

23           A.      Exactly.

## FREEDOM COURT REPORTING

Page 157

1          A.      Yes.

2          Q.      And that would take you two

3    hours every morning, by yourself?

4          A.      Yeah.  Because you're going to

5    wait on that horse.  You let them in.  They

6    got to eat, now.  And they'll probably take

7    thirty, forty minutes, you know, to eat, and

8    then you release them back to the field.

9                  They might be did what they

10   had to do while they in there so, then you

11   got to -- they gone out, now you straighten

12   it up.  And head on to whatever duties that

13   somebody else has got you assigned to.

14   That's the way I saw it.

15         Q.      Okay.  How long during this

16   period from September 1, 2005, through

17   December 31, 2005, did you clean out the

18   stalls by yourself?

19         A.      I don't know if Will or the

20   other mechanic was there or not, but I know

21   at one point in time I was cleaning it by

22   myself.

23         Q.      Okay.  At some point, did Will

# FREEDOM COURT REPORTING

Page 158

1  help you some?

2          A.      When I was on that punishment,

3  I don't know.  I was by myself.  Joel was

4  like he was mad at me, is what I'm saying,

5  and it was like something for spite.  I was

6  by myself.

7          Q.      Okay.  How long did that

8  happen that you were doing it by yourself?

9          A.      A month, two months, something

10 like that.

11         Q.      Okay.  And that's the paper --

12         A.      I got a paper saying that.

13         Q.      Okay.  Hold on.  That's that

14 period of time between September 1, 2005,

15 and December 31, 2005, that you did it a

16 month or two months by yourself?

17         A.      I would say yes.

18         Q.      Okay.  Now, Will Hubbard

19 wasn't hired and Adam Mays were not hired

20 until November 21, 2005?

21         A.      Uh-huh.

22         Q.      Does that sound right to you?

23         A.      I got to look.  But I know I

# FREEDOM COURT REPORTING

Page 170

1  put together.  And I'm not asking you to

2  look at anything.

3       A.     I believe, back in when Byron

4  got there, Anthony --

5       Q.     What is that, by the way?

6       A.     That's the time frame.

7            MR. ROBERSON:  It's

8  Plaintiff's Exhibit 1.

9            MR. DUKES:  No, this is

10  something --

11            MR. ROBERSON:  It's the same

12  thing as Plaintiff's Exhibit 1.

13            MR. DUKES:  It's got some

14  handwriting on there that's different.

15       A.     Yeah.  I wrote that on there.

16       Q.     What white employees do you

17  believe were paid more than you?

18       A.     Anthony, Brother Man, William

19  Beckwith, whatever his name is, Charlie Will

20  Hubbard and Adam Mays.  I know a lot about

21  that plantation.

22       Q.     Okay.  Well, Adam and Will

23  Hubbard were paid more than you --

# FREEDOM COURT REPORTING

Page 178

1   anguish?  Or how have you been caused to

2   suffer mental anguish?

3        A.    I've had people tell me:  Man,

4   why you not driving the truck?  You know,

5   different things.

6        Q.    Have you seen a doctor, a

7   psychiatrist, psychologist, counselor,

8   practitioner of the healing arts with

9   regards to your mental anguish or emotional

10  distress?

11       A.    No, I haven't seen a doctor or

12  nothing about that.

13       Q.    Have you seen anybody about

14  it?

15       A.    A doctor?  A psychiatrist?

16       Q.    Or anybody, yeah.

17       A.    No.

18       Q.    Have you talked to anybody

19  about it?

20       A.    No more than our lawyer.

21       Q.    Okay.  Do you know of any

22  black employees who are paid more than you,

23  other than Mr. Lee?

# FREEDOM COURT REPORTING

1    A.    Yes, I do.

2    Q.    Who is that?

3    A.    A lady by the name of Brenda

4  Tarver and a lady by the name of Katie

5  Tarver.

6    Q.    Okay. Brenda Tarver and Katie

7  Harris, would that be right?

8    A.    I guess -- I would say yes.

9    Q.    Do you think that's fair?

10    A.    I can't understand how a cook

11  can come in and make more than a laborer. I

12  ain't never understood that yet.

13    Q.    Do you believe that's

14  discrimination?

15    A.    I wouldn't say -- What you

16  saying, race discrimination?

