IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| JEFFREY HARRIS, WILLIE BERNARD MACK, DEMETRIUS PARHAM and HENRY TARVER,<br><br>    Plaintiffs<br><br>v.<br><br>MID-STATE LAND & TIMBER COMPANY, INC., d/b/a SEDGEFIELDS PLANTATION,<br><br>    Defendant. | Civil Action No.:<br><br>2:06-cv-875-ID-CSC |

### PLAINTIFF ROY LEE'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COMES NOW Roy Lee, one of the Plaintiffs in the above styled action, and files this Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment.

### STATEMENT OF FACTS

The Defendant Mid-State purchased a 13,000 acre parcel of property in Bullock County in approximately 1998 for $14 million dollars. (Pl's Ex. 4, pp. 73-74). Mid-State owned this parcel until it was sold to Tolleson's in May 2006 for $32 million dollars. (Pl's Ex. 4, p. 74). Mid-State operated this property as a hunting lodge during this time period. (Pl's Ex. 4, pp. 9-10).

Mid-State Land and Timber (hereinafter Mid-State has had numerous people who have worked in management at Sedgefields operation in Bullock County since 1998. (Pl's Ex. 1, pp. 49-63). These include Paul Broadhead, Jr., the owner's son, (who was fired), (Pl's Ex. 1, p. 49), and his sister-in-law, Donna Davison, (who left). (Pl's Ex. 4, p. 11).

Davison was previously married to Broadhead's brother before he died and Donna remarried Byron Davison. (Pl's Ex. 4, p. 17). Byron Davison also worked in management at Mid-State. (Pl's Ex. 4, pp. 17-18). Byron Davison was fired. (Pl's Ex. 1, p. 55). The Davison's were paid by 1099s, as they were originally contracted to manage the timber on the property. (Pl's Ex. 4, p. 27). The Davison's were also provided housing on the property. (Pl's Ex. 4, p. 13). Other managers included Hunter McDuffie, Mark Greg and Greg Wallace. (Pl's Ex. 1, pp. 49-63). All these people turned out to be unsuitable managers, they were all white, and all were paid a salary. (Pl's Ex. 1, pp. 49-63).

Lee went to work at Sedgefields in the year 2000. (Pl's Ex. 5). He was initially hired as a laborer at $6.00 per hour. (Pl's Ex. 5). Lee, a high school graduate, had previously been employed with Columbus Mills for approximately 18-19 years. (Pl's Ex. 1, p. 16). Lee was a supervisor of 32 people when the mill closed in Union Springs. (Pl's Ex. 1, p. 16).

Lee began working at Sedgefields after the mill closed. (Pl's Ex. 1, p. 19). Lee is an avid deer hunter and coon hunter. (Pl's Ex. 1, pp. 18-19). Lee has been working with hunting dogs all of his life. (Pl's Ex. 2, p. 32).

Lee was originally assigned to work in the quail hunting crew. (Pl's Ex. 2, p. 35). He was a back-up man. (Pl's Ex. 1, p. 21). He held the horses, picked up birds and assisted the guests. (Pl's Ex. 1, p. 21). He learned about quail hunting from Hunter McDuffie. (Pl's Ex. 1, p. 35). Lee knows how to work dogs and he has been the guide on numerous quail hunts. (Pl's Ex. 5). Lee has put out birds before a hunt (put and take) as well as pre-released wild birds several months in advance of hunting season. (Pl's Ex. 2, pp. 45-46). He is familiar with preparing the land for hunting, providing the birds cover, and general

maintenance operations of a hunting lodge. (Pl's Ex. 2, pp. 44-47). He can operate heavy equipment and has operated back-hoes, bull dozers, tractors, etc. (Pl's Ex. 5).

Lee is the only black who has ever held a management position for Mid-State. (Pl's Ex. 4, p. 22). Lee is also the only person ever to be employed in Mid-State management who was paid hourly. (Pl's Ex. 4, p 22).

Lee now makes a salary of $41,000.00. (Pl's Ex. 1, p. 73). Joel Norman, a white male hired in September 2005 as quail operations manager, makes $70, 000.00 annually and is provided housing on the property. (Pl's Ex. 3, pp. 104-105). Norman was provided health insurance, but Lee was never offered health insurance. (Pl's Ex. 5). Lee has never been offered housing. (Pl's Ex. 3, p. 105). No black man has ever lived on the property at Sedgefields's, even as a night watchman. (Pl's Ex. 5). Bullock County has a predominately black population and most laborers hired at Sedgefields have been black. (Pl's Ex. 3, p. 106).

