**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **JEFFREY HARRIS, WILLIE BERNARD MACK, DEMETRIUS PARHAM and HENRY TARVER,** | ) ) ) | |
| | ) | **Civil Action No.:** |
| **Plaintiffs** | ) ) | **2:06-cv-875-ID-CSC** |
| **v.** | ) ) | |
| **MID-STATE LAND & TIMBER COMPANY, INC., d/b/a SEDGEFIELDS PLANTATION,** | ) ) ) | |
| **Defendant.** | | |

**PLAINTIFF ROY LEE'S NOTICE OF FILING OF EVIDENTIARY MATERIALS
IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

**COMES NOW** Roy Lee, one of the Plaintiffs in the above styled action, by and

through his undersigned counsel of record, and files the following evidentiary materials

in Opposition to the Defendant's Motion for Summary Judgment:

Exhibit 1.    Deposition of Roy Lee (1), ***Norris Foster v. Mid-State Land & Timber Company, Inc.,* 2:06-CV-405 ID**

Exhibit 2.    Deposition of Roy Lee (2), ***Jeffrey Harris, et al. v. Mid-State Land & Timber Company, Inc.*, 2:06-cv-875-ID-CSC**

Exhibit 3.    Deposition of David Carroll (1), ***Norris Foster v. Mid-State Land & Timber Company, Inc.* 2:06-CV-405 ID**

Exhibit 4.    Deposition of David Carroll (2), ***Jeffrey Harris, et al. v. Mid-State Land & Timber Company, Inc.*, 2:06-cv-875-ID-CSC**

Exhibit 5.    Declaration of Roy Lee

Exhibit 6.    Declaration of Norris Foster

Exhibit 7.      Norman Personnel File

Exhibit 8.      Norman Application

Exhibit 9.      Lee's Personnel File

Exhibit 10.     Lee's application

Exhibit 11.     William Hubbard's application

Exhibit 12.     Hubbard wages

Exhibit 13.     May wages

Exhibit14.      May application

Exhibit15.      Hamm wages

Exhibit 16.     Hamm application

Exhibit 17.     Jeffrey Harris wages

Exhibit 18.     Jeffrey Harris application

Exhibit 19.     Mack wages

Exhibit 20.     Mack application

Exhibit 21.     2005-2006 Employee Wage Chart

Exhibit 22.     Foster wages

Exhibit 23.     Balkcom application

Exhibit 24.     2003-2004 Employee Wage Chart

Exhibit 25.     Second Amended Complaint filed in ***Jeffrey Harris, et al. v. Mid-State Land & Timber Company, Inc.***, **2:06-cv-875-ID-CSC**

Exhibit 26.     Sedgefields Plantation Organizational Chart 2006

Respectfully submitted,


s/Jerry Roberson
Jerry Roberson (ROB010)
Roberson & Roberson
P.O. Box 380487
Birmingham, Alabama 35238-0487
Phone Number:    205.981.3906
Fax Number:        205.981.3908
E-mail: jdratty@charter.net
           tlbaker@charter.net


**OF COUNSEL:**

Albert H. Adams, Jr., Esq.  (ADA-058)
IRBY LAW FIRM, LLC
P.O. Box 910
Eufaula, Al. 36072


## CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of April, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Carter H. Dukes, Esq.
Kimberly W. Geisler, Esq.
HUCKABY SCOTT & DUKES, P.C.
2100 Third Avenue North, Suite 700
Birmingham, Alabama 35203


s/Jerry Roberson
Jerry Roberson (ROB010)

EXHIBIT 1

# Condensed Transcript

# Deposition of
# Roy Lee

### taken on
### October 11, 2006

### Norris Foster
### v.
### Mid State Land and Timber Company, Incorporated,
### d/b/a Sedgefields Plantation

### Case No. 206-cv-00405-IDSRW



**Certified Court Reporters and Certified Legal Video Specialists**
334.262.3332  1.888.253.DEPS
Email: depo@baker-baker.com
www.baker-baker.com

1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

NORRIS FOSTER,
         Plaintiff,
vs.                CASE NO. 206-cv-00405-IDSRW
MID STATE LAND AND TIMBER
COMPANY, INCORPORATED,
d/b/a SEDGEFIELDS PLANTATION,
         Defendant.

*    *    *    *    *    *    *    *    *

The videotaped deposition of ROY LEE
was taken before Cornelia J. Baker,
Certified Court Reporter and Certified
Shorthand Reporter, as Commissioner, on
Wednesday, October 11, 2006, commencing at
approximately 12:33 p.m., in the law
office of John Waters, Union Springs,
Alabama, pursuant to the stipulations set
forth herein.

---

2

1   *    *    *    *    *    *    *
2            APPEARANCES
3
4   Representing the Plaintiff:
5       MR. JERRY D. ROBERSON
        Attorney at Law
6       Roberson & Roberson
        8 Office Park Circle, Suite 150
7       Birmingham, Alabama 35223
8       MR. ALBERT ADAMS
        Attorney at Law
9       Irby Law Firm, L.L.C.
        257 West Broad Street
10      Eufaula, Alabama 36027
11
12  Representing the Defendant:
13      MR. CARTER H. DUKES
        Attorney at Law
14      Concord Center, Suite 700
        2100 Third Avenue North
15      Birmingham, Alabama 35203
16
17
18  Also present:
19      Mr. Jeff Baker, CLVS
20      Mr. Norris Foster
21      Mr. David Carroll
22
23

---

3

1   *    *    *    *    *    *    *    *
2
3            STIPULATIONS
4
5       It is hereby stipulated and agreed by
6   and between counsel representing the
7   parties that the videotaped deposition of
8   ROY LEE is taken pursuant to the Rules of
9   Civil Procedure, and that said deposition
10  may be taken before Cornelia J. Baker,
11  Certified Court Reporter, as Commissioner,
12  without the formality of a commission;
13  that objections to questions, other than
14  objections as to the form of the
15  questions, need not be made at this time,
16  but may be reserved for a ruling at such
17  time as the deposition may be offered into
18  evidence, or used for any other purpose by
19  either party hereto, provided by the
20  Statute.
21      It is further stipulated and agreed by
22  and between counsel representing the
23  parties in this case, that the filing of

---

4

1   the deposition of ROY LEE is hereby
2   waived, and that said deposition may be
3   introduced at the trial of this case or
4   used in any other manner by either party
5   hereto provided for by the Statute,
6   regardless of the waiving of the filing of
7   same.
8       It is further stipulated and agreed by
9   and between counsel and the witness that
10  the reading and signing of the deposition
11  by the witness is hereby not waived.
12
13  *    *    *    *    *    *    *    *
14
15
16
17
18
19
20
21
22
23

Pages 1 to 4

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377     Certified Court Reporters and Certified Legal Video Specialists     888.253.3377

Roy Lee
October 11, 2006

5

1    * * * * * * * *
2        I N D E X
3
4  EXAMINATION                    PAGE
5  BY MR. ROBERSON:                 10
6  EXHIBIT                        PAGE
7  Plaintiff's Exhibit No. 1 .......... 25
      3/23/01 Employee Termination form
8     on Norris Foster
9  Plaintiff's Exhibit No. 2 .......... 27
      4/04/01 Unemployment Compensation
10    form on Norris Foster
11 Plaintiff's Exhibit No. 3 .......... 31
      Mid State Land and Timber New
12    Management Structure
13 Plaintiff's Exhibit No. 4 .......... 37
      3/24/06 Employment Organizational
14    Chart for Sedgefields Plantation
15 Plaintiff's Exhibit No. 5 .......... 74
      Employee Records Jacket on Joel
16    Norman
17 Plaintiff's Exhibit No. 6 .......... 82
      9/01/05 Employment Application on
18    Joel S. Norman, Jr.
19 Plaintiff's Exhibit No. 7 .......... 91
      3/08/05 Mid State Land and Timber
20    Employee Information on Norman
      Foster
21
   Plaintiff's Exhibit No. 8 .......... 92
22    Employee Records Jacket on Norris
      Foster
23

6

1
   Plaintiff's Exhibit No. 9 .......... 94
2     5/01/05 Payroll Status Change Form
      for Norris Foster
3
   Plaintiff's Exhibit No. 10 .......... 96
4     12/16/05 Sedgefields Plantation
      Formal Reprimand for Norris Foster
5
   Plaintiff's Exhibit No. 11 .......... 107
6     12/29/05 Payroll Status Change Form
      on Norris Harris
7
   Plaintiff's Exhibit No. 12 .......... 114
8     Employee Records Jacket on Roy Lee
9  Plaintiff's Exhibit No. 13 .......... 115
      8/10/00 Employment Application on
10    Roy Lee
11 Plaintiff's Exhibit No. 14 .......... 116
      3/04/02 Mid State Land and Timber
12    Employee Information on Roy Lee
13 Plaintiff's Exhibit No. 15 .......... 118
      Affidavit of Jeffrey Harris
14
   Plaintiff's Exhibit No. 16 .......... 125
15    9/30/05 Employee Termination Form
      on William Beckwith, Jr.
16
   Plaintiff's Exhibit No. 17 .......... 131
17    11/17/05 Employee Application of
      William Rogers Hubbard
18
   Plaintiff's Exhibit No. 18 .......... 132
19    Employee Records Jacket of Will
      Hubbard
20
   Plaintiff's Exhibit No. 19 .......... 137
21    Employee Records Jacket of Joseph
      Adam May
22
   Plaintiff's Exhibit No. 20 .......... 138
23    11/17/05 Employment Application of

7

1  Plaintiff's Exhibit No. 21 .......... 142
      Employment Records Jacket of Chance
2     Hamm
3  Plaintiff's Exhibit No. 22 .......... 142
      11/22/05 Employment Application of
4     Forest Chance Hamm
5  Plaintiff's Exhibit No. 23 .......... 146
      Employee Records Jacket on Jeffrey
6     Harris
7  Plaintiff's Exhibit No. 24 .......... 147
      8/30/05 Employment Application of
8     Jeffrey Harris
9  Plaintiff's Exhibit No. 25 .......... 148
      Certificate of Birth for Jeffrey
10    Noel Harris
11 Plaintiff's Exhibit No. 26 .......... 149
      Employee Records Jacket for Willie
12    Mack
13 Plaintiff's Exhibit No. 27 .......... 150
      3/16/04 Employment Application of
14    Willie B. Mack
15
16
17
18
19
20
21
22
23

8

1     THE VIDEOGRAPHER:  We are now on
2     the Record.  Today is
3     October 11th, 2006.  The
4     time is 12:33 p.m.
5        My name is Jeff Baker,
6     Certified Legal Video
7     Specialist for Advanced
8     Video Services.  And this
9     is the videotaped
10    deposition of Mr. Roy Lee
11    taken in the law office of
12    John Waters in Union
13    Springs, Alabama.
14       This deposition is
15    being taken in the matter
16    of Norris Foster,
17    Plaintiff, vs. Mid State
18    Land and Timber Company,
19    Incorporated, doing
20    business as Sedgefields
21    Plantation, Civil Action
22    No. 206-cv-00405-IGSRW, in
23    the U.S. District Court for

Pages 5 to 8

334.262.3332         Baker & Baker Reporting and Video Services, Inc.         334.262.3332
888.253.3377    Certified Court Reporters and Certified Legal Video Specialists    888.253.3377

Roy Lee
October 11, 2006

9

1   the Middle District of
2   Alabama, Northern Division.
3       At this time all
4   persons present will state
5   their name and affiliation
6   with this case, and
7   immediately following we'll
8   have the swearing-in of the
9   Witness.
10      MR. ROBERSON:  My name is Jerry
11  Roberson.  I'm an attorney,
12  and I represent the
13  Plaintiff, Norris Foster.
14      MR. ADAMS:  Albert Adams,
15  representing Norris Foster,
16  the Plaintiff.
17      MR. FOSTER:  Norris Foster, the
18  Plaintiff.
19      MR. DUKES:  I'm Carter Dukes,
20  representing Mid State.
21      Say your name.
22      MR. LEE:  Roy Lee.
23      MR. CARROLL:  David Carroll,

10

1       Sedgefields Plantation.
2       COURT REPORTER:  Usual
3   stipulations?
4       (Whereupon all parties agreed
5   to usual stipulations.)
6       ROY LEE,
7   The Witness, having first been duly sworn
8   or affirmed to speak the truth, the whole
9   truth, and nothing but the truth,
10  testified as follows:
11      EXAMINATION
12  BY MR. ROBERSON:
13  Q. Mr. Lee, my name is Jerry Roberson.  I
14  represent Norris Foster in this case.  And
15  he has filed a lawsuit alleging race
16  discrimination as concerns his employment
17  with the former owner of Sedgefields, Mid
18  State Land and Timber Company.  Do you
19  understand that?
20  A. I understand.
21  Q. Okay.  And do you -- did you, up until the
22  sale of Mid States in May of this year,
23  did you work for Mid States prior?

11

1   A. Yes.
2   Q. Okay.  And what period of time did you
3   begin your employment with Mid States?
4   A. I can't recall what time I started.
5   Q. Okay.  Well, I've got your personnel file.
6   And if I suggest to you that it was in the
7   year 2000, would that sound about right?
8   A. I think so, about right.
9   Q. Okay.  Now, Mr. Lee, what position do you
10  hold at Mid -- at what was Mid States?
11  A. Farm manager.
12  Q. So you're in management at Mid States?
13  A. Right.
14  Q. And do you know when you were assigned to
15  work in management at Mid States?  Do you
16  know what year it was?
17  A. Not right off.
18  Q. Okay.  Well, Mr. Dukes is the lawyer that
19  represents Mid States.
20  A. Uh-huh (affirmative response).
21  Q. Do you understand that?
22  A. Right.
23  Q. Have you ever given a deposition before

12

1   today?
2   A. No.
3   Q. Okay.  There are some rules when I'm
4   talking to you.  And one rule is she's got
5   to take down everything we say.  So you
6   and I shouldn't try to talk at the same
7   time.
8   A. I understand.
9   Q. Okay?
10  A. I understand.
11  Q. And another rule, you're sworn, so you
12  understand you're supposed to tell the
13  truth?
14  A. Right.
15  Q. Okay.  And today, since we're trying to
16  make a record of what's said, I need you
17  to answer out.  That is, don't nod your
18  head or say uh-huh or huh-uh, okay?
19  A. Okay.
20  Q. So we can have a clear record about what
21  was said, okay?
22  A. Okay.
23  Q. And if I ask you a question that you don't

Pages 9 to 12

13

1  understand the question, you don't
2  understand what I'm asking you, you need
3  to tell me so that I -- otherwise, I'll
4  think you understood it, and I'll accept
5  your answer, okay?
6  A. Okay.
7  Q. So if I ask you something and you don't
8  understand what I'm asking, let me know,
9  okay?
10 A. Okay.
11 Q. And today, if you need to stop and go to
12 the bathroom or get a drink or, you know,
13 just take a break, let us know, because we
14 need to go off the Record --
15 A. Okay.
16 Q. -- and do that, okay?
17 A. Okay.
18 Q. All right. Now, where do you live, Roy?
19 A. Midway, Alabama.
20 Q. And are you from this area originally?
21 A. Yes.
22 Q. Have you lived here all your life?
23 A. All my life.

14

1  Q. Okay. Now, Midway -- I'm not from Midway,
2  but Midway is kind of a small town, right?
3  A. Right.
4  Q. Do you know Norris Foster?
5  A. Yes, I do.
6  Q. Have you been knowing him really all your
7  life?
8  A. Yes.
9  Q. Because he lives in Midway, too, right?
10 A. Right.
11 Q. Okay. And how -- just how many -- about
12 how many people live in Midway?
13 A. The City of Midway?
14 Q. Yeah.
15 A. I would like -- I would say -- I really
16 don't know how many. It's a lot of them.
17 Q. Okay. Well, Midway is in -- is it in
18 Bullock County?
19 A. Bullock County.
20 Q. And as far as the demographics, the
21 population of Bullock County, do you know
22 what percentage of black people live --
23 make up the population of Bullock County?

15

1  A. No, I don't. It's more black, I know,
2  than white, so . . .
3  Q. Okay.
4  A. I wouldn't know how many.
5  Q. All right. Now, you started working at
6  Mid States in the year 2000. And now, do
7  you work for Tollison's?
8  A. Yes, I do.
9  Q. In the same job you had at Mid States?
10 A. Yes.
11 Q. And that job is farm manager?
12 A. Yes.
13 Q. Okay. Now, before you went to work at --
14 how old are you, Roy?
15 A. Forty-seven.
16 Q. Before you went to work at Mid States, did
17 you work?
18 A. Before I went to work?
19 Q. Yeah.
20 A. At Mid States?
21 Q. Yes.
22 A. Yes.
23 Q. Where did you work?

16

1  A. Beaulieu of America.
2  Q. What kind of business is that?
3  A. Yarn division.
4  Q. Yarn?
5  A. Uh-huh (affirmative response).
6  Q. Textile industry?
7  A. Right.
8  Q. How long did you work for Beaulieu?
9  A. Probably eighteen, nineteen years.
10 Q. And what position when you left there,
11 were you?
12 A. Supervisor.
13 Q. Is that also in management?
14 A. Right.
15 Q. How many people did you supervise?
16 A. Thirty-two.
17 Q. Did you work -- where was your job? Where
18 did you work for them?
19 A. What you mean?
20 Q. At Beaulieu they've got -- don't they have
21 a plant or . . .
22 A. Yeah, they have a plant.
23 Q. In Eufaula?

Pages 13 to 16

334.262.3332                Baker & Baker Reporting and Video Services, Inc.                334.262.3332
888.253.3377         Certified Court Reporters and Certified Legal Video Specialists         888.253.3377

17

1  A. Union Springs.
2  Q. In Union Springs?
3  A. Right.
4  Q. Do they have one in Eufaula?
5  A. Yeah, Eufaula.
6  Q. Okay. But you worked in Union Springs?
7  A. Right.
8  Q. Okay. Now, why did you leave Beaulieu?
9  A. The mill shut down. A new company come in
10  and bought us out.
11  Q. Okay.
12  A. And they wanted to transport me to
13  Columbus. They had a plant in Columbus.
14  I went over there for --
15  Q. Columbus, Georgia?
16  A. Right.
17  Q. Okay.
18  A. So I went a couple of weeks, and I didn't
19  like it. So they transferred me to
20  Eufaula, and I didn't like it. So I took
21  the layoff.
22  Q. Okay. So they were relocating you?
23  A. Right.

18

1  Q. And you didn't like where they reassigned
2  you?
3  A. Right.
4  Q. Is that fair?
5  A. That's right.
6  Q. Okay. And so how did you get a job at Mid
7  States?
8  A. When I first -- Norris.
9  Q. Norris Foster?
10  A. Norris told me about it. And Bow Jack
11  (phonetic), a guy named Bow Jack.
12  Q. Was he just a laborer, too?
13  A. Bow Jack?
14  Q. Bow Jack.
15  A. Yes.
16  Q. And did they both work at Mid States?
17  A. Right.
18  Q. Now, are you a hunter? I mean, that is
19  before you started working at Mid States,
20  were you a hunter?
21    MR. DUKES: Object to the form.
22  Q. That is, did you hunt deer or quail or
23  anything?

19

1  A. Deer hunter, yes. Coon hunter, yeah.
2  Q. Okay. And do you -- do you like, enjoy
3  being -- working outside or being outside?
4  A. Yes. I love it, yeah.
5  Q. Okay. So that appealed to you to work on
6  a plantation?
7  A. Right.
8  Q. Work outside on a plantation?
9  A. Right.
10  Q. And did you start working at Mid States as
11  a laborer?
12  A. Yes, I did.
13  Q. Who -- do you know who hired you?
14  A. Hunter McDuffie.
15  Q. Okay. And was he the plantation manager
16  when you started?
17  A. Right.
18  Q. And was he a white man?
19  A. Yes.
20  Q. Okay. And were you assigned to a crew
21  initially?
22  A. Yes.
23  Q. Who was in your crew, if you recall?

20

1  A. Kevin Terrell (phonetic).
2  Q. Kevin?
3  A. Kevin.
4  Q. Yes. All right.
5  A. Norris Foster.
6  Q. Okay.
7  A. Myself.
8  Q. All right. Anybody else?
9  A. Mr. Hunter McDuffie.
10  Q. Okay. Now, was Hunter the guide, so to
11  speak, of the crew?
12  A. Of the crew?
13  Q. Yeah.
14  A. Hunter was the manager of the plantation.
15  Q. Right.
16  A. Norris was the guide.
17  Q. Oh, Norris. What kind of hunting did
18  y'all do initially?
19  A. Quail hunt.
20  Q. Okay. So did Norris take the dogs out and
21  handle the dogs?
22  A. Yes.
23  Q. Okay. And what was your job on the crew?

Pages 17 to 20

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377       Certified Court Reporters and Certified Legal Video Specialists       888.253.3377

21

1  A. I was a backup man.
2  Q. Backup?
3  A. Backup man.
4  Q. What were your responsibilities?
5  A. Pick up birds. Hold horses when the
6     client get off the horses.
7  Q. They hunt from a horse?
8  A. Right.
9  Q. Do they --
10 A. And a wagon.
11 Q. Do they actually shoot from a horse or do
12    they get down to shoot?
13 A. No. They get down to shoot.
14 Q. They just ride the horses in the field --
15 A. Right.
16 Q. -- from one place to another?
17 A. To the dog points, uh-huh.
18 Q. Okay. I apologize to you --
19 A. That's okay.
20 Q. -- but I'm not a hunter.
21 A. That's okay.
22 Q. And some of the people that are hunting
23    ride in a wagon?

22

1  A. Right.
2  Q. Okay. And what pulls the wagon; is it
3     horses or mules?
4  A. They had mules at that time pulling the
5     wagon.
6  Q. Okay. And that's just, again, to
7     transport the people?
8  A. Right.
9  Q. And they get out of the wagon and shoot?
10 A. Right.
11 Q. When the dog points?
12 A. Right.
13 Q. Okay. Now, what was Kevin's job?
14 A. Kevin's job was the same thing. Kevin was
15    running the wagon.
16 Q. Okay.
17 A. He was holding the mules. Because you
18    couldn't get down off of the wagon.
19 Q. Okay.
20 A. Somebody had to be there all the time.
21 Q. Right.
22 A. That was Kevin Terrell's job.
23 Q. Okay. Now, when y'all took people on

23

1     hunts and Roy -- and Norris was the
2     handler, the guide --
3  A. Uh-huh (affirmative response).
4  Q. -- when you had a successful hunt, that is
5     they killed a lot of birds, did sometimes
6     the guests leave a tip for y'all?
7  A. Yes.
8  Q. How did y'all divide up the tips?
9  A. That would go up under Hunter McDuffie.
10 Q. Okay.
11 A. Hunter McDuffie would divide it up with
12    us.
13 Q. Okay. And did you, from time to time,
14    receive tips?
15 A. Yes.
16 Q. I mean, would they pay you in cash or
17    would it be something that would be put on
18    your check?
19 A. Sometimes cash. Sometimes it would have
20    to go through the office on payroll
21    deduction.
22 Q. Okay. All right. Now, Norris was laid
23    off -- before I get to that, would you say

24

1     that initially Norris was your supervisor?
2  A. Huh?
3  Q. Was Norris ever your supervisor?
4  A. No. Hunter had Norris by -- Norris been
5     there longer than I have --
6  Q. Yes, sir.
7  A. -- and Kevin was there longer than I have.
8     I was the last man came.
9  Q. Okay.
10 A. Norris was there all the time. So they
11    had Norris showing us what to do.
12 Q. Okay. So Norris helped, for lack of a
13    belter word? You hadn't worked on a
14    plantation before, right?
15 A. No, no.
16 Q. So he trained you?
17 A. Right.
18 Q. That is he showed you what the work was
19    that had to be done before the hunts --
20 A. Right.
21 Q. -- and how to hunt? I mean, what --
22    correct?
23 A. Right.

334.262.3332                Baker & Baker Reporting and Video Services, Inc.                334.262.3332
888.253.3377              Certified Court Reporters and Certified Legal Video Specialists              888.253.3377

Roy Lee
October 11, 2006

---

**25**

1  Q. Okay. Now, in 2001, Norris -- in March of
2    2001, Norris was laid off?
3  A. Uh-huh (affirmative response).
4  Q. Do you recall that?
5        MR. DUKES: Object to the form.
6  A. Yes.
7  Q. Okay. Were there a lot of people, not
8    just Norris? That is it wasn't a one-man
9    layoff, it was several people were laid
10   off; is that correct?
11       MR. DUKES: Object to the form.
12 A. That's correct.
13 Q. Okay. I'm going to show you what I've
14   already marked as Plaintiff's Exhibit 1 to
15   your deposition. And this is a piece of
16   paper that's marked 0055. It's from
17   Norris' personnel file. And I will tell
18   you we've got a protective order in this
19   case. That is, you're not supposed to
20   discuss how much people make and things
21   like that.
22       (Whereupon Plaintiff's Exhibit
23        No. 1 was marked for

---

**26**

1        identification and attached
2        hereto.)
3  A. Right.
4  Q. It's not supposed to leave this room,
5    okay?
6  A. Okay.
7  Q. Do you agree with that?
8  A. I understand that.
9  Q. Okay. I'm going to show you Norris' --
10   part of his personnel file, and ask you to
11   read what Mid States Land and Timber said
12   was the reason he was let go.
13       MR. DUKES: Object to the form.
14       Document speaks for itself.
15 Q. You can answer. Does it have a reason for
16   his termination? Do you see that about
17   the middle of the page?
18 A. Right here?
19 Q. Yes.
20 A. From my understanding, what I see down
21   here, it looks like --
22 Q. Reduction in staff?
23 A. Reduction in staff.

---

**27**

1  Q. Yeah.
2  A. From plantation work.
3  Q. Okay. So, it looks -- and does it -- on
4    the document, does it say whether or not
5    he's eligible for rehire?
6        MR. DUKES: Object to the form.
7  A. Yeah. Say he is.
8  Q. He is eligible --
9  A. Right.
10 Q. -- on that document?
11 A. Uh-huh (affirmative response).
12 Q. Okay. Then I'm going to show you what
13   I've marked as Exhibit 2 to your
14   deposition. And this is a document that
15   Mid State sent to the Department of
16   Unemployment, Alabama Industrial
17   Relations, for Norris Foster. And they
18   indicated the reason why he separated.
19   Would you read at the bottom of the page
20   what that reason that they -- as they
21   reported to the unemployment office?
22       (Whereupon Plaintiff's Exhibit
23        No. 2 was marked for

---

**28**

1        identification and attached
2        hereto.)
3        MR. DUKES: Object to the form.
4  A. Reduction of staff.
5  Q. Okay. Now, do you see the signature at
6    the bottom of that page?
7  A. On the left-hand corner?
8  Q. Yes, sir.
9  A. Uh-huh, yes.
10 Q. Who is that?
11 A. Charlie -- looks like Charlie Phillips
12   (phonetic).
13 Q. Was he ever at the -- was he ever
14   a work -- somebody that worked at
15   Sedgefields?
16 A. Charlie was the CEO.
17 Q. Was he ever on the property?
18 A. He come in like once a month with
19   Mr. Broadhead.
20 Q. Okay. Was he in Meridian?
21 A. Right.
22 Q. Okay. But he was the -- the employee of
23   Mid States who would be responsible for

---

Pages 25 to 28

29

1  signing a form like that?
2       MR. DUKES:  Object to the form.
3  A. Right.
4  Q. Right?
5  A. Right.
6  Q. Okay.  And he indicated that Norris was
7     let go for reduction in staffing?
8       MR. DUKES:  Object to the form.
9  A. Right.
10 Q. And that -- does that show that Norris
11    received a severance, two weeks paid
12    severance?
13      MR. DUKES:  Object to the form.
14 Q. I mean, about the middle of the page
15    again.  I know you're not familiar with
16    that form.
17 A. I see where it says, Paid for period
18    3/19/2000.  Right here.
19      MR. DUKES:  Right here is what
20          he's asking you about.
21      THE WITNESS:  Okay.
22 BY MR. ROBERSON:
23 Q. Did he get a severance?  Does that

30

1     document indicate that he got a severance?
2       MR. DUKES:  It says he got a --
3           what does it say?
4  Q. He got paid after he left work; is that
5     correct?
6  A. No.  I mean, I don't --
7       THE WITNESS:  What is that?
8       MR. DUKES:  He got -- well, the
9           document says, does it not,
10          that he got a separation
11          pay of $520 as a courtesy,
12          slash, gift?
13 A. Okay.
14 Q. Okay.  So they gave him $500 --
15 A. $500.
16 Q. -- after he stopped working there?
17 A. Right.
18 Q. And then he drew his unemployment?
19 A. Right.
20 Q. It shows that?
21 A. Right.
22 Q. All right.  Now, Roy, you were in
23    management at Beaulieu, right?

31

1  A. Beaulieu.
2  Q. Beaulieu.
3  A. Uh-huh (affirmative response).
4  Q. And if somebody stole from you and you
5     fired them, they can't draw their
6     unemployment, can they?
7       MR. DUKES:  Object to the form.
8  A. No.  No, they can't.
9  Q. But Norris drew his unemployment there,
10    didn't he?
11 A. Right.  According to this form, right.
12 Q. Okay.  Now, I'm going to show you Exhibit
13    3, which is a document that was provided
14    to me from Mid States, and it lists some
15    people, an organizational chart.  Have you
16    ever seen that document before today?
17      (Whereupon Plaintiff's Exhibit
18          No. 3 was marked for
19          identification and attached
20          hereto.)
21 A. I know these names and these peoples, but
22    I've never seen this form right here.
23 Q. Okay.  Well, and it lists on there -- will

32

1     you just list the people that are in
2     management there?
3  A. Donna.
4  Q. Donna Davidson?
5  A. Yeah.  It's just got Donna wrote on here.
6  Q. Okay.
7  A. But her last name was Davidson.
8  Q. All right.  Who else?
9  A. It's got Donna Davidson again for
10    follow-up manager.
11 Q. All right.
12 A. It's got Byron Davidson.  That was her
13    husband.
14 Q. Now, are they related to the Broadheads,
15    if you know?
16 A. Well, they used to be.  Donna used to be
17    married to his brother before he passed.
18 Q. Okay.
19 A. But after he passed, she remarried Byron
20    Davidson.
21 Q. Okay.
22 A. And you got Roy for farm manager.
23 Q. Now, farm manager, what does that mean?

Pages 29 to 32

334.262.3332                Baker & Baker Reporting and Video Services, Inc.                334.262.3332
888.253.3377          Certified Court Reporters and Certified Legal Video Specialists          888.253.3377

Roy Lee
October 11, 2006

33

1      **What were your duties as a farm manager?**
2   A. Everything on the outside that wasn't
3      involved in office work.
4   **Q. There's about 13,000 acres at Sedgefields,**
5      **right?**
6   A. Yes, sir, 14.
7   **Q. Okay.  So you were responsible for the**
8      **13,000 acres?**
9   A. Right.
10  **Q. Not the office and the lodge --**
11  A. No.
12  **Q. -- but everything else?**
13  A. Right.
14  **Q. Okay.  All right.  Did that -- does that**
15     **include the hunting?**
16  A. That included everything, hunting, the
17     peoples that worked under me.
18  **Q. Okay.  Now, when that document was made,**
19     **how were you paid?  Do you recall?**
20  A. I haven't ever seen this paper before.
21  **Q. Okay.  Well, when you were the farm**
22     **manager, how were you paid?  Were you paid**
23     **a salary or were you paid by the hour?**

34

1           MR. DUKES:  Object to the form.
2   A. I was paid weekly.
3   **Q. By the hour?**
4   A. Yeah, by the hour.
5   **Q. How much did you make an hour?**
6   A. When I become farm manager, I think they
7      raised me up to $10.
8   **Q. Okay.  And I guess you got paid $15 an**
9      **hour overtime, right?**
10  A. Right.  Because I did a lot of overtime,
11     yeah.
12  **Q. Okay.  All right.  Who else is on that**
13     **list?**
14  A. Chuck.  His last name is Sikes.  It would
15     be Chuck Sikes, wildlife manager.
16  **Q. All right.  Now, what was his job?**
17  A. Wildlife manager.  He would come in there
18     and determine where to plant food plots,
19     how your stands located, stuff like that
20     there.
21  **Q. Okay.  Was he black or white?**
22  A. He's a white guy.
23  **Q. Was he -- does he still work there?**

35

1   A. No.
2   **Q. Do you know why he doesn't?  Did anybody**
3      **ever tell you why he doesn't?**
4   A. Yeah -- well, I heard rumors.  I don't
5      know for sure.
6   **Q. What did you hear?**
7   A. They fired Chuck Sikes.
8   **Q. Why?**
9   A. Because he told some things about Byron
10     Davidson to Mr. Broadhead.  And they fired
11     Byron first.  So I heard they did a
12     background on Chuck Sikes.  And then they
13     went and they fired Chuck Sikes.  But I
14     don't know if that's true or not.
15  **Q. Okay.  Well, all I can ask you is what you**
16     **heard.**
17  A. Okay.
18  **Q. You haven't seen any documents about that?**
19  A. No, huh-uh.
20  **Q. Okay.  And do you know why they fired**
21     **Byron Davidson?**
22  A. I -- I heard why they fired him.  He told
23     me why they fired him.  But I don't

36

1      know --
2   **Q. What did he tell you?**
3   A. He told me -- said that Chuck Sikes told
4      Mr. Broadhead that he was drinking on the
5      job.  He left some client in the woods who
6      was deer hunting, and he didn't go back to
7      get them, that I had to go get them.
8   **Q. And was that true?  Did you have to go get**
9      **some folks?**
10  A. I mean, we -- we was understaffed, and we
11     was booked up.  He wasn't drinking when I
12     was around him.
13  **Q. Okay.**
14  A. I did when it got more mens than what I
15     normally pick up.  Just because, you know,
16     we check in and find out who was still in
17     and who was out.  If there ain't no man
18     there, then I'm going back out to the
19     office first, then I'll go back and get
20     the next man.
21  **Q. Okay.  All right.  So it's not that you're**
22     **saying he was drinking on the job, you**
23     **never saw him?**

Pages 33 to 36

37

1    A. I never saw that.
2    Q. But you did have to go get some people --
3    A. Right.
4    Q. -- that he had left in the woods?
5    A. One.
6    Q. Okay.
7    A. Yeah.
8    Q. All right.  Anything else that you know
9       about with Mr. Davidson?
10   A. No.
11   Q. Okay.  Now, I'm going to show you what's
12      been marked as Exhibit 4 to a previous
13      deposition.  And this is an organizational
14      chart from March of 2006.  Have you ever
15      seen that document before?
16          (Whereupon Plaintiff's Exhibit
17           No. 4 was marked for
18           identification and attached
19           hereto.)
20          (Witness reviewed document.)
21   A. I had never seen this paper.  But I know
22      my position, what I was in out there to
23      the job.  I know what Denise's position

38

1       was, David and Joel.
2    Q. Okay.  So is it fair that's an accurate
3       organizational chart as of March of 2006?
4    A. Say that again.
5    Q. That's an accurate depiction of the
6       organizational chart as of March of 2006?
7    A. As of March 2006, yes.
8    Q. Okay.  Now, what is your position that's
9       listed on there?
10   A. Roy Lee, deer operations manager.
11   Q. Okay.  And then --
12   A. Head of ground crew.
13   Q. Okay.  So what are your duties as the deer
14      operations manager and the head of the
15      ground crew?
16   A. It's a lot of different things.  One in
17      particular is cleaning deers.  Making sure
18      my hunters are out, deer hunters.  Put
19      them out on time.  Picking them up on
20      time.  Making sure my crew do the same
21      thing.
22   Q. Now, you told me about quail hunting.
23      Now, I don't hunt, so can you tell me

39

1       about deer hunting, what y'all -- if
2       somebody -- you have a customer at
3       Sedgefields who pays for a hunt, a deer
4       hunt --
5    A. Okay.
6    Q. -- do you bow hunt?
7    A. We had a couple of hunters -- do I bow
8       hunt personally?
9    Q. Do you take people on bow hunts?
10   A. Yes, sir, I have.
11   Q. Okay.  How do you do that?  I mean --
12   A. I go out and start and determine where the
13      deer crossing.
14   Q. Kind of a scout?
15   A. Right.
16   Q. You scout out ahead of time?
17   A. Right.
18   Q. Where they're -- where they're gathered or
19      where they're passing?
20   A. Right.
21   Q. Okay.
22   A. And then I show my bow hunters.  My bow
23      hunters will come a couple of hours early.

40

1       We'll go in and look and be thinking it's
2       a good place.  He'll put his own stand in
3       there.
4    Q. So they hunt from a stand?
5    A. Yeah.
6    Q. And do you -- with a truck or --
7    A. No, no.
8    Q. How do y'all get around in there?
9    A. We get around in a truck.  We ride so far
10      and then we'll walk.
11   Q. Okay.
12   A. To keep from disturbing the animals.
13   Q. Okay.  Y'all don't have four-wheelers and
14      stuff like that?
15   A. Yeah, we got that.
16   Q. You do, but you don't drive them?  You
17      don't take them, because they're loud?
18   A. Right.
19   Q. Okay.  All right.  Then do they stay in
20      a stand?  Y'all don't -- what I'm getting
21      to is y'all don't use dogs to drive the
22      deer?
23   A. No, we don't do that.

Pages 37 to 40

334.262.3332                    Baker & Baker Reporting and Video Services, Inc.                    334.262.3332
888.253.3377          Certified Court Reporters and Certified Legal Video Specialists          888.253.3377

41

1   Q. Don't, okay.  You just -- they get out in
2      the woods ahead of time and get in the
3      stand and be real quiet --
4   A. Right.
5   Q. -- and hope they show up, and that's it?
6   A. Right.  My job is been to went out there
7      and looked and scouted already to see what
8      I see.
9   Q. Okay.
10  A. And then I would tell my bow hunters what
11     I think would be the best place for them
12     to go.  Then I take them out early to let
13     them look to see if they like the signs.
14     They'll put -- they'll come back in there
15     and put their stands up.
16  Q. Okay.  And then you go back and get
17     them at --
18  A. Right.  First dark.  First dark.  We'll
19     put them out after lunch, about 12:30 or
20     1:00, and go back and get them.  It'll be
21     dark about 6:00.
22  Q. Now, is there any difference when it's gun
23     season?  I mean, do you do the same thing

42

1      when they have a gun instead of a bow?
2   A. Right.  Well, gun season is different, a
3      lot different from bow season.
4   Q. Okay.  Tell me about that.
5   A. A lot different.  In gun season, I would
6      take my hunters out.  I'd already be done
7      sought out and scouted and looked for the
8      deer, setting the deer stands.  I had some
9      of my peoples setting the deer stands,
10     some of my crew.
11  Q. You actually set the stands up ahead of
12     time?
13  A. Yeah.  They be already -- some of them are
14     there permanently.  We don't ever move
15     them.
16  Q. Okay.
17  A. We've got food plots we never move.  Some
18     new food plots we have to move.
19  Q. Okay.  So you've got plots where there's
20     grass growing --
21  A. Right.  Stuff we plant.
22  Q. -- that you hope will attract the deer?
23  A. Right.

43

1   Q. And then you put a permanent stand close
2      to that plot so that --
3   A. That's right.
4   Q. Okay.
5   A. Right.
6   Q. That's one way you do it?
7   A. Right.
8   Q. And then what else do you do?
9   A. And then I go back and tell my deer
10     hunters when they come in what we seen.
11     And then the weather, we check the weather
12     and all that.
13  Q. All right.
14  A. If the weather is right, we can put them
15     on that stand.  If it's not, we can't.
16  Q. You mean, which way the wind is blowing
17     and that kind of stuff?
18  A. Right.  If it's out of the -- if you've
19     got a stand out there in the west, where a
20     west wind, and it's blowing out of the
21     north, you wouldn't want to put them in
22     there.
23  Q. Okay.  Because the deer can smell you?

44

1   A. Right.
2   Q. Okay.  Anything -- and how many hunters do
3      you take when you're deer hunting?  I
4      mean, I'm sure it varies, but what's the
5      range?
6   A. The range, no more than ten.  Maybe nine.
7      No more than nine.  For three days.
8      You've got three days to kill.
9   Q. Okay.  And then they come back and spend
10     the night at the lodge?
11  A. Right.
12  Q. And get fed --
13  A. Right.
14  Q. -- and then they go out again the next
15     day?
16  A. Right.
17  Q. Okay.  And it sounds to me, though, like
18     there's a whole lot of work that goes into
19     a successful hunt before you hunt?
20  A. It is.
21  Q. I mean, most of the work is preparing the
22     place to be hunted --
23  A. Right.

Pages 41 to 44

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377     Certified Court Reporters and Certified Legal Video Specialists     888.253.3377

Roy Lee
October 11, 2006

45

1  Q. -- is that right?
2  A. That's right.
3  Q. And what do you have to do besides plant
4     food plots and things?
5  A. Well, see, there's a lot of man hours.
6     You have to bushhog. You have to go in
7     there and bushhog. You have to trim
8     limbs, check your stands, then come back
9     and plant. You have a whole lot of stuff
10    to do.
11 Q. It's a -- is it a year-round --
12 A. Right.
13 Q. -- job to get ready to hunt for just a
14    very limited season?
15 A. Right. You've got certain times to plant.
16    You've got to know when to plant and what
17    time to plant --
18 Q. Right.
19 A. -- before bow season comes in. At least
20    you want your grass that tall before bow
21    season comes in.
22 Q. Okay. All right. Now, was there ever a
23    period of time where you were over -- you

46

1     were the -- where y'all didn't have a
2     general manager?
3  A. Yes.
4  Q. Do you know how long that was, that period
5     of time was?
6  A. Donna Davidson was the manager after they
7     fired Byron Davidson.
8  Q. Okay.
9  A. Donna stayed there until the last day --
10    if I'm not mistaken, she stayed there
11    until the last day of deer season. The
12    last day, yeah.
13 Q. Which year?
14 A. That would be in -- which year?
15 Q. Yes, sir. Is that '05?
16 A. I believe -- I don't think it was '05.
17 Q. Okay.
18 A. I can't recall what year that was, but I
19    do know it's before David came.
20 Q. Okay. There was a gap, and you don't know
21    the date, but there was a gap from Donna
22    leaving --
23 A. Uh-huh (affirmative response).

47

1  Q. -- until David was hired --
2  A. Right.
3  Q. -- is that -- is that right?
4  A. That's right.
5  Q. Y'all didn't have a manager?
6  A. Right.
7  Q. Was that for a year or more? Or do you
8     know?
9  A. It wasn't quite a year, I don't think. I
10    don't think it was quite a year. No, it
11    wasn't quite a year.
12 Q. Okay.
13 A. It was close, but not quite a year.
14 Q. Well, my question that I'm trying to ask
15    is: Was there ever a period of time where
16    you were doing both jobs, that is running
17    both the deer hunting and the quail
18    hunting?
19 A. Well, I did the deers and quails when
20    Donna was there.
21 Q. Okay.
22 A. So I did it after she left. I did the
23    deers while she was there, because Byron

48

1     was gone.
2  Q. Okay.
3  A. But see, when Byron was there, Byron was
4     helping me. I trained Byron myself.
5  Q. What did he do? What kind of --
6  A. He used to go out and help me plant food
7     plots. He'd help me put out hunters,
8     stuff like that.
9  Q. But did he ever go on the hunts, Byron?
10 A. Deer hunts?
11 Q. Deer hunts or quail?
12 A. Yeah. We had certain deer hunters -- I
13    mean, we had a certain amount of deers we
14    had to harvest. And quail hunts, Byron,
15    yeah, he'd go. He'd ride sometimes.
16 Q. Okay. Have you ever worked as a guide?
17    I'm going to use the term "guide," that
18    person that handles the dogs. Have you
19    ever taken hunters out on a quail hunt
20    where you were handling the dogs?
21 A. Lots of times, yeah.
22 Q. Okay. Do you call it a guide, that --
23 A. That particular word?

49

1  Q. Yeah.  What do you call that position
2     where you're handling --
3  A. I call that -- well, if I'm handling the
4     dogs, I call that a handler.
5  Q. Okay.  You're the handler?
6  A. Right.
7  Q. Are you in charge of the hunt as the
8     handler?
9  A. Right.
10 Q. Okay.  And then . . . so Norris was laid
11    off in 2001?
12        MR. DUKES:  Object to the form.
13 Q. Correct?
14 A. Correct.
15 Q. We've discussed that document.  And then
16    he was hired -- rehired in 2005; is that
17    correct?
18 A. That's correct.
19 Q. And who hired him?
20 A. I hired him.
21 Q. Okay.  And why did you hire him?
22 A. Why did I hire him?  Because I needed some
23    help.

50

1  Q. Okay.
2  A. I needed -- I was low in staff, and I
3     needed some help.  And I got approval from
4     the main office to find some help.
5  Q. Okay.  And who were you talking to at the
6     main office?
7  A. Sherry Howell.  Bob Rea.
8  Q. Okay.  Now, and you knew Norris --
9  A. Yes.
10 Q. -- because he had worked -- you had worked
11    with him before?
12 A. Right.
13 Q. And you knew he knew about hunting?
14 A. Right.
15 Q. I mean --
16 A. I know he knowed the place.
17 Q. Yeah.  He knows the place, and he's
18    experienced?
19 A. Right.
20 Q. Okay.  Now, I want -- do you know how to
21    handle -- operate heavy equipment?
22 A. Yes, I do.
23 Q. Have you ever operated a backhoe?

51

1  A. Yes, I have.
2  Q. Have you ever operated a bulldozer?
3  A. Yes.
4  Q. What do y'all use that kind of equipment
5     for there on the farm?
6  A. Well, it depends.  On putting in covers.
7     What I'm calling the cover, a pipe like --
8  Q. Drain?
9  A. Yeah, stuff like that.
10 Q. Drainpipe?
11 A. Yeah.  You've got a septic tank backed up.
12    We might have to re-dig a field line,
13    stuff like that with the backhoe.
14 Q. Okay.
15 A. The dozer, if we're building a new road or
16    pushing firebreaks or anything like that.
17    If the tractor's stuck or something, we
18    pull it out.
19 Q. Pushing firebreaks, what do you mean by
20    that?
21 A. You know, like on the line there.  Like
22    you got -- like this is your property on
23    this side --

52

1  Q. Right.
2  A. -- this is another man's property on this
3     side, you're going to separate.  If you're
4     burning off, you want to separate in
5     between there.  So you want to make a
6     firebreak around it to keep the fire from
7     jumping over on his side.
8  Q. You push -- you put your blade down and
9     push --
10 A. Right.
11 Q. -- and make a barrier kind of?
12 A. Right, make a clean path.
13 Q. Okay.
14 A. Just keep the fire from burning across.
15 Q. Keep the fire from spreading?
16 A. Right.  That's right.
17 Q. You take the fuel away from the fire --
18 A. That's right.
19 Q. -- basically?
20 A. Right.
21 Q. Okay.  And you do that.  And why do you
22    burn off?
23 A. For habitat reason, quails.  You know,

Pages 49 to 52

53

1    you've got a certain place to circle
2    around in the area for the quails or
3    deers, just anything. You know, the
4    wildlife biologists go out and tell you
5    what -- the wildlife biologists go out and
6    determine it. That's what we used to do.
7    **Q. Okay.**
8    A. Determine what is what.
9    **Q. And so you burn off to thin out the brush?**
10   A. Make a new growth, yeah.
11   **Q. Okay.**
12   A. A lot of wildlife like that scratching out
13   there when it's burnt, turkeys.
14   **Q. All right. When you worked with Norris,**
15   **before he got laid off, did you have an**
16   **opportunity to watch him work?**
17   A. Yes. Before?
18   **Q. Yes, before he got laid off --**
19   A. Yes, I did.
20   **Q. -- from the time you were hired until he**
21   **got laid off?**
22   A. Right.
23   **Q. Was he a good worker?**

54

1    A. Yeah.
2    **Q. I mean --**
3    A. I would think so.
4    **Q. -- was he knowledgeable about bird**
5    **hunting?**
6    A. Yeah. He knowed about bird hunting,
7    because that was his job before I came.
8    **Q. All right.**
9    A. I mean, he was working with Hunter
10   McDuffie.
11   **Q. And did he know how to operate a tractor?**
12   A. Yes.
13   **Q. And did he train you or show you how to**
14   **operate one?**
15   A. Yeah.
16   **Q. Or I guess you knew, but I mean . . .**
17   A. Yeah, he gave me a lot of tips.
18   **Q. But I mean, about how you prepare the**
19   **fields and stuff?**
20   A. Right, yeah.
21   **Q. Okay. And so when you were back as a**
22   **foreman after he got laid off --**
23   A. Uh-huh (affirmative response).

55

1    **Q. -- and they put you in charge, did you**
2    **seek him out to hire? Do you know what**
3    **I'm saying?**
4    A. No, I don't.
5    **Q. Okay. In other words, you needed some**
6    **help, right?**
7    A. Right.
8    **Q. So did you go to him and ask him if he**
9    **would work for you?**
10   A. No. I went to Sherry Howell --
11   **Q. Okay.**
12   A. -- and Bob Rea first.
13   **Q. Right.**
14   A. I told them they had a lot of work on me,
15   and I was putting in a lot of hours. I
16   needed some help.
17   **Q. Okay. You got permission to hire**
18   **somebody?**
19   A. Permission from Bob Rea and Sherry Howell
20   to find somebody that -- to help me that
21   knew how to drive a tractor real good that
22   knowed the place.
23   **Q. Okay. And did you talk to Norris?**

56

1    A. No. I talked to Damon Duncan first.
2    **Q. Okay. Did you hire him? Did he ever work**
3    **for you?**
4    A. No. I didn't hire him, because he
5    wouldn't come.
6    **Q. Okay. All right. And then did you go to**
7    **Norris?**
8    A. I went -- I sent my brother-in-law,
9    Demetrius Parham, to go tell Norris I
10   needed to see him about a job.
11   **Q. Okay. And did he?**
12   A. Yes, he did.
13   **Q. And then Norris --**
14   A. Norris came to my house.
15   **Q. Okay.**
16   A. The next -- the first day I sent
17   Demetrius, Norris wasn't at home. The
18   next day I sent Demetrius, he found
19   Norris. Norris come to my house.
20   **Q. Now, Demetrius Parham, I represent him.**
21   **He's also suing. Did you know that?**
22   A. No.
23   **Q. Well, he's a black male, you know that?**

Pages 53 to 56

334.262.3332              Baker & Baker Reporting and Video Services, Inc.              334.262.3332
888.253.3377        Certified Court Reporters and Certified Legal Video Specialists     888.253.3377

57

1  A. Right.
2  Q. And he works at Sedge -- or worked at Mid
3     States, correct?
4  A. Uh-huh (affirmative response).
5  Q. What did he do? Was he a laborer, too?
6  A. He was a labor worker.
7  Q. Okay. Did he ever work -- did he work
8     under you?
9  A. Yeah.
10  Q. Demetrius Parham?
11  A. Yeah.
12  Q. Now, if he's your -- you say in-law?
13  A. He's married to my sister.
14  Q. Okay.
15  A. Brother-in-law.
16  Q. Is it -- as far as you know, is there any
17     prohibition for you supervising your
18     brother-in-law?
19  A. No. Because like this, if he messes up,
20     he -- I mean, no favors.
21  Q. Okay. Well, I'm not implying --
22  A. Okay.
23  Q. -- that you give him a favor.

58

1  A. Okay.
2  Q. I'm just asking about the work. That's
3     never been a problem --
4  A. No.
5  Q. -- that anybody's discussed with you?
6  A. No, No, no.
7  Q. Okay. All right. Well, then, did you and
8     Norris have some discussions about the job
9     and about how much he would make?
10  A. When I sent for Norris?
11  Q. Yes.
12  A. Okay, when I sent for Norris -- I don't
13     know. I believe that was on a Thursday.
14     I sent for Norris on a Tuesday or a
15     Wednesday. He wasn't at home. The next
16     day Demetrius found him. He came to me on
17     Thursday. I say, Norris, I say, I'm
18     looking for some help. I need some help.
19     Ms. Sherry Howell and Mr. Bob Rea told me
20     to find somebody that could drive a
21     tractor real good and could take the
22     pressure off of me, that know the place,
23     to help me bird hunt.

59

1  Q. Right.
2  A. I said, Well, are you interested in the
3     job? He said, When can I start? I said,
4     Hold on a minute. I said, Now, you
5     know -- I'm going to let you know now,
6     you'd be working under me. He said, I
7     ain't got a problem. I said, You know, me
8     and you ain't been talking lately. I
9     said, But now, if you have a problem
10     working for me, you tell me now. He said,
11     No, I don't; when can I start? I said,
12     Norris, let me tell you something like
13     this here. I said, You know why you left
14     before. I said, You know what they say
15     you left before. He said, Okay, yeah. I
16     said, All right, I'm going to tell you
17     like this here now, if you come up with
18     anything missing, a can of oil or anything
19     missing, I'm going to have to let you go.
20     I ain't got to see you, I'll let the boys
21     see you. If they tell me, you're gone.
22     He said, Fine.
23        All right. So I said, You just

60

1     wait till Monday and come down there and
2     meet me at the barn at 7:00. That was on
3     a Thursday. I called Sherry Howell back
4     and Bob Rea. I told them, I said, I
5     talked with Damon. Damon said he wasn't
6     coming for under $10 an hour. I said,
7     Okay. I talked to Norris. I said, you
8     know, Norris used to work here. I said,
9     He knows about the dogs; he knows how to
10     bushhog. He knows where to go.
11        He said, What did he say? I
12     said, He said he'd come back. I said, But
13     he's making $8 now. He ain't working --
14     he ain't working no less. He said, Well,
15     we'll give him $9. I said, Okay. I said,
16     Okay. But he said, Start him off with 8.
17     And then you keep him there a month, and
18     if you like -- he's doing what you need
19     him to do, then move him up to $9, as far
20     as me and Bob Rea talking on the phone.
21        I said, Okay. I said, Well, now,
22     you make sure you run this by Ms. Sherry.
23     He said, I will. All right. So I left

Pages 57 to 60

334.262.3332        Baker & Baker Reporting and Video Services, Inc.        334.262.3332
888.253.3377    Certified Court Reporters and Certified Legal Video Specialists    888.253.3377

61

1   that alone.
2        I still was thinking about
3   whether to hire Norris or whether or not
4   to hire Norris.  So I called
5   Mr. Broadhead's daughter, Suzanne.  And
6   she stay in Atlanta.  I called Suzanne and
7   Matt Garver.
8   **Q. Does she have some job with --**
9   A. She had a lot of input in the place.
10  **Q. Okay.**
11  A. Yeah.  And so I said, I've talked to them.
12  I said, Look here, I need some help down
13  there.  I said, I need to hire somebody,
14  and I got Norris.  I've already talked
15  with Sherry Howell and Bob.  Bob said
16  whatever I do, I'm behind you 100 percent.
17  So Suzanne said, Well, you know what
18  happened before with Norris.  I said,
19  Yeah.  I said, Well, I know that, but any
20  man can be changed.  I said, I see him all
21  of the time.  I said, Anybody can be
22  changed, give him a second chance.  She
23  said, Okay, whatever you decide, I'm 100

62

1   percent with you.  She said, I appreciate
2   you calling us and letting us know that
3   you were thinking about us when you did
4   that.  She said, Whatever your decision
5   is, I'm with you 100 percent.  I said,
6   Thank you.  So when Norris got there that
7   Monday, I put Norris to work.
8   **Q. Did you know how much he was making?**
9   A. Not at the time.  Norris supposed to have
10  been making $8.  Supposed to start him off
11  at 8, but stay here a month, he'd move him
12  up to 9.
13       All right.  So when Norris came
14  to me after got his first check, I
15  think -- you've got to put two weeks in a
16  hole, I think.  After he got his first
17  check, he said, Roy -- he said, I thought
18  you said I'd make $8.  I said, Yeah,
19  that's what you supposed to be.  I said, I
20  ran that by Denise, though.  Denise was
21  with Bob.  Rea said start you off with $8
22  I said, But let me go down here and check.
23  So I went down there.  I called Bob.  Bob

63

1   said, Well, Roy -- he said, look here.  He
2   said, On Norris's application, he's got
3   down there I work for $7.  I said, Well --
4   I said, he told me he wasn't working under
5   that.  I said, Okay, then, well, I'll tell
6   him that's his fault.  So I went back and
7   told Norris, Norris, you know what
8   happened, you put on your application $7.
9   I said, Now, I done told you I'd start you
10  off with $8, and you'd make up to $9.  I
11  said, but -- he said, Well, my girlfriend
12  filled that out, and I didn't even check
13  it.  That's what he said.  I said, Okay.
14       I said, Well, then, maybe you
15  stay here a month, then you get up -- you
16  get back up where you supposed to be if
17  you're doing a good job.  A month went by,
18  two months went by, they didn't never say
19  nothing.  Then David came.  And then
20  Norris was asking me again.  I said, Well,
21  you need to take that up with David.
22  David is the manager.  You need to go talk
23  to David about that.  And then, after

64

1   then, I don't know what happened.
2   **Q. All right.  But you understood and you got**
3   **permission to hire him at $8 an hour**
4   **before --**
5   A. Correct.
6   **Q. -- he was hired?**
7   A. Correct.
8   **Q. And then he put -- or somebody put $7 --**
9   A. On his application, uh-huh.
10  **Q. -- on his application, and that's what**
11  **they paid him?**
12  A. Right.
13  **Q. And they never -- to your knowledge, while**
14  **Norris worked at Mid States, he never did**
15  **make $8 an hour, did he?**
16  A. To my knowledge, he never did.  He said he
17  didn't.  I never did -- I didn't have -- I
18  was going by what he said he never did.
19  **Q. Okay.  All right.  Now, after you hired**
20  **Norris back -- and we've had some**
21  **discussions with some other people -- do**
22  **you have any personal knowledge that**
23  **Norris ever stole any birds before the**

Pages 61 to 64

Roy Lee
October 11, 2006

---

65

1    2001 --
2    A. Before I hired him back?
3    Q. Yes. Do you know -- in other words, did
4       you ever see --
5    A. I don't know that for a fact.
6    Q. Okay. You heard that he had?
7    A. I heard he did.
8    Q. And you heard from Hunter McDuffie?
9    A. Right.
10   Q. I mean, that's who --
11   A. That's my manager.
12   Q. Yeah. Denise said Hunter McDuffie said
13      it?
14   A. I heard that Hunter McDuffie said that.
15   Q. Okay.
16   A. That's what I heard, but I don't know that
17      for a fact.
18   Q. And you never seen a document that says
19      that he stole?
20   A. I never seen that.
21   Q. Okay. Now, at least during the period of
22      time when Norris worked for you before
23      David Carroll was hired as manager --

---

66

1    A. Yes.
2    Q. -- did he do his job?
3    A. Very good job.
4    Q. Did you have any criticism of his job
5       performance?
6    A. I didn't have any problem out of Norris or
7       none of the guys. When Sherry Broadhead
8       and them come down, they said the place
9       looked real good, Roy. I appreciate the
10      hard work y'all doing. Norris kept the
11      road mowed. When I'd tell him actually to
12      do something, he'd go do it. Now,
13      whatever happened after then when he left
14      my department, I don't know.
15   Q. Okay. But at least during the time when
16      you were supervising him --
17   A. He did what he was supposed to do.
18   Q. Okay.
19   A. Right.
20   Q. Then at some point, did they hire Joel
21      Norman, Mid States?
22   A. My understanding -- this is my
23      understanding.

---

67

1    Q. Okay.
2    A. When they hired Joel Norman, David told
3       me, said, I'm going to get somebody in
4       here to do the birds to take the pressure
5       off of you.
6    Q. Because -- were you doing both?
7    A. Huh?
8    Q. Were you having to do both?
9    A. I was doing both. We didn't have bird
10      hunting when David came. I was doing both
11      before David came.
12   Q. Right.
13   A. I was doing both when Donna -- before
14      Donna came, I was doing it when Mark Gregg
15      was there. So Mark Gregg was the manager,
16      too.
17   Q. Mark Gregg?
18   A. Mark Gregg.
19   Q. Before --
20   A. Before Donna Davidson.
21   Q. He was the general manager before Donna?
22   A. Right, right.
23   Q. Okay.

---

68

1    A. They had --
2    Q. Well, wait a minute. Wait a minute. I
3       thought Byron was the manager?
4    A. Huh-uh (negative response).
5    Q. Okay.
6    A. No.
7    Q. He was before --
8    A. Mark Gregg was there after they fired
9       Hunter McDuffie. Hunter McDuffie and Mark
10      Gregg was there together. Both of them
11      was a manager.
12   Q. Where is Mark Gregg now?
13   A. He work for Cornerstone Plantation.
14   Q. Do you know why he doesn't work for
15      Sedgefields?
16   A. Well, I heard rumors. He told me a few
17      things. Then, one thing --
18   Q. What did -- what did he tell you?
19   A. Do I really have to say that?
20   Q. Yes, sir.
21   A. He told me that Donna put some stuff in
22      the game and got him fired.
23   Q. Put some stuff in the game?

Pages 65 to 68

334.262.3332                Baker & Baker Reporting and Video Services, Inc.                334.262.3332
888.253.3377        Certified Court Reporters and Certified Legal Video Specialists        888.253.3377

69

1 A. I wouldn't repeat the cussing words he
2   used, but he said that Donna put some
3   things in the game to tell Mr. Broadhead,
4   what got him fired.
5       What I'm saying is, we had Mark
6   Gregg. We had Mark. We had Greg Wallace.
7   All of these were -- all of these were
8   managers.
9 Q. How many managers have you --
10 A. It was --
11 Q. -- had at --
12 A. Whew, a lot of them.
13 Q. Since 2000?
14 A. Yeah, yeah. Okay. See, all of them guys
15   was -- all of us was working together. We
16   had a team. Each man had their own crew.
17   Okay. After this happened, after they
18   fired Paul, Jr., Paul, Jr. --
19 Q. Paul Broadhead, Jr.?
20 A. Yeah. They come down and fired Hunter
21   McDuffie.
22 Q. You mean, Mr. Broadhead fired his own son?
23 A. Right.

70

1 Q. Why?
2 A. I don't know. I don't know.
3       Okay. After then, Greg, Greg
4   Wallace -- Greg Wallace and Mark was
5   there. They fired Hunter McDuffie after
6   Paul, Jr.
7 Q. Do you know why they fired Hunter?
8 A. No -- well, I heard a few rumors. He was
9   more interested in birds than picking
10   Mr. Broadhead up at the airport. That's
11   what I heard. Now, I don't know.
12 Q. All right.
13 A. Okay. After they got rid of Hunter, that
14   left Mark in charge -- no. Let me back
15   that up. That left Mark and Greg Wallace.
16   Greg Wallace was messing around and went
17   up to Montgomery to work for Paul, Jr.
18   Carried some of the crew to Montgomery and
19   worked there for Paul, Jr., at his house.
20   It got back to Mr. Broadhead -- got back
21   to Sherry Howell, and they fired Greg the
22   next week.
23 Q. To do personal work at his house?

71

1 A. Right, right.
2 Q. Like landscaping or . . .
3 A. Right. Cutting grass, stuff like that.
4   He had a crew that he took up there to do
5   that. They told them Paul, Jr., don't
6   work for Sedgefields Plantation anymore.
7   So Greg got upset. So they fired Greg.
8   That left Mark in charge of everybody.
9   Okay. So that leaves me -- there was
10   Mark, Damon Duncan, a guy named Tom Cat,
11   and me. And Joseph, I think. Joseph and
12   Chris, a guy named Chris. We was the only
13   shakers that were left.
14 Q. Okay. And these other people you've
15   described were laborers?
16 A. Laborers, labor workers, yeah.
17 Q. All right. So you've had numerous
18   managers at Sedgefields?
19 A. Well, I done left out one, but he didn't
20   stay long enough to tie his shoe.
21 Q. Who was he?
22 A. That was Joe McFerrin. He out of
23   Fort Davis, right up above Sedgefield. He

72

1   might have stayed six months.
2 Q. Why did they fire him? Or did they fire
3   him?
4 A. Well, he baited the dove field the wrong
5   way. And the CEO came down and found it,
6   and then they got rid of him. He was
7   raising sand anyway.
8 Q. Okay. Now, this is a race discrimination
9   case. So other than you, has there ever
10   been anybody in management at Sedgefields
11   that's been black that you're aware of?
12 A. No, huh-uh, no.
13 Q. Now -- and then David hired Joel Norman?
14 A. Right.
15 Q. To run the quail operations?
16 A. Right.
17 Q. I gave you that one. All right. Now --
18   MR. ROBERSON: Where is Joel
19     Norman's stuff?
20 Q. Mr. Roy Lee, are you on a salary now?
21 A. Yes.
22 Q. How much do you make as the deer
23   operations manager?

Roy Lee
October 11, 2006

73

1   A. I think I make $20 and a quarter, I
2      believe, an hour.
3   Q. Do you know what that is annually?
4   A. That's something like $600 -- before
5      takeout? Before taxes?
6   Q. No. After -- yeah, before taxes, what
7      that is annually.
8   A. That's about $800 every two weeks.
9   Q. Is it about $41,000 a year?
10  A. It's close, yeah.
11  Q. And do you live on the property at
12     Sedgefields?
13  A. No.
14  Q. But they do provide you with a vehicle, a
15     truck?
16  A. Right.
17  Q. And the gas, too?
18  A. Right.
19  Q. Do they have a gas pump on the property?
20  A. Yes.
21  Q. And a tank, and you can just fill up when
22     you're out there?
23  A. Yeah, you can, yeah.

75

1   A. Yes, I did.
2   Q. Did they ever pay you anything approaching
3      $70,000?
4   A. No, they haven't.
5   Q. Is Joel Norman white?
6   A. Yes.
7   Q. Now, I have asked the people at
8      Sedgefields, David Carroll, why he makes
9      so much more than you. And one of the
10     reasons they gave was that he had a
11     degree, a two-year degree?
12  A. Uh-huh (affirmative response).
13  Q. And another reason they gave is saying you
14     had never been a supervisor before you
15     worked at Sedgefields.
16  A. Uh-huh (affirmative response).
17        MR. DUKES: Object to the form.
18  Q. That's not true, is it? You had been a
19     supervisor.
20  A. That's not true. At Beaulieu of America,
21     yeah.
22  Q. You were a supervisor?
23  A. Right.

74

1   Q. Now, I'm going to show you -- and again,
2      I'll caution you that we have a protective
3      order, and so you can't discuss this, but
4      I'm going to show you what I'll mark as
5      Exhibit 5 to your deposition. And this is
6      a part of the personnel file of Joel
7      Norman. And I'll ask you if you know what
8      he makes after looking at that document.
9         (Whereupon Plaintiff's Exhibit
10           No. 5 was marked for
11           identification and attached
12           hereto.)
13        (Witness reviewed document.)
14  Q. Do you see where he makes $70,000 a year?
15  A. Uh-huh (affirmative response).
16  Q. Now, he has -- now, you need to know this.
17     He has a two-year Associates degree in
18     Wildlife Technology or Wildlife
19     Management; are you aware of that?
20  A. No, I wasn't -- well, I didn't know.
21  Q. Did you do the job that he's doing before
22     he was hired to do it?
23        MR. DUKES: Object to the form.

76

1   Q. You supervised thirty-two people?
2   A. Thirty-two peoples, yeah.
3   Q. Okay. Did you put that on your
4      application?
5   A. Yeah. I'm going to change that. I don't
6      know. That's been a long time.
7   Q. Okay. Well -- now, Mr. Dukes takes the
8      position that I can't talk to you without
9      him being present, because you're in
10     management. And you are in management,
11     right?
12  A. Right.
13  Q. I'm going to tell you that the same law
14     that protects Norris Foster protects you.
15     You see what I was saying?
16  A. Uh-huh (affirmative response).
17  Q. That if they can -- if they discriminate
18     against Norris Foster on account of his
19     race, they can also discriminate against
20     you on account of your race, okay?
21  A. Okay.
22  Q. And I'll also tell you, and I don't know
23     if anybody has told you this --

77

1  A. Uh-huh (affirmative response).
2  Q. Have you met with Mr. Dukes before today?
3     I'm not entitled to know what you talked
4     about, but have you met with him?
5  A. Yes.
6  Q. How many times?
7  A. I think today will be -- today will be
8     three times.
9  Q. Okay. Has anybody ever told you that
10    where you work now, they cannot take any
11    action against you because of testimony
12    you give in this case?
13 A. No.
14 Q. Nobody's told you that?
15 A. Huh-uh (negative response).
16 Q. Well, I'm telling you that.
17 A. Okay.
18 Q. The same law that protects you -- protects
19    him, protects you. And you were asked to
20    come here and testify, correct?
21 A. Correct.
22 Q. They asked you to come?
23 A. Correct.

78

1  Q. You're not volunteering to be here?
2  A. No, I'm not.
3  Q. Okay. I suspect you don't want to be
4     here?
5  A. I really don't.
6        MR. DUKES: You noticed the
7           deposition, did you not?
8        MR. ROBERSON: I did.
9        MR. DUKES: Okay.
10 BY MR. ROBERSON:
11 Q. Well, Mr. Lee, do you know any reason why
12    they are paying Joel Norman $70,000 to do
13    what you were doing for $10 an hour?
14       MR. DUKES: Object to the form.
15 Q. You can answer.
16 A. No, I don't. I don't know any reason why.
17    I mean, I didn't know what he was making.
18    And I mean, like, I done birds a long
19    time. It don't take a genius to figure
20    out how to prepare for birds --
21 Q. Well --
22 A. -- quails, or whatever.
23 Q. Mr. Norman says that he's doing things now

79

1     that you weren't doing, that is he claims
2     that he's initiated a wild bird program,
3     wild bird recovery program, and that he
4     puts birds out a month ahead of time.
5        MR. DUKES: Object to the form.
6           Mischaracterizes his
7           testimony.
8  Q. Do you understand that?
9  A. I understand what you're saying.
10 Q. Yeah. He says he ain't just putting them
11    out in the morning before the hunt and
12    then shooting them, he's putting them out
13    in order to build up the birds.
14 A. Okay.
15 Q. Okay. Was that something you could have
16    done if they'd have asked you to?
17 A. I mean, we -- I did that.
18 Q. You did it?
19 A. All of that before Donna Davidson got
20    there. The only reason why we stopped
21    doing that is because Donna Davidson
22    didn't want to do it. And she was the
23    manager.

80

1  Q. All right. Well, do you feel like it's
2     fair for them to pay Joel Norman so much
3     more than you to do half the job you were
4     doing?
5        MR. DUKES: Object to the form.
6  Q. You can answer.
7  A. I don't feel like it --
8        MR. DUKES: Hey, I'll tell him
9           when to answer. You don't
10          tell him when to answer,
11          okay? You've done that to
12          every single deponent down
13          here. I've objected to the
14          form. And he can surely
15          answer it. But you don't
16          instruct him when to
17          answer, okay?
18             You can answer his
19          question.
20 A. Say -- repeat the question.
21 Q. Do you feel like it's fair how they pay
22    you as opposed to Joel Norman?
23       MR. DUKES: Object to the form.

Pages 77 to 80

334.262.3332                Baker & Baker Reporting and Video Services, Inc.                334.262.3332
888.253.3377       Certified Court Reporters and Certified Legal Video Specialists       888.253.3377

81

1  A. I don't think it's fair.  Personally, I
2     don't, from the job that I know I know
3     what to do.  But I don't know what he
4     makes from looking at this form here.
5  Q. Now, after Joel was hired, did Norris
6     start -- he had been working under you,
7     right?
8  A. Right.
9  Q. Norris had?
10 A. Right.
11 Q. Then he -- was he reassigned to work under
12    Joel?
13 A. Yes.  David came to me and told me that we
14    couldn't do no more hiring right now, so
15    Joel going to have to have some men to
16    help him to prepare for -- they wanted to
17    turn that thing around and get the bird --
18    get the bird thing more than what we'd
19    been having.
20 Q. Right.
21 A. So he said, We have to have some of your
22    guys.  So I went to Norris.  I said, Well,
23    Norris, you know you're good on birds.

82

1     You know, I said, dogs, too.  I said, You
2     want to work with Joel?  Norris said,
3     Yeah, I'll go.  I said, Now, once you go
4     over there, you can't come back.  I said,
5     you'll be with Joel.  So he went with
6     Joel.
7  Q. Now, and Joel was hired, I think --
8        MR. ROBERSON:  Let me mark this.
9  Q. I'm going to show you Exhibit 6.  This is
10    really just Joel's -- Joel's application.
11    But it shows that he was -- he filled out
12    the application in September of '05, and
13    he was hired in September of '05, correct?
14    It looks like 9/19.
15       (Whereupon Plaintiff's Exhibit
16        No. 6 was marked for
17        identification and attached
18        hereto.)
19 A. Nine --
20 Q. See this one on Exhibit 5?
21 A. Oh, 9/19/05.
22 Q. 9/19/05.
23 A. Okay.

83

1  Q. And then, shortly after he was hired,
2     Norris went to work for him?
3  A. Right.  Maybe a couple of weeks after, I
4     think.
5  Q. Okay.  Now -- and Norris was hired back by
6     you in February of '05, right?
7  A. Right.
8  Q. So from February until September or
9     October, Norris worked for you?
10 A. Right.
11 Q. And you didn't have any problems with him?
12 A. At all.
13 Q. Okay.  And then beginning in October --
14    about, I'm saying about -- he worked for
15    Joel; is that right?
16 A. Yes.
17 Q. Who else worked for Joel?
18 A. Brother Man.  We had a guy out there they
19    called Brother Man.  I don't know his real
20    name.  Then we had Willie Mack.  Demetrius
21    was -- Demetrius started with him, but
22    then he ended up back with B.B. -- I mean,
23    with Willie Mack.  And Demetrius came back

84

1     with me.  And Jeffrey --
2  Q. Harris?
3  A. Yeah.  That's his name, Jeffrey Harris.
4  Q. Okay.  He worked with Norris and Joel?
5  A. Norris and Joel, uh-huh.
6  Q. Okay.  Was that a crew, Jeffrey, Norris --
7  A. Jeffrey, Norris --
8  Q. And Joel?
9  A. -- Brother Man and Joel.
10 Q. All right.  Was Brother Man white?
11 A. Right.
12 Q. And was he the guy that was hired and only
13    worked a short -- I say a few months?  Or
14    did he work longer than that?  I think he
15    was hired in July, and then he was -- he's
16    the guy that was fired for stealing gas;
17    is that --
18 A. That's correct.
19 Q. Okay.  But he lived on the property?
20 A. Correct.
21 Q. And he was paid $8 an hour; did you know
22    that?
23 A. No, I didn't.

Pages 81 to 84

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377    Certified Court Reporters and Certified Legal Video Specialists    888.253.3377

85

1   Q. Okay. Well, I want you to assume that he
2      was paid $8 an hour. What kind of work
3      did he do, Brother Man do?
4   A. With me?
5   Q. Yeah. Did he ever work for you?
6   A. Yeah, he worked for me.
7   Q. What did he do?
8   A. Bushhogging, cut grass, weed eat.
9   Q. Labor?
10  A. Labor work.
11  Q. Just general labor?
12  A. Yeah, labor work.
13  Q. To your knowledge, did he have any special
14     skills? I mean --
15  A. Not to my -- only knowledge that I know,
16     that he told me, that was catering,
17     but . . .
18  Q. Okay. All right. Well, I mean, like he
19     wasn't -- to your knowledge, he didn't
20     know how to run a bulldozer or a backhoe
21     or anything like that?
22  A. I never seen him on none of that, huh-uh.
23  Q. Okay. And he lived on the property. Who

86

1      hired Brother Man?
2   A. David.
3   Q. David Carroll?
4   A. Uh-huh (affirmative response).
5   Q. The manager. And he's sitting here today,
6      right?
7   A. Right.
8   Q. All right. The guy worked for you. Did
9      you have anything to do with how much he
10     was paid?
11  A. Which guy, Brother Man?
12  Q. Brother Man, yeah.
13  A. No, I didn't.
14  Q. Okay. And so you didn't hire him, so you
15     weren't even involved in that?
16  A. I wasn't involved. The only thing I know
17     he was -- he was hired.
18  Q. Well, do you know how he was hired? That
19     is, how did they select him or . . .
20  A. I -- the only thing I know about that is
21     David said he was looking for somebody, an
22     older guy, to stay on the place, a night
23     watchman to help out; night watch a little

87

1      bit. Because I was coming back and
2      forewards checking. That was before Joel
3      moved -- that was before Joel came.
4   Q. Okay.
5   A. Other than that, I don't know.
6   Q. All right. Then, after Norris went to
7      work for Joel and his crew, did Norris
8      ever come to you with any complaint about
9      Joel or how he was being treated?
10  A. Yes, he did.
11  Q. What was his complaint?
12  A. Norris complained. Came to me saying that
13     Joel was doing him wrong; Joel was racial.
14     I said, What you mean? He said, Man,
15     everything we do just ain't satisfying
16     Joel. He's always on us. He didn't want
17     us smoking. On any tract that we park for
18     three or four minutes, he'll be peeking
19     behind trees looking at him, watching him.
20     I said, Well, Norris, I said, Well, you
21     need to tell David that then. I said, You
22     know you went over there to work for Joel.
23     Now, you left me. I said, But I hear what

88

1      you're saying. He said, Man, he ain't
2      right. Roy, he stays on us for something.
3      He's just picking, picking, picking. I
4      said, Okay. I said, Well, tough it out,
5      Norris, and see what we do. Just wait,
6      you just got over there. He's just
7      getting there. Maybe he'll blend in.
8         A couple of weeks went by, it was
9      the same ole' thing. What I mean by the
10     same ole' thing, Norris complaining again
11     about how Joel was, how he was treating
12     him.
13  Q. Did you ever talk to Joel or David
14     Carroll about --
15  A. I talked to both.
16  Q. -- about those complaints?
17  A. Both.
18  Q. Okay. Tell me what you talked to Joel
19     about.
20  A. I talked to Joel. I said, Joel, I said,
21     Look here. I said, Your guys coming to me
22     complaining. I said, They're doing that
23     because they used to work for me. I said,

Pages 85 to 88

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377     Certified Court Reporters and Certified Legal Video Specialists     888.253.3377

89

1     Look here, if you respect them guys, them
2   guys will respect you. I said, But if you
3   don't respect them guys, them guys ain't
4   going to respect you. I said, I know you
5   the boss; I ain't telling you to --
6 **Q. How to run his job?**
7 A. How to run his crew. But respect them
8   guys. I said, because them guys, you've
9   gots a good team. I said, Don't tear down
10   what we already got. Well, well, they got
11   to work. They got to work. I said, Well,
12   you told me. I'll find out where they'll
13   work. Don't want them to stay long if
14   they won't work. That's exactly his exact
15   words. I said, Well, I don't know. I
16   said, But your guys, something's wrong.
17   They keep complaining and complaining.
18   They got to work, Roy. I said, Well --
19   well, that's true. So that's the words me
20   and him had.
21 **Q. Did you talk to David?**
22 A. Yep, I also talked to David. If it wasn't
23   at that same time, it was later on down in

90

1   the month when Norris came back to me and
2   Jeffrey Harris. They said, Man --
3 **Q. Jeff Harris came, too?**
4 A. Yeah.
5 **Q. Okay. What did he --**
6 A. They said, Man -- they said, Joel ain't
7   right, man. Joel ain't right, man. He
8   complain. He complain. He expects us to
9   get out there and run them tractors when
10   they overheat. He said, We cut them off
11   when they overheat. Said, Joel said run
12   them; let them overheat. I said, Well,
13   man, he tell you that, that's going to
14   tear the equipment up. I said, But I'll
15   tell you what, why don't y'all tell David.
16   These were Norris' words. Norris said, I
17   talked to David. David said you have to
18   take that up with Joel. Joel is your
19   boss.
20     So when Norris came back and told
21   me what David said -- so I went to David.
22   I said, David, there's something wrong,
23   that them guys was doing their job before

91

1   Joel got here. Maybe all of them need to
2   get together and come to talk to you at
3   the same time, and then you find out what
4   the problem is. I said, But I ain't
5   trying to tell you how to do your job,
6   because I know you know how to do a job.
7   I said, But now, that's my -- that's what
8   I'm saying. I don't know what the problem
9   was. We hadn't been having problems. So
10   maybe -- I don't know. I really don't
11   know. I don't know did they talk or not.
12 **Q. But you relayed the complaint that the men**
13   **had to both Joel and David?**
14 A. Right, yeah.
15 **Q. Okay.**
16     MR. ROBERSON: Give me that.
17 **Q. I'm going to show you a document that's**
18   **from Mid States about Norris Foster. Have**
19   **you ever seen that? Do you know what that**
20   **is, Exhibit 7?**
21     (Whereupon Plaintiff's Exhibit
22     No. 7 was marked for
23     identification and attached

92

1     hereto.)
2     (Witness reviewed document.)
3 **Q. It shows that he was hired in February of**
4   **'05, at $7 an hour?**
5 A. Uh-huh, yes.
6 **Q. And who signed that at the bottom, Denise**
7   **Pierce?**
8 A. Denise Pierce.
9 **Q. Okay. Now I'm going to show you another**
10   **document, and this is also from Norris'**
11   **personnel file. But this has to deal with**
12   **the period of time before when he worked**
13   **there, okay?**
14 A. Okay.
15 **Q. And I understand that you didn't work**
16   **there then. That's -- this is before --**
17   **well, I guess you did. I guess you did if**
18   **you started in 2000. But I'll show you**
19   **what's been marked as Exhibit 8.**
20     (Whereupon Plaintiff's Exhibit
21     No. 8 was marked for
22     identification and attached
23     hereto.)

Pages 89 to 92

334.262.3332      Baker & Baker Reporting and Video Services, Inc.      334.262.3332
888.253.3377      Certified Court Reporters and Certified Legal Video Specialists      888.253.3377

93

1    (Witness reviewed document.)
2    Q. Do you see where Norris was hired in '99?
3    And actually he worked out there before
4    '99, but that's when Mid States bought
5    it --
6    A. Okay.
7    Q. -- isn't it? I think.
8    A. 9/14/99.
9    Q. Yeah, uh-huh.
10   A. Yes.
11   Q. Okay. And so what were they paying him to
12   begin with? Does it say on there?
13   A. 5.15 an hour.
14   Q. Minimum wage?
15   A. Right, yes.
16   Q. And then tell me what he got a raise to
17   and when.
18   A. That looks like the first of 2000, he got
19   a 5 -- he got 5.50 an hour now.
20   Q. Okay. Did he get another raise?
21   A. Six month, 11 of 2000, he got up to $6.25
22   an hour.
23   Q. Okay. Did he get any further raises?

94

1    MR. DUKES: Object to the form.
2    The document speaks for
3    itself.
4    A. The 2nd of 8 of 2005, he got up to $7.
5    Q. Okay. Now I'm going to show you Exhibit
6    9. When you hired Norris in February of
7    '05 --
8    A. Uh-huh (affirmative response).
9    Q. -- was he full-time or part-time?
10   A. Full-time.
11   Q. Did he ever work part-time for you?
12   A. No.
13   Q. I'll show you Exhibit 9. Have you ever
14   seen that before?
15   (Whereupon Plaintiff's Exhibit
16   No. 9 was marked for
17   identification and attached
18   hereto.)
19   (Witness reviewed document.)
20   A. No.
21   Q. It says changed from part-time to
22   full-time. And in what month is that?
23   A. 5th, the 1st, '05.

95

1    Q. Did anybody sign that?
2    A. No. Approval by.
3    Q. Does it say -- has it got a signature on
4    it?
5    THE WITNESS: What's that?
6    A. I don't know. I don't know. I don't
7    understand that.
8    Q. You don't recognize that signature?
9    A. No, I don't.
10   Q. Okay. Do you need a driver's license to
11   operate a tractor?
12   MR. DUKES: Object to the form.
13   Calls for a legal
14   conclusion.
15   Q. You can answer if you know. Do you know?
16   A. Not to my knowing, you don't. Not to my
17   knowing, you don't need a driver's
18   license. Unless you're going to get on
19   that road, you're supposed to have a tag,
20   owner's tag on it.
21   Q. Now let me show you Exhibit 10. And this
22   is a document that's been provided to me
23   that says Formal Reprimand, and it's got a

96

1    date. Have you ever seen this document
2    before today?
3    MR. DUKES: Talking about
4    Plaintiff's Exhibit 10?
5    MR. ROBERSON: Yeah.
6    (Whereupon Plaintiff's Exhibit
7    No. 10 was marked for
8    identification and attached
9    hereto.)
10   (Witness reviewed document.)
11   A. No, I haven't seen this.
12   Q. Now, you've been a supervisor at
13   Sedgefields for years?
14   A. Uh-huh (affirmative response).
15   Q. The last several years, correct?
16   A. Correct. Last four.
17   Q. Four. Have you ever written anybody up?
18   A. Yes.
19   Q. Okay. Do they have forms for you to write
20   people up?
21   A. Right.
22   Q. Is that a form that you can use to write
23   people up? Have you ever seen one like

Pages 93 to 96

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377    Certified Court Reporters and Certified Legal Video Specialists    888.253.3377

97

1    that?
2    A. For Beaulieu or for . . .
3    Q. For Sedgefields.
4    A. I've never seen a form like this.
5    Q. At Sedgefields?
6    A. Yeah, at Sedgefields. I've never seen one
7       like this.
8    Q. Have you ever written anybody up at
9       Sedgefields?
10   A. No, I haven't.
11   Q. I'm going to show you -- well, do you
12      know -- do you have any personal knowledge
13      about this incident that's described in
14      Exhibit 10?
15   A. This right here?
16   Q. Yes, sir.
17   A. No, I don't.
18   Q. You weren't there when Norris was written
19      up, you weren't at the barn or wherever
20      they were?
21   A. No, I wasn't at the barn -- let me read
22      this again.
23            I wasn't at the barn when this

98

1       took place. I heard about it, but I
2       wasn't there.
3    Q. Okay. Well, do you know what the clippers
4       are?
5    A. Yes.
6    Q. I mean, how you clip horses?
7    A. Yes, I do.
8    Q. Is it clippers like that you clip their
9       mane or their -- you -- you groom the
10      horses or is it clippers like you --
11      toenail clippers? I don't know.
12   A. No. It's clippers like you cut your hair
13      with. You've got different blades.
14   Q. Okay.
15   A. Different size clippers depending on what
16      part you're clipping.
17   Q. How you groom the horses?
18   A. Right.
19   Q. And that's -- is that part of Norris' job,
20      to groom the horses?
21   A. Yes.
22   Q. And do you know if in December of '05, if
23      there was a problem or the clippers were

99

1       broken?
2    A. No, I don't know that. I know Norris and
3       them said they was broken.
4    Q. Okay.
5    A. I didn't check to see whether it was broke
6       or not. I don't know that.
7    Q. Okay.
8    A. I know they told me that it was broken.
9    Q. Okay. And so they -- Norris told you the
10      clippers were broken and that he'd been
11      written up for riding the horses; is
12      that --
13   A. Before he got wrote up, Norris and Jeffrey
14      told me the clippers was broken. We tried
15      to get up with Joel. He didn't answer his
16      radio, and so we just rode the horses.
17            To me, personally, I would have
18      wrote them up if they had left there
19      riding the horses and I told them to clip
20      them. Now, if the clippers were broke and
21      he didn't answer his radio, I would have
22      stayed at that barn . . . to me. But I
23      hadn't never seen this before.

100

1    Q. All right. Other than Norris and -- and
2       Jeff Harris was also written up?
3    A. Uh-huh (affirmative response).
4    Q. Do you know anybody that's ever been
5       written up at Sedgefields? Do you know --
6       have personal knowledge of it?
7            MR. DUKES: Object to the form.
8    Q. You can answer.
9            MR. ROBERSON: I'm sorry.
10           It's a habit.
11           MR. DUKES: Go ahead.
12   A. Not to my knowledge.
13   Q. Now, were you -- Norris was fired at the
14      end of December of '05. Were you -- were
15      you ever told -- were you present when
16      Norris was fired?
17   A. I was on the plantation, yes. Was I up
18      there when they fired Norris? No, I
19      wasn't.
20   Q. Okay. You weren't part of the discussion
21      about Norris being fired?
22   A. No, I wasn't, no.
23   Q. But you found out after the fact that he

Pages 97 to 100

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377      Certified Court Reporters and Certified Legal Video Specialists      888.253.3377

101

1    had been fired?
2    A. Right, correct.
3    Q. How did you find out?
4    A. David called me on the cell phone, said I
5       had to let Norris go. I said, Who? He
6       said, Norris. I said, Okay, then. He
7       said, well, we'll talk about it later. So
8       then me and Henry was together, Henry
9       Tolliver. I said, Man, I just saw Norris
10      in the barn.
11   Q. You guess Norris --
12   A. I said, I just saw Norris at the barn when
13      we left, because we was feeding the deer.
14      But I didn't know he was fired. David
15      called me and told me he was fired. He
16      had let him go.
17   Q. Did anyone ever tell you why Norris was
18      fired?
19   A. Yes. A month went by --
20            THE WITNESS: Can I answer that?
21            MR. ROBERSON: Was it me telling
22         you?
23            THE WITNESS: No, no.

102

1            MR. ROBERSON: I'm not talking
2         about Mr. Dukes.
3            THE WITNESS: I said, Can I
4         answer that?
5            MR. ROBERSON: Yeah.
6            MR. DUKES: If you know, go
7         ahead.
8    A. I was at -- a month -- maybe a month went
9       by, and I asked David. I said, David --
10      it might not quite been a month. I said,
11      Norris was fired, he said, because of the
12      birds. David comments -- David said,
13      Yeah, the birds and his attitude. He had
14      an attitude. He didn't want to be part of
15      the team. He said Norris kept the
16      attitude all the time. I said, Yeah. I
17      said, Well, he stayed angry a whole lot,
18      didn't he? He said, Yep. He said, Well,
19      he kept pulling the crew down. He had an
20      attitude problem. He just wouldn't do the
21      jobs I asked him to do. So I had to let
22      him go, Roy. I said, Well, in that case,
23      he fired hisself. That was my exact

103

1       words. So I left it like that.
2    Q. Okay. Well, did David -- did David
3       Carroll or Joel Norman ever tell you that
4       Norris was fired because he stole birds?
5    A. No. Joel didn't tell me that. But in --
6       a conversation come up when I was talking
7       to David. David said it was about the
8       birds and his attitude. I didn't hear
9       that from Joel.
10   Q. Well, do you know, have any personal
11      knowledge, as to whether Norris ever stole
12      any birds?
13   A. No. No. I heard that, but I haven't seen
14      it.
15   Q. Okay. Well, the -- and my understanding
16      is that there were some birds that were
17      removed in October. Do you know anything
18      about that? It was right after the first
19      hunt or one of the -- one of the early
20      hunts that they had. Do you know anything
21      about that?
22   A. My understanding about the birds, when we
23      come in, we have -- I think, if I'm not

104

1       mistaken, I don't know did I have some
2       hunters up there and we was looking over
3       the place -- my understanding, when I came
4       in, I saw birds sitting on the wagon. And
5       everybody was gone. They hadn't put the
6       birds up.
7    Q. What are you supposed to do with the
8       birds?
9    A. You supposed to put the birds in the
10      walk-in cooler to keep them cool.
11   Q. Is that a freezer?
12   A. A freezer unit.
13   Q. A freezer?
14   A. Uh-huh (affirmative response). But it's
15      more like a --
16   Q. But you can't walk in --
17   A. You can walk in.
18   Q. Okay.
19   A. One's a freezing unit and one's a cooling
20      unit. The cooling unit is to keep the
21      temperature right on the birds where they
22      won't spoil.
23         The first two hunts, I know them

Pages 101 to 104

105

1    birds was spoiled, because one set of
2    birds sat in the refrigerator, I know, a
3    week. And I asked Joel, I said, Joel,
4    look here, ain't nobody going to clean
5    them birds? He said, I thought B.B. -- I
6    said, No, he didn't. Them birds still
7    sitting there, man, they ain't going to be
8    no good. They had them in the
9    refrigerator setting there, the birds, at
10   the green barn, our workshop.
11   **Q. Okay. So I understand it, if -- if -- if**
12   **you shoot the -- do they ever shoot the**
13   **birds, and clean them, and then cook them**
14   **there the same day?**
15   A. No, no, not the same day.
16   **Q. Okay. Is there a process whereby maybe**
17   **they -- they already have birds that are**
18   **cleaned and everything -- do they -- do**
19   **they cook quail there at the plantation?**
20   A. Sometime.
21   **Q. Okay. And -- and so what I'm saying is,**
22   **do they -- maybe they have some birds**
23   **that's already ready? In other words,**

106

1    **they can cook them while they're out**
2    **hunting; would that be right? There's --**
3    A. Yeah, we have some --
4    **Q. -- quail that's already dressed --**
5    A. Right.
6    **Q. -- and they're ready, and the cooks**
7    **prepare them while they're out hunting,**
8    **and they serve them for dinner --**
9    A. Right.
10   **Q. -- even before they -- they get them ready**
11   **before they get back?**
12   A. Right.
13   **Q. Okay. And then -- but the birds that they**
14   **kill, then they may go into the -- get**
15   **cleaned and go into the cooler or the**
16   **freezer, and then they have them later; is**
17   **that -- would that be right?**
18   A. The birds that was shot, they clean them
19   birds, put them in the freezer for the
20   next crew that's going to come in, what
21   shoots birds.
22   **Q. Right.**
23   A. But we already have birds already cleaned

107

1    in the freezer.
2    **Q. Okay.**
3    A. But the ones that they kill their birds
4    and they leave back the same day, you have
5    to give them the amount what they kill.
6    We have them in the freezer.
7    **Q. Okay. So you just swap them out?**
8    A. Swap them out, that's right.
9    **Q. Okay. You've got some already dressed,**
10   **and if they're already going --**
11   A. Right.
12   **Q. -- you just give them to them?**
13   A. That's right.
14   **Q. I mean, you --**
15   A. We try not to feed a shot bird down at the
16   lodge.
17   **Q. Okay.**
18   A. See, they have dressed birds that's never
19   been shot that they cook at the lodge.
20   **Q. Okay. All right. I'm going to show you**
21   **Exhibit 11, and ask you if you've ever**
22   **seen that?**
23   **(Whereupon Plaintiff's Exhibit**

108

1           **No. 11 was marked for**
2           **identification and attached**
3           **hereto.)**
4           **(Witness reviewed document.**
5           MR. DUKES: Do you need to take
6           a break or anything?
7           MR. ROBERSON: Yeah, we -- if
8           you ever want to take a
9           break, just let us know.
10          We're going to have to take
11          a break in a few minutes,
12          because he's got to change
13          his tape.
14   A. No, I ain't never seen this.
15   **Q. Okay. Now, when Norris worked for you,**
16   **did he ever have an attitude problem that**
17   **you -- that you observed?**
18   A. No.
19   **Q. Well, was he angry? I think that's the**
20   **word you used.**
21   A. Was he upset?
22   **Q. Well --**
23   A. With me?

Pages 105 to 108

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377     Certified Court Reporters and Certified Legal Video Specialists     888.253.3377

109

1  Q. Yeah.
2  A. No.
3  Q. Okay. Did he ever criticize you for the
4     way you were doing things, running the
5     show?
6  A. Never, not to my -- not that I know of.
7  Q. I mean -- okay. Now, did Norris or
8     Jeffrey or anybody that was in Joel's crew
9     ever complain to you about their tip
10    money?
11 A. All of them.
12 Q. Everybody complained?
13 A. Everybody that was in the crew.
14 Q. B.B. -- was B.B. in the crew?
15 A. B.B., Norris, and Jeffrey.
16 Q. All complained about --
17 A. And Will didn't complain, because Will was
18    out there. He didn't complain.
19 Q. What -- what was the nature of their
20    complaint?
21 A. On a couple of incidents after the quail
22    hunt was over, the guys come in. I said,
23    Man, how did y'all do? Yeah, we found a

110

1  few birds. We found a few birds. We had
2  did good. So then Norris said, Well,
3  yeah. He said, The clients come up to me,
4  man, patted me on the shoulder and said
5  job well done. Said I took care of you, I
6  left your tip money with Joel. And so
7  Norris said, Oh, well, that's fine, that's
8  fine. Said Joel told me to put everything
9  up and he'd see them later. So Norris, he
10 did him like that. And Joel walked up to
11 him and told him, said, Look here, don't
12 let me see you do that no more.
13 Q. On the deer hunts that you take folks
14    on --
15 A. Uh-huh (affirmative response).
16 Q. -- do sometimes you get tips?
17 A. Right.
18 Q. You and your crew?
19 A. Right.
20 Q. How do you do the tips, Roy?
21 A. If we get a tip -- it ain't necessary that
22    you get a tip.
23 Q. I understand that.

111

1  A. But if a man feels free to want to give
2     you a tip -- but like if I've got -- just
3     say I got Demetrius and Henry Tolliver
4     working under me putting out, then I give
5     them three guys -- each one of them three
6     guys, whatever tip money they want to give
7     them, I tell them, Leave it with them. If
8     Demetrius has got three guys and the three
9     guys, they want to tip him, that's fine.
10    If they do, they do. If they don't, they
11    don't. Same thing about Henry. If the
12    guys -- if I take five or six guys out,
13    whatever they tip me, that would be my
14    tip. I never had to split the deer hunter
15    tip money, and luck, didn't no deer
16    hunters leave them a tip. Then I turn
17    around and I'll split my money with
18    them -- for them, where each one of us
19    will have some money.
20 Q. Okay. Did you ever take people on quail
21    hunts?
22 A. Uh-huh (affirmative response).
23 Q. And when -- when you were over the quail

112

1  hunting and you got a tip, what did you do
2  with the tips?
3  A. The tip money I got, when we come in, if
4     the guys tip us -- plenty of times they
5     didn't -- if they tip us, they'd come to
6     me and give me the money. I would take
7     time when everything was put up, before
8     we'd go, lay my tailgate down, and count
9     the money out right there in front of all
10    my guys and split it up.
11 Q. Equally?
12 A. Equally. No matter what. Even though --
13 Q. You didn't take more because you were the
14    guide?
15 A. No. Even though I was the guide, the
16    handler. The handler is always supposed
17    to get more money. That's what I thought
18    ever since I've been out there. But I
19    wasn't even going with that. I just -- if
20    my guys didn't get no money, I would give
21    them -- split them up straight down the
22    middle.
23 Q. Well, if -- if somebody gave you a tip --

Pages 109 to 112

334.262.3332                  Baker & Baker Reporting and Video Services, Inc.                  334.262.3332
888.253.3377        Certified Court Reporters and Certified Legal Video Specialists        888.253.3377

---

113

1  A. Uh-huh (affirmative response).
2  Q. -- would you always divide it up as
3     opposed to keeping that tip yourself?  I
4     mean, when you're quail hunting, would you
5     give everybody in the crew money or would
6     you keep the money?
7  A. No.  I would give every -- make sure if
8     the other guys didn't get a tip -- I would
9     ask them.  I'd say, Did the guy leave
10    y'all a tip?  And they'd say no.  If they
11    say no, I split the money up with them.
12        MR. ROBERSON:  Okay.  Let's go
13            off the Record and take a
14            break and change tapes.
15        THE VIDEOGRAPHER:  We're going
16            off the Record at 1:56 p.m.
17        (Whereupon a brief recess was
18            taken.)
19        THE VIDEOGRAPHER:  We're back on
20            the Record at 2:14 p.m.
21  BY MR. ROBERSON:
22  Q. Mr. Lee, we took a break, but now we're
23     back on the Record.  I'm going to show you

---

114

1     what I've marked as Exhibit 12.  And this
2     is actually from your personnel file, and
3     it shows that you were hired in September
4     of 2000 as a laborer.  Were you making $6
5     an hour when you were hired?
6        (Whereupon Plaintiff's Exhibit
7            No. 12 was marked for
8            identification and attached
9            hereto.)
10        (Witness reviewed document.)
11  A. Yes, I started with $6.
12  Q. Okay.  And then it progresses to show what
13     you made; is that correct?
14        (Witness reviewed document.)
15  A. That's correct.
16  Q. Okay.  What does it show you making now?
17  A. Now?
18  Q. Now, yes, sir.
19  A. Forty hours -- well, looks like -- well,
20     $12.
21        MR. DUKES:  No.  Right here.
22  A. $41,623.40 a year.
23  Q. Annual salary?

---

115

1  A. Uh-huh (affirmative response).
2  Q. Is that yes?
3  A. Yes.
4  Q. Okay.  And I'm going to show you what I've
5     marked as Exhibit 13, and ask you is this
6     is a copy of the application that you
7     filled out before you went to work at
8     Sedgefields?
9        (Whereupon Plaintiff's Exhibit
10            No. 13 was marked for
11            identification and attached
12            hereto.)
13        (Witness reviewed document.)
14        MR. DUKES:  Let me see that one.
15  BY MR. ROBERSON:
16  Q. Is that your application, Roy?
17  A. It's a copy.
18  Q. Okay.
19  A. I'm pretty sure it's the same thing,
20     because back then they had an application,
21     you know, like this.  So I'm pretty sure
22     it's the same thing.  It's about right.
23  Q. Is it dated on the last page when you

---

116

1     filled it out?
2  A. August the 10th, 2000.
3  Q. Okay.  And you started, according to this
4     sheet, on --
5  A. The ninth month, the 8th, 2000.
6  Q. Yeah.  Okay.  Maybe that's when you got
7     your first check.  I don't know.
8  A. Probably.  I mean, it's been awhile.
9  Q. Right.  All right.  And I'm going to show
10     you what I'll mark as Exhibit 14 to your
11     deposition.  And this is a document that
12     says for you, Roy Lee -- Roy Lee Chester?
13        (Whereupon Plaintiff's Exhibit
14            No. 14 was marked for
15            identification and attached
16            hereto.)
17  A. That's my middle name, Chester.
18  Q. Oh, okay.  Day of hire, 9/8/01.  New rate
19     of pay $10 an hour.  Do you -- is that --
20  A. What do you mean by date of hiring?
21  Q. Well, that's just what it says.
22        Is that when they promoted -- if
23     you recall, is that when they promoted

---

Pages 113 to 116

334.262.3332                Baker & Baker Reporting and Video Services, Inc.                334.262.3332
888.253.3377        Certified Court Reporters and Certified Legal Video Specialists        888.253.3377

117

1    you?
2    A. This was Donna Davidson.  After they got
3       rid of Mark Gregg, that's when Donna
4       Davidson called me in the office and gave
5       me up to $10.
6    Q. And they make you a manager then?
7    A. Huh?
8    Q. Did they make you a manager then?
9    A. No, no.  She didn't make me a manager at
10      that time.  Not that day.  About a month
11      later.
12   Q. Okay, okay.  Roy, I -- do you know what an
13      affidavit is?
14   A. Uh-huh, yes, I do.
15   Q. Okay.  It's a sworn statement?
16   A. Right.
17   Q. And this is an affidavit from Jeffrey
18      Harris.  And I'm going to ask you to look
19      at this.  I'll mark this as Exhibit 15 to
20      your deposition.  It's a couple of pages,
21      so I'll just ask you to read that to
22      yourself first.  And you can have -- I've
23      given that to Mr. Dukes.

118

1            (Whereupon Plaintiff's Exhibit
2            No. 15 was marked for
3            identification and attached
4            hereto.)
5            (Witness reviewed document.)
6    A. Okay.
7    Q. Do you know Jeffrey Harris?
8    A. Yes, I know him.
9    Q. Did he ever work for you and your crew?
10   A. Jeffrey Harris.  I'm trying to see.
11      Jeffrey Harris worked for me a couple of
12      weeks, I think.  If I'm not mistaken, I
13      think Jeffrey Harris worked under me a
14      couple of weeks.  Because I think Jeffrey
15      Harris came -- I don't know was Charles
16      there when Jeffrey came or not.
17   Q. Okay.  Well, did -- you didn't hire him?
18   A. No.
19   Q. Okay.  Do you know who did?
20   A. David.
21   Q. David Carroll?
22   A. Yes.
23   Q. Okay.  And in the time that he worked for

119

1    you, that is Jeffrey Harris, did you have
2    any problem with his work?
3    A. No.  At the time Jeffrey Harris was
4       working for me, the only thing he was
5       doing then was cutting grass.  Norris told
6       him he could drive a tractor, so . . . he
7       could fix anything.
8    Q. He's a mechanic or something?
9    A. That's what Norris told me he was, a
10      mechanic.  But we didn't have nothing
11      broke down at the time.  But I had him
12      cutting grass.  And I think -- I'm trying
13      to see.  I don't know.  I don't think he
14      worked for me that long.
15   Q. Okay.  Now, but in the short time that he
16      worked for you, did you have any problem
17      with him or his work or attitude or
18      anything?
19   A. No.
20   Q. Now, I'm going to show you what I've
21      marked as exhibit -- well, first of all,
22      let me ask you:  He makes some statements
23      in there about things that he heard Joel

120

1    Norman say.
2    A. Uh-huh (affirmative response).
3    Q. Did you see that?  Did you read it?
4    A. I saw that.
5    Q. Did you ever hear Joel Norman make any
6       statement about blacks or about that he
7       was going to replace the blacks in his
8       crew?
9    A. No, I haven't.  I have never heard that.
10      I heard rumors, but I haven't never heard
11      that.
12   Q. Okay.
13   A. I mean, he hadn't never said that around
14      me that I could hear.
15   Q. You've never personally heard it?
16   A. Right.
17   Q. Before Norris Foster was fired in December
18      of '05 --
19   A. Uh-huh (affirmative response).
20   Q. -- did they complain to you about any
21      statement he had made -- Joel Norman had
22      made?
23   A. Yes.  They come to me and told me some

Pages 117 to 120

334.262.3332                Baker & Baker Reporting and Video Services, Inc.            334.262.3332
888.253.3377          Certified Court Reporters and Certified Legal Video Specialists   888.253.3377

Roy Lee
October 11, 2006

121

1   things he said.  But I don't know for
2   sure.
3   Q. You -- I know you don't know that he said
4      them.
5   A. Right.
6   Q. I understand that.
7   A. Okay.
8   Q. But they did complain to you about
9      statements they claim that he made prior
10     to Norris being fired; is that fair?
11  A. Repeat that.
12  Q. Okay.  Before Norris got fired --
13  A. Right.
14  Q. -- Jeff and Norris had been to you and
15     said that Joel said these things, like he
16     was going to get a white crew or something
17     like that?
18  A. No.  When they come to me and told me
19     before, they told me that Joel was
20     telling -- Will was telling them things.
21     B.B. was telling me.  Norris and them was
22     saying that that's what Will -- when Will
23     got mad with Joel, Will was going to come

122

1   around and tell them everything.  Will was
2   telling them everything that Joel was
3   saying.
4   Q. Will told them?
5   A. Will told them.  To my understanding, Will
6   told them.
7   Q. Okay.
8   A. I never heard Joel saying nothing.
9   Q. Okay.  Then -- and Will was a white guy --
10  A. Right.
11  Q. -- that was hired.  And we'll get to that.
12        But do y'all have a tradition
13     there at the plantation that when you have
14     homecoming, Bullock County homecoming, the
15     high school football game, that you let
16     off early?
17  A. Yes, we used to.
18  Q. And, in fact, it's not just Sedgefields, I
19     mean, it's a lot of businesses --
20  A. Yeah.
21  Q. -- that they give --
22  A. Right.
23  Q. -- employees off early?

123

1   A. Right.
2   Q. Because they have a parade, right?
3   A. Right, right.
4   Q. And so they give people time off so they
5      can go to the parade and do the
6      activities?
7   A. Right.
8   Q. Do you have a son that plays on the
9      football team?
10  A. Yes, I do.
11  Q. And Norris has a son, right?
12  A. Yes, he do.
13  Q. Tailback?
14  A. Tailback, yes.
15  Q. Is he pretty good?
16  A. Oh, yeah.
17  Q. What about your son?
18  A. He's very good.
19  Q. What does he play?
20  A. Defensive end, linebacker -- no, defensive
21     end, tight end.
22  Q. What year is he?
23  A. He's in the ninth grade.

124

1   Q. And he plays?
2   A. Oh, yeah.  He's good.
3   Q. Okay.  Well, and did you let your crew off
4      early on homecoming?
5   A. Yes.  Depends.
6   Q. What time is -- what time is early?
7   A. Early depends on -- if we ain't got
8      nothing going on at the job, I would let
9      them come in and clean the equipment up.
10     Because the game always have been on
11     Friday.  Parade is on Friday.  Let them
12     come in early, clean the equipment up, and
13     they leave.
14  Q. Okay.
15  A. The quicker you can get through with that
16     equipment, the quicker you can leave.
17  Q. Now, did the guys in Joel's crew complain
18     to you or did you find out that they had a
19     complaint because Joel wouldn't let them
20     leave early on homecoming?
21  A. No.  I never --
22  Q. Do you remember anything about that?
23  A. I don't remember that, no.

Pages 121 to 124

125

1  **Q. I'm going to show you Plaintiffs' Exhibit**
2    **16. And there's a guy that you referred**
3    **to as Brother Man?**
4  A. Right.
5  **Q. That's what y'all called him?**
6  A. Right.
7  **Q. Is this the same guy, William Beckwith,**
8    **Jr.? Do you know? This is a form from**
9    **Beckwith's --**
10      (Whereupon Plaintiff's Exhibit
11      No. 16 was marked for
12      identification and attached
13      hereto.)
14  A. I don't know Brother Man's full name. The
15    only thing I've ever known, his name was
16    Brother Man.
17  **Q. Okay.**
18  A. I mean, I really don't know his name.
19  **Q. Well, that document shows that he worked**
20    **until the end of September and that he**
21    **was -- Mr. Beckwith was fired for stealing**
22    **gas and not having a driver's license. Do**
23    **you see that?**

126

1  A. Right, yes.
2  **Q. Does that describe anybody else that you**
3    **know about?**
4  A. For stealing gas?
5  **Q. Yeah. Was anybody else stealing gas and**
6    **didn't have a driver's license that you**
7    **know about?**
8      MR. DUKES: That was terminated?
9      MR. ROBERSON: Yeah.
10  A. No.
11  **Q. Okay. And was that about when Beckwith**
12    **left or was fired, in -- around the end of**
13    **September, right after Joel got there?**
14  A. I can't recall what month it was. But I
15    do know he was fired.
16  **Q. After Joel got there?**
17  A. After Joel got there.
18  **Q. Now, did he -- did -- what vehicle**
19    **did Brother Man use when he was a night**
20    **watchman? Did he have a vehicle?**
21  A. Yes. We had a red Ford F150. And we let
22    Brother --
23  **Q. On the farm?**

127

1  A. On the farm. And we let Brother Man keep
2    that on the weekends.
3  **Q. But he didn't have a driver's license,**
4    **correct?**
5  A. Yeah. I didn't know he didn't have a
6    driver's license at that time.
7  **Q. Okay. Well, what I'm saying is, he**
8    **couldn't drive that off the property**
9    **legally, right?**
10  A. No, he couldn't.
11  **Q. Okay. Do you know whether he ever did**
12    **take it off of the property?**
13  A. Well, he went down the highway. I mean,
14    that was off the property.
15  **Q. Okay.**
16  A. But as far as me knowing if he went to
17    town or not, I don't know.
18  **Q. Okay. Now, this -- did you ever tell**
19    **anybody that Brother Man was taking gas?**
20    **Did you ever report him for stealing gas?**
21  A. Yes. I assumed that Brother Man was
22    taking gas.
23  **Q. All right. Why did you assume that?**

128

1  A. Because I filled the truck up on a Tuesday
2    or a Wednesday. I come back the next --
3  **Q. Your truck?**
4  A. No, no. The burgundy truck that he's
5    supposed to been done drove.
6  **Q. The red truck?**
7  A. Right.
8  **Q. Okay.**
9  A. And it was empty the next day. And a six
10    cylinder, you can't put that kind of miles
11    on it right around the farm off a full
12    tank of gas and then empty the next day.
13  **Q. What was he doing with the gas? Do you**
14    **know?**
15  A. I assumed that he was siphoning it out.
16  **Q. And selling it or something?**
17  A. No. Putting it in his personal truck.
18    That's what I assumed. Because we keep
19    the gas tanks locked up.
20  **Q. Okay. So do you have to have a key to**
21    **pump gas --**
22  A. Right.
23  **Q. -- at Sedgefields?**

Pages 125 to 128

334.262.3332        Baker & Baker Reporting and Video Services, Inc.      334.262.3332
888.253.3377    Certified Court Reporters and Certified Legal Video Specialists    888.253.3377

129

1    A. Right.
2    Q. I mean, at their -- for their pump, you
3       have to have a key in order to get gas; is
4       that right?
5    A. In order to get gas, yes.
6    Q. And he didn't have a key?
7    A. No, he didn't.
8    Q. So you, because if he was filling --
9       having to fill up the truck so often, you
10      assumed he wasn't just burning the gas --
11   A. Right.
12   Q. -- in the truck?
13   A. Yes.
14   Q. Who did you report that to?
15   A. David Carroll.
16   Q. Okay.  Did they act on that, that you know
17      of?
18         MR. DUKES: Object to the form.
19   A. Not that I know of.
20   Q. All right.  What happened that Brother Man
21      got fired for stealing gas?  Was there
22      something that happened?
23   A. My recall, as far as I know of, I don't

130

1       know what I was doing that day -- oh, I
2       went to get some fertilizer from Clayton
3       in a tag-along buggy.  And I came back.
4       David told me, said, Well, Joel caught
5       Brother Man taking gas.  Joel's wife seen
6       Brother Man taking some gas and --
7    Q. Did he say what he was taking it from or
8       where?
9    A. He took it in a jug and poured it in his
10      truck.  She was watching him.  She saw
11      him.
12   Q. Oh.
13   A. She reported it to Joel --
14   Q. She stays on the property, right?
15   A. Right.
16   Q. Okay.
17   A. She reported it to Joel.  Joel reported it
18      to David.  David told me about it.  I
19      said, Well, did you tell Brother Man?  I
20      said, How did Brother Man get it in the
21      gas tank with the top -- with it locked?
22      He said he had a jug.  I said, Whoa.  I
23      said, Well he knowed better than that.  I

131

1       said, Well, I been told you he been
2       getting that gas.  Okay.  So David said,
3       Well, I'll let him work the rest of the
4       day, and I'll let him know we can't have
5       nobody out here stealing.
6          MR. ROBERSON:  Now, give me Will
7             Hubbard's, please.
8    Q. Do you know Will Hubbard?
9    A. Do I know of him?
10   Q. Yeah.
11   A. Yes.  I know his -- I just know his name.
12      Nothing about him, but I know his name.
13   Q. Okay.  Well, he worked out there for a
14      while, a short time, correct?
15   A. Yes, correct.
16   Q. And he's a white?
17   A. Correct.
18   Q. Is he young, fairly young?
19   A. Real young.
20   Q. Okay.  I'm going to show you what I've
21      marked as Exhibit 17 which is his
22      application.  Take a look at that.
23         (Whereupon Plaintiff's Exhibit

132

1          No. 17 was marked for
2          identification and attached
3          hereto.)
4       (Witness reviewed document.)
5          MR. ROBERSON:  Do you have the
6             sheet that shows how much
7             he made?
8          MR. DUKES:  I'll stipulate, if
9             it moves things along, that
10            he was paid $8 an hour.
11         MR. ROBERSON:  Okay.  Well, I --
12      BY MR. ROBERSON:
13   Q. Will worked for Joel, right?
14   A. Right.
15   Q. Do you know who hired him?  Did David hire
16      him or do you know?
17   A. I don't know.
18   Q. Okay.  I'm going to show you what's marked
19      as Exhibit 18.  And it shows that Will
20      Hubbard was paid $8 an hour.  Do you see
21      that, Mr. Lee?
22         (Whereupon Plaintiff's Exhibit
23         No. 18 was marked for

Pages 129 to 132

334.262.3332                Baker & Baker Reporting and Video Services, Inc.                334.262.3332
888.253.3377        Certified Court Reporters and Certified Legal Video Specialists        888.253.3377

133

1           identification and attached
2               hereto.)
3           (Witness reviewed document.)
4   A. Right.
5   Q. When was he hired?
6   A. On this paper?
7   Q. Yes, sir.
8   A. 11 -- on this paper?
9   Q. On that paper, when did he start?
10  A. 11/21/05.
11  Q. About Thanksgiving of '05?
12  A. Right.
13  Q. Now, did y'all have some -- at that time,
14      you had Jeff Harris and Norris working for
15      Joel Norman, right?
16  A. Correct.
17  Q. How many people do you need in the quail
18      hunting?
19  A. How many people did he need, Joel need?
20  Q. Yeah.
21  A. It all depends on what -- what they have
22      going on at that time.  I think when he
23      had Norris and Jeffrey, he had Brother

134

1       Man.  Then he had Willie -- B.B., Willie
2       Mack sometimes.  I think Will come after
3       they got rid of Brother Man.
4   Q. That's correct.  Well, my question to you
5       is:  Do you know what Will did in the
6       crew, in Joel's crew?
7   A. I know what Will started off doing when he
8       got there.
9   Q. What?
10  A. Riding horses.
11  Q. What does that mean?
12  A. Getting horses in shape.  Knew he had to
13      get them ready before the clients get
14      there.  The clients ain't going to want
15      to --
16  Q. Exercising horses?
17  A. Right.
18  Q. Okay.
19  A. Going out getting them in shape.  I know
20      he did that for a while.
21  Q. What they disciplined Norris Foster for,
22      riding horses, is what Will Hubbard was
23      assigned to do?

135

1       MR. DUKES:  Object to the form.
2   Q. Is that right?
3   A. I don't understand that.
4   Q. Okay.  Well, I showed you that write-up
5       where Norris was written up for riding
6       horses, right?
7   A. Where Norris was written up for riding
8       horses, for leaving --
9   Q. The barn.
10  A. -- the barn, when they was supposed to
11      have been clipping them.
12  Q. Okay.  But the same horses that Norris was
13      riding, Will Hubbard was hired to ride; is
14      that your understanding?
15  A. No.
16  Q. Okay.  What --
17  A. My understanding is Will -- when Will
18      started.  But when I seen Will when he
19      started, he was riding horses.  Then they
20      was -- Norris and Jeffrey was chopping.
21  Q. Was riding the tractor --
22  A. Right.
23  Q. -- and cutting in the fields?

136

1   A. Right.
2   Q. Okay.
3   A. And Will and Joel was exercising the
4       horses and the dogs.  That's what I seen.
5   Q. Did you ever see -- in the time that Will
6       Hubbard worked there, did you ever see him
7       operating any heavy equipment?
8   A. Yes.
9   Q. What did he run?
10  A. Bulldozer.  He ran the tractor.  I never
11      seen him run the backhoe.  He run the
12      tractor and the bulldozer.  He run the
13      tractor, bulldozer, and skidder.
14  Q. All right.
15      MR. ROBERSON:  Give me Joseph
16          Mays' information.
17  Q. Okay.  Do you know a gentleman named
18      Joseph May?
19  A. Yes.
20  Q. And he's also a white man, correct?
21  A. Yes, correct.
22  Q. And he -- is he also young?
23  A. Correct.

Pages  133 to 136

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377     Certified Court Reporters and Certified Legal Video Specialists   888.253.3377

137

1  Q. And Norris is forty-seven years old.  Did
2     you know that?
3  A. Correct.
4  Q. And he spent six years in the military?
5  A. Correct.
6  Q. Did you know that?
7  A. Yes.
8  Q. Do you think that military service is
9     valuable?
10 A. Yes.
11 Q. Did you ever serve in the military?
12 A. No.
13 Q. Okay.  Let me show you Exhibit 19 that
14    shows Joseph May was hired when -- on what
15    date?
16        (Whereupon Plaintiff's Exhibit
17         No. 19 was marked for
18         identification and attached
19         hereto.)
20 A. The 11th, the 21st, '05.
21 Q. Same day as Will Hubbard?
22 A. Same day.
23 Q. And where was he assigned to work?

138

1  A. With Joel Norman.
2  Q. So now he's got four people in his crew?
3  A. Right, correct.
4  Q. I'll show you Exhibit 20 which is -- and
5     Joseph May paid -- was paid $8 an hour?
6  A. Correct.
7  Q. All right.  This is Joseph Mays'
8     application.  I want you to look at that.
9        (Whereupon Plaintiff's Exhibit
10        No. 20 was marked for
11        identification and attached
12        hereto.)
13       (Witness reviewed document.)
14 Q. Do you have -- and I'm not trying to make
15    you into somebody that works at the
16    carnival --
17 A. Uh-huh (affirmative response).
18 Q. -- but do you know how old Joseph was or
19    have an estimate for how old he was?
20 A. Do I know how old is he now --
21 Q. Yeah.
22 A. -- or at that time?
23 Q. At that time.

139

1  A. No, I didn't.
2  Q. Okay.  Was he a young guy?
3  A. Yeah, he looked young.
4  Q. Now, what was Joseph May doing that you
5     saw?
6  A. Only thing I seen Joseph doing -- Joseph
7     May?
8  Q. Right.
9  A. -- doing was trapping.  They had --
10 Q. Trapping?
11 A. Traps, yeah.  Toe pad traps for trapping
12    predators.
13 Q. Trapping --
14 A. Predators.
15 Q. Predators like --
16 A. Racoons, possums, stuff that was eating
17    quail.
18 Q. Okay.
19 A. Coyotes.
20 Q. Okay.  So he was trapping the things that
21    would lower the bird population?
22 A. Correct.
23 Q. Is that right?

140

1  A. Correct.
2  Q. And predators of the birds?
3  A. Correct.
4  Q. Okay.  So if you can reduce the predators,
5     you can increase your bird population?
6  A. Correct.
7  Q. And have more -- better hunts, right?
8  A. Correct.
9  Q. Okay.  Now, how do you trap?  Do you know?
10 A. Well, when I -- I know what he say how he
11    do it.  I never did that myself.
12 Q. Right.
13 A. The only way I ever trapped before was a
14    live trap.  Sat a can of sardines in a
15    cage, in a live trap like that there.  In
16    a water ditch or a crossing in a road,
17    that side of the road.  But he had toe pad
18    traps with a flag.
19 Q. What kind of traps?
20 A. Toe pad.
21 Q. Toe pad?
22 A. Right.  Something -- a little small trap
23    with pads on them that close up to keep

141

1  from hurting the animal.
2  Q. Uh-huh (affirmative response).
3  A. And it will hold him till you get there.
4  He'll be alive when you get there.
5  Q. Oh, it's live trapping, right?
6  A. Well, yeah, you can say.
7  Q. And then do you remove the animal?  That
8  is, do you take it somewhere?
9  A. No.  You kill it.
10 Q. Okay.
11       MR. DUKES:  Is it a leg trap?
12       THE WITNESS:  Right.  It just
13          traps his toes.  He reach
14          in that trap, and you trap
15          his toes.
16 BY MR. ROBERSON:
17 Q. Okay.  All right.  Now, do you know this
18 other guy, Chance Hamm?
19 A. Yes, I know him.
20 Q. He still -- he still works out there,
21 doesn't he?
22 A. Yes.
23 Q. And he's also a white guy, correct?

143

1  A. Correct.
2  Q. Now, Will Hubbard and Joseph May don't
3  work there anymore?
4  A. No.
5  Q. Why is that?
6  A. My understanding, Will come to me and told
7  me to pick him up one day.
8  Q. That they -- that they what?
9  A. Will called me on the radio and told me,
10 he said, Roy, come get me.  I said, Where
11 you at?  He said, I'm down here by the big
12 lake.  I said, Man, You need to call Joel.
13 He's your boss.  He said, No, I'm tired of
14 Joel's Shit.  I said, What?  I'm tired --
15 I said, Hold on a minute.  I said, I'll be
16 there in a minute.
17      So I wanted to know what he was
18 talking about, so I gets down there and
19 pick him up.  He said, Well, Roy, I'm just
20 sick of him.  I'm tired of him.  I said,
21 Man, you ain't going to quit your job, is
22 you?  He said, Yeah, I'm tired of Joel.
23 He in love with Chance.  Chance telling

142

1  A. Correct.
2  Q. Let me show you what I'll mark as Exhibit
3  21.
4        MR. DUKES:  I'll stipulate as to
5        his pay if you want me to.
6        MR. ROBERSON:  That's all right.
7        I'm having too much fun.
8  BY MR. ROBERSON:
9  Q. I'll show you 21.  Does that show that
10 Chance Hamm was paid $8 an hour when he
11 was hired in January of '06?
12      (Whereupon Plaintiff's Exhibit
13        No. 21 was marked for
14        identification and attached
15        hereto.)
16 A. Correct.
17 Q. Okay.  And then I'll show you Exhibit 22
18 which is his application.  And he was also
19 a young white male, correct?
20      (Whereupon Plaintiff's Exhibit
21        No. 22 was marked for
22        identification and attached
23        hereto.)

144

1  him everything.  He in love.  Chance
2  watching the guys up there telling him
3  everything.  I said, What?  I said, Man, I
4  don't know nothing about that.  I said,
5  Why don't you go talk to David before you
6  just quit and leave your job?  I said,
7  Man, look, if you ain't got plenty of
8  money, don't leave your job.  Well, no,
9  no, no.
10      I said, Well, you going to have
11 to turn that key in before you leave.  You
12 might as well leave me your key if you're
13 fixin' to quit.  I said, Better yet, take
14 it to David.  He said, Well, I'll go down
15 there and take it to David.  I said, You
16 really need to think about it before you
17 walk away from your job.  So he said,
18 Well, no, I'm going to quit.  I'm just
19 tired of it.  I'm tired of Joel.  He ain't
20 right.  He ain't right.  He's just crazy
21 as he can be whether y'all can see it or
22 not.  I said, Hey, man, I don't know
23 nothing about that.  I said, But you need

Pages 141 to 144

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377    Certified Court Reporters and Certified Legal Video Specialists    888.253.3377

145

1     to tell David all of this.
2          So I dropped him off at his barn
3     at his truck.  And I saw Joel.  I said,
4     Joel, that man say he fixin' to quit.  He
5     said, For real?  I said, Yeah.  He said,
6     Well, let him go then.  I can't make him
7     stay.  So I just pulled on off.
8          And as of -- what you say the
9     other guy's name is?
10    Q. Joseph May or Brother Man, Beckwith?
11    A. No.  Joseph May.
12         MR. DUKES:  Joseph May.
13    A. I don't know why Joseph May quit.
14    Q. He quit, too?
15    A. He quit, yeah.  I do know I heard that he
16    went back to school, but I don't know the
17    reason why he quit.
18    Q. He didn't talk to you?
19    A. No, he didn't.  He just --
20    Q. He just left.
21    A. Right.  He didn't ever come back and pick
22    the traps up.  He just left.
23    Q. He didn't get his traps?

146

1     A. No.  He just left.
2     Q. All right.  Well, I've showed you four
3     documents of four white males who were
4     hired, correct?
5     A. Correct.
6     Q. And each one of them were paid $8 an hour,
7     correct?
8     A. Correct.
9     Q. Norris Foster was paid $7 an hour, and I
10    showed you that document?
11    A. Correct.
12    Q. Jeffrey Harris --
13         MR. ROBERSON:  Have you
14         got . . .
15    Q. Jeffrey Harris is black, isn't he?
16    A. Correct.
17    Q. Does it show that he was hired -- when was
18    he hired, what date?
19         (Whereupon Plaintiff's Exhibit
20         No. 23 was marked for
21         identification and attached
22         hereto.)
23         (Witness reviewed document.)

147

1     A. He was hired -- I can't make out -- I
2     guess that's a one or a --
3     Q. I think that's nine -- 9/6/05 --
4     A. Okay.
5     Q. -- he was hired.  Does that sound about
6     right, September of '05?
7     A. That sounds about right.
8     Q. He was hired before Joel was hired; do you
9     remember that, right before --
10    A. Correct.
11    Q. -- Joel was hired?
12    A. Yeah, correct.
13    Q. Okay.
14    A. Maybe a couple of weeks or maybe sooner.
15    Q. Right.
16    A. Three or four weeks maybe.
17    Q. And he was hired at $7 an hour, correct?
18    A. Correct.
19    Q. Do you know how old Jeffrey is?
20    A. No, I don't.
21    Q. Let me show you Exhibit 24.  This is
22    Jeffrey Harris' application.
23         (Whereupon Plaintiff's Exhibit

148

1          No. 24 was marked for
2          identification and attached
3          hereto.)
4          (Witness reviewed document.)
5     Q. You see where he had military service?
6     A. Correct.
7     Q. Okay.  And I'm going to show you Exhibit
8     25 which is Jeffrey Harris' birth
9     certificate.  Shows he was born
10    December 4, 1967.  So that would have made
11    him in 2005, what, thirty-eight?
12         (Whereupon Plaintiff's Exhibit
13         No. 25 was marked for
14         identification and attached
15         hereto.)
16         (Witness reviewed document.)
17    A. Correct.  '67?
18    Q. Right, '67.
19    A. He was born in '67?
20    Q. That's what it says, yeah.  Makes him
21    about thirty-eight, doesn't it?
22    A. Yeah.  He was born the 4th, 1967.
23    Q. All right.  And I'm also going to show you

Pages 145 to 148

334.262.3332                    Baker & Baker Reporting and Video Services, Inc.                    334.262.3332
888.253.3377              Certified Court Reporters and Certified Legal Video Specialists           888.253.3377

149

1 the deposition -- I mean, Willie Mack's
2 personnel file.  Willie Mack, do y'all
3 call him B.B.?
4        (Whereupon Plaintiff's Exhibit
5        No. 26 was marked for
6        identification and attached
7        hereto.)
8 A. We call him B.B., that's correct.
9 Q. Okay.  What does he do in the crew?
10 A. B.B. used to -- in my crew now?
11 Q. Does he work for you?
12 A. Now, yeah.
13 Q. Is he a good employee?
14 A. Oh, yeah.
15 Q. I mean, does he do his job?
16 A. Yeah.
17 Q. Have you ever had any problems out of B.B.
18    not coming to work or whatever?
19 A. A couple of times, yeah.
20 Q. Says this is the application.  He didn't
21    complete any of it, but here's his
22    application, Exhibit 27, for Willie
23    Bernard Mack.

150

1        (Whereupon Plaintiff's Exhibit
2        No. 27 was marked for
3        identification and attached
4        hereto.)
5        (Witness reviewed document.)
6 Q. What did Willie Mack make an hour when he
7    was hired?
8 A. When he was hired? 6.50 when he started.
9 Q. What date did he start?
10 A. Third month, the 16th of '04.
11 Q. Okay.  And then how much did he get?
12 A. He got a raise the first month, the first
13    of '05, to 7.80 it looks like.
14 Q. $7 an hour, I think it is.
15        MR. DUKES:  I don't know.
16 A. I can't make out what that is.
17 Q. Okay.
18 A. And then on the first -- the first month,
19    the first of '06, he got a raise to $8.
20 Q. Okay.  Now, I don't have the documents,
21    but I'm asking you to assume -- do you
22    know Henry Tolliver?
23 A. Yes, I know him.

151

1 Q. Did he work for you?
2 A. Correct.
3 Q. Was he a good worker?
4 A. Correct.
5 Q. And Demetrius Parham, do you --
6 A. Correct.
7 Q. Do you know him?
8 A. Correct.
9 Q. I know he's related to you.  But is he a
10    good worker?
11 A. Correct, yes.
12 Q. I mean, he does his job?
13 A. He does his job.
14 Q. And he knows how to take people deer
15    hunting, right?
16 A. Some places.  Some places.  Not all the
17    places.
18 Q. Well, I want you to --
19 A. Majority.
20 Q. I want you to assume that every -- that
21    Henry and Demetrius both made less than $8
22    an hour, okay?
23 A. Correct.

152

1 Q. Do you know any explanation other than
2    their race -- they're black men -- why
3    they were paid less?
4        MR. DUKES:  Than?
5        MR. ROBERSON: The Plaintiffs.
6        MR. DUKES:  I object to the
7        form.
8 Q. You want me to ask you again?  You may not
9    understand that.
10 A. Yeah.  Ask me again.
11 Q. Norris Foster, Jeff Harris, Willie Mack,
12    Henry Tolliver, and Demetrius Parham, all
13    black men; do you agree?
14 A. Correct.
15 Q. All of them paid less than $8 an hour; do
16    you agree?
17        MR. DUKES:  Object to the form.
18 A. Correct.
19 Q. Do you know any reason why they were paid
20    less than these four white people who were
21    hired in 2005 and 2006 at $8 an hour?  Do
22    you know any reason for it?
23 A. No, I don't.  I don't know any reason why.

153

1    I mean, I didn't know what nobody was
2    making but the black guys.  I didn't know
3    what the white guys was making.
4    Q. Well, does it appear to you that Mid
5        States was discriminating against those
6        people as to their pay?
7            MR. DUKES:  Object to the form.
8    Q. You can answer.
9    A. When you saying Mid States, you talking
10       about the peoples in the main office?
11   Q. Yeah.
12   A. Like Meridian, the main office?
13   Q. Right.
14   A. Yeah, I think they was.  As far as I'm
15       concerned, I think they was.  If they was
16       making more, $8, and them guys been there,
17       that ain't right.
18   Q. Norris had been there ten years, hadn't
19       he?
20           MR. DUKES:  Object to the form.
21   A. Yeah.
22   Q. About ten -- I mean, working on the
23       plantation.  I don't mean for Mid States,

154

1        but working at Sedgefields for about ten
2        years, different periods of time, right?
3    A. Correct.
4    Q. I mean, he'd been running a tractor out
5        there, and he knew every hill and hollow
6        out there, didn't he?
7            MR. DUKES:  Object to the form.
8    Q. You can answer.
9    A. Correct.
10   Q. And -- and I know when you were a
11       supervisor, Norris probably didn't operate
12       the heavy equipment because you probably
13       did?
14   A. I did.  He operated tractors.
15   Q. He did tractors.  Did he ever run a
16       backhoe?
17   A. Every now and then.
18   Q. Okay.  Did you ever see him on a bulldozer
19       doing a firebreak or anything like that?
20   A. I never seen him on a bulldozer.
21   Q. He said he pushed up piles.  Do you know
22       what I'm talking about?
23   A. That might have been before my time.  I

155

1    never seen that.
2    Q. Okay.  Fair enough.  When -- when you were
3        working out there with Norris, if anybody
4        was on a bulldozer, it was you?
5    A. Correct.
6    Q. Okay.  Have you ever seen Joel Norman on a
7        bulldozer?
8    A. Yes.
9    Q. Have you ever seen him on a backhoe?
10   A. Yes.
11   Q. Well, and after today, you know that
12       they're paying Joel Norman $70,000,
13       providing him a place to live, and they're
14       paying you $41,000, and you don't live on
15       the property, do you?
16   A. Correct.
17   Q. Do you think that's fair?
18           MR. DUKES:  Object to the form.
19   Q. You can answer.
20           MR. DUKES:  You can go ahead.
21   A. No, I don't think that's fair.
22   Q. Do you think that they may be
23       discriminating against you and your pay?

156

1    A. I thought about it.  It's on my mind now
2        when I see them forms.  It ain't right.
3        It don't matter about a man got a degree,
4        to me, if I'm doing the same job just as
5        good as he's doing it -- I mean, you know.
6    Q. I do know.
7    A. I don't understand that.  It ain't right.
8        I don't care if you're a Mexican, because
9        Hispanic don't matter.  If you can do that
10       job, you ought to be getting paid right.
11           MR. ROBERSON:  Let's go off the
12           Record.  And I think I'm
13           about through.
14           THE VIDEOGRAPHER:  Off the
15           Record at 2:54 p.m.
16           (Whereupon a brief recess was
17           taken.)
18           MR. ROBERSON:  Let's go back on
19           the Record.
20           THE VIDEOGRAPHER:  Back on the
21           Record at 3:07 p.m.
22           BY MR. ROBERSON:
23   Q. Mr. Lee, I showed you a document at one

Pages 153 to 156

334.262.3332         Baker & Baker Reporting and Video Services, Inc.         334.262.3332
888.253.3377      Certified Court Reporters and Certified Legal Video Specialists   888.253.3377

157

1    time about when Norris was written up for
2    clipping -- riding the horses when he was
3    supposed to have been clipping them; do
4    you remember that?
5    A. Correct.
6    Q. Norris says that he came and talked to
7      you, after that date, about that. On the
8      day he was written up, he told Joel Norman
9      and David Carroll that he was going to go
10     report them to -- I think it's Suzanne and
11     Matt. Do you know who that is?
12   A. Yeah, correct.
13   Q. Who are those people?
14   A. Suzanne is Paul Broadhead's daughter.
15   Q. Okay.
16   A. And Matt is his son-in-law.
17   Q. And are they out of state?
18   A. They stay in Atlanta.
19   Q. Okay. Do you recall anything about
20     what -- Norris claims that he threatened
21     to talk to them, and he was told something
22     by David Carroll. Do you know what I'm
23     talking about?

158

1    A. Correct. I know what Norris told me.
2    Q. Well, and all I'm asking you is what
3      Norris told you. This is before he was
4      fired?
5    A. Correct.
6    Q. What did he tell you?
7    A. We was at the skinning shed down there at
8      the dog kennel. And Norris come to me and
9      told me, he said, Well, I told David. I
10     went to David about what was going on.
11     And said David told him, said you had to
12     take that up with Joel. And said that
13     Norris told him, said, Well, I'm going to
14     tell them peoples. I'm going to tell
15     Suzanne and Matt. I'm going to talk to
16     them and let them know. And then Norris
17     said David say, If you tell anything what
18     goes on out here, you're automatically
19     fired. What goes on out here stays out
20     here. That's what Norris -- Norris' exact
21     words Norris told me. I didn't hear David
22     say --
23   Q. You didn't -- that's -- my point is: You

159

1    didn't hear David say that?
2    A. I didn't hear that, no.
3    Q. That's -- but -- but --
4    A. I got it from Norris.
5    Q. But Norris was still working there --
6    A. Correct.
7    Q. -- when he said that, right?
8    A. Yeah.
9    Q. And it was right after he had been written
10     up about the --
11   A. With the clippers, correct.
12   Q. Okay. All right. Now, I'm going to tell
13     you again. I want -- I want to try to
14     make myself clear. You now work for
15     Tollison's, right?
16   A. Correct.
17   Q. But the guy that's your boss at Tollison's
18     is David Carroll --
19   A. Correct.
20   Q. -- do you understand that?
21   A. Correct.
22   Q. And Joel Norman works for Tollison's,
23     right?

160

1    A. Correct.
2    Q. And David Carroll's been sitting in here
3      while you've been testifying?
4    A. Correct.
5    Q. And he's your boss?
6    A. Correct.
7    Q. And he can take action against you; do you
8      understand that? As your boss, he can.
9    A. Correct.
10   Q. I'm telling you that if he does take some
11     action against you, and you feel like it's
12     because of your testimony, that you need
13     to have legal representation, okay?
14   A. Okay, correct.
15   Q. And you can -- you're free to contact any
16     lawyer you want to about that.
17   A. Correct.
18   Q. Okay. And I'm not saying he's going to
19     take any action against you. I'm just
20     telling you if he does.
21   A. Correct.
22   Q. Now, you've been working out there for --
23   A. Quite some time.

Pages 157 to 160

161

1  Q. Six years?
2  A. Yeah, correct -- longer.
3  Q. Okay. And I ain't heard anybody say
4     anything bad about you.
5  A. Good.
6  Q. To be honest with you, I've asked
7     everybody, and everybody says you're a
8     good worker and you do your job.
9  A. Correct.
10 Q. All right. And I don't expect that to
11    change, do you?
12 A. I don't expect it to.
13 Q. But I'm going to be honest with you, Roy,
14    you make $41,000 a year, right?
15 A. Correct.
16 Q. That's a pretty good job in Bullock
17    County, isn't it?
18 A. Correct.
19 Q. I mean, there ain't a lot of jobs that pay
20    that?
21 A. No, it isn't.
22 Q. Okay. And you'd like to keep that job, I
23    assume?

162

1  A. Correct.
2  Q. Okay. Well, if anybody does anything to
3     affect that, I think you ought to be
4     represented, okay?
5  A. Correct.
6  Q. And I'm going to tell you, I do that --
7        MR. DUKES: Wait a minute.
8  Q. -- kind of work.
9        MR. DUKES: Let me -- let me
10          stop you here, Jerry.
11       MR. ROBERSON: Okay.
12       MR. DUKES: I think you need to
13          reconsider doing what
14          you're doing for ethical
15          reasons. You don't need to
16          do what you're about to do.
17          I'm giving you an
18          opportunity not to do it.
19       MR. ROBERSON: Not to do what?
20       MR. DUKES: This -- it has a
21          taint of barratry to it.
22          And I think under the
23          ethical guidelines that we

163

1        both go by, I don't think
2        you need to --
3     MR. ROBERSON: Okay.
4     MR. DUKES: -- give him a card.
5     MR. ROBERSON: Okay.
6  BY MR. ROBERSON:
7  Q. Well, I'll just tell you that I cannot
8     contact you. I agree with Mr. Dukes that
9     I -- I'm not permitted to contact you,
10    because you're in management at Mid
11    States. Do you understand that?
12 A. Correct, correct.
13 Q. But you can contact anybody you want to
14    contact if you want legal advice or legal
15    representation. You understand that?
16 A. I understand.
17       MR. ROBERSON: Okay. Thank you.
18          You may answer his
19          questions.
20       MR. DUKES: I don't have any
21          questions.
22       THE VIDEOGRAPHER: This
23          concludes the deposition of

164

1     the Witness. And we're
2     going off the Record at
3     3:12 p.m.
4     (The deposition of ROY LEE
5     concluded at 3:12 p.m.)
6
7  * * * * * * * * * *
8     FURTHER DEPONENT SAITH NOT
9  * * * * * * * * * *

Pages 161 to 164

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377      Certified Court Reporters and Certified Legal Video Specialists      888.253.3377

Roy Lee
October 11, 2006

```
                                                    165
1      * * * * * * * * * *
2         REPORTER'S CERTIFICATE
3      * * * * * * * * * *
4
5    STATE OF ALABAMA)
6    COUNTY OF MONTGOMERY)
7
8      I, Cornelia J. Baker, Certified Court
9    Reporter, Certified Shorthand Reporter,
10   and Notary Public in and for the State of
11   Alabama at Large, do hereby certify that
12   on Wednesday, October 11, 2006, pursuant
13   to notice and stipulation on behalf of the
14   Plaintiff, I reported the deposition of
15   ROY LEE, who was first duly sworn by me to
16   speak the truth, the whole truth, and
17   nothing but the truth, in the matter of
18   NORRIS FOSTER, Plaintiff, versus MID STATE
19   LAND AND TIMBER COMPANY, INCORPORATED,
20   d/b/a SEDGEFIELDS PLANTATION, Defendant,
21   Case Number 206-CV-00405-IDSRW, now
22   pending in the UNITED STATES DISTRICT
23   COURT FOR THE MIDDLE DISTRICT OF ALABAMA,
```

```
                                                    166
1     NORTHERN DIVISION; that the foregoing
2    pages contain a true and accurate
3    transcription of the examination of said
4    witness by counsel for the parties set out
5    herein; that the reading and signing of
6    said deposition was waived by witness and
7    counsel for the parties.
8      I further certify that I am neither of
9    kin nor of counsel to the parties to said
10   cause, nor in any manner interested in the
11   results thereof.
12     This the 17th day of October, 2006.
13
14
15
        Cornelia J. Baker
16      Certified Shorthand Reporter,
        Certified Court Reporter and
17      Notary Public for the
        State of Alabama
18
19      My Commission expires 6/9/08.
20
21
22
23
```

EXHIBIT 2

# FREEDOM COURT REPORTING

## Page 1

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE MIDDLE DISTRICT OF ALABAMA
3  NORTHERN DIVISION
4
5  CASE NUMBER: 2:06-CV-875-ID
6  JEFFREY HARRIS, et al.,
7  Plaintiffs,
8  vs.
9  MID STATE LAND & TIMBER CO., INC.,
10  d/b/a SEDGEFIELDS PLANTATION,
11  Defendant.
12
13  S T I P U L A T I O N
14  IT IS STIPULATED AND AGREED by and
15  between the parties through their respective
16  counsel, that the deposition of Roy Lee may
17  be taken before Angela Smith, RPR, CRR, at
18  the offices of John W. Waters, Jr., at 214
19  North Prairie Street, Union Springs, Alabama
20  36089, on the 18th day of January, 2007.
21
22  DEPOSITION OF ROY LEE
23

## Page 2

1  IT IS FURTHER STIPULATED AND
2  AGREED that the signature to and the reading
3  of the deposition by the witness is waived,
4  the deposition to have the same force and
5  effect as if full compliance had been had
6  with all laws and rules of Court relating to
7  the taking of depositions.
8  IT IS FURTHER STIPULATED AND
9  AGREED that it shall not be necessary for
10  any objections to be made by counsel to any
11  questions except as to form or leading
12  questions, and that counsel for the parties
13  may make objections and assign grounds at
14  the time of the trial, or at the time said
15  deposition is offered in evidence, or prior
16  thereto.
17  IT IS FURTHER STIPULATED AND
18  AGREED that the notice of filing of the
19  deposition by the Commissioner is waived.
20
21  * * * * * * * * * * * * *
22
23

## Page 3

1  * * * * * * * * * * * * *
2  I N D E X
3  EXAMINATION
4  PAGE
5  By Mr. Dukes ........................ 5
6  DEFENDANT'S EXHIBITS
7  PAGE
8  Ex. 19 - Memo regarding the
9  hiring of Anthony ........ 62
10  Ex. 20 - Mr. Lee's payroll
11  records .................. 72
12  Ex. 21 - Mr. Lee's personnel file .. 74
13  Ex. 22 - A declaration written by
14  Mr. Dukes ............... 106
15  Ex. 23 - Answers to
16  interrogatories ......... 133
17  * * * * * * * * * * * * *
18
19
20
21
22
23

## Page 4

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE MIDDLE DISTRICT OF ALABAMA
3  NORTHERN DIVISION
4  CASE NUMBER: 2:06-CV-875-ID
5  JEFFREY HARRIS, et al.,
6  Plaintiffs,
7  vs.
8  MID STATE LAND & TIMBER CO., INC.,
9  d/b/a SEDGEFIELDS PLANTATION,
10  Defendant.
11  BEFORE:
12  ANGELA SMITH, Commissioner.
13  APPEARANCES:
14  ALBERT H. ADAMS, ESQUIRE, of THE
15  IRBY LAW FIRM, P.O. Box 910, Eufaula,
16  Alabama, appearing on behalf of the
17  Plaintiff.
18  CARTER DUKES, ESQUIRE, of HUCKABY,
19  SCOTT & DUKES, 2100 3rd Avenue N., Ste: 700,
20  Birmingham, Alabama 35203, appearing on
21  behalf of the Defendant.
22  ALSO PRESENT: David Carroll
23  * * * * * *

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 5

1    I, ANGELA SMITH, RPR, CRR, a Court
2  Reporter of Wetumpka, Alabama, acting as
3  Commissioner, certify that on this date, as
4  provided by the Federal Rules of Civil
5  Procedure and the foregoing stipulation of
6  counsel, there came before me at the offices
7  of John W. Waters, Jr., 214 North Prairie
8  Street, Union Springs, Alabama 36089,
9  beginning at 9:18 a.m., Roy Lee, witness in
10 the above cause, for oral examination,
11 whereupon the following proceedings were
12 had:
13         ROY LEE,
14 being first duly sworn, was examined and
15 testified as follows:
16         COURT REPORTER:  Usual
17 stipulations?
18         MR. ADAMS:  Please.
19         MR. DUKES:  Please.
20         EXAMINATION
21 BY MR. DUKES:
22   Q.    Roy, we know each other.
23   A.    Yes, sir, we do, by name.

Page 6

1    Q.    I'm going to ask you some
2  questions under oath.  Let me just tell you
3  what I'm -- I don't really have a formal
4  outline of what I'm going to ask you
5  questions about.
6    A.    Okay.
7    Q.    But I'm going to ask you a few
8  questions about your background.
9    A.    Okay.
10   Q.    And about who you're related
11 to and that kind of thing.
12   A.    All right.
13   Q.    Little bit about your work
14 history.
15   A.    Okay.
16   Q.    A little bit about your work
17 history at Sedgefields.
18   A.    Okay.
19   Q.    And what you might know about
20 the other Plaintiffs.
21   A.    Okay.
22   Q.    Tarver, Mack, Foster, Harris,
23 their claims, and Parhams' claims?

Page 7

1    A.    Okay.
2    Q.    While I'm thinking about it,
3  yesterday, or the day before, I deposed
4  Mr. Parhams, and his driver's license is
5  Parhams?
6    A.    Parham or Parhams?
7    Q.    Parhams with an S.
8    A.    Okay.
9    Q.    The Social Security card is
10 Parhams, with an S.
11   A.    Uh-huh.
12   Q.    But he signs his name Parham.
13 And his application is completed with a
14 Parham without an S.
15   A.    Okay.
16   Q.    Do you know anything about
17 that?
18   A.    No, I don't.
19   Q.    Do you know a Demetrius Parham
20 that lives in the area?
21   A.    That's what Demetrius's name,
22 Demetrius Parham, I assume.  That's the only
23 name I ever know.

Page 8

1    Q.    Okay.  You don't know of
2  anybody else that goes by that same name
3  that lives in this area, do you?
4    A.    No.  I know a lot of Parhams,
5  but I don't know nobody that got that name,
6  I don't.
7         MR. DUKES:  While I'm thinking
8  about it, the court reporter brought to our
9  attention that I had marked two exhibits, I
10 think, as 15.  And with Plaintiff's
11 counsel's approval, we'll just let the court
12 reporter go back and change the reference to
13 those exhibits as 15-A and 15-B on the
14 Record.  Is that okay with you, sir?
15         MR. ADAMS:  That will be fine.
16   Q.    Okay.  Mr. Lee, you're
17 married; right?
18   A.    Right.
19   Q.    And your wife's name is?
20   A.    Lucille Long Lee.
21   Q.    Does she have any relatives in
22 Alabama?
23   A.    In Alabama?  Yeah.  She's got

2 (Pages 5 to 8)

# FREEDOM COURT REPORTING

Page 9

1  grandparents.  That are living?
2  **Q.    Yes, sir.  That are living.**
3  A.    Yes.  She have a sister in
4  Clayton, Alabama.
5  **Q.    In where?**
6  A.    Clayton.
7  **Q.    Clayton?**
8  A.    Uh-huh.
9  **Q.    Okay.  What's her sister's**
10  **name?**
11  A.    Gloria Straw.  I think that's
12  her last name.
13  **Q.    Can you spell that for me?**
14  A.    Not really, no.  Not Straw.  I
15  think she's named Gloria Straw.  I don't
16  know.
17  MR. ADAMS:  It's S-T-R-A-W.
18  A.    She got a sister that stay in
19  Birmingham, Viola Coleman.
20  **Q.    Okay.**
21  A.    And that's about it right
22  here.  Oh, she's got a sister here in Union
23  Springs named Sharon Long.

Page 10

1  **Q.    She's got what, now?**
2  A.    A sister named Sharon Long.
3  **Q.    Where does -- Does Sharon**
4  **work?**
5  A.    No.
6  **Q.    Is she married?**
7  A.    No.
8  **Q.    Does she have any children?**
9  A.    I think she's got four.
10  **Q.    Any of them nineteen years or**
11  **older?**
12  A.    I think her oldest two is over
13  nineteen.
14  **Q.    Do you know what their names**
15  **are, by any chance?**
16  A.    One's name -- The oldest son
17  is named Shannon Long.  Her oldest's
18  daughter's name is Macale.
19  **Q.    Do they still live in the**
20  **area?**
21  A.    Yes.
22  **Q.    Do either one of them work?**
23  A.    Macale works for Wayne

Page 11

1  Poultry.
2  **Q.    Okay.**
3  A.    Last I heard about Shannon
4  Long, he was working for Hunky Daniel, a
5  logging company.
6  MR. ADAMS:  Herman is his
7  name, but it's Daniel's Logging Company, I
8  think.
9  **Q.    Is that all her sisters and**
10  **brothers?**
11  A.    No.  She got some in Florida.
12  **Q.    Okay.  Those are all that live**
13  **in Alabama?**
14  A.    Right.
15  **Q.    Her mom and dad still alive?**
16  A.    No.
17  **Q.    Okay.  Any aunts and uncles in**
18  **Alabama?**
19  A.    My wife?
20  **Q.    Yes.**
21  A.    She got an auntie in Alabama.
22  **Q.    Okay.  Where does her aunt**
23  **live?**

Page 12

1  A.    Well, I call her Aunt Ollie
2  Mae.  That's what I call her.  She stay in
3  Three Notch, Alabama.
4  **Q.    You don't know her last name?**
5  A.    No, I don't know her last
6  name.
7  **Q.    Okay.**
8  A.    Let me see.  I think that's
9  it.
10  **Q.    Okay.  Now, do you have any**
11  **children over nineteen?**
12  A.    Oh, yeah.
13  **Q.    Okay.  Tell me -- If you'll**
14  **just tell me your children's name, their**
15  **age, and where they --**
16  A.    Okay.  My babies --
17  **Q.    Let me finish. -- their age,**
18  **where they live and where they work, if they**
19  **work.**
20  A.    Okay.  My youngest daughter,
21  she's in elementary school.
22  **Q.    Okay.**
23  A.    My knee baby, he's a boy, his

3  (Pages  9 to 12)

# FREEDOM COURT REPORTING

Page 13

1  name is Shamara Lee.
2  **Q.   Okay.**
3  A.   He's in high school, in the
4  eleventh grade.
5  **Q.   Okay.**
6  A.   My oldest daughter is going to
7  college at Sparks Tech in Eufaula.
8  **Q.   Okay.  What's her name?**
9  A.   Alexia.
10  **Q.   Okay.**
11  A.   My oldest son's name is Rashan
12  Lee.  He works for Pitts in Hurtsboro.  He's
13  a welder.
14  **Q.   Okay.**
15  A.   That's it.
16  **Q.   All right.  And do you have**
17  **any aunts and uncles that live in Alabama?**
18  A.   Yes, I do.
19  **Q.   Okay.  Tell me their names,**
20  **and if they work, tell me where they work**
21  **and where they live.**
22  A.   All right.  I've got my Uncle
23  Richard West, he lives in Midway, Alabama.

Page 14

1  He don't work.
2  **Q.   Okay.**
3  A.   He's retired from Columbus
4  Mills.
5  **Q.   Okay.**
6  A.   Okay.
7  **Q.   And who is he married to?**
8  A.   Cynthia West.
9  **Q.   Does she work?**
10  A.   No.  She's -- I think she
11  retired from Columbus Mills.
12  **Q.   Okay.**
13  A.   Not Columbus Mills, but the
14  place that make the lights in Eufaula.  I
15  can't think of the name of the place.
16  MR. ADAMS:  Cooper Lighting.
17  **Q.   Okay.  Any other aunts and**
18  **uncles?**
19  A.   No.
20  **Q.   Okay.  What about brothers and**
21  **sisters?  Do you have any brothers and**
22  **sisters that live in Alabama?**
23  A.   Yes, I do.

Page 15

1  **Q.   All right.  To make this as**
2  **quick as possible --**
3  A.   Okay.
4  **Q.   -- you just tell me their**
5  **name --**
6  A.   All right.
7  **Q.   -- where they live.**
8  A.   Okay.
9  **Q.   If they're married, tell me**
10  **their -- or formerly married, I want to know**
11  **their spouse's name, or former spouse's**
12  **name, and where he worked, too.  Okay?**
13  A.   Okay.  All right.  My oldest
14  brother is Willie James Lee, Junior.  He
15  lives in Tuskegee, Alabama.  He works at
16  Piggly Wiggly in Union Springs.
17  **Q.   Okay.**
18  A.   My baby brother lives in
19  Tuskegee, his name is Joseph Lee.
20  **Q.   Okay.**
21  A.   He works in -- I think at
22  Russell County, he's a superintendent for
23  the roadside thing, working in Russell

Page 16

1  County.
2  **Q.   Okay.**
3  A.   All right.  My next brother's
4  name is Jerry Lee.  He lives in -- Let me
5  see.  Fulton County, that's in Atlanta.
6  **Q.   Okay.**
7  A.   He drive trucks.
8  **Q.   Okay.**
9  A.   All right.  My sisters.  My
10  oldest sister's name is Corrine West, she
11  lives in Miami.
12  **Q.   Okay.**
13  A.   One named Landa Kendrick.  She
14  lives in Midway, Alabama.
15  **Q.   How do you spell her name?**
16  A.   L-A-N-D-A.
17  **Q.   Her last name?**
18  A.   K-I-N-T --
19  **Q.   Is it Kendrick?**
20  A.   Yeah.
21  **Q.   All right.**
22  A.   She don't work.
23  **Q.   Okay.**

4  (Pages 13 to 16)

# FREEDOM COURT REPORTING

Page 17

1    A.    My next sister is Doris.  I
2  don't know what her last -- I don't know
3  what her husband's last name.
4    **Q.    Okay.  Where does she live?**
5    A.    She live in Midway.
6    **Q.    Okay.**
7    A.    She don't work at all.
8    **Q.    Do you know what her last name**
9  **is?**
10    A.    I believe it's Hunter.  I
11  think her husband is named John Hunter.  I
12  think that's what it is.
13    **Q.    Okay.**
14    A.    My next sister is Peggy Jesse.
15  She's not married.
16    **Q.    Okay.**
17    A.    She lives in Midway.  She
18  works part time at the school.
19    **Q.    Okay.**
20    A.    And she works -- runs a
21  filling station.
22    **Q.    Okay.**
23    A.    My next sister is Pamela

Page 18

1  Harrison.  She got her own business.  She
2  married.
3    **Q.    What kind of business is she**
4  **in?**
5    A.    She do hair.
6    **Q.    Okay.  And what does her**
7  **husband do?**
8    A.    I think he works in Atlanta.
9    **Q.    Okay.  Where does she stay?**
10    A.    She stays in Midway.
11    **Q.    Okay.**
12    A.    My baby sister is Kimberly
13  Lee.  She lives in -- Kimberly Parham
14  because she's married to Demetrius Parham.
15    **Q.    Okay.**
16    A.    She lives in Midway.
17    **Q.    And Demetrius is who I was**
18  **asking you about earlier; right?**
19    A.    Right.  My brother-in-law.
20    **Q.    He's your brother-in-law?**
21    A.    Yeah.  That's all my sisters
22  and brothers.
23    **Q.    I'm still just stuck on that.**

Page 19

1  So give me a second, I'm going to ask you
2  some questions about that.
3    A.    Okay.
4    **Q.    I got Demetrius's mailing**
5  **address as P.O. Box 271, Midway, Alabama.**
6  **Do you know if that's --**
7    A.    I don't know his address.
8    **Q.    You don't know his mailing**
9  **address?**
10    A.    No.
11    **Q.    Do you know where 272 Main**
12  **Street is in Midway?  I think it may be Oak**
13  **Street, too.**
14    A.    No, I don't.
15        MR. ADAMS:  If this will help,
16  Carter, I think Demetrius lives on the
17  street right behind city hall and the Post
18  Office.
19        THE WITNESS:  Right.
20        MR. ADAMS:  He's in that
21  second block.  And I think that is Main
22  Street there, beside the Post Office and the
23  -- he told me he gets his mail at the Post

Page 20

1  Office box.
2    **Q.    Do you know -- DO you know**
3  **what his street address is?**
4    A.    No, I don't.  I just know
5  mine.  Because they went to -- You know when
6  they made -- where they can come out and get
7  you, they went to 7173, something like that,
8  when they call sick or something, an
9  emergency, ambulance will know how to look
10  it on the computer and come find you.
11        MR. ADAMS:  E-911.
12    A.    Yeah.  So they went to that in
13  Midway.  Some of them got Post Office box,
14  some of them got mailbox.
15    **Q.    But you don't know what his**
16  **mailbox number is?**
17    A.    No.
18    **Q.    Do you know if Demetrius has**
19  **had any trouble with the law?  Has he gotten**
20  **in any trouble?**
21    A.    No, I don't.
22    **Q.    Okay.  But you don't have any**
23  **reason to dispute that Demetrius, the**

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 21

1  Demetrius we're talking about, lives on Main
2  Street?
3      A.    Yeah. He definitely lives in
4  Midway. I would definitely say it's right
5  by the Post Office, like you described. I
6  just don't know the name of the street.
7      Q.    Okay. Are you related by
8  marriage or blood to anybody else that works
9  or has worked out at Sedgefields?
10     A.    Yes.
11     Q.    Okay. Who else?
12     A.    I'm related to Joseph Lee.
13 That's a different Joseph than my brother.
14     Q.    Okay.
15     A.    Joseph Lee is my cousin, first
16 cousin.
17     Q.    Okay.
18     A.    He used to work for
19 Sedgefields Plantation.
20     Q.    Okay. Anybody else?
21     A.    That's it.
22     Q.    How far does Demetrius live
23 from you?

Page 22

1      A.    Maybe a -- Maybe two blocks.
2      Q.    Okay.
3      A.    Maybe.
4      Q.    Are those city blocks or
5  country blocks? Do you know what I'm
6  talking about?
7      A.    Close.
8          MR. ADAMS: Less than half a
9  mile.
10     A.    Yeah. It's walking distance.
11 Less than half a mile.
12     Q.    What about Henry Tarver, is he
13 pretty close to you as well?
14     A.    Henry stays maybe -- Yeah,
15 less than a half a mile from me. Yeah.
16     Q.    Okay. And BB?
17     A.    BB stays a good -- I stay
18 thirteen miles from here. I'd say BB's
19 house is another mile, fourteen miles.
20     Q.    Fourteen miles from you?
21     A.    From me, yeah.
22     Q.    Okay.
23     A.    BB.

Page 23

1      Q.    So, he doesn't live near you?
2      A.    No. He stays in Union
3  Springs.
4      Q.    Okay. That's right. Jeffrey
5  Harris lives out towards Fort Mitchell, is
6  that right?
7      A.    I don't know where Jeff lives.
8      Q.    All right.
9          MR. ADAMS: Fitzpatrick.
10     Q.    Fitzpatrick.
11         MR. ADAMS: What they call
12 High Log. He lives with High Log.
13     Q.    How many people live with you
14 now at your home?
15     A.    At my home, all my kids and my
16 wife.
17     Q.    Do the two oldest still live
18 with you?
19     A.    Right. Correct.
20     Q.    Have you got anybody else that
21 stays with you?
22     A.    No.
23     Q.    And how long have you lived

Page 24

1  there, Mr. Lee?
2      A.    I lived in Midway all my life.
3  But I bought ten acres of land in the city
4  of Midway. I been down there, I'd say
5  approximately four years.
6      Q.    Okay.
7      A.    Yeah.
8      Q.    What is your street address?
9      A.    I have to look on my driver's
10 license to tell you. I don't know it by
11 heart. 7175 Highway 51 South.
12     Q.    Okay. Are you a member of any
13 church?
14     A.    Hayes Hill Baptist Church.
15     Q.    Do Mr. Harris, Mr. Mack,
16 Mr. Parham, Mr. Tarver or Mr. Foster, do
17 they attend there as well?
18     A.    Parham do. Norris Foster,
19 maybe three or four times out of the year,
20 maybe.
21     Q.    Okay. Do you hold any office
22 or position at Hayes Hill?
23     A.    No, I don't.

6 (Pages 21 to 24)

## FREEDOM COURT REPORTING

Page 25

1    Q.    Okay.  Are you a member of,
2  like, the Masons or any other kind of club
3  or organization?
4    A.    Order of the Masonic.
5    Q.    Okay.  What's the name of your
6  Mason lodge?  You don't know?
7    A.    I know, but I --
8    Q.    Oh, you're not supposed to
9  tell me?
10    A.    Yeah.
11    Q.    I couldn't remember what's
12  secret and what's not secret.
13    A.    Okay.
14    Q.    Where does it meet?  What city
15  does it meet, can you tell me that?
16    A.    Midway.
17    Q.    Okay.  Are Mr. Harris,
18  Mr. Mack, Mr. Parham, or Mr. Tarver or
19  Mr. Foster members of that same lodge?
20    A.    No.
21    Q.    Okay.  All right.  Did you
22  attend -- Where were you born, Mr. Lee?
23    A.    In Bullock County.

Page 26

1    Q.    Okay.  Lived here all your
2  life?
3    A.    All my life.
4    Q.    Okay.  How long have you known
5  Mr. Foster?
6    A.    I known -- Norris Foster?
7    Q.    Yes, sir.
8    A.    I known Norris through high
9  school, elementary school, and from working
10  out here with Sedgefields.
11    Q.    Okay.  Are y'all about the
12  same age?
13    A.    He's a year older than I am.
14    Q.    Okay.  Do you know if he ever
15  went into the military?
16    A.    I heard he went into the
17  military, I don't know that for a fact, but
18  I heard he have been.
19    Q.    Okay.  How did you hear that,
20  just by these depositions?
21    A.    Yeah.  By what he -- I mean,
22  he said he had been in the military, but I
23  don't know that for a fact.

Page 27

1    Q.    Okay.
2    A.    Just by the depositions.
3    Q.    Okay.  Have you read
4  Mr. Foster's deposition?
5    A.    No, I haven't.
6    Q.    Okay.  And did you graduate
7  from Bullock County High School?
8    A.    Yes, I did.
9    Q.    And what year did you
10  graduate?
11    A.    '78.
12    Q.    And where did you start
13  working after Bullock County High School?
14    A.    Welsh Company.
15    Q.    Did you help Demetrius get on
16  there, too?
17    A.    Not at Welsh.  I didn't know
18  Demetrius at that time.
19    Q.    Okay.  And how long did you
20  work at Welsh?
21    A.    Probably something like a
22  summer program.  When you get out of school
23  for the summer, something like a summer

Page 28

1  program.
2    Q.    And then why did you leave
3  there?
4    A.    I got a job at Columbus Mills.
5    Q.    All right.  And how long did
6  you work at Columbus Mills?
7    A.    I'd say sixteen, seventeen
8  years, something along in there.
9    Q.    Okay.  And you worked -- You
10  started out working here at the Union
11  Springs --
12    A.    Welsh Company.
13    Q.    No.  Where was the Columbus
14  Mills plant located that you started out at?
15    A.    Oh, Union Springs.
16    Q.    Okay.  They closed that plant;
17  right?
18    A.    Yes, they closed it.
19    Q.    And they offered you, I think,
20  a position either in Phenix City or Columbus
21  or Eufaula?
22    A.    Right.
23    Q.    And I think you said you may

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 29

1 have worked at Eufaula for a short while; is
2 that right?
3     A.    I went to Phenix City for a
4 short while, I didn't like it, so they sent
5 me to Eufaula.
6     Q.    Okay.
7     A.    And then I didn't like Eufaula
8 because I was supposed to be on night shift.
9 I had been on day shift all the time, for a
10 while. So they wanted to put me on night,
11 so I told them I'd just take the layoff.
12     Q.    Who was your supervisor at --
13 Was it Beaulieu by the time you left?
14     A.    It was Beaulieu. Yeah. A
15 different company bought it.
16     Q.    Who was your supervisor at
17 Beaulieu?
18     A.    I didn't have a -- Who did I
19 had to report to?
20     Q.    Yes, sir?
21     A.    Lawrence Penn.
22     Q.    What was his title?
23     A.    Plant manager.

Page 30

1     Q.    Was he the plant manager the
2 whole time you were down in Eufaula?
3     A.    No. This is Union Springs.
4     Q.    Okay. All right. When you
5 were at -- I'm sorry. When you were at
6 Eufaula, who was your supervisor, or who did
7 you report to?
8     A.    I was the supervisor. They
9 put me on as supervisor of night shift.
10     Q.    Okay.
11     A.    And I think the plant manager
12 down there was named Scott. I don't know
13 Scott's last name.
14     Q.    Uh-huh. I know who you're
15 talking about.
16     A.    Okay.
17     Q.    Did you report to him?
18     A.    Yeah.
19     Q.    Okay.
20     A.    But I didn't stay down there
21 but about four days, and went back to Union
22 Springs.
23     Q.    All right. You took the

Page 31

1 layoff.
2     A.    Uh-huh.
3     Q.    And what was your next job?
4     A.    My next job, I ended up at
5 Sedgefields Plantation.
6     Q.    How long were you unemployed
7 from when you took the layoff with Beaulieu
8 to when you started working at Sedgefields?
9     A.    I don't know the exact date,
10 but I think I was -- I'm thinking maybe a
11 month, a month and a week. It wasn't long.
12     Q.    And when you went to work at
13 Sedgefields, when was that, do you recall?
14     A.    I don't recall.
15     Q.    And you took a -- What you
16 were getting paid at Sedgefields was less
17 than what you were making at Columbus Mills
18 or Beaulieu?
19     A.    Well less.
20     Q.    And if I recall, you took into
21 account, when you took the Sedgefields job,
22 that you liked working outdoors; is that
23 right?

Page 32

1     A.    Correct.
2     Q.    Okay. Did you apply for
3 anywhere else, trying to make some more
4 money, or were you . . .
5     A.    No. When I came to apply at
6 Sedgefields, guy named Bo Jack. I don't
7 know Bo Jack's last name. He was telling me
8 about the job. And Norris was telling me
9 about the job, Norris Foster. So I came up
10 and I applied for a job.
11         I told them that was I good at
12 horses, training, working with dogs. I had
13 coon dogs. I could train coon dogs, but not
14 birds.
15     Q.    Yeah.
16     A.    But I know how to work dogs.
17 So I started from there. They hired me the
18 next day.
19     Q.    Okay. They don't do any coon
20 hunting at Sedgefields, do they?
21     A.    No.
22     Q.    I understand you're a good
23 coon hunter, though.

8  (Pages 29 to 32)

# FREEDOM COURT REPORTING

Page 33

1      A.     Yes, sir.
2      Q.     And you have coon dogs; is
3   that right?
4      A.     Correct.
5      Q.     What kind of dogs do you use
6   for coon hunting?
7      A.     Blue ticks.
8      Q.     Okay.  And how many of those
9   do you have?
10     A.     Five.
11     Q.     Okay.  And how long have you
12  been training coon dogs?
13     A.     Ever since '77.
14     Q.     Okay.
15            (Recess taken.)
16     Q.     Coon dogs and bird dogs for
17  quail hunting are --
18     A.     Entirely different.
19     Q.     -- Entirely different?
20     A.     Correct.
21     Q.     You train them differently, do
22  you not?
23     A.     Correct.

Page 34

1      Q.     Okay.  And you don't claim to
2   be an expert in training bird dogs, do you?
3      A.     I'm not.
4      Q.     Okay.
5      A.     I'm an expert at working a
6   bird dog when he already trained.
7      Q.     Okay.
8      A.     I'll put it that way.
9      Q.     Okay.  And other than coon
10  hunting, you do a lot of -- you grew up
11  doing a lot of deer hunting, too, did you
12  not?
13     A.     Correct.
14     Q.     And did you ever use dogs for
15  deer hunting, too?
16     A.     Never.
17     Q.     Okay.  But you didn't grow up
18  doing any quail hunting, if I recall?
19     A.     No, I haven't.  A fellow, Mike
20  McDuffie, trained me to quail hunt.
21     Q.     Okay.  If I recall, you know,
22  we've talked, and you've been deposed once
23  before.

Page 35

1      A.     Correct.
2      Q.     All right.  And I can't
3   remember where I heard it, if I recall, I
4   think you told me, or told Mr. Roberson,
5   that you had not done any quail hunting at
6   all before you came to Sedgefields?
7      A.     Never.
8      Q.     Okay.  And then when you came
9   to Sedgefields, I've got September 8, 2000,
10  does that sound about right?
11     A.     Uh-huh.
12     Q.     Mr. McDuffie, who was the
13  plant manager --
14     A.     Correct.
15     Q.     -- taught you about quail
16  hunting?
17     A.     Correct.
18     Q.     Okay.  Now, do you have any
19  schooling beyond Bullock County High School?
20     A.     No more than supervisor
21  classes, what they train for supervisors at
22  Columbus Mills and the Dale Carnegie courses
23  I took up, and little course that we had at

Page 36

1   Eufaula at the Holiday Inn for CPR and stuff
2   like that, yeah.
3      Q.     Okay.  I saw on your resume
4   where you -- Sparks Technical College, CPR
5   Training Course.
6      A.     Right.
7      Q.     1998, and computer operator
8   course in 1998; is that right?
9      A.     Correct.  Technician,
10  operator, training course in South Carolina.
11     Q.     And that was through -- with
12  Beaulieu?
13     A.     Yeah.  Columbus Mills.
14     Q.     Columbus Mills?
15     A.     Yeah.
16     Q.     On how to operate their
17  machinery?
18     A.     On a technician.  I was a
19  technician.
20     Q.     Oh, how to be a technician on
21  their machinery?
22     A.     Right.
23     Q.     How to fix it?

9 (Pages 33 to 36)

# FREEDOM COURT REPORTING

Page 37

1    A.    Correct.
2    Q.    And what kind of machinery
3 were you learning how to fix?
4    A.    Volkmans, spinning frames,
5 twisting and carding department.
6    Q.    Did you know Jeff Harris when
7 he worked at Columbus Mills --
8    A.    No, I didn't.
9    Q.    -- or Beaulieu?
10    A.    No.
11    Q.    Did any of these other folks
12 work at Beaulieu or Columbus Mills, to your
13 knowledge?
14    A.    I think Norris Foster worked
15 there once.
16    Q.    Okay.
17    A.    I don't know what year or
18 when.  He didn't -- I don't know was he
19 there.  I know I heard he worked at the
20 Columbus Mills.
21    Q.    Okay.
22    A.    Willie Mack, I recommended him
23 for Columbus Mills.

Page 38

1    Q.    Okay.  That's who I'm thinking
2 about, Willie Mack.
3    A.    Uh-huh.
4    Q.    Did he work under you?
5    A.    Sometimes.
6    Q.    Okay.
7    A.    He was a serviceman.
8    Q.    Okay.  And let's try to go
9 through this as quickly as possible, your
10 work at Columbus Mills and Beaulieu.  Okay?
11    A.    Okay.
12    Q.    What was your job when you
13 started out at Columbus Mills?
14    A.    When I started at Columbus
15 Mills, I was an operator.
16    Q.    Okay.  And what kind of
17 machine were you operating?
18    A.    Twisting.
19    Q.    Okay.  And how long were you
20 an operator, approximately?  I know you're
21 probably going to have to guess, and that's
22 fine.
23    A.    Probably five, six years,

Page 39

1 probably.
2    Q.    Okay.  And then what was your
3 next job title?
4    A.    Technician.
5    Q.    Okay.  About what year are we
6 at now?
7    A.    I really don't know.
8    Q.    Okay.
9    A.    I got some papers at home
10 where I went to them classes.  I really
11 don't know.  I don't know.
12    Q.    Okay.  Let me see if I can
13 help you out.  It says:  Computer operator
14 class in 1998.  Does that help you?
15    A.    All that was with the
16 supervisor class.
17    Q.    Okay.  You've got in your
18 application for employment that you started
19 out with Columbus Mills/Beaulieu in 1978,
20 does that sound about right?
21    A.    Uh-huh.
22    Q.    And left --
23    A.    No.  I finished high school in

Page 40

1 '78.  I worked for the Welsh Company maybe
2 -- not that long, then I went to Columbus
3 Mills.  So it might have been -- It wasn't a
4 couple months, I don't think.
5    Q.    Okay.  And it has you -- Your
6 application says that you ended your
7 employment with Beaulieu, or Columbus Mills,
8 on July 14, 2000.  Does that sound about
9 right?
10    A.    Sounds about right.
11    Q.    So, how long were you a
12 technician, do you think?
13    A.    Oh, that been a long time.
14 Maybe -- I don't know.
15    Q.    Couple of years?
16    A.    It was more than a couple of
17 years.
18    Q.    Okay.
19    A.    It was over five years, I
20 know.
21    Q.    Okay.  That's fine.  And as a
22 technician, did you supervise anybody?
23    A.    No.  I was just over my

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 41

1  machine.
2     **Q.    Right.  If your machine went**
3  **down --**
4     A.    I had to fix it for
5  production.
6     **Q.    They send in Mr. Lee to come**
7  **in there and fix it?**
8     A.    There you go.
9     **Q.    After you were a technician,**
10  **what was your next job?**
11     A.    Lawrence Penn come to me for
12  being -- wanted me to be a supervisor.
13     **Q.    Okay.**
14     A.    He said: Roy, I'll give you a
15  couple days to think about it.  They didn't
16  post them jobs on the bulletin.  I didn't
17  supervisor jobs.  So I thought about it,
18  thought about it, and I took the job.
19     **Q.    Okay.  And what were you**
20  **supervising when you became a supervisor?**
21     A.    Twenty-three workers.  I was
22  something like a floating supervisor at that
23  time.

Page 42

1     **Q.    Uh-huh.**
2     A.    I go -- They had four shifts,
3  it's A, B, C and D.
4     **Q.    Uh-huh.**
5     A.    So when I had -- They shipped
6  me around a lot.  Then when they got through
7  shifting me around, supervisor go on
8  vacation, I fill their weeks.  When they
9  come back, I go to the next one and fill
10  their week.
11        System plant manager was Jimmy
12  Patrick, he had a shift on A shift -- He had
13  B shift, so I had to do his shift.  So in
14  the mean time, when all of that was over, so
15  I just walked the floor.  I just supervised
16  while him and Lawrence was in the office.
17     **Q.    Okay.  And were you assigned**
18  **to a particular part of the plant or --**
19     A.    The whole plant.
20     **Q.    Okay.**
21     A.    Yeah.
22     **Q.    And so, you would supervise**
23  **about twenty-three workers or so?**

Page 43

1     A.    Night shift, you might have
2  something like twenty-two, twenty-three.
3  Day shift, you had more on day than you did
4  on night.
5     **Q.    Okay.**
6     A.    I'd say on day, you might have
7  maybe twenty-nine people, sometimes maybe
8  thirty, it just depends.
9     **Q.    And you did that up until you**
10  **left the employ of Columbus Mills/Beaulieu?**
11     A.    Correct.
12     **Q.    Okay.  Have you told me all**
13  **about your work history and employment up**
14  **until Sedgefields?**
15     A.    Yeah.  Well, I did a little --
16     **Q.    That is not a trick question.**
17     A.    I did a little logging, but
18  that wasn't no -- that just --
19     **Q.    Yeah.  That was just**
20  **here and there working?**
21     A.    Yeah.  It wasn't no really a
22  job.
23     **Q.    Okay.  Right.  I understand.**

Page 44

1  **And that logging was with Chris Caldwell**
2  **Logging Company?**
3     A.    Correct.
4     **Q.    Okay.**
5     A.    I had a little summer job with
6  the City of Midway, you know, but it was
7  just a summer thing, when you get out of
8  school, just for the summer.
9     **Q.    Okay.  Including the logging**
10  **company and the working for the City of**
11  **Midway, have you told me all your employment**
12  **leading up to Sedgefields?**
13     A.    Correct.
14     **Q.    All right.  When you were**
15  **hired on at Sedgefields, what were you hired**
16  **on to do?**
17     A.    To work dogs -- I mean, to
18  work horses.  I hired on with the bird crew.
19  I was working with Hunter McDuffie, Norris
20  Foster, Kevin Terrell.  That's it.
21     **Q.    Okay.  And what did you do in**
22  **working with the bird crew?**
23     A.    Hunter was showing me how to

11 (Pages 41 to 44)

# FREEDOM COURT REPORTING

Page 45

1 scout dogs, training me how to scout dogs,
2 training me how to when dogs point -- all
3 the basics that go down with bird hunting.
4    Q.    Okay.  What about field
5 preparation, were you doing any of that as
6 well?
7    A.    Yes.  I was driving tractors,
8 planting all those strips, checkerboarding,
9 getting ready for field trialing, liberated
10 hunts.  We'd did a lot of liberated hunts.
11    Q.    What's a liberated hunt?
12 Explain that to the jury.
13    A.    Put and take birds.  You buy
14 birds, you go out there, you put them out in
15 the morning, you hunt them the same day.
16    Q.    Yeah.
17    A.    Wild birds are some birds that
18 have been already released seven or eight
19 months ago and you hunt them.
20    Q.    That's called prerelease;
21 right?
22    A.    Prerelease.
23    Q.    And y'all were doing primarily

Page 46

1 put and take?
2    A.    Put and takes and wild birds,
3 we hunt them that day, and field trial.
4    Q.    But y'all were doing primarily
5 put and take over prerelease, were you not?
6    A.    Correct.
7    Q.    How long did you -- Did your
8 duties ever change?
9    A.    My duties changed when they
10 fired Hunter McDuffie.
11    Q.    Okay.  And do you know
12 approximately when that was?
13    A.    No.
14    Q.    Okay.  I don't either.
15    A.    Okay.  I really don't know.
16    Q.    Was it about a year after
17 you'd gotten there or --
18    A.    I'll be honest, I don't know.
19 I'm going to be honest.
20    Q.    Well, was Hunter there during
21 the deer season, the first deer season after
22 you got there?
23    A.    The first deer season, yeah,

Page 47

1 Hunter was there.
2    Q.    Did you help with the deer
3 hunting at all that first deer hunting
4 season?
5    A.    No.  Mark Greg.
6    Q.    Mark Greg did that?
7    A.    Uh-huh.  Mark Greg and Damon
8 Duncan.
9    Q.    What did Kevin Terrell do?
10 Did he do the same thing you did?
11    A.    Same thing I did, me, him and
12 Norris.
13    Q.    Do you know how much he was
14 paid?
15    A.    No.
16    Q.    What about Damon Duncan, what
17 did he do with the deer hunting group?
18    A.    See, out there, when I started
19 with Damon Duncan, Damon Duncan and Mark
20 Greg were working together.  They had three
21 different crews.  Damon Duncan, Mark Greg
22 were working on the deer crew.
23    Q.    Uh-huh.

Page 48

1    A.    Hunter McDuffie, myself,
2 Norris, Kevin Terrell were working, doing
3 all the bird hunts.
4    Q.    Uh-huh.
5    A.    Greg Wallace was over the
6 yard, like cutting grass, Greg Wallace,
7 Joseph Lee, Chris -- I don't know what Chris
8 last name, and one more fellow, I done
9 forgot what his name.
10    Q.    Okay.  What kind of work was
11 Damon Duncan doing at the time, if you know?
12    A.    Planting food plots, putting
13 up deer stands.
14    Q.    Anything else that you know
15 of?
16    A.    Driving tractors.  I mean,
17 that's about the basic.
18    Q.    Was he a black man?
19    A.    Black guy.
20    Q.    Do you know how much he was
21 paid?
22    A.    No, I don't.
23    Q.    All right.  When Hunter

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 49

1  McDuffie left, how did your job duties
2  change?
3      A.    Okay.  When Hunter McDuffie --
4  They come down and they fired Paul, Junior,
5  first.
6      Q.    Okay.
7      A.    They come back, they fired
8  Hunter McDuffie.
9      Q.    How much time was in between
10  that?
11      A.    Maybe a month.
12      Q.    Okay.
13      A.    Two or three weeks, maybe a
14  month.  After they fired Hunter McDuffie,
15  that left Mark Greg, Wallace -- Mark Greg --
16  I'm trying to think of the other guy's name.
17  Mark Greg.  Whatever the other guy's name I
18  just named a few minutes ago that was
19  working with both of them, it was him.
20      Q.    Damon Duncan?
21      A.    No.  There's another guy I
22  called that was over the ground crew.
23      Q.    Oh, Wallace?

Page 50

1      A.    Greg Wallace, wasn't it?
2      Q.    That's what you told me.
3      A.    Yeah.  Greg Wallace, I think
4  that's his name.
5      Q.    Okay.
6      A.    Okay.  It was him, Mark Greg
7  and myself.
8      Q.    Okay.  And did Mark Greg then
9  assume the duties of plantation manager?
10      A.    Correct.
11      Q.    Okay.  All right.  And how did
12  your job duties change when they fired
13  Hunter McDuffie?
14      A.    When they fired Hunter
15  McDuffie, Mark Greg come to me and said:
16  Roy, can you work the bird dogs?  Do you
17  think that you can handle them dogs?  I
18  said:  Well, we can give it a try.  I'll
19  see.  I said:  All I know is what Hunter
20  McDuffie taught me, what I picked up when
21  Hunter McDuffie was showing me.
22      Q.    Okay.
23      A.    So we started from there.  We

Page 51

1  started carrying out people on the wagons
2  hunting, I was over the dog crew.  I was the
3  head man.
4      Q.    Okay.
5      A.    So everything worked out fine
6  when ever since then I was doing it.
7      Q.    Okay.
8      A.    Later on down in the year,
9  they come right back and they hired Donald
10  Davidson.
11      Q.    How long after -- Did Mark
12  Greg, was he fired?
13      A.    Correct.
14      Q.    Or did he leave?
15      A.    No.  They fired Mark.
16      Q.    Do you know how long he was
17  the plantation manager?
18      A.    Not long.
19      Q.    Okay.
20      A.    They fired Greg Wallace before
21  they fired Mark Greg.
22      Q.    How long was Mark Greg the
23  plantation manager, you think, just

Page 52

1  approximately?
2      A.    Approximately two, three
3  months, approximately.
4      Q.    Okay.  Oh, he wasn't there
5  long?
6      A.    I'd say three months.  He
7  wasn't there long.
8      Q.    Okay.
9      A.    He wasn't there long.
10      Q.    Then they hired Donna
11  Davidson?
12      A.    Donna Davidson.  She was there
13  in between, before Mark left.  She was doing
14  secretary work with Mary Francis.  Lady's
15  name Mary Francis.  We had Lance, I don't
16  know Lance's last name, she worked for
17  Ingram Plantation.  But after she quit, they
18  hired Mary Mae Francis.  She was the head
19  cook at the kitchen, but they moved her up
20  to secretary.
21      Q.    In any event, Donna Davidson
22  became plantation manager; right?
23      A.    Correct.

13  (Pages 49 to 52)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 53

1    Q.    Okay.  And do you know what
2    year we're in now, when she became the
3    plantation manager?
4    A.    No, I don't.  I know Donna
5    Davidson, when she came -- She was supposed
6    to have been running the plantation all the
7    time, her and her -- her first husband,
8    Mr. Paul Broadhead's brother.  But he died.
9    And so she remarried.  So then she came down
10   a couple of years later.
11   Q.    With her husband, Byron?
12   A.    Byron Davidson.
13   Q.    When she became plantation
14   manager after Mark Greg left, did Byron --
15   was he on the --
16   A.    No.
17   Q.    Okay.  When did Byron come
18   into the picture?
19   A.    I don't know the correct date.
20   Maybe seven, seven, eight months later.
21   Q.    Seven or eight months later?
22   A.    Maybe, uh-huh.
23   Q.    And what did he do when he

Page 54

1    came onboard?
2    A.    I trained Byron.  When Byron
3    came to the plantation, I trained Byron.
4    Q.    Okay.  What did you train him
5    to do?
6    A.    Plant food plots, showed him
7    how I worked bird dogs, putting up deer
8    stands, wind direction and all that.
9    Q.    Okay.  Let me show you a
10   document that Mr. Roberson identified as
11   Plaintiff's Exhibit 2.
12   A.    Uh-huh.
13   Q.    Does that accurately reflect
14   the job duties that were in place in 2004 --
15   sometime in 2004?
16   A.    Well, they got one name ain't
17   on this paper.  Joe McFerrin.  He was
18   supposed to have been right here in front of
19   Byron Davidson.
20   Q.    He was supposed to be what,
21   now?
22   A.    He was here before Byron
23   Davidson even come in the picture right

Page 55

1    here.
2    Q.    Okay.  But Byron was here, and
3    he became the hunt manager, did he not?
4    A.    That's what they say.  I don't
5    know.
6    Q.    Okay.  And you were the farm
7    manager; is that right?
8    A.    Right, right.
9    Q.    Then late in 2004, they fired
10   Byron -- Well, they told Donna Davidson that
11   they didn't want Byron Davidson working at
12   Sedgefields anymore; is that right?
13   A.    I can't say that's right.  I
14   can tell you what I heard.  I don't know.
15   Q.    Well, in any event, near the
16   end of -- or around the first of December of
17   2004, Byron Davidson was no longer the
18   wildlife -- was no longer the hunting
19   manager; is that right?
20   A.    I don't understand what you
21   mean by hunting manager.
22   Q.    Well, there's a title, and
23   I've shown you this in Plaintiff's Exhibit

Page 56

1    2, where Byron Davidson, it shows him as the
2    hunting manager, and it gives -- describes
3    what the hunting manager's duties are.
4    A.    Okay.
5    Q.    So, at some point, Byron
6    Davidson was the hunting manager and you
7    were the farm manager; is that right?
8    A.    Correct.
9    Q.    Okay.  And it says that:  The
10   farm manager handles the farm workers,
11   provides services to hospitality manager as
12   requested, provides planting of food plots
13   and feeding of deer as directed by the
14   wildlife manager.
15   A.    Correct.
16   Q.    Is that a correct description
17   of your duties as farm manager?
18   A.    No.
19   Q.    Okay.  How is it not correct?
20   A.    Because, see, I was doing all
21   quail hunts.
22   Q.    Okay.
23   A.    I was doing all of that.  Deer

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 57

1  hunts, I was on deer hunts.  The days we
2  didn't have quail hunts, I had to put out
3  and get the wind direction for the deer
4  hunts, because, see, Chuck Sikes was gone in
5  between that time.  Right after they got rid
6  of Byron, they had the wildlife manager
7  right here, he was gone.  All of this took
8  place in less than four or five months
9  together.
10      Q.    Okay.  I'm just trying to
11  think of a way that we can clear it up.
12      A.    That's what I'm -- Because
13  you're confusing me like you're doing like
14  that.  I'm trying to think of a way, too.
15  But according to that paper, that's not
16  correct, to me.
17      Q.    Well, the problem is, this
18  isn't dated.
19      A.    Okay.
20      Q.    And, you know, I think we're
21  talking about different periods of time.
22      A.    Different peoples, yeah.  And
23  all of it happened right there in together.

Page 58

1      Q.    Okay.  And after Mark Greg
2  left, Donna Davidson became the plantation
3  manager; correct?
4      A.    Correct.
5      Q.    And I think you told me
6  several, up to seven or eight months later,
7  Byron Davidson came.
8      A.    He came.  He was working for
9  BellSouth at the time.
10      Q.    Okay.  Byron was Donna
11  Davidson's husband?
12      A.    Correct.
13      Q.    Okay.
14      A.    But in between all that time,
15  Joe McFerrin was in that slot.  His name is
16  not on that paper.
17      Q.    Okay.  Well, that's because it
18  was before this time, before Plaintiff's
19  Exhibit 2.
20      A.    Okay.
21      Q.    And I'm not trying to confuse
22  you or say -- have something on the Record
23  that's not right.  But I understand what

Page 59

1  you're telling me, Joe McFerrin, at some
2  time, was a hunt manager before Byron?
3      A.    Correct.  Correct.  They told
4  me Joe McFerrin's title was assistant
5  manager.
6      Q.    Okay.  Was assistant manager?
7      A.    Correct.
8      Q.    Okay.  And he came onboard
9  after Donna was onboard; is that right?
10      A.    Correct.
11      Q.    And was he heading up the
12  hunts, McFerrin, before Byron got there?
13      A.    Correct.  He was heading up
14  quails.
15      Q.    Quails?
16      A.    We was trying to get back to
17  quail hunting.
18      Q.    Okay.  And who was doing the
19  deer hunting?
20      A.    Roy.
21      Q.    Roy Lee?
22      A.    Roy Lee.
23      Q.    Okay.  That -- You started

Page 60

1  heading up the deer hunts after they got rid
2  of Mark Greg?
3      A.    Correct.
4      Q.    Okay.  So, after Mark Greg was
5  terminated, or he left, Donna Davidson
6  became the plantation manager; correct?
7      A.    Correct.
8            (Off-the-Record discussion
9            was held.)
10      Q.    And McFerrin, after Donna
11  Davidson became plantation manager, was
12  doing the quail hunting, is that what your
13  testimony is?
14      A.    Donna Davidson?
15      Q.    No.  McFerrin?
16      A.    McFerrin started, but he
17  didn't stay there six months.
18      Q.    Okay.
19      A.    That's what's confusing.  See,
20  all this happened right there in the same
21  ballpark.
22      Q.    I know.  All right.  So, when
23  McFerrin left, is that when Byron Davidson

15  (Pages 57 to 60)

# FREEDOM COURT REPORTING

Page 61

1 came onboard, to your knowledge?
2    A.    Correct.
3    Q.    Okay.  And so, we're talking
4 about July, August, 2004, is when you think
5 Byron Davidson came into the picture?
6    A.    Yeah.  But we still -- There's
7 another guy in the picture, too, ain't on
8 this paper.
9    Q.    Okay.
10    A.    Dewayne.
11    Q.    Okay.  And what did Dewayne
12 do?
13    A.    They had two wildlife
14 biologists, Chuck Sikes and Dewayne.  I
15 don't know what Dewayne's last name is.
16    Q.    I don't care about the
17 wildlife biologists, now.  Okay?  I'm just
18 caring about plantation managers, hunt
19 managers and farm managers.
20    A.    I never seen this, is what I'm
21 saying, about being a hunting manager, about
22 Byron Davidson, I never seen this until we
23 start coming up there.

Page 62

1    Q.    Okay.
2    A.    I didn't know what his job
3 title was.  I never did.  All I know is, Roy
4 Lee was doing all these jobs.
5    Q.    Okay.  When Byron came on,
6 Byron Davidson, was he doing any of the deer
7 hunting?
8    A.    Yeah.  He took out guys.
9    Q.    Okay.  And was he doing any
10 quail hunting?
11    A.    No.
12          (Defendant's Exhibit 19
13             was marked for
14             identification purposes.)
15    Q.    Okay.  All right.  I'm going
16 to show you a document that I will identify
17 as Defendant's Exhibit 19.  Have you had a
18 chance to look at Defendant's Exhibit 19?
19    A.    Correct.
20    Q.    Have you ever seen Defendant's
21 Exhibit 19 before today?
22    A.    No, I haven't.
23    Q.    Okay.  And that's fine.  I

Page 63

1 mean, it doesn't show that it went to you.
2 But I think we were talking earlier that
3 Byron Davidson was fired sometime end of
4 November, first of December of 2004.  And I
5 think you told me that that sounded about
6 right; is that right?
7    A.    Maybe.  I don't know when he
8 was fired.
9    Q.    Well, you don't have any
10 reason to dispute it?
11    A.    I don't have any reason to
12 dispute it, but I know he was fired.
13    Q.    Yeah.  He was told that his
14 services were no longer needed at
15 Sedgefields sometime around that time.  But
16 you don't have any reason to dispute that?
17    A.    I don't have any reason to
18 dispute it, but I don't know the correct
19 date.
20    Q.    Okay.  When he left, someone
21 had to fill in the hunt manager position; is
22 that right?
23    A.    Correct.

Page 64

1    Q.    And from this document, it
2 appears that Anthony --
3    A.    Incorrect.
4    Q.    -- was put in that position.
5    A.    Incorrect.
6    Q.    Okay.  You and Anthony didn't
7 get along, did you?
8    A.    Me and Anthony got along very
9 well, to a certain extent.
10    Q.    Okay.  To a certain extent?
11    A.    Correct.
12    Q.    Okay.  He left very soon after
13 Byron left, did he not?
14    A.    He quit very soon after Byron
15 left.
16    Q.    Right.  Okay.
17    A.    Byron hired Anthony.  I don't
18 know Anthony's last name.  Anthony was a
19 student at Auburn University.
20    Q.    Okay.
21    A.    He hired Anthony as part-time
22 help to work with Sedgefields.  So Anthony
23 would come there three days out of a week

16 (Pages 61 to 64)

# FREEDOM COURT REPORTING

Page 65

1  when he first started.
2  **Q.    Right.**
3        A.    After then, Anthony started
4  missing days out of school and started
5  coming more days.  And he kept coming and
6  kept coming and kept coming more days.  I
7  said:  Well, Byron, how can Anthony go to
8  school and work?  I said:  In the mean time,
9  Anthony is coming here after one o'clock.
10       If he's going to school in
11  Auburn, it's going to take you more than ten
12  minutes to come from Auburn.  If he won't be
13  here at one o'clock, he's here at eleven
14  o'clock, that means he ain't going to
15  school.
16       That means we're doing all the
17  work, and after lunchtime here he pops up.
18  About eleven-thirty, he pops up.  The work
19  over with, then.  Actually, this is not
20  correct.
21  **Q.    Okay.  Well, whether it's**
22  **correct or not, it was never communicated to**
23  **you that Anthony was a hunt manager?**

Page 66

1        A.    Never.
2  **Q.    Okay.**
3        A.    Never.
4  **Q.    Do you know anything about**
5  **Anthony's background?**
6        A.    As far as I know, Anthony was
7  a good guy.  In fact, he still are.  I
8  talked to Anthony -- I talked to Anthony
9  last year.  I haven't talked to him this
10  year.  I mean, him and Byron had some
11  difficulties, but, hey, Anthony never did
12  nothing to me, and me and Anthony never had
13  any problems.
14       I do also know, they tell me,
15  I don't know this for a fact, that Anthony
16  was after my job, him and Chuck Sikes.  So I
17  don't know.  That's hearsay.  I don't know.
18  **Q.    Yeah.  Do you know anything**
19  **about his family business?**
20       A.    Anthony?
21  **Q.    Yeah.**
22       A.    No more than what he said --
23  sell lawn mowers.  We bought a lawn mower

Page 67

1  from his father.  I think he's living in
2  Birmingham.  No more than what he spoke to
3  me at the job.
4  **Q.    Okay.  And did he have some**
5  **skills on how to repair machinery, such as**
6  **lawn mowers and such?**
7        A.    Correct.  Correct.
8  **Q.    He could service, I guess, the**
9  **equipment that his family business rented or**
10  **sold, is that right, to your knowledge?**
11       A.    Some things.  For instance, I
12  know we had Weed Eaters we bought from him,
13  he couldn't fix them, but they sold them.
14  Lawn mowers had a problem, he didn't know
15  what it was.
16  **Q.    Okay.**
17       A.    But --
18  **Q.    He couldn't fix everything?**
19       A.    Not everything, but some
20  things he could, correct.
21  **Q.    Okay.  And did you ever see**
22  **him on any -- operating any heavy equipment?**
23       A.    Tractors, backhoe.

Page 68

1  **Q.    Did he do a pretty good job**
2  **with that?**
3        A.    Yeah.
4  **Q.    Okay.  And he was hired also**
5  **to set up some deer stands on the property,**
6  **wasn't he?**
7        A.    No, he wasn't.
8  **Q.    He never was hired to do that?**
9        A.    No.  He was hired to tie down
10  the bull pen, part time.  Give him a little
11  extra money, pay for his books.
12  **Q.    And he just sort of worked his**
13  **way into a job?**
14       A.    Correct.
15  **Q.    I don't know if worked his way**
16  **into a job, but he just sort of nosed his**
17  **way into a job?**
18       A.    Correct, correct.  Byron
19  knowed him from a fishing crew down there in
20  Pensacola.
21  **Q.    Okay.**
22       A.    He knows his grandparents.
23  That's how he knowed Anthony.

17  (Pages 65 to 68)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 69

1    Q.    Okay.  So, he -- Byron knew
2 his family, and that was the reason why
3 Byron got -- at least to your knowledge, got
4 him onboard?
5    A.    Correct.  Correct.
6    Q.    Okay.  And Donna Davidson
7 stayed at Sedgefields through the end of the
8 deer hunting season, did she not, that
9 2004/2005 deer hunting season?
10    A.    Correct.
11    Q.    Deer hunting season, I think,
12 generally ends around the end of January; is
13 that right?
14    A.    January 31st.
15    Q.    Is that every year?
16    A.    Every year.
17    Q.    Okay.  How many bird hunts did
18 y'all have, if you recall, and I'll try to
19 get the records myself, but from the time
20 that Byron Davidson left Sedgefields, from
21 the end of -- to the end of the bird hunting
22 season?
23    A.    From the time Byron Davidson

Page 70

1 left Sedgefields, I don't know did I have a
2 hunt after Byron left.  Not a quail hunt.
3    Q.    Yeah.
4    A.    I had deer hunting going on.
5 But while Byron was there, the time he was
6 working, we had I'd say anywhere from ten to
7 fifteen hunts.
8    Q.    Okay.  Fair enough.
9    A.    Before he left.
10    Q.    Right.  And then after that,
11 you don't recall --
12    A.    Nothing but deer, deer and
13 turkey.
14    Q.    All right.
15    A.    But before Byron Davidson came
16 with Mark Greg, I was doing the quail hunts,
17 we did a bunch of quail hunts.
18    Q.    Okay.  I understand.
19    A.    All right.
20    Q.    I'm not trying to take away
21 from that either.
22    A.    Okay.
23    Q.    Then in April 2005,

Page 71

1 Mr. Carroll comes onboard as plantation
2 manager; is that right?
3    A.    I don't know exact date, but I
4 know he come aboard.
5    Q.    Does that sound about right?
6    A.    Correct.
7    Q.    Okay.  No reason to dispute
8 that?
9    A.    No reason to dispute it.
10    Q.    Then in September of 2005,
11 that's when Mr. Norman comes onboard.  Does
12 that sound about right to you?
13    A.    I don't know his exact date,
14 but I know he come aboard after David.
15    Q.    Okay.  And so, y'all didn't
16 have any quail hunts in 2005, until after
17 Joel Norman came onboard?
18    A.    Correct.
19    Q.    Okay.
20    A.    Correct.
21    Q.    And I'm just limiting it to
22 2005.
23    A.    Okay.  That's the time David

Page 72

1 started.
2    Q.    That's right.
3    A.    Correct.
4    Q.    So the -- So Sedgefields was
5 without a plantation manager from January
6 31, 2005, when Donna Davidson left, through
7 the time in which -- or until the time in
8 which Mr. Carroll came in April of 2005?
9    A.    Correct.
10    Q.    All right.
11        MR. DUKES:  Let's take a
12 break.
13        (Recess taken.)
14        (Defendant's Exhibit 20
15         was marked for
16         identification purposes.)
17    Q.    I'm going to show you a
18 document that I will identify as Defendant's
19 Exhibit 20.  And I know -- I don't think any
20 of that is your handwriting, is it?
21    A.    No.
22    Q.    You see over on the left-hand
23 side they've got some dates and what you

18  (Pages 69 to 72)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 73

1  were paid?
2      A.    Right here (indicating)?
3      Q.    Yes, sir.
4      A.    Uh-huh.  This is for me?
5      Q.    Yes, sir.  That's for you.  I
6  think.  Yes, sir.  That's for you.
7          MR. ADAMS:  It looks like his
8  name might be obscured up here at the top,
9  cut off Roy Chester Lee.
10      A.    Okay.
11      Q.    Do the dates and do the pay,
12  does that correspond to your recollection of
13  what you were paid and when you got the pay
14  raise?
15      A.    I don't know exact date when I
16  got the pay raise.  According to this paper,
17  if I say correct, then I might be -- it
18  might not be correct.  I don't know.
19      Q.    Okay.
20      A.    It could be wrote later, I
21  don't know.  Do you see what I'm saying?
22      Q.    Yeah.  Well, let me ask it
23  this way, then.  Do you have any reason to

Page 74

1  dispute the pay and the dates that you got
2  the pay raise, as identified in Defendant's
3  Exhibit 20?
4      A.    No.
5          (Defendant's Exhibit 21
6              was marked for
7              identification purposes.)
8      Q.    Okay.  I'm going to show you a
9  document that I will identify as Defendant's
10  Exhibit 21.  I'll say that's a -- I'll
11  represent to you that it's your personnel
12  file.
13      A.    Okay.
14      Q.    And I'm not going to ask you
15  about the Status Payroll Change Reports.
16          MR. ADAMS:  That's the first
17  page.
18      Q.    The first couple of -- The
19  first number of pages.
20      A.    Okay.
21      Q.    I'm going to direct your
22  attention to your application, which starts
23  on Defendant's Production Number 173.

Page 75

1          MR. ADAMS:  It's titled:
2  Peble, Corp., at the top.
3      A.    Okay.
4      Q.    Now, is this your handwriting
5  on your application here, that starts on
6  Defendant's Production Number 173, and goes
7  through 176?
8      A.    Correct.
9      Q.    Okay.  That is your
10  handwriting?
11      A.    Correct.
12      Q.    And you'll note, and just for
13  the Record, when I produced this, I redacted
14  your telephone numbers and your Social
15  Security number and your address.
16      A.    Okay.
17      Q.    Other than how you may have
18  modified or amended the information in your
19  deposition testimony today, is everything
20  true and correct, to the best of your
21  knowledge and belief, on this employment
22  application, which is part of Defendant's
23  Exhibit 21?

Page 76

1      A.    On these -- From 173 to 176?
2      Q.    Yes, sir.
3      A.    Is everything correct?
4      Q.    Yes, sir.  And we talked about
5  some of this today and, you know, you may
6  have given me -- you know, dates may be a
7  little different and so forth.  So that's
8  why I'm saying it may have been changed by
9  your deposition testimony.
10      A.    Okay.
11      Q.    But is it generally --
12  everything true and correct, to the best of
13  your knowledge and belief?
14      A.    Correct.
15      Q.    Okay.  You said you went out
16  to -- when Norris told you they were looking
17  for somebody, you went out to Sedgefields.
18  Did you complete the application when you
19  went out there?
20      A.    Bo Jack told me.
21      Q.    Oh, I'm sorry.  Bo Jack told
22  you?
23      A.    Correct.

19 (Pages 73 to 76)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 77

1    Q.    So, Bo Jack told you about the
2 job and you went out there. Is that when
3 you completed this application?
4    A.    No. I took the application
5 home. I talked to Hunter McDuffie when I
6 went out.
7    Q.    Uh-huh.
8    A.    So I went and talked to Hunter
9 McDuffie. I took the application home.
10    Q.    Okay.
11    A.    I sat down, me and my wife
12 talked about it, filled it out, I brought it
13 back to Hunter McDuffie.
14    Q.    Okay. And they then hired
15 you?
16    A.    Correct.
17    Q.    Okay.
18    A.    Hunter did.
19    Q.    And the last two pages of
20 Defendant's Production Numbers 177 and 178,
21 is that a resume that you provided them that
22 you -- when you gave them your application?
23    A.    Correct.

Page 78

1    Q.    Okay. I want to go back a
2 little bit in time, back when David Carroll
3 came to Sedgefields and became the
4 plantation manager. And I think we've
5 established you don't remember the exact
6 date.
7    A.    Correct.
8    Q.    But I think you agreed with me
9 that April of 2005 sounded about right; is
10 that right?
11    A.    Correct.
12    Q.    Okay. Right before David came
13 there, tell me who all was working at
14 Sedgefields.
15    A.    Before David Carroll came --
16    Q.    And I'm talking about the day
17 before he came.
18    A.    Oh, just that day?
19    Q.    Or the week before.
20    A.    Not about the year before?
21    Q.    No. The day or week before.
22    A.    Okay. The day before, let me
23 see. Norris Foster -- Myself, Norris

Page 79

1 Foster.
2    Q.    Wait a minute. Hold on.
3 Norris Foster, you.
4    A.    Denise Pierce, Demetrius
5 Parham, Willie Mack, Katie Mae Woods, I
6 think, Brenda Tarver. I think that's it.
7    Q.    Seven people, what I counted
8 out?
9    A.    Correct. Norris, me, Denise,
10 BB, Demetrius, Katie, Brenda, correct.
11    Q.    Okay. And BB is Willie Mack;
12 right?
13    A.    Correct.
14    Q.    Okay. Brenda Tarver and Katie
15 Woods, they were working at the lodge, were
16 they not?
17    A.    Correct.
18    Q.    Were they doing the cooking
19 and cleaning?
20    A.    Cooking and cleaning.
21    Q.    And they're --
22        (Off-the-Record discussion
23        was held.)

Page 80

1    Q.    Katie Mae Woods and Brenda
2 Tarver, they're black; right?
3    A.    Correct.
4    Q.    Okay. Denise Pierce was the
5 only white person out there at the time?
6    A.    At the time.
7    Q.    At that time?
8    A.    Correct.
9    Q.    And Denise, what was she doing
10 at that time?
11    A.    Secretary.
12    Q.    Okay. She was doing all the
13 paperwork in the office; right?
14    A.    Correct.
15    Q.    All right. What was Demetrius
16 doing at that time?
17    A.    At that time --
18    Q.    The day before David Carroll
19 got there.
20    A.    The exact thing what he was
21 doing? I don't -- I know what his job
22 performance was.
23    Q.    What was his job duties at

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 81

1  that time?
2      A.    Okay, then.  Cutting grass,
3  Weedeating.
4      Q.    **Anything else?**
5      A.    Picking up limbs.
6      Q.    **Okay.  He was primarily --**
7      A.    A labor worker.  We'll put it
8  that way.
9      Q.    **-- a labor worker.  And he was**
10  **primarily working around the lodge; right?**
11      A.    Around the lodge.  Sometimes I
12  get him to bring, if I need fertilizer, dog
13  feed, stuff like that, little stuff like
14  that.
15      Q.    **Okay.  Doing some fetching?**
16      A.    Correct.
17      Q.    **And he didn't operate heavy**
18  **machinery at that time, he was just doing a**
19  **riding lawn mower and Weedeating, wasn't he?**
20      A.    Weedeating.  And we had a
21  finishing mower, smaller tractor.
22      Q.    **Massey Ferguson?**
23      A.    Yeah.

Page 82

1      Q.    **A little, small tractor,**
2  **Massey Ferguson?**
3      A.    Right.
4      Q.    **Not a big tractor --**
5      A.    Not a big tractor.
6      Q.    **-- that you use to pull**
7  **choppers or Bush Hogs with?**
8      A.    Correct.  Correct.
9      Q.    **All right.  What was Willie**
10  **Mack or BB, what was he doing at that time?**
11  **And that time, again, is, you know, the day**
12  **before, a week before, David Carroll came to**
13  **Sedgefields.**
14      A.    Generally the same thing that
15  Demetrius was doing.  He was doing the same
16  thing that Demetrius was doing.
17      Q.    **Okay.  Was he driving a Bush**
18  **Hog or anything -- I mean, pulling a Bush**
19  **Hog, driving a bigger tractor?**
20      A.    Not at that time.
21      Q.    **Okay.  All right.  What about**
22  **Norris Foster, what was he doing at that**
23  **time?**

Page 83

1      A.    Cutting -- Bush Hogging.
2      Q.    **Okay.  Now, Norris was driving**
3  **a bigger tractor?**
4      A.    Bigger tractor.
5      Q.    **Were y'all chopping at that**
6  **time, in April?**
7      A.    At that time, we was planting
8  milo strips at that time, strips for the
9  birds at that time, Bush Hogging rows.
10      Q.    **Okay.  And I guess maybe fire**
11  **lanes, too?**
12      A.    Some, yeah.
13      Q.    **What were you doing at that**
14  **time?**
15      A.    Basically, the same thing.
16      Q.    **Okay.**
17      A.    Bush Hogging.
18      Q.    **Bush Hogging and planting?**
19      A.    Planting.  Making sure they do
20  their jobs.
21      Q.    **Okay.  Now, in April, had**
22  **y'all released the horses out to the field**
23  **yet?**

Page 84

1      A.    What you mean?
2      Q.    **My understanding is that**
3  **during the summertime, the horses, for the**
4  **most part, stay out in the fields.**
5      A.    Yeah.
6      Q.    **Or out in the pasture.**
7      A.    Correct.
8      Q.    **And then when it gets closer**
9  **to the hunting season, September, October,**
10  **you start bringing the horses in to get them**
11  **ready for the hunts, and also because the**
12  **weather, you know, starts turning a little**
13  **cold and you get worse weather?**
14      A.    Depends on whether Matt or
15  Susan, one, will come out and ride.  Then we
16  had to go to the pasture to get them and
17  bring them up to the barn.
18      Q.    **Okay.  Yeah.**
19      A.    Just for them.
20      Q.    **For the personal riding**
21  **horses, you might want to bring those horses**
22  **in?**
23      A.    Four horses in, yeah.

21 (Pages 81 to 84)

# FREEDOM COURT REPORTING

Page 85

1    Q.    And get them ready for riding?
2    A.    Right.
3    Q.    Okay. But for the most part,
4    the horses that you use for the bird hunts
5    and so forth --
6    A.    They stay in the big pasture.
7    Q.    -- they stay in the big
8    pasture --
9    A.    Correct.
10    Q.    -- until right before the
11    hunting season starts?
12    A.    At least about a month,
13    because we had to work them and get them in
14    shape.
15    Q.    Yeah. Okay.
16    A.    At least about a month, yeah.
17    Q.    And then when it gets to
18    summertime, you release them back out in the
19    pasture; right?
20    A.    Yeah. We take shoes -- The
21    horse shoes off, the ones that -- I make
22    sure, I call Susan and make sure how many
23    she want to leave up. She said: Roy, maybe

Page 86

1    four, no more than four.
2    Q.    Okay. I didn't even know
3    that. I don't know anything about horses.
4    So during the summertime, if they're not
5    going to be -- no one is going to be riding
6    them, you take the shoes off?
7    A.    Yeah. Take them off of
8    everything, yeah.
9    Q.    When does that start in the
10    year? So, right before David got there,
11    were the horses already out in the field,
12    for the most part, and the shoes off?
13    A.    In the pasture, correct.
14    Q.    In the pasture?
15    A.    Correct. Big pasture, yeah.
16    Q.    Okay.
17    A.    All but four, four or three
18    was at the main barn. Correct.
19        (Off-the-Record discussion
20        was held.)
21    Q.    Okay. All right. I have the
22    hire date for Norris Foster as February 8,
23    2005. Do you have any reason to dispute

Page 87

1    that?
2    A.    Rehire?
3    Q.    Yeah. Rehire.
4    A.    Correct.
5    Q.    And you hired him on that
6    occasion?
7    A.    Correct.
8    Q.    So, he had been there, you
9    know, two months before David got there?
10    A.    Correct.
11    Q.    And then after David got
12    there, my understanding is the first hire to
13    work out at Sedgefields was Brother Man?
14    A.    Correct.
15    Q.    And I've got him being hired
16    July 25, 2005.
17    A.    No. Henry Tarver.
18    Q.    Henry Tarver.
19    A.    I brought him in before
20    Brother Man.
21    Q.    You're right. That was June
22    7, 2005?
23    A.    Yeah.

Page 88

1    Q.    Okay. I'm sorry. You're
2    right. Then Brother Man; right?
3    A.    Correct.
4    Q.    What did you have -- What did
5    y'all have Henry Tarver doing when you hired
6    him?
7    A.    When we hired Henry Tarver,
8    David told me, he said he need someone, an
9    older guy, not a young guy, to stay on the
10    plantation, that can spend night, stay out
11    there on the plantation patrolling at night.
12        He said: Do you know anybody?
13    I said: Well, not really, but I'll check
14    around. So I thought about Henry Tarver. I
15    said: Well, he's an older man, single.
16    Well, he coon hunts a little bit. He ain't
17    doing that much.
18        So I told Henry Tarver about
19    the job. I said: You need to go talk to
20    Mr. David. So he came up and talked to
21    David about it. The next day I think they
22    hired Henry, but they hired Henry as a labor
23    worker.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 89

1    Q.    Okay.
2    A.    Cutting grass, Weedeating.
3    Q.    Okay.
4    A.    Picking up limbs, painting,
5    whatever.
6    Q.    Okay.  Did you know -- I
7    deposed Mr. Tarver earlier this week.  Did
8    you know that he says he's been smoking dope
9    since the '70s?
10    A.    I can't say I know that he
11    smoked dope since the '70s, but I know that
12    he smokes pot.
13    Q.    Yeah.
14    A.    But I don't know about the
15    '70s.  I don't know about that.  Because
16    then I was in high school.  I don't know.
17    Q.    Did you know he was a dope
18    smoker when you --
19    A.    I know he smoked pot.  I
20    didn't know -- I know that when I told David
21    he needed somebody older to watch the place.
22    Q.    You know that he was smoking
23    pot?

Page 90

1    A.    I know that he was smoking
2    marijuana -- I can't say at that time, but I
3    know he had smoked marijuana.
4    Q.    Yeah.  You didn't tell David
5    about that, though, did you?
6    A.    No, no.
7    Q.    Okay.  And do you know why
8    Mr. Tarver wasn't hired on by Tolleson?
9    A.    Failed -- He failed the drug
10    test, even though he said he told them that
11    he smoked weed.
12    Q.    Okay.
13    A.    Even thought I told him:
14    Ain't no need in you taking it if you going
15    to smoke weed.
16    Q.    July 25, 2005, Mr. Carroll
17    hired Brother Man to be a laborer and to be
18    a night watch man; is that right?
19    A.    I don't know the correct date.
20    But he hired Brother Man.
21    Q.    You don't have any reason to
22    dispute that date, do you?
23    A.    No.

Page 91

1    Q.    Okay.  Do you know how
2    Mr. Carroll knew Brother Man before he hired
3    him?  Have you ever heard?
4    A.    I think David said he -- that
5    he -- he cooks for the Little League
6    Baseball, something like that, in Auburn or
7    Tuskegee.  I don't know.
8    Q.    Did Mr. Carroll know his
9    family?
10    A.    I don't know.
11    Q.    Okay.  You didn't know
12    anything about that?
13    A.    Huh-uh.
14    Q.    Then the next hire is Jeff
15    Harris, I've got, on September 6, 2005.
16    Does that sound about right for you?
17    A.    He was the next hire, yeah.
18    Q.    Okay.  And so now we're up to
19    when Jeff Harris was hired, we're up to --
20    Let's see.  We've got Henry Tarver, Brother
21    Man, and Harris, we're up to ten employees
22    now; is that right?  If we were at seven
23    right before, we've got ten employees, plus,

Page 92

1    Mr. Carroll; is that right?
2    A.    Uh-huh.  Correct.
3    Q.    All right.  When Mr. Harris
4    was hired on September 6, 2005, do you know
5    if the horses had been brought into the
6    barn?  You remember what we were talking
7    about, all the --
8    A.    When who?
9    Q.    When the horses were -- Had
10    you started bringing --
11    A.    When Jeffrey Harris was hired?
12    Q.    Yeah.
13    A.    Yeah, they was up.  They was
14    got in.
15    Q.    Okay.  Had you just started
16    bringing the horses in?  If he was hired on
17    September 6th, around Labor Day, I guess,
18    would you have been starting to bring the
19    horses in around that time?
20    A.    I think just the same four
21    horses were got in, I think.
22    Q.    Okay.  So, a little bit after
23    Mr. Harris was hired, you started bringing

23  (Pages 89 to 92)

# FREEDOM COURT REPORTING

Page 93

1 in the other horses?
2     A.    No.  When Joel Norman was
3 hired, we pulled the horses off the big
4 pasture and brought them up.
5     Q.    Okay.  And I've got his hire
6 date -- I think it was sometime a little bit
7 later in September of 2005; is that about
8 right?
9     A.    The same month, the 19th, a
10 week or two later.
11     Q.    Okay.  And that's when y'all
12 started bringing the horses in from the
13 pasture?
14     A.    Right.  The rest of them.
15 Because four was already up there.
16     Q.    Okay.  The rest of the horses?
17     A.    Correct.
18     Q.    So, when the rest of the
19 horses -- Well, who was cleaning out the
20 barn --
21     A.    With the four horses up there?
22     Q.    -- with the four horses up
23 there?

Page 94

1     A.    With the four horses up there,
2 we weren't riding the horses.  I had BB or
3 Norris feeding the horses on the outside.
4 We've got a cradle on the outside where they
5 were feeding.  So the barn stay clean.  They
6 were always on us about the barns, so we had
7 to keep it clean.
8     Q.    Okay.  So, who was cleaning
9 the barn?
10     A.    Wasn't nobody cleaning the
11 barn at that time.
12     Q.    Okay.
13     A.    Because there wasn't no need,
14 there wasn't no horses in there.
15     Q.    Okay.  All right.  And then
16 when the horses -- When you brought the
17 horses in, who started cleaning out the
18 barn?
19     A.    BB, Norris and Jeff.
20     Q.    Okay.
21     A.    I even had Demetrius clean it
22 every now and then.  Depending on the grass.
23     Q.    Okay.  So, that's what those

Page 95

1 individuals were doing when Will Hubbard and
2 Joseph Mays were hired?
3     A.    No.
4     Q.    Okay.  How did it change?
5     A.    Which individuals are you
6 talking about, now?  Jeffrey Harris?
7     Q.    Right.
8     A.    Norris Foster?
9     Q.    Yes, sir.
10     A.    Willie Mack?
11     Q.    Yes, sir.  And Demetrius.
12     A.    Okay.
13     Q.    You said those four would
14 clean the barn.
15     A.    Okay.  Norris was -- Before
16 them guys were hired, Norris was Bush
17 Hogging.
18     Q.    Okay.
19     A.    Cutting rows, keeping rows
20 cut.  BB was keeping that barn, doing the
21 outside, he'd feed the horses, throwing a
22 bale of hay or something like that on the
23 outside.  Keeping up limbs, cutting grass,

Page 96

1 it wasn't that large, that's what BB was
2 doing.  Demetrius was doing the same thing.
3     All right.  When Jeffrey
4 Harris come, when David hired Jeffrey
5 Harris, Jeffrey Harris came, we put Jeffrey
6 Harris on the tractor at that time.  He
7 claimed that Norris said that he knows how
8 to drive a tractor.
9     I had never seen Jeffrey
10 Harris before in my life until he brought
11 him up there.  And David sent him to me and
12 said he needed to talk to Roy.  Then he went
13 back to David.  I said: Well, okay.  So
14 David hired him.
15     Q.    Okay.
16     A.    So that's what they were doing
17 before Mr. Norman came, Bush Hogging,
18 cutting rows.  Wasn't but four horses at
19 that point.
20     Q.    Okay.  But you told me earlier
21 that Jeff Harris and Norris helped clean out
22 the barn, too, after you put the horses in.
23     A.    That's with Joel Norman.

24  (Pages 93 to 96)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 97

1    Q.    Okay.
2    A.    Not before.
3    Q.    Right.
4    A.    That's with Joel Norman.
5    Q.    Right.
6    A.    They clean horses -- We had
7  them clean -- Depend on the weather. When
8  Joel came, they brought all the horses in
9  the barn.
10    Q.    Okay.
11    A.    So Joel was doing it different
12  from the way I was doing it. He would bring
13  the horses in and let them feed them in the
14  barn. But for me, we had three troughs out
15  there, I'd feed them on the outside, unless
16  we was going to ride.
17          But he would bring them in the
18  barn and leave them in the barn all night.
19  We wouldn't leave no horses in the barn,
20  standing on cement like that. And so I
21  wasn't over that department, so I don't
22  know.
23    Q.    All right. That's why you

Page 98

1  weren't using cedar shavings?
2    A.    Correct.
3    Q.    Because you weren't keeping
4  them in overnight?
5    A.    Overnight. Correct.
6    Q.    Okay. But when Mr. Norman
7  came onboard, he started keeping them in
8  overnight?
9    A.    Correct.
10    Q.    And so he had to have the
11  cedar shavings to make it --
12    A.    To stand on the concrete.
13    Q.    -- where the horses wouldn't
14  stand on the concrete?
15    A.    Correct.
16    Q.    All night long?
17    A.    Especially with their shoes
18  on.
19    Q.    Right.
20    A.    Yeah.
21    Q.    Okay. So, when Mr. Norman
22  came and he started keeping the -- I just
23  want to make sure the Record is clear. When

Page 99

1  he started keeping the horses in overnight,
2  who, again, was cleaning out the barn when
3  they first started?
4    A.    When Joel -- Let me back up.
5  Okay. Before they hired Joel Norman, the
6  horses was in the main pasture.
7    Q.    Right.
8    A.    Okay. We kept four horses put
9  up at the main barn. We got two different
10  pastures -- three different pastures.
11    Q.    Okay.
12    A.    But at the horse barn, we've
13  got a pasture right around the horse barn.
14  We kept four horse right there. We would
15  feed them on the outside. If Susan call me
16  two -- a couple of days ahead of time, I'll
17  leave a message. We'll come and we'll clean
18  the horses, bathe them up and put them in
19  the barn. We put hay down and let them
20  stand on hay all night. All right. Other
21  than that, they'll stay on the outside.
22          So Norris, Demetrius -- And BB
23  was cleaning because Jeff wasn't there at

Page 100

1  that time. Okay. So when they hired Jeff,
2  David hired Joel Norman a couple of weeks
3  later. That's when they pulled all of the
4  horses to the big barn.
5    Q.    Okay.
6    A.    And after that, Roy don't know
7  because Roy wasn't over that department.
8    Q.    Okay. But it had to be either
9  Joel Norman himself cleaning up that barn --
10    A.    I seen BB cleaning out the
11  barn.
12    Q.    Okay.
13    A.    That's what I seen.
14    Q.    All right.
15    A.    I also seen Jeffrey and Norris
16  cleaning the barn, you know what I mean? I
17  was right there, I could see that, but, you
18  know, I wasn't over that department, so I
19  didn't get in it.
20    Q.    All right. So I've got
21  Brother Man was fired on September 27, 2005.
22  Do you have any reason to dispute that date?
23    A.    I don't know that that's the

25  (Pages 97 to 100)

# FREEDOM COURT REPORTING

Page 101

1  correct date, but I do know he was fired.
2      Q.   Okay.  And so, we're now down
3  to about ten employees, including David; is
4  that right?
5      A.   So, you're counting Norris,
6  myself, BB, Demetrius, Jeffrey Harris --
7          MR. ADAMS:  It's back to
8  eleven, I think, if it includes you.
9          (Off-the-Record discussion
10             was held.)
11     Q.   Okay.  When Joel Norman was
12  hired, and I think you told me the date, and
13  I'm not even sure, but sometime in the
14  second half of September of 2005.
15     A.   After Jeffrey Harris.
16     Q.   Right.  You're up to twelve
17  employees.  I've got Foster, Lee, Pierce,
18  Parham, Mack, Woods, Tarver, and then Henry
19  Tarver, Brother Man, Harris, David Carroll
20  and Joel Norman; is that right?  So you've
21  got twelve.
22         (Off-the-Record discussion
23             was held.)

Page 102

1          MR. ADAMS:  You've got Norris,
2  Roy, Denise, Demetrius, BB, Katie Mae Woods,
3  Brenda Tarver, Henry Tarver, then Brother
4  Man and Beckwith, and then Jeffrey Harris
5  and then Joel Norman and then David Carroll.
6          THE WITNESS:  Correct.
7      Q.   So, when Norman is hired,
8  you've got twelve people working out at
9  Sedgefields; is that right?
10     A.   Correct.
11     Q.   Brother Man is fired shortly
12  after Norman gets there; is that about
13  right?
14     A.   Correct.  Correct.
15     Q.   So, you're back down to
16  eleven; is that right?
17     A.   Correct.
18     Q.   And then Joseph Mays and Will
19  Hubbard are hired on November 21, 2005.  Do
20  you have any reason to dispute that date?
21     A.   Correct.  I do.
22     Q.   Oh, you do dispute that?
23     A.   I do dispute that, because,

Page 103

1  see, when Will Hubbard and Joseph Mays was
2  hired, they was hired -- they told me they
3  wasn't.
4          I come to David at the field
5  trial after they hired, I said:  Who is the
6  guys that Norman was interviewing up there?
7  He said:  Those are some guys he might want
8  to let them work on the weekend.  But, also,
9  David, you told me that Sara Hall wasn't
10  doing no hiring right then at that time, she
11  wouldn't let you hire.
12         So me knowing them two guys --
13  I was at the office when they pulled up.
14  They said:  Well, Roy -- They didn't know my
15  name, they saw it on my shirt, they said:
16  We come after paperwork.  I said:  Some
17  paperwork?  I said:  Are you come looking
18  for application?  They said:  No.
19         I said:  What you need?  They
20  said:  We come to sign up.  We already got
21  the job.  I said:  Really?  I said:  Oh, I
22  thought they wasn't hiring.  I said:  But I
23  don't know, I'll call Denise.

Page 104

1          So I called Denise and told
2  her.  She said:  Well, tell them I'll meet
3  them down there.  I left it like that there.
4      Q.   Okay.  I understand --
5      A.   I don't know the exact date
6  they was hired, I really don't.
7      Q.   Okay.
8      A.   My understanding, we wasn't
9  supposed to be hiring anybody.
10     Q.   I understand.  You don't have
11  any reason to dispute, do you?  -- I mean,
12  you don't know when they started getting
13  paid, do you?
14     A.   Who?
15     Q.   Will Hubbard and Adam or
16  Joseph Mays.
17     A.   Whatever David say.  I don't
18  know.
19     Q.   Okay.  All right.  Are you a
20  good coon hunter?
21     A.   I think so.
22     Q.   Why are you a good coon
23  Hunter?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 105

1    A.    Because I'm good at what I do.
2  You can ask David that.
3    Q.    You've been doing it for a
4  long time?
5    A.    A long time.
6    Q.    Experience makes you --
7  sometimes makes you good at something,
8  doesn't it?
9    A.    Yeah. Experience. Yeah.
10  Some things.
11    Q.    There are some people -- And
12  I'll give you this, there are some people
13  that have been doing something a long time,
14  but still don't --
15    A.    And they're not good at it.
16    Q.    -- They're still not good at
17  it?
18    A.    Correct.
19    Q.    But, generally, if someone has
20  been doing something a long time, they're
21  usually good at it, aren't they?
22    A.    Usually. On some things. It
23  just depends.

Page 106

1    Q.    Okay. Now, we've talked a
2  couple of times, have we not?
3    A.    Correct.
4    Q.    Before you retained a lawyer,
5  correct?
6    A.    Correct.
7    Q.    And we've always been cordial,
8  nice to one another, haven't we?
9    A.    Correct.
10        (Defendant's Exhibit 22
11          was marked for
12          identification purposes.)
13    Q.    And one day we sat down and
14  talked, and I wrote down a declaration,
15  which is Defendant's Exhibit 22.
16    A.    Correct.
17    Q.    Trying to summarize what we
18  had been talking about.
19    A.    Correct.
20    Q.    Now, I realize now, in looking
21  at this declaration and going back and
22  looking at your personnel file, that maybe
23  some of the pay things, what you were paid,

Page 107

1  may be a little off.
2    A.    Correct.
3    Q.    But other than that, is
4  everything true and correct, to the best of
5  your knowledge and belief, that's contained
6  on Defendant's Exhibit 22?
7    A.    That's on this?
8    Q.    Yes, sir.
9    A.    Correct. On this
10  (indicating).
11    Q.    Okay. Having worked at
12  Sedgefields, and I know it's no longer owned
13  by Mid State, but owned by Tolleson now;
14  right?
15    A.    Right.
16    Q.    But having worked out on that
17  property that's called Sedgefields, have you
18  gotten to learn a little bit of the history
19  of Sedgefields?
20    A.    Before Sedgefields became
21  Sedgefields or Maytag, or which one are you
22  speaking of?
23    Q.    Yeah. Back when the Maytag

Page 108

1  family developed the property.
2    A.    Correct.
3    Q.    What do you know about that
4  Maytag family, when they operated the
5  property?
6    A.    I know old man Maytag invented
7  the first washing machine, I know that. I
8  don't know it for a fact, but I heard it.
9    Q.    In fact, they had --
10    A.    They had an old one out there,
11  the first one they ever invented. That's
12  what they say.
13    Q.    Yeah. It's sitting there in
14  the lodge, isn't it, in the corner?
15    A.    Correct, correct, correct.
16  It's a -- It's the field trial capital of
17  the world.
18    Q.    Okay. The Maytags came down
19  here -- They didn't come down here to deer
20  hunt, did they, they came down to quail
21  hunt?
22    A.    I don't know about that.
23    Q.    Okay. Well, Mr. Maytag loved

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 109

1  hunting dogs, didn't he?
2      A.    Correct.
3      Q.    And he's sort of the one that
4  was around -- started -- Didn't he have some
5  involvement in the National Field Trials?
6      A.    Correct.
7      Q.    And those field trials are
8  held on the Sedgefields property, aren't
9  they?
10     A.    Correct.
11     Q.    Draw people from all over the
12 country; right?
13     A.    All over the world.
14     Q.    All over the world?
15     A.    Correct.
16     Q.    And those field trials are for
17 dogs that hunt quail?
18     A.    Bird dogs.
19     Q.    Bird dogs; is that correct?
20     A.    Correct.
21     Q.    And they're hunting quail?
22     A.    Correct.
23     Q.    They're used to hunt quail?

Page 110

1      A.    Correct.
2      Q.    You will agree with me, will
3  you not, that the beginnings of Sedgefields
4  was based on the rich quail hunting history
5  that existed out at Sedgefields?
6      A.    I don't -- Ask me that again.
7      Q.    Well, when did they start --
8  Is it called the National Free For All?
9      A.    National Free For All.  I
10 don't know what year.
11     Q.    Okay.
12     A.    But I know when I came, they
13 was doing a lot of field trials.  Before I
14 came, they was doing a lot of field trials.
15 They told me that was the capital of the
16 world right there in field trials.
17     Q.    Was at Sedgefields?
18     A.    When I came it was, but it was
19 Maytag's when I know about it.  When I came,
20 Mr. Paul Broadhead purchased it, so it was
21 Sedgefields Plantation.
22     Q.    Right.  I understand.  But I'm
23 talking about the piece of property now.

Page 111

1  I'm not talking about who owned it.
2      A.    What it was for?
3      Q.    Yeah.  What it was for.
4      A.    Quail hunting.
5      Q.    Okay.
6      A.    My understanding.
7      Q.    Your understanding --
8      A.    Yeah.
9      Q.    -- was that that property was
10 developed for quail hunting?
11     A.    Correct.
12     Q.    Now, I know that there is some
13 great deer hunting out there, too.
14     A.    Correct.
15     Q.    That I haven't gotten an
16 opportunity to go out there and hunt.
17           (Off-the-Record discussion
18           was held.)
19     Q.    Over the years, just based on
20 what you've heard and your experience,
21 living around this community --
22     A.    Correct.
23     Q.    -- you don't have the quail

Page 112

1  hunting natural habitat, you don't have
2  natural quail like you used to have back
3  when the Maytags may have been down here in
4  the '20s and '30s?
5      A.    No.
6      Q.    Now, I hear people tell me all
7  different reasons for that.
8      A.    Okay.
9      Q.    But the fact is, you just
10 don't have that quail hunting experience
11 like you used to have back in the '20s and
12 '30s, and maybe even '40s and '50s; is that
13 right?
14     A.    That's before I was born.  I
15 can't say.
16     Q.    I know you can't say.
17     A.    I agree with you.
18     Q.    That's what you've heard, too?
19     A.    That's what I heard.
20     Q.    Okay.
21     A.    Because they was planting more
22 then.
23     Q.    Okay.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 113

1    A.    So I don't know.
2    Q.    In fact, over the recent
3 years, out at the Sedgefields property,
4 y'all were doing more deer hunting than
5 quail hunting?
6    A.    Not when I started.
7    Q.    Not when you started?
8    A.    Not when I started.  They
9 wasn't really killing nothing but the cull
10 bucks when I started.  Cull buck is a deer
11 three years old or older, mature deer,
12 older, messed up racks.
13    Q.    Cull bucks.
14    A.    They didn't want their genes.
15 And so they -- Because we was quail hunting
16 a lot then, when I start, field trialing,
17 too.
18    Q.    Uh-huh.  And then after you
19 start, what happened?
20    A.    After I started --
21    Q.    How did it change?
22    A.    It changed when they had a lot
23 of turnover in the main office.  That

Page 114

1 changed a lot.  When Paul, Junior, when they
2 said the things that they say Paul, Junior,
3 was doing, that changed the whole thing.
4    Q.    This may get me fired, but
5 let's call a spade a spade.  Paul Broadhead
6 did a poor job managing that property, did
7 he not?
8    A.    Paul Broadhead, Junior.
9    Q.    That's right.  Paul Broadhead,
10 Junior, did a poor job managing that
11 property?
12    A.    Right.
13    Q.    He cut a lot of timber, did he
14 not?
15    A.    Lot of timber.
16    Q.    Destroyed a lot of the quail
17 habitat?
18    A.    Correct.  Was not at a lot of
19 field trials when he was expected to be.
20 Sometimes we had to run his dogs, stuff like
21 that there.
22    Q.    Sedgefields, sort of during
23 those years of turmoil, lost some of the

Page 115

1 shine, or some of the luster of its quail
2 hunting history, did it not?
3    A.    Correct.
4    Q.    Mr. Harris and Mr. Foster and
5 I guess to some extent, BB, talk about -- or
6 it may have been Demetrius, I'm sorry, I
7 don't want to confuse the two.
8    A.    Okay.
9    Q.    But at least Mr. Harris and
10 Mr. Foster talk about a time when Joel
11 Norman held their paycheck, wouldn't give
12 them a paycheck.  Do you --
13    A.    I heard about it.
14    Q.    Do you know what I'm talking
15 about?
16    A.    I know what you're speaking --
17 Yeah, I know what you're talking about.
18    Q.    Okay.  I think it was on a
19 Thursday, and they were looking for their
20 paycheck?
21    A.    On a Thursday.  The bottom
22 line is on that paycheck thing.
23    Q.    On or about okay.

Page 116

1    A.    When Roy was running it,
2 before David started it, we was getting paid
3 off every Thursday.  I would get a check --
4 The check would come in on UPS, I think, or
5 FedEx.  I would get a check out on a
6 Thursday.  It was costing the company a
7 dollar to get it the day before time to cash
8 it.
9    Q.    Uh-huh.
10    A.    So I was getting their checks
11 out.  So after David came, David still was
12 giving them out for a little while on a
13 Thursday.  So when David hired Joel Norman,
14 Joel Norman had his crew -- David would --
15 Joel would give his crew their own checks.
16 David would give checks to Joel for his
17 crew, my checks to Denise to put in my slot
18 for me, for my crew.
19    Q.    And then the checks were, even
20 though they got there on a Thursday, they
21 were dated for Friday?
22    A.    Friday.  Correct.
23    Q.    And nothing right or wrong

29  (Pages 113 to 116)

# FREEDOM COURT REPORTING

Page 117

1    about it, but you would just go ahead and
2    give them their checks on Thursday when you
3    did it?
4        A.    Yeah.
5        Q.    When David got there, he said:
6    Well, let's hold them until Friday, the date
7    of the check, and give it to them?
8        A.    No.  When Joel Norman got
9    there.
10        Q.    Okay.  Well, David was there.
11    But, then, after Joel got there, he changed
12    it and said:  We're going to hold the checks
13    until Friday?
14        A.    After Joel Norman got there,
15    we were still given our checks on Thursday
16    for awhile.
17        Q.    Uh-huh.
18        A.    Conflict came up with Joel
19    Norman and his crew, that would be Jeffrey
20    Harris, Norris and Brother Man.
21        Q.    Uh-huh.
22        A.    They was going to town to cash
23    their check.  Then when they come back, they

Page 118

1    would punch in in time to go back to work.
2    When they get out to the tractor -- Joel
3    said it was time for them to come to work,
4    it was right time for them to go back home.
5    They said Joel start carrying the checks
6    home.  I don't know this, because I can't
7    prove that.  So that's what I heard.
8        Q.    But I thought David told you
9    and Joel to hold the checks until Friday?
10        A.    Not right at that time.  That
11    was a little later after we start giving
12    them that Friday.  No.  He wouldn't give
13    them to me.  We start getting them on that
14    Friday after then.  If they were there in
15    the office on Thursday, we still didn't get
16    them until that Friday.
17        Q.    Okay.  I think I see what
18    you're saying.  Even before David said:
19    Hold the checks until Friday --
20        A.    Hold them till Friday, instead
21    of giving them out on Thursday.
22        Q.    -- Joel, when he got his
23    checks on Thursday, he just independently

Page 119

1    started holding the checks for his people
2    that worked under him until Friday?  Is that
3    your understanding?
4        A.    No.  My understanding is what
5    the guys told me.
6        Q.    Okay.
7        A.    Now, I don't know this.  The
8    guys come and told me, said when David gave
9    Joel the checks, that's before we agreed to
10    give it to them on Friday, Joel took their
11    checks home to his wife and left it at his
12    house.  Joel got on his truck and went back
13    to the woods.  It was time for the guys to
14    go to lunch cash their checks.  They get
15    their check on a Thursday.
16        And so they couldn't find
17    Joel.  So they went through the plantation
18    looking for Joel.  I saw BB, Jeffrey Harris
19    and Norris Foster, went by looking for Joel.
20        And so when they got back
21    there, Joel told them, he said:  Well, your
22    checks at home, at my house.  So he had to
23    come all the way back out from back there to

Page 120

1    cash the checks because I think the bank
2    closed at -- on Thursday, I think the bank
3    closed early, something like that.
4        So after then --
5        Q.    All right.  Let me stop you.
6    That's right.  Here in Union Springs -- In
7    Opelika things close down on Wednesday
8    afternoon.  In Union Springs, they close
9    down on Thursday afternoon?
10        A.    Correct.  They close after
11    lunch.
12        Q.    So, people wanted to come in
13    and get their check cashed before lunch?
14        A.    Yeah.  Before twelve o'clock.
15        Q.    And Joel Norman decided he
16    wasn't going to give those checks out until
17    the next day, Friday?
18        A.    Well, he decided -- To my
19    understanding, what they said Joel was way
20    back -- went way back there during
21    lunchtime.  They thought Joel had the checks
22    and the time cards -- they used to put them
23    in the time card, but everybody could see

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 121

1  what your check was, so they started --
2  David started giving them to the supervisor.
3        So Joel took the checks and
4  said they was at home. Them guys went way
5  back to the plantation looking for their
6  checks. It was already about eleven, 11:40,
7  something like that. They was trying to get
8  their checks. Our check number would be
9  right there and time card.
10        So when they found out where
11  the checks were, they started raising Sam
12  with Joel, raising Sam with Joel. So I
13  reckon Joel told David. David said: I tell
14  you what, it's costing a dollar more money
15  to cash your check a day early. Which I
16  told the guys: There ain't no need in
17  raising Sam, because I would give you all
18  the check a day early, because she didn't
19  ever say nothing to me about giving them
20  early.
21        So, then, David said: Well, I
22  tell you, we'll just give everybody theirs
23  on Friday. So that's what we went to, on

Page 122

1  Friday.
2        Q.    Okay. Fair enough.
3        A.    Okay.
4        Q.    Now, you have filed a lawsuit
5  against Mid State Land and Timber; correct?
6        A.    Correct.
7        Q.    And your only claim, and I
8  don't want to put words in your mouth, but I
9  just trying to make sure we're all talking
10  about the same thing.
11        A.    Correct.
12        Q.    You believe that you were
13  discriminated against on the basis of your
14  race?
15        A.    Correct.
16        Q.    And the way that you believe
17  you were discriminated against on the basis
18  of your race is your pay as compared to Joel
19  Norman; is that correct?
20        A.    Correct. And the way that I
21  was the only -- making the management on the
22  time card.
23        Q.    Okay. All right. So, your

Page 123

1  claim of race discrimination is based solely
2  on pay? And you can talk with your lawyer
3  about this, if you want to. That's fine
4  with me. I just want to make sure that --
5        A.    On pay, yeah. I think that
6  was discrimination on pay.
7        Q.    Okay.
8        A.    That's what I'm thinking.
9        Q.    Okay.
10        A.    Because, see, well before any
11  of this took place, Roy Lee was running that
12  job. I was on the time card. I had a
13  hundred hours overtime every two weeks. I
14  was getting paid for eighty hours, but I
15  still had a hundred hours overtime. So you
16  know how many.
17        That was nineteen or twenty
18  hours a day. I worked from breakfast,
19  supper and dinner. My wife thought I had
20  moved up there. So, you know, I didn't mind
21  working because Sherri -- we needed the
22  help. So Ms. Sherri and -- they would come
23  tell me: Roy, you're doing an excellent

Page 124

1  job. I'm going to take care of you.
2        Q.    Let me stop you. You think
3  you should have been paid more?
4        A.    I know I should have been paid
5  more for my job performance.
6        Q.    Okay. I understand.
7        A.    That's what I think.
8        Q.    Okay.
9        A.    But can I say something? It
10  ain't all about the pay. If Mr. Broadhead
11  had -- If I was so good with them, they
12  could have came to me and said: Roy, you
13  did an excellent job. That would have been
14  fine.
15        Q.    You're talking about --
16        A.    I'm talking about
17  Mr. Broadhead, Paul Broadhead.
18        Q.    Right. They were nice to you,
19  treated you like family?
20        A.    Correct. That's what I
21  thought.
22        Q.    Except when they sold the
23  place, they didn't -- What did they do, just

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 125

1  give you a watch?
2      A.    A Seiko watch.  Come and say:
3  Well, you're doing an excellent job.  Even
4  thought Mr. Broadhead's daughter come to me
5  and said:  Roy, look here, my father really
6  appreciates the things you've done for
7  Sedgefields.  You've sticking up for
8  Sedgefields.  You're the only somebody
9  that's been here this long, and daddy really
10  appreciates that.
11          Sherri Howell and Barbara Ray
12  come down.  I picked them up.  They come
13  down.  They said:  Roy, you're doing an
14  excellent job.  You're a very good asset to
15  this company.  I'm going to take care of
16  you.
17          How are you going to take care
18  of me?  I wasn't on salary.  David Carroll
19  put me on salary.  David come to me and
20  said:  Roy, I'm going to have to put you on
21  salary.  I think that was a couple of months
22  after you were there.
23          I said:  Well, David, let me

Page 126

1  tell you like this, now.  I said:  You can
2  pull my time and see how many hours I work.
3  I said:  I'm not going under.  He said:  All
4  right.  I'll get back with you, but you
5  never did.  David put me on salary.
6      Q.    Okay.
7      A.    So I didn't say anything.
8      Q.    Okay.  All right.  Will
9  Hubbard -- Y'all got a skidder at some
10  point, didn't you, up there at Sedgefields?
11      A.    Correct.
12      Q.    Will knows how to operate that
13  skidder, or knew how to operate that
14  skidder?
15      A.    I -- I seen Will on the
16  skidder one -- Now, there's a difference in
17  operating and driving the skidder.
18      Q.    Right.
19      A.    And what you might say an
20  operator, my man going down that row
21  operating the skidder, that would make a big
22  difference to me.
23      Q.    All right.  I get my people

Page 127

1  confused, but I think Demetrius -- No,
2  excuse me, BB said -- I think it was BB said
3  that Will trained him on the skidder.
4      A.    I don't know about that.
5      Q.    You don't know about that?
6      A.    Huh-uh.
7      Q.    But Will was able, and you've
8  already testified about it, but he was able
9  to operate heavy machinery, was he not?
10      A.    Correct.  I seen him on
11  tractors.  I never seen him on the -- Yeah.
12  I seen him on the bulldozer once.
13      Q.    Okay.  And I think you said
14  you saw him on --
15      A.    Backhoe.
16      Q.    -- on the backhoe?
17      A.    Correct.
18      Q.    Your attorney, when you were
19  deposed by your attorney, was talking about
20  how difficult it was for you to be deposed
21  with Mr. Carroll being in the room, who is
22  your boss.  And I guess my question is, I
23  know this whole thing is difficult for you,

Page 128

1  is it not?
2      A.    I don't have a problem with
3  David sitting right there.  I have a problem
4  with Broadhead.
5      Q.    Okay.  Is it also difficult
6  for you to be living around and working
7  among, you know, and being related to, you
8  know, Demetrius, and Norris and Tarver and
9  Willie Mack, and them wanting you to say or
10  do one thing and, you know, you wanting to
11  do what's right?
12      A.    I always believed in doing
13  what's right, to me.  I have no problem
14  living around none of them guys.  I have no
15  problem living around David or Joel Norman.
16          I don't agree -- There's a lot
17  of things I don't say.  I sit back and look.
18  I don't say.  That don't mean I don't care.
19  We all have feelings.  We all grown peoples.
20          But I would have a problem
21  staying around Joel Norman, I would.  Me and
22  him had a few words.  I would.  Because deep
23  in my heart, I believe that he is

32  (Pages 125 to 128)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 129

1 prejudiced, to me. To the rest of the
2 blacks. I don't think he likes black
3 people. I can't prove that he don't like
4 black people, but I really -- You can tell
5 the way a man talks and the way he treats
6 you. We all grown. That's not right.
7     Q. At your last deposition,
8 Mr. Roberson was about to hand you his
9 business card.
10     A. Correct.
11     Q. And I told him that he
12 couldn't contact you because you were in
13 management --
14     A. Correct.
15     Q. -- at Mid State?
16     A. Yeah.
17     Q. How did you and Mr. Roberson
18 get together?
19     A. I seen Norris and I saw Henry.
20 And told Henry to tell Norris to call me or
21 send me Mr. Roberson's card or phone number.
22 I really need to talk to him because, you
23 know, I talked to my preacher, I talked to

Page 130

1 my wife, I even told you, I said: Now, the
2 next time you see me, I might be sitting on
3 the opposite side of the table from you,
4 remember?
5     Q. You also remember me telling
6 you, explaining to you why, even though
7 Mr. Norman was paid more than you, that
8 there was a reason for it?
9     A. Right. You said that he had a
10 two-year degree in biology; correct?
11     Q. Right. And he had experience
12 managing a plantation, and all these years
13 of experience in dog handling and quail
14 hunting; right?
15     A. So have Roy, correct.
16     Q. He's got more than you, does
17 he not?
18     A. He's got a degree.
19     Q. No. He's got more years in
20 dog handling and bird hunting than you?
21     A. I mean, I don't know his
22 background. The only I know, I heard he had
23 a degree in biology. I don't know his

Page 131

1 background.
2     Q. Okay. Fair enough. Has your
3 attorney told you that I have -- and nothing
4 personal with you --
5     A. Correct.
6     Q. Well, no, I can't ask you
7 that --
8     MR. ADAMS: I was fixing to
9 object to that.
10     Q. I have told your lawyer, and
11 have served him with a Rule 11 Motion as to
12 your claims, saying that there is no
13 good-faith basis in fact or in law to
14 support your claims, which I am required to
15 do under the Federal Rules of Civil
16 Procedure.
17     And I gave him twenty-one days
18 to withdraw your claims or I would seek
19 sanctions if I prevail on summary judgment.
20 And my sanctions that I would seek and ask
21 the Court to give me would be my attorneys
22 fees and costs in having to defend the
23 claim.

Page 132

1     Are you aware that I served
2 your lawyer with a Rule 11 Motion, asking
3 that the -- your claims be dismissed?
4     A. No, I'm not aware of that.
5     Q. Okay. Are you aware that you
6 let that twenty-one days lapse, and if I get
7 summary judgment, that the Court may award
8 me attorney's fees and costs as sanctions?
9     A. Yeah. I'm aware as you just
10 telling me.
11     Q. Okay.
12     A. Yeah.
13     Q. Are you aware that the Court
14 may order you to pay my attorney's fees?
15     A. No, I'm not.
16     Q. And costs?
17     A. But if you win, I will pay
18 your attorney's fees. We'll put it that
19 way.
20     Q. Well, the Court may not do it.
21 They may make your lawyer do it.
22     A. Might not. But I definitely
23 want to be able to tell my side.

33 (Pages 129 to 132)

# FREEDOM COURT REPORTING

Page 133

1  Definitely. Because I know it ain't right.
2          MR. DUKES: Let's take another
3  break.
4          (Recess taken.)
5      Q.   So, I take it, you got
6  Mr. Roberson's phone number, and did you
7  call him?
8      A.   I called him.
9          (Defendant's Exhibit 23
10         was marked for
11         identification purposes.)
12     Q.   Okay. Let me show you a
13 document I will identify as Defendant's
14 Exhibit 23. I'll represent to you that it's
15 your interrogatory answers. If you'll just
16 take a second to look at those and let me
17 know when you're through.
18     A.   (Witness complies.)
19     Q.   Have you had a chance to
20 review Defendant's Exhibit 23?
21     A.   Uh-huh. Yes, I have.
22     Q.   All right. Is everything true
23 and correct, to the best of your knowledge

Page 134

1  and belief?
2      A.   Correct.
3      Q.   You say that you -- claim that
4  you have incurred or sustained damages in
5  this action. And you say that your damages
6  include mental anguish. What kind of mental
7  anguish damages have you sustained?
8      A.   Man, I can't even -- I mean, I
9  sit up at night thinking about my job,
10 thinking about the way I was treated through
11 the Broadhead family. I think about how
12 Joel Norman makes more money than I do and I
13 was doing the same job.
14         Y'all ain't got the correct
15 date down there. There's a lot of people
16 missing off that paper. I was doing that
17 job after they fired Hunter McDuffie, up
18 till when they hired David Carroll.
19         Whatever, Roy was running that
20 plantation. Regardless of whatever they
21 tell you, I was running that plantation. I
22 did an excellent job, and I think so. David
23 don't have a problem with my work, if he do,

Page 135

1  he never mentioned it.
2          Broadhead was so enthused with
3  how I had kept things going, if they
4  appreciated me and the way I was doing
5  things, you know, that bothered me. I can't
6  rest with that. I think about it all the
7  time. I even talked to my pastor. I even
8  talked to David about it. I talked to
9  Denise about it. I said: Well, I've I got
10 to make my own mind up, make my own
11 decision.
12     Q.   Have you ever seen a doctor,
13 psychiatrist, psychologist, any practitioner
14 of the healing arts about your mental
15 anguish, other than your preacher?
16     A.   No. No more than my wife, the
17 preacher and my wife.
18     Q.   Okay. Well, who have you
19 talked to, other than your preacher, your
20 wife and your coworkers about your claims in
21 this lawsuit?
22     A.   About my claims -- No more
23 than -- Well, I didn't tell David that I was

Page 136

1  having a lawsuit, but I did tell Denise.
2      Q.   You were never the plantation
3  manager out at Sedgefields, were you? You
4  never held that title, did you?
5      A.   I never held that title.
6      Q.   Okay.
7      A.   Only title I held was: Roy,
8  go out there and do this, Roy, do that,
9  you're doing an excellent job. What I can't
10 understand, if I'm doing such a great job,
11 how could you hire a man, because he got a
12 two-year degree more than me, and I'm
13 putting out birds, doing the same thing,
14 deer hunting, the same things, running the
15 plantation before they hired Mr. David,
16 doing an excellent job, and I get pushed
17 down the road like this. That ain't right.
18 I think that explains it. Other than
19 that, Mr. Carter --
20     Q.   I don't have a question on the
21 table.
22     A.   Okay.
23     Q.   I don't want to be rude to

34  (Pages 133 to 136)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 137

1  you.
2      A.    Okay.  But I did talk to you
3  about it.  I got to say that.
4      Q.    Oh, okay.
5          MR. DUKES:  Let me talk with
6  David for a second.  I think we're through.
7          (Recess taken.)
8      Q.    **Have you had any family**
9  **experiences, any deaths in the family in the**
10 **last year or so?**
11     A.    I got death in the family this
12 week.
13     Q.    **This week?**
14     A.    This week, yeah.
15     Q.    **Who passed?**
16     A.    My fourth cousin.  Guy named
17 James Hurt.  They're going to bury him
18 Saturday.
19     Q.    **Any close relatives pass in**
20 **the last year?**
21     A.    One of my best friends I coon
22 hunt with, passed last week.
23     Q.    **That caused you some -- Well,**

Page 139

1  trying to get across.
2          MR. DUKES:  Okay.  I have no
3  further questions at this time.
4          MR. ADAMS:  I don't have
5  anything.
6  (The deposition was concluded at 11:55 a.m.,
7  January 17, 2007.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 138

1  **that caused some mental anguish, too, did it**
2  **not, to have a friend die that you coon hunt**
3  **-- a hunting friend?**
4      A.    I thinks about him, but he was
5  an older man, you know?
6      Q.    **Yeah.**
7      A.    Anybody close to home bothers
8  you anyway, regardless whether they a cousin
9  or friend, you're going to think about them.
10     Q.    **Right.  You were talking**
11 **earlier about, you know -- and I'm not**
12 **trying to put words in your mouth, but I'm**
13 **just trying to summarize, that, you know,**
14 **despite the job titles and what these**
15 **different sheets might have as people being**
16 **hunt manager or what have you, it's your**
17 **testimony that despite the title out there,**
18 **you felt like you were doing all the work**
19 **out there?**
20     A.    I was.
21     Q.    **And that's what you've been**
22 **trying to tell me; is that right?**
23     A.    That's the only point I'm

Page 140

1      REPORTER'S CERTIFICATE
2  STATE OF ALABAMA,
3  ELMORE COUNTY,
4      I, Angela Smith, Registered
5  Professional Reporter and Commissioner for
6  the State of Alabama at Large, do hereby
7  certify that the above and foregoing
8  proceeding was taken down by me by
9  stenographic means, and that the content
10 herein was produced in transcript form by
11 computer aid under my supervision, and
12 that the foregoing represents, to the best
13 of my ability, a true and correct
14 transcript of the proceedings occurring on
15 said date and at said time.
16     I further certify that I am neither
17 of kin nor of counsel to the parties to the
18 action; nor in any manner interested in the
19 result of said case.
20
21
22  _____
     Angela Smith, RPR, CRR,
     for the State of
23  Alabama at Large.

35  (Pages 137 to 140)

EXHIBIT 3

# American Court Reporting
## toll-free (877) 320-1050

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CIVIL ACTION NUMBER
2:06-CV-00405-ID-SRW

NORRIS FOSTER,
    Plaintiff,
vs.
MID STATE LAND & TIMBER COMPANY, INC.,
d/b/a SEDGEFIELDS PLANTATION,

    Defendant.

THE VIDEOTAPED

DEPOSITION TESTIMONY OF:

DAVID CARROLL

September 8, 2006

1:29        p.m.

COURT REPORTER:

Gwendolyn P. Timbie, CSR

---

**Page 2**

1    STIPULATIONS
2        IT IS STIPULATED AND AGREED by and
3    between the parties through their
4    respective counsel that the videotaped
5    deposition of DAVID CARROLL, may be taken
6    before Gwendolyn P. Timbie, Certified
7    Shorthand Reporter and Notary Public,
8    State at Large, at the law office of John
9    Waters, Union Springs, Alabama, on
10   September 8, 2006, commencing at
11   approximately 1:29 p.m.
12       IT IS FURTHER STIPULATED AND
13   AGREED that the signature to and the
14   reading of the deposition by the witness
15   is not waived, the deposition to have the
16   same force and effect as if full
17   compliance had been had with all laws and
18   rules of Court relating to the taking of
19   depositions.
20       IT IS FURTHER STIPULATED AND
21   AGREED that it shall not be necessary for
22   any objections to be made by counsel to
23   any questions, except as to form or

---

**Page 3**

1    leading questions, and that counsel for
2    the parties may make objections and assign
3    grounds at the time of trial or at the
4    time said deposition is offered in
5    evidence, or prior thereto.
6        Please be advised that this is the
7    same and not retained by the Court
8    Reporter, nor filed with the Court.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

---

**Page 4**

1    INDEX
2    EXAMINATION BY:              PAGE NO:
3    Mr. Roberson                    8
4    Certificate                   176
5    Instructions to Witness       177
6    Signature Page                179
7    Errata Sheet                  180
8
9        LIST OF EXHIBITS
10   EXHIBITS:                   PAGE NO:
11   Plaintiff's 19                48
12   Plaintiff's 20               156
13   Plaintiff's 21               157

---

## www.AmericanCourtReporting.com
## September 8, 2006

**American Court Reporting**
**toll-free (877) 320-1050**

Page 5

1
2
3
4     A P P E A R A N C E S
5
6    FOR THE PLAINTIFF:
7      JERRY ROBERSON, Esquire
       Roberson & Roberson
8      8 Office Park Circle
       Suite 150
9      Birmingham, Alabama 35223
10    ALBERT H. ADAMS, JR., Esquire
       Irby Law Firm, LLC
11     Post Office Box 910
       Eufaula, Alabama 36072
12
13
      FOR THE DEFENDANT:
14
       CARTER H. DUKES, Esquire
15     Huckaby, Scott & Dukes, P.C.
       2100 Third Avenue North
16     Suite 700
       Birmingham, Alabama 35203
17
18
      VIDEOGRAPHER:
19
       CHRISTI MAZE
20
21
22
23

Page 6

1     I, Gwendolyn P. Timbie, Certified
2  Shorthand Reporter and Notary Public for
3  the State of Alabama at Large, acting as
4  Commissioner, certify that on this date,
5  pursuant to the Federal Rules of Civil
6  Procedure, and the foregoing stipulation
7  of counsel, there came before me at the
8  law office of John Waters, Union Springs,
9  Alabama, commencing at approximately
10 1:29 p.m., on September 8, 2006, David
11 Carroll, witness in the above cause, for
12 oral examination, whereupon the following
13 proceedings were had:
14
15     THE VIDEOGRAPHER:  This
16 deposition is being taken of David --
17 David Carroll on this, the 8th day of
18 September 2006, in the case of Norris
19 Foster versus Mid State Land and Timber
20 Company, Inc., d/b/a Sedgefields Farm -- I
21 mean -- sorry -- Plantation.  This case is
22 set in the United States District Court,
23 for the Middle District of Alabama,

Page 7

1  Northern Division; Civil Action Number 2:
2  06-CV-00405-ID-SRW.
3      Would Counsel please state
4  their names and who they represent?
5      MR. ROBERSON:  My name is
6  Jerry Roberson, and I, along with Albert
7  Adams, represent the plaintiff, Norris
8  Foster.
9      MR. DUKES:  Carter Dukes,
10 representing Mid State.
11     THE VIDEOGRAPHER:  Would the
12 court reporter please swear the witness?
13
14     DAVID CARROLL,
15 Having been first duly sworn, was examined
16 and testified as follows:
17
18     THE REPORTER:  And will these
19 be usual stipulations?
20     MR. ROBERSON:  Yes, ma'am.
21     MR. DUKES:  Yes.  But we'll
22 read and sign.
23

Page 8

1  EXAMINATION BY MR. ROBERSON:
2      Q   Mr. Carroll, my name is Jerry
3  Roberson, and I represent Norris Foster.
4  Do you understand we're here today about
5  his race discrimination claim?
6      A   Yes.
7      Q   And are you employed -- or
8  were you formerly employed with Mid States
9  Land and Timber?
10     A   Yes.
11     Q   In what capacity?
12     A   I was hired as the general
13 manager.
14     Q   When were you hired, sir?
15     A   I was hired during the month
16 of March -- uh -- or early April of 2005.
17     Q   Do you know who you replaced,
18 who was the former manager?
19     A   I'm told a lady named Donna
20 Davidson was general manager before I was
21 hired.
22     Q   And do you know where
23 Ms. Davidson is?

2  (Pages 5 to 8)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 9

1    A    I understand she lives on the
2  coast somewhere.
3    Q    Was she related at all to the
4  Broadheads?
5    A    I believe she was.
6    Q    Do you know how she was
7  related?
8    A    I would say through marriage.
9    Q    That is, she was -- she
10  married into the Broadhead family?
11    A    I -- I guess so.  In some
12  capacity.
13    Q    You didn't, did you?
14    A    No, sir.
15    Q    Okay.  How old are you, Mr. --
16    A    Forty-two.
17    Q    -- Carroll?  And where had you
18  worked prior to coming to work at
19  Sedgefields?
20    A    My work history would be that
21  I -- I grew up on a farm, farm labor,
22  working for my father and other
23  individuals around my hometown.

Page 10

1    Q    Where?
2    A    Hurtsboro, Alabama.
3    Q    Hurtsboro?
4    A    Uh-huh.  I attended high
5  school and -- and worked some my senior
6  year.  At the completion of my senior year
7  of high school, before I went to college
8  --
9    Q    What year did you graduate
10  high school, sir?
11    A    I graduated in 1982.
12    Q    From Hurtsboro High?
13    A    No.  I went to Glenwood High
14  School in Lee County.
15    Q    I'm sorry.  What high school?
16    A    Glenwood.
17    Q    Thank you.  And is -- is -- so
18  had you moved from Hurtsboro?
19    A    No, sir.
20    Q    That's just the -- the high
21  school you go to?
22    A    No, sir.  That -- Glenwood
23  High School is a private school.  I went

Page 11

1  to public school.
2    Q    Okay.  How many students did
3  they have?
4    A    Kindergarten through twelfth
5  grade would probably be in the
6  neighborhood of eight hundred students.
7    Q    All right, sir.  And then
8  after high school -- you graduated in 1982
9  -- where did you go to college?
10    A    I went to Auburn University.
11    Q    Did you graduate?
12    A    I did.
13    Q    What year?
14    A    1986.
15    Q    And in -- in what area did you
16  get your degree?
17    A    Bachelor of Science in forest
18  management.
19    Q    All right, sir.  And then what
20  was your employment after college?
21    A    After college, I went to work
22  for a family-owned business, A. B. Carroll
23  Lumber Company, located there in

Page 12

1  Hurtsboro.
2    Q    A. B. Carroll?
3    A    A -- A, period, B, period,
4  Carroll, C-A-R-R-O-L-L.
5    Q    Were they related to you?
6    A    Yes.
7    Q    How so?
8    A    My grandfather at one time
9  owned the mill.  My father at that time,
10  when I graduated school, was the --
11  general manager of the mill.  And I went
12  back to work for the company.
13    Q    And what was your job there?
14    A    My primary responsibilities
15  were timber procurement, timber inventory
16  for the saw mill, purchasing timber.  With
17  a family-owned business, before we sold
18  out -- or -- or sold the business, it was
19  everything, from A to Z.
20    Q    You -- how many employees at
21  A. B. Carroll, approximately?
22    A    Approximately eighty to
23  eighty-five employees.

3  (Pages  9 to 12)

# American Court Reporting
## toll-free (877) 320-1050

Page 13

1    Q    And where is that located?
2    A    It was in Hurtsboro, Alabama.
3    Q    Okay.  And you sold -- your
4    family sold that business?
5    A    That's correct.  Closed it
6    down and sold -- sold it.
7    Q    When was that?
8    A    That happened in the mid
9    '90s.  Mid to late '90s.
10    Q    Who did they sell it to?
11    A    Well, they -- it was --
12    actually, took part in -- not in one
13    event, but in multiple events.  The saw
14    mill itself was closed, and we auctioned
15    off some equipment.  We kept the planer
16    mill treating facility for a few more
17    years and just ran those facilities until
18    we finally just closed the doors and sold
19    off that equipment.
20    Q    Okay.  So no -- is anybody
21    operating --
22    A    No.
23    Q    -- that now?

Page 14

1    A    No.
2    Q    So since it's not operating,
3    you had to find another job, I take it?
4    A    Certainly.
5    Q    And where did you go to work?
6    A    Well, before the mill was
7    totally closed, I went back to school and
8    earned a Master's degree in wildlife
9    management.  Along that time, that the
10    mill was closing and I was working on my
11    second degree, I opened my own private
12    consulting business and -- and, more or
13    less, still own it today.  Do some things
14    from time to time, when I'm asked to.
15    It's called The Environmental Forestry
16    Company.
17    Q    Is that an LLC or --
18    A    No.
19    Q    -- just a company?
20    A    Just a -- just a company.
21    Q    Where is that business
22    located?
23    A    I just run it out of my home.

Page 15

1    Q    Where was your Master's degree
2    from?
3    A    Auburn University, as well.
4    Q    Okay.  When did you get your
5    degree, the Master's?
6    A    Master's degree was completed,
7    I believe, in 1996.
8    Q    Okay.  And --
9    A    I'm sorry.  I went to school
10    back in '96.  Finished up about '98 to
11    '99.
12    Q    All right.  Well -- and are
13    there any other employees of this
14    environmental consulting business you're
15    operating?
16    A    No.  I'm just self-employed.
17    If I had any other labor, it was just
18    contract labor.
19    Q    And what do -- how -- what
20    kind of work do you do as a consultant?
21    A    Well, I am a registered
22    forester in the state.  So I provide
23    professional forestry services, such as

Page 16

1    timber sales, timber cruising, land
2    management, boundary line marking --
3    everything from start to finish there, I
4    guess.
5    Q    Okay.  And are you -- you're
6    currently operating that business; right?
7    A    I do -- yeah.  I mean, it's --
8    it's -- my doors are open, but I really
9    don't do anything right now because my
10    full-time employment basically is here.
11    Q    Okay.  And the folks at
12    Tollesons -- Tollesons bought the property
13    in Union Springs, of Sedgefields
14    Plantation --
15    A    Yes, sir.
16    Q    -- from Mid States --
17    A    Yes, sir.
18    Q    -- is that correct?
19    A    That's correct.
20    Q    That was in May of 2006?
21    A    That's correct.
22    Q    And you're now employed with
23    Tollesons; is that correct?

4  (Pages 13 to 16)

## www.AmericanCourtReporting.com
## September 8, 2006

**American Court Reporting**
**toll-free (877) 320-1050**

Page 17

1    A    Correct.
2    Q    As the manager, still?
3    A    That is correct.
4    Q    So there was sort of a -- a
5  continuation of the operations of that
6  facility.
7    A    Yes.
8    Q    Is that fair?
9    A    Yes.
10        MR. DUKES:  Object to the
11  form.
12    Q    And the people at Tollesons
13  know that you do environmental consulting
14  outside their employment; correct?
15    A    They are aware that I am a
16  registered forester and hold that license
17  and have performed those services for
18  people, yes.
19    Q    Do they object to you doing
20  that?
21    A    No.
22    Q    I mean, there's -- it's not a
23  problem for them, is it?

Page 18

1    A    No.  Actually, it probably
2  would -- it would be a benefit to them,
3  because the type of clients that I have
4  would -- may be people that would
5  eventually sell them wood.
6    Q    Okay.  And so the time I want
7  to talk to you about is from when you
8  worked -- worked at -- at Mid State Land
9  and Timber Company until it was
10  purchased.  Okay.
11        And we're talking about at the
12  plantation here in -- in Union Springs,
13  Alabama; correct?
14    A    Yes, sir.
15    Q    Now, I don't hunt, so you've
16  got to help me out, if you will.
17        How many acres was Sedgefields
18  Plantation here?
19    A    I believe it called for twelve
20  thousand seven hundred and eighty-seven
21  acres.
22    Q    So it's almost thirteen
23  thousand acres?

Page 19

1    A    Close.
2    Q    When you -- when you were
3  working there, when --
4    A    That --
5    Q    -- Mid State had it?
6    A    That is correct.
7    Q    And what kind of operation is
8  it; that is, besides -- they do hunting
9  there; correct?
10    A    That is correct.
11    Q    Do they also raise or grow
12  timber on the property?
13    A    That would be a -- a natural
14  benefit of owning the property, yes.  They
15  grow timber.
16    Q    Okay.  Did you have any duties
17  associated with the timber management of
18  -- of -- at Sedgefields?
19    A    I do.
20    Q    What are those?
21    A    It just -- a general manager.
22  My duties would be not only to look after
23  the wildlife portion and the hunting

Page 20

1  portion of it, but oversee any of the
2  timber management aspects of it -- whether
3  we would be thinning wood, whether we
4  would be planting trees, marking lines.
5  Anything of that nature.
6    Q    So by owning that much
7  property, there are trees on it; right?
8    A    That is correct.
9    Q    And what kind of trees?
10    A    Predominantly, in certain
11  areas, it's planted pines, which you're
12  saying that they grow for, basically, a
13  product --
14    Q    To harvest?
15    A    To harvest.  There are pine
16  hardwood stands, and there are hardwood
17  stands on the property.
18    Q    Okay.  And it's your job to
19  make sure that that -- to optimize the
20  recovery from having those resources;
21  correct?
22    A    My job, when I was interviewed
23  and hired by Mid State Land and Timber,

5  (Pages 17 to 20)

# American Court Reporting
## toll-free (877) 320-1050

Page 21

1  was to not only see about timber and --
2  and -- I wasn't really given the
3  instructions to maximize timber production
4  on every square acre of the property,
5  because, obviously, some of that property
6  we use for --
7      Q    Hunting?
8      A    Hunting.
9      Q    Sure.
10     A    And other aspects.  But a
11  common-sense answer would be, where --
12  where timber was a priority, we would grow
13  as much timber as possible.  Where hunting
14  was a priority, we would make that the
15  most -- the most available.
16     Q    Okay.  And -- and I may -- I
17  don't want to misstate anything, but,
18  approximately, how many acres did you hunt
19  on at -- at -- at Mid States?
20     A    Well, it depends on what type
21  of hunting you describe.
22     Q    Okay.
23     A    If -- if we're deer hunting,

Page 22

1  we can cover, basically, the whole
2  thirteen thousand acres.  We may not hunt
3  every square foot, but there would be
4  hunters in each parcel.
5      Q    Yeah.  Okay.
6      A    If we're -- if we're up and
7  bird hunting, quail hunting, about half
8  that, about sixty-five hundred acres.
9      Q    Okay.  And -- and I take it
10  from your answer that you don't deer hunt
11  in the same areas that bird hunts are
12  going on, at the same time --
13     A    That is correct.
14     Q    -- correct?
15     A    That is correct.
16     Q    That -- that wouldn't be a --
17  from a common sense standpoint, very safe
18  to do, would it?
19     A    Exactly.
20     Q    Okay.  But -- but you can deer
21  hunt on the entire property; right?
22     A    Yes.
23     Q    As long as you're not doing

Page 23

1  the bird hunting on any part of it --
2      A    Yes.
3      Q    -- correct?
4      A    That's correct.
5      Q    And then a portion -- the more
6  open lands, you can bird hunt on; correct?
7      A    Yes.
8      Q    I mean, they probably have
9  some thickets and stuff where you can't
10  bird hunt; isn't that fair?
11     A    Yes.
12     Q    Okay.  Now -- and the -- the
13  -- do you have any job responsibilities
14  in -- insofar as the revenue stream from
15  the operations?
16     A    In my initial interview with
17  Ms. Howell, I was asked to be as
18  productive as possible, given the current
19  circumstances of the plantation.
20     Q    Okay.  What are the current
21  circumstances?
22     A    The circumstances were that
23  the property was not groomed the way

Page 24

1  it want -- they wanted it to be -- the
2  home office wanted it to be.  So it was --
3  it -- for a phrase that I would use, it
4  was a "diamond in the rough."
5      Q    Okay.  Well, I'm going to show
6  you what we previously -- and you were
7  here for Mr. Norman's deposition; correct?
8      A    I was.
9      Q    You actually were here for
10  Mr. Foster's deposition yesterday;
11  correct?
12     A    I was, yes.
13     Q    So you've heard all the
14  testimony in this case; correct?
15     A    Yes.
16     Q    All right.  And, then, I'm
17  going to show you what we marked as
18  Plaintiff's Exhibit 3 to Mr. Norman's
19  deposition.
20         Is that the organizational chart for
21  Sedgefields as of March of 2006?
22     A    I believe that would be
23  correct, yes.

6  (Pages 21 to 24)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 25

```
1      Q    Now, other than the plantation
2   here in Union Springs, did y'all have any
3   other properties that you owned in
4   Alabama?
5      A    When you mean "y'all," what --
6      Q    Mid State.  Did Mid State own
7   any other property in Alabama?
8      A    Not in the state of Alabama.
9      Q    Okay.  So all the Alabama
10  operations were on these, roughly,
11  thirteen thousand acres; is that fair?
12     A    That -- to my knowledge, that
13  is accurate.
14     Q    And -- so all the employees
15  for Mid State in Alabama would be on that
16  property?
17     A    I do believe there was one
18  other employee.  I -- she would -- she
19  would work for maybe the home office, not
20  necessarily Mid State.  But she also lived
21  in -- in Alabama.
22     Q    Who is that?
23     A    I will try to recall her
```

Page 26

```
1   name.  But she lives in -- in Decatur, and
2   she is a reference for us for -- I'm
3   trying to think of the correct term --
4   issues that we might have concerning,
5   maybe, tax laws in the state or something
6   of that nature.
7      Q    Okay.
8      A    I don't -- I'm sorry.  I don't
9   recall her name at this time.
10     Q    All right.  Did Mid State have
11  to provide accounting information from its
12  operations here in Union Springs?
13     A    Ex -- rephrase that.  I don't
14  quite understand the question.
15     Q    Did you have any kind of
16  report that you sent off every month, how
17  much money you made from hunting or
18  anything like that?
19     A    All -- all of our
20  bookkeeping -- not -- all of our
21  accounting and bookkeeping work was done
22  in -- in Mississippi, at the home office.
23     Q    Okay.
```

Page 27

```
1      A    We would, basically -- for
2   example, if we had a hunt, we would
3   provide documentation to the home office
4   of who the customer was and what the
5   charges were per the rates that -- that
6   we used.  That was sent to the home
7   office, and the billing occurred in
8   Mississippi and sent to the clients.
9      Q    Okay.  So does that indicate
10  all the employees in Alabama in March of
11  2006?
12     A    It does.
13     Q    How many of them are there?
14     A    One, two, three, four, five,
15  six, seven, eight, nine, ten, eleven.
16  Counting myself.
17     Q    Do you think that's about how
18  many you had?
19     A    I believe so.
20     Q    Okay.  And, I mean, from -- of
21  course, from time to time, it might vary
22  slightly; correct?
23     A    Yes.
```

Page 28

```
1      Q    Did -- did -- how many are --
2   and how many employees have you had -- the
3   most employees that you had in Alabama?
4      A    Maybe thirteen, total, at --
5   at one time.
6      Q    Now --
7         MR. DUKES:  And you --
8   obviously, you're talking about during his
9   time --
10     A    Right.
11        MR. DUKES:  -- at Mid State?
12     Q    (BY MR. ROBERSON)  All right.
13  Now, Mr. Carroll, you told me about your
14  consulting business, and you told me you
15  started working here in two -- in 2005.
16  What -- what was your employment history
17  prior to -- working here?
18     A    Upon receiving my Master's
19  degree at Auburn, I went and -- basically,
20  immediately to work for Five Star
21  Plantation, located in Kellyton, Alabama.
22     Q    Kellyton?
23     A    K-E-L-L-Y-T-O-N.
```

7 (Pages 25 to 28)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 29

1    Q    Where is that?
2    A    It's Coosa County, right next
3    door to Alex City.
4    Q    Okay. That's a little farther
5    north, then, isn't it?
6    A    That's correct.
7    Q    All right. And what kind of
8    work did you do at the Five Star
9    Plantation?
10    A    I was -- it was a multipurpose
11    hunting plantation, much like Sedgefields,
12    other than it was not operated
13    commercially. It was privately owned by a
14    number of people. And I was --
15    Q    How many acres did they have
16    there?
17    A    The total acreage that was --
18    that was leased or used by the facility
19    was, approximately, six thousand.
20    Q    Okay. And did they -- did --
21    besides hunting, did they do anything
22    else? You know, farming or anything like
23    that.

Page 30

1    A    No agriculture. None -- none
2    of that, no.
3    Q    But timber?
4    A    The explanation would be that,
5    when I went to work there, it was a -- a
6    hunting lodge operation that rented
7    property from the landowner. And so,
8    other than the hunting and the fishing
9    that took place on the property, there
10    weren't any -- any forced land
11    or agricultural operations that we owned
12    on the property when I went to work there
13    initially.
14    Q    All right. How long did you
15    work at Five Star?
16    A    A little better than three
17    years.
18    Q    What was your position there?
19    A    General manager.
20    Q    How many employees did they
21    have?
22    A    Approximately, fifteen, but it
23    varied. It was -- some was seasonal. So

Page 31

1    it would vary a little bit.
2    Q    And they did fishing there
3    too?
4    A    They -- yes, they did.
5    Q    Is that bass fishing? Or what
6    kind of fishing is it?
7    A    Bass and brim.
8    Q    Okay. So would they have
9    guides and use boats or --
10    A    From time to time, some of our
11    staff may guide. Most of the time,
12    individuals that -- that were there would
13    just fish, themselves.
14    Q    From boats or --
15    A    Uh-huh.
16    Q    -- from banks?
17    A    Mostly boats.
18    Q    All right. And did they have
19    a lodge?
20    A    They did.
21    Q    So they -- you could keep
22    guests overnight?
23    A    Yes.

Page 32

1    Q    See, I'm -- I'm sorry, but I'm
2    just not that familiar with these
3    operations. But when you say "commercial"
4    -- and this wasn't commercial -- what does
5    that really mean?
6    A    It was -- to simplify things,
7    it was a hunting club. And people --
8    Q    You had to be a member or a
9    guest of a member?
10    A    That is correct.
11    Q    Okay.
12    A    And I --
13    Q    They all paid dues or
14    something? Or how --
15    A    Yes.
16    Q    -- does it work?
17    A    Yes. They paid dues.
18    Q    It's a private club. And
19    the -- the dues fund the club?
20    A    That's correct.
21    Q    Is that fair?
22    A    Yeah.
23    Q    And so, if you stay at the

8 (Pages 29 to 32)

**www.AmericanCourtReporting.com**
**September 8, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 33

1 lodge, you don't have to pay?
2    A    If you're a guest of somebody,
3 they would pay, but you would not have to
4 pay.
5    Q    Okay. All right. You worked
6 there for three years?
7    A    Yes, sir.
8    Q    And who -- who's the -- I
9 don't -- I want to say "the boss," but
10 that's probably not the right term. Who
11 did you report to?
12    A    I was hired by a gentleman
13 named William Ireland.
14    Q    Bill Ireland?
15    A    Yes, sir.
16    Q    In -- from Birmingham?
17    A    Yes, sir. My immediate boss
18 at the time was a gentleman named Tom
19 Clark.
20    Q    Where did he live?
21    A    In Birmingham also.
22    Q    Okay. Did you ever do any of
23 the guide work?

Page 34

1    A    I did from time to time.
2    Q    Do you handle dogs or anything
3 like that?
4    A    I do from time to time.
5    Q    Okay. Well, I'm not trying to
6 make you something you're not, but I --
7 this is no time to be modest. I mean,
8 are -- are you an experienced --
9    A    I'm an amateur. I'm not a
10 professional.
11    Q    Okay. And when you did that,
12 how many people would you take out and how
13 many people would be part of your crew?
14    A    It -- we were individual
15 guides, with groups of two. Occasionally,
16 maybe three hunters, but a standard rule
17 was one guide and two hunters.
18    Q    Okay. And so you -- you take
19 the dogs; correct?
20    A    Yes, sir.
21    Q    And this was unlike
22 Sedgefields, then. The people weren't on
23 a wagon or anything?

Page 35

1    A    That is correct. And we
2 hunted on foot.
3    Q    On foot and not on horseback;
4 correct?
5    A    That's correct, yes.
6    Q    And so when -- when you had
7 successful hunts, did you ever get tips?
8    A    As a general rule, with me
9 being the boss man, more or less, no, I
10 didn't.
11    Q    Okay. What about the other
12 people that took people on hunts?
13    A    Certainly, they -- from time
14 to time, they would get tips.
15    Q    Okay. And was that part of
16 their just compensation?
17    A    You know, it wasn't a standard
18 part of their compensation, but if it --
19 somebody wanted to give them a tip at the
20 end of the hunt, then they gladly received
21 it.
22    Q    Okay. All right. Then, after
23 you worked at Five Star -- did you leave

Page 36

1 there voluntarily?
2    A    I did.
3    Q    Where did you go?
4    A    I worked for myself for the
5 time that I left there and then began work
6 here, at Sedgefields.
7    Q    You worked as a consultant,
8 then?
9    A    That is correct.
10    Q    Okay. And how long would that
11 have been?
12    A    From about 2001 till 2005. So
13 three and a half to four years.
14    Q    How did you hear about the job
15 at Sedgefields?
16    A    I was contacted by one of the
17 family members.
18    Q    Who was that?
19    A    The gentleman's name is Matt
20 Garver.
21    Q    Matt?
22    A    Uh-huh.
23    Q    Garver?

9  (Pages 33 to 36)

**www.AmericanCourtReporting.com**
**September 8, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 37

1    A    G-A-R-V-E-R.
2    Q    When you say "one of the
3    family members," what does that mean?
4    A    He is the son-in-law of
5    Mr. Broadhead. I -- I had, unknowingly,
6    met him while I was at Five Star.
7    Q    And did he say how he tracked
8    you down or --
9    A    No.
10   Q    Well, he called you at -- in
11   your business?
12   A    He called me at home.
13   Q    And tell me what he said.
14   A    He said that they were looking
15   for a general manager to oversee
16   Sedgefields Plantation, and asked me was I
17   interested. And I told him that I was,
18   that I would talk to him about it. And I
19   had an interview.
20   Q    With just Mr. Garver?
21   A    No. I didn't -- didn't meet
22   with Matt. I met with Ms. Sherry Howell
23   and Mr. Bob Rea.

Page 38

1    Q    Who is Sherry Howell?
2    A    Corporate executive for Paul
3    Broadhead.
4    Q    Is she in Meridian?
5    A    She is.
6    Q    And you said Bob Rea?
7    A    Bob Rea, R-E-A.
8    Q    And what does he do?
9    A    He is accounting for the
10   company.
11   Q    For -- also for Mid State?
12   A    That is correct. I don't --
13   Q    Does he also work in
14   Meridian?
15   A    Yes.
16   Q    Did you go to Meridian to
17   interview?
18   A    No, I didn't.
19   Q    Where did you go?
20   A    Interviewed at the plantation.
21   Q    Okay. So they came here to
22   meet with you?
23   A    Yes, sir.

Page 39

1    Q    And y'all rode around the
2    property, I assume?
3    A    We did.
4    Q    And -- and they talked about
5    what they were looking for, generally?
6    A    They did.
7    Q    Did they offer you the job?
8    A    They did.
9    Q    At what salary?
10   A    It was negotiated. The final
11   pay rate was seventy-five thousand dollars
12   a year.
13   Q    Did -- did you get to live on
14   the property?
15   A    If I choose to do so. I could
16   have, but I -- I still live in Auburn.
17   Q    And is that where you've been
18   living?
19   A    Yes, sir.
20   Q    How far is that from here?
21   A    About forty minutes.
22   Q    How many miles?
23   A    No more than forty-five.

Page 40

1    Q    And are you married?
2    A    I am.
3    Q    What's your wife's name?
4    A    Rebecca.
5    Q    Does she work outside the
6    home?
7    A    No, sir.
8    Q    Okay. And you've only been
9    married one time?
10   A    Yes, sir.
11   Q    Well, do you have any kids?
12   A    I do.
13   Q    What are their names and ages,
14   please?
15   A    I have a son named Patrick.
16   He's fourteen.
17   Q    He's about to start driving.
18   A    Unfortunately.
19   Q    Okay.
20   A    And a daughter, Mary Margaret.
21   Q    How old is she?
22   A    She's twelve.
23   Q    Is she on the phone all the

10  (Pages 37 to 40)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 41

1  time?
2      A    No.  Thank goodness.
3      Q    Now, do they go -- where do
4  they go to school?
5      A    Auburn city school.
6      Q    Now, you're here in this case,
7  but you've had some involvement in this
8  lawsuit before today; is that fair?
9      A    As far as speaking with a
10  attorney, Carter Dukes, yes.
11      Q    Okay.  But, I mean, I sent
12  some questions, some interrogatories, to
13  Mid State, and I got some answers.  And
14  then you signed a verification as the
15  representative of Mid State, since you're
16  the general manager --
17      A    Yes, sir.
18      Q    -- saying that the, you
19  know -- essentially, the answers are
20  accurate.  And you've looked at the
21  business records; correct?
22      A    That is correct.
23      Q    So you provided the

Page 42

1  information, primarily, to respond to my
2  questions; is that fair?
3      A    I would think what I didn't
4  provide, the home office would have
5  provided to me to give to you.
6      Q    Okay.  And I asked, in those
7  interrogatories, who made the decision to
8  fire Norris Foster.  Do you understand
9  that?
10      A    Yes, sir, I do.
11      Q    And it says -- well, why don't
12  you just read what the interrogatory says
13  for an answer.  Exhibit 6.
14      I'll tell you, if you would -- do
15  you see my question, about who fired
16  Norris Foster?
17      A    It says, see answer inter --
18  interrogatory question number one, above.
19  So it would be --
20      Q    No.  Look.
21      A    This one?
22      Q    Number one.  Just read my
23  question, and then read you -- the answer

Page 43

1  you provided, if you would, please, sir.
2  Out loud.
3      A    Identify all persons --
4  providing their name, address, and job
5  title -- who had any role in the decision
6  to terminate the plaintiff.
7      Answer:  Defendants ob -- objects to
8  this interrogatory to the extent "any
9  role" is vague and ambiguous.  Subject to
10  and notwithstanding this objection, Joel
11  Norman, quail operations manager, reported
12  performance issues concerning plaintiff to
13  David Carroll, general manager.  David
14  Carroll personally observed performance
15  issues concerning plaintiff, investigated
16  reports made by Norman, and made the
17  decision to terminate the plaintiff's
18  employment with defendant.
19      Q    Okay.  Now, do you have any
20  problem understanding what it means when I
21  ask you to identify any person who had any
22  role in terminating Norris Foster?
23      MR. DUKES:  Object to the

Page 44

1  form.
2      Q    You can answer.
3      A    No, sir.
4      Q    That's a pretty clear
5  question, isn't it -- who fired him?
6      A    Yes, sir.
7      Q    Who fired Norris?
8      A    I did.
9      Q    And was it based on -- in
10  part, on reports you got from Joel Norman,
11  his immediate supervisor?
12      A    In part.
13      Q    Okay.  That's -- and I want
14  you to tell me -- because this is the only
15  time I get to talk to you before trial.
16  And I'm -- I'm plain-spoken, and I want
17  you to be plain-spoken.  Okay.  Fair
18  enough?
19      A    Yes, sir.
20      Q    I'm not trying to trick you.
21  I just want to know every reason you say
22  that you fired Norris Foster.  Is that a
23  fair question?  You understand it?

11  (Pages 41 to 44)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 45

1  A  That's a fair question.
2     MR. DUKES:  Object to the
3  form.
4     Q  Okay.  Tell me every reason
5  that you fired Norris Foster.
6     A  One reason would be lack of
7  timely performance.  As was mentioned
8  earlier by Joel Norman, Norris had been
9  assigned to do some duties, whether it be
10 cleaning out the barn or roller chopping.
11 And based on my visiting the sites and
12 seeing the performance that was done
13 there, I concurred with Joel's assumption
14 that those things were not getting done on
15 time.  I personally viewed some of the
16 activities in the woods that Norris was
17 doing and came to the same conclusion.
18    Besides completing things in a
19 timely manner, I would say also part of
20 the reason would be that -- when asked to
21 not do something that continued, a lack
22 of -- of responding to directions such as
23 in the roller chopping and clipping the

Page 46

1  bark on trees.  I observed personally his
2  doing those things and stopped him and
3  talked to him about it, and it continued
4  to happen.
5     Q  Okay.  Excuse me.  I -- I
6  interrupted you, and I apologize for
7  that.
8     But when you say "clipping the
9  trees," is that the same thing as scraping
10 trees with the equipment?
11    A  That is correct.
12    Q  Okay.
13    A  Knocking the bark off and
14 exposing the cambium layer underneath.
15    Q  Okay.  And that harms the
16 trees; right?
17    A  It can.  Certainly.
18    Q  And that's important to a
19 timber operation, that you don't hurt the
20 trees; right?
21    A  Not ti -- just timber, but
22 also the aesthetic quality of the property
23 as well.

Page 47

1     Q  Okay.  All right, sir.
2  Anything else?
3     A  Uh.
4     Q  I interrupted you.  I --
5     A  Yeah.
6     Q  I'll give you a chance to
7  finish.
8     A  Thank you.  Uh.  Uh.  So we
9  would say job performance, not finishing
10 things in a timely manner.  I would also
11 say failure to respond to -- to
12 directions.  I would say also making
13 comments in front of clients that were
14 derogatory to our quail operation.  The
15 issue of being unsatisfied with our
16 tipping policy.
17    Q  I don't want to cut you off.
18 You paused.
19    A  No.  In general, those are
20 the -- the main categories, the reasons --
21 the reasons why.
22    Q  Okay.  So have you told me now
23 all the reasons why you made the decision

Page 48

1  to fire Norris?  I'm not --
2     A  That come to mind at this
3  time.  That's -- that's what I know.
4     Q  Okay.
5     (WHEREUPON, a document was and
6  marked as Plaintiff's Exhibit Number 19 is
7  attached to the original transcript.)
8     Q  I'm going to show you what
9  I've marked as Plaintiff's Exhibit 19,
10 which is a memo that you wrote that's
11 dated -- it says on here -- January 3rd,
12 '06, which would be about a week after
13 Norris was fired.
14    Is that your memo?
15    A  Yes, it is.
16    Q  And did you write that?
17    A  I did -- I did write it.  Yes.
18    Q  Now, do y'all have any kind of
19 forms out there and -- when you hire and
20 fire?
21    A  There are some forms, yes,
22 sir.
23    Q  Got an application, don't you?

12  (Pages 45 to 48)

**www.AmericanCourtReporting.com**
**September 8, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 49

1　　A　We do use standard
2　applications.
3　　Q　And you've got discharge
4　documents, don't you?
5　　A　There are, I believe, some
6　one-page discharge documents.
7　　Q　And, you know, in Norris
8　Foster's file, there's a formal reprimand
9　document. Looks to me like a form. Would
10　you agree with that?
11　　A　I'm not sure which document
12　you're referring to.
13　　Q　Okay. I apologize. Exhibit 5
14　to Mr. Norman's deposition.
15　　A　Yes, sir. I'm familiar with
16　this document.
17　　Q　Doesn't it look to you like a
18　form?
19　　A　It -- it was a -- a document
20　that was created for this instance.
21　　Q　Okay. Well, now, how long
22　have you been a manager?
23　　A　Six -- five, six years, I

Page 50

1　would say then.
2　　Q　And how -- how many people
3　have you hired and fired, would you say?
4　　A　Probably hired anywhere from
5　ten to fifteen, and fired anywhere from
6　three to five.
7　　Q　Okay. Have you had any
8　training about hiring and firing?
9　　A　No formal training.
10　　Q　Well, before you fire some --
11　it's expensive to hire and train people,
12　isn't it?
13　　A　It can be.
14　　Q　It's not a very efficient way
15　to do business, to constantly hire and
16　fire, is it?
17　　A　I wouldn't think so, no, sir.
18　　Q　Okay. And employees are
19　valuable to a business, aren't they?
20　　A　They can be.
21　　Q　Well, if they do their jobs,
22　if they perform satisfactorily, they
23　should be; correct?

Page 51

1　　A　They should, yes.
2　　Q　They're part of a team, aren't
3　they?
4　　A　Yes.
5　　Q　And it's important that you
6　reward good performance; correct?
7　　A　Reward good performance. It
8　-- it should be, yes.
9　　Q　I -- I mean, it -- you've got
10　to give a "attaboy" every now and then,
11　don't you?
12　　A　Certainly.
13　　Q　Okay. And sometimes you have
14　to give raises; right?
15　　A　That's usually standard
16　procedure at most places.
17　　Q　Okay. So that's what I'm
18　saying. You want people to be loyal to
19　you, don't you?
20　　A　Certainly, I do.
21　　Q　And you want -- uh -- uh -- in
22　order for them to be loyal to you, you
23　have to be loyal to them, don't you?

Page 52

1　　A　Certainly.
2　　Q　Okay. That's just common
3　sense, now, isn't it?
4　　A　Yes, it is.
5　　Q　All right. And for an
6　employee to do a satisfactory job, it's
7　important that you communicate
8　expectations, isn't it?
9　　A　It is.
10　　Q　Because an employee may not
11　know that he's not meeting those
12　expectations you have; correct?
13　　A　Correct.
14　　Q　So it's important to document
15　performance issues. Wouldn't you say
16　that?
17　　A　Document it? It's a
18　possibility. Verbal communication is also
19　very important.
20　　Q　Okay. Other than Exhibit 5 --
21　are you familiar with Norris' personnel
22　file?
23　　A　Somewhat, yes, sir.

13 (Pages 49 to 52)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 53

1  Q  Where is it kept?
2  A  It would be in a filing
3  cabinet in the office.
4  Q  Where you are?
5  A  Yes, sir. I am there.
6  Q  How far from you?
7  A  Within thirty-five, forty
8  feet.
9  Q  Do you have access to it every
10  day?
11  A  Certainly.
12  Q  Do you have access to every
13  person's personnel file?
14  A  Every -- every personnel file
15  that's in that office, that worked for me
16  at the time.
17  MR. DUKES: Hey, Jerry, I know
18  you like to pace, but what I'm concerned
19  about is, the deponent -- it doesn't show
20  you pacing on the camera, but it does show
21  him having to look in different
22  directions. That's my concern. So if you
23  could just stay in one place, I'd -- I

Page 54

1  would appreciate it.
2  MR. ADAMS: Do you want me to
3  fence him in back here?
4  MR. DUKES: If you will.
5  Q  (BY MR. ROBERSON)
6  Mr. Carroll, just let your eyes go back
7  and forth. Okay?
8  MR. DUKES: Well, look, I'm
9  not trying to be difficult, but I just
10  want the record to be clear. I don't want
11  Mr. Carroll looking over here in one
12  direction, and if this is played in front
13  of a jury, for them not to understand why
14  he's having to look to his left and that
15  it's because of you walking from one side
16  of the table to the other.
17  Q  I apologize to you,
18  Mr. Carroll, if I'm distracting you.
19  In the -- in the -- Norris Foster
20  worked for you for -- from -- did you say
21  you were hired in March 2005? April?
22  A  Actually, I believe it was in
23  April --

Page 55

1  Q  Okay.
2  A  -- when I actually went to
3  work.
4  Q  So he worked for you in April,
5  didn't he?
6  A  Yes.
7  Q  Is there a write-up of any
8  performance issue for Norris Foster in
9  April?
10  A  Not to my knowledge.
11  Q  Did he work for you in May?
12  A  Well, when you say worked for
13  me, technically, he didn't work directly
14  for me. He worked for his supervisor.
15  That would be Roy Lee. When I went to
16  work -- when I came to work at
17  Sedgefields, he was working directly under
18  Roy Lee.
19  Q  Okay. Did you have the
20  authority to write up any employee at
21  Sedgefields?
22  A  Certainly.
23  Q  You're the manager; correct?

Page 56

1  A  That is correct.
2  Q  You can fire anybody there,
3  can't you?
4  A  Yes, sir.
5  Q  If you want to hire somebody,
6  you're authorized to do it, aren't you?
7  A  That's correct.
8  Q  Is there a write-up by you,
9  Roy Lee, or anybody else for any
10  performance issue for Norris Foster in May
11  2005?
12  A  Not that I'm aware of.
13  Q  Well, you would be aware of
14  it, wouldn't you, if there was one?
15  A  I should be, unless there was
16  something in his file that was written and
17  put there before I came to work at
18  Sedgefield.
19  But as far as written in May, during
20  the time of May, no.
21  Q  Okay. June, is there a
22  write-up?
23  A  No, sir.

14 (Pages 53 to 56)

# American Court Reporting
## toll-free (877) 320-1050

Page 57

1   Q   July?
2   A   No, sir.
3   Q   August?
4   A   No, sir.
5   Q   September?
6   A   No, sir.
7   Q   October?
8   A   No, sir.
9   Q   November?
10  A   No, sir.
11  Q   There's one write-up in
12  December; correct?
13  A   That is correct.
14  Q   Exhibit 5; correct?
15  A   Correct.
16  Q   And Norris Foster was supposed
17  to be clipping some horses, wasn't he?
18  A   That's correct.
19  Q   And the clippers were broken,
20  weren't they?
21  A   I --
22      MR. DUKES:  Object to the
23  form.

Page 58

1   A   I don't know that they were
2   broken.
3   Q   You didn't go up to the barn
4   when Norris Foster was written up in -- in
5   December of '06 -- oh, I'm sorry -- '05?
6   A   Certainly, I did.
7   Q   You were there, weren't you?
8   A   I was there.
9   Q   And the clippers were broken,
10  weren't they?
11  A   Nobody told me anything about
12  any clippers being broken.
13  Q   Was Norris Foster riding a
14  horse?
15  A   He was -- he was back at the
16  barn when I arrived there.
17  Q   Well, how -- why were you
18  summoned?
19  A   Joel called me and said that
20  he returned, from whatever activities he
21  was involved in, to check on the clipping
22  of the horses at the barn.  And nobody was
23  there, and so he waited.  And Norris and

Page 59

1   Jeffrey Harris arrived a few minutes later
2   on horseback, back to the barn.
3   Q   Okay.  Do y'all have radios
4   out there at Sedgefields?
5   A   We do have some radios.
6   Q   And I -- does every
7   employee --
8   A   No.
9   Q   -- get assigned a radio?
10  A   No.
11  Q   How many radios do you have?
12  Do you know?
13  A   Maybe five.
14  Q   Did Norris Foster have a
15  radio?
16  A   He might have at that time.
17  Q   Because I -- it's thirteen
18  thousand acres.  It's a big place, isn't
19  it?
20  A   It is.  It is.
21  Q   And -- and y'all work at
22  different locations; correct?
23  A   Yes, we do.

Page 60

1   Q   And so, if somebody wanted to
2   contact someone, that's how they'd do it
3   normally; correct?
4   A   Normally, yes.
5   Q   Okay.  Did you know -- and --
6   and listen.  When Norris is on his radio
7   calling Joel, is that something that you
8   can hear?
9   A   No.
10  Q   Okay.  Why not?  I mean, is it
11  a Linc?  Is it --
12  A   That's correct.  They're
13  Southern Linc radios.
14  Q   Okay.  So he -- he can -- he's
15  only calling the other person.  He's not
16  calling the whole --
17  A   Network.  That's correct.
18  Q   Network.  Okay.  All right.
19  So you don't know -- is it fair to say
20  that you don't know whether Norris had
21  tried to call Joel on that date?
22  A   I don't know.
23  Q   Okay.  And you don't know

15  (Pages 57 to 60)

## www.AmericanCourtReporting.com
## September 8, 2006

Page 61

1   whether the clippers were broke; correct?
2       A    Correct.
3       Q    And you don't know whether
4   Norris tried to get Joel, to get some
5   instructions; correct?
6       A    Correct.
7       Q    And you don't know if -- do
8   you know what horse Norris was riding?
9       A    No, I don't.
10      Q    So you don't know what horse
11  he was riding.  You don't know a lot
12  about -- I -- and I'm not being critical
13  of you.  You just came up after the fact.
14      A    That is --
15      Q    Is that fair?
16      A    That is fair.
17      Q    All right.  And so you heard,
18  essentially, Joel's side of the story;
19  correct?
20      A    To begin with.
21      Q    He's the supervisor; correct?
22      A    Correct.
23      Q    And look.  I -- I don't fault

Page 62

1   you at all.  You've got to back your
2   supervisor, don't you?  I mean --
3       MR. DUKES:  Object to the
4   form.
5       A    I hear --
6       Q    Normally speaking.
7       A    I hear both sides of the
8   story.
9       Q    I agree.  But -- but what I'm
10  saying is, you'll undercut that guy, that
11  supervisor -- you'll diminish his
12  supervisory ability if you don't back him
13  up.
14      A    Well, not --
15      MR. DUKES:  Object to the
16  form.
17      A    Not necessarily.
18      Q    Okay.  Did you back him up?
19      A    After talking to everybody
20  involved, I did.
21      Q    Okay.  Did anybody tell you
22  the clippers were broke?
23      A    No.

Page 63

1       Q    What did they tell you?
2       A    My understanding was that the
3   employees that were there, supposed to be
4   clipping horses, had left, for whatever
5   reason.  And, obviously, now, because the
6   clippers weren't working, saddled two
7   horses and went riding across the
8   plantation.
9       Q    The clippers weren't working?
10      A    I don't know whether they were
11  working or not.  I know that I was told
12  that the employees were not at their
13  assigned tasks, doing what they were
14  supposed to be doing.  They were out doing
15  something totally different.
16      Q    Okay.  Is part of Norris' job
17  to care for the horses?
18      A    It would be part of anybody on
19  that team.  Yes.
20      Q    Oh, I --
21      A    Yes.  Yes.
22      Q    Okay.  He -- he shoveled out
23  the stalls; right?  Correct?

Page 64

1       A    Several people have, yes.
2   Yes.  Yes.  He has shoveled out stalls.
3       Q    And do you know if part of his
4   job was to ride the horses from time to
5   time?
6       A    Not -- not in any other
7   capacity other than while we were on hunts
8   or if maybe we had an organized group to
9   go out and work dogs or train dogs that
10  required horseback riding.  But we didn't
11  -- did not have a policy where, as a
12  matter of course of their employment, they
13  would just get on a horse and saddle it
14  and go ride it to exercise it.
15      Q    Who exercised the horses?
16      A    They would be exercised when
17  we would start practice hunting.  It's
18  about three weeks to a month before the
19  season.
20      Q    What -- this was December,
21  wasn't it?  This write-up was in December?
22      A    Yes, it was.
23      Q    Is that hunting season?

16  (Pages 61 to 64)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 65

1    A    Yeah, it is. Yes, sir.
2    Q    Do y'all use the horses then?
3    A    Yes, sir, we do.
4    Q    On the hunts?
5    A    On the hunts.
6    Q    Did y'all get some new horses
7  in?
8    A    We did have two new horses
9  purchased.
10    Q    Is it important that you know
11  about the temperament of those horses?
12    A    I knew about it before I
13  bought them.
14    Q    How is that?
15    A    Because I looked at those
16  horses.
17    Q    Did you ride them?
18    A    They were ridden. That is
19  correct.
20    Q    You know, I -- I don't know
21  much about trading horses either. But,
22  you know, you can drug a horse to calm him
23  down for a few days when you purchase him,

Page 66

1  can't you?
2    A    You can.
3    Q    And have you ever bought any
4  horses like that, that maybe they weren't
5  really good horses?
6    A    No, I haven't.
7    Q    I mean -- or -- well, okay.
8  Have you ever taken any of your horses
9  back that you bought at Sedgefields?
10    A    Taken them back?
11    Q    Yeah.
12    A    No. I was shown -- I was
13  shown five horses, and I selected two
14  horses out of those five that I chose to
15  keep. And the rest -- I didn't need five,
16  so the rest went back.
17    Q    Okay.
18    A    If that's what you're asking.
19    Q    So you only bought two?
20    A    That is correct.
21    Q    And you had -- you had more
22  than you needed; correct?
23    A    I was brought five to try out,

Page 67

1  and I kept two of those five.
2    Q    Picked two out of five?
3    A    That is correct.
4    Q    Well, if all of them had been
5  good, would you have kept them all?
6    A    No, sir.
7    Q    Okay. Now -- so you're saying
8  that there was no business need for Norris
9  to be on that horse; is that -- that -- do
10  I understand that correctly?
11    A    That is correct, yes.
12    Q    Okay. Now, did you -- did you
13  think that Norris Foster and Jeffrey
14  Harris had been out smoking marijuana that
15  day?
16    A    No.
17    Q    Did you smell marijuana?
18    A    No.
19    Q    Did Joel Norman tell you that
20  he smelled marijuana?
21    A    He probably has since then,
22  but not at that time.
23    Q    Oh. Well, if you had known

Page 68

1  that people in your employ were smoking
2  marijuana on the job, you would have at
3  least taken some action, wouldn't you?
4    A    "Known," being if I had
5  visually seen it? Yes, I would have.
6    Q    Okay. Well, if you suspected
7  it, you would have done something,
8  wouldn't you?
9    A    I -- I don't see how I can do
10  anything if I suspect something. I have
11  to -- I'm going to have to witness it or
12  see it.
13    Q    Okay. Well -- now, in all the
14  things that you mentioned about Norris
15  Foster, the reasons why he was fired, you
16  didn't say anything about stealing, did
17  you?
18    A    No, I didn't.
19    Q    Is Norris Foster a thief?
20        MR. DUKES: Object to the
21  form.
22    A    Not to my knowledge.
23    Q    Do you know that Norris Fo --

17  (Pages 65 to 68)

**www.AmericanCourtReporting.com**
**September 8, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 69

1  whether Norris Foster has ever taken any
2  property from Mid States?
3      A   I don't have any kno --
4  firsthand knowledge of it, no.
5      Q   Has anybody ever told you that
6  he did?
7      A   I've heard a lot of things
8  about a lot of people.  That -- that's
9  part of it, yes.
10     Q   Well, who has told you Norris
11 Foster took something?
12     A   Oh, I've heard it from people,
13 such as Roy Lee, that worked there on the
14 plantation.
15     Q   Anybody else?
16     A   I've heard it from Denise
17 Pierce that works there at the plantation.
18     Q   Is she a female?
19     A   Yes, sir.
20     Q   And what did she tell you?
21     A   The only thing she indicated
22 to me was that the probable reason for his
23 dismissal the first time that he worked

Page 70

1  there was possibly because he had stolen
2  some stuff from the plantation.
3      Q   What did he steal -- alleged
4  to have stole?
5      A   Alleged to have, I guess,
6  taken some quail.
7      Q   Have you ever spoken with
8  anybody who has any firsthand information
9  that Norris Foster has taken anything from
10 Sedgefields?
11     A   No, I have not.
12     Q   What about dog food?  Have you
13 ever heard of that?
14     A   No, sir.
15     Q   Okay.  Did he blow up a
16 tractor?
17     A   Not aware of him, firsthand
18 knowledge, blowing up any equipment.
19     Q   Or tear it up.  Has he damaged
20 your -- your equipment, other than just
21 the normal operation?
22     A   Nothing that I would say,
23 specifically, Norris Foster tore up.  Just

Page 71

1  general use, yes.
2      Q   I mean, you know, farm
3  equipment wears out, doesn't it?
4      A   Yes, it does.
5      Q   What about the lift?  The
6  chopper or the lifter.  Did he damage
7  anything with respect to that, that you
8  know about?
9      A   Not other than common use.
10     Q   Okay.  I mean, sometimes it
11 just wears out, doesn't it?
12     A   Yes, it does.
13     Q   Now, you told me -- and I want
14 to go through each one of these things
15 individually.  But you told me about a
16 lack of timely performance.  And -- and in
17 that, you specifically referenced the
18 chopping of the fields; correct?
19     A   Correct.
20     Q   And that's where you prepare
21 them for bird hunting; right?
22     A   That is correct.
23     Q   You knock the -- and we -- we

Page 72

1  ought to tell the jury this.  Sedgefields
2  gets its name because of this --
3      A   Broom sedge.
4      Q   -- broom sedge, which is a --
5  tell -- tell us what that is.
6      A   It's called a bunch grass.
7  It's a -- it's a particular type of grass
8  that has benefit to quail, and it provides
9  nesting cover during the summer months.
10     Q   And when you walk through a
11 field of that, how high is it?
12     A   It can be anywhere from --
13 typically, waist high.
14     Q   Okay.  And when you chop a
15 sedgefield, you -- what do you do?
16     A   You're laying that -- you're
17 laying that debris down so that hunters,
18 dogs are more visible, have access to the
19 property while you're hunting.
20     Q   Okay.  And you don't do all
21 the field, do you?  You don't chop the
22 whole field?
23     A   No, sir.

18  (Pages 69 to 72)

# American Court Reporting
## toll-free (877) 320-1050

Page 73

1  Q    You just chop a lane that you
2  can walk in; correct?
3  A    It's typically done in a
4  checkerboard pattern.
5  Q    And how wide would that be?
6  A    The width -- do you mean
7  between --
8  Q    Yes.
9  A    Anywhere from thirty to fifty
10  feet.
11  Q    Okay.  And so that -- that
12  provides the hunters with a -- a lane
13  where they can spot the quail; correct?
14  Walk and -- and shoot the quail?
15  A    Yes, it does.
16  Q    Okay.  But that -- you still
17  have the sedge up around that to provide
18  cover for the birds; correct?
19  A    We do, yes.
20  Q    And -- and Sedgefields --
21  where does the "plantation" come from?
22  A    I'm sorry?
23  Q    It's called -- the place is

Page 74

1  called Sedgefields Plantation.
2  A    Yes, it is.
3  Q    Okay.  You told me about the
4  Sedgefield.
5  A    Right.
6  Q    Where does the "plantation"
7  come from?
8  A    That -- that's a word that was
9  assigned to it from when Mr. Maytag
10  purchased the property, I guess, decades
11  ago.
12  Q    Back before black people got
13  their rights?
14  MR. DUKES:  Object to the
15  form.
16  A    Most probably, yes.
17  Q    And you just kept the name?
18  A    I didn't keep the name.
19  MR. DUKES:  Object to the
20  form.
21  Q    Well, I mean, the name
22  continued?
23  A    That is correct.

Page 75

1  Q    Okay.  But it's still being
2  used, is what I'm saying.
3  A    It is being used.
4  Q    Now, you also mentioned some
5  things about -- Norris said some things
6  that you -- you felt like were derogatory,
7  about his comments in front of the
8  guests.  Now, that would be bad.  I
9  agree.  That would be bad, wouldn't it?
10  MR. DUKES:  Object to the
11  form.
12  Q    Correct?
13  A    Correct, yes.
14  Q    I mean, you -- you don't want
15  your employees making derogatory
16  statements, do you?  That's not -- that
17  doesn't give a good impression to your
18  guests.
19  A    No, it doesn't.
20  Q    Okay.  I agree with you.
21  Okay.  But I don't understand what it is
22  you're saying that Norris said that you --
23  you feel like was derogatory.

Page 76

1  A    Right.
2  Q    Okay.
3  A    Right.
4  Q    I wasn't there.
5  A    Right.
6  Q    So tell me about those
7  comments that Norris made.
8  A    The comments that I observed
9  was when I was present on the wagon,
10  during a hunt.
11  Q    You went with -- with them on
12  some hunts?
13  A    Most of them, I did.
14  Q    What -- were you part of the
15  crew?
16  A    No, sir.
17  Q    All right.  Tell me what you
18  were doing --
19  A    I went --
20  Q    -- while you were there.
21  A    I went as an observer of my
22  employees of the plantation and how they
23  conducted themselves and ran the hunts, to

## www.AmericanCourtReporting.com
## September 8, 2006

## American Court Reporting
### toll-free (877) 320-1050

Page 77

1  make sure that they were -- performed as I
2  wanted them to be.
3      Q    Okay.  So you rode in the
4  wagon?
5      A    I did.
6      Q    Did you -- did you hunt?  I
7  mean, did you --
8      A    No.  I --
9      Q    -- have a gun or anything?
10     A    No.
11     Q    Okay.  You were just an
12 observer, then?
13     A    I was.
14     Q    All right.  Most of the hunts
15 you think you went on?
16     A    I did.
17     Q    What did you observe Norris
18 doing?
19     A    I observed him coming back
20 with a dog that he was holding, and have a
21 dog in his hand while Joel and the clients
22 were out -- customers were out shooting
23 birds in front of us.  And on different

Page 78

1  occasions, it would be -- in the -- in a
2  group of four or maybe six, if we had six,
3  only two of those people would be out
4  hunting at the same time.  The oth --
5  remainder of the clients would either be
6  on horseback and/or the wagon, back there
7  waiting with the wagon driver, who was
8  Jeffrey Harris at the time.
9      And Norris would typically -- a lot
10 of times, if it was hot, the dog that he
11 was holding, he would bring him back to
12 the wagon to give him some water or
13 something like that and there exchanges a
14 conversation -- were the comments that I
15 heard about Joel's performance, and he
16 didn't know what he was doing and this is
17 not the way we need to do it.  They were
18 not doing it right.  Things of that
19 nature.
20     Q    So no -- you heard Norris
21 telling Jeffrey Harris comments that were
22 critical of Joel Norman.
23     A    I did.

Page 79

1      Q    Is that what you're saying?
2      A    In front of clients.  I did.
3      Q    Okay.  And anything -- any --
4  anything more than that, what you --
5      A    In -- in effect, that was it.
6      Q    Okay.  That Joel doesn't know
7  what he's doing or -- what about -- would
8  he say -- ever say anything like --
9  that's -- that's all right.  Nevermind.
10     Okay.  And you also mentioned the
11 tipping policy; right?
12     A    That's correct.
13     Q    Now, these guys that work on
14 the hunting crew, they get paid by the
15 hour, don't they?
16     A    They do.
17     Q    How much do they get paid?
18     A    Depending on the pay rate and
19 what -- what raises they've gotten.  It
20 could be anywhere from seven to eight
21 dollars an hour.
22     Q    You make seventy-five thousand
23 dollars a year?

Page 80

1      A    I do.
2      Q    Have you got a 401(k)?
3      A    I do.
4      Q    Do they -- what do they
5  contribute to that?
6      A    Who is "they"?
7      Q    Mid State.
8      A    They match whatever I put in.
9      Q    Up to how much?
10     A    I think it's three percent.
11     Q    Do they give you a car or
12 truck?
13     A    I am provided with a vehicle
14 to drive back and forth, to use for work.
15     Q    What's your -- what's your
16 truck?
17     A    We have three vehicles that
18 are basically the same.  It's a
19 three-quarter ton Chevrolet four-wheel
20 drive.
21     Q    What year?
22     A    I think they were all
23 purchased at the same time.  I think

### www.AmericanCourtReporting.com
### September 8, 2006

# American Court Reporting
## toll-free (877) 320-1050

Page 81

1  they're all around 2001 models.
2      Q    Do you buy any gas?
3      A    Do I buy gas?
4      Q    Yeah.
5      A    Yeah.  I don't understand.
6  Certainly, I buy gas.
7      Q    Well, do they not have gas for
8  you at Sedgefields you've got to pump?
9      A    Oh, you mean am I -- am I
10  provided gas in the --
11      Q    Yeah.
12      A    For a company vehicle?
13      Q    Sure.
14      A    We have a gas tank on site for
15  the company vehicles, yes, sir.
16      Q    That you can -- you have
17  access to and you can pump?
18      A    Certainly, yes, sir.
19      Q    All right.  Now, have you ever
20  gotten tips -- you -- you've been provided
21  a tip on any of these hunts?
22      A    No, sir.
23      Q    Has anybody, to your

Page 82

1  knowledge, on any hunting trip, ever
2  received a tip?
3      A    Yes.
4      Q    How does -- how does that
5  work?  I'm not -- I don't work -- I'm not
6  in the hunting industry.  So tell me how
7  it works.
8      A    Typically, one of three things
9  will happen with our tipping policy.
10      Q    Okay.
11      A    At the end of a hunt, a client
12  may personally walk to each individual
13  that was part of the hunting party and
14  give them cash, or it could be that they
15  handed the entire tip to be disbursed to
16  the hunting party to Joel Norman.  He
17  would then give it to me.  I would make
18  change and re -- re-distribute the
19  money, because, most often, I didn't get
20  exact change for those folks.
21      And the third way is, if they wanted
22  to, then they could put it on their bill.
23  And it would be billed to them with their

Page 83

1  bill, and then the employees would be paid
2  in their following paychecks.
3      Q    So if they used their credit
4  card, that would appear on the employee's
5  paycheck; is that right?
6      A    Yeah.  Or if they were sent a
7  bill and they paid by check or whatever,
8  then that -- that money that came back to
9  them would come from the home office.
10      Q    Well, y'all don't send them a
11  bill for a tip, though, do you?
12      A    If I -- if you -- if you come
13  and hunt and you ask for a gratuity to
14  be -- to be placed on your bill, then it
15  is included on the bill and sent to
16  Mississippi.  And then they, per our
17  instructions on the ticket, put the money
18  in -- in individuals that are awarded
19  those tips, and then the bill is sent to
20  the customer.
21      Q    Okay.  So for every hunting
22  party, there is a bill; is that fair?
23      A    Certainly.

Page 84

1      Q    And that would -- the bill
2  would identify who went on the hunt?
3      A    It would.
4      Q    I mean --
5      A    It would -- it would identify
6  who the --
7      Q    Payer was?
8      A    Yes.
9      Q    All right.  But it wouldn't
10  identify all the people that went on the
11  hunt?
12      A    As far as guests?
13      Q    Yes.
14      A    Not necessarily, no.
15      Q    Okay.  And do y'all maintain a
16  list of people that have been there?
17      A    I have -- I have bills and
18  things and -- that I have sent off and
19  collected.  So I do have it that way, yes.
20      Q    Do you have every bill from
21  the time you've been employed until
22  December 29th, when Norris was fired?
23      A    I would think that most should

21  (Pages 81 to 84)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 85

1  be there. Some could have originated in
2  Mississippi and not in our office.
3      Q   Do you have access to every
4  one of them?
5      A   I -- if I called and asked for
6  something, I'm sure I would receive it,
7  yes.
8      Q   Okay. And would that reflect
9  at least all the bills or credit cards on
10 which there was a tip?
11     A   Sure.
12     Q   Now, it wouldn't reflect if
13 they gave them a cash tip --
14     A   Certainly.
15     Q   -- right?
16     A   That's correct.
17     Q   Okay. And if Joel Norman got
18 a cash tip, it wouldn't be reflected on
19 there either, would it?
20     A   No, it wouldn't.
21     Q   Do you know if Joel Norman has
22 ever received any cash tips that he didn't
23 give to you or he didn't provide to his

Page 86

1  crew?
2      A   No. I'm not aware of any of
3  that.
4      Q   Well, you heard him testify;
5  right?
6      A   I did.
7      Q   If you work for eight dollars
8  an hour, seven dollars an hour -- and it's
9  hard work out there, isn't it?
10     A   It can --
11     Q   I mean, it's hot?
12     A   It can be, certainly.
13     Q   You're -- you're driving a
14 wagon or you're scouting people,
15 scouting -- going to get dogs, keeping up
16 with horses. I mean, it's hard work,
17 isn't it?
18     A   It can be, yes, sir.
19     Q   Wouldn't you want to get your
20 tip?
21     A   Certainly. If they pro --
22 wanted to provide you with a tip, I -- and
23 you were due the money, they wanted to be

Page 87

1  gracious enough to give it to you, I'd
2  certainly want it.
3      Q   It wouldn't be right to keep
4  an employee's tip, would it?
5      A   No, it wouldn't.
6      Q   And you wouldn't let that
7  happen, would you?
8      A   No, sir.
9      Q   You haven't let that happen;
10 right?
11     A   I have not let that happen,
12 no, sir.
13     Q   Tell me every time Norris
14 Foster got a tip. How many tips did he
15 get?
16     A   I can't recall every instance.
17     Q   Did you ever give him any
18 money?
19     A   Certainly.
20     Q   Tips?
21     A   Certainly.
22     Q   How many times?
23     A   I would have to go back and

Page 88

1  look at the number of hunts we had. But
2  any time that money was distributed and I
3  was there, it was always given to me
4  and -- and I re-distributed, unless it was
5  given directly to him by the customer.
6      Q   Do you remember this
7  Mr. Hardaway?
8      A   I certainly do.
9      Q   You heard Norris' testimony,
10 didn't you?
11     A   I did.
12     Q   Mr. Hardaway, is -- is he a
13 regular guest at your lodge?
14     A   He's not a regular guest. But
15 for -- the first time that he had been
16 there was this year.
17     Q   Okay. Well, has he been there
18 more than one time?
19     A   His group has only been in
20 once.
21     Q   Did Mr. Hardaway give every
22 member of the hunting group a
23 hundred-and-fifty-dollar tip?

22  (Pages 85 to 88)

Page 89

1    A   No.

2    Q   What did he give them?

3    A   I -- I'd have to go back and

4   look at the statement.  He was one of

5   those who gave -- he gave cash to the two

6   ladies that were in the lodge because he

7   saw them.  He did not see the rest of the

8   guys before they left, so he asked that

9   the rest of the money be put on the

10   ticket.  And we wrote down what he wanted

11   to be placed on the ticket, and that was

12   turned in to Mississippi.  And those funds

13   were paid through their next paycheck.

14    Q   You just don't remember what

15   that was?

16    A   I don't remember.  I -- I do

17   remember thinking -- or not thinking, but

18   seeing that each of the individuals, like

19   Norris and the other two that were there,

20   got fifty dollars a piece and that -- I

21   think Joel received a hundred dollars,

22   instead of fifty dollars.

23    Q   Do y'all have copies of all of

Page 90

1   Norris' paychecks and pay stubs?

2    A   I would think the home office

3   has them.

4    Q   That's what -- that's what I

5   mean.

6    A   Yes, sir.

7    Q   Mid State --

8    A   Yes, sir.

9    Q   -- has them.  And you think

10   that it would be reflected on there

11   because this customer paid through -- paid

12   his bill?

13    A   Certainly.

14    Q   Those -- those tips would go

15   on the paychecks; right?

16    A   Certainly.

17    Q   And is that reported on your

18   W2 for compensation?  Do you know?

19    A   For -- on Norris' W2?

20    Q   Yes.  Yes.

21    A   Well, it certainly should be.

22    Q   Okay.  So y'all are actually

23   reporting to the IRS his tips?

Page 91

1    A   Anything that has to go

2   through -- that's not a cash tip that goes

3   through and he receives his payroll, he

4   had taken the necessary -- the deductions

5   are taken out of it before they're given

6   to the employee.

7    Q   Now, did you ever tell --

8   wait.  Did you ever talk to Roy Lee about

9   any problems in Norris' crew?

10    A   You mean when he worked

11   underneath Joel?

12    Q   Yes.  Exactly.  That's what I

13   mean.

14    A   All right.  It was mentioned

15   to me on one occasion that Norris was

16   not ha -- by Roy Lee that Norris was not

17   happy working under Joel?

18    Q   Did you have the ability to

19   move him?

20    A   Certainly, I did.

21    Q   Could you have moved him to

22   Roy Lee's crew?

23    A   I certainly could have.

Page 92

1    Q   Did you?

2    A   No, I didn't.

3    Q   Why not?

4    A   Because Norris had approached

5   me and said he wanted to be involved with

6   the quail hunting and working the dogs.

7   And that's where he best fit, and that's

8   where he wanted to be.

9    Q   Did you ever talk to Norris?

10    A   Certainly, I did.

11    Q   How many times?

12    A   I seen -- I seen Norris on and

13   off several times during the course of a

14   week.

15    Q   Before you fired him, did you

16   ever offer him the opportunity to work for

17   Roy Lee?

18    A   No, I didn't.

19    Q   Do you think that Roy Lee only

20   approached you one time about any problem?

21    A   To my knowledge, it was just

22   one incidence that he spoke to me and said

23   that Norris wasn't happy working under

23  (Pages 89 to 92)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 93

1  Joel.
2      Q    Did he tell you why he wasn't
3  happy?
4      A    He just said they had a diff
5  -- difference in agreement about the way
6  things were being done.
7      Q    Now, when you wrote -- you
8  were there at the barn when Norris was
9  written up in December; correct?
10     A    I was.
11     Q    And did Norris tell you that
12 he was going to tell the people in -- in
13 the home office the -- the way things --
14 the men were being treated out there? Did
15 he make a statement to that effect?
16     A    He made a statement that he
17 was going to call Matt or Suzanne and --
18 and say something to them about what was
19 going on.
20     Q    And who were those people?
21     A    That's the daughter and the
22 son-in-law of Mr. Broadhead.
23     Q    Okay. Would he have their

Page 94

1  number?
2      A    I don't -- I don't -- I don't
3  know.
4      Q    What did you tell Norris?
5      A    I don't remember that I said
6  anything to him about it.
7      Q    Did you tell him that if he
8  called anybody, you were going to fire
9  him?
10     A    Certainly not.
11     Q    Would you?
12     A    Would I do what?
13     Q    If he -- would you fire him if
14 he called them?
15     A    No. I wouldn't fire him for
16 that reason.
17     Q    You mean it would be okay if
18 he went over your head and reported that
19 there were problems at Sedgefields
20 Plantation? You wouldn't take any action
21 against him?
22     A    No. I don't think that I
23 would. I mean, anybody that works out

Page 95

1  there, if they disagree with what I'm
2  doing, certainly would have to speak to
3  somebody about it. It would be who hired
4  me.
5      Q    Now, did you hire Joel
6  Norman?
7      A    I did.
8      Q    And --
9      A    Well, let's -- I will say I
10 had input in hiring him. Certainly.
11     Q    Okay. Now --
12     MR. DUKES: Jerry, we've been
13 going for an -- I've got over an hour. Is
14 that right? Are you at a good stopping
15 point?
16     MR. ROBERSON: What -- well,
17 how much tape have we got?
18     THE VIDEOGRAPHER: Twenty-four
19 minutes.
20     MR. ROBERSON: Why don't we go
21 to the end of this tape.
22     MR. DUKES: Are you okay?
23     MR. ROBERSON: Are you okay,

Page 96

1  David?
2      THE WITNESS: I'm fine, yes,
3  sir.
4      Q    (BY MR. ROBERSON) All right.
5  Well, have you ever heard Joel Norman say
6  he was going to get rid of all the blacks
7  in his crew?
8      A    No, sir.
9      Q    Have you ever heard -- well,
10 homecoming is a tradition in Bullock
11 County, isn't it -- getting off early?
12     A    I was told that, yes.
13     Q    Who told you that?
14     A    Roy Lee.
15     Q    Okay. Well, Roy is in -- how
16 long has he worked there?
17     A    A number of years.
18     Q    Is he a good worker?
19     A    He is a very good worker.
20     Q    I mean, Roy don't know
21 anything but hard work, does he?
22     A    That's just what it seems,
23 yes.

24  (Pages 93 to 96)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 97

1    Q    Okay.  And, in fact, Roy --
2    before Joel was hired, Roy was doing both
3    jobs.  And when I say "both jobs," he was
4    running the deer and the quail, wasn't
5    he?
6        A    I will -- I would say this in
7    an answer:  In that when I was hired, I
8    was told that Ms. Davidson, who was the
9    general manager, and her husband, who was
10   working there, was -- he and her husband
11   was, more or less, in charge of -- over
12   the deer hunting and stuff.
13       The time that, quote, unquote, Roy
14   was in charge of all of it was a time when
15   we weren't actively participating in all
16   -- in any of those activities that were
17   ongoing.  Quail season was over with.
18   Deer season was over with.  And for that
19   time frame that he was, quote, unquote, in
20   charge of the plantation, it was,
21   basically, summertime maintenance and
22   things of that nature.  Not to discredit
23   his -- what Roy does for me.  He's a very

Page 98

1    valuable employee.
2        Q    Okay.  Well, that -- you're
3    saying that Roy was never over both of the
4    hunting operations during the season; is
5    that --
6        A    Not to my -- not to my
7    knowledge.
8        Q    I mean, that -- but in
9    fairness to that statement -- and I don't
10   disagree with what you say.  But in
11   fairness, you weren't there during the
12   hunting season --
13       A    That's correct.
14       Q    -- prior to that?
15       A    That is correct.
16       Q    So --
17       A    Yeah.
18       Q    Is that fair?
19       A    That is fair.
20       Q    Okay.  Now, did -- was there
21   ever any issue, that you were made aware
22   of, about the -- the employees getting off
23   early at homecoming?

Page 99

1        A    I was approached by Roy Lee
2    about the situation, and I told him that I
3    would leave it up to the supervisor of
4    those crews; that if they had the work
5    done that they needed to get done for that
6    day, then they could clock out and go
7    home.  But it was up to their
8    supervisor -- Roy and his crew, Joel and
9    his crew -- as far as what they needed to
10   get done for that day.
11       Q    Okay.  And -- and Roy has got
12   a son that plays on the high school
13   football team?
14       A    I believe he did at that time,
15   yes.
16       Q    Okay.  And there is a parade
17   that day.  You're aware of that, aren't
18   you?
19       A    I am told there was
20   festivities before the game.
21       Q    Okay.
22       A    You know, what time they start
23   and when they start and how long they go,

Page 100

1    I'm not aware of any of that.
2        Q    Okay.  Well, I -- and -- and
3    that's because your home is in Auburn, and
4    your -- you don't -- you're not part of
5    this community from that aspect.
6        A    That's --
7        Q    Is that fair?
8        A    That's fair.
9        Q    Okay.  But Roy is; correct?  I
10   mean, Roy has a son going to this high
11   school, and he is part of those
12   festivities; right?
13       A    Yes.
14       Q    And Norris, at the time, had a
15   son that was in high school, playing
16   football; correct?
17       A    If you tell me he did, I
18   believe you.
19       Q    Okay.  So they might have had
20   interest that you didn't have.  Would that
21   be fair?
22       A    That would be fair.
23       Q    Okay.  And they might have had

25  (Pages 97 to 100)

## American Court Reporting
## toll-free (877) 320-1050

Page 101

1 a reason for wanting to be off on
2 homecoming, even though they weren't no
3 longer in high school; correct?
4     A    Correct.
5     Q    Now, has Roy -- I mean --
6 excuse me. Has Joel ever told -- made any
7 statement to you about he'd never been --
8 worked with anybody -- never worked with
9 black people who were so concerned about
10 their money, referring to their tips?
11     A    No. He did not mention that
12 to me.
13     Q    Have you ever had any
14 discussions with him about tips?
15     A    Certainly.
16     Q    Tell me about those.
17     A    All right. The discussion
18 that I -- that I had with him was one that
19 I initiated, that I wanted the tipping
20 policy to be that we would run a class act
21 at Sedgefields. And I didn't want any
22 employees standing around at the end of
23 the hunt with their hands held out,

Page 102

1 waiting to receive gratuities; that if our
2 clients were so inclined to give them
3 something at the end of the day, then they
4 would either give it to them while they
5 were untacking the horses or -- or doing
6 what they were supposed to be doing or
7 would be given to me and I would
8 distribute it or be put in their check.
9     Q    Now, when you went to work at
10 Sedgefields, there were about eleven
11 employees?
12     A    Yes, sir.
13     Q    How many of them were black?
14     A    When I went to work there, the
15 majority of them were black.
16     Q    Well, how many?
17     A    But -- well --
18     Q    Name them.
19     A    Brenda and Katie, in the
20 kitchen.
21     Q    They -- they were cooks?
22     A    They were cooks.
23     Q    They worked at the lodge?

Page 103

1     A    They did.
2     Q    Black ladies?
3     A    They were, yes.
4     Q    How long had they worked at
5 Sedgefields?
6     A    Only from, I think, the
7 beginning of the year. Somewhere around
8 December -- before I came -- or January,
9 through the hunting season.
10     Q    All right.
11     A    Then you have --
12     Q    So that's two; right?
13     A    That's two. You have Roy Lee.
14     Q    All right. Roy is the foreman
15 over the deer operations; correct?
16     A    At this time, certainly.
17 Yes. That's his title.
18     Q    Did he --
19     A    Deer operations manager.
20     Q    Well, he was then, wasn't he?
21     A    I assume. He looked after a
22 lot of things. I don't know if he had a,
23 quote, unquote, title at that time.

Page 104

1     Q    All right. Roy Lee, he's a
2 black male?
3     A    Yes, sir.
4     Q    And he's in management, isn't
5 he?
6     A    He is now, yes, sir. For
7 sure.
8     Q    Well, hasn't he been for some
9 time?
10     A    Well, I -- I felt like I'm --
11 made sure I moved him to management. He
12 was an hourly employee at one time. And
13 so I wanted my management employees to be
14 salaried, so I -- I got him moved from
15 hourly to salary employee.
16     Q    When did that happen?
17     A    The middle of the summer.
18     Q    Mid summer of when?
19     A    Of 2005.
20     Q    What is his salary?
21     A    His salary is probably around
22 forty-four thousand dollars.
23     Q    What is Joel Norman's salary?

26 (Pages 101 to 104)

# American Court Reporting
## toll-free (877) 320-1050

Page 105

```
 1      A    His salary is, approximately,
 2   seventy thousand dollars.
 3      Q    And Roy -- Roy doesn't live on
 4   the property, does he?
 5      A    No, he doesn't.  He lives in
 6   Midway.
 7      Q    Does he have that option, to
 8   live on the property?
 9      A    I never discussed that as an
10   option with him.  And he told me that he
11   was satisfied where he was and he'd drive
12   back and forth.
13      Q    Roy has got a truck, though,
14   doesn't he?
15      A    He does.
16      Q    Just like yours and Joel's?
17      A    He does.
18      Q    And anything else about Roy?
19      A    In what regard?
20      Q    Well, that's three.  Two black
21   cooks.
22      A    Oh, as far as people.  I'm
23   sorry.
```

Page 106

```
 1      Q    Yeah.
 2      A    All right.  Two cooks and
 3   Roy.  Of course, certainly, Norris.
 4      Q    All right.  That's four.
 5      A    Willie Mack.
 6      Q    What did Willie Mack do?
 7      A    Willie Mack was an outside
 8   laborer with the rest of the crew.  He
 9   works in the -- in the yard at the lodge
10   from time to time.  But you're -- at that
11   time, he was working on -- on Roy's crew
12   ninety percent of the time.
13      Q    Okay.  He --
14      A    And --
15      Q    That's --
16      A    Demetrius Parham.
17      Q    -- five.
18      A    I believe --
19      Q    Demetrius?
20      A    Demetrius.
21      Q    By the way, how much did --
22   did Willie Mack make in 2005?
23      A    I'd have to go back and look
```

Page 107

```
 1   at the records and see.
 2      Q    Was it six fifty, seven
 3   dollars an hour?
 4      A    Somewhere in there, I would
 5   assume.
 6      Q    Okay.  And Jeffrey Harris?
 7      A    Jeffrey Harris came, but he
 8   was not there when I was -- came to work
 9   there.  I hired Jeffrey.
10      Q    Okay.  And that would have
11   been in September of '05?
12      A    I believe that's correct.
13      Q    Okay.  All right.  All right.
14   You -- I -- I'm sorry.  We've got --
15   Norris Foster makes four, Willie Mack
16   makes five, Demetrius Parham makes six.
17   Six of the eleven.
18        Now, what did Demetrius do?
19   Laborer?
20      A    Yes.
21      Q    Was he in the hunting crew?
22      A    No.
23      Q    What did he do?
```

Page 108

```
 1      A    Demetrius is just a general
 2   laborer, and then he -- you mean when I
 3   first came to work there, or what his
 4   duties are now?
 5      Q    Yeah.  What -- what --
 6      A    Essentially, they were all --
 7   basically, they were all doing -- was weed
 8   eating and cutting grass during the
 9   summer.
10      Q    All right.  That's six.  Tell
11   me all the employees.
12      A    I'm trying to think.  Of
13   course, myself and Denise.
14      Q    All right.  That's eight.
15      A    I guess at that time, that was
16   probably it.  It must have just been
17   eight.  I'm -- not eleven.  Eleven must
18   have been later on during the year.
19      Q    Of eight, six were black; is
20   that fair?
21      A    Yeah.  That's accurate.
22      Q    Okay.  Then you hired Joel
23   Norman.  That made nine; right?
```

27 (Pages 105 to 108)

## American Court Reporting
## toll-free (877) 320-1050

Page 109

1    A    Well, I hired -- Jeffrey
2  Harris would have been before him, and --
3    Q    Okay.
4    A    -- William Beckwith would have
5  been before him.
6    Q    Okay.  You hired William
7  Beckwith?
8    A    I did.
9    Q    As a night watchman?
10   A    I hired him for -- to be a
11  general laborer, as the rest of the crew
12  was.  In addition to that, he was to be a
13  night watchman.
14   Q    Did he work during the day,
15  then?
16   A    He did.
17   Q    Okay.  I'm sorry.  I'm --
18  looking at his personnel file, I thought
19  he was hired to be the night watchman.
20   A    No.  He was a -- he was a
21  laborer during the day, like everybody
22  else, and he was a night watchman during
23  -- after hours.

Page 110

1    Q    He was going to get a lot of
2  overtime, then, wasn't he?
3    A    Well, I provided him with a --
4  I had a mobile home on the place.  I
5  provided him with a simple place to stay.
6  And provided him with a little extra money
7  in his paycheck to offset the expenses for
8  what, you know, the reasonable fee would
9  be for somebody who would be putting in a
10  few hours during the evening, just making
11  sure everything was locked up and nobody
12  was on the place.
13   Q    So at the time that
14  Mr. Beckwith was working there, there
15  wasn't anybody living on the property; is
16  that fair?
17   A    That is correct.
18   Q    Okay.
19   A    From time to time before that,
20  Roy Lee had access to a -- a house during
21  the busy time of the season, and he could
22  stay there.  He didn't live there full
23  time, but he did stay there quite often

Page 111

1  during the season, I'm told.
2    Q    All right.  But Mr. Beckwith
3  didn't quite work out, did he?
4    A    No, he didn't.
5    Q    He -- he stole some gas?
6    A    He did.
7    Q    Did y'all see him?  Did y'all
8  have evidence of him?
9    A    I confronted him about it, and
10  he admitted it to me.
11   Q    Okay.  So he was let go?
12   A    He was.
13   Q    He also didn't have a driver's
14  license, did he?
15   A    Turned out, he didn't.  And
16  that's another one of the reasons he was
17  let go.
18   Q    Okay.  Well, turned out.  Did
19  he show you one?
20   A    He provided me with a license
21  upon being hired there, but it turned out
22  it was not a current and/or valid license.
23   Q    All right.  You hired

Page 112

1  Mr. Beckwith, but he only stayed a short
2  time.  Then you hired Jeffrey Harris, and
3  he's black.  Then you hired Joel Norman,
4  and he's white.
5    A    It was -- there was one other
6  individual.  I don't remember his name.
7  He worked for a couple of days.  He was a
8  black male.  He came in and -- and worked
9  for, like, two days and then never came
10  back -- and worked half a day and never
11  came back.  I don't remember his name.
12   Q    Okay.  And then we had kind of
13  a string of three guys that were hired
14  that were all white; correct?
15       MR. DUKES:  Object to the
16  form.
17   A    If -- if they were all white
18  that were hired, then yes.
19   Q    No.  I mean, Will Hubbard and
20  Joseph Mays were hired about the same
21  time; right?
22   A    Pretty close to the same time,
23  I think.

28  (Pages 109 to 112)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 113

1    Q    Okay.  In November; correct?
2    A    I think that's correct.  In
3  November.
4    Q    And -- and Chance Ham was
5  hired in January?
6    A    Later on in January, yes.
7    Q    Okay.  Now, have you hired
8  anybody since then?
9    A    No.
10    Q    Well, when did Henry Tarver
11  start work there?
12    A    Oh, I'm sorry.  You are --
13  you're correct about that.  I'm not sure
14  exactly what day Henry was hired.  It was
15  some time during the fall.
16    Q    Was he a general laborer?
17    A    No.  No.  I take that back.
18  It might have been early or late summer.
19    Q    2006?  2006?
20    A    No.  '05.
21    Q    Oh, okay.
22    A    I'm sorry.
23    Q    Well, how did -- how did Henry

Page 114

1  get hired?  Did you hire him?
2    A    Yes, I did.
3    Q    Did you place an ad, or how
4  did you --
5    A    No.  I had people from time to
6  time stop by the office, looking for
7  employment.  He was one of them.
8    Q    Okay.  And Jeffrey Harris, the
9  same way?
10    A    Yeah.
11    Q    Do y'all ever post jobs?
12    A    I haven't, no.  The only --
13  the only time I've posted a job was for --
14  looking for somebody specific when I hired
15  Joel Norman.
16    Q    Well, did you need workers?
17    A    Oh, certainly.
18    Q    Is there any reason why you
19  didn't go to the unem -- the employment
20  office or Staffing Solutions or somewhere
21  like that?
22    A    Well, what I needed and what
23  the home office would give me were two

Page 115

1  different things.
2    Q    Oh.
3    A    I mean, I -- I needed, in my
4  estimation, upwards of twenty people to do
5  what needed to be done, but they -- they
6  weren't about to let me have that kind of
7  staff at this time.
8    Q    Was Sedgefields a profitable
9  place to work?  I mean, are y'all making
10  more money than --
11    A    No.
12    MR. DUKES:  Object to the
13  form.  Are you talking about did Mid State
14  make money as Sedgefields?
15    MR. ROBERSON:  Yeah.  Yeah.
16    A    No.  We didn't make -- we
17  didn't make profit.
18    Q    You didn't?  Why was that?
19    A    More expenses than income.
20    Q    No.  But -- I'm not trying to
21  be funny.  I know you're not either.  But,
22  I mean, are hunting operations just
23  inherently unprofitable or --

Page 116

1    A    Yeah.  Yeah.
2    Q    So you make your money on the
3  land appreciation?  Or how do you make
4  your money?
5    A    I -- most people that own
6  operations of this nature, it's -- it's --
7  for lack of a better term, it's almost
8  like a hobby.  Instead of maybe having a
9  small hunting club, you own a big piece of
10  property and like to do it.  I -- none
11  that I know of are profitable businesses
12  in the long-run.
13    Q    When did Mr. Broadhead buy
14  Sedgefields?
15    A    I believe it was in the early
16  '90s, mid '90s.  Maybe around '96.
17    Q    How about 1999?
18    A    Okay.
19    Q    Do you know what he paid for
20  it?
21    A    No.
22    Q    Look at Exhibit 7.  He paid
23  fourteen million, didn't he?

29  (Pages 113 to 116)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 117

1       A    I don't have Exhibit 7 in
2   front of me.
3       Q    You do now.
4       A    Thank you.  According to this
5   article, he did.  Yes.
6       Q    Paid fourteen million;
7   correct?
8       A    According to the article.
9       Q    Okay.  And in 2006, seven
10  years later, he sold the property for
11  thirty-two million; correct?
12      A    I wasn't at the closing,
13  but -- I don't know what it was.
14      Q    Well, do you have any
15  reason -- that's what it says in that
16  article.
17      A    If the article says that and
18  the article is accurate, then it should be
19  accurate.  But I don't have any firsthand
20  knowledge of what it was purchased for or
21  what it was sold for.
22      Q    Did he come to the closing,
23  Mr. Broadhead?

Page 118

1       A    I've -- I wasn't involved in
2   any of that.  I don't know.
3       Q    Have you ever met him?
4       A    I have.
5       Q    How many times has he been to
6   Sedgefields?
7       A    Probably three or four times.
8       Q    Does he hunt?
9       A    No.
10      Q    Well, what -- what did he do
11  when he came -- you -- he came there three
12  or four times while you were there?
13      A    Yes.
14      Q    For what reason?
15      A    Discuss with me the status of
16  the plantation, to hear what my goals were
17  for the place, what we were going to be
18  doing, and discussed those issues.
19      Q    Did you ever talk staffing to
20  him?
21      A    Excuse me?
22      Q    Staffing.  You said -- you
23  know, you said you needed more.

Page 119

1       A    Oh.  That -- certainly, that
2   was -- that was --
3           MR. DUKES:  Object to the
4   form?
5       A    That was part of what we
6   talked about, yeah.
7       Q    Well, did you talk about how
8   you needed some help to properly groom, I
9   guess, the -- the place?
10      A    Not so -- inasmuch as our
11  individual needs at that particular time,
12  but that if -- if he wanted certain things
13  done, it would take necessary equipment
14  and personnel to do it.
15      Q    Did you have a budget?
16      A    I was required to give a
17  budget once I got here.  They -- I -- they
18  didn't really give me an operating budget
19  they had been working on.
20      Q    What was your budget?
21      A    My budget was, approximately,
22  eight hundred thousand dollars.
23      Q    Now, was that for everything?

Page 120

1       A    Yes.
2       Q    I mean, like -- that's -- how
3   much was it for labor?
4       A    I would say labor would
5   probably be almost -- not a half, but
6   close to a half of that.
7       Q    And what kind of expenses
8   would make up the rest of that figure?
9       A    General overhead, gasoline,
10  diesel fuel, the cost of doing business --
11  such as electricity bills and gas bills,
12  buying food stuff for the lodge if we
13  needed it, general supplies, farming
14  implements needed to be repaired, deer
15  feed, dog feed.  All of it.
16      Q    Birds?
17      A    All of it.  Birds included.
18      Q    Is that a large part of the
19  expense, is buying birds?
20      A    Not necessarily.  In the
21  scheme of the whole thing, it's not.
22      Q    Where do you get the birds?
23      A    We have various sources.

30  (Pages 117 to 120)

**www.AmericanCourtReporting.com**
**September 8, 2006**

# American Court Reporting
## toll-free (877) 320-1050

Page 121

1    Q    Do you buy them to let loose?
2  I mean, are they --
3    A    The pre-release bird program,
4  which we were -- was part of our goal at
5  the time, yeah.  We would buy birds that
6  were almost mature -- mature birds and
7  pre-release them a month, a month and a
8  half before the season started.
9    Q    Could they fly?
10   A    Certainly.
11   Q    Okay.  I mean, they --
12   A    They were that far along, yes.
13   Q    Yes.
14   A    Yeah.
15   Q    They were mature enough that
16  they could fly?
17   A    Yeah.
18   Q    And you -- did you hope they
19  stayed there at Sedgefields?
20   A    Certainly.
21   Q    All right.
22        MR. ADAMS:  Jerry, I think
23  she's got about five minutes left.

Page 122

1        MR. ROBERSON:  Why don't we go
2  ahead and take a break.
3        THE VIDEOGRAPHER:  At this
4  time, we're going off the record.  The
5  approximate time is 2:55 p.m., and this
6  will be the end of tape one.
7        (Recess taken.)
8        THE VIDEOGRAPHER:  At this
9  time, we're going back on the record.
10  This will be the beginning of tape two.
11  The time is approximately 3:06 p.m.
12   Q    (BY MR. ROBERSON)
13  Mr. Carroll, there's been some talk here
14  about how Norris Foster didn't list every
15  employer that he had had on his
16  application.
17        Did you hear that talk?
18   A    I did.
19   Q    He didn't list C&W, and he
20  worked there for about three weeks.
21        MR. DUKES:  Object to the
22  form.
23   Q    Is that correct?  That's your

Page 123

1  understanding of the testimony?
2    A    I understood that he worked
3  there on two different occasions.
4    Q    Okay.  Have you ever talked to
5  anybody at C&W?
6    A    Yeah.
7    Q    Who?  About Norris Foster.
8    A    Oh, no.  Not -- not
9  particularly about Norris, no.
10   Q    Do you know any -- any
11  information from C&W about Norris Foster?
12   A    No.
13   Q    You weren't work -- working
14  at -- at Sedgefields in 1999, were you?
15   A    No, sir.
16   Q    Or in -- were you -- you
17  weren't working there in 2005, when Norris
18  was hired; correct?
19   A    That's correct.
20   Q    Well, are you telling me that
21  if Norris had listed that he had worked
22  there, that y'all wouldn't have hired him?
23   A    I don't -- I can't answer that

Page 124

1  because I'm not the one that had anything
2  to do with it.
3    Q    Okay.  But I'm telling you.
4  I'm telling you right now, Norris listed
5  that he worked at C&W and that he worked
6  there for three weeks.  Would y'all have
7  hired him?  Would that have made any
8  difference to you?
9    A    No.
10   Q    Okay.  Why do you think it
11  makes any difference to Carter Dukes?
12        MR. DUKES:  Object to the
13  form.
14   Q    Do you know?
15   A    No, I don't.
16   Q    Okay.  Now, also, on that
17  application, he didn't list that he had
18  been convicted of a crime, third-degree
19  assault.  He did not -- is not an accurate
20  application.  Okay.  Do you agree with
21  that?
22   A    I agree.
23   Q    He's -- he's got a misdemeanor

31 (Pages 121 to 124)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 125

1  conviction for third-degree assault.
2  Okay. I want -- knowing that he does,
3  would you have hired him anyway in 2005?
4      A    No.
5      Q    You wouldn't have hired him
6  because he got an assault conviction; is
7  that right?
8      A    That's correct.
9      Q    Is it every crime you've
10  got to -- you wouldn't -- you wouldn't
11  hire? I mean -- what I'm asking you is,
12  if somebody lists that they've been
13  convicted of a crime, you won't -- you
14  won't hire them?
15      A    No.
16      Q    Won't -- you won't do it?
17      A    No. Not if you're convicted
18  of a crime, no.
19      Q    Any crime?
20      A    I don't know about any crime.
21  But if you're convicted and you put it on
22  there and it reflects bad of you, then,
23  most likely, you will not be hired.

Page 126

1      Q    Did you hire Jeffrey Harris?
2      A    I did.
3      Q    Let me show you Jeffrey
4  Harris' application. When you hired him,
5  did you know -- I can't remember which
6  number he is. Exhibit 14.
7      Look at Jeffrey Harris' application,
8  please, sir. Has Jeffrey Harris been
9  convicted of a crime?
10      A    Yes, he has.
11      Q    And you hired him, though,
12  didn't you?
13      A    That was my mistake.
14      Q    Mistake?
15      A    Yes, sir.
16      Q    So it's not true, is it, that
17  if you've been convicted of a crime, you
18  won't be hired at Sedgefields? Is it?
19      MR. DUKES: Object to the
20  form.
21      A    Not intentionally hired.
22      Q    Was he unintentionally hired?
23      A    No. But I'm -- obviously, I

Page 127

1  missed that part or didn't see it.
2      Q    You -- you can read, can't
3  you?
4      A    Certainly, I can.
5      Q    You graduated from Auburn.
6      A    Certainly, I did.
7      Q    Got a Master's degree;
8  correct?
9      MR. DUKES: Jerry, I can hear
10  you.
11      A    That's correct.
12      Q    Correct?
13      A    Yes, sir.
14      Q    He wrote it right there on his
15  application, didn't he?
16      A    I see it on the application in
17  front of me, yes.
18      Q    And you hired him. What does
19  it say he was convicted of?
20      A    Possession of marijuana.
21      Q    Okay. What else has he got
22  there?
23      A    Misdemeanor. Fine paid.

Page 128

1  Rehab, one year.
2      Q    Rehab, one year. You hired
3  him; correct?
4      A    Yes, I did.
5      Q    Okay. Does Sedgefields --
6  does Sedgefields -- Mid -- did Mid States
7  check references before they hired people?
8      A    Mid States, as far as the home
9  office? No.
10      Q    Did you?
11      A    Sedgefields, as far as me? If
12  I had the opportunity to check references,
13  as much as I could, I certainly did.
14      Q    Did you check Jeffrey Harris'?
15      A    I -- I spoke with his --
16  with -- with Roy and some other folks that
17  knew him, and they said that he would --
18  would work fine. So I hired him.
19      Q    Did you speak with any
20  previous employers of Jeffrey Harris?
21      A    I don't remember that I did at
22  this time.
23      Q    Did you send them anything in

32  (Pages 125 to 128)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 129

1  writing?
2      A    No.  Not that I'm aware of.
3      Q    Did -- have you ever spoken to
4  any previous employer of any applicant for
5  work at Mid State Land and Timber Company?
6      A    I have.
7      Q    Who?
8      A    For -- about the hiring of
9  Joel Norman.
10     Q    Okay.  Other than Mr. Norman.
11     A    No.
12     Q    So you've never checked a
13  reference, have you, for a worker?
14     A    I have attempted to check
15  references.  But as far as other places of
16  employment, most of the folks that have
17  come through my door, no.
18     Q    Okay.
19          MR. ROBERSON:  Yeah.  Let's go
20  off the record.  Our court reporter needs
21  a break for a second.
22          THE VIDEOGRAPHER:  At this
23  time, we're going off the record.  The

Page 130

1  approximate time is 3:12 p.m.
2          (Recess taken.)
3          THE VIDEOGRAPHER:  At this
4  time, we're going back on the record.  The
5  approximate time is 3:13 p.m.
6      Q    (BY MR. ROBERSON)
7  Mr. Carroll, I identified three
8  employees -- Chance Ham, Joel -- I'm
9  sorry -- Joseph Mays and Will Hubbard.
10  And they're white guys; correct?
11     A    Yes.
12     Q    They're all under twenty-four
13  years of age, aren't they?
14     A    If you say so.  They're around
15  that age, yes.
16     Q    Some of them were twenty-one
17  when they were hired; right?
18     A    Yes.
19     Q    None of them had military
20  experience; correct?
21     A    Not to my knowledge.
22     Q    Norris has six years of
23  military experience, doesn't he?

Page 131

1      A    If that's what's on his
2  application, I would believe him, yes.
3      Q    And did you have any military
4  service?
5      A    No, sir, I don't.
6      Q    Do you think that that can be
7  a valuable experience in -- for a -- for a
8  maturing-type in somebody's life?
9      A    Certainly, it can be.
10     Q    Okay.  I mean, there are --
11  there are life lessons to be learned in
12  the military.  You'd agree with that,
13  wouldn't you?
14     A    I would agree with that.
15     Q    Okay.  And does Sedgefields --
16  and when I say "Sedgefields" -- does Mid
17  States have any preference in hiring that
18  they give to people that are Veterans or
19  have prior military experience?
20     A    Not that I'm aware of.
21     Q    Do y'all have any written race
22  discrimination policy?
23          MR. DUKES:  Object to the

Page 132

1  form.
2      A    The only thing that I'm aware
3  of is just a common-sense policy, and
4  that's don't discriminate against anybody.
5      Q    Okay.  But that ain't in
6  writing, is it?
7      A    I -- I haven't -- I haven't
8  seen anything placed in front of me, other
9  than the common sense aspect of it.
10     Q    Okay.  Well, do y'all have a
11  written sex discrimination policy -- I
12  mean, sexual harassment policy?
13     A    I was -- I was given several
14  papers when I was hired.  Everybody else
15  was.  And I'm -- I'm assuming that was
16  addressed in there as well, in the package
17  that was given to each perspective
18  employee or ap -- when the application was
19  filed.
20     Q    Have you ever seen the sexual
21  harassment policy from Mid States?
22     A    Have I seen -- I've seen,
23  maybe, a notice that says we don't

33 (Pages 129 to 132)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 133

1 tolerate it. But as far as a lengthy
2 policy, I'm not aware of that, no.
3     Q     Would it -- to your knowledge,
4 would it violate any written policy if you
5 were having sex with an employee, a female
6 employee?
7     A     Well, certainly, it would.
8     Q     It would?
9     A     Yeah.
10    Q     If you don't have one, it
11 would violate it?
12    A     It would violate my policy.
13    Q     Okay. Your common-sense
14 policy, again?
15    A     Absolutely.
16    Q     That -- that -- that would be
17 a bad thing, wouldn't it?
18    A     Yes, it would.
19    Q     Because you -- you don't need
20 to have sexual relations with an employee
21 of Mid States, do you?
22    A     Not only that, but I'm a
23 married man.

Page 134

1     Q     Oh. It would violate that
2 policy too?
3     A     Certainly, it would.
4     Q     All right. Well, I -- I
5 shouldn't say it -- couch it in terms of
6 "you." If any employee had sex with an
7 employee at Mid States, that would be a
8 violation of the policy, you think?
9     A     What two employees may do when
10 they're not working there and off and
11 on -- on their own somewhere else and I
12 don't know anything about, I can't judge
13 morality there.
14    Q     Yes, sir. Now, when you go
15 out checking on your employees, does --
16 you ever take anybody with you?
17    A     From time to time, I have.
18    Q     Who is that?
19    A     I've had Joel with me. I've
20 had Roy with me. And when I first started
21 there, I've had Denise go out with me a
22 few times.
23    Q     The -- what's -- what's her

Page 135

1 last name?
2     A     Pierce.
3     Q     And she normally works in the
4 office?
5     A     She normally works there. But
6 when I first came to work at Sedgefields
7 and Roy and his crew was out working, she
8 would take me and show me parts of the
9 facility, like this is where such and
10 such -- the field house is; you know,
11 these keys open this, and these keys open
12 that; this is the -- this is the cedar
13 house; this is how many bedrooms; and this
14 is the way we do things. Explaining to me
15 what her -- aspects of her job were as far
16 as maintaining those facilities.
17    Q     Okay. And showing you the
18 ropes, basically? Showing you around
19 Sedgefields?
20    A     That's correct.
21    Q     And is Denise married?
22    A     At -- I -- at this time, I
23 assume she is.

Page 136

1     Q     Okay. When you went to work
2 there, was she married?
3     A     Yes. Certainly.
4     Q     Okay. What does her husband
5 do?
6     A     I think he works for the
7 county commission.
8     Q     Do you know in what capacity?
9     A     I don't really know.
10    Q     Okay. Now, has Joel ever
11 mentioned anything to you about his first
12 wife?
13    A     No.
14    Q     Has he ever told you that he
15 had any indication that she was dating
16 anyone who was a black male?
17    A     No.
18    Q     Before today, did you know she
19 was a -- had a problem with alcohol abuse?
20    A     No, I didn't.
21    Q     Now, will you tell me -- I
22 want you to assume that Norris Foster has
23 worked on and off for Sedgefields for ten

34 (Pages 133 to 136)

# American Court Reporting
## toll-free (877) 320-1050

Page 137

1    years -- eight to ten years, okay, as a --
2    as a laborer -- general laborer, driving a
3    tractor, being in the -- part of the
4    hunting crew. Before Mid States owned it,
5    you know -- and they bought it in '99 --
6    he -- he worked on the property. Okay.
7        Assuming that to be true, how can
8    you hire a white male, who doesn't have
9    any hunting experience, at a higher hourly
10   rate than Norris Foster, who's had six
11   years of military service, years of
12   experience around dogs and in hunting --
13   hunting camps? How can you do that and be
14   fair to Norris Foster?
15       A   If I hired an individual and
16   paid him a higher wage than somebody else,
17   the wage I paid him was -- was based on
18   his proficiency in doing something that we
19   needed done here at the plantation.
20       Q   Okay. What was that?
21       A   For instance, Adam May was
22   somebody who -- who was good at trapping
23   and a mechanic. I didn't have either one

Page 138

1    of those at that time.
2        Q   What is "trapping"?
3        A   Trapping?
4        Q   Uh-huh.
5        A   Is trapping and removing
6    nuisance predators to a quail program:
7    bobcats, fox, things of that nature.
8        Q   Okay. Okay. So you say you
9    paid Adam -- I mean, Joseph Mays more
10   money than Norris Foster because he could
11   trap and he was a mechanic?
12       A   I didn't pay him, not in
13   reference to Norris, anything. I paid him
14   a rate that I thought was fair for what
15   his specialties were and what he could do
16   for the plantation that I didn't have at
17   that time.
18       Q   Okay. Why did you pay Will
19   Hubbard eight dollars an hour?
20       A   Will Hubbard was paid what he
21   was paid because he had specialties in
22   working heavy equipment. My understanding
23   is, he worked at McDonald Construction

Page 139

1    before he came to work here and that he
2    was working with skidders and large
3    equipment. We had just purchased a
4    skidder. I needed somebody that could
5    operate that piece of equipment
6    proficiently, and he was the one that I
7    hired.
8        Q   You -- you bought a skidder?
9        A   I did.
10       Q   And Will Hubbard drove it?
11       A   He drove it a lot.
12       Q   Okay. Could anybody else
13   drive it?
14       A   Joel drives it some.
15       Q   Is any -- who -- Will Hubbard
16   doesn't work there now. Is -- who's
17   driving it now?
18       A   Joel.
19       Q   Anybody else?
20       A   For all I know, Chance may get
21   on it every now and then.
22       Q   Okay. What about Chance Ham?
23       A   Chance had specialties in

Page 140

1    welding. And that's -- we needed that.
2    We had pieces of equipment that we needed
3    repairing, and I had pieces of equipment
4    such as Joel mentioned -- the drag that I
5    needed built. And he brought to the -- to
6    the plantation skills that I didn't have
7    in anybody else.
8        Q   What kind of welding does
9    Chance do?
10       A   Well, as Joel described, he
11   repairs just about any type of equipment.
12   I'm sorry.
13       Q   What kind of welding do you
14   call it?
15       A   Wire welding is what Joel
16   mentioned.
17       Q   Okay. Do you have to have any
18   kind of training to do wire welding?
19       A   Training? Certainly.
20       Q   Can you -- have you ever --
21       A   As far --
22       Q   -- wire welded?
23       A   I have. Only because --

35  (Pages 137 to 140)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 141

1    Q    Anybody can do it, can't
2  they?
3    A    No.  Only because Chance
4  stayed there with me and showed me how to
5  do it.
6    Q    Oh, okay.
7    A    It's not something you'll pick
8  up and just do at the drop of a hat and do
9  a good job of it.
10   Q    All right.  Has Norris Foster
11  welded pieces of equipment before?
12   A    Not to my knowledge.
13   Q    Made repairs using a welder?
14  Has he done that?
15   A    Who?
16   Q    Norris.
17   A    Not to my knowledge.
18   Q    Okay.  Okay.  So -- so you
19  claim that all these three guys had
20  specialties?
21   A    They had things that they were
22  proficient at that I needed, if you want
23  to call it a "specialty."  Some --

Page 142

1  something that they could do that I didn't
2  have a person here that was good at doing
3  it, and I needed to add people to my
4  staff.  And -- so I chose those people at
5  that time because they had those qualities
6  that I needed.
7    Q    Did you list every reason --
8  have we discussed every reason that they
9  were paid more than Norris Foster?
10   A    I mean, I -- I didn't set
11  Norris' pay rate.
12   Q    Well, who repaired the
13  equipment before Chance was hired?
14   A    Well, most all of it was done
15  by Roy Lee, with the help of his folks.
16  But Roy Lee was the one that was in charge
17  of it.  As a matter of fact, we mentioned
18  operating heavy equipment.  To my
19  knowledge, the only person here that
20  operated any heavy equipment was Roy Lee.
21  His crew was with him, but he was always
22  running -- running the equipment.
23   Q    Could -- have you ever seen

Page 143

1  Norris Foster on a dozer?
2    A    No.
3    Q    Ever seen him on a backhoe?
4    A    I've seen him move the backhoe
5  from place to place, but I have not seen
6  him use a backhoe.
7    Q    Have you -- you've never seen
8  him operate it, to put in drainage pipe or
9  anything like that?
10   A    I've seen Roy do it, but not
11  Norris.
12   Q    Okay.  Well, I -- this is the
13  only time I -- like I say, I get to talk
14  to you.  All I want to know is what you
15  say about why they were paid eight dollars
16  an hour and why Norris -- Norris wasn't
17  paid eight dollars an hour, was he?
18   A    He -- I didn't hire Norris.
19  But he was not making eight dollars an
20  hour at the time that I came here.
21   Q    Or the time he was fired.  He
22  was making seven fifty an hour, wasn't he?
23   A    He was making seven fifty an

Page 144

1  hour.  I offered him an -- an opportunity
2  to try to make eight dollars an hour if
3  he -- if he could.  Norris came to me one
4  day and claimed, when I hired Brother Man,
5  that I was being unfair in paying Brother
6  Man more than I was paying him.
7    Q    You mean Norris made a
8  complaint to you about his pay?
9    A    He did.
10   Q    When Brother Man was hired?
11   A    He did.
12   Q    Did he say it was because of
13  discrimination?
14   A    He did.
15   Q    You're kidding me.
16   A    No, I'm not.
17   Q    That Norris complained that
18  you were paying Brother Man eight
19  dollars -- now, Brother Man was white;
20  right?
21   A    He was making -- he was white,
22  yeah.
23   Q    And he was -- he was the guy

36 (Pages 141 to 144)

**www.AmericanCourtReporting.com**
**September 8, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 145

1  we were talking about that didn't have a
2  driver's license?
3      A    Turned out he didn't have a
4  driver's license.
5      Q    And he was stealing gas?
6      A    That's correct.  He was fired
7  for it.
8      Q    He was hired as a general
9  laborer, wasn't he?
10     A    And a night watchman.
11     Q    And a night watchman.  Okay.
12 You were going to pay him more; that is,
13 you were going to provide him with a place
14 to live, weren't you?
15     A    I was going to compensate him
16 for the extra work that he was going to do
17 for me.
18     Q    What special skills did he
19 have, Brother Man?
20     A    For being a night watchman and
21 being available to do those things for me.
22     Q    Okay.  Does that require a
23 special skill?

Page 146

1      A    It requires being here after
2  hours.
3      Q    Okay.  So he didn't have any
4  special skills, did he?  And you paid him
5  eight dollars an hour as a general
6  laborer; correct?
7          MR. DUKES:  Object to the
8  form.
9      A    I didn't pay him eight dollars
10 an hour for general labor.  I paid him
11 compensation for general labor and for
12 being a night watchman.
13     Q    Oh, you're saying you're
14 paying him more because he was a night
15 watchman?
16     A    I was paying him a different
17 rate because of what he was doing for me.
18     Q    Okay.  Did you ever give
19 Norris -- after you fired Mr. Beckwith,
20 Brother Man, did you ever give Norris an
21 opportunity to make eight dollars an hour
22 as a night watchman?
23     A    No, I didn't.

Page 147

1      Q    Why not?
2      A    But I did -- I did offer him
3  eight dollars an hour if he could provide
4  me with a valid driver's license, for
5  which I loaned him the money to go get,
6  and he never provided for me.
7      Q    You said you'd pay him eight
8  dollars an hour --
9      A    Yes.
10     Q    -- if he had a driver's
11 license?
12     A    I did.
13     Q    Is that in writing anywhere?
14     A    No, it's not.
15     Q    Do you type?
16     A    I can type, yes, sir.
17     Q    And you're thirty-five feet
18 from Norris Foster's personnel file,
19 aren't you?  Correct?
20     A    That's correct.
21     Q    And you were for eight months,
22 weren't you?
23     A    Sure.  From everybody's file.

Page 148

1  Certainly.
2      Q    Okay.  Oh.  And you had a
3  complaint of discrimination by Norris
4  Foster in -- at the time that you hired
5  Brother Man; correct?
6      A    Not at the time I hired him,
7  but after.
8      Q    Shortly after that.
9      A    Yeah.
10     Q    Would that be fair?
11     A    Yeah.
12     Q    So when you fired Norris
13 Foster, it was after he had complained of
14 race discrimination, wasn't it?
15         MR. DUKES:  Object to the
16 form.
17     A    Well, certainly, it would have
18 to be after.
19     Q    Yeah.  Just a few months;
20 right?  When was Brother Man fired?
21     A    Probably some time in late
22 September.
23     Q    Now, do y'all have a

**www.AmericanCourtReporting.com**
**September 8, 2006**

# American Court Reporting
## toll-free (877) 320-1050

Page 149

1  progressive disciplinary policy?
2      A    No.
3      Q    Do you know what that is?
4      A    I'm assuming it -- well, no.
5      Q    Well, let me explain to you.
6  You write somebody up; you suspend them;
7  you fire them; you communicate to them, if
8  the conduct is repeated, that they will be
9  terminated; and you sign -- get them to
10  sign and acknowledge that they've been
11  given that warning.
12      Do y'all have anything like that?
13      A    No, sir.
14      Q    Who else have you fired
15  besides Norris Foster?
16      A    Bill Beckwith, Brother Man.
17  Just those two.
18      Q    Anybody else?
19      A    To my knowledge, just those
20  two.
21      Q    At Sedgefields?
22      A    Yes, sir.
23      Q    What about your crew working

Page 150

1  out there now?  Are they team players?
2      A    Everybody seems to be doing
3  fine.
4      Q    I mean, you're satisfied with
5  the people that work out there, aren't
6  you?
7      A    Yes.
8      Q    Roy Lee?
9      A    Yes.
10      Q    Good man?
11      A    Good man.
12      Q    B. B.?  Is that his name?
13      A    Willie Mack.
14      Q    Will -- Willie Mack.
15      A    Uh-huh.
16      Q    Okay.  Is he a good man?
17      A    Yeah.
18      Q    How much does he get paid now?
19      A    I'd have to look at his -- his
20  sheet to see exactly what it is.
21      Q    Is he getting eight dollars
22  today?
23      A    I don't -- it may be eight.

Page 151

1  It may be seven fifty.  It may be seven
2  seventy-five.  I'm not sure.
3      Q    He's getting seven fifty,
4  isn't he?
5      A    I -- if you say so.  I haven't
6  looked at his sheet.
7      Q    Now, I'm going to show you
8  Exhibit 18, and ask you if you're familiar
9  with that document.  That was just
10  provided today.  But...
11      A    I am familiar with it.
12      Q    Okay.  What is 18?  What is
13  Exhibit 18?
14      A    It is a request from
15  Mississippi for my recommendations for pay
16  raises to be effective in the year 2006.
17      Q    When was that made?  It's not
18  dated.  So --
19      A    I -- Ms. Sherry asked me for
20  it about the 1st of December, somewhere
21  along in there.
22      Q    Hum.  Well, how -- did you do
23  it on your computer?

Page 152

1      A    Did I do it on my computer?  I
2  could have.
3      Q    Well, I'm trying to get some
4  help with the dates and --
5      A    Yeah.  I -- I would have to
6  ask Ms. Howell the day maybe she received
7  it or she had it.  I don't have any
8  particular date on this piece of paper.
9      Q    Right.  Right.  Well, I
10  thought maybe you might have created a
11  document, you know, and saved it or
12  something.  Is there a way to look for the
13  date?
14      A    I certainly can look through
15  my computer and see if it's still in there
16  and the date of it.  Certainly.
17      Q    Okay.  Would you do that and
18  provide that information to Mr. --
19  Mr. Dukes?
20      A    I'll be glad to.
21      Q    All I'm trying to do is
22  determine when that document was created.
23  That's all.  Fair enough?

38  (Pages 149 to 152)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 153

1    A    Fair enough.
2    Q    All right. Well, some time --
3    and -- and we'll go with your best
4    estimate for right now. Some time around
5    the 1st of December, correct, you think is
6    about when you --
7    A    Yeah. Right.
8    Q    Well, why would you be
9    recommending Norris Foster for a raise
10   when all you've done is talk about the
11   problems you had with Norris Foster?
12   A    Well, if Norris was going to
13   stay on, which at that time I assumed he
14   was, I felt like he needed a raise just
15   like everybody else.
16   Q    So his raise wouldn't have
17   been based on his job performance, would
18   it? Because his job performance was
19   lousy, according to you.
20   A    Aspects of his job performance
21   were not up to par.
22   Q    Well, he was going to get,
23   according to that document, a fifty cent

Page 154

1    raise; right? For 2006; correct?
2    A    Correct.
3    Q    At the time, he was making
4    seven dollars an hour; right?
5    A    Correct, yes.
6    Q    And he got a raise before he
7    got fired, didn't he?
8    A    He did.
9    Q    Fifty cents. Just what you
10   recommended; correct?
11   A    Correct.
12   Q    He got a raise on his last
13   check, didn't he?
14   A    If you say that's when it took
15   effect, then that -- that would be
16   correct.
17   Q    So he got a raise on the check
18   that he got fired; correct?
19   A    I would assume that's the
20   case, then.
21   Q    You think that's kind of a
22   mixed message? We're giving you a raise,
23   but we're letting you go.

Page 155

1        MR. DUKES: Object to the
2    form.
3    A    I don't know what you mean by
4    "mixed message." If -- if I'm accurate
5    and this notice was sent in the 1st of
6    December, then at that time, although
7    I might have had some feelings that Norris
8    wasn't doing -- exactly up to par what
9    he's supposed to be, I had not made the
10   decision to terminate him at that time.
11   Q    Okay. Well, did you talk to
12   them?
13   A    To who?
14   Q    To anybody at Mid States. I
15   mean, surely, after you wrote him up,
16   after his job performance took such a turn
17   for the worse, you wouldn't give him a
18   raise, would you?
19       MR. DUKES: Object to the
20   form.
21   A    Well, I think the time frame
22   is -- like I said, when this was written
23   and upon the progression of -- of his

Page 156

1    employment, I can see where this makes
2    logical sense.
3    Q    You couldn't stop his raise?
4    A    Certainly, I could have.
5    Q    But you didn't, did you?
6    A    No, I didn't.
7    Q    You just fired him; right?
8    A    You're right.
9    Q    Okay. I've got just a few
10   housekeeping things here.
11       (WHEREUPON, a document was
12   marked as Plaintiff's Exhibit Number 20
13   and is attached to the original
14   transcript.)
15   Q    I'm going to show you
16   Plaintiff's Exhibit 20. It's a letter
17   that's been produced to me. Does that,
18   Exhibit 20, describe the offer that was
19   made to employees who were working at the
20   time that Mid States sold the -- the --
21   Sedgefields to Tolleson?
22   A    I believe this letter was
23   distributed to each employee.

**www.AmericanCourtReporting.com**
**September 8, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 157

1    Q    That's right. Every -- every
2    employee that was working then got a copy
3    of this letter; right? Correct?
4    A    That's correct.
5        (WHEREUPON, a document was
6    marked as Plaintiff's Exhibit Number 21
7    and is attached to the original
8    transcript.)
9    Q    Okay. Now, let me show you
10   21. And does that show and accurately
11   reflect the holidays that were paid to
12   your employees?
13   A    At the time this was written,
14   I would say that was accurate.
15   Q    Okay. And did your employees,
16   like Norris Foster -- were they provided
17   with health insurance?
18   A    Yes. If they chose that they
19   wanted it, they were provided with it,
20   yeah.
21   Q    Well, if you're making eight
22   dollars an hour or seven dollars an hour,
23   you probably want it, don't you?

Page 158

1    A    Certainly.
2    Q    Does Mid State pay most of the
3    expense?
4    A    I think they pay half, and the
5    employee pays half.
6    Q    How much is it? Do you know?
7    A    I don't know off the top of my
8    head.
9    Q    Who at Sedgefields would be
10   the most knowledgeable about Norris'
11   benefits?
12   A    The most knowledgeable person
13   at Mid State would be in their home
14   office, that handles all that type of
15   information.
16   Q    I'm just asking who that is.
17   I don't know.
18   A    I would think Ms. Sherry
19   Howell.
20   Q    Okay. Would she be the one
21   that would have his pay stubs too?
22   A    I would assume they would be
23   in her office, yes.

Page 159

1    Q    Okay. And that would -- would
2    she be the one that would have the records
3    about tips, about bills --
4    A    As far as --
5    Q    Bills and tips?
6    A    It -- she would have access to
7    all of that.
8    Q    And would she have information
9    about how much money y'all made at
10   Sedgefields?
11   A    Certainly.
12   Q    Okay.
13       MR. ROBERSON: I'm working it.
14       MR. ADAMS: Okay.
15       MR. ROBERSON: Let me see
16   these exhibits.
17       Let's go off the record for a
18   second. I think I'm about to wrap up,
19   Mr. Dukes.
20       THE VIDEOGRAPHER: At this
21   time, we're going off the record. The
22   approximate time is 3:36 p.m.
23       (Recess taken.)

Page 160

1        THE VIDEOGRAPHER: At this
2    time, we're going back on the record. The
3    approximate time is 3:37 p.m.
4    Q    (BY MR. ROBERSON)
5    Mr. Carroll, before Joel Norman was hired,
6    Norris worked for Roy Lee, didn't he?
7    A    He did.
8    Q    Is that the only supervisor he
9    had after you were hired and before Joel
10   was hired?
11   A    To my knowledge, yes. Just --
12   just Roy.
13   Q    Did you ever have any
14   complaints by Norris Foster about anything
15   before Joel Norman was hired?
16   A    I believe if -- if -- if
17   anybody complained to him about
18   anything -- and I don't know that it
19   necessarily was just Norris. But it was,
20   in general, we need to be making more
21   money. Just hear that across the board.
22   Q    Okay. Well -- but,
23   specifically, about job -- job issues,

**www.AmericanCourtReporting.com**
**September 8, 2006**

# American Court Reporting
## toll-free (877) 320-1050

Page 161

1  other than pay, did Norris have any
2  complaints about working at Sedgefields?
3     A    No.
4     Q    That you're aware of.
5     A    Not that I'm --
6     Q    He made you aware of.
7     A    Not that I'm aware of.
8     Q    All right.  Now, Roy was his
9  supervisor; correct?
10    A    That is correct.
11    Q    Did Roy have any complaints
12  about Norris' job performance when he
13  worked for him?
14    A    No.  Roy did not comment to me
15  about anything, no.
16    Q    Okay.  Is -- Roy is a good
17  supervisor, isn't he?  Yes?
18    A    Roy does a good job, yes.
19    Q    Okay.  And Roy makes his men
20  work, doesn't he?
21    A    He does.
22    Q    I mean, you're satisfied with
23  their job output, aren't you?

Page 162

1     A    I am satisfied.
2     Q    Okay.  Now, I want to talk to
3  you about this memo, Exhibit 19.
4        MR. ROBERSON:  Have you got a
5  copy, Carter?
6        MR. DUKES:  Somewhere.
7        MR. ROBERSON:  Okay.
8     Q    (BY MR. ROBERSON)  Well,
9  look.  Did you tell Norris, on the last
10  day that he worked there, that it was
11  obvious he was not happy working at
12  Sedgefields?  Did you tell him that?
13    A    I did.
14    Q    Based on his attitude and job
15  performance?
16    A    I did.
17    Q    And that -- did you make the
18  decision that day to fire him?
19    A    The ultimate decisions was
20  made on that day, yes, to fire him.
21    Q    Okay.  So you told him this.
22  It's obvious he wasn't happy.  And then he
23  asked you if he was being fired; is that

Page 163

1  correct?
2     A    That's correct.
3     Q    I mean -- and you said yes,
4  you -- he was being fired; right?
5     A    Correct.
6     Q    And you took his keys?
7     A    Correct.
8     Q    Now, what -- what did he --
9  what did he have keys to?
10    A    Gate keys.  Just things of
11  that nature.
12    Q    Okay.  I mean, just in order
13  to do his job on the farm, he needed some
14  keys?
15    A    Access to get through the
16  property.
17    Q    Okay.  And so that's -- that's
18  a -- every time you fire an employee, you
19  take their keys; is that fair?  I mean --
20    A    That's fair.
21    Q    Okay.  As I was leaving the
22  barn -- this is a memo that you wrote to
23  the file -- I heard him talking in a

Page 164

1  raised voice to Joel -- that is, Norris
2  was talking in a raised voice -- so I
3  stepped back in the barn to see if I was
4  needed.  Norris told me that Suzanne had
5  hired him and this would not be the last I
6  heard from him.
7        Now, was Norris talking to you?
8     A    I stepped -- I did not hear
9  what the conversation were.  I heard
10  Norris speaking in a very loud voice to
11  Joel.  I stepped back in the barn to see
12  if there was -- what was going on or if I
13  was needed.  And then Norris told that
14  statement to me as he was walking out of
15  the barn, across the parking lot.
16    Q    I asked Norris what he meant.
17  He replied, that is what lawyers are for.
18        Is that -- is that what he said?
19    A    That's what he said.
20    Q    Then he went on to say the
21  reason he was being fired was because of
22  his skin color.
23        So that's the second complaint of

## www.AmericanCourtReporting.com
### September 8, 2006

**American Court Reporting**
**toll-free (877) 320-1050**

Page 165

1  race discrimination by Norris Foster,
2  isn't it? Yes?
3      A   Yes.
4      Q   I let him know that I was
5  sorry he felt that way, and then he left;
6  correct?
7      A   Correct.
8      Q   He didn't hit anybody or
9  threaten anybody or do anything like that,
10 did he?
11     A   No.
12     Q   He -- he was upset. Would
13 that be fair to say, he was upset?
14     A   Certainly.
15     Q   And -- and you can understand
16 that, couldn't you? I mean, nobody likes
17 to lose their job, do they?
18     A   No. I wouldn't think so, no.
19     Q   Okay. So you -- it didn't
20 come as a surprise to you that Norris was
21 upset when he was let go, did it?
22     A   No. His emotions at that
23 time, I would think, were normal.

Page 166

1      Q   Okay. And is it fair to say
2  that, just the way Norris left, you
3  believed he felt like he was getting a raw
4  deal? Would that be fair?
5      A   I don't nec --
6          MR. DUKES: Object to the
7  form.
8      A   I don't necessarily think he
9  would think he was getting a raw deal. I
10 would think he was unhappy that he was
11 being fired or let go.
12     Q   Okay. What -- did he ask you
13 what he was being fired for?
14     A   He did.
15     Q   What did you tell him?
16     A   I told him his job performance
17 was not up to par.
18     Q   Did you say anything about him
19 stealing birds?
20     A   No, I didn't.
21     Q   Did anybody?
22     A   I didn't mention anything
23 about stealing birds.

Page 167

1      Q   Did anybody?
2      A   I -- I'm not aware of anybody
3  mentioning -- me, him, or Joel at that
4  time -- about stealing birds.
5      Q   Okay. I'm -- I'm just
6  asking. It's what my son always tells
7  me. Daddy, I'm just asking.
8      It says, on several quail hunts,
9  Norris has displayed a negative attitude.
10 He has made derogatory -- and there's
11 nothing -- about quail hunts in front of
12 guests.
13     That's what you were telling me
14 about when he said Joel wasn't -- he was
15 referring to Joel about not knowing what
16 he was doing or whatever?
17     A   Not just Joel, but the way
18 things were being operated on the quail
19 hunts.
20     Q   Okay. Then this says, Norris
21 has complained to me that they were not
22 receiving hot meals for lunch while they
23 were -- between morning and afternoon

Page 168

1  quail hunts. Sack lunches were delivered
2  to the employees who did not have an
3  opportunity to clock out and go to town.
4      Now, Norris worked on the crew;
5  right?
6      A   That's correct.
7      Q   The guests would go back to
8  the lodge and eat lunch, wouldn't they?
9      A   That is correct.
10     Q   What would the crew do?
11     A   The crew would stay on the
12 clock, and we would provide them with
13 lunch.
14     Q   From the lodge?
15     A   That is correct.
16     Q   Did you take the lunches to
17 them?
18     A   Sometimes I did; sometimes
19 other personnel did.
20     Q   Was it the same thing the
21 guests were eating? Or what was it?
22     A   It had been that way on some
23 occasions. It had been hot meals.

42  (Pages 165 to 168)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 169

1    Q    Norris has called me after
2    hours, on the company radio, complaining
3    and wanting to know where his cash tip
4    money was from guests of the most recent
5    quail hunt.
6        Now, called you after hours. Does
7    that mean you take your radio home?
8    A    I do.
9    Q    And that's where he called
10   you?
11   A    I was at home when he called
12   me. It was probably eight o'clock in the
13   evening.
14   Q    And he asked you where his tip
15   money was?
16   A    He did.
17   Q    What did you tell him?
18   A    I told him that he would get
19   his tip money. That -- that that
20   particular hunt was the Hardaway hunt, and
21   that the tip money wasn't going to be
22   given to him right then and there in cash.
23   It may come to him in his check when it --

Page 170

1    when it was time.
2    Q    Okay. He implied that I was
3    keeping tip money from him when, in fact,
4    time was needed so that correct change
5    could be obtained.
6    A    That has happened as well.
7    Q    Well, that's two different
8    things, isn't it?
9    A    Yes, it is.
10   Q    Because the Hardaway hunt was
11   on his bill, wasn't it?
12   A    It was.
13   Q    So that would be on Norris'
14   check, wouldn't it?
15   A    It would.
16   Q    So you mixed two things up
17   there, didn't you?
18      MR. DUKES: Object to the
19   form.
20   A    No. That particular instance
21   was about the Hardaway, when the other one
22   would have been probably another
23   situation, where I was given a hundred

Page 171

1    dollar bill and asked to split it, you
2    know, three or four ways. And I didn't --
3    it was five-thirty. Banks were closed. I
4    didn't have access to correct change. I
5    would take the tip money back, go the next
6    day, put it appropriately in each envelope
7    for the person that it went to, and
8    distribute it that way.
9    Q    Did y'all have a petty cash
10   box out there?
11   A    We do from time to time.
12   Q    How much money do you keep in
13   it?
14   A    Sometimes I keep as much as
15   five hundred dollars in it.
16   Q    You don't keep change?
17   A    Not exact change like that all
18   the time. It just depends on what's going
19   on. Sometimes there's five
20   one-hundred-dollar bills in there;
21   sometimes it's other stuff.
22   Q    Why would you need petty cash,
23   except to make change for tips?

Page 172

1    A    No. We sell stuff from time
2    to time in the pro shop, or somebody may
3    pay cash for something. It just happened
4    to be, that particular instance, there
5    wasn't that correct amount of change in
6    there.
7    Q    You mean y'all have a pro
8    shop?
9    A    Well, you could call it that.
10   It's more like a closet with some goods in
11   it.
12   Q    What does it sell? Like
13   t-shirts and stuff? Or what -- what is
14   it?
15   A    T-shirts and shirts.
16   Q    Do y'all sell ammo?
17   A    We do from time to time, yes.
18   Q    Do y'all sell guns?
19   A    No.
20   Q    You have to be a dealer to do
21   that.
22   A    You do, yeah.
23   Q    Do y'all have guns, maybe,

43  (Pages 169 to 172)

# American Court Reporting
## toll-free (877) 320-1050

Page 173

1    they can rent?
2        A    No.  We don't provide guns.
3        Q    Okay.  All of these complaints
4    came after I sent the memo to all
5    employees.  That's that memo we talked
6    about; right?
7        A    The tipping memo?
8        Q    Tipping memo.  That's right.
9    Joel has brought to my attention, on
10   several occasions, that no person --
11   others, when instructed to chop an area,
12   would claim they were finished and then,
13   upon inspection, were not.  That's what
14   you talked about not doing his task;
15   right?  Correct?  You need to answer out.
16       A    I'm sorry.  Say -- not doing
17   his what?
18       Q    Task.
19       A    Task.  That's correct.
20       Q    Okay.  Now, Sedgefields is
21   thirteen thousand acres, isn't it?
22       A    The whole place, yes.
23       Q    That's a lot to chop, isn't

Page 174

1    it?
2        A    I don't -- six thousand five
3    hundred acres of it I don't chop.  It's
4    forest land.
5        Q    Okay.  Sixty-five hundred is a
6    lot to chop, isn't it?
7        A    Minus lakes and drains.  It's
8    still a good bit to chop.
9        Q    And you can't always chop all
10   of it, can you?  I mean, there's places a
11   tractor won't go; right?
12       A    If it's to be chopped, the
13   tractor should go through it.
14       Q    I think I asked you this, but
15   did you ever -- you didn't receive tips,
16   did you?
17       A    No, I didn't.
18       Q    So you don't claim any on your
19   tax returns because you didn't get any;
20   right?
21       A    That's correct.
22       Q    Okay.  Well, Mr. Carroll, as
23   much as I hate to, I believe I'm going to

Page 175

1    quit.  You know when you end up -- you're
2    in a hole, you need to quit digging.
3        MR. ROBERSON:  Have you got
4    any questions, Mr. Dukes?
5        MR. DUKES:  No, sir.
6        MR. ROBERSON:  Thank you,
7    sir.
8        THE WITNESS:  You're welcome.
9        THE VIDEOGRAPHER:  This
10   concludes the deposition of David Carroll.
11   This is the 8th day of September 2006, and
12   the time is approximately 3:49 p.m.
13       At this time, we're off the
14   record.
15
16       FURTHER DEPONENT SAITH NOT
17
18
19
20
21
22
23

Page 176

1        C E R T I F I C A T E
2
3    STATE OF ALABAMA  )
4    MONTGOMERY COUNTY )
5        I hereby certify that the above
6    and foregoing deposition was taken down by
7    me in stenotype, and the questions and
8    answers thereto were transcribed by means
9    of computer-aided transcription, and that
10   the foregoing represents a true and
11   correct transcript of the deposition given
12   by said witness upon said hearing.
13       I further certify that I am
14   neither of counsel nor of kin to the
15   parties to the action, nor am I in anywise
16   interested in the result of said cause.
17
18
         GWENDOLYN P. TIMBIE, CSR
19       Certificate No: AL-CSR-569
20
21   My Commission Expires
     March 4, 2009
22
23

## www.AmericanCourtReporting.com
## September 8, 2006

**American Court Reporting**
**toll-free (877) 320-1050**

Page 177

1  INSTRUCTIONS TO THE WITNESS
2
3      PLEASE READ YOUR DEPOSITION OVER
4  CAREFULLY BEFORE YOU SIGN IT.  YOU SHOULD
5  MAKE ALL OF YOUR CHANGES ON THE ATTACHED
6  ERRATA SHEET.  PLEASE DO NOT MARK ON THE
7  ORIGINAL DEPOSITION.
8      AFTER MAKING ANY CHANGES WHICH YOU
9  HAVE NOTED ON THE ATTACHED ERRATA SHEET,
10  SIGN YOUR NAME ON THE ERRATA SHEET AND
11  DATE IT.
12      THEN SIGN YOUR DEPOSITION AT THE
13  END OF YOUR TESTIMONY IN THE SPACE
14  PROVIDED.  YOU ARE SIGNING IT SUBJECT TO
15  THE CHANGES YOU HAVE MADE ON THE ERRATA
16  SHEET, WHICH WILL BE ATTACHED TO THE
17  DEPOSITION.
18      RETURN THE ORIGINAL ERRATA SHEET
19  AND TRANSCRIPT TO AMERICAN COURT REPORTING
20  SERVICE, 2100-A SOUTHBRIDGE PARKWAY, SUITE
21  375, BIRMINGHAM, ALABAMA 35209.
22      ACCORDING TO RULES OF CIVIL
23  PROCEDURE, YOU WILL HAVE THIRTY (30) DAYS

Page 178

1  FROM THE DATE YOU RECEIVED THIS DEPOSITION
2  IN WHICH TO READ, SIGN AND RETURN YOUR
3  DEPOSITION TO THE ABOVE OFFICE.  IF YOU
4  FAIL TO DO SO, YOU AUTOMATICALLY WAIVE
5  YOUR RIGHT TO MAKE ANY CORRECTIONS TO YOUR
6  DEPOSITION.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 179

1  SIGNATURE PAGE
2      OF
3  DAVID CARROLL
4
5
6      I HEREBY ACKNOWLEDGE THAT I
7  HAVE READ THE FOREGOING DEPOSITION AND
8  THAT THE SAME IS A TRUE AND CORRECT
9  TRANSCRIPTION OF THE ANSWERS GIVEN BY ME
10  TO THE QUESTIONS PROPOUNDED, EXCEPT FOR
11  THE CHANGES, IF ANY, NOTED ON THE ATTACHED
12  ERRATA SHEET.
13
14
15
16
17
18
19
20
21  SIGNATURE: _____
22
23  DATE: _____

Page 180

1  PAGE   LINE        EXPLANATION
2  _____
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  DEPONENT'S SIGNATURE     DATE
22
23  _____

45  (Pages 177 to 180)

EXHIBIT 4

# Condensed Transcript

# Deposition of
# David Carroll

**taken on
March 27, 2007**

**Jeffrey Harris, Willie Bernard Mack, Demetrius Parham and Henry Tarver**

**v.**

**Mid-State Land and Timber Company, Incorporated, d/b/a Sedgefields Plantation**

**Case No. 2:06-cv-875-ID-CSC**



**Certified Court Reporters and Certified Legal Video Specialists
334.262.3332  1.888.253.DEPS
Email: depo@baker-baker.com
www.baker-baker.com**

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


JEFFREY HARRIS, WILLIE

BERNARD MACK, DEMETRIUS

PARHAM and HENRY TARVER,

      Plaintiffs,

vs.            CASE NO. 2:06-cv-875-ID-CSC

MID-STATE LAND AND TIMBER

COMPANY, INCORPORATED,

d/b/a SEDGEFIELDS PLANTATION,

      Defendant.


\*    \*    \*    \*    \*    \*    \*    \*


    The videotaped deposition of DAVID

CARROLL was taken before Cornelia J.

Baker, Certified Court Reporter and

Certified Shorthand Reporter, as

Commissioner, on Tuesday, March 27, 2007,

commencing at approximately 12:22 p.m., in

the law offices of Huckaby, Scott & Dukes,

2100 Third Avenue North, Suite 700,

Birmingham, Alabama, pursuant to the

stipulations set forth herein.

Page 2

```
 1   *   *   *   *   *   *   *
 2         APPEARANCES
 3
 4   Representing the Plaintiffs:
 5        MR. JERRY D. ROBERSON
          Attorney at Law
 6        Roberson & Roberson
          8 Office Park Circle, Suite 150
 7        Birmingham, Alabama 35223
 8        MR. ALBERT ADAMS
          Attorney at Law
 9        Irby Law Firm, L.L.C.
          257 West Broad Street
10        Eufaula, Alabama 36027
11
12   Representing the Defendant:
13        MR. CARTER H. DUKES
          Attorney at Law
14        Huckaby, Scott & Dukes
          Concord Center, Suite 700
15        2100 Third Avenue North
          Birmingham, Alabama 35203
16
17
18   Also present:
19        Mr. Jeff Baker, CLVS
20
21
22
23
24
25
```

Page 4

```
 1   is hereby waived, and that said deposition
 2   may be introduced at the trial of this
 3   case or used in any other manner by either
 4   party hereto provided for by the Statute,
 5   regardless of the waiving of the filing of
 6   same.
 7        It is further stipulated and agreed by
 8   and between counsel and the witness that
 9   the reading and signing of the deposition
10   by the witness is hereby waived.
11
12   *   *   *   *   *   *   *   *
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2   *   *   *   *   *   *   *
 3
 4         STIPULATIONS
 5
 6        It is hereby stipulated and agreed by
 7   and between counsel representing the
 8   parties that the videotaped deposition of
 9   DAVID CARROLL is taken pursuant to the
10   Rules of Civil Procedure, and that said
11   deposition may be taken before Cornelia J.
12   Baker, Certified Court Reporter, as
13   Commissioner, without the formality of a
14   commission; that objections to questions,
15   other than objections as to the form of
16   the questions, need not be made at this
17   time, but may be reserved for a ruling at
18   such time as the deposition may be offered
19   into evidence, or used for any other
20   purpose by either party hereto, provided
21   by the Statute.
22        It is further stipulated and agreed by
23   and between counsel representing the
24   parties in this case, that the filing of
25   the videotaped deposition of DAVID CARROLL
```

Page 5

```
 1   *   *   *   *   *   *   *   *
 2             I N D E X
 3
 4   EXAMINATION               PAGE
 5   BY MR. ROBERSON:            8
     BY MR. DUKES:            114
 6
 7   EXHIBIT                   PAGE
 8   Plaintiffs' Exhibit No. 1 .......... 12
     2002 Form 1099 on Donna Monroe
 9   Davison
10   Plaintiffs' Exhibit No. 2 .......... 13
     2003 Form 1099 on Donna Monroe
11   Davison
12   Plaintiffs' Exhibit No. 3 .......... 14
     2004 Form 1099 on Donna Monroe
13   Davison
14   Plaintiffs' Exhibit No. 4 .......... 14
     2005 Form 1099 on Donna Monroe
15   Davison
16   Plaintiffs' Exhibit No. 5 .......... 33
     0036, Mid-State Land & Timber
17   Company document prepared 2/23/07
18   Plaintiffs' Exhibit No. 6 .......... 37
     0070-0073, 5/10/05 employment
19   application of Corey Balkcom
20   Plaintiffs' Exhibit No. 7 .......... 38
     0078, 5/23/05 Mid-State Land and
21   Timber Employee Information filled
     out by hiring manager on Corey
22   Balkcom
23   Plaintiffs' Exhibit No. 8 .......... 42
     0001, Mid-State Land & Timber New
24   Management Structure
25
```

Page 6

1
Plaintiffs' Exhibit No. 9 .......... 43
2  0002, Sedgefields Plantation
     Employee Organization Chart,
3  March 24, 2006
4  Plaintiffs' Exhibit No. 10 .......... 44
     12/02/2004, Management Structure
5  Revision
6  Plaintiffs' Exhibit No. 11 .......... 60
     0035
7
   Plaintiffs' Exhibit No. 12 .......... 82
8  0089-0093
9  Plaintiffs' Exhibit No. 13 .......... 92
     0095-0106
10
   Plaintiffs' Exhibit No. 14 .......... 93
11  3/19/07 Declaration by Anthony J.
     Dickey
12
   Plaintiffs' Exhibit No. 15 ....... 104
13  Re-Notice of Deposition of
     Mid-State Land and Timber
14
15
16
17
18
19
20
21
22
23
24
25

Page 8

1          immediately following, we'll
2          have the swearing-in of the
3          Witness.
4          MR. ROBERSON:  My name is Jerry
5          Roberson.  I represent the
6          Plaintiffs.
7          MR. ADAMS:  Albert Adams, counsel
8          for Plaintiffs.
9          MR. DUKES:  My name is Carter
10         Dukes, and I represent
11         Mid-State.
12         MR. CARROLL:  David Carroll,
13         corporate representative.
14         DAVID CARROLL,
15    The Witness, having first been duly sworn
16    or affirmed to speak the truth, the whole
17    truth, and nothing but the truth,
18         testified as follows:
19         MR. ROBERSON:  Is he going to
20         waive signature, Carter?
21         MR. DUKES:  Yeah, that will be
22         fine.
23         EXAMINATION
24    BY MR. ROBERSON:
25         Q.  Mr. Carroll, I've met you before.

Page 7

1          THE VIDEOGRAPHER:  We are now on
2          the Record.  Today is
3          March 27th, 2007.  The time
4          is 12:22 p.m.
5               This is the video-
6          taped deposition of
7          Mr. David Carroll, 30(b)(6)
8          corporate representative for
9          Mid-State Land and Timber
10         Company, Incorporated.
11              We are here in the
12         matter of Jeffrey Harris, et
13         cetera, Plaintiffs, versus
14         Mid-State Land and Timber
15         Company, Incorporated, doing
16         business as Sedgefields
17         Plantation, Civil Action No.
18         206-cv-875-ID-CSC in the
19         U.S. District Court for the
20         Middle District of Alabama,
21         Northern Division.
22              At this time all
23         persons present will state
24         their name and affiliation
25         with this case, and

Page 9

1     I'm Jerry Roberson.  I represent the
2     Plaintiffs in this case.  And today you have
3     been designated as the corporate represent-
4     ative for Mid-State Land and Timber Company,
5     Inc.; is that correct?
6          A.  Yes, sir.
7          Q.  And did you formally work for
8     them?
9          A.  Yes, sir.
10         Q.  In what capacity?
11         A.  I was the plantation manager at
12    Sedgefields Plantation.
13         Q.  During what period of time, sir?
14         A.  I started work there, I believe,
15    April 15th, 2005.
16         Q.  Until what date?  Until they were
17    sold?
18         A.  Until they were sold, that's
19    correct, in 2006.
20         Q.  And they sold in May of 2006?
21         A.  I believe May 19th.
22         Q.  So you were there for a little
23    over a year; is that correct?
24         A.  Yes, sir.
25         Q.  Now, I'm going to ask you some

Page 10

1  questions about employees that worked at the
2  Mid-State Land and Timber operation in
3  Bullock County, and that's also known as
4  Sedgefields Plantation, correct?
5      A.  Yes, sir.
6      Q.  Now, I know you didn't work
7  there, didn't arrive there until April of
8  2005, and I'm asking about a time period
9  before then.  Have you looked at records to
10  help you gain familiarity and knowledge about
11  those employees?
12     A.  I have.
13     Q.  And you've produced documents or
14  Mid-State has produced documents today,
15  correct?
16     A.  Correct.
17     Q.  Now, I want to show you some
18  documents that I already have from another
19  case about Mid-State Land and Timber Company.
20         Did you sign some interrogatory
21  responses in another case, verification?  Do
22  you recall that?
23     A.  Yes.  I have.
24     Q.  Yeah.  You know I represent
25  Norris Foster as well, correct?

Page 11

1      A.  I do.
2      Q.  And I took your deposition in the
3  Norris Foster case, correct?
4      A.  Correct.
5      Q.  Okay.  Well, Mr. Carroll, who was
6  the manager at Mid-State before you?
7      A.  I believe the manager would be
8  Donna Davidson -- Davison.  Excuse me.
9      Q.  I'm sorry.  What's the last name?
10     A.  D-A-V-I-S-O-N.
11     Q.  Davison?
12     A.  Yes.
13     Q.  And do you know what period of
14  time that she was the manager at Mid-State?
15     A.  I'd probably have to look back in
16  the records to see when she began.
17     Q.  And let me assure you that I
18  don't mind you looking at any of those
19  documents.  If you would, I just want the
20  answer to that question.  So if you need to
21  look at documents to help you with that, I
22  don't object to that.
23         (Witness reviewed document.)
24     A.  I would guess she started in
25  2002.

Page 12

1      Q.  And do you know what her earnings
2  were in 2002?  Do you have a W-2 form for
3  her?
4      A.  I have a 1099.
5      Q.  Well, was she not an employee in
6  2002?
7      A.  The only documents --
8          MR. DUKES:  Object to the form.
9      A.  The only documents that I have
10  are 1099s for her.
11     Q.  Okay.  And your documents are
12  Bates-stamped.  Would you tell me what number
13  you're looking at, please, sir?
14     A.  This is page eight.
15     Q.  Okay.  I'm going to mark as
16  Plaintiffs' Exhibit 1 this document.  And are
17  you -- Donna Monroe Davison, a 2002 1099 from
18  Mid-State Land and Timber Company shows that
19  she made, in the year 2002, $35,796; is that
20  correct?
21         (Whereupon Plaintiffs' Exhibit
22          No. 1 was marked for
23          identification and attached
24          hereto.)
25     A.  That is correct.

Page 13

1      Q.  Now, we don't know when she
2  started working in 2002, correct?
3      A.  I do not.
4      Q.  So that may not be a full year,
5  right?
6      A.  That's correct.
7      Q.  And then I'll show you what I've
8  marked as Exhibit 2, which is a 1099 from
9  Mid-State to Donna Davison for the year 2003.
10  And it shows in that year she earned $54,490;
11  is that correct?
12         (Whereupon Plaintiffs' Exhibit
13          No. 2 was marked for
14          identification and attached
15          hereto.)
16     A.  That is correct.
17     Q.  Did she work on-site, that is, in
18  Bullock County?
19     A.  She did.
20     Q.  Did she live on the property?
21     A.  She did.
22     Q.  Okay.  So in addition to this
23  compensation -- it doesn't appear that she's
24  an employee; that is, she's getting a 1099 --
25  she also received housing; is that fair?

Page 14

1    A. I think she did, yes.
2    Q. Okay. And did she have a
3 vehicle? Do you know?
4    A. I don't know.
5    Q. Okay. I'm going to show you what
6 I've marked as Plaintiffs' Exhibit 3 and ask
7 you if this is Mrs. Davison's 1099 for the
8 year 2004? And, if you would, tell me what
9 she earned as 1099 compensation in that year.
10       (Whereupon Plaintiffs' Exhibit
11       No. 3 was marked for
12       identification and attached
13       hereto.)
14    A. $66,507.34.
15    Q. Now let me show you Plaintiffs'
16 Exhibit 4. This is for the year 2005. And
17 Mrs. Davison, did she leave Mid-State Land
18 and Timber? If you came in April of 2005,
19 did she leave sometime before that?
20       (Whereupon Plaintiffs' Exhibit
21       No. 4 was marked for
22       identification and attached
23       hereto.)
24    A. She did.
25    Q. Do you know where she went to

Page 15

1 work --
2    A. No.
3    Q. -- or what she did?
4    A. I don't know.
5    Q. Do you know if she did anything
6 that would entitle her to compensation from
7 Mid-State after she left Sedgefields?
8    A. I don't know.
9    Q. Well, in 2005 -- I'll show you
10 her 1099 and ask you what amount of
11 compensation did she receive in 2005?
12    A. $33,717.44.
13    Q. And you don't know what time
14 period that's for, but you do agree with me
15 that she stopped working before you arrived
16 in April 15th?
17    A. That's correct.
18    Q. Okay. Now, do you know what
19 Mrs. Davison's duties were?
20    A. Mrs. Davison was hospitality
21 manager and timber manager.
22    Q. Well, do you know what her
23 qualifications were for that position?
24    A. The only thing that I know is
25 that she has a two-year degree in forest

Page 16

1 management.
2    Q. How do you know that?
3    A. Spoke with Ms. Sherry Howell and
4 informed me of that.
5    Q. Who is Ms. Howell?
6    A. She is an employee of Mid-State
7 Land and Timber.
8    Q. Do you have any document, resume,
9 or application or anything for Mrs. Davison?
10    A. I don't.
11    Q. So do you know where her two-year
12 degree is from?
13    A. I don't know which school it's
14 from, no, sir.
15    Q. Do you know if she'd ever worked
16 in the timber industry before?
17    A. I don't.
18    Q. Do you know anything about her
19 prior job experience or her qualifications?
20    A. No, sir.
21    Q. And Mrs. Davison was married to
22 Byron Davison, correct?
23    A. That is correct.
24    Q. Now, are they related by blood or
25 marriage to the owner of Mid-State Land and

Page 17

1 Timber?
2    A. Mrs. Donna is. Was by marriage,
3 yes.
4    Q. All right. Can you explain how
5 she's related?
6    A. Mr. Broadhead's wife, her
7 brother, it was -- that was her husband.
8    Q. Was she at one time married to
9 her brother?
10    A. She was married to Mrs. Broad-
11 head's brother.
12    Q. Right. And she got a divorce and
13 married Mr. --
14    A. He died of a heart attack.
15    Q. Okay. And after his death, she
16 remarried Byron Davison?
17    A. Yes.
18    Q. Is that correct?
19    A. That's correct.
20    Q. So she was a sister-in-law by
21 marriage, correct?
22    A. Correct.
23    Q. Now, did Byron Davison also work
24 at Mid-State?
25    A. He did.

Page 18

```
 1      Q.  And what was his job?
 2      A.  His position was hunt manager.
 3      Q.  Okay.  Well, do we know what he
 4  made at Mid-State?  I've got a W -- I mean, a
 5  1099 for him for 2003 and 2002.  It's Bates
 6  No. 9 and -- 8 and 9.  Do you see that he
 7  made 14,897 in 2002?
 8          (Witness reviewed document.)
 9      A.  Yes.
10      Q.  Do you see that?
11      A.  Yes.
12      Q.  And how much did he make in 2003?
13      A.  $36,961.67.
14      Q.  Okay.  Well, but that's -- and he
15  was provided housing as well?
16      A.  Well --
17      Q.  Did he live on the property?
18      A.  I assume, since he was married to
19  Mrs. Davison.
20      Q.  Okay.  Do we know what his duties
21  and responsibilities were?
22      A.  Well, hunt manager is responsible
23  for assigning guests to particular stands
24  where they hunt, to taking care of those
25  guests to and from the hunts; would have a
```

Page 19

```
 1  relationship, obviously, with the hospitality
 2  manager in making sure the clients got to and
 3  from the lodge to the stands and the fields
 4  and everything that was around the hunting
 5  part of it, the deer hunting part of it.
 6      Q.  Would Donna Davison hire people?
 7  Did she have hiring and firing ability?
 8      A.  Yes.
 9      Q.  Would she hire the guides, the
10  people that actually took the people on
11  hunts?
12      A.  I don't know that.
13      Q.  See, that's -- I don't know
14  either.  Would her husband, the hunt manager,
15  do that?  You don't know?
16      A.  I don't know.
17      Q.  Now, do you know when Mr. Byron
18  Davison left the employ of Mid-State, because
19  I don't have anything after 2003 showing he
20  worked there?
21      A.  I don't know.
22      Q.  But we know Mrs. Davison didn't
23  leave until 2005, correct?
24      A.  That's correct.
25      Q.  Well, do you know where he was
```

Page 20

```
 1  during that period of time?
 2      A.  I don't.
 3      Q.  Does anybody at Mid-State Land
 4  and Timber?
 5      A.  Not to my knowledge.
 6      Q.  Do you know what Byron Davison's
 7  qualifications were?
 8      A.  I don't.
 9      Q.  Don't know the level of his
10  education?
11      A.  No.
12      Q.  Sir?
13      A.  No, sir.
14      Q.  Do you have a job application for
15  him?
16      A.  I do not.
17      Q.  Any personnel records for him?
18      A.  Nothing, no more than we have
19  right here in front of us.
20      Q.  The only thing I have is a 1099.
21      A.  That would be it, I guess.
22      Q.  Okay.  Don't know his age?
23      A.  No, sir.
24      Q.  Wouldn't know his race?  He was
25  white, wasn't he?
```

Page 21

```
 1      A.  I believe he was, yes, sir.
 2      Q.  Okay.  Did you ever meet Byron
 3  Davison?
 4      A.  No, sir.
 5      Q.  Well, do you know how Mid-State
 6  could not have an application or a resume or
 7  anything on these people?
 8      A.  I'm assuming since Mrs. Davison
 9  was married into the family, they knew all
10  about her and her husband.
11      Q.  Who's "they"?
12      A.  It would be Mr. Broadhead.
13      Q.  Have you talked to Mr. Broadhead
14  about them?
15      A.  No, sir.
16      Q.  Have you tried to get any
17  information about Byron or Donna Davison?
18      A.  No, sir.
19      Q.  Do you know what the arrangement
20  was?  Was there just a contractual
21  arrangement with these people?
22      A.  I don't know.
23      Q.  You don't know how they were paid
24  other than what's reflected on the 1099?
25      A.  That's all I know, is what's
```

Page 22

1  reflected on the 1099.
2      Q. Well, do you know my client, Roy
3  Lee?
4      A. I do.
5      Q. Is he a black man?
6      A. Yes, he is.
7      Q. Other than Roy Lee, has there
8  ever been a black man who worked in
9  management at Mid-State Land and Timber
10  Company.
11      A. Not that I'm aware of.
12      Q. Well, are you aware -- at one
13  time, Roy Lee, while he worked in management,
14  was paid by the hour, correct?
15      A. That's correct.
16      Q. And I think initially he made $11
17  an hour, correct?
18      A. Correct.
19      Q. And then he made -- got a raise
20  to $12 an hour, right?
21      A. I'd have to look at the
22  documents, but I believe you.
23      Q. Okay. Well, has there ever been
24  anybody else in management that's ever been
25  paid by the hour?

Page 23

1      A. Not based on the documents I have
2  in front of me -- well, no, I'll take that
3  back. Denise Pierce was paid hourly.
4      Q. What is Denise Pierce's job?
5      A. Denise Pierce is a lodge manager,
6  office manager.
7      Q. Okay. And what are her responsi-
8  bilities?
9      A. Her responsibilities are all
10  duties of running the office; of maintaining
11  the lodge so that it's in good shape, keeping
12  it stocked and the kitchen stocked with
13  necessary items; managing the personnel, the
14  ladies that cook and clean.
15      Q. What was Ms. Pierce's hourly
16  rate?
17      A. I'd have to go back and look and
18  see the documents.
19      Q. Well, please do.
20      (Witness reviewed document.)
21      A. Initially, Denise made $10 an
22  hour.
23      Q. When was that? What year was
24  that?
25      A. 2003.

Page 24

1      Q. Okay. Was that as the manager?
2      A. At that time, I don't know if she
3  held that title or not.
4      Q. Okay. Then what did she make the
5  next year?
6      A. Let's see. $10.75 an hour in
7  2004.
8      Q. Do you know if she was manager
9  then?
10      A. I do not know -- well, I do not
11  know, no.
12      Q. Okay. In 2005, what did she
13  make?
14      A. 11.50 an hour. And she was
15  managing at that time.
16      Q. Okay. You know because you were
17  the manager in 2005, right?
18      A. That's correct.
19      Q. Now, did she normally work
20  inside?
21      A. Most of the time, yes.
22      Q. And she wasn't responsible for
23  grooming the place, was she?
24      A. No.
25      Q. That is, getting it ready for

Page 25

1  hunts or anything?
2      A. Not outside, no.
3      Q. All right. Her work was indoors,
4  making sure that guests were comfortable
5  and accommodated, correct?
6      A. That was part of her responsi-
7  bility.
8      Q. Fed and the rooms were clean,
9  that type thing, correct?
10      A. Correct.
11      Q. So you'd agree with me she had a
12  much different job, much different responsi-
13  bility than Roy Lee, correct?
14      A. Different, yes.
15      Q. Okay. Can you think of anybody
16  that's ever worked in management that had any
17  responsibility for hunting or hunting
18  operations that's ever been paid by the hour
19  other than Roy Lee?
20      A. We had one young gentleman named
21  Anthony Dickey that worked for a short period
22  of time that was listed as a manager for a
23  brief period of time, and he was paid by the
24  hour.
25      Q. What document do you have that

1  shows he was a manager?
2      A. That was just -- that was told to
3  me.
4          MR. DUKES: That's previously
5              been produced to you.
6          MR. ROBERSON: I'm not saying it
7              hadn't. I just don't --
8          MR. DUKES: I know. I know.
9          MR. ROBERSON: What is it? I
10             mean, I don't recall it.
11         MR. DUKES: It's a document that
12             we produced that showed the
13             different managers and their
14             responsibilities.
15         MR. ROBERSON: Do you know what
16             number it is?
17         MR. DUKES: I have no idea, but
18             it's come up in depositions
19             before. In fact, I think in
20             Roy Lee's deposition we
21             talked about it at some
22             length.
23         MR. ROBERSON: You mean the --
24             are you talking about the
25             organization chart?

1          MR. DUKES: That may be it. So
2              it may be in two different
3              places.
4          MR. ROBERSON: Okay. Well, we'll
5              take a break after a while
6              and try to find that.
7  BY MR. ROBERSON:
8      Q. Mr. Carroll, you're a manager,
9  correct?
10     A. Yes, sir.
11     Q. You're paid a salary, aren't you?
12     A. I am.
13     Q. You don't get a 1099?
14     A. I don't.
15     Q. Do you know why Donna Davison and
16 Byron Davison got 1099s?
17     A. I was told that Mrs. Davison
18 initially came to work there to look after
19 some of the timber management aspects of it,
20 and that once she started that, ended up
21 staying on and running the place.
22     Q. So did she have a consulting
23 arrangement initially?
24     A. I would assume that was the case,
25 yes.

1      Q. Okay. Well, you weren't ever
2  hired as a consultant by Mid-State, correct?
3      A. That is correct.
4      Q. You were an employee, correct?
5      A. Correct.
6      Q. You've got a four-year degree
7  from Auburn, don't you?
8      A. I do.
9      Q. And a Master's degree from
10 Auburn, correct?
11     A. I do.
12     Q. You get paid a salary, don't you?
13     A. Yes, sir.
14     Q. $75,000 a year?
15     A. Yes, sir.
16     Q. I mean, that was what you made
17 for Mid-State?
18     A. Yes, sir.
19     Q. Okay. Now, and you hired
20 someone, Joel Norman, correct?
21     A. I did.
22     Q. He was to be over the quail
23 hunting operations, correct?
24     A. Correct.
25     Q. He is also a white male, correct?

1      A. He is.
2      Q. And you paid him a salary,
3  correct, or Mid-State paid him a salary?
4      A. That's correct.
5      Q. He was provided a truck, correct?
6      A. Yes.
7      Q. He was provided lodging or
8  housing on the property, correct?
9      A. Yes.
10     Q. And he was paid an annual salary
11 of $70,000 per year, correct?
12     A. Yes.
13     Q. He has a two-year degree,
14 correct?
15     A. Yes.
16     Q. So you have a Master's degree and
17 a four-year degree, and you get 75, right?
18     A. That's correct.
19     Q. He has a two-year degree, and he
20 gets 70, right?
21     A. That's correct.
22     Q. Roy Lee doesn't have a degree,
23 does he?
24     A. Not that I'm aware of.
25     Q. Doesn't have a college degree,

1  does he?
2      A. That's correct.
3      Q. He graduated from high school
4  there in Bullock County, didn't he?
5      A. Yes.
6      Q. And he worked for numerous years
7  as a supervisor in the -- at the Beaulieu
8  plant?
9          MR. DUKES: Object to the form.
10     Q. Do you know what that is?
11     A. I do.
12     Q. Okay. Isn't it a -- well, tell
13 me what it is.
14     A. Some type of textile mill.
15     Q. That's right. And he was a
16 manager there, correct? He was over -- he
17 supervised people, correct?
18         MR. DUKES: Object to the form.
19     Q. Do you know that?
20     A. I've heard that, yes.
21     Q. Well, he gave you a resume,
22 didn't he?
23     A. He didn't give me a resume.
24     Q. Oh, okay. Well, he gave
25 Mid-State a resume?

1      A. Yes.
2      Q. Roy Lee was hired long before
3  you, correct?
4      A. He was.
5      Q. He was working there when you
6  arrived, right?
7      A. He was, yes.
8      Q. In fact, when you arrived, he was
9  running the plantation, wasn't he?
10         MR. DUKES: Object to the form.
11     A. For a brief month or so, yes.
12     Q. Okay. He was -- was there
13 anybody at the -- at Sedgefields that was
14 higher than him at that time?
15     A. He and Denise, I think, shared
16 responsibilities until I was hired.
17     Q. Okay. And he was a black man
18 getting paid $11 an hour, correct?
19         MR. DUKES: Object to the form.
20     A. I agree, yes.
21     Q. Now, would you agree with me -- I
22 know you only started working there in April
23 of 2005 -- that Roy Lee works a lot of hours?
24     A. Roy works a lot of hours.
25     Q. And normally, if you work more

1  than forty hours, the law requires that you
2  be paid time and a half for hours over forty;
3  do you agree with that?
4      A. I do.
5      Q. And Roy made a lot of overtime,
6  didn't he, before he went on salary, correct?
7      A. He did.
8      Q. And he earned it, because he
9  worked the hours, correct?
10     A. Correct.
11     Q. Now, did you make the decision to
12 put him on a salary?
13     A. Roy came to me and said he would
14 like to be placed on a salary, and he wanted
15 to be more of a management individual, not an
16 hourly worker, with the people he worked
17 with. I told him if that's what he would
18 like, then I certainly would go to the home
19 office and see if we could arrange that.
20     Q. Okay. Was he ultimately placed
21 on a salary?
22     A. He was.
23     Q. What is that salary?
24     A. I'd have to look and see.
25         (Witness reviewed document.)

1      A. It says the annual compensation,
2  $47,230.50 for the year of 2005.
3      Q. Forty-seven? Is that what you
4  said?
5      A. Uh-huh (affirmative response).
6      Q. What number are you looking at,
7  sir?
8          MR. DUKES: Thirty-six.
9      A. Thirty-six.
10     Q. I'll mark that as an exhibit.
11 I'll show you what I've marked as Exhibit 5.
12 Is that what you're looking at?
13         (Whereupon Plaintiffs' Exhibit
14             No. 5 was marked for
15             identification and attached
16             hereto.)
17     A. Yes, sir.
18     Q. Okay. And what is Exhibit 5, if
19 you know? Is that y'all's payroll for 2005
20 and 2006?
21     A. That's correct.
22     Q. And does it list all of the
23 employees there at Sedgefields Plantation?
24     A. It does.
25     Q. All right. And it's got the

Page 34

1  name. It says, DOH. Is that date of hire?
2      A. That's correct.
3      Q. Their hours, that is -- is that
4  the total number of hours that they were on
5  the clock for those years?
6      A. Yes.
7      Q. And then their annual
8  compensation and their hourly rate, correct?
9      A. Or biweekly.
10     Q. Or in your case, biweekly rate?
11     A. Yes.
12     Q. That's right. Okay. So with
13 your help -- are you familiar -- you worked
14 in 2005, do you know all of these employees?
15     A. I know most of them. Not all
16 of them.
17     Q. Okay. Well, I just want to go
18 through this list, and I want to designate
19 what race these people are, if I may, okay?
20     A. Okay.
21     Q. Because I don't -- I don't know
22 these people. And at the top of the list,
23 Yolanda -- I'm not sure how you pronounce
24 that, Armenda-Pineda?
25     A. Don't know her.

Page 35

1      Q. Okay. And she was hired in
2  December of 2004, and she only worked two
3  hundred and ten hours. So that's why you
4  don't know her, she left before you got
5  there?
6      A. Yes, sir.
7      Q. Okay. Casey Balkcom -- I'm
8  sorry, Corey Balkcom, do you know him?
9      A. I do.
10     Q. What race is he?
11     A. He's black.
12     Q. A black male?
13     A. That's correct.
14     Q. Now, he only worked, looks like
15 ninety-two hours at $7 an hour; is that
16 correct?
17     A. That's correct.
18     Q. All right. Let me see if I can
19 find his information that's in here. Tell me
20 about Mr. Balkcom, though. Why did you hire
21 him? I mean, what was he going to do for
22 y'all?
23     A. After I had been at the
24 plantation for a few weeks, I sat down and
25 discussed with Roy our immediate needs for

Page 36

1  personnel. He reflected that we had had a
2  greater personnel in the past and that we
3  were sort of on a bare-bones crew, and that
4  he needed some individuals to help at that
5  time of the year with cutting grass and
6  weedeating and taking care of immediate needs
7  at the plantation. And this gentleman was
8  recommended to me by Denise Pierce. She knew
9  him. He came out and filled out an
10 application for me. And we hired him on, and
11 he worked for one two-week pay period and
12 then left.
13     Q. Okay. Do you know why he left?
14     A. I don't.
15     Q. He didn't come talk to you or let
16 you know why he was leaving?
17     A. Somebody said he got a job at the
18 Hyundai plant up in Montgomery, I guess. But
19 I don't know that for a fact.
20     Q. Okay. Did Mr. Balkcom have any
21 special skills?
22     A. He listed several things on his
23 application that he could do -- supposedly
24 could do.
25     Q. And I -- I mean, I know when you

Page 37

1  were there at Mid-State, did y'all check
2  references?
3      A. I didn't -- no references were
4  checked on our hourly workers that were hired
5  for labor and stuff like that.
6      Q. Why not?
7      A. Just at that point, it really
8  wasn't much of a need for it. We needed to
9  add personnel. If they said they could cut
10 grass and weed-eat, at that time, we looked
11 at their application, and they were hired or
12 not.
13     Q. Well, I'm going to show you what
14 I've marked as Exhibit 6 and ask you if
15 that's the application that Mr. Balkcom
16 filled out?
17         (Whereupon Plaintiffs' Exhibit
18         No. 6 was marked for
19         identification and attached
20         hereto.)
21         (Witness reviewed document.)
22     A. It is.
23     Q. Does he list that he had worked
24 as a diesel mechanic for twenty years?
25     A. It does. It also shows that he

Page 38

1  can't spell the word diesel.
2       Q.  Okay.  Can you do diesel mechanic
3  work without spelling it?
4       A.  I would hope so.
5       Q.  I suspect you can, don't you?
6       A.  Yes, sir.
7       Q.  And in fact, if you're doing
8  diesel mechanic work, you don't really have
9  to spell, do you?
10      MR. DUKES:  Object to the form.
11      A.  Not necessarily.
12      Q.  I'm going to show you what I'm
13  going to mark as Exhibit 7 and ask you what
14  that is?
15      (Whereupon Plaintiffs' Exhibit
16          No. 7 was marked for
17          identification and attached
18          hereto.)
19      (Witness reviewed document.)
20      A.  It's a manager's checklist for
21  employees to be filled out.
22      Q.  Is it for Mr. Balkcom?
23      A.  It is.
24      Q.  What was he hired as?  Does it
25  say?

Page 39

1       A.  Outside laborer.
2       Q.  Okay.  And who hired him?
3       A.  I did.
4       Q.  When you hire someone like that,
5  do you set the wages?
6       A.  Wages are set based on, you know,
7  what I need at the time and what the
8  responsibilities of the person would be that
9  I'm hiring.  So, yeah, I would say that I'm
10  the one responsible for setting those within
11  the guidelines of the company.
12      Q.  Well, that's what I'm asking you,
13  Mr. Carroll.  Do you have to get anybody's
14  approval to pay him, whatever hourly rate
15  that is?
16      A.  No.
17      Q.  Do you have a staffing budget?
18      A.  No.
19      Q.  Well, if you want to hire
20  someone, do you have to get approval from the
21  home office or anyone?
22      A.  Possibly.
23      Q.  Did you for Mr. Balkcom?
24      A.  No, sir.
25      Q.  How much did you pay him?

Page 40

1       A.  $7 an hour.
2       Q.  And you hired him when?
3       A.  5/17/05.
4       Q.  I see.  Do you know how old
5  Mr. Balkcom was?
6       A.  No.  I'd have to look at the
7  application.
8       Q.  Did you know whether Mr. Balkcom
9  had military service?
10      A.  If it lists it on there, then I'm
11  assuming I knew he did.
12      Q.  Yeah.  He served in the marines
13  for nine years; is that important?
14      A.  I guess it can be.
15      Q.  Well, is it important to you?
16  You hired him.
17      A.  What's important to me is that he
18  can do what I need for him to do at the
19  plantation.
20      Q.  And what was it you needed him to
21  do, cut grass?
22      A.  Cut grass, weed-eat, those types
23  of things that we were doing during that time
24  of the year he was hired.
25      Q.  A guy that's a diesel mechanic,

Page 41

1  he'd probably be a pretty valuable employee,
2  wouldn't he?
3       MR. DUKES:  Object to the form.
4       A.  Could be.
5       Q.  I mean --
6       A.  He wasn't there long enough to be
7  anything other than a guy to cut grass.
8       Q.  Okay.  Well, a guy who worked as
9  a diesel mechanic could probably work on your
10  equipment, wouldn't you think?
11      MR. DUKES:  Object to the form.
12      A.  He could, sure.
13      Q.  Yeah.  Is, in fact, some of your
14  equipment diesel equipment?
15      A.  Sure.  We have diesel equipment.
16      Q.  What kind of diesel equipment,
17  tractors or . . .
18      A.  Tractors, sure.  Heavy equipment.
19  At that time, I had a few tractors and a
20  backhoe.
21      Q.  Bulldozer, is that a diesel?
22      A.  It is.  But I didn't have one at
23  that time.
24      Q.  Oh, okay.  What about your
25  skidder?

Page 42

```
 1        A.  Didn't have one at that time.
 2        Q.  Are they diesel?
 3        A.  Yes.
 4        Q.  So a diesel mechanic would be a
 5   pretty valuable employee to a 13,000-acre
 6   timber operation, wouldn't they?
 7        MR. DUKES:  Object to the form.
 8        A.  Could be, yes.
 9        MR. ROBERSON:  Off the Record.
10        THE VIDEOGRAPHER:  We're going
11             off the Record at 12:59 p.m.
12             (A brief recess was taken.)
13        THE VIDEOGRAPHER:  Back on the
14             Record at 1:22 p.m.
15   BY MR. ROBERSON:
16        Q.  Mr. Carroll, let me show you what
17   I've marked as Plaintiffs' Exhibit 8.  And do
18   you recognize that document?
19             (Whereupon Plaintiffs' Exhibit
20             No. 8 was marked for
21             identification and attached
22             hereto.)
23             (Witness reviewed document.)
24        A.  I do.
25        Q.  What is Exhibit 8?
```

Page 43

```
 1        A.  It's a management structure of
 2   Mid-State Land and Timber.
 3        Q.  And is it dated?
 4        A.  No, it is not.
 5        Q.  All right.  Well, who -- let me
 6   see it.  All right.  And this was produced in
 7   another case, correct, the Norris Foster
 8   case?  It says Defendant's Document
 9   Production 0001.
10        A.  Okay.
11        Q.  And I'll also show you Exhibit 9
12   and ask you if you recognize that document?
13             (Whereupon Plaintiffs' Exhibit
14             No. 9 was marked for
15             identification and attached
16             hereto.)
17        A.  I do.
18        Q.  And what is Exhibit 9?
19        A.  It's an employee organizational
20   chart.
21        Q.  Is that when you were the
22   manager?
23        A.  That's correct.
24        Q.  Okay.  And neither of these
25   documents lists Anthony as any kind of
```

Page 44

```
 1   manager, correct?
 2        A.  I can personally speak for the
 3   last one, that he was not there when I was
 4   there.  So he wouldn't be on that one.  For
 5   the other one, I don't know.
 6        Q.  Well, it doesn't list him as a
 7   manager, does it?
 8        A.  No, it doesn't.
 9        Q.  I'm going to show you what I'll
10   mark as Exhibit 10 to your deposition.  It's
11   formally Defendant's Exhibit 19, and it's a
12   document dated 12/2/04.  Now, who are the
13   Mid-State Board of Directors?
14             (Whereupon Plaintiffs' Exhibit
15             No. 10 was marked for
16             identification and attached
17             hereto.)
18        A.  I do not know.
19        Q.  I don't know either.  That'd be
20   nice to know, wouldn't it?
21        MR. DUKES:  Object to the form.
22        Q.  Have you made any inquiry into
23   that?
24        A.  No, sir.
25        Q.  You've been -- you were a manager
```

Page 45

```
 1   there for over a year.  Did you ever meet
 2   anybody that was on the Board of Directors?
 3        A.  I just met two people that
 4   interviewed me, plus Mr. Broadhead.
 5        Q.  Who interviewed you?
 6        A.  Ms. Sherry Howell and Mr. Bob
 7   Rae.
 8        Q.  Okay.  And then Mr. Broadhead is
 9   the owner, correct?
10        A.  That's correct.
11        Q.  Well, this document was made
12   available to me, and it references approval
13   of the Board of Directors, and it references
14   that Anthony is the hunt manager in December
15   of 2004.  You see that?
16        A.  It does.
17        Q.  Now, what is Roy Lee?
18        A.  Farm manager.
19        Q.  Okay.  Now, do you know when
20   Mr. Byron Davison left the employ of
21   Mid-State?
22        A.  I don't know the exact date.
23        Q.  Do you know the circumstances
24   surrounding his departure?
25        A.  I don't know that.
```

Page 46

1    Q.  Do you know if anyone replaced
2  him as the hunt manager?
3    A.  My understanding is that as soon
4  as Mr. Davison left, that Anthony assumed
5  that position immediately and for a very
6  short time.  And then he wasn't there much
7  more probably than a month, I guess.
8    Q.  He went back to school?
9    A.  I guess so.
10    Q.  About January?
11    A.  I'm not sure of the date.
12    Q.  Okay.  And then who assumed that
13  position?
14    A.  Which position?
15    Q.  The hunt manager.
16    A.  The hunt manager.  Well, once the
17  season is over with, I don't know necessarily
18  there would be a hunt manager for that
19  particular time.
20    Q.  Well, when was deer season over?
21    A.  End of January.
22    Q.  Yeah.  So who was the hunt
23  manager for January?
24    A.  I don't -- I would have thought
25  Anthony was until the end of the season.  I

Page 47

1  thought that's what you were just telling me.
2    Q.  No.  I'm telling you Anthony went
3  back to school, I believe, in January, first
4  of January.
5    A.  I don't know that.  I don't know.
6    Q.  Okay.  Well, have I identified
7  every reason that you claim that you've paid
8  Joel Norman $70,000 a year?
9    MR. DUKES:  Can you restate that
10      question for me?
11    MR. ROBERSON:  Sure.
12    MR. DUKES:  Or if you want to
13      repeat it, I'm not . . .
14  BY MR. ROBERSON:
15    Q.  First of all, did you pay Joel
16  Norman $70,000 a year?
17    A.  I didn't.  I had to get
18  permission to pay him $70,000.
19    Q.  Okay.  Whose permission did you
20  get?
21    A.  I had to talk with Ms. Sherry
22  Howell and Mr. Bob Rae.
23    Q.  Okay.  Did you get their
24  permission?
25    A.  And ultimately, probably

Page 48

1  Mr. Broadhead, although that I didn't speak
2  to him personally, I did get permission.
3    Q.  And Joel Norman has a two-year
4  degree, correct?
5    A.  He does.
6    Q.  He was working at a plantation in
7  Georgia, right?
8    A.  Managing it, yes.
9    Q.  He's handled bird dogs for a long
10  time, right?
11    A.  He has.
12    Q.  And he's -- he's experienced in
13  quail hunting; is that fair?
14    A.  Something I needed at the time,
15  yes.
16    Q.  Okay.  Is there any other reason,
17  other than those things, why you paid --
18  agreed to pay Joel Norman $70,000?
19    MR. DUKES:  Object to the form,
20      that it's been asked and
21      answered.
22    Q.  You can answer.
23    MR. DUKES:  Go ahead.
24    A.  That's what it took to get him to
25  come to work for us.

Page 49

1    Q.  Okay.  How much was he making at
2  the place in Georgia?
3    A.  I don't know.
4    Q.  Well, then how do you know that's
5  what it took?
6    A.  That's what it took for him to
7  say yes to come to work at Sedgefields.
8    Q.  What did y'all offer him
9  originally?
10    A.  Probably around 55, $60,000.
11    Q.  And he said no?
12    A.  That's correct.
13    Q.  And then did you offer him 60?
14    A.  I don't remember the exact
15  process.
16    Q.  Are there any documents about
17  that?
18    A.  No, sir.
19    Q.  All right.  Well, we were going
20  through this chart, and I'm -- do y'all have
21  charts like this, the payroll and employees
22  for the years 2004 and 2003?
23    A.  Which page number is that?
24    Q.  That's 36.
25    A.  '03 and '04 are on page 35.

Page 50

1    Q. Great. Okay. Well, let's go
2    through what I've marked as Exhibit 5, and
3    you just tell me what race these people are
4    and if they're male or female, okay?
5    A. Uh-huh (affirmative response).
6    Q. And we said -- we agreed that
7    Corey Balkcom is a black male. What about
8    William Beckwith?
9    A. He's a white male.
10    Q. And his rate of pay was what?
11    A. It was $8 an hour.
12    Q. Okay. Now, why was he paid $8 an
13    hour?
14    A. Well, I hired him --
15    MR. DUKES: Let me -- who are you
16        asking about?
17    MR. ROBERSON: William H.
18        Beckwith who was hired on
19        8/5/2005.
20    MR. DUKES: Object to the form.
21        It's outside the scope of
22        the 30(b)(6) deposition
23        notice, and it's been asked
24        and answered.
25

Page 51

1 BY MR. ROBERSON:
2    Q. You can tell me.
3    MR. DUKES: Well, I'll tell him
4        if he can tell you.
5        But go ahead and
6        answer until I tell you you
7        can't.
8    A. He was paid that rate because I
9 hired him as an hourly worker and a night
10 watchman.
11    Q. Okay. I know about you, David
12 Carroll. Norris Foster, he's a black male,
13 correct?
14    A. Correct.
15    Q. And he was paid $7 an hour,
16 correct?
17    A. Correct.
18    Q. And he was hired, at least this
19 document -- actually, Norris was rehired. Do
20 you understand that?
21    A. I do.
22    Q. He worked at Sedgefields prior to
23 this, but he was rehired on February 8th,
24 2005, correct?
25    A. Yes.

Page 52

1    Q. All right. Now, Jeffrey Harris
2 was hired 9/16/2005. What race is he?
3    A. Black male.
4    Q. And how much was he paid?
5    A. $7 an hour.
6    Q. Now, who is Stacy Howington?
7    A. I do not know.
8    Q. Hired in December of '04. Only
9 worked four hundred and sixty-one hours. Do
10 you know Stacy, if that's a male or a female?
11    A. I don't know.
12    Q. Okay. Well, did you make any
13 inquiry?
14    MR. DUKES: That's outside the
15        scope of a 30(b)(6)
16        deposition notice.
17    Q. Did you make any inquiry to find
18 out who Stacy was?
19    A. I don't have any knowledge of who
20 Stacy was.
21    Q. Do y'all have any documents for
22 Stacy --
23    A. I haven't seen --
24    Q. -- an application or anything?
25    A. No documents that I've seen, no,

Page 53

1 sir.
2    Q. All right. The next one -- well,
3 Stacy's paid $9 an hour. And we'll just --
4 I'm going to put a question mark, okay?
5 Because we don't know if that's a male,
6 female, or black or white, correct?
7    A. Correct.
8    Q. Okay. William Hubbard?
9    A. A white male.
10    Q. He's paid $8 an hour?
11    A. Yes.
12    Q. Hired December 9th, 2005?
13    A. Yes.
14    Q. Okay. And why was he paid $8 an
15 hour?
16    A. I hired him because he was very
17 proficient at what he did, which was run
18 heavy equipment. I needed that. It was a
19 critical time.
20    Q. All right. Roy Lee, he's a black
21 male, correct?
22    A. Yes.
23    Q. Now, it's got hours. And Roy Lee
24 for the year 2005 worked 2,944 hours; is that
25 correct?

Page 54

```
 1        A.  I don't know if that's correct.
 2   I can tell you that when I came to work there
 3   in 2005, Roy Lee was an hourly employee and
 4   was switched to management during that year.
 5   So I don't know how those hours would
 6   actually reflect the total number of hours
 7   that were worked during that year.
 8        Q.  I mean, that's what -- I read
 9   correctly what's on this document, didn't I?
10        A.  You did.
11        Q.  Okay.  You're just telling me you
12   don't know if that is accurate; is that what
13   you're telling me?
14        A.  Considering he went from hourly
15   to salary, I don't know if that's accurate or
16   not.
17        Q.  Do you know if they still tracked
18   his hours after he went to salary?
19        A.  I don't know.
20        Q.  All right.  Willie Mack?
21        A.  Black male.
22        Q.  What's his rate of pay?
23        A.  $7.50 an hour.
24        Q.  Okay.  And he was hired in 4/2 of
25   '04, correct?
```

Page 55

```
 1        A.  That's correct.
 2        Q.  And he worked 2,167 hours,
 3   correct?
 4        A.  That's correct.
 5        Q.  Dorotea Norman -- I'm sorry,
 6   Nopal, Dorotea Nopal?
 7        A.  I do not know that person.
 8        Q.  Okay.  She only worked about
 9   forty-four hours in March, so we'll put a
10   question mark there.
11            Joel Norman?
12        A.  White male.
13        Q.  Okay.  Demetrius Parham?
14        A.  Black male.
15        Q.  Denise Pierce?
16        A.  White female.
17        Q.  Griselda Tirado?
18        A.  Griselda was not working there at
19   the time that I came there, but I know who
20   she is.
21        Q.  What race is she?
22        A.  She is Latin, a Mexican.
23            MR. DUKES:  Hispanic.
24            THE WITNESS:  Hispanic.  Thank
25        you.  My apologies.
```

Page 56

```
 1        Q.  All right.  If I put H-I-S-P --
 2   okay.
 3            All right.  Brenda Traver?
 4        A.  Tarver.
 5        Q.  Tarver?
 6        A.  Black female.
 7        Q.  And then is that Henry Tarver
 8   also?
 9        A.  That's correct.  Black male.
10        Q.  Are they related?
11        A.  No.
12        Q.  They just have the same last
13   name?
14        A.  That's correct.
15        Q.  Okay.  Charlie Walker?
16        A.  I don't know Charlie.
17        Q.  Okay.  It looks like he's the
18   lowest paid guy here.  You don't know what he
19   did?
20        A.  No, sir.
21        Q.  Katie Woods?
22        A.  Black female.
23        Q.  Okay.  All right.  Then we'll go
24   down to 2006.  It looks like there are fewer
25   employees in 2006; is that -- is that
```

Page 57

```
 1   correct?  Do you agree with that?
 2        A.  Compared to the list in 2005, it
 3   is, yes.
 4        Q.  Okay.  We've got you.  You're a
 5   white male.  Norris Foster.  Now Norris only
 6   worked -- is that seventy hours in 2006?
 7        A.  That's correct.
 8        Q.  Now, does that mean that -- do
 9   y'all hold back; that is, do you get your
10   pay --
11        A.  Every two weeks.
12        Q.  So he actually worked that time
13   in 2005; is that correct?
14        A.  That's correct.
15        Q.  Okay.  And so Norris is right
16   that he got a raise after he got fired?
17        A.  That's not correct.  The raise
18   was established before he was fired.
19        Q.  Okay.  It was established, but it
20   actually showed up on the check he received
21   after he was fired; is that fair?
22        A.  I would think that's fair, yes.
23        Q.  Okay.  So he's a black male, and
24   he got a fifty-cent raise that was
25   established in December, but it didn't show
```

Page 58

1　up or appear on his check until January,
2　correct?
3　　　A.　That's correct.
4　　　Q.　And he was fired at the end of
5　December, correct?
6　　　A.　That's correct.
7　　　Q.　Okay.　And then we've got Forest
8　Hamm?
9　　　A.　A white male.
10　　　Q.　And he's paid $8 an hour?
11　　　A.　That's correct.
12　　　Q.　Hired January 20th, 2006?
13　　　A.　That's correct.
14　　　Q.　Now, see, look at Norris Foster.
15　On this one, it says his date of hire is
16　9/14/99?
17　　　A.　That must have been the original
18　date he was hired the first time around.
19　　　Q.　Right, okay.　Jeffrey Harris,
20　he's a black male?
21　　　A.　Yes.
22　　　Q.　And William Hubbard is a white
23　male?
24　　　A.　Yes.
25　　　Q.　Roy Lee is a black male?

Page 59

1　　　A.　Yes.
2　　　Q.　Now, would this only reflect --
3　since Mid-State was sold on May the 19th,
4　this would only reflect wages earned between
5　January and May; is that --
6　　　A.　That's correct.
7　　　Q.　We've got Willie Mack, and he's
8　paid in 2006 $8 an hour?
9　　　A.　Yes.
10　　　Q.　And he's a black male, correct?
11　　　A.　Yes.
12　　　Q.　Joseph May is a white male?
13　　　A.　Yes.
14　　　Q.　Joel Norman is a white male.
15　Demetrius Parham is a black male, correct?
16　　　A.　Correct.
17　　　Q.　And Denise -- now, do you see --
18　does it look like Denise goes to a salary in
19　2006?
20　　　A.　She did.
21　　　Q.　Did you do that?
22　　　A.　I did.
23　　　Q.　Why?
24　　　A.　I requested that all my managers
25　be placed on salary.

Page 60

1　　　Q.　Okay.　Henry Tarver is a black
2　male?
3　　　A.　Yes.
4　　　Q.　And Brenda Tarver is a black
5　female, and Katie Woods is a black female,
6　correct?
7　　　A.　Correct.
8　　　Q.　Okay.　All right.　Let me go back
9　to -- was it page 35 or 36?
10　　　A.　Thirty-five.
11　　　Q.　Are you looking at 35?　Let me
12　just mark it.　I can't find mine.　Mr.
13　Carroll, if you would, just do the same
14　thing.　And I'll ask you, in order to make a
15　Record, take my pen and read the name of the
16　individual, the date he's hired -- or he or
17　she is hired, and then write out beside it.
18　If it's a white male, put WM.　If it's a
19　black male, BM.　And female, say the same
20　thing, okay?
21　　　　　(Whereupon Plaintiffs' Exhibit
22　　　　　　No. 11 was marked for
23　　　　　　identification and attached
24　　　　　　hereto.)
25　　　　　MR. DUKES:　Object to the form.

Page 61

1　　　　　It's outside the scope of a
2　　　　　30(b)(6).
3　　　　　MR. ROBERSON:　Well, you can
4　　　　　object.
5　BY MR. ROBERSON:
6　　　Q.　Go ahead and do it, Mr. Carroll.
7　　　　　MR. DUKES:　To the extent that
8　　　　　you know.
9　　　　　MR. ROBERSON:　Yeah.
10　　　A.　Okay.　Anthony Dickey.　Do you
11　also want the date of hire?
12　　　Q.　Date of hire, yes, sir.
13　　　A.　5/24/2003.
14　　　Q.　And his hourly rate?
15　　　A.　$8.50.　And I believe he is a
16　white male.
17　　　Q.　Okay.
18　　　A.　Joseph Lee, 4/5/2002.　$6.50.　I
19　don't -- don't know him.
20　　　Q.　Is that Roy Lee's cousin?
21　　　A.　I don't know.
22　　　Q.　I do.　And he's a black male.　So
23　put black male on that.
24　　　A.　Roy Lee, 9/8/2000.　$11 an hour.
25　　　　　Denise Pierce --

Page 62

1    Q. Roy Lee is a black male, right?
2    A. Yes.
3    Q. Okay. Go ahead.
4    A. Denise Pierce, a white female,
5 9/6/2002. Hired at $10 an hour.
6    Q. She was -- is that the year she
7 started?
8    A. I'm assuming.
9    Q. Do you know?
10    A. I don't know. But I think it was
11 about then.
12    Q. Okay. When she started, she was
13 paid $10 an hour; is that correct?
14    A. That's what it says on this
15 sheet.
16    Q. Okay.
17    A. Rosa Rosales, 12/2/2003. $5.65.
18 I don't know her.
19    Q. Okay.
20    A. Anthony Ryan, III, 3/19/2003.
21 $6.50 an hour. I don't know him.
22        Manuel Silva, 11/9/2003, at 6 an
23 hour. I don't know him.
24        Charles Sykes, 2/1/2003. Was
25 paid looks like a salary of 461.54 biweekly.

Page 63

1 And he is a white male, I assume.
2    Q. That's the wildlife biologist; is
3 that correct?
4    A. He was hourly and contract
5 laborer as well I do believe.
6    Q. Yeah. I've seen some documents
7 about him. Okay.
8    A. Kevin Terrell, 10/20/2003. $6 an
9 hour. Don't know him.
10        And Griselda Tirado, 11/19/2003.
11 $6.00 an hour. And we said she was a
12 Hispanic female.
13        That's all for 2003 that I have.
14 2004?
15    Q. Yes, sir.
16    A. Fortino Cisneros, 4/2/2004.
17 $6.50. I don't -- well, I do know who he is.
18 He is a Hispanic male.
19    Q. Was he an outside laborer or
20 had --
21    A. At that time, I don't know. But
22 he -- I now know that he is.
23    Q. Okay.
24    A. Anthony Dickey -- the ones I've
25 already mentioned, you want me to do them

Page 64

1 again as well?
2    Q. Anthony Dickey, what was he hired
3 at when he was hired in 2004?
4    A. $8.50. He's a white male.
5    Q. Okay.
6    MR. DUKES: Object to the form.
7    A. Stacy Howington, I don't know.
8        Roy Lee, black male. $11 an
9 hour. 9/8/2000.
10        Willie Mack, black male.
11 4/2/2004. $7.00 an hour.
12        Sonya Martinez, I don't know.
13        Oscar Montiel, I don't know.
14    Q. What hourly rate were those
15 gentleman paid?
16    A. Six and 6.50 an hour.
17    Q. Okay.
18    A. Dorotea Nopal, don't know. $7 an
19 hour.
20        Demetrius Parham is a black male.
21 7/23/2004. $6.50 an hour.
22        Denise Pierce, a white female.
23 9/6/2002. $10.75 an hour.
24        Rosa Rosales, I don't know. She
25 was paid $6.25 an hour.

Page 65

1        Raul Secundino, don't know.
2 $7.00 an hour.
3        Manuel Silva, I don't know.
4 $6.00 an hour.
5        Charles Sykes, a white male.
6 Again, he was paid salary and hourly. It
7 says 461.54 biweekly.
8        Kevin Terrell, I don't know.
9 $6.00 an hour.
10        Griselda Tirado, Hispanic female.
11 $7.00 an hour.
12        And then the last one on the list
13 is Charlie Walker. I don't know. $5.59 an
14 hour.
15    Q. Okay.
16    A. Do you mind if I get the rest of
17 those back that I gave you?
18    Q. Oh, I'm sorry.
19    A. I'm trying to keep them in
20 halfway order, so I will know where
21 everything is.
22    Q. I'll try to do that, too. See if
23 those are --
24    A. That's fine. That stack right
25 there you've got your hands on is the rest of

Page 66

1  them, I think. Let's see.
2      Q. Well, make sure.
3      A. And that group right there, I
4  think. Let's see, six and seven. Okay.
5  That's all of them except -- thank you. I
6  think that's your copy.
7      Q. Okay. Well, do you know -- who
8  was the gentleman that testified -- or not
9  testified, but allegedly told Denise Pierce
10 that Norris Foster was a thief? Do you know
11 who I'm talking about, a guy that used to
12 work at Sedgefields that they ran off?
13     MR. DUKES: Object to the form.
14     A. You're saying that this guy was
15 run off or the thief was run off or who was
16 run off?
17     Q. No. I'm saying this guy used to
18 be a manager at Sedgefields. Is it Joe?
19     A. I can't think of his name.
20     Q. Do you know who I'm talking
21 about?
22     A. I've heard conversations of three
23 or four guys who worked there at one time or
24 another who didn't, but I don't know this
25 exact individual's name.

Page 67

1      Q. This guy worked there when
2  Broadhead's son worked there.
3      A. Yeah. I don't -- I don't know
4  him.
5      Q. Because they used to allegedly
6  use drugs together. You don't know who I'm
7  talking about?
8      A. Huh-uh (negative response).
9      Q. No? Is that a no?
10     A. That's a no. I'm sorry.
11     Q. All right. Well, where's that
12 boy's deposition? I think he names -- Joe
13 McEarn (phonetic) or something like that.
14     Do you know -- other than Byron
15 Davison, Donna Davison, and yourself and Roy
16 Lee, do you know anybody else that's worked
17 there at Mid-State in management?
18     MR. DUKES: Object to the form.
19     Other than what's already
20     been stated? Other than
21     what he's already testified
22     to?
23     Q. Do you know anybody else that's
24 worked there in management?
25     A. The only other name that comes to

Page 68

1  mind, and I don't know if it was for
2  Mid-State or the previous owner, was a
3  gentleman named Mark Greg. But I believe he
4  worked there before the Broadhead's purchased
5  it.
6      Q. Okay. Well --
7      McFerrin? Do you know a guy
8  named McFerrin?
9      A. No. And we mentioned the Sykes
10 fellow that was --
11     Q. Yeah. Chuck Sykes, he was a
12 wildlife biologist, right?
13     A. That's right.
14     Q. Now, is he the one that sued you
15 or was that the other guy?
16     A. I'm not aware of him suing me,
17 suing the company. He's listed as wildlife
18 manager on this sheet.
19     Q. Okay. Was there another guy
20 named Dewayne?
21     A. I don't know a Dewayne.
22     Q. Okay. Do you know if Mid-State
23 was sued by a wildlife biologist?
24     A. I don't.
25     Q. Not during your tenure?

Page 69

1      A. That's correct.
2      Q. All right. Have you got all of
3  Roy Lee's W-2 forms over there? I want you
4  to find them if you do.
5      A. Okay.
6      Q. If you would, let me know what
7  page they are.
8      A. All right. I'll just give them
9  to you in chronological order as I come to
10 them, if that's all right.
11     Q. Yes, sir.
12     A. The first one is on page 38.
13     Q. Okay.
14     A. It's 2003.
15     Q. How much did he make as a W-2
16 employee in 2003?
17     A. Wages, tips, total and everything
18 is 35,352.61.
19     Q. Okay. Does that have another
20 year on there for Roy?
21     A. That's just 2003.
22     Q. Right. There's two W-2s. Who's
23 the other one?
24     A. Oh, it's just a different
25 employee.

Page 70

```
1      Q. Okay. All right. Go to the next
2  one.
3      A. Okay. 2004.
4      Q. What page are you on?
5      A. Forty-three.
6      Q. Okay. What's his wages?
7      A. Down at the bottom it says
8  44,234.
9      Q. Okay.
10     A. Page 54. 2005 year.
11     Q. Okay.
12     A. The figure at the bottom says
13 48,504.60.
14     Q. Okay. And 2006?
15     A. Yes. Page 62 -- or I can't tell.
16 It may be 3, 63. 2006, total of $19,399.80.
17     Q. That's through May --
18     A. That's correct.
19     Q. -- or part of May, correct?
20     A. Yes, sir.
21     Q. All right. Now, when did Mr. Lee
22 go on a salary?
23     A. Would be sometime during the year
24 of 2005.
25     Q. Well, do you know when it was?
```

Page 71

```
1      A. Seems like I made the request
2  during the middle of the summer, so I would
3  assume sometime toward the end of the summer.
4      Q. Well, when did you hire Joel
5  Norman?
6      A. He was hired in September.
7      Q. Yeah. Do you think you might
8  have made it -- since you hired him at a
9  salary, you might have put Mr. Lee on a
10 salary in September?
11     MR. DUKES: Object to the form.
12     A. No. That was done -- or was in
13 the process of doing that before I ever
14 thought about hiring Joel Norman or anybody
15 else. Roy came to me and asked me about it.
16 And I agreed that I would do it for him.
17     Q. Okay. Well, do you know at what
18 time he started being paid effective on a
19 salary?
20     A. I don't.
21     Q. Would y'all have a payroll record
22 that would tell you?
23     A. I would have to check with the
24 home office. I don't have it in front of me.
25     Q. Yeah. Well, y'all have -- don't
```

Page 72

```
1  y'all give employees checks?
2      A. Yes, sir.
3      Q. I mean, a paycheck. And so that
4  would reflect when his raise was effective,
5  wouldn't it?
6      A. It should, yes, sir.
7      Q. Well, can you undertake to locate
8  the first salaried check that Roy Lee
9  received and provide that to Mr. Dukes?
10     A. Yes, sir.
11     Q. Okay. And you'll need to do it
12 right away, because I've got to write a brief
13 right away, okay? Fair enough?
14     A. Fair enough.
15     Q. Now, did you provide any
16 documents which relate to the purchase price
17 and sales price of Sedgefields Plantation?
18     A. I have not.
19     Q. And why not?
20     MR. DUKES: We objected to it.
21         The Court didn't order us to
22         produce it. We agreed to
23         provide someone to testify
24         about the sales price and
25         purchase price generally.
```

Page 73

```
1          And he's ready to do that.
2      Q. Okay. When did Mid-State Land
3  and Timber purchase Sedgefields?
4      A. I'm not sure of the exact date.
5      Q. What year?
6      A. I believe it was in '98.
7      Q. Okay. And what was the amount?
8      A. Or '96.
9      MR. DUKES: If you don't know,
10         don't --
11     A. I don't -- I don't know. I don't
12 know the exact date. I'm sorry.
13     Q. Well, do you know who purchased
14 it? Did Mid-State?
15     A. I don't know the exact company
16 name that purchased it, no, sir.
17     Q. Did they get a deed? They got
18 13,000 acres in Bullock County. Did they get
19 a deed to it?
20     A. I'm assuming they did.
21     Q. Well, wouldn't that -- wouldn't
22 there be a record of that, Mr. Carroll?
23     A. Yes, sir.
24     Q. How much did they pay?
25     A. The price that was paid for it, I
```

Page 74

1  believe was 14 million.
2      Q. I see. And did that include all
3  of that acreage and all of the structures on
4  that?
5      A. I don't know what structures were
6  on there at the time, but I'm sure whatever
7  was there went with it.
8      Q. Well, they had a hunting camp
9  there before, didn't they, a lodge?
10     A. A lodge, yes.
11     Q. Sure. Did that include any
12 equipment or do you know?
13     A. I don't know.
14     Q. Well, see, that's why we need to
15 get a copy of those documents, don't we?
16         MR. DUKES: Object to the form.
17     Q. Because that would tell us what
18 they bought for $14 million, wouldn't it?
19     A. Yes, sir.
20     Q. Okay. And they sold it in May of
21 2006; you agree with that?
22     A. Yes, sir.
23     Q. And what did they sell it for?
24     A. The price was around 32 million.
25     Q. Thirty-two million. So you don't

Page 75

1  know when they bought it. Do you think it
2  could have been as late as 1999?
3      A. I don't know.
4      Q. Well, if Norris Foster, if his --
5  if it shows that he was working for them in
6  1999, for Mid-State Land and Timber, do you
7  think they may well have purchased it in
8  1999?
9          MR. DUKES: Object to the form.
10     A. I don't know.
11     Q. Well, let's just assume that they
12 purchased it in 1998 or 1999. So in seven or
13 eight years, what's that, about 125 percent
14 gain?
15         MR. DUKES: Object to the form.
16     Q. Do you know?
17     A. I don't know what the property
18 was of anyone that sold it.
19     Q. And, of course, that would be a
20 long-term capital gain, wouldn't it?
21         MR. DUKES: Object to the form.
22     Q. Well, if you have an asset -- you
23 agree with me that Mid-State is an -- that
24 Sedgefields was an asset, don't you?

Page 76

1      A. I guess it could be considered
2  that.
3      Q. Yeah. If they held it for more
4  than a year, and then they made a gain, it
5  would be a long-term gain, correct?
6          MR. DUKES: Object to the form.
7              Calls for a legal
8              conclusion --
9      A. You can answer.
10         MR. DUKES: -- beyond the scope.
11         MR. ROBERSON: Doesn't call for a
12             legal conclusion.
13         MR. DUKES: Yeah, it does. I'm
14             not a tax expert. I don't
15             think he is.
16         MR. ROBERSON: Well, I'll be glad
17             to swear me in and testify,
18             because I am.
19 BY MR. ROBERSON:
20     Q. So for the whole time that they
21 operated this hunting lodge, they lost money
22 every year, correct?
23     A. I do not know.
24     Q. Well, for the time period that
25 you operated it as the manager, did they lose

Page 77

1  money?
2      A. Yes.
3      Q. Would you expect them to lose
4  money?
5          MR. DUKES: Object to the form.
6      A. Possibly.
7      Q. Well, you've been in the hunting
8  business for how many years, Mr. Carroll?
9      A. Probably at least ten.
10     Q. Yeah. You ran a hunting camp,
11 didn't you?
12         MR. DUKES: Object to the form.
13     Q. Five Star?
14     A. Yeah, I did.
15     Q. Yeah. Did they own that property
16 or did they just lease it?
17     A. Some of both.
18     Q. Okay. Well, you don't really
19 expect to make a profit by running the
20 hunting operation, do you?
21     A. Some do, and some don't.
22     Q. Okay. Where you make the money
23 is in the appreciation of the land, correct?
24         MR. DUKES: Object to the form.
25             It's outside the scope of a

1          30(b)(6) deposition.
2     Q. You can answer.
3     A. That's possible.
4     Q. Well, we know that it's not only
5 possible, the land appreciated from
6 14 million to 32 million in this case, didn't
7 it?
8     A. That's what it sold for. I don't
9 know about the appreciation of it.
10    Q. Well, there's timber on the land,
11 isn't there?
12    A. Yes.
13    Q. Don't you expect that that timber
14 is going to get more valuable as time passes?
15    A. That's a possibility.
16    Q. Okay. That's a hope, isn't it?
17    A. That's a hope.
18    Q. So if you can sustain, that is,
19 you can endure the losses for the time that
20 you run the hunting camp, then you can make
21 up the money. They didn't have $18 million
22 in losses during the time that they operated
23 this hunting camp, did they?
24    MR. DUKES: Object to the form.
25    A. I don't know.

1     Q. What did -- in the year that you
2 ran the hunting operation, how much did they
3 lose?
4     A. I don't know the exact figure.
5     Q. Well, how much? Was it less than
6 a million dollars?
7     A. Probably right at a million for
8 that particular year.
9     Q. That they lost?
10    A. It's a possibility.
11    Q. What was your budget? Your
12 budget wasn't even a million dollars, was it?
13    A. It was close to a million.
14    Q. Well, they made some money; that
15 is, they generated some revenue, didn't they?
16    A. A little bit, yes.
17    Q. They charged $5,000 a hunt,
18 correct?
19    MR. DUKES: Object to the form.
20    A. There's a possibility that you
21 can take a hunt that's $5,000, yes. A
22 package, let's put it that way, not a hunt.
23    Q. Well, that's for four quail
24 hunters for a weekend, right?
25    A. That's correct.

1     Q. Okay. And, of course, every year
2 that you make a loss, you get some tax
3 benefit for that, don't you?
4     MR. DUKES: Object to the form.
5         It's outside the scope.
6     Q. Do you know?
7     MR. DUKES: Calls for a legal
8         conclusion.
9     Q. You can answer.
10    A. I would think so.
11    Q. Now, one of the areas that I
12 wanted to talk to you about today concerns
13 tips. And I asked that you provide me with
14 documents that would demonstrate the tips
15 received by employees of Mid-State Land and
16 Timber. I'm not talking about the lodge
17 employees or the people that waited on
18 tables. Those aren't the tips I'm talking
19 about. I'm talking about the tips for the
20 hunt -- from the hunters, okay?
21    A. Uh-huh (affirmative response).
22    Q. Is that a yes?
23    A. Yes.
24    Q. Have you produced those documents
25 to me?

1     A. I believe I have.
2     Q. All right. Tell me what number,
3 what pages they're on.
4     A. I have page 91.
5     MR. DUKES: Eighty-nine.
6     A. Nine, okay. I have one on 89.
7     MR. DUKES: Through . . .
8     Q. Eighty-nine through 94; is that
9 correct?
10    A. That's correct.
11    Q. Okay. I'm going to just make all
12 of those pages Exhibit 12. And we'll go
13 through it, okay.
14    A. Okay.
15    Q. So I can understand what these
16 documents signify.
17    MR. ROBERSON: Let's go off the
18        Record and change tapes.
19    THE VIDEOGRAPHER: Going off the
20        record at 2:06 p.m.
21    (A brief recess was taken.)
22    THE VIDEOGRAPHER: Back on the
23        Record at 2:18 p.m.
24        Beginning of Tape No. 2.
25

Page 82

BY MR. ROBERSON:
1  Q. Mr. Carroll, I've got pages 89
2  through 94. I would ask you, if you could,
3  to explain to me what -- well, start with
4  page 89, what I marked as Plaintiffs' Exhibit
5  12. What does this document represent?
6          (Whereupon Plaintiffs' Exhibit
7          No. 12 was marked for
8          identification and attached
9          hereto.)
10     A. Page 89 is an invoice to a
11 customer, Standard Concrete Company. And it
12 shows a half-day quail hunt and gratuity to
13 be disbursed amongst three employees and the
14 amount to be disbursed.
15     Q. Okay. So this is essentially an
16 invoice which shows a $100 tip to the hunting
17 crew, the quail hunting crew, correct?
18     A. That's correct.
19     Q. But this is only for $1,000, that
20 is half a day and two hunters hunt, correct?
21     A. That's correct.
22     Q. Okay. All right. And is this
23 one that they paid on a credit card or can
24 you tell?

Page 83

1      A. I can't tell from this.
2      Q. Okay. All right. Thank you.
3  That's page 89. And does this -- do you know
4  if 89 -- it does relate to Norris, because it
5  says B.B. Norris and Jeff; is that right?
6      A. That's correct. It says a
7  three-way split of $100 between those three
8  individuals.
9      Q. Now, who were the folks -- do you
10 know who the folks were at Standard Concrete?
11     A. The gentleman's name on the
12 invoice is Mason Lampton.
13     Q. Okay. Thank you. All right. Go
14 to page 90.
15     A. Okay.
16     Q. Now -- okay. Are we just
17 referencing this thing, the reference at the
18 bottom of that page?
19     A. That is correct.
20     Q. Okay. It says tip. I will fax
21 copy of invoice to you to forward on to Ron
22 St. John, $100 to be divided between Willie
23 Mack, Jeff Harris, and Norris Foster.
24 Denise. Now, would that be something just
25 like this?

Page 84

1      A. Denise faxed that to the home
2  office. That's why her name is on the end of
3  that. She prepared the weekly payroll
4  schedule and put that note at the bottom to
5  send to the home office.
6      Q. All right. If they gave them
7  cash, there wouldn't be a document, correct?
8      A. That's correct.
9      Q. So what we have is some documents
10 that reflect -- were these credit card tips?
11     A. Either paid by check or credit
12 card, something other than cash, where I sent
13 them the bill, and they asked for the tip to
14 be included on their bill. Then there's a
15 record of it going through their payroll.
16     Q. Okay. And when they receive
17 this, the tip, whether it's by check or by
18 credit card, is that amount placed on their
19 payroll check? Do you know?
20     A. The employee?
21     Q. Yes.
22     A. Yes. Yes, it is.
23     Q. The employee, he receives --
24     A. The deductions are taken out, and
25 the remainder is placed in their payroll.

Page 85

1      Q. Does it have a place on the
2  payroll check that says tip?
3      A. I believe it does, yes.
4      Q. Okay. So if there's a difference
5  between wages and what they actually earned,
6  is that the explanation for that?
7      A. I think on the bottom of the stub
8  of the check it'll have wages. And they have
9  tips and/or other. And it'll have that line
10 item on there.
11     Q. Okay. All right. Page 91.
12 Standard Concrete Company. Again, this one
13 says B. H. Hardaway?
14     A. Different individual.
15     Q. Okay. Works at the same company?
16     A. Uh-huh (affirmative response).
17     Q. And now, this was the full-day
18 hunt, correct, for two days?
19     A. It appears to be a multiple-day
20 hunt, yes.
21     Q. All right. Tip for three
22 helpers, Norris, B.B., and Jeff. And he's
23 got a total of $150 split three ways, right?
24     A. That should be $50 per person,
25 yes.

Page 86

1    Q. Okay. Now, is 92 the same thing
2  as 91?
3    A. Yes. It has the same invoice
4  number on it.
5    Q. Okay. Do you know -- I mean, is
6  there a reason I've got two documents or did
7  they just --
8    MR. DUKES: There's some
9       additional writing on it.
10    Q. Okay. Do you know whose writing
11  that is on page 92?
12    A. I don't recognize that, no, sir.
13    Q. Okay. Page 93. These are the
14  raises that you referred to?
15    A. That's correct.
16    Q. Now, this document is not dated,
17  correct?
18    A. That's correct.
19    Q. Do you know when this document
20  was created?
21    A. I sent this back to Mrs. Howell
22  about the first week of December, right after
23  Thanksgiving.
24    Q. Okay. Now, everybody that's
25  listed at the top of this page was getting a

Page 87

1  raise, correct?
2    A. Not everybody.
3    MR. DUKES: Object to the form.
4    A. In the first section, yes.
5    Q. Yeah. From Henry Tarver above --
6    A. Yes.
7    Q. -- was getting a raise, correct?
8    A. That's correct.
9    Q. And all of those people were
10  black, correct?
11    A. Correct.
12    Q. The two white guys, Will Hubbard
13  and Adam May, they just started. They were
14  hired in -- was it November or December? I
15  think it was November.
16    A. Later in the year, December --
17  late November or December.
18    Q. Right. That is, they just were
19  hired, correct?
20    A. That's correct.
21    Q. And they were making $8 an hour,
22  correct?
23    A. That's correct.
24    Q. Okay. And so they weren't
25  getting a raise when they just started and --

Page 88

1    A. (Witness nodded head.)
2    Q. Okay. And Roy Lee was getting a
3  raise to 1,500?
4    A. A $1,500 raise, yes.
5    Q. I'm sorry. You're correct. I
6  misspoke. You're right.
7    And Joel Norman, again, he was
8  hired in September for $70,000, right?
9    A. That's correct.
10    Q. So he wasn't getting a raise in
11  January, right?
12    A. That's correct.
13    Q. But then you were going to put --
14  make Ms. Pierce go to a salary?
15    A. That's correct.
16    Q. That's what you'd recommended for
17  her, okay. And this is a document that you
18  created, correct?
19    A. That's correct.
20    Q. All right. Now, but nobody was
21  getting more than a fifty-cent raise; do you
22  agree with that?
23    A. Hourly, yes.
24    Q. All right. No hourly employee
25  was getting it. And Norris Foster was

Page 89

1  getting a fifty-cent raise or that's what you
2  had recommended, correct?
3    A. That's correct.
4    Q. Well -- okay. Then 94. What is
5  94, page 94?
6    A. It's a payroll sheet with tips
7  included. For a line item on tips, it says
8  from 3/15/2005 to 5/19/2006. So that would
9  be tips recorded for the 2005 portion part of
10  the year and 2006 part of the year.
11    Q. Okay. Is this really -- see,
12  I'm -- I'm -- I'm having trouble
13  understanding why we're dealing with certain
14  periods. And maybe it's -- are these just
15  periods of time when they're hunting or do
16  you know why we're dealing with certain time
17  periods?
18    MR. DUKES: This is within the
19       scope of the protective
20       order that the Court entered
21       in this case. This is what
22       the Court ordered -- or what
23       we agreed to produce, and
24       the Court entered the
25       protective order. So this

Page 90

1          is for the period of time
2          within the Court's
3          protective order.
4      Q. Norris Foster, it shows he
5  received $83.00 in tips. And what period of
6  time is this?
7      A. From -- that occurred somewhere
8  between 3/15 and 12/31 of 2005.
9      Q. Okay. And when you -- when we
10 say $83, are we referring to this was the
11 amount on his paystubs?
12     A. That's after taxes, yes.
13     Q. Okay. Jeff Harris got -- looks
14 like $83.34. Maybe he got an extra penny?
15     A. (Witness nodded head.)
16     Q. Roy Lee got $100. Willie Mack
17 got $133. Demetrius Parham got $50.
18        Now, William Hubbard, who only --
19 how long did he work, about a month?
20     A. No. Will was here longer than
21 that.
22     Q. Oh, okay. Was it Adam Mays?
23     A. Adam Mays.
24     Q. Okay. Will Hubbard got $175,
25 correct?

Page 91

1      A. (Witness nodded head.)
2      Q. Is that a yes?
3      A. That's yes.
4      Q. And he's a white male?
5      A. That's correct. And these aren't
6  necessarily total tips, what they might have
7  got in cash. This is obviously what's
8  reported through their paystubs.
9      Q. Well, what crew did William
10 Hubbard work in?
11     A. He worked also in the quail
12 hunting party.
13     Q. With who?
14     A. With whoever else was on the
15 party that day, whether it be Norris or
16 whether it be Jeff Harris or whomever.
17     Q. Norris Foster was fired in
18 December.
19     A. Oh, you mean after?
20     Q. Yeah.
21     A. During his tip time?
22     Q. Will Hubbard got tips in 2006.
23     A. And also, some of those tips
24 came -- he was a turkey hunting guide. He
25 was the only one I had on the plantation that

Page 92

1  could guide for turkeys. So he probably got
2  the bulk of that during turkey season.
3      Q. Okay. Well, how long did William
4  Hubbard work out there?
5      A. I'd have to go back and check the
6  records and see. But I would estimate seven
7  months.
8      Q. All right. And you've provided
9  me some documents, this Exhibit 13. That's
10 these pages. And it's 95 -- Bates stamp
11 No. 95 to page 106?
12        (Whereupon Plaintiffs' Exhibit
13         No. 13 was marked for
14         identification and attached
15         hereto.)
16     A. That's correct.
17     Q. And this just shows -- I think
18 what it shows is that Byron Davison was paid
19 through Pensacola Forestry Services in
20 2000 -- is this four; is that correct?
21     A. '04, yes.
22     Q. Okay. And these are just the
23 monthly amounts that he received?
24     A. That's correct.
25     Q. Is that correct?

Page 93

1      A. Yeah.
2      Q. All right. Now I'm going to show
3  you Exhibit 14. Do you know Anthony Dickey?
4        (Whereupon Plaintiffs' Exhibit
5         No. 14 was marked for
6         identification and attached
7         hereto.)
8      A. I have met Anthony, yes.
9      Q. Okay. Well, did he ever work for
10 you?
11     A. No, sir.
12     Q. How did you meet him?
13     A. One of the pieces of equipment
14 that we purchased from his family's company,
15 I returned to them to have some service work
16 done on it and met him there.
17     Q. What equipment?
18     A. Well, riding lawnmower.
19     Q. Have you seen Exhibit 14? It's
20 his declaration.
21     A. I have.
22     Q. In fact, when was that provided?
23     A. It says the 19th day of March,
24 2007.
25     Q. And today is the 27th day of

Page 94

1  March?
2      A. That's correct.
3      Q. So eight days ago. And I got it
4  about two days ago from Mr. Dukes. Did you
5  have anything to do with getting this
6  document?
7      A. No, I didn't.
8      Q. Did your attorney get that for
9  you?
10     A. I don't know. It was just in my
11 package of paperwork that I looked at.
12     Q. Does he say anything in here
13 about ever being a manager of Sedgefields?
14     A. I don't see the word "manager" in
15 here, no.
16     Q. Okay. Mr. Carroll, Sedgefields
17 -- Mid-State Land and Timber sold the
18 plantation in Bullock County to Tollisons,
19 correct?
20     A. That's correct.
21     Q. And that sale took place in May
22 of 2006, and they're the people that paid
23 32 million, correct?
24     A. Yes.
25     Q. Then you worked as the -- in the

Page 95

1  same capacity; that is as manager of the
2  plantation for Tollisons, correct?
3      A. Correct.
4      Q. And then they have since that
5  time now sold the plantation again; is that
6  correct?
7          MR. DUKES: Let me stop you right
8              here. I mean, he's here in
9              his capacity as Mid-State
10             corporate representative.
11             And I don't represent
12             Tollisons, but I would be
13             very careful. I don't know
14             where you're going. But
15             don't divulge any confi-
16             dential --
17         MR. ROBERSON: I'm just going to
18             ask him what he's doing.
19         MR. DUKES: Okay. I just want to
20             tell him not to divulge any
21             confidential or business
22             information that may belong
23             to Tollisons.
24         MR. ROBERSON: Well, I'm
25             certainly not trying to

Page 96

1          discover any.
2  BY MR. ROBERSON:
3      Q. But Tollisons sold the
4  plantation, correct?
5      A. They're in the process, yes.
6      Q. I mean, has the sale gone through
7  or do you know?
8      A. It's been sold in different
9  pieces, I believe. So some probably have,
10 and some probably have not.
11     Q. Okay. Well, the point is,
12 Tollisons is not operating the plantation, as
13 you understand it?
14     A. Currently?
15     Q. Yes.
16     A. That is correct.
17     Q. Okay. And so your employer at
18 Tollisons has let you go; is that fair or --
19     A. I was -- it is fair as far as
20 being the manager of Sedgefields Plantation,
21 yes.
22     Q. Right. That's right.
23     A. Yeah.
24     Q. You're no longer the manager at
25 Sedgefields, correct?

Page 97

1      A. That is correct.
2      Q. But they still have retained you,
3  that is Tollisons. You're now working as a
4  consultant in their timber operations; is
5  that fair?
6      A. I do work for Tollison.
7      Q. Is it -- do you have a consulting
8  relationship with them or a contract --
9      A. Yeah.
10     Q. -- or are you an employee?
11     A. Well, some of both, almost.
12     Q. Okay. All right. Well, you're
13 living in Auburn?
14     A. I do.
15     Q. Okay. And where do you go to
16 work?
17     A. I don't have any specific place.
18 I travel around.
19     Q. Okay. And does Tollisons own
20 timberlands in Alabama?
21     A. Other than Sedgefields, at this
22 time, I don't know that they own any real
23 estate in Alabama.
24     Q. Okay. Well, what type work are
25 you doing for them then?

Page 98

1    A. Well, I do -- I do buying and
2  selling of land for them, for what you would
3  call a trader. Kind of what the gentleman
4  who purchased Sedgefields does.
5    Q. Does that mean you go and find
6  properties, and they may want to exchange
7  properties for those properties?
8    A. Well, it would be more of a
9  purchase and possibly a resale.
10   Q. Okay. Well, do you get paid when
11 the transaction occurs or do you get paid
12 every month or how do you --
13   A. Get paid a consulting -- well, a
14 commission, so to speak.
15   Q. Now, these guys like Jeffrey
16 Harris and Norris Foster and Demetrius and
17 all these people, the people that weren't in
18 management, just hourly laborers, did they
19 have health insurance?
20   A. I believe they did. It was
21 accessible to them if they wanted it.
22   Q. Okay. It was their choice
23 whether to get it or not, correct?
24   A. Yeah.
25   Q. It was made available to them.

Page 99

1  Do you know if any of them opted to obtain
2  health insurance?
3    A. I don't. I don't know.
4    Q. And other than health
5  insurance -- was that through Blue Cross or
6  do you know?
7    A. Yes.
8    Q. Other than health insurance, did
9  they have any other employment-related
10 benefits; that is like a 401(k)?
11   A. We did have a 401(k) that they
12 could participate in.
13   Q. Do you know if any of those
14 gentlemen participated in it?
15   A. I don't know.
16   Q. Okay. If they did, would
17 Mid-State match their contributions or pay
18 some percentage of their contributions?
19   A. Yes.
20   Q. All right. How much? Do you
21 know what that --
22   A. I believe they would match up to
23 3 percent of your annual pay.
24   Q. Okay. And other than those two
25 things, do you know if Mid-State provided any

Page 100

1  other employment-related benefits?
2    A. Not that I'm aware of.
3    Q. Did they get holiday pay and
4  vacation pay, that kind of thing?
5    A. Yes.
6    Q. If you had been there for a year,
7  how much vacation did you get?
8    A. I think, after a full year, you
9  were given a week with pay. And after, I
10 think it was three years, you were given
11 two-weeks pay.
12   Q. Okay. Do y'all have personnel
13 files for all employees at Mid-State?
14   A. There were personnel files there,
15 yes.
16   Q. Have you produced any personnel
17 files today?
18   A. Well, the documentation is in
19 front of me here.
20   Q. Okay. Well, for example, Kevin
21 Terrell is listed as an employee who worked
22 at Mid-State during this time period. You
23 don't -- he never worked with you, so you
24 don't know who is he, correct?
25   A. That's correct.

Page 101

1    Q. Does he have an application or
2  anything that you've seen?
3    A. I haven't seen one, no, sir.
4    Q. Well, do you know how he could
5  come to work there and not complete an
6  application? I mean, I know that you didn't
7  hire him or anything, but --
8    A. I don't know if that was possible
9  or not. I don't know.
10   Q. You'd agree with my that there's
11 not any document about Kevin Terrell, right?
12   MR. DUKES: No. Object to the
13       form. I think you're
14       misunderstanding his
15       testimony. The Court order
16       did not require us to
17       produce personnel files for
18       those employees. It only
19       said the Defendant shall
20       produce payroll information.
21   Q. Oh. So you do have personnel
22 files; you just didn't review them?
23   A. I'm assuming that there are
24 personnel files on all employees there.
25   Q. And you didn't review them?

Page 102

1    A. That's correct. I haven't
2 reviewed all of them, no, sir.
3    Q. Okay. Because you didn't want to
4 know what race he was, correct?
5        MR. DUKES: Object to the form.
6    A. No, that's not correct.
7    Q. Well . . . Did y'all have
8 written job descriptions?
9    A. No, sir. Not at the time that I
10 was the manager there.
11    Q. And while you were manager there,
12 did y'all ever do background checks?
13        MR. DUKES: Object to the form;
14            asked and answered.
15    A. I didn't do any background checks
16 on hourly employees that I hired.
17    Q. Okay. Because Jeffrey Harris
18 listed on his application that he had been
19 convicted of a crime. I just wondered if
20 y'all ever investigated that?
21    A. No. He talked to me about it
22 during the interview process.
23    Q. You knew about it?
24    A. Yes, sir.
25    Q. And you hired him?

Page 103

1    A. I did.
2    Q. And did you ever check their
3 credit?
4    A. No, sir.
5    Q. Did you ever check any reference;
6 that is, any previous employer or anything
7 like that?
8    A. Not inasmuch as maybe I ran into
9 somebody in town that they had worked for and
10 talked to them about it. But other than
11 that, no.
12    Q. I mean, you know, Union Springs
13 is kind of a small town. You normally see
14 folks there and might ask somebody if they
15 knew -- what they knew about them, that kind
16 of thing?
17    A. That's correct.
18    Q. Sort of an informal kind of chat?
19        MR. DUKES: Object to the form.
20    A. Yes.
21    Q. Okay. Well, anybody ever tell
22 you anything bad about Norris Foster?
23    A. I didn't hire Norris Foster.
24    Q. All right. Let me mark this as
25 Exhibit 15. Mr. Carroll, were you provided a

Page 104

1 copy of that deposition notice?
2        (Whereupon Plaintiffs' Exhibit
3         No. 15 was marked for
4         identification and attached
5         hereto.)
6        (Witness reviewed document.)
7    A. I believe I was, yes.
8    Q. Read the first thing that's
9 listed there for the areas of inquiry about
10 what I asked the corporate representative to
11 be knowledgeable.
12        MR. DUKES: Jerry, let me object
13            to the form of the question.
14            I don't understand the
15            purpose of the question.
16            When you -- you filed -- we
17            filed objections. You filed
18            a motion to compel. We
19            filed an opposition --
20        MR. ROBERSON: Is that an
21            objection to the form?
22        MR. DUKES: And a protective
23            order. And the Court has
24            entered an order.
25        MR. ROBERSON: Okay.

Page 105

1 BY MR. ROBERSON:
2    Q. What's the first thing that's
3 listed there? Would you read that, please,
4 sir?
5    A. Item No. 1?
6    Q. Yes.
7    A. The names, qualifications,
8 references, job descriptions, duties, salary
9 or wages, or other compensation of all
10 employees of this Defendant who worked at
11 Sedgefields Plantation during the period of
12 time from its purchase until its sale on
13 May 19th, 2006.
14    Q. What's No. 2?
15    A. All personnel files of Mid-State
16 Land and Timber Company employees who worked
17 at Sedgefields Plantation during its period
18 of operation by Mid-State Land and Timber
19 Company.
20    Q. Have you reviewed any personnel
21 files before today?
22    A. No, sir.
23    Q. Why not?
24    A. I reviewed the information that
25 was given to me by my attorney to be

Page 106

1  reviewed.
2      Q. And you didn't look at anything
3  else, did you?
4      A. No, sir.
5      Q. So if he wasn't producing it, you
6  weren't reviewing it, correct?
7          MR. DUKES: Object to the form.
8      Q. Correct?
9      A. I have not reviewed anything
10  other than what he has given me.
11      Q. Okay. That's the only thing I
12  wanted to prove, Mr. Carroll.
13          And you've produced Bates stamp
14  Nos. 1 through what page?
15      A. 106.
16      Q. Okay. Well, Mr. Carroll, I
17  represent black men; do you understand that?
18      A. If you say you do, I understand
19  it.
20      Q. Well, I represent Jeffrey Harris,
21  Henry Tarver, Demetrius Parham and -- and
22  Jeffrey Harris, and Willie Mack, and also Roy
23  Lee. Now, those four gentlemen are all
24  blacks who were hired as laborers; do you
25  agree with that?

Page 107

1      A. Yeah.
2      Q. They all worked at Mid-State as
3  laborers, outside work, correct?
4      A. (Witness nodded head.)
5      Q. Is that yes?
6      A. Yes.
7      Q. All right. None of them was paid
8  $8 an hour --
9          MR. DUKES: Object to the form.
10      Q. -- until 2006. None of them in
11  2005 or four or anytime prior to that were
12  ever paid $8 an hour?
13      A. Roy Lee was paid more than that
14  per hour.
15      Q. I understand Roy Lee, but I'm
16  just talking about these laborers.
17      A. But you mentioned him in that --
18      Q. Okay.
19      A. -- in those list of names. I'm
20  just trying to be accurate.
21      Q. Okay. Well, Roy Lee was hired as
22  a laborer originally, correct?
23      A. That's correct.
24      Q. And he was paid 6.50 an hour when
25  he was hired as a laborer. Did you know

Page 108

1  that?
2      A. If that's what his original pay
3  was?
4      Q. Yeah.
5      A. Okay.
6      Q. And you -- you hired four white
7  males in 2005 and January of 2006, and all
8  those -- all those individuals made $8 an
9  hour, correct?
10      A. That's correct.
11      Q. You hired Chance Hamm, correct?
12      A. I did.
13      Q. You hired Joseph May, correct?
14      A. Correct.
15      Q. And you hired William Hubbard,
16  correct?
17      A. Yes.
18      Q. And you also hired Mr. Beckwith,
19  right?
20      A. Yes.
21      Q. How did you hire Mr. Beckwith?
22  How did you come to know him?
23          MR. DUKES: Object to the form;
24          asked and answered. It's
25          beyond the scope of a

Page 109

1          30(b)(6).
2      Q. You can answer. You can answer.
3          MR. DUKES: He can answer when I
4          tell him to answer.
5          And it's okay to
6          answer.
7      A. I had known Mr. Beckwith for a
8  year or two before I hired him. Lives in the
9  same town that I do.
10      Q. Was he a friend of yours?
11      A. Yes.
12      Q. Did you know where he worked
13  before?
14      A. Yeah. He had -- I know where he
15  had -- had worked at different places, yes.
16      Q. What special skills did
17  Mr. Beckwith have?
18      A. I wouldn't say that he had really
19  special skills. I hired him basically, in my
20  mind, as paying him $7 an hour for labor work
21  like the rest of them. And the other dollar
22  an hour, plus a place, a mobile home, place
23  to stay, was for my night watchman's role.
24      Q. Well, was he not going to get
25  paid overtime for his hours after his labor?

Page 110

1    A.  I had not figured that into the
2  way I had set it up with him, no.
3    Q.  Wouldn't that violate the Fair
4  Labor Standards Act if you didn't pay a
5  person overtime wages for hours over eight
6  each -- or over forty each week?
7    A.  I guess it could.  But the way we
8  had it set up, I didn't think it was a
9  problem.
10    Q.  Well, is there any document, any
11  writing anywhere that shows that $7 an hour
12  was for his labor and a dollar an hour was
13  for his work as a night watchman?
14    A.  No, sir.  There is no
15  documentation.
16    Q.  Oh.  We just have to take your
17  word for that, don't we?
18      MR. DUKES:  Object to the form.
19    A.  Yes, sir.
20    Q.  Okay.  Mr. Carroll, what high
21  school did you attend?
22    A.  Glenwood High School.
23    Q.  Where is that located?
24    A.  It's north of Phenix City in Lee
25  County.

Page 111

1    Q.  What kind of school is that?
2    A.  It's a high school.
3    Q.  Private?
4    A.  It is, yes, sir.
5    Q.  How many black people do they
6  have attending that high school?
7      MR. DUKES:  Object to the form.
8    Q.  You can answer.
9    A.  I don't know the number.
10    Q.  Any?
11    A.  Yes.
12    Q.  Scholarshipped?
13    A.  Possibly.
14    Q.  Athletic?
15    A.  Some were, some weren't.
16    Q.  Was it a Christian school -- I
17  mean, religious school?
18    A.  No.  It doesn't have any specific
19  religious background to it, no, sir.
20    Q.  You know some private schools are
21  religious in nature, correct?
22    A.  No, sir.
23    Q.  This wasn't like that?
24    A.  Huh-uh (negative response).
25    Q.  Your kids go to public schools in

Page 112

1  Auburn?
2      MR. DUKES:  Object to the form.
3    A.  Yes, sir.
4    Q.  Mr. Carroll, were you the person
5  who set the wages for these people?
6      MR. DUKES:  Object to the form.
7    A.  I was.
8      THE WITNESS:  Excuse me.
9    Q.  Do you know that it's wrong to
10  discriminate against someone because of their
11  race?
12    A.  Yes, sir, I do.
13    Q.  Do you know that that's unlawful?
14    A.  Yes, sir, I do.
15    Q.  And how old are you Mr. Carroll?
16    A.  Forty-three.
17    Q.  Did you know that it's been
18  unlawful for all the days that you've been
19  alive?  Did you know that?
20    A.  If you tell me, I'll assume that
21  it's true.
22    Q.  Do you agree with me that a
23  person who discriminates based on race, which
24  is unlawful, should be punished?
25    A.  If found that they're guilty of

Page 113

1  it, I assume they should be, yes, sir.
2    Q.  If there's proof that a person
3  discriminated based on race, then that person
4  or that company should be punished; do you
5  agree with that?
6      MR. DUKES:  Object to the form.
7    A.  Yes.
8    Q.  Well, what do you think would be
9  a fair punishment for that?
10      MR. DUKES:  Object to the form.
11    A.  I don't have any idea.
12    Q.  Do you think that someone who's
13  been in the military for nine years and
14  served this country for nine years and has
15  worked as a diesel mechanic for twenty years,
16  do you think it would be demeaning to them to
17  pay them less money than you paid a
18  twenty-one-year-old boy?
19      MR. DUKES:  Object to the form.
20    A.  It would depend on the
21  circumstances.
22    Q.  Yeah.  Do you think that person
23  might be offended --
24      MR. DUKES:  Object to the form.
25    Q.  -- under those circumstances?

Page 114

1  A. I don't know.
2  Q. Well, would you be?
3      MR. DUKES: Object to the form.
4  A. Again, it would depend on the
5  circumstances.
6  Q. Well, Mr. Carroll, if Mid-State
7  Land and Timber sold this property in May of
8  2006 for $32 million, what do you think would
9  be a fair punishment for them if there's
10 evidence that they discriminated against my
11 clients on the basis of race?
12     MR. DUKES: Object to the form.
13 A. I couldn't answer that.
14     MR. ROBERSON: Thank you,
15     Mr. Carroll.
16     MR. DUKES: I've got one or two
17     follow-ups.
18     EXAMINATION
19 BY MR. DUKES:
20 Q. You testified earlier that you
21 had not inquired as to the background of
22 Byron Davison. Do you recall speaking with
23 Mrs. Howell about Mr. Davison?
24 A. I do.
25 Q. And based on that conversation,

Page 115

1  did Mrs. Howell tell you anything about his
2  background or say that anyone had been
3  stating anything about his background?
4  A. They basically -- Mrs. Howell
5  basically told me that being the husband of
6  Donna Davison -- and she was hired primarily
7  because she was in the family -- that he was
8  hired along for those same reasons.
9      MR. DUKES: That's all I have.
10     MR. ROBERSON: That's good.
11     THE VIDEOGRAPHER: This concludes
12     the deposition of David
13     Carroll. The time is
14     2:57 p.m. A total of two
15     tapes were used. We're
16     going off the Record.
17 (The videotaped deposition of
18 DAVID CARROLL concluded at
19 approximately 2:57 p.m.)
20 * * * * * * * * * *
21 FURTHER DEPONENT SAITH NOT
22 * * * * * * * * * *
23
24
25

Page 116

1  * * * * * * * * * *
2  REPORTER'S CERTIFICATE
3  * * * * * * * * * *
4
5  STATE OF ALABAMA)
6  COUNTY OF MONTGOMERY)
7
8  I, Cornelia J. Baker, Certified Court
9  Reporter, Certified Shorthand Reporter,
10 and Notary Public in and for the State of
11 Alabama at Large, do hereby certify that
12 on Tuesday, March 27, 2007, pursuant to
13 notice and stipulation on behalf of the
14 Plaintiffs, I reported the videotaped
15 deposition of DAVID CARROLL, who was first
16 duly sworn by me to speak the truth, the
17 whole truth, and nothing but the truth, in
18 the matter of JEFFREY HARRIS, WILLIE
19 BERNARD MACK, DEMETRIUS PARHAM and HENRY
20 TARVER, Plaintiffs, versus MID-STATE LAND
21 AND TIMBER COMPANY, INCORPORATED, d/b/a
22 SEDGEFIELDS PLANTATION, Defendant, Case
23 Number 2:06-cv-875-ID-CSC, now pending in
24 the United States District Court for the
25 Middle District of Alabama, Northern

Page 117

1  Division; that the foregoing pages contain
2  a true and accurate transcription of the
3  examination of said witness by counsel for
4  the parties set out herein; that the
5  reading and signing of said deposition was
6  waived by witness and counsel for the
7  parties.
8      I further certify that I am neither of
9  kin nor of counsel to the parties to said
10 cause, nor in any manner interested in the
11 results thereof.
12     This the 3rd day of April, 2007.
13
14
15
        Cornelia J. Baker
16      Certified Shorthand Reporter,
        Certified Court Reporter and
17      Notary Public for the
        State of Alabama
18
19      My Commission expires 6/9/08.
20
21
22
23
24
25

EXHIBIT 5

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

JEFFREY HARRIS, WILLIE           )
BERNARD MACK, DEMETRIUS          )
PARHAM and HENRY TARVER,         )
                                 )         Civil Action No.:
        **Plaintiffs**           )
                                 )         **2:06-cv-875-ID-CSC**
**v.**                           )
                                 )
MID-STATE LAND & TIMBER          )
COMPANY, INC., d/b/a             )
SEDGEFIELDS PLANTATION,          )

        **Defendant.**

### DECLARATION OF ROY LEE

My name is Roy Lee. I am a Plaintiff in the above action. I claim that Mid-State has treated me unfairly in the terms and conditions of my employment. I believe that I have been discriminated against on account of my race as concerns my compensation from Mid-State. I worked for them from the year 2000 until Mid-State was sold in May 2006.

I was initially hired at $6.00 per hour as a laborer. I worked continuously for Mid-State until they were sold. I was promoted and received raises. I was made a member of management around the year 2004. I was paid by the hour even after I was a member of management.

I was over the entire plantation including all hunting operations at Sedgefields before the hiring of David Carroll in April 2005. I ran both the deer and quail hunting operations. I have taken numerous guests on quail hunts.

I have pre-released birds which is putting out wild birds before the hunting season. I have also put and take which is releasing birds the day of the hunt.

I was put on a salary in 2005 of $41,000.00 annually. I made more than that as an hourly worker in 2004. I have never been offered lodging on the property. Mid-State did not provide my health insurance and it has never been offered to me. I know that Joel Norman had his health insurance paid for by Mid-State. Norman also lived on the property at Mid-State. He received an annual salary of $70,00.00 per year. I worked more hours than any employee at Mid-State. I worked far in excess of the hours that Norman did.

I am a high school graduate. I worked at Columbus Mills for approximately 18-19 years. I was a supervisor of over 32 people when the Mill closed in Union Springs.

I can operate heavy equipment. I have operated backhoes, bulldozers, tractors, and numerous other pieces of equipment at Mid-State.

I recommended Henry Tarver a black male, to Carroll to hire as a night watchman in June of 2005. Tarver was hired as a laborer at $7.00 per hour. Carroll later hired Beckwith, a white male, as a laborer and night watchman at an hourly rate of $8.00 per hour. During the time that I had worked at Mid-State, no black has maintained a residence on the property at Sedgefields Plantation.

I declare pursuant to 28 U.S.C. §1746, under penalty of perjury that the following statement is true and correct.

Executed by Roy Lee on this the 7th day of April, 2007.

Roy Lee

EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JEFFREY HARRIS, WILLIE            )
BERNARD MACK, DEMETRIUS           )
PARHAM and HENRY TARVER,          )
                                  )          Civil Action No.:
        Plaintiffs                )
                                  )          2:06-cv-875-ID-CSC
v.                                )
                                  )
MID-STATE LAND & TIMBER           )
COMPANY, INC., d/b/a              )
SEDGEFIELDS PLANTATION,

        Defendant.

## DECLARATION OF NORRIS FOSTER

My name is Norris Foster. I am a Plaintiff in a race discrimination claim against Mid-State Land and Timber. I have worked on Sedgefields Plantation for many years. I was working there when Mid-State acquired it in 1999. I worked for Mid-State until I was laid off in a force reduction in the year 2001.

I was rehired by Mid-State in February 2005. Roy Lee offered me a job. I had approximately 10 years experience preparing fields for hunting, driving a tractor, and working in a hunting crew when I was rehired in February 2005. I have been on numerous quail hunts with Roy Lee. He is an experienced dog handler and an outstanding guide for quail hunts. I think he is a better guide than Joel Norman. I was more successful when I worked in his crew and we received larger tips when I worked in his crew. At least I received the portion of my tips when I worked with Roy.

I declare pursuant to 28 U.S.C. §1746, under penalty of perjury, that the following

statement is true and correct.

Executed by Norris Foster on this the 7th day of April, 2007.

Norris Foster

EXHIBIT 7

#1753

PRINT EMPLOYEE'S NAME ON T.

# EMPLOYEE RECORDS JACKET

ADDRESS 22137 Hwy 29N    Union Springs , AL 36089 , (334) 738.537
                                        City    State  Zip    Telephone

                                        City    State  Zip    Telephone

                                        City    State  Zip    Telephone

## POSITION HISTORY

| DATE | | POSITION AND DEPARTMENT | PAY RATE | |
|------|------|---|---|---|
| FROM | TO | | AMOUNT | PER |
| 9-19-05 | | Quail Operations Mgr. | 70000 | Year |
| | | | | |
| | | This one had NO | | |
| | | SS Card or | | |
| | | Dr License in file. | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

SOCIAL SECURITY NO._____ DATE OF BIRTH 08-22-59 ___ SEX: M

CITIZEN OF U.S.A.: YES ☒ OTHER (Name) _____

MARITAL STATUS: ☐ SINGLE  ☒ MARRIED  ☐ SEPARATED  ☐ WIDOWED  ☐ DIVORCE

NAME OF SPOUSE  Tina Norman                    NO. OF DEPENDENTS 3

IN EMERGENCY NOTIFY  Tina Norman               RELATIONSHIP Wife

ADDRESS 22137 Hwy 29N, Union Sp. AL 36089 TELEPHONE 738-5379

RELATIVES WORKING FOR US: NAME _____ RELATIONSHIP _____

EDUCATION: ELEMENTARY _____ HIGH _____ COLLEGE _____ GRADUATE _____

OTHER _____

UNION MEMBER: ☐ YES ☐ NO  UNION (Local) NAME _____

| NAME | DATES | | NAME | DATES | |
|------|-------|-------|------|-------|-------|
| | Eligible | Enrolled | | Eligible | Enrolled |
| PENSION PLAN | | | GROUP INSURANCE | | |
| PROFIT SHARING | | | | | |
| CREDIT UNION | | | | | |

COMPANY TRAINING AND SPECIAL SKILLS _____

## TERMINATION INFORMATION

DATE TERMINATED _____ WOULD WE REHIRE? YES ☐ NO ☐

REASON FOR TERMINATION:

Y CLEARANCE _____

EXHIBIT 8

# The Peble Corp.

## EMPLOYMENT APPLICATION

*PLEASE PRINT ANSWERS TO THE FOLLOWING QUESTIONS CAREFULLY AND IN INK. TO BE CONSIDERED FOR EMPLOYMENT, ALL ITEMS MUST BE COMPLETED, INCLUDING SIGNATURE. THIS APPLICATION IS VALID FOR 30 DAYS. IF YOU WISH TO BE CONSIDERED FOR EMPLOYMENT AFTER THIS APPLICATION EXPIRES, THEN YOU MUST RE-APPLY.*

NAME _Joel S. Norman Jr._      TELEPHONE NUMBER

ADDRESS _22137 Highway 29 N._      Home # _(334) 738-5371_

CITY _Union Springs_  STATE _AL_  ZIP _36089_   Daytime # _(   )   ._

SOCIAL SECURITY NUMBER _

**EMPLOYMENT INTERESTS:**

Type of work desired _____

Full Time ___✓___   Part Time _____   Temporary _____

Starting pay expected _____ Date Available to start _____

IF APPLICABLE

Are you willing to travel? _____ If yes, what percentage of the time _____

Would you be willing to relocate? _Yes_

Would you object to:  Irregular work hours  ☐ YES  ☑ NO   Night work  ☐ YES  ☑ NO

Swing or fluctuating shift work  ☐ YES  ☑ NO

**SPECIAL SKILLS - COMPLETE IF APPLICABLE TO THE POSITION FOR WHICH YOU ARE APPLYING:**

Skill _Bird Dog Training & Handling_  Experience _27 yrs_

Skill _Plantation Mng_  Experience _7 yrs_

Skill _____  Experience _____

Please discuss other specialized skills you feel are pertinent to the job for which you are applying _____

_____

**UNITED STATES MILITARY SERVICE STATUS:**

_t_ Military Service - FROM _____ TO _____

_ranch _____ Rank on discharge _____ Present Status_____

List duties and special training

CONFIDENTIAL    0070

**EDUCATION:**

| | NAME OF SCHOOL AND LOCATION | MAJOR AREA OF STUDY and/or DEGREE RECEIVED |
|---|---|---|
| High School | TCCHS Thomasville, GA | High School Diploma |
| Jr. College, College, or University | Abraham Baldwin Agricultural College Tifton, GA | Associate Degree in Wildlife Technology |
| Technical or Trade Schools | | |

Honors and Scholarships _____

Grade Average (approx.)  High School_____  College_____  Other_____

**General Information:**

Are you legally authorized to work in the United States?  ☑ YES   ☐ NO  If not, what is your present status and do you have a work visa?_____

Have you ever been convicted of a crime?  ☐ YES  ☑ NO  If yes, please explain. Give dates, charge, penalty assessed or disposition.  Conviction will not necessarily bar employment.  Consideration will be given to the nature of the crime, age at the time of offense, rehabilitation and the position for which you are applying.

_____

_____

Have you ever been discharged from a job?  ☐ YES  ☑ NO  If yes, please explain_____

_____

_____

Have you ever been bonded?  ☐ Yes  ☑ NO   If yes, when and in what job_____

_____

_____

CONFIDENTIAL   0079

Do you have a valid, active driver's license? ☑ YES ☐ NO. Issuing State _G A_

_____vers License #_____ Class of License_____ C _____

_____w long have you been a resident of this City_____ 20 _____ State _GA_

How long at your present address? _20_ Give previous address if less than one year at present

address_____

Are you over the age of 18? ☑ YES ☐ NO If hired can you provide proof of age? ☑ YES ☐ NO

**EMPLOYMENT DATA:**

Have you ever been employed by this company before? ☐ YES ☑ NO If yes, please give dates of

employment, position employed, and reason for leaving_____

_____

_____

Please list all jobs (if not listed above), beginning with your present or last employer and working backwards
to earlier positions. Account for all periods, including unemployment, self-employment, and military service.
If additional space is needed, please list on a separate page or on the back of this form.

DATES - From _Aug 1984_ to _Sept 2005_

Company Name, City, and State _Millpond Plantation, Thomasville, GA_

Supervisor's Name/Title_____ SALARY - Start_____End_____

Phone #_____ May we contact?_____ Final position with the company_____

Reason for leaving?_____

#2 DATES - From _Aug 1982_ to _Aug 1984_

Company Name, City, and State_Gillionville Plantation, Albany, GA_

Supervisor's Name/Title_____ SALARY - Start_____End_____

Phone #_____ May we contact?_____ Final position with the company_____

Reason for leaving?_____

#3 DATES - From_____to_____

Company Name, City, and State_____

Supervisor's Name/Title_____ SALARY - Start_____End_____

Phone #_____ May we contact?_____ Final position with the company_____

Reason for leaving?_____

CONFIDENTIAL

#4 DATES - From_____to_____

Company Name, City, and State_____

Supervisor's Name/Title _____ SALARY - Start_____End_____

Phone #_____ May we contact?_____ Final position with the company_____

Reason for leaving?_____

---

#5 DATES - From_____to_____

Company Name, City, and State_____

Supervisor's Name/Title _____ SALARY - Start_____End_____

Phone #_____ May we contact?_____ Final position with the company_____

Reason for leaving?_____

---

PERSONAL REFERENCES (Not Former Employers or Relatives)

| Name and Occupation | Address | Phone Number |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

The Pablo Corp. is an Equal Opportunity Employer which endeavors, pursuant to all applicable Federal and State Laws, to give every applicant for employment, and every employee, equal consideration in all matters relating to employment, without regard to race, color, sex, age, religion, national origin, citizenship and disability.

By my signature below, I certify the facts set forth in this application for employment are true and complete to the best of my knowledge and belief, and I agree you may investigate my statements. I agree to permit all past employers to give any information concerning me and release them from liability in furnishing such information. I understand that my employment and, if employed, my continued employment, is conditional upon my participating in and clearing such security examinations or investigations as may be deemed advisable by the company. I agree to participate in such examinations and investigations when requested to do so by the company, and agree that the company shall be held harmless and free from liability in connection with any security examination or investigation in which I may be involved.

I understand, if employed, false statements on this application shall result in disciplinary action up to and including discharge. Also if employed, I understand that it is the company's policy that all employees who do not have a written employment contract with the company for a specific, fixed term of employment are employed at the company's will. I understand that I would be subject to termination at any time, for any reason, with or without cause or notice.

_____
Applicant's Signature

9-1-05
_____
Signed

CONFIDENTIAL

0061

EXHIBIT 9

Lee, Roy Chester

REDACT

PRINT EMPLOYEE'S NAME ON TAB ↑

# EMPLOYEE RECORDS JACKET

## POSITION HISTORY

| DATE | | POSITION AND DEPARTMENT | PAY RATE | |
|------|------|---|-------|------|
| FROM | TO | | AMOUNT | PER |
| 9/18/00 | | Labourer | 6 00 | hr. |
| 4/16/01 | | Raise | 7 00 | hr |
| 10/1/01 | | Merit Increase | 8 50 | hr |
| 3/1/02 | | Merit Increase | 10 00 | hr |
| 10/1/03 | | Merit Increase | 11 00 | hr |
| 1/1/05 | | Merit Increase | 12 00 | hr |
| 3/1/06 | | Raise | 41,623 40 | yrly |

## TERMINATION INFORMATION

DATE TERMINATED 5-19-06 _____ WOULD WE REHIRE? YES ☐ NO ☐

REASON FOR TERMINATION:

Job ended - business sold

*(Continue on Reverse, if necessary)*

ADDRESS

REDACT

REDACT

| | City | State | Zip | Telephone |
| REDACT | City | State | Zip | Telephone |
| REDACT | City | State | Zip | Telephone |

SOCIAL SECURITY NO _____ DATE OF BIRTH _____ SEX: ☒ M ☐ F

CITIZEN OF U.S.A.: YES ☒ OTHER (Name) _____

MARITAL STATUS: ☐ SINGLE ☒ MARRIED ☐ SEPARATED ☐ WIDOWED ☐ DIVORCED

NAME OF SPOUSE _____ REDACT _____ NO. OF DEPENDENTS __

IN EMERGENCY NOTIFY _____ RELATIONSHIP

ADDRESS Same _____ REDACT

RELATIVES WORKING FOR US: NAME _____ RELATIONSHIP _____

EDUCATION: ELEMENTARY _____ HIGH _____ COLLEGE _____ GRADUATE _____

OTHER _____

UNION MEMBER: ☐ YES ☐ NO  UNION (Local) NAME _____

| NAME | DATES | | NAME | DATES | |
|------|----------|----------|------|----------|----------|
| | Eligible | Enrolled | | Eligible | Enrolled |
| PENSION PLAN | | | GROUP INSURANCE | | |
| PROFIT SHARING | | | | | |
| CREDIT UNION | | | | | |

COMPANY TRAINING AND SPECIAL SKILLS _____

SECURITY CLEARANCE _____ — _____

0163    CONFIDENTIAL
        DEFENDANT'S PROD

© Copyright 1980, 1996 — SELECTFORM, INC., Box 3045, Freeport NY 11520    FORM 14 — Printed in U.S.A.

EXHIBIT 10

# The Peble Corp.

## EMPLOYMENT APPLICATION

*PLEASE PRINT ANSWERS TO THE FOLLOWING QUESTIONS CAREFULLY AND CONSIDERED FOR EMPLOYMENT, ALL ITEMS MUST BE COMPLETED, INCLUDING SIGNATURE. THIS APPLICATION IS VALID FOR 30 DAYS. IF YOU WISH TO BE CONSIDERED FOR EMPLOYMENT AFTER THIS APPLICATION EXPIRES, THEN YOU MUST RE-APPLY.*

NAME _Roy    Chester    Lee_ _____ TELEPHONE NUMBER

ADDRESS _ REDACT _____ ____ Home # REDACT

CITY _ REDACT ___ STATE _AL_ ZIP _ ____ Daytime # REDACT

SOCIAL SECURITY NUMBER    REDACT

## EMPLOYMENT INTERESTS:

Type of work desired _Horse/Dog Trainer/Hunting Guide or Tractor_

Full Time _X_ ____ Part Time _____ Temporary _____

Starting pay expected _$6.00 per Hour_ Date Available to start _Any time_

**IF APPLICABLE:**

Are you willing to travel? _____ If yes, what percentage of the time _____

Would you be willing to relocate? _____

Would you object to: Irregular work hours ☐ YES ☒ NO   Night work ☐ YES ☒ NO

Swing or fluctuating shift work ☐ YES ☒ NO

## SPECIAL SKILLS - COMPLETE IF APPLICABLE TO THE POSITION FOR WHICH YOU ARE APPLYING:

Skill _Horse Training_ _____ Experience _9 years_

Skill _License forklift Operator_ Experience _23 years_

Skill _Dog Trainer_ _____ Experience _13 years_

Please discuss other specialized skills you feel are pertinent to the job for which you are applying _____

_____

## UNITED STATES MILITARY SERVICE STATUS:

Past Military Service - FROM _____ , 19 ___ TO _____ , 19 ___

Branch _____ Rank on discharge _____ Present Status _____

List duties and special training

CONFIDENTIAL
DEFENDANT'S PROD

**EDUCATION:**

|  | NAME OF SCHOOL AND LOCATION | MAJOR AREA OF STUDY and/or DEGREE RECEIVED |
|---|---|---|
| High School | *Bullock County High School* *Union Springs, AL* | *Science, Math, History* |
| Jr. College, College, or University | | |
| Technical or Trade Schools | | |

Honors and Scholarships _____

Grade Average (approx.)   High School _____ X _____   College _____ Other _____

**General Information:**

Are you legally authorized to work in the United States?   ☒ YES   ☐ NO  If not, what is your present status and

do you have a work visa? _____

Have you ever been convicted of a crime?   ☐ YES   ☒ NO  If yes, please explain. Give dates, charge, penalty assessed or disposition.  Conviction will not necessarily bar employment.  Consideration will be given to the nature of the crime, age at the time of offense, rehabilitation and the position for which you are applying.

_____

_____

Have you ever been discharged from a job?   ☐ YES   ☒ NO  If yes, please explain _____

_____

_____

Have you ever been bonded?   ☐ Yes   ☒ NO    If yes, when and in what job _____

_____

_____

0174   CONFIDENTIAL
DEFENDANT'S PROD

Do you have a valid, active driver's license?  ☒ YES  ☐ NO  Issuing State _____

Drivers License    REDACT    _____    Class of License _____

) long have you been a resident of this City _*41 years*_ State _*41 years*_

How long at your present address? _*40 years*_ Give previous address if less than one year at present

address _____

Are you over the age of 18?  ☒ YES  ☐ NO  If hired can you provide proof of age?  ☐ YES  ☐ NO

**EMPLOYMENT DATA:**

Have you ever been employed by this company before?  ☐ YES  ☒ NO    If yes, please give dates of

employment, position employed, and reason for leaving _____

_____

Please list all jobs (if not listed above), beginning with your present or last employer and working backwards
to earlier positions. Account for all periods, including unemployment, self-employment, and military service.
If additional space is needed, please list on a separate page or on the back of this form.

**#1 DATES - From** _July 9, 1978_ **to** _July 14, 00_

Company Name, City, and State _Beaulieu of America_

Supervisor's Name/Title _Lawrence Penn_    SALARY - Start _$9.70_ End _13.26 per hr_

Phone # _738-4600_ May we contact? _yes_ Final position with the company _Supervisor Trainee_

Reason for leaving? _Plant Closed_

**#2 DATES - From** _Summer 75/76_ to _to Summer 1977_

Company Name, City, and State _Welsh Company of the South_

Supervisor's Name/Title _M. Driggers_    SALARY - Start _____ End _____

Phone # _____ May we contact? _____ Final position with the company _Assembly Worker_

Reason for leaving? _Plant Closed_

**#3 DATES - From** _____ to _____

Company Name, City, and State _Chris Caldwell Logging Company_

Supervisor's Name/Title _Chris Caldwell / Deceased_ SALARY - Start _____ End _____

Phone # _____ May we contact? _____ Final position with the company _Truck Driver,_
_Skidder / Tractor_
_operator_

#4 DATES - From_____to_____

Company Name, City, and State_____

Supervisor's Name/Title_____ SALARY - Start_____End_____

Phone #_____ May we contact?_____Final position with the company_____

Reason for leaving?_____

#5 DATES - From_____to_____

Company Name, City, and State_____

Supervisor's Name/Title_____ SALARY - Start_____End_____

Phone #_____ May we contact?_____Final position with the company_____

Reason for leaving?_____

PERSONAL REFERENCES (Not Former Employers or Relatives)

| Name and Occupation | Address | Phone Number |
|---|---|---|
| Hill + Hill Grocery Milton Hill - Owner | Hwy. 82 E. Miday, Alabama 36053 | 529-3700 |
| Bill Davis Grocery Bill Davis - Owner | Rt. 2 Midway, Alabama | 529-9859 |
| Sherman Bowens Grocery Sherman Bowens - Owner | Rt. 2 Midway, Alabama 36053 | 529-3327 |

The Peble Corp. is an Equal Opportunity Employer which endeavors, pursuant to all applicable Federal and State Laws, to give every applicant for employment, and every employee, equal consideration in all matters relating to employment, without regard race, color, sex, age, religion, national origin, citizenship and disability.

By my signature below, I certify the facts set forth in this application for employment are true and complete to the best of my knowledge and belief, and I agree you may investigate my statements. I agree to permit all past employers to give any information concerning me and release them from liability in furnishing such information. I understand that my employment and, if employed, my continued employment, is conditional upon my participating in and clearing such security examinations or

investigations as may be deemed advisable by the company. I agree to participate in such examinations and investigations when requested to do so by the company, and agree that the company shall be held harmless and free from liability in connection with any security examination or investigation in which I may be involved.

I understand, if employed, false statements on this application shall result in disciplinary action up to and including discharge. Also if employed, I understand that it is the company's policy that all employees who do not have a written employment contract with the company for a specific, fixed term of employment are employed at the company's will. I understand that I would be subject to termination at any time, for any reason, with or without cause or notice.

_Roy Chester Lee_
**Applicant's Signature**

_August 10, 2000_
**Date Signed**

0176    CONFIDENTIAL DEFENDANT'S PROD

EXHIBIT 11

# The Peble Corp.

## EMPLOYMENT APPLICATION

*PLEASE PRINT ANSWERS TO THE FOLLOWING QUESTIONS CAREFULLY AND IN INK. TO BE CONSIDERED FOR EMPLOYMENT, ALL ITEMS MUST BE COMPLETED, INCLUDING SIGNA-TURE. THIS APPLICATION IS VALID FOR 30 DAYS. IF YOU WISH TO BE CONSIDERED FOR EMPLOYMENT AFTER THIS APPLICATION EXPIRES, THEN YOU MUST RE-APPLY.*

NAME William. Rogers Hubbard          TELEPHONE NUMBER

ADDRESS 12703 co. Road 7 Troy AL          Home # (334) 474-3088

CITY Troy          STATE AL          ZIP 36091          Daytime # (     ) -

SOCIAL SECURITY NUMBER _

**EMPLOYMENT INTERESTS:**

Type of work desired Outside Labor

Full Time 40 HR week  Part Time _____  Temporary _____

Starting pay expected $8⁰⁰ HR _____  Date Available to start _____

**IF APPLICABLE:**

Are you willing to travel? No   If yes, what percentage of the time _____

Would you be willing to relocate? No _____

Would you object to:  Irregular work hours ☑ YES ☐ NO   Night work ☑ YES ☐ NO

Swing or fluctuating shift work ☑ YES ☐ NO

**SPECIAL SKILLS - COMPLETE IF APPLICABLE TO THE POSITION FOR WHICH YOU ARE APPLYING:**

Skill Equipment operator          Experience Dozier - Tractor - Skidder

Skill Horse Rider          Experience _____

Skill _____          Experience _____

Please discuss other specialized skills you feel are pertinent to the job for which you a[re]

_____

**UNITED STATES MILITARY SERVICE STATUS:**

[pa]st Military Service - FROM N/A          TO _____

[Bra]nch _____  Rank on discharge _____  Present Status _____

List duties and special training

**EDUCATION:**

| | NAME OF SCHOOL AND LOCATION | MAJOR AREA OF STUDY and/or DEGREE RECEIVED |
|---|---|---|
| High School | Banks Middle School | general |
| Jr. College, College, or University | | |
| Technical or Trade Schools | | |

Honors and Scholarships _____

Grade Average (approx.)  High School _____  College _____ Other _____

**General Information:**

Are you legally authorized to work in the United States? ☑ YES ☐ NO  If not, what is your present status and

do you have a work visa? _____

Have you ever been convicted of a crime?  ☐ YES ☑ NO  If yes, please explain. Give dates, charge, penalty assessed or disposition.  Conviction will not necessarily bar employment.  Consideration will be given to the nature of the crime, age at the time of offense, rehabilitation and the position for which you are applying.

_____

_____

Have you ever been discharged from a job?  ☐ YES ☑ NO  If yes, please explain _____

_____

_____

Have you ever been bonded?  ☐ Yes ☑ NO  If yes, when and in what job _____

_____

_____

Do you have a valid, active driver's license?  ☑ YES  ☐ NO  Issuing State __ALABAMA__

Drivers License # _____  Class of License __D__

How long have you been a resident of this City __9 years__  State __AL__

How long at your present address? __19 years__  Give previous address if less than one year at present

address_____

Are you over the age of 18?  ☑ YES  ☐ NO  If hired can you provide proof of age? ☑ YES  ☐ NO

**EMPLOYMENT DATA:**

Have you ever been employed by this company before? ☐ YES  ☑ NO   If yes, please give dates of

employment, position employed, and reason for leaving _____

_____

Please list all jobs (if not listed above), beginning with your present or last employer and working backwards
to earlier positions.  Account for all periods, including unemployment, self-employment, and military service.
If additional space is needed, please list on a separate page or on the back of this form.

#1 DATES - From __Aug- 03__  to __11-20-05__   __Union springs AL__

Company Name, City, and State __Bonie plant Farm__

Supervisor's Name/Title __Paul Poughton__ _____ SALARY - Start $7⁰⁰ End $8⁰⁰

Phone # __738-3104__ May we contact? __Yes__ Final position with the company __Sales Helper__

Reason for leaving? __Job ~~~~ Opporinty__

#2 DATES - From _____ to _____

Company Name, City, and State_____

Supervisor's Name/Title _____   SALARY - Start_____ End_____

Phone #_____ May we contact?_____ Final position with the company_____

Reason for leaving?_____

#3 DATES - From_____ to_____

Company Name, City, and State_____

Supervisor's Name/Title_____ SALARY - Start_____ End_____

Phone #_____ May we contact?_____ Final position with the company_____

Reason for leaving?_____

CONFIDENTIAL

**#4 DATES - From**_____ to _____

Company Name, City, and State_____

Supervisor's Name/Title_____ SALARY - Start_____End_____

Phone #_____ May we contact?_____Final position with the company_____

Reason for leaving?_____

---

**#5 DATES - From**_____ to _____

Company Name, City, and State_____

Supervisor's Name/Title_____ SALARY - Start_____End_____

Phone #_____May we contact?_____Final position with the company_____

Reason for leaving?_____

---

## PERSONAL REFERENCES (Not Former Employers or Relatives)

| Name and Occupation | Address | Phone Number |
|---|---|---|
| Peggy Word | 9823 co Rd 15 Union Springs AC | 334) 474) 3666 |
| Bobby Earles | 13699 co Rd 7 Troy AC | 334) 474) 3540 |
| Doren Hooks | 14043 co Rd 7 Troy Ac | 334) 474) 3378 |

The Pable Corp. is an Equal Opportunity Employer which endeavors, pursuant to all applicable Federal and State Laws, to give any applicant for employment, and every employee, equal consideration in all matters relating to employment, without regard to race, color, sex, age, religion, national origin, citizenship and disability.

By my signature below, I certify the facts set forth in this application for employment are true and complete to the best of my knowledge and belief, and I agree you may investigate my statements. I agree to permit all past employers to give any information concerning me and release them from liability in furnishing such information. I understand that my employment and, if employed, my continued employment, is conditional upon my participating in and clearing such security examinations or

investigations as may be deemed advisable by the company. I agree to participate in such examinations and investigations when requested to do so by the company, and agree that the company shall be held harmless and free from liability in connection with any security examination or investigation in which I may be involved.

I understand, if employed, false statements on this application shall result in disciplinary action up to and including discharge. Also if employed, I understand that it is the company's policy that all employees who do not have a written employment contract with the company for a specific, fixed term of employment are employed at the company's will. I understand that I would be subject to termination at any time, for any reason, with or without cause or notice.

_William R. Shepherd_    11-17-05
**Applicant's Signature**

**Date Signed**_____

CONFIDENTIAL

EXHIBIT 12

Dept 851

*PRINT EMPLOYEE'S NAME ON TAB*

# EMPLOYEE RECORDS JACKET

CONFIDENTIAL DEFENDANT'S PROD.

0064

## POSITION HISTORY

| DATE | | POSITION AND DEPARTMENT | PAY RATE | |
|------|------|-------------------------|----------|-----|
| FROM | TO | | AMOUNT | PER |
| 11/21/05 | | Labourer | 8 00 | hr. |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

ADDRESS 12703 CR7    Troy   AL, 36081   334-474.3088

| | City | State | Zip | Telephone |

| | City | State | Zip | Telephone |

SOCIAL SECURITY NO. _____ DATE OF BIRTH 10·14.1986  SEX: ☒M ☐F

CITIZEN OF U.S.A.: YES ☒ OTHER (Name) _____

MARITAL STATUS: ☒SINGLE  ☐MARRIED  ☐SEPARATED  ☐WIDOWED  ☐DIVORCED

NAME OF SPOUSE _____ NO. OF DEPENDENTS ___

IN EMERGENCY NOTIFY Debbie Hubbard    RELATIONSHIP Mom

ADDRESS 12703 CR7 , Troy AL 36081  TELEPHONE (334) 474-3088

RELATIVES WORKING FOR US: NAME _____ RELATIONSHIP ___

EDUCATION: ELEMENTARY _____ HIGH _____ COLLEGE _____ GRADUATE _____

OTHER _____

UNION MEMBER: ☐YES ☐NO  UNION (Local) NAME _____

| NAME | DATES | | NAME | DATES | |
|------|-------|------|------|-------|------|
| | Eligible | Enrolled | | Eligible | Enrolled |
| PENSION PLAN | | | GROUP INSURANCE | | |
| PROFIT SHARING | | | | | |
| CREDIT UNION | | | | | |

COMPANY TRAINING AND SPECIAL SKILLS _____

## TERMINATION INFORMATION

DATE TERMINATED 4-28-06 _____ WOULD WE REHIRE? YES ☐ NO ☐

REASON FOR TERMINATION:

Resign in

SEC___Y CLEARANCE _____

EXHIBIT 13

*Mayi Joseph.com*

CONFIDENTIAL    0092

PAGE 11

ROBERSON AND ROBERSO

205-871-5115

02:51

09/05/2006

Dept # 851

**PRINT EMPLOYEE'S NAME ON TAB**

# EMPLOYEE RECORDS JACKET

ADDRESS 4440 CR 15      Uhion Sp., AL. 36089. 474-3280

| | City | State | Zip | Telephone |

| | City | State | Zip | Telephone |

SOCIAL SECURITY NO. _____ DATE OF BIRTH 05-24-81  SEX: ☒M ☐F

CITIZEN OF U.S.A.: ☐ YES ☐ OTHER (Name) _____

MARITAL STATUS: ☒ SINGLE   ☐ MARRIED   ☐ SEPARATED   ☐ WIDOWED   ☐ DIVORCED

NAME OF SPOUSE _____ NO. OF DEPENDENTS ____

IN EMERGENCY NOTIFY Beth May      RELATIONSHIP Mom

ADDRESS 4340 CR 15 Union Spring AL 36089  TELEPHONE (334) 474.3257

RELATIVES WORKING FOR US: NAME _____ RELATIONSHIP ____

EDUCATION: ELEMENTARY ____ HIGH ____ COLLEGE ____ GRADUATE ____

OTHER _____

## POSITION HISTORY

| DATE | | POSITION AND DEPARTMENT | PAY RATE | |
|------|------|------|------|------|
| FROM | TO | | AMOUNT | PER |
| 10/21/05 | | Labourer | 8 00 | hr. |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

UNION MEMBER: ☐ YES ☐ NO  UNION (Local) NAME _____

| NAME | DATES | | NAME | DATES | |
|------|------|------|------|------|------|
| | Eligible | Enrolled | | Eligible | Enrolled |
| PENSION PLAN | | | GROUP INSURANCE | | |
| PROFIT SHARING | | | | | |
| CREDIT UNION | | | | | |

COMPANY TRAINING AND SPECIAL SKILLS _____

SECURITY CLEARANCE _____

## TERMINATION INFORMATION

DATE TERMINATED  12-29-05      WOULD WE REHIRE? YES ☐ NO ☐

REASON FOR TERMINATION: didn't show up for work Quit

*(Continue on Reverse, if necessary)*

© Copyright 1990 - 1996 SELECTFORM, INC., Box 3045, Freeport NY 11520 Tel: 800-326-0311

FORM 14 — Printed in U.S.A.




EXHIBIT 14

# The Peble Corp.

## EMPLOYMENT APPLICATION

PLEASE PRINT ANSWERS TO THE FOLLOWING QUESTIONS CAREFULLY AND IN __ _ _
CONSIDERED FOR EMPLOYMENT, ALL ITEMS MUST BE COMPLETED, INCLUDING S __  NA-
TURE. THIS APPLICATION IS VALID FOR 30 DAYS.  IF YOU WISH TO BE CONSIDERED FOR
EMPLOYMENT AFTER THIS APPLICATION EXPIRES, THEN YOU MUST RE-APPLY.

NAME _Joseph Adam May_ _____ TELEPHONE NUMBER

ADDRESS _4440 CoRd 15_ _____ Home # _(334)474-3280_

CITY_Union Springs_ STATE _Alabama_ ZIP _36089_    Daytime # _(334)850-0350_

SOCIAL SECURITY NUMBER ____'

**EMPLOYMENT INTERESTS:**

Type of work desired _Outside labor_ _____

Full Time_40 hr week_Part Time_____ Temporary_____

Starting pay expected_$9oo hr_ _____ Date Available to start _11-21-05_

**F APPLICABLE:**

Are you willing to travel? _NO_   If yes, what percentage of the time _____

Would you be willing to relocate?  _NO_

Would you object to:   Irregular work hours  ☑ YES  ☐ NO   Night work  ☑ YES  ☐ NO

Swing or fluctuating shift work  ☑ YES  ☐ NO

**SPECIAL SKILLS - COMPLETE IF APPLICABLE TO THE POSITION FOR WHICH YOU ARE APPLYING:**

Skill _Trapping_ _____ Experience _7years_

Skill _Tractor Operater_ _____ Experience _9years_

Skill _Mecanhic_ _____ Experience _6 months_

Please discuss other specialized skills you feel are pertinent to the job for which you are applying_____

**ITED STATES MILITARY SERVICE STATUS:**

ast Military Service - FROM _____ _N/A_ _____ TO_____

branch_____ Rank on discharge_____ Present Status_____

List duties and special training

CONFIDENTIAL

**EDUCATION:**

| | NAME OF SCHOOL AND LOCATION | MAJOR AREA OF STUDY and/or DEGREE RECEIVED |
|---|---|---|
| High School | Bullock Memorial Union Springs, AL | General |
| Jr. College, College, or University | Tuskegee University Tuskegee, AL | G.E.D. |
| Technical or Trade Schools | | |

Honors and Scholarships _____

Grade Average (approx.) High School _____ College _____ Other _____

**General Information:**

Are you legally authorized to work in the United States? ☑ YES ☐ NO If not, what is your present status and

do you have a work visa? _____

Have you ever been convicted of a crime? ☐ YES ☑ NO If yes, please explain. Give dates, charge, penalty assessed or disposition. Conviction will not necessarily bar employment. Consideration will be given to the nature of the crime, age at the time of offense, rehabilitation and the position for which you are applying.

_____

_____

Have you ever been discharged from a job? ☐ YES ☑ NO If yes, please explain _____

_____

_____

Have you ever been bonded? ☐ Yes ☑ NO If yes, when and in what job _____

_____

_____

CONFIDENTIAL   0108

Do you have a valid, active driver's license? ☑ YES ☐ NO  Issuing State _Alabama_

Driver's License #: _____ Class of License _D_

How long have you been a resident of this City _11 yrs_ _____ State _Alabama_

How long at your present address? _3 yrs_ ____ Give previous address if less than one year at present

address _____

Are you over the age of 18? ☑ YES ☐ NO  If hired can you provide proof of age? ☑ YES ☐ NO

**EMPLOYMENT DATA:**

Have you ever been employed by this company before? ☐ YES ☑ NO  If yes, please give dates of

employment, position employed, and reason for leaving _____

_____

Please list all jobs (if not listed above), beginning with your present or last employer and working backwards
to earlier positions. Account for all periods, including unemployment, self-employment, and military service.
If additional space is needed, please list on a separate page or on the back of this form.

#1 DATES - From _Dec "04"_ to _Feb "05"_              _Union Springs_

Company Name, City, and State _Fine Cutz Deer Pr_

Supervisor's Name/Title _Chris Simpson_ ____ SALARY - Start _$7 00 hr_ End _$7 00 hr_

Phone # _738-8732_ May we contact? _Yes_ Final position with the company _____

Reason for leaving? _Seasonal_

#2 DATES - From _March "04"_ to _Sept "04"_

Company Name, City, and State _Brooks Tractor_        _Union Springs, AL_

Supervisor's Name/Title _____ SALARY - Start _$6 25 hr_ End _$6 50 hr_

Phone # _474-3212_ May we contact? _Yes_ Final position with the company _Mecanhic_

Reason for leaving? _Personal_

#3 DATES - From _Feb "03"_ to _Feb "04"_

Company Name, City, and State _Pronto Grassing_        _Troy, AL_

Supervisor's Name/Title _Chad Thrash_ ____ SALARY - Start _$8 00 hr_ End _$9 00 hr_

Phone # _735-2506_ May we contact? _Yes_ Final position with the company _Labor_

Reason for leaving? _Differences with some Employees_

CONFIDENTIAL                    0105

**#4 DATES - From** Jan "2000" **to** Jan "04"

Company Name, City, and State _Bonnie Plant Farm      Union Springs, AL_

Supervisor's Name/Title _Gene Montgomell Charles Clay, Mark G / Sales man_ SALARY - Start $9.00 End $9.00

Phone # _738-3104_ May we contact? _Yes_ Final position with the company _Sales Helper_

Reason for leaving? _Not What I wanted Anymore._

---

**#5 DATES - From** _____ **to** _____

Company Name, City, and State _____

Supervisor's Name/Title _____ SALARY - Start _____ End _____

Phone # _____ May we contact? _____ Final position with the company _____

Reason for leaving? _____

---

PERSONAL REFERENCES (Not Former Employers or Relatives)

| Name and Occupation | Address | Phone Number |
|---|---|---|
| Peggy Wood | 4823 Co Rd 15 Union Springs, AL | (334) 474-3666 |
| Bobby Earles | 13679 Co Rd 7 Troy, AL | (334) 474-3540 |
| Rodger Hubbard | 12703 Co Rd 7 Troy, AL | (334) 474-3088 |

The Peble Corp. is an Equal Opportunity Employer which endeavors, pursuant to all applicable Federal and State Laws, to give every applicant for employment, and every employee, equal consideration in all matters relating to employment, without regard to race, color, sex, age, religion, national origin, citizenship and disability.

By my signature below, I certify the facts set forth in this application for employment are true and complete to the best of my knowledge and belief, and I agree you may investigate my statements. I agree to permit all past employers to give any information concerning me and release them from liability in furnishing such information. I understand that my employment and, if employed, my continued employment, is conditional upon my participating in and clearing such security examinations or investigations as may be deemed advisable by the company. I agree to participate in such examinations and investigations when requested to do so by the company, and agree that the company shall be held harmless and free from liability in connection with any security examination or investigation in which I may be involved.

I understand, if employed, false statements on this application shall result in disciplinary action up to and including discharge. Also if employed, I understand that it is the company's policy that all employees who do not have a written employment contract with the company for a specific, fixed term of employment are employed at the company's will. I understand that I would be subject to termination at any time, for any reason, with or without cause or notice.

_Joseph Adam May_
Applicant's Signature

_11-17-05_
Signed

CONFIDENTIAL
DEFENDANT'S PROD.      0110

# EXHIBIT 15

HAMM, FOREST C.                                                    # 1156

CONFIDENTIAL
DEFENDANT'S PROD.
0082

Dept 851

*PRINT EMPLOYEE'S NAME ON TAB*

# EMPLOYEE RECORDS JACKET

## POSITION HISTORY

| DATE | | POSITION AND DEPARTMENT | PAY RATE | |
| FROM | TO | | AMOUNT | PER |
|------|-----|-------------------------|----------|-----|
| 12/06 | | Outside labourer | 8 00 | hr |
| | | | | |
| | | | | |

## TERMINATION INFORMATION

DATE TERMINATED_____ WOULD WE REHIRE? YES ☐ NO ☐

REASON FOR TERMINATION:

---

ADDRESS 594 CR 19   Union Springs, AL 36089   -334- 474-3587
                    City    State   Zip      Telephone

                    City    State   Zip      Telephone

                    City    State   Zip      Telephone

SOCIAL SECURITY NO._____ DATE OF BIRTH 07-20-84   SEX: ☒M ☐F

CITIZEN OF U.S.A.: YES ☒ OTHER (Name)_____

MARITAL STATUS: ☒ SINGLE   ☐ MARRIED   ☐ SEPARATED   ☐ WIDOWED   ☐ DIVORCED

NAME OF SPOUSE_____ NO. OF DEPENDENTS_____

IN EMERGENCY NOTIFY Nancy Hamm   RELATIONSHIP Mother

ADDRESS 594 CR 196, Union Springs, AL   TELEPHONE (334) 850-4252

RELATIVES WORKING FOR US: NAME_____ RELATIONSHIP_____

EDUCATION: ELEMENTARY_____ HIGH_____ COLLEGE_____ GRADUATE_____

OTHER_____

---

UNION MEMBER: ☐ YES ☐ NO   UNION (Local) NAME_____

| NAME | DATES | | NAME | DATES | |
| | Eligible | Enrolled | | Eligible | Enrolled |
|------|----------|----------|------|----------|----------|
| PENSION PLAN | | | GROUP INSURANCE | | |
| PROFIT SHARING | | | | | |
| CREDIT UNION | | | | | |

COMPANY TRAINING AND SPECIAL SKILLS_____

SECURITY CLEARANCE_____

EXHIBIT 16

# The Peble Corp.

## EMPLOYMENT APPLICATION

*PLEASE PRINT ANSWERS TO THE FOLLOWING QUESTIONS CAREFULLY AND IN INK. TO BE CONSIDERED FOR EMPLOYMENT, ALL ITEMS MUST BE COMPLETED, INCLUDING SIGNA- TURE. THIS APPLICATION IS VALID FOR 30 DAYS. IF YOU WISH TO BE CONSIDERED FOR EMPLOYMENT AFTER THIS APPLICATION EXPIRES, THEN YOU MUST RE-APPLY.*

NAME _Forest Chance Hamm_                TELEPHONE NUMBER

ADDRESS _594 Co Rd 196_                Home # _(334) 474-3557_

CITY _Union Springs_ STATE _Al_ ZIP _36089_ Daytime # _(334) 608-8024_

SOCIAL SECURITY NUMBER _____

**EMPLOYMENT INTERESTS:**

Type of work desired _Outdoors_

Full Time __✓__ Part Time _____ Temporary _____

Starting pay expected _Negotiable_ ___ Date Available to start _ASAP_

**IF APPLICABLE:**

Are you willing to travel? _yes_    If yes, what percentage of the time _____

Would you be willing to relocate? _No_

Would you object to:  Irregular work hours  ☐ YES  ☑ NO    Night work  ☐ YES  ☑ NO

Swing or fluctuating shift work  ☐ YES  ☑ NO

**SPECIAL SKILLS** - COMPLETE IF APPLICABLE TO THE POSITION FOR WHICH YOU ARE APPLYING:

Skill _Welding_                Experience _2 years_

Skill _Hunting Guide (Deer and Quail)_ Experience _4 year_

Skill _Heavy Equiment_            Experience _5 years_

Please discuss other specialized skills you feel are pertinent to the job for which you are applying _enjoy the Outdoors, meeting people and assisting the hunting guests. As well as getting ready for the season driving heavy equipment._

**UNITED STATES MILITARY SERVICE STATUS:**

Past Military Service - FROM _____ TO _____

_____ch _____ Rank on discharge _____ Present Status _____

List duties and special training

_____

CONFIDENTIAL
DEFENDANT'S PROD.      0083

**EDUCATION:**

| | NAME OF SCHOOL AND LOCATION | MAJOR AREA OF STUDY and/or DEGREE RECEIVED |
|---|---|---|
| High School | Dixie Academy Louisville Alabama | |
| Jr. College, College, or University | | |
| Technical or Trade Schools | | |

Honors and Scholarships _____

Grade Average (approx.) High School ____B____ College _____ Other _____

**eral Information:**

Are you legally authorized to work in the United States? ☒ YES ☐ NO If not, what is your present status and

do you have a work visa? _____

Have you ever been convicted of a crime? ☐ YES ☒ NO If yes, please explain. Give dates, charge, penalty assessed or disposition. Conviction will not necessarily bar employment. Consideration will be given to the nature of the crime, age at the time of offense, rehabilitation and the position for which you are applying.

_____

_____

Have you ever been discharged from a job? ☐ YES ☒ NO If yes, please explain _____

_____

_____

Have you ever been bonded? ☐ Yes ☒ NO If yes, when and in what job. _____

_____

_____

CONFIDENTIAL
DEFENDANT'S PROD.    0084

Do you have a valid, active driver's license?  ☒ YES  ☐ NO  Issuing State _Alabama_

Drivers License # _____  Class of License _____

~~y~~ long have you been a resident of this City _15 years_ _____ State _Alabama_

How long at your present address? _4years_ Give previous address if less than one year at present

address _____

Are you over the age of 18?  ☒ YES  ☐ NO  If hired can you provide proof of age?  ☒ YES  ☐ NO

**EMPLOYMENT DATA:**

Have you ever been employed by this company before?  ☐ YES  ☒ NO  If yes, please give dates of

employment, position employed, and reason for leaving _____

_____

_____

Please list all jobs (if not listed above), beginning with your present or last employer and working backwards to earlier positions. Account for all periods, including unemployment, self-employment, and military service. If additional space is needed, please list on a separate page or on the back of this form.

#1 DATES - From _2000_ to _2001_

Company Name, City, and State _Wheelin Sportmen NWTF  Union Springs Al_

Supervisor's Name/Title _Kirk Thomas / Founder_ ____ SALARY - Start _hrs 8.00_ End _8.00_

Phone # _unknown_ May we contact? _yes_ Final position with the company _grounds keeper/Guide_

Reason for leaving? _Closed_ _____

#2 DATES - From _2001_ to _2003_

Company Name, City, and State _Bonnie Plant Farm Union Springs Al_

Supervisor's Name/Title _Richard Brooks / Routeman_ SALARY - Start _8.00_ End _8.00_

Phone # _unknown_ May we contact? _yes_ Final position with the company _Helper_

Reason for leaving? _Seasonal_ _____

#3 DATES - From _2003_ to _2004_

Company Name, City, and State _Great Southern Outdoors UnionSpring Al_

Supervisor's Name/Title _Rex Pritchett/Owner_ SALARY - Start _a day 80.00 plus Tips_ End _____

Phone # _738-5066_ May we contact? _yes_ Final position with the company _Grounds Keeper/Guic_

Reason for leaving? _Seasonal_ _____

CONFIDENTIAL
DEFENDANT'S PROD.    0085

Company Name, City, and State_ C³W Industries   UnionSpring Al

Supervisor's Name/Title Bill Moorer-Gene Combest / owner SALARY - Start $9:00 End_ Curre

Phone # 738-8556 May we contact? yes Final position with the company Supervisor

Reason for leaving?_____

---

#5 DATES - From_____to_____

Company Name, City, and State_____

Supervisor's Name/Title_____SALARY - Start_____End_____

Phone #_____May we contact?_____Final position with the company_____

Reason for leaving?_____

---

## PERSONAL REFERENCES (Not Former Employers or Relatives)

| Name and Occupation | Address | Phone Number |
|---|---|---|
| Kirk Thomas | Edgefield, South Carolina | |
| Thomas Rich | 36 Co Rd 15 UnionSprings | 738-3719 |
| Bill Lee | 353 Sugar Harris Rd | 738-2591 |

The Peble Corp. is an Equal Opportunity Employer which endeavors, pursuant to all applicable Federal and State Laws, to give every applicant for employment, and every employee, equal consideration in all matters relating to employment, without regard to race, color, sex, age, religion, national origin, citizenship and disability.

By my signature below, I certify the facts set forth in this application for employment are true and complete to the best of my knowledge and belief, and I agree you may investigate my statements. I agree to permit all past employers to give any information concerning me and release them from liability in furnishing such information. I understand that my employment and, if employed, my continued employment, is conditional upon my participating in and clearing such security examinations or

investigations as may be deemed advisable by the company. I agree to participate in such examinations and investigations when requested to do so by the company, and agree that the company shall be held harmless and free from liability in connection with any security examination or investigation in which I may be involved.

I understand, if employed, false statements on this application shall result in disciplinary action up to and including discharge. Also if employed, I understand that it is the company's policy that all employees who do not have a written employment contract with the company for a specific, fixed term of employment are employed at the company's will. I understand that I would be subject to termination at any time, for any reason, with or without cause or notice.

_Foust Chaufffa_
Applicant's Signature

11/22/05
Date Signed

CONFIDENTIAL
DEFENDANT'S PROD.   0086

EXHIBIT 17

Harris, Perry                                                    Dept 001

PAGE 04

*1750*

# EMPLOYEE RECORDS JACKET

ADDRESS
242 Orchard Lane        Fitzpatrick AL 36089    738 2502
                         City    State   Zip   Telephone

                         City    State   Zip   Telephone

                         City    State   Zip   Telephone

SOCIAL SECURITY NO. _____ DATE OF BIRTH 12.4.67    SEX: ☒ M ☐ F

CITIZEN OF U.S.A.: YES ☒ OTHER (Name) _____

MARITAL STATUS: ☒ SINGLE ☐ MARRIED ☐ SEPARATED ☐ WIDOWED ☐ DIVORCED

NAME OF SPOUSE _____ NO. OF DEPENDENTS _____

IN EMERGENCY NOTIFY Dianne Patterson    RELATIONSHIP Friend
    ADDRESS 242 Orchid Lane Fitzpatrick    (334)
    AL 36089    TELEPHONE 738 2502

RELATIVES WORKING FOR US: NAME _____ RELATIONSHIP _____

EDUCATION: ELEMENTARY _____ HIGH _____ COLLEGE _____ GRADUATE _____

    OTHER _____

## POSITION HISTORY

| DATE | | POSITION AND DEPARTMENT | PAY RATE | |
|------|------|-------------------------|--------|-----|
| FROM | TO | | AMOUNT | PER |
| 1-6-05 | | Outside laborer | 7 00 | hr |
| 4/1/06 | | Raise | 7 50 | hr |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

ROBERSON AND ROBERSO

205-871-5115

02:07

09/06/2006

UNION MEMBER: ☐ YES ☐ NO   UNION (Local) NAME _____

| NAME | DATES | | NAME | DATES | |
|------|----------|----------|------|----------|----------|
| | Eligible | Enrolled | | Eligible | Enrolled |
| PENSION PLAN | | | GROUP INSURANCE | | |
| PROFIT SHARING | | | | | |
| CREDIT UNION | | | | | |

COMPANY TRAINING AND SPECIAL SKILLS _____

## TERMINATION INFORMATION

DATE TERMINATED _____ WOULD WE REHIRE? YES ☐ NO ☐

REASON FOR _____ TION:

SEC. CLEARANCE

EXHIBIT 18

RECEIVED
SEP 1 2 2005

# The Peco Corp.

## EMPLOYMENT APPLICATION

PLEASE PRINT ANSWERS TO THE QUESTIONS CAREFULLY AND IN INK.  TO BE CONSIDERED FOR EMPLOYMENT MUST BE COMPLETED, INCLUDING SIGNA- TURE. THIS APPLICATION IS VALID FOR 30 DAYS.  IF YOU WISH TO BE CONSIDERED FOR EMPLOYMENT AFTER THIS APPLICATION EXPIRES, THEN YOU MUST RE-APPLY.

NAME _Jeffrey Harris_        TELEPHONE NUMBER

ADDRESS _242 Orchid Ln_     Home # _(334) 738-2502_

CITY _Fitzpatrick_   STATE _Al_   ZIP _36089_    Daytime # ( )  -

SOCIAL SECURITY NUMBER _

**EMPLOYMENT INTERESTS:**

Type of work desired _Animal Care (Feeding + Watering) Tractor Operator_

Full Time ✓        Part Time_____    Temporary_____

Starting pay expected_____    Date Available to start _8 26 05_

**IF APPLICABLE:**

Are you willing to travel? _Yes_  If yes, what percentage of the time _60%_

Would you be willing to relocate? _No_

Would you object to:  Irregular work hours ☑ YES  ☐ NO  Night work ☑ YES  ☐ NO

Swing or fluctuating shift work ☑ YES  ☐ NO

**SPECIAL SKILLS - COMPLETE IF APPLICABLE TO THE POSITION FOR WHICH YOU ARE APPLYING:**

Skill _Forklift_                Experience _6 yrs_

Skill _Bush hog_                Experience _8 yrs_

Skill _Bush hog Maintanace_     Experience _3 yrs_

Please discuss other specialized skills you feel are pertinent to the job for which you are applying_____

_Hunting_

**UNITED STATES MILITARY SERVICE STATUS:**

Last Military Service - FROM _1985_        TO _1986_

_National Gaurd_ Rank on discharge _E1_      Present Status _Same_

Last duties and special training

_Ammonition Clerk_

CONFIDENTIAL
DEFENDANT'S PROD.    0058

**EDUCATION:**

|  | NAME OF SCHOOL AND LOCATION | MAJOR AREA OF STUDY and/or DEGREE RECEIVED |
|---|---|---|
| High School | Bullock co High Shooll Sardis Rd | |
| Jr. College, College, or University | None | |
| Technical or Trade Schools | None | |

Honors and Scholarships _____None_____

Grade Average (approx.)  High School ___C___  College _____  Other _____

**General Information:**

Are you legally authorized to work in the United States?  ☑ YES  ☐ NO  If not, what is your present status and do you have a work visa?_____

Have you ever been convicted of a crime?  ☑ YES  ☐ NO  If yes, please explain.  Give dates, charge, penalty assessed or disposition.  Conviction will not necessarily bar employment.  Consideration will be given to the nature of the crime, age at the time of offense, rehabilitation and the position for which you are applying.

_Possesion of Mariquanes, Misdemeanor 1994 fine paid_
_Rehab 1 yr_

Have you ever been discharged from a job?  ☐ YES  ☑ NO  If yes, please explain _____

Have you ever been bonded?  ☐ Yes  ☑ NO  If yes, when and in what job _____

CONFIDENTIAL
DEFENDANT'S PROD.     0059

Do you have a valid, active driver's license?  ☑ YES  ☐ NO  Issuing State  Al.

Drivers License # _____  Class of License  Dm

How long have you been a resident of this City  25 yrs  State  Al.

How long at your present address?  5yrs  Give previous address if less than one year at present

address _____

Are you over the age of 18?  ☑ YES  ☐ NO  If hired can you provide proof of age?  ☑ YES  ☐ NO

**EMPLOYMENT DATA:**

Have you ever been employed by this company before?  ☐ YES  ☑ NO  If yes, please give dates of

employment, position employed, and reason for leaving _____

_____

_____

Please list all jobs (if not listed above), beginning with your present or last employer and working backwards
to earlier positions.  Account for all periods, including unemployment, self-employment, and military service.
If additional space is needed, please list on a separate page or on the back of this form.

#1 DATES - From  1999  to  2001

    Company Name, City, and State  Winn Dixie  mont.

    Supervisor's Name/Title  Terry  SALARY - Start 9.50  End 11.25

    Phone # N/A  May we contact? Yes  Final position with the company  loader

    Reason for leaving?  2 Back Surgery's

#2 DATES - From  1993  to  1999

    Company Name, City, and State  mr turf  Banks Al.

    Supervisor's Name/Title  Rob Cameron  SALARY - Start 4.50  End 8.50

    Phone # _____  May we contact? Yes  Final position with the company  Mower maintance

    Reason for leaving?  Financial

#3 DATES - From  1987  to  1993

    Company Name, City, and State  National Industries

    Supervisor's Name/Title  Wendy bronzon  SALARY - Start 4.25  End 4.75
    Moved to mexico

    Phone # N/A  May we contact? yes  Final position with the company  Stock man

    Reason for leaving?  Financial

CONFIDENTIAL
DEFENDANT'S PROD.    0060

#4 DATES - From _____ to _____

Company Name, City, and State _____

Supervisor's Name/Title _____ SALARY - Start _____ End _____

Phone # _____ May we contact? _____ Final position with the company _____

Reason for leaving? _____

---

#5 DATES - From _____ to _____

Company Name, City, and State _____

Supervisor's Name/Title _____ SALARY - Start _____ End _____

Phone # _____ May we contact? _____ Final position with the company _____

Reason for leaving? _____

---

## PERSONAL REFERENCES (Not Former Employers or Relatives)

| Name and Occupation | Address | Phone Number |
|---|---|---|
| Henry Himmons | Rt 2 Box 9nn Union Springs Al | 334-738-4547 |
| atan williams | Adams Ridge | 334-738-5998 |
|  |  |  |

The Peble Corp. is an Equal Opportunity Employer which endeavors, pursuant to all applicable Federal and State Laws, to give every applicant for employment, and every employee, equal consideration in all matters relating to employment, without regard to race, color, sex, age, religion, national origin, citizenship and disability.

By my signature below, I certify the facts set forth in this application for employment are true and complete to the best of my knowledge and belief, and I agree you may investigate my statements. I agree to permit all past employers to give any information concerning me and release them from liability in furnishing such information. I understand that my employment and, if employed, my continued employment, is conditional upon my participating in and clearing such security examinations or

investigations as may be deemed advisable by the company. I agree to participate in such examinations and investigations when requested to do so by the company, and agree that the company shall be held harmless and free from liability in connection with any security examination or investigation in which I may be involved.

I understand, if employed, false statements on this application shall result in disciplinary action up to and including discharge. Also if employed, I understand that it is the company's policy that all employees who do not have a written employment contract with the company for a specific, fixed term of employment are employed at the company's will. I understand that I would be subject to termination at any time, for any reason, with or without cause or notice.

Applicant's Signature _____

Date Signed 8-30-05

CONFIDENTIAL DEFENDANT'S PROD.     0061

# EXHIBIT 19

CONFIDENTIAL
DEFENDANT'S PROD.
0070

**Dept 851**

*PRINT EMPLOYEE'S NAME ON TAB ↑*

## EMPLOYEE RECORDS JACKET

### POSITION HISTORY

| DATE | | POSITION AND DEPARTMENT | PAY RATE | |
|------|------|------|------|------|
| FROM | TO | | AMOUNT | PER |
| 3/16/01 | | outside labourer | 6 50 | hr. |
| 4/1/05 | | Raise | 7 80 | hr. |
| 4/1/06 | | Raise | 8 00 | hr. |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

### TERMINATION INFORMATION

DATE TERMINATED _____ WOULD WE REHIRE? YES ☐ NO ☐

REASON FOR TERMINATION:

---

ADDRESS 966 Johnson St.   Union Springs , AL 36089 , 738-4523
_____ City   State   Zip   Telephone

_____ City   State   Zip   Telephone

_____ City   State   Zip   Telephone

SOCIAL SECURITY NO. _____ DATE OF BIRTH 12·28·62 SEX: ☒M ☐F

CITIZEN OF U.S.A.: YES ☐ OTHER (Name) _____

MARITAL STATUS: ☒SINGLE   ☐MARRIED   ☐SEPARATED   ☐WIDOWED   ☐DIVORCED

NAME OF SPOUSE _____ NO. OF DEPENDENTS 1

IN EMERGENCY NOTIFY _____ RELATIONSHIP _____

ADDRESS _____ TELEPHONE _____

RELATIVES WORKING FOR US: NAME _____ RELATIONSHIP _____

EDUCATION: ELEMENTARY _____ HIGH _____ COLLEGE _____ GRADUATE _____

OTHER _____

---

UNION MEMBER: ☐ YES ☐ NO   UNION (Local) NAME _____

| NAME | DATES | | NAME | DATES | |
|------|-------|---------|------|-------|---------|
| | Eligible | Enrolled | | Eligible | Enrolled |
| PENSION PLAN | | | GROUP INSURANCE | | |
| PROFIT SHARING | | | | | |
| CREDIT UNION | | | | | |

COMPANY TRAINING AND SPECIAL SKILLS _____

SECURITY CLEARANCE _____

EXHIBIT 20

# The Peble Corp.

## EMPLOYMENT APPLICATION

*PLEASE PRINT ANSWERS TO THE FOLLOWING QUESTIONS CAREFULLY AND IN INK. TO BE CONSIDERED FOR EMPLOYMENT, ALL ITEMS MUST BE COMPLETED, INCLUDING SIGNATURE. THIS APPLICATION IS VALID FOR 30 DAYS. IF YOU WISH TO BE CONSIDERED FOR EMPLOYMENT AFTER THIS APPLICATION EXPIRES, THEN YOU MUST RE-APPLY.*

NAME William Bernard Mack                          TELEPHONE NUMBER

ADDRESS 966 Johnson St                          Home #    (      )    -

CITY Union Springs STATE Al          ZIP 36089          Daytime # (

SOCIAL SECURITY NUMBER

EMPLOYMENT INTERESTS:

Type of work desired _____

Full Time_____ Part Time_____ Temporary_____

Starting pay expected_____ Date Available to start_____

IF APPLICABLE:

Are you willing to travel?_____ If yes, what percentage of the time _____

Would you be willing to relocate? _____

Would you object to:  Irregular work hours  ☐ YES  ☐ NO   Night work  ☐ YES  ☐ NO

Swing or fluctuating shift work  ☐ YES  ☐ NO

SPECIAL SKILLS - COMPLETE IF APPLICABLE TO THE POSITION FOR WHICH YOU ARE APPLYING:

Skill_____ Experience _____

Skill_____ Experience _____

Skill_____ Experience _____

Please discuss other specialized skills you feel are pertinent to the job for which you are applying_____

_____

UNITED STATES MILITARY SERVICE STATUS:

Past Military Service - FROM _____ TO _____

Branch _____ Rank on discharge _____ Present Status_____

List duties and special training

CONFIDENTIAL
DEFENDANT'S PROD.    0071

**EDUCATION:**

|  | NAME OF SCHOOL AND LOCATION | MAJOR AREA OF STUDY and/or DEGREE RECEIVED |
|---|---|---|
| High School | | |
| Jr. College, College, or University | | |
| Technical or Trade Schools | | |

Honors and Scholarships _____

Grade Average (approx.)   High School _____   College _____   Other _____

**General Information:**

Are you legally authorized to work in the United States?  ☐ YES   ☐ NO  If not, what is your present status and do you have a work visa? _____

Have you ever been convicted of a crime?  ☐ YES   ☐ NO  If yes, please explain. Give dates, charge, penalty assessed or disposition.  Conviction will not necessarily bar employment.  Consideration will be given to the nature of the crime, age at the time of offense, rehabilitation and the position for which you are applying.

_____

_____

Have you ever been discharged from a job?  ☐ YES   ☐ NO  If yes, please explain _____

_____

_____

Have you ever been bonded?  ☐ Yes   ☐ NO   If yes, when and in what job _____

_____

_____

CONFIDENTIAL
DEFENDANT'S PROD.     0072

Do you have a valid, active driver's license? ☐ YES ☐ NO Issuing State _____

Drivers License # _____ Class of License _____

How long have you been a resident of this City _____ State _____

How long at your present address? _____ Give previous address if less than one year at present

address _____

Are you over the age of 18? ☐ YES ☐ NO If hired can you provide proof of age? ☐ YES ☐ NO

## EMPLOYMENT DATA:

Have you ever been employed by this company before? ☐ YES ☐ NO   If yes, please give dates of

employment, position employed, and reason for leaving _____

_____

_____

Please list all jobs (if not listed above), beginning with your present or last employer and working backwards to earlier positions.  Account for all periods, including unemployment, self-employment, and military service. If additional space is needed, please list on a separate page or on the back of this form.

#1 DATES - From _____ to _____

   Company Name, City, and State _____

   Supervisor's Name/Title _____ SALARY - Start _____ End _____

   Phone # _____ May we contact? _____ Final position with the company _____

   Reason for leaving? _____

#2 DATES - From _____ to _____

   Company Name, City, and State _____

   Supervisor's Name/Title _____ SALARY - Start _____ End _____

   Phone # _____ May we contact? _____ Final position with the company _____

   Reason for leaving? _____

#3 DATES - From _____ to _____

   Company Name, City, and State _____

   Supervisor's Name/Title _____ SALARY - Start _____ End _____

   Phone # _____ May we contact? _____ Final position with the company _____

   Reason for leaving? _____

CONFIDENTIAL
DEFENDANT'S PROD.    0073

#4 DATES - From_____to_____

Company Name, City, and State_____

Supervisor's Name/Title _____ SALARY - Start _____ End _____

Phone #_____ May we contact?_____ Final position with the company_____

Reason for leaving?_____

#5 DATES - From_____to_____

Company Name, City, and State_____

Supervisor's Name/Title_____ SALARY - Start _____ End _____

Phone #_____ May we contact?_____ Final position with the company_____

Reason for leaving?_____

PERSONAL REFERENCES (Not Former Employers or Relatives)

| Name and Occupation | Address | Phone Number |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

The Peble Corp. is an Equal Opportunity Employer which endeavors, pursuant to all applicable Federal and State Laws, to give every applicant for employment, and every employee, equal consideration in all matters relating to employment, without regard to race, color, sex, age, religion, national origin, citizenship and disability.

By my signature below, I certify the facts set forth in this application for employment are true and complete to the best of my knowledge and belief, and I agree you may investigate my statements. I agree to permit all past employers to give any informa- tion concerning me and release them from liability in furnishing such information. I understand that my employment and, if employed, my continued employment, is conditional upon my participating in and clearing such security examinations or

investigations as may be deemed advisable by the company. I agree to participate in such examinations and investigations when requested to do so by the company, and agree that the company shall be held harmless and free from liability in connection with any security examination or investigation in which I may be involved.

I understand, if employed, false statements on this application shall result in disciplin- ary action up to and including discharge. Also if employed, I understand that it is the company's policy that all employees who do not have a written employment contract with the company for a specific, fixed term of employment are employed at the company's will. I understand that I would be subject to termination at any time, for any reason, with or without cause or notice.

X _Willie B. Mose_
Applicant's Signature

_3-16-04_
Date Signed

CONFIDENTIAL
DEFENDANT'S PROD.    0074

EXHIBIT 21

| | Mid-State Land & Timber, Co. | | | Prepared - 2/23/2007 | | | | |
|---|---|---|---|---|---|---|---|---|
| Year Worked | Last Name | First Name | MLT Div | DOH | Hours | Annual Compensation | Rate Hour/BiW | |
| **1/1 - 12/31** | | | | | | | | |
| 2005 | Armenda-Pineda | Yolanda | 2 | 12/27/2004 | 210 | 1,372.50 | 6.54 | BM |
| 2005 | Balkcom | Corey | 2 | 5/27/2005 | 92 | 686.00 | 7.00 | WM |
| 2005 | Beckwith, Jr | William H | 2 | 8/5/2005 | 389 | 3,293.00 | 8.00 | WM |
| 2005 | Carroll | David F | 2 | 4/18/2005 | 1,240 | 44,711.61 | 2,884.62 | BM |
| 2005 | Foster | Norris | 2 | 2/8/2005 | 1,671 | 12,289.51 | 7.00 | BM |
| 2005 | Harris | Jeffery | 2 | 9/16/2005 | 495 | 3,721.46 | 7.00 | ? |
| 2005 | Howington | Stacy | 2 | 12/24/2004 | 461 | 5,018.63 | 9.00 | WM |
| 2005 | Hubbard | William | 2 | 12/9/2005 | 154 | 1,261.00 | 8.00 | BM |
| 2005 | Lee | Roy | 2 | 9/8/2000 | 2,944 | 47,230.50 | 1,538.46 | BM |
| 2005 | Mack | Willie | 2 | 4/2/2004 | 2,167 | 17,126.03 | 7.50 | BM |
| 2005 | Nopal | Dorotea | 2 | 3/5/2004 | 44 | 309.75 | 7.00 | ? |
| 2005 | Norman | Joel S | 2 | 10/14/2005 | 360 | 12,115.40 | 2,692.31 | JM |
| 2005 | Parhams | Demetius | 2 | 7/23/2004 | 2,133 | 15,746.79 | 7.00 | BM |
| 2005 | Pierce | Denise | 2 | 9/6/2002 | 2,330 | 29,243.10 | 11.50 | WF |
| 2005 | Tirado | Griselda | 2 | 11/19/2003 | 254 | 1,887.38 | 7.00 | Hisp. |
| 2005 | Traver | Brenda | 2 | 1/16/2005 | 1,816 | 15,105.00 | 8.00 | BF |
| 2005 | Traver | Henry L | 2 | 6/24/2005 | 1,041 | 7,634.39 | 7.00 | BM |
| 2005 | Walker | Charlie | 2 | 10/15/2004 | 360 | 2,012.40 | 5.59 | |
| 2005 | Woods | Katie Mae | 2 | 1/16/2005 | 1,829 | 17,244.54 | 9.00 | BF |
| **1/1 - 12/31** | | | | | | | | |
| 2006 | Carroll | David F | 2 | 4/29/2005 | 923 | 33,290.66 | 2,884.40 | WM |
| 2006 | Foster | Norris | 2 | 9/14/1999 | 70 | 523.13 | 7.50 | BM |
| 2006 | Hamm | Forest | 2 | 1/20/2006 | 865 | 7,420.00 | 8.00 | WM |
| 2006 | Harris | Jeffery | 2 | 9/15/2005 | 130 | 973.13 | 7.50 | BM |
| 2006 | Hubbard | William | 2 | 12/9/2005 | 826 | 7,192.00 | 8.00 | WM |
| 2006 | Lee | Roy | 2 | 9/8/2000 | 1,009 | 20,285.35 | 1,600.90 | BM |
| 2006 | Mack | Willie | 2 | 4/2/2004 | 939 | 7,647.72 | 8.00 | BM |
| 2006 | May | Joseph | 2 | 12/9/2005 | 59 | 470.00 | 8.00 | WM |
| 2006 | Norman | Joel S | 2 | 10/14/2005 | 907 | 30,561.84 | 2,692.30 | WM |
| 2006 | Parhams | Demetius | 2 | 7/23/2004 | 1,088 | 8,749.08 | 7.50 | BM |
| 2006 | Pierce | Denise | 2 | 9/6/2002 | 1,082 | 16,656.93 | 1,230.77 | WF |
| 2006 | Tarver | Henry | 2 | 6/24/2005 | 1,180 | 9,508.53 | 7.50 | BM |
| 2006 | Tarver | Brenda | 2 | 2/4/2005 | 1,068 | 9,255.21 | 8.25 | BF |
| 2006 | Woods | Katie Mae | 2 | 2/4/2005 | 1,097 | 10,601.40 | 9.25 | BF |



CONFIDENTIAL

EXHIBIT 22

Dept 851    PRINT EMPLOYEE NAME ON TAB
#1677

# EMPLOYEE RECORDS JACKET

## POSITION HISTORY

| DATE | | POSITION AND DEPARTMENT | PAY RATE | |
|------|------|-------------------------|----------|-----|
| FROM | TO | | AMOUNT | PER |
| 9-14-99 | | Labourer | 5 15 | hr |
| 1/1/00 | | Raise | 5 50 | hr |
| 6/11/00 | | Raise - Merit | 6 25 | hr |
| 2/8/05 | | Rehire | 7 00 | hr. |
| 5-1-05 | | Fulltime | 7 00 | hr. |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

CONFIDENTIAL
DEFFENDANTS BRFN
0036

### TERMINATION INFORMATION

DATE TERMINATED 3-22-01    WOULD WE REHIRE? YES ☑ NO ☐

REASON FOR TERMINATION:
Reduction in Staff

*(Continue on Reverse, if necessary)*

© Copyright 1980, 1998 – SELECTFORM, INC., Box 3045, Freeport NY 11520

ADDRESS Rt 3 Box 269 A    Midway    36053    334-738-3531
Rt 2 Box 298 A
33745 Hwy 82    Midway Al 36053
City    State    Zip    Telephone
PO Box 253    Midway    Al 36053    334 355 8505
City    State    Zip    Telephone

SOCIAL SECURITY NO. _____    DATE OF BIRTH 6-13-58    SEX: ☑M ☐F

CITIZEN OF U.S.A.: YES ☑ OTHER (Name) _____

MARITAL STATUS: ☑ SINGLE ☐ MARRIED ☐ SEPARATED ☐ WIDOWED ☐ DIVORCED

NAME OF SPOUSE Annie Foster    NO. OF DEPENDENTS ____

IN EMERGENCY NOTIFY Mary D. Jenkins    RELATIONSHIP Daughter Aunt (334)
3282 Co. Road #A Midway Al 36053
ADDRESS Rt 3 Box 269 A    TELEPHONE 738-353 529-4560

RELATIVES WORKING FOR US: NAME _____ RELATIONSHIP _____

EDUCATION: ELEMENTARY ____ HIGH ____ COLLEGE ____ GRADUATE ____

OTHER _____

UNION MEMBER: ☐ YES ☐ NO   UNION (Local) NAME _____

| NAME | DATES | | NAME | DATES | |
|------|----------|----------|------|----------|----------|
| | Eligible | Enrolled | | Eligible | Enrolled |
| PENSION PLAN | | | GROUP INSURANCE | | |
| PROFIT SHARING | | | | | |
| CREDIT UNION | | | | | |

COMPANY TRAINING AND SPECIAL SKILLS _____

SECURITY CLEARANCE _____

FORM 14 — Printed in U.S.A.

EXHIBIT 23

# The Peble Corp.

## EMPLOYMENT APPLICATION

*PLEASE PRINT ANSWERS TO THE FOLLOWING QUESTIONS CAREFULLY AND IN INK. TO BE CONSIDERED FOR EMPLOYMENT, ALL ITEMS MUST BE COMPLETED, INCLUDING SIGNATURE. THIS APPLICATION IS VALID FOR 30 DAYS. IF YOU WISH TO BE CONSIDERED FOR EMPLOYMENT AFTER THIS APPLICATION EXPIRES, THEN YOU MUST RE-APPLY.*

NAME *Corey Balkcom*                                    TELEPHONE NUMBER

ADDRESS *1114 Hwy 239*                         Home # *(334) 738-8105*

CITY *Union Springs*   STATE *Al.*   ZIP *36089*   Daytime # *(334) 738-3267*

SOCIAL SECURITY NUMBER

**EMPLOYMENT INTERESTS:**

Type of work desired _____

Full Time ✓    Part Time _____    Temporary _____

Starting pay expected _____   Date Available to start *today*

**IF APPLICABLE:**

Are you willing to travel? *yes*   If yes, what percentage of the time *Most*

Would you be willing to relocate? *yes*

Would you object to:   Irregular work hours   ☐ YES  ☑ NO   Night work   ☐ YES  ☑ NO

Swing or fluctuating shift work   ☐ YES  ☑ NO

**SPECIAL SKILLS** - COMPLETE IF APPLICABLE TO THE POSITION FOR WHICH YOU ARE APPLYING:

Skill *Disiel Mechanic*          Experience *20 yrs*

Skill *welding*          Experience *3 yrs*

Skill _____          Experience _____

Please discuss other specialized skills you feel are pertinent to the job for which you are applying *operate heavy equipment such as, tractors, skidders, big trucks*

**UNITED STATES MILITARY SERVICE STATUS:**

Past Military Service - FROM *Sept. 1988*     TO *Dec 1997*

Branch *Marines*   Rank on discharge *E-5*     Present Status *EAS*

List duties and special training                                    CONFIDENTIAL

*Enlist Instructor*

**EDUCATION:**

| | NAME OF SCHOOL AND LOCATION | MAJOR AREA OF STUDY and/or DEGREE RECEIVED |
|---|---|---|
| High School | Bullock County High School Union Springs, Al. | |
| Jr. College, College, or University | | |
| Technical or Trade Schools | | |

Honors and Scholarships _____

Grade Average (approx.)  High School _*12*_____ College _____ Other _____

**General Information:**

Are you legally authorized to work in the United States? ☑ YES  ☐ NO  If not, what is your present status and

do you have a work visa? _____

Have you ever been convicted of a crime?  ☐ YES  ☑ NO  If yes, please explain. Give dates, charge, penalty assessed or disposition.  Conviction will not necessarily bar employment.  Consideration will be given to the nature of the crime, age at the time of offense, rehabilitation and the position for which you are applying.

_____

_____

Have you ever been discharged from a job?  ☐ YES  ☑ NO  If yes, please explain _____

_____

_____

Have you ever been bonded?  ☐ Yes  ☑ NO   If yes, when and in what job. _____

_____

_____

CONFIDENTIAL

Do you have a valid, active driver's license?  ☐ YES  ☑ NO  Issuing State _____

Drivers License # _____ Class of License _____

How long have you been a resident of this City _2 yrs_____ State _2 yrs_____

How long at your present address? _8 yrs_____ Give previous address if less than one year at present

address _____

Are you over the age of 18?  ☑ YES  ☐ NO  If hired can you provide proof of age?  ☑ YES  ☐ NO

**EMPLOYMENT DATA:**

Have you ever been employed by this company before?  ☐ YES  ☑ NO  If yes, please give dates of

employment, position employed, and reason for leaving _____

_____

_____

Please list all jobs (if not listed above), beginning with your present or last employer and working backwards
to earlier positions. Account for all periods, including unemployment, self-employment, and military service.
If additional space is needed, please list on a separate page or on the back of this form.

#1 DATES - From _Dec 1997_____ to _Feb. 2004_____

Company Name, City, and State _Walker Logging Co. Inc._

Supervisor's Name/Title _P.J. Walker  Owner_  SALARY - Start _$8.00 ph_ End _$10.25 ph_

Phone # _(334) 738-2920_  May we contact? _yes_  Final position with the company _Mechanic_

Reason for leaving? _job got slow, worked on + off up until March 2005_

#2 DATES - From _March 2005_____ to _April 2005_____

Company Name, City, and State _McWhorter's Auto_

Supervisor's Name/Title _Wiley McWhorter_  SALARY - Start _very_ End _____

Phone # _____ May we contact? _yes_  Final position with the company _Mechanic_

Reason for leaving? ~~the~~ the pay wasn't there

#3 DATES - From _Sept 1988_____ to _Dec. 1997_____

Company Name, City, and State _U.S. Marine Corps_

Supervisor's Name/Title _SSgt. Smith_  SALARY - Start _____ End _____

Phone # _____ May we contact? _____ Final position with the company _Enlisted_

Reason for leaving? _Instructor, taught Combat Survival_

CONFIDENTIAL

#4 DATES - From_____to_____

Company Name, City, and State_____

Supervisor's Name/Title_____    SALARY - Start_____End_____

Phone #_____ May we contact?_____Final position with the company_____

Reason for leaving?_____

#5 DATES - From_____to_____

Company Name, City, and State_____

Supervisor's Name/Title_____    SALARY - Start_____End_____

Phone #_____ May we contact?_____Final position with the company_____

Reason for leaving?_____

PERSONAL REFERENCES (Not Former Employers or Relatives)

| Name and Occupation | Address | Phone Number |
|---|---|---|
| Raymond Rodgers (Sheriff) | Union Springs | 334) 738-3131 |
| Danny Pierce | Union Springs | |
| Jake Wheeler (Police Chief) | Union Springs | 334) 738-3131 |

The Peble Corp. is an Equal Opportunity Employer which endeavors, pursuant to all applicable Federal and State Laws, to give every applicant for employment, and every employee, equal consideration in all matters relating to employment, without regard to race, color, sex, age, religion, national origin, citizenship and disability.

By my signature below, I certify the facts set forth in this application for employment are true and complete to the best of my knowledge and belief, and I agree you may investigate my statements. I agree to permit all past employers to give any information concerning me and release them from liability in furnishing such information. I understand that my employment and, if employed, my continued employment, is conditional upon my participating in and clearing such security examinations or

investigations as may be deemed advisable by the company. I agree to participate in such examinations and investigations when requested to do so by the company, and agree that the company shall be held harmless and free from liability in connection with any security examination or investigation in which I may be involved.

I understand, if employed, false statements on this application shall result in disciplinary action up to and including discharge. Also if employed, I understand that it is the company's policy that all employees who do not have a written employment contract with the company for a specific, fixed term of employment are employed at the company's will. I understand that I would be subject to termination at any time, for any reason, with or without cause or notice.

_Corey Baffcon_
Applicant's Signature

_5/10/05_
Date Signed

CONFIDENTIAL

EXHIBIT 24

| 1/1 - 12/31 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 2003 | Dickey | Anthony | 2 | 5/24/2003 | 1,526 | 14,835.92 | 8.50 | W M |
| 2003 | Lee | Joseph | 2 | 4/5/2002 | 672 | 4,458.21 | 6.50 | B M |
| 2003 | Lee | Roy | 2 | 9/8/2000 | 3,119 | 37,213.29 | 11.00 | B M |
| 2003 | Pierce | Denise | 2 | 9/6/2002 | 1,178 | 12,098.75 | 10.00 | W F |
| 2003 | Rosales | Rosa | 2 | 12/2/2003 | 122 | 701.33 | 5.65 | |
| 2003 | Ryan III | Anthony | 2 | 3/19/2003 | 663 | 4,373.71 | 6.50 | |
| 2003 | Silva | Manuel | 2 | 11/9/2003 | 234 | 1,559.50 | 6.00 | |
| 2003 | Sykes | Charles | 2 | 2/1/2003 | 1,380 | 10,615.42 | 461.54 | W M |
| 2003 | Terrell | Kevin | 2 | 10/20/2003 | 242 | 1,552.00 | 6.00 | |
| 2003 | Tirado | Griselda | 2 | 11/19/2003 | 192 | 1,291.00 | 6.00 | Hisp. F. |
| | | | | | | | | |
| 1/1 - 12/31 | | | | | | | | |
| 2004 | Cisneros | Fortino | 2 | 4/2/2004 | 611 | 4,092.58 | 6.50 | Hisp. M. |
| 2004 | Dickey | Anthony | 2 | 5/24/2003 | 670 | 6,441.34 | 8.50 | W M |
| 2004 | Howington | Stacy | 2 | 12/24/2004 | 142 | 1,557.00 | 9.00 | |
| 2004 | Lee | Roy | 2 | 9/8/2000 | 3,452 | 45,744.69 | 11.00 | B M |
| 2004 | Mack | Willie | 2 | 4/2/2004 | 1,732 | 12,461.79 | 7.00 | B M |
| 2004 | Martinez | Sonya G. | 2 | 2/6/2004 | 93 | 559.50 | 6.00 | |
| 2004 | Montiel | Oscar | 2 | 8/20/2004 | 78 | 511.88 | 6.50 | |
| 2004 | Nopal | Dorotea | 2 | 3/5/2004 | 1,880 | 12,938.35 | 7.00 | |
| 2004 | Parhams | Demetius | 2 | 7/23/2004 | 1,054 | 7,274.39 | 6.50 | B M |
| 2004 | Pierce | Denise | 2 | 9/6/2002 | 1,581 | 17,179.09 | 10.75 | W F |
| 2004 | Rosales | Rosa | 2 | 12/2/2003 | 270 | 1,382.80 | 6.25 | |
| 2004 | Secundino | Raul | 2 | 4/2/2004 | 800 | 5,460.21 | 7.00 | |
| 2004 | Silva | Manuel | 2 | 11/9/2003 | 28 | 168.00 | 6.00 | |
| 2004 | Sykes | Charles | 2 | 2/1/2003 | 1,500 | 11,688.50 | 461.54 | W M |
| 2004 | Terrell | Kevin | 2 | 10/20/2003 | 925 | 5,582.25 | 6.00 | |
| 2004 | Tirado | Griselda | 2 | 11/19/2003 | 2,155 | 14,145.62 | 7.00 | Hisp. F. |
| 2004 | Walker | Charlie | 2 | 10/15/2004 | 640 | 3,677.60 | 5.59 | |

CONFIDENTIAL

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

JEFFREY HARRIS, WILLIE BERNARD ）
MACK, DEMETRIUS PARHAM and ）
HENRY TARVER ）
）
        **Plaintiffs,** ）
）
  **vs.** ）
）
MID STATE LAND & TIMBER ）
COMPANY, INC., D/B/A ）
SEDGEFIELDS PLANTATION ）
）
        **Defendant.** ）

**PLAINTIFF DEMANDS TRIAL
BY A STRUCK JURY**

**Civil Action No.:**

**2:06-cv-875-ID-CSC**

## PLAINTIFFS' SECOND AMENDED COMPLAINT

### I. JURISDICTION

1.     The jurisdiction of this court is invoked pursuant to 42 U.S.C. § 1981  to secure

the protection of and redress deprivation of contract (i.e. employment) rights.  42 U.S.C.

§ 1981 provides for injunctive, declaratory and legal relief for racial discrimination in the

making and enforcement of contract rights.

### II. PARTIES

2.     Plaintiff Jeffrey Harris is a black citizen of the United States and is a

resident of Bullock County, Alabama.  Harris was employed by the Defendant Mid-State

Land & Timber Company, Inc., a corporation, d/b/a Sedgefields Plantation at its Hunting

Lodge located in Union Springs, Bullock County, Alabama at all times relevant hereto.

Plaintiff was employed by said Defendant beginning in September 2005 as general

laborer paid $7.00 per hour until Sedgefields was sold to Tolleson's on or about May

19, 2006.

3.     Plaintiff, Willie Mack, is a black citizen of the United States and is a resident of Bullock County, Alabama.  Mack was employed by the Defendant Mid-State Land & Timber Company, Inc., a corporation, d/b/a Sedgefields Plantation at its Hunting Lodge located in Union Springs, Alabama at all times relevant hereto.  Plaintiff was employed by said Defendant as a general laborer paid $6.50 per hour beginning in March 2004 until Sedgefields was sold to Tolleson's on or about May 19, 2006.

4.     Plaintiff, Demetrius Parham,  is a black citizen of the United States and is a resident of Bullock County, Alabama.  Parham was employed by the Defendant Mid-State Land & Timber Company, Inc., a corporation, d/b/a Sedgefields Plantation at its Hunting Lodge located in Union Springs, Alabama at all times relevant hereto.  Plaintiff was employed by said Defendant as a general laborer paid $6.50 per hour beginning in July 2004 until Sedgefields was sold to Tolleson's on or about May 19, 2006.

5.     Plaintiff, Henry Tarver, is a black citizen of the United States and is a resident of Bullock County, Alabama.  Tarver was employed by the Defendant Mid-State Land & Timber Company, Inc., a corporation, d/b/a Sedgefields Plantation at its Hunting Lodge located in Union Springs, Alabama at all times relevant hereto.  Plaintiff was employed by said Defendant as a general laborer paid $7.00 per hour beginning in June 2005 until Sedgefields was sold to Tolleson's on or about May 19, 2006.

6.     Plaintiff Roy Lee is a black citizen of the United States and is a resident of Bullock County, Alabama.  Lee was employed by the Defendant Mid State Land & Timber Company, Inc., a corporation, d/b/a Sedgefields Plantation at its Hunting Lodge

located in Union Springs, Bullock County, Alabama at all times relevant hereto.  Plaintiff

was employed by said Defendant beginning in the year 2000 as a general laborer.

Plaintiff was later promoted to foreman over the entire hunting operations.  Plaintiff Roy

Lee was initially paid $10.00 per hour to work as a foreman over both the deer hunting

and quail hunting operations.

7.      The Plaintiff, Roy Lee, was paid an annual salary of $41,000.00.  Lee

did not receive lodging on the property.  Lee received a vehicle for his use and gasoline

for work related activities.

8.      Defendant, Mid-State Land & Timber Company, Inc., a corporation, d/b/a

Sedgefields Plantation, is subject to suit as the Plaintiffs' employer and the maker of

each of the Plaintiffs' employment contract.  The Defendant operates a hunting lodge

where sportsmen pay for the privileges of engaging in quail hunting, deer hunting,

turkey hunting, or bass fishing.

### III. CAUSE OF ACTION

### RACE DISCRIMINATION

9.      The Plaintiffs reallege and incorporate by reference paragraphs 1 through 8

above with the same force and effect as if fully set out herein below.

10.      The Defendant engaged in unlawful discriminatory employment practices on

the basis of race as concerns the terms, conditions and privileges of the Plaintiffs'

employment, including their wages.

11.      Plaintiffs Harris, Mack, Parham and Tarver were employed as general

laborers and  hunting crew members at Defendant's hunting lodge near Union Springs in

Bullock County, Alabama.  Each of the Plaintiffs was  paid an hourly rate of $6.50 to $7.00 per hour.  Plaintiffs often worked more than 40 hours per week.  Plaintiffs performed their job duties in a satisfactory manner for said Defendant.

12.     Beginning in July, 2005, the Defendant hired a white male, William Beckwith, to work as a general laborer.  Said employee was paid $8.00 per hour.

13.     Beginning in approximately September 2005, the Defendant hired Joel Norman, a white male, as quail operations manager.  Norman receives a salary of $70,000.00 annually, a company provided truck, and housing on the property.  Roy Lee, a black male, previously performed the job along with other additional duties, and was paid only $10.00 per hour.  Lee received a truck but no housing on the property.  Lee presently receives an annual salary of $41,000.00 annually as deer operations manager.

14.     Norman talked openly about how he wished to replace the black employees of the Defendant with a white hunting crew, and made numerous derogatory comments criticizing the performance of the predominantly black staff.

15.     Beginning in November 2005, the Defendant hired two young white males, Will Hubbard and Joseph May, to work with Norman in his crew at the rate of $8.00 per hour.  Prior to these hirings, Norman's crew had consisted of three black males, Norris Foster, Jeffrey Harris and Willie Mack, none of whom was paid the rate of $8.00 per hour. After the white males were hired, Foster and Harris trained them on how to operate the tractors and the white males assumed the duties of preparing the fields for hunting.  Harris and Foster were assigned to shovel manure out of the horse barn.

16.     In January 2006, Defendant hired Chance Hamm, a young white male, as a

general laborer at the hourly rate of $8.00 per hour.

17.    The white crew members were hired at substantially higher wage rates than their black counterparts, even though they have less knowledge, less training, and less experience in the hunting industry.  The whites were assigned preferable job duties.

18.    Joel Norman kept many of the tips he received which were supposed to be shared with black hunting crew members.

19.    The effect of the Defendant's race discrimination in the open and notorious operation of a two-tiered compensation system for whites and blacks has been to deprive the Plaintiffs of the same right to make and enforce contracts as enjoyed by similarly situated white persons in violation of 42 U.S.C. § 1981, as amended.

20.    The Plaintiffs do not claim any damages after the effective date of the sale or transfer of the Sedgefield property to Tolleson's, which occurred in May of 2006.

20.    Plaintiffs seek to address the discrimination alleged herein, in this suit for back-pay, injunctive relief, compensatory and punitive damages, and a declaratory judgment is their only means of securing adequate relief.  The Plaintiffs are now suffering and will continue to suffer irreparable injury from the Defendant's unlawful practices as set forth herein.

21.    As a consequence of the Defendant's unlawful discriminatory conduct against the Plaintiffs on the basis of their race, Plaintiffs have suffered embarrassment, have been demeaned, and have suffered mental anguish.

22.    Defendant engaged in the discriminatory practices complained of herein with malice and/or reckless indifference to the Plaintiffs' federally protected rights thereby

entitling the Plaintiffs to an award of punitive damages.

### IV.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this court assume jurisdiction of this action and after trial:

A)     Issue declaratory judgment that the employment policies and practice, conditions and customs of the Defendant are violative of the rights of the Plaintiffs as secure by the Civil Rights Act of 1991, 42 U.S.C. § 1981, as amended.

B)     Grant the Plaintiffs a permanent injunction enjoining the Defendant, its agents, successors, employees and those acting in concert with the Defendant from continuing to violate the Civil Rights Act of 1991, 42 U.S.C. § as amended.

C)     Enter and Order requiring the Defendant to make the Plaintiffs whole by awarding them wages, back-pay plus interest, declaratory and injunctive relief, nominal damages, compensatory and punitive damages, and lost seniority and benefits.

D)     Plaintiffs further pray for such other relief and benefits as the cause of justice may require, including but not limited to an award of costs, attorney's fees and expenses.

Respectfully submitted,

s/Jerry Roberson

_____
Jerry Roberson (ROB010)
Attorney for Plaintiffs
**ROBERSON & ROBERSON**
8 Office Park Circle, Suite 150
Birmingham, Al 35223
Telephone:   (205) 871-1115
Facsimile:   (205) 871-5115
E-mail:      jdratty@bellsouth.net

**OF COUNSEL*:***

Albert H. Adams, Jr., Esq.  (ADA-058)
IRBY LAW FIRM, LLC
P.O. Box 910
Eufaula, Al. 36072

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 21st day of November, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Carter H. Dukes, Esq.
Kimberly W. Geisler, Esq.
HUCKABY SCOTT & DUKES, P.C.
2100 Third Avenue North, Suite 700
Birmingham, Alabama 35203

s/Jerry Roberson

_____
OF COUNSEL

EXHIBIT 26



# Sedgefields Plantation
## Employee Organization Chart
### March 24, 2006



```
                        David Carroll
                       General Manager

        ┌──────────────────┼──────────────────────┐
  Denise Pierce        Roy Lee              Joel Norman
  Lodge Manager    Deer Operations Manager  Quail Operations Manager
                   Head of Grounds Crew

  ┌──────┬──────┐   ┌──────┬──────┐   ┌──────┬──────┬──────┐
Katie Woods  Brenda Tarver  Demetrius Parham  Henry Tarver  Chance Ham  Will Hubbard  Willie Mack
Cook         Cook           Farm Labor        Farm Labor    Farm Labor  Farm Labor    Farm Labor
Housekeeping Housekeeping   Grounds Crew       Grounds Crew                            Grounds Crew
```

Defendant's Document
Production

0002