# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| JEFFREY HARRIS, WILLIE BERNARD MACK, DEMETRIUS PARHAM and HENRY TARVER, ) ) ) ) | |
| **Plaintiffs,** ) | **CIVIL ACTION NO.:** **2:06-CV-00875-ID-CSC** |
| ) | |
| vs. ) | |
| ) | |
| MID STATE LAND & TIMBER COMPANY, INC., D/B/A SEDGEFIELDS PLANTATION, ) ) ) ) | |
| **Defendant.** | |

## DEFENDANT MID STATE LAND & TIMBER COMPANY, INC.'S REPLY BRIEF IN FURTHER SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF ROY LEE'S CLAIMS[1]

COMES NOW Defendant Mid State Land & Timber Company, Inc. (hereafter referred to as "Mid State" or "Defendant"), pursuant to Rule 56 of the Federal Rules of Civil Procedure and in accordance with this Court's Order, and submits this Reply brief in response to Plaintiff Roy Lee's ("Lee" or "Plaintiff") Opposition to Defendant's Motion for Summary Judgment.

## I. INTRODUCTION

In response to Defendant's properly supported Motion for Summary Judgment,

---

[1] Rebuttal evidence not previously attached to Defendant's Memorandum of Law in Support of Defendant's Motion for Summary Judgment is attached hereto. All evidence not specified as attached hereto is part of Defendant's initial submission.

Plaintiff ignores his burden under Rule 56 and proceeds to closing arguments. To survive summary judgment, Plaintiff must establish a prima facie case of discrimination, rebut each of Defendant's legitimate non-discriminatory reasons, and demonstrate a genuine issue of material fact exists as to whether racial animus was the reason for the alleged pay disparity. Rhetorical questions and unsubstantiated allegations are not "evidence" within the meaning of Rule 56. The admissible, undisputed evidence in this case establishes that Plaintiff can neither identify a proper comparator under the law of this Circuit nor refute the legitimate bases for Defendant's pay decisions. Accordingly, for the reasons set forth herein, Plaintiff's rhetorical questions require answers contrary to the ones they invite and summary judgment is due to be granted as to Plaintiff's claim.

## II.  ARGUMENT

A.    Plaintiff has not established a prima facie case of discrimination.

Contrary to Plaintiff's representation,[2] *Cooper v. Southern Company* remains the law of this Circuit and the recited elements of a prima facie case of wage

---

[2] Plaintiff claims the *Cooper* decision has been "overruled." (Opposition at 7.) It has not. The "slap you in the face" language concerning the standard for demonstrating pretext based on disparities in qualifications, which is contained in the *Cooper* decision, was deemed imprecise and inappropriate by the United States Supreme Court in *Ash v. Tyson Foods, Inc.*, 126 S.Ct. 1195 (2006). In the same decision, however, the United States Supreme Court cited other language from *Cooper* affirmatively as a more acceptable standard for establishing pretext. *See Ash v. Tyson Foods, Inc.*, 126 S.Ct. 1195, 1197 (2006). The *Cooper* decision was not appealed and its holdings on the requirements for a wage discrimination claim have not been questioned.

discrimination are applicable in the instant case.[3]  In his brief, Plaintiff fails to identify any similarly situated employee who was paid more than him.  Plaintiff concedes that  Norman, the only alleged comparator for whom Plaintiff provides any background, has "greater educational qualifications" and "more experience than Lee." (Opposition at 9.)  Notwithstanding the other deficiencies and misstatements in Plaintiff's brief,[4] these admissions as to Norman's superior education and experience, standing alone, preclude Plaintiff from establishing a prima facie case.  *See Cooper*, 390 F.3d at 745 (affirming summary judgment for employer on plaintiff's compensation claim because "[Plaintiff] has not established that the proposed comparators had similar levels of experience or education").

Nor are Plaintiff's allegations that white managers, other than Norman, were paid more sufficient to establish a prima facie case.[5]  (Opposition at 2.)  Plaintiff

---

[3]  Plaintiff implies that the "class" aspect of *Cooper* renders it inapplicable. (Opposition Brief at 7.)  In fact, however, the "class" claims in *Cooper* were for pattern and practice discrimination and disparate impact; plaintiffs were proceeding individually as to their disparate treatment pay discrimination claims.  *Cooper*, 390 F.3d at 723, 726-45.

[4]  For example, contrary to the law of this Circuit, Plaintiff fixates on Norman's two year college degree to the exclusion of any other bases for compensation although there were multiple reasons articulated for Norman's pay.  (Mem. of Law in Support of Summary Judgment as to Plaintiff Roy Lee's Claim at 2, 5.)

[5]  The referenced pages of Exhibit 1, cited in support of Plaintiff's reference to other white managers, do not contain any information as to the identity of other managers, the race of other managers, or the current employment status of other managers.  Greg Wallace, one of the individuals cited in support of Plaintiff's claim of race discrimination, is also a black male.

bears the burden of establishing a proper comparator. "In order to meet the comparability requirement a plaintiff is required to show that he is similarly situated in all relevant aspects to the non-minority employee." *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001). Although Plaintiff provides a laundry list of names, he fails to demonstrate that he is "similarly situated in all relevant aspects" to any of the "other managers" identified.[6] To the contrary, the little information that Plaintiff does provide demonstrates that these individuals are not proper comparators as the Davisons, in addition to being related to the owners of Mid State,[7] handled timber management for Mid State and McDuffie had significantly more quail hunting experience than Lee. (Opposition at 2.) Accordingly, because Lee has failed to establish a prima facie case, summary judgment is due to be granted as to his wage discrimination claim.

---

[6] Plaintiff does not hesitate to make sweeping statements about "all managers" or "every other manager" even when the evidence does not support his statements. For instance, conspicuously absent from Plaintiff's list of "other managers" are Anthony Dickey, a white employee who worked as a hunt manager, and Denise Pierce, a white employee who worked as the lodge manager. (Deposition of David Carroll ("Carroll Dep."), attached hereto as Exhibit A, at 23:4 through 24:15; 25:15-24.) Dickey was a manager temporarily for a brief period of time and was only paid an hourly wage of $8.50 per hour, significantly less than Lee. (Carroll Dep. at 25:15-24.) Pierce was also paid an hourly wage of $11.50 as a manager. (Carroll Dep. at 23:4 through 24:15.) In addition to undermining Lee's claim that he was paid less than all the other white managers, this fact directly contradicts Plaintiff's statement that he was "the only person ever to work in management on an hourly rate instead of a salary." (Opposition at 8.)

[7] Second Deposition of David Carroll, attached hereto as Exhibit B, at 16:21 through 17:22.

B.     Even assuming Lee established a prima facie case, Lee has failed to rebut the legitimate nondiscriminatory reasons for compensation.