17    Q.    I'll withdraw the question.

18  Any other black employees you know that are

19  paid more than you, other than those two

20  people and Mr. Lee?

21    A.    No, I don't.

22    Q.    How about employees, black

23  employees of Mid State that came to work

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660





# DECLARATION

My name is Willie Bernard Hack. I am over the age of nineteen years and am suffering from no legal disability.

I started working at Sedgefields in March 2004. Roy Lee called me at home and offered me a job. I started at $6.50/hr. I got a raise in January 2005 to $7.50, and in January 2006 I got a raise to $8.00/hr.

When I started working at Sedgefields, Mr. Lee was over the bird hunts and Mr. Davidson was over the deer hunts. Later, Mr. Davidson was fired and Mr. Lee took over for deer and bird hunting. I worked as a general farm laborer, helping the upkeep around the grounds and help prepare for the deer and bird hunts. I continue to do these same duties I also help feed the fish.

When Joel Norman began working at Sedgefields he managed the bird hunts. Mr. Norman treated me like a "champ." We would often ride together on lunch breaks and into town. One day I drove Norris Foster and Jeff Harris to where Mr. Norman was working, and we questioned where our paycheck was. Ever since then, I feel like Mr. Norman has asked me to do "harder" work than I was doing before. However, he did not like the way that Jeff Harris and Norris Foster were cutting the fields for the quail hunts and he trained me later on

house to operate the tractors. Norris Foster did not like the fact that I was now doing his job and told me and others that he was unhappy about it.

I heard from Jeff Harris and Will Hubbard that Norris Foster stuck his hand to Joel Norman and rubbed his thumb and first finger together and ask "where's my money?" as to tips left by a customer. Mr. Norman did not like people asking about money and a policy was issued about it.

Norris Foster did not have a driver's license and I, or others who had a driver's license, would have to drive him around to different parts of the grounds. I know he was given money to get a license, but to my knowledge hi never got one.

I have never heard anyone use a racial slur. David Carroll treats me like "No. 1." I love working for him. I have never complained about race discrimination to anyone at Mid State or my new employer at Sedgefields. Because of my experience and knowledge, I think I should be paid more. I think I should be paid the same as the house people.

**DECLARATION**

I think it is unfair that the house people (Katie Woods Brenda Tarver) came in making more than me because of my versability.

Norris Foster would tell Joel Norman the way that we use to do quail hunts, like placing birds and handling the dogs. Joel Norman wanted to do it his way which at times was different than the way we use to do it. This caused alot of conflict between the two. I have heard Joel Norman complaining about the fact that Norris Foster and Jeff Harris did not cut certain fields like they were instructed to do.



Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1st day of August, 2006

Willie B. Mack



**DECLARATION**

My name is Demetrius Parham. I am over the age of 19 yrs of age and am suffering from no legal disability.

I was hired by Roy Lee in July 2004, making $6.50 hr. I work as a general laborer. I primarily work for Mr. Lee and help him with the deer hunts. Before Mr. Norman began working here, I also helped Mr. Lee with quail hunts from time to time. As a general labor, in the summer time I primarily cut grass; in the fall I take clients to deer stands. I can operate a tractor, have worked a back hoe but do not know how to operate a dozier or a skidder. I do not do any welding.

I have not personally observed Norm's Foster being treated differently because of his race. I believe I am being discriminated against because of my pay. Work wise everything is good and the only way that I believe I have been discriminated against is as to my rate of pay. I have not heard or observed any racial slurs nor have I personally observed any racial discrimination at sedgfields. I have not complained about racial discrimination to my present employer.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this / 5t day of August, 2006