Plaintiff's Second Amended Complaint alleged that Mid-State has a two- tiered compensation system. (Pl's Ex. 25). Lee alleges that blacks are paid less wages than whites. (Pl's Ex. 25).

Plaintiffs Norris Foster, Jeffrey Harris, Demetrius Parham, Henry Tarver and Willie Mack, all of whom are black and all were paid $7.00 per hour or less when hired. (Ex. 21). David Carroll was hired as manager in April 2005. (Pl's Ex. 1, p. 8). He hired four white employees after he was hired in 2005 and early 2006. (Pl's Ex. 3, pp. 109, 137-140). These individuals were Will Hubbard, Adam Mays, Chance Hamm and William Beckwith. (Pl's Ex. 3, pp. 109, 137-140). All of these individuals were white and were paid $8.00 per hour. (Pl's Ex. 3, pp. 109, 137-140). This is true even though all but Beckwith were 24

3

years of age or less. (Pl's Ex. 3, p. 130).

Carroll claims that the whites all possessed special skills such as the ability to operate heavy equipment, trap wild animals or welding which qualified them for higher wages. (Pl's Ex. 3, pp. 137-140). Carroll also claims that Beckwith was hired as a night watchman and that is the reason he was paid $8.00 per hour. (Pl's Ex. 3, pp. 109-110).

Norris Foster had six years of military experience. (Pl's Ex. 3, pp. 130-131). Foster was working at Sedgefields when it was acquired by Mid-State in 1999. (Pl's Ex. 22). He worked for $5.00 per hour originally, but was rehired in February 2005 at $7.00 per hour. (Ex. 22). Foster had worked on the plantation for years, and was experienced in quail hunting and preparing the fields for hunting. (Pl's Ex. 6).

None of the white individuals hired was an experienced hunting crew member. (Pl's Ex. 12; Ex. 15; Ex. 17).

Corey Balkcom, a black male hired by Carroll in May 2005 was paid $7.00 per hour. (Pl's Ex. 21). Balkcom had twenty years of diesel mechanic experience, eight years of military service where he was an instructor for the Marines in combat survival, and prior experience welding. (Pl's Ex. 23). Beckwith had no special skills and was hired as a laborer. (Pl's Ex. 3, pp. 109-110). Beckwith was also provided lodging. (Pl's Ex. 3, pp. 109-110). Carroll claims Beckwith was paid an extra amount because he was working as a night watchman. (Pl's Ex. 3, pp. 109-110).

Carroll has also claimed that he would not have hired Foster had he known of a misdemeanor assault charge to which Foster previously plead guilty. (Pl's Ex. 3, pp. 124-125). Carroll hired Harris who indicated on his application that he had been convicted of marijuana possession. (Pl's Ex. 18). Carroll claims that the hiring of Harris was a

"mistake". (Pl's Ex. 3, p. 126).

Every person who is black or Hispanic that has been hired at Sedgefields made $7.00 or less per hour. (Pl's Ex. 21). Every person who was white and was hired made $8.00 or more per hour. (Pl's Ex. 21).

For a period of time Lee was over both the deer hunting and quail hunting operations. (Pl's Ex. 5). Lee was still being paid by the hour even though he was in management. (Pl's Ex. 5). Lee was assigned a salary of $41,000.00 per year, but Lee actually made less money on salary because it cut out his overtime. (Pl's Ex. 24).

Norman has a two year degree in wildlife biology. (Pl's Ex. 4, p. 29). Mid-State hired a wildlife biologist, Chuck Sykes, and paid him substantially less than Norman earns. (Pl's Ex. 24). Carroll has both a four year degree and a masters degree in timber management, and he only makes $75,000.00 per year. (Pl's Ex. 4, p. 29). Carroll does not live on the property as Norman does. (Pl's Ex. 4, 9. 29). Lee has never been offered lodging on the property. (Pl's Ex. 5). Mid-State has never offered to pay Lee's insurance, although it paid Norman's. (Pl's Ex. 5).

Tarver was recommended by Lee to Carroll for the night watchman's position. (Pl's Ex. 5). Tarver was hired in June 2005. (Pl's Ex. 5). Tarver never worked as a night watchman, as he was not allowed to live on the property. (Pl's Ex. 5). Instead, Carroll hired Beckwith in July 2005. (Pl's Ex. 5). No black has maintained a residence on the property. (Pl's Ex. 5).

## SUMMARY JUDGMENT STANDARD

Summary judgment is to be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56.

"As the moving party, [the defendant] has the burden of showing the absence of a genuine issue of material fact, and for these purposes the material it lodged must be viewed in the light most favorable to the opposing party." *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970); *Hairston v. Gainesville Sun Publishing Co.,* 9 F.3d 913, 918 (11th Cir. 1993). The district court cannot weigh conflicting evidence or make credibility determinations; instead, "'[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Hairston*, 9 F.3d.