In response to Plaintiff claim of discrimination, Defendant offered numerous reasons for the compensation paid to Norman: (1) Norman has an associate degree in wildlife technology (Norman Dep. at 19:15-19; Norman App.); (2) Norman, prior to coming to work for Defendant, had twenty-seven years experience in bird dog training and handling for quail hunts, twenty-four years of experience working on quail hunting plantations, and approximately seven years experience managing a thirty-three hundred acre plantation in Georgia and supervising up to twenty plantation employees (Norman Dep. at 37:1 to 41:23; Norman App.); (3) Norman was experienced in cultivating and maintaining a wild quail population and was capable of helping Mid State revive its reputation for outstanding quail hunting (Norman Dep. at 39:21 to 41:23); (4) Norman told Mid State that he must be paid $70,000 to "lure" him away from his position in Georgia (Norman Dep. at 50:2-5, 72:6); and (5) Mid State hoped that Norman's quail hunting customers from Mill Pond (the quail hunting plantation that Norman managed) would follow Norman and increase Sedgefields' customer base (Carroll Aff. ¶ 4).

In his Opposition, Plaintiff fixates upon only one criterion–Norman's degree (which Lee concedes he does not have)–and quarrels with the wisdom of Defendant's decision to consider a degree in wildlife technology in setting compensation.

5

(Opposition at 9.)  Plaintiff then argues that a "junior college degree" does not explain the difference between Lee's and Norman's compensation.  (Opposition at 9.)  So long as the criteria is non-discriminatory, neither Plaintiff nor the Court can quarrel with the wisdom of Defendant's criteria or second-guess Defendant's decision.  *Chapman v. AI Transport*, 229 F.3d 1012, 1029 (11th Cir. 2000).  Accordingly, Plaintiff argument as to Defendant's consideration of Norman's college degree is insufficient to demonstrate pretext.

Furthermore, Plaintiff's Opposition fails to rebut the numerous other reasons for Norman's compensation.  "If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether *each* of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim." *Chapman,* 229 F.3d at 1024-25 (emphasis added). Plaintiff has failed to even address the numerous other reasons for Norman's compensation – his twenty-seven years experience in bird dog training and handling for quail hunts,[8] twenty-four years of experience working on quail hunting plantations, and approximately seven years experience managing a thirty-three

---

[8] Plaintiff states that he has been "working with hunting dogs all his life." (Opposition at 2.) Plaintiff actually testified, however, that his experience is with "coon dogs" and that Defendant did not do any "coon hunting" on the property.  (Second Deposition of Roy Lee ("Lee Dep. II"), attached hereto as Exhibit C, at 32:2-21.)  Plaintiff also testified that he had no experience working with quail dogs prior to coming to Sedgefields, that the two types of dogs are "very different," and that he could not train bird dogs**.** (Lee Dep. II at 33:16 through 34:8.)

6

hundred acre plantation in Georgia and supervising up to twenty plantation employees (Norman Dep. at 37:1 to 41:23; Norman App.).  Plaintiff's argument as to Norman also fails to address the fact that, at the time Norman was hired, Mid State was seeking to implement a wild quail recovery program and Norman was qualified to institute such a program at Sedgefields.  (Norman Dep. at 69:16 through 70:21.) Finally, Plaintiff does not address the fact that Norman required a salary of $70,000 to leave his position of plantation manager in Georgia or that Mid State hoped Norman's quail hunting customers from Mill Pond would follow Norman to Sedgefields.  (Norman Dep. at 50:2-5; Carroll Aff. ¶ 4.)  All of these reasons are legitimate bases for Defendant's compensation decision.  Because Plaintiff has failed to demonstrate that each of these reasons is pretextual, summary judgment is due to be granted.

Unable to meet his burden under the law, Plaintiff concedes there were legitimate reasons for the disparity and then makes a novel argument: his claim is not that he was impermissibly paid less than a white employee, it is that he was paid too much less.[9]  (Opposition at 10.)  Where there are legitimate, non-discriminatory

---

[9]  In support of his claim that his compensation should have been more, Plaintiff claims, without citation to the record, that he "was for a year in charge of deer operations and hunting operations." (Opposition at 10.) There is no evidence in the record to support this claim.  The evidence reveals that Plaintiff temporarily oversaw quail and deer hunting operations for a few months (February through April 2005) when Defendant was shorthanded.  (Lee Dep. at 46:15-22, 47:14-23; Carroll Dep. at 97:13 through 98:7; Lee Dep. II at 71:15-18; 72:4-9.)  During that time

reasons for a disparity, and Plaintiff's concedes there are, Plaintiff's "claim" is nothing more than an impermissible request for this Court to sit as a "super-personnel department."[10]  *Elrod v. Sears Roebuck & Co.*, 939 F.2d 1466, 1470 (explaining that federal courts do not "sit as a super-personnel department that reexamines an entity's business decisions.").  Although Plaintiff believes that either he should have been paid more or that Norman should have been paid less, these beliefs neither rebut the legitimate reasons for the disparity nor demonstrate the disparity was based upon race.[11]  *See Cooper*, 390 F.3d at 738 ("P. Harris's assertion that she deserved to earn the same salary as these employees does not render Plunkett's stated explanations unworthy of credence or otherwise raise any genuine issue of fact.").  Accordingly, because Plaintiff has failed to demonstrate Defendant's reasons for its compensation decisions are pretext for discrimination, summary judgment is due to be granted as to Plaintiff's claim

---

frame, deer season was over, and Lee's duties involved primarily maintenance activities.  (Carroll Dep. at 97:13 through 98:7.)

[10]  To put the absurdity of this argument in Plaintiff's preferred form of rhetorical questions: At what dollar amount does an admittedly acceptable difference in pay become discrimination? Should the Court publish a list of proper salaries for every position for every employer?

[11]  Indeed, Plaintiff appears to argue that Norman's compensation was disproportionately high as compared to white employees.  (Opposition at 10 (comparing, without citation to the record, Norman's salary to the salary of Carroll and "former wildlife biologists")).  Even accepting Plaintiff's contention that Norman was "overpaid," Plaintiff seems to admit that he was "overpaid" in relation to both black and white employees thereby negating any inference that Defendant's compensation of Norman (or any of its employees) was based on race.

C.    Plaintiff other "arguments" are irrelevant, largely unsupported by the record, and insufficient to defeat summary judgment.

1.    Plaintiff's "pattern and practice" evidence cannot sustain his claim of wage discrimination.

Plaintiff does not and cannot assert a pattern and practice claim. *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir. 2000) ("a pattern and practice claim either may be brought by the EEOC if there is 'reasonable cause to believe that any person or group of persons is engaged in a pattern or practice' of discrimination. . . or by a class of private plaintiffs") (internal citations omitted).   Nonetheless, Plaintiff seeks to support his individual disparate treatment claim with allegations that other black employees, who held different positions than Plaintiff, were paid less than white employees.   (Opposition at 8.)   Plaintiff's "evidence" is irrelevant and insufficient to sustain his wage disparity claim.

As an initial matter, "[s]tatistical evidence alone" is insufficient to "establish a prima facie case of individual disparate treatment." *Rasor v. Rice*, No. 804CV2060T30MAP, 2005 WL 2978332, *1 (M.D. Fla. Nov. 7, 2005).  *See also Langston v. Carraway Methodist Hospitals of Ala.*, 840 F. Supp. 854, 863 (N.D. Ala. 1993) ("While statistics are often important in class actions and disparate impact cases, they 'are of relatively low importance in a case of individual disparate treatment.'") (quoting *Gilty v. Village of Oak Park*, 919 F.2d 1247, 1253 n. 8 (7th Cir.