Demetrius Parham



**DECLARATION**

My name is Anthony J. Dickey. I am over the age of 18 yrs and am suffering from no legal disability. I met and became friends with Byron Davidson while I was working on a Charter boat in Florida. Mr. Davidson was one of the managers at Sedgefields. Later when I moved to Auburn to go to college, I contacted ~~the~~ Mr. Davidson and asked him if he had a job. When I applied for the job, I was asked about my ability to operate different equipment. I told him I could operate about anything — including dozer, backhoe, and farm tractors — based on my family business (power equipment sales and rentals), ~~from~~ being around construction all my life, and selling heavy equipment for Key Machinery for approximately three years. Based on my prior involvement with Mr. Davidson, he saw me perform mechanical work and I did mechanical work at Sedgefields. I did light mechanical work at Sedgefields, light construction work, and general labor work. I also operated the backhoe at Sedgefields. I did some hunting guide work for deer and quail hunts. ~~Soon~~ after I started, my family's power equipment business ~~sold~~ ~~did~~ State some equipment at a favorable discount. ~~A~~ ~~█████████████████~~ I was given gas by Sedgefields three or four times at the very most after I asked for more money to compensate for ~~the~~ trip to and from Sedgefields and Auburn. I was paid $8.5~~0~~ ~~█~~ per hour. They said they could not pay me anymore. ~~AD~~

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 19 day of March, 2007

134 Vann Circle
Trussville, AL 35173
205-281-0596



IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JEFFREY HARRIS, | ) | |
| WILLIE BERNARD MACK, | ) | |
| DEMETRIUS PARHAM and | ) | |
| HENRY TARVER, | ) | |
| | ) | CIVIL ACTION NO.: |
| Plaintiffs, | ) | 2:06-CV-00875-ID-CSC |
| | ) | |
| vs. | ) | |
| | ) | |
| MID STATE LAND & TIMBER | ) | |
| COMPANY, INC., D/B/A | ) | |
| SEDGEFIELDS PLANTATION, | ) | |
| | ) | |
| Defendant. | ) | |

## AFFIDAVIT OF DENISE PIERCE

| | |
|---|---|
| STATE OF ALABAMA | ) |
| | : |
| COUNTY OF BULLOCK | ) |

Before me, the undersigned notary public in and for said county and state, personally appeared DENISE PIERCE who being known to me and who being first duly sworn, deposes on oath and states as follows:

1.     My name is Denise Pierce. I am over the age of nineteen years and am suffering from no legal disability. I was employed by Mid State Land & Timber Company, Inc. ("Mid State") from August 2002 through May 2006. I worked during that time as the Lodge and Office Manager. This affidavit is based upon my personal knowledge.

2.     I recall, and am familiar with, the hiring of Anthony Dickey. Mr. Dickey knew one of our managers from his prior work on a fishing boat in Florida. Mr. Dickey's family owned a sales and rental company that did business with Sedgefields. Mr. Dickey was a college student living in

Auburn, Alabama at the time that he began working at Sedgefields. He was clean cut, articulate, and had very good social skills. It was perceived at the time, and proven to be true, that Mid State would benefit from his social skills in his dealings with customers. Mr. Dickey served as a hunting guide, and also did general labor work as well as mechanical work. Mr. Dickey, when he applied for employment at Sedgefields, said that he had mechanical experience with power equipment based on his years of working at his family's store. His family's business sold power equipment which led to the sell of power equipment to Sedgefields at a favorable discount. Mr. Dickey was able to do mechanical work on Sedgefields' outdoor power equipment and could do most anything asked of him.

FURTHER AFFIANT SAITH NOT.

Executed this ___ day of April, 2007.

Denise Pierce

STATE OF ALABAMA            )
                                             :
COUNTY OF BULLOCK        )

I, the undersigned authority, a Notary Public in and for said County in said State, hereby certify that DENISE PIERCE whose name is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that being informed of the contents of the said instrument, she executed the same voluntarily on the day the same bears date.

GIVEN under my hand and seal this 2 day of April, 2007.

[NOTARIAL SEAL]

Notary Public

Print Name _Rebecca L. Faulkner_
My Commission Expires: _2/4/08_

2



## FREEDOM COURT REPORTING

Page 1

1      IN THE UNITED STATES DISTRICT COURT

2      FOR THE MIDDLE DISTRICT OF ALABAMA

3              NORTHERN DIVISION

4

5   CASE NUMBER:  2:06cv405-ID          **COPY**

6   NORRIS FOSTER,

7              Plaintiff,

8              vs.

9   MID STATE LAND & TIMBER COMPANY,

10   INC., d/b/a SEDGEFIELDS PLANTATION,

11              Defendant.

12

13          S T I P U L A T I O N

14              IT IS STIPULATED AND AGREED by and

15   between the parties through their respective

16   counsel, that the deposition of Norris

17   Foster may be taken before Angela Smith,

18   RPR, CRR, at the offices of John W. Waters,

19   at 214 North Prairie St., Union Springs,

20   Alabama 36089, on the 7th day of September,

21   2006.