The substantive law defines which facts are "material." A factual dispute is "genuine" if "a reasonable jury could return a verdict for the non-movant," and there is "a real basis in the record" for the factual dispute. *Hairston,* 9 F.3d at 919.

**ARGUMENT**

The Supreme Court has emphasized that a plaintiff's burden in establishing a prima facie case "is not onerous;" it serves only to "eliminate] the most common nondiscriminatory reasons" for the challenged action. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253-54 (1981); *see also Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir 1997) ("demonstrating a prima facie case requires only that the plaintiff establish facts adequate to permit an inference of discrimination"). The Eleventh Circuit has "generally eschew[ed] an overly strict formulation of the elements of a prima facie case." *Maddow v. Proctor & Gamble Co.*, 107 F.3d 846, 851 (11th Cir. 1997); *see also Isenbergh v. Knight-Ridder Newspaper Sales, Inc.*, 97 F.3d 436, 440 (11th Cir. 1996)

(emphasizing that "any prima facie case test must be flexible").

The Eleventh Circuit stated:

> We have repeatedly emphasized that the requisite showings that make up a prima facie case are not meant to be rigid or inflexible. In cases where the evidence does not fit neatly into the classic prima facie case formula, for example, we have stated that "[a] prima facie case of disparate treatment can be established by any 'proof of actions taken by the employer from which we infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations."

*Schoenfield v. Babbitt*, 168 F.3d 1257, 1268 (11th Cir. 1999).

The Defendant asserts that Lee cannot establish a prima facie case of wage discrimination because, under *Cooper v. Southern Company*, 390 F. 3d 695, 735 (11th Cir. 2004), he is not similarly situated to Norman. Defendant asserts this because Norman has a two year degree in wildlife biology and is more experienced than Lee in the area of quail hunting. The *Cooper* case is not applicable here. The *Cooper* decision, which has been overruled, was a class action case involving Southern Company, where the plaintiffs were seeking class certification with respect to discriminatory pay claims.

This case involves only 11-12 employees in Bullock County. This case does not involve any written anti-discrimination policy as Mid-State did not have a written policy forbidding discrimination based on race. How can Mid-State claim that its conduct was reasonable when it failed to have a written policy forbidding discrimination. Obviously, if you don't have a written policy, you can not train your employees on your policy. Mid-State likewise did not have an employee manual, handbook, or written job descriptions. Its compensation scheme is, shall we say, based on unfettered discretion which lends itself

to discriminatory decisions.

Here, the black Plaintiffs are claiming that the Defendant operated an unfair two-tiered pay scheme. They allege that all blacks were paid less than whites. For the laborer positions, that was clearly the case. All one needs to do is look at Plaintiffs Exhibit 21. This is a statement showing wages for all employees in 2004 and 2005. It shows that all blacks were hired at an hourly rate of $7.00 per hour or less and that all whites were hired at an hourly rate of $8.00 per hour or more. One of the whites, Chance Hamm, was hired by Carroll in 2006. He was paid $8.00 per hour allegedly because he was a welder. However, Cory Balkcom, a black male, was hired in 2005. Balkcom put on his application that he was not only a welder but a diesel mechanic with 20 years experience and 8 years as a Marine instructor. (Pl's Exhibit 23). However, he was only paid $7.00 per hour.

Furthermore, Beckwith was hired in July of 2005. He was a general laborer who cut grass. However, he was allowed to stay on the property and was paid $8.00 per hour. Carroll claims that Beckwith was paid more because he had additional duties as a night watchman. But in order to comply with the FLSA, they would have to pay him for hours spent as a night watchman. Lee recommended Henry Tarver for the position of night watchman. Tarver is a black male. He was hired in June 2005 at $7.00 hour. He was never a night watchman. Instead, Carroll hired Beckwith in July. No black has ever been allowed to live on the property at Sedgefields. As one can see, there is evidence of racial discrimination. This manifests itself in Lee's claim in a number of different areas. Lee is the only black who has ever been hired in management in Mid-State. He is also the only person ever to work in management on an hourly rate instead of a salary. This occurred in 2004 and through the first half of 2005. In fact, in 2004, Lee put in over 3,900 hours.

If Lee works a 40 hour week for 52 weeks it totals 2,080 hours. Lee's wages, including overtime for 2004, were $45,000.00.

When one looks at the Mid-State organization chart, Lee's and Norman's jobs appear to be equal. (Pl's Ex. 26). Both positions are supervisory, and both have about the same number of men under them. How can there be such a disparity in the total compensation package? Does the junior college degree adequately explain the difference? Hardly.