9

1990)).    In this case, however, there are no statistics, merely cherry-picked comparisons from a limited period of time for employees who held different positions than Plaintiff.    Accordingly, Plaintiff's "evidence" has no probative value.

Even if raw numbers for other positions were relevant to Plaintiff's claim, and they are not, Plaintiff's purported "evidence" is fatally flawed because there is no analysis that takes into account the employees' skills and experience, the type of work they were hired to perform, and the legitimate reasons for compensation decisions.[12]

---

[12] Plaintiff cites Corey Balkcam, who is not a plaintiff in this action, in support of his claim that black employees with skills similar to white employees were not paid the same. (Opposition at 4.) Again, however, Plaintiff ignores the explanation for Defendant's hiring decisions – namely, that compensation was based on a determination of Mid State's needs at the time of hiring, the applicant's skills, and the ability of the prospective employee to meet those needs. (Carroll Dep., attached hereto as Exhibit A, at 137:15-19; 141:18 through 142:6.) Balkcam was hired in May 2005, at the request of Lee, to meet an immediate need for assistance with mowing the fields and performing ground maintenance in the coming summer months. (Carroll Aff. II, attached hereto as Exhibit D, ¶ 3.) Balkcam was paid the same salary as other employees hired to perform exclusively ground maintenance. An employer can legitimately base compensation upon current needs and conditions. *Cooper*, 390 F.3d at 738 (affirming summary judgment based on employer's testimony that it utilized "different criteria in hiring Golden and Page, who were hired in tight labor markets in which new employees could command more competitive compensation packages").

Plaintiff also cites William Beckwith as a comparator to the other plaintiffs. (Opposition at 8.) There is no dispute that Beckwith worked as a night watchman and none of the other laborers had that responsibility. (Deposition of Jeffrey Harris ("Harris Dep."), attached hereto as Exhibit E, at 106:18-20; Declaration of Willie Mack ("Mack Decl."), attached hereto as Exhibit F, at 1 (listing all of his duties); Declaration of Demetrius Parham ("Parham Decl."), attached hereto as Exhibit G (listing duties); Deposition of Henry Tarver ("Tarver Dep."), attached hereto as Exhibit H, at 42:15 through 43:9 (listing duties).) Plaintiff's belief that Defendant should not have provided extra compensation to Beckwith because he agreed to assume this additional position does not evidence that the additional compensation was discriminatory. Moreover, even if Defendant could have insisted that overtime pay be the only additional compensation (as counsel alleges it should have been), a mistaken belief that some additional compensation should be paid to an employee asked to assume an additional position with additional duties, even if not required under the law, is not discriminatory. Also, while Plaintiff claims Tarver should have been given the night watchman p

*See, e.g., Furr v. Seagate Technology, Inc.*, 82 F.3d 980, 986-87 (10th Cir. 1996) (citation omitted) (finding plaintiffs' statistics flawed because they "grouped all employees together regardless of specialty or skill and failed to take into account nondiscriminatory reasons for the numerical disparities.") As discussed in detail in Defendant's Memorandum of Law filed in support of summary judgment as to the claims of the other *Harris* plaintiffs, the comparisons Plaintiff makes are not proper under the law of this Circuit and there are legitimate, non-discriminatory reasons for Defendant's compensation decisions. (Memorandum of Law in Support of Summary Judgment, filed April 5, 2007, at 21-22.) Plaintiff's "raw unadorned figures" cannot and do not support his claim of disparate treatment. *See Davidson v. Quorum Health*

---

position, Tarver has not asserted a claim of discrimination with regard to the hiring for this position. (Second Am. Compl.; Tarver Dep., attached hereto as Exhibit H, at 57:5 through 58:10 (stating only claim was as to pay).) If Tarver himself does not believe his non-selection for the night watchman position was discriminatory, his non-selection certainly does not seem probative of wage discrimination as to Roy Lee.

Additionally, to the extent that Beckwith's close personal friendship with David Carroll may have played a role in Beckwith's selection for the night watchman position and accompanying rate of pay, the law is clear that discrimination based on personal relationships is not actionable. *See Phillips v. Hibbett Sporting Goods, Inc.*, 329 F. Supp. 2d 1280, 1291 n. 8 (M.D. Ala. 2004) ("If [Plaintiff's] speculation is correct, then her case challenges the "fairness" of employment decisions based on friendship rather than the legality of employment decisions motivated by racial preference. . . . Put another way, even if a jury believed [Plaintiff's] speculation, Bundrick's decision to promote his friends would not support a claim of race or sex discrimination."); *Darden v. Housing Authority of Baltimore*, No. PWG-06-216, 2006 WL 3231964, *5 (D. Md. Nov. 7, 2006) (rejecting plaintiff's wage discrimination claim and holding that "these 'isms' [nepotism and favoritism] are not prohibited by Title VII or §1981 to the extent they are unrelated to race, color, religion, sex, or national origin").

11

*Group, Inc.*, 1 F. Supp. 2d 1321, 1325 (N.D. Ala. 1997).[13]

> 2.    A *Faragher* analysis is irrelevant to Plaintiff's wage discrimination claim.

Plaintiff has not asserted a hostile work environment claim.  Nevertheless, in his very brief attempt to link a plethora of unsupported, uncited, and irrelevant facts to actual case law, Plaintiff (again without citation to the record) highlights the supposed deficiencies in Defendant's written anti-discrimination policies and training and claims these supposed deficiencies render *Cooper* inapposite.  (Opposition at 7.) The analysis of the reasonableness of an employer's policies and preventative or remedial measures arises in the Court's consideration of the *Faragher* affirmative defense to hostile work environment claims.  *See Faragher v. Boca Raton*, 118 S.Ct. 2275 (1998).   Defendant's ability or inability to satisfy this defense is of no consequence to Plaintiff's claim of disparate treatment.[14]  *See, e.g., Smith v. Alabama*

---

[13]   Plaintiff's claim that "[n]o black has ever been allowed to live on the property at Sedgefields" (Opposition at 5, 8) is a misstatement since Plaintiff's affidavit, which is once cited as evidentiary support for this statement, is limited to the period of time that he was employed at Sedgefields. Moreover, this claim is directly contradicted by the sworn deposition testimony of David Carroll that before Beckwith lived on the property, Lee was permitted to stay, and in fact often stayed, at a house on the Sedgefield's property during the busy season.  (Carroll Dep., attached hereto as Exhibit A, at 110:19 through 111:1.)

[14]   Moreover, to the extent that Plaintiff infers from the absence of an anti-discrimination policy that Defendant must have discriminated against Plaintiff (Opposition at 7), such an inference is not supported by federal case law, as an employer is under no duty to promulgate a written anti-discrimination policy. *See Zisumbo v. McCleodUSA Telecomm. Services, Inc.*, 154 Fed. Appx. 715, 727 (10th Cir. 2005) (holding that Title VII does not impose an affirmative duty on employers to promulgate anti-discrimination policies).

*Department of Corrections*, 145 F. Supp. 2d 1291, 1297 (M.D. Ala. 2001).

> 3.   Plaintiff's contradictory allegations concerning his hourly vs. salaried status are insufficient to create a question of fact as to his wage disparity claim.