22

23          DEPOSITION OF NORRIS FOSTER

## FREEDOM COURT REPORTING

Page 110

1  chickens from one supermarket to another.

2          Q.     Okay.  And do you know when he

3  was hired on at Mid State?

4          A.     It was either the last of

5  November or around the first of December,

6  something like that.

7          Q.     Okay.  I've got November 21,

8  2005, do you have any reason to dispute

9  that?

10          A.     Should be something like that.

11          Q.     Okay.  So, you worked around

12  him for about a month, little over a month;

13  is that right?

14          A.     Right.

15          Q.     Do you know if Mr. Hubbard had

16  a driver's license?

17          A.     Yes.

18          Q.     Okay.  He could drive?

19          A.     Yeah.

20          Q.     Okay.  Joseph Mayes is another

21  fellow you mentioned.  Do you know anything

22  about his work experience?

23          A.     I never even met the guy

## FREEDOM COURT REPORTING

1    before he started working there.  I never

2    even knew him or seen him.

3        Q.    Okay.  Do you know what his

4    hunting experience was?

5        A.    I know he told me he liked to

6    deer hunt.

7        Q.    Okay.  What about trapping, do

8    you know if he could trap?

9        A.    He said he -- I think -- Yeah,

10   he used to trap while he was out there.

11       Q.    Okay.  Did he have a driver's

12   license, Mr. Mayes?

13       A.    I'm pretty sure he did.

14       Q.    Okay.  Brotherman, who, by the

15   way, is Mr. Beckwith --

16       A.    Yeah.

17       Q.    Do you know anything about his

18   work experience before coming to Mid State?

19       A.    No.  No more than he told me

20   he used to work on a big golf course, and he

21   did clean up barbecues and stuff like that.

22   Other than that, no.

23       Q.    And do you know what his job



IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| NORRIS FOSTER, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO.: |
| | ) | |
| v. | ) | 2:06-CV-00405-ID-SRW |
| | ) | |
| MID STATE LAND & TIMBER | ) | |
| COMPANY, INC., D/B/A | ) | |
| SEDGEFIELDS PLANTATION, | ) | |
| | ) | |
| Defendant. | ) | |

### AFFIDAVIT OF DAVID CARROLL

| | |
|---|---|
| STATE OF ALABAMA | ) |
| | : |
| COUNTY OF BULLOCK | ) |

Before me, the undersigned notary public in and for said county and state, personally appeared DAVID CARROLL who being known to me and who being first duly sworn, deposes on oath and states as follows:

1.  My name is David Carroll. I am over the age of nineteen years and am suffering from no legal disability. I am currently employed with Tolleson Land & Timber ("Tolleson") as the General Manager of Sedgefield's Plantation. I was previously employed by Mid State Land & Timber Company, Inc. ("Mid State") and worked as the General Manager for Sedgefield's Plantation. This affidavit is based upon my personal knowledge.

2.  On May 19, 2006, Mid State terminated all the employees working at Sedgefield's Plantation, including me, at the time it sold Sedgefield's Plantation to Tolleson. Former employees of Mid State who wished to work for Tolleson were required to apply for a position with Tolleson.

Tolleson requires    a mandatory drug test for all new hires. Tolleson's offer of employment is conditioned upon an individual consenting to and passing a drug test. If Norris Foster had applied for position with Tolleson, Mr. Foster would have been required to submit to and pass a drug test.

3.    One of Mid State's former employees failed Tolleson's mandatory drug test and was not permitted to work for Tolleson.

FURTHER AFFIANT SAITH NOT.

Executed this ___14___ day of August, 2006.

_David Carroll_

STATE OF ALABAMA                )
                                :
COUNTY OF BULLOCK               )

I, the undersigned authority, a Notary Public in and for said County in said State, hereby certify that DAVID CARROLL whose name is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that being informed of the contents of the said instrument, he executed the same voluntarily on the day the same bears date.

GIVEN under my hand and seal this 4th day of August, 2006.

[NOTARIAL SEAL]

_Denise R. Pierce_
Notary Public

Print Name _Denise R. Pierce_

My Commission Expires: _9/2008_

38399.1

2