Carroll is the one who set Lee's salary. Carroll actually reduced Lee's compensation by placing him on a salary of $41,000.00 annually. Lee alleges this was discriminatory. How can one be placed on a salary that is lower than their hourly wages?

Lee was over both deer operations and quail hunting in 2004. He was one of very few employees on the plantation at that time. He worked extreme hours because he had so much responsibility for the plantation. Lee was informed he was doing an outstanding job. (Pl's Ex. 1, p. 36).

In September 2005, Carroll hired Norman. Norman has a two year degree in wildlife biology. He makes $70,000.00 per year annually. He also lives on the plantation. Carroll admits that he has never discussed living on the plantation with Lee. Obviously, that is an item of compensation that has never been offered to Lee.

Additionally, Mid-State paid for Norman's health insurance. Mid-State has never offered to compensate Lee for his health insurance. (Pl's Ex. 5).

Lee acknowledges that Norman has greater educational qualifications. Norman has also had more experience than Lee. However, Norman does not have more hunting experience as Lee has been an avid outdoorsman and hunter for all of his life.

Lee does not claim that he should be paid equally to Norman. He only claims that Norman's total compensation, when compared with his, shows that Mid-State is discriminating against blacks. As has been demonstrated, Norman gets paid over $30,000.00 more for a two year degree, gets his housing provided and also his insurance. Lee, who has worked on the plantation since the year 2000, was for a year was in charge of deer operations and quail hunting operations. The job was divided between Lee and Norman. Lee now makes $41,000.00 per year, does not receive lodging on the property, and does not have his insurance paid for. Lee works far more hours than Norman. Under these facts, a jury could find that Mid-State's pay scheme is discriminatory. They could also find that articulated reason for the disparity, a two year degree is pretextual. Carroll has a four year degree in timber management, along with a masters degree. He only makes $75,000.00. The former wildlife biologists had four year degrees and were not paid anything approaching $70,000.00 annually. There is ample reason to doubt Mid-State's articulated reason. Why are all blacks paid less than whites? Why is no black allowed to live on the property? Why is Lee paid salary which is less than he earned on an hourly basis the previous year? Why doesn't Mid-State allow Lee to live on the property or pay for his insurance? Why was Corey Balkcom, a black male who listed welding on his application as a special skill, paid $7.00 per hour when Chance Hamm, a 20 year old white male was paid $8.00 an hour because he is a welder? All of these facts show a discriminatory pay scheme was in place at Mid-State. These facts all provide an ample inference from which a jury can infer intentional discrimination. Plaintiff would assert that the very name of the hunting operation, "Sedgefields Plantation", is circumstantial evidence of discrimination. Why in the year 2000 does an employer refer to itself as a "plantation"?

This very idea connotes mistreatment of blacks and the vestiges of slavery. Mid-State lived up to the time honored tradition of exploiting black labor. It paid blacks $7.00 per hour while the property it owned appreciated from $14 million to $32 million in value. It paid young white men more money than it paid experienced black men with the same or similar skills. This is not justice. This is discrimination.

This is also materially adverse when viewed by a reasonable person under the same circumstances, *Davis v. Town of Lake Park*, 245 F 2d 1232, 1239 (11th Cir. 2001).

The only issue on summary judgment is whether the Plaintiff's evidence has placed material facts at issue, *Farley v. Nationwide Mutual Insurance Co.*, 197 F. 3d 1322, at 1337 (11th Cir. 1999).

The burden on Lee is only to show such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's articulated reasons for its actions that a reasonable fact finder could find them unworthy of credence. *Combs v. Plantation Patterns*, 106 F 3d 1519, 1528 (11th Cir. 1997). Lee has clearly met his burden of proving pretext.

Wherefore, Lee respectfully requests that the Defendant's Motion for Summary Judgment be denied.

        Respectfully submitted,

        s/Jerry Roberson
        Jerry Roberson (ROB010)
        Roberson & Roberson
        P.O. Box 380487
        Birmingham, Alabama 35238-0487
        Phone Number:   205.981.3906
        Fax Number:   205.981.3908
        E-mail: jdratty@charter.net

tlbaker@charter.net

**OF COUNSEL*:*

Albert H. Adams, Jr., Esq.  (ADA-058)
IRBY LAW FIRM, LLC
P.O. Box 910
Eufaula, Al. 36072

### CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of April 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Carter H. Dukes, Esq.
Kimberly W. Geisler, Esq.
HUCKABY SCOTT & DUKES, P.C.
2100 Third Avenue North, Suite 700
Birmingham, Alabama 35203

            s/Jerry Roberson
            _____
            OF COUNSEL