On the one hand, Plaintiff alleges it was discriminatory to pay Lee an hourly wage as a manager and incorrectly claims (without citation to the record) that he was the "only manager" paid an hourly wage.[15]  (Opposition at 8.)  On the other hand, at the same time, Lee claims that it was discriminatory to make Lee a salaried employee because the salary set was too low.  (Opposition at 9.)  Lee has failed, however, to raise an inference of discrimination as to either of these actions because he has not identified a similarly situated employee who was treated differently.  Additionally, Lee's claim of the "unfairness" of his $41,000 salary, based on Lee's work load in 2004, ignores the fact that Lee actually earned more in 2005 than in 2004, Defendant had more employees available to work after Lee was placed on salary thereby decreasing the need for so many workweeks in excess of forty hours, and Lee indisputably received the benefit of a consistent bi-weekly paycheck in a business with obvious fluctuations in work load depending upon the season.  *See* 2004 and 2005 W2 Statements for Roy Lee, attached hereto as Exhibit I; Carroll Aff. II,

---

[15]  At least two other white employees were paid an hourly wage while working as managers, *supra* note 6 and citations therein.

attached hereto as Exhibit D, ¶ 3 (detailing hires from June 2005 through December 2006).  Accordingly, Plaintiff's contradictory allegations as to the "discriminatory" classification of Plaintiff as an hourly employee and then a salaried employee fail to support a claim of disparate treatment.

### III.  CONCLUSION

In this case, Lee cannot prove that Mid State's legitimate, non-discriminatory explanation for the difference in salary between Norman and Lee was a pretext for discrimination.  Plaintiff admits that he lacked Norman's credentials.  As the evidence indicates, Mid State reasonably believed that Norman's combination of experience and education made him a great fit for the Quail Operations Manager position and that Norman could, among other things, remedy the dwindling quail population at Sedgefields and bring his customers from Mill Pond to Sedgefields.  Mid State knew that Norman could not be "lured away" from his position with Mill Pond for less than an annual salary of $70,000.  Mid State honestly believed that  Norman would be an asset to Sedgefields Plantation and for that reason Mid State agreed to pay Norman the salary he requested.  Lee cannot demonstrate that Mid State's belief was not honestly held.  Accordingly, for the reasons set forth herein as well as the reasons  set forth in Defendant's Memorandum of Law, summary judgment is due to be granted as to Lee's claims.

WHEREFORE, PREMISES CONSIDERED, Defendant Mid State Land & Timber Company, Inc. respectfully requests this Court enter summary judgment in favor of Defendant and against Plaintiff Roy Lee as to all claims asserted in Lee's Complaint.  Further, as there is no just reason for delay, Defendant respectfully requests that this Court render a judgment in favor of this Defendant as to Plaintiff Roy Lee a final judgment pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.

/s/ Carter H. Dukes
Carter H. Dukes
Kimberly W. Geisler
Attorneys for Defendant
Mid State Land & Timber Company, Inc.

**Of Counsel:**
Huckaby Scott & Dukes, P.C.
2100 Third Avenue North, Suite 700
Birmingham, Alabama 35203
Telephone: (205) 251-2300
Telecopier: (205) 251-6773

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Jerry D. Roberson, Esq.
Roberson & Roberson
8 Office Park Circle
Suite 150
Birmingham, Alabama 35223

Albert H. Adams, Jr., Esq.
Irby Law Firm, LLC
Post Office Box 910
Eufaula, Alabama 36072

DONE this the 16th day of April, 2007.

/s/ Carter H. Dukes
Of Counsel

40628.1

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


CIVIL ACTION NUMBER

2:06-CV-00405-ID-SRW


NORRIS FOSTER,

     Plaintiff,

vs.

MID STATE LAND & TIMBER COMPANY, INC.,
d/b/a SEDGEFIELDS PLANTATION,

     Defendant.


THE VIDEOTAPED

DEPOSITION TESTIMONY OF:

DAVID CARROLL


September 8, 2006

1:29

     p.m.


COURT REPORTER:

Gwendolyn P. Timbie, CSR



Page 23

1    the bird hunting on any part of it --

2         A     Yes.

3         Q     -- correct?

4         A     That's correct.

5         Q     And then a portion -- the more

6    open lands, you can bird hunt on; correct?

7         A     Yes.

8         Q     I mean, they probably have

9    some thickets and stuff where you can't

10   bird hunt; isn't that fair?

11        A     Yes.

12        Q     Okay.  Now -- and the -- the

13   -- do you have any job responsibilities

14   in -- insofar as the revenue stream from

15   the operations?

16        A     In my initial interview with

17   Ms. Howell, I was asked to be as

18   productive as possible, given the current

19   circumstances of the plantation.

20        Q     Okay.  What are the current

21   circumstances?

22        A     The circumstances were that

23   the property was not groomed the way

**American Court Reporting**
**toll-free (877) 320-1050**

Page 24

1    it want -- they wanted it to be -- the

2    home office wanted it to be.  So it was --

3    it -- for a phrase that I would use, it

4    was a "diamond in the rough."

5         Q    Okay.  Well, I'm going to show

6    you what we previously -- and you were

7    here for Mr. Norman's deposition; correct?

8         A    I was.

9         Q    You actually were here for

10   Mr. Foster's deposition yesterday;

11   correct?

12        A    I was, yes.

13        Q    So you've heard all the

14   testimony in this case; correct?

15        A    Yes.

16        Q    All right.  And, then, I'm

17   going to show you what we marked as

18   Plaintiff's Exhibit 3 to Mr. Norman's

19   deposition.

20        Is that the organizational chart for

21   Sedgefields as of March of 2006?

22        A    I believe that would be

23   correct, yes.

Page 25

1        Q      Now, other than the plantation

2     here in Union Springs, did y'all have any

3     other properties that you owned in

4     Alabama?

5        A      When you mean "y'all," what --

6        Q      Mid State.  Did Mid State own

7     any other property in Alabama?

8        A      Not in the state of Alabama.

9        Q      Okay.  So all the Alabama

10    operations were on these, roughly,

11    thirteen thousand acres; is that fair?

12       A      That -- to my knowledge, that

13    is accurate.

14       Q      And -- so all the employees

15    for Mid State in Alabama would be on that

16    property?

17       A      I do believe there was one

18    other employee.  I -- she would -- she

19    would work for maybe the home office, not

20    necessarily Mid State.  But she also lived

21    in -- in Alabama.

22       Q      Who is that?

23       A      I will try to recall her

Page 110

1    Q    He was going to get a lot of

2  overtime, then, wasn't he?

3    A    Well, I provided him with a --

4  I had a mobile home on the place.  I

5  provided him with a simple place to stay.

6  And provided him with a little extra money

7  in his paycheck to offset the expenses for

8  what, you know, the reasonable fee would

9  be for somebody who would be putting in a

10  few hours during the evening, just making

11  sure everything was locked up and nobody

12  was on the place.

13    Q    So at the time that

14  Mr. Beckwith was working there, there

15  wasn't anybody living on the property; is

16  that fair?

17    A    That is correct.

18    Q    Okay.

19    A    From time to time before that,

20  Roy Lee had access to a -- a house during

21  the busy time of the season, and he could

22  stay there.  He didn't live there full

23  time, but he did stay there quite often

Page 111

1    during the season, I'm told.

2         Q    All right.  But Mr. Beckwith

3    didn't quite work out, did he?

4         A    No, he didn't.

5         Q    He -- he stole some gas?

6         A    He did.

7         Q    Did y'all see him?  Did y'all

8    have evidence of him?

9         A    I confronted him about it, and

10   he admitted it to me.

11        Q    Okay.  So he was let go?

12        A    He was.

13        Q    He also didn't have a driver's

14   license, did he?

15        A    Turned out, he didn't.  And

16   that's another one of the reasons he was

17   let go.

18        Q    Okay.  Well, turned out.  Did

19   he show you one?

20        A    He provided me with a license

21   upon being hired there, but it turned out

22   it was not a current and/or valid license.

23        Q    All right.  You hired

Page 137

1    years -- eight to ten years, okay, as a --

2    as a laborer -- general laborer, driving a

3    tractor, being in the -- part of the

4    hunting crew.  Before Mid States owned it,

5    you know -- and they bought it in '99 --

6    he -- he worked on the property.  Okay.

7         Assuming that to be true, how can

8    you hire a white male, who doesn't have

9    any hunting experience, at a higher hourly

10   rate than Norris Foster, who's had six

11   years of military service, years of

12   experience around dogs and in hunting --

13   hunting camps?  How can you do that and be

14   fair to Norris Foster?

15        A    If I hired an individual and

16   paid him a higher wage than somebody else,

17   the wage I paid him was -- was based on

18   his proficiency in doing something that we

19   needed done here at the plantation.

20        Q    Okay.  What was that?

21        A    For instance, Adam May was

22   somebody who -- who was good at trapping

23   and a mechanic.  I didn't have either one

Page 141

1        Q       Anybody can do it, can't

2    they?

3        A       No.   Only because Chance

4    stayed there with me and showed me how to

5    do it.

6        Q       Oh, okay.

7        A       It's not something you'll pick

8    up and just do at the drop of a hat and do

9    a good job of it.

10       Q       All right.  Has Norris Foster

11   welded pieces of equipment before?

12       A       Not to my knowledge.

13       Q       Made repairs using a welder?

14   Has he done that?

15       A       Who?

16       Q       Norris.

17       A       Not to my knowledge.

18       Q       Okay.  Okay.  So -- so you

19   claim that all these three guys had

20   specialties?

21       A       They had things that they were

22   proficient at that I needed, if you want

23   to call it a "specialty."  Some --

Page 142

1    something that they could do that I didn't

2    have a person here that was good at doing

3    it, and I needed to add people to my

4    staff.  And -- so I chose those people at

5    that time because they had those qualities

6    that I needed.

7         Q    Did you list every reason --

8    have we discussed every reason that they

9    were paid more than Norris Foster?

10        A    I mean, I -- I didn't set

11   Norris' pay rate.

12        Q    Well, who repaired the

13   equipment before Chance was hired?

14        A    Well, most all of it was done

15   by Roy Lee, with the help of his folks.

16   But Roy Lee was the one that was in charge

17   of it.  As a matter of fact, we mentioned

18   operating heavy equipment.  To my

19   knowledge, the only person here that

20   operated any heavy equipment was Roy Lee.

21   His crew was with him, but he was always

22   running -- running the equipment.

23        Q    Could -- have you ever seen

1              IN THE UNITED STATES DISTRICT COURT

2             FOR THE MIDDLE DISTRICT OF ALABAMA

3                     NORTHERN DIVISION

4

5       JEFFREY HARRIS, WILLIE

6       BERNARD MACK, DEMETRIUS

7       PARHAM and HENRY TARVER,

8            Plaintiffs,

9       vs.                CASE NO. 2:06-cv-875-ID-CSC

10      MID-STATE LAND AND TIMBER

11      COMPANY, INCORPORATED,

12      d/b/a SEDGEFIELDS PLANTATION,

13            Defendant.

14

15         *     *     *     *     *     *     *     *

16          The videotaped deposition of **DAVID**

17      **CARROLL** was taken before Cornelia J.

18      Baker, Certified Court Reporter and

19      Certified Shorthand Reporter, as

20      Commissioner, on Tuesday, March 27, 2007,

21      commencing at approximately 12:22 p.m., in

22      the law offices of Huckaby, Scott & Dukes,

23      2100 Third Avenue North, Suite 700,

24      Birmingham, Alabama, pursuant to the

25      stipulations set forth herein.

1    management.

2            **Q.**  How do you know that?

3            **A.**  Spoke with Ms. Sherry Howell and

4    informed me of that.

5            **Q.**  Who is Ms. Howell?

6            **A.**  She is an employee of Mid-State

7    Land and Timber.

8            **Q.**  Do you have any document, resume,

9    or application or anything for Mrs. Davison?

10           **A.**  I don't.

11           **Q.**  So do you know where her two-year

12   degree is from?

13           **A.**  I don't know which school it's

14   from, no, sir.

15           **Q.**  Do you know if she'd ever worked

16   in the timber industry before?

17           **A.**  I don't.

18           **Q.**  Do you know anything about her

19   prior job experience or her qualifications?

20           **A.**  No, sir.

21           **Q.**  And Mrs. Davison was married to

22   Byron Davison, correct?

23           **A.**  That is correct.

24           **Q.**  Now, are they related by blood or

25   marriage to the owner of Mid-State Land and

1    Timber?

2         **A.**   Mrs. Donna is.  Was by marriage,

3    yes.

4         **Q.**   All right.  Can you explain how

5    she's related?

6         **A.**   Mr. Broadhead's wife, her

7    brother, it was -- that was her husband.

8         **Q.**   Was she at one time married to

9    her brother?

10        **A.**   She was married to Mrs. Broad-

11   head's brother.

12        **Q.**   Right.  And she got a divorce and

13   married Mr. --

14        **A.**   He died of a heart attack.

15        **Q.**   Okay.  And after his death, she

16   remarried Byron Davison?

17        **A.**   Yes.

18        **Q.**   Is that correct?

19        **A.**   That's correct.

20        **Q.**   So she was a sister-in-law by

21   marriage, correct?

22        **A.**   Correct.

23        **Q.**   Now, did Byron Davison also work

24   at Mid-State?

25        **A.**   He did.

# FREEDOM COURT REPORTING

Page 1

1      IN THE UNITED STATES DISTRICT COURT

2      FOR THE MIDDLE DISTRICT OF ALABAMA

3              NORTHERN DIVISION

4

5   CASE NUMBER:  2:06-CV-875-ID

6   JEFFREY HARRIS, et al.,                **COPY**

7              Plaintiffs,

8              vs.

9   MID STATE LAND & TIMBER CO., INC.,

10  d/b/a SEDGEFIELDS PLANTATION,

11             Defendant.

12

13          S T I P U L A T I O N

14          IT IS STIPULATED AND AGREED by and

15  between the parties through their respective

16  counsel, that the deposition of Roy Lee may

17  be taken before Angela Smith, RPR, CRR, at

18  the offices of John W. Waters, Jr., at 214

19  North Prairie Street, Union Springs, Alabama

20  36089, on the 18th day of January, 2007.

21

22          DEPOSITION OF ROY LEE

23

# FREEDOM COURT REPORTING

Page 32

1     A.      Correct.

2     Q.      Okay.  Did you apply for

3  anywhere else, trying to make some more

4  money, or were you . . .

5     A.      No.  When I came to apply at

6  Sedgefields, guy named Bo Jack.  I don't

7  know Bo Jack's last name.  He was telling me

8  about the job.  And Norris was telling me

9  about the job, Norris Foster.  So I came up

10  and I applied for a job.

11          I told them that was I good at

12  horses, training, working with dogs.  I had

13  coon dogs.  I could train coon dogs, but not

14  birds.

15     Q.      Yeah.

16     A.      But I know how to work dogs.

17  So I started from there.  They hired me the

18  next day.

19     Q.      Okay.  They don't do any coon

20  hunting at Sedgefields, do they?

21     A.      No.

22     Q.      I understand you're a good

23  coon hunter, though.

# FREEDOM COURT REPORTING

Page 33

1      A.    Yes, sir.

2      Q.    And you have coon dogs; is

3  that right?

4      A.    Correct.

5      Q.    What kind of dogs do you use

6  for coon hunting?

7      A.    Blue ticks.

8      Q.    Okay.  And how many of those

9  do you have?

10      A.    Five.

11      Q.    Okay.  And how long have you

12  been training coon dogs?

13      A.    Ever since '77.

14      Q.    Okay.

15            (Recess taken.)

16      Q.    Coon dogs and bird dogs for

17  quail hunting are --

18      A.    Entirely different.

19      Q.    -- Entirely different?

20      A.    Correct.

21      Q.    You train them differently, do

22  you not?

23      A.    Correct.

**FREEDOM COURT REPORTING**

Page 34

1      Q.      Okay.  And you don't claim to

2  be an expert in training bird dogs, do you?

3      A.      I'm not.

4      Q.      Okay.

5      A.      I'm an expert at working a

6  bird dog when he already trained.

7      Q.      Okay.

8      A.      I'll put it that way.

9      Q.      Okay.  And other than coon

10 hunting, you do a lot of -- you grew up

11 doing a lot of deer hunting, too, did you

12 not?

13     A.      Correct.

14     Q.      And did you ever use dogs for

15 deer hunting, too?

16     A.      Never.

17     Q.      Okay.  But you didn't grow up

18 doing any quail hunting, if I recall?

19     A.      No, I haven't.  A fellow, Mike

20 McDuffie, trained me to quail hunt.

21     Q.      Okay.  If I recall, you know,

22 we've talked, and you've been deposed once

23 before.

# FREEDOM COURT REPORTING

Page 71

1  Mr. Carroll comes onboard as plantation

2  manager; is that right?

3          A.     I don't know exact date, but I

4  know he come aboard.

5          Q.     Does that sound about right?

6          A.     Correct.

7          Q.     Okay.  No reason to dispute

8  that?

9          A.     No reason to dispute it.

10         Q.     Then in September of 2005,

11  that's when Mr. Norman comes onboard.  Does

12  that sound about right to you?

13         A.     I don't know his exact date,

14  but I know he come aboard after David.

15         Q.     Okay.  And so, y'all didn't

16  have any quail hunts in 2005, until after

17  Joel Norman came onboard?

18         A.     Correct.

19         Q.     Okay.

20         A.     Correct.

21         Q.     And I'm just limiting it to

22  2005.

23         A.     Okay.  That's the time David

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 72

1    started.

2           Q.     That's right.

3           A.     Correct.

4           Q.     So the -- So Sedgefields was

5    without a plantation manager from January

6    31, 2005, when Donna Davidson left, through

7    the time in which -- or until the time in

8    which Mr. Carroll came in April of 2005?

9           A.     Correct.

10          Q.     All right.

11                 MR. DUKES:   Let's take a

12   break.

13                 (Recess taken.)

14                 (Defendant's Exhibit 20

15                  was marked for

16                  identification purposes.)

17          Q.     I'm going to show you a

18   document that I will identify as Defendant's

19   Exhibit 20.  And I know -- I don't think any

20   of that is your handwriting, is it?

21          A.     No.

22          Q.     You see over on the left-hand

23   side they've got some dates and what you

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| **JEFFREY HARRIS,** ) | |
| **WILLIE BERNARD MACK,** ) | |
| **DEMETRIUS PARHAM and** ) | |
| **HENRY TARVER,** ) | |
| ) | **CIVIL ACTION NO.:** |
| **Plaintiffs,** ) | **2:06-CV-00875-ID-CSC** |
| ) | |
| **vs.** ) | |
| ) | |
| **MID STATE LAND & TIMBER** ) | |
| **COMPANY, INC., D/B/A** ) | |
| **SEDGEFIELDS PLANTATION,** ) | |
| ) | |
| **Defendant.** | |

### SECOND AFFIDAVIT OF DAVID CARROLL

| | |
|---|---|
| STATE OF ALABAMA | ) |
| | : |
| COUNTY OF BULLOCK | ) |

Before me, the undersigned notary public in and for said county and state, personally appeared David Carroll, who being known to me and who being first duly sworn, deposes oath and states as follows:

1.    My name is David Carroll. I am over the age of nineteen years and am suffering from no legal disability. I am currently the general manager for Sedgefields Plantation ("Sedgefields") which is owned by Tolleson Land & Timber. I was previously employed by Mid State Land & Timber Company, Inc. ("Mid State") from April 2005 through May 19, 2006 as the general manager for Sedgefields before the plantation was purchased by Tolleson. This affidavit is based upon my personal knowledge.

2.    Horses were brought back to the barn in preparation for hunting season in late

September or early October 2005. Other than myself, Joel Norman, the quail operations manager, and Denise Pierce, the office manager, there were no other white employees at Sedgefields from September 27, 2005, when William Beckwith was terminated, until November 21, 2005.

3.      When I was hired to work for Mid State in April 2005, my first months were spent assessing the more twenty square miles of property to ascertain what needed to be done with the property. While making this assessment, I utilized the existing staff and did not make any new hires except for my hiring of Corey Balkcam. Mr. Balkcam was hired in May 2005, at the request of Roy Lee, to meet the immediate need for assistance with mowing the fields and handling ground maintenance in the coming summer months. I based my hiring decisions for Mid State upon what I believed to be Mid State's immediate needs at the time and an individual's ability to meet those needs. Mr. Balkcam worked a couple of weeks and then quit. After Mr. Balkcam quit, I hired Henry Tarver in June 2005 to perform ground maintenance. William "Brother Man" Beckwith was hired on July 25, 2005 to work as a laborer and night watchman. On September 6, 2005, I hired Jeffrey Harris. Shortly thereafter, on September 19, 2005, Joel Norman was hired to be the quail operations manager. A week or so after Mr. Norman was hired, I terminated the employment of Mr. Beckwith. On or about November 21, 2005, I hired Joseph May and Will Hubbard. Norris Foster was terminated on December 28, 2005. On December 29, 2005, Mr. May voluntarily quit and Mr. Harris was injured and never returned to work at Sedgefields. Chance Hamm was hired in January 2006 to work at Sedgefields. After Mr. Hamm's hiring in January 2006, Mid State did not hire any new employees for Sedgefields.

4.      None of the white employees at Sedgefields who were hired in late 2005 received a pay raise in 2006. All of the black employees received a raise on January 1, 2006, including Willie "BB" Mack who received a raise to $8.00 per hour (from his previous rate of $7.50 per hour) and Jeffrey Harris, Henry Tarver, and Demetrius Parham who received raises to $7.50 per hour.

5.    Mid State has never retained an employee who, like Norris Foster, failed to perform

assigned tasks, failed to follow directives about performance, ignored the procedures and policies

concerning tips, and displayed a negative attitude.

FURTHER AFFIANT SAITH NOT.

Executed this 3ʳᵈ day of April, 2007.

_____
David Carroll

STATE OF ALABAMA            )
                                             :
COUNTY OF BULLOCK          )

I, the undersigned authority, a Notary Public in and for said County in said State, hereby
certify that DAVID CARROll whose name is signed to the foregoing instrument and who is known to
me, acknowledged before me on this day that being informed of the contents of the said instrument,
_____ executed the same voluntarily on the day the same bears date.

GIVEN under my hand and seal this 3ʳᵈ day of April, 2007.

[NOTARIAL SEAL]

_____
Notary Public

Print Name  RONDA G. Keisre

My Commission Expires:_____

NOTARY PUBLIC STATE OF ALABAMA AT L/
MY COMMISSION EXPIRES: Apr 30, 2
BONDED THRU NOTARY PUBLIC UNDERWRI

40459

# FREEDOM COURT REPORTING

Page 1

1      IN THE UNITED STATES DISTRICT COURT

2      FOR THE MIDDLE DISTRICT OF ALABAMA

3            NORTHERN DIVISION

4

5   CASE NUMBER:  2:06-CV-875-ID

6   JEFFREY HARRIS, et al.,            **ORIGINAL**

7            Plaintiffs,

8            vs.

9   MID STATE LAND & TIMBER CO., INC.,

10  d/b/a SEDGEFIELDS PLANTATION,

11           Defendant.

12

13         S T I P U L A T I O N

14           IT IS STIPULATED AND AGREED by and

15  between the parties through their respective

16  counsel, that the deposition of Jeffrey

17  Harris may be taken before Angela Smith,

18  RPR, CRR, at the offices of John W. Waters,

19  Jr., at 214 North Prairie Street, Union

20  Springs, Alabama 36089, on the 16th day of

21  January, 2007.

22

23         DEPOSITION OF JEFFREY HARRIS

## FREEDOM COURT REPORTING

Page 106

1      A.      No.

2      Q.      Okay.  The next category I

3  have is pay.  And I think you said that you

4  should have been paid the same or more, I

5  guess, than Will Hubbard and Joseph Mays; is

6  that correct?

7      A.      Yes, that's correct.

8      Q.      Is there any other white

9  person that you believe that you should have

10 been paid the same as or more than, that

11 worked at Sedgefields, or Mid State?

12     A.      Yeah.  Bill Beckwith, Brother

13 Man.

14     Q.      Brother Man.  Okay.  Brother

15 Man worked as a laborer and a night

16 watchman, did he not?

17     A.      Yes.

18     Q.      You didn't do any night

19 watchman work, did you?

20     A.      No.  But I would have.  I

21 stayed, like, ten miles from Sedgefields, so

22 it wouldn't have been a problem for me to do

23 that.

# DECLARATION

My name is willie Bernard Hack. I am over the age of nineteen years and am suffering from no legal disability.

I started working at Sedgefields in March 2004. Roy Lee called me at home and offered me a job. I started at $6.50/hr. I got a raise in January 2005 to $7.50, and in January 2006 I got a raise to $8.00 hr.

When I started working at Sedgefields, Mr. Lee was over the bird hunts and Mr. Davidson was over the deer hunts. Later, Mr. Davidson was fired and Mr. Lee took over for deer and bird hunting. I worked as a general farm laborer, helping the upkeep around the grounds and help prepare for the deer and bird hunts. I also help feed the fish. I continue to do these same duties.

When Joel Norman began working at Sedgefields he managed the bird hunts. Mr. Norman treated me like a "champ." We would often ride together on lunch breaks and into town. One day I drove Norris Foster and Jeff Harris to where Mr. Norman was working, and we questioned where our paycheck was. Ever since then, I feel like Mr. Norman has asked me to do "harder" work than I was doing before. However, he did not like the way that Jeff Harris and Norris Foster were cutting the fields for the quail hunts and he trained me later on

②

how to operate the tractors. Norris Foster did not like the fact that I was now doing his job and told me and others that he was unhappy about it.

I heard from Jeff Harris and Will Hubbard that Norris Foster stuck his hand to Joel Norman and rubbed his thumb and first finger together and ask "where's my money?" as to tips left by a customer. Mr. Norman did not like people asking about money and a policy was issued about it.

Norris Foster did not have a driver's license and I, or others who had a driver's license, would have to drive him around to different parts of the grounds. I know he was given money to get a license, but to my knowledge he never got one.

I have never heard anyone use a racial slur. David Carroll treats me like "No. 1." I love working for him. I have never complained about race discrimination to anyone at Mid State or my new employer at Sedgefields. Because of my experience and knowledge, I think I should be paid more. I think I should be paid the same as the house people.

## DECLARATION

I think it is unfair that the house people (Katie Woods Brenda Tarver) came in making more than me because of my versatility.

Norris Foster would tell Joel Norman the way that we use to do quail hunts, like placing birds and handling the dogs. Joel Norman wanted to do it his way which at times was different than the way we use to do it. This caused alot of conflict between the two. I have heard Joel Norman complaining about the fact that Norris Foster and Jeff Harris did not cut certain fields like they were instructed to do.



Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1st day of August, 2006

_____  Willie B. Mack

## DECLARATION

My name is Demetrius Parham. I am over the age of 19 yrs of age and am suffering from no legal disability.

I was hired by Roy Lee in July 2004, making $6.50 hr. I work as a general laborer. I primarily work for Mr. Lee and help him with the deer hunts. Before Mr. Norman began working here, I also helped Mr. Lee with quail hunts from time to time. As a general labor, in the summertime I primarily cut grass; in the fall I take clients to deer stands. I can operate a tractor, have worked a back hoe but do not know how to operate a dozier or a skidder. I do not do any welding.

I have not personally observed Norris Foster being treated differently because of his race. I believe I am being discriminated against because of my pay. Work wise everything is good and the only way that I believe I have been discriminated against is as to my rate of pay. I have not heard or observed any racial slurs nor have I personally observed any racial discrimination at Sedgefields. I have not complained about racial discrimination to my present employer.



Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this /5t day of August, 2006

Demetrius Parham

**FREEDOM COURT REPORTING**

1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE MIDDLE DISTRICT OF ALABAMA

3              NORTHERN DIVISION

4

5    CASE NUMBER:  2:06-CV-875-ID

6    JEFFREY HARRIS, et al.,

7            Plaintiffs,            COPY

8            vs.

9    MID STATE LAND & TIMBER CO., INC.,

10   d/b/a SEDGEFIELDS PLANTATION,

11           Defendant.

12

13          S T I P U L A T I O N

14           IT IS STIPULATED AND AGREED by and

15   between the parties through their respective

16   counsel, that the deposition of Henry Tarver

17   may be taken before Angela Smith, RPR, CRR,

18   at the offices of John W. Waters, Jr., at

19   214 North Prairie Street, Union Springs,

20   Alabama 36089, on the 16th day of January,

21   2007.

22

23          DEPOSITION OF HENRY TARVER

# FREEDOM COURT REPORTING

Page 42

1  think we said anything about pay.

2        Q.    So, you didn't even know what

3  you would be earning?

4        A.    No.  Until I got the check, I

5  didn't even knew.

6        Q.    Okay.  Did you say anything to

7  Mr. Carroll after you got the check about --

8        A.    About the pay?

9        Q.    Yes.

10       A.    No.  I took the pay.

11       Q.    Did you say:  I need to get

12  paid more than that?

13       A.    No.  I took the pay and went

14  on to work.

15       Q.    Okay.  And you're working as

16  an outside laborer; is that right?

17       A.    Yeah.  Working on the farm.

18       Q.    And mainly cutting grass; is

19  that right?

20       A.    Mainly cutting grass and

21  Weedeating and so on and so forth.

22       Q.    Okay.  And Mr. Lee was your

23  supervisor?

# FREEDOM COURT REPORTING

Page 43

1    A.    Supervisor, right.

2    Q.    Okay.  And when Mr. Norman

3  came on, you still worked with Mr. Lee?

4    A.    Still worked with Mr. Lee.

5    Q.    Okay.  Did your job duties

6  ever change while you were out there?

7    A.    No.  When I went there, that's

8  what I was doing.  When I left, that's what

9  I was doing, same thing.

10    Q.    Okay.  Did you ever have any

11  conversations with Mr. Carroll about pay or

12  your job duties or anything like that?

13    A.    Never talked to him about

14  that.  Just speak to him and go ahead.  We

15  never talked no pay.

16    Q.    Did you ever have any problems

17  with Mr. Carroll?

18    A.    No.  I ain't got no problems

19  with him.

20             (Defendant's Exhibit 9 was

21              marked for identification

22              purposes.)

23    Q.    I'm going to show you a

# FREEDOM COURT REPORTING

1      A.      Uh-huh.  That's right.

2      Q.      Have you ever filed a charge

3  of discrimination with the EEOC?

4      A.      No, I haven't.

5      Q.      Okay.  It's your claim that

6  you were discriminated against by Mid-State

7  with regards to your race; is that correct?

8      A.      That's right.

9      Q.      How do you believe that you

10 were discriminated against by Mid-State?

11     A.      Because they paid the white

12 more than they paid me.

13     Q.      Okay.  How else do you believe

14 that you were discriminated against on the

15 basis of your race?

16     A.      Being humiliated behind that

17 out there.

18     Q.      Being humiliated with regards

19 to the pay?

20     A.      Yeah.  I mean, you know, when

21 they get more than me and you doing the same

22 thing.

23     Q.      Okay.  I'm not asking you

# FREEDOM COURT REPORTING

1   about how you were damaged or what damages

2   you may have sustained, I'm just asking you

3   how do you believe that Mid-State

4   discriminated against you?  And you've told

5   me as to pay, paying white people more than

6   you.

7           A.      Uh-huh.

8           Q.      How else do you believe

9   Mid-State discriminated against you?

10          A.      That's about it.

11          Q.      Okay.  You didn't work under

12  Joel Norman, did you?

13          A.      No, I didn't.

14          Q.      You heard Mr. Harris testify

15  about statements that he heard Mr. Norman

16  make?

17          A.      Uh-huh.

18          Q.      You didn't hear any of those,

19  did you?

20          A.      I didn't hear him saying that,

21  but I've heard the same thing that he said,

22  and I heard it from different times from the

23  time he said it, that he did use them kind

| a Control number | | Void ☐ | Copy D—For Employer. OMB No. 1545-0008 | | |
|---|---|---|---|---|---|

| b Employer identification number | | | 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|---|---|---|
| 64-0741681 | | | 44234.00 | 6242.07 |

| c Employer's name, address, and ZIP code | 3 Social security wages | 4 Social security tax withheld |
|---|---|---|
| Mid State Land & Timber Co. | 45744.69 | 2836.17 |
| 2212 B Street | 5 Medicare wages and tips | 6 Medicare tax withheld |
| Meridian, Ms | 45744.69 | 663.30 |
| | 7 Social security tips | 8 Allocated tips |
| 39301 | 0.00 | 0.00 |

| d t                          tber | 9 Advance EIC payment | 10 Dependent care benefits |
|---|---|---|
| | 0.00 | 0.00 |

| e Employee's name, address, and ZIP code | 11 Nonqualified plans | 12a See instructions for box 12 |
|---|---|---|
| ROY        C        LEE | 0.00 | |
| | 13 Statutory employee / Retirement plan X / Third-party sick pay | 12b |
| 7375 HWY 51 SOUTH | | |
| MIDWAY, AL | 14 Other | 12c |
| | | |
| 36053 | | 12d |

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| AL | 344548 | 44234.00 | 1516.78 | 0.00 | 0.00 | |
| | | 0.00 | 0.00 | 0.00 | 0.00 | |

Form **W-2** Wage and Tax Statement

**2004**

39-1908647  Department of the Treasury—Internal Revenue Service

**For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.**

CONFIDENTIAL

**BW2ERD**    NTF 2561052*

30(b)(6) Production   0043

| a Control number | | Void ☐ | Copy D—For Employer.<br>OMB No. 1545-0008 | | |
|---|---|---|---|---|---|

| b Employer identification number (EIN)<br>64-0741681 | | **1** Wages, tips, other compensation<br>48504.60 | **2** Federal income tax withheld<br>7234.87 |
|---|---|---|---|
| c Employer's name, address, and ZIP code<br>Mid State Land & Timber Co.<br>2212 B Street<br>Meridian, Ms<br><br>39301 | | **3** Social security wages<br>51057.42 | **4** Social security tax withheld<br>3165.56 |
| | | **5** Medicare wages and tips<br>51057.42 | **6** Medicare tax withheld<br>740.33 |
| | | **7** Social security tips<br>0.00 | **8** Allocated tips<br>0.00 |
| d E          'ty number<br>           ; | | **9** Advance EIC payment<br>0.00 | **10** Dependent care benefits<br>0.00 |
| e Employee's name, address, and ZIP code<br>ROY       C       LEE<br><br>7375 HWY 51 SOUTH<br>MIDWAY, AL<br><br>36053 | | **11** Nonqualified plans<br>0.00 | **12a** See instructions for box 12<br>D       2552.82 |
| | | **13** Statutory employee ☐  Retirement plan ☐  Third-party sick pay X | **12b** |
| | | **14** Other | **12c** |
| | | | **12d** |

| 15 State<br>AL | Employer's state ID number<br>344548 | 16 State wages, tips, etc.<br>48504.60 | 17 State income tax<br>1682.11 | 18 Local wages, tips, etc.<br>0.00 | 19 Local income tax<br>0.00 | 20 Locality name |
|---|---|---|---|---|---|---|
| | | 0.00 | 0.00 | 0.00 | 0.00 | |

Form **W-2** Wage and Tax Statement

**2005**

39-1908647   Department of the Treasury—Internal Revenue Service

For Privacy Act and Paperwork Reduction
Act Notice, see back of Copy D.

ЯW2ERD   NTF 2561834

CONFIDENTIAL

30(b)(6) Production   0054