**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **JEFFREY HARRIS, WILLIE BERNARD MACK, DEMETRIUS PARHAM and HENRY TARVER,** | ) ) ) ) | |
| **Plaintiffs** | ) ) | **Civil Action No.:** |
| **v.** | ) ) | **2:06-cv-875-ID-CSC** |
| **MID-STATE LAND & TIMBER COMPANY, INC., d/b/a SEDGEFIELDS PLANTATION,** | ) ) ) ) | |
| **Defendant.** | ) ) | |
| **NORRIS FOSTER,** | ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **Civil Action No.:** |
| **MID-STATE LAND & TIMBER COMPANY, INC., d/b/a SEDGEFIELDS PLANTATION,** | ) ) ) ) | **2:06-CV-00405-ID-SRW** |
| **Defendant.** | ) ) ) | |

**PLAINTIFFS' NOTICE OF FILING OF EVIDENTIARY MATERIALS**
**IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

**COME NOW** Plaintiffs in the above styled action, by and through his

undersigned counsel of record, and files the following evidentiary materials in

Opposition to the Defendant's Motion for Summary Judgment:

Exhibit 1.    Deposition of Norris Foster, ***Norris Foster v. Mid-State Land &***
***Timber Company, Inc.,* 2:06-CV-405 ID**

Exhibit 2.  Deposition of Joel Norman, ***Norris Foster v. Mid-State Land & Timber Company, Inc.,* 2:06-CV-405 ID**

Exhibit 3.  Deposition of Roy Lee, ***Norris Foster v. Mid-State Land & Timber Company, Inc.,* 2:06-CV-405 ID**

Exhibit 4.  Exhibit Deposition of David Carroll, ***Norris Foster v. Mid-State Land & Timber Company, Inc.* 2:06-CV-405 ID**

Exhibit 5.  Deposition of David Carroll, ***Jeffrey Harris, et al. v. Mid-State Land & Timber Company, Inc.*, 2:06-cv-875-ID-CSC**

Exhibit 6.  Defendant's Answers to Interrogatories

Exhibit 7.  Norris Foster hourly rate of pay $7.00 2/8/2005

Exhibit 8.  Foster Wages

Exhibit 9.  Foster reduction in force 3/22/2001

Exhibit 10.  Foster's written reprimand 12/6/2005 - strike 1

Exhibit 11.  Foster Discharge 12/29/2005

Exhibit 12.  Foster's Unemployment

Exhibit 13.  Attitude - Tipping Memo

Exhibit 14.  Harris Affidavit

Exhibit15.  Lee application

Exhibit16.  Beckwith termination 9/30/2005 $8.00 per hour

Exhibit 17.  Hubbard application

Exhibit 18.  Hubbard wages

Exhibit 19.  May wages

Exhibit 20.  May application

Exhibit 21.  Hamm wages

Exhibit 22.  Hamm application

Exhibit 23.    Harris wages

Exhibit 24.    Harris application

Exhibit 25.    OMIT

Exhibit 26.    Mack wages

Exhibit 27.    Mack application

Exhibit 28.    Foster pay-stubs

Exhibit 29.    Foster 2005 W-2

Exhibit 30.    Memo regarding 2006 raises

Exhibit 31.    Sale of Sedgefields to Tollesons $32 million

Exhibit 32.    Organization Chart

Exhibit 33.    Balkcom application

Exhibit 34.    Mid-State wages 2005-2006

Exhibit 35.    Mid-State wages 2003-2004

Exhibit 36.    Declaration of Roy Lee

Exhibit 37.    Declaration of Norris Foster

Exhibit 38.    Foster Discharge Memo

Respectfully submitted,


s/Jerry Roberson
Jerry Roberson (ROB010)
Roberson & Roberson
P.O. Box 380487
Birmingham, Alabama 35238-0487
Phone Number:     205.981.3906
Fax Number:     205.981.3908
E-mail: jdratty@charter.net
        tlbaker@charter.net

**OF COUNSEL***:*

Albert H. Adams, Jr., Esq.  (ADA-058)
IRBY LAW FIRM, LLC
P.O. Box 910
Eufaula, Al. 36072


## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of April, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Carter H. Dukes, Esq.
Kimberly W. Geisler, Esq.
HUCKABY SCOTT & DUKES, P.C.
2100 Third Avenue North, Suite 700
Birmingham, Alabama 35203


s/Jerry Roberson
Jerry Roberson (ROB010)

# FREEDOM COURT REPORTING

Page 1

```
1        IN THE UNITED STATES DISTRICT COURT
2        FOR THE MIDDLE DISTRICT OF ALABAMA
3               NORTHERN DIVISION
4
5    CASE NUMBER:  2:06cv405-ID
6    NORRIS FOSTER,
7          Plaintiff,
8          vs.
9    MID STATE LAND & TIMBER COMPANY,
10   INC., d/b/a SEDGEFIELDS PLANTATION,
11         Defendant.
12
13         S T I P U L A T I O N
14       IT IS STIPULATED AND AGREED by and
15   between the parties through their respective
16   counsel, that the deposition of Norris
17   Foster may be taken before Angela Smith,
18   RPR, CRR, at the offices of John W. Waters,
19   at 214 North Prairie St., Union Springs,
20   Alabama 36089, on the 7th day of September,
21   2006.
22
23         DEPOSITION OF NORRIS FOSTER
```

Page 2

```
1        IT IS FURTHER STIPULATED AND
2    AGREED that the signature to and the reading
3    of the deposition by the witness is waived,
4    the deposition to have the same force and
5    effect as if full compliance had been had
6    with all laws and rules of Court relating to
7    the taking of depositions.
8        IT IS FURTHER STIPULATED AND
9    AGREED that it shall not be necessary for
10   any objections to be made by counsel to any
11   questions except as to form or leading
12   questions, and that counsel for the parties
13   may make objections and assign grounds at
14   the time of the trial, or at the time said
15   deposition is offered in evidence, or prior
16   thereto.
17       IT IS FURTHER STIPULATED AND
18   AGREED that the notice of filing of the
19   deposition by the Commissioner is waived.
20
21         * * * * * * * * * * * * *
22
23
```

Page 3

```
1        * * * * * * * * * * * * *
2               I N D E X
3             EXAMINATION
4                              PAGE
5    By Mr. Dukes ........................ 6
6        DEFENDANT'S EXHIBITS
7                              PAGE
8    Ex. 1 - Application for
9         employment ............... 72
10   Ex. 2 - The complaint ............. 89
11   Ex. 3 - Mr. Norris' personnel
12        file ................... 136
13         * * * * * * * * * * * * *
14
15
16
17
18
19
20
21
22
23
```

Page 4

```
1        IN THE UNITED STATES DISTRICT COURT
2        FOR THE MIDDLE DISTRICT OF ALABAMA
3               NORTHERN DIVISION
4
5    CASE NUMBER:  2:06cv405-ID
6    NORRIS FOSTER,
7          Plaintiff,
8          vs.
9    MID STATE LAND & TIMBER COMPANY,
10   INC., d/b/a SEDGEFIELDS PLANTATION,
11         Defendant.
12
13   BEFORE:
14       ANGELA SMITH, Commissioner.
15
16   APPEARANCES:
17       JERRY D. ROBERSON, ESQUIRE, of
18   ROBERSON & ROBERSON, 8 Office Park Circle,
19   Ste: 150, Birmingham, Alabama 35223,
20   appearing on behalf of the Plaintiff.
21       ALBERT H. ADAMS, JR., ESQUIRE,
22   P.O. Box 910, Eufaula, Alabama 36027,
23   appearing on behalf of the Plaintiff.
```

1 (Pages 1 to 4)

# FREEDOM COURT REPORTING

Page 5

1  APPEARANCES (continued):
2      CARTER H. DUKES, ESQUIRE, of
3  HUCKABY, SCOTT & DUKES, 2100 Third Avenue
4  N., Ste: 700, Birmingham, Alabama 35203,
5  appearing on behalf of the Defendant.
6      ALSO PRESENT: David Carroll
7          * * * * * *
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 6

1      I, ANGELA SMITH, RPR, CRR, a Court
2  Reporter of Wetumpka, Alabama, acting as
3  Commissioner, certify that on this date, as
4  provided by the Federal Rules of Civil
5  Procedure and the foregoing stipulation of
6  counsel, there came before me at the offices
7  of John W. Waters, 214 North Prairie St.,
8  Union Springs, Alabama 36089, beginning at
9  9:07 a.m., Norris Foster, witness in the
10  above cause, for oral examination, whereupon
11  the following proceedings were had:
12          NORRIS FOSTER,
13  being first duly sworn, was examined and
14  testified as follows:
15      COURT REPORTER:  Usual
16  stipulations?
17      MR. ROBERSON:  Yes, ma'am.
18      MR. DUKES:  Please.
19      EXAMINATION
20  BY MR. DUKES:
21      Q.   Can you state your full name
22  for the Record?
23      A.   Norris Foster.

Page 7

1      Q.   Mr. Foster, have you ever had
2  your deposition taken before?
3      A.   No.
4      Q.   Okay. Let me go over a few
5  things with you.  Do you understand, first
6  of all, that your testimony here today is
7  under oath and has the same force and effect
8  as if you were before a Judge and a jury?
9      A.   Yes, I understand.
10      Q.   Okay. If I ask you a question
11  that you don't understand, I'll ask you to
12  tell me to rephrase it.  If you answer the
13  question, it will be my understanding that
14  you understood the question.  Does that make
15  sense to you?
16      A.   Yes.
17      Q.   Okay. If I ask you a question
18  that calls for a yes or no answer, you'll
19  need to answer out loud.  Don't nod your
20  head or say uh-huh or huh-uh because the
21  court reporter will have a hard time
22  understanding what you mean by that.  Is
23  that okay with you?

Page 8

1      A.   Yeah.
2      Q.   Okay. Also, and you're doing
3  a very good job of it, let me complete my
4  question before you try to answer it, just
5  so the court reporter can clearly take down
6  what we're saying.  Is that okay with you?
7      A.   That's okay.
8      Q.   Okay. What is your Social
9  Security number, Mr. Foster?
10      A.   ▓▓▓▓▓▓▓▓▓
11      Q.   Okay. And what is your date
12  of birth?
13      A.   ▓▓▓▓▓▓▓▓▓
14      Q.   And where were you born,
15  Mr. Foster?
16      A.   In Bullock County.
17      Q.   Okay. Now, have you gone by
18  any other names, other than Norris Foster?
19      A.   Nicknames.
20      Q.   Okay. What kind of nicknames?
21      A.   Some people call me Bull, some
22  call me Bull Hog, and some call me Nod.
23      Q.   Call you what?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 9

1    A.    Nod.
2    Q.    Nard?
3    A.    Nod.
4        MR. ROBERSON:  N-O-D.
5    Q.    Nod, N-O-D.  Okay.  What about
6   last names?  You changed your name not too
7   long ago, didn't you?
8    A.    Yeah.  But it was -- I never
9   knew it was like that until I had got a
10  ticket one time, and I had to go and get my
11  birth certificate and it had Norris Jordan
12  on it.  And I didn't know that until I was
13  an adult.
14   Q.    Okay.  When did you realize
15  that your name was legally Norris Jordan?
16   A.    I don't know.  About '96, '97,
17  somewhere around in there.
18   Q.    Okay.
19   A.    I had got a traffic ticket.
20   Q.    Okay.  So, all your life
21  you've been going by Norris Foster?
22   A.    Yes.
23   Q.    Okay.  And the reason why I'm

Page 10

1   going to ask these questions, in case this
2   case goes to a jury, I want to know if any
3   of your family members might be on the jury
4   pool or anybody you work with or anybody
5   that your family members have worked with,
6   if they're on the jury pool.  So I'm going
7   to ask you some questions about your family
8   and where they may work.  Are your mother
9   and father still alive?
10   A.    My father.
11   Q.    Where does your father reside?
12   A.    Columbus, Georgia.
13   Q.    What is his name?
14   A.    Willie Hugh Jordan.
15   Q.    Are you a junior, by any
16  chance?
17   A.    No.
18   Q.    It's just Norris Foster?
19   A.    Uh-huh.
20   Q.    Okay.  And do you have any
21  brothers and sisters?
22   A.    Yeah.
23   Q.    Okay.  Tell me their names.

Page 11

1    A.    My oldest sister's name is
2   Annie Foster.
3    Q.    Okay.
4    A.    The next one is Carolyn
5   Foster.  Patricia Jordan, Talisa Ellison.
6   Let me see.  They be twins.  I can't -- It's
7   -- They got funny names.  We call them Tree
8   and Tee, but it's Trenesha and Tenisha,
9   they're twins.
10   Q.    What are their last names?
11   A.    Jordan.
12   Q.    Any other brothers and
13  sisters?
14   A.    I got one brother that's named
15  Reginald Jordan.
16   Q.    Any other brothers and
17  sisters?
18   A.    No.
19   Q.    Where does Annie Foster live?
20   A.    Midway, here in Bullock
21  County.
22   Q.    Okay.  Is she employed?
23   A.    Yeah.

Page 12

1    Q.    Where does she work?
2    A.    I think the name is Beaulieu,
3   it's a place down in Eufaula, Beaulieu,
4   something like that.
5    Q.    Beaulieu.  What kind of
6   business is it?
7    A.    Textile.
8    Q.    Oh, Beaulieu.  Okay.  I know
9   what you're talking about.  Used to be
10  Columbus Mills?
11   A.    Right.
12   Q.    And is she married?
13   A.    Yeah.
14   Q.    And what's her husband's name?
15   A.    James Foster.
16   Q.    Just out of curiosity, is
17  James any relation, a distant cousin, to
18  you?
19   A.    No.  It's a whole different
20  city.  He's from a different state.
21   Q.    Okay.  Does James work?
22   A.    Yeah.
23   Q.    Where does he work?

3 (Pages 9 to 12)

# FREEDOM COURT REPORTING

Page 13

1     A.   He works in Columbus, at -- I
2 don't know which one of those jails he works
3 with. He's a correctional officer.
4     Q.   All right. Do Annie and James
5 have any children over the age of nineteen?
6     A.   Well, Annie does, but James
7 don't.
8     Q.   Okay. What's Annie's child
9 over the age of eighteen?
10     A.   Terrence Foster and LaToya
11 Foster.
12     Q.   Where do they live?
13     A.   Terrence, he's in the service.
14 He's stationed out in Texas. And LaToya,
15 she lives right by her mother in Midway.
16     Q.   Okay. Does she work?
17     A.   Yes, sir.
18     Q.   Where does she work?
19     A.   Victoryland.
20     Q.   Okay. Carolyn Foster, is she
21 married?
22     A.   Well, her husband passed.
23     Q.   Okay. Does she have any

Page 14

1 children?
2     A.   Yeah. She have a daughter.
3     Q.   Over the age of nineteen?
4     A.   Yeah.
5     Q.   What's her name?
6     A.   Makita.
7     Q.   Where does Makita live?
8     A.   Here in Union Springs.
9     Q.   Does she work?
10     A.   Yeah. But I'm not for sure
11 whereabouts, though. I don't really know --
12 I don't know.
13     Q.   What's Makita's last name?
14     A.   Jordan.
15     Q.   Okay. You said Carolyn was
16 Carolyn Foster. Is she a Carolyn Jordan?
17     A.   That's what I should have
18 said, Jordan.
19     Q.   Does Carolyn work?
20     A.   Yeah. Same place, Beaulieu.
21     Q.   At Beaulieu?
22     A.   Yeah.
23     Q.   Okay. In Eufaula?

Page 15

1     A.   Right.
2     Q.   Okay. Patricia Jordan, where
3 does she live?
4     A.   In Columbus.
5     Q.   Okay.
6     A.   She's deceased.
7     Q.   Okay. Does Patricia have any
8 children that live in Alabama?
9     A.   No.
10     Q.   I've got Talisa Ellison.
11 Where does she live?
12     A.   In Midway, here in Bullock
13 County.
14     Q.   Does she work?
15     A.   Yeah. She works out at the
16 prison. She ain't no corrections officer.
17 I don't know exactly what she does, but
18 that's where she's working.
19     Q.   Does she have any children
20 over the age of nineteen?
21     A.   No.
22     Q.   Is she married?
23     A.   No.

Page 16

1     Q.   Okay. I've go Trenesha
2 Jordan.
3     A.   Yeah. They live in Columbus,
4 both of them.
5     Q.   Okay. Do they have any
6 children that live in Alabama?
7     A.   No. Their kid is small, he's
8 four or five years old.
9     Q.   Reginald Jordan?
10     A.   He live in Columbus.
11     Q.   Okay. Any children by
12 Reginald that live in Alabama?
13     A.   No. He ain't got none.
14     Q.   Okay. Where do you live,
15 Mr. Foster?
16     A.   Midway.
17     Q.   What's your physical address?
18     A.   It's Route -- Let me see --
19 3282 County Road 47, Midway, Alabama.
20     Q.   Is Midway in Bullock County or
21 Barbour County?
22     A.   Bullock.
23     Q.   Bullock. And how long have

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 17

1  you lived at that address?
2      A.    About six months.
3      Q.    Where did you live before
4  then?
5      A.    I lived up here in Union
6  Springs, around -- Well, it's out -- was out
7  on 29, Henley Trailer Park.
8      Q.    And how long did you live
9  there?
10     A.    About a year and a half.
11     Q.    All right.  Where did you live
12 prior to that time?
13     A.    Down in Midway.
14     Q.    What was the address there?
15     A.    I believe it was P.O. Box 383
16 -- P.O. Box 3 --
17     Q.    Let me stop you there.  Did
18 you have a physical address for that address
19 -- for that residence in Midway?
20     A.    No.  Not really.  Well, I was
21 staying with a friend.
22     Q.    Oh, okay.  Who were you
23 staying with?

Page 18

1      A.    My girlfriend.
2      Q.    Okay.  What was her name?
3      A.    Sharon McElroy.
4      Q.    Are you still with Sharon?
5      A.    Yeah.
6      Q.    Does Sharon work?
7      A.    No.
8      Q.    Okay.  Has she ever worked?
9      A.    Not to my knowing.
10     Q.    Okay.  Do you have any
11 children?
12     A.    By her?
13     Q.    Okay.  We'll start with her.
14     A.    No.
15     Q.    Okay.  Do you have any -- Tell
16 me about your children.
17     A.    What you want to know?
18     Q.    Well, give me their names.
19     A.    My oldest one, her name is
20 Shaquita, Shaquinta, Dezwan.
21     Q.    Oh, Dezwan.  Okay.
22     A.    DeLacory.  I have to give them
23 in order.  LaNorris, Veronica, Norzell,

Page 19

1  Fallon, Cornelius, Terrell, Norris,
2  Quanisha, Cadeidre.
3      Q.    Is that all of them?
4      A.    Yeah.
5      Q.    Thirteen children?
6      A.    (Witness nods head in the
7  affirmative.)
8      Q.    How old is Shaquita?
9      A.    Thirty-two.
10     Q.    And what's Shaquita's last
11 name?
12     A.    Turner.
13     Q.    And what's her mother's name?
14     A.    Diane.
15     Q.    Diane Turner?
16     A.    Well, it's Murray, now.
17     Q.    And where does Shaquita live?
18     A.    Atlanta.
19     Q.    Okay.  And she's thirty-one,
20 did you say?
21     A.    Two.
22     Q.    Thirty-two.  Shaquinta?
23     A.    Yeah.

Page 20

1      Q.    What's her last name?
2      A.    Turner.
3      Q.    Where does she live?
4      A.    Montgomery.
5      Q.    Does she work?
6      A.    Yeah.
7      Q.    Where does she work?
8      A.    I think it's -- What is it?
9  Pony Express, I think that's the name of it.
10     Q.    Pony Express Magazine?
11     A.    No.
12     MR. ROBERSON:  Courier
13 service?
14     THE WITNESS:  Yeah.  It's a
15 courier service.
16     Q.    Is she married?
17     A.    No.
18     Q.    Does she have any children?
19     A.    Yeah.
20     Q.    Any over the age of nineteen?
21     A.    No.
22     Q.    Okay.  And is Diane her
23 mother?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

| Page 21 | |
|---|---|
| 1 | A.   Right. |
| 2 | Q.   All right.  Dezwan, how old is |
| 3 | Dezwan? |
| 4 | A.   He'll be twenty-nine in |
| 5 | December. |
| 6 | Q.   Where does he live? |
| 7 | A.   Columbus. |
| 8 | Q.   What's his last name? |
| 9 | A.   Manuel. |
| 10 | Q.   Manuel? |
| 11 | A.   Yeah. |
| 12 | Q.   How do you spell that, do you |
| 13 | know? |
| 14 | A.   No. |
| 15 | Q.   Okay.  All right.  And how old |
| 16 | is Shaquinta? |
| 17 | A.   Thirty. |
| 18 | Q.   All right. |
| 19 | A.   DeLacory. |
| 20 | Q.   No.  Next -- Yeah, that's |
| 21 | right, DeLacory. |
| 22 | A.   His last name Manuel, too. |
| 23 | Q.   How do you spell DeLacory, do |

| Page 23 | |
|---|---|
| 1 | Dezwan and DeLacory? |
| 2 | A.   Their mama's name is Yolanda. |
| 3 | Q.   Yolanda what? |
| 4 | A.   Yolanda Manuel. |
| 5 | Q.   And where does she live? |
| 6 | A.   Columbus. |
| 7 | Q.   And where does Linda Williams |
| 8 | live? |
| 9 | A.   Tennessee, Clarksville. |
| 10 | Q.   Okay.  All right.  Next I have |
| 11 | Veronica. |
| 12 | A.   Lee. |
| 13 | Q.   Lee is her last name? |
| 14 | A.   Yeah. |
| 15 | Q.   And where does she live? |
| 16 | A.   She live here in Bullock |
| 17 | County. |
| 18 | Q.   And how old is she? |
| 19 | A.   Twenty-three. |
| 20 | Q.   And does she work? |
| 21 | A.   Yeah. |
| 22 | Q.   Where does she work? |
| 23 | A.   Wayne Farms. |

| Page 22 | |
|---|---|
| 1 | you know? |
| 2 | A.   Huh-uh. |
| 3 | Q.   Is that a no? |
| 4 | MR. ROBERSON:  You need to |
| 5 | answer out, no. |
| 6 | A.   No. |
| 7 | Q.   Okay.  How old is DeLacory? |
| 8 | A.   Twenty-seven. |
| 9 | Q.   And where does he live? |
| 10 | A.   Columbus. |
| 11 | Q.   LaNorris, how old is LaNorris? |
| 12 | A.   She's twenty-three -- |
| 13 | twenty-four. |
| 14 | Q.   What's her last name? |
| 15 | A.   Foster. |
| 16 | Q.   Where does she live? |
| 17 | A.   Tennessee. |
| 18 | Q.   Whereabouts in Tennessee? |
| 19 | A.   Clarksville. |
| 20 | Q.   And who is her mother? |
| 21 | A.   Her mother's name is Linda |
| 22 | Williams. |
| 23 | Q.   And who is the mother for |

| Page 24 | |
|---|---|
| 1 | Q.   Where does she live? |
| 2 | A.   Here in Union Springs? |
| 3 | Q.   Yes, sir.  What's the street |
| 4 | address? |
| 5 | A.   I don't know the name of the |
| 6 | street. |
| 7 | Q.   Okay. |
| 8 | A.   She in Union Springs. |
| 9 | Q.   And is she married? |
| 10 | A.   No. |
| 11 | Q.   And who was her mother? |
| 12 | A.   Mother named Agnes. |
| 13 | Q.   Agnes Lee? |
| 14 | A.   Right. |
| 15 | Q.   Is Agnes -- Where does she |
| 16 | live? |
| 17 | A.   She's here in Bullock County, |
| 18 | a little community called Sardis. |
| 19 | Q.   Uh-huh.  And does she work? |
| 20 | A.   I don't know. |
| 21 | Q.   Next I have Norzell. |
| 22 | A.   Yeah. |
| 23 | Q.   Do you know how to spell that? |

6 (Pages 21 to 24)

# FREEDOM COURT REPORTING

Page 25

1    A.    N-O-R-Z-E-L-L.
2    Q.    And how old is Norzell?
3    A.    Twenty-two.
4    Q.    And what's Norzell's first
5    name?
6    A.    That is the first name.  His
7    last name is Lee.
8    Q.    Excuse me.  His last name is
9    what?
10   A.    Lee.
11   Q.    Okay.  And how old is Norzell,
12   again?
13   A.    Twenty-two.
14   Q.    And Norzell, is that a
15   daughter or a son?
16   A.    Son.
17   Q.    Son.  And his mother is Agnes
18   Lee as well?
19   A.    Right.
20   Q.    Does Norzell live here in
21   Bullock County?
22   A.    Yeah.
23   Q.    And does he work?

Page 26

1    A.    I think so.
2    Q.    Do you know where he works?
3    A.    I think it's C&W.
4    Q.    You used to work at C&W,
5    didn't you?
6    A.    Yeah.
7    Q.    All right.  Next I have
8    Fallon; is that right?
9    A.    Yeah.
10   Q.    What's Fallon's last name?
11   A.    Streeter.
12   Q.    How old is Fallon?
13   A.    Twenty-two.
14   Q.    And where does he live?
15   A.    She.
16   Q.    She.  Excuse me.
17   A.    She live in Midway.
18   Q.    And does she work?
19   A.    Yeah.
20   Q.    Where does she work?
21   A.    Cooper Lighting.
22   Q.    Okay.
23         (Off-the-Record discussion

Page 27

1          was held.)
2    Q.    And who is Fallon's mother?
3    A.    Her name is Dorothy.
4    Q.    Dorothy Streeter?
5    A.    Right.
6    Q.    And where does Dorothy
7    Streeter live?
8    A.    In Midway.
9    Q.    Does she work?
10   A.    I don't think so, no.
11   Q.    Okay.
12   A.    I think she got disability,
13   something like that.
14   Q.    Okay.  Is Fallon married?
15   A.    No.
16   Q.    All right.  Next I have
17   Cornelius.
18   A.    Cornelius.
19   Q.    What's Cornelius's last name?
20   A.    Lee.
21   Q.    Is that Agnes's son?
22   A.    Yeah.
23   Q.    Where does Cornelius live?

Page 28

1    A.    He's in prison right now.
2    Q.    Okay.  Where is he in prison?
3    A.    In Birmingham somewhere, West
4    Jefferson, I think, something like that.
5    Q.    What's he in prison for?
6    A.    Drugs.
7    Q.    Okay.  How old is he?
8    A.    Twenty-one.
9    Q.    All right.  Next I have
10   Terrell.
11   A.    Anthony.
12   Q.    Anthony is Terrell's last
13   name?
14   A.    Yeah.
15   Q.    What's his mother's name?
16   A.    Josilyn.
17   Q.    Josilyn Anthony?
18   A.    Right.
19   Q.    And where does Terrell live?
20   A.    He go to school in Huntsville.
21   Q.    How old is he?
22   A.    He'll be nineteen in November.
23   Q.    Where does Josilyn live?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

| Page 29 |
|---|
| 1  Don't know? |
| 2     A.   No.  I know she and her |
| 3  husband split up.  I don't know where she |
| 4  live at. |
| 5     Q.   Okay.  The next child I have |
| 6  is Norris. |
| 7     A.   Yeah. |
| 8     Q.   What's Norris's last name? |
| 9     A.   Lee. |
| 10    Q.   And is that Agnes's child? |
| 11    A.   Right. |
| 12    Q.   How old is Norris? |
| 13    A.   Eighteen. |
| 14    Q.   And where does he live? |
| 15    A.   Here in Union Springs. |
| 16    Q.   Does he work? |
| 17    A.   He's in high school. |
| 18    Q.   Okay.  Then I've got Quanisha. |
| 19    A.   Quanisha. |
| 20    Q.   Quanisha.  What's Quanisha's |
| 21  last name? |
| 22    A.   Foster. |
| 23    Q.   And who is Quanisha's mother? |

| Page 30 |
|---|
| 1     A.   Mary Dell Jenkins. |
| 2    Q.   How old is Quanisha? |
| 3    A.   She'll be thirteen on the 15th |
| 4  of this month. |
| 5    Q.   Where does Mary Dell live? |
| 6    A.   Here in Union Springs. |
| 7    Q.   Does she work? |
| 8    A.   Seasonal job out at Bonnie |
| 9  Plant Farm. |
| 10    Q.   Bonnie Plant? |
| 11    A.   Yeah. |
| 12    Q.   And then I have Cadeidre. |
| 13    A.   Yeah. |
| 14    Q.   What's Cadeidre's last name? |
| 15    A.   Borders. |
| 16    Q.   And who is her mother? |
| 17    A.   Her name is Diane Borders. |
| 18    Q.   And how old is Cadeidre? |
| 19    A.   She'll be thirteen in |
| 20  November. |
| 21    Q.   And where does Diane Borders |
| 22  live? |
| 23    A.   Here in Union Springs. |

| Page 31 |
|---|
| 1     Q.   And does she work? |
| 2    A.   I don't know. |
| 3    Q.   Okay.  Have you told me all |
| 4  your children? |
| 5    A.   Yeah. |
| 6    Q.   Okay.  And who currently -- |
| 7  Who do you currently live with? |
| 8    A.   Me? |
| 9    Q.   Yes, sir. |
| 10    A.   I stay by myself, me and my |
| 11  girlfriend. |
| 12    Q.   Okay.  Does your girlfriend |
| 13  live with you? |
| 14    A.   Yeah. |
| 15    Q.   What's her name? |
| 16    A.   Sharon McElroy. |
| 17    Q.   Does Sharon have any children? |
| 18    A.   She got a little girl. |
| 19    Q.   Does her little girl live with |
| 20  y'all? |
| 21    A.   No. |
| 22    Q.   Okay.  Does Sharon work? |
| 23    A.   No. |

| Page 32 |
|---|
| 1     Q.   Okay.  How long have you and |
| 2  Sharon been living together? |
| 3    A.   Seven years. |
| 4    Q.   Okay.  Do you attend any |
| 5  church regularly? |
| 6    A.   I go sometimes.  I don't go |
| 7  regular. |
| 8    Q.   Okay.  Where do you go |
| 9  sometimes? |
| 10    A.   My church is Hayes Hill |
| 11  Baptist. |
| 12    Q.   Where is that? |
| 13    A.   That's in Midway. |
| 14    Q.   Are you a member of any club |
| 15  or organization, such as the Masons or |
| 16  anything like that? |
| 17    A.   No. |
| 18    Q.   Okay.  Where did you go to |
| 19  school, Mr. Foster? |
| 20    A.   I went to elementary and |
| 21  junior high in Midway, at Marion Junior High |
| 22  School. |
| 23    Q.   What is the last grade that |

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 33

1  you completed?
2      A.    Twelfth.  I finished high
3  school.
4      Q.    Did you graduate from high
5  school?
6      A.    Yeah.  I graduated.
7      Q.    And where did you graduate
8  from high school, again?
9      A.    Here in Bullock County High
10  School.
11      Q.    Okay.  And that would have
12  been about '76 or so?
13      A.    '77.
14      Q.    '77.
15      A.    That was the year, '76/'77.
16      Q.    Okay.  Tell me about your
17  employment.  Did you work during high
18  school?
19      A.    A little bit.  No.  Like -- I
20  don't know if they still have them or not.
21  But they used to have jobs after school,
22  work a couple hours, I did that.
23      Q.    Okay.  What was your first job

Page 34

1  after high school?
2      A.    I went in the military.
3      Q.    Okay.  And what branch of the
4  Armed Services did you go into?
5      A.    Army.
6      Q.    And what unit were you with in
7  the Army?
8      A.    I was -- My MOS, my job?
9      Q.    Yes, sir.
10      A.    I was Latin Bravo.  That was
11  inventory, combat service.
12      Q.    And where were you stationed?
13      A.    I took my basic at Fort
14  Jackson.  Took my AIT, and I went to jump
15  school at Fort Benning.  And from Fort
16  Benning, I went to Fort Campbell in
17  Kentucky.  And from Kentucky, I reenlist for
18  three more years and I went to Germany.  I
19  stayed over there for eighteen months and I
20  came back to Fort Campbell, and that's where
21  I ETS from.
22      Q.    Okay.  And did you have an
23  honorable discharge?

Page 35

1      A.    Yeah.
2      Q.    What was your -- I'm sorry, I
3  don't know the correct terminology.
4      A.    Rank?
5      Q.    But what was your grade or
6  rank when you were discharged?
7      A.    I was an E-5, buck sergeant.
8      Q.    So you entered the Army in
9  1977?
10      A.    Yeah.
11      Q.    And you were discharged out of
12  Fort Campbell in --
13      A.    '83.
14      Q.    -- '83?  All right.  After you
15  left the Army in 1983, what was your first
16  job?
17      A.    I did a little work,
18  construction work, in Atlanta.
19      Q.    Let me go back to when you
20  were in the Army.  What kind of -- You're an
21  infantryman, so what would you do during
22  those six years you were in the Army?
23      A.    I was a combat soldier.

Page 36

1      Q.    Okay.
2      A.    You know, played war games.
3  You know, just if there was a war or
4  whatever.
5      Q.    Okay.  You were an
6  infantryman.  You didn't drive a tank or
7  drive any heavy equipment?
8      A.    Yeah.  We drove heavy
9  equipment, but it basically, you know, had
10  to do with infantry, you know, like building
11  bridges, different stuff like that.
12      Q.    Okay.  What kind of training
13  did you get in the Army?
14      A.    That was all.
15      Q.    Like, job training?
16      A.    That was it.  And I went in
17  supplies, supply clerk.
18      Q.    Okay.  All right.  And then
19  you did construction work in Atlanta; is
20  that correct?
21      A.    Right.
22      Q.    And who did you work for in
23  Atlanta?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 37

1      A.    That was so long ago. I don't
2  even remember the name. It's been a long
3  time ago. It was a construction company.
4  They was pouring concrete. You know, like,
5  pouring floors in big buildings, but I don't
6  even remember what the name of the company
7  was.
8      Q.    Okay. How long were you in
9  Atlanta, working?
10     A.    I stayed about seven or eight
11 months. I really didn't like the city.
12     Q.    Okay. And then what did you
13 do?
14     A.    I moved back home, back here
15 to Bullock County.
16     Q.    Okay. To Bullock County?
17     A.    Yeah.
18     Q.    What was your next job when
19 you returned from Atlanta?
20     A.    I worked at Columbus Mills.
21     Q.    Here in Union Springs?
22     A.    No.
23     Q.    Or in Eufaula?

Page 38

1      A.    Eufaula. Well, both. I
2  worked down there, then I got a transfer
3  back here to Union Springs.
4      Q.    Okay. How long did you work
5  for Columbus Mills?
6      A.    Maybe about two years,
7  something like that.
8      Q.    Are we talking '83 to '85,
9  approximately?
10     A.    No. It was, like, in -- I
11 don't know, maybe '84, '85, somewhere around
12 there. Something like that.
13     Q.    You said you worked there for
14 two years, so it would have been from --
15     A.    I'd just say from '84, maybe
16 to about '86, something like that.
17     Q.    Okay. Why did you leave
18 Columbus Mills?
19     A.    I didn't like working on the
20 inside.
21     Q.    Okay. What was your job there
22 at Columbus Mills?
23     A.    I operated a machine.

Page 39

1      Q.    What kind of machine?
2      A.    Call it a twister.
3      Q.    Okay. You were operating a
4  twister?
5      A.    Yeah.
6      Q.    Did you do anything else while
7  you were working for Columbus Mills?
8      A.    No.
9      Q.    Okay. What did you do after
10 -- Did you voluntarily leave Columbus Mills?
11     A.    Yeah. I quit.
12     Q.    Okay. Who was your supervisor
13 at Columbus Mills?
14     A.    I know him. He was from
15 Eufaula. I remember the guy from Union
16 Springs. His name was Jimmy Padgette. Bob
17 Newsome, something like that, Robert
18 Newsome. I think that was his name. That
19 was the one from Eufaula.
20     Q.    Do you recall what your pay
21 was when you quit?
22     A.    Five dollars and something.
23     Q.    What was your next job after

Page 40

1  Columbus Mills?
2      A.    I worked around Four Way Plant
3  Farm, maybe just to plant seed, maybe a year
4  or so.
5      Q.    What was the name of the plant
6  farm?
7      A.    Four Way Plant Farm.
8      Q.    Okay. Where is that located?
9      A.    In Union Springs. On the
10 outskirts of Union Springs.
11     Q.    Is it still in existence
12 today?
13     A.    Yeah. But Bonnie Plant Farm
14 owns it now.
15     Q.    Okay. And how long did you
16 work at Four Way Plant Farms?
17     A.    Off and on, maybe a couple of
18 years, off and on.
19     Q.    From '86 to '89 or so?
20     A.    It might have been something
21 like that.
22     Q.    And you just worked part time?
23     A.    Yeah. Because it's just a

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 41

1  seasonal job.
2      Q.    What do you mean it's a
3  seasonal job?  What are you doing at the
4  Four Way Plant Farm?
5      A.    They haul plants, you know,
6  all types of vegetables, flowers.
7      Q.    I have no idea what Four Way
8  Plant Farm does.  They're growing plants?
9      A.    Plants and vegetables.  They
10  haul them and sell them and take them to
11  K-Mart, Wal-Mart, places like that.
12      Q.    And so, you'd work during the
13  summer?
14      A.    Well, it started, like, in
15  maybe about December until maybe last of
16  April, May, something like that.
17      Q.    And what kind of work did you
18  do for Four Way Plant Farm?
19      A.    I used to water, water
20  flowers, mostly.
21      Q.    Anything else that you would
22  do for them?
23      A.    It's a lot of different things

Page 42

1  you did.  You know, you might be doing
2  something different every day.  You might be
3  loading trucks, putting plants in the
4  houses.  They call it a dirt bin, where they
5  make the trays the flowers go in.  It was
6  always something different you be doing all
7  the time.
8      Q.    Do you know what I mean by
9  manual when I say manual labor?
10      A.    Yeah.
11      Q.    So, what you were doing for
12  them was manual labor?
13      A.    Manual labor, right.
14      Q.    Okay.  You weren't operating
15  any machinery?
16      A.    No.
17      Q.    All right.  And were you paid
18  with a paycheck, were you paid cash?  How
19  were you paid?
20      A.    Paycheck.
21      Q.    Okay.  And what was your next
22  job after Four Way?
23      A.    I went to work at Midway

Page 43

1  Plantation after that.
2      Q.    And when did you start working
3  for Midway Plantation?
4      A.    I think it was, like, in about
5  '89, I believe, '89, '90, one of those
6  years.
7      Q.    Were you off work some from
8  when you last worked at Four Way to when you
9  started working at Midway Plantation?
10      A.    Yeah.
11      Q.    How long were you off work, do
12  you think?
13      A.    It been a long time ago.  I
14  can't remember.  It's been awhile.
15      Q.    I mean, were you off work for
16  a year, six months?
17      A.    I don't know.  I guess six
18  months.
19      Q.    Okay.  Why did you leave Four
20  Way?  Why did you stop working for Four Way?
21      A.    I found another job.
22      Q.    Okay.  And that was at Midway
23  Plantation?

Page 44

1      A.    Yeah.
2      Q.    And what were you hired on at
3  Midway Plantation to do?
4      A.    Well, I drove tractors,
5  backhoe, bulldozers, helped train dogs.
6      Q.    And did you have a job title
7  at Midway?
8      A.    Just --
9      Q.    General laborer?
10      A.    General labor, yeah.
11      Q.    And were you full-time
12  employment, or was it seasonal again?
13      A.    Yeah.  Full time.
14      Q.    Okay.  And how long did you
15  work at Midway?
16      A.    About three years, give or
17  take a few.  You know, about three years.
18      Q.    Who was your -- Who was the
19  boss man out at Midway when you were working
20  there?
21      A.    Nathan Smith.
22      Q.    And did they pay you cash or
23  were you paid by a check?

11 (Pages 41 to 44)

# FREEDOM COURT REPORTING

Page 45

1    A.    By check.
2    Q.    Okay.  And why did you leave
3  Midway?
4    A.    Well, it was -- They cut back
5  on help.  There was four of us that worked
6  there.  And I was the last one that was
7  hired.  And they cut back from four to three
8  people.  And I was the last one hired, so I
9  got laid off.
10    Q.    Okay.  What kind of -- Is
11  Midway Plantation, is that a hunting camp?
12    A.    Yeah.
13    Q.    Is it open to the public or is
14  it private?
15    A.    No.  It's private.
16    Q.    Okay.
17    A.    They don't commercial hunt,
18  they just mostly a family thing.
19    Q.    Okay.  Who owns Midway, if you
20  know?
21    A.    It's Taylor.  I think her name
22  is Catherine Taylor, I believe that's her
23  first name.  I know her last name is Taylor.

Page 46

1    Q.    Okay.  And what kind of
2  hunting did they do at Midway?
3    A.    Quail hunting.  They did a
4  little deer hunting, but like I said, it was
5  mostly just a family thing.
6    Q.    And how many hours a week
7  would you work at Midway?
8    A.    Forty, fifty hours.
9    Q.    And what was your rate of pay?
10    A.    When I first started, they was
11  paying two-twenty-five a week, straight
12  time.  And by the time I left, I think I was
13  making two-seventy-five, straight time.
14    Q.    What do you mean straight
15  time?  What do you mean by that?
16    A.    If I work one day or five, I
17  still get paid the same thing.
18    Q.    Okay.  And as a general
19  laborer, you said you would drive tractors.
20  What kind of work would you -- What kind of
21  tractor would you drive?
22    A.    John Deere tractors.
23    Q.    Okay.  And what were you doing

Page 47

1  with these tractors?
2    A.    Sometimes I'd be Bush Hogging,
3  sometimes harrowing, planting fire lanes,
4  different stuff, sometimes planting.
5    Q.    You said you worked with
6  dozers; is that right?
7    A.    Yeah.
8    Q.    What kind of work did you do
9  with dozers?
10    A.    Nothing.  Mostly just pushing
11  up piles for to burn.  You know, old stumps.
12  And we'd be hauling timber, pushing up
13  piles.
14    Q.    Okay.  What about backhoes,
15  what kind of work were you doing with
16  backhoes?
17    A.    Different things, you know,
18  like fixing -- Well, crossing bridges,
19  putting pipes in, different stuff like that.
20    Q.    Who worked with you out at
21  Midway?
22    A.    Robert -- What was his last
23  name?  Robert Youngblood and Eddie Streeter

Page 48

1  and Nathan Smith, and his son would help
2  sometimes.  But he's the manager of it now.
3  His son would help him out sometimes, his
4  name is Dale Smith.
5    Q.    Is Nathan still out there?
6    A.    No.  The son.
7    Q.    Dale?
8    A.    Yeah.
9    Q.    But Dale was working while you
10  were out there?
11    A.    Part time.  You know,
12  sometimes.
13    Q.    Is Nathan still alive?
14    A.    Yeah.  I guess.
15    Q.    Is Nathan a white guy or a
16  black guy?
17    A.    White.
18    Q.    By the way, it makes no
19  difference to me, whatever you're
20  comfortable with, would you --
21  African-American or black?
22    A.    Don't make no difference.
23    Q.    Does it make any difference to

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

Page 49

1  you?
2      A.    No.
3      Q.    And so, you left Midway about
4  '92 or so, 1992?
5      A.    Yeah.  Something like that.
6      Q.    And that was because they had
7  a reduction in force, and you were the last
8  man?
9      A.    Right.
10     Q.    Were you ever disciplined for
11 any work-performance issues while you were
12 out there?
13     A.    No.
14     Q.    No write-ups or anything like
15 that, to your knowledge?
16     A.    No.
17     Q.    All right.  After Midway,
18 where did you work?
19     A.    Mr. Turf Sod Farm.
20     Q.    Where is that?
21     A.    It's here in Bullock County.
22 But it's -- They call it Smut Eye, something
23 like that, Smut Eye.

Page 50

1      MR. ROBERSON:  Smut Eye,
2  S-M-U-T, E-Y-E?
3      THE WITNESS:  Yeah.
4      Q.    What did you do at Mr. Turf
5  Sod Farm?
6      A.    Drove a tractor and forklift.
7      Q.    And when did you start working
8  at Mr. Turf Sod Farm?
9      A.    I don't know.  Some -- '91,
10 '92, something like that.
11     Q.    And were you working there
12 full time?
13     A.    Yeah.
14     Q.    And how long did you work at
15 Mr. Turf's?
16     A.    I don't know.  Maybe -- It
17 might have been a year.
18     Q.    And why did you leave
19 Mr. Turf's?
20     A.    I got another job.
21     Q.    What was your pay at
22 Mr. Turf's, do you recall?
23     A.    Minimum wages, whatever it was

Page 51

1  at that time.
2      Q.    Who was the boss man out at
3  Turf's -- Mr. Turf's when you were out
4  there?
5      A.    Guy that owned the place?
6      Q.    Sure.
7      A.    Al Vann, James Vann -- I think
8  his real name is James Vann.  I know they
9  called him Al.
10     Q.    Is he still alive, still
11 around?
12     A.    Yeah.
13     Q.    Were you ever disciplined or
14 reprimanded when you were at Mr. Turf's?
15     A.    (Witness shakes head in the
16 negative.)
17     MR. ROBERSON:  You have to
18 answer out loud.
19     A.    No.
20     Q.    Where did you go after
21 Mr. Turf's Sod Farm?
22     A.    I started working at
23 Sedgefields.

Page 52

1      Q.    And when -- What year would
2  this have been?
3      A.    '93.
4      Q.    Do you know who owned
5  Sedgefields at that time?
6      A.    Tommy McArthur.
7      Q.    And were you hired on as a
8  general laborer?
9      A.    Yeah.
10     Q.    And do you know what your rate
11 of pay was?
12     A.    He paid us, you know,
13 basically like I did at Midway Plantation,
14 just a salary.
15     Q.    Okay.  Do you recall what that
16 salary was?
17     A.    Three hundred dollars a week.
18     Q.    And what kind of work did you
19 do for Sedgefields when you were hired on in
20 '93?
21     A.    Just operate a tractor.  Same
22 thing.  Bulldozer, horses, dogs,
23     Q.    And who worked with you out at

13  (Pages 49 to 52)

# FREEDOM COURT REPORTING

Page 53

1  Sedgefields during this time?
2      A.    There's a lot of different
3  people that worked there.  Some of the guys
4  ain't even living now.  Guy named -- His
5  real name -- I don't even know what Bo
6  Jack's real name was.  His last name was
7  Cooper.  Tommy Molton, he was the -- He was
8  the plantation manager.
9      Q.    Tommy who?
10     A.    Molton.  Tony Fitzpatrick.
11 Another old guy named Bochie Davis.  Let's
12 see.  John Molton.  Richard Calloway.  And
13 they had one of the cooks named Miss Hattie.
14 I don't remember what the other lady was
15 named.  There was a another cook, but I
16 don't know what her name was.
17     Q.    How long did you work at
18 Sedgefields during this time?
19     A.    I think it was from '93 to --
20 I can't remember whether it was '97 or '98.
21 Whichever year that Broadhead bought it.
22     Q.    And when Broadhead bought it,
23 what happened?

Page 54

1      A.    I'm still working there.
2      Q.    Okay.  When did you stop
3  working at Sedgefields?
4      A.    In 2001.
5      Q.    Okay.  Did your duties ever
6  change from 1993 to 2001, or were you still
7  doing some of the same work that you told me
8  earlier?
9      A.    Yeah.  Basically the same
10 thing.  Basically the same thing all the
11 time.  You do -- There's always different
12 stuff that you do.
13     Q.    When you were working the
14 tractor, what were you doing?
15     A.    Sometime I be Bush Hogging
16 roads or fields.  Sometimes plant fire
17 breaks, plant deer plots.  Plant deer plots.
18 You know, just different things.
19     Q.    And with the dozer, what kind
20 of work were you doing with the dozer?
21     A.    Mostly the same.  Like I said,
22 pushing up piles.
23     Q.    Okay.

Page 55

1      A.    That's basically what you'd be
2  doing with the dozers.
3      Q.    Did you work any skidders or
4  anything like that?
5      A.    Sometimes.
6      Q.    Did they have any skidders
7  back then?
8      A.    No.  They would rent one.
9  Every now and then we would need it, then
10 they would rent one.
11     Q.    And who would operate the
12 skidder when they would rent one?
13     A.    This old guy, his name was Bo
14 Jack, he'd mostly just operate it.
15     Q.    But he was the one who would
16 operate it most of the time?
17     A.    Yeah.
18     Q.    What about on the dozer work,
19 who would do most of the dozer work?
20     A.    It would be different ones,
21 you know, different guys.  Sometimes I'd be
22 on it, sometimes Bo Jack would be on it,
23 sometimes Richard would be on it, whoever

Page 56

1  the supervisor tell, you know, whatever he
2  would want us to do.
3      Q.    What about -- Did you operate
4  a backhoe during that time?
5      A.    Sometimes.
6      Q.    Who would operate the backhoe
7  most of the time when you were working
8  during this period of time?
9      A.    Well, John he used to do it a
10 lot, John Molton.
11     Q.    Okay.  He would work the
12 backhoe most of the time?
13     A.    Well, you know, different
14 people would be on it.  Sometimes it would
15 be me.  Like I said, sometimes it would be
16 John.  Sometimes it would be Richard,
17 sometimes Bo Jack, you know, whoever the
18 supervisor told, "I need you to go here and
19 do that, go and do this or that."  Whichever
20 one he told.  It just wasn't no same person
21 that did it.  That was their job, just
22 operated it.
23     Q.    Okay.  From 1993 to 1997,

14  (Pages 53 to 56)

# FREEDOM COURT REPORTING

Page 57

1  before Mr. Broadhead bought Sedgefields, did
2  you have any write-ups or disciplinary
3  action taken against you?
4      A.    No.
5      Q.    Did you have any performance
6  issues that management talked to you about?
7      A.    I don't understand what you're
8  saying.
9      Q.    Well, did anybody criticize
10  your work during that period of time, from
11  1993 to 1997?
12     A.    No.  They never came to me
13  with it, if they did.
14     Q.    Okay.  And then you said you
15  left Sedgefields in 2001.  To your
16  knowledge, why did you leave Sedgefields?
17     A.    They told us they was cutting
18  back on the help.
19     Q.    Okay.
20     A.    And they laid off, I don't
21  know, about six or seven of us.
22     Q.    Okay.  Where did you work
23  after that, after you were laid off in 2001?

Page 58

1      A.    I went to work at Frog Pond
2  Turf.
3      Q.    When did you start working at
4  Frog Pond Turf?
5      A.    2002.
6      Q.    How long were you off work
7  from Sedgefields to when you started working
8  at Frog Pond Turf?
9      A.    I think it was, like, from
10  April to December.  I drawed unemployment.
11     Q.    Did you try to look for work
12  during that time?
13     A.    Yes.
14     Q.    None available?
15     A.    No.
16     Q.    And when did your unemployment
17  run out?
18     A.    I think it was October,
19  something like that.
20     Q.    Okay.  What did you do with
21  Frog Pond Turf, what kind of work did you
22  do?
23     A.    Drove a tractor and forklift.

Page 59

1  Operated a tractor and forklift.
2      Q.    How long did you work at Frog
3  Pond Turf?
4      A.    From 2000 to the last of 2000
5  -- To December 2004 -- 2002 to 2004,
6  December 2004.
7      Q.    So, about two years?
8      A.    Yeah.
9      Q.    Why did you leave Frog Pond?
10     A.    I went back to work at
11  Sedgefields.
12     Q.    I didn't think you started
13  working at Sedgefields again until March of
14  2005; is that right?
15     A.    I went back to work there in
16  January.  I started and my ID wasn't right.
17  And they told me I couldn't start to work
18  until I got that straightened out, and
19  that's what I did.
20     Q.    Okay.  Did you ever have any
21  write-ups or disciplinary action taken
22  against you at Frog Pond Turf?
23     A.    No.

Page 60

1      Q.    And you left voluntarily?
2      A.    Right.
3      Q.    Who was your supervisor at
4  Frog Pond Turf?
5      A.    Al Davis.
6      Q.    Who was the owner or manager
7  of Frog Pond Turf?
8      A.    William Baker.
9      Q.    And what kind of pay were you
10  getting at Frog Pond Turf?
11     A.    I was making
12  eight-seventy-five when I left there.
13     Q.    What about C&W?  I thought you
14  said you worked at C&W.
15     A.    Yeah.  That was during the
16  time when I was trying to get my ID
17  straightened out, I worked there for about,
18  I don't know, a couple of weeks.  Maybe --
19  About three weeks.  About three weeks.
20     Q.    What did you do for C&W?
21     A.    I was working on a line, you
22  know, hanging different parts.
23     Q.    Working on an assembly line?

15 (Pages 57 to 60)

# FREEDOM COURT REPORTING

Page 61

1    A.    Assembly line, yeah.
2    Q.    What kind of pay did you get
3 there?
4    A.    Six dollars an hour.
5    Q.    Were you ever disciplined or
6 reprimanded when you worked there?
7    A.    No.
8    Q.    Why did you leave C&W?
9    A.    That's when I went back at
10 Sedgefields, when I got my ID and Social
11 Security cards. I had lost them all. I was
12 going to go to work. I had to have that
13 before they'd let me start working. I had
14 to wait until they got back.
15    Q.    Okay. Have you -- Other than
16 the termination at Mid State Land and
17 Timber, have you ever been fired from a job?
18    A.    One time.
19    Q.    Okay. When was that?
20    A.    I think it was in -- When I
21 was in Atlanta. I got fired off that job
22 and that's when I moved back on.
23    Q.    Why did you get fired from

Page 62

1 that job?
2    A.    Came to work late a couple of
3 times. I didn't have a ride. And I worked
4 out real far. And the bus only ran so far,
5 and then I had to walk the rest of the way.
6    Q.    Were you not fired from C&W?
7    A.    No.
8    Q.    Okay.
9    A.    I quit at C&W.
10    Q.    Okay. And you didn't -- No
11 one talked to you about performance issues
12 at C&W?
13    A.    Yeah. Me and one guy,
14 supervisor, got in -- We had a few words
15 about the job. He had told me that I was
16 going to start, and he gave the job to
17 somebody else, so we had a few words.
18    Q.    Who was that?
19    A.    His name was Jody. I don't
20 know what his last name.
21    Q.    And what did Jody say to you?
22    A.    We just had a few words. You
23 know, different opinion about things.

Page 63

1    Q.    Did you accuse him of
2 discriminating against you on the basis of
3 your race?
4    A.    No, I didn't. Because only
5 black guys worked there, mostly.
6    Q.    Well, what did you say to him?
7    A.    I told him he had asked me --
8 He had told me that he was going to give me
9 the forklifting job -- driving job, and they
10 hired another guy and gave it to him.
11    Q.    Okay. And what -- Did you --
12 You didn't tell him that you felt like you
13 were being discriminated against?
14    A.    No. I didn't tell him I was
15 discriminated against. I just told him he
16 had offered me the job and he gave it to
17 somebody else.
18    Q.    And is that when you quit?
19    A.    Yeah.
20    Q.    But you don't recall anybody
21 at C&W talking to you about any performance
22 issues?
23    A.    No.

Page 64

1    Q.    Okay. How did you get hired
2 on back at Sedgefields in January of 2005?
3    A.    I had talked with -- Roy had
4 came by and talked with me.
5    Q.    Roy Lee?
6    A.    Yes. And he had told me
7 Suzanne asked him would he think that I'd be
8 willing to come back to work there. And I
9 told them I would, I would come back. But I
10 did go back to work out there.
11    Q.    Did Mr. Lee, did he come by
12 your house or give you a call?
13    A.    Yeah. Came by my house and
14 talked to me.
15    Q.    Okay. And who is Suzanne?
16    A.    Suzanne was a Broadhead at the
17 time. But I don't know what her last name
18 is now.
19    Q.    Okay. And to the best of your
20 recollection, what did Mr. Lee tell you when
21 he stopped by your house and offered you a
22 job?
23    A.    He asked me was I interested

16 (Pages 61 to 64)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 65

1  in coming back to work there. And like I
2  said, at the time I was still working at
3  Frog Pond. And I asked him was they going
4  to pay me the same thing I was making. And
5  he told me he'd get back with me in a day or
6  two. Which he did. In a day or two, he
7  told me that they would start me out -- back
8  out with eight dollars an hour, and in
9  ninety days, they would give me a dollar
10  raise.
11      Q.    Okay. All right. Did
12  Mr. Lee, at any time during that
13  conversation, or before you started working
14  at Sedgefields Plantation for the second
15  time, did he say anything to you about you
16  stealing birds?
17      A.    I never knew nothing about
18  that.
19      Q.    Okay. So, he didn't say
20  anything about you stealing birds the first
21  time you worked there?
22      A.    No.
23      Q.    Okay. He didn't make any

Page 66

1  warning to you that if he caught you
2  stealing again he would fire you?
3      A.    Yeah. He said that, but he
4  didn't say no birds.
5      Q.    Well, what did you think he
6  meant by stealing again? What did you think
7  that he was referring to?
8      A.    I don't know.
9      Q.    Well, the man accused you of
10  stealing, did he not?
11      A.    He didn't accuse me.
12      Q.    Well, he said, "If I catch you
13  stealing again, I'm going to fire you;" is
14  that right?
15      A.    Yeah.
16      Q.    And you didn't ask him what he
17  meant by stealing again?
18      A.    Yeah.
19      Q.    Okay. What did you say to
20  him?
21      A.    He told me when I was fired --
22  Let me see. When we got laid off last time
23  -- the first time, the other guy that was

Page 67

1  the plantation manager, he told me that he
2  had put that on my record, that I had stole
3  something. But other than that, I never
4  knew anything about that, until he said
5  something to me about that then.
6      Q.    Okay. And what did you tell
7  him when he told you that?
8      A.    I said, "Okay".
9      Q.    Okay. You didn't say, "I
10  didn't steal those birds back then?"
11      A.    None of that even came up.
12      MR. DUKES: We've been going
13  for about an hour. Let's take a little
14  break.
15          (Recess taken.)
16      Q.    Now, why, again, did you leave
17  Four Way Plant Farms?
18      A.    Why I leave Four Way?
19      Q.    Yes, sir.
20      A.    I got another job. Like I
21  said, it was a seasonal job. You know, you
22  just work so many months and then you draw
23  unemployment or go to work somewhere else

Page 68

1  until they come back around again.
2      Q.    Okay. All right. And when
3  did you start working at Midway? What time
4  of year did you start working at Midway?
5      A.    Midway Plantation?
6      Q.    Yes, sir.
7      A.    It was, like, about September,
8  August, September, something like that.
9  August, September, something like that.
10     Q.    So, instead of waiting until
11  Four Way had more work in December, you went
12  to Midway, is that what you're saying?
13     A.    Yeah. A guy that was working
14  there told me they was looking for some
15  help, and he knew I knew how to operate
16  tractors, and he helped me got on out there.
17     Q.    What was Roy Lee's title, if
18  you know, when he came by your house and
19  offered you a job at Sedgefields, back in
20  2005?
21     A.    I think he was, like,
22  plantation foreman, something like that.
23     Q.    Okay. And so, you started

17 (Pages 65 to 68)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 69

1  working back again at Sedgefields in March
2  or January of 2005?
3      A.    Like I said, when I went out
4  there, I worked there a few days, and my
5  Social Security -- I didn't have it.  My
6  Social Security card.  And I didn't have my
7  ID card.  And they told me I couldn't work
8  until I got those items.  And once I got
9  those, I went back to work.
10     Q.    Okay.  And that would have
11  been somewhere around March of 2005?
12     A.    I believe it was either March
13  or last of February.
14     Q.    Okay.  And I think your lawyer
15  is showing you something.  Does that help
16  you refresh your memory?
17     A.    Yes.  It's the second month,
18  8th day, '05.
19     Q.    Okay.  And were you hired back
20  at Sedgefields in 2005 as a general laborer?
21     A.    Yeah.
22     Q.    Okay.  And what were your
23  duties when you started back working at

Page 70

1  Sedgefields in March of 2005?
2      A.    Basically the same.  I worked
3  with the dogs, horses, I did tractor work, I
4  did a little dozer work, I did a little work
5  on the backhoe.  I mostly did tractor,
6  tractor driver.
7      Q.    And who was your immediate
8  supervisor?
9      A.    When I first went back?
10     Q.    Yes, sir.
11     A.    Roy Lee.
12     Q.    Okay.  And when Mr. Lee was
13  your supervisor, who would do most of the
14  dozer work and backhoe work?
15     A.    Sometimes he would and
16  sometimes I did.
17     Q.    Okay.  Is it fair to say that
18  he did most of the backhoe work and dozer
19  work?
20     A.    Yeah.
21     Q.    And at what point did Mr. Lee
22  no longer become your -- At what point did
23  Mr. Lee no longer -- At what point was he no

Page 71

1  longer your supervisor?
2      A.    When -- When they hired Joel
3  Norman.
4      Q.    Okay.  So, from March,
5  sometime in March of 2005, until when they
6  hired Mr. Norman, you worked under Mr. Lee?
7      A.    Right.
8      Q.    And I think Mr. Norman started
9  work at Sedgefields sometime in the middle
10  of September 2005.  Does that sound right to
11  you?
12     A.    Yeah, sounds about right.
13     Q.    Did your job duties ever
14  change from March 2005 through September of
15  2005?
16     A.    No.  I basically did the same
17  thing.  Mostly -- You know, I mostly did --
18  I mostly did all the Bush Hogging, but it's
19  a lot -- big place.  I had to Bush Hog every
20  day.
21     Q.    What was your starting salary
22  at -- when you came to work in March 2005?
23     A.    Well, they told me one thing

Page 72

1  but they paid me another.
2      Q.    Okay.  What did they tell you
3  -- I think you may have told me a little bit
4  about it.  But what did they tell you your
5  starting salary would be?
6      A.    They told me when I started
7  back there, because I quit a job that was
8  paying me more than what they was paying me
9  from the beginning.  When I went back to
10  work there, they told me I would be making
11  eight dollars an hour, and in ninety days, I
12  would get a dollar raise.
13     Q.    And who made that
14  representation to you?
15     A.    Roy had told me that.  I can't
16  think of his name.  Bob Ray had told him
17  that.
18     Q.    Mr. Lee told you that Bob Ray
19  told him that?
20     A.    Yeah.
21         (Defendant's Exhibit 1 was
22          marked for identification
23          purposes.)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 73

1    Q.    Okay. I'm going to show you a
2  document I will identify as Defendant's
3  Exhibit 1. And it is labeled, "Document
4  Numbers One Through Four."
5         MR. ROBERSON: I've seen that.
6  That's part of what you produced to us?
7         MR. DUKES: Uh-huh.
8         MR. ROBERSON: Take a look at
9  that, Norris.
10    Q.    I think I may have the pages
11  out of order, looking at it a little bit.
12  Looks like maybe page four really should be
13  page three and page three should be page
14  four. Does that look right to you? Do you
15  see what I mean by that, Mr. Foster?
16    A.    Now, what am I supposed to be
17  looking for?
18    Q.    I think I've got page three
19  and page four turned around. I think page
20  four should really be page three, and page
21  three should be page four, and I'm asking
22  you if you agree with me.
23    A.    Yeah.

Page 74

1    Q.    Does that look right to you?
2    A.    Yeah.
3    Q.    Okay. Can you read and write,
4  Mr. Foster?
5    A.    Yeah.
6    Q.    Okay. Is this your
7  handwriting on Defendant's Exhibit 1?
8    A.    This right here (indicating)?
9    Q.    Yes, sir. All the handwriting
10  on Defendant's Exhibit 1.
11    A.    No, I didn't fill that out, my
12  girlfriend did.
13    Q.    Okay. Did you look at it
14  after she filled it out?
15    A.    Not really. I see a couple of
16  things on there that she ain't got on there.
17    Q.    Is that your signature on page
18  three?
19    A.    Yeah.
20    Q.    Okay. Did you understand by
21  signing page three, that you were saying
22  that your application for employment is true
23  and correct, to the best of your knowledge

Page 75

1  and belief?
2    A.    Yeah. I know it now.
3    Q.    Okay. What do you see that's
4  not correct, or you believe is not correct
5  at this time, on Defendant's Exhibit 1?
6    A.    Where she got seven, it should
7  have been an eight. And down here where --
8  That's on the front page, it should have
9  been eight dollars an hour instead of seven.
10  And down at the bottom where it got E-1, it
11  should have been an E-5.
12    Q.    I think that may be E-4, but
13  you're saying it should be E-5?
14    A.    Yeah. Right.
15    Q.    I also see here that as your
16  duties, when you were with Sedgefields
17  before, was training dogs and tractor
18  driver; is that right?
19    A.    That's right.
20    Q.    And I'm on page two of
21  Defendant's Exhibit 1, if you'll follow
22  along with me.
23    A.    (Witness complies.)

Page 76

1    Q.    Do you see under employment
2  data, it asks you to, "Please list all jobs
3  beginning with your present or last employer
4  and working backwards?"
5    A.    Yeah.
6    Q.    Frog Pond Turf was not your
7  last employer, was it?
8    A.    Before I went back to work?
9    Q.    Yes, sir.
10    A.    Yeah. You right. Because I
11  should have been put C&W, but it was only
12  about a week, a couple of weeks, two or
13  three weeks.
14    Q.    Okay. You didn't put that
15  employer down, did you?
16    A.    No.
17    Q.    And you also didn't put down
18  Mr. Turf Sod Farm, Midway Plantation, or
19  Four Way Plant Farm or Beaulieu, did you?
20    A.    No, I didn't put none of those
21  down there.
22         MR. ROBERSON: Have you got
23  his first application, Carter?

19 (Pages 73 to 76)

# FREEDOM COURT REPORTING

Page 77

1        MR. DUKES: I might.
2        MR. ROBERSON: I mean, they
3   had that -- I mean, I've got it, if you
4   don't have it.
5        MR. DUKES: No. But let me
6   take the deposition.
7        MR. ROBERSON: I'm trying to.
8   But I don't want you to mislead anybody, you
9   know.
10       MR. DUKES: You can ask him
11  anything you want to after I get through,
12  but don't interrupt my deposition.
13       MR. ROBERSON: Okay.
14   Q.   Who is Ben -- Is this Ben
15  Jordan?
16   A.   My grandfather.
17   Q.   That's who?
18   A.   My grandfather.
19   Q.   Okay. Where does he live?
20   A.   Midway.
21   Q.   Is he still alive?
22   A.   Yeah.
23   Q.   Okay. Does he work?

Page 78

1    A.   He's ninety-two years old.
2    Q.   Okay. And Brenda Turner, who
3   is that?
4    A.   My aunt.
5    Q.   Okay. Is she still alive?
6    A.   Yeah. She teach school down
7   at the elementary school.
8    Q.   Okay. How many aunts and
9   uncles do you have that live around the
10  area?
11   A.   Well, on my father's side,
12  there was fifteen children, eleven of them
13  still living. And most of them -- Well,
14  it's only three that's still live here, the
15  rest of them live in Georgia, Atlanta,
16  different places.
17   Q.   Okay. Give me the names of
18  those -- aunts and uncles that live in
19  Alabama.
20   A.   Brenda Turner, Terry Jordan,
21  and Annie Watkins. And I have one aunt on
22  my mother's side, her name is Julia Reese.
23   Q.   Let me direct your attention

Page 79

1   to the fourth page of Defendant's Exhibit 1,
2   under General Information. The question is,
3   "Have you ever been convicted of a crime?"
4   How did you answer that question?
5    A.   I answered no.
6    Q.   That's not true, is it?
7    A.   No.
8    Q.   At the time that you completed
9   this application and signed that everything
10  was true and correct on February 8, 2005,
11  you had been convicted of a crime; is that
12  correct?
13   A.   Yes.
14   Q.   What had you been convicted of
15  at that time?
16   A.   Assault in the third degree.
17   Q.   Okay. Any other convictions
18  at that time?
19   A.   No. I've had a bunch of
20  tickets, but that's the only thing that I
21  ever been convicted of.
22   Q.   Okay. Have you ever been
23  arrested for anything?

Page 80

1    A.   Tickets.
2    Q.   Other than tickets, have you
3   been arrested for anything other than
4   tickets?
5    A.   Yeah. Assault, but no -- A
6   couple of times I got arrested for fighting,
7   domestic violence.
8    Q.   But you just say you haven't
9   been convicted of those things?
10   A.   I never been. That's the only
11  thing.
12   Q.   Okay. When were you convicted
13  of assault?
14   A.   That was back in '89, '88,
15  '89, somewhere in there.
16   Q.   And did you spend any time in
17  jail for that?
18   A.   No.
19   Q.   Okay. What led up to your
20  arrest and conviction for assault?
21   A.   What I got --
22   Q.   What did you do? Yes, sir.
23   A.   Me and a guy got in a fight.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 81

1    Q.    Okay.  And where was that
2  fight?
3    A.    At a club.
4    Q.    And did you -- Was it just
5  fists or did you stab him or shoot him?
6    A.    No.  I whooped him with a hole
7  digger handle.
8    Q.    You whooped him with a what?
9    A.    A hole digger.  You know a
10  hole digger?
11    Q.    Yeah.
12        MR. ROBERSON:  Post hole
13  diggers?
14        THE WITNESS:  Yeah.  Post hole
15  digger.  I broke a handle out of one of
16  them.
17    Q.    Okay.  And hit him with that?
18    A.    Yeah.
19    Q.    The next question under
20  General Information is, have you ever been
21  discharged from a job?  How did you answer
22  that question?
23    A.    I said no.

Page 82

1    Q.    That's not true, is it?
2    A.    No.
3    Q.    So, you had been discharged
4  from a job at the time that you completed
5  this application, which is Defendant's
6  Exhibit 1?
7    A.    Yes, I had.
8    Q.    Okay.  What job had you been
9  terminated from?
10    A.    The one in Atlanta.  I got
11  fired off a construction job up there.
12    Q.    All right.  Any other jobs
13  that you had been terminated from?
14    A.    Nope.  None other that I know
15  of.
16    Q.    In your previous employment,
17  did you ever supervise any other employees?
18    A.    Yeah.  At Sedgefields.
19    Q.    Okay.  When at Sedgefields did
20  you supervise other employees?
21    A.    Well, it was back when -- I
22  wasn't no, say, a supervisor, just a lead
23  person.  You know, I had been there a little

Page 83

1  longer than they had, and things that they
2  wanted done that the other guys didn't know
3  how to do, I showed them.
4    Q.    Okay.
5    A.    So I wouldn't say it was a
6  supervisor, just somebody that knew a little
7  bit more than the other persons.
8    Q.    Okay.  So, you didn't -- You
9  never had a title as a supervisor, did you?
10    A.    No.
11    Q.    In any of your previous
12  employment?
13    A.    No.
14    Q.    Did you do any -- Were you
15  ever hired as a welder with any job?
16    A.    No.
17    Q.    Have you ever been hired as a
18  mechanic for any job?
19    A.    No.
20    Q.    Okay.  You said you worked
21  under Mr. Lee until Mr. Norman came to work
22  at Sedgefields?
23    A.    Yes.

Page 84

1    Q.    When Mr. Norman came to work,
2  how did -- Who did you report to?
3    A.    Well, I didn't start off
4  working with him.  I was still working with
5  Roy.  And they came up with -- He had two
6  other guys working with him.  And --
7    Q.    Who were the two other guys
8  working with him?
9    A.    Jeff Harris and Demetrius
10  Parham.
11    Q.    Okay.  And then what happened?
12    A.    They really didn't know the
13  way to go.  They didn't know the plantation
14  that well.  And they had a meeting.  I guess
15  Dave or George knew I knew the place pretty
16  good as I had been working there for a
17  while.  And he suggested that since I knew
18  which way to go, knew the places where they
19  wanted to chop at, that I work with him.
20    Q.    Okay.  And so, was that in
21  September, you think, or was that in
22  October?
23    A.    I don't know.  It might have

21 (Pages 81 to 84)

Page 85

1  been maybe the last of September, around the
2  first of October, something like that, where
3  they had a meeting between him and Roy and
4  David and that's what they came up with.
5      Q.    All right.  And at that time
6  did you, Jeff, and Demetrius work with
7  Mr. Norman?
8      A.    No.  Just me and Jeff.  They
9  took Demetrius, he started back to working
10 under Roy.
11     Q.    Okay.  And what kind of work
12 did you do when you were working with
13 Mr. Norman?
14     A.    Basically, just chopping.
15     Q.    What is chopping?  Explain
16 that to the jury.
17     A.    All it is is cutting pathways
18 for the dogs.  Let's say a hunter get down
19 for the hunt, and it's something like a
20 checkerboard, you go one way and come back
21 another.
22         Let's say if the dog point a
23 covey of birds and he's in the grass, you

Page 86

1  know, where we have chopped at, the riders
2  -- the hunters can get off the horses and
3  stand in that clearing while you walk in the
4  thick part.  They flush the birds.  It's
5  just chopping, you know, chopping.
6      Q.    In other words, you're just
7  knocking down the brush where people can
8  walk inside the fields?
9      A.    Right.  And see your dogs.
10     Q.    Okay.  Before Mr. Norman had
11 gotten there, did y'all have any chopping
12 equipment?
13     A.    No.  We didn't chop, but we
14 Bush Hogged.
15     Q.    Okay.  And he changed it to
16 where you were chopping instead of Bush
17 Hogging?
18     A.    Right.
19     Q.    And is that what you primarily
20 did for Mr. Norman?
21     A.    That, and when we went bird
22 hunting.
23     Q.    Okay.  And then when you would

Page 87

1  have -- When was your first bird hunt that
2  season, if you recall?
3      A.    October the 14th, I believe it
4  was.
5      Q.    Okay.  How do you know that
6  date, just out of curiosity?
7      A.    Because when I was fired,
8  that's when he told me I stole some birds on
9  that day.
10     Q.    Okay.  And who all went with
11 you -- How many hunts did you have from
12 October 14, 2005, until the day that you
13 were terminated in I think December 28 or 29
14 of 2005?
15     A.    I'm not going to tell you a
16 lie.  I can't remember how many.  I just --
17 Maybe nine or ten, something like that.
18     Q.    Okay.
19     A.    I don't know.
20     Q.    Okay.  But nine or ten would
21 be a pretty good approximation?
22     A.    I don't know.  I'm not going
23 to say because I don't remember.  I'm going

Page 88

1  to be honest again.
2      Q.    And on those nine or ten
3  hunts, who would go out on the hunt with
4  Mr. Norman?
5      A.    It would be Joel, myself,
6  Willie Mack and Jeff Harris, sometimes
7  David.
8      Q.    Sometimes David Carroll?
9      A.    Yeah.
10     Q.    How many hunts do you think
11 David Carroll went on out of those nine or
12 ten?
13     A.    I don't know.
14     Q.    More than five?
15     A.    I really don't know.  Maybe
16 half.  I don't know.
17     Q.    Okay.  And on these hunts,
18 what was your job?
19     A.    Scout dogs and help Joel with
20 the dogs, make sure I kept up with -- help
21 him keep up with the dogs.
22     Q.    Okay.  And what do you mean by
23 scouting dogs?

22  (Pages 85 to 88)

## FREEDOM COURT REPORTING

Page 89

1    A.    Well, just say you got two
2  dogs out there running, one of them might
3  get away, and the person that working the
4  dog, he -- he can't keep his eyes on both
5  dogs -- most of the time he can, but just
6  say if one get away, and he's still got to
7  keep the hunting party going, and,
8  therefore, I'll go and get the dog and bring
9  him back to them.
10    Q.    Okay.  And is that part of
11  just helping Joel with the dogs?
12    A.    Right.
13    Q.    Okay.  Did your job duties on
14  these hunts ever change from October the
15  14th until the date that you were
16  terminated?
17    A.    No.
18        (Defendant's Exhibit 2 was
19         marked for identification
20         purposes.)
21    Q.    Okay.  I'm going to show you a
22  document that I will identify as Defendant's
23  Exhibit 2.  And after you've read that, just

Page 90

1  let me know.
2        (Off-the-Record discussion
3         was held.)
4    MR. ROBERSON:  You got the
5  wrong pay rate in there, Norris.
6    THE WITNESS:  Okay.
7    MR. ROBERSON:  Is there a
8  particular section you want him to look at
9  or is it the whole thing?
10    MR. DUKES:  Whole thing.
11    MR. ROBERSON:  Okay.
12    A.    Okay.
13    Q.    Is Defendant's Exhibit 2, is
14  it complete and accurate, to the best of
15  your knowledge and belief?
16    A.    Yeah.  Couple of things.
17    Q.    All right.  What couple things
18  may be wrong?  I think your lawyer said
19  something about the pay.  I think it says
20  eight dollars an hour.  What was your pay
21  when you were working at --
22    A.    When I started?
23    Q.    Yes, sir.

Page 91

1    A.    Seven dollars.
2    Q.    Okay.  And what was it when
3  you ended?
4    A.    Well, seven-fifty.
5    Q.    Okay.  When did you get a
6  fifty cent pay raise?
7    A.    They had already fired me
8  then.  When the raise came, that was my last
9  check.
10    Q.    Okay.  Other than the amount
11  that you were being paid, is there anything
12  else inaccurate in Defendant's Exhibit 2?
13    A.    Yeah.  The years what -- It's
14  more like ten years instead of twelve.
15    Q.    Okay.  Anything else
16  inaccurate or wrong?
17    A.    Not that I see.
18    Q.    Have you ever seen Defendant's
19  Exhibit 2 before today?
20    A.    No.
21    Q.    This is the first time you've
22  seen it?
23    A.    This here?

Page 92

1    Q.    Yes, sir.
2    A.    Yeah.
3    Q.    Tell me everything that serves
4  as the basis for your belief that you were
5  discriminated against because of your race.
6    A.    For one thing, the time I had
7  worked there, then some younger guys came to
8  work there and they got paid more.
9    Q.    Okay.
10    A.    Things that Joel would say.
11    Q.    Anything else?
12    A.    No.
13    Q.    Did you ever complain to
14  anybody about the way you were being
15  treated?
16    A.    Yeah.
17    Q.    Who did you complain to?
18    A.    Roy.
19    Q.    What did you tell Roy?
20    A.    The things that he would say.
21    Q.    He, being Joel Norman?
22    A.    Yes.
23    Q.    When did you first complain to

23 (Pages 89 to 92)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 93

1  Joel, Mr. Lee?
2      A.   Maybe a couple of days after I
3  started working with him.
4      Q.   How many times did you
5  complain to him?
6      A.   I don't know. A bunch of
7  times.
8      Q.   Less than five?
9      A.   Yeah. I even tried to talk to
10  David about it, but he said they were my
11  boss and he didn't have nothing to do with
12  it.
13      Q.   How many times did you say
14  something to David Carroll about the way you
15  were being treated?
16      A.   I tried to talk to him twice.
17      Q.   Okay. What did you say to him
18  on the first time?
19      A.   I asked him could I talk to
20  him. And he told me if I had any problems,
21  talk to Joel, he my supervisor.
22      Q.   Did you tell him what your
23  problem was?

Page 94

1      A.   He didn't want to hear it. He
2  told me to talk to Joel.
3      Q.   The second -- When was that?
4      A.   I can't remember the dates.
5  Just say sometime in October, when he first
6  -- around the first week or two in October.
7      Q.   Okay. And when was the next
8  time you approached David Carroll?
9      A.   A couple of days. I didn't
10  approach him. I talked to him over the
11  radio.
12      Q.   Okay. Called him on the
13  radio?
14      A.   Yeah.
15      Q.   And what did you say to him
16  that time?
17      A.   Same thing. I need to talk
18  with him, and he told me the same thing.
19      Q.   So, you never told Mr. Carroll
20  what your issues were with Mr. Norman?
21      A.   No.
22      Q.   Okay. You did tell Mr. Lee
23  what your issues were with Mr. Norman,

Page 95

1  didn't you?
2      A.   Yeah.
3      Q.   What did Mr. Lee tell you?
4      A.   That he was my supervisor, no
5  matter what he said, do. He your
6  supervisor, and you going to have to -- You
7  know, he kept asking me had I talked to I
8  David. And I had told him that I tried to
9  talk to David a couple times about it, and
10  he told me the same thing, talk to Joel.
11  But I could talk to Roy, you know, tell him,
12  probably, and wasn't nothing he could do
13  because I didn't work with him no more.
14      Q.   Okay. What did you complain
15  to Roy about specifically?
16      A.   The way he talk to us.
17      Q.   Anything else?
18      A.   That's basically it.
19      Q.   Okay. Do you know if Mr. Lee
20  ever told anybody else at Sedgefields or Mid
21  State about the complaints that you made to
22  him?
23      A.   I don't know.

Page 96

1      Q.   He never told you he spoke to
2  anybody about your complaints?
3      A.   No.
4      Q.   Okay. What were some of the
5  things that Joel would say that you believe
6  serve as the basis for your complaint that
7  you were discriminated against on the basis
8  of your race?
9      A.   He used to always ask me were
10  we going hunting, before we got there who
11  took the guests out? And I told him either
12  me or Roy. He said he had never worked on a
13  plantation or been on a plantation where
14  black guys -- they had black guides.
15      Q.   And did he make that comment
16  before your first hunt?
17      A.   Yeah.
18      Q.   Did he make that comment any
19  other time?
20      A.   He said -- Not that comment,
21  but he said other things.
22      Q.   Okay. Well, I'm just -- I'm
23  going to let you tell me about the other

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 97

1  comments. But on this thing about his
2  comment, "He's never worked at a place where
3  they had black guides," he said that on how
4  many occasions?
5      A.    Two, maybe three times I've
6  heard him say it.
7      Q.    Okay. And what did you say in
8  response to that?
9      A.    Nothing. Just looked at him.
10     Q.    Okay. All right. What was
11  another comment that he made that you
12  believe serves as the basis of your
13  complaint that you were discriminated
14  against because of your race?
15     A.    Well, he asked about who ran
16  the place before David took over as manager.
17  And I told him, "Roy". He said, "That's
18  unbelievable, a black man running a
19  plantation."
20     Q.    When did he make that comment?
21     A.    When he first started working
22  there sometime. I can't remember no dates
23  -- the dates.

Page 98

1      Q.    How many times did he make
2  that comment?
3      A.    I only heard him say that a
4  couple of times.
5      Q.    Anybody else overhear that
6  comment?
7      A.    Jeff Harris. He was standing
8  right there when he said it.
9      Q.    All right. Anybody else?
10     A.    Willie Mack was standing
11  around one time when he said it.
12     Q.    Anybody else?
13     A.    That's it, because we was the
14  only ones working around him.
15     Q.    What about the comment, "Never
16  worked on a plantation where they had black
17  guides," anybody else, to your knowledge,
18  overhear that comment?
19     A.    I told you, Jeff Harris.
20     Q.    Anybody else?
21     A.    That was it. Because it was
22  just us three standing there.
23     Q.    Okay. All right. Any other

Page 99

1  comments serve as the basis for your belief
2  that you were discriminated against because
3  of your race?
4      A.    Nah.
5      Q.    Did you ever hear Mr. Norman
6  talk about wanting to replace black
7  employees?
8      A.    Yeah.
9      Q.    Okay. Would that be a comment
10  that would serve as the basis for your
11  belief that you were discriminated against
12  because of your race?
13     A.    Yeah.
14     Q.    Okay. What exactly did
15  Mr. Norman say in that regard?
16     A.    He said, "By January, first of
17  the year, it going to be an all white crew,
18  like it should be."
19     Q.    And when did he make that
20  comment?
21     A.    I don't know. Maybe after the
22  first hunt or two we had.
23     Q.    And how many times did he make

Page 100

1  that statement?
2      A.    I heard him say it a couple of
3  times, maybe three. About three times I've
4  heard him say that.
5      Q.    When was the last time he said
6  it?
7      A.    I don't know. Maybe a couple
8  of weeks before I got fired.
9      Q.    What prompted him to say that,
10  if you know?
11     A.    Nothing but a racist. That's
12  the only thing I can come up with.
13     Q.    Was anybody around when he
14  made those comments?
15     A.    Me and Jeff always worked
16  together.
17     Q.    What did you say in response
18  to those -- to that comment?
19     A.    I never said anything to Joel,
20  because he -- All he wanted was any kind of
21  reason for me to say anything to him for me
22  to fire -- for to get fired.
23     Q.    Any other comments by

25  (Pages 97 to 100)

# FREEDOM COURT REPORTING

Page 101

1  Mr. Norman that serve as the basis of your
2  belief that you were discriminated against
3  because of your race?
4       A.    No.  No more than I tell him,
5  "Whenever I saw Suzanne or somebody from the
6  big office, I was going to tell them about
7  what was going on and how we were being
8  treated."  And Mr. Carroll told me if I said
9  anything to anybody about it, that he would
10 fire me.
11          THE WITNESS:  Do you remember
12 that?  I know you don't, but two other
13 people do.
14      Q.    I'm a little confused.  I
15 asked you earlier about your conversations
16 with Mr. Carroll and you said you never were
17 able to tell him anything.  Is your
18 testimony changed now that you were able to
19 talk --
20      A.    When he said -- When that
21 comment was made, was one day that we got
22 wrote up and he was up there to verify that's
23 Joel had wrote -- wrote us up.  And that's

Page 102

1  when I said something and made that comment.
2       Q.    Okay.  All right.  So, you
3  were written up on one occasion, I think,
4  for -- you were supposed to be taking care
5  of the horses and Mr. Norman said that y'all
6  were out riding the horses instead of taking
7  care of the horses.
8       A.    But he didn't put the reason
9  why we was out there riding horses.
10      Q.    Okay.  Well, we can get to
11 that later.  But it was on that occasion
12 when you were written up for that?
13      A.    Right.
14      Q.    And Mr. Carroll was present.
15 You told Mr. Carroll that you were going to
16 complain to the big office?
17      A.    Right.  I said, "If any of
18 them, Suzanne or Mr. Ray came down there,
19 that I was going to tell them what was going
20 on."
21      Q.    Did you say -- Did you say
22 exactly or explain yourself as to what was
23 going on?

Page 103

1       A.    No.
2       Q.    You just said, "I'm going to
3  tell them what's going on?"
4       A.    They already knew what was
5  going on.
6       Q.    But you didn't tell them that
7  you were going to complain about race
8  discrimination, did you?
9       A.    No.
10      Q.    And that write-up, I think,
11 was sometime in the middle of December; is
12 that right?
13      A.    I can't remember what month it
14 was.  It might have been sometime in
15 December, somewhere around in there.
16          MR. ROBERSON:  I think it's
17 12/6.
18      Q.    All right.  Any other
19 comments --
20      A.    No.
21      Q.    -- made by anybody at
22 Sedgefields that you believe serves as the
23 basis for your belief that you were

Page 104

1  discriminated against because of your race?
2       A.    No.  Nobody else.
3       Q.    Okay.  Other than Mr. Norman,
4  do you believe you were treated fairly by
5  Sedgefields or Mid State?
6       A.    Everything was fine until he
7  started working there.
8       Q.    Okay.  So, other than
9  Mr. Norman's conduct, you believe you were
10 treated fairly by Mid State?
11      A.    Sure.  Except for the pay.
12      Q.    Okay.  That's what I'm about
13 to get to.  I asked you earlier, "What
14 served as the basis for your complaint that
15 you were discriminated against because of
16 your race?"  You said, "The pay, that
17 younger guys were paid more than you, and
18 things that Joel would say."
19      A.    Right.
20      Q.    Have I accurately summarized
21 your deposition testimony?
22      A.    Yes.
23      Q.    All right.  And I think you've

26 (Pages 101 to 104)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 105

1 told me everything about what Joel would
2 say; is that right?
3     A.    Right.
4     Q.    Now I want to go into the
5 issue that you have with pay. What is your
6 complaint about the pay, Mr. Foster?
7     A.    Because they promised me one
8 thing, and paid me another.
9     Q.    Okay. What other complaints
10 do you have about your pay?
11     A.    Wasn't getting paid enough.
12 That's it.
13     Q.    Okay. Well, do you believe
14 that other employees were paid more than you
15 for similar work?
16     A.    Yeah. Most of the -- All the
17 black guys, all of us was making the same
18 amount of money. I think Willie might have
19 been -- Willie Mack might have been making
20 thirty-five or forty cents more, but the
21 rest of us were making seven dollars an
22 hour, and the white guys that they hired was
23 making eight.

Page 106

1     Q.    Okay. And what white guys do
2 you compare yourself to?
3     A.    I know Will Hubbard and the
4 other young guy, he's a Mayes. I can't
5 think of his first name.
6     Q.    Joseph Mayes?
7     A.    Yeah.
8     Q.    Anybody else?
9     MR. ROBERSON: The Ham boy?
10     A.    Yeah. He had started working
11 there, maybe a week or two after I was
12 fired.
13     MR. ROBERSON: Okay.
14     A.    And there was another guy that
15 was working there previous, before he got
16 fired, and he was making eight dollars an
17 hour.
18     Q.    Brotherman?
19     A.    Yeah.
20     Q.    That's Beckwith, Brotherman
21 Beckwith, William Beckwith? They called him
22 Brotherman?
23     A.    Yeah, Brotherman. I don't

Page 107

1 know what his real name was.
2     Q.    Okay. Do you know anything
3 about Will Hubbard's prior work experience?
4     A.    He told me he was training,
5 working with me, that since he had got out
6 of school, only thing he had did was help
7 his dad haul chickens. I think his daddy
8 hauled chickens from one place to another.
9 I think he bought them from, like, Wayne
10 Poultry and they take them to different
11 stores and stuff. And he said that's the
12 only thing he had did prior to that.
13     Q.    Do you know his experience
14 with heavy equipment, with dozers and
15 skidders?
16     A.    He told me he had never messed
17 with none before he came out there.
18     MR. DUKES: Can we go off the
19 Record?
20     (Off-the-Record discussion
21     was held.)
22     (Recess taken.)
23     Q.    Mr. Foster, we just took a

Page 108

1 break. Is there anything about your
2 previous testimony that you want to change
3 or add to?
4     A.    Yeah.
5     Q.    What do you want to change or
6 add to your testimony?
7     A.    I don't want to change
8 nothing.
9     Q.    Okay.
10     A.    Like you saying about some of
11 the things about the discrimination part.
12 Like, for example, when I started working at
13 Sedgefields, I was operating tractors,
14 bulldozers, backhoe, working horses, dogs.
15 And the day I got fired, I was shoveling
16 manure.
17     Plus, another way they would
18 discriminate against us, they was taking all
19 our tip money.
20     Q.    All right. So I asked you
21 earlier what served as the basis for your
22 belief that you were discriminated against
23 at Mid State because of your race, you told

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 109

1  me pay and things that Joel would say. Now
2  that we've come back from a break, are you
3  saying that some other things lead you to
4  believe that you were discriminated against
5  because of your race?
6      A.    Yes.
7      Q.    And those two other things
8  would be tip money?
9      A.    Right.
10     Q.    And the other, I'll just
11  generalize and say terms and conditions of
12  your employment; is that fair enough?
13     A.    Right.
14     Q.    Okay. We'll go back into that
15  a little bit later. And I think before we
16  took a break, we were talking about Will
17  Hubbard. Do you know what his education
18  background was?
19     A.    Like I said, he told me he had
20  just finished high school. He had been out
21  of school about -- Well, he had just
22  finished high school. And the only job he
23  had did was working with his father, hauling

Page 110

1  chickens from one supermarket to another.
2      Q.    Okay. And do you know when he
3  was hired on at Mid State?
4      A.    It was either the last of
5  November or around the first of December,
6  something like that.
7      Q.    Okay. I've got November 21,
8  2005, do you have any reason to dispute
9  that?
10     A.    Should be something like that.
11     Q.    Okay. So, you worked around
12  him for about a month, little over a month;
13  is that right?
14     A.    Right.
15     Q.    Do you know if Mr. Hubbard had
16  a driver's license?
17     A.    Yes.
18     Q.    Okay. He could drive?
19     A.    Yeah.
20     Q.    Okay. Joseph Mayes is another
21  fellow you mentioned. Do you know anything
22  about his work experience?
23     A.    I never even met the guy

Page 111

1  before he started working there. I never
2  even knew him or seen him.
3      Q.    Okay. Do you know what his
4  hunting experience was?
5      A.    I know he told me he liked to
6  deer hunt.
7      Q.    Okay. What about trapping, do
8  you know if he could trap?
9      A.    He said he -- I think -- Yeah,
10  he used to trap while he was out there.
11     Q.    Okay. Did he have a driver's
12  license, Mr. Mayes?
13     A.    I'm pretty sure he did.
14     Q.    Okay. Brotherman, who, by the
15  way, is Mr. Beckwith --
16     A.    Yeah.
17     Q.    Do you know anything about his
18  work experience before coming to Mid State?
19     A.    No. No more than he told me
20  he used to work on a big golf course, and he
21  did clean up barbecues and stuff like that.
22  Other than that, no.
23     Q.    And do you know what his job

Page 112

1  duties were out at Mid State, when he worked
2  there?
3      A.    He Bush Hogged mostly with me,
4  when he first started. He was doing a lot
5  of Bush Hogging and everybody.
6      Q.    I've got him being hired July
7  25, and then being fired on September 27,
8  2005. Does that sound about right to you?
9      A.    Yeah.
10     Q.    Was he also -- Did he work as
11  a night watchman for Mid State?
12     A.    Yeah. That's what he said.
13     Q.    Do you have any reason to
14  dispute that?
15     A.    No.
16     Q.    What about Chance Ham, do you
17  know anything about his work -- previous
18  work experience?
19     A.    No.
20     Q.    Do you know anything about his
21  education?
22     A.    No.
23     Q.    Do you know what kind of work

28  (Pages 109 to 112)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 113

1  he's been doing out at Mid State?
2      A.   No.
3      Q.   Okay.  Do you know any black
4  employees at Mid State, during the time you
5  worked there, that were being paid more than
6  you?
7      A.   Nobody except for Roy, I don't
8  think.  Like I said, Roy, and I think Willie
9  Mack, I think he was making a little bit
10  more.
11      Q.   Are there any other white
12  employees that you compare yourself to,
13  other than Will Hubbard, Joseph Mayes,
14  Chance Ham and Brotherman?
15      A.   What you mean by that?
16      Q.   Was there anybody else that
17  you believe that was similarly situated to
18  you that was paid more than you?
19      A.   Well, I know I can't compare
20  with Joel because he -- I know he got a
21  college degree or whatever, but I got a CS
22  degree in the job.
23      Q.   You got a what degree?

Page 114

1      A.   CS.
2      Q.   What is that?
3      A.   Commonsense.
4      Q.   Do you know anything about
5  Joel Norman's background?
6      A.   No.
7      Q.   Do you know anything about
8  Mr. Lee's background in bird hunting?
9      A.   I taught him.
10      Q.   Okay.  When did he start
11  working out at Sedgefields?
12      A.   The last of 2000 -- I think
13  about -- I don't know, maybe it was October,
14  November, something like that, of 2000.
15      Q.   Okay.  Did he have any
16  previous bird experience before he came to
17  Sedgefields?
18      A.   No.  He worked at Beaulieu,
19  Columbus Mills, he had worked there about
20  twenty-five years.
21      Q.   So, to your knowledge, he
22  didn't have any previous bird experience
23  before he came out to Sedgefields?

Page 115

1      A.   No more than what I showed
2  him.
3      Q.   Okay.  How did y'all do bird
4  hunts before Mr. Norman came out there?
5      A.   Well, just according to --
6      Q.   And let me say quail hunts.
7      A.   It was according to the
8  clients, what kind of hunting that they
9  wanted to do.  If they wanted to wild bird
10  hunt, we go different places, you know,
11  where we knew where wild birds was, where we
12  had seen them at and where we had been
13  feeding the wild birds.
14          And if they wanted to hunt
15  liberated birds, they call it put and take.
16  You put the birds out there and hunt them.
17  It's according to whatever the client is
18  wanting to do, if it's wild bird hunting, we
19  go wild bird hunting.
20          If they want to, you know,
21  just do a lot of shooting, the liberated
22  hunting, that's what we do.  We put the
23  birds out there to make sure they got a lot

Page 116

1  of shooting in.  Every now and then we run
2  across a wild bird.
3      Q.   How did Mr. Norman change the
4  way y'all did bird hunts, or quail hunts?
5      A.   They just strictly said they
6  was going to turn it around to just straight
7  wild birds.  Wasn't going to be no put and
8  take.  Like, in the morning, you put them
9  out there and then you go hunt them maybe an
10  hour or two later.  What they did was
11  release some birds into the wild,
12  prerelease, you know, maybe a month or two
13  before hunting season start.
14      Q.   Okay.  Was Mr. Norman, to your
15  knowledge, was he trying to reestablish the
16  wild quail population at Sedgefields?
17      A.   That's what he said.  That's
18  why they were going to change it to just --
19  There wasn't going to be no more putting no
20  birds out, it was just going to be strictly,
21  you know, wild birds.
22      Q.   Did you have any criticisms of
23  the way Mr. Norman handled the quail hunts?

29  (Pages 113 to 116)

## FREEDOM COURT REPORTING

Page 117

1    A.    Well, I didn't say it to him,
2  I said it to other guys, the way he -- Like,
3  lot of times we said, "We can't find no
4  birds." And I might be talking to Willie
5  Mack or I might have told Russ, some of
6  them, that the birds be there because a lot
7  of times after we done hunted through that
8  area, I might ride on the bottom hill or
9  something and I been flushed the birds up,
10  but they wouldn't know it.
11        Only thing I said, "If he was
12  to hunt the dogs a little harder in that
13  area, that he would find the birds." He
14  just always pushing through. You know,
15  everybody got different styles how to do
16  things.
17    Q.    Did you ever tell anybody that
18  you would not tell Mr. Norman where the
19  birds were?
20    A.    No.
21    Q.    Did you ever refuse to tell
22  Mr. Norman where you knew wild coveys were?
23    A.    No. He never -- If he ever

Page 118

1  asked me have I seen any, I would tell him
2  if I saw them.
3    Q.    You never told another
4  employee out at Mid State that you wouldn't
5  tell Mr. Norman where the wild coveys were?
6    A.    No. I have told him, "I have
7  passed by a lot of birds while we was
8  hunting, but once you go through that area,
9  ain't not going to turn back and come back
10  to them, you're going to keep going
11  straight." I've said that.
12    Q.    Would you ever criticize the
13  way Mr. Norman was handling the hunt in
14  front of customers and other employees?
15    A.    No.
16    Q.    Based on your experience in
17  working out at Sedgefields, when were the
18  horses put in the barn?
19    A.    Talking about when we start
20  hunting, before we start hunting?
21    Q.    Well, let me ask the question
22  a different way. Were the horses always
23  kept in the barn?

Page 119

1    A.    No.
2    Q.    Okay. When did you start
3  keeping them in the barn?
4    A.    I'm going to get -- Let me
5  understand what you're talking about first.
6    Q.    Okay.
7    A.    You saying -- Okay. You know,
8  you let them in and out every day.
9    Q.    I understand that. But during
10  the summertime, in the pasture --
11    A.    Oh, they be out in the
12  pasture. We may keep two or three up there
13  at the barn, you know, because Suzanne and
14  her husband, they like to come down and
15  ride. And we basically kept two or three
16  horses up at the barn at all times. The
17  rest of them be out in the pastures.
18    Q.    Okay. And so, at some time
19  during the year, you would take them out of
20  the pasture and keep them in the barn;
21  right?
22    A.    Yeah. When hunting season
23  about to start, they'll come up and they'll

Page 120

1  get them in and shear them up and put shoes
2  on them and stuff like that.
3    Q.    Okay. So, that would be
4  September?
5    A.    September, yeah, last of
6  September, something like that.
7    Q.    And then, when would you --
8    A.    Maybe October. Week or two,
9  couple weeks before hunting season.
10    Q.    Okay. So -- And then when
11  would you let them back out in the fields?
12    A.    After hunting season over.
13    Q.    When is the hunting season
14  over?
15    A.    If I'm not mistaken, I think
16  wild bird season goes out in the last of
17  February. But you could put birds out until
18  the end of March, if they haven't changed
19  it.
20    Q.    Okay. And so, when would
21  y'all put the horses out to pasture?
22    A.    After March.
23    Q.    Okay. So, from September to

30  (Pages 117 to 120)

# FREEDOM COURT REPORTING

Page 121

1  October -- September or October through
2  March, you'd keep the horses in the barn?
3      A.    Right.
4      Q.    And I think what you're
5  saying, also, is that throughout the year,
6  you'd keep one or two horses in the barn for
7  the Broadheads to ride; is that right?
8      A.    Well, they don't basically be
9  in the barn, they'd be out in the pasture.
10  But in case they wanted to ride, they would
11  be there for them and we could let them in
12  the barn.
13      Q.    Oh, okay.
14      A.    You might have fed them, you
15  know, once or twice a week, something like
16  that.
17      Q.    Okay.  And part of your
18  duties, in working on the quail team, was to
19  take care of those horses, wasn't it?
20      A.    Right.
21      Q.    Okay.  And then you'd go out
22  on a hunt when there was a quail hunt;
23  correct?

Page 122

1      A.    Right.
2      Q.    And you would prepare the
3  fields; correct?
4      A.    Right.
5      Q.    Now, was preparing the fields,
6  did you do that all the way through the
7  hunting season?
8      A.    Yeah, we were -- we -- All the
9  way through.
10      Q.    Okay.  And when the horses are
11  out in the field, you don't have to clean
12  the barn as much; correct?
13      A.    What you mean, like, in the
14  summertime?
15      Q.    Yes, sir.
16      A.    We don't have to clean them at
17  all because we didn't even feed them on the
18  inside in the summertime.  They've got a big
19  trough out there.  There's only three horses
20  out there.  Just take it and fill it all the
21  way down where they don't be bumping into
22  each other.  You didn't have to clean it in
23  the summertime.

Page 123

1      Q.    Okay.  How many horses were
2  out at Sedgefields when you were working
3  there the last time?  And I'll add mules to
4  that, too.
5      A.    Okay.  I think it was eight
6  horses and two mules, if I'm not mistaken.
7      Q.    Okay.
8      A.    I think that's the way it was.
9  Eight or nine horses, I think it was eight,
10  and two mules.
11      Q.    You were telling me when we
12  came back from the break that you felt like
13  you were discriminated against because of
14  your race because by the end of your
15  employment, you felt like all you were doing
16  was shoveling manure; is that right?
17      A.    Yeah.
18      Q.    Okay.  What was -- I mean,
19  someone had to clean the barn, did they not?
20      A.    Yeah.  But I say it like this.
21  He just did things a little different.
22  Before he came, you know, during the hunting
23  season or whatever, we didn't put shavings,

Page 124

1  they would be putting shavings in there in
2  the stalls on the concrete.
3          The way we did it, it was just
4  naked concrete there.  And once they leave
5  out, we let them out in the morning time, we
6  cleaned up every stall.  Every morning,
7  whatever waste they had in there from that
8  night, we cleaned it out.
9          And, see, with the shavings in
10  there, it's that high (indicating).  And
11  it's urine and, you know, the other, too, is
12  in it.
13      Q.    Yeah.
14      A.    And it's just -- The shaving,
15  he got it like that thick (indicating), and
16  it's like ten or twelve stalls, whatever it
17  was we had to clean out.  Because sometimes
18  he changed one horse from one stall to the
19  other.
20      Q.    So, with the shavings, there
21  was more work?
22      A.    A lot more.
23      Q.    Okay.  When you came to work

31 (Pages 121 to 124)

# FREEDOM COURT REPORTING

Page 125

1 in March of 2005, were the horses already
2 out to pasture?
3    A.    No.
4    Q.    Okay.  There was just a bare,
5 concrete floor in the barn?
6    A.    Yes.
7    Q.    And did you have to clean out
8 the barn then?
9    A.    (Witness nods head in the
10 affirmative.)
11    Q.    Okay.
12    MR. ROBERSON:  You have to
13 answer out.
14    A.    Yes, sir.  Like I said, it was
15 so much easier, you could take one scoop to
16 each stall and you're finished with it.  But
17 the way he had it, it would take you
18 thirty-five or forty minutes to clean one
19 stall.
20    Q.    Okay.  And when you first
21 started back at Sedgefields in March of
22 2005, who helped you clean the stalls then?
23    A.    Well, all of us did it.

Page 126

1    Q.    Who is all of us?
2    A.    Demetrius, Willie Mack, me and
3 Roy.  Where most of the time, it would be
4 Demetrius, Willie and me.  We go -- Okay.
5 There's one side we had down so far where
6 the water was, and all you got to do is just
7 shovel it out the window.  And the other
8 side, where the mules was, we had a
9 wheelbarrow and dump it in.  And I'm telling
10 you, it would take maybe fifteen minutes to
11 do the whole thing where we had it just
12 naked concrete.
13    Q.    All right.  And then when you
14 put the horses back in the stall in the fall
15 of 2005, who helped clean out the stalls?
16    A.    Mostly it was just me and
17 Jeff, and sometimes Willie Mack would help
18 us.
19    Q.    Okay.
20    A.    When he wasn't working down at
21 the lodge.
22    Q.    Okay.  Were there any white
23 employees during that time that you think

Page 127

1 should have been helping you?
2    A.    No.  There wasn't none.
3    Q.    All right.  Is shoveling
4 manure the only -- Let me strike that and
5 start over again.
6    I asked you, and I hate to
7 keep on repeating it, but I want to make
8 sure the Record is clear.  I asked you
9 earlier, "Tell me everything that serves as
10 the basis of your complaint that you were
11 discriminated against because of your race."
12 You told me about the pay, and I think we've
13 gone over all of that.  Is there anything
14 you'd you want to add about pay?
15    A.    Yeah.  More money, I wanted
16 more money.
17    Q.    Okay.  Anything other than
18 that?
19    A.    Huh-uh.
20    Q.    Okay.  Things that Joel would
21 say.  And then a third category, which I've
22 listed as terms and conditions of
23 employment, and you told me about you felt

Page 128

1 like you were having to shovel manure all
2 the time.
3    Is there anything else, other
4 than the tips, that you believe serves as a
5 basis for your belief that you were
6 discriminated against because of your race?
7    A.    Yeah.  Couple more.  Like I
8 use, for instance, he said -- Okay.  Like
9 around here, homecoming, it's a tradition.
10 You know, they mostly close down everything
11 in town that day whenever homecoming is
12 here in Bullock County.
13    Q.    Let me stop you.  Are you
14 talking about high school homecoming?
15    A.    Right.  And David had told all
16 of us we could get off at twelve o'clock.
17    Q.    Okay.
18    A.    And Joel raise so much sin
19 about, "We need to be working, we need to be
20 working."  Which we wasn't behind on
21 nothing.  We needed to be working.  So we
22 worked on -- We told him that we would work
23 on until two o'clock.  And he told us that

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 129

1  if we couldn't work all day, he's going to
2  get him some white boys and Mexicans to do
3  the job if we don't want to do it.
4      Q.    How many times did he make
5  that statement?
6      A.    I only heard him say it that
7  one time, about he go get him some white
8  boys and Mexicans.
9      Q.    Okay.  And who heard that
10  statement, to your knowledge?
11      A.    Me and Jeffrey Harris.
12      Q.    All right.  Did you complain
13  to anybody about Mr. Norman making that
14  statement?
15      A.    I told Roy, and I told --
16  Well, they was all sitting around together,
17  Roy, Henry and Demetrius, I told them what
18  he had said.
19      Q.    And what did Roy say?
20      A.    Nothing.  Just laughed and
21  shook his head.
22      Q.    Did you try to tell
23  Mr. Carroll or anyone else at Mid State

Page 130

1  about this statement?
2      A.    At one time I probably could
3  have went to David and talked to him about
4  it.  But after Joel changed, yeah, he
5  changed too.
6      Q.    How did Mr. Carroll change?
7      A.    From a good guy to a devil.
8      Q.    Okay.  Did Mr. Carroll do
9  anything that would lead you to believe that
10  he was discriminating against you on the
11  basis of your race?
12      A.    No.  He wouldn't ever do
13  anything like that.  Just Joel, when he went
14  against him, he did whatever he would want
15  him to do.  Because before Joel got there,
16  he was a nice guy.  You could go to him and
17  talk to him about anything.
18      Q.    Do you have any knowledge of
19  any conversations or communications between
20  Mr. Norman and Mr. Carroll?
21      A.    No more than he was my
22  supervisor and Joel -- Mr. David was the
23  plantation manager.

Page 131

1      Q.    But you don't have any
2  knowledge of any specific conversation
3  between Mr. Norman and Mr. Carroll, with
4  regards to the treatment of you?
5      A.    No.
6      Q.    Okay.  All right.  Then,
7  again, I'm going back.  I'm just trying to
8  make sure I've got it right for the Record.
9  I asked you to tell me everything that
10  serves as a basis for your belief that you
11  were discriminated against because of your
12  race while you worked for Mid State.  You
13  told me about pay.  You told me about things
14  that Joel would say.  Now, have you told me
15  everything that Joel would say that serves
16  as the basis of your complaint?
17      A.    I tried to.
18      Q.    Is that yes?
19      A.    Yes.
20      Q.    Then we talked about terms and
21  conditions of employment, and you said you
22  had to shovel a lot of manure.
23      A.    Right.

Page 132

1      Q.    Is there anything else about
2  the terms and conditions of your employment
3  that would lead you to believe that you were
4  discriminated against because of your race?
5      A.    No.  I told you everything.
6      Q.    Okay.  The last thing I have
7  is tip money.
8      A.    Right.
9      Q.    I think you said they kept the
10  tip money.
11      A.    Right.
12      Q.    Who is they?
13      A.    Joel and David.
14      Q.    Okay.  Is it your allegation
15  that when a customer would come and give tip
16  money to Joel or David after a hunt, that
17  they would keep it and not give it to the
18  employees?
19      A.    He gave us some twice.
20      Q.    Okay.
21      A.    And only reason why then
22  because we kept on complaining.  And I got
23  fired that same day that I complained about

33  (Pages 129 to 132)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 133

1 it. Which he -- I remember at one time,
2 after a hunt, this guy had told us, I think
3 his name was Calloway or whatever it was, he
4 told us he left us a hundred and fifty
5 dollars apiece, and we didn't get not one
6 dime of it. And we worked --
7    Q.    How did you know that -- Is it
8 Mr. Calloway?
9    A.    Yes, sir. I think that was
10 his name.
11    Q.    How do you know Mr. Calloway
12 left that kind of money for tips?
13    A.    He told us.
14    Q.    When did he tell you?
15    A.    Right before -- When they was
16 going in for that day -- because they was
17 there for two days. When they was going in
18 that afternoon -- Well, he left at lunchtime
19 and he said, "I'm going to leave y'all a
20 hundred and fifty dollar tip."
21    Q.    And when was this, do you
22 recall?
23    A.    That was -- I don't know

Page 134

1 whether it was the first, second, third. I
2 can't remember what hunt it was.
3    Q.    Well, we know the first hunt
4 was in, I think, October 14, 2005.
5    A.    I can't remember what hunt it
6 was.
7    Q.    Okay. Do you recall when the
8 last hunt was before you were fired?
9    A.    Maybe a day or two before I
10 was fired.
11    Q.    Okay. Was -- Mr. Calloway we
12 know wasn't the first hunt, was he?
13    A.    No.
14    Q.    He wasn't the last hunt, was
15 he?
16    A.    No.
17    Q.    Okay. Was he near the end or
18 near the first?
19    A.    Near the first.
20    Q.    Okay. All right. Anything
21 else about tip money that you believe serves
22 as the basis for your claim that you were
23 discriminated against because of your race?

Page 135

1    A.    Yeah. Because they told us if
2 we asked about it or said anything about it,
3 we would be fired.
4    Q.    Okay. And that memo went out
5 to all employees?
6    A.    Right.
7    Q.    Okay.
8    A.    It give him the right to take
9 it as much as he want to if you can't say
10 nothing about it.
11    Q.    Okay. Do you know if
12 Mr. Norman, Mr. Carroll, or anyone at
13 Sedgefields took in some tip money, gave it
14 to some white employees but didn't give it
15 to any black employees?
16    A.    I don't -- I don't know that.
17    Q.    Okay. All right. Now, have
18 you told me now everything, because this is
19 -- This will most likely be the last and
20 only opportunity I get to ask you questions
21 in this case. Have you told me everything
22 that serves as the basis for your belief
23 that you were discriminated against because

Page 136

1 of your race?
2    A.    Yes, sir.
3       MR. DUKES: This is probably a
4 good stopping point to go to lunch.
5       (Recess taken.)
6       (Defendant's Exhibit 3 was
7       marked for identification
8       purposes.)
9    Q.    I'm going to show you,
10 Mr. Foster, a document that I will identify
11 as Defendant's Exhibit 3. And it contains
12 some of the same documents that were in
13 Defendant's Exhibit 1, but it's Defendant's
14 Production Numbers 1 through 56. And I'll
15 represent to you it's a personnel file for
16 you.
17       And I'm going to ask you some
18 questions about some of the documents
19 contained in your personnel file. First, if
20 I can direct your attention to document
21 number -- starting at document number 37,
22 you'll see at the bottom, right-hand corner
23 of the page, there are document numbers. So

34  (Pages 133 to 136)

# FREEDOM COURT REPORTING

Page 137

1  if you could turn to document number 37, and
2  look through 37, 38, 39, and 40.
3       Do document numbers 37 through
4  40, do they represent your application for
5  employment with Mid State back in 1999?
6    A.   Okay.
7       MR. ROBERSON:  Is that your
8  application?
9       THE WITNESS:  Yeah.
10    Q.   And whose handwriting -- Am I
11  correct to say that document numbers 37
12  through 40 are your application -- together,
13  comprise of your application -- Let me start
14  over again.
15       Documents number 37 through
16  40, is that your first application for
17  employment with Mid State?
18    A.   No.  It should have been
19  another one when they changed over in --
20  like I said, it should have been '97, '98,
21  somewhere around there.  I remember doing
22  this one (indicating).
23    Q.   Do you recall filling out this

Page 138

1  application in 1999?
2    A.   Yes.  Yes, sir.
3    Q.   Okay.  And is everything true
4  and correct, to the best of your knowledge,
5  on this application?
6    A.   Except for a couple of things.
7    Q.   Okay.  What's wrong?
8       MR. ROBERSON:  That one does
9  say '85 there.
10    A.   Where it says, "Have you ever
11  been fired from a job?"  I put no, I should
12  have put yes.
13    Q.   Okay.  And what about, "Have
14  you ever been convicted of a crime?"
15    A.   I should have put yes.
16    Q.   Okay.  And you didn't list all
17  your employers either, did you, on this
18  application?
19    A.   No.
20    Q.   I'm sorry, did you say no?
21    A.   Yeah.
22    Q.   Okay.  And is that your
23  signature there on page number 40?

Page 139

1    A.   Yes.
2    Q.   And whose handwriting is it
3  on --
4    A.   My girlfriend's.
5    Q.   The same one who --
6    A.   No.
7    Q.   Different girlfriend?
8    A.   Yeah.
9    Q.   Okay.  Anything else incorrect
10  on this application, which is represented by
11  document numbers 37 through 40?
12    A.   Yeah.  It's basically right.
13    Q.   While I'm thinking about it,
14  I've got that you were arrested back in 1989
15  for assault, first degree, do you know what
16  that was regarding?
17    A.   It's third degree.
18    Q.   Well, I've got assault with
19  third degree as well.
20    A.   That's the same -- It's got to
21  be the same case, where they dropped it from
22  the first to third.
23    Q.   Okay.  What happened to the

Page 140

1  guy that you assaulted?
2    A.   What you mean, what happened?
3    Q.   Was he -- Did he have to go to
4  the hospital?
5    A.   Yeah.
6    Q.   What kind of injuries did he
7  sustain?
8    A.   A broken jaw bone.
9    Q.   Okay.  I've got you were
10  arrested for disorderly conduct in 2001; is
11  that right?
12    A.   Yeah.
13    Q.   Tell me about that arrest.
14  What was that for?
15    A.   Me and my girlfriend got to
16  arguing.
17    Q.   Okay.  I've got in 1998 you
18  were arrested for giving a false name to a
19  law enforcement official; is that correct?
20    A.   Yeah.
21    Q.   What name did you give them?
22    A.   Norris Jordan.
23    Q.   Okay.  Is that about the time

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 141

1  you found out that you should have been --
2  you thought your name was Norris Foster the
3  whole time?
4      A.   Yeah.  Well, I was trying to
5  get out of going to jail that night because
6  I had some previous tickets.  I knew if I'd
7  have said Norris Foster, I was going to
8  jail.  So I gave him my father's last name.
9      Q.   Norris Jordan?
10     A.   Yeah.
11     Q.   Okay.  I've got being arrested
12  for burglary in the second degree back in
13  1998 what was that about?
14     A.   Wasn't no burglary.  Me and my
15  girlfriend had got to arguing and I kicked
16  my own door in and she called the police on
17  me.
18     Q.   Okay.
19     A.   The charges were dropped.
20     Q.   Does that have to do with the
21  assault and --
22     A.   All that.
23     Q.   I've got assault in the third

Page 142

1  degree in 1998, was that a fight with your
2  girlfriend?
3      A.   The same thing.
4      Q.   All right.  Disorderly conduct
5  in 1998, is that related to a fight you had
6  with your girlfriend, too?
7      A.   You said another year before
8  you said that one.
9      Q.   Yeah.  I've got that you've
10  got a disorderly conduct in 2001, I
11  think you said that was a fight with your
12  girlfriend.  Then I also show a disorderly
13  conduct in 1998.
14         MR. ROBERSON:  Arrested, not a
15  conviction?
16         MR. DUKES:  To be honest with
17  you, I don't know.  I'm going to have to
18  find out.
19         MR. ROBERSON:  Okay.
20     A.   I just told you, me and my
21  girlfriend got to arguing.
22     Q.   Okay.  And then in 2005, I
23  have an arrest for domestic violence, third

Page 143

1  degree assault.
2      A.   I never been arrested for
3  that.  I wasn't arrested at that -- He came
4  and talked to me about it.  The charges were
5  dropped.  Me and my girlfriend, like you,
6  I'd be out cheating, and they get mad and
7  call the police and tell them a lie.
8      Q.   Okay.  Is that the same thing
9  with reckless endangerment in 2005?
10     A.   Same thing.  All the charges
11  were dropped because once they get
12  satisfied, they go and drop the charges.
13     Q.   Have you ever had any charges
14  brought against you or any lawsuit brought
15  against you with not paying child support?
16     A.   Yes, I pay child support.
17     Q.   Have you ever had any charges
18  brought against you for failing to pay your
19  child support?
20     A.   No.  Because they always take
21  -- If I go to work, they take it out of my
22  checks.
23     Q.   Okay.  Any other arrests that

Page 144

1  I didn't go over?
2      A.   No, sir.
3      Q.   Why don't you have a driver's
4  license?
5      A.   Well, when I was -- When I
6  went to Germany, my license got expired.
7  When I came back home, I just never went
8  back and got them.  David lent me the money
9  to go and get them reinstated.  Ain't
10  nothing but I just have been too lazy to go
11  and get them.  Not that I can't, because I
12  don't have no tickets or nothing.
13     Q.   When is the last time you've
14  had a driver's -- a valid driver's license?
15     A.   In the '80s, sometime, '83,
16  '84, somewhere like that.
17     Q.   How much money did Mr. Carroll
18  loan you to get a driver's license?
19     A.   A hundred and fifty dollars.
20     Q.   Did you ever pay him back that
21  money?
22     A.   No.
23     Q.   Has Mr. Carroll ever loaned

36 (Pages 141 to 144)

# FREEDOM COURT REPORTING

Page 145

1  you any other money?
2      A.    Not to my knowledge.  That was
3  it.
4      Q.    Have you ever, from time to
5  time, asked him for twenty dollars or saying
6  you need a little cash, you're short, and
7  Mr. Carroll gave you money?
8      A.    Yeah.  I did ask him, you're
9  right, it was twice.  I got twenty dollars
10 from him one time and a hundred fifty
11 dollars one time.
12     Q.    Any other times that you asked
13 for money and he gave you money?
14     A.    Nope.
15     Q.    Did you ever give him any of
16 that money back?
17     A.    Nothing but the twenty.
18     Q.    You did give him twenty
19 dollars back?
20     A.    That's it.
21            (Off-the-Record discussion
22            was held.)
23     Q.    Sedgefields Plantation is a

Page 146

1  pretty big place, isn't it?
2      A.    Right.
3      Q.    Sometimes you have to get on
4  public roads to go from one place to the
5  other place; is that right?
6      A.    Right.
7      Q.    Because you didn't have a
8  driver's license, did employees sometimes
9  have to drive you to one place or another
10 place?
11     A.    Yeah, they have.
12     Q.    Okay.  Back in the first time
13 that you worked for Mid State, do you recall
14 doing some plumbing work on the barn?
15     A.    Yes, sir.
16     Q.    Okay.  Did you represent to
17 the folks at Mid State that you had
18 completed that plumbing work, when you
19 actually had not?
20     A.    I wasn't doing the plumbing
21 work, Roy and another guy was doing it.
22     Q.    Okay.  Did you tell Roy that
23 you had finished the plumbing work?

Page 147

1      A.    Tell Roy?  He the one that was
2  doing it, him and -- Who was that?  I think
3  a guy named Kevin.
4      Q.    Okay.  So, if Roy says that
5  you were the one supposed to be helping with
6  the plumbing work, and you said that you had
7  done it and hadn't, he just wouldn't be
8  telling the truth?
9      A.    Repeat that again.
10            MR. DUKES:  Can you repeat
11 that?
12            (Requested portion of the
13            Record was read by the
14            Reporter.)
15     A.    Yeah, yeah.
16     Q.    Okay.
17     A.    Because I wasn't the one doing
18 it.  Him and Kevin was the one doing it.  I
19 was working down at the kennel, doing
20 something else.
21     Q.    What were you doing?
22     A.    I had left them in charge -- I
23 had left them to do that.

Page 148

1      Q.    Did you ever get reprimanded
2  or counseled about not clocking out when you
3  were supposed to, or, you know, having
4  someone else clock out for you?  Do you know
5  what I mean by that?
6      A.    Yeah.  I'm talking about when
7  you talking about?
8      Q.    When you worked at Mid State
9  at any time.
10     A.    No.
11     Q.    Okay.
12     A.    Well, they said something to
13 all of us about it.  Just say all three of
14 us was sitting here, and it's time to go
15 back to work, one person would go back and
16 clock all of us in and then we go to work.
17     Q.    Okay.  Did anyone ever accuse
18 you of stealing any dog food during the
19 first time you worked at Mid State?
20     A.    Not to my knowledge.
21     Q.    Have you ever heard of that
22 allegation, that you stole some dog food?
23     A.    After I went back to work the

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 149

1  second time, Roy mentioned, said that --
2  mentioned it to me.
3       Q.   What did Roy tell you?
4       A.   He said -- Asked me did I know
5  what they had on my record when I got --
6  when I left there?  I told him no.  He said
7  that Hunter McDuffie had put on there, I had
8  stole some birds that we had.  He never said
9  nothing about no dog food.
10      Q.   Okay.  You don't know anything
11 about stealing dog food?
12      A.   No.
13      Q.   What about stealing -- Did you
14 ever steal any dog food from Mid State?
15      A.   Nope.
16      Q.   What about traps, did you
17 steal any traps from Mid State that first
18 time you were employed there?
19      A.   No.
20      Q.   Have you ever heard anybody
21 say anything about you stealing traps?
22      A.   Nope.
23          (Off-the-Record discussion

Page 150

1          was held.)
2       Q.   Do you know any other
3  employees at Mid State that didn't have a
4  valid driver's license?
5       A.   No, I don't.
6       Q.   Were you ever reprimanded
7  about complaining about where your paycheck
8  was?
9       A.   Yes.
10      Q.   Okay.  When did that occur?
11      A.   When we got our first check,
12 when -- when Joel started working there.
13 Normally, Roy would always have our checks
14 and he just put them in the mail, where I
15 would clock in and out.  And we would always
16 get them on a Thursday.
17          And when he started working
18 there, that first time we got a paycheck,
19 and he took them with him back off in the
20 woods, where he was at back there riding or
21 whatever.
22          And we called him -- Because
23 everybody fixing to knock off, and we called

Page 151

1  him and asked him where our check was, and
2  he said he didn't have to give them to us
3  until that Friday, but David told him to
4  give them to us.
5       Q.   But David said -- Did you
6  complain to David about it?
7       A.   No, I complained to him about
8  it, Joel.
9       Q.   And Joel said what?
10      A.   That we -- The check was dated
11 for that Friday, and that's when we supposed
12 to been got them.
13      Q.   Right.  And you said something
14 about David said you were supposed to get
15 them.  Who told you that?
16      A.   I didn't say David said we was
17 supposed to get them, if I did I was
18 mistaken.  I said, "David told him to give
19 us our checks."
20      Q.   Okay.  Well, how did David
21 know to tell him that if no one complained
22 about it?
23      A.   Because I called him and asked

Page 152

1  him.
2       Q.   What did you ask David?
3       A.   I asked him, "Where was Joel,
4  and we needed our checks."
5       Q.   Okay.  And to your knowledge,
6  David told Joel to go ahead and give them to
7  you a day early?
8       A.   We always got them on that
9  Thursday.  Yes, he did tell him to give them
10 to us, yes.
11      Q.   Okay.  Did you ever -- Did
12 anyone ever complain about the way that you
13 were chopping on the fields?
14      A.   Well, Joel would say
15 something, no matter what I did, he always
16 going to have -- It wasn't going to be right
17 unless he was doing it.
18      Q.   When you were chopping the
19 fields, did you ever scrape any of the
20 trees?
21      A.   No.
22      Q.   Never scraped a tree when you
23 were chopping the field?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 153

1    A.    I been doing it a long time.
2  He know who was doing it, Jeff.
3    Q.    You're saying it wasn't you
4  that was scraping the trees, it was Jeff
5  Harris?
6    A.    Yeah.  That's who he went and
7  complained to with David.
8    Q.    Did you -- Did anybody ever
9  complain about the fact that you were told
10 to chop a field and then you didn't complete
11 chopping the whole field?
12   A.    That's a real big place.
13 What's your name?
14   Q.    My name is Carter Dukes.
15   A.    Mr. Carter, that's a real big
16 place.  Ain't nobody perfect.  Ain't no way
17 in the world you going to go over that whole
18 place and not miss a spot somewhere.
19   Q.    Did anybody complain about you
20 missing a spot?
21   A.    Joel said something to me
22 about a couple of spots I had missed, but it
23 was so far down up under the hill until I

Page 154

1  didn't bother because it was such a strain
2  on the tractor, pulling it back up the hill.
3    Q.    Do you know whether
4  Mr. Carroll ever looked over the work that
5  you had done chopping the fields?
6    A.    He always would come through
7  riding, never stopped or said anything.
8    Q.    It was customary for
9  Mr. Carroll to sort of check on how you were
10 doing, check on your work?
11   A.    I guess so, yeah.
12   Q.    Well, I mean, don't guess so.
13 But, I mean, would you often see Mr. Carroll
14 out looking --
15   A.    Not often.
16   Q.    Well, from time to time?
17   A.    From time to time, I would see
18 him.  According to where you was working, if
19 it was somewhere close by a road where we
20 was working at, every now and then I would
21 see him.  When you down on a bottom
22 somewhere, no, I didn't see him.
23   Q.    From time to time, though, you

Page 155

1  would observe Mr. Carroll checking up on
2  your work?
3    A.    Right.
4    Q.    Okay.  Did Mr. Norman teach
5  Mr. Mack how to drive a tractor?
6    A.    Who?
7    Q.    B.B., did he teach B.B. how to
8  drive a tractor?
9    A.    I taught him how.  I showed
10 him the basics on how to drive it.  And
11 after he took me off my tractor and he put
12 me on a different tractor chopping, he
13 showed him, you know, basic fundamentals,
14 same things that I had showed him.
15   Q.    Okay.  And did you ever
16 complain to anybody about the fact that Mack
17 was getting to drive the tractor?
18   A.    I said it to him, to B.B.
19   Q.    What did you say to B.B.?
20   A.    I told him, "You got it made."
21   Q.    Okay.  I think I've asked you
22 this question.  I apologize for asking it
23 again.  Did you ever complain about the way

Page 156

1  that Mr. Norman was conducting the quail
2  hunts?
3    A.    Nope.  I told you that one
4  time, the only thing -- I didn't say it to
5  him, I said it to Jeff and said it to Willie
6  Mack, that if he was to let the dogs hunt,
7  the area where we was hunting at, he would
8  find some birds.  I said it to them, not to
9  him.
10   Q.    So, you said it to
11 coemployees?
12   A.    Right.
13   Q.    Didn't say it to Mr. Norman?
14   A.    Never.
15   Q.    Did you ever say it within
16 earshot of any customers?
17   A.    No.  Because I mostly be
18 riding off from them because I'm scouting
19 dogs, keeping my eyes on them.
20   Q.    Mr. Carroll was on some of
21 those hunts, was he not, when you would have
22 explained about the way that Mr. Norman was
23 conducting the hunt?

39 (Pages 153 to 156)

# FREEDOM COURT REPORTING

Page 157

1    A.    He might have been.  I can't
2  recall.  I don't know.
3    Q.    Okay.  We talked earlier about
4  a memo that Mr. Carroll sent out about tips.
5    A.    Right.
6    Q.    Do you recall -- I'm not
7  testing your memory.  Do you recall
8  generally what that memo said about tips?
9    A.    Basically, that if they didn't
10  walk up to us and give it to us in our hand,
11  if they left a tip with them, within two or
12  three days, they would give it to us.
13        And if we complained about it,
14  we would be terminated and either they'll
15  stop the tipping, period.  Something similar
16  to that.
17    Q.    Did anyone ever talk to you or
18  with you about you asking or suggesting to
19  customers that they give you a tip?
20    A.    Say that again.
21    Q.    Did anyone ever talk with you
22  about the fact that you were asking
23  customers or suggesting to customers that

Page 158

1  they tip you?
2    A.    No.  I said -- I said it to
3  the clients myself, that if they had
4  something to give me, give it to me in my
5  hand, because if they didn't, I wasn't going
6  to get it.
7    Q.    Okay.  And you said that to
8  the customers?
9    A.    Yes.  I said it to a couple of
10  clients.
11    Q.    Okay.  And that would have
12  been in violation of that policy, would it
13  not have?
14    A.    What you mean?
15    Q.    If you said that to a
16  customer, you would have been violating this
17  tip policy, which is document number 22?
18        MR. ROBERSON:  I'm going to
19  object to that.  I don't think it violates
20  it.  I object to the form.  I think that
21  mischaracterizes the policy.
22        MR. DUKES:  Okay.
23    A.    We weren't standing around

Page 159

1  waiting on no tip.  When I said that to
2  them, we would be out in the field hunting
3  or something.
4    Q.    Okay.
5    A.    We couldn't have been standing
6  around waiting on no customers, because by
7  the time we got back to the barn, they would
8  already be gone.
9    Q.    Okay.  And you did that after
10  that policy was published?
11    A.    I don't remember.
12    Q.    Okay.  What about -- Did
13  anybody ever complain about the way you
14  treated the equipment at Sedgefields?
15    A.    No.
16    Q.    Did you blow up the engine of
17  a tractor at Sedgefields?
18    A.    No.
19    Q.    You didn't operate a tractor
20  after it was running hot and blowed the
21  engine?
22    A.    No.
23    Q.    Did you use any heavy

Page 160

1  equipment at C&W?
2    A.    No.
3    Q.    Did you ever ask, after a
4  hunt, ask Mr. Norman or Mr. Carroll for tip
5  money?
6    A.    I asked them the time when
7  Mr. Calloway was there, when he specifically
8  told us he had left us some money.  I asked
9  that time.  That was the only time.
10    Q.    Okay.  Could that be
11  Mr. Hardaway?
12    A.    Hardaway.  That's his name.
13  Mr. Hardaway.
14    Q.    All right.  And you never made
15  any gesture with your hands, sort of like
16  rubbing your thumb and your first finger
17  together in front of Mr. Norman or
18  Mr. Carroll, suggesting you wanted your tip
19  money?
20    A.    Nope.
21    Q.    Did you ever call Mr. Carroll
22  or Mr. Norman at home asking about your tip
23  money?

40  (Pages 157 to 160)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 161

1    A.    No. I called Mr. Carroll one
2  time, like I told you that once before, I
3  called him when Mr. Hardaway had left us
4  that money and I asked about it, and he told
5  us it would be on our check and it never
6  was.
7    Q.    Okay. Did you ever use the
8  "N" word at Sedgefields? Do you know what I
9  mean by that?
10    A.    Yeah.
11    Q.    Did you ever use that?
12    A.    Man, you know, when black guys
13  sitting around talking, we always did.
14  That's a common thing.
15    Q.    Anybody ever complain about
16  you not completing an assigned task in a
17  timely fashion?
18    A.    No more than that day that I
19  was fired.
20    Q.    Any time prior to the day that
21  you were fired?
22    A.    Nope.
23    Q.    Did you ever smoke marijuana

Page 162

1  while you were working at Sedgefields?
2    A.    I smoke marijuana, but not at
3  Sedgefields. I smoked it when I was off
4  work.
5    Q.    Okay. Do you still smoke
6  marijuana?
7    A.    Yeah.
8    Q.    Are you under the influence of
9  marijuana right now, as we speak?
10    A.    No, I'm not.
11    Q.    Okay. What about cocaine?
12    A.    No, I don't smoke or snort no
13  cocaine.
14    Q.    Even crack cocaine, talking
15  about powder or crack?
16    A.    I don't do neither one of
17  them.
18    Q.    Do you think you were a team
19  player during the time you were working at
20  Sedgefields?
21    A.    I always have been, because
22  the guys that I was working with, they --
23  neither one of them even really knew what

Page 163

1  was going on because they -- I was -- I was
2  basically showing them what to do. They was
3  following my lead.
4    Q.    Tell me about the day that
5  your employment was terminated. What
6  happened? If you can just sort of take me
7  through step by step.
8    A.    That morning, we got to work,
9  it was raining. And Joel told us -- Me and
10  Jeff started cleaning the stalls out. And
11  him and two young white guys, they was over
12  in the barn working on a Bush Hog, well,
13  it's a tree cutter.
14    And we had been -- did what he
15  told us. Like I said, it's about twelve,
16  thirteen stalls, and it's going to take
17  anywhere from thirty-five to forty minutes,
18  fifty minutes to clean out one stall.
19    And we had cleaned all of them
20  out. And maybe it was around about maybe
21  one or two, two-thirty, something like that.
22  They had put back together a tree cutter.
23  And me and Roy had worked on that same

Page 164

1  cutter before. And I knew if you didn't set
2  it level, both sides, when he make a turn,
3  it was going to do the same thing and tear
4  right back up.
5    I told Joel that. I said, "If
6  you don't put those two braces off of there,
7  as soon as you make the first turn it was
8  going to tear up." He told me he knew what
9  he was doing, you just keep working in the
10  barn.
11    So I went back out there and I
12  was standing right there in the barn door
13  when he went out there and start cutting
14  grass. As soon as he made that turn, it
15  tore up. And he drove back up on the hill,
16  I looked at him and started laughing, and
17  started back to work. I went back to work.
18    Q.    Did he see you laughing?
19    A.    Yeah, he saw me laughing.
20    Q.    Okay.
21    A.    And I went back to work. And
22  I went to dump a load of that shaving, Jeff
23  was in the barn. And as soon as I left to

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 165

1  go dump that, he took Jeff away from the
2  barn. And maybe fifteen to twenty minutes
3  later, that's when him and David came up
4  there and fired me.
5      Q.    Okay. And David and Joel were
6  there together?
7      A.    Right.
8      Q.    Who did the speaking?
9      A.    Both of them was talking.
10     Q.    All right. Who spoke first,
11 if you recall?
12     A.    David.
13     Q.    What did David say?
14     A.    That I wasn't doing my job.
15 He wasn't satisfied with my work, but I been
16 working there all -- Like I told him, I been
17 working there all this time --
18     Q.    Okay. Wait a minute. Either
19 I'll let you talk about that or your
20 attorney will, but tell me exactly what
21 David told you right there at the --
22     A.    That he wasn't -- They wasn't
23 satisfied with my work and that would be my

Page 166

1  last day at work.
2      Q.    Okay. Is that the sum and
3  substance of what he told you?
4      A.    Yeah.
5      Q.    Okay. Then what did -- Who
6  spoke next?
7      A.    Joel said that, "Really, your
8  work ain't about nothing no way, we can get
9  by without you."
10     Q.    Okay. Is that the sum and
11 substance of what Joel said?
12     A.    Right.
13     Q.    Okay. What did you say?
14     A.    When I got -- After he had
15 fired me?
16     Q.    Well, did anybody say anything
17 -- Did David speak after Joel spoke?
18     A.    Yeah. I think when I -- When
19 I asked him what I'm being fired for.
20     Q.    Okay. So, after Joel said
21 that, you said, "What am I being fired for?"
22     A.    Right.
23     Q.    And then who spoke?

Page 167

1      A.    David. Well, they sit over
2  there -- Joel called David to the side, and
3  they talked, and then he came back and told
4  me what I was fired for.
5      Q.    Okay. What did David say?
6      A.    He said on October the 14th I
7  stole fourteen birds.
8      Q.    Okay. Did he say anything
9  else?
10     A.    I just started laughing and
11 walked out the door.
12     Q.    Okay. And you left?
13     A.    No, I didn't left -- Yeah, I
14 left, after I said a few more things.
15     Q.    Okay. What did you say?
16     A.    I told him that they were
17 firing me for nothing, for no reason, and he
18 know that I hadn't stole no birds. I told
19 him things like this, the way y'all doing,
20 they got lawyers for that. That's what I
21 said.
22     Q.    Okay. And then what did they
23 say?

Page 168

1      A.    Nothing.
2      Q.    And what did you do then?
3      A.    Got in my truck and left.
4      Q.    You were driving, even though
5  you don't have a driver's license?
6      A.    Yeah.
7      Q.    How did you get here today?
8      A.    With my attorneys.
9             (Off-the-Record discussion
10            was held.)
11     Q.    Have you told me the sum and
12 substance of conversations between you, Joel
13 Norman and David Carroll at the barn at the
14 time that your employment was terminated?
15     A.    Yeah. That's it, what
16 happened.
17     Q.    Okay.
18            MR. DUKES: I need to take a
19 break.
20            (Recess taken.)
21     Q.    All right. You left
22 Sedgefields on the day that Mr. Carroll
23 terminated your employment. Did you return

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

1    back to Sedgefields at any time thereafter?
2        A.    One time.
3        Q.    Okay.  And how soon after did
4    you return?
5        A.    I came and picked up my last
6    check.
7        Q.    Okay.  And who did you meet
8    with?
9        A.    Well, I went down to the
10   office, checks always come on Thursday.  And
11   I went to the office and asked the secretary
12   for my check and she wouldn't give it to me.
13   And about that time, David pulled up and I
14   told him and he went in and got my check.
15   And I haven't been back out there since
16   then.
17       Q.    Okay.  Did she say why she
18   wouldn't give you the check?
19       A.    She said we got paid on
20   Fridays now.
21       Q.    Okay.  Did she ask you to turn
22   in your keys before you could get the check?
23       A.    She got my keys the day I

1    left.
2        Q.    Okay.
3        A.    Well, David did.
4        Q.    Did you say anything to the
5    secretary, when you were in there, about
6    suing Mid State or suing somebody?
7        A.    Nope.
8        Q.    Did you make any kind of
9    disparaging remarks about Sedgefields or any
10   of its employees with the secretary?
11       A.    You finished?
12       Q.    Yes, sir.
13       A.    Only thing that I said to her:
14   is, "I don't work here anymore.  I done got
15   fired for nothing.  Why won't you give me my
16   check?"  And I walked out of the office.
17   And that's when David pulled up and he went
18   in the office and got my check and I left.
19       Q.    Okay.  You know, I asked you
20   earlier in the deposition about what you
21   believe serves as the basis for your
22   complaint that you were discriminated
23   against because of your race.  Who witnessed

1    any of the -- witnessed or observed any of
2    the incidences about which you complained?
3        A.    What I said -- Or what was
4    said?
5        Q.    What was said or what was
6    done, you know.  Who -- What witnesses do
7    you have or do you believe can support your
8    claims that you were discriminated against
9    on the basis of your race?  To put it
10   another way.
11       A.    Same two people that I worked
12   around, that was Jeff Harris and Willie
13   Mack.  And I think I said that four or five
14   times today.
15       Q.    Okay.  And I know you've
16   spoken with Jeff Harris about your claims;
17   right?
18       A.    Yeah.
19       Q.    All right.  When's the last
20   time you've spoken with Mr. Harris?
21       A.    I talk -- I see him all the
22   time.
23       Q.    Why do you see him all the

1    time?
2        A.    We -- Well, by blood, we not
3    cousin, but my first cousin raised him from
4    a baby.  And I just say we are cousins
5    because his -- Well, that's just like his
6    father.
7        Q.    Okay.
8        A.    He's my first cousin.  And me
9    and my first cousin see each other all the
10   time and he be down to his dad's house.
11       Q.    Who is that first cousin that
12   you're referring to?
13       A.    His name is Robert Smith.
14       Q.    Where does he live?
15       A.    It's here in Bullock County,
16   but there's a little community called
17   Ponderosa.
18       Q.    Okay.
19       A.    If I come to town, any time,
20   most of the time I see him.
21       Q.    Okay.  What has Jeff Harris
22   told you about -- Does Jeff believe that he
23   was discriminated against on the basis of

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 173

1  his race?
2    A.    I don't know.
3    Q.    You just told Jeff that you
4  thought you were?
5    A.    Right.
6    Q.    What about Willie Mack, what
7  have you said -- What have you and Willie
8  Mack talked about?
9    A.    Nothing.
10    Q.    Have you told Willie Mack that
11  you felt like you were discriminated
12  against?
13    A.    Since I stopped working at
14  Sedgefields, I have not seen him.
15    Q.    Okay.  Do you know if any of
16  your lawyers have spoken to any employees or
17  former employees of Mid State?
18    A.    I don't know.
19    Q.    Have you spoken to any --
20  Since you -- your employment was terminated,
21  other than Jeff Harris, have you spoken to
22  anyone who works -- who used to work for Mid
23  State?

Page 174

1    A.    Yeah.  Because some of them --
2  Three of them are my neighbors.
3    Q.    Okay.  Who was that?
4    A.    Roy Lee, Demetrius Parham and
5  Henry Tarver.  All of us live, like, right
6  in a circle from each other.
7    Q.    Okay.
8    A.    I could walk to either one of
9  them house is five minutes.
10    Q.    Roy Lee, Demetrius Parham and
11  who else?
12    A.    Henry Tarver.
13    Q.    Okay.  Why isn't Henry Tarver
14  still employed down at Sedgefields, if you
15  know?
16    A.    I don't know.
17    Q.    You haven't talked to him why
18  he's no longer working there?
19    A.    I never asked him.
20    Q.    Well, did he ever tell you?
21    A.    No.
22    Q.    Has anyone ever told you why
23  he's no longer working out at Sedgefields?

Page 175

1    A.    Nope.
2    MR. ROBERSON:  Sedgefields
3  sold the business, didn't they?
4    MR. DUKES:  Yeah.  And, look,
5  I hope I'm not confusing anything.
6  Sedgefields is the -- and I've used it
7  different ways.  Sedgefields is the
8  geographic location, in fact, it's a little
9  point on the map.
10    Q.    Mid State was your employer?
11    A.    Right.
12    Q.    And Mr. Tarver had an
13  opportunity to continue working with the new
14  people that now own Sedgefields, is that
15  correct, to your knowledge?
16    A.    I guess, yeah.
17    Q.    Okay.  And do you know why he
18  is not working with the folks who now own
19  Sedgefields?
20    A.    I just answered that question,
21  no, I don't.
22    Q.    Okay.  Have you talked to --
23  Since your termination, have you talked to

Page 176

1  Mr. Lee about your claims in this lawsuit?
2    A.    No, I haven't.  I see them all
3  the time.  Sometimes I go by his house, he
4  come by mine, we ride horses together.  But
5  as far as this here, the conversation don't
6  come up.
7    Q.    Okay.  Y'all don't talk about
8  it at all?
9    A.    Nope.
10    Q.    Same thing with Demetrius
11  Parham?
12    A.    That's right.
13    Q.    Is there anyone else, other
14  than Jeff Harris or Willie Mack, that may
15  have witnessed or observed any act or
16  comment that you believe was racist in
17  nature?
18    A.    No.
19    MR. ROBERSON:  Other than Joel
20  Norman and David Carroll?  I mean, are you
21  including them?  They would have witnessed
22  these, since they made them.
23    MR. DUKES:  Allegedly.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 177

1    Q.    I'll include those people.
2  Other than Joel Norman, David Carroll, Jeff
3  Harris and Willie Mack, is there anyone else
4  at Mid State who you believe may have
5  witnessed or observed any act or comment of
6  a racist nature?
7    A.    No.
8    Q.    What efforts have you made,
9  since December 28 or 29, 2005, to gain
10 employment?
11   A.    I went to several plantations
12 seeking work, but none of them was hiring.
13   Q.    Okay.  What plantations did
14 you go to?
15   A.    I went to Enon Plantation.  I
16 went to Sehoy Plantation.  I went to Panther
17 Creek Plantation.  I went to Cornerstone
18 Plantation.  I went to White Oak Plantation.
19 And I went to Southern Outdoors Plantation.
20 Those are basically the biggest plantations
21 that's in the county.  Well, White Oak
22 Plantation is in Macon County.
23   Q.    Okay.  Have you ever worked at

Page 178

1  Enon before?
2    A.    Just -- It wasn't what you
3  would say -- Well, I was working with them.
4  It was like during hunting season.  Just say
5  like from October to maybe March.  They was
6  paying me cash money because I wasn't on a
7  payroll.
8    Q.    What kind of work did you do
9  for Enon?
10   A.    Same thing I did at -- Helped
11 with the hunting, did a little Bush Hogging
12 -- well, not Bush Hogging, blocking -- some
13 people call it blocking off and some of them
14 say chopping.  Basically, it's the same
15 thing.
16   Q.    When did you do that work?
17   A.    Back in the '90s.  And then it
18 was -- It was during the time when I was
19 working at Sedgefields.  When I wasn't
20 working, I would go and help them work, you
21 know, like some days that we wasn't hunting
22 or wasn't doing nothing, and I'd get off and
23 go and help them.

Page 179

1    If I know I can go make me a
2  hundred dollars going helping them hunt, and
3  I wasn't going to make it at work, I'd tell
4  a lie to get off work and go and help them.
5    Q.    Okay.  Who did you talk to at
6  Enon about trying to get hired on there
7  after your employment was terminated by
8  Sedgefields, or by Mid State?
9    A.    I only talked to one somebody.
10 Well, I briefly talked to him because he was
11 in a hurry, and that was Cam -- Little Cam
12 Lanier, Junior.  He said -- All he said is
13 they wasn't hiring and he kept riding.
14   Q.    Little Cam?
15   A.    Yeah, Lanier.
16   Q.    Okay.  Let me make sure.  We
17 talked about it just a second ago.  And I
18 want to make sure we've got it right for the
19 Record.  I've used the term "Sedgefields,"
20 and I've also used the name "Mid State."
21 Have you understood who I was talking about
22 when I used those different names?
23   A.    Yes, I did.

Page 180

1    Q.    Okay.  And I don't know how
2  you pronounce this.  Sehoy.
3    A.    Sehoy.
4    Q.    Sehoy, S-E-H-O-Y.  And who did
5  you talk with at Sehoy?
6    A.    I didn't know the guy.  The
7  same man own both places.
8    Q.    Okay.  And did you complete an
9  application, or turn in an application?
10   A.    Said that they wasn't taking
11 no applications.
12   Q.    Okay.  So, when you talked to
13 Little Cam, you were really talking about
14 Enon and Sehoy?
15   A.    Yeah.  It's the one man --
16 It's two different places, but one man own
17 both places.
18   Q.    Okay.  I understand.  Panther
19 Creek.  Who did you talk with at Panther
20 Creek?
21   A.    I think he a Rutledge.  Frank
22 Rutledge, I think that was his name.
23   Q.    And what did he tell you?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 181

1  A. He wasn't hiring.
2  Q. What about Cornerstone?
3  A. The guy that worked there, his
4  name is Mark. I didn't go out to the place.
5  I saw him in town. But I think he's the
6  plantation manager, I saw him in town.
7  MR. ROBERSON: Griggs, Mark
8  Griggs?
9  THE WITNESS: Mark Griggs.
10  Yeah.
11  A. And he told me that he wasn't
12  doing any hiring.
13  Q. What about White Oak? Who did
14  you see at White Oak?
15  A. I don't know those people.
16  I'm saying I don't know them.
17  Q. Did you turn in an
18  application?
19  A. No. He told me if he give an
20  application out or you put an application
21  in, he would consider hiring you, or he said
22  that he was going to be hiring.
23  Q. And so, did you turn in an

Page 182

1  application?
2  A. No.
3  Q. Why not?
4  A. I just told you why. He said
5  if he accept an application, he fixing to
6  hire you or you going to be hired in a few
7  days, that's it, like that.
8  Q. I think I understand what you
9  mean.
10  A. Nobody really was hiring at
11  that time because it was during full time --
12  hunting season in full bloom, and they
13  mostly have their whole crew, what they're
14  going to use.
15  Q. Okay. What about Southern
16  Oak, who did you --
17  A. Southern Outdoors?
18  Q. Yeah. Southern Outdoors. I'm
19  sorry.
20  A. It was a colored guy there.
21  He said --
22  MR. ROBERSON: Tony Gibson?
23  THE WITNESS: Yeah.

Page 183

1  A. That's who own the place, I
2  think, Tony Gibson. And he -- This black
3  guy told me that he wasn't -- they wasn't
4  doing any hiring.
5  Q. Have you applied for
6  employment anywhere else?
7  A. No.
8  Q. Did you apply for unemployment
9  compensation?
10  A. Yes, sir, I did.
11  Q. After you were -- After your
12  employment was terminated?
13  A. Yes, sir.
14  MR. DUKES: Okay. I don't
15  have any of that paperwork.
16  MR. ROBERSON: I don't either.
17  MR. DUKES: Okay. He doesn't
18  have it?
19  MR. ROBERSON: He doesn't
20  either. He can't find any. I'd give it to
21  you if I had it.
22  MR. DUKES: Okay. The only
23  reason I was asking is in your Rule 26

Page 184

1  disclosures, you referenced it.
2  MR. ROBERSON: I assumed we
3  could get it from unemployment, but
4  apparently they said they don't have it.
5  MR. DUKES: That's right.
6  MR. ROBERSON: So I don't know
7  where we are on that. He says he applied,
8  they say he didn't, or they don't have any
9  record of it.
10  Q. Did you get any unemployment
11  compensation benefits?
12  A. No.
13  Q. And did they tell you why you
14  weren't getting any unemployment
15  compensation benefits?
16  A. Well, when I signed up -- When
17  you sign up for unemployment, you have to do
18  it over the phone, and you talk to a
19  computer. And after the computer finishes
20  talking, then you talk to a person.
21  And she told me, "Expect a
22  letter in two to three days," which it came,
23  and it said I would get a hundred and

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 185

1  thirty-one dollars a week.
2      And she told me could -- She
3  said once I got the paper, you know, let me
4  know what I was going to be getting, I could
5  start from that Sunday to that Friday, for
6  my unemployment. So that Monday when I
7  called in and punched all my numbers in and
8  everything, they told me I had been denied
9  unemployment.
10     Q.   Okay. And you didn't make any
11 further inquiry?
12     A.   No.
13     Q.   Okay. When is the last time
14 you've looked for a job?
15     A.   Well, I been, you know,
16 piddling around, helping a guy every now and
17 then, you know, work sometimes one, two days
18 out of the week, and he paying me cash
19 money. And sometime, you know, finding odds
20 and ends, that's how I've been paying my
21 bills.
22     Q.   Who have you been working with
23 a day or two at a time that's been paying

Page 186

1  you cash money?
2      A.   This guy named Jerry Hill.
3  He's a painter.
4      Q.   Does he have a company?
5      A.   Nope.
6      Q.   Where does Jerry live?
7      A.   Midway.
8      Q.   So, you've been doing some
9  painting?
10     A.   Sometimes when he have a
11 little something for me to do, yeah.
12     Q.   How much money have you made
13 from him, or doing painting since -- since
14 January 1, 2006?
15     A.   Well, this here is -- Well, I
16 had a little money saved up I used from most
17 of it, the money that I have been using is
18 my girlfriend's. She's been -- She's on
19 disability, and she been helping me with my
20 bills.
21     Q.   Okay. How much money have you
22 made painting or working for Jerry Hill
23 since January 1, 2006?

Page 187

1      A.   I only worked with him just --
2  This here just started, like, in June, I'd
3  say over the -- from June up until now,
4  maybe about six, seven hundred dollars,
5  something like that.
6      Q.   Okay. Have you worked
7  anywhere else?
8      A.   No.
9      Q.   Have you applied for
10 employment anywhere else?
11     A.   No.
12     Q.   Have you applied for
13 employment at C&W?
14     A.   No.
15     Q.   How many times have you worked
16 at C&W?
17     A.   Twice.
18     Q.   Okay. I think you only told
19 me one time. When was the other time? You
20 told me about working there right before you
21 started working at -- working for Mid State
22 the second time. When was the other time
23 you worked for C&W?

Page 188

1      A.   It was in 2003, I believe it
2  was, 2003, 2002, something like that.
3      Q.   How long did you work there
4  during that time?
5      A.   About -- I don't know, maybe
6  about three months.
7      Q.   This was during the time you
8  were employed at --
9      A.   No. I wasn't employed at
10 Sedgefields then.
11     Q.   Okay. And how long were you
12 working, about three months at C&W that
13 time?
14     A.   Yes.
15     Q.   And why did you leave their
16 employment at that time?
17     A.   I went back to where I usually
18 work at -- where I had been working at Frog
19 Pond Turf. In the wintertime, you've got a
20 choice out there, because the work is real
21 slow. You might work two or three hours a
22 day, you either draw your unemployment, or
23 you can take a chance on getting a good

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 189

1 week.
2          And when that job -- Before I
3 signed up for unemployment, I went and
4 applied for that job there and I got on
5 there and I never did have to sign up for my
6 unemployment. Well, I had signed up for it,
7 but by the time a check came, I had started
8 working.
9     Q.    So, you've drawn unemployment
10 compensation benefits in the past?
11    A.    Yeah.
12    Q.    On how many occasions do you
13 think you've drawn unemployment compensation
14 benefits?
15    A.    I don't know. A couple of
16 times.
17    Q.    More than five?
18    A.    No.
19    Q.    Less than five?
20    A.    Yeah. Less than five.
21    Q.    When is the last time you've
22 talked with someone at Enon, Sehoy, Panther
23 Creek, Cornerstone, White Oak, or Southern

Page 190

1 Outdoors about a job?
2    A.    Not since I applied for one.
3    Q.    When was the last time you
4 applied for a job with one of those
5 companies?
6    A.    I don't know. Probably been
7 February.
8    Q.    Okay. Where have you sought
9 employment since February of 2006?
10    A.    Nowhere. See, I didn't
11 understand that.
12    Q.    Where have you sought
13 employment since February of 2006?
14    A.    That was it. Besides no --
15 You know, like I said, little piddling
16 around work.
17    Q.    And the only piddling around
18 work is this with Jerry Hill in Midway,
19 painting; is that right?
20    A.    This another guy, Albert
21 Perry, he do vegetables and stuff. I go by
22 there sometime and he might have, you know,
23 something for me to do that day, sometimes

Page 191

1 two days, you know.
2    Q.    I think you said you got six
3 or seven hundred dollars from Jerry Hill
4 doing painting work.
5    A.    Yeah.
6    Q.    How much money have you been
7 paid since January 1, 2006, just doing
8 piddling around work?
9    A.    I don't know. Maybe a
10 thousand dollars.
11    Q.    Who have you done piddling
12 around work for, other than Albert Perry?
13    A.    Jerry Hill.
14    Q.    What work have you done for
15 Jerry Hill?
16    A.    Painting.
17    Q.    I'm sorry. Other than for
18 Albert Perry and Jerry Hill, what other work
19 have you -- Have you worked for anybody
20 else?
21    A.    No. Like I said, my
22 granddaddy might call me and say, "I got
23 some pipes that need fixing or a tire or

Page 192

1 something needs changing or something need
2 fixing," I go and do that for him and he
3 give me five, ten, fifteen dollars,
4 something like that.
5    Q.    Okay. Do you intend to try to
6 get on with Enon, Sehoy, Panther Creek,
7 Cornerstone, White Oak or Southern Outdoors
8 this fall?
9    A.    Yes. If they hire me, I
10 definitely am.
11         (Off-the-Record discussion
12          was held.)
13    Q.    In your complaint that I
14 showed you earlier, you allege that you have
15 suffered damages as a result of the -- as a
16 result of Mid State's conduct. What damages
17 have you sustained?
18    A.    Lights done been cut off,
19 water done been cut off, I had to moved
20 twice. If I was working, it would never
21 happen.
22    Q.    Anything else? Do you claim
23 that you've suffered mental anguish or

48  (Pages 189 to 192)

# FREEDOM COURT REPORTING

Page 193

1 emotional distress?
2    A.    Of course, I have. If I was
3 working, it wouldn't be like that.
4    Q.    What sources of income do you
5 have currently?
6    A.    None.
7    Q.    Okay. And you live off your
8 girlfriend's disability?
9    A.    I ain't said I live off her
10 disability, I said she helps me out from
11 time to time. I live from day to day, the
12 best way I can.
13    Q.    And y'all live together?
14    A.    Right.
15    Q.    How much disability does she
16 get a month?
17    A.    I don't know. I don't know.
18    Q.    Have you been to -- When is
19 the last time you've been to a doctor?
20    A.    It's been a few years, besides
21 going to a dentist last year. I don't have
22 no reason to go, because I'm not sick and
23 nothing ever wrong with me.

Page 194

1    Q.    Okay. Who was the last doctor
2 you went to?
3    A.    Dr. Rumph.
4    MR. ROBERSON: R-U-M-P-H; is
5 that right?
6    THE WITNESS: Uh-huh.
7    Q.    Where is he?
8    A.    Right here on this corner, in
9 Union Springs.
10    Q.    What did you see him for?
11    A.    I was doing Bush Hogging -- I
12 was doing some Bush Hogging one weekend for
13 this guy, and a limb got hung behind a pipe
14 of the tractor and I was looking back, and
15 by the time I turned around, it hit me right
16 across here (indicating).
17    Q.    Have you ever -- When is the
18 last time you've been to a hospital?
19    A.    I ain't never been in a
20 hospital but once in my life.
21    Q.    When was that?
22    A.    I don't even remember. It had
23 to been around in the '80s sometimes.

Page 195

1    Q.    Which hospital would that have
2 been?
3    A.    It was here in Union Springs.
4    Q.    What about the VA Hospital in
5 Tuskegee?
6    A.    Nah.
7    Q.    Have you ever been there?
8    A.    Yeah, I've been there.
9    Q.    What were you --
10    A.    A physical.
11    Q.    Anything else?
12    A.    That's it.
13    Q.    Has there been anything else
14 that's happened in your life that's caused
15 you mental anguish and emotional distress,
16 other than your work at Mid State?
17    A.    No. No more than one time
18 when my mother passed, you know, I got a
19 little depressed and stuff about that, but
20 other than that, no.
21    Q.    When did your mother pass?
22    A.    '89.
23    Q.    Has it caused you any mental

Page 196

1 anguish or emotional distress about --
2    A.    No.
3    MR. ROBERSON: Let him finish
4 his question.
5    Q.    If I was smart enough, I could
6 change my question midway through, but I'm
7 not smart enough. Has it caused you any
8 mental anguish or emotional distress, the
9 fact that you've had these, and I'll just
10 say actions, asserted against you for child
11 support?
12    A.    No. Because I knew they were
13 my children, and that's what I was used to,
14 they taking my money out of my check.
15 That's reason I got to always work two jobs
16 most of the time.
17    Q.    Okay. But if you're getting
18 paid in cash, nothing is being taken out of
19 your pay, is it?
20    A.    No. But that don't stop me
21 from taking care of my children.
22    Q.    Well, do you make the child
23 support payments, even though you're getting

49 (Pages 193 to 196)

# FREEDOM COURT REPORTING

Page 197

1   paid in cash?
2       A.    Yeah.  No, no.  I give money
3   to my kids, well, their mothers.
4       Q.    Have you tape-recorded any
5   conversation with any employee or former
6   employee of Mid State?
7       A.    No.
8       Q.    Do you have any notes or
9   diaries or calendars that would record any
10  -- any of your reflections about your
11  employment at Mid State?
12      A.    No.
13      Q.    Have you ever sued anybody
14  before?
15      A.    No.  Never had a reason.
16      Q.    Have you ever been sued
17  before?
18      A.    No.
19      Q.    What did you do to prepare for
20  your deposition today?
21      A.    I don't understand.
22      Q.    What did you do to prepare for
23  your deposition today?

Page 198

1       A.    Nothing.
2       Q.    Did you review any documents?
3       A.    No.  I didn't have any to
4   review.
5       Q.    You've never filed for
6   bankruptcy, correct?
7       A.    Right.
8       Q.    Who have you spoken to
9   concerning the claims that you make in this
10  lawsuit?
11      A.    My lawyers.
12      Q.    Anybody else?
13      A.    Nope.  I talked to my
14  grandfather.
15      Q.    What does he have to say about
16  it?
17      A.    Do what you got to do.
18      Q.    I'm always curious about this.
19  How did you find your lawyers?  I don't want
20  to know anything that you've said to your
21  lawyers or anything that they've said to
22  you.  I'm just curious how you found your
23  lawyers.

Page 199

1       A.    They was referred to me from a
2   friend.
3       Q.    Okay.  Who referred them to
4   you?
5       A.    A friend of mine.
6       Q.    What was his name or her name?
7       A.    His name is Sammy Rogers.
8       Q.    Did they represent Sammy in
9   another case?
10      A.    I think he did years ago.
11      Q.    Okay.  When is the last time
12  you have filed State or Federal tax returns?
13      A.    This year, this past year.
14            MR. ROBERSON:  You filed a tax
15  return?
16            THE WITNESS:  This past year.
17            MR. ROBERSON:  You did?
18            THE WITNESS:  Yeah.
19            MR. ROBERSON:  Where is it?
20            THE WITNESS:  Talking about
21  the money?
22            MR. ROBERSON:  Where is a copy
23  of your tax return, yeah?

Page 200

1             THE WITNESS:  At home, I
2   guess.
3       Q.    When was the last time -- Are
4   you talking about you filed a tax return for
5   your income that you earned in 2005?
6       A.    Yeah.
7             MR. ROBERSON:  Did you prepare
8   it or who did?
9             THE WITNESS:  No.  My aunt
10  did.
11            MR. ROBERSON:  Can you get us
12  a copy?
13            THE WITNESS:  Yeah.  I can go
14  and see.
15      Q.    Is that State and Federal tax
16  returns for 2005?
17      A.    Yeah.
18      Q.    Before 2005, when was the last
19  time you filed a State or a Federal tax
20  return?
21      A.    I don't remember.  It's been
22  some years.
23      Q.    Well, have you filed any tax

50  (Pages 197 to 200)

# FREEDOM COURT REPORTING

Page 201

1  returns within the ten years preceding that?
2      A.    Yeah.  Maybe once, one time.
3          MR. DUKES:  Let me just say
4  for the Record that, you know, I'll conclude
5  this deposition at the end, regardless of
6  what I say, with the opportunity to reopen
7  the deposition as to any tax returns.
8          MR. ROBERSON:  I agree.
9          MR. DUKES:  Yeah.  I mean, I
10  don't anticipate that being an issue, but
11  just to protect myself.
12          MR. ROBERSON:  Well, I agree,
13  if he's filed tax returns, you're entitled
14  to examine him about it.  I agree with that.
15  I apologize.  I thought we had plowed this
16  ground.
17      Q.    The fact that Mary Jenkins
18  filed a child support action against you,
19  did that cause you any mental anguish or
20  emotional distress?
21      A.    No.
22      Q.    Have any of your arrests
23  caused you any mental anguish or emotional

Page 202

1  distress?
2      A.    I didn't understand.
3      Q.    Have any of your arrests
4  caused you any mental anguish or emotional
5  distress?
6      A.    No, sir.
7      Q.    Have you ever applied for
8  Social Security Disability benefits?
9      A.    No.
10      Q.    You know something, I didn't
11  -- I failed to talk to you about.  I
12  apologize.  On Defendant's Exhibit 3, page
13  25, is this formal reprimand.  Is this the
14  occasion that we were talking about where
15  Mr. Norman saw you and Jeff Harris riding
16  the horses, and he thought you should have
17  been in the barn working?
18      A.    Yeah.  I tried calling him, I
19  don't know five, six times over the radio,
20  and he didn't answer, because the clippers
21  had tore up, what we were shaving the horses
22  with.
23          And I told Jeff, "He come back

Page 203

1  to the barn and see us standing around,
2  ain't shaving, even though he know the
3  clippers is tore up, it going to be a bunch
4  of mess."
5          I said, "We got these new
6  horses."  I said, "Let's just ride around
7  the block, around the circle, just try them
8  out, see how they was," which that is a part
9  of the job.
10      Q.    Uh-huh.
11      A.    And when I got back, he said
12  we didn't -- that -- Well, he had already
13  went and wrote this up by the time we had
14  went and came back from where we had went
15  to.  He had already went and got this.  Then
16  he told us if we didn't sign it, that we
17  were going to be determinated (sic) that
18  day.
19          He ain't got nothing about
20  that down there about the clippers, towards
21  the reason why we did that.
22      Q.    Did you and Mr. Harris go and
23  smoke marijuana when you went off to ride

Page 204

1  the horses that day?
2      A.    I told you one time, I don't
3  smoke marijuana at work, I do it off work.
4      Q.    Okay.  Other than the pay that
5  you've received for, I think that you
6  described it as piddling here and there, and
7  the money that your girlfriend has given
8  you, have you received any welfare or public
9  assistance or charitable gifts?
10      A.    No.
11      Q.    Are you on any prescription
12  medication?
13      A.    No.
14      Q.    When is the last time you've
15  used any prescription medication?
16      A.    I don't know.  It's been some
17  years.
18      Q.    What pharmacy did you use?
19      A.    Main Drug Store.
20      Q.    Main Drug Store?
21      A.    Right.
22      Q.    Is that here in Union Springs?
23      A.    Right.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 205

1      Q.     You know, have you ever heard
2   of the phrase or the saying, "Hindsight is
3   20/20?"
4      A.     I didn't understand you.
5      Q.     Have you ever heard people
6   say, "Hindsight is 20/20?"
7      A.     What's hindsight?
8      Q.     That means looking back on
9   things that have happened, you can always
10  see things more clearly, looking back than
11  as they're happening.  Do you see what I
12  mean by that?
13         Like looking back at my life,
14  I can see situations where I wish I would
15  have done things differently or I wish I
16  would have taken a different fork in the
17  road or I'm glad I took a certain fork in
18  the road.
19         Looking back at your
20  employment at Mid State, is there anything
21  that you wish you would have done
22  differently?
23     A.     No.  Because I did my job the

Page 206

1   whole while I was working at Mid State.  I
2   don't have no regrets, because I know I did
3   my job.
4      Q.     In my deposition notice, I
5   asked you to provide me with all documents
6   that were responsive to the interrogatories
7   -- that were identified in your
8   interrogatory answers or that were
9   responsive to your request for production.
10  Other than the 2005 tax returns, are there
11  any other documents that you have not
12  produced to me that would comply with that
13  request?
14     A.     No.
15     Q.     What's the longest time you've
16  been unemployed for?
17     A.     Like I am now.  This job --
18  This last job.
19     Q.     Why haven't you applied for
20  employment at C&W or Frog Turf or any of
21  those other places?
22     A.     Because it's been slow, the
23  work we doing because it's been so dry.

Page 207

1   This has been one of the driest years
2   there's been and they ain't been selling
3   that much grass.  Mexicans got all them
4   jobs.
5      Q.     Okay.
6      A.     They've mostly got Mexicans
7   working for them now, very few.
8      Q.     What about, like, at the
9   McDonald's or anything like that, have you
10  applied for employment there?
11     A.     No.
12     Q.     Why not?
13     A.     That's a lady's job.
14     Q.     Okay.
15     A.     I always worked outside all my
16  life.  That's the kind of work I like doing,
17  on the outside, hot or cold.
18     Q.     So, you haven't applied for
19  any inside jobs?
20     A.     No, sir.
21     Q.     Because you don't like inside
22  jobs?
23     A.     I didn't say I wouldn't work

Page 208

1   on the inside, I said I would prefer to work
2   on the outside because that's what I like
3   doing, outdoors.
4      Q.     Have you gone to the
5   Department of Industrial Relations and seen
6   if they could have helped you find a job?
7      A.     What's that?
8      Q.     Have you gone anywhere to see
9   if someone could help you try to find a job?
10     A.     No.
11     Q.     Why not?
12     A.     I always find a job on my own.
13         MR. DUKES:  I think that's all
14  I've got, but let me take a break.
15         MR. ROBERSON:  Sure.
16            (Recess taken.)
17  (The deposition was concluded at 2:55 p.m.,
18  September 7, 2006.)
19
20
21
22
23

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 209

```
 1        REPORTER'S CERTIFICATE
 2   STATE OF ALABAMA,
 3   ELMORE COUNTY,
 4        I, Angela Smith, Registered
 5   Professional Reporter and Commissioner for
 6   the State of Alabama at Large, do hereby
 7   certify that the above and foregoing
 8   proceeding was taken down by me by
 9   stenographic means, and that the content
10   herein was produced in transcript form by
11   computer aid under my supervision, and
12   that the foregoing represents, to the best
13   of my ability, a true and correct
14   transcript of the proceedings occurring on
15   said date and at said time.
16        I further certify that I am neither
17   of kin nor of counsel to the parties to the
18   action; nor in any manner interested in the
19   result of said case.
20
21
         _____
22       Angela Smith, RPR, CRR,
         for the State of
23       Alabama at Large.
```

53 (Page 209)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# American Court Reporting
## toll-free (877) 320-1050

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CIVIL ACTION NUMBER
2:06-CV-00405-ID-SRW

NORRIS FOSTER,
    Plaintiff,
vs.
MID STATE LAND & TIMBER COMPANY, INC.,
d/b/a SEDGEFIELDS PLANTATION,

    Defendant.

THE VIDEOTAPED

DEPOSITION TESTIMONY OF:

JOEL NORMAN

September 8, 2006

9:11    a.m.

COURT REPORTER:

Gwendolyn P. Timbie, CSR

---

**Page 3**

1 leading questions, and that counsel for
2 the parties may make objections and assign
3 grounds at the time of trial or at the
4 time said deposition is offered in
5 evidence, or prior thereto.
6     Please be advised that this is the
7 same and not retained by the Court
8 Reporter, nor filed with the Court.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

---

**Page 2**

1     S T I P U L A T I O N S
2     IT IS STIPULATED AND AGREED by and
3 between the parties through their
4 respective counsel that the videotaped
5 deposition of JOEL NORMAN, may be taken
6 before Gwendolyn P. Timbie, Certified
7 Shorthand Reporter and Notary Public,
8 State at Large, at the law office of John
9 Waters, Union Springs, Alabama, on
10 September 8, 2006, commencing at
11 approximately 9:11 a.m.
12     IT IS FURTHER STIPULATED AND
13 AGREED that the signature to and the
14 reading of the deposition by the witness
15 is not waived, the deposition to have the
16 same force and effect as if full
17 compliance had been had with all laws and
18 rules of Court relating to the taking of
19 depositions.
20     IT IS FURTHER STIPULATED AND
21 AGREED that it shall not be necessary for
22 any objections to be made by counsel to
23 any questions, except as to form or

---

**Page 4**

1     I N D E X
2 EXAMINATION BY:     PAGE NO:
3 Mr. Roberson     9
4 Mr. Dukes     203
5 Certificate     206
6 Instructions to Witness     207
7 Signature Page     209
8 Errata Sheet     210
9
10     LIST OF EXHIBITS
11 EXHIBITS:     PAGE NO:
12 Plaintiff's 1     15
13 Plaintiff's 2     64
14 Plaintiff's 3     65
15 Plaintiff's 4     82
16 Plaintiff's 5     89
17 Plaintiff's 6     97
18 Plaintiff's 7     101
19 Plaintiff's 8     120
20 Plaintiff's 9     121
21 Plaintiff's 10     123
22 Plaintiff's 11     126
23 Plaintiff's 12     133

**American Court Reporting**
**toll-free (877) 320-1050**

Page 5

INDEX OF EXHIBITS (Continued)

1
2
3    EXHIBITS:               PAGE NO:
4    Plaintiff's 13           135
5    Plaintiff's 14           146
6    Plaintiff's 15           164
7    Plaintiff's 16           168
8    Plaintiff's 17           169
9    Plaintiff's 18           202
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 6

A P P E A R A N C E S

FOR THE PLAINTIFF:
    JERRY ROBERSON, Esquire
    Roberson & Roberson
    8 Office Park Circle
    Suite 150
    Birmingham, Alabama 35223
    ALBERT H. ADAMS, JR., Esquire
    Irby Law Firm, LLC
    Post Office Box 910
    Eufaula, Alabama 36072


FOR THE DEFENDANT:

    CARTER H. DUKES, Esquire
    Huckaby, Scott & Dukes, P.C.
    2100 Third Avenue North
    Suite 700
    Birmingham, Alabama 35203


ALSO PRESENT:

    DAVID CARROLL


VIDEOGRAPHER:

    CHRISTI MAZE

Page 7

I, Gwendolyn P. Timbie, Certified Shorthand Reporter and Notary Public for the State of Alabama at Large, acting as Commissioner, certify that on this date, pursuant to the Federal Rules of Civil Procedure, and the foregoing stipulation of counsel, there came before me at the law office of John Waters, Union Springs, Alabama, commencing at approximately 9:11 a.m., on September 8, 2006, Joel Norman, witness in the above cause, for oral examination, whereupon the following proceedings were had:

THE VIDEOGRAPHER: This deposition is being taken of Joel Norman on this, the 8th day of September 2006, in the case of Norris Foster versus Mid State Land and Timber Company, Inc., d/b/a Sedgefields Plantation. This case is set

Page 8

in the United States District Court for the Middle District of Alabama, Northern Division; Civil Action Number 2:06-CV-00405-ID-SRW.

Would Counsel please state their names and who they represent?

MR. ROBERSON: My name is Jerry Roberson. I represent the plaintiff, Norris Foster.

MR. DUKES: My name is Carter Dukes, and I represent Mid State.

MR. ADAMS: My name -- my name is Albert Adams. I represent Norris Foster, the plaintiff.

THE VIDEOGRAPHER: Court Reporter, please swear the witness.

JOEL NORMAN,
Having been first duly sworn, was examined and testified as follows:

THE REPORTER: And will these be usual stipulations?

2 (Pages 5 to 8)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 9

1    MR. ROBERSON: They will.
2    MR. DUKES: Please.
3    MR. ROBERSON: Is he going to
4  waive signature, Carter?
5    MR. DUKES: No. He'll read
6  and sign.
7    MR. ROBERSON: All right.
8
9  EXAMINATION BY MR. ROBERSON:
10    Q    Mr. Norman, my name is Jerry
11  Roberson. We met before the deposition.
12  But I represent Norris Foster.
13    You know Norris?
14    A    Yes, sir.
15    Q    Okay. And are you -- did you
16  work formerly -- until the -- Sedgefields
17  was sold in May of 2006. Did you work for
18  Sedgefields, Mid State Land and Timber
19  Company?
20    A    Yes, sir.
21    Q    Okay. And you're still
22  working out there; right?
23    A    I'm still on the property.

Page 10

1    Q    For the new owner; correct?
2    A    Yes, sir.
3    Q    Tolleson --
4    A    That's right.
5    Q    -- bought -- bought the
6  property in May; isn't that right?
7    A    Right around in there.
8    Q    All right. Have you ever
9  given a deposition before?
10    A    No, sir.
11    Q    Okay. Well, it's not hard.
12    A    No.
13    Q    You just need to listen to my
14  question and answer it truthfully.
15    A    Right.
16    Q    Is that fair?
17    A    Yes, sir.
18    Q    And you need to make sure you
19  understand what I'm asking you because, if
20  you answer, I'll assume that you
21  understood me.
22    A    Right.
23    Q    Is that fair enough?

Page 11

1    A    Yes, sir.
2    Q    So if you don't understand it,
3  tell me.
4    A    Okay.
5    Q    And I'll try to rephrase it.
6  And you know that today you're under
7  oath --
8    A    Yes, sir.
9    Q    -- right? And you have to
10  tell the truth.
11    Tell me, what is your age, please,
12  sir.
13    A    Forty-seven.
14    Q    And are you married?
15    A    Yes, sir.
16    Q    Who are you married to?
17    A    Tina.
18    Q    Tina Norman?
19    A    That's right.
20    Q    Have you ever been married
21  before?
22    A    Yes, sir.
23    Q    What -- did that marriage end

Page 12

1  in divorce?
2    A    It did.
3    Q    When did you and Tina get
4  married?
5    A    September the 17th.
6    Q    Of 2005?
7    A    Yes, sir.
8    Q    Okay. Now, when did -- who
9  were you married to before Tina?
10    A    Melanie.
11    Q    Melanie? And what's her last
12  name now?
13    A    I assume it's still Norman.
14    Q    How long were you married to
15  Melodie?
16    A    Probably nineteen years.
17    Q    Is that --
18    A    Somewhere around -- about
19  nineteen years. I'm not going --
20    Q    Yes, sir.
21    A    Eighteen, nineteen.
22    Q    Is that -- how do you spell
23  her first name?

3 (Pages 9 to 12)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 13

1    A    M-E-L-A-N-I-E.
2    Q    And that marriage ended in
3  divorce where?  What county?
4    A    Thomas County, Georgia.
5    Q    Did you and Melanie have any
6  children?
7    A    Yes, sir.
8    Q    Who -- how many, and what are
9  their names and ages?
10    A    We've got four.  The oldest is
11  twenty-one, and his name is Joel Samuel
12  Norman, III.  Everybody -- I mean --
13  yeah.  They call him Trey.  Better known
14  as Trey.
15    Q    Okay.
16    A    Jason Lamar Norman, age
17  nineteen; Sarah Elizabeth Norman,
18  seventeen; and Joshua James Norman, age
19  twelve.
20    Q    Now, where do those children
21  live?
22    A    Three of them are with me, and
23  the -- the three younger are with me, at

Page 14

1  this point, and the oldest one is in
2  Mooresville, North Carolina, working and
3  living on his own.
4    Q    Are your three children that
5  live -- do they live with you and
6  Melanie?
7    A    They live with me.
8    Q    Okay.  They don't live with
9  Melanie?
10    A    They -- she had -- I have
11  custody.  She has visitation that she does
12  not exercise.
13    Q    Okay.  Do they live with you
14  and Tina, then?
15    A    Yes.  Yes.
16    Q    Okay.  You and Tina don't have
17  any children?
18    A    No.
19    Q    Okay.  Now, had you ever been
20  married before?
21    A    No, sir.
22    Q    So you've just been married
23  twice?

Page 15

1    A    That's right.
2    Q    Okay.  Now, do any of your
3  children go to school?
4    A    The two younger ones go to
5  school.
6    Q    Where do they go to school?
7    A    They go to Macon East
8  Montgomery Academy.
9    Q    Is that a private school?
10    A    It is.
11    Q    How do they get to that
12  school?
13    A    They drive this year.  She --
14  my daughter drives this year.
15    Q    So she can drive both of them
16  to that school?
17    A    That's right.  And she car --
18  takes some more with her.  Carpooling.
19    (WHEREUPON, a document was
20  marked as Plaintiff's Exhibit Number 1 and
21  is attached to the original transcript.)
22    Q    Now, I want to show you what
23  I'll mark as Exhibit 1 to your deposition,

Page 16

1  and ask you if this is the application
2  that you completed before you went to work
3  at -- for Mid States, at Sedgefields.  All
4  right, sir.
5    Mr. Norman, did you complete an
6  application before you went to work there?
7    A    I completed a bunch of
8  paperwork.  I -- I'm sure -- I'm sure an
9  application was in there.
10    Q    Okay.  Well, take a minute to
11  look at that.  But I've asked for your
12  personnel file, and Mr. Dukes has provided
13  some documents to me in response to that
14  request, and that's a portion of those
15  records.
16    A    Yes, sir.  That's my signature
17  there.
18    Q    Okay.
19    A    I filled -- I filled that out.
20    Q    Okay.  And that -- that
21  includes information about your education,
22  your previous work experience, that type
23  thing; correct?

4  (Pages 13 to 16)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 17

1   A   Most of it. There's -- I
2   mean, that's as far as was necessary
3   on the -- I -- I -- I worked for other
4   places.
5   Q   Oh, you mean you didn't put
6   all the places that you've worked?
7   A   I put what was necessary.
8   Q   I see.
9   A   But --
10  Q   Well, maybe you had a job that
11  you only worked for two or three weeks and
12  maybe didn't put that?
13  A   Never. I've never worked
14  anywhere two or three weeks.
15  Q   Oh, okay. Well, you didn't
16  list all your employment; is that right?
17  A   No, sir.
18  Q   Okay.
19  A   It don't look -- I didn't -- I
20  didn't see them on there, now.
21  Q   All right. Well, you've
22  been -- it says on here you've been bird
23  dog training and handling for twenty-seven

Page 18

1   years. Is that a true statement?
2   A   It's right at approximately
3   twenty-seven years.
4   Q   Okay. And you were a
5   plantation manager for seven years?
6   A   Yes, sir.
7   Q   Okay. And when you filled
8   this out -- looks like you applied on
9   September 1st of '05.
10  A   That -- that's about --
11  Q   Does that sound right?
12  A   Yeah. Somewhere right along
13  in there.
14  Q   Okay. And did you attend high
15  school in Thomasville, Georgia?
16  A   I did. Thomas County --
17  Thomas County schools.
18  Q   Okay. And you graduated --
19  A   Yes.
20  Q   -- at Thomas County schools?
21  And then did you further your education
22  after that?
23  A   Yes, sir.

Page 19

1   Q   Where did you attend college?
2   A   Abraham Baldwin Agriculture
3   College, Tifton.
4   Q   Okay. And did you -- is that
5   a junior college?
6   A   It -- it is, yes. About the
7   same thing.
8   Q   I mean, it -- they have
9   two-year degrees?
10  A   Two-year degrees. And you --
11  or you can take your first two years there
12  and move on, you know.
13  Q   Okay.
14  A   It's also -- transfer.
15  Q   And so you got an associate
16  degree, a two-year degree --
17  A   That's right.
18  Q   -- in wildlife technology --
19  A   That's right.
20  Q   -- is that correct? When did
21  you finish that college?
22  A   I think my -- I actually may
23  have received my diploma in '86, but I had

Page 20

1   finished all my core -- all my classes
2   probably in, just guessing, '82 or three.
3   I'm -- I'm not sure. But I had to
4   finish -- I had to take a remedial English
5   class, and I did that several years after
6   I had completed all my stuff. And I got
7   my degree several years after I had quit
8   attending ABAC.
9   Q   And when did you graduate high
10  school, please, sir?
11  A   '77.
12  Q   Okay. So you think you got
13  your degree -- your two-year degree about
14  nine years after you completed high
15  school. Would that be fair?
16  A   That probably -- I've got a
17  diploma at home I could look at, but I did
18  -- it was not relevant, you know, to me.
19  Q   Okay. Well, after you
20  finished high school, where did you work,
21  please, sir?
22  A   After I finished high school,
23  I worked for -- let me see. After I

**www.AmericanCourtReporting.com**
**September 8, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 21

1　finished high school, I probably worked
2　for my wife's family, farming.
3　　Q　Your fir -- first wife?
4　　A　Yes.
5　　Q　And did they have a -- the
6　name to that farm or --
7　　A　Hurst Farms.
8　　Q　Hurst?
9　　A　Hurst Farms.
10　　Q　Can you spell that for me?
11　　A　H-U-R-S-T.
12　　Q　Where were they located?
13　　A　In Ochlocknee, Georgia.
14　　Q　I'm really not familiar with
15　where that is.
16　　A　That's North Thomas County.
17　　Q　Okay.  And what did you do for
18　them?
19　　A　I run farm equipment.
20　　Q　Drove a tractor?
21　　A　Just worked on the farm.  They
22　had --
23　　Q　Did you get paid?

Page 22

1　　A　Yes, sir.
2　　Q　Did you file tax returns?
3　　A　I think so, but I'm not for
4　sure.  I mean, that's -- I think it was --
5　it was farm labor.  I don't remember.
6　Seems to me like I -- I can't remember, to
7　tell you the truth.
8　　Q　Huh.
9　　A　You know, it was --
10　　Q　Well, did you get a W2?
11　　A　At some point, I know I -- I
12　probably did.  But to begin with, it was
13　part time.  You know, I had school on the
14　weekends and that sort of stuff.  I might
15　not have been required to.  I'm not -- you
16　know, at that point.
17　　Q　Did you get a W2 from him?
18　　A　I can't remember.  It was so
19　far back.
20　　Q　Yeah.  Well, how -- how long
21　did you work on the farm there for the
22　Hurst family?
23　　A　Till -- till I started to

Page 23

1　college.
2　　Q　Okay.  And what was your next
3　job?
4　　A　When I -- while I was going to
5　college, I took a job with the Riverview
6　Plantation in Camilla, a seasonal job, as
7　a hunting guide.
8　　Q　Okay.  Now, before you started
9　working with -- at the -- what did you
10　call it?  The plantation?
11　　A　Riverview Plantation.
12　　Q　Riverview.  Before you started
13　working at Riverview, had you ever had any
14　work experience in the gui -- as a guide
15　or on a plantation?
16　　A　No, sir.
17　　Q　All you had done was farm
18　work.
19　　A　Farm work.
20　　Q　Is that fair?
21　　A　Farm work.
22　　Q　Okay.  And, then, when did you
23　begin at the Riverview Plantation?

Page 24

1　　A　I -- seems like '81, but I'm
2　-- I'm not -- I'm not -- I'm not sure.
3　I'd have to go back and do a little
4　digging up.  It may have been before
5　then.  It was three years.  It was three
6　years.  I think I started college in
7　probably seventy -- I don't know if I -- I
8　-- I'm -- it's about -- I'm not real sure,
9　but it was probably after I had been in
10　college for about a year.  And they
11　offered this summertime program.  And
12　during the summer, they offered a program
13　where they'd come over and interview
14　people for guides -- seasonal guides.  And
15　I started doing that every season.
16　　Q　Okay.
17　　A　For three years.
18　　Q　Now, you didn't list that on
19　your resume here.
20　　A　I probably didn't.  I probably
21　discussed it with David.
22　　Q　Okay.
23　　A　You know, I -- I didn't even

**www.AmericanCourtReporting.com**
**September 8, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 25

1   do a formal resume, as far as that goes.
2       Q     All right.  So you worked for,
3   you think, about three years, doing
4   seasonal work?
5       A     Well, two years was seasonal;
6   the last one, I worked there for about a
7   year solid.  I -- I -- after the hunting
8   season, I got on the farm crew and worked
9   there for probably another six months.
10      Q     And what kind of work were you
11  doing there as a guide and -- and -- on
12  the plantation?
13      A     We would put quail out for
14  paying guests, take the dog -- take the --
15  go pick the guests up and take them out
16  with the dogs.  And they would find the
17  birds, shoot the birds.  Just entertain
18  them, you know, on a quail hunt.
19      Q     How much did you charge folks
20  for doing something like that?
21      A     Well, I -- I didn't charge.  I
22  was paid a --
23      Q     Well, Riverview charged.

Page 26

1       A     I was paid a salary and a --
2   you know, and -- and -- a tip, which was a --
3   was a standard tip.  They -- I don't
4   remember.  It seems like then it was,
5   like, two fifty a day, and that -- and
6   that was, you know, a long time ago.  It
7   was a lot of money.
8       Q     Okay.  And -- but you were
9   paid a salary.  A weekly salary?
10      A     I was paid a salary, yes.
11      Q     Or was it by the trip?
12      A     No.  It was -- it was a set
13  salary.  It seemed like it was twice a
14  month, if I'm not mistaken.
15      Q     And there's a lot of work that
16  goes into the preparation of those hunting
17  trips; correct?  You have to get your
18  property ready to hunt; right?
19      A     Sure.
20      Q     Okay.  So you're working even
21  when you're not doing guide work.
22      A     That's right.
23      Q     Is that fair?

Page 27

1       A     That's right.
2       Q     Because you've got to get
3   everything ready for the hunt.
4       A     That's right.
5       Q     Correct?
6       A     That's right.
7       Q     And that takes a lot of time
8   and effort, doesn't it?
9       A     Yes, sir.
10      Q     And you got paid a salary, as
11  a hunting guide; correct?
12      A     Yes.
13      Q     And you got paid a tip?
14      A     That's right.
15      Q     Correct?  And did -- did you
16  depend on those tips?
17      A     It was -- it was -- yes.  But
18  it was upfront.  We knew what it was --
19  how it was going to be, you know.  It
20  was --
21      Q     How was it going to be?
22      A     We got paid at that point.  It
23  was a set rate.  It was twenty-five

Page 28

1   dollars per day that you hunted.  You
2   didn't -- if you didn't hunt that day, you
3   didn't get that -- that deal.  It was --
4   it was factored in when they hired us.
5   They told us, you know, exactly what it
6   was going to be, so we could consider that
7   as part of the -- taking the job.
8       Q     Yeah.  Well, does -- the
9   hunting guide and the crew, is that an
10  important part of their compensation, is
11  the tip?
12      A     These guys that were guiding,
13  most of them were college students.  Yes.
14  It was -- it was -- it was part of their
15  living expenses.
16      Q     Okay.
17      A     Part of the contract.
18      Q     So after Riverview -- did you
19  handle any dogs there?
20      A     Yes.
21      Q     Okay.  Tell me about your
22  training with dogs.  How -- do you go to
23  school to get training with quail dogs --

7   (Pages 25 to 28)

Page 29

1  bird dogs?
2      A    We -- there at Riverview, they
3  had somewhat of a -- kind of a little
4  orientation deal with older guides, for
5  some of the guys that had never been
6  around bird dogs.  I grew up with dogs.  I
7  was not a dog trainer, but I grew up with
8  dogs.  I love dogs.  I probably learned
9  more from the dogs than any -- anybody.
10  Just --
11      Q    So is it fair to say that you
12  don't -- you haven't had any formal
13  training?
14      A    At Riverview, no.  Not from --
15      Q    Or anywhere.
16      A    Yes.
17      Q    Oh.  Well, I'm sorry.  Tell me
18  about your formal training with bird
19  dogs.
20      A    I would -- I would say the --
21  the -- when you say "formal," explain.
22  What do you mean by "formal training"?
23      Q    Well, do you go to a school?

Page 30

1      A    No.  But I've worked for a
2  professional -- under a professional.
3      Q    Well, who was that?
4      A    William Pierce.
5      Q    What -- what was the name of
6  his business?
7      A    He worked for -- we worked for
8  Rollings Ranch in Okeechobee, Florida.
9      Q    You know, that's another one
10  of those places that's not on your
11  application, isn't it?
12      A    It wasn't necessary.
13      Q    Okay.  Well, when -- after
14  Riverview, what was the next job you had?
15      A    Rollings Ranch.
16      Q    In Florida?
17      A    Okeechobee, Florida.
18      Q    How long did you work there?
19      A    Approximately two years.
20      Q    Did you voluntarily quit at
21  Riverview?
22      A    I did.  I did.
23      Q    Okay.  Did -- how -- and did

Page 31

1  you voluntarily quit Rollings Ranch?
2      A    I did.
3      Q    Who was your supervisor there,
4  at Rollings Ranch?
5      A    William Pierce.
6      Q    Who was it at Riverview?
7      A    I'd probably just say the
8  owner, Cader Cox.  C-A-D-E-R C-O-X.
9      Q    Okay.
10      A    There were several people that
11  I worked under while there, but he was the
12  owner and the --
13      Q    All right.  What -- when you
14  worked at Rollings Ranch for Mr. Pierce,
15  what was your job title?
16      A    Assistant dog trainer and
17  assistant manager.
18      Q    How -- how many people worked
19  there?
20      A    On the whole ranch?
21      Q    Yes, sir.
22      A    I -- I'm not sure, but it
23  would probably be -- I -- I wasn't

Page 32

1  associated with all the departments of the
2  ranch.  But probably, guessing, fifteen to
3  thirty.  I don't know.  It just -- it was
4  a big ranch.
5      Q    What did they do on it besides
6  hunt?
7      A    Cattle and -- and farming.
8      Q    You didn't do any of that, did
9  you?
10      A    No, sir.
11      Q    You were just a hunter; right?
12      A    Well, we -- we managed the
13  quail woods.  We managed -- we did that.
14      Q    Okay.  So, again, you charged
15  guests?
16      A    No, sir.
17      Q    No?
18      A    Private.
19      Q    It's only private there?
20      A    (Witness nodded head in the
21  affirmative.)
22      Q    What does that mean, when you
23  say a private quail ranch?

8 (Pages 29 to 32)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 33

1    A    It's not commercial.
2    Non-commercial.
3    Q    Well, does that mean they just
4    bring their family members on there?  Or
5    what does it mean?
6    A    Family, friends, business
7    partners.  Whoever, you know.
8    Q    Did they have a lodge?
9    A    Yes.
10   Q    So you could stay there;
11   correct?
12   A    I didn't stay in the lodge.
13   Q    Okay.  But guests could stay
14   overnight; right?
15   A    Yes.
16   Q    Were they charged for that?
17   A    No.  As far as I know, no.
18   Q    How were you paid?
19   A    Out of Mr. Rollings' bank
20   account.
21   Q    Well, was it a salary or an
22   hourly rate?
23   A    It was a salary.

Page 34

1    Q    What was your salary?
2    A    I don't remember.
3    Q    Did you file tax returns
4    during this period of time?
5    A    Yes, sir.
6    Q    Were you married?
7    A    Yes, sir.
8    Q    Did you live -- where did you
9    live dur --
10   A    I lived on the property.
11   Q    So was that part of your
12   compensation too?
13   A    It was.  I...
14   Q    What was your next employment,
15   please, sir, after Rollings Ranch?
16   A    It would be -- I -- when I
17   came back and worked a little while with
18   the -- Hurst Farms again, temporarily.
19   Q    Why did you leave Rollings
20   Ranch?
21   A    My wife was pregnant, and we
22   was homesick.
23   Q    All right.  So you came back

Page 35

1    and worked on the farm for a period of
2    time.  And then what was your next job?
3    A    Gillionville Plantation.
4    Q    Okay.  And this application
5    has listed Gillionville, and says you
6    worked there from '82 to '84, in Albany,
7    Georgia.
8    A    That's -- that's pretty --
9    that's the way -- that seems right.
10   Q    Okay.  What was your job
11   there, please, sir?
12   A    I was the -- a dog
13   trainer/handler and looked after the quail
14   woods.
15   Q    Is that commercial or private?
16   A    It was commercial.
17   Q    So you charged guests to hunt
18   quail?
19   A    That's right.
20   Q    Did they stay on the property?
21   A    Yes, sir.
22   Q    How many employees did they
23   have?

Page 36

1    A    Ten -- ten to fifteen.  It
2    probably varied.  Some were seasonal.
3    Q    When they're hunting --
4    A    Yes.
5    Q    In the hunting season, they
6    have more?
7    A    That's right.
8    Q    Okay.  And did they do
9    anything besides hunting, you know?  Is it
10   any other kind --
11   A    They had a farming operation.
12   Q    All right.  And your job there
13   was what?
14   A    I was a dog trainer, and I
15   assumed a lot of responsibilities in the
16   quail -- over the quail habitat.
17   Q    Were you any kind of manager
18   or supervisor?
19   A    I did not have a title, I
20   don't -- I don't guess, other than a
21   dog -- I was a dog trainer, and I did what
22   they typically do.
23   Q    Were you on a -- paid a

9  (Pages 33 to 36)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 37

1  salary?
2      A    Yes, sir.
3      Q    How much was the salary?
4      A    I don't remember.
5      Q    Do they have any black
6  employees there?
7      A    Yes, sir.
8      Q    All right.  And who -- who
9  would you say would have been in charge of
10  that?
11      A    A guy by the name of Jesse
12  Jackson.
13      Q    Was he white or black?
14      A    He was white.
15      Q    Is he still living?  Do you
16  know?
17      A    I think so.
18      Q    Do you ever talk to him?
19      A    Not in the last couple of
20  years.
21      Q    All right.  Why did you leave
22  there in '84?
23      A    I had an opportunity to work

Page 38

1  in my hometown, on a -- on a plantation
2  there.
3      Q    At Millpond?
4      A    At Millpond.
5      Q    Who owns Millpond Plantation?
6      A    It's now owned by the
7  Sedgewick -- Sedgewick family.
8      Q    Well, when you worked there,
9  who owned it?
10      A    The Sedgewick family owned it
11  for the last year.  The Perry family owned
12  it for the years prior to that.  They're
13  all first cousins.  I mean, it's all in
14  the same family, basically.  But...
15      Q    Okay.  Now, what was your job
16  at Millpond?
17      A    Well, for the first -- I don't
18  know.  First period, it was just a dog
19  trainer.  Title was a dog trainer, but I
20  did have a -- the responsibility of
21  looking after the quail woods.  In the --
22  the last, approximately, six years, I was
23  the manager and the dog trainer.

Page 39

1      Q    Last six years, you were
2  manager?
3      A    Manager and dog trainer, with
4  the exception of -- the last year, I
5  brought in a -- a guy to -- to take the
6  dog -- the actual hunts out, and started
7  training him and getting him ready to do
8  that.  I had too much responsibility.
9      Q    Okay.  Well, as -- as a
10  manager at Millpond, did you hire and fire
11  employees?
12      A    Yes, sir.
13      Q    And you -- you worked there as
14  a manager for six or seven years; right?
15      A    That's right.
16      Q    So I -- how many employees did
17  you have?
18      A    It -- it varied from -- from
19  eight to twenty.  Seasonal.  We had some
20  seasonal help, and it fluctuated some.
21      Q    Did -- did they have any other
22  aspect to their operation other than the
23  quail hunting?  Did they farm or

Page 40

1  anything?
2      A    We -- just a little bit.  Not
3  a lot.  Just -- we -- we did a little bit
4  once or twice.
5      Q    How many acres did they have?
6      A    The property that I was
7  responsible for was thirty-three hundred,
8  plus another -- approximately a thousand
9  that was neighbor's property -- family
10  property that we managed quail on.
11      Q    Did y'all set birds out?
12      A    No, sir.
13      Q    It was a -- it was a wild
14  quail?
15      A    All wild quail.
16      Q    Okay.  So you have to manage
17  that population --
18      A    Yes, sir.
19      Q    -- is that right?  Is that
20  what you're talking about, managing the
21  quail woods?
22      A    Yes, sir.
23      Q    How do you do that?

**www.AmericanCourtReporting.com**
**September 8, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 41

1    A    Well, it's -- that's not
2  easy. That's not a question I can answer
3  just in a few minutes. Do you want to
4  hear it?
5    Q    Well, I -- do you -- do you
6  feed them?
7    A    We do feed them.
8    Q    Okay.
9    A    You do feed them.
10   Q    Okay.
11   A    You feed them. You burn
12  properly. You -- you manicure the woods.
13  You trap -- you have it trapped.
14   Q    Do you provide cover for them?
15   A    We do.
16   Q    And --
17   A    That's -- that's included in
18  burning properly.
19   Q    Okay. And -- and so it's a
20  year-round process --
21   A    Yes, sir.
22   Q    -- of making conditions
23  optimum for their population.

Page 42

1    A    That's right.
2    Q    Is that fair?
3    A    Yes, sir.
4    Q    Did they teach you how to do
5  that at junior college?
6    A    No, sir.
7    Q    When you got an associate's
8  degree in wildlife technologies, they
9  didn't teach you that?
10   A    They teach me the basic
11  principles of wildlife technology. They
12  weren't -- it was not -- I did not special
13  -- specialize in quail management.
14   Q    Could you have?
15   A    No, sir.
16   Q    Okay. All right. Well --
17   A    I learned more from
18  experience.
19   Q    While you were over there
20  at -- at Millpond, were there any lawsuits
21  against that plantation?
22   A    Not that I'm aware of. Other
23  than maybe a workers' comp claim or

Page 43

1  something like that.
2    Q    Okay. Did you have any blacks
3  working for you?
4    A    Yes, sir.
5    Q    Did you have any black guides?
6    A    I was the only guide.
7    Q    Okay. What did the -- what
8  did the blacks do as -- in their jobs at
9  Millpond?
10   A    To drive equipment, a hunting
11  wagon. Drive a hunting wagon, worked in
12  the main house, worked on the grounds.
13   Q    How much did you pay, an hour,
14  to them?
15   A    It varied, based on their --
16  their experience and what they could
17  contribute to the -- to the place. And it
18  were -- you know --
19   Q    Give me the range.
20   A    Uh, starting when? Ten years
21  ago? Twenty years ago?
22   Q    No. You only managed for six
23  years.

Page 44

1    A    Well, I was -- I was having --
2    Q    So from 1999 on.
3    A    It would probably start at
4  minimum wage and go to eight fifty, nine
5  dollars an hour, just based on how long
6  they had been there and what their needs
7  were. If they come to me and asked for a
8  raise, we'd evaluate them, you know.
9    Q    Did you have written job --
10  job evaluations?
11   A    No, sir.
12   Q    Did you have a progressive
13  disciplinary policy?
14        MR. DUKES: Object to the
15  form.
16   A    Didn't --
17        MR. DUKES: Go ahead.
18   Q    You can answer.
19   A    Didn't really ever have a
20  problem with disciplinary -- with
21  discipline.
22   Q    Well, did you ever write
23  anybody up?

11 (Pages 41 to 44)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 45

1  A   I can't remember.
2  Q   Did you ever fire anybody?
3  A   Yes, sir.
4  Q   Why?
5  A   Not showing up for work,
6  basically.
7  Q   Yeah. But --
8  A   More of that than anything.
9  A   Yeah.
10 A   Stealing.
11 Q   Oh, my goodness. People were
12 stealing from you?
13 A   Yes, sir.
14 Q   What did they steal?
15 A   Well, there was a lot of
16 things that were -- we suspected. But a
17 -- but a camera -- video camera from -- a
18 personal video camera.
19 Q   Was that from a guest, or was
20 that --
21 A   No. It was from me. But they
22 was stealing from the guests. I had
23 complaints. And -- and -- and then it

Page 46

1  happened -- when it happened and I knew
2  who was doing it.
3  Q   Who stole that camera from
4  you?
5  A   A Mexican lady that worked
6  there.
7  Q   How did you find out?
8  A   Well, the camera went missing,
9  but the case weren't with it. And I found
10 a situation when she was the only one
11 around. And I set the case and the
12 charger down, and I observed her take it.
13 And I confronted her with it.
14 Q   She admitted it?
15 A   Basically.
16 Q   Okay. Did you press charges?
17 A   No.
18 Q   Did you lock her up?
19 A   No.
20 Q   Just fired her?
21 A   Got her off the property.
22 Q   Okay. Now, why did you leave
23 Millpond? If you were the manager and it

Page 47

1  was your hometown and your wife is from
2  there, why would you leave Millpond
3  Plantation?
4  A   Money.
5  Q   Well, how much money were you
6  making as a manager at Millpond?
7  A   Fifty thousand dollars a year.
8  Q   And somebody -- how did you
9  get in touch with Mid State Land and
10 Timber?
11 A   There was an ad in the paper,
12 and --
13 Q   What paper?
14 A   Thomasville Times-Enterprise.
15 Q   What did it say?
16 A   His -- something along the
17 lines of historical Sedgefields Plantation
18 is looking for someone with experience
19 with quail -- with equine -- equine and --
20 and dogs. I don't remember exactly. But
21 responsible for the dogs and the horses
22 and the hunting.
23 Q   Did it list a salary?

Page 48

1  A   No, sir.
2  Q   Did -- who did you call?
3  A   I think I called and might
4  have spoke with David.
5  Q   David Carroll?
6  A   But I'm not sure. I may have
7  got Denise first. I don't remember, but I
8  eventually talked to David.
9  Q   Okay. And what did he tell
10 you about it?
11 A   He just kind of -- I don't
12 remember exactly. But he did tell me that
13 he would like for me -- I told -- but he
14 asked me some questions. And I told him
15 what I was doing and a little bit about my
16 experience. And he asked me to come over
17 and -- and talk to him.
18 Q   Come over for an interview;
19 right?
20 A   Yes, sir.
21 Q   Did you do that?
22 A   I did.
23 Q   Did you know how much the job

12 (Pages 45 to 48)

**www.AmericanCourtReporting.com**
**September 8, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 49

1 paid?
2    A   No.
3    Q   Okay.
4    A   Didn't even know what the
5 place looked like.
6    Q   All right. You came over.
7 Was it -- when would you have come over?
8 In September when you filled out this
9 application?
10    A   I'm pretty sure it was -- it
11 may have been -- no. It was probably in
12 August. No. Actually, it was in July,
13 wasn't it? I was fixing to go to South
14 Dakota. It was in July.
15    Q   Okay. And who did you meet
16 with?
17    A   David.
18    Q   Anybody else?
19    A   Not that I recall.
20    Q   Did you ever talk to
21 Mr. Broadhead?
22    A   No, sir.
23    Q   So who hired you?

Page 50

1    A   David.
2    Q   And how much were you
3 making -- take to lure you away from your
4 hometown in Thomasville, Georgia?
5    A   Seventy thousand dollars.
6    Q   Seventy thousand dollars.
7 Plus what? A truck?
8    A   All the benefits that I was
9 receiving, basically, in Thomasville.
10 Truck.
11    Q   Okay. Does --
12    A   Insurance, house.
13    Q   Does Mid States provide you
14 with a vehicle?
15    A   They do.
16    Q   What kind of vehicle?
17    A   It's a Chevrolet -- four-wheel
18 drive, Chevrolet truck.
19    Q   What year?
20    A   I'm not -- I'm not for sure.
21 I would probably say an '04 or somewhere
22 along in there. I'm not sure.
23    Q   Air conditioned?

Page 51

1    A   Yes, sir.
2    Q   Power steering?
3    A   Yes, sir.
4    Q   Got an AM/FM, CD player?
5    A   No CD player.
6    Q   Okay. Three-quarter ton?
7    A   Yes, sir.
8    Q   Now, in addition, do they
9 provide for all your gasoline?
10    A   They do when I'm on the --
11 when I'm -- job-related.
12    Q   Any -- any maintenance --
13    A   Yes, sir.
14    Q   -- they pay for?
15    A   Yes, sir.
16    Q   Insurance for your truck?
17    A   Yes, sir.
18    Q   Tires?
19    A   Yes, sir.
20    Q   Everything?
21    A   It's their truck.
22    Q   You get to drive it, though;
23 right?

Page 52

1    A   That's right.
2    Q   You get to drive it on
3 personal business, too, don't you?
4    A   I do.
5    Q   Okay. Have you ever taken
6 your kids to school in it?
7    A   Yes, sir.
8    Q   Now, is that reflected as
9 compensation on your income tax return?
10    A   No, sir. Not that I know of.
11    Q   Hum. Okay. Then you're also
12 provided with housing, aren't you?
13    A   Yes, sir.
14    Q   Where do you live?
15    A   On Sedgefields Plantation.
16    Q   In -- in what -- in what type
17 housing?
18    A   It's a --
19    Q   Is it a house?
20    A   Yes, sir.
21    Q   Okay. Does anybody else live
22 there besides you and your family?
23    A   No, sir.

13 (Pages 49 to 52)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 53

1   Q   Okay. So where is it located
2   on Sedgefields' property?
3   A   Right next to the -- the
4   equipment barns and the horse stables.
5   Q   Okay. So in addition to
6   having transportation and everything
7   associated with it, you're provided with
8   housing. And that means you don't pay an
9   electric bill, doesn't it?
10  A   That's right.
11  Q   Don't pay for cable or
12  satellite TV; right?
13  A   That's right.
14  Q   Telephone; correct?
15  A   That's right. That's right.
16  Q   You don't have any expenses,
17  do you?
18  A   I do.
19  Q   For housing?
20  A   No.
21  Q   For transportation?
22  A   Yes.
23  Q   What?

Page 54

1   A   I own another vehicle.
2   Q   Okay. Well, your wife wants
3   to drive a car, I suspect, doesn't she?
4   A   That's right.
5   Q   Okay. So --
6   A   Actually, I own several other
7   vehicles. But...
8   Q   Okay. So you have to keep the
9   insurance on them; right?
10  A   That's right.
11  Q   And one for your daughter to
12  drive back and forth --
13  A   That's right.
14  Q   -- to school; correct?
15  A   Yes, sir.
16  Q   Okay. Well, does anybody else
17  in your family work at Mid States, or did
18  work at Mid States --
19  A   No, sir.
20  Q   -- before they were sold?
21  Anybody in your family work on any
22  plantation?
23  A   Yes.

Page 55

1   Q   Who?
2   A   Jason just went to work for
3   Sehoy. Been there about three or four
4   weeks.
5   Q   What does he do there?
6   A   Anything they need done.
7   Q   Did he ever work at
8   Sedgefields?
9   A   No.
10  Q   Do they have any kind of
11  policy that prohibits him from working
12  there?
13  A   I -- I'm -- I'm not aware of
14  one.
15  Q   I mean, you know how some
16  places have --
17  A   Sure.
18  Q   -- a nepotism policy?
19  A   Yes, sir. I've experienced
20  that.
21  Q   Yeah. Okay. So they don't
22  want people supervising their family
23  members; correct?

Page 56

1   A   That's right.
2   Q   Have you ever had a discussion
3   with anybody at -- at Mid State about
4   that?
5   A   No.
6   Q   You just didn't want Jason
7   working there.
8   A   No.
9   Q   Right?
10  A   That's right. It's not -- not
11  best -- in his best interest to work for
12  me.
13  Q   Okay. Mr. Norman, I'm not
14  asking you this to embarrass you, but it's
15  a little unusual for the husband, the
16  male, to get custody of his children. Do
17  you agree with that?
18  A   Yes, sir.
19  Q   Do you want to tell me why you
20  got custody of your children?
21      MR. DUKES: Object to the
22  form.
23  Q   You can answer.

14 (Pages 53 to 56)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 57

1  A  I requested custody -- custody
2  of them.
3  Q  Okay. Well, does your wife
4  have any kind of problem? Your ex-wife.
5  A  Yes, sir.
6  MR. DUKES: Let's -- hold on
7  one second. Let's stop and go off the
8  record for a second.
9  MR. ROBERSON: Okay. Let's go
10  off the record. Tell me what time it is.
11  THE VIDEOGRAPHER: At this
12  time, we're going off the record. The
13  approximate time is 9:47 a.m.
14  (Recess taken.)
15  THE VIDEOGRAPHER: At this
16  time, we're going back on the record. The
17  approximate time is 9:49 a.m.
18  Q  (BY MR. ROBERSON) Where does
19  your ex-wife live?
20  A  Somewhere in South Carolina.
21  Q  Somewhere?
22  A  (Witness nodded head in the
23  affirmative.)

Page 58

1  Q  Is that a town or --
2  A  It's -- it's in South
3  Carolina, is all I can tell you.
4  Q  Do you have to pay her any
5  alimony?
6  A  No.
7  Q  You don't have any contact
8  with her?
9  A  No.
10  Q  And she doesn't visit her own
11  children?
12  A  No. They occasionally visit
13  her, and I -- I pay for them going over
14  there because it's in the kids' best
15  interest to visit their mother.
16  Q  In -- in South Carolina?
17  A  That's right.
18  Q  So you know where she lives,
19  then, don't you?
20  A  Somewhere -- approximately,
21  but I don't know what her address is.
22  Q  Well, how do your kids get
23  there to visit?

Page 59

1  A  They get in the car that I
2  furnish, and they drive over there. They
3  know where she lives.
4  Q  And you don't?
5  A  I've never been there.
6  Q  You don't know what city it
7  is?
8  A  No. She's moved. I mean, I
9  knew at one time it was somewhere around
10  Elloree. But I know she's moved, and I'm
11  not for sure if she's still in that same
12  community or somewhere close. I don't
13  know.
14  Q  Why did your -- why did you
15  get a divorce from her?
16  MR. DUKES: Object to the
17  form.
18  A  It was -- you'd have to know a
19  little history. And the fact is, she was
20  trying everything she could to destroy
21  me -- my job. She was undermining -- she
22  actually worked for me --
23  Q  On the --

Page 60

1  A  -- at --
2  Q  -- plantation?
3  A  She did.
4  Q  What -- what was her job?
5  A  She ran the house. She was --
6  she was a house manager. But she --
7  Q  Like the --
8  A  She was also an alc -- severe
9  alcoholic, and she had mental problems
10  that were starting to compound.
11  Q  And --
12  A  It was a real delicate
13  situation, and it had just reached a point
14  where somebody had to -- I mean, my --
15  my -- my bosses was coming to me with it,
16  and something had to be done. And it was
17  just -- I just -- I did whatever I thought
18  was in the best interest of my kids, you
19  know.
20  I knew that she was potentially
21  going to grab my kids and run with them,
22  and it was not going to be a stable home.
23  And I did -- I just took preventive

**www.AmericanCourtReporting.com**
**September 8, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 61

1  measures, when the timing was right, to
2  just go ahead and file for divorce, file
3  for custody, and -- so I could raise my
4  kids properly.
5      Q   Have you ever told --
6      A   She had already moved out.
7      Q   Have you ever told anybody
8  that your ex-wife was dating a black man?
9      A   No, sir.
10     Q   Was she?
11     A   I don't know.
12     Q   Was the -- Tina, did she also
13 work on the plantation?
14     A   She did.
15     Q   What was her job there?
16     A   She was a gardener. She was a
17 gardener and looked after all the
18 grounds. She had the responsibility of
19 all the grounds.
20     Q   When did your relationship
21 with Tina start? Before or after your
22 marriage ended?
23     A   After.

Page 62

1      Q   Hum. When did your marriage
2  end?
3      A   I married, I believe, on
4  September the 17th of last year.
5      Q   No. When did your first
6  marriage end?
7      A   Oh, the marriage ended a long
8  time ago.
9      Q   What -- when was the divorce
10 final?
11     A   I'd have to pull it up and
12 see. It's been -- it's just a lot of --
13 been a lot of water under bridge, and it's
14 just -- it wasn't a -- it's just
15 something -- not something that I -- that
16 I mentally log. It wasn't -- it's not a
17 pleasant experience.
18     Q   All right. So did you have to
19 get married to Tina before they would let
20 you live at Sedgefields?
21     A   It --
22         MR. DUKES: Object to the
23 form.

Page 63

1      A   It -- we -- I'll say that
2  we -- we planned to be married -- we had
3  planned to get married, and it -- the -- I
4  -- we did not want to live together. We
5  lived in separate houses before we came
6  here. And we had discussed getting
7  married.
8          It was a comment that was made to
9  me, that they did not want us living
10 together, you know, shacking up. And I --
11 and I appreciate and respect that
12 comment. And we talked about it, and we
13 decided that we should -- if we were going
14 to move over here together, we should --
15 we should go ahead and get married.
16     Q   Did you get married before you
17 moved on the property?
18     A   I sure did.
19     Q   Okay.
20     A   The day before -- two days
21 before.
22     Q   All right. Where did you get
23 married?

Page 64

1      A   Thomasville, Georgia.
2      Q   Did -- now --
3          MR. DUKES: And let's go off
4  the record again. Stop.
5          MR. ROBERSON: Why?
6          MR. DUKES: I need to talk to
7  him.
8          MR. ROBERSON: Okay. Let's go
9  off the record.
10         THE VIDEOGRAPHER: At this
11 time, we're going off the record. The
12 approximate time is 9:54 a.m.
13         (Recess taken.)
14         THE VIDEOGRAPHER: At this
15 time, we're going back on the record. The
16 approximate time is 10:04 a.m.
17     Q   (BY MR. ROBERSON) Mr. Norman,
18 are you the quail operations manager?
19     A   I -- I think that's on my
20 card, yes, sir.
21         (WHEREUPON, a document was
22 marked as Plaintiff's Exhibit Number 2 and
23 is attached to the original transcript.)

**www.AmericanCourtReporting.com**
**September 8, 2006**

# American Court Reporting
## toll-free (877) 320-1050

Page 65

```
 1    Q    Okay.  Let me show you what
 2  I'll mark as Plaintiff's Exhibit 2 to your
 3  deposition, and ask you -- and you may not
 4  have seen this before.  But ask you --
 5  that indicates that you are the quail
 6  operations manager and make a salary of
 7  seventy thousand dollars a year.
 8    A    That looks right to me.
 9    Q    Okay.  Is that your current
10  salary for Tolleson's?
11    A    Yes, sir.
12    Q    Do you have the same job with
13  the new owner?
14    A    Yes, sir.
15    Q    I mean, in other words --
16    A    Nothing -- nothing has
17  changed.  David --
18    Q    Okay.  Same job, same truck,
19  same housing; right?
20    A    Yes, sir.
21    Q    And David Carroll hired you;
22  correct?
23    A    That's -- that's right.
```

Page 66

```
 1         (WHEREUPON, a document was
 2  marked as Plaintiff's Exhibit Number 3 and
 3  is attached to the original transcript.)
 4    Q    I'm going to show you what
 5  I've marked as Plaintiff's Exhibit 3 to
 6  your deposition, and that -- this is a
 7  Sedgefield Plantation employee
 8  organization chart, dated March 24, 2006.
 9  It's been provided by Sedgefields'
10  lawyer -- Mid State's lawyer.
11         Have you ever seen that document
12  before, Exhibit 3?
13    A    No, sir.
14    Q    Well, would you take a minute
15  to look at it, and tell me if that's an
16  accurate depiction of the organizational
17  chart as of March of '06.
18    A    March of '06?
19    Q    Yeah.
20    A    Yeah.  That's -- that's -- I'd
21  say so.
22    Q    And does it show who the
23  manager of Sedgefields was?
```

Page 67

```
 1    A    Yes, it does.
 2    Q    Who was that, please, sir?
 3    A    David Carroll was the general
 4  manager.
 5    Q    He's sitting here today, isn't
 6  he?
 7    A    Yes.
 8    Q    In fact, while you're being
 9  deposed, your manager is sitting here at
10  your deposition; correct?
11    A    That's right.
12    Q    Okay.  And he's a white male;
13  correct?
14    A    Yes, sir.
15    Q    You're a white male --
16    A    That's right.
17    Q    -- correct?
18    A    Yes, sir.
19    Q    Roy Lee.  What is Roy Lee's
20  title?
21    A    Deer operations manager and
22  head of grounds crew.
23    Q    Do you know Roy?
```

Page 68

```
 1    A    Yes, sir.
 2    Q    Have you worked with him since
 3  September of '05?
 4    A    Yes, sir.
 5    Q    Is he a capable employee?
 6    A    Yes, sir.
 7    Q    Is he honest?
 8    A    I don't know that, but I --
 9  but I -- but if he's never been -- that I
10  can say -- right off the top of my head, I
11  can't say he's been dishonest to me.
12    Q    Has he been honest in his
13  dealings with you?
14    A    I believe he has.
15    Q    Do you have any reservations
16  about Roy Lee?
17         MR. DUKES:  Object to the
18  form.
19    Q    His job performance or
20  anything.
21    A    No, sir.  Other than may --
22  you know, no.  Not really.  Not -- not --
23  he's -- he's capable of doing what -- what
```

17 (Pages 65 to 68)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 69

1  these people have him assigned to do.
2      Q    In fact, Roy Lee was doing
3  your job before you were hired, wasn't he?
4      A    No, sir.
5      Q    He wasn't?
6      A    No, sir.
7      Q    He wasn't taking people on
8  quail hunts?
9      A    He was putting birds out and
10 going and getting them and taking them
11 right back and shooting them, but he
12 wasn't doing what I do.
13     Q    Oh.  What is it that you do
14 that Roy wasn't doing?
15     A    Well, I'm not totally familiar
16 with everything Roy did.  But we have a
17 wild -- we have a wild quail recovery
18 program in place.  That wasn't being
19 done.
20     Q    What does that mean?  Tell me
21 what you mean about a "wild quail recovery
22 program."
23     A    Well, we're -- we're managing

Page 70

1  for wild quail on some of the property,
2  and we -- and we initiate an early release
3  program -- quail program on -- on another
4  portion of the property.
5      Q    What is an "early release
6  program"?  Is that where you set --
7      A    Set them out --
8      Q    -- your birds out?
9      A    -- a couple of months before
10 hunting season and try to carry them
11 through the hunting season.  Basically,
12 just trying to manage that population of
13 released birds.
14     Q    Now, that ain't setting them
15 out to shoot them, is it?
16     A    It is releasing them --
17 pre-releasing them months prior to hunting
18 them, to -- to simulate wild-bird type
19 hunting.  Different kind of dog.  Dog
20 steady to winging shot, not -- not dogs
21 flushing birds for you.
22     Q    Anything else you say you're
23 doing that Roy Lee didn't do?

Page 71

1      A    Like I said, I'm not familiar
2  with everything -- all -- all of his
3  responsibilities, what they were before I
4  went there.  I don't -- I don't know.
5      Q    Have you ever told anybody
6  that you've never worked on a plantation
7  where they used black guides?
8      A    No.  I worked with black
9  guides.
10     Q    Is Roy Lee a black guide?
11     A    Yes.
12     Q    Do you know any other black
13 guides at Mid States?
14     A    I don't know if you would --
15 would consider the guys that put people on
16 deer stands guides or not.  But if they
17 are, they're guides too.  Whoever helped
18 Roy what -- if you're considering them
19 guides.
20     Q    Okay.  What about quail
21 hunting?  Did you have any black guides?
22     A    I was the guide.
23     Q    Oh.  You were the only person

Page 72

1  that was a guide?
2      A    I was the only person that was
3  a guide.
4      Q    Okay.  So when Norris
5  Foster -- and you worked with Norris from
6  the time of your hiring in September until
7  he was fired on December the 29th;
8  correct?
9      A    Pretty much.  The -- the first
10 few weeks was sort of a -- trying to
11 figure out who-could-help-who deal.  So I
12 can't remember exactly when he became
13 strictly to my crew, you know.
14     Q    Okay.  Well, what I'm saying
15 is, your time there at Sedgefields only
16 overlapped from September to the end of
17 December; isn't that fair?  From the time
18 of your hiring --
19     A    That's right, yes.  Yes.  Yes.
20     Q    -- until December?
21     A    That's right.
22     Q    So that's four months, isn't
23 it?  September, October, November, and

**www.AmericanCourtReporting.com**
**September 8, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 73

1  December; correct?
2      A    It sounds like it, yes, sir.
3      Q    Okay.  And Norris Foster is a
4  black man, isn't he?
5      A    Yes, sir.
6      Q    He's forty-seven years old,
7  isn't he?
8      A    I don't know.
9      Q    You don't know how old the
10  people are in your crew?
11      A    Nope.  He's a mature adult.
12      Q    All right.  He's a man, isn't
13  he?
14      A    Yes, sir.
15      Q    Do you believe that to
16  discriminate against someone because of
17  their race is wrong?
18      A    Yes, sir.
19      Q    Do you know that it's
20  unlawful?
21      A    Yes, sir.
22      Q    It's against the law, isn't
23  it?

Page 74

1      A    Yes, sir.
2      Q    We agree about that, don't we?
3      A    It's -- it's unethical.
4      Q    It's unethical.  And you also
5  agree that people that do discriminate
6  against people because of their race
7  should be punished.
8      A    Yes, sir.
9      Q    Don't you?
10      A    Yes, sir.
11      Q    That's wrongful conduct, and
12  we ought to punish it, shouldn't we?
13      A    Yes, sir.
14      Q    So if we show that somebody is
15  intentionally discriminated against
16  because of their race, the people who did
17  the discriminating ought to be punished.
18      A    That's right.
19      Q    You agree with that?
20      A    Yes, sir.
21      Q    What should we do to them?
22      A    Whatever --
23      Q    Give them a fine?

Page 75

1      MR. DUKES:  Object to the
2  form.
3      A    Whatever the law -- whatever
4  the law requires.
5      Q    Okay.
6      A    Leave that up to a judge.
7      Q    Now -- and do you agree with
8  me that you ought to pay people based on
9  their experience and their qualifications?
10      A    Yes.
11      Q    You've -- you've been a
12  plantation manager; right?
13      A    Yes.
14      Q    You've hired people and set
15  their salary; correct?
16      A    Yes.  I've -- I've made
17  suggestions to their salary.  I've always
18  run it past whoever was above me before
19  I --
20      Q    Okay.  Have you hired anybody
21  at Mid State Land and Timber?
22      A    No.
23      Q    Have you recommended anybody

Page 76

1  for hire?
2      A    Yes.
3      Q    Who?
4      A    Adam May, Will Hubbard, Chance
5  Ham.
6      Q    Anybody else?
7      A    Not that I -- comes to mind.
8      Q    Are all those white boys?
9      A    Yes, sir.
10      Q    Did you recommend that they be
11  hired at eight dollars an hour?
12      A    It depended on which one
13  you're talking about.  As I recall, these
14  guys filled out applications.  Some of
15  them already had applications on file.
16      In talking to them -- I interviewed
17  them before David.  I asked them what it
18  would take.  They would make suggestions,
19  and I would take it to David.  And I --
20  and then we -- we discussed it.  And then
21  David made the ultimate decision on
22  whether or not we could pay whatever they
23  were asking, or either we made a

**www.AmericanCourtReporting.com**
**September 8, 2006**

# American Court Reporting
## toll-free (877) 320-1050

Page 77

1  counteroffer. David -- David made the
2  offer.
3      Q    Okay.
4      A    I had no authority as to
5  who -- as to what anybody made.
6      Q    Now, do you have any military
7  experience?
8      A    No, sir.
9      Q    Do you think that's valuable
10  when you're looking to hire somebody, that
11  they have military experience?
12      A    I don't. Not necessarily.
13      Q    Yeah. Well, I see all these
14  ads on TV about, you know, be all you can
15  be, and we teach you everything within the
16  military. That just -- is that just
17  recruiting crap? Doesn't mean anything?
18      MR. DUKES:  Object to the
19  form.
20      A    We ain't fighting, you know.
21  I mean, we're -- it's just an organization
22  that doesn't require military experience.
23      Q    Well, you give orders, don't

Page 78

1  you?
2      A    No, sir. We -- we -- we
3  give duty -- we assign duties to people,
4  and -- and I wouldn't necessarily call it
5  an order. But we assign duties, and it's
6  all normally taken in good faith. And
7  somebody does their job, what their
8  assignment is.
9      Q    You don't give orders to
10  people that work for you?
11      A    I don't think "order" is an
12  appropriate word. We just -- everybody
13  knows what their respon -- we tell people
14  what their job is for that day, but it's
15  not like you're ordered to do something.
16  It's -- we're all grown. We're all
17  adults. I think that -- when we discuss
18  the duties -- we know what the duties for
19  the day is. It's done -- should be done.
20      Q    Do you know if Mid State Land
21  and Timber gives somebody a preference
22  for -- to -- consideration for employment
23  if they have military experience?

Page 79

1      A    I don't know. I don't know.
2  That's never come up.
3      Q    Well, you know Norris Foster,
4  don't you?
5      A    Yes, sir.
6      Q    Is Norris a thief?
7      MR. DUKES:  Object to the
8  form.
9      Q    You can answer.
10      A    I have reason to believe
11  that -- that he's not -- that he's -- that
12  he's -- has taken things in the past.
13      Q    Have you ever seen him,
14  observed him, take anything that didn't
15  belong to him?
16      A    Not with my eyes, no, sir.
17      Q    Well, what reason do you have
18  to believe that Norris Foster is a thief?
19      MR. DUKES:  Object to the
20  form.
21      Q    You can answer.
22      A    One of the -- one of his
23  employ -- co-employees told me he did,

Page 80

1  not -- not knowing that he was telling me
2  that he was stealing.
3      Q    Who is that?
4      A    Jeff Harris.
5      Q    Jeff Harris told you that
6  Norris Foster was a thief?
7      A    No.
8      MR. DUKES:  Object to the
9  form.
10      A    He did not.
11      Q    What did he tell you?
12      A    He told me that Norris
13  took the -- I asked where the quail --
14  what happened to the quail, and he told me
15  Norris took them home with him.
16      Q    When was that?
17      A    It was after the first hunt
18  that we had. It was somewhere, I think,
19  in October. And Nor -- Jeff did not
20  realize -- Jeff was new to the program.
21  He didn't realize that he was -- that what
22  Norris -- I don't think Jeff realized he
23  had told on Norris. And I did not know

www.AmericanCourtReporting.com
September 8, 2006

# American Court Reporting
## toll-free (877) 320-1050

Page 81

1  that Norris had already been accused of
2  taking things in a previous employment
3  there, so I give Norris the benefit of the
4  doubt. And I said, I'll just handle this
5  on the next hunt. I'll be sure that the
6  bird -- that we discuss, you know, getting
7  the birds in the right place and where
8  they're supposed to be.
9      I give everybody the benefit of the
10  doubt and never -- and never confronted
11  Norris with it because I said, well, maybe
12  -- because we were pushed for time, got in
13  late, that -- that somebody just grabbed
14  them to keep them from spoiling or
15  whatever. There wasn't but a handful of
16  birds, you know.
17      But he -- when I asked Jeff -- I
18  said, Jeff, what happened with -- where's
19  the birds? What happened to the birds?
20  Because I looked for them the next
21  morning -- no. I looked for them that
22  night and couldn't find them. Me and
23  David talked. David said, be sure them

Page 82

1  birds get in the refrigerator. I went and
2  looked for them and couldn't find them.
3  Asked Jeff the next morning where the
4  birds was. He said, Norris took them home
5  with him.
6      Q   Okay. Would this be the same
7  Jeffrey Harris who lives at 242 Orchid
8  Lane, in Fitzpatrick, Alabama?
9      A   I don't know where he lives.
10      Q   He began working at
11  Sedgefields in -- or -- in two thou --
12  September 2005?
13      A   I think he was there when I
14  started.
15      Q   Okay.
16          (WHEREUPON, a document was
17  marked as Plaintiff's Exhibit Number 4 and
18  is attached to the original transcript.)
19      Q   I'm going to show you what
20  I've marked as Exhibit Number 4 to your
21  deposition, and that's the affidavit of
22  Jeffrey Harris.
23      Have you ever seen that before

Page 83

1  today?
2      A   No, sir.
3      Q   Why don't we go off the record
4  and let you read that.
5      A   Okay.
6      Q   Okay?
7      A   All right.
8          MR. ROBERSON: Let's go off
9  the record.
10          THE VIDEOGRAPHER: At this
11  time, we're going off the record. The
12  approximate time is 10:19 a.m.
13          (Recess taken.)
14          THE VIDEOGRAPHER: At this
15  time, we're going back on the record. The
16  approximate time is 10:23 a.m.
17      Q   (BY MR. ROBERSON) Mr. Norman,
18  have you had an opportunity to read --
19      A   Yes, sir.
20      Q   -- this affidavit, Exhibit
21  4 --
22      A   Yes.
23      Q   -- during our break? Okay.

Page 84

1  And you hadn't seen it before today?
2      A   No, sir.
3      Q   Well, you know what an
4  affidavit is, don't you?
5      A   I think so, yes, sir.
6      Q   It's a sworn statement.
7      A   Yes, sir.
8      Q   Correct?
9      A   Yes, sir.
10      Q   And Jeffrey Harris, in this
11  affidavit -- read what he says, starting
12  right there, on December 29th.
13      A   28th or 29th?
14      Q   Well, whatever it says.
15      A   On December 28th, I spoke with
16  Joel Norman about Norris Foster. He
17  claimed that I had told him that Norris
18  took dead birds out of the refrigerator.
19  I told him that Norris didn't take the
20  birds, but, rather, the birds were thrown
21  out of the refrigerator because they were
22  rotten. Joel fired Norris Foster that
23  same day.

21 (Pages 81 to 84)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 85

1    Q    Okay.  Now, do you -- have you
2    never seen that before?
3    A    Just -- just while ago I saw
4    it.
5    Q    Okay.  Is Jeffrey Harris
6    lying?
7    A    Yes, sir.
8    Q    Okay.  So he's --
9    A    He's lying about me firing Nor
10   -- Norris.  I didn't fire Norris.
11   Q    Oh, you didn't?
12   A    No.
13   Q    David Carroll did?
14   A    David did.
15   Q    I see.  Well, did you
16   recommend to David Carroll that Norris be
17   fired?
18   A    No, sir.  I told him that --
19   that things had just got to the point
20   where we had some -- something had to be
21   done, that we weren't making -- we were
22   going backwards.
23   Q    Something had to be done.

Page 86

1    Well, you weren't leaving, were you?
2    A    No, sir.
3    Q    So Norris had to be fired,
4    didn't he?
5    MR. DUKES:  Object to the
6    form.
7    A    I don't know.
8    Q    Okay.
9    A    I don't know what other
10   options there were.
11   Q    Now, did anybody hear Jeffrey
12   Harris tell you that Norris Foster took
13   some birds?
14   A    I don't think so.
15   Q    So he was alone with you when
16   he told you that?
17   A    Probably so.
18   Q    Okay.  Did you ever make any
19   document of any kind, any writing
20   whatsoever, about the theft of property at
21   Mid State Land and Timber by Norris
22   Foster?
23   MR. DUKES:  Jerry, can you

Page 87

1    lower your voice a little bit?  We can --
2    we can hear you okay.
3    A    No, sir.  No -- nothing formal
4    was written.
5    Q    Well, is it against the policy
6    of Mid State Land and Timber for employees
7    to steal their property?
8    A    It is.  But I did not
9    realize -- I give -- I did not realize
10   that he stole them.  I knew they were
11   taken, but I -- I did not deem it as
12   stolen until I found out that he had
13   already been fired for stealing one -- one
14   time before.
15   Q    Oh.  Norris had been fired for
16   stealing?
17   A    Well, that's -- I heard --
18   that's what was told to me.
19   Q    Well, who told you that?
20   A    Denise.
21   Q    Denise who?
22   A    Pierce.
23   Q    Is she on that chart?

Page 88

1    A    She is.
2    Q    What is Denise Pierce?
3    A    She's the lodge manager and
4    bookkeeper.
5    Q    Is she white?
6    A    She is.
7    Q    So you -- you claim that
8    Denise told you that Norris was previously
9    fired from Sedgefields -- or from Mid
10   State Land and Timber for stealing; is
11   that correct?
12   A    She told me that he had stole
13   from them before, in a previous
14   employment, and I assumed that's why he
15   was fired.
16   Q    Okay.  Did you create any
17   document, during any time that Norris
18   Foster worked at Mid State Land and
19   Timber, to show that Norris Foster was
20   stealing from them?
21   A    No, sir.  We -- I discussed
22   it -- I just discussed it with David, what
23   -- what I felt had happened.

22  (Pages 85 to 88)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 89

1    Q    Okay. Now, Norris Foster,
2    from -- in the -- he -- how -- how many
3    years, to your knowledge, had Norris
4    Foster worked at what was Sedgefields
5    Plantation?  Do you know?
6    A    I don't know.
7    Q    Hum.  You -- there was one
8    reprimand in Norris Foster's personnel
9    file.
10    A    That's right.  One --
11    Q    And you wrote it?
12    A    That's right.
13    Q    And you wrote it.  Does
14    Sedgefields -- Mid State Land and
15    Timber/Sedgefields have a progressive
16    disciplinary policy?
17    A    Not that I'm aware of.
18    Q    Well, they've got --
19         (WHEREUPON, a document was
20    marked as Plaintiff's Exhibit Number 5 and
21    is attached to the original transcript.)
22    Q    Let me show you what I'll mark
23    as Plaintiff's Exhibit 5.  And this is the

Page 90

1    formal reprimand that you wrote up for --
2    for Norris Foster; right?
3    A    Yes, sir.
4    Q    And it's dated December 6,
5    2005; correct?
6    A    That's right.
7    Q    And Norris signed it, didn't
8    he?
9    A    Yes, sir.  That's right.
10    Q    And you signed it?
11    A    Yes, sir.
12    Q    And it says that -- says
13    "formal reprimand"; right?
14    A    Right.
15    Q    So they've got a form there.
16    This is a form.
17    A    No.  I made that.  I -- David
18    told me we need to document something.  We
19    were having so many problems that we
20    decided we -- well, we knew we were
21    headed -- headed down the road of trouble,
22    so we started documenting things.
23         And that's something I had done on

Page 91

1    the spur of the moment.  David said, write
2    something up, have him sign it.  And I
3    just went and threw something together in
4    the best of my ability that -- just to --
5    to show that we had had that conversation
6    and he had been reprimanded.
7    Q    Okay.
8    A    In the event that it came up
9    again.
10    Q    All right.  Well, you see here
11    where it says, at the bottom, "strike
12    one"?
13    A    That's right.
14    Q    So this was the first and only
15    time that Norris was ever the recipient of
16    a formal reprimand; correct?
17    A    Other than --
18    MR. DUKES:  Object to the
19    form.
20    Go ahead.
21    A    Other than verbally.  We had
22    had conversations about things that he had
23    been -- I -- you could call it

Page 92

1    reprimands.  We had had conversations
2    about things that weren't going right and
3    things that were -- had been doing wrong.
4    We just realized we needed to start
5    documenting it in -- on paper.
6    Q    So you had never before
7    documented any problems --
8    A    Just verb --
9    Q    -- with Norris Foster;
10    correct?
11    A    Verbally -- verbally with
12    David.
13    Q    No, sir.  You understand that
14    document --
15    A    No document.
16    Q    -- means writing?
17    A    No document.  Right.
18    Q    So never before December 6th
19    did you ever document any problem with
20    Norris Foster; correct?
21    A    Not that I can recall.
22    Q    And never after November 6th
23    did you document any problem with Norris

23 (Pages 89 to 92)

**www.AmericanCourtReporting.com**
**September 8, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 93

1  Foster?
2      A    Not that I can recall.
3      Q    And this thing -- this
4  reprimand has three strikes on it, doesn't
5  it?
6      A    That's right.
7      Q    Well, wouldn't that imply that
8  an employee gets three strikes before he's
9  fired?
10     A    I -- we -- I really felt like
11  they were all used up by the time he got
12  fired.
13     Q    Okay.
14     A    They -- they -- we weren't
15  getting anywhere with continually -- we
16  weren't getting anywhere with that.
17     Q    I see.
18     A    Norris was not happy -- I
19  mean, he was happy, and he was causing
20  discord with other employees.  And it had
21  just got to the breaking point that, to
22  prevent further damage with other
23  employees and to -- to continue to try to

Page 94

1  build a team, something -- something had
2  to happen.
3      Q    You didn't want Norris working
4  for you, did you?
5      A    I asked for Nor --
6          MR. DUKES:  Object to the
7  form.
8      A    I requested Norris work for
9  me.
10     Q    On December 29, 2005, you no
11  longer wanted Norris Foster to work for
12  you, did you?
13     A    I would have loved for him to
14  continued working for me and being a
15  member of the team, but he had shown that
16  he was not willing to do that.  He was
17  capable of doing what I needed done.
18     Q    Mr. Norman, did Mid State Land
19  and Timber have any kind of a written
20  policy about race discrimination?
21     A    I don't know.  I would think
22  they would, but I don't know.  I never --
23     Q    You've never seen one, have

Page 95

1  you?
2      A    No, sir.  Not that I can
3  recall.  I -- they may have had a handbook
4  or something, but I don't -- I don't
5  recall reading that.
6      Q    Hum.
7      A    It would --
8      Q    Well --
9      A    If they had one, I'm sure it
10  included it.
11     Q    I see.  Well, they've got
12  insurance, though.  Did you know that?
13     A    I know now.
14     Q    Hum.  That covers them for
15  race discrimination claims; correct?
16     A    It appears that -- yes.
17     Q    Well, Mr. -- Mr. Carter -- you
18  didn't know him.  You didn't hire him, did
19  you?
20     A    No, sir.  He's a lawyer, is
21  all I know.
22     Q    Yeah.  Okay.  So the only
23  evidence you have that Norris Foster is a

Page 96

1  thief and that he has stolen things from
2  Mid State Land and Timber is a statement
3  that was made to you by Jeffrey Harris; is
4  that fair?
5      A    And De --
6          MR. DUKES:  Object to the
7  form.
8      A    And Denise Pierce.
9      Q    And Denise Pierce.  You're
10  right.  That's -- he -- you claim he had
11  stolen before, but during your -- while
12  you worked there, that was a statement by
13  Jeff Harris; right?
14     A    I -- the statement was made by
15  Denise.  I don't know how it came about.
16  It was in discussing Norris' job
17  performance, me asking a little bit about
18  his history, that that came up.  That's
19  when I realized that -- when the birds
20  went missing, that they were stolen
21  instead of just taken to keep them from
22  going to waste.  I knew then he knew the
23  protocol and that he shouldn't have took

**www.AmericanCourtReporting.com**
**September 8, 2006**

Page 97

1  them.
2  Q  Now, when -- when people are
3  hired at Mid States, do they ever get a
4  written job evaluation?
5  A  Not that I'm aware of.
6  Q  Okay.
7  A  Possibly.  I don't know.  I
8  never -- I think they have an evaluation
9  at six months with David.  I think they
10  had a job evaluation, confirmation, or
11  whatever.  And I don't think I ever quite
12  made it to the six-month point before it
13  sold.  Somewhere about there.
14  Q  All right.
15  (WHEREUPON, a document was
16  marked as Plaintiff's Exhibit Number 6 and
17  is attached to the original transcript.)
18  Q  I'm going to show you what
19  I've marked as Plaintiff's Exhibit 6 to
20  your deposition, and I'll represent to you
21  that these are a copy of the defendant's
22  answers to plaintiff's interrogatories.
23  And that means -- those are just

Page 98

1  questions.  I asked questions and Mid
2  States, through their lawyers, answered
3  them.
4  A  Uh-huh.
5  Q  Okay.  Are you familiar with
6  that, generally?  Have you ever seen this
7  document before?
8  A  No.
9  Q  Okay.  Well, look at that.  Is
10  it fair to say that you and David Carroll
11  made the decision to fire Norris Foster?
12  MR. DUKES:  Object to the
13  form.
14  Q  You can answer.
15  A  David made the decision.  I --
16  I told him what I -- what I was up against
17  and what the problems were.  He made the
18  decision.
19  Q  Well, Norris Foster worked for
20  you; correct?
21  A  He worked -- he worked under
22  me, yes, sir.
23  Q  You were his immediate

Page 99

1  supervisor; correct?
2  A  Yes.  Right.
3  Q  And David Carroll wouldn't
4  fire one of your employees without talking
5  to you and getting your approval for that,
6  would he?
7  MR. DUKES:  Object to the
8  form.
9  Q  Would he?
10  A  I wouldn't think he would.
11  Q  He didn't, did he?
12  MR. DUKES:  Object to the
13  form.
14  A  No.  I talked to -- I went to
15  David, and we discussed the problems, and
16  we -- we had been discussing the whole
17  scenario from the get-go.  Any time we had
18  a problem, I took it to David.
19  Q  And you agreed with David's
20  decision to fire Norris Foster, didn't
21  you?
22  A  That was the only recourse,
23  I guess, he felt like he had, and I agreed

Page 100

1  with it.
2  Q  Okay.  You didn't object to
3  him firing him, did you?
4  A  No, sir.  No.
5  Q  Okay.  You didn't argue to try
6  to save Norris' job, did you?
7  A  No, sir.
8  Q  Okay.  That's all I'm asking.
9  You approved it.
10  MR. NORRIS:  Object to the
11  form.
12  Q  Correct?  I don't mean that --
13  MR. DUKES:  Misstates his
14  prior testimony.
15  A  I took --
16  MR. DUKES:  Been asked and
17  answered.
18  A  I took it to David, and David
19  made the decision.  And I -- and I support
20  whatever decision David made.
21  Q  Okay.  Well, good.  How
22  much did Sedgefields -- when it was sold,
23  how much was the price of Sedgefields?  Do

25 (Pages 97 to 100)

# American Court Reporting
## toll-free (877) 320-1050

Page 101

1  you know?
2      A    All I know is what I've
3  heard. I don't -- I haven't seen any
4  documents. I just -- I've heard
5  thirty-two million dollars, but I don't
6  know if it's -- I've heard -- I've heard
7  thirty-six. I've heard forty-five. I've
8  heard eighteen too.
9      Q    Have you ever -- have you ever
10 heard of American Field, The Sportsman's
11 Journal?
12     A    Yes, sir.
13     Q    What is that?
14     A    That's a -- that's a bird dog
15 magazine.
16         (WHEREUPON, a document was
17 marked as Plaintiff's Exhibit Number 7 and
18 is attached to the original transcript.)
19     Q    Let me show you Plaintiff's
20 Exhibit 7. Is it a legitimate
21 publication?
22     A    Yes, sir. Well, I assume so.
23     Q    I mean, will you get it?

Page 102

1      A    Yes, sir.
2      Q    Do you read it?
3      A    Yes, sir.
4      Q    Do you rely on it?
5      A    It's got some opinions in it.
6      Q    Sure.
7      A    You know.
8      Q    But it's fairly accurate,
9  wouldn't you think?
10     A    As far as the facts go,
11 normally --
12     Q    Okay.
13     A    -- of reporting field trials
14 and such, yes. I read this. Sure did.
15     Q    And in that -- in Exhibit 7,
16 it says that Sedgefields was sold for
17 thirty-two million, doesn't it?
18     A    It also says it was -- let's
19 see. But I -- but I question some of the
20 things about Orvis, Cushman, and
21 Wakefield. I don't know who -- who -- I
22 don't know who sold it to who. I mean, I
23 knew they were showing it. I read that.

Page 103

1      Q    All right. I want to go back
2  to the day that Norris Foster was fired.
3  And I don't know. Was it December 28th or
4  29th?
5      A    I don't know.
6      Q    Okay. Well, do you remember
7  that you had done some work on some farm
8  equipment? I believe a -- some kind of
9  mower, a grass cutter.
10     A    Probably so. I worked on
11 every -- probably most everything out
12 here.
13     Q    And you spent eight hundred
14 dollars at the tractor place getting some
15 parts. Does that sound about right?
16     A    On which piece of equipment?
17     Q    And --
18     A    Which piece of equipment are
19 you talking -- are you referring to?
20     Q    The tree cutter.
21     A    No, sir.
22         MR. ROBERSON:  Is that what it
23 was?

Page 104

1      A    No, sir.
2      Q    Okay. Well, did -- were you
3  working on a tree cutter in December?
4      A    I have worked on a tree
5  cutter.
6      Q    And did you take it out and
7  make one -- one circle with it, and it
8  broke again?
9      A    No, sir. Not that I'm aware
10 of. I can't remember. I mean, it -- I'm
11 not saying I didn't. I've had -- took a
12 bunch of stuff out before and it broke and
13 be back at the bottom with it.
14     Q    Well, did Norris, while you
15 were working on it, tell you that you
16 needed to get the bars level before you
17 went out there?
18     A    Now, I don't recall that.
19     Q    Yeah. And if you didn't get
20 them level, that the thing was going to
21 break, and it would be right back where
22 you were. Did he tell you that?
23     A    I don't remember that.

26 (Pages 101 to 104)

## www.AmericanCourtReporting.com
## September 8, 2006

**American Court Reporting**
**toll-free (877) 320-1050**

Page 105

1   Q   And then --
2   A   I don't even know what -- what
3   bars you're talking about on a tree
4   cutter.
5   Q   And then you went out there
6   and made one pass, and it broke again.
7   And Norris was laughing at you, wasn't
8   he?
9   A   I don't know.
10  Q   You didn't see him laughing?
11  A   No, sir. I don't recall that.
12  Q   Would that -- would that hurt
13  your feelings, if he laughed at you after
14  he told you what you were about to do?
15      MR. DUKES: Object to the
16  form.
17  A   I -- I don't necessarily think
18  it would hurt my feelings.
19  Q   Okay. Well --
20  A   I'll say I, you know --
21  Q   Do you think you can learn
22  from Norris Foster? Do you think he --
23  A   No, sir.

Page 106

1   Q   No? Do you think he might
2   know more than you about some things?
3   A   It's possible, but not
4   anything I'm interested in.
5   Q   Okay. Like equipment -- farm
6   equipment?
7   A   Definitely not.
8   Q   So you can't learn anything
9   from Norris Foster, can you?
10  A   I don't --
11      MR. DUKES: Object to the
12  form.
13  Q   Well, you can answer.
14  A   Not that -- not that I feel
15  valuable.
16  Q   Did you -- do you remember
17  anything Norris said the day he was fired?
18  A   Yes, sir.
19  Q   What did he say?
20  A   He said -- he said something
21  to the effect, so I guess that means I'm
22  fired. And I think David might have
23  replied yes or whatever. And he said

Page 107

1   that -- that it wouldn't be the last we
2   heard from him.
3   Q   Okay. Anything else?
4   A   He said something to the
5   effect of, that's what lawyers are made
6   for. And then, as he walked to his truck
7   out there, he made a statement of -- which
8   I don't like really repeating because I
9   don't like to hear the word. He referred
10  to his self as a no good, sorry nigger.
11  Q   Norris said that?
12  A   He said that.
13  Q   Exactly what did he say?
14  A   He said, I guess I'm just a
15  worthless, no good, sorry nigger, when he
16  was walking to his car. And I -- I
17  thought that was -- I really -- I thought
18  that was an improper statement for him --
19  even him to make, you know.
20  Q   Okay. Did you ever use that
21  word before?
22  A   If -- if I did, it would be in
23  maybe telling my kids or -- or -- or

Page 108

1   sharing that it's not an appropriate
2   word. It just not is an appropriate word
3   to use.
4   Q   So you've never referred to
5   black people as niggers, ever in your
6   life?
7   A   I -- the only time I would
8   ever use that word is in maybe telling my
9   kids -- trying to settle a dispute or
10  something where -- showing them it's not a
11  proper word. Only in reference. Never as
12  to being improper. It's not a proper
13  word.
14  Q   You -- you grew up in
15  Thomasville, Georgia?
16  A   I did.
17  Q   Did you go to public schools?
18  A   I did. Went to school with
19  black people. I've worked with black
20  people all my life.
21  Q   And you've never called a
22  black person a nigger?
23  A   I cannot recall doing that.

27 (Pages 105 to 108)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 109

1    Q    Even when maybe a black person
2  cut in front of you on the interstate or
3  something? You never even said it in
4  anger?
5    A    Not that I can recall. I
6  don't -- I don't -- like I said, I don't
7  feel like that's a proper word. And if I
8  ever used it in that -- in that demeanor,
9  it -- you know, it would have been wrong.
10  And I don't recall doing that.
11    Q    What church do you go to?
12    A    I don't -- I'm not going to
13  church right now.
14    Q    Have you ever gone to church?
15    A    Yes, sir.
16    Q    Well, are you a member of any
17  clubs, any country clubs?
18    A    No, sir.
19    Q    Are you a member of any
20  organizations like the, you know, Chamber
21  of Commerce or --
22    A    I'm a member --
23    Q    -- Kiwanis Club or anything?

Page 110

1    A    Georgia/Florida Invitational
2  Field Trial Club. I'm a member of that.
3    Q    Is that a hunting dog club?
4    A    It's a field trial club.
5    Q    Okay. Anything else?
6    A    That's all I can think of.
7    Q    Now, there's been some
8  questions raised in this case about Norris
9  Foster. And you've told me the basis --
10  about stealing birds. Has Norris Foster,
11  to your knowledge, ever stolen any dog
12  food from Mid State Land and Timber?
13    A    I don't know.
14    Q    Do you have any information?
15    A    I heard --
16    Q    Have you heard from any
17  source?
18    A    I have heard that -- I have
19  heard that he did.
20    Q    Well, who did you hear it
21  from?
22    A    I think it come up yesterday.
23  I think -- I think I heard maybe --

Page 111

1    Q    You didn't hear about it until
2  yesterday?
3    A    It seemed like -- yeah. That
4  he -- but that's not why Norris Foster was
5  fired from -- from -- from here this
6  go-round. That was --
7    Q    Well, what did you hear
8  yesterday?
9    MR. DUKES: You don't need to
10  tell him any conversations that we've
11  had.
12    A    Yeah. I -- I don't remember
13  where -- I've heard something along the
14  lines of -- it may have been -- well,
15  then -- I'm not going to answer that,
16  then.
17    Q    Well, have you heard from any
18  source, other than Sedgefields' lawyer,
19  that Norris Foster stole dog food?
20    A    I'd have to think about that.
21  I can't remember exactly what -- who --
22  who -- who -- who I heard say it. But it
23  seems like I heard that in discussing

Page 112

1  Norris with somebody several -- several
2  months before he -- you know, back before
3  he was fired, in asking about him or
4  something, you know. Asking -- I can't
5  remember.
6    It seems like I heard that, but I
7  didn't really -- that was in a prior
8  employment there, you know. And I knew
9  about the -- that some -- he had been
10  accused of taking food or birds or
11  something out of the cooler. It seems
12  like dog food might have been said too. I
13  can't remember, you know, exactly.
14    Q    Well, Mr. Norman --
15    A    But it -- but it answered some
16  questions for me, where I had questions.
17  When I found out he had already been
18  accused of that, it kind of -- but that's
19  not why Norris Foster was fired.
20    Q    Mr. Norman, I'm just a country
21  lawyer, and I only get to talk to you one
22  time --
23    A    Yes, sir.

28 (Pages 109 to 112)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 113

1  Q  -- before there's a trial --
2  A  Right.
3  Q  -- in this case.
4  A  Right.
5  Q  So I'm just asking you, sir,
6  to tell me who told you that Norris
7  Foster -- other than your lawyer.  I don't
8  want to know about conversations --
9  A  Yeah.  That's right.
10  Q  -- with your lawyer.  But who
11  told you?  And I'm entitled to that
12  information.
13  A  I can't -- I can't remember
14  exactly because -- who told me.  I'm
15  not going to -- I can tell you that Denise
16  told me that he had -- that Roy had hired
17  him back and that she basically was
18  against it because he had already been
19  terminated one time for what she
20  thought -- what she said, he had been
21  accused of stealing, you know.
22  As far as I knew, that was the
23  reason he was terminated, for stealing

Page 114

1  birds.  And I don't remember if that's
2  where the dog food word come in or not.
3  But I -- it seems like dog food is a
4  familiar part of it.
5  Q  Now, you know, you're a
6  manager of a -- you formerly were a
7  manager of a plantation, weren't you?
8  A  Yes, sir.
9  Q  And everybody has a personnel
10  file that works at the plantation, don't
11  they?
12  A  Not necessarily.
13  MR. DUKES:  Object to the
14  form.
15  Q  No?
16  A  No.  I mean, they may have a
17  file regarding their wages or whatever,
18  but that's, you know --
19  Q  Well, if somebody was fired
20  for stealing birds, wouldn't you expect
21  that there would be a document somewhere
22  that would show that?  Wouldn't you expect
23  that?

Page 115

1  A  It's possible, yeah.
2  Q  Well, it's not just possible.
3  It would be there, wouldn't it?
4  A  I guess if there was a reason
5  for firing him.
6  Q  And let me tell you
7  something.  Have you ever opposed
8  anybody's unemployment?
9  MR. DUKES:  Object to the
10  form.  Do you know what he's talking
11  about?
12  Q  You can answer.  Anybody?
13  A  Yeah.  I'm sitting here
14  thinking.  Yeah, I did.  And I'm trying to
15  remember why.
16  Q  Well, I can tell you why.
17  A  It seems like it -- it seems
18  like it was -- it was for --
19  Q  Well, if that lady stole a
20  camera from you and she filed for
21  unemployment, she can't get it if you
22  tell -- tell them that she stole from you
23  and that's why she was fired.

Page 116

1  A  I don't know.  I objected one
2  time for -- I can't remember for what, and
3  it didn't seem to matter.  It just -- in
4  Georgia.  They just got it anyway, you
5  know.
6  Q  Hum.
7  A  I don't have a lot of faith in
8  that system.
9  Q  I see.  Well, have you ever --
10  and Norris Foster has sued Mid State Land
11  and Timber for discrimination.  You're
12  aware of that, aren't you?
13  A  Yes, sir.
14  Q  That's why you're here today,
15  isn't it?
16  A  It seems so, yes, sir.
17  Q  So to your knowledge, is there
18  any document, in the history of the world,
19  that shows that Norris Foster was ever
20  fired for stealing from Mid States?  Have
21  you seen any kind of document like that?
22  A  No, sir.
23  Q  Well, that seems like the kind

29 (Pages 113 to 116)

**www.AmericanCourtReporting.com**
**September 8, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CIVIL ACTION NUMBER
2:06-CV-00405-ID-SRW

NORRIS FOSTER,
    Plaintiff,
vs.
MID STATE LAND & TIMBER COMPANY, INC.,
d/b/a SEDGEFIELDS PLANTATION,

    Defendant.


THE VIDEOTAPED

DEPOSITION TESTIMONY OF:

JOEL NORMAN

September 8, 2006

9:11    a.m.


COURT REPORTER:

Gwendolyn P. Timbie, CSR

Page 2

```
 1         STIPULATIONS
 2         IT IS STIPULATED AND AGREED by and
 3   between the parties through their
 4   respective counsel that the videotaped
 5   deposition of JOEL NORMAN, may be taken
 6   before Gwendolyn P. Timbie, Certified
 7   Shorthand Reporter and Notary Public,
 8   State at Large, at the law office of John
 9   Waters, Union Springs, Alabama, on
10   September 8, 2006, commencing at
11   approximately 9:11 a.m.
12         IT IS FURTHER STIPULATED AND
13   AGREED that the signature to and the
14   reading of the deposition by the witness
15   is not waived, the deposition to have the
16   same force and effect as if full
17   compliance had been had with all laws and
18   rules of Court relating to the taking of
19   depositions.
20         IT IS FURTHER STIPULATED AND
21   AGREED that it shall not be necessary for
22   any objections to be made by counsel to
23   any questions, except as to form or
```

Page 3

```
 1   leading questions, and that counsel for
 2   the parties may make objections and assign
 3   grounds at the time of trial or at the
 4   time said deposition is offered in
 5   evidence, or prior thereto.
 6         Please be advised that this is the
 7   same and not retained by the Court
 8   Reporter, nor filed with the Court.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

Page 4

```
 1              INDEX
 2   EXAMINATION BY:            PAGE NO:
 3   Mr. Roberson                  9
 4   Mr. Dukes                   203
 5   Certificate                 206
 6   Instructions to Witness     207
 7   Signature Page              209
 8   Errata Sheet                210
 9
10        LIST OF EXHIBITS
11   EXHIBITS:                 PAGE NO:
12   Plaintiff's 1                15
13   Plaintiff's 2                64
14   Plaintiff's 3                65
15   Plaintiff's 4                82
16   Plaintiff's 5                89
17   Plaintiff's 6                97
18   Plaintiff's 7               101
19   Plaintiff's 8               120
20   Plaintiff's 9               121
21   Plaintiff's 10              123
22   Plaintiff's 11              126
23   Plaintiff's 12              133
```

1 (Pages 1 to 4)

Page 117

1  of document you ought to have if you're
2  making that claim, isn't it?
3  　　　MR. DUKES: Object to the
4  form.
5  　　A　If you were going to fire him
6  for that, it -- it needed to be
7  documented.
8  　　Q　You told me he got fired for
9  stealing.
10  　　A　That's what I heard.
11  　　　MR. DUKES: Object to the
12  form.
13  　　Q　Are you saying that might not
14  be true?
15  　　A　No, sir. I believe that's why
16  he got fired.
17  　　Q　You do?
18  　　　MR. DUKES: Object to the
19  form.
20  　　A　The first time.
21  　　Q　Well, why do you believe that?
22  　　A　Because he -- because he stole
23  while I was there. I believe that's

Page 118

1  the legitimate reason. And the reason
2  that I didn't suggest he be fired when he
3  stole from me is because I had just went
4  to work there. I was coming in. I was
5  the underdog, and I was trying to build
6  positive relationships. And I give him
7  the benefit of the doubt at that point.
8  And farther -- later on, I realized that I
9  had been taken advantage of.
10  　　Q　I see.
11  　　A　But I did not make an issue
12  out of it. I did not want to make an
13  issue out of it. I was trying to build a
14  team, and it got to a point where the team
15  was not -- was going the other direction.
16  　　Q　I see. Well, did you ever
17  have a discussion with Norris Foster about
18  him stealing some birds?
19  　　A　I don't think so.
20  　　Q　Did you ever ask him if he
21  stole some birds before you fired him?
22  　　A　No. I didn't fire him.
23  　　Q　Well, before he was fired.

Page 119

1  Did you ever discuss with him the fact
2  that you claim that Jeffrey Harris told
3  you he stole some birds?
4  　　A　No. I don't believe so.
5  　　Q　Was that the reason Norris was
6  fired, is because he stole some birds?
7  　　A　From -- the second time he was
8  fired?
9  　　Q　Yes.
10  　　A　No, sir. It was -- it may
11  have been part of the compounding of the
12  reasons. It didn't help his cause.
13  　　Q　Now, you hired -- or you
14  recommended Joseph Mays and William
15  Hubbard be hired in -- in September of
16  '05; isn't that correct?
17  　　A　It seems somewhere -- when,
18  now? September?
19  　　Q　Yes, sir.
20  　　A　Of '05? I don't --
21  　　Q　I'm sorry. November of '05.
22  　　A　That's -- that's -- that's
23  probably close to it. I can't -- I'm not

Page 120

1  good with dates.
2  　　Q　All right.
3  　　　(WHEREUPON, a document was
4  marked as Plaintiff's Exhibit Number 8 and
5  is attached to the original transcript.)
6  　　Q　I'm going to show you Exhibit
7  8, and ask you if you've ever seen that
8  document.
9  　　A　I haven't read this one yet
10  because you ain't give me time.
11  　　Have I ever seen this?
12  　　Q　Yes.
13  　　A　This is -- this is when David
14  terminated him. No. I haven't seen this.
15  　　Q　Okay. Let's go off the
16  record. We're about out of tape. And
17  let's go off the record and let her change
18  tapes if we can.
19  　　　THE VIDEOGRAPHER: At this
20  time, we're going off the record. The
21  approximate time is 10:52 a.m., and this
22  will be the end of tape one.
23  　　　(Recess taken.)

30 (Pages 117 to 120)

Page 121

```
 1        THE VIDEOGRAPHER:  At this
 2   time, we're going back on the record.  The
 3   approximate time is 11:04 a.m., and this
 4   will be the beginning of tape two.
 5        (WHEREUPON, a document was
 6   marked as Plaintiff's Exhibit Number 9 and
 7   is attached to the original transcript.)
 8        Q    (BY MR. ROBERSON)  Mr. Norman,
 9   I'm going to show you what I've marked as
10   Exhibit 9 to your deposition, and ask you
11   if this is related to the first time
12   Norris Foster wor -- worked at Mid State
13   Land and Timber Company.
14        Have you ever seen that document
15   before?
16        A    It don't look familiar.  I
17   don't -- I don't think I've had access to
18   that.
19        Q    Well, read -- why don't you
20   read that.  It is about Norris Foster,
21   isn't it?
22        A    This is pertaining to his
23   first employment?
```

Page 122

```
 1        Q    Yeah.  Well, did they give a
 2   reason why his employment was terminated
 3   in nine -- in 2001?
 4        A    Reduction in staffing for
 5   plantation work.
 6        Q    That doesn't say anything
 7   about stealing, does it?
 8        A    No.
 9        Q    Does it say Norris Foster is
10   eligible for rehire?
11        A    That's what it says.
12        Q    Now, why would they make a
13   document like that if he had been stealing
14   from them?
15        A    It may be to --
16        MR. DUKES:  Object to the
17   form.
18        A    -- give him a break, get him
19   on down the road, get him -- wouldn't hurt
20   his next -- get him -- get him -- you
21   know, not to hurt him.
22        Q    Why would they hire him back
23   if he had been stealing from them?
```

Page 123

```
 1        A    I don't know the answer to
 2   that.  Poor judgment.
 3        Q    That would be stupid, wouldn't
 4   it?
 5        A    Yep.
 6        Q    That would be stupid.  That
 7   would be -- you'd deserve to get sued
 8   then, would you?
 9        MR. DUKES:  Object to the
10   form.
11        A    I don't know about that.
12   But...
13        (WHEREUPON, a document was
14   marked as Plaintiff's Exhibit Number 10
15   and is attached to the original
16   transcript.)
17        Q    I'm going to -- I'm going to
18   show you Exhibit 10.  And is this an
19   unemployment application for Norris
20   Foster?
21        A    It looks like it.
22        Q    It looks like --
23        A    Well, I've never seen one
```

Page 124

```
 1   before, but this looks like that's what
 2   that is.
 3        Q    And, in fact, Norris Foster
 4   drew unemployment after he got laid off
 5   for a reduction in staffing at Mid State
 6   Land and Timber in 2001, didn't he?
 7        A    Looks like they did.
 8        Q    He should have, if that's the
 9   reason he got laid off; correct?
10        MR. DUKES:  Object to the
11   form.
12        Q    He should draw unemployment,
13   shouldn't he?
14        MR. DUKES:  Same objection.
15        A    That's up -- that's between
16   him and employment.  I don't have any --
17   any say-so over that.
18        Q    Okay.  Well, wouldn't you
19   expect an employee to draw unemployment if
20   they were laid off as a result of staffing
21   reduction?
22        A    I'd expect him to get out and
23   hunt another job.
```

**American Court Reporting**
**toll-free (877) 320-1050**

Page 125

1   Q   Oh, okay.  Let me show you
2   this -- this exhibit we didn't finish
3   going over about -- Exhibit 3.
4       Now, if you would -- this indicates
5   the people who worked under you in the
6   quail operations part; correct?
7   A   In March?
8   Q   Yes, sir.
9   A   That -- that looks right.
10  Q   Okay.  Who are those
11  individuals listed there?
12  A   Chance Ham.
13  Q   Is he a white male?
14  A   He is.
15  Q   Okay.  Who else?
16  A   Will Hubbard.
17  Q   Is he a white male?
18  A   He is.
19  Q   Who else?
20  A   Willie Mack.
21  Q   Is he a white male?
22  A   No.
23  Q   He's black, isn't he?

Page 126

1   A   Yes, sir.
2   Q   Now, do you know how much each
3   one of those people made in March of '06?
4   A   I can't -- I can't -- I can't
5   sit here and say that and be -- and be
6   sure.
7   Q   Well, I'll help you.  Did
8   you -- tell me -- Chance Ham was hired in
9   January of '06; isn't that correct?
10  A   I can't -- I can't remember
11  the date.  It was -- it was before hunting
12  season was over.  I remember that.
13  Q   All right.  Now, is Chance
14  Ham -- would that be Forest Chance Ham?
15  A   I believe that's his full
16  name.
17  Q   Okay.
18      (WHEREUPON, a document was
19  marked as Plaintiff's Exhibit Number 11
20  and is attached to the original
21  transcript.)
22  Q   Well, I'm going to show you
23  what I'm going to mark as Exhibit 11.  And

Page 127

1   this is Chance Ham's application for
2   employment with Mid State Land and Timber
3   Company.
4       Have you ever seen that before?
5   A   I believe I did.  But if this
6   was filled out -- he filled out an
7   application way back, early on.  I don't
8   know if this is the original.  Let's see.
9   I don't -- I don't see a date on here.
10  Q   How old is Chance?  He's got
11  his driver's license there.
12  A   11/22.  I don't think --
13  this -- this was on file before we
14  ever inter -- before I ever interviewed
15  Chance, for several months.
16  Q   Okay.  Well --
17  A   I -- I was referred to that
18  file when we were -- when we started
19  looking for some more help.
20  Q   And this is such a bad copy.
21  You probably can't read his date of birth
22  on his driver's license.  But is -- would
23  you say Chance was in his early twenties?

Page 128

1   A   I think he would be, yes, sir.
2   Q   He didn't have any military
3   service, did he?
4   A   No, sir.
5   Q   He had a high school
6   education, didn't he?
7   A   I assume so, yes, sir.
8   Q   And he had worked at Bonnie
9   Plant Farm as a helper; correct?
10  A   He -- that's what's on his
11  application.
12  Q   And he -- and do you -- do
13  y'all check references when -- when
14  somebody applies for a job there?
15  A   I had -- I -- I've talked with
16  Denise about him.  She knew of him and
17  knew a little bit about him.  And I -- she
18  -- I used her as a -- as a reference.
19  Q   Well, that doesn't answer my
20  question.  Do y'all check references on
21  applications?
22  A   I'm sure that they're -- that
23  it has been done.  And David checked on

32 (Pages 125 to 128)

Page 129

1  me. And I...
2    Q  Well, Chance was born in
3  1984. And so in 2005, he would have been
4  twenty-one years old, wouldn't he?
5    A  I assume so. I haven't done
6  my math on it.
7    Q  And he claimed on his
8  application that he had been dri -- using
9  heavy equipment -- had a skill of heavy
10  equipment for five years, didn't he?
11    A  If that's what's on there.
12  That -- I have -- like I said, I haven't
13  got that in front of me. You do.
14    Q  Okay. Well, Norris Foster,
15  when he worked there, did he drive
16  tractors?
17    A  He did.
18    Q  Did he drive backhoes?
19    A  I -- I -- I -- I imagine he
20  did if it needed driving.
21    Q  Could he operate one,
22  backhoe?
23    A  I would think he could. I

Page 130

1  have confidence in him to believe he
2  could.
3    Q  What about bulldozers? Could
4  he drive bulldozers, push up piles?
5    A  He -- I have -- I have not put
6  him on a bulldozer, but he has convinced
7  me that he can. I haven't had the need to
8  put him on there at this point.
9    Q  Okay.
10    MR. DUKES: Wait a minute.
11  Who are we talking about? Chance Ham or
12  Norris Foster?
13    MR. ROBERSON: Norris Foster.
14    A  Oh, Norris?
15    Q  Yeah.
16    A  Well, wait. How did you get
17  to him? We talked -- you're telling me
18  about -- you were asking me questions
19  about Chance Ham's resume.
20    Q  You need to -- you need to
21  listen to my question.
22    A  Application.
23    MR. DUKES: Yeah. I think you

Page 131

1  misunderstood him.
2    Q  We'll -- we'll do it again.
3    A  Okay.
4    Q  I'm sorry if you misunderstood
5  it.
6    A  Sure.
7    Q  Do you know Norris Foster?
8    A  Yes, sir.
9    Q  Did he drive a tractor when he
10  worked at Mid State?
11    A  He did.
12    Q  Did he drive a bulldozer when
13  he worked at --
14    A  No.
15    Q  -- Mid State?
16    A  Now, I've never witnessed
17  that.
18    Q  Did he drive a -- operate a
19  backhoe?
20    A  I -- I can't specifically say
21  he did, but I would -- I would not -- he
22  probably put some hay in the horse pasture
23  with one, which doesn't require a lot of

Page 132

1  backhoe skills.
2    Q  On the day he was fired, was
3  he shoveling manure out of the barn?
4  Norris Foster.
5    A  They had been cleaning the
6  stalls in the horse barn.
7    Q  "They" being Jeffrey Harris
8  and Norris Foster; correct?
9    A  On that particular day.
10    Q  Will Hubbard and Joseph May
11  weren't shoveling stalls, were they?
12    A  I don't know if Joseph May
13  even worked there at that time.
14    MR. DUKES: Object to the
15  form.
16    Q  Well, this says, starting pay
17  expected, negotiable; correct?
18    MR. DUKES: You're referring
19  to?
20    MR. ROBERSON: Number 11.
21    A  Yes. That's what it says.
22    Q  Did you pay him eight dollars
23  an hour?

33 (Pages 129 to 132)

Page 133

1    A    It says that he -- this was
2  the application that was put in on
3  11/22/05. I did not interview him until
4  just before we hired him.
5    Q    Okay. And you hired him after
6  Norris Foster was fired; correct?
7    A    I'm not sure. I'm not sure as
8  to the dates of that.
9        (WHEREUPON, a document was
10 marked as Plaintiff's Exhibit Number 12
11 and is attached to the original
12 transcript.)
13   Q    I'm going to show you what I'm
14 going to mark as Exhibit 12, which is
15 William Hubbard's personnel file.
16       Do you know Will Hubbard?
17   A    I do.
18   Q    Does he still work out at
19 Sedgefields?
20   A    No, sir.
21   Q    Did he quit?
22   A    He did.
23   Q    Did you interview him and

Page 134

1  recommend that he be hired in November of
2  2005, as a laborer, at eight dollars per
3  hour?
4    A    After talking with him and
5  interviewing him, I discussed with David
6  did I -- did I feel he -- like he met the
7  qualifications we were looking for. And I
8  suggested that they pay him eight dollars,
9  if that's what it took to get him.
10   Q    Okay. Why did you hire Will
11 Hubbard in November of 2005?
12   A    Needed him.
13   Q    To do what?
14   A    To run equipment.
15   Q    So you recommended that you
16 hire additional staff --
17   A    Yes, sir.
18   Q    -- in November of '05.
19   A    That's right.
20   Q    Is that correct?
21   A    That's right.
22   Q    And David agreed with you;
23 correct?

Page 135

1    A    That's right.
2        MR. ROBERSON: I'm sorry,
3  Carter. What's that number?
4        MR. DUKES: The last exhibit?
5        MR. ROBERSON: Yes, sir. Is
6  it 12?
7        MR. DUKES: 12.
8        MR. ROBERSON: Yeah.
9        (WHEREUPON, a document was
10 marked as Plaintiff's Exhibit Number 13
11 and is attached to the original
12 transcript.)
13   Q    Let me show you Exhibit 13.
14 And this is the personnel file of Joseph
15 May. And it's actually Exhibits 092
16 through 106.
17       Ask you if Joseph May was hired as a
18 laborer in November of '05, at the rate of
19 eight dollars per hour.
20   A    He was -- he asked for nine.
21   Q    Sir, was he hired at -- is he
22 a white male?
23   A    Yes, sir.

Page 136

1    Q    Was he hired at an hourly rate
2  of eight dollars per hour?
3    A    I -- I believe that's right.
4  I haven't -- I haven't --
5    Q    Well, look right there on
6  Exhibit 13.
7    A    Yes, he was.
8    Q    He was, wasn't he?
9    A    That's right.
10   Q    And Will Hubbard doesn't even
11 have a high school education, does he?
12   A    No.
13   Q    How old is Will Hubbard?
14   A    I don't know. Probably about
15 the same age as these other boys.
16   Q    About half Norris Foster's
17 age?
18   A    Probably so.
19   Q    None of those boys have
20 military experience, do they?
21   A    They've got a driver's
22 license.
23       MR. DUKES: Just answer his

34 (Pages 133 to 136)

Page 137

1 questions.
2     Q    Are you saying that's why they
3 were paid eight dollars and Norris
4 Foster --
5     A    I --
6     Q    -- was paid --
7     A    No.
8     Q    -- less than that?
9     A    No.  But I think it was
10 something we considered.  We did not
11 consider military experience.  We
12 considered what they could do for
13 Sedgefields.
14     Q    Do you need a driver's license
15 to drive a tractor?
16     A    No, sir.
17     Q    Do you need a driver's license
18 to drive a backhoe or a bulldozer?
19     A    No, sir.
20     Q    Do you need a driver's license
21 to perform general labor?
22     A    You need one to go to town to
23 get parts or to transport horses to and

Page 138

1 from the hunt, to drive a company vehicle.
2     Q    Okay.  Are you telling me that
3 the only reason that these boys were paid
4 eight dollars per hour --
5     A    No, sir.
6     Q    -- and Norris Foster made
7 seven dollars per hour was because he
8 didn't have a driver's license?
9     A    No, sir.
10         MR. DUKES:  Object to the
11 form.
12     A    That's not the only reason.
13     Q    Okay.  What's the other
14 reason?
15     A    I had no input on what Norris
16 Foster made.  Norris Foster was hired
17 before I came there.  I only had input on
18 these guys.  These guys could drive
19 equipment.  They could trap.  They could
20 mechanic.  They could fix ma -- machinery
21 that had been broke down that we couldn't
22 use until they got there, till we could
23 hire somebody to help put it back

Page 139

1 together.  These were the duties that I
2 needed fulfilled.
3     Q    What --
4     A    And we also needed additional
5 help.  We were building up.  Building up.
6 There were -- no magic number.  We needed
7 more.  I didn't -- we -- I didn't hire any
8 of them to replace anybody.  It was
9 building a staff.
10     Q    Well, did you advertise these
11 positions?
12     A    Word of mouth.
13     Q    Did you advertise these
14 positions?
15     A    Just through word of mouth.
16     Q    Is there anything in writing
17 where you posted that jobs were available?
18     A    I don't think so.
19     Q    Because black people could
20 respond to written postings, couldn't
21 they?
22     A    All word of mouth.
23         MR. DUKES:  Object to the

Page 140

1 form.
2     Q    Well, they can't respond to
3 word of mouth if they don't know about
4 it?  Do they?
5         MR. DUKES:  Object to the
6 form.
7     A    No, sir.
8     Q    What's the percentage of black
9 people in Bullock County?  Do you know?
10     A    No, sir.
11     Q    Is it heavy majority black?
12         MR. DUKES:  Object to the
13 form.
14     A    It appears so.
15     Q    And did you hire three white
16 people, beginning in November of '05, to
17 work -- or David Carroll hire them to
18 work as laborers --
19     A    I did.
20     Q    -- on your plantation?
21     A    I did.
22     Q    Did you have any black
23 applicants --

35 (Pages 137 to 140)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 141

1  A  I don't --
2  Q  -- for those positions?
3  A  I don't recall any qualified
4  applicants.
5  Q  Do you recall any black
6  applicants?
7  A  No, sir.
8  Q  So the only three applicants
9  were white, and they got hired by word of
10  mouth; correct?
11  A  Well, actually, there were
12  four applicants, but --
13  Q  Who was that other one?
14  A  A guy that worked for David's
15  father.
16  Q  Who was he?
17  A  I can't remember his name. I
18  can --
19  Q  Was he white?
20  A  He was.
21  Q  So the only four applicants
22  were white; correct?
23  A  That's all I had an -- had an

Page 142

1  interview with. That's all that I was
2  supposed to.
3  Q  I see. Well, why wasn't that
4  fourth one hired?
5  A  I think he wanted too much
6  money. He couldn't afford to work for
7  what we were willing to pay.
8  Q  Did he fill out an
9  application?
10  A  I don't know if he did or we
11  just inter -- may have just interviewed
12  him and -- and -- and just talked about
13  it. I don't remember for sure.
14  Q  So would it be fair to say,
15  Mr. Norman, that you handpicked these
16  people who were going to work as laborers
17  at Mid State Land and Timber Company?
18  A  No, sir.
19  MR. DUKES: Object to the
20  form.
21  A  I didn't handpick them. I
22  took the first qualified applicants that
23  come along to fill a position that was an

Page 143

1  -- position that needed immediately
2  filling, just as quick as we could.
3  Q  Okay. Well, how did the word
4  get out by word of mouth?
5  A  I --
6  Q  Did you tell anybody?
7  A  I would ask Denise did she
8  know anybody around town that's -- that's
9  got some experience. She -- and I think
10  somehow -- I don't know where the word got
11  out. But I had -- Will, I think, was the
12  first guy that come by or called me. No.
13  I take it back. It was -- I don't
14  remember if it was Adam or Will. But one
15  of them suggested the other one. He knew
16  him and told me about his capabilities.
17  And so we decided to hire them both.
18  Chance's application was already on
19  file, and I didn't know it. I think Will
20  told me, after Adam left, that -- look,
21  said, there's a guy down there that's got
22  experience welding. His file is already
23  on -- already with the thing. So I asked

Page 144

1  Denise about it, and she said, yeah. So
2  we give him a call. We interviewed him.
3  I wasn't aware of that until they made me
4  aware of that, or I would have done hired
5  him.
6  Q  So was it generally known?
7  Did you go to the unemployment office?
8  A  No, sir.
9  Q  Did you go post any posters
10  down on Main Street?
11  A  Didn't have to.
12  Q  Just word of mouth?
13  A  Yes, sir.
14  Q  Is Sedgefields an equal
15  opportunity employer?
16  A  I don't know. I don't know.
17  MR. DUKES: Object to the
18  form.
19  Do you know what that means?
20  A  I -- I would think that they
21  wouldn't -- they wouldn't discriminate, I
22  mean.
23  Q  Well, wouldn't they post --

**American Court Reporting**
**toll-free (877) 320-1050**

Page 145

1 wouldn't they want to fill positions by
2 posting their jobs, so they could get a
3 diverse and broad experience of -- of
4 applicants for their labor pool?
5     MR. DUKES:  Object to the
6 form.
7     A    You know, I don't know if that
8 -- if they -- I don't know.
9     Q    Can you think of any reason --
10    A    I -- I never --
11    Q    -- why they wouldn't post the
12 job?  Can you think of any reason?
13    A    We had people that were
14 available.  If it were to become necessary
15 to post a job, we -- we probably would
16 have.
17    Q    Since you've been the -- the
18 quail operations manager, have you ever
19 posted any position for -- for work at --
20 at Sedgefields?
21    A    No, sir.
22    Q    Do you know if they have ever
23 posted any job at Sedgefields?

Page 146

1     A    Yes.
2     Q    When was that?
3     A    When they -- the one I
4 responded to.
5     Q    Do you know if there were any
6 other applicants for the position when you
7 were hired?
8     A    I hear there were, but I don't
9 know who they were.
10    (WHEREUPON, a document was
11 marked as Plaintiff's Exhibit Number 14
12 and is attached to the original
13 transcript.)
14    Q    Now, I'm going to show you
15 what I'm going to mark as Exhibit 14, I
16 believe it is.
17    Is Jeffrey Harris a black male?
18    A    Yes, sir.
19    Q    Does he have a driver's
20 license?
21    A    I think he has a driver's
22 license.
23    Q    And he was hired in September

Page 147

1 of '05, the same month you were hired?
2     A    Before I was hired, yes, sir.
3     Q    Okay.  Well, he got a raise in
4 January of '06, didn't he?
5     A    Probably his three-month
6 evaluation period, I think.  Probably
7 right along -- I think I remember that.
8     Q    Well, why would he get a raise
9 when he was hired before all these white
10 guys and he has a driver's license?  And
11 he must have been doing a satisfactory job
12 because he got a raise.
13    A    That's right.
14    MR. DUKES:  Object to the
15 form.
16    Q    Why would he get a raise to
17 seven fifty an hour, where he is still
18 making less than the white employees,
19 please, sir?
20    MR. DUKES:  Object to the
21 form.
22    Q    I'll show you Exhibit 14.
23 Will you please explain that to me?

Page 148

1     MR. DUKES:  Object to the
2 form.
3     A    Well, because he was -- he was
4 making seven, and seven fifty is better
5 than seven.
6     Q    Yeah.  Can't argue with that.
7     A    But he still can't weld, still
8 can't drive a bulldozer.  He's still in a
9 learning process.  He -- he -- he still
10 has a ways to go as far as his value to me
11 on -- on equipment goes and repairing
12 equipment, welding.
13    Do you think a welder should make
14 more than a tractor driver, you know?
15 That's how I evaluate it.
16    Q    Tell me all the people that
17 were white that could weld.
18    A    Before when?
19    Q    Tell me all the people that
20 were white that could weld.
21    A    Now or before I hired any of
22 those guys?
23    Q    Sir, you hired three people --

37 (Pages 145 to 148)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 149

```
 1    A    That's right.
 2    Q    -- that were white; correct?
 3         MR. DUKES:  Object to the
 4    form.
 5    A    Right.
 6    Q    Of those three people, which
 7    ones could weld?
 8    A    Chance.  Will could do some
 9    welding, not as good as Chance.  And Adam.
10    All three of them.
11         MR. ROBERSON:  Let me have
12    those exhibits, please.
13    Q    Had any of them ever worked
14    anywhere as a welder?
15    A    Chance.
16    Q    Where?
17    A    I think it's C&W, or whatever
18    this place is down the street here that
19    builds these --
20    Q    Had Will Hubbard or Joseph May
21    ever worked as a welder?
22    A    I don't think they were --
23    worked as a, quote, welder, but they had
```

Page 150

```
 1    welding experience.
 2    Q    Did they ever have any
 3    certifications as a welder?
 4    A    I don't know about that.
 5    Q    Did they list as skills that
 6    they held that they could weld?
 7    A    We -- they told me they could
 8    weld.
 9    Q    Oh.
10    A    And I took...
11    Q    Well, wasn't it --
12    A    And they showed me they could
13    weld.
14    Q    Wasn't it important enough to
15    write down?
16    A    I didn't fill out that.
17    Q    I see.
18         MR. ROBERSON:  Can you weld?
19    Q    What do you weld over there at
20    Sedgefields?
21    A    Anything that -- that breaks,
22    you know, on machinery that -- that --
23    that -- to keep it going.  Anything that
```

Page 151

```
 1    breaks.
 2    Q    And tell me everything that
 3    Chance Ham has welded for you.
 4    A    Well, he's -- did a bunch of
 5    welding on the roller choppers, welded --
 6    did some welding on a roam bed and plow.
 7    On -- did some welding on some bulldozer
 8    tracks that we use.  It's called a -- it's
 9    called a Herschel drag, that drags through
10    the woods.  Totally built that.  And I
11    couldn't name all the stuff he's welded
12    up, just, you know, put back together.
13    Good wire welder.
14    Q    Has --
15    A    Could make a lot more money
16    doing something else.
17    Q    Did Will Hubbard ever weld
18    anything for you?
19    A    Yes.
20    Q    What did he weld?
21    A    He welded on the roller
22    choppers.  That's all I can remember.
23    That's basically what his job was, roller
```

Page 152

```
 1    chopping.  And that's where his -- we
 2    would have been exposed to having to weld.
 3    Q    Did Joseph Mays ever weld for
 4    you?
 5    A    I'm pretty sure he did.  Joe
 6    -- Joseph wasn't there very long, and he
 7    --
 8    Q    Can you name one thing he
 9    welded?
10    A    I can't -- I can't remember.
11    He did a bunch of mechanic'ing work,
12    and -- and I'm sure he tacked some stuff
13    together.  But I can't -- I can't -- I
14    can't -- he wasn't there long enough to --
15    to really --
16    Q    Were they hired full time or
17    part time?
18    A    I think they may have been
19    considered part time until their
20    evaluation terms of three months, before
21    they were considered full time, I believe.
22    Q    After three months, is there
23    any written evaluation of anybody's job
```

38  (Pages 149 to 152)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 153

1 performance?
2     A    I'm not -- I'm not sure. They
3 -- that's something that -- I'm not sure
4 about it being written.
5     Q    So it's kind of a subjective
6 evaluation? Do you know what that means,
7 "subjective"?
8     A    I would -- I would -- no,
9 sir. Explain it.
10         MR. DUKES: Object to the
11 form.
12     Q    Excuse me?
13     A    It's subject to what?
14     Q    Well, basically, it's Dave
15 Carroll's opinion of their work
16 performance.
17     A    I'm -- based on -- sure. I'm
18 -- he would ask someone else's opinion,
19 I'm sure, if he didn't have a chance to
20 observe them.
21     Q    Okay. Now, let me ask you,
22 Mr. Norman -- I -- I've never been to a --
23 I don't hunt, so I've never been to a

Page 154

1 quail hunting place. But I hear that at
2 Sedgefields, they charge guests five
3 thousand dollars to hunt on their
4 property. Is that true?
5         MR. DUKES: Object to the
6 form.
7     A    I -- I think so. I think that
8 sounds right.
9     Q    Five thousand dollars for one
10 person to hunt?
11     A    No, sir. I think that's for a
12 party of four.
13     Q    Party of four?
14     A    I believe that's right.
15     Q    Twelve hundred and fifty
16 dollars a piece. And how many --
17     A    That if --
18     Q    -- days of hunting does that
19 get you?
20     A    I think -- I think it's a day.
21     Q    A day?
22     A    Yes.
23     Q    Five thousand dollars a day if

Page 155

1 you -- do -- what if you spend the night?
2     A    I think that probably includes
3 a night's lodging.
4     Q    Oh. So it -- are there people
5 who can pay that?
6     A    Oh, yeah.
7         MR. DUKES: Object to the
8 form.
9     A    Obviously.
10     Q    Well, surely those people have
11 to pay with a credit card or something,
12 don't they?
13     A    Some, yeah.
14     Q    I mean, you don't bring five
15 thousand dollars in a wad of bills out
16 there, do you?
17     A    Some people -- I have seen
18 people come with money, but they didn't --
19 they don't normally pay their bill with
20 cash.
21     Q    Yeah. I mean, of course not.
22 And so there's probably a record of the
23 guests and the amount paid for everyone

Page 156

1 who's visited the lodge, isn't there?
2     A    Should be.
3     Q    And who would have that
4 record?
5     A    Probably somebody in
6 Mississippi, for sure.
7     Q    Okay. Now, if you're paying
8 five thousand dollars a day to hunt, would
9 you give somebody a tip?
10     A    If I was a gracious person, I
11 probably would.
12     Q    Have you ever had a guest at
13 Sedgefields leave a tip?
14     A    Yes, sir.
15     Q    Do they do that also on their
16 credit card?
17     A    I don't know.
18     Q    Well --
19     A    I don't take -- I don't -- I
20 don't collect the money. I just take them
21 hunting.
22     Q    Well, have -- do -- do you
23 know if some people leave money --

39 (Pages 153 to 156)

Page 157

1    A    Yes.
2    Q    -- and some people leave it on
3    their credit card?
4    A    I know that people leave money
5    from time to time, and I have people walk
6    up and hand you money from time to time.
7    But I don't know how they pay when -- I
8    don't know how they -- other than somebody
9    giving me a cash tip, I don't know how
10   they pay Sedgefields.  It's not my
11   business.
12   Q    Oh, I -- I understand that.
13   But it's sort of the custom, in the
14   hunting industry, that if it's a
15   successful hunt, that you'd leave a tip,
16   isn't it?
17   A    Not necessarily, no.
18   Q    No?
19   A    I know places that -- that
20   won't let people tip.
21   Q    Well, at Sedgefields, is it
22   sort of customary to leave a tip?
23   A    Not -- I don't know.  I

Page 158

1    haven't been at Sedgefields long enough
2    to -- to know what the customs are.  This
3    -- I mean, this is a new thing that we
4    just kind of got kicked off.  I don't
5    think there's a written rule.
6    Q    You've been there since
7    September.
8    A    Yes, sir.
9    Q    How many hunts have you been
10   on?
11   A    Probably twenty, twenty-five,
12   something like that.  Half-a-day hunts.
13   Q    How many tips have you gotten?
14   A    I don't know.  I didn't count
15   them.
16   Q    Well, is there a record of the
17   tips that hunting crews get at
18   Sedgefields?
19   A    There would be a record of
20   those that went through the office.  I'm
21   sure that -- that was required.
22   Q    What -- what about those that
23   didn't go through the office?

Page 159

1    A    No.  There's not a record of
2    that.
3    Q    That's just cash, isn't it?
4    A    (Witness nodded head in the
5    affirmative.)
6    Q    Is that yes?
7    A    That's yes.
8    Q    And if they give that cash to
9    you, what happens to it?
10   A    If -- if they give it to me?
11       MR. DUKES:  Object to the
12   form.
13   Q    Yes.
14   A    If they give it to me -- give
15   it to me, I spend it.
16   Q    Do you share it with the
17   people in your crew?
18   A    Yeah.  If -- if it's given --
19   if it's given to me and I'm directed to
20   share it, I will.
21   Q    What if they just give it to
22   you?
23   A    I walk -- I walk and give it

Page 160

1    to Dave -- I give it to David and have
2    David disburse it.  If it's given to me
3    to -- to divide, I give it to David and
4    let David divide it.  If it's given to me
5    as my gift, I put it in my pocket.
6    Q    Well, what you're saying, as I
7    understand it, is if you get cash, unless
8    the guest directs you to divide it to --
9    with the hunting crew and the other people
10   that have -- went out on the hunt, you
11   keep it?
12   A    Absolutely.  I ain't that
13   free-hearted.  Something that's give --
14   you said "give" -- to me, is mine.
15   Q    So you make seventy thousand
16   dollars.  You are provided with a car and
17   housing.  And these guys that are working
18   alongside you for, in Norris' case, seven
19   dollars an hour -- are they part of the
20   hunt?
21   A    Yes, sir.
22       MR. DUKES:  Object to the
23   form.

40  (Pages 157 to 160)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 161

1    Q    Are they an important part --
2    A    Yes, sir.
3    Q    -- of the successful hunting
4    experience?
5    A    Absolutely.
6    Q    Do they provide customer
7    service?
8    A    Yes.
9    Q    Do they assist the guests?
10   A    Yes.
11   Q    Do they make sure that the
12   guests at Sedgefields has a pleasurable
13   experience?
14   A    It's -- it's their job to.
15   Q    It is their job to.
16   A    But I'm not saying they always
17   make sure of it. It's their job, their
18   description.
19   Q    Okay. Well, they're supposed
20   to. Is that fair?
21   A    Supposed to. There you go.
22   Yes, sir.
23   Q    Okay. Did you ever give

Page 162

1    Norris Foster any tips?
2    A    I can't -- I can't recall. If
3    I was instructed to, if -- if -- I did.
4    But I realized there was a problem with
5    it. Became -- it became an issue. So I
6    started giving it to David and said,
7    David, here, disburse this. I don't want
8    -- I want you to handle this. The tips
9    were becoming an issue.
10   Q    Okay. Well, do you file an
11   income tax return?
12   A    Yes, sir.
13   Q    How much did you report as
14   income from tips you received?
15   A    None.
16   Q    None?
17   A    None.
18   Q    Didn't you get some tips?
19   A    Yes, sir.
20   Q    You just didn't report them?
21   A    Just didn't report them.
22   Q    Well, isn't that a crime?
23   A    Possibly.

Page 163

1    Q    So you didn't share them, and
2    you didn't report them as income, and you
3    didn't give them to Norris Foster or the
4    other hunting -- hunting member -- crew
5    members?
6    A    I give --
7         MR. DUKES: Object to the
8    form.
9    A    I did not give what was give
10   -- given to me from -- to anybody. If it
11   was given to me -- if it was handed to me
12   and asked to disburse, I disbursed it.
13   Q    Okay. But you sent a memo
14   there, didn't you?
15   A    I -- I talked with David, and
16   David sent a memo out.
17   Q    Okay. And you sent a memo
18   about the tips, didn't you?
19   A    Yes, sir.
20   Q    In fact, you sent that memo on
21   November 3rd. So it had already become a
22   problem from September to November;
23   correct?

Page 164

1    A    Yes, sir. Well, hunting --
2    hunting started in October. From October
3    to November, it become an issue.
4         (WHEREUPON, a document was
5    marked as Plaintiff's Exhibit Number 15
6    and is attached to the original
7    transcript.)
8    Q    I'll show you what I've marked
9    as Exhibit 15, and ask you if that's a
10   copy of the memo that was sent to
11   Sedgefield employees about tipping. Is
12   it?
13   A    Oh, yeah. That was sent out.
14   Q    And that's what you talked
15   about with David, and then he -- he sent
16   out that memo; correct?
17   A    Right.
18   Q    All right. Now, did Norris
19   Foster ever blow up a tractor?
20   A    I don't know.
21   Q    Did he ever while you were out
22   there working?
23   A    I don't know.

41 (Pages 161 to 164)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 165

1    Q    Do you have any information,
2  from any source whatsoever, other than
3  your lawyer or Mid State's lawyer, that he
4  did?
5    A    Well, we -- we have one that
6  we just had some work done on it that we
7  assumed the engine was good in that he was
8  driving that's giving us problems now.  So
9  I -- I don't know.  I -- I don't know what
10  happened to it.  It's been sitting there
11  since -- basically since he left.  So I
12  don't know, you know.
13    Q    Okay.  And what -- which
14  tractor is that?
15    A    It's a Kubota 9000 that the --
16  the lift in the -- we just had to work --
17  the lift worked on and come back.  Now the
18  engine is no good.
19    Q    All right.  Norris Foster was
20  fired on December the 29th of 2005.  Are
21  you telling me that Sedgefields hadn't had
22  anybody drive that tractor since he was
23  fired?

Page 166

1    A    What was the date?  December?
2    Q    December 29th.
3    A    I can't -- I can't say to that
4  because we had some other equipment, you
5  know, we were using.  I can't -- I can't
6  be specific about that.  But we have -- we
7  had not discovered a -- a problem with it
8  until we had it sent to the shop.  It's
9  been -- both of them -- we've got two of
10  them.  Both of them have been sitting up
11  for a long period of time.
12    Q    So you're just blaming Norris
13  for that?
14    A    No.  I didn't blame nobody.
15    MR. DUKES:  Object to the
16  form.
17    A    You asked me, and I said I
18  didn't know.
19    Q    Okay.  Well -- now, you know,
20  I go to the restaurant.  And let's say I
21  have a ten dollar check.  And I'm going
22  to -- usually, I leave twenty percent as a
23  tip.  Is that the usual tip in -- on the

Page 167

1  hunting industry?
2    A    No, sir.
3    Q    Twenty percent?
4    A    No, sir.  I don't know if it
5  --
6    Q    That would be high, wouldn't
7  it?
8    A    I don't know if there is a set
9  thing for it.
10    Q    Yeah.  I don't know either.  I
11  don't hunt.
12    But would -- would you ever get as
13  much as a thousand-dollar tip from
14  somebody?
15    A    No.
16    Q    That -- that would just be --
17  that would be twenty percent, wouldn't
18  it?  Of a five-thousand-dollar bill, that
19  would be twenty percent?
20    A    Yeah.  Yeah.
21    Q    What about five hundred
22  dollars?  Would you get ten percent?
23    A    I'm -- I would never -- not --

Page 168

1  not at Sedgefields.  I don't think I've --
2  I've seen that.  But -- but I can't -- I
3  don't know.  I don't think I've seen that
4  much.  Not in cash, especially.  I think
5  -- I don't know what was disbursed through
6  the office, you know.
7    Q    Well, when -- when somebody
8  left a tip on their credit card, would
9  their -- they ever -- would the employees
10  ever -- their paychecks show that they got
11  a tip?  In other words --
12    A    Not --
13    Q    -- would part of their
14  compensation be tips that they received?
15    A    I think so.  I think so.
16    Q    Did you -- have you ever
17  gotten a tip on -- on your paycheck?
18    A    I think so.  Yes, sir.
19    Q    How much was it?
20    A    I don't remember.
21    (WHEREUPON, a document was
22  marked as Plaintiff's Exhibit Number 16
23  and is attached to the original

42 (Pages 165 to 168)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 169

1   transcript.)
2       Q    Let me show you Exhibit 16.
3   Is that Norris Foster's 2005 W2 from Mid
4   State?
5           MR. DUKES:  Let me look at
6   it.
7           If you know.
8       A    Looks like it is.
9       Q    Okay.  Now, how many hunts
10  would you say Norris Foster went on
11  between the time you were employed there
12  until he was fired in December?  Do you
13  have a ballpark?  Just a best judgment?
14      A    I'd just guess at twenty, you
15  know.
16      Q    Most every weekend?  I mean,
17  is it --
18      A    No.  Sometimes it was during
19  the week.  It just varied.  It's --
20      Q    Okay.
21           (WHEREUPON, a document was
22  marked as Plaintiff's Exhibit Number 17
23  and is attached to the original

Page 170

1   transcript.)
2       Q    Well, I'm going to show you
3   Exhibit 17.  And these are copies of pay
4   stubs for Norris Foster.  Now, I
5   don't have every week of pay stubs.  I
6   want you to know that.  Okay?
7       A    Okay.
8       Q    But these are the ones that he
9   still has.  Fair enough?
10      A    Yeah.
11      Q    And I've only seen where -- on
12  one of the pay stubs that he's provided --
13  and there are three, six, nine, eleven.
14  Eleven weeks.  That he got a tip one time.
15      A    I don't see the tip.
16           MR. DUKES:  What was your
17  response?
18           THE WITNESS:  I don't see the
19  tip.
20      Q    (BY MR. ROBERSON)  Here.  All
21  right.  On the first page of Exhibit 17 --
22      A    Okay.
23      Q    I've circled it now.

Page 171

1       A    All right.
2       Q    Do you see it now?
3       A    Yeah.  I see it.
4       Q    Okay.  And what is the amount
5   of the tip?
6       A    Thirty-three dollars and
7   thirty-three cents.
8       Q    So what that means to me, if
9   -- is if there were three people on the
10  hunt, that somebody tipped a hundred
11  dollars.
12      A    There was four people on the
13  hunt.
14      Q    Okay.
15      A    Most of the time.  Sometimes
16  it was three.  It's according.
17      Q    Well, I'm trying to do it --
18  make it easy.
19      A    They may not always work like
20  that.  It varied to how many people was
21  there, who was there, and if they needed
22  horses or not.
23      Q    Well, do we agree that that's

Page 172

1   the only tip on those checks?
2       A    That's all I see on there.
3       Q    Yeah.  So from September to
4   December, the only thing that's reflected
5   on those checks that Norris got in tips is
6   thirty-three dollars?
7           MR. DUKES:  Objection to
8   form.  I mean, you -- you've said that
9   this isn't all the -- the check stubs
10  out.
11          MR. ROBERSON:  That's the only
12  ones I have.  If you've got some more,
13  I'll be glad to --
14          MR. DUKES:  I don't need --
15          MR. ROBERSON:  Be glad to look
16  at them.  Y'all paid him.
17          MR. DUKES:  Object to the
18  form.
19      A    I see some September pay
20  periods here -- that are in here that we
21  -- that we didn't even -- we weren't even
22  hunting.  These -- this -- this is
23  September paychecks right there.  There

43 (Pages 169 to 172)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 173

```
 1   were no tips in September or in May.  May
 2   and September was out of the hunting
 3   season.
 4       Q    Did you give Norris any cash
 5   tips?
 6       A    If I was told to, I did.
 7       Q    Can you remember any?
 8       A    I -- I cannot specifically,
 9   but I can -- I do -- I don't remember
10   anything specific.
11       Q    Do you remember a guest by the
12   name of Hardaway?
13       A    Yes, sir.
14       Q    Hardwick, Hardaway, something.
15       A    Right.  Sure do.
16       Q    Did he leave Norris a tip?
17       A    He could have.  He could have.
18       Q    What's his name?
19       A    We've had Hardaway there more
20   than one time, so I can't -- I can't tell
21   you.
22       Q    Where is he from?
23       A    I believe Columbus.
```

Page 174

```
 1       Q    Georgia; is that correct?
 2       A    I think so.
 3       Q    And would he have -- you know,
 4   I would think -- I don't know, but I would
 5   think that if somebody is paying you five
 6   thousand dollars to go hunting, that you'd
 7   have their name and address; right?
 8       A    I don't have it.
 9            MR. DUKES:  Object to the
10   form.
11       Q    Well, I -- no.  I meant -- I
12   don't mean you.  I apologize.  I mean Mid
13   State.  They know who their customers
14   are.
15       A    Sure.
16       Q    Right?  They might try to
17   market to them; that is, send them a
18   brochure.
19       A    Uh-huh.
20       Q    Whatever.
21       A    That's right.
22       Q    Things like that.  Direct
23   marketing.
```

Page 175

```
 1       A    Yes, sir.
 2       Q    Maybe even call them.  Say,
 3   we've got space this weekend --
 4       A    That's right.
 5       Q    -- if you -- if you want to
 6   come.  Do you think they might do that?
 7       A    Probably so.
 8       Q    Yeah.  Because there probably
 9   ain't a lot of people that pay five
10   thousand dollars.
11            MR. DUKES:  Object to the
12   form.
13       Q    Are there?
14       A    Not enough.
15       Q    Yeah.  Well, how many guests
16   can you have hunting?
17       A    At one time?
18       Q    Yes, sir.
19       A    We try --
20       Q    What's your capacity?
21       A    We try to -- we try to limit
22   to just four people.  Four shooters.
23       Q    Four shooters?
```

Page 176

```
 1       A    Try to.
 2       Q    Is that for safety reasons?
 3       A    Yes.
 4       Q    Okay.  You don't want, like,
 5   Vice-President Cheney.  You don't want
 6   them shooting each other; right?
 7       A    I'd love to have
 8   Vice-President Cheney down here.
 9       Q    Okay.  Well -- but can you
10   have a hunt every day?
11       A    No.
12       Q    Why not?
13       A    Well, we didn't have -- we
14   didn't have the grounds available for
15   that, with birds on it.  We just put out
16   enough to accommodate two to three days a
17   week.
18       Q    Would that be about how much
19   traffic you have?
20       A    No.
21       Q    Who kind of -- is there
22   somebody there in the office that keeps up
23   with guests and how much they spend and
```

44  (Pages 173 to 176)

**www.AmericanCourtReporting.com**
**September 8, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 177

```
 1   stuff?
 2       A    Yes.
 3       Q    Who is that?
 4       A    I would assume it to be David
 5   and Denise, both.
 6       Q    Okay.  They're more in the
 7   financial part of it?
 8       A    That's right.
 9       Q    All right.
10           MR. ROBERSON:  Let's take a
11   break.  And I'm getting close to wrapping
12   up, Carter.  Can we go off the record for
13   a few minutes?
14           MR. DUKES:  Sure.
15           THE VIDEOGRAPHER:  At this
16   time, we're going off the record.  The
17   approximate time is 11:55 a.m.
18           (Recess taken.)
19           THE VIDEOGRAPHER:  At this
20   time, we're going back on the record.  The
21   approximate time is 12:03 p.m.
22       Q    (BY MR. ROBERSON)  If you
23   would, Mr. Norman, would you look at
```

Page 178

```
 1   Jeffrey Harris' affidavit?  And -- now,
 2   Jeffrey is a black male; correct?
 3       A    Yes, sir.
 4       Q    And Jeffrey was working with
 5   Norris before Norris was fired; isn't that
 6   true?
 7       A    Yes, sir.
 8       Q    Okay.  Is Jeff an honest
 9   person?
10           MR. DUKES:  Object to the
11   form.
12       A    I think he is, but I'm not a
13   hundred percent positive.
14       Q    Okay.  Well, if you'll look on
15   the second page of Jeffrey Harris'
16   affidavit, it says, I heard Joel Norman
17   make several statements about his
18   intention to replace the black crew with a
19   white crew.  About a month after he
20   arrived, he stated, in my presence, that
21   he was going to get rid of all the blacks
22   in his crew.
23           Did you ever say that?
```

Page 179

```
 1       A    No, sir.
 2       Q    So he's lying about that,
 3   isn't he?
 4       A    If he said that, he's lying.
 5       Q    Well, he swore falsely is what
 6   you're saying?
 7       A    I'm saying he -- that's
 8   absolute.
 9       Q    Okay.  When we had homecoming
10   in Bullock County, he threatened my job
11   and stated he was going to, quote, get
12   some white boys and Mexicans who wanted to
13   work, closed quote.  Because we wanted to
14   get off early for homecoming.
15           Now, did -- did your crew want to
16   get off early for homecoming?
17       A    I -- there was an issue at
18   homecoming.  I can't remember all the --
19   it seems like get off early or get off
20   period.  I don't remember which it was,
21   you know, but I remember homecoming being
22   an issue.
23       Q    And that's the football game.
```

Page 180

```
 1   Homecoming for the high school football
 2   team; right?
 3       A    I guess.
 4       Q    They have a parade here in
 5   Bullock County, don't they?
 6       A    I think so.
 7       Q    In fact, a number of
 8   industries close all day on that day,
 9   don't they?
10       A    I wouldn't doubt it.
11       Q    Did you know that?
12       A    They close around here on --
13   one day a week for -- I don't know what,
14   anyway.  I don't know.  I don't know why
15   they close around here -- you know, why
16   they close up.
17       Q    Did you know it was a
18   tradition to get off early on homecoming?
19       A    Not where I'm from.  It's not
20   a tradition.
21       Q    So you didn't know?
22       A    No.
23           MR. DUKES:  Hey, Jerry, I can
```

45  (Pages 177 to 180)

Page 181

1  hear you.  You need to tone it down a
2  little bit.
3      A    Not -- not grown -- grownups,
4  forty-seven years old, don't take off for
5  homecoming where I'm from.
6      Q    Joel told me he had, quote,
7  never worked with black people who were so
8  concerned about their money, closed quote,
9  referring to tips for the crew that he
10  kept.
11      Did you ever make that statement?
12      A    I've told them -- I made the
13  statement that they didn't need to let
14  tips continue to be an issue; that we
15  were -- that David had addressed that, and
16  there was still some static about it.  And
17  I told them that tips shouldn't become an
18  issue because we -- that's something that
19  we -- we're going to lose if we continue
20  to make it an issue.
21      Q    So you didn't want anybody
22  complaining when they didn't get a tip and
23  you did?

Page 182

1      A    And I didn't com --
2      MR. DUKES:  Object to the
3  form.
4      A    I didn't complain when I
5  didn't get a tip.
6      Q    But when you got a tip, they
7  didn't, unless the guests directed you to
8  give it to them; correct?
9      A    I don't know.  I don't know.
10  I don't know what somebody may have handed
11  them.
12      Q    Did Norris train Joseph Mays
13  and Will Hubbard on how to drive a
14  tractor?
15      A    No.
16      Q    Is -- what's -- what's Jeffrey
17  Harris' current status?  Is he still
18  employed with --
19      A    No.
20      Q    Was he fired?
21      A    No.
22      Q    Well, why isn't he working
23  there?

Page 183

1      A    He -- he was -- he supposedly
2  fell down and hurt his back.  He's on
3  workers' comp, I assume.
4      Q    You don't believe him?  I
5  mean, "supposedly."
6      A    I don't know.  I don't have --
7  I don't have no way of knowing that, you
8  know.  I don't know.  I assume -- I assume
9  he's hurt.  If he's been to the doctor and
10  they -- and they -- he's drawing
11  unemployment, I assume he's hurt.
12      Q    Do you mean workers' comp?
13      A    Workers' comp, yeah.
14      Q    Is he -- did you fire him?
15      A    No, sir.
16      Q    Did you replace him?
17      A    I did.
18      Q    With who?
19      A    With somebody already on the
20  payroll.
21      Q    Who?
22      A    Will Hubbard.
23      Q    Okay.  Did -- has Norris

Page 184

1  Foster been replaced?
2      A    No.  Well, I have --
3      MR. DUKES:  Object to the
4  form.
5      A    I have one employee at this
6  point.  So there are several people that
7  need replacing.  I wouldn't --
8      Q    I guess my question to you
9  is --
10      A    Yes.  Yes.
11      Q    -- has Norris Foster been
12  replaced?
13      MR. DUKES:  Object to the
14  form.
15      A    We replaced him.
16      Q    With who?
17      A    Chance Harn.
18      Q    A white male?
19      A    Yes.
20      Q    Okay.  And Chance works --
21  what is his job on the hunting crew?
22      A    He scouted.  Basically the
23  same that Norris had.

46 (Pages 181 to 184)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 185

1    Q  What did Norris do on the
2 hunting crew?  What role did he play in --
3    A  He was the scout.
4    Q  What does that mean?  We -- I
5 don't hunt, so help me out with that.
6    A  It means if -- if -- out -- if
7 a dog is out of pocket, so to speak, he
8 goes and looks for that dog, calls point,
9 or helps get the dog back in the gallery
10 -- back with us.
11    Q  Okay.
12    A  He holds horses.  He holds the
13 dog.  He does not handle the dogs, which
14 is -- which --
15    Q  You do that, don't you?
16    A  I handle the dogs.
17    Q  Okay.  And so you're the,
18 quote, guide; is that true?
19    A  I'm the dog -- I'm the dog
20 handler.  I'm the guide.
21    Q  Okay.
22    A  Yes, sir.
23    Q  All right.  And so would you

Page 186

1 say you're the most important part of the
2 hunt?  I --
3    A  Not really the --
4    Q  This is no time to be modest.
5    A  Other than the dogs and the
6 quail, yes.
7    Q  Well, person involved with
8 providing the hunting experience.
9    A  Yes.
10    Q  Would you be the most
11 important?
12    A  Right.
13    Q  And that's because you've got
14 to put the people on the birds; right?
15    A  That's right.
16    Q  I mean, you and the dogs --
17    A  Sure.
18    Q  -- correct?  Okay.  And these
19 other guys, they're just there to assist
20 you and the guests --
21    A  That's right.
22    Q  -- is that fair?
23    A  That's right, yes, sir.

Page 187

1    Q  Okay.  And -- and, like, you
2 use more than one dog in the hunt; right?
3    A  That's right.
4    Q  And sometimes a dog will stray
5 or get away from where you are --
6    A  Right.
7    Q  -- right?  And you can't stop
8 the dog that's working.  You don't want
9 to, I guess maybe is a --
10    A  Right.
11    Q  -- better way to say it.  You
12 could, but you don't want to because that
13 would be interrupting the hunt --
14    A  That's right.
15    Q  -- right?
16    A  Yes, sir.
17    Q  So you continue hunting with a
18 dog that's working, and then Norris, or
19 now Will -- Forest -- Will --
20 Mr. Chance -- Chance Ham will go get that
21 stray dog; is that fair?
22    A  Yes, sir.
23    Q  And he'll bring him back to

Page 188

1 you and -- so --
2    A  That's right.
3    Q  -- they can both work?
4    A  That's right.
5    Q  Okay.  And that's just part of
6 his job; right?
7    A  Yes.
8    Q  Does Chance get tips?
9    A  If -- if there's a tip left
10 for him, he does.
11    Q  Okay.  The same as Norris?
12    A  Yes.
13    Q  Now, since this is the only
14 time I get to talk to you before trial, I
15 want to know every reason why Norris
16 Foster was fired.
17    MR. DUKES:  Object to the
18 form.
19    Go ahead.
20    A  That you know about.
21    A  Well, he failed to complete a
22 task.
23    Q  What was that?  What task did

47 (Pages 185 to 188)

Page 189

1 he fail to complete?
2     A    He -- he was asked to roller
3 chop the entire place. They would get --
4 they would turn around on top of the hill,
5 and they wouldn't go over the hill and
6 chop down in the roughest area that needed
7 it the worst. And I would discover that
8 on a hunt, with my guests on my -- with
9 me, going down into there on foot to
10 follow up birds. And I'd find out they --
11 they hadn't even been in there with the
12 equipment. And I assumed it had been done
13 because they were on into another area.
14     Q    Hold on. When did you
15 discover that?
16     A    While out hunting. I don't --
17 I don't -- it was probably early -- pretty
18 early on in the hunting season. Fairly
19 early.
20     Q    Was there -- was there
21 anything to keep you from making any
22 written documentation about that problem?
23     A    No, sir.

Page 190

1     Q    Did you document it?
2     A    Except for the fact that I
3 took them to the spot and I explained it
4 to them and we went over it. After they
5 denied it, I went to them and took them to
6 the spot, walked them down into the
7 briars, and they admitted and confessed to
8 it, that they wouldn't do it to that.
9     Q    Did you document it?
10     A    Other than -- no more than
11 telling my super -- my supervisor.
12     Q    Is there any writing anywhere
13 about that?
14     A    I don't think so.
15     Q    Okay. So it wasn't important
16 enough to put it down on paper?
17         MR. DUKES: Object to the
18 form.
19     Q    You didn't put it down, did
20 you?
21     A    I -- I don't know if I would
22 say it in those terms. I thought that
23 speaking with them -- I wanted to give

Page 191

1 them an opportunity to talk about it. I
2 really feel like putting things on paper
3 sometimes adds a little extra stress. I
4 feel like talking to somebody should be
5 enough.
6     Q    Okay. Any other criticisms of
7 Norris Foster's job performance while he
8 worked there with you before his
9 termination?
10     A    Well, there's criticism in the
11 hunt around guests.
12     Q    Do you mean -- what do you
13 mean by that, please, sir?
14     A    Say -- make negative comments.
15     Q    About you?
16     A    Yes.
17     Q    What did he say?
18     A    Well, most of these are things
19 that -- that David observed and shared
20 with me. Just -- just -- just derogatory
21 remarks about this or that. He'd come up
22 from behind with a dog and holler and
23 scream, here's your dog. Make a big scene

Page 192

1 out of bringing a lost dog back.
2         One time as --
3     Q    That -- well, excuse me.
4 That's -- you say that's derogatory?
5     A    Whenever you -- these guests
6 are out there for a positive experience,
7 not to have negative things. There's a
8 lost dog advertised in front of the whole
9 crowd, you know.
10         Bring the -- he -- he did not do his
11 job properly. His job is to get the dog
12 back up there, not holler at me and tell
13 me, here's -- there's the dog.
14         Another instance, we release birds.
15 We released them early. We had one area
16 we had to go back and put bird -- more
17 birds out. For whatever reason, the birds
18 weren't there. One of the boxes that the
19 birds were released in was accidentally
20 left in the -- in the field. The dog
21 pointed right at the box. I took the
22 guests in. Some birds got up and flew off
23 in a different direction. I saw the box.

48 (Pages 189 to 192)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 193

1   We did not want to see -- the guests to
2   see the box. I mean, that's something
3   that you just -- you don't do. You want
4   it --
5       Q   You don't want the guests to
6   know that you put the birds out?
7       A   They know we put them out, but
8   they don't -- it don't need to look like
9   we put them out a few minutes before. The
10  box had been there a couple of weeks. The
11  box got left. It had already been rained
12  on.
13      I diverted the guests to where the
14  other birds had flown. Diverted the whole
15  party and asked Norris to hold the dog.
16  The dog was standing by the box, with some
17  more birds still walking around in the
18  patch. And he hollered three or four
19  times at me, here's some more birds over
20  here, trying to get our attention. I
21  said, I know about it. I said, we're
22  going over here. He intentionally tried
23  to get me to have to come back into that

Page 194

1   patch -- feed patch where the birds were,
2   walking around in the same area where the
3   box was, you know.
4       Something that you never anticipate
5   on happening, but it did. I did the best
6   I could with the situation. He did what
7   he could to expose what you don't need
8   exposing.
9       Q   Did you write him up?
10      A   No.
11      Q   Did you make any document
12  about it?
13      A   No, sir.
14      Q   Did you ever explain to Norris
15  that you -- why you wouldn't want him to
16  bring hunting guests back by this box?
17      A   Sure.
18      Q   You explained that to him?
19      A   Yes, sir.
20      Q   Okay. Anything else?
21      A   Tip issue.
22      Q   Yeah. We talked about that.
23      A   Because the tip continued to

Page 195

1   be an issue after it was supposed to be
2   resolved.
3       And, like I say, failure to complete
4   tasks on a timely manner. There was a lot
5   of things taking three times longer than
6   it should. As -- for instance, the roller
7   chopping, along with the -- cleaning out
8   the barn. Cleaning up the horse barn.
9       I would observe Norris. I'd go in
10  to check, just to see how things were
11  coming along because there's other things
12  that need to be done. It shouldn't take
13  all day. Norris would usually be standing
14  in the doorway of one of the stalls, with
15  his hands in his pockets while whoever
16  else was in there would be working.
17  Usually Willie Mack or -- or Jeff or
18  whoever. He'd stand there with his door
19  -- with his hands in his pockets. And
20  this was all observed.
21      Q   No writing --
22      A   No, sir.
23      Q   -- correct?

Page 196

1       A   No, sir.
2       Q   Now, on this date that you
3   wrote him up, the formal reprimand, had
4   the clippers broken?
5       A   The clippers weren't in that
6   good of shape. That --
7       Q   Were the clippers broken on
8   that day --
9       A   The clippers --
10      Q   -- when he was riding horses?
11      A   The clippers were -- had a
12  crack in them before they ever started
13  clipping horses, but they -- but it didn't
14  prevent them from clipping the horses.
15      Q   So you're saying the clippers
16  were operational?
17      A   Yes, sir.
18      Q   They weren't broken?
19      A   No. I said they had a crack
20  in them. They were -- they did have a
21  crack, but they were operational.
22      Q   Do y'all have horses out
23  there?

49 (Pages 193 to 196)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 197

1    A    Yes, sir.
2    Q    Do you have to take care of
3    the horses?
4    A    Yes, sir.
5    Q    In fact, did y'all have some
6    new horses?
7    A    Yes.
8    Q    Is it important, before guests
9    ride new horses, that you know something
10   about the temperament of those horses?
11   A    Yes.
12   Q    In fact, if you put a guest on
13   a wild horse and he gets injured, you
14   could be liable, couldn't you?
15   A    That's right.
16   Q    So wouldn't it be important to
17   know something about the temperament of
18   those horses?
19   A    Yes.
20   Q    How long had y'all had these
21   horses?
22   A    I don't remember exactly.
23   Q    Huh. Well, wouldn't part of

Page 198

1    Norris' job be to know the temperament of
2    these horses?
3    A    Which horses?
4    Q    The ones that he was riding.
5    A    He wasn't riding the new
6    horses.
7    Q    What was he riding?
8    A    He was riding, probably, that
9    black horse he rode. Jerry and -- I don't
10   know what Jeff was riding, but Jeff wasn't
11   even -- wasn't even qualified to ride a
12   horse, didn't have permission to ride a
13   horse. His job wasn't to ride a horse.
14   Q    Well, did Norris -- did part
15   of his job duties ever involve riding
16   horses?
17   A    Yes.
18   Q    And --
19   A    During the hunts or during
20   when we were out working dogs. Not -- not
21   -- he was not -- he was not to go on his
22   own and just ride horses.
23   Q    Well, of course not.

Page 199

1    A    But he did.
2    Q    Of course not. He wasn't just
3    supposed to show up for work and ride a
4    horse all day, was he?
5    A    No.
6    Q    Was he smoking marijuana on
7    the job?
8    A    I feel like he was.
9    Q    What information do you have
10   about that?
11   A    Just by observations. I've
12   been around it, and I know what it smells
13   like. I know when somebody -- I can --
14   you can tell things -- a lot of it, I
15   don't have the proof of it. But I do feel
16   like he was.
17   Q    Why do you feel that way? I
18   wasn't there, sir.
19   A    I would -- you could smell it
20   on them. You go -- they -- I feel like
21   they actually smoked it in the horse barn.
22   I'd come back and smell the aroma in the
23   barn.

Page 200

1    Q    Did you ever order a drug
2    test?
3    A    I asked David if there was a
4    drug test procedure, and there was not.
5    And I re -- I said it would be great if we
6    had one.
7    Q    Did you ever call the law?
8    A    No.
9    Q    That's illegal, to smoke
10   marijuana, isn't it?
11   A    Sure.
12   Q    Well -- so you're saying that
13   there's no document about smoking
14   marijuana -- even though you felt like
15   your employees were smoking marijuana --
16   on the job, at work; correct?
17   A    That's right. Sure do.
18   Q    If Norris was such a bad
19   employee, why did it take you till
20   December to fire him?
21       MR. DUKES: Object to the
22   form.
23   A    I thought Norris had a lot of

**www.AmericanCourtReporting.com**
**September 8, 2006**

Page 201

1 things he could have added to our team. I
2 chose Norris because Norris could -- after
3 talking with Roy, Norris knew his way
4 around. He had experience and -- but
5 there was some friction from the
6 beginning. I don't know where all the
7 friction stemmed from.
8     But I continued to try to make
9 things work. I overlooked a lot of
10 things. Some of the things I took to
11 David, just so that David knew -- if it
12 ever got to a point, he was informed. I
13 tried, as long as I could, to make the
14 team work.
15     When it got to the point where
16 Norris' attitude was rubbing off on
17 Jeff and Norris would have a fit or a rage
18 or whatever and then I would see the same
19 thing exemplified in Jeff, I knew right
20 then something had to be done. I mean, it
21 just -- it was tearing the team apart. We
22 weren't -- we were not going forward
23 any -- any longer.

Page 202

1    Q   So you hired these two white
2 guys to take Norris' and Jeff's place?
3    A   No.
4     MR. DUKES:  Object to the
5 form.
6    A   I hired them because we needed
7 more help.
8    Q   Oh.
9    A   They -- because they were
10 available, they took the place. I still
11 need help.
12    Q   You -- you -- you know -- you
13 knew in November, when they were hired,
14 that you needed some help to work as a
15 team; right?
16    A   I -- we were building a team.
17    Q   You were? It was a white
18 team, though, wasn't it?
19     MR. DUKES:  Object to the
20 form.
21    A   No, sir. We already -- we --
22 we had members of the team that weren't
23 white.

Page 203

1    Q   Okay.
2     (WHEREUPON, a document was
3 marked as Plaintiff's Exhibit Number 18
4 and is attached to the original
5 transcript.)
6    Q   I'm going to show you what's
7 been marked as Exhibit 18. Do you
8 recognize this document? It's just been
9 produced today, on today's date. But...
10    A   No. I haven't seen it before.
11    Q   Okay. Well, why would you
12 give Norris Foster a raise -- a fifty cent
13 raise for 2006 if he was such a bad
14 worker?
15    A   I didn't suggest that.
16    Q   Did you agree with it?
17    A   I never seen it. Never --
18 never was -- never was consulted on it.
19    Q   Thank you, Mr. Norman. I
20 don't have any further questions.
21     MR. ROBERSON:  Have you got
22 any questions, Carter?
23     MR. DUKES:  Yeah. I've got

Page 204

1 one follow-up question.
2
3 EXAMINATION BY MR. DUKES:
4    Q   You testified earlier about
5 the employment history that you provided
6 Mid State when you were applying for
7 employment with Mid State.
8    A   Sure.
9    Q   How many years of work
10 experience did you provide Mid State in
11 that application?
12    A   On paper?
13    Q   Yes, sir.
14    A   Probably about twenty-one.
15 Twenty -- twenty -- twenty or twenty-one
16 years' experience.
17    Q   And did -- were there any gaps
18 in your employment that you did not
19 provide Mid State in that twenty-one,
20 twenty-two years of employment history?
21    A   No.
22    Q   There were no other jobs
23 during that twenty-two years of employment

51 (Pages 201 to 204)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 205

```
1   history that you failed to --
2       A    No.
3       Q    -- tell Mid State about?
4       A    No.
5       Q    That's all I have.
6       MR. ROBERSON:  That's all.
7   That's all.  Thank you, Mr. Norman.
8       THE WITNESS:  Yes, sir.
9       MR. ROBERSON:  Appreciate your
10  help.
11      THE VIDEOGRAPHER:  This
12  concludes the deposition of Joel Norman.
13  This is the 8th day of September 2006, and
14  the time is approximately 12:23 p.m.  At
15  this time, we're off the record.
16
17      FURTHER DEPONENT SAITH NOT
18
19
20
21
22
23
```

Page 206

```
1           C E R T I F I C A T E
2
3   STATE OF ALABAMA  )
4   MONTGOMERY COUNTY )
5       I hereby certify that the above
6   and foregoing deposition was taken down by
7   me in stenotype, and the questions and
8   answers thereto were transcribed by means
9   of computer-aided transcription, and that
10  the foregoing represents a true and
11  correct transcript of the deposition given
12  by said witness upon said hearing.
13      I further certify that I am
14  neither of counsel nor of kin to the
15  parties to the action, nor am I in anywise
16  interested in the result of said cause.
17
18
            GWENDOLYN P. TIMBIE, CSR
            Certificate No:  AL-CSR-569
19
20
21  My Commission Expires
    March 4, 2009
22
23
```

Page 207

```
1       INSTRUCTIONS TO THE WITNESS
2
3       PLEASE READ YOUR DEPOSITION OVER
4   CAREFULLY BEFORE YOU SIGN IT.  YOU SHOULD
5   MAKE ALL OF YOUR CHANGES ON THE ATTACHED
6   ERRATA SHEET.  PLEASE DO NOT MARK ON THE
7   ORIGINAL DEPOSITION.
8       AFTER MAKING ANY CHANGES WHICH YOU
9   HAVE NOTED ON THE ATTACHED ERRATA SHEET,
10  SIGN YOUR NAME ON THE ERRATA SHEET AND
11  DATE IT.
12      THEN SIGN YOUR DEPOSITION AT THE
13  END OF YOUR TESTIMONY IN THE SPACE
14  PROVIDED.  YOU ARE SIGNING IT SUBJECT TO
15  THE CHANGES YOU HAVE MADE ON THE ERRATA
16  SHEET, WHICH WILL BE ATTACHED TO THE
17  DEPOSITION.
18      RETURN THE ORIGINAL ERRATA SHEET
19  AND TRANSCRIPT TO AMERICAN COURT REPORTING
20  SERVICE, 2100-A SOUTHBRIDGE PARKWAY, SUITE
21  375, BIRMINGHAM, ALABAMA 35209.
22      ACCORDING TO RULES OF CIVIL
23  PROCEDURE, YOU WILL HAVE THIRTY (30) DAYS
```

Page 208

```
1   FROM THE DATE YOU RECEIVED THIS DEPOSITION
2   IN WHICH TO READ, SIGN AND RETURN YOUR
3   DEPOSITION TO THE ABOVE OFFICE.  IF YOU
4   FAIL TO DO SO, YOU AUTOMATICALLY WAIVE
5   YOUR RIGHT TO MAKE ANY CORRECTIONS TO YOUR
6   DEPOSITION.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

52  (Pages 205 to 208)

**www.AmericanCourtReporting.com**
**September 8, 2006**

American Court Reporting
toll-free (877) 320-1050

Page 209

```
 1        SIGNATURE PAGE
 2            OF
 3        JOEL NORMAN
 4
 5
 6        I HEREBY ACKNOWLEDGE THAT I
 7   HAVE READ THE FOREGOING DEPOSITION AND
 8   THAT THE SAME IS A TRUE AND CORRECT
 9   TRANSCRIPTION OF THE ANSWERS GIVEN BY ME
10   TO THE QUESTIONS PROPOUNDED, EXCEPT FOR
11   THE CHANGES, IF ANY, NOTED ON THE ATTACHED
12   ERRATA SHEET.
13
14
15
16
17
18
19
20
21   SIGNATURE: _____
22
23   DATE: _____
```

Page 210

```
 1   PAGE   LINE      EXPLANATION
 2   _____
 3   _____
 4   _____
 5   _____
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   DEPONENT'S SIGNATURE     DATE
22
23   _____    _____
```

53 (Pages 209 to 210)

EXHIBIT 1

# Condensed Transcript

# Deposition of
# Roy Lee

taken on
October 11, 2006

### Norris Foster
v.
### Mid State Land and Timber Company, Incorporated,
d/b/a Sedgefields Plantation

## Case No. 206-cv-00405-IDSRW



Certified Court Reporters and Certified Legal Video Specialists
334.262.3332  1.888.253.DEPS
Email: depo@baker-baker.com
www.baker-baker.com

1

```
          IN THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF ALABAMA
                    NORTHERN DIVISION


     NORRIS FOSTER,
             Plaintiff,
     vs.              CASE NO. 206-cv-00405-IDSRW
     MID STATE LAND AND TIMBER
     COMPANY, INCORPORATED,
     d/b/a SEDGEFIELDS PLANTATION,
             Defendant.

     *    *    *    *    *    *    *    *

          The videotaped deposition of ROY LEE
     was taken before Cornelia J. Baker,
     Certified Court Reporter and Certified
     Shorthand Reporter, as Commissioner, on
     Wednesday, October 11, 2006, commencing at
     approximately 12:33 p.m., in the law
     office of John Waters, Union Springs,
     Alabama, pursuant to the stipulations set
     forth herein.
```

3

1  *  *  *  *  *  *  *  *  *
2
3          STIPULATIONS
4
5     It is hereby stipulated and agreed by
6  and between counsel representing the
7  parties that the videotaped deposition of
8  ROY LEE is taken pursuant to the Rules of
9  Civil Procedure, and that said deposition
10 may be taken before Cornelia J. Baker,
11 Certified Court Reporter, as Commissioner,
12 without the formality of a commission;
13 that objections to questions, other than
14 objections as to the form of the
15 questions, need not be made at this time,
16 but may be reserved for a ruling at such
17 time as the deposition may be offered into
18 evidence, or used for any other purpose by
19 either party hereto, provided by the
20 Statute.
21    It is further stipulated and agreed by
22 and between counsel representing the
23 parties in this case, that the filing of

2

```
1  *   *   *   *   *   *   *
2          APPEARANCES
3
4  Representing the Plaintiff:
5     MR. JERRY D. ROBERSON
         Attorney at Law
6      Roberson & Roberson
         8 Office Park Circle, Suite 150
7      Birmingham, Alabama 35223
8     MR. ALBERT ADAMS
         Attorney at Law
9      Irby Law Firm, L.L.C.
         257 West Broad Street
10     Eufaula, Alabama 36027
11
12 Representing the Defendant:
13    MR. CARTER H. DUKES
         Attorney at Law
14     Concord Center, Suite 700
         2100 Third Avenue North
15     Birmingham, Alabama 35203
16
17
18 Also present:
19    Mr. Jeff Baker, CLVS
20    Mr. Norris Foster
21    Mr. David Carroll
22
23
```

4

1  the deposition of ROY LEE is hereby
2  waived, and that said deposition may be
3  introduced at the trial of this case or
4  used in any other manner by either party
5  hereto provided for by the Statute,
6  regardless of the waiving of the filing of
7  same.
8     It is further stipulated and agreed by
9  and between counsel and the witness that
10 the reading and signing of the deposition
11 by the witness is hereby not waived.
12
13  *   *   *   *   *   *   *   *   *
14
15
16
17
18
19
20
21
22
23

Pages 1 to 4

334.262.3332                Baker & Baker Reporting and Video Services, Inc.                334.262.3332
888.253.3377          Certified Court Reporters and Certified Legal Video Specialists      888.253.3377

**5**

1        * * * * * * * *
2              INDEX
3
4   EXAMINATION                    PAGE
5   BY MR. ROBERSON:                10
6   EXHIBIT                        PAGE
7   Plaintiff's Exhibit No. 1 .......... 25
       3/23/01 Employee Termination form
8      on Norris Foster
9   Plaintiff's Exhibit No. 2 .......... 27
       4/04/01 Unemployment Compensation
10     form on Norris Foster
11  Plaintiff's Exhibit No. 3 .......... 31
       Mid State Land and Timber New
12     Management Structure
13  Plaintiff's Exhibit No. 4 .......... 37
       3/24/06 Employment Organizational
14     Chart for Sedgefields Plantation
15  Plaintiff's Exhibit No. 5 .......... 74
       Employee Records Jacket on Joel
16     Norman
17  Plaintiff's Exhibit No. 6 .......... 82
       9/01/05 Employment Application on
18     Joel S. Norman, Jr.
19  Plaintiff's Exhibit No. 7 .......... 91
       3/08/05 Mid State Land and Timber
20     Employee Information on Norman
       Foster
21
       Plaintiff's Exhibit No. 8 .......... 92
22     Employee Records Jacket on Norris
       Foster
23

**6**

1
   Plaintiff's Exhibit No. 9 .......... 94
2     5/01/05 Payroll Status Change Form
      for Norris Foster
3
   Plaintiff's Exhibit No. 10 .......... 96
4     12/16/05 Sedgefields Plantation
      Formal Reprimand for Norris Foster
5
   Plaintiff's Exhibit No. 11 .......... 107
6     12/29/05 Payroll Status Change Form
      on Norris Harris
7
   Plaintiff's Exhibit No. 12 .......... 114
8     Employee Records Jacket on Roy Lee
9  Plaintiff's Exhibit No. 13 .......... 115
      8/10/00 Employment Application on
10    Roy Lee
11 Plaintiff's Exhibit No. 14 .......... 116
      3/04/02 Mid State Land and Timber
12    Employee Information on Roy Lee
13 Plaintiff's Exhibit No. 15 .......... 118
      Affidavit of Jeffery Harris
14
   Plaintiff's Exhibit No. 16 .......... 125
15    9/30/05 Employee Termination Form
      on William Beckwith, Jr.
16
   Plaintiff's Exhibit No. 17 .......... 131
17    11/17/05 Employee Application of
      William Rogers Hubbard
18
   Plaintiff's Exhibit No. 18 .......... 132
19    Employee Records Jacket of Will
      Hubbard
20
   Plaintiff's Exhibit No. 19 .......... 137
21    Employee Records Jacket of Joseph
      Adam May
22
   Plaintiff's Exhibit No. 20 .......... 138
23    11/17/05 Employment Application of

**7**

1   Plaintiff's Exhibit No. 21 .......... 142
       Employment Records Jacket of Chance
2      Hamm
3   Plaintiff's Exhibit No. 22 .......... 142
       11/22/05 Employment Application of
4      Forest Chance Hamm
5   Plaintiff's Exhibit No. 23 .......... 146
       Employee Records Jacket on Jeffrey
6      Harris
7   Plaintiff's Exhibit No. 24 .......... 147
       8/30/05 Employment Application of
8      Jeffrey Harris
9   Plaintiff's Exhibit No. 25 .......... 148
       Certificate of Birth for Jeffrey
10     Noel Harris
11  Plaintiff's Exhibit No. 26 .......... 149
       Employee Records Jacket for Willie
12     Mack
13  Plaintiff's Exhibit No. 27 .......... 150
       3/16/04 Employment Application of
14     Willie B. Mack
15
16
17
18
19
20
21
22
23

**8**

1        THE VIDEOGRAPHER:  We are now on
2   the Record.  Today is
3   October 11th, 2006.  The
4   time is 12:33 p.m.
5        My name is Jeff Baker,
6   Certified Legal Video
7   Specialist for Advanced
8   Video Services.  And this
9   is the videotaped
10  deposition of Mr. Roy Lee
11  taken in the law office of
12  John Waters in Union
13  Springs, Alabama.
14       This deposition is
15  being taken in the matter
16  of Norris Foster,
17  Plaintiff, vs. Mid State
18  Land and Timber Company,
19  Incorporated, doing
20  business as Sedgefields
21  Plantation, Civil Action
22  No. 206-cv-00405-IGSRW, in
23  the U.S. District Court for

Pages 5 to 8

334.262.3332              Baker & Baker Reporting and Video Services, Inc.              334.262.3332
888.253.3377        Certified Court Reporters and Certified Legal Video Specialists     888.253.3377

Roy Lee
October 11, 2006

---

**9**

1       the Middle District of
2       Alabama, Northern Division.
3          At this time all
4       persons present will state
5       their name and affiliation
6       with this case, and
7       immediately following we'll
8       have the swearing-in of the
9       Witness.
10      MR. ROBERSON: My name is Jerry
11      Roberson. I'm an attorney,
12      and I represent the
13      Plaintiff, Norris Foster.
14      MR. ADAMS: Albert Adams,
15      representing Norris Foster,
16      the Plaintiff.
17      MR. FOSTER: Norris Foster, the
18      Plaintiff.
19      MR. DUKES: I'm Carter Dukes,
20      representing Mid State.
21          Say your name.
22      MR. LEE: Roy Lee.
23      MR. CARROLL: David Carroll,

---

**10**

1       Sedgefields Plantation.
2      COURT REPORTER: Usual
3      stipulations?
4      (Whereupon all parties agreed
5      to usual stipulations.)
6         ROY LEE,
7 The Witness, having first been duly sworn
8 or affirmed to speak the truth, the whole
9 truth, and nothing but the truth,
10 testified as follows:
11        EXAMINATION
12 BY MR. ROBERSON:
13 Q. Mr. Lee, my name is Jerry Roberson. I
14      represent Norris Foster in this case. And
15      he has filed a lawsuit alleging race
16      discrimination as concerns his employment
17      with the former owner of Sedgefields, Mid
18      State Land and Timber Company. Do you
19      understand that?
20 A. I understand.
21 Q. Okay. And do you -- did you, up until the
22      sale of Mid States in May of this year,
23      did you work for Mid States prior?

---

**11**

1 A. Yes.
2 Q. Okay. And what period of time did you
3      begin your employment with Mid States?
4 A. I can't recall what time I started.
5 Q. Okay. Well, I've got your personnel file.
6      And if I suggest to you that it was in the
7      year 2000, would that sound about right?
8 A. I think so, about right.
9 Q. Okay. Now, Mr. Lee, what position do you
10     hold at Mid -- at what was Mid States?
11 A. Farm manager.
12 Q. So you're in management at Mid States?
13 A. Right.
14 Q. And do you know when you were assigned to
15     work in management at Mid States? Do you
16     know what year it was?
17 A. Not right off.
18 Q. Okay. Well, Mr. Dukes is the lawyer that
19     represents Mid States.
20 A. Uh-huh (affirmative response).
21 Q. Do you understand that?
22 A. Right.
23 Q. Have you ever given a deposition before

---

**12**

1      today?
2 A. No.
3 Q. Okay. There are some rules when I'm
4      talking to you. And one rule is she's got
5      to take down everything we say. So you
6      and I shouldn't try to talk at the same
7      time.
8 A. I understand.
9 Q. Okay?
10 A. I understand.
11 Q. And another rule, you're sworn, so you
12      understand you're supposed to tell the
13      truth?
14 A. Right.
15 Q. Okay. And today, since we're trying to
16      make a record of what's said, I need you
17      to answer out. That is, don't nod your
18      head or say uh-huh or huh-uh, okay?
19 A. Okay.
20 Q. So we can have a clear record about what
21      was said, okay?
22 A. Okay.
23 Q. And if I ask you a question that you don't

---

Roy Lee
October 11, 2006

| 13 |
|---|
| 1    understand the question, you don't |
| 2    understand what I'm asking you, you need |
| 3    to tell me so that I -- otherwise, I'll |
| 4    think you understood it, and I'll accept |
| 5    your answer, okay? |
| 6    A. Okay. |
| 7    Q. So if I ask you something and you don't |
| 8    understand what I'm asking, let me know, |
| 9    okay? |
| 10  A. Okay. |
| 11  Q. And today, if you need to stop and go to |
| 12    the bathroom or get a drink or, you know, |
| 13    just take a break, let us know, because we |
| 14    need to go off the Record -- |
| 15  A. Okay. |
| 16  Q. -- and do that, okay? |
| 17  A. Okay. |
| 18  Q. All right.  Now, where do you live, Roy? |
| 19  A. Midway, Alabama. |
| 20  Q. And are you from this area originally? |
| 21  A. Yes. |
| 22  Q. Have you lived here all your life? |
| 23  A. All my life. |

| 14 |
|---|
| 1    Q. Okay.  Now, Midway -- I'm not from Midway, |
| 2    but Midway is kind of a small town, right? |
| 3    A. Right. |
| 4    Q. Do you know Norris Foster? |
| 5    A. Yes, I do. |
| 6    Q. Have you been knowing him really all your |
| 7    life? |
| 8    A. Yes. |
| 9    Q. Because he lives in Midway, too, right? |
| 10  A. Right. |
| 11  Q. Okay.  And how -- just how many -- about |
| 12    how many people live in Midway? |
| 13  A. The City of Midway? |
| 14  Q. Yeah. |
| 15  A. I would like -- I would say -- I really |
| 16    don't know how many.  It's a lot of them. |
| 17  Q. Okay.  Well, Midway is in -- is it in |
| 18    Bullock County? |
| 19  A. Bullock County. |
| 20  Q. And as far as the demographics, the |
| 21    population of Bullock County, do you know |
| 22    what percentage of black people live -- |
| 23    make up the population of Bullock County? |

| 15 |
|---|
| 1    A. No, I don't.  It's more black, I know, |
| 2    than white, so . . . |
| 3    Q. Okay. |
| 4    A. I wouldn't know how many. |
| 5    Q. All right.  Now, you started working at |
| 6    Mid States in the year 2000.  And now, do |
| 7    you work for Tollison's? |
| 8    A. Yes, I do. |
| 9    Q. In the same job you had at Mid States? |
| 10  A. Yes. |
| 11  Q. And that job is farm manager? |
| 12  A. Yes. |
| 13  Q. Okay.  Now, before you went to work at -- |
| 14    how old are you, Roy? |
| 15  A. Forty-seven. |
| 16  Q. Before you went to work at Mid States, did |
| 17    you work? |
| 18  A. Before I went to work? |
| 19  Q. Yeah. |
| 20  A. At Mid States? |
| 21  Q. Yes. |
| 22  A. Yes. |
| 23  Q. Where did you work? |

| 16 |
|---|
| 1    A. Beaulieu of America. |
| 2    Q. What kind of business is that? |
| 3    A. Yarn division. |
| 4    Q. Yarn? |
| 5    A. Uh-huh (affirmative response). |
| 6    Q. Textile industry? |
| 7    A. Right. |
| 8    Q. How long did you work for Beaulieu? |
| 9    A. Probably eighteen, nineteen years. |
| 10  Q. And what position when you left there, |
| 11    were you? |
| 12  A. Supervisor. |
| 13  Q. Is that also in management? |
| 14  A. Right. |
| 15  Q. How many people did you supervise? |
| 16  A. Thirty-two. |
| 17  Q. Did you work -- where was your job?  Where |
| 18    did you work for them? |
| 19  A. What you mean? |
| 20  Q. At Beaulieu they've got -- don't they have |
| 21    a plant or . . . |
| 22  A. Yeah, they have a plant. |
| 23  Q. In Eufaula? |

334.262.3332            Baker & Baker Reporting and Video Services, Inc.         334.262.3332
888.253.3377     Certified Court Reporters and Certified Legal Video Specialists     888.253.3377

Roy Lee
October 11, 2006

---

**17**

1  A. Union Springs.
2  Q. In Union Springs?
3  A. Right.
4  Q. Do they have one in Eufaula?
5  A. Yeah, Eufaula.
6  Q. Okay. But you worked in Union Springs?
7  A. Right.
8  Q. Okay. Now, why did you leave Beaulieu?
9  A. The mill shut down. A new company come in
10    and bought us out.
11 Q. Okay.
12 A. And they wanted to transport me to
13    Columbus. They had a plant in Columbus.
14    I went over there for --
15 Q. Columbus, Georgia?
16 A. Right.
17 Q. Okay.
18 A. So I went a couple of weeks, and I didn't
19    like it. So they transferred me to
20    Eufaula, and I didn't like it. So I took
21    the layoff.
22 Q. Okay. So they were relocating you?
23 A. Right.

---

**18**

1  Q. And you didn't like where they reassigned
2    you?
3  A. Right.
4  Q. Is that fair?
5  A. That's right.
6  Q. Okay. And so how did you get a job at Mid
7    States?
8  A. When I first -- Norris.
9  Q. Norris Foster?
10 A. Norris told me about it. And Bow Jack
11    (phonetic), a guy named Bow Jack.
12 Q. Was he just a laborer, too?
13 A. Bow Jack?
14 Q. Bow Jack.
15 A. Yes.
16 Q. And did they both work at Mid States?
17 A. Right.
18 Q. Now, are you a hunter? I mean, that is
19    before you started working at Mid States,
20    were you a hunter?
21     MR. DUKES: Object to the form.
22 Q. That is, did you hunt deer or quail or
23    anything?

---

**19**

1  A. Deer hunter, yes. Coon hunter, yeah.
2  Q. Okay. And do you -- do you like, enjoy
3    being -- working outside or being outside?
4  A. Yes. I love it, yeah.
5  Q. Okay. So that appealed to you to work on
6    a plantation?
7  A. Right.
8  Q. Work outside on a plantation?
9  A. Right.
10 Q. And did you start working at Mid States as
11    a laborer?
12 A. Yes, I did.
13 Q. Who -- do you know who hired you?
14 A. Hunter McDuffie.
15 Q. Okay. And was he the plantation manager
16    when you started?
17 A. Right.
18 Q. And was he a white man?
19 A. Yes.
20 Q. Okay. And were you assigned to a crew
21    initially?
22 A. Yes.
23 Q. Who was in your crew, if you recall?

---

**20**

1  A. Kevin Terrell (phonetic).
2  Q. Kevin?
3  A. Kevin.
4  Q. Yes. All right.
5  A. Norris Foster.
6  Q. Okay.
7  A. Myself.
8  Q. All right. Anybody else?
9  A. Mr. Hunter McDuffie.
10 Q. Okay. Now, was Hunter the guide, so to
11    speak, of the crew?
12 A. Of the crew?
13 Q. Yeah.
14 A. Hunter was the manager of the plantation.
15 Q. Right.
16 A. Norris was the guide.
17 Q. Oh, Norris. What kind of hunting did
18    y'all do initially?
19 A. Quail hunt.
20 Q. Okay. So did Norris take the dogs out and
21    handle the dogs?
22 A. Yes.
23 Q. Okay. And what was your job on the crew?

---

**21**

1  A. I was a backup man.
2  Q. Backup?
3  A. Backup man.
4  Q. What were your responsibilities?
5  A. Pick up birds. Hold horses when the
6    client get off the horses.
7  Q. They hunt from a horse?
8  A. Right.
9  Q. Do they --
10 A. And a wagon.
11 Q. Do they actually shoot from a horse or do
12   they get down to shoot?
13 A. No. They get down to shoot.
14 Q. They just ride the horses in the field --
15 A. Right.
16 Q. -- from one place to another?
17 A. To the dog points, uh-huh.
18 Q. Okay. I apologize to you --
19 A. That's okay.
20 Q. -- but I'm not a hunter.
21 A. That's okay.
22 Q. And some of the people that are hunting
23   ride in a wagon?

**22**

1  A. Right.
2  Q. Okay. And what pulls the wagon; is it
3    horses or mules?
4  A. They had mules at that time pulling the
5    wagon.
6  Q. Okay. And that's just, again, to
7    transport the people?
8  A. Right.
9  Q. And they get out of the wagon and shoot?
10 A. Right.
11 Q. When the dog points?
12 A. Right.
13 Q. Okay. Now, what was Kevin's job?
14 A. Kevin's job was the same thing. Kevin was
15   running the wagon.
16 Q. Okay.
17 A. He was holding the mules. Because you
18   couldn't get down off of the wagon.
19 Q. Okay.
20 A. Somebody had to be there all the time.
21 Q. Right.
22 A. That was Kevin Terrell's job.
23 Q. Okay. Now, when y'all took people on

**23**

1    hunts and Roy -- and Norris was the
2    handler, the guide --
3  A. Uh-huh (affirmative response).
4  Q. -- when you had a successful hunt, that is
5    they killed a lot of birds, did sometimes
6    the guests leave a tip for y'all?
7  A. Yes.
8  Q. How did y'all divide up the tips?
9  A. That would go up under Hunter McDuffie.
10 Q. Okay.
11 A. Hunter McDuffie would divide it up with
12   us.
13 Q. Okay. And did you, from time to time,
14   receive tips?
15 A. Yes.
16 Q. I mean, would they pay you in cash or
17   would it be something that would be put on
18   your check?
19 A. Sometimes cash. Sometimes it would have
20   to go through the office on payroll
21   deduction.
22 Q. Okay. All right. Now, Norris was laid
23   off -- before I get to that, would you say

**24**

1    that initially Norris was your supervisor?
2  A. Huh?
3  Q. Was Norris ever your supervisor?
4  A. No. Hunter had Norris by -- Norris been
5    there longer than I have --
6  Q. Yes, sir.
7  A. -- and Kevin was there longer than I have.
8    I was the last man came.
9  Q. Okay.
10 A. Norris was there all the time. So they
11   had Norris showing us what to do.
12 Q. Okay. So Norris helped, for lack of a
13   belter word? You hadn't worked on a
14   plantation before, right?
15 A. No, no.
16 Q. So he trained you?
17 A. Right.
18 Q. That is he showed you what the work was
19   that had to be done before the hunts --
20 A. Right.
21 Q. -- and how to hunt? I mean, what --
22   correct?
23 A. Right.

Pages 21 to 24

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377      Certified Court Reporters and Certified Legal Video Specialists      888.253.3377

25

1  Q. Okay. Now, in 2001, Norris -- in March of
2     2001, Norris was laid off?
3  A. Uh-huh (affirmative response).
4  Q. Do you recall that?
5        MR. DUKES: Object to the form.
6  A. Yes.
7  Q. Okay. Were there a lot of people, not
8     just Norris? That is it wasn't a one-man
9     layoff, it was several people were laid
10    off; is that correct?
11       MR. DUKES: Object to the form.
12 A. That's correct.
13 Q. Okay. I'm going to show you what I've
14    already marked as Plaintiff's Exhibit 1 to
15    your deposition. And this is a piece of
16    paper that's marked 0055. It's from
17    Norris' personnel file. And I will tell
18    you we've got a protective order in this
19    case. That is, you're not supposed to
20    discuss how much people make and things
21    like that.
22       (Whereupon Plaintiff's Exhibit
23        No. 1 was marked for

26

1        identification and attached
2        hereto.)
3  A. Right.
4  Q. It's not supposed to leave this room,
5     okay?
6  A. Okay.
7  Q. Do you agree with that?
8  A. I understand that.
9  Q. Okay. I'm going to show you Norris' --
10    part of his personnel file, and ask you to
11    read what Mid States Land and Timber said
12    was the reason he was let go.
13       MR. DUKES: Object to the form.
14       Document speaks for itself.
15 Q. You can answer. Does it have a reason for
16    his termination? Do you see that about
17    the middle of the page?
18 A. Right here?
19 Q. Yes.
20 A. From my understanding, what I see down
21    here, it looks like --
22 Q. Reduction in staff?
23 A. Reduction in staff.

27

1  Q. Yeah.
2  A. From plantation work.
3  Q. Okay. So, it looks -- and does it -- on
4     the document, does it say whether or not
5     he's eligible for rehire?
6        MR. DUKES: Object to the form.
7  A. Yeah. Say he is.
8  Q. He is eligible --
9  A. Right.
10 Q. -- on that document?
11 A. Uh-huh (affirmative response).
12 Q. Okay. Then I'm going to show you what
13    I've marked as Exhibit 2 to your
14    deposition. And this is a document that
15    Mid State sent to the Department of
16    Unemployment, Alabama Industrial
17    Relations, for Norris Foster. And they
18    indicated the reason why he separated.
19    Would you read at the bottom of the page
20    what that reason that they -- as they
21    reported to the unemployment office?
22       (Whereupon Plaintiff's Exhibit
23        No. 2 was marked for

28

1        identification and attached
2        hereto.)
3        MR. DUKES: Object to the form.
4  A. Reduction of staff.
5  Q. Okay. Now, do you see the signature at
6     the bottom of that page?
7  A. On the left-hand corner?
8  Q. Yes, sir.
9  A. Uh-huh, yes.
10 Q. Who is that?
11 A. Charlie -- looks like Charlie Phillips
12    (phonetic).
13 Q. Was he ever at the -- was he ever
14    a work -- somebody that worked at
15    Sedgefields?
16 A. Charlie was the CEO.
17 Q. Was he ever on the property?
18 A. He come in like once a month with
19    Mr. Broadhead.
20 Q. Okay. Was he in Meridian?
21 A. Right.
22 Q. Okay. But he was the -- the employee of
23    Mid States who would be responsible for

Pages 25 to 28

334.262.3332                Baker & Baker Reporting and Video Services, Inc.                334.262.3332
888.253.3377           Certified Court Reporters and Certified Legal Video Specialists      888.253.3377

Roy Lee
October 11, 2006

---

**29**

1    signing a form like that?
2        MR. DUKES: Object to the form.
3    A. Right.
4    Q. Right?
5    A. Right.
6    Q. Okay. And he indicated that Norris was
7        let go for reduction in staffing?
8        MR. DUKES: Object to the form.
9    A. Right.
10   Q. And that -- does that show that Norris
11       received a severance, two weeks paid
12       severance?
13       MR. DUKES: Object to the form.
14   Q. I mean, about the middle of the page
15       again. I know you're not familiar with
16       that form.
17   A. I see where it says, Paid for period
18       3/19/2000. Right here.
19       MR. DUKES: Right here is what
20           he's asking you about.
21       THE WITNESS: Okay.
22   BY MR. ROBERSON:
23   Q. Did he get a severance? Does that

---

**30**

1        document indicate that he got a severance?
2            MR. DUKES: It says he got a --
3                what does it say?
4    Q. He got paid after he left work; is that
5        correct?
6    A. No. I mean, I don't --
7        THE WITNESS: What is that?
8        MR. DUKES: He got -- well, the
9            document says, does it not,
10           that he got a separation
11           pay of $520 as a courtesy,
12           slash, gift?
13   A. Okay.
14   Q. Okay. So they gave him $500 --
15   A. $500.
16   Q. -- after he stopped working there?
17   A. Right.
18   Q. And then he drew his unemployment?
19   A. Right.
20   Q. It shows that?
21   A. Right.
22   Q. All right. Now, Roy, you were in
23       management at Beaulieu, right?

---

**31**

1    A. Beaulieu.
2    Q. Beaulieu.
3    A. Uh-huh (affirmative response).
4    Q. And if somebody stole from you and you
5        fired them, they can't draw their
6        unemployment, can they?
7        MR. DUKES: Object to the form.
8    A. No. No, they can't.
9    Q. But Norris drew his unemployment there,
10       didn't he?
11   A. Right. According to this form, right.
12   Q. Okay. Now, I'm going to show you Exhibit
13       3, which is a document that was provided
14       to me from Mid States, and it lists some
15       people, an organizational chart. Have you
16       ever seen that document before today?
17       (Whereupon Plaintiff's Exhibit
18           No. 3 was marked for
19           identification and attached
20           hereto.)
21   A. I know these names and these peoples, but
22       I've never seen this form right here.
23   Q. Okay. Well, and it lists on there -- will

---

**32**

1        you just list the people that are in
2        management there?
3    A. Donna.
4    Q. Donna Davidson?
5    A. Yeah. It's just got Donna wrote on here.
6    Q. Okay.
7    A. But her last name was Davidson.
8    Q. All right. Who else?
9    A. It's got Donna Davidson again for
10       follow-up manager.
11   Q. All right.
12   A. It's got Byron Davidson. That was her
13       husband.
14   Q. Now, are they related to the Broadheads,
15       if you know?
16   A. Well, they used to be. Donna used to be
17       married to his brother before he passed.
18   Q. Okay.
19   A. But after he passed, she remarried Byron
20       Davidson.
21   Q. Okay.
22   A. And you got Roy for farm manager.
23   Q. Now, farm manager, what does that mean?

---

Pages 29 to 32

Roy Lee
October 11, 2006

---

**33**

1    **What were your duties as a farm manager?**
2    A. Everything on the outside that wasn't
3    involved in office work.
4    **Q. There's about 13,000 acres at Sedgefields,**
5    **right?**
6    A. Yes, sir, 14.
7    **Q. Okay. So you were responsible for the**
8    **13,000 acres?**
9    A. Right.
10   **Q. Not the office and the lodge --**
11   A. No.
12   **Q. -- but everything else?**
13   A. Right.
14   **Q. Okay. All right. Did that -- does that**
15   **include the hunting?**
16   A. That included everything, hunting, the
17   peoples that worked under me.
18   **Q. Okay. Now, when that document was made,**
19   **how were you paid? Do you recall?**
20   A. I haven't ever seen this paper before.
21   **Q. Okay. Well, when you were the farm**
22   **manager, how were you paid? Were you paid**
23   **a salary or were you paid by the hour?**

---

**34**

1         MR. DUKES: Object to the form.
2    A. I was paid weekly.
3    **Q. By the hour?**
4    A. Yeah, by the hour.
5    **Q. How much did you make an hour?**
6    A. When I become farm manager, I think they
7    raised me up to $10.
8    **Q. Okay. And I guess you got paid $15 an**
9    **hour overtime, right?**
10   A. Right. Because I did a lot of overtime,
11   yeah.
12   **Q. Okay. All right. Who else is on that**
13   **list?**
14   A. Chuck. His last name is Sikes. It would
15   be Chuck Sikes, wildlife manager.
16   **Q. All right. Now, what was his job?**
17   A. Wildlife manager. He would come in there
18   and determine where to plant food plots,
19   how your stands located, stuff like that
20   there.
21   **Q. Okay. Was he black or white?**
22   A. He's a white guy.
23   **Q. Was he -- does he still work there?**

---

**35**

1    A. No.
2    **Q. Do you know why he doesn't? Did anybody**
3    **ever tell you why he doesn't?**
4    A. Yeah -- well, I heard rumors. I don't
5    know for sure.
6    **Q. What did you hear?**
7    A. They fired Chuck Sikes.
8    **Q. Why?**
9    A. Because he told some things about Byron
10   Davidson to Mr. Broadhead. And they fired
11   Byron first. So I heard they did a
12   background on Chuck Sikes. And then they
13   went and they fired Chuck Sikes. But I
14   don't know if that's true or not.
15   **Q. Okay. Well, all I can ask you is what you**
16   **heard.**
17   A. Okay.
18   **Q. You haven't seen any documents about that?**
19   A. No, huh-uh.
20   **Q. Okay. And do you know why they fired**
21   **Byron Davidson?**
22   A. I -- I heard why they fired him. He told
23   me why they fired him. But I don't

---

**36**

1    know --
2    **Q. What did he tell you?**
3    A. He told me -- said that Chuck Sikes told
4    Mr. Broadhead that he was drinking on the
5    job. He left some client in the woods who
6    was deer hunting, and he didn't go back to
7    get them, that I had to go get them.
8    **Q. And was that true? Did you have to go get**
9    **some folks?**
10   A. I mean, we -- we was understaffed, and we
11   was booked up. He wasn't drinking when I
12   was around him.
13   **Q. Okay.**
14   A. I did when it got more mens than what I
15   normally pick up. Just because, you know,
16   we check in and find out who was still in
17   and who was out. If there ain't no man
18   there, then I'm going back out to the
19   office first, then I'll go back and get
20   the next man.
21   **Q. Okay. All right. So it's not that you're**
22   **saying he was drinking on the job, you**
23   **never saw him?**

---

Pages 33 to 36

Roy Lee
October 11, 2006

---

37

1  A. I never saw that.
2  Q. But you did have to go get some people --
3  A. Right.
4  Q. -- that he had left in the woods?
5  A. One.
6  Q. Okay.
7  A. Yeah.
8  Q. All right.  Anything else that you know
9     about with Mr. Davidson?
10 A. No.
11 Q. Okay.  Now, I'm going to show you what's
12    been marked as Exhibit 4 to a previous
13    deposition.  And this is an organizational
14    chart from March of 2006.  Have you ever
15    seen that document before?
16        (Whereupon Plaintiff's Exhibit
17         No. 4 was marked for
18         identification and attached
19         hereto.)
20        (Witness reviewed document.)
21 A. I had never seen this paper.  But I know
22    my position, what I was in out there to
23    the job.  I know what Denise's position

---

38

1     was, David and Joel.
2  Q. Okay.  So is it fair that's an accurate
3     organizational chart as of March of 2006?
4  A. Say that again.
5  Q. That's an accurate depiction of the
6     organizational chart as of March of 2006?
7  A. As of March 2006, yes.
8  Q. Okay.  Now, what is your position that's
9     listed on there?
10 A. Roy Lee, deer operations manager.
11 Q. Okay.  And then --
12 A. Head of ground crew.
13 Q. Okay.  So what are your duties as the deer
14    operations manager and the head of the
15    ground crew?
16 A. It's a lot of different things.  One in
17    particular is cleaning deers.  Making sure
18    my hunters are out, deer hunters.  Put
19    them out on time.  Picking them up on
20    time.  Making sure my crew do the same
21    thing.
22 Q. Now, you told me about quail hunting.
23    Now, I don't hunt, so can you tell me

---

39

1     about deer hunting, what y'all -- if
2     somebody -- you have a customer at
3     Sedgefields who pays for a hunt, a deer
4     hunt --
5  A. Okay.
6  Q. -- do you bow hunt?
7  A. We had a couple of hunters -- do I bow
8     hunt personally?
9  Q. Do you take people on bow hunts?
10 A. Yes, sir, I have.
11 Q. Okay.  How do you do that?  I mean --
12 A. I go out and start and determine where the
13    deer crossing.
14 Q. Kind of a scout?
15 A. Right.
16 Q. You scout out ahead of time?
17 A. Right.
18 Q. Where they're -- where they're gathered or
19    where they're passing?
20 A. Right.
21 Q. Okay.
22 A. And then I show my bow hunters.  My bow
23    hunters will come a couple of hours early.

---

40

1     We'll go in and look and be thinking it's
2     a good place.  He'll put his own stand in
3     there.
4  Q. So they hunt from a stand?
5  A. Yeah.
6  Q. And do you -- with a truck or --
7  A. No, no.
8  Q. How do y'all get around in there?
9  A. We get around in a truck.  We ride so far
10    and then we'll walk.
11 Q. Okay.
12 A. To keep from disturbing the animals.
13 Q. Okay.  Y'all don't have four-wheelers and
14    stuff like that?
15 A. Yeah, we got that.
16 Q. You do, but you don't drive them?  You
17    don't take them, because they're loud?
18 A. Right.
19 Q. Okay.  All right.  Then do they stay in
20    a stand?  Y'all don't -- what I'm getting
21    to is y'all don't use dogs to drive the
22    deer?
23 A. No, we don't do that.

Pages 37 to 40

Roy Lee
October 11, 2006

**41**

1  Q. Don't, okay. You just -- they get out in
2     the woods ahead of time and get in the
3     stand and be real quiet --
4  A. Right.
5  Q. -- and hope they show up, and that's it?
6  A. Right. My job is been to went out there
7     and looked and scouted already to see what
8     I see.
9  Q. Okay.
10 A. And then I would tell my bow hunters what
11    I think would be the best place for them
12    to go. Then I take them out early to let
13    them look to see if they like the signs.
14    They'll put -- they'll come back in there
15    and put their stands up.
16 Q. Okay. And then you go back and get
17    them at --
18 A. Right. First dark. First dark. We'll
19    put them out after lunch, about 12:30 or
20    1:00, and go back and get them. It'll be
21    dark about 6:00.
22 Q. Now, is there any difference when it's gun
23    season? I mean, do you do the same thing

**42**

1     when they have a gun instead of a bow?
2  A. Right. Well, gun season is different, a
3     lot different from bow season.
4  Q. Okay. Tell me about that.
5  A. A lot different. In gun season, I would
6     take my hunters out. I'd already be done
7     sought out and scouted and looked for the
8     deer, setting the deer stands. I had some
9     of my peoples setting the deer stands,
10    some of my crew.
11 Q. You actually set the stands up ahead of
12    time?
13 A. Yeah. They be already -- some of them are
14    there permanently. We don't ever move
15    them.
16 Q. Okay.
17 A. We've got food plots we never move. Some
18    new food plots we have to move.
19 Q. Okay. So you've got plots where there's
20    grass growing --
21 A. Right. Stuff we plant.
22 Q. -- that you hope will attract the deer?
23 A. Right.

**43**

1  Q. And then you put a permanent stand close
2     to that plot so that --
3  A. That's right.
4  Q. Okay.
5  A. Right.
6  Q. That's one way you do it?
7  A. Right.
8  Q. And then what else do you do?
9  A. And then I go back and tell my deer
10    hunters when they come in what we seen.
11    And then the weather, we check the weather
12    and all that.
13 Q. All right.
14 A. If the weather is right, we can put them
15    on that stand. If it's not, we can't.
16 Q. You mean, which way the wind is blowing
17    and that kind of stuff?
18 A. Right. If it's out of the -- if you've
19    got a stand out there in the west, where a
20    west wind, and it's blowing out of the
21    north, you wouldn't want to put them in
22    there.
23 Q. Okay. Because the deer can smell you?

**44**

1  A. Right.
2  Q. Okay. Anything -- and how many hunters do
3     you take when you're deer hunting? I
4     mean, I'm sure it varies, but what's the
5     range?
6  A. The range, no more than ten. Maybe nine.
7     No more than nine. For three days.
8     You've got three days to kill.
9  Q. Okay. And then they come back and spend
10    the night at the lodge?
11 A. Right.
12 Q. And get fed --
13 A. Right.
14 Q. -- and then they go out again the next
15    day?
16 A. Right.
17 Q. Okay. And it sounds to me, though, like
18    there's a whole lot of work that goes into
19    a successful hunt before you hunt?
20 A. It is.
21 Q. I mean, most of the work is preparing the
22    place to be hunted --
23 A. Right.

Pages 41 to 44

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377      Certified Court Reporters and Certified Legal Video Specialists      888.253.3377

45

1  Q. -- is that right?
2  A. That's right.
3  Q. And what do you have to do besides plant
4     food plots and things?
5  A. Well, see, there's a lot of man hours.
6     You have to bushhog.  You have to go in
7     there and bushhog.  You have to trim
8     limbs, check your stands, then come back
9     and plant.  You have a whole lot of stuff
10    to do.
11 Q. It's a -- is it a year-round --
12 A. Right.
13 Q. -- job to get ready to hunt for just a
14    very limited season?
15 A. Right.  You've got certain times to plant.
16    You've got to know when to plant and what
17    time to plant --
18 Q. Right.
19 A. -- before bow season comes in.  At least
20    you want your grass that tall before bow
21    season comes in.
22 Q. Okay.  All right.  Now, was there ever a
23    period of time where you were over -- you

46

1     were the -- where y'all didn't have a
2     general manager?
3  A. Yes.
4  Q. Do you know how long that was, that period
5     of time was?
6  A. Donna Davidson was the manager after they
7     fired Byron Davidson.
8  Q. Okay.
9  A. Donna stayed there until the last day --
10    if I'm not mistaken, she stayed there
11    until the last day of deer season.  The
12    last day, yeah.
13 Q. Which year?
14 A. That would be in -- which year?
15 Q. Yes, sir.  Is that '05?
16 A. I believe -- I don't think it was '05.
17 Q. Okay.
18 A. I can't recall what year that was, but I
19    do know it's before David came.
20 Q. Okay.  There was a gap, and you don't know
21    the date, but there was a gap from Donna
22    leaving --
23 A. Uh-huh (affirmative response).

47

1  Q. -- until David was hired --
2  A. Right.
3  Q. -- is that -- is that right?
4  A. That's right.
5  Q. Y'all didn't have a manager?
6  A. Right.
7  Q. Was that for a year or more?  Or do you
8     know?
9  A. It wasn't quite a year, I don't think.  I
10    don't think it was quite a year.  No, it
11    wasn't quite a year.
12 Q. Okay.
13 A. It was close, but not quite a year.
14 Q. Well, my question that I'm trying to ask
15    is:  Was there ever a period of time where
16    you were doing both jobs, that is running
17    both the deer hunting and the quail
18    hunting?
19 A. Well, I did the deers and quails when
20    Donna was there.
21 Q. Okay.
22 A. So I did it after she left.  I did the
23    deers while she was there, because Byron

48

1     was gone.
2  Q. Okay.
3  A. But see, when Byron was there, Byron was
4     helping me.  I trained Byron myself.
5  Q. What did he do?  What kind of --
6  A. He used to go out and help me plant food
7     plots.  He'd help me put out hunters,
8     stuff like that.
9  Q. But did he ever go on the hunts, Byron?
10 A. Deer hunts?
11 Q. Deer hunts or quail?
12 A. Yeah.  We had certain deer hunters -- I
13    mean, we had a certain amount of deers we
14    had to harvest.  And quail hunts, Byron,
15    yeah, he'd go.  He'd ride sometimes.
16 Q. Okay.  Have you ever worked as a guide?
17    I'm going to use the term "guide," that
18    person that handles the dogs.  Have you
19    ever taken hunters out on a quail hunt
20    where you were handling the dogs?
21 A. Lots of times, yeah.
22 Q. Okay.  Do you call it a guide, that --
23 A. That particular word?

Pages 45 to 48

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377     Certified Court Reporters and Certified Legal Video Specialists     888.253.3377

49

1  Q. Yeah.  What do you call that position
2    where you're handling --
3  A. I call that -- well, if I'm handling the
4    dogs, I call that a handler.
5  Q. Okay.  You're the handler?
6  A. Right.
7  Q. Are you in charge of the hunt as the
8    handler?
9  A. Right.
10  Q. Okay.  And then . . . so Norris was laid
11    off in 2001?
12        MR. DUKES:  Object to the form.
13  Q. Correct?
14  A. Correct.
15  Q. We've discussed that document.  And then
16    he was hired -- rehired in 2005; is that
17    correct?
18  A. That's correct.
19  Q. And who hired him?
20  A. I hired him.
21  Q. Okay.  And why did you hire him?
22  A. Why did I hire him?  Because I needed some
23    help.

50

1  Q. Okay.
2  A. I needed -- I was low in staff, and I
3    needed some help.  And I got approval from
4    the main office to find some help.
5  Q. Okay.  And who were you talking to at the
6    main office?
7  A. Sherry Howell.  Bob Rea.
8  Q. Okay.  Now, and you knew Norris --
9  A. Yes.
10  Q. -- because he had worked -- you had worked
11    with him before?
12  A. Right.
13  Q. And you knew he knew about hunting?
14  A. Right.
15  Q. I mean --
16  A. I know he knowed the place.
17  Q. Yeah.  He knows the place, and he's
18    experienced?
19  A. Right.
20  Q. Okay.  Now, I want -- do you know how to
21    handle -- operate heavy equipment?
22  A. Yes, I do.
23  Q. Have you ever operated a backhoe?

51

1  A. Yes, I have.
2  Q. Have you ever operated a bulldozer?
3  A. Yes.
4  Q. What do y'all use that kind of equipment
5    for there on the farm?
6  A. Well, it depends.  On putting in covers.
7    What I'm calling the cover, a pipe like --
8  Q. Drain?
9  A. Yeah, stuff like that.
10  Q. Drainpipe?
11  A. Yeah.  You've got a septic tank backed up.
12    We might have to re-dig a field line,
13    stuff like that with the backhoe.
14  Q. Okay.
15  A. The dozer, if we're building a new road or
16    pushing firebreaks or anything like that.
17    If the tractor's stuck or something, we
18    pull it out.
19  Q. Pushing firebreaks, what do you mean by
20    that?
21  A. You know, like on the line there.  Like
22    you got -- like this is your property on
23    this side --

52

1  Q. Right.
2  A. -- this is another man's property on this
3    side, you're going to separate.  If you're
4    burning off, you want to separate in
5    between there.  So you want to make a
6    firebreak around it to keep the fire from
7    jumping over on his side.
8  Q. You push -- you put your blade down and
9    push --
10  A. Right.
11  Q. -- and make a barrier kind of?
12  A. Right, make a clean path.
13  Q. Okay.
14  A. Just keep the fire from burning across.
15  Q. Keep the fire from spreading?
16  A. Right.  That's right.
17  Q. You take the fuel away from the fire --
18  A. That's right.
19  Q. -- basically?
20  A. Right.
21  Q. Okay.  And you do that.  And why do you
22    burn off?
23  A. For habitat reason, quails.  You know,

Pages 49 to 52

53

1    you've got a certain place to circle
2    around in the area for the quails or
3    deers, just anything.  You know, the
4    wildlife biologists go out and tell you
5    what -- the wildlife biologists go out and
6    determine it.  That's what we used to do.
7    **Q. Okay.**
8    A. Determine what is what.
9    **Q. And so you burn off to thin out the brush?**
10   A. Make a new growth, yeah.
11   **Q. Okay.**
12   A. A lot of wildlife like that scratching out
13      there when it's burnt, turkeys.
14   **Q. All right.  When you worked with Norris,**
15      **before he got laid off, did you have an**
16      **opportunity to watch him work?**
17   A. Yes.  Before?
18   **Q. Yes, before he got laid off --**
19   A. Yes, I did.
20   **Q. -- from the time you were hired until he**
21      **got laid off?**
22   A. Right.
23   **Q. Was he a good worker?**

54

1    A. Yeah.
2    **Q. I mean --**
3    A. I would think so.
4    **Q. -- was he knowledgeable about bird**
5       **hunting?**
6    A. Yeah.  He knowed about bird hunting,
7       because that was his job before I came.
8    **Q. All right.**
9    A. I mean, he was working with Hunter
10      McDuffie.
11   **Q. And did he know how to operate a tractor?**
12   A. Yes.
13   **Q. And did he train you or show you how to**
14      **operate one?**
15   A. Yeah.
16   **Q. Or I guess you knew, but I mean . . .**
17   A. Yeah, he gave me a lot of tips.
18   **Q. But I mean, about how you prepare the**
19      **fields and stuff?**
20   A. Right, yeah.
21   **Q. Okay.  And so when you were back as a**
22      **foreman after he got laid off --**
23   A. Uh-huh (affirmative response).

55

1    **Q. -- and they put you in charge, did you**
2       **seek him out to hire?  Do you know what**
3       **I'm saying?**
4    A. No, I don't.
5    **Q. Okay.  In other words, you needed some**
6       **help, right?**
7    A. Right.
8    **Q. So did you go to him and ask him if he**
9       **would work for you?**
10   A. No.  I went to Sherry Howell --
11   **Q. Okay.**
12   A. -- and Bob Rea first.
13   **Q. Right.**
14   A. I told them they had a lot of work on me,
15      and I was putting in a lot of hours.  I
16      needed some help.
17   **Q. Okay.  You got permission to hire**
18      **somebody?**
19   A. Permission from Bob Rea and Sherry Howell
20      to find somebody that -- to help me that
21      knew how to drive a tractor real good that
22      knowed the place.
23   **Q. Okay.  And did you talk to Norris?**

56

1    A. No.  I talked to Damon Duncan first.
2    **Q. Okay.  Did you hire him?  Did he ever work**
3       **for you?**
4    A. No.  I didn't hire him, because he
5       wouldn't come.
6    **Q. Okay.  All right.  And then did you go to**
7       **Norris?**
8    A. I went -- I sent my brother-in-law,
9       Demetrius Parham, to go tell Norris I
10      needed to see him about a job.
11   **Q. Okay.  And did he?**
12   A. Yes, he did.
13   **Q. And then Norris --**
14   A. Norris came to my house.
15   **Q. Okay.**
16   A. The next -- the first day I sent
17      Demetrius, Norris wasn't at home.  The
18      next day I sent Demetrius, he found
19      Norris.  Norris come to my house.
20   **Q. Now, Demetrius Parham, I represent him.**
21      **He's also suing.  Did you know that?**
22   A. No.
23   **Q. Well, he's a black male, you know that?**

Pages 53 to 56

57

1   A. Right.
2   Q. And he works at Sedge -- or worked at Mid
3       States, correct?
4   A. Uh-huh (affirmative response).
5   Q. What did he do? Was he a laborer, too?
6   A. He was a labor worker.
7   Q. Okay. Did he ever work -- did he work
8       under you?
9   A. Yeah.
10  Q. Demetrius Parham?
11  A. Yeah.
12  Q. Now, if he's your -- you say in-law?
13  A. He's married to my sister.
14  Q. Okay.
15  A. Brother-in-law.
16  Q. Is it -- as far as you know, is there any
17      prohibition for you supervising your
18      brother-in-law?
19  A. No. Because like this, if he messes up,
20      he -- I mean, no favors.
21  Q. Okay. Well, I'm not implying --
22  A. Okay.
23  Q. -- that you give him a favor.

58

1   A. Okay.
2   Q. I'm just asking about the work. That's
3       never been a problem --
4   A. No.
5   Q. -- that anybody's discussed with you?
6   A. No, No.
7   Q. Okay. All right. Well, then, did you and
8       Norris have some discussions about the job
9       and about how much he would make?
10  A. When I sent for Norris?
11  Q. Yes.
12  A. Okay, when I sent for Norris -- I don't
13      know. I believe that was on a Thursday.
14      I sent for Norris on a Tuesday or a
15      Wednesday. He wasn't at home. The next
16      day Demetrius found him. He came to me on
17      Thursday. I say, Norris, I say, I'm
18      looking for some help. I need some help.
19      Ms. Sherry Howell and Mr. Bob Rea told me
20      to find somebody that could drive a
21      tractor real good and could take the
22      pressure off of me, that know the place,
23      to help me bird hunt.

59

1   Q. Right.
2   A. I said, Well, are you interested in the
3       job? He said, When can I start? I said,
4       Hold on a minute. I said, Now, you
5       know -- I'm going to let you know now,
6       you'd be working under me. He said, I
7       ain't got a problem. I said, You know, me
8       and you ain't been talking lately. I
9       said, But now, if you have a problem
10      working for me, you tell me now. He said,
11      No, I don't; when can I start? I said,
12      Norris, let me tell you something like
13      this here. I said, You know why you left
14      before. I said, You know what they say
15      you left before. He said, Okay, yeah. I
16      said, All right, I'm going to tell you
17      like this here now, if you come up with
18      anything missing, a can of oil or anything
19      missing, I'm going to have to let you go.
20      I ain't got to see you, I'll let the boys
21      see you. If they tell me, you're gone.
22      He said, Fine.
23          All right. So I said, You just

60

1   wait till Monday and come down there and
2   meet me at the barn at 7:00. That was on
3   a Thursday. I called Sherry Howell back
4   and Bob Rea. I told them, I said, I
5   talked with Damon. Damon said he wasn't
6   coming for under $10 an hour. He said,
7   Okay. I talked to Norris. I said, you
8   know, Norris used to work here. I said,
9   He knows about the dogs; he knows how to
10  bushhog. He knows where to go.
11      He said, What did he say? I
12  said, He said he'd come back. I said, But
13  he's making $8 now. He ain't working --
14  he ain't working no less. He said, Well,
15  we'll give him $9. I said, Okay. I said,
16  Okay. But he said, Start him off with 8.
17  And then you keep him there a month, and
18  if you like -- he's doing what you need
19  him to do, then move him up to $9, as far
20  as me and Bob Rea talking on the phone.
21      I said, Okay. I said, Well, now,
22  you make sure you run this by Ms. Sherry.
23  He said, I will. All right. So I left

Pages 57 to 60

334.262.3332                 Baker & Baker Reporting and Video Services, Inc.                334.262.3332
888.253.3377         Certified Court Reporters and Certified Legal Video Specialists         888.253.3377

61

1    that alone.
2        I still was thinking about
3    whether to hire Norris or whether or not
4    to hire Norris.  So I called
5    Mr. Broadhead's daughter, Suzanne.  And
6    she stay in Atlanta.  I called Suzanne and
7    Matt Garver.
8    Q. Does she have some job with --
9    A. She had a lot of input in the place.
10   Q. Okay.
11   A. Yeah.  And so I said, I've talked to them.
12   I said, Look here, I need some help down
13   there.  I said, I need to hire somebody,
14   and I got Norris.  I've already talked
15   with Sherry Howell and Bob.  Bob said
16   whatever I do, I'm behind you 100 percent.
17   So Suzanne said, Well, you know what
18   happened before with Norris.  I said,
19   Yeah.  I said, Well, I know that, but any
20   man can be changed.  I said, I see him all
21   of the time.  I said, Anybody can be
22   changed, give him a second chance.  She
23   said, Okay, whatever you decide, I'm 100

62

1    percent with you.  She said, I appreciate
2    you calling us and letting us know that
3    you were thinking about us when you did
4    that.  She said, Whatever your decision
5    is, I'm with you 100 percent.  I said,
6    Thank you.  So when Norris got there that
7    Monday, I put Norris to work.
8    Q. Did you know how much he was making?
9    A. Not at the time.  Norris supposed to have
10   been making $8.  Supposed to start him off
11   at 8, but stay here a month, he'd move him
12   up to 9.
13       All right.  So when Norris came
14   to me after he got his first check, I
15   think -- you've got to put two weeks in a
16   hole, I think.  After he got his first
17   check, he said, Roy -- he said, I thought
18   you said I'd make $8.  I said, Yeah,
19   that's what you supposed to be.  I said, I
20   ran that by Denise, though.  Denise was
21   with Bob.  Rea said start you off with $8
22   I said, But let me go down here and check.
23   So I went down there.  I called Bob.  Bob

63

1    said, Well, Roy -- he said, look here.  He
2    said, On Norris's application, he's got
3    down there I work for $7.  I said, Well --
4    I said, he told me he wasn't working under
5    that.  I said, Okay, then, well, I'll tell
6    him that's his fault.  So I went back and
7    told Norris, Norris, you know what
8    happened, you put on your application $7.
9    I said, Now, I done told you I'd start you
10   off with $8, and you'd make up to $9.  I
11   said, but -- he said, Well, my girlfriend
12   filled that out, and I didn't even check
13   it.  That's what he said.  I said, Okay.
14       I said, Well, then, maybe you
15   stay here a month, then you get up -- you
16   get back up where you supposed to be if
17   you're doing a good job.  A month went by,
18   two months went by, they didn't never say
19   nothing.  Then David came.  And then
20   Norris was asking me again.  I said, Well,
21   you need to take that up with David.
22   David is the manager.  You need to go talk
23   to David about that.  And then, after

64

1    then, I don't know what happened.
2    Q. All right.  But you understood and you got
3    permission to hire him at $8 an hour
4    before --
5    A. Correct.
6    Q. -- he was hired?
7    A. Correct.
8    Q. And then he put -- or somebody put $7 --
9    A. On his application, uh-huh.
10   Q. -- on his application, and that's what
11   they paid him?
12   A. Right.
13   Q. And they never -- to your knowledge, while
14   Norris worked at Mid States, he never did
15   make $8 an hour, did he?
16   A. To my knowledge, he never did.  He said he
17   didn't.  I never did -- I didn't have -- I
18   was going by what he said he never did.
19   Q. Okay.  All right.  Now, after you hired
20   Norris back -- and we've had some
21   discussions with some other people -- do
22   you have any personal knowledge that
23   Norris ever stole any birds before the

Pages 61 to 64

334.262.3332                Baker & Baker Reporting and Video Services, Inc.                334.262.3332
888.253.3377          Certified Court Reporters and Certified Legal Video Specialists       888.253.3377

65

1     **2001 --**
2     A. Before I hired him back?
3     **Q. Yes.  Do you know -- in other words, did**
4        **you ever see --**
5     A. I don't know that for a fact.
6     **Q. Okay.  You heard that he had?**
7     A. I heard he did.
8     **Q. And you heard from Hunter McDuffie?**
9     A. Right.
10    **Q. I mean, that's who --**
11    A. That's my manager.
12    **Q. Yeah.  Denise said Hunter McDuffie said**
13       **it?**
14    A. I heard that Hunter McDuffie said that.
15    **Q. Okay.**
16    A. That's what I heard, but I don't know that
17       for a fact.
18    **Q. And you never seen a document that says**
19       **that he stole?**
20    A. I never seen that.
21    **Q. Okay.  Now, at least during the period of**
22       **time when Norris worked for you before**
23       **David Carroll was hired as manager --**

66

1     A. Yes.
2     **Q. -- did he do his job?**
3     A. Very good job.
4     **Q. Did you have any criticism of his job**
5        **performance?**
6     A. I didn't have any problem out of Norris or
7        none of the guys.  When Sherry Broadhead
8        and them come down, they said the place
9        looked real good, Roy.  I appreciate the
10       hard work y'all doing.  Norris kept the
11       road mowed.  When I'd tell him actually to
12       do something, he'd go do it.  Now,
13       whatever happened after then when he left
14       my department, I don't know.
15    **Q. Okay.  But at least during the time when**
16       **you were supervising him --**
17    A. He did what he was supposed to do.
18    **Q. Okay.**
19    A. Right.
20    **Q. Then at some point, did they hire Joel**
21       **Norman, Mid States?**
22    A. My understanding -- this is my
23       understanding.

67

1     **Q. Okay.**
2     A. When they hired Joel Norman, David told
3        me, said, I'm going to get somebody in
4        here to do the birds to take the pressure
5        off of you.
6     **Q. Because -- were you doing both?**
7     A. Huh?
8     **Q. Were you having to do both?**
9     A. I was doing both.  We didn't have bird
10       hunting when David came.  I was doing both
11       before David came.
12    **Q. Right.**
13    A. I was doing both when Donna -- before
14       Donna came, I was doing it when Mark Gregg
15       was there.  So Mark Gregg was the manager,
16       too.
17    **Q. Mark Gregg?**
18    A. Mark Gregg.
19    **Q. Before --**
20    A. Before Donna Davidson.
21    **Q. He was the general manager before Donna?**
22    A. Right, right.
23    **Q. Okay.**

68

1     A. They had --
2     **Q. Well, wait a minute.  Wait a minute.  I**
3        **thought Byron was the manager?**
4     A. Huh-uh (negative response).
5     **Q. Okay.**
6     A. No.
7     **Q. He was before --**
8     A. Mark Gregg was there after they fired
9        Hunter McDuffie.  Hunter McDuffie and Mark
10       Gregg was there together.  Both of them
11       was a manager.
12    **Q. Where is Mark Gregg now?**
13    A. He work for Cornerstone Plantation.
14    **Q. Do you know why he doesn't work for**
15       **Sedgefields?**
16    A. Well, I heard rumors.  He told me a few
17       things.  Then, one thing --
18    **Q. What did -- what did he tell you?**
19    A. Do I really have to say that?
20    **Q. Yes, sir.**
21    A. He told me that Donna put some stuff in
22       the game and got him fired.
23    **Q. Put some stuff in the game?**

Pages 65 to 68

Roy Lee
October 11, 2006

69

1 A. I wouldn't repeat the cussing words he
2 used, but he said that Donna put some
3 things in the game to tell Mr. Broadhead,
4 what got him fired.
5 What I'm saying is, we had Mark
6 Gregg. We had Mark. We had Greg Wallace.
7 All of these were -- all of these were
8 managers.
9 Q. How many managers have you --
10 A. It was --
11 Q. -- had at --
12 A. Whew, a lot of them.
13 Q. Since 2000?
14 A. Yeah, yeah. Okay. See, all of them guys
15 was -- all of us was working together. We
16 had a team. Each man had their own crew.
17 Okay. After this happened, after they
18 fired Paul, Jr., Paul, Jr. --
19 Q. Paul Broadhead, Jr.?
20 A. Yeah. They come down and fired Hunter
21 McDuffie.
22 Q. You mean, Mr. Broadhead fired his own son?
23 A. Right.

70

1 Q. Why?
2 A. I don't know. I don't know.
3 Okay. After then, Greg, Greg
4 Wallace -- Greg Wallace and Mark was
5 there. They fired Hunter McDuffie after
6 Paul, Jr.
7 Q. Do you know why they fired Hunter?
8 A. No -- well, I heard a few rumors. He was
9 more interested in birds than picking
10 Mr. Broadhead up at the airport. That's
11 what I heard. Now, I don't know.
12 Q. All right.
13 A. Okay. After they got rid of Hunter, that
14 left Mark in charge -- no. Let me back
15 that up. That left Mark and Greg Wallace.
16 Greg Wallace was messing around and went
17 up to Montgomery to work for Paul, Jr.
18 Carried some of the crew to Montgomery and
19 worked there for Paul, Jr., at his house.
20 It got back to Mr. Broadhead -- got back
21 to Sherry Howell, and they fired Greg the
22 next week.
23 Q. To do personal work at his house?

71

1 A. Right, right.
2 Q. Like landscaping or . . .
3 A. Right. Cutting grass, stuff like that.
4 He had a crew that he took up there to do
5 that. They told them Paul, Jr., don't
6 work for Sedgefields Plantation anymore.
7 So Greg got upset. So they fired Greg.
8 That left Mark in charge of everybody.
9 Okay. So that leaves me -- there was
10 Mark, Damon Duncan, a guy named Tom Cat,
11 and me. And Joseph, I think. Joseph and
12 Chris, a guy named Chris. We was the only
13 shakers that were left.
14 Q. Okay. And these other people you've
15 described were laborers?
16 A. Laborers, labor workers, yeah.
17 Q. All right. So you've had numerous
18 managers at Sedgefields?
19 A. Well, I done left out one, but he didn't
20 stay long enough to tie his shoe.
21 Q. Who was he?
22 A. That was Joe McFerrin. He out of
23 Fort Davis, right up above Sedgefield. He

72

1 might have stayed six months.
2 Q. Why did they fire him? Or did they fire
3 him?
4 A. Well, he baited the dove field the wrong
5 way. And the CEO came down and found it,
6 and then they got rid of him. He was
7 raising sand anyway.
8 Q. Okay. Now, this is a race discrimination
9 case. So other than you, has there ever
10 been anybody in management at Sedgefields
11 that's been black that you're aware of?
12 A. No, huh-uh, no.
13 Q. Now -- and then David hired Joel Norman?
14 A. Right.
15 Q. To run the quail operations?
16 A. Right.
17 Q. I gave you that one. All right. Now --
18 MR. ROBERSON: Where is Joel
19 Norman's stuff?
20 Q. Mr. Roy Lee, are you on a salary now?
21 A. Yes.
22 Q. How much do you make as the deer
23 operations manager?

Roy Lee
October 11, 2006

73

1  A. I think I make $20 and a quarter, I
2     believe, an hour.
3  Q. Do you know what that is annually?
4  A. That's something like $600 -- before
5     takeout? Before taxes?
6  Q. No. After -- yeah, before taxes, what
7     that is annually.
8  A. That's about $800 every two weeks.
9  Q. Is it about $41,000 a year?
10 A. It's close, yeah.
11 Q. And do you live on the property at
12    Sedgefields?
13 A. No.
14 Q. But they do provide you with a vehicle, a
15    truck?
16 A. Right.
17 Q. And the gas, too?
18 A. Right.
19 Q. Do they have a gas pump on the property?
20 A. Yes.
21 Q. And a tank, and you can just fill up when
22    you're out there?
23 A. Yeah, you can, yeah.

74

1  Q. Now, I'm going to show you -- and again,
2     I'll caution you that we have a protective
3     order, and so you can't discuss this, but
4     I'm going to show you what I'll mark as
5     Exhibit 5 to your deposition. And this is
6     a part of the personnel file of Joel
7     Norman. And I'll ask you if you know what
8     he makes after looking at that document.
9         (Whereupon Plaintiff's Exhibit
10        No. 5 was marked for
11        identification and attached
12        hereto.)
13        (Witness reviewed document.)
14 Q. Do you see where he makes $70,000 a year?
15 A. Uh-huh (affirmative response).
16 Q. Now, he has -- now, you need to know this.
17    He has a two-year Associates degree in
18    Wildlife Technology or Wildlife
19    Management; are you aware of that?
20 A. No, I wasn't -- well, I didn't know.
21 Q. Did you do the job that he's doing before
22    he was hired to do it?
23        MR. DUKES: Object to the form.

75

1  A. Yes, I did.
2  Q. Did they ever pay you anything approaching
3     $70,000?
4  A. No, they haven't.
5  Q. Is Joel Norman white?
6  A. Yes.
7  Q. Now, I have asked the people at
8     Sedgefields, David Carroll, why he makes
9     so much more than you. And one of the
10    reasons they gave was that he had a
11    degree, a two-year degree?
12 A. Uh-huh (affirmative response).
13 Q. And another reason they gave is saying you
14    had never been a supervisor before you
15    worked at Sedgefields.
16 A. Uh-huh (affirmative response).
17        MR. DUKES: Object to the form.
18 Q. That's not true, is it? You had been a
19    supervisor.
20 A. That's not true. At Beaulieu of America,
21    yeah.
22 Q. You were a supervisor?
23 A. Right.

76

1  Q. You supervised thirty-two people?
2  A. Thirty-two peoples, yeah.
3  Q. Okay. Did you put that on your
4     application?
5  A. Yeah. I'm going to change that. I don't
6     know. That's been a long time.
7  Q. Okay. Well -- now, Mr. Dukes takes the
8     position that I can't talk to you without
9     him being present, because you're in
10    management. And you are in management,
11    right?
12 A. Right.
13 Q. I'm going to tell you that the same law
14    that protects Norris Foster protects you.
15    You see what I was saying?
16 A. Uh-huh (affirmative response).
17 Q. That if they can -- if they discriminate
18    against Norris Foster on account of his
19    race, they can also discriminate against
20    you on account of your race, okay?
21 A. Okay.
22 Q. And I'll also tell you, and I don't know
23    if anybody has told you this --

Pages 73 to 76

334.262.3332              Baker & Baker Reporting and Video Services, Inc.              334.262.3332
888.253.3377        Certified Court Reporters and Certified Legal Video Specialists     888.253.3377

77

1  A. Uh-huh (affirmative response).
2  Q. Have you met with Mr. Dukes before today?
3     I'm not entitled to know what you talked
4     about, but have you met with him?
5  A. Yes.
6  Q. How many times?
7  A. I think today will be -- today will be
8     three times.
9  Q. Okay. Has anybody ever told you that
10    where you work now, they cannot take any
11    action against you because of testimony
12    you give in this case?
13 A. No.
14 Q. Nobody's told you that?
15 A. Huh-uh (negative response).
16 Q. Well, I'm telling you that.
17 A. Okay.
18 Q. The same law that protects you -- protects
19    him, protects you. And you were asked to
20    come here and testify, correct?
21 A. Correct.
22 Q. They asked you to come?
23 A. Correct.

78

1  Q. You're not volunteering to be here?
2  A. No, I'm not.
3  Q. Okay. I suspect you don't want to be
4     here?
5  A. I really don't.
6     MR. DUKES: You noticed the
7        deposition, did you not?
8     MR. ROBERSON: I did.
9     MR. DUKES: Okay.
10    BY MR. ROBERSON:
11 Q. Well, Mr. Lee, do you know any reason why
12    they are paying Joel Norman $70,000 to do
13    what you were doing for $10 an hour?
14    MR. DUKES: Object to the form.
15 Q. You can answer.
16 A. No, I don't. I don't know any reason why.
17    I mean, I didn't know what he was making.
18    And I mean, like, I done birds a long
19    time. It don't take a genius to figure
20    out how to prepare for birds --
21 Q. Well --
22 A. -- quails, or whatever.
23 Q. Mr. Norman says that he's doing things now

79

1     that you weren't doing, that is he claims
2     that he's initiated a wild bird program,
3     wild bird recovery program, and that he
4     puts birds out a month ahead of time.
5     MR. DUKES: Object to the form.
6        Mischaracterizes his
7        testimony.
8  Q. Do you understand that?
9  A. I understand what you're saying.
10 Q. Yeah. He says he ain't just putting them
11    out in the morning before the hunt and
12    then shooting them, he's putting them out
13    in order to build up the birds.
14 A. Okay.
15 Q. Okay. Was that something you could have
16    done if they'd have asked you to?
17 A. I mean, we -- I did that.
18 Q. You did it?
19 A. All of that before Donna Davidson got
20    there. The only reason why we stopped
21    doing that is because Donna Davidson
22    didn't want to do it. And she was the
23    manager.

80

1  Q. All right. Well, do you feel like it's
2     fair for them to pay Joel Norman so much
3     more than you to do half the job you were
4     doing?
5     MR. DUKES: Object to the form.
6  Q. You can answer.
7  A. I don't feel like it --
8     MR. DUKES: Hey, I'll tell him
9        when to answer. You don't
10       tell him when to answer,
11       okay? You've done that to
12       every single deponent down
13       here. I've objected to the
14       form. And he can surely
15       answer it. But you don't
16       instruct him when to
17       answer, okay?
18          You can answer his
19       question.
20 A. Say -- repeat the question.
21 Q. Do you feel like it's fair how they pay
22    you as opposed to Joel Norman?
23    MR. DUKES: Object to the form.

Pages 77 to 80

334.262.3332                Baker & Baker Reporting and Video Services, Inc.                334.262.3332
888.253.3377         Certified Court Reporters and Certified Legal Video Specialists         888.253.3377

Roy Lee
October 11, 2006

81

1    A. I don't think it's fair. Personally, I
2    don't, from the job that I know I know
3    what to do. But I don't know what he
4    makes from looking at this form here.
5    **Q. Now, after Joel was hired, did Norris**
6    **start -- he had been working under you,**
7    **right?**
8    A. Right.
9    **Q. Norris had?**
10   A. Right.
11   **Q. Then he -- was he reassigned to work under**
12   **Joel?**
13   A. Yes. David came to me and told me that we
14   couldn't do no more hiring right now, so
15   Joel going to have to have some men to
16   help him to prepare for -- they wanted to
17   turn that thing around and get the bird --
18   get the bird thing more than what we'd
19   been having.
20   **Q. Right.**
21   A. So he said, We have to have some of your
22   guys. So I went to Norris. I said, Well,
23   Norris, you know you're good on birds.

82

1    You know, I said, dogs, too. I said, You
2    want to work with Joel? Norris said,
3    Yeah, I'll go. I said, Now, once you go
4    over there, you can't come back. I said,
5    you'll be with Joel. So he went with
6    Joel.
7    **Q. Now, and Joel was hired, I think --**
8          MR. ROBERSON: Let me mark this.
9    **Q. I'm going to show you Exhibit 6. This is**
10   **really just Joel's -- Joel's application.**
11   **But it shows that he was -- he filled out**
12   **the application in September of '05, and**
13   **he was hired in September of '05, correct?**
14   **It looks like 9/19.**
15         (Whereupon Plaintiff's Exhibit
16          No. 6 was marked for
17          identification and attached
18          hereto.)
19   A. Nine --
20   **Q. See this one on Exhibit 5?**
21   A. Oh, 9/19/05.
22   **Q. 9/19/05.**
23   A. Okay.

83

1    **Q. And then, shortly after he was hired,**
2    **Norris went to work for him?**
3    A. Right. Maybe a couple of weeks after, I
4    think.
5    **Q. Okay. Now -- and Norris was hired back by**
6    **you in February of '05, right?**
7    A. Right.
8    **Q. So from February until September or**
9    **October, Norris worked for you?**
10   A. Right.
11   **Q. And you didn't have any problems with him?**
12   A. At all.
13   **Q. Okay. And then beginning in October --**
14   **about; I'm saying about -- he worked for**
15   **Joel; is that right?**
16   A. Yes.
17   **Q. Who else worked for Joel?**
18   A. Brother Man. We had a guy out there they
19   called Brother Man. I don't know his real
20   name. Then we had Willie Mack. Demetrius
21   was -- Demetrius started with him, but
22   then he ended up back with B.B. -- I mean,
23   with Willie Mack. And Demetrius came back

84

1    with me. And Jeffrey --
2    **Q. Harris?**
3    A. Yeah. That's his name, Jeffrey Harris.
4    **Q. Okay. He worked with Norris and Joel?**
5    A. Norris and Joel, uh-huh.
6    **Q. Okay. Was that a crew, Jeffrey, Norris --**
7    A. Jeffrey, Norris --
8    **Q. And Joel?**
9    A. -- Brother Man and Joel.
10   **Q. All right. Was Brother Man white?**
11   A. Right.
12   **Q. And was he the guy that was hired and only**
13   **worked a short -- I say a few months? Or**
14   **did he work longer than that? I think he**
15   **was hired in July, and then he was -- he's**
16   **the guy that was fired for stealing gas;**
17   **is that --**
18   A. That's correct.
19   **Q. Okay. But he lived on the property?**
20   A. Correct.
21   **Q. And he was paid $8 an hour; did you know**
22   **that?**
23   A. No, I didn't.

Pages 81 to 84

Roy Lee
October 11, 2006

85

1  Q. Okay.  Well, I want you to assume that he
2     was paid $8 an hour.  What kind of work
3     did he do, Brother Man do?
4  A. With me?
5  Q. Yeah.  Did he ever work for you?
6  A. Yeah, he worked for me.
7  Q. What did he do?
8  A. Bushhogging, cut grass, weed eat.
9  Q. Labor?
10 A. Labor work.
11 Q. Just general labor?
12 A. Yeah, labor work.
13 Q. To your knowledge, did he have any special
14    skills?  I mean --
15 A. Not to my -- only knowledge that I know,
16    that he told me, that was catering,
17    but . . .
18 Q. Okay.  All right.  Well, I mean, like he
19    wasn't -- to your knowledge, he didn't
20    know how to run a bulldozer or a backhoe
21    or anything like that?
22 A. I never seen him on none of that, huh-uh.
23 Q. Okay.  And he lived on the property.  Who

86

1     hired Brother Man?
2  A. David.
3  Q. David Carroll?
4  A. Uh-huh (affirmative response).
5  Q. The manager.  And he's sitting here today,
6     right?
7  A. Right.
8  Q. All right.  The guy worked for you.  Did
9     you have anything to do with how much he
10    was paid?
11 A. Which guy, Brother Man?
12 Q. Brother Man, yeah.
13 A. No, I didn't.
14 Q. Okay.  And so you didn't hire him, so you
15    weren't even involved in that?
16 A. I wasn't involved.  The only thing I know
17    he was -- he was hired.
18 Q. Well, do you know how he was hired?  That
19    is, how did they select him or . . .
20 A. I -- the only thing I know about that is
21    David said he was looking for somebody, an
22    older guy, to stay on the place, a night
23    watchman to help out; night watch a little

87

1     bit.  Because I was coming back and
2     forewards checking.  That was before Joel
3     moved -- that was before Joel came.
4  Q. Okay.
5  A. Other than that, I don't know.
6  Q. All right.  Then, after Norris went to
7     work for Joel and his crew, did Norris
8     ever come to you with any complaint about
9     Joel or how he was being treated?
10 A. Yes, he did.
11 Q. What was his complaint?
12 A. Norris complained.  Came to me saying that
13    Joel was doing him wrong; Joel was racial.
14    I said, What you mean?  He said, Man,
15    everything we do just ain't satisfying
16    Joel.  He's always on us.  He didn't want
17    us smoking.  On any tract that we park for
18    three or four minutes, he'll be peeking
19    behind trees looking at him, watching him.
20    I said, Well, Norris, I said, Well, you
21    need to tell David that then.  I said, You
22    know you went over there to work for Joel.
23    Now, you left me.  I said, But I hear what

88

1     you're saying.  He said, Man, he ain't
2     right.  Roy, he stays on us for something.
3     He's just picking, picking, picking.  I
4     said, Okay.  I said, Well, tough it out,
5     Norris, and see what he do.  Just wait,
6     you just got over there.  He's just
7     getting there.  Maybe he'll blend in.
8        A couple of weeks went by, it was
9     the same ole' thing.  What I mean by the
10    same ole' thing, Norris complaining again
11    about how Joel was, how he was treating
12    him.
13 Q. Did you ever talk to Joel or David
14    Carroll about --
15 A. I talked to both.
16 Q. -- about those complaints?
17 A. Both.
18 Q. Okay.  Tell me what you talked to Joel
19    about.
20 A. I talked to Joel.  I said, Joel, I said,
21    Look here.  I said, Your guys coming to me
22    complaining.  I said, They're doing that
23    because they used to work for me.  I said,

Pages 85 to 88

89

1  Look here, if you respect them guys, them
2  guys will respect you. I said, But if you
3  don't respect them guys, them guys ain't
4  going to respect you. I said, I know you
5  the boss; I ain't telling you to --
6  Q. How to run his job?
7  A. How to run his crew. But respect them
8  guys. I said, because them guys, you've
9  gots a good team. I said, Don't tear down
10  what we already got. Well, well, they got
11  to work. They got to work. I said, Well,
12  you told me. I'll find out where they'll
13  work. Don't want them to stay long if
14  they won't work. That's exactly his exact
15  words. I said, Well, I don't know. I
16  said, But your guys, something's wrong.
17  They keep complaining and complaining.
18  They got to work, Roy. I said, Well --
19  well, that's true. So that's the words me
20  and him had.
21  Q. Did you talk to David?
22  A. Yep, I also talked to David. If it wasn't
23  at that same time, it was later on down in

90

1  the month when Norris came back to me and
2  Jeffrey Harris. They said, Man --
3  Q. Jeff Harris came, too?
4  A. Yeah.
5  Q. Okay. What did he --
6  A. They said, Man -- they said, Joel ain't
7  right, man. Joel ain't right, man. He
8  complain. He complain. He expects us to
9  get out there and run them tractors when
10  they overheat. He said, We cut them off
11  when they overheat. Said, Joel said run
12  them; let them overheat. I said, Well,
13  man, he tell you that, that's going to
14  tear the equipment up. I said, But I'll
15  tell you what, why don't y'all tell David.
16  These were Norris' words. Norris said, I
17  talked to David. David said you have to
18  take that up with Joel. Joel is your
19  boss.
20  So when Norris came back and told
21  me what David said -- so I went to David.
22  I said, David, there's something wrong,
23  that them guys was doing their job before

91

1  Joel got here. Maybe all of them need to
2  get together and come to talk to you at
3  the same time, and then you find out what
4  the problem is. I said, But I ain't
5  trying to tell you how to do your job,
6  because I know you know how to do a job.
7  I said, But now, that's my -- that's what
8  I'm saying. I don't know what the problem
9  was. We hadn't been having problems. So
10  maybe -- I don't know. I really don't
11  know. I don't know did they talk or not.
12  Q. But you relayed the complaint that the men
13  had to both Joel and David?
14  A. Right, yeah.
15  Q. Okay.
16  MR. ROBERSON: Give me that.
17  Q. I'm going to show you a document that's
18  from Mid States about Norris Foster. Have
19  you ever seen that? Do you know what that
20  is, Exhibit 7?
21  (Whereupon Plaintiff's Exhibit
22  No. 7 was marked for
23  identification and attached

92

1  hereto.)
2  (Witness reviewed document.)
3  Q. It shows that he was hired in February of
4  '05, at $7 an hour?
5  A. Uh-huh, yes.
6  Q. And who signed that at the bottom, Denise
7  Pierce?
8  A. Denise Pierce.
9  Q. Okay. Now I'm going to show you another
10  document, and this is also from Norris'
11  personnel file. But this has to deal with
12  the period of time before when he worked
13  there, okay?
14  A. Okay.
15  Q. And I understand that you didn't work
16  there then. That's -- this is before --
17  well, I guess you did. I guess you did if
18  you started in 2000. But I'll show you
19  what's been marked as Exhibit 8.
20  (Whereupon Plaintiff's Exhibit
21  No. 8 was marked for
22  identification and attached
23  hereto.)

Pages 89 to 92

334.262.3332                Baker & Baker Reporting and Video Services, Inc.                334.262.3332
888.253.3377        Certified Court Reporters and Certified Legal Video Specialists        888.253.3377

93

1          (Witness reviewed document.)
2  Q. Do you see where Norris was hired in '99?
3     And actually he worked out there before
4     '99, but that's when Mid States bought
5     it --
6  A. Okay.
7  Q. -- isn't it?  I think.
8  A. 9/14/99.
9  Q. Yeah, uh-huh.
10 A. Yes.
11 Q. Okay.  And so what were they paying him to
12    begin with?  Does it say on there?
13 A. 5.15 an hour.
14 Q. Minimum wage?
15 A. Right, yes.
16 Q. And then tell me what he got a raise to
17    and when.
18 A. That looks like the first of 2000, he got
19    a 5 -- he got 5.50 an hour now.
20 Q. Okay.  Did he get another raise?
21 A. Six month, 11 of 2000, he got up to $6.25
22    an hour.
23 Q. Okay.  Did he get any further raises?

94

1          MR. DUKES:  Object to the form.
2             The document speaks for
3             itself.
4  A. The 2nd of 8 of 2005, he got up to $7.
5  Q. Okay.  Now I'm going to show you Exhibit
6     9.  When you hired Norris in February of
7     '05 --
8  A. Uh-huh (affirmative response).
9  Q. -- was he full-time or part-time?
10 A. Full-time.
11 Q. Did he ever work part-time for you?
12 A. No.
13 Q. I'll show you Exhibit 9.  Have you ever
14    seen that before?
15        (Whereupon Plaintiff's Exhibit
16         No. 9 was marked for
17         identification and attached
18         hereto.)
19        (Witness reviewed document.)
20 A. No.
21 Q. It says changed from part-time to
22    full-time.  And in what month is that?
23 A. 5th, the 1st, '05.

95

1  Q. Did anybody sign that?
2  A. No.  Approval by.
3  Q. Does it say -- has it got a signature on
4     it?
5          THE WITNESS:  What's that?
6  A. I don't know.  I don't know.  I don't
7     understand that.
8  Q. You don't recognize that signature?
9  A. No, I don't.
10 Q. Okay.  Do you need a driver's license to
11    operate a tractor?
12        MR. DUKES:  Object to the form.
13           Calls for a legal
14           conclusion.
15 Q. You can answer if you know.  Do you know?
16 A. Not to my knowing, you don't.  Not to my
17    knowing, you don't need a driver's
18    license.  Unless you're going to get on
19    that road, you're supposed to have a tag,
20    owner's tag on it.
21 Q. Now let me show you Exhibit 10.  And this
22    is a document that's been provided to me
23    that says Formal Reprimand, and it's got a

96

1  date.  Have you ever seen this document
2  before today?
3          MR. DUKES:  Talking about
4          Plaintiff's Exhibit 10?
5          MR. ROBERSON:  Yeah.
6          (Whereupon Plaintiff's Exhibit
7           No. 10 was marked for
8           identification and attached
9           hereto.)
10         (Witness reviewed document.)
11 A. No, I haven't seen this.
12 Q. Now, you've been a supervisor at
13    Sedgefields for years?
14 A. Uh-huh (affirmative response).
15 Q. The last several years, correct?
16 A. Correct.  Last four.
17 Q. Four.  Have you ever written anybody up?
18 A. Yes.
19 Q. Okay.  Do they have forms for you to write
20    people up?
21 A. Right.
22 Q. Is that a form that you can use to write
23    people up?  Have you ever seen one like

Pages 93 to 96

334.262.3332                Baker & Baker Reporting and Video Services, Inc.           334.262.3332
888.253.3377          Certified Court Reporters and Certified Legal Video Specialists     888.253.3377

97

1  that?
2  A. For Beaulieu or for . . .
3  Q. For Sedgefields.
4  A. I've never seen a form like this.
5  Q. At Sedgefields?
6  A. Yeah, at Sedgefields. I've never seen one
7     like this.
8  Q. Have you ever written anybody up at
9     Sedgefields?
10 A. No, I haven't.
11 Q. I'm going to show you -- well, do you
12    know -- do you have any personal knowledge
13    about this incident that's described in
14    Exhibit 10?
15 A. This right here?
16 Q. Yes, sir.
17 A. No, I don't.
18 Q. You weren't there when Norris was written
19    up, you weren't at the barn or wherever
20    they were?
21 A. No, I wasn't at the barn -- let me read
22    this again.
23       I wasn't at the barn when this

98

1  took place. I heard about it, but I
2  wasn't there.
3  Q. Okay. Well, do you know what the clippers
4     are?
5  A. Yes.
6  Q. I mean, how you clip horses?
7  A. Yes, I do.
8  Q. Is it clippers like that you clip their
9     mane or their -- you -- you groom the
10    horses or is it clippers like you --
11    toenail clippers? I don't know.
12 A. No. It's clippers like you cut your hair
13    with. You've got different blades.
14 Q. Okay.
15 A. Different size clippers depending on what
16    part you're clipping.
17 Q. How you groom the horses?
18 A. Right.
19 Q. And that's -- is that part of Norris' job,
20    to groom the horses?
21 A. Yes.
22 Q. And do you know if in December of '05, if
23    there was a problem or the clippers were

99

1  broken?
2  A. No, I don't know that. I know Norris and
3     them said they was broken.
4  Q. Okay.
5  A. I didn't check to see whether it was broke
6     or not. I don't know that.
7  Q. Okay.
8  A. I know they told me that it was broken.
9  Q. Okay. And so they -- Norris told you the
10    clippers were broken and that he'd been
11    written up for riding the horses; is
12    that --
13 A. Before he got wrote up, Norris and Jeffrey
14    told me the clippers was broken. We tried
15    to get up with Joel. He didn't answer his
16    radio, and so we just rode the horses.
17       To me, personally, I would have
18    wrote them up if they had left there
19    riding the horses and I told them to clip
20    them. Now, if the clippers were broke and
21    he didn't answer his radio, I would have
22    stayed at that barn . . . to me. But I
23    hadn't never seen this before.

100

1  Q. All right. Other than Norris and -- and
2     Jeff Harris was also written up?
3  A. Uh-huh (affirmative response).
4  Q. Do you know anybody that's ever been
5     written up at Sedgefields? Do you know --
6     have personal knowledge of it?
7       MR. DUKES: Object to the form.
8  Q. You can answer.
9       MR. ROBERSON: I'm sorry.
10      It's a habit.
11      MR. DUKES: Go ahead.
12 A. Not to my knowledge.
13 Q. Now, were you -- Norris was fired at the
14    end of December of '05. Were you -- were
15    you ever told -- were you present when
16    Norris was fired?
17 A. I was on the plantation, yes. Was I up
18    there when they fired Norris? No, I
19    wasn't.
20 Q. Okay. You weren't part of the discussion
21    about Norris being fired?
22 A. No, I wasn't, no.
23 Q. But you found out after the fact that he

Pages 97 to 100

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377      Certified Court Reporters and Certified Legal Video Specialists      888.253.3377

101

1     **had been fired?**
2  A. Right, correct.
3  **Q. How did you find out?**
4  A. David called me on the cell phone, said I
5     had to let Norris go. I said, Who? He
6     said, Norris. I said, Okay, then. He
7     said, well, we'll talk about it later. So
8     then me and Henry was together, Henry
9     Tolliver. I said, Man, I just saw Norris
10     in the barn.
11  **Q. You guess Norris --**
12  A. I said, I just saw Norris at the barn when
13     we left, because we was feeding the deer.
14     But I didn't know he was fired. David
15     called me and told me he was fired. He
16     had let him go.
17  **Q. Did anyone ever tell you why Norris was**
18     **fired?**
19  A. Yes. A month went by --
20         THE WITNESS: Can I answer that?
21         MR. ROBERSON: Was it me telling
22         you?
23         THE WITNESS: No, no.

102

1         MR. ROBERSON: I'm not talking
2         about Mr. Dukes.
3         THE WITNESS: I said, Can I
4         answer that?
5         MR. ROBERSON: Yeah.
6         MR. DUKES: If you know, go
7         ahead.
8  A. I was at -- a month -- maybe a month went
9     by, and I asked David. I said, David --
10     it might not quite been a month. I said,
11     Norris was fired, he said, because of the
12     birds. David comments -- David said,
13     Yeah, the birds and his attitude. He had
14     an attitude. He didn't want to be part of
15     the team. He said Norris kept the
16     attitude all the time. I said, Yeah. I
17     said, Well, he stayed angry a whole lot,
18     didn't he? He said, Yep. He said, Well,
19     he kept pulling the crew down. He had an
20     attitude problem. He just wouldn't do the
21     jobs I asked him to do. So I had to let
22     him go, Roy. I said, Well, in that case,
23     he fired hisself. That was my exact

103

1     words. So I left it like that.
2  **Q. Okay. Well, did David -- did David**
3     **Carroll or Joel Norman ever tell you that**
4     **Norris was fired because he stole birds?**
5  A. No. Joel didn't tell me that. But in --
6     a conversation come up when I was talking
7     to David. David said it was about the
8     birds and his attitude. I didn't hear
9     that from Joel.
10  **Q. Well, do you know, have any personal**
11     **knowledge, as to whether Norris ever stole**
12     **any birds?**
13  A. No. No. I heard that, but I haven't seen
14     it.
15  **Q. Okay. Well, the -- and my understanding**
16     **is that there were some birds that were**
17     **removed in October. Do you know anything**
18     **about that? It was right after the first**
19     **hunt or one of the -- one of the early**
20     **hunts that they had. Do you know anything**
21     **about that?**
22  A. My understanding about the birds, when we
23     come in, we have -- I think, if I'm not

104

1     mistaken, I don't know did I have some
2     hunters up there and we was looking over
3     the place -- my understanding, when I came
4     in, I saw birds sitting on the wagon. And
5     everybody was gone. They hadn't put the
6     birds up.
7  **Q. What are you supposed to do with the**
8     **birds?**
9  A. You supposed to put the birds in the
10     walk-in cooler to keep them cool.
11  **Q. Is that a freezer?**
12  A. A freezer unit.
13  **Q. A freezer?**
14  A. Uh-huh (affirmative response). But it's
15     more like a --
16  **Q. But you can't walk in --**
17  A. You can walk in.
18  **Q. Okay.**
19  A. One's a freezing unit and one's a cooling
20     unit. The cooling unit is to keep the
21     temperature right on the birds where they
22     won't spoil.
23         The first two hunts, I know them

Pages 101 to 104

334.262.3332                    Baker & Baker Reporting and Video Services, Inc.                    334.262.3332
888.253.3377          Certified Court Reporters and Certified Legal Video Specialists          888.253.3377

105

1    birds was spoiled, because one set of
2    birds sat in the refrigerator, I know, a
3    week. And I asked Joel, I said, Joel,
4    look here, ain't nobody going to clean
5    them birds? He said, I thought B.B. -- I
6    said, No, he didn't. Them birds still
7    sitting there, man, they ain't going to be
8    no good. They had them in the
9    refrigerator setting there, the birds, at
10   the green barn, our workshop.
11   **Q. Okay. So I understand it, if -- if -- if**
12   **you shoot the -- do they ever shoot the**
13   **birds, and clean them, and then cook them**
14   **there the same day?**
15   A. No, no, not the same day.
16   **Q. Okay. Is there a process whereby maybe**
17   **they -- they already have birds that are**
18   **cleaned and everything -- do they -- do**
19   **they cook quail there at the plantation?**
20   A. Sometime.
21   **Q. Okay. And -- and so what I'm saying is,**
22   **do they -- maybe they have some birds**
23   **that's already ready? In other words,**

106

1    **they can cook them while they're out**
2    **hunting; would that be right? There's --**
3    A. Yeah, we have some --
4    **Q. -- quail that's already dressed --**
5    A. Right.
6    **Q. -- and they're ready, and the cooks**
7    **prepare them while they're out hunting,**
8    **and they serve them for dinner --**
9    A. Right.
10   **Q. -- even before they -- they get them ready**
11   **before they get back?**
12   A. Right.
13   **Q. Okay. And then -- but the birds that they**
14   **kill, then they may go into the -- get**
15   **cleaned and go into the cooler or the**
16   **freezer, and then they have them later; is**
17   **that -- would that be right?**
18   A. The birds that was shot, they clean them
19   birds, put them in the freezer for the
20   next crew that's going to come in, what
21   shoots birds.
22   **Q. Right.**
23   A. But we already have birds already cleaned

107

1    in the freezer.
2    **Q. Okay.**
3    A. But the ones that they kill their birds
4    and they leave back the same day, you have
5    to give them the amount what they kill.
6    We have them in the freezer.
7    **Q. Okay. So you just swap them out?**
8    A. Swap them out, that's right.
9    **Q. Okay. You've got some already dressed,**
10   **and if they're already going --**
11   A. Right.
12   **Q. -- you just give them to them?**
13   A. That's right.
14   **Q. I mean, you --**
15   A. We try not to feed a shot bird down at the
16   lodge.
17   **Q. Okay.**
18   A. See, they have dressed birds that's never
19   been shot that they cook at the lodge.
20   **Q. Okay. All right. I'm going to show you**
21   **Exhibit 11, and ask you if you've ever**
22   **seen that?**
23          (Whereupon Plaintiff's Exhibit

108

1          **No. 11 was marked for**
2          **identification and attached**
3          **hereto.)**
4          **(Witness reviewed document.**
5          MR. DUKES: Do you need to take
6          a break or anything?
7          MR. ROBERSON: Yeah, we -- if
8          you ever want to take a
9          break, just let us know.
10         We're going to have to take
11         a break in a few minutes,
12         because he's got to change
13         his tape.
14   A. No, I ain't never seen this.
15   **Q. Okay. Now, when Norris worked for you,**
16   **did he ever have an attitude problem that**
17   **you -- that you observed?**
18   A. No.
19   **Q. Well, was he angry? I think that's the**
20   **word you used.**
21   A. Was he upset?
22   **Q. Well --**
23   A. With me?

Pages 105 to 108

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377      Certified Court Reporters and Certified Legal Video Specialists   888.253.3377

Roy Lee
October 11, 2006

109

1  Q. Yeah.
2  A. No.
3  Q. Okay.  Did he ever criticize you for the
4      way you were doing things, running the
5      show?
6  A. Never, not to my -- not that I know of.
7  Q. I mean -- okay.  Now, did Norris or
8      Jeffrey or anybody that was in Joel's crew
9      ever complain to you about their tip
10     money?
11  A. All of them.
12  Q. Everybody complained?
13  A. Everybody that was in the crew.
14  Q. B.B. -- was B.B. in the crew?
15  A. B.B., Norris, and Jeffrey.
16  Q. All complained about --
17  A. And Will didn't complain, because Will was
18     out there.  He didn't complain.
19  Q. What -- what was the nature of their
20     complaint?
21  A. On a couple of incidents after the quail
22     hunt was over, the guys come in.  I said,
23     Man, how did y'all do?  Yeah, we found a

110

1      few birds.  We found a few birds.  We had
2      did good.  So then Norris said, Well,
3      yeah.  He said, The clients come up to me,
4      man, patted me on the shoulder and said
5      job well done.  Said I took care of you, I
6      left your tip money with Joel.  And so
7      Norris said, Oh, well, that's fine, that's
8      fine.  Said Joel told me to put everything
9      up and he'd see them later.  So Norris, he
10     did him like that.  And Joel walked up to
11     him and told him, said, Look here, don't
12     let me see you do that no more.
13  Q. On the deer hunts that you take folks
14     on --
15  A. Uh-huh (affirmative response).
16  Q. -- do sometimes you get tips?
17  A. Right.
18  Q. You and your crew?
19  A. Right.
20  Q. How do you do the tips, Roy?
21  A. If we get a tip -- it ain't necessary that
22     you get a tip.
23  Q. I understand that.

111

1  A. But if a man feels free to want to give
2      you a tip -- but like if I've got -- just
3      say I got Demetrius and Henry Tolliver
4      working under me putting out, then I give
5      them three guys -- each one of them three
6      guys, whatever tip money they want to give
7      them, I tell them, Leave it with them.  If
8      Demetrius has got three guys and the three
9      guys, they want to tip him, that's fine.
10     If they do, they do.  If they don't, they
11     don't.  Same thing about Henry.  If the
12     guys -- if I take five or six guys out,
13     whatever they tip me, that would be my
14     tip.  I never had to split the deer hunter
15     tip money, and luck, didn't no deer
16     hunters leave them a tip.  Then I turn
17     around and I'll split my money with
18     them -- for them, where each one of us
19     will have some money.
20  Q. Okay.  Did you ever take people on quail
21     hunts?
22  A. Uh-huh (affirmative response).
23  Q. And when -- when you were over the quail

112

1      hunting and you got a tip, what did you do
2      with the tips?
3  A. The tip money I got, when we come in, if
4      the guys tip us -- plenty of times they
5      didn't -- if they tip us, they'd come to
6      me and give me the money.  I would take
7      time when everything was put up, before
8      we'd go, lay my tailgate down, and count
9      the money out right there in front of all
10     my guys and split it up.
11  Q. Equally?
12  A. Equally.  No matter what.  Even though --
13  Q. You didn't take more because you were the
14     guide?
15  A. No.  Even though I was the guide, the
16     handler.  The handler is always supposed
17     to get more money.  That's what I thought
18     ever since I've been out there.  But I
19     wasn't even going with that.  I just -- if
20     my guys didn't get no money, I would give
21     them -- split them up straight down the
22     middle.
23  Q. Well, if -- if somebody gave you a tip --

Pages 109 to 112

---

113

1  A. Uh-huh (affirmative response).
2  Q. -- would you always divide it up as
3     opposed to keeping that tip yourself?  I
4     mean, when you're quail hunting, would you
5     give everybody in the crew money or would
6     you keep the money?
7  A. No.  I would give every -- make sure if
8     the other guys didn't get a tip -- I would
9     ask them.  I'd say, Did the guy leave
10    y'all a tip?  And they'd say no.  If they
11    say no, I split the money up with them.
12        MR. ROBERSON:  Okay.  Let's go
13           off the Record and take a
14           break and change tapes.
15        THE VIDEOGRAPHER:  We're going
16           off the Record at 1:56 p.m.
17        (Whereupon a brief recess was
18           taken.)
19        THE VIDEOGRAPHER:  We're back on
20           the Record at 2:14 p.m.
21    BY MR. ROBERSON:
22    Q. Mr. Lee, we took a break, but now we're
23       back on the Record.  I'm going to show you

---

114

1     what I've marked as Exhibit 12.  And this
2     is actually from your personnel file, and
3     it shows that you were hired in September
4     of 2000 as a laborer.  Were you making $6
5     an hour when you were hired?
6        (Whereupon Plaintiff's Exhibit
7           No. 12 was marked for
8           identification and attached
9           hereto.)
10       (Witness reviewed document.)
11    A. Yes, I started with $6.
12    Q. Okay.  And then it progresses to show what
13       you made; is that correct?
14       (Witness reviewed document.)
15    A. That's correct.
16    Q. Okay.  What does it show you making now?
17    A. Now?
18    Q. Now, yes, sir.
19    A. Forty hours -- well, looks like -- well,
20       $12.
21       MR. DUKES:  No.  Right here.
22    A. $41,623.40 a year.
23    Q. Annual salary?

---

115

1  A. Uh-huh (affirmative response).
2  Q. Is that yes?
3  A. Yes.
4  Q. Okay.  And I'm going to show you what I've
5     marked as Exhibit 13, and ask you is this
6     is a copy of the application that you
7     filled out before you went to work at
8     Sedgefields?
9        (Whereupon Plaintiff's Exhibit
10          No. 13 was marked for
11          identification and attached
12          hereto.)
13       (Witness reviewed document.)
14       MR. DUKES:  Let me see that one.
15    BY MR. ROBERSON:
16    Q. Is that your application, Roy?
17    A. It's a copy.
18    Q. Okay.
19    A. I'm pretty sure it's the same thing,
20       because back then they had an application,
21       you know, like this.  So I'm pretty sure
22       it's the same thing.  It's about right.
23    Q. Is it dated on the last page when you

---

116

1     filled it out?
2  A. August the 10th, 2000.
3  Q. Okay.  And you started, according to this
4     sheet, on --
5  A. The ninth month, the 8th, 2000.
6  Q. Yeah.  Okay.  Maybe that's when you got
7     your first check.  I don't know.
8  A. Probably.  I mean, it's been awhile.
9  Q. Right.  All right.  And I'm going to show
10    you what I'll mark as Exhibit 14 to your
11    deposition.  And this is a document that
12    says for you, Roy Lee -- Roy Lee Chester?
13       (Whereupon Plaintiff's Exhibit
14          No. 14 was marked for
15          identification and attached
16          hereto.)
17    A. That's my middle name, Chester.
18    Q. Oh, okay.  Day of hire, 9/8/01.  New rate
19       of pay $10 an hour.  Do you -- is that --
20    A. What do you mean by date of hiring?
21    Q. Well, that's just what it says.
22       Is that when they promoted -- if
23       you recall, is that when they promoted

---

Pages 113 to 116

334.262.3332                    Baker & Baker Reporting and Video Services, Inc.                    334.262.3332
888.253.3377            Certified Court Reporters and Certified Legal Video Specialists            888.253.3377

117

1    you?
2    A. This was Donna Davidson. After they got
3       rid of Mark Gregg, that's when Donna
4       Davidson called me in the office and gave
5       me up to $10.
6    Q. And they make you a manager then?
7    A. Huh?
8    Q. Did they make you a manager then?
9    A. No, no. She didn't make me a manager at
10      that time. Not that day. About a month
11      later.
12   Q. Okay, okay. Roy, I -- do you know what an
13      affidavit is?
14   A. Uh-huh, yes, I do.
15   Q. Okay. It's a sworn statement?
16   A. Right.
17   Q. And this is an affidavit from Jeffrey
18      Harris. And I'm going to ask you to look
19      at this. I'll mark this as Exhibit 15 to
20      your deposition. It's a couple of pages,
21      so I'll just ask you to read that to
22      yourself first. And you can have -- I've
23      given that to Mr. Dukes.

118

1         (Whereupon Plaintiff's Exhibit
2            No. 15 was marked for
3            identification and attached
4            hereto.)
5         (Witness reviewed document.)
6    A. Okay.
7    Q. Do you know Jeffrey Harris?
8    A. Yes, I know him.
9    Q. Did he ever work for you and your crew?
10   A. Jeffrey Harris. I'm trying to see.
11      Jeffrey Harris worked for me a couple of
12      weeks, I think. If I'm not mistaken, I
13      think Jeffrey Harris worked under me a
14      couple of weeks. Because I think Jeffrey
15      Harris came -- I don't know was Charles
16      there when Jeffrey came or not.
17   Q. Okay. Well, did -- you didn't hire him?
18   A. No.
19   Q. Okay. Do you know who did?
20   A. David.
21   Q. David Carroll?
22   A. Yes.
23   Q. Okay. And in the time that he worked for

119

1    you, that is Jeffrey Harris, did you have
2       any problem with his work?
3    A. No. At the time Jeffrey Harris was
4       working for me, the only thing he was
5       doing then was cutting grass. Norris told
6       him he could drive a tractor, so . . . he
7       could fix anything.
8    Q. He's a mechanic or something?
9    A. That's what Norris told me he was, a
10      mechanic. But we didn't have nothing
11      broke down at the time. But I had him
12      cutting grass. And I think -- I'm trying
13      to see. I don't know. I don't think he
14      worked for me that long.
15   Q. Okay. Now, but in the short time that he
16      worked for you, did you have any problem
17      with him or his work or attitude or
18      anything?
19   A. No.
20   Q. Now, I'm going to show you what I've
21      marked as exhibit -- well, first of all,
22      let me ask you: He makes some statements
23      in there about things that he heard Joel

120

1    Norman say.
2    A. Uh-huh (affirmative response).
3    Q. Did you see that? Did you read it?
4    A. I saw that.
5    Q. Did you ever hear Joel Norman make any
6       statement about blacks or about that he
7       was going to replace the blacks in his
8       crew?
9    A. No, I haven't. I have never heard that.
10      I heard rumors, but I haven't never heard
11      that.
12   Q. Okay.
13   A. I mean, he hadn't never said that around
14      me that I could hear.
15   Q. You've never personally heard it?
16   A. Right.
17   Q. Before Norris Foster was fired in December
18      of '05 --
19   A. Uh-huh (affirmative response).
20   Q. -- did they complain to you about any
21      statement he had made -- Joel Norman had
22      made?
23   A. Yes. They come to me and told me some

Pages 117 to 120

334.262.3332            Baker & Baker Reporting and Video Services, Inc.            334.262.3332
888.253.3377        Certified Court Reporters and Certified Legal Video Specialists   888.253.3377

121

1    things he said.  But I don't know for
2    sure.
3    Q. You -- I know you don't know that he said
4       them.
5    A. Right.
6    Q. I understand that.
7    A. Okay.
8    Q. But they did complain to you about
9       statements they claim that he made prior
10      to Norris being fired; is that fair?
11   A. Repeat that.
12   Q. Okay.  Before Norris got fired --
13   A. Right.
14   Q. -- Jeff and Norris had been to you and
15      said that Joel said these things, like he
16      was going to get a white crew or something
17      like that?
18   A. No.  When they come to me and told me
19      before, they told me that Joel was
20      telling -- Will was telling them things.
21      B.B. was telling me.  Norris and them was
22      saying that that's what Will -- when Will
23      got mad with Joel, Will was going to come

122

1    around and tell them everything.  Will was
2    telling them everything that Joel was
3    saying.
4    Q. Will told them?
5    A. Will told them.  To my understanding, Will
6    told them.
7    Q. Okay.
8    A. I never heard Joel saying nothing.
9    Q. Okay.  Then -- and Will was a white guy --
10   A. Right.
11   Q. -- that was hired.  And we'll get to that.
12      But do y'all have a tradition
13      there at the plantation that when you have
14      homecoming, Bullock County homecoming, the
15      high school football game, that you let
16      off early?
17   A. Yes, we used to.
18   Q. And, in fact, it's not just Sedgefields, I
19      mean, it's a lot of businesses --
20   A. Yeah.
21   Q. -- that they give --
22   A. Right.
23   Q. -- employees off early?

123

1    A. Right.
2    Q. Because they have a parade, right?
3    A. Right, right.
4    Q. And so they give people time off so they
5       can go to the parade and do the
6       activities?
7    A. Right.
8    Q. Do you have a son that plays on the
9       football team?
10   A. Yes, I do.
11   Q. And Norris has a son, right?
12   A. Yes, he do.
13   Q. Tailback?
14   A. Tailback, yes.
15   Q. Is he pretty good?
16   A. Oh, yeah.
17   Q. What about your son?
18   A. He's very good.
19   Q. What does he play?
20   A. Defensive end, linebacker -- no, defensive
21      end, tight end.
22   Q. What year is he?
23   A. He's in the ninth grade.

124

1    Q. And he plays?
2    A. Oh, yeah.  He's good.
3    Q. Okay.  Well, and did you let your crew off
4       early on homecoming?
5    A. Yes.  Depends.
6    Q. What time is -- what time is early?
7    A. Early depends on -- if we ain't got
8       nothing going on at the job, I would let
9       them come in and clean the equipment up.
10      Because the game always have been on
11      Friday.  Parade is on Friday.  Let them
12      come in early, clean the equipment up, and
13      they leave.
14   Q. Okay.
15   A. The quicker you can get through with that
16      equipment, the quicker you can leave.
17   Q. Now, did the guys in Joel's crew complain
18      to you or did you find out that they had a
19      complaint because Joel wouldn't let them
20      leave early on homecoming?
21   A. No.  I never --
22   Q. Do you remember anything about that?
23   A. I don't remember that, no.

Pages 121 to 124

334.262.3332                Baker & Baker Reporting and Video Services, Inc.                334.262.3332
888.253.3377        Certified Court Reporters and Certified Legal Video Specialists        888.253.3377

125

1  Q. I'm going to show you Plaintiffs' Exhibit
2      16. And there's a guy that you referred
3      to as Brother Man?
4  A. Right.
5  Q. That's what y'all called him?
6  A. Right.
7  Q. Is this the same guy, William Beckwith,
8      Jr.? Do you know? This is a form from
9      Beckwith's --
10         (Whereupon Plaintiff's Exhibit
11          No. 16 was marked for
12          identification and attached
13          hereto.)
14  A. I don't know Brother Man's full name. The
15      only thing I've ever known, his name was
16      Brother Man.
17  Q. Okay.
18  A. I mean, I really don't know his name.
19  Q. Well, that document shows that he worked
20      until the end of September and that he
21      was -- Mr. Beckwith was fired for stealing
22      gas and not having a driver's license. Do
23      you see that?

126

1  A. Right, yes.
2  Q. Does that describe anybody else that you
3      know about?
4  A. For stealing gas?
5  Q. Yeah. Was anybody else stealing gas and
6      didn't have a driver's license that you
7      know about?
8         MR. DUKES: That was terminated?
9         MR. ROBERSON: Yeah.
10  A. No.
11  Q. Okay. And was that about when Beckwith
12      left or was fired, in -- around the end of
13      September, right after Joel got there?
14  A. I can't recall what month it was. But I
15      do know he was fired.
16  Q. After Joel got there?
17  A. After Joel got there.
18  Q. Now, did he -- did -- what vehicle
19      did Brother Man use when he was a night
20      watchman? Did he have a vehicle?
21  A. Yes. We had a red Ford F150. And we let
22      Brother --
23  Q. On the farm?

127

1  A. On the farm. And we let Brother Man keep
2      that on the weekends.
3  Q. But he didn't have a driver's license,
4      correct?
5  A. Yeah. I didn't know he didn't have a
6      driver's license at that time.
7  Q. Okay. Well, what I'm saying is, he
8      couldn't drive that off the property
9      legally, right?
10  A. No, he couldn't.
11  Q. Okay. Do you know whether he ever did
12      take it off of the property?
13  A. Well, he went down the highway. I mean,
14      that was off the property.
15  Q. Okay.
16  A. But as far as me knowing if he went to
17      town or not, I don't know.
18  Q. Okay. Now, this -- did you ever tell
19      anybody that Brother Man was taking gas?
20      Did you ever report him for stealing gas?
21  A. Yes. I assumed that Brother Man was
22      taking gas.
23  Q. All right. Why did you assume that?

128

1  A. Because I filled the truck up on a Tuesday
2      or a Wednesday. I come back the next --
3  Q. Your truck?
4  A. No, no. The burgundy truck that he's
5      supposed to been done drove.
6  Q. The red truck?
7  A. Right.
8  Q. Okay.
9  A. And it was empty the next day. And a six
10      cylinder, you can't put that kind of miles
11      on it right around the farm off a full
12      tank of gas and then empty the next day.
13  Q. What was he doing with the gas? Do you
14      know?
15  A. I assumed that he was siphoning it out.
16  Q. And selling it or something?
17  A. No. Putting it in his personal truck.
18      That's what I assumed. Because we keep
19      the gas tanks locked up.
20  Q. Okay. So do you have to have a key to
21      pump gas --
22  A. Right.
23  Q. -- at Sedgefields?

Pages 125 to 128

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377     Certified Court Reporters and Certified Legal Video Specialists     888.253.3377

129

1   A. Right.
2   Q. I mean, at their -- for their pump, you
3       have to have a key in order to get gas; is
4       that right?
5   A. In order to get gas, yes.
6   Q. And he didn't have a key?
7   A. No, he didn't.
8   Q. So you, because if he was filling --
9       having to fill up the truck so often, you
10      assumed he wasn't just burning the gas --
11  A. Right.
12  Q. -- in the truck?
13  A. Yes.
14  Q. Who did you report that to?
15  A. David Carroll.
16  Q. Okay.  Did they act on that, that you know
17      of?
18          MR. DUKES: Object to the form.
19  A. Not that I know of.
20  Q. All right.  What happened that Brother Man
21      got fired for stealing gas?  Was there
22      something that happened?
23  A. My recall, as far as I know of, I don't

130

1       know what I was doing that day -- oh, I
2       went to get some fertilizer from Clayton
3       in a tag-along buggy.  And I came back.
4       David told me, said, Well, Joel caught
5       Brother Man taking gas.  Joel's wife seen
6       Brother Man taking some gas and --
7   Q. Did he say what he was taking it from or
8       where?
9   A. He took it in a jug and poured it in his
10      truck.  She was watching him.  She saw
11      him.
12  Q. Oh.
13  A. She reported it to Joel --
14  Q. She stays on the property, right?
15  A. Right.
16  Q. Okay.
17  A. She reported it to Joel.  Joel reported it
18      to David.  David told me about it.  I
19      said, Well, did you tell Brother Man?  I
20      said, How did Brother Man get it in the
21      gas tank with the top -- with it locked?
22      He said he had a jug.  I said, Whoa.  I
23      said, Well he knowed better than that.  I

131

1       said, Well, I been told you he been
2       getting that gas.  Okay.  So David said,
3       Well, I'll let him work the rest of the
4       day, and I'll let him know we can't have
5       nobody out here stealing.
6           MR. ROBERSON:  Now, give me Will
7               Hubbard's, please.
8   Q. Do you know Will Hubbard?
9   A. Do I know of him?
10  Q. Yeah.
11  A. Yes.  I know his -- I just know his name.
12      Nothing about him, but I know his name.
13  Q. Okay.  Well, he worked out there for a
14      while, a short time, correct?
15  A. Yes, correct.
16  Q. And he's a white?
17  A. Correct.
18  Q. Is he young, fairly young?
19  A. Real young.
20  Q. Okay.  I'm going to show you what I've
21      marked as Exhibit 17 which is his
22      application.  Take a look at that.
23          (Whereupon Plaintiff's Exhibit

132

1           No. 17 was marked for
2           identification and attached
3           hereto.)
4       (Witness reviewed document.)
5       MR. ROBERSON:  Do you have the
6           sheet that shows how much
7           he made?
8       MR. DUKES:  I'll stipulate, if
9           it moves things along, that
10          he was paid $8 an hour.
11      MR. ROBERSON:  Okay.  Well, I --
12  BY MR. ROBERSON:
13  Q. Will worked for Joel, right?
14  A. Right.
15  Q. Do you know who hired him?  Did David hire
16      him or do you know?
17  A. I don't know.
18  Q. Okay.  I'm going to show you what's marked
19      as Exhibit 18.  And it shows that Will
20      Hubbard was paid $8 an hour.  Do you see
21      that, Mr. Lee?
22          (Whereupon Plaintiff's Exhibit
23          No. 18 was marked for

Pages 129 to 132

334.262.3332                Baker & Baker Reporting and Video Services, Inc.            334.262.3332
888.253.3377         Certified Court Reporters and Certified Legal Video Specialists    888.253.3377

133

1           identification and attached
2                 hereto.)
3           (Witness reviewed document.)
4  A. Right.
5  Q. When was he hired?
6  A. On this paper?
7  Q. Yes, sir.
8  A. 11 -- on this paper?
9  Q. On that paper, when did he start?
10 A. 11/21/05.
11 Q. About Thanksgiving of '05?
12 A. Right.
13 Q. Now, did y'all have some -- at that time,
14    you had Jeff Harris and Norris working for
15    Joel Norman, right?
16 A. Correct.
17 Q. How many people do you need in the quail
18    hunting?
19 A. How many people did he need, Joel need?
20 Q. Yeah.
21 A. It all depends on what -- what they have
22    going on at that time.  I think when he
23    had Norris and Jeffrey, he had Brother

134

1     Man.  Then he had Willie -- B.B., Willie
2     Mack sometimes.  I think Will come after
3     they got rid of Brother Man.
4  Q. That's correct.  Well, my question to you
5     is:  Do you know what Will did in the
6     crew, in Joel's crew?
7  A. I know what Will started off doing when he
8     got there.
9  Q. What?
10 A. Riding horses.
11 Q. What does that mean?
12 A. Getting horses in shape.  Knew he had to
13    get them ready before the clients get
14    there.  The clients ain't going to want
15    to --
16 Q. Exercising horses?
17 A. Right.
18 Q. Okay.
19 A. Going out getting them in shape.  I know
20    he did that for a while.
21 Q. What they disciplined Norris Foster for,
22    riding horses, is what Will Hubbard was
23    assigned to do?

135

1       MR. DUKES:  Object to the form.
2  Q. Is that right?
3  A. I don't understand that.
4  Q. Okay.  Well, I showed you that write-up
5     where Norris was written up for riding
6     horses, right?
7  A. Where Norris was written up for riding
8     horses, for leaving --
9  Q. The barn.
10 A. -- the barn, when they was supposed to
11    have been clipping them.
12 Q. Okay.  But the same horses that Norris was
13    riding, Will Hubbard was hired to ride; is
14    that your understanding?
15 A. No.
16 Q. Okay.  What --
17 A. My understanding is Will -- when Will
18    started.  But when I seen Will when he
19    started, he was riding horses.  Then they
20    was -- Norris and Jeffrey was chopping.
21 Q. Was riding the tractor --
22 A. Right.
23 Q. -- and cutting in the fields?

136

1  A. Right.
2  Q. Okay.
3  A. And Will and Joel was exercising the
4     horses and the dogs.  That's what I seen.
5  Q. Did you ever see -- in the time that Will
6     Hubbard worked there, did you ever see him
7     operating any heavy equipment?
8  A. Yes.
9  Q. What did he run?
10 A. Bulldozer.  He ran the tractor.  I never
11    seen him run the backhoe.  He run the
12    tractor and the bulldozer.  He run the
13    tractor, bulldozer, and skidder.
14 Q. All right.
15       MR. ROBERSON:  Give me Joseph
16             Mays' information.
17 Q. Okay.  Do you know a gentleman named
18    Joseph May?
19 A. Yes.
20 Q. And he's also a white man, correct?
21 A. Yes, correct.
22 Q. And he -- is he also young?
23 A. Correct.

Pages 133 to 136

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377       Certified Court Reporters and Certified Legal Video Specialists       888.253.3377

137

1  Q. And Norris is forty-seven years old.  Did
2     you know that?
3  A. Correct.
4  Q. And he spent six years in the military?
5  A. Correct.
6  Q. Did you know that?
7  A. Yes.
8  Q. Do you think that military service is
9     valuable?
10 A. Yes.
11 Q. Did you ever serve in the military?
12 A. No.
13 Q. Okay.  Let me show you Exhibit 19 that
14    shows Joseph May was hired when -- on what
15    date?
16       (Whereupon Plaintiff's Exhibit
17       No. 19 was marked for
18       identification and attached
19       hereto.)
20 A. The 11th, the 21st, '05.
21 Q. Same day as Will Hubbard?
22 A. Same day.
23 Q. And where was he assigned to work?

138

1  A. With Joel Norman.
2  Q. So now he's got four people in his crew?
3  A. Right, correct.
4  Q. I'll show you Exhibit 20 which is -- and
5     Joseph May paid -- was paid $8 an hour?
6  A. Correct.
7  Q. All right.  This is Joseph Mays'
8     application.  I want you to look at that.
9       (Whereupon Plaintiff's Exhibit
10      No. 20 was marked for
11      identification and attached
12      hereto.)
13      (Witness reviewed document.)
14 Q. Do you have -- and I'm not trying to make
15    you into somebody that works at the
16    carnival --
17 A. Uh-huh (affirmative response).
18 Q. -- but do you know how old Joseph was or
19    have an estimate for how old he was?
20 A. Do I know how old is he now --
21 Q. Yeah.
22 A. -- or at that time?
23 Q. At that time.

139

1  A. No, I didn't.
2  Q. Okay.  Was he a young guy?
3  A. Yeah, he looked young.
4  Q. Now, what was Joseph May doing that you
5     saw?
6  A. Only thing I seen Joseph doing -- Joseph
7     May?
8  Q. Right.
9  A. -- doing was trapping.  They had --
10 Q. Trapping?
11 A. Traps, yeah.  Toe pad traps for trapping
12    predators.
13 Q. Trapping --
14 A. Predators.
15 Q. Predators like --
16 A. Racoons, possums, stuff that was eating
17    quail.
18 Q. Okay.
19 A. Coyotes.
20 Q. Okay.  So he was trapping the things that
21    would lower the bird population?
22 A. Correct.
23 Q. Is that right?

140

1  A. Correct.
2  Q. And predators of the birds?
3  A. Correct.
4  Q. Okay.  So if you can reduce the predators,
5     you can increase your bird population?
6  A. Correct.
7  Q. And have more -- better hunts, right?
8  A. Correct.
9  Q. Okay.  Now, how do you trap?  Do you know?
10 A. Well, when I -- I know what he say how he
11    do it.  I never did that myself.
12 Q. Right.
13 A. The only way I ever trapped before was a
14    live trap.  Sat a can of sardines in a
15    cage, in a live trap like that there.  In
16    a water ditch or a crossing in a road,
17    that side of the road.  But he had toe pad
18    traps with a flag.
19 Q. What kind of traps?
20 A. Toe pad.
21 Q. Toe pad?
22 A. Right.  Something -- a little small trap
23    with pads on them that close up to keep

Pages 137 to 140

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377       Certified Court Reporters and Certified Legal Video Specialists       888.253.3377

141

1    from hurting the animal.
2    **Q. Uh-huh (affirmative response).**
3    A. And it will hold him till you get there.
4    He'll be alive when you get there.
5    **Q. Oh, it's live trapping, right?**
6    A. Well, yeah, you can say.
7    **Q. And then do you remove the animal? That**
8    **is, do you take it somewhere?**
9    A. No.  You kill it.
10   **Q. Okay.**
11        MR. DUKES:  Is it a leg trap?
12        THE WITNESS:  Right.  It just
13           traps his toes.  He reach
14           in that trap, and you trap
15           his toes.
16   BY MR. ROBERSON:
17   **Q. Okay.  All right.  Now, do you know this**
18   **other guy, Chance Hamm?**
19   A. Yes, I know him.
20   **Q. He still -- he still works out there,**
21   **doesn't he?**
22   A. Yes.
23   **Q. And he's also a white guy, correct?**

142

1    A. Correct.
2    **Q. Let me show you what I'll mark as Exhibit**
3    **21.**
4        MR. DUKES:  I'll stipulate as to
5           his pay if you want me to.
6        MR. ROBERSON:  That's all right.
7           I'm having too much fun.
8    BY MR. ROBERSON:
9    **Q. I'll show you 21.  Does that show that**
10   **Chance Hamm was paid $8 an hour when he**
11   **was hired in January of '06?**
12        **(Whereupon Plaintiff's Exhibit**
13           **No. 21 was marked for**
14           **identification and attached**
15           **hereto.)**
16   A. Correct.
17   **Q. Okay.  And then I'll show you Exhibit 22**
18   **which is his application.  And he was also**
19   **a young white male, correct?**
20        **(Whereupon Plaintiff's Exhibit**
21           **No. 22 was marked for**
22           **identification and attached**
23           **hereto.)**

143

1    A. Correct.
2    **Q. Now, Will Hubbard and Joseph May don't**
3    **work there anymore?**
4    A. No.
5    **Q. Why is that?**
6    A. My understanding, Will come to me and told
7    me to pick him up one day.
8    **Q. That they -- that they what?**
9    A. Will called me on the radio and told me,
10   he said, Roy, come get me.  I said, Where
11   you at?  He said, I'm down here by the big
12   lake.  I said, Man, You need to call Joel.
13   He's your boss.  He said, No, I'm tired of
14   Joel's Shit.  I said, What?  I'm tired --
15   I said, Hold on a minute.  I said, I'll be
16   there in a minute.
17        So I wanted to know what he was
18   talking about, so I gets down there and
19   pick him up.  He said, Well, Roy, I'm just
20   sick of him.  I'm tired of him.  I said,
21   Man, you ain't going to quit your job, is
22   you?  He said, Yeah, I'm tired of Joel.
23   He in love with Chance.  Chance telling

144

1    him everything.  He in love.  Chance
2    watching the guys up there telling him
3    everything.  I said, What?  I said, Man, I
4    don't know nothing about that.  I said,
5    Why don't you go talk to David before you
6    just quit and leave your job?  I said,
7    Man, look, if you ain't got plenty of
8    money, don't leave your job.  Well, no,
9    no, no.
10        I said, Well, you going to have
11   to turn that key in before you leave.  You
12   might as well leave me your key if you're
13   fixin' to quit.  I said, Better yet, take
14   it to David.  He said, Well, I'll go down
15   there and take it to David.  I said, You
16   really need to think about it before you
17   walk away from your job.  So he said,
18   Well, no, I'm going to quit.  I'm just
19   tired of it.  I'm tired of Joel.  He ain't
20   right.  He ain't right.  He's just crazy
21   as he can be whether y'all can see it or
22   not.  I said, Hey, man, I don't know
23   nothing about that.  I said, But you need

Pages 141 to 144

334.262.3332                Baker & Baker Reporting and Video Services, Inc.                334.262.3332
888.253.3377          Certified Court Reporters and Certified Legal Video Specialists          888.253.3377

145

1    to tell David all of this.
2        So I dropped him off at his barn
3    at his truck. And I saw Joel. I said,
4    Joel, that man say he fixin' to quit. He
5    said, For real? I said, Yeah. He said,
6    Well, let him go then. I can't make him
7    stay. So I just pulled on off.
8        And as of -- what you say the
9    other guy's name is?
10   **Q. Joseph May or Brother Man, Beckwith?**
11   A. No. Joseph May.
12       MR. DUKES: Joseph May.
13   A. I don't know why Joseph May quit.
14   **Q. He quit, too?**
15   A. He quit, yeah. I do know I heard that he
16   went back to school, but I don't know the
17   reason why he quit.
18   **Q. He didn't talk to you?**
19   A. No, he didn't. He just --
20   **Q. He just left.**
21   A. Right. He didn't ever come back and pick
22   the traps up. He just left.
23   **Q. He didn't get his traps?**

147

1    A. He was hired -- I can't make out -- I
2    guess that's a one or a --
3    **Q. I think that's nine -- 9/6/05 --**
4    A. Okay.
5    **Q. -- he was hired. Does that sound about**
6    **right, September of '05?**
7    A. That sounds about right.
8    **Q. He was hired before Joel was hired; do you**
9    **remember that, right before --**
10   A. Correct.
11   **Q. -- Joel was hired?**
12   A. Yeah, correct.
13   **Q. Okay.**
14   A. Maybe a couple of weeks or maybe sooner.
15   **Q. Right.**
16   A. Three or four weeks maybe.
17   **Q. And he was hired at $7 an hour, correct?**
18   A. Correct.
19   **Q. Do you know how old Jeffrey is?**
20   A. No, I don't.
21   **Q. Let me show you Exhibit 24. This is**
22   **Jeffrey Harris' application.**
23       **(Whereupon Plaintiff's Exhibit**

146

1    A. No. He just left.
2    **Q. All right. Well, I've showed you four**
3    **documents of four white males who were**
4    **hired, correct?**
5    A. Correct.
6    **Q. And each one of them were paid $8 an hour,**
7    **correct?**
8    A. Correct.
9    **Q. Norris Foster was paid $7 an hour, and I**
10   **showed you that document?**
11   A. Correct.
12   **Q. Jeffrey Harris --**
13       MR. ROBERSON: Have you
14       got . . .
15   **Q. Jeffrey Harris is black, isn't he?**
16   A. Correct.
17   **Q. Does it show that he was hired -- when was**
18   **he hired, what date?**
19       **(Whereupon Plaintiff's Exhibit**
20       **No. 23 was marked for**
21       **identification and attached**
22       **hereto.)**
23       **(Witness reviewed document.)**

148

1        **No. 24 was marked for**
2        **identification and attached**
3        **hereto.)**
4        **(Witness reviewed document.)**
5    **Q. You see where he had military service?**
6    A. Correct.
7    **Q. Okay. And I'm going to show you Exhibit**
8    **25 which is Jeffrey Harris' birth**
9    **certificate. Shows he was born**
10   **December 4, 1967. So that would have made**
11   **him in 2005, what, thirty-eight?**
12       **(Whereupon Plaintiff's Exhibit**
13       **No. 25 was marked for**
14       **identification and attached**
15       **hereto.)**
16       **(Witness reviewed document.)**
17   A. Correct. '67?
18   **Q. Right, '67.**
19   A. He was born in '67?
20   **Q. That's what it says, yeah. Makes him**
21   **about thirty-eight, doesn't it?**
22   A. Yeah. He was born the 4th, 1967.
23   **Q. All right. And I'm also going to show you**

Pages 145 to 148

149

1    the deposition -- I mean, Willie Mack's
2    personnel file.  Willie Mack, do y'all
3    call him B.B.?
4            (Whereupon Plaintiff's Exhibit
5            No. 26 was marked for
6            identification and attached
7            hereto.)
8  A. We call him B.B., that's correct.
9  Q. Okay.  What does he do in the crew?
10 A. B.B. used to -- in my crew now?
11 Q. Does he work for you?
12 A. Now, yeah.
13 Q. Is he a good employee?
14 A. Oh, yeah.
15 Q. I mean, does he do his job?
16 A. Yeah.
17 Q. Have you ever had any problems out of B.B.
18    not coming to work or whatever?
19 A. A couple of times, yeah.
20 Q. Says this is the application.  He didn't
21    complete any of it, but here's his
22    application, Exhibit 27, for Willie
23    Bernard Mack.

150

1            (Whereupon Plaintiff's Exhibit
2            No. 27 was marked for
3            identification and attached
4            hereto.)
5            (Witness reviewed document.)
6  Q. What did Willie Mack make an hour when he
7    was hired?
8  A. When he was hired? 6.50 when he started.
9  Q. What date did he start?
10 A. Third month, the 16th of '04.
11 Q. Okay.  And then how much did he get?
12 A. He got a raise the first month, the first
13    of '05, to 7.80 it looks like.
14 Q. $7 an hour, I think it is.
15            MR. DUKES:  I don't know.
16 A. I can't make out what that is.
17 Q. Okay.
18 A. And then on the first -- the first month,
19    the first of '06, he got a raise to $8.
20 Q. Okay.  Now, I don't have the documents,
21    but I'm asking you to assume -- do you
22    know Henry Tolliver?
23 A. Yes, I know him.

151

1  Q. Did he work for you?
2  A. Correct.
3  Q. Was he a good worker?
4  A. Correct.
5  Q. And Demetrius Parham, do you --
6  A. Correct.
7  Q. Do you know him?
8  A. Correct.
9  Q. I know he's related to you.  But is he a
10    good worker?
11 A. Correct, yes.
12 Q. I mean, he does his job?
13 A. He does his job.
14 Q. And he knows how to take people deer
15    hunting, right?
16 A. Some places.  Some places.  Not all the
17    places.
18 Q. Well, I want you to --
19 A. Majority.
20 Q. I want you to assume that every -- that
21    Henry and Demetrius both made less than $8
22    an hour, okay?
23 A. Correct.

152

1  Q. Do you know any explanation other than
2    their race -- they're black men -- why
3    they were paid less?
4            MR. DUKES:  Than?
5            MR. ROBERSON:  The Plaintiffs.
6            MR. DUKES:  I object to the
7            form.
8  Q. You want me to ask you again?  You may not
9    understand that.
10 A. Yeah.  Ask me again.
11 Q. Norris Foster, Jeff Harris, Willie Mack,
12    Henry Tolliver, and Demetrius Parham, all
13    black men; do you agree?
14 A. Correct.
15 Q. All of them paid less than $8 an hour; do
16    you agree?
17            MR. DUKES:  Object to the form.
18 A. Correct.
19 Q. Do you know any reason why they were paid
20    less than these four white people who were
21    hired in 2005 and 2006 at $8 an hour?  Do
22    you know any reason for it?
23 A. No, I don't.  I don't know any reason why.

Pages 149 to 152

Ross Lee
October 11, 2006

153

1  I mean, I didn't know what nobody was
2  making but the black guys.  I didn't know
3  what the white guys was making.
4  **Q. Well, does it appear to you that Mid**
5  **States was discriminating against those**
6  **people as to their pay?**
7        MR. DUKES:  Object to the form.
8  **Q. You can answer.**
9  A. When you saying Mid States, you talking
10  about the peoples in the main office?
11  **Q. Yeah.**
12  A. Like Meridian, the main office?
13  **Q. Right.**
14  A. Yeah, I think they was.  As far as I'm
15  concerned, I think they was.  If they was
16  making more, $8, and them guys been there,
17  that ain't right.
18  **Q. Norris had been there ten years, hadn't**
19  **he?**
20        MR. DUKES:  Object to the form.
21  A. Yeah.
22  **Q. About ten -- I mean, working on the**
23  **plantation.  I don't mean for Mid States,**

154

1  **but working at Sedgefields for about ten**
2  **years, different periods of time, right?**
3  A. Correct.
4  **Q. I mean, he'd been running a tractor out**
5  **there, and he knew every hill and hollow**
6  **out there, didn't he?**
7        MR. DUKES:  Object to the form.
8  **Q. You can answer.**
9  A. Correct.
10  **Q. And -- and I know when you were a**
11  **supervisor, Norris probably didn't operate**
12  **the heavy equipment because you probably**
13  **did?**
14  A. I did.  He operated tractors.
15  **Q. He did tractors.  Did he ever run a**
16  **backhoe?**
17  A. Every now and then.
18  **Q. Okay.  Did you ever see him on a bulldozer**
19  **doing a firebreak or anything like that?**
20  A. I never seen him on a bulldozer.
21  **Q. He said he pushed up piles.  Do you know**
22  **what I'm talking about?**
23  A. That might have been before my time.  I

155

1  never seen that.
2  **Q. Okay.  Fair enough.  When -- when you were**
3  **working out there with Norris, if anybody**
4  **was on a bulldozer, it was you?**
5  A. Correct.
6  **Q. Okay.  Have you ever seen Joel Norman on a**
7  **bulldozer?**
8  A. Yes.
9  **Q. Have you ever seen him on a backhoe?**
10  A. Yes.
11  **Q. Well, and after today, you know that**
12  **they're paying Joel Norman $70,000,**
13  **providing him a place to live, and they're**
14  **paying you $41,000, and you don't live on**
15  **the property, do you?**
16  A. Correct.
17  **Q. Do you think that's fair?**
18        MR. DUKES:  Object to the form.
19  **Q. You can answer.**
20        MR. DUKES:  You can go ahead.
21  A. No, I don't think that's fair.
22  **Q. Do you think that they may be**
23  **discriminating against you and your pay?**

156

1  A. I thought about it.  It's on my mind now
2  when I see them forms.  It ain't right.
3  It don't matter about a man got a degree,
4  to me, if I'm doing the same job just as
5  good as he's doing it -- I mean, you know.
6  **Q. I do know.**
7  A. I don't understand that.  It ain't right.
8  I don't care if you're a Mexican, because
9  Hispanic don't matter.  If you can do that
10  job, you ought to be getting paid right.
11        MR. ROBERSON:  Let's go off the
12        Record.  And I think I'm
13        about through.
14        THE VIDEOGRAPHER:  Off the
15        Record at 2:54 p.m.
16        (Whereupon a brief recess was
17        taken.)
18        MR. ROBERSON:  Let's go back on
19        the Record.
20        THE VIDEOGRAPHER:  Back on the
21        Record at 3:07 p.m.
22  BY MR. ROBERSON:
23  **Q. Mr. Lee, I showed you a document at one**

Pages 153 to 156

334.262.3332          Baker & Baker Reporting and Video Services, Inc.          334.262.3332
888.253.3377     Certified Court Reporters and Certified Legal Video Specialists     888.253.3377

Roy Lee
October 11, 2006

**157**

1    time about when Norris was written up for
2    clipping -- riding the horses when he was
3    supposed to have been clipping them; do
4    you remember that?
5  A. Correct.
6  Q. Norris says that he came and talked to
7    you, after that date, about that. On the
8    day he was written up, he told Joel Norman
9    and David Carroll that he was going to go
10   report them to -- I think it's Suzanne and
11   Matt. Do you know who that is?
12 A. Yeah, correct.
13 Q. Who are those people?
14 A. Suzanne is Paul Broadhead's daughter.
15 Q. Okay.
16 A. And Matt is his son-in-law.
17 Q. And are they out of state?
18 A. They stay in Atlanta.
19 Q. Okay. Do you recall anything about
20   what -- Norris claims that he threatened
21   to talk to them, and he was told something
22   by David Carroll. Do you know what I'm
23   talking about?

**158**

1  A. Correct. I know what Norris told me.
2  Q. Well, and all I'm asking you is what
3    Norris told you. This is before he was
4    fired?
5  A. Correct.
6  Q. What did he tell you?
7  A. We was at the skinning shed down there at
8    the dog kennel. And Norris come to me and
9    told me, he said, Well, I told David. I
10   went to David about what was going on.
11   And said David told him, said you had to
12   take that up with Joel. And said that
13   Norris told him, said, Well, I'm going to
14   tell them peoples. I'm going to tell
15   Suzanne and Matt. I'm going to talk to
16   them and let them know. And then Norris
17   said David say, If you tell anything what
18   goes on out here, you're automatically
19   fired. What goes on out here stays out
20   here. That's what Norris -- Norris' exact
21   words Norris told me. I didn't hear David
22   say --
23 Q. You didn't -- that's -- my point is: You

**159**

1    didn't hear David say that?
2  A. I didn't hear that, no.
3  Q. That's -- but -- but --
4  A. I got it from Norris.
5  Q. But Norris was still working there --
6  A. Correct.
7  Q. -- when he said that, right?
8  A. Yeah.
9  Q. And it was right after he had been written
10   up about the --
11 A. With the clippers, correct.
12 Q. Okay. All right. Now, I'm going to tell
13   you again. I want -- I want to try to
14   make myself clear. You now work for
15   Tollison's, right?
16 A. Correct.
17 Q. But the guy that's your boss at Tollison's
18   is David Carroll --
19 A. Correct.
20 Q. -- do you understand that?
21 A. Correct.
22 Q. And Joel Norman works for Tollison's,
23   right?

**160**

1  A. Correct.
2  Q. And David Carroll's been sitting in here
3    while you've been testifying?
4  A. Correct.
5  Q. And he's your boss?
6  A. Correct.
7  Q. And he can take action against you; do you
8    understand that? As your boss, he can.
9  A. Correct.
10 Q. I'm telling you that if he does take some
11   action against you, and you feel like it's
12   because of your testimony, that you need
13   to have legal representation, okay?
14 A. Okay, correct.
15 Q. And you can -- you're free to contact any
16   lawyer you want to about that.
17 A. Correct.
18 Q. Okay. And I'm not saying he's going to
19   take any action against you. I'm just
20   telling you if he does.
21 A. Correct.
22 Q. Now, you've been working out there for --
23 A. Quite some time.

161

1  Q. Six years?
2  A. Yeah, correct -- longer.
3  Q. Okay. And I ain't heard anybody say
4     anything bad about you.
5  A. Good.
6  Q. To be honest with you, I've asked
7     everybody, and everybody says you're a
8     good worker and you do your job.
9  A. Correct.
10 Q. All right. And I don't expect that to
11    change, do you?
12 A. I don't expect it to.
13 Q. But I'm going to be honest with you, Roy,
14    you make $41,000 a year, right?
15 A. Correct.
16 Q. That's a pretty good job in Bullock
17    County, isn't it?
18 A. Correct.
19 Q. I mean, there ain't a lot of jobs that pay
20    that?
21 A. No, it isn't.
22 Q. Okay. And you'd like to keep that job, I
23    assume?

162

1  A. Correct.
2  Q. Okay. Well, if anybody does anything to
3     affect that, I think you ought to be
4     represented, okay?
5  A. Correct.
6  Q. And I'm going to tell you, I do that --
7        MR. DUKES: Wait a minute.
8  Q. -- kind of work.
9        MR. DUKES: Let me -- let me
10          stop you here, Jerry.
11     MR. ROBERSON: Okay.
12     MR. DUKES: I think you need to
13          reconsider doing what
14          you're doing for ethical
15          reasons. You don't need to
16          do what you're about to do.
17          I'm giving you an
18          opportunity not to do it.
19     MR. ROBERSON: Not to do what?
20     MR. DUKES: This -- it has a
21          taint of barratry to it.
22          And I think under the
23          ethical guidelines that we

163

1        both go by, I don't think
2        you need to --
3     MR. ROBERSON: Okay.
4     MR. DUKES: -- give him a card.
5     MR. ROBERSON: Okay.
6  BY MR. ROBERSON:
7  Q. Well, I'll just tell you that I cannot
8     contact you. I agree with Mr. Dukes that
9     I -- I'm not permitted to contact you,
10    because you're in management at Mid
11    States. Do you understand that?
12 A. Correct, correct.
13 Q. But you can contact anybody you want to
14    contact if you want legal advice or legal
15    representation. You understand that?
16 A. I understand.
17     MR. ROBERSON: Okay. Thank you.
18        You may answer his
19        questions.
20     MR. DUKES: I don't have any
21        questions.
22     THE VIDEOGRAPHER: This
23        concludes the deposition of

164

1     the Witness. And we're
2     going off the Record at
3     3:12 p.m.
4     (The deposition of ROY LEE
5     concluded at 3:12 p.m.)
6
7  * * * * * * * * * * *
8     FURTHER DEPONENT SAITH NOT
9  * * * * * * * * * * *
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Pages 161 to 164

165

```
 1        * * * * * * * * * * *
 2           REPORTER'S CERTIFICATE
 3        * * * * * * * * * * *
 4
 5    STATE OF ALABAMA)
 6    COUNTY OF MONTGOMERY)
 7
 8      I, Cornelia J. Baker, Certified Court
 9    Reporter, Certified Shorthand Reporter,
10    and Notary Public in and for the State of
11    Alabama at Large, do hereby certify that
12    on Wednesday, October 11, 2006, pursuant
13    to notice and stipulation on behalf of the
14    Plaintiff, I reported the deposition of
15    ROY LEE, who was first duly sworn by me to
16    speak the truth, the whole truth, and
17    nothing but the truth, in the matter of
18    NORRIS FOSTER, Plaintiff, versus MID STATE
19    LAND AND TIMBER COMPANY, INCORPORATED,
20    d/b/a SEDGEFIELDS PLANTATION, Defendant,
21    Case Number 206-CV-00405-IDSRW, now
22    pending in the UNITED STATES DISTRICT
23    COURT FOR THE MIDDLE DISTRICT OF ALABAMA,
```

166

```
 1      NORTHERN DIVISION; that the foregoing
 2    pages contain a true and accurate
 3    transcription of the examination of said
 4    witness by counsel for the parties set out
 5    herein; that the reading and signing of
 6    said deposition was waived by witness and
 7    counsel for the parties.
 8      I further certify that I am neither of
 9    kin nor of counsel to the parties to said
10    cause, nor in any manner interested in the
11    results thereof.
12      This the 17th day of October, 2006.
13
14
15
          Cornelia J. Baker
16        Certified Shorthand Reporter,
          Certified Court Reporter and
17        Notary Public for the
          State of Alabama
18
19        My Commission expires 6/9/08.
20
21
22
23
```

Pages 165 to 166

334.262.3332                Baker & Baker Reporting and Video Services, Inc.            334.262.3332
888.253.3377          Certified Court Reporters and Certified Legal Video Specialists   888.253.3377

EXHIBIT

# American Court Reporting
## toll-free (877) 320-1050

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CIVIL ACTION NUMBER
2:06-CV-00405-ID-SRW

NORRIS FOSTER,
    Plaintiff,
vs.
MID STATE LAND & TIMBER COMPANY, INC.,
d/b/a SEDGEFIELDS PLANTATION,

    Defendant.

THE VIDEOTAPED

DEPOSITION TESTIMONY OF:

DAVID CARROLL

September 8, 2006
1:29
    p.m.

COURT REPORTER:

Gwendolyn P. Timbie, CSR

---

Page 3

1  leading questions, and that counsel for
2  the parties may make objections and assign
3  grounds at the time of trial or at the
4  time said deposition is offered in
5  evidence, or prior thereto.
6      Please be advised that this is the
7  same and not retained by the Court
8  Reporter, nor filed with the Court.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

---

Page 2

1      S T I P U L A T I O N S
2      IT IS STIPULATED AND AGREED by and
3  between the parties through their
4  respective counsel that the videotaped
5  deposition of DAVID CARROLL, may be taken
6  before Gwendolyn P. Timbie, Certified
7  Shorthand Reporter and Notary Public,
8  State at Large, at the law office of John
9  Waters, Union Springs, Alabama, on
10  September 8, 2006, commencing at
11  approximately 1:29 p.m.
12      IT IS FURTHER STIPULATED AND
13  AGREED that the signature to and the
14  reading of the deposition by the witness
15  is not waived, the deposition to have the
16  same force and effect as if full
17  compliance had been had with all laws and
18  rules of Court relating to the taking of
19  depositions.
20      IT IS FURTHER STIPULATED AND
21  AGREED that it shall not be necessary for
22  any objections to be made by counsel to
23  any questions, except as to form or

---

Page 4

1      I N D E X
2  EXAMINATION BY:              PAGE NO:
3  Mr. Roberson               8
4  Certificate                176
5  Instructions to Witness    177
6  Signature Page             179
7  Errata Sheet               180
8
9      LIST OF EXHIBITS
10  EXHIBITS:                  PAGE NO:
11  Plaintiff's 19             48
12  Plaintiff's 20             156
13  Plaintiff's 21             157
14
15
16
17
18
19
20
21
22
23

# American Court Reporting
## toll-free (877) 320-1050

Page 5

```
 1
 2
 3
 4       A P P E A R A N C E S
 5
 6   FOR THE PLAINTIFF:
 7     JERRY ROBERSON, Esquire
       Roberson & Roberson
 8     8 Office Park Circle
       Suite 150
 9     Birmingham, Alabama 35223
10     ALBERT H. ADAMS, JR., Esquire
       Irby Law Firm, LLC
11     Post Office Box 910
       Eufaula, Alabama 36072
12
13
     FOR THE DEFENDANT:
14
       CARTER H. DUKES, Esquire
15     Huckaby, Scott & Dukes, P.C.
       2100 Third Avenue North
16     Suite 700
       Birmingham, Alabama 35203
17
18
     VIDEOGRAPHER:
19
       CHRISTI MAZE
20
21
22
23
```

Page 6

```
 1      I, Gwendolyn P. Timbie, Certified
 2   Shorthand Reporter and Notary Public for
 3   the State of Alabama at Large, acting as
 4   Commissioner, certify that on this date,
 5   pursuant to the Federal Rules of Civil
 6   Procedure, and the foregoing stipulation
 7   of counsel, there came before me at the
 8   law office of John Waters, Union Springs,
 9   Alabama, commencing at approximately
10   1:29 p.m., on September 8, 2006, David
11   Carroll, witness in the above cause, for
12   oral examination, whereupon the following
13   proceedings were had:
14
15      THE VIDEOGRAPHER:  This
16   deposition is being taken of David --
17   David Carroll on this, the 8th day of
18   September 2006, in the case of Norris
19   Foster versus Mid State Land and Timber
20   Company, Inc., d/b/a Sedgefields Farm -- I
21   mean -- sorry -- Plantation.  This case is
22   set in the United States District Court,
23   for the Middle District of Alabama,
```

Page 7

```
 1   Northern Division; Civil Action Number 2:
 2   06-CV-00405-ID-SRW.
 3      Would Counsel please state
 4   their names and who they represent?
 5      MR. ROBERSON:  My name is
 6   Jerry Roberson, and I, along with Albert
 7   Adams, represent the plaintiff, Norris
 8   Foster.
 9      MR. DUKES:  Carter Dukes,
10   representing Mid State.
11      THE VIDEOGRAPHER:  Would the
12   court reporter please swear the witness?
13
14      DAVID CARROLL,
15   Having been first duly sworn, was examined
16   and testified as follows:
17
18      THE REPORTER:  And will these
19   be usual stipulations?
20      MR. ROBERSON:  Yes, ma'am.
21      MR. DUKES:  Yes.  But we'll
22   read and sign.
23
```

Page 8

```
 1   EXAMINATION BY MR. ROBERSON:
 2      Q   Mr. Carroll, my name is Jerry
 3   Roberson, and I represent Norris Foster.
 4   Do you understand we're here today about
 5   his race discrimination claim?
 6      A   Yes.
 7      Q   And are you employed -- or
 8   were you formerly employed with Mid States
 9   Land and Timber?
10      A   Yes.
11      Q   In what capacity?
12      A   I was hired as the general
13   manager.
14      Q   When were you hired, sir?
15      A   I was hired during the month
16   of March -- uh -- or early April of 2005.
17      Q   Do you know who you replaced,
18   who was the former manager?
19      A   I'm told a lady named Donna
20   Davidson was general manager before I was
21   hired.
22      Q   And do you know where
23   Ms. Davidson is?
```

2  (Pages 5 to 8)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 9

1    A    I understand she lives on the
2    coast somewhere.
3    Q    Was she related at all to the
4    Broadheads?
5    A    I believe she was.
6    Q    Do you know how she was
7    related?
8    A    I would say through marriage.
9    Q    That is, she was -- she
10   married into the Broadhead family?
11   A    I -- I guess so.  In some
12   capacity.
13   Q    You didn't, did you?
14   A    No, sir.
15   Q    Okay.  How old are you, Mr. --
16   A    Forty-two.
17   Q    -- Carroll?  And where had you
18   worked prior to coming to work at
19   Sedgefields?
20   A    My work history would be that
21   I -- I grew up on a farm, farm labor,
22   working for my father and other
23   individuals around my hometown.

Page 10

1    Q    Where?
2    A    Hurtsboro, Alabama.
3    Q    Hurtsboro?
4    A    Uh-huh.  I attended high
5    school and -- and worked some my senior
6    year.  At the completion of my senior year
7    of high school, before I went to college
8    --
9    Q    What year did you graduate
10   high school, sir?
11   A    I graduated in 1982.
12   Q    From Hurtsboro High?
13   A    No.  I went to Glenwood High
14   School in Lee County.
15   Q    I'm sorry.  What high school?
16   A    Glenwood.
17   Q    Thank you.  And is -- is -- so
18   had you moved from Hurtsboro?
19   A    No, sir.
20   Q    That's just the -- the high
21   school you go to?
22   A    No, sir.  That -- Glenwood
23   High School is a private school.  I went

Page 11

1    to public school.
2    Q    Okay.  How many students did
3    they have?
4    A    Kindergarten through twelfth
5    grade would probably be in the
6    neighborhood of eight hundred students.
7    Q    All right, sir.  And then
8    after high school -- you graduated in 1982
9    -- where did you go to college?
10   A    I went to Auburn University.
11   Q    Did you graduate?
12   A    I did.
13   Q    What year?
14   A    1986.
15   Q    And in -- in what area did you
16   get your degree?
17   A    Bachelor of Science in forest
18   management.
19   Q    All right, sir.  And then what
20   was your employment after college?
21   A    After college, I went to work
22   for a family-owned business, A. B. Carroll
23   Lumber Company, located there in

Page 12

1    Hurtsboro.
2    Q    A. B. Carroll?
3    A    A -- A, period, B, period,
4    Carroll, C-A-R-R-O-L-L.
5    Q    Were they related to you?
6    A    Yes.
7    Q    How so?
8    A    My grandfather at one time
9    owned the mill.  My father at that time,
10   when I graduated school, was the --
11   general manager of the mill.  And I went
12   back to work for the company.
13   Q    And what was your job there?
14   A    My primary responsibilities
15   were timber procurement, timber inventory
16   for the saw mill, purchasing timber.  With
17   a family-owned business, before we sold
18   out -- or -- or sold the business, it was
19   everything, from A to Z.
20   Q    You -- how many employees at
21   A. B. Carroll, approximately?
22   A    Approximately eighty to
23   eighty-five employees.

3  (Pages  9 to 12)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 13

1    Q    And where is that located?
2    A    It was in Hurtsboro, Alabama.
3    Q    Okay.  And you sold -- your
4    family sold that business?
5    A    That's correct.  Closed it
6    down and sold -- sold it.
7    Q    When was that?
8    A    That happened in the mid
9    '90s.  Mid to late '90s.
10    Q    Who did they sell it to?
11    A    Well, they -- it was --
12    actually, took part in -- not in one
13    event, but in multiple events.  The saw
14    mill itself was closed, and we auctioned
15    off some equipment.  We kept the planer
16    mill treating facility for a few more
17    years and just ran those facilities until
18    we finally just closed the doors and sold
19    off that equipment.
20    Q    Okay.  So no -- is anybody
21    operating --
22    A    No.
23    Q    -- that now?

Page 14

1    A    No.
2    Q    So since it's not operating,
3    you had to find another job, I take it?
4    A    Certainly.
5    Q    And where did you go to work?
6    A    Well, before the mill was
7    totally closed, I went back to school and
8    earned a Master's degree in wildlife
9    management.  Along that time, that the
10    mill was closing and I was working on my
11    second degree, I opened my own private
12    consulting business and -- and, more or
13    less, still own it today.  Do some things
14    from time to time, when I'm asked to.
15    It's called The Environmental Forestry
16    Company.
17    Q    Is that an LLC or --
18    A    No.
19    Q    -- just a company?
20    A    Just a -- just a company.
21    Q    Where is that business
22    located?
23    A    I just run it out of my home.

Page 15

1    Q    Where was your Master's degree
2    from?
3    A    Auburn University, as well.
4    Q    Okay.  When did you get your
5    degree, the Master's?
6    A    Master's degree was completed,
7    I believe, in 1996.
8    Q    Okay.  And --
9    A    I'm sorry.  I went to school
10    back in '96.  Finished up about '98 to
11    '99.
12    Q    All right.  Well -- and are
13    there any other employees of this
14    environmental consulting business you're
15    operating?
16    A    No.  I'm just self-employed.
17    If I had any other labor, it was just
18    contract labor.
19    Q    And what do -- how -- what
20    kind of work do you do as a consultant?
21    A    Well, I am a registered
22    forester in the state.  So I provide
23    professional forestry services, such as

Page 16

1    timber sales, timber cruising, land
2    management, boundary line marking --
3    everything from start to finish there, I
4    guess.
5    Q    Okay.  And are you -- you're
6    currently operating that business; right?
7    A    I do -- yeah.  I mean, it's --
8    it's -- my doors are open, but I really
9    don't do anything right now because my
10    full-time employment basically is here.
11    Q    Okay.  And the folks at
12    Tollesons -- Tollesons bought the property
13    in Union Springs, of Sedgefields
14    Plantation --
15    A    Yes, sir.
16    Q    -- from Mid States --
17    A    Yes, sir.
18    Q    -- is that correct?
19    A    That's correct.
20    Q    That was in May of 2006?
21    A    That's correct.
22    Q    And you're now employed with
23    Tollesons; is that correct?

4  (Pages 13 to 16)

**www.AmericanCourtReporting.com**
**September 8, 2006**

# American Court Reporting
## toll-free (877) 320-1050

Page 17

1    A    Correct.
2    Q    As the manager, still?
3    A    That is correct.
4    Q    So there was sort of a -- a
5  continuation of the operations of that
6  facility.
7    A    Yes.
8    Q    Is that fair?
9    A    Yes.
10        MR. DUKES:  Object to the
11  form.
12    Q    And the people at Tollesons
13  know that you do environmental consulting
14  outside their employment; correct?
15    A    They are aware that I am a
16  registered forester and hold that license
17  and have performed those services for
18  people, yes.
19    Q    Do they object to you doing
20  that?
21    A    No.
22    Q    I mean, there's -- it's not a
23  problem for them, is it?

Page 18

1    A    No.  Actually, it probably
2  would -- it would be a benefit to them,
3  because the type of clients that I have
4  would -- may be people that would
5  eventually sell them wood.
6    Q    Okay.  And so the time I want
7  to talk to you about is from when you
8  worked -- worked at -- at Mid State Land
9  and Timber Company until it was
10  purchased.  Okay.
11        And we're talking about at the
12  plantation here in -- in Union Springs,
13  Alabama; correct?
14    A    Yes, sir.
15    Q    Now, I don't hunt, so you've
16  got to help me out, if you will.
17        How many acres was Sedgefields
18  Plantation here?
19    A    I believe it called for twelve
20  thousand seven hundred and eighty-seven
21  acres.
22    Q    So it's almost thirteen
23  thousand acres?

Page 19

1    A    Close.
2    Q    When you -- when you were
3  working there, when --
4    A    That --
5    Q    -- Mid State had it?
6    A    That is correct.
7    Q    And what kind of operation is
8  it; that is, besides -- they do hunting
9  there; correct?
10    A    That is correct.
11    Q    Do they also raise or grow
12  timber on the property?
13    A    That would be a -- a natural
14  benefit of owning the property, yes.  They
15  grow timber.
16    Q    Okay.  Did you have any duties
17  associated with the timber management of
18  -- of -- at Sedgefields?
19    A    I do.
20    Q    What are those?
21    A    It just -- a general manager.
22  My duties would be not only to look after
23  the wildlife portion and the hunting

Page 20

1  portion of it, but oversee any of the
2  timber management aspects of it -- whether
3  we would be thinning wood, whether we
4  would be planting trees, marking lines.
5  Anything of that nature.
6    Q    So by owning that much
7  property, there are trees on it; right?
8    A    That is correct.
9    Q    And what kind of trees?
10    A    Predominantly, in certain
11  areas, it's planted pines, which you're
12  saying that they grow for, basically, a
13  product --
14    Q    To harvest?
15    A    To harvest.  There are pine
16  hardwood stands, and there are hardwood
17  stands on the property.
18    Q    Okay.  And it's your job to
19  make sure that that -- to optimize the
20  recovery from having those resources;
21  correct?
22    A    My job, when I was interviewed
23  and hired by Mid State Land and Timber,

5  (Pages 17 to 20)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 21

1 was to not only see about timber and --
2 and -- I wasn't really given the
3 instructions to maximize timber production
4 on every square acre of the property,
5 because, obviously, some of that property
6 we use for --
7     Q    Hunting?
8     A    Hunting.
9     Q    Sure.
10    A    And other aspects. But a
11 common-sense answer would be, where --
12 where timber was a priority, we would grow
13 as much timber as possible. Where hunting
14 was a priority, we would make that the
15 most -- the most available.
16    Q    Okay. And -- and I may -- I
17 don't want to misstate anything, but,
18 approximately, how many acres did you hunt
19 on at -- at -- at Mid States?
20    A    Well, it depends on what type
21 of hunting you describe.
22    Q    Okay.
23    A    If -- if we're deer hunting,

Page 22

1 we can cover, basically, the whole
2 thirteen thousand acres. We may not hunt
3 every square foot, but there would be
4 hunters in each parcel.
5     Q    Yeah. Okay.
6     A    If we're -- if we're up and
7 bird hunting, quail hunting, about half
8 that, about sixty-five hundred acres.
9     Q    Okay. And -- and I take it
10 from your answer that you don't deer hunt
11 in the same areas that bird hunts are
12 going on, at the same time --
13    A    That is correct.
14    Q    -- correct?
15    A    That is correct.
16    Q    That -- that wouldn't be a --
17 from a common sense standpoint, very safe
18 to do, would it?
19    A    Exactly.
20    Q    Okay. But -- but you can deer
21 hunt on the entire property; right?
22    A    Yes.
23    Q    As long as you're not doing

Page 23

1 the bird hunting on any part of it --
2     A    Yes.
3     Q    -- correct?
4     A    That's correct.
5     Q    And then a portion -- the more
6 open lands, you can bird hunt on; correct?
7     A    Yes.
8     Q    I mean, they probably have
9 some thickets and stuff where you can't
10 bird hunt; isn't that fair?
11    A    Yes.
12    Q    Okay. Now -- and the -- the
13 -- do you have any job responsibilities
14 in -- insofar as the revenue stream from
15 the operations?
16    A    In my initial interview with
17 Ms. Howell, I was asked to be as
18 productive as possible, given the current
19 circumstances of the plantation.
20    Q    Okay. What are the current
21 circumstances?
22    A    The circumstances were that
23 the property was not groomed the way

Page 24

1 it want -- they wanted it to be -- the
2 home office wanted it to be. So it was --
3 it -- for a phrase that I would use, it
4 was a "diamond in the rough."
5     Q    Okay. Well, I'm going to show
6 you what we previously -- and you were
7 here for Mr. Norman's deposition; correct?
8     A    I was.
9     Q    You actually were here for
10 Mr. Foster's deposition yesterday;
11 correct?
12    A    I was, yes.
13    Q    So you've heard all the
14 testimony in this case; correct?
15    A    Yes.
16    Q    All right. And, then, I'm
17 going to show you what we marked as
18 Plaintiff's Exhibit 3 to Mr. Norman's
19 deposition.
20    Is that the organizational chart for
21 Sedgefields as of March of 2006?
22    A    I believe that would be
23 correct, yes.

6  (Pages 21 to 24)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 25

1    Q    Now, other than the plantation
2  here in Union Springs, did y'all have any
3  other properties that you owned in
4  Alabama?
5    A    When you mean "y'all," what --
6    Q    Mid State.  Did Mid State own
7  any other property in Alabama?
8    A    Not in the state of Alabama.
9    Q    Okay.  So all the Alabama
10  operations were on these, roughly,
11  thirteen thousand acres; is that fair?
12    A    That -- to my knowledge, that
13  is accurate.
14    Q    And -- so all the employees
15  for Mid State in Alabama would be on that
16  property?
17    A    I do believe there was one
18  other employee.  I -- she would -- she
19  would work for maybe the home office, not
20  necessarily Mid State.  But she also lived
21  in -- in Alabama.
22    Q    Who is that?
23    A    I will try to recall her

Page 26

1  name.  But she lives in -- in Decatur, and
2  she is a reference for us for -- I'm
3  trying to think of the correct term --
4  issues that we might have concerning,
5  maybe, tax laws in the state or something
6  of that nature.
7    Q    Okay.
8    A    I don't -- I'm sorry.  I don't
9  recall her name at this time.
10    Q    All right.  Did Mid State have
11  to provide accounting information from its
12  operations here in Union Springs?
13    A    Ex -- rephrase that.  I don't
14  quite understand the question.
15    Q    Did you have any kind of
16  report that you sent off every month, how
17  much money you made from hunting or
18  anything like that?
19    A    All -- all of our
20  bookkeeping -- not -- all of our
21  accounting and bookkeeping work was done
22  in -- in Mississippi, at the home office.
23    Q    Okay.

Page 27

1    A    We would, basically -- for
2  example, if we had a hunt, we would
3  provide documentation to the home office
4  of who the customer was and what the
5  charges were per the rates that -- that
6  we used.  That was sent to the home
7  office, and the billing occurred in
8  Mississippi and sent to the clients.
9    Q    Okay.  So does that indicate
10  all the employees in Alabama in March of
11  2006?
12    A    It does.
13    Q    How many of them are there?
14    A    One, two, three, four, five,
15  six, seven, eight, nine, ten, eleven.
16  Counting myself.
17    Q    Do you think that's about how
18  many you had?
19    A    I believe so.
20    Q    Okay.  And, I mean, from -- of
21  course, from time to time, it might vary
22  slightly; correct?
23    A    Yes.

Page 28

1    Q    Did -- did -- how many are --
2  and how many employees have you had -- the
3  most employees that you had in Alabama?
4    A    Maybe thirteen, total, at --
5  at one time.
6    Q    Now --
7        MR. DUKES:  And you --
8  obviously, you're talking about during his
9  time --
10    A    Right.
11        MR. DUKES:  -- at Mid State?
12    Q    (BY MR. ROBERSON)  All right.
13  Now, Mr. Carroll, you told me about your
14  consulting business, and you told me you
15  started working here in two -- in 2005.
16  What -- what was your employment history
17  prior to -- to working here?
18    A    Upon receiving my Master's
19  degree at Auburn, I went and -- basically,
20  immediately to work for Five Star
21  Plantation, located in Kellyton, Alabama.
22    Q    Kellyton?
23    A    K-E-L-L-Y-T-O-N.

7  (Pages 25 to 28)

# American Court Reporting
## toll-free (877) 320-1050

Page 29

1     Q   Where is that?
2     A   It's Coosa County, right next
3 door to Alex City.
4     Q   Okay. That's a little farther
5 north, then, isn't it?
6     A   That's correct.
7     Q   All right. And what kind of
8 work did you do at the Five Star
9 Plantation?
10     A   I was -- it was a multipurpose
11 hunting plantation, much like Sedgefields,
12 other than it was not operated
13 commercially. It was privately owned by a
14 number of people. And I was --
15     Q   How many acres did they have
16 there?
17     A   The total acreage that was --
18 that was leased or used by the facility
19 was, approximately, six thousand.
20     Q   Okay. And did they -- did --
21 besides hunting, did they do anything
22 else? You know, farming or anything like
23 that.

Page 30

1     A   No agriculture. None -- none
2 of that, no.
3     Q   But timber?
4     A   The explanation would be that,
5 when I went to work there, it was a -- a
6 hunting lodge operation that rented
7 property from the landowner. And so,
8 other than the hunting and the fishing
9 that took place on the property, there
10 weren't any -- any forced land
11 or agricultural operations that we owned
12 on the property when I went to work there
13 initially.
14     Q   All right. How long did you
15 work at Five Star?
16     A   A little better than three
17 years.
18     Q   What was your position there?
19     A   General manager.
20     Q   How many employees did they
21 have?
22     A   Approximately, fifteen, but it
23 varied. It was -- some was seasonal. So

Page 31

1 it would vary a little bit.
2     Q   And they did fishing there
3 too?
4     A   They -- yes, they did.
5     Q   Is that bass fishing? Or what
6 kind of fishing is it?
7     A   Bass and brim.
8     Q   Okay. So would they have
9 guides and use boats or --
10     A   From time to time, some of our
11 staff may guide. Most of the time,
12 individuals that -- that were there would
13 just fish, themselves.
14     Q   From boats or --
15     A   Uh-huh.
16     Q   -- from banks?
17     A   Mostly boats.
18     Q   All right. And did they have
19 a lodge?
20     A   They did.
21     Q   So they -- you could keep
22 guests overnight?
23     A   Yes.

Page 32

1     Q   See, I'm -- I'm sorry, but I'm
2 just not that familiar with these
3 operations. But when you say "commercial"
4 -- and this wasn't commercial -- what does
5 that really mean?
6     A   It was -- to simplify things,
7 it was a hunting club. And people --
8     Q   You had to be a member or a
9 guest of a member?
10     A   That is correct.
11     Q   Okay.
12     A   And I --
13     Q   They all paid dues or
14 something? Or how --
15     A   Yes.
16     Q   -- does it work?
17     A   Yes. They paid dues.
18     Q   It's a private club. And
19 the -- the dues fund the club?
20     A   That's correct.
21     Q   Is that fair?
22     A   Yeah.
23     Q   And so, if you stay at the

8 (Pages 29 to 32)

# American Court Reporting
## toll-free (877) 320-1050

Page 33

1  lodge, you don't have to pay?
2      A    If you're a guest of somebody,
3  they would pay, but you would not have to
4  pay.
5      Q    Okay. All right. You worked
6  there for three years?
7      A    Yes, sir.
8      Q    And who -- who's the -- I
9  don't -- I want to say "the boss," but
10  that's probably not the right term. Who
11  did you report to?
12      A    I was hired by a gentleman
13  named William Ireland.
14      Q    Bill Ireland?
15      A    Yes, sir.
16      Q    In -- from Birmingham?
17      A    Yes, sir. My immediate boss
18  at the time was a gentleman named Tom
19  Clark.
20      Q    Where did he live?
21      A    In Birmingham also.
22      Q    Okay. Did you ever do any of
23  the guide work?

Page 34

1      A    I did from time to time.
2      Q    Do you handle dogs or anything
3  like that?
4      A    I do from time to time.
5      Q    Okay. Well, I'm not trying to
6  make you something you're not, but I --
7  this is no time to be modest. I mean,
8  are -- are you an experienced --
9      A    I'm an amateur. I'm not a
10  professional.
11      Q    Okay. And when you did that,
12  how many people would you take out and how
13  many people would be part of your crew?
14      A    It -- we were individual
15  guides, with groups of two. Occasionally,
16  maybe three hunters, but a standard rule
17  was one guide and two hunters.
18      Q    Okay. And so you -- you take
19  the dogs; correct?
20      A    Yes, sir.
21      Q    And this was unlike
22  Sedgefields, then. The people weren't on
23  a wagon or anything?

Page 35

1      A    That is correct. And we
2  hunted on foot.
3      Q    On foot and not on horseback;
4  correct?
5      A    That's correct, yes.
6      Q    And so when -- when you had
7  successful hunts, did you ever get tips?
8      A    As a general rule, with me
9  being the boss man, more or less, no, I
10  didn't.
11      Q    Okay. What about the other
12  people that took people on hunts?
13      A    Certainly, they -- from time
14  to time, they would get tips.
15      Q    Okay. And was that part of
16  their just compensation?
17      A    You know, it wasn't a standard
18  part of their compensation, but if it --
19  somebody wanted to give them a tip at the
20  end of the hunt, then they gladly received
21  it.
22      Q    Okay. All right. Then, after
23  you worked at Five Star -- did you leave

Page 36

1  there voluntarily?
2      A    I did.
3      Q    Where did you go?
4      A    I worked for myself for the
5  time that I left there and then began work
6  here, at Sedgefields.
7      Q    You worked as a consultant,
8  then?
9      A    That is correct.
10      Q    Okay. And how long would that
11  have been?
12      A    From about 2001 till 2005. So
13  three and a half to four years.
14      Q    How did you hear about the job
15  at Sedgefields?
16      A    I was contacted by one of the
17  family members.
18      Q    Who was that?
19      A    The gentleman's name is Matt
20  Garver.
21      Q    Matt?
22      A    Uh-huh.
23      Q    Garver?

9  (Pages 33 to 36)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 37

1   A   G-A-R-V-E-R.
2   Q   When you say "one of the
3   family members," what does that mean?
4   A   He is the son-in-law of
5   Mr. Broadhead. I -- I had, unknowingly,
6   met him while I was at Five Star.
7   Q   And did he say how he tracked
8   you down or --
9   A   No.
10  Q   Well, he called you at -- in
11  your business?
12  A   He called me at home.
13  Q   And tell me what he said.
14  A   He said that they were looking
15  for a general manager to oversee
16  Sedgefields Plantation, and asked me was I
17  interested. And I told him that I was,
18  that I would talk to him about it. And I
19  had an interview.
20  Q   With just Mr. Garver?
21  A   No. I didn't -- didn't meet
22  with Matt. I met with Ms. Sherry Howell
23  and Mr. Bob Rea.

Page 38

1   Q   Who is Sherry Howell?
2   A   Corporate executive for Paul
3   Broadhead.
4   Q   Is she in Meridian?
5   A   She is.
6   Q   And you said Bob Rea?
7   A   Bob Rea, R-E-A.
8   Q   And what does he do?
9   A   He is accounting for the
10  company.
11  Q   For -- also for Mid State?
12  A   That is correct. I don't --
13  Q   Does he also work in
14  Meridian?
15  A   Yes.
16  Q   Did you go to Meridian to
17  interview?
18  A   No, I didn't.
19  Q   Where did you go?
20  A   Interviewed at the plantation.
21  Q   Okay. So they came here to
22  meet with you?
23  A   Yes, sir.

Page 39

1   Q   And y'all rode around the
2   property, I assume?
3   A   We did.
4   Q   And -- and they talked about
5   what they were looking for, generally?
6   A   They did.
7   Q   Did they offer you the job?
8   A   They did.
9   Q   At what salary?
10  A   It was negotiated. The final
11  pay rate was seventy-five thousand dollars
12  a year.
13  Q   Did -- did you get to live on
14  the property?
15  A   If I choose to do so. I could
16  have, but I -- I still live in Auburn.
17  Q   And is that where you've been
18  living?
19  A   Yes, sir.
20  Q   How far is that from here?
21  A   About forty minutes.
22  Q   How many miles?
23  A   No more than forty-five.

Page 40

1   Q   And are you married?
2   A   I am.
3   Q   What's your wife's name?
4   A   Rebecca.
5   Q   Does she work outside the
6   home?
7   A   No, sir.
8   Q   Okay. And you've only been
9   married one time?
10  A   Yes, sir.
11  Q   Well, do you have any kids?
12  A   I do.
13  Q   What are their names and ages,
14  please?
15  A   I have a son named Patrick.
16  He's fourteen.
17  Q   He's about to start driving.
18  A   Unfortunately.
19  Q   Okay.
20  A   And a daughter, Mary Margaret.
21  Q   How old is she?
22  A   She's twelve.
23  Q   Is she on the phone all the

**www.AmericanCourtReporting.com**
**September 8, 2006**

# American Court Reporting
## toll-free (877) 320-1050

Page 41

1 time?
2     A   No. Thank goodness.
3     Q   Now, do they go -- where do
4 they go to school?
5     A   Auburn city school.
6     Q   Now, you're here in this case,
7 but you've had some involvement in this
8 lawsuit before today; is that fair?
9     A   As far as speaking with a
10 attorney, Carter Dukes, yes.
11     Q   Okay. But, I mean, I sent
12 some questions, some interrogatories, to
13 Mid State, and I got some answers. And
14 then you signed a verification as the
15 representative of Mid State, since you're
16 the general manager --
17     A   Yes, sir.
18     Q   -- saying that the, you
19 know -- essentially, the answers are
20 accurate. And you've looked at the
21 business records; correct?
22     A   That is correct.
23     Q   So you provided the

Page 42

1 information, primarily, to respond to my
2 questions; is that fair?
3     A   I would think what I didn't
4 provide, the home office would have
5 provided to me to give to you.
6     Q   Okay. And I asked, in those
7 interrogatories, who made the decision to
8 fire Norris Foster. Do you understand
9 that?
10     A   Yes, sir, I do.
11     Q   And it says -- well, why don't
12 you just read what the interrogatory says
13 for an answer. Exhibit 6.
14     I'll tell you, if you would -- do
15 you see my question, about who fired
16 Norris Foster?
17     A   It says, see answer inter --
18 interrogatory question number one, above.
19 So it would be --
20     Q   No. Look.
21     A   This one?
22     Q   Number one. Just read my
23 question, and then read you -- the answer

Page 43

1 you provided, if you would, please, sir.
2 Out loud.
3     A   Identify all persons --
4 providing their name, address, and job
5 title -- who had any role in the decision
6 to terminate the plaintiff.
7     Answer: Defendants ob -- objects to
8 this interrogatory to the extent "any
9 role" is vague and ambiguous. Subject to
10 and notwithstanding this objection, Joel
11 Norman, quail operations manager, reported
12 performance issues concerning plaintiff to
13 David Carroll, general manager. David
14 Carroll personally observed performance
15 issues concerning plaintiff, investigated
16 reports made by Norman, and made the
17 decision to terminate the plaintiff's
18 employment with defendant.
19     Q   Okay. Now, do you have any
20 problem understanding what it means when I
21 ask you to identify any person who had any
22 role in terminating Norris Foster?
23     MR. DUKES: Object to the

Page 44

1 form.
2     Q   You can answer.
3     A   No, sir.
4     Q   That's a pretty clear
5 question, isn't it -- who fired him?
6     A   Yes, sir.
7     Q   Who fired Norris?
8     A   I did.
9     Q   And was it based on -- in
10 part, on reports you got from Joel Norman,
11 his immediate supervisor?
12     A   In part.
13     Q   Okay. That's -- and I want
14 you to tell me -- because this is the only
15 time I get to talk to you before trial.
16 And I'm -- I'm plain-spoken, and I want
17 you to be plain-spoken. Okay. Fair
18 enough?
19     A   Yes, sir.
20     Q   I'm not trying to trick you.
21 I just want to know every reason you say
22 that you fired Norris Foster. Is that a
23 fair question? You understand it?

11 (Pages 41 to 44)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 45

1     A    That's a fair question.
2          MR. DUKES:  Object to the
3    form.
4     Q    Okay.  Tell me every reason
5    that you fired Norris Foster.
6     A    One reason would be lack of
7    timely performance.  As was mentioned
8    earlier by Joel Norman, Norris had been
9    assigned to do some duties, whether it be
10   cleaning out the barn or roller chopping.
11   And based on my visiting the sites and
12   seeing the performance that was done
13   there, I concurred with Joel's assumption
14   that those things were not getting done on
15   time.  I personally viewed some of the
16   activities in the woods that Norris was
17   doing and came to the same conclusion.
18        Besides completing things in a
19   timely manner, I would say also part of
20   the reason would be that -- when asked to
21   not do something that continued, a lack
22   of -- of responding to directions such as
23   in the roller chopping and clipping the

Page 46

1    bark on trees.  I observed personally his
2    doing those things and stopped him and
3    talked to him about it, and it continued
4    to happen.
5     Q    Okay.  Excuse me.  I -- I
6    interrupted you, and I apologize for
7    that.
8         But when you say "clipping the
9    trees," is that the same thing as scraping
10   trees with the equipment?
11    A    That is correct.
12    Q    Okay.
13    A    Knocking the bark off and
14   exposing the cambium layer underneath.
15    Q    Okay.  And that harms the
16   trees; right?
17    A    It can.  Certainly.
18    Q    And that's important to a
19   timber operation, that you don't hurt the
20   trees; right?
21    A    Not ti -- just timber, but
22   also the aesthetic quality of the property
23   as well.

Page 47

1     Q    Okay.  All right, sir.
2    Anything else?
3     A    Uh.
4     Q    I interrupted you.  I --
5     A    Yeah.
6     Q    I'll give you a chance to
7    finish.
8     A    Thank you.  Uh.  Uh.  So we
9    would say job performance, not finishing
10   things in a timely manner.  I would also
11   say failure to respond to -- to
12   directions.  I would say also making
13   comments in front of clients that were
14   derogatory to our quail operation.  The
15   issue of being unsatisfied with our
16   tipping policy.
17    Q    I don't want to cut you off.
18   You paused.
19    A    No.  In general, those are
20   the -- the main categories, the reasons --
21   the reasons why.
22    Q    Okay.  So have you told me now
23   all the reasons why you made the decision

Page 48

1    to fire Norris?  I'm not --
2     A    That come to mind at this
3    time.  That's -- that's what I know.
4     Q    Okay.
5          (WHEREUPON, a document was and
6    marked as Plaintiff's Exhibit Number 19 is
7    attached to the original transcript.)
8     Q    I'm going to show you what
9    I've marked as Plaintiff's Exhibit 19,
10   which is a memo that you wrote that's
11   dated -- it says on here -- January 3rd,
12   '06, which would be about a week after
13   Norris was fired.
14        Is that your memo?
15    A    Yes, it is.
16    Q    And did you write that?
17    A    I did -- I did write it.  Yes.
18    Q    Now, do y'all have any kind of
19   forms out there and -- when you hire and
20   fire?
21    A    There are some forms, yes,
22   sir.
23    Q    Got an application, don't you?

12  (Pages 45 to 48)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 49

1    A    We do use standard
2  applications.
3    Q    And you've got discharge
4  documents, don't you?
5    A    There are, I believe, some
6  one-page discharge documents.
7    Q    And, you know, in Norris
8  Foster's file, there's a formal reprimand
9  document. Looks to me like a form. Would
10  you agree with that?
11    A    I'm not sure which document
12  you're referring to.
13    Q    Okay. I apologize. Exhibit 5
14  to Mr. Norman's deposition.
15    A    Yes, sir. I'm familiar with
16  this document.
17    Q    Doesn't it look to you like a
18  form?
19    A    It -- it was a -- a document
20  that was created for this instance.
21    Q    Okay. Well, now, how long
22  have you been a manager?
23    A    Six -- five, six years, I

Page 50

1  would say then.
2    Q    And how -- how many people
3  have you hired and fired, would you say?
4    A    Probably hired anywhere from
5  ten to fifteen, and fired anywhere from
6  three to five.
7    Q    Okay. Have you had any
8  training about hiring and firing?
9    A    No formal training.
10    Q    Well, before you fire some --
11  it's expensive to hire and train people,
12  isn't it?
13    A    It can be.
14    Q    It's not a very efficient way
15  to do business, to constantly hire and
16  fire, is it?
17    A    I wouldn't think so, no, sir.
18    Q    Okay. And employees are
19  valuable to a business, aren't they?
20    A    They can be.
21    Q    Well, if they do their jobs,
22  if they perform satisfactorily, they
23  should be; correct?

Page 51

1    A    They should, yes.
2    Q    They're part of a team, aren't
3  they?
4    A    Yes.
5    Q    And it's important that you
6  reward good performance; correct?
7    A    Reward good performance. It
8  -- it should be, yes.
9    Q    I -- I mean, it -- you've got
10  to give a "attaboy" every now and then,
11  don't you?
12    A    Certainly.
13    Q    Okay. And sometimes you have
14  to give raises; right?
15    A    That's usually standard
16  procedure at most places.
17    Q    Okay. So that's what I'm
18  saying. You want people to be loyal to
19  you, don't you?
20    A    Certainly, I do.
21    Q    And you want -- uh -- uh -- in
22  order for them to be loyal to you, you
23  have to be loyal to them, don't you?

Page 52

1    A    Certainly.
2    Q    Okay. That's just common
3  sense, now, isn't it?
4    A    Yes, it is.
5    Q    All right. And for an
6  employee to do a satisfactory job, it's
7  important that you communicate
8  expectations, isn't it?
9    A    It is.
10    Q    Because an employee may not
11  know that he's not meeting those
12  expectations you have; correct?
13    A    Correct.
14    Q    So it's important to document
15  performance issues. Wouldn't you say
16  that?
17    A    Document it? It's a
18  possibility. Verbal communication is also
19  very important.
20    Q    Okay. Other than Exhibit 5 --
21  are you familiar with Norris' personnel
22  file?
23    A    Somewhat, yes, sir.

13 (Pages 49 to 52)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 53

1    Q    Where is it kept?
2    A    It would be in a filing
3  cabinet in the office.
4    Q    Where you are?
5    A    Yes, sir. I am there.
6    Q    How far from you?
7    A    Within thirty-five, forty
8  feet.
9    Q    Do you have access to it every
10 day?
11   A    Certainly.
12   Q    Do you have access to every
13 person's personnel file?
14   A    Every -- every personnel file
15 that's in that office, that worked for me
16 at the time.
17      MR. DUKES:  Hey, Jerry, I know
18 you like to pace, but what I'm concerned
19 about is, the deponent -- it doesn't show
20 you pacing on the camera, but it does show
21 him having to look in different
22 directions. That's my concern. So if you
23 could just stay in one place, I'd -- I

Page 54

1  would appreciate it.
2      MR. ADAMS:  Do you want me to
3  fence him in back here?
4      MR. DUKES:  If you will.
5    Q    (BY MR. ROBERSON)
6  Mr. Carroll, just let your eyes go back
7  and forth. Okay?
8      MR. DUKES:  Well, look, I'm
9  not trying to be difficult, but I just
10 want the record to be clear. I don't want
11 Mr. Carroll looking over here in one
12 direction, and if this is played in front
13 of a jury, for them not to understand why
14 he's having to look to his left and that
15 it's because of you walking from one side
16 of the table to the other.
17   Q    I apologize to you,
18 Mr. Carroll, if I'm distracting you.
19      In the -- in the -- Norris Foster
20 worked for you for -- from -- did you say
21 you were hired in March 2005? April?
22   A    Actually, I believe it was in
23 April --

Page 55

1    Q    Okay.
2    A    -- when I actually went to
3  work.
4    Q    So he worked for you in April,
5  didn't he?
6    A    Yes.
7    Q    Is there a write-up of any
8  performance issue for Norris Foster in
9  April?
10   A    Not to my knowledge.
11   Q    Did he work for you in May?
12   A    Well, when you say worked for
13 me, technically, he didn't work directly
14 for me. He worked for his supervisor.
15 That would be Roy Lee. When I went to
16 work -- when I came to work at
17 Sedgefields, he was working directly under
18 Roy Lee.
19   Q    Okay. Did you have the
20 authority to write up any employee at
21 Sedgefields?
22   A    Certainly.
23   Q    You're the manager; correct?

Page 56

1    A    That is correct.
2    Q    You can fire anybody there,
3  can't you?
4    A    Yes, sir.
5    Q    If you want to hire somebody,
6  you're authorized to do it, aren't you?
7    A    That's correct.
8    Q    Is there a write-up by you,
9  Roy Lee, or anybody else for any
10 performance issue for Norris Foster in May
11 2005?
12   A    Not that I'm aware of.
13   Q    Well, you would be aware of
14 it, wouldn't you, if there was one?
15   A    I should be, unless there was
16 something in his file that was written and
17 put there before I came to work at
18 Sedgefield.
19      But as far as written in May, during
20 the time of May, no.
21   Q    Okay. June, is there a
22 write-up?
23   A    No, sir.

14  (Pages 53 to 56)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 57

1  Q   July?
2  A   No, sir.
3  Q   August?
4  A   No, sir.
5  Q   September?
6  A   No, sir.
7  Q   October?
8  A   No, sir.
9  Q   November?
10 A   No, sir.
11 Q   There's one write-up in
12 December; correct?
13 A   That is correct.
14 Q   Exhibit 5; correct?
15 A   Correct.
16 Q   And Norris Foster was supposed
17 to be clipping some horses, wasn't he?
18 A   That's correct.
19 Q   And the clippers were broken,
20 weren't they?
21 A   I --
22     MR. DUKES:  Object to the
23 form.

Page 58

1  A   I don't know that they were
2  broken.
3  Q   You didn't go up to the barn
4  when Norris Foster was written up in -- in
5  December of '06 -- oh, I'm sorry -- '05?
6  A   Certainly, I did.
7  Q   You were there, weren't you?
8  A   I was there.
9  Q   And the clippers were broken,
10 weren't they?
11 A   Nobody told me anything about
12 any clippers being broken.
13 Q   Was Norris Foster riding a
14 horse?
15 A   He was -- he was back at the
16 barn when I arrived there.
17 Q   Well, how -- why were you
18 summoned?
19 A   Joel called me and said that
20 he returned, from whatever activities he
21 was involved in, to check on the clipping
22 of the horses at the barn.  And nobody was
23 there, and so he waited.  And Norris and

Page 59

1  Jeffrey Harris arrived a few minutes later
2  on horseback, back to the barn.
3  Q   Okay.  Do y'all have radios
4  out there at Sedgefields?
5  A   We do have some radios.
6  Q   And I -- does every
7  employee --
8  A   No.
9  Q   -- get assigned a radio?
10 A   No.
11 Q   How many radios do you have?
12 Do you know?
13 A   Maybe five.
14 Q   Did Norris Foster have a
15 radio?
16 A   He might have at that time.
17 Q   Because I -- it's thirteen
18 thousand acres.  It's a big place, isn't
19 it?
20 A   It is.  It is.
21 Q   And -- and y'all work at
22 different locations; correct?
23 A   Yes, we do.

Page 60

1  Q   And so, if somebody wanted to
2  contact someone, that's how they'd do it
3  normally; correct?
4  A   Normally, yes.
5  Q   Okay.  Did you know -- and --
6  and listen.  When Norris is on his radio
7  calling Joel, is that something that you
8  can hear?
9  A   No.
10 Q   Okay.  Why not?  I mean, is it
11 a Linc?  Is it --
12 A   That's correct.  They're
13 Southern Linc radios.
14 Q   Okay.  So he -- he can -- he's
15 only calling the other person.  He's not
16 calling the whole --
17 A   Network.  That's correct.
18 Q   Network.  Okay.  All right.
19 So you don't know -- is it fair to say
20 that you don't know whether Norris had
21 tried to call Joel on that date?
22 A   I don't know.
23 Q   Okay.  And you don't know

**www.AmericanCourtReporting.com**
**September 8, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 61

1  whether the clippers were broke; correct?
2      A    Correct.
3      Q    And you don't know whether
4  Norris tried to get Joel, to get some
5  instructions; correct?
6      A    Correct.
7      Q    And you don't know if -- do
8  you know what horse Norris was riding?
9      A    No, I don't.
10     Q    So you don't know what horse
11  he was riding.  You don't know a lot
12  about -- I -- and I'm not being critical
13  of you.  You just came up after the fact.
14     A    That is --
15     Q    Is that fair?
16     A    That is fair.
17     Q    All right.  And so you heard,
18  essentially, Joel's side of the story;
19  correct?
20     A    To begin with.
21     Q    He's the supervisor; correct?
22     A    Correct.
23     Q    And look.  I -- I don't fault

Page 62

1  you at all.  You've got to back your
2  supervisor, don't you?  I mean --
3          MR. DUKES:  Object to the
4  form.
5      A    I hear --
6      Q    Normally speaking.
7      A    I hear both sides of the
8  story.
9      Q    I agree.  But -- but what I'm
10  saying is, you'll undercut that guy, that
11  supervisor -- you'll diminish his
12  supervisory ability if you don't back him
13  up.
14     A    Well, not --
15          MR. DUKES:  Object to the
16  form.
17     A    Not necessarily.
18     Q    Okay.  Did you back him up?
19     A    After talking to everybody
20  involved, I did.
21     Q    Okay.  Did anybody tell you
22  the clippers were broke?
23     A    No.

Page 63

1      Q    What did they tell you?
2      A    My understanding was that the
3  employees that were there, supposed to be
4  clipping horses, had left, for whatever
5  reason.  And, obviously, now, because the
6  clippers weren't working, saddled two
7  horses and went riding across the
8  plantation.
9      Q    The clippers weren't working?
10     A    I don't know whether they were
11  working or not.  I know that I was told
12  that the employees were not at their
13  assigned tasks, doing what they were
14  supposed to be doing.  They were out doing
15  something totally different.
16     Q    Okay.  Is part of Norris' job
17  to care for the horses?
18     A    It would be part of anybody on
19  that team.  Yes.
20     Q    Oh, I --
21     A    Yes.  Yes.
22     Q    Okay.  He -- he shoveled out
23  the stalls; right?  Correct?

Page 64

1      A    Several people have, yes.
2  Yes.  Yes.  He has shoveled out stalls.
3      Q    And do you know if part of his
4  job was to ride the horses from time to
5  time?
6      A    Not -- not in any other
7  capacity other than while we were on hunts
8  or if maybe we had an organized group to
9  go out and work dogs or train dogs that
10  required horseback riding.  But we didn't
11  -- did not have a policy where, as a
12  matter of course of their employment, they
13  would just get on a horse and saddle it
14  and go ride it to exercise it.
15     Q    Who exercised the horses?
16     A    They would be exercised when
17  we would start practice hunting.  It's
18  about three weeks to a month before the
19  season.
20     Q    What -- this was December,
21  wasn't it?  This write-up was in December?
22     A    Yes, it was.
23     Q    Is that hunting season?

16  (Pages 61 to 64)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 65

1   A   Yeah, it is. Yes, sir.
2   Q   Do y'all use the horses then?
3   A   Yes, sir, we do.
4   Q   On the hunts?
5   A   On the hunts.
6   Q   Did y'all get some new horses
7  in?
8   A   We did have two new horses
9  purchased.
10   Q   Is it important that you know
11  about the temperament of those horses?
12   A   I knew about it before I
13  bought them.
14   Q   How is that?
15   A   Because I looked at those
16  horses.
17   Q   Did you ride them?
18   A   They were ridden. That is
19  correct.
20   Q   You know, I -- I don't know
21  much about trading horses either. But,
22  you know, you can drug a horse to calm him
23  down for a few days when you purchase him,

Page 66

1  can't you?
2   A   You can.
3   Q   And have you ever bought any
4  horses like that, that maybe they weren't
5  really good horses?
6   A   No, I haven't.
7   Q   I mean -- or -- well, okay.
8  Have you ever taken any of your horses
9  back that you bought at Sedgefields?
10   A   Taken them back?
11   Q   Yeah.
12   A   No. I was shown -- I was
13  shown five horses, and I selected two
14  horses out of those five that I chose to
15  keep. And the rest -- I didn't need five,
16  so the rest went back.
17   Q   Okay.
18   A   If that's what you're asking.
19   Q   So you only bought two?
20   A   That is correct.
21   Q   And you had -- you had more
22  than you needed; correct?
23   A   I was brought five to try out,

Page 67

1  and I kept two of those five.
2   Q   Picked two out of five?
3   A   That is correct.
4   Q   Well, if all of them had been
5  good, would you have kept them all?
6   A   No, sir.
7   Q   Okay. Now -- so you're saying
8  that there was no business need for Norris
9  to be on that horse; is that -- that -- do
10  I understand that correctly?
11   A   That is correct, yes.
12   Q   Okay. Now, did you -- did you
13  think that Norris Foster and Jeffrey
14  Harris had been out smoking marijuana that
15  day?
16   A   No.
17   Q   Did you smell marijuana?
18   A   No.
19   Q   Did Joel Norman tell you that
20  he smelled marijuana?
21   A   He probably has since then,
22  but not at that time.
23   Q   Oh. Well, if you had known

Page 68

1  that people in your employ were smoking
2  marijuana on the job, you would have at
3  least taken some action, wouldn't you?
4   A   "Known," being if I had
5  visually seen it? Yes, I would have.
6   Q   Okay. Well, if you suspected
7  it, you would have done something,
8  wouldn't you?
9   A   I -- I don't see how I can do
10  anything if I suspect something. I have
11  to -- I'm going to have to witness it or
12  see it.
13   Q   Okay. Well -- now, in all the
14  things that you mentioned about Norris
15  Foster, the reasons why he was fired, you
16  didn't say anything about stealing, did
17  you?
18   A   No, I didn't.
19   Q   Is Norris Foster a thief?
20     MR. DUKES: Object to the
21  form.
22   A   Not to my knowledge.
23   Q   Do you know that Norris Fo --

17 (Pages 65 to 68)

**www.AmericanCourtReporting.com**
**September 8, 2006**

# American Court Reporting
## toll-free (877) 320-1050

Page 69

1    whether Norris Foster has ever taken any
2    property from Mid States?
3         A    I don't have any kno --
4    firsthand knowledge of it, no.
5         Q    Has anybody ever told you that
6    he did?
7         A    I've heard a lot of things
8    about a lot of people.  That -- that's
9    part of it, yes.
10        Q    Well, who has told you Norris
11   Foster took something?
12        A    Oh, I've heard it from people,
13   such as Roy Lee, that worked there on the
14   plantation.
15        Q    Anybody else?
16        A    I've heard it from Denise
17   Pierce that works there at the plantation.
18        Q    Is she a female?
19        A    Yes, sir.
20        Q    And what did she tell you?
21        A    The only thing she indicated
22   to me was that the probable reason for his
23   dismissal the first time that he worked

Page 70

1    there was possibly because he had stolen
2    some stuff from the plantation.
3         Q    What did he steal -- alleged
4    to have stole?
5         A    Alleged to have, I guess,
6    taken some quail.
7         Q    Have you ever spoken with
8    anybody who has any firsthand information
9    that Norris Foster has taken anything from
10   Sedgefields?
11        A    No, I have not.
12        Q    What about dog food?  Have you
13   ever heard of that?
14        A    No, sir.
15        Q    Okay.  Did he blow up a
16   tractor?
17        A    Not aware of him, firsthand
18   knowledge, blowing up any equipment.
19        Q    Or tear it up.  Has he damaged
20   your -- your equipment, other than just
21   the normal operation?
22        A    Nothing that I would say,
23   specifically, Norris Foster tore up.  Just

Page 71

1    general use, yes.
2         Q    I mean, you know, farm
3    equipment wears out, doesn't it?
4         A    Yes, it does.
5         Q    What about the lift?  The
6    chopper or the lifter.  Did he damage
7    anything with respect to that, that you
8    know about?
9         A    Not other than common use.
10        Q    Okay.  I mean, sometimes it
11   just wears out, doesn't it?
12        A    Yes, it does.
13        Q    Now, you told me -- and I want
14   to go through each one of these things
15   individually.  But you told me about a
16   lack of timely performance.  And -- and in
17   that, you specifically referenced the
18   chopping of the fields; correct?
19        A    Correct.
20        Q    And that's where you prepare
21   them for bird hunting; right?
22        A    That is correct.
23        Q    You knock the -- and we -- we

Page 72

1    ought to tell the jury this.  Sedgefields
2    gets its name because of this --
3         A    Broom sedge.
4         Q    -- broom sedge, which is a --
5    tell -- tell us what that is.
6         A    It's called a bunch grass.
7    It's a -- it's a particular type of grass
8    that has benefit to quail, and it provides
9    nesting cover during the summer months.
10        Q    And when you walk through a
11   field of that, how high is it?
12        A    It can be anywhere from --
13   typically, waist high.
14        Q    Okay.  And when you chop a
15   sedgefield, you -- what do you do?
16        A    You're laying that -- you're
17   laying that debris down so that hunters,
18   dogs are more visible, have access to the
19   property while you're hunting.
20        Q    Okay.  And you don't do all
21   the field, do you?  You don't chop the
22   whole field?
23        A    No, sir.

## www.AmericanCourtReporting.com
## September 8, 2006

**American Court Reporting**
**toll-free (877) 320-1050**

Page 73

1    Q    You just chop a lane that you
2  can walk in; correct?
3    A    It's typically done in a
4  checkerboard pattern.
5    Q    And how wide would that be?
6    A    The width -- do you mean
7  between --
8    Q    Yes.
9    A    Anywhere from thirty to fifty
10  feet.
11    Q    Okay.  And so that -- that
12  provides the hunters with a -- a lane
13  where they can spot the quail; correct?
14  Walk and -- and shoot the quail?
15    A    Yes, it does.
16    Q    Okay.  But that -- you still
17  have the sedge up around that to provide
18  cover for the birds; correct?
19    A    We do, yes.
20    Q    And -- and Sedgefields --
21  where does the "plantation" come from?
22    A    I'm sorry?
23    Q    It's called -- the place is

Page 74

1  called Sedgefields Plantation.
2    A    Yes, it is.
3    Q    Okay.  You told me about the
4  Sedgefield.
5    A    Right.
6    Q    Where does the "plantation"
7  come from?
8    A    That -- that's a word that was
9  assigned to it from when Mr. Maytag
10  purchased the property, I guess, decades
11  ago.
12    Q    Back before black people got
13  their rights?
14    MR. DUKES:  Object to the
15  form.
16    A    Most probably, yes.
17    Q    And you just kept the name?
18    A    I didn't keep the name.
19    MR. DUKES:  Object to the
20  form.
21    Q    Well, I mean, the name
22  continued?
23    A    That is correct.

Page 75

1    Q    Okay.  But it's still being
2  used, is what I'm saying.
3    A    It is being used.
4    Q    Now, you also mentioned some
5  things about -- Norris said some things
6  that you -- you felt like were derogatory,
7  about his comments in front of the
8  guests.  Now, that would be bad.  I
9  agree.  That would be bad, wouldn't it?
10    MR. DUKES:  Object to the
11  form.
12    Q    Correct?
13    A    Correct, yes.
14    Q    I mean, you -- you don't want
15  your employees making derogatory
16  statements, do you?  That's not -- that
17  doesn't give a good impression to your
18  guests.
19    A    No, it doesn't.
20    Q    Okay.  I agree with you.
21  Okay.  But I don't understand what it is
22  you're saying that Norris said that you --
23  you feel like was derogatory.

Page 76

1    A    Right.
2    Q    Okay.
3    A    Right.
4    Q    I wasn't there.
5    A    Right.
6    Q    So tell me about those
7  comments that Norris made.
8    A    The comments that I observed
9  was when I was present on the wagon,
10  during a hunt.
11    Q    You went with -- with them on
12  some hunts?
13    A    Most of them, I did.
14    Q    What -- were you part of the
15  crew?
16    A    No, sir.
17    Q    All right.  Tell me what you
18  were doing --
19    A    I went --
20    Q    -- while you were there.
21    A    I went as an observer of my
22  employees of the plantation and how they
23  conducted themselves and ran the hunts, to

**www.AmericanCourtReporting.com**
**September 8, 2006**

# American Court Reporting
## toll-free (877) 320-1050

Page 77

1  make sure that they were -- performed as I
2  wanted them to be.
3      Q    Okay.  So you rode in the
4  wagon?
5      A    I did.
6      Q    Did you -- did you hunt?  I
7  mean, did you --
8      A    No.  I --
9      Q    -- have a gun or anything?
10     A    No.
11     Q    Okay.  You were just an
12 observer, then?
13     A    I was.
14     Q    All right.  Most of the hunts
15 you think you went on?
16     A    I did.
17     Q    What did you observe Norris
18 doing?
19     A    I observed him coming back
20 with a dog that he was holding, and have a
21 dog in his hand while Joel and the clients
22 were out -- customers were out shooting
23 birds in front of us.  And on different

Page 78

1  occasions, it would be -- in the -- in a
2  group of four or maybe six, if we had six,
3  only two of those people would be out
4  hunting at the same time.  The oth --
5  remainder of the clients would either be
6  on horseback and/or the wagon, back there
7  waiting with the wagon driver, who was
8  Jeffrey Harris at the time.
9      And Norris would typically -- a lot
10 of times, if it was hot, the dog that he
11 was holding, he would bring him back to
12 the wagon to give him some water or
13 something like that and there exchanges a
14 conversation -- were the comments that I
15 heard about Joel's performance, and he
16 didn't know what he was doing and this is
17 not the way we need to do it.  They were
18 not doing it right.  Things of that
19 nature.
20     Q    So no -- you heard Norris
21 telling Jeffrey Harris comments that were
22 critical of Joel Norman.
23     A    I did.

Page 79

1      Q    Is that what you're saying?
2      A    In front of clients.  I did.
3      Q    Okay.  And anything -- any --
4  anything more than that, what you --
5      A    In -- in effect, that was it.
6      Q    Okay.  That Joel doesn't know
7  what he's doing or -- what about -- would
8  he say -- ever say anything like --
9  that's -- that's all right.  Nevermind.
10     Okay.  And you also mentioned the
11 tipping policy; right?
12     A    That's correct.
13     Q    Now, these guys that work on
14 the hunting crew, they get paid by the
15 hour, don't they?
16     A    They do.
17     Q    How much do they get paid?
18     A    Depending on the pay rate and
19 what -- what raises they've gotten.  It
20 could be anywhere from seven to eight
21 dollars an hour.
22     Q    You make seventy-five thousand
23 dollars a year?

Page 80

1      A    I do.
2      Q    Have you got a 401(k)?
3      A    I do.
4      Q    Do they -- what do they
5  contribute to that?
6      A    Who is "they"?
7      Q    Mid State.
8      A    They match whatever I put in.
9      Q    Up to how much?
10     A    I think it's three percent.
11     Q    Do they give you a car or
12 truck?
13     A    I am provided with a vehicle
14 to drive back and forth, to use for work.
15     Q    What's your -- what's your
16 truck?
17     A    We have three vehicles that
18 are basically the same.  It's a
19 three-quarter ton Chevrolet four-wheel
20 drive.
21     Q    What year?
22     A    I think they were all
23 purchased at the same time.  I think

## www.AmericanCourtReporting.com
## September 8, 2006

**American Court Reporting**
**toll-free (877) 320-1050**

Page 81

1    they're all around 2001 models.
2        Q    Do you buy any gas?
3        A    Do I buy gas?
4        Q    Yeah.
5        A    Yeah.  I don't understand.
6    Certainly, I buy gas.
7        Q    Well, do they not have gas for
8    you at Sedgefields you've got to pump?
9        A    Oh, you mean am I -- am I
10    provided gas in the --
11        Q    Yeah.
12        A    For a company vehicle?
13        Q    Sure.
14        A    We have a gas tank on site for
15    the company vehicles, yes, sir.
16        Q    That you can -- you have
17    access to and you can pump?
18        A    Certainly, yes, sir.
19        Q    All right.  Now, have you ever
20    gotten tips -- you -- you've been provided
21    a tip on any of these hunts?
22        A    No, sir.
23        Q    Has anybody, to your

Page 82

1    knowledge, on any hunting trip, ever
2    received a tip?
3        A    Yes.
4        Q    How does -- how does that
5    work?  I'm not -- I don't work -- I'm not
6    in the hunting industry.  So tell me how
7    it works.
8        A    Typically, one of three things
9    will happen with our tipping policy.
10        Q    Okay.
11        A    At the end of a hunt, a client
12    may personally walk to each individual
13    that was part of the hunting party and
14    give them cash, or it could be that they
15    handed the entire tip to be disbursed to
16    the hunting party to Joel Norman.  He
17    would then give it to me.  I would make
18    change and re -- re-distribute the
19    money, because, most often, I didn't get
20    exact change for those folks.
21        And the third way is, if they wanted
22    to, then they could put it on their bill.
23    And it would be billed to them with their

Page 83

1    bill, and then the employees would be paid
2    in their following paychecks.
3        Q    So if they used their credit
4    card, that would appear on the employee's
5    paycheck; is that right?
6        A    Yeah.  Or if they were sent a
7    bill and they paid by check or whatever,
8    then that -- that money that came back to
9    them would come from the home office.
10        Q    Well, y'all don't send them a
11    bill for a tip, though, do you?
12        A    If I -- if you -- if you come
13    and hunt and you ask for a gratuity to
14    be -- to be placed on your bill, then it
15    is included on the bill and sent to
16    Mississippi.  And then they, per our
17    instructions on the ticket, put the money
18    in -- in individuals that are awarded
19    those tips, and then the bill is sent to
20    the customer.
21        Q    Okay.  So for every hunting
22    party, there is a bill; is that fair?
23        A    Certainly.

Page 84

1        Q    And that would -- the bill
2    would identify who went on the hunt?
3        A    It would.
4        Q    I mean --
5        A    It would -- it would identify
6    who the --
7        Q    Payer was?
8        A    Yes.
9        Q    All right.  But it wouldn't
10    identify all the people that went on the
11    hunt?
12        A    As far as guests?
13        Q    Yes.
14        A    Not necessarily, no.
15        Q    Okay.  And do y'all maintain a
16    list of people that have been there?
17        A    I have -- I have bills and
18    things and -- that I have sent off and
19    collected.  So I do have it that way, yes.
20        Q    Do you have every bill from
21    the time you've been employed until
22    December 29th, when Norris was fired?
23        A    I would think that most should

21  (Pages 81 to 84)

**www.AmericanCourtReporting.com**
**September 8, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 85

1    be there.  Some could have originated in
2    Mississippi and not in our office.
3        Q    Do you have access to every
4    one of them?
5        A    I -- if I called and asked for
6    something, I'm sure I would receive it,
7    yes.
8        Q    Okay.  And would that reflect
9    at least all the bills or credit cards on
10    which there was a tip?
11        A    Sure.
12        Q    Now, it wouldn't reflect if
13    they gave them a cash tip --
14        A    Certainly.
15        Q    -- right?
16        A    That's correct.
17        Q    Okay.  And if Joel Norman got
18    a cash tip, it wouldn't be reflected on
19    there either, would it?
20        A    No, it wouldn't.
21        Q    Do you know if Joel Norman has
22    ever received any cash tips that he didn't
23    give to you or he didn't provide to his

Page 86

1    crew?
2        A    No.  I'm not aware of any of
3    that.
4        Q    Well, you heard him testify;
5    right?
6        A    I did.
7        Q    If you work for eight dollars
8    an hour, seven dollars an hour -- and it's
9    hard work out there, isn't it?
10        A    It can --
11        Q    I mean, it's hot?
12        A    It can be, certainly.
13        Q    You're -- you're driving a
14    wagon or you're scouting people,
15    scouting -- going to get dogs, keeping up
16    with horses.  I mean, it's hard work,
17    isn't it?
18        A    It can be, yes, sir.
19        Q    Wouldn't you want to get your
20    tip?
21        A    Certainly.  If they pro --
22    wanted to provide you with a tip, I -- and
23    you were due the money, they wanted to be

Page 87

1    gracious enough to give it to you, I'd
2    certainly want it.
3        Q    It wouldn't be right to keep
4    an employee's tip, would it?
5        A    No, it wouldn't.
6        Q    And you wouldn't let that
7    happen, would you?
8        A    No, sir.
9        Q    You haven't let that happen;
10    right?
11        A    I have not let that happen,
12    no, sir.
13        Q    Tell me every time Norris
14    Foster got a tip.  How many tips did he
15    get?
16        A    I can't recall every instance.
17        Q    Did you ever give him any
18    money?
19        A    Certainly.
20        Q    Tips?
21        A    Certainly.
22        Q    How many times?
23        A    I would have to go back and

Page 88

1    look at the number of hunts we had.  But
2    any time that money was distributed and I
3    was there, it was always given to me
4    and -- and I re-distributed, unless it was
5    given directly to him by the customer.
6        Q    Do you remember this
7    Mr. Hardaway?
8        A    I certainly do.
9        Q    You heard Norris' testimony,
10    didn't you?
11        A    I did.
12        Q    Mr. Hardaway, is -- is he a
13    regular guest at your lodge?
14        A    He's not a regular guest.  But
15    for -- the first time that he had been
16    there was this year.
17        Q    Okay.  Well, has he been there
18    more than one time?
19        A    His group has only been in
20    once.
21        Q    Did Mr. Hardaway give every
22    member of the hunting group a
23    hundred-and-fifty-dollar tip?

22  (Pages 85 to 88)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 89

1    A    No.
2    Q    What did he give them?
3    A    I -- I'd have to go back and
4    look at the statement.  He was one of
5    those who gave -- he gave cash to the two
6    ladies that were in the lodge because he
7    saw them.  He did not see the rest of the
8    guys before they left, so he asked that
9    the rest of the money be put on the
10   ticket.  And we wrote down what he wanted
11   to be placed on the ticket, and that was
12   turned in to Mississippi.  And those funds
13   were paid through their next paycheck.
14   Q    You just don't remember what
15   that was?
16   A    I don't remember.  I -- I do
17   remember thinking -- or not thinking, but
18   seeing that each of the individuals, like
19   Norris and the other two that were there,
20   got fifty dollars a piece and that -- I
21   think Joel received a hundred dollars,
22   instead of fifty dollars.
23   Q    Do y'all have copies of all of

Page 90

1    Norris' paychecks and pay stubs?
2    A    I would think the home office
3    has them.
4    Q    That's what -- that's what I
5    mean.
6    A    Yes, sir.
7    Q    Mid State --
8    A    Yes, sir.
9    Q    -- has them.  And you think
10   that it would be reflected on there
11   because this customer paid through -- paid
12   his bill?
13   A    Certainly.
14   Q    Those -- those tips would go
15   on the paychecks; right?
16   A    Certainly.
17   Q    And is that reported on your
18   W2 for compensation?  Do you know?
19   A    For -- on Norris' W2?
20   Q    Yes.  Yes.
21   A    Well, it certainly should be.
22   Q    Okay.  So y'all are actually
23   reporting to the IRS his tips?

Page 91

1    A    Anything that has to go
2    through -- that's not a cash tip that goes
3    through and he receives his payroll, he
4    had taken the necessary -- the deductions
5    are taken out of it before they're given
6    to the employee.
7    Q    Now, did you ever tell --
8    wait.  Did you ever talk to Roy Lee about
9    any problems in Norris' crew?
10   A    You mean when he worked
11   underneath Joel?
12   Q    Yes.  Exactly.  That's what I
13   mean.
14   A    All right.  It was mentioned
15   to me on one occasion that Norris was
16   not ha -- by Roy Lee that Norris was not
17   happy working under Joel?
18   Q    Did you have the ability to
19   move him?
20   A    Certainly, I did.
21   Q    Could you have moved him to
22   Roy Lee's crew?
23   A    I certainly could have.

Page 92

1    Q    Did you?
2    A    No, I didn't.
3    Q    Why not?
4    A    Because Norris had approached
5    me and said he wanted to be involved with
6    the quail hunting and working the dogs.
7    And that's where he best fit, and that's
8    where he wanted to be.
9    Q    Did you ever talk to Norris?
10   A    Certainly, I did.
11   Q    How many times?
12   A    I seen -- I seen Norris on and
13   off several times during the course of a
14   week.
15   Q    Before you fired him, did you
16   ever offer him the opportunity to work for
17   Roy Lee?
18   A    No, I didn't.
19   Q    Do you think that Roy Lee only
20   approached you one time about any problem?
21   A    To my knowledge, it was just
22   one incidence that he spoke to me and said
23   that Norris wasn't happy working under

23  (Pages 89 to 92)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 93

1  Joel.
2     Q    Did he tell you why he wasn't
3  happy?
4     A    He just said they had a diff
5  -- difference in agreement about the way
6  things were being done.
7     Q    Now, when you wrote -- you
8  were there at the barn when Norris was
9  written up in December; correct?
10     A    I was.
11     Q    And did Norris tell you that
12  he was going to tell the people in -- in
13  the home office the -- the way things --
14  the men were being treated out there? Did
15  he make a statement to that effect?
16     A    He made a statement that he
17  was going to call Matt or Suzanne and --
18  and say something to them about what was
19  going on.
20     Q    And who were those people?
21     A    That's the daughter and the
22  son-in-law of Mr. Broadhead.
23     Q    Okay. Would he have their

Page 94

1  number?
2     A    I don't -- I don't -- I don't
3  know.
4     Q    What did you tell Norris?
5     A    I don't remember that I said
6  anything to him about it.
7     Q    Did you tell him that if he
8  called anybody, you were going to fire
9  him?
10     A    Certainly not.
11     Q    Would you?
12     A    Would I do what?
13     Q    If he -- would you fire him if
14  he called them?
15     A    No. I wouldn't fire him for
16  that reason.
17     Q    You mean it would be okay if
18  he went over your head and reported that
19  there were problems at Sedgefields
20  Plantation? You wouldn't take any action
21  against him?
22     A    No. I don't think that I
23  would. I mean, anybody that works out

Page 95

1  there, if they disagree with what I'm
2  doing, certainly would have to speak to
3  somebody about it. It would be who hired
4  me.
5     Q    Now, did you hire Joel
6  Norman?
7     A    I did.
8     Q    And --
9     A    Well, let's -- I will say I
10  had input in hiring him. Certainly.
11     Q    Okay. Now --
12         MR. DUKES: Jerry, we've been
13  going for an -- I've got over an hour. Is
14  that right? Are you at a good stopping
15  point?
16         MR. ROBERSON: What -- well,
17  how much tape have we got?
18         THE VIDEOGRAPHER: Twenty-four
19  minutes.
20         MR. ROBERSON: Why don't we go
21  to the end of this tape.
22         MR. DUKES: Are you okay?
23         MR. ROBERSON: Are you okay,

Page 96

1  David?
2         THE WITNESS: I'm fine, yes,
3  sir.
4     Q    (BY MR. ROBERSON) All right.
5  Well, have you ever heard Joel Norman say
6  he was going to get rid of all the blacks
7  in his crew?
8     A    No, sir.
9     Q    Have you ever heard -- well,
10  homecoming is a tradition in Bullock
11  County, isn't it -- getting off early?
12     A    I was told that, yes.
13     Q    Who told you that?
14     A    Roy Lee.
15     Q    Okay. Well, Roy is in -- how
16  long has he worked there?
17     A    A number of years.
18     Q    Is he a good worker?
19     A    He is a very good worker.
20     Q    I mean, Roy don't know
21  anything but hard work, does he?
22     A    That's just what it seems,
23  yes.

24  (Pages 93 to 96)

**www.AmericanCourtReporting.com**
**September 8, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 97

1   Q   Okay. And, in fact, Roy --
2   before Joel was hired, Roy was doing both
3   jobs. And when I say "both jobs," he was
4   running the deer and the quail, wasn't
5   he?
6   A   I will -- I would say this in
7   an answer: In that when I was hired, I
8   was told that Ms. Davidson, who was the
9   general manager, and her husband, who was
10   working there, was -- he and her husband
11   was, more or less, in charge of -- over
12   the deer hunting and stuff.
13   The time that, quote, unquote, Roy
14   was in charge of all of it was a time when
15   we weren't actively participating in all
16   -- in any of those activities that were
17   ongoing. Quail season was over with.
18   Deer season was over with. And for that
19   time frame that he was, quote, unquote, in
20   charge of the plantation, it was,
21   basically, summertime maintenance and
22   things of that nature. Not to discredit
23   his -- what Roy does for me. He's a very

Page 98

1   valuable employee.
2   Q   Okay. Well, that -- you're
3   saying that Roy was never over both of the
4   hunting operations during the season; is
5   that --
6   A   Not to my -- not to my
7   knowledge.
8   Q   I mean, that -- but in
9   fairness to that statement -- and I don't
10   disagree with what you say. But in
11   fairness, you weren't there during the
12   hunting season --
13   A   That's correct.
14   Q   -- prior to that?
15   A   That is correct.
16   Q   So --
17   A   Yeah.
18   Q   Is that fair?
19   A   That is fair.
20   Q   Okay. Now, did -- was there
21   ever any issue, that you were made aware
22   of, about the -- the employees getting off
23   early at homecoming?

Page 99

1   A   I was approached by Roy Lee
2   about the situation, and I told him that I
3   would leave it up to the supervisor of
4   those crews; that if they had the work
5   done that they needed to get done for that
6   day, then they could clock out and go
7   home. But it was up to their
8   supervisor -- Roy and his crew, Joel and
9   his crew -- as far as what they needed to
10   get done for that day.
11   Q   Okay. And -- and Roy has got
12   a son that plays on the high school
13   football team?
14   A   I believe he did at that time,
15   yes.
16   Q   Okay. And there is a parade
17   that day. You're aware of that, aren't
18   you?
19   A   I am told there was
20   festivities before the game.
21   Q   Okay.
22   A   You know, what time they start
23   and when they start and how long they go,

Page 100

1   I'm not aware of any of that.
2   Q   Okay. Well, I -- and -- and
3   that's because your home is in Auburn, and
4   your -- you don't -- you're not part of
5   this community from that aspect.
6   A   That's --
7   Q   Is that fair?
8   A   That's fair.
9   Q   Okay. But Roy is; correct? I
10   mean, Roy has a son going to this high
11   school, and he is part of those
12   festivities; right?
13   A   Yes.
14   Q   And Norris, at the time, had a
15   son that was in high school, playing
16   football; correct?
17   A   If you tell me he did, I
18   believe you.
19   Q   Okay. So they might have had
20   interest that you didn't have. Would that
21   be fair?
22   A   That would be fair.
23   Q   Okay. And they might have had

25 (Pages 97 to 100)

## American Court Reporting
## toll-free (877) 320-1050

Page 101

1  a reason for wanting to be off on
2  homecoming, even though they weren't no
3  longer in high school; correct?
4     A    Correct.
5     Q    Now, has Roy -- I mean --
6  excuse me. Has Joel ever told -- made any
7  statement to you about he'd never been --
8  worked with anybody -- never worked with
9  black people who were so concerned about
10  their money, referring to their tips?
11    A    No. He did not mention that
12  to me.
13    Q    Have you ever had any
14  discussions with him about tips?
15    A    Certainly.
16    Q    Tell me about those.
17    A    All right. The discussion
18  that I -- that I had with him was one that
19  I initiated, that I wanted the tipping
20  policy to be that we would run a class act
21  at Sedgefields. And I didn't want any
22  employees standing around at the end of
23  the hunt with their hands held out,

Page 102

1  waiting to receive gratuities; that if our
2  clients were so inclined to give them
3  something at the end of the day, then they
4  would either give it to them while they
5  were untacking the horses or -- or doing
6  what they were supposed to be doing or
7  would be given to me and I would
8  distribute it or be put in their check.
9     Q    Now, when you went to work at
10  Sedgefields, there were about eleven
11  employees?
12    A    Yes, sir.
13    Q    How many of them were black?
14    A    When I went to work there, the
15  majority of them were black.
16    Q    Well, how many?
17    A    But -- well --
18    Q    Name them.
19    A    Brenda and Katie, in the
20  kitchen.
21    Q    They -- they were cooks?
22    A    They were cooks.
23    Q    They worked at the lodge?

Page 103

1     A    They did.
2     Q    Black ladies?
3     A    They were, yes.
4     Q    How long had they worked at
5  Sedgefields?
6     A    Only from, I think, the
7  beginning of the year. Somewhere around
8  December -- before I came -- or January,
9  through the hunting season.
10    Q    All right.
11    A    Then you have --
12    Q    So that's two; right?
13    A    That's two. You have Roy Lee.
14    Q    All right. Roy is the foreman
15  over the deer operations; correct?
16    A    At this time, certainly.
17  Yes. That's his title.
18    Q    Did he --
19    A    Deer operations manager.
20    Q    Well, he was then, wasn't he?
21    A    I assume. He looked after a
22  lot of things. I don't know if he had a,
23  quote, unquote, title at that time.

Page 104

1     Q    All right. Roy Lee, he's a
2  black male?
3     A    Yes, sir.
4     Q    And he's in management, isn't
5  he?
6     A    He is now, yes, sir. For
7  sure.
8     Q    Well, hasn't he been for some
9  time?
10    A    Well, I -- I felt like I'm --
11  made sure I moved him to management. He
12  was an hourly employee at one time. And
13  so I wanted my management employees to be
14  salaried, so I -- I got him moved from
15  hourly to salary employee.
16    Q    When did that happen?
17    A    The middle of the summer.
18    Q    Mid summer of when?
19    A    Of 2005.
20    Q    What is his salary?
21    A    His salary is probably around
22  forty-four thousand dollars.
23    Q    What is Joel Norman's salary?

26  (Pages 101 to 104)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 105

1　　A　His salary is, approximately,
2　seventy thousand dollars.
3　　Q　And Roy -- Roy doesn't live on
4　the property, does he?
5　　A　No, he doesn't. He lives in
6　Midway.
7　　Q　Does he have that option, to
8　live on the property?
9　　A　I never discussed that as an
10　option with him. And he told me that he
11　was satisfied where he was and he'd drive
12　back and forth.
13　　Q　Roy has got a truck, though,
14　doesn't he?
15　　A　He does.
16　　Q　Just like yours and Joel's?
17　　A　He does.
18　　Q　And anything else about Roy?
19　　A　In what regard?
20　　Q　Well, that's three. Two black
21　cooks.
22　　A　Oh, as far as people. I'm
23　sorry.

Page 106

1　　Q　Yeah.
2　　A　All right. Two cooks and
3　Roy. Of course, certainly, Norris.
4　　Q　All right. That's four.
5　　A　Willie Mack.
6　　Q　What did Willie Mack do?
7　　A　Willie Mack was an outside
8　laborer with the rest of the crew. He
9　works in the -- in the yard at the lodge
10　from time to time. But you're -- at that
11　time, he was working on -- on Roy's crew
12　ninety percent of the time.
13　　Q　Okay. He --
14　　A　And --
15　　Q　That's --
16　　A　Demetrius Parham.
17　　Q　-- five.
18　　A　I believe --
19　　Q　Demetrius?
20　　A　Demetrius.
21　　Q　By the way, how much did --
22　did Willie Mack make in 2005?
23　　A　I'd have to go back and look

Page 107

1　at the records and see.
2　　Q　Was it six fifty, seven
3　dollars an hour?
4　　A　Somewhere in there, I would
5　assume.
6　　Q　Okay. And Jeffrey Harris?
7　　A　Jeffrey Harris came, but he
8　was not there when I was -- came to work
9　there. I hired Jeffrey.
10　　Q　Okay. And that would have
11　been in September of '05?
12　　A　I believe that's correct.
13　　Q　Okay. All right. All right.
14　You -- I -- I'm sorry. We've got --
15　Norris Foster makes four, Willie Mack
16　makes five, Demetrius Parham makes six.
17　Six of the eleven.
18　　Now, what did Demetrius do?
19　Laborer?
20　　A　Yes.
21　　Q　Was he in the hunting crew?
22　　A　No.
23　　Q　What did he do?

Page 108

1　　A　Demetrius is just a general
2　laborer, and then he -- you mean when I
3　first came to work there, or what his
4　duties are now?
5　　Q　Yeah. What -- what --
6　　A　Essentially, they were all --
7　basically, they were all doing -- was weed
8　eating and cutting grass during the
9　summer.
10　　Q　All right. That's six. Tell
11　me all the employees.
12　　A　I'm trying to think. Of
13　course, myself and Denise.
14　　Q　All right. That's eight.
15　　A　I guess at that time, that was
16　probably it. It must have just been
17　eight. I'm -- not eleven. Eleven must
18　have been later on during the year.
19　　Q　Of eight, six were black; is
20　that fair?
21　　A　Yeah. That's accurate.
22　　Q　Okay. Then you hired Joel
23　Norman. That made nine; right?

27 (Pages 105 to 108)

# American Court Reporting
## toll-free (877) 320-1050

Page 109

1      A    Well, I hired -- Jeffrey
2  Harris would have been before him, and --
3      Q    Okay.
4      A    -- William Beckwith would have
5  been before him.
6      Q    Okay.  You hired William
7  Beckwith?
8      A    I did.
9      Q    As a night watchman?
10      A    I hired him for -- to be a
11  general laborer, as the rest of the crew
12  was.  In addition to that, he was to be a
13  night watchman.
14      Q    Did he work during the day,
15  then?
16      A    He did.
17      Q    Okay.  I'm sorry.  I'm --
18  looking at his personnel file, I thought
19  he was hired to be the night watchman.
20      A    No.  He was a -- he was a
21  laborer during the day, like everybody
22  else, and he was a night watchman during
23  -- after hours.

Page 110

1      Q    He was going to get a lot of
2  overtime, then, wasn't he?
3      A    Well, I provided him with a --
4  I had a mobile home on the place.  I
5  provided him with a simple place to stay.
6  And provided him with a little extra money
7  in his paycheck to offset the expenses for
8  what, you know, the reasonable fee would
9  be for somebody who would be putting in a
10  few hours during the evening, just making
11  sure everything was locked up and nobody
12  was on the place.
13      Q    So at the time that
14  Mr. Beckwith was working there, there
15  wasn't anybody living on the property; is
16  that fair?
17      A    That is correct.
18      Q    Okay.
19      A    From time to time before that,
20  Roy Lee had access to a -- house during
21  the busy time of the season, and he could
22  stay there.  He didn't live there full
23  time, but he did stay there quite often

Page 111

1  during the season, I'm told.
2      Q    All right.  But Mr. Beckwith
3  didn't quite work out, did he?
4      A    No, he didn't.
5      Q    He -- he stole some gas?
6      A    He did.
7      Q    Did y'all see him?  Did y'all
8  have evidence of him?
9      A    I confronted him about it, and
10  he admitted it to me.
11      Q    Okay.  So he was let go?
12      A    He was.
13      Q    He also didn't have a driver's
14  license, did he?
15      A    Turned out, he didn't.  And
16  that's another one of the reasons he was
17  let go.
18      Q    Okay.  Well, turned out.  Did
19  he show you one?
20      A    He provided me with a license
21  upon being hired there, but it turned out
22  it was not a current and/or valid license.
23      Q    All right.  You hired

Page 112

1  Mr. Beckwith, but he only stayed a short
2  time.  Then you hired Jeffrey Harris, and
3  he's black.  Then you hired Joel Norman,
4  and he's white.
5      A    It was -- there was one other
6  individual.  I don't remember his name.
7  He worked for a couple of days.  He was a
8  black male.  He came in and -- and worked
9  for, like, two days and then never came
10  back -- and worked half a day and never
11  came back.  I don't remember his name.
12      Q    Okay.  And then we had kind of
13  a string of three guys that were hired
14  that were all white; correct?
15          MR. DUKES:  Object to the
16  form.
17      A    If -- if they were all white
18  that were hired, then yes.
19      Q    No.  I mean, Will Hubbard and
20  Joseph Mays were hired about the same
21  time; right?
22      A    Pretty close to the same time,
23  I think.

28  (Pages 109 to 112)

# American Court Reporting
## toll-free (877) 320-1050

Page 113

1  Q   Okay. In November; correct?
2  A   I think that's correct. In
3  November.
4  Q   And -- and Chance Ham was
5  hired in January?
6  A   Later on in January, yes.
7  Q   Okay. Now, have you hired
8  anybody since then?
9  A   No.
10  Q   Well, when did Henry Tarver
11  start work there?
12  A   Oh, I'm sorry. You are --
13  you're correct about that. I'm not sure
14  exactly what day Henry was hired. It was
15  some time during the fall.
16  Q   Was he a general laborer?
17  A   No. No. I take that back.
18  It might have been early or late summer.
19  Q   2006? 2006?
20  A   No. '05.
21  Q   Oh, okay.
22  A   I'm sorry.
23  Q   Well, how did -- how did Henry

Page 114

1  get hired? Did you hire him?
2  A   Yes, I did.
3  Q   Did you place an ad, or how
4  did you --
5  A   No. I had people from time to
6  time stop by the office, looking for
7  employment. He was one of them.
8  Q   Okay. And Jeffrey Harris, the
9  same way?
10  A   Yeah.
11  Q   Do y'all ever post jobs?
12  A   I haven't, no. The only --
13  the only time I've posted a job was for --
14  looking for somebody specific when I hired
15  Joel Norman.
16  Q   Well, did you need workers?
17  A   Oh, certainly.
18  Q   Is there any reason why you
19  didn't go to the unem -- the employment
20  office or Staffing Solutions or somewhere
21  like that?
22  A   Well, what I needed and what
23  the home office would give me were two

Page 115

1  different things.
2  Q   Oh.
3  A   I mean, I -- I needed, in my
4  estimation, upwards of twenty people to do
5  what needed to be done, but they -- they
6  weren't about to let me have that kind of
7  staff at this time.
8  Q   Was Sedgefields a profitable
9  place to work? I mean, are y'all making
10  more money than --
11  A   No.
12  MR. DUKES: Object to the
13  form. Are you talking about did Mid State
14  make money as Sedgefields?
15  MR. ROBERSON: Yeah. Yeah.
16  A   No. We didn't make -- we
17  didn't make profit.
18  Q   You didn't? Why was that?
19  A   More expenses than income.
20  Q   No. But -- I'm not trying to
21  be funny. I know you're not either. But,
22  I mean, are hunting operations just
23  inherently unprofitable or --

Page 116

1  A   Yeah. Yeah.
2  Q   So you make your money on the
3  land appreciation? Or how do you make
4  your money?
5  A   I -- most people that own
6  operations of this nature, it's -- it's --
7  for lack of a better term, it's almost
8  like a hobby. Instead of maybe having a
9  small hunting club, you own a big piece of
10  property and like to do it. I -- none
11  that I know of are profitable businesses
12  in the long-run.
13  Q   When did Mr. Broadhead buy
14  Sedgefields?
15  A   I believe it was in the early
16  '90s, mid '90s. Maybe around '96.
17  Q   How about 1999?
18  A   Okay.
19  Q   Do you know what he paid for
20  it?
21  A   No.
22  Q   Look at Exhibit 7. He paid
23  fourteen million, didn't he?

29 (Pages 113 to 116)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 117

1    A    I don't have Exhibit 7 in
2    front of me.
3    Q    You do now.
4    A    Thank you. According to this
5    article, he did. Yes.
6    Q    Paid fourteen million;
7    correct?
8    A    According to the article.
9    Q    Okay. And in 2006, seven
10   years later, he sold the property for
11   thirty-two million; correct?
12   A    I wasn't at the closing,
13   but -- I don't know what it was.
14   Q    Well, do you have any
15   reason -- that's what it says in that
16   article.
17   A    If the article says that and
18   the article is accurate, then it should be
19   accurate. But I don't have any firsthand
20   knowledge of what it was purchased for or
21   what it was sold for.
22   Q    Did he come to the closing,
23   Mr. Broadhead?

Page 118

1    A    I've -- I wasn't involved in
2    any of that. I don't know.
3    Q    Have you ever met him?
4    A    I have.
5    Q    How many times has he been to
6    Sedgefields?
7    A    Probably three or four times.
8    Q    Does he hunt?
9    A    No.
10   Q    Well, what -- what did he do
11   when he came -- you -- he came there three
12   or four times while you were there?
13   A    Yes.
14   Q    For what reason?
15   A    Discuss with me the status of
16   the plantation, to hear what my goals were
17   for the place, what we were going to be
18   doing, and discussed those issues.
19   Q    Did you ever talk staffing to
20   him?
21   A    Excuse me?
22   Q    Staffing. You said -- you
23   know, you said you needed more.

Page 119

1    A    Oh. That -- certainly, that
2    was -- that was --
3        MR. DUKES: Object to the
4    form?
5    A    That was part of what we
6    talked about, yeah.
7    Q    Well, did you talk about how
8    you needed some help to properly groom, I
9    guess, the -- the place?
10   A    Not so -- inasmuch as our
11   individual needs at that particular time,
12   but that if -- if he wanted certain things
13   done, it would take necessary equipment
14   and personnel to do it.
15   Q    Did you have a budget?
16   A    I was required to give a
17   budget once I got here. They -- I -- they
18   didn't really give me an operating budget
19   they had been working on.
20   Q    What was your budget?
21   A    My budget was, approximately,
22   eight hundred thousand dollars.
23   Q    Now, was that for everything?

Page 120

1    A    Yes.
2    Q    I mean, like -- that's -- how
3    much was it for labor?
4    A    I would say labor would
5    probably be almost -- not a half, but
6    close to a half of that.
7    Q    And what kind of expenses
8    would make up the rest of that figure?
9    A    General overhead, gasoline,
10   diesel fuel, the cost of doing business --
11   such as electricity bills and gas bills,
12   buying food stuff for the lodge if we
13   needed it, general supplies, farming
14   implements needed to be repaired, deer
15   feed, dog feed. All of it.
16   Q    Birds?
17   A    All of it. Birds included.
18   Q    Is that a large part of the
19   expense, is buying birds?
20   A    Not necessarily. In the
21   scheme of the whole thing, it's not.
22   Q    Where do you get the birds?
23   A    We have various sources.

30  (Pages 117 to 120)

**www.AmericanCourtReporting.com**
**September 8, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 121

1    Q    Do you buy them to let loose?
2  I mean, are they --
3    A    The pre-release bird program,
4  which we were -- was part of our goal at
5  the time, yeah.  We would buy birds that
6  were almost mature -- mature birds and
7  pre-release them a month, a month and a
8  half before the season started.
9    Q    Could they fly?
10   A    Certainly.
11   Q    Okay.  I mean, they --
12   A    They were that far along, yes.
13   Q    Yes.
14   A    Yeah.
15   Q    They were mature enough that
16  they could fly?
17   A    Yeah.
18   Q    And you -- did you hope they
19  stayed there at Sedgefields?
20   A    Certainly.
21   Q    All right.
22        MR. ADAMS:  Jerry, I think
23  she's got about five minutes left.

Page 122

1        MR. ROBERSON:  Why don't we go
2  ahead and take a break.
3        THE VIDEOGRAPHER:  At this
4  time, we're going off the record.  The
5  approximate time is 2:55 p.m., and this
6  will be the end of tape one.
7        (Recess taken.)
8        THE VIDEOGRAPHER:  At this
9  time, we're going back on the record.
10  This will be the beginning of tape two.
11  The time is approximately 3:06 p.m.
12   Q    (BY MR. ROBERSON)
13  Mr. Carroll, there's been some talk here
14  about how Norris Foster didn't list every
15  employer that he had had on his
16  application.
17        Did you hear that talk?
18   A    I did.
19   Q    He didn't list C&W, and he
20  worked there for about three weeks.
21        MR. DUKES:  Object to the
22  form.
23   Q    Is that correct?  That's your

Page 123

1  understanding of the testimony?
2    A    I understood that he worked
3  there on two different occasions.
4    Q    Okay.  Have you ever talked to
5  anybody at C&W?
6    A    Yeah.
7    Q    Who?  About Norris Foster.
8    A    Oh, no.  Not -- not
9  particularly about Norris, no.
10   Q    Do you know any -- any
11  information from C&W about Norris Foster?
12   A    No.
13   Q    You weren't work -- working
14  at -- at Sedgefields in 1999, were you?
15   A    No, sir.
16   Q    Or in -- were you -- you
17  weren't working there in 2005, when Norris
18  was hired; correct?
19   A    That's correct.
20   Q    Well, are you telling me that
21  if Norris had listed that he had worked
22  there, that y'all wouldn't have hired him?
23   A    I don't -- I can't answer that

Page 124

1  because I'm not the one that had anything
2  to do with it.
3    Q    Okay.  But I'm telling you.
4  I'm telling you right now, Norris listed
5  that he worked at C&W and that he worked
6  there for three weeks.  Would y'all have
7  hired him?  Would that have made any
8  difference to you?
9    A    No.
10   Q    Okay.  Why do you think it
11  makes any difference to Carter Dukes?
12        MR. DUKES:  Object to the
13  form.
14   Q    Do you know?
15   A    No, I don't.
16   Q    Okay.  Now, also, on that
17  application, he didn't list that he had
18  been convicted of a crime, third-degree
19  assault.  He did not -- is not an accurate
20  application.  Okay.  Do you agree with
21  that?
22   A    I agree.
23   Q    He's -- he's got a misdemeanor

31  (Pages 121 to 124)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 125

1  conviction for third-degree assault.
2  Okay. I want -- knowing that he does,
3  would you have hired him anyway in 2005?
4      A    No.
5      Q    You wouldn't have hired him
6  because he got an assault conviction; is
7  that right?
8      A    That's correct.
9      Q    Is it every crime you've
10 got to -- you wouldn't -- you wouldn't
11 hire? I mean -- what I'm asking you is,
12 if somebody lists that they've been
13 convicted of a crime, you won't -- you
14 won't hire them?
15     A    No.
16     Q    Won't -- you won't do it?
17     A    No. Not if you're convicted
18 of a crime, no.
19     Q    Any crime?
20     A    I don't know about any crime.
21 But if you're convicted and you put it on
22 there and it reflects bad of you, then,
23 most likely, you will not be hired.

Page 126

1      Q    Did you hire Jeffrey Harris?
2      A    I did.
3      Q    Let me show you Jeffrey
4  Harris' application. When you hired him,
5  did you know -- I can't remember which
6  number he is. Exhibit 14.
7      Look at Jeffrey Harris' application,
8  please, sir. Has Jeffrey Harris been
9  convicted of a crime?
10     A    Yes, he has.
11     Q    And you hired him, though,
12 didn't you?
13     A    That was my mistake.
14     Q    Mistake?
15     A    Yes, sir.
16     Q    So it's not true, is it, that
17 if you've been convicted of a crime, you
18 won't be hired at Sedgefields? Is it?
19     MR. DUKES: Object to the
20 form.
21     A    Not intentionally hired.
22     Q    Was he unintentionally hired?
23     A    No. But I'm -- obviously, I

Page 127

1  missed that part or didn't see it.
2      Q    You -- you can read, can't
3  you?
4      A    Certainly, I can.
5      Q    You graduated from Auburn.
6      A    Certainly, I did.
7      Q    Got a Master's degree;
8  correct?
9      MR. DUKES: Jerry, I can hear
10 you.
11     A    That's correct.
12     Q    Correct?
13     A    Yes, sir.
14     Q    He wrote it right there on his
15 application, didn't he?
16     A    I see it on the application in
17 front of me, yes.
18     Q    And you hired him. What does
19 it say he was convicted of?
20     A    Possession of marijuana.
21     Q    Okay. What else has he got
22 there?
23     A    Misdemeanor. Fine paid.

Page 128

1  Rehab, one year.
2      Q    Rehab, one year. You hired
3  him; correct?
4      A    Yes, I did.
5      Q    Okay. Does Sedgefields --
6  does Sedgefields -- Mid -- did Mid States
7  check references before they hired people?
8      A    Mid States, as far as the home
9  office? No.
10     Q    Did you?
11     A    Sedgefields, as far as me? If
12 I had the opportunity to check references,
13 as much as I could, I certainly did.
14     Q    Did you check Jeffrey Harris'?
15     A    I -- I spoke with his --
16 with -- with Roy and some other folks that
17 knew him, and they said that he would --
18 would work fine. So I hired him.
19     Q    Did you speak with any
20 previous employers of Jeffrey Harris?
21     A    I don't remember that I did at
22 this time.
23     Q    Did you send them anything in

32 (Pages 125 to 128)

Page 129

1   writing?
2       A    No.  Not that I'm aware of.
3       Q    Did -- have you ever spoken to
4   any previous employer of any applicant for
5   work at Mid State Land and Timber Company?
6       A    I have.
7       Q    Who?
8       A    For -- about the hiring of
9   Joel Norman.
10      Q    Okay.  Other than Mr. Norman.
11      A    No.
12      Q    So you've never checked a
13  reference, have you, for a worker?
14      A    I have attempted to check
15  references.  But as far as other places of
16  employment, most of the folks that have
17  come through my door, no.
18      Q    Okay.
19           MR. ROBERSON:  Yeah.  Let's go
20  off the record.  Our court reporter needs
21  a break for a second.
22           THE VIDEOGRAPHER:  At this
23  time, we're going off the record.  The

Page 130

1   approximate time is 3:12 p.m.
2           (Recess taken.)
3           THE VIDEOGRAPHER:  At this
4   time, we're going back on the record.  The
5   approximate time is 3:13 p.m.
6       Q    (BY MR. ROBERSON)
7   Mr. Carroll, I identified three
8   employees -- Chance Ham, Joel -- I'm
9   sorry -- Joseph Mays and Will Hubbard.
10  And they're white guys; correct?
11      A    Yes.
12      Q    They're all under twenty-four
13  years of age, aren't they?
14      A    If you say so.  They're around
15  that age, yes.
16      Q    Some of them were twenty-one
17  when they were hired; right?
18      A    Yes.
19      Q    None of them had military
20  experience; correct?
21      A    Not to my knowledge.
22      Q    Norris has six years of
23  military experience, doesn't he?

Page 131

1       A    If that's what's on his
2   application, I would believe him, yes.
3       Q    And did you have any military
4   service?
5       A    No, sir, I don't.
6       Q    Do you think that that can be
7   a valuable experience in -- for a -- for a
8   maturing-type in somebody's life?
9       A    Certainly, it can be.
10      Q    Okay.  I mean, there are --
11  there are life lessons to be learned in
12  the military.  You'd agree with that,
13  wouldn't you?
14      A    I would agree with that.
15      Q    Okay.  And does Sedgefields --
16  and when I say "Sedgefields" -- does Mid
17  States have any preference in hiring that
18  they give to people that are Veterans or
19  have prior military experience?
20      A    Not that I'm aware of.
21      Q    Do y'all have any written race
22  discrimination policy?
23           MR. DUKES:  Object to the

Page 132

1   form.
2       A    The only thing that I'm aware
3   of is just a common-sense policy, and
4   that's don't discriminate against anybody.
5       Q    Okay.  But that ain't in
6   writing, is it?
7       A    I -- I haven't -- I haven't
8   seen anything placed in front of me, other
9   than the common sense aspect of it.
10      Q    Okay.  Well, do y'all have a
11  written sex discrimination policy -- I
12  mean, sexual harassment policy?
13      A    I was -- I was given several
14  papers when I was hired.  Everybody else
15  was.  And I'm -- I'm assuming that was
16  addressed in there as well, in the package
17  that was given to each perspective
18  employee or ap -- when the application was
19  filed.
20      Q    Have you ever seen the sexual
21  harassment policy from Mid States?
22      A    Have I seen -- I've seen,
23  maybe, a notice that says we don't

33 (Pages 129 to 132)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 133

1  tolerate it. But as far as a lengthy
2  policy, I'm not aware of that, no.
3      Q    Would it -- to your knowledge,
4  would it violate any written policy if you
5  were having sex with an employee, a female
6  employee?
7      A    Well, certainly, it would.
8      Q    It would?
9      A    Yeah.
10     Q    If you don't have one, it
11 would violate it?
12     A    It would violate my policy.
13     Q    Okay. Your common-sense
14 policy, again?
15     A    Absolutely.
16     Q    That -- that -- that would be
17 a bad thing, wouldn't it?
18     A    Yes, it would.
19     Q    Because you -- you don't need
20 to have sexual relations with an employee
21 of Mid States, do you?
22     A    Not only that, but I'm a
23 married man.

Page 134

1      Q    Oh. It would violate that
2  policy too?
3      A    Certainly, it would.
4      Q    All right. Well, I -- I
5  shouldn't say it -- couch it in terms of
6  "you." If any employee had sex with an
7  employee at Mid States, that would be a
8  violation of the policy, you think?
9      A    What two employees may do when
10 they're not working there and off and
11 on -- on their own somewhere else and I
12 don't know anything about, I can't judge
13 morality there.
14     Q    Yes, sir. Now, when you go
15 out checking on your employees, does --
16 you ever take anybody with you?
17     A    From time to time, I have.
18     Q    Who is that?
19     A    I've had Joel with me. I've
20 had Roy with me. And when I first started
21 there, I've had Denise go out with me a
22 few times.
23     Q    The -- what's -- what's her

Page 135

1  last name?
2      A    Pierce.
3      Q    And she normally works in the
4  office?
5      A    She normally works there. But
6  when I first came to work at Sedgefields
7  and Roy and his crew was out working, she
8  would take me and show me parts of the
9  facility, like this is where such and
10 such -- the field house is; you know,
11 these keys open this, and these keys open
12 that; this is the -- this is the cedar
13 house; this is how many bedrooms; and this
14 is the way we do things. Explaining to me
15 what her -- aspects of her job were as far
16 as maintaining those facilities.
17     Q    Okay. And showing you the
18 ropes, basically? Showing you around
19 Sedgefields?
20     A    That's correct.
21     Q    And is Denise married?
22     A    At -- I -- at this time, I
23 assume she is.

Page 136

1      Q    Okay. When you went to work
2  there, was she married?
3      A    Yes. Certainly.
4      Q    Okay. What does her husband
5  do?
6      A    I think he works for the
7  county commission.
8      Q    Do you know in what capacity?
9      A    I don't really know.
10     Q    Okay. Now, has Joel ever
11 mentioned anything to you about his first
12 wife?
13     A    No.
14     Q    Has he ever told you that he
15 had any indication that she was dating
16 anyone who was a black male?
17     A    No.
18     Q    Before today, did you know she
19 was a -- had a problem with alcohol abuse?
20     A    No, I didn't.
21     Q    Now, will you tell me -- I
22 want you to assume that Norris Foster has
23 worked on and off for Sedgefields for ten

34 (Pages 133 to 136)

**www.AmericanCourtReporting.com**
**September 8, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 137

1  years -- eight to ten years, okay, as a --
2  as a laborer -- general laborer, driving a
3  tractor, being in the -- part of the
4  hunting crew. Before Mid States owned it,
5  you know -- and they bought it in '99 --
6  he -- he worked on the property. Okay.
7      Assuming that to be true, how can
8  you hire a white male, who doesn't have
9  any hunting experience, at a higher hourly
10  rate than Norris Foster, who's had six
11  years of military service, years of
12  experience around dogs and in hunting --
13  hunting camps? How can you do that and be
14  fair to Norris Foster?
15      A  If I hired an individual and
16  paid him a higher wage than somebody else,
17  the wage I paid him was -- was based on
18  his proficiency in doing something that we
19  needed done here at the plantation.
20      Q  Okay. What was that?
21      A  For instance, Adam May was
22  somebody who -- who was good at trapping
23  and a mechanic. I didn't have either one

Page 138

1  of those at that time.
2      Q  What is "trapping"?
3      A  Trapping?
4      Q  Uh-huh.
5      A  Is trapping and removing
6  nuisance predators to a quail program:
7  bobcats, fox, things of that nature.
8      Q  Okay. Okay. So you say you
9  paid Adam -- I mean, Joseph Mays more
10  money than Norris Foster because he could
11  trap and he was a mechanic?
12      A  I didn't pay him, not in
13  reference to Norris, anything. I paid him
14  a rate that I thought was fair for what
15  his specialties were and what he could do
16  for the plantation that I didn't have at
17  that time.
18      Q  Okay. Why did you pay Will
19  Hubbard eight dollars an hour?
20      A  Will Hubbard made what he
21  was paid because he had specialties in
22  working heavy equipment. My understanding
23  is, he worked at McDonald Construction

Page 139

1  before he came to work here and that he
2  was working with skidders and large
3  equipment. We had just purchased a
4  skidder. I needed somebody that could
5  operate that piece of equipment
6  proficiently, and he was the one that I
7  hired.
8      Q  You -- you bought a skidder?
9      A  I did.
10      Q  And Will Hubbard drove it?
11      A  He drove it a lot.
12      Q  Okay. Could anybody else
13  drive it?
14      A  Joel drives it some.
15      Q  Is any -- who -- Will Hubbard
16  doesn't work there now. Is -- who's
17  driving it now?
18      A  Joel.
19      Q  Anybody else?
20      A  For all I know, Chance may get
21  on it every now and then.
22      Q  Okay. What about Chance Ham?
23      A  Chance had specialties in

Page 140

1  welding. And that's -- we needed that.
2  We had pieces of equipment that we needed
3  repairing, and I had pieces of equipment
4  such as Joel mentioned -- the drag that I
5  needed built. And he brought to the -- to
6  the plantation skills that I didn't have
7  in anybody else.
8      Q  What kind of welding does
9  Chance do?
10      A  Well, as Joel described, he
11  repairs just about any type of equipment.
12  I'm sorry.
13      Q  What kind of welding do you
14  call it?
15      A  Wire welding is what Joel
16  mentioned.
17      Q  Okay. Do you have to have any
18  kind of training to do wire welding?
19      A  Training? Certainly.
20      Q  Can you -- have you ever --
21      A  As far --
22      Q  -- wire welded?
23      A  I have. Only because --

35 (Pages 137 to 140)

# American Court Reporting
## toll-free (877) 320-1050

Page 141

1    Q    Anybody can do it, can't
2    they?
3    A    No.  Only because Chance
4    stayed there with me and showed me how to
5    do it.
6    Q    Oh, okay.
7    A    It's not something you'll pick
8    up and just do at the drop of a hat and do
9    a good job of it.
10   Q    All right.  Has Norris Foster
11   welded pieces of equipment before?
12   A    Not to my knowledge.
13   Q    Made repairs using a welder?
14   Has he done that?
15   A    Who?
16   Q    Norris.
17   A    Not to my knowledge.
18   Q    Okay.  Okay.  So -- so you
19   claim that all these three guys had
20   specialties?
21   A    They had things that they were
22   proficient at that I needed, if you want
23   to call it a "specialty."  Some --

Page 142

1    something that they could do that I didn't
2    have a person here that was good at doing
3    it, and I needed to add people to my
4    staff.  And -- so I chose those people at
5    that time because they had those qualities
6    that I needed.
7    Q    Did you list every reason --
8    have we discussed every reason that they
9    were paid more than Norris Foster?
10   A    I mean, I -- I didn't set
11   Norris' pay rate.
12   Q    Well, who repaired the
13   equipment before Chance was hired?
14   A    Well, most all of it was done
15   by Roy Lee, with the help of his folks.
16   But Roy Lee was the one that was in charge
17   of it.  As a matter of fact, we mentioned
18   operating heavy equipment.  To my
19   knowledge, the only person here that
20   operated any heavy equipment was Roy Lee.
21   His crew was with him, but he was always
22   running -- running the equipment.
23   Q    Could -- have you ever seen

Page 143

1    Norris Foster on a dozer?
2    A    No.
3    Q    Ever seen him on a backhoe?
4    A    I've seen him move the backhoe
5    from place to place, but I have not seen
6    him use a backhoe.
7    Q    Have you -- you've never seen
8    him operate it, to put in drainage pipe or
9    anything like that?
10   A    I've seen Roy do it, but not
11   Norris.
12   Q    Okay.  Well, I -- this is the
13   only time I -- like I say, I get to talk
14   to you.  All I want to know is what you
15   say about why they were paid eight dollars
16   an hour and why Norris -- Norris wasn't
17   paid eight dollars an hour, was he?
18   A    He -- I didn't hire Norris.
19   But he was not making eight dollars an
20   hour at the time that I came here.
21   Q    Or the time he was fired.  He
22   was making seven fifty an hour, wasn't he?
23   A    He was making seven fifty an

Page 144

1    hour.  I offered him an -- an opportunity
2    to try to make eight dollars an hour if
3    he -- if he could.  Norris came to me one
4    day and claimed, when I hired Brother Man,
5    that I was being unfair in paying Brother
6    Man more than I was paying him.
7    Q    You mean Norris made a
8    complaint to you about his pay?
9    A    He did.
10   Q    When Brother Man was hired?
11   A    He did.
12   Q    Did he say it was because of
13   discrimination?
14   A    He did.
15   Q    You're kidding me.
16   A    No, I'm not.
17   Q    That Norris complained that
18   you were paying Brother Man eight
19   dollars -- now, Brother Man was white;
20   right?
21   A    He was making -- he was white,
22   yeah.
23   Q    And he was -- he was the guy

36 (Pages 141 to 144)

## www.AmericanCourtReporting.com
## September 8, 2006

# American Court Reporting
## toll-free (877) 320-1050

Page 145

1  we were talking about that didn't have a
2  driver's license?
3      A    Turned out he didn't have a
4  driver's license.
5      Q    And he was stealing gas?
6      A    That's correct.  He was fired
7  for it.
8      Q    He was hired as a general
9  laborer, wasn't he?
10     A    And a night watchman.
11     Q    And a night watchman.  Okay.
12 You were going to pay him more; that is,
13 you were going to provide him with a place
14 to live, weren't you?
15     A    I was going to compensate him
16 for the extra work that he was going to do
17 for me.
18     Q    What special skills did he
19 have, Brother Man?
20     A    For being a night watchman and
21 being available to do those things for me.
22     Q    Okay.  Does that require a
23 special skill?

Page 146

1      A    It requires being here after
2  hours.
3      Q    Okay.  So he didn't have any
4  special skills, did he?  And you paid him
5  eight dollars an hour as a general
6  laborer; correct?
7          MR. DUKES:  Object to the
8  form.
9      A    I didn't pay him eight dollars
10 an hour for general labor.  I paid him
11 compensation for general labor and for
12 being a night watchman.
13     Q    Oh, you're saying you're
14 paying him more because he was a night
15 watchman?
16     A    I was paying him a different
17 rate because of what he was doing for me.
18     Q    Okay.  Did you ever give
19 Norris -- after you fired Mr. Beckwith,
20 Brother Man, did you ever give Norris an
21 opportunity to make eight dollars an hour
22 as a night watchman?
23     A    No, I didn't.

Page 147

1      Q    Why not?
2      A    But I did -- I did offer him
3  eight dollars an hour if he could provide
4  me with a valid driver's license, for
5  which I loaned him the money to go get,
6  and he never provided for me.
7      Q    You said you'd pay him eight
8  dollars an hour --
9      A    Yes.
10     Q    -- if he had a driver's
11 license?
12     A    I did.
13     Q    Is that in writing anywhere?
14     A    No, it's not.
15     Q    Do you type?
16     A    I can type, yes, sir.
17     Q    And you're thirty-five feet
18 from Norris Foster's personnel file,
19 aren't you?  Correct?
20     A    That's correct.
21     Q    And you were for eight months,
22 weren't you?
23     A    Sure.  From everybody's file.

Page 148

1  Certainly.
2      Q    Okay.  Oh.  And you had a
3  complaint of discrimination by Norris
4  Foster in -- at the time that you hired
5  Brother Man; correct?
6      A    Not at the time I hired him,
7  but after.
8      Q    Shortly after that.
9      A    Yeah.
10     Q    Would that be fair?
11     A    Yeah.
12     Q    So when you fired Norris
13 Foster, it was after he had complained of
14 race discrimination, wasn't it?
15         MR. DUKES:  Object to the
16 form.
17     A    Well, certainly, it would have
18 to be after.
19     Q    Yeah.  Just a few months;
20 right?  When was Brother Man fired?
21     A    Probably some time in late
22 September.
23     Q    Now, do y'all have a

**www.AmericanCourtReporting.com**
**September 8, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 149

1  progressive disciplinary policy?
2      A    No.
3      Q    Do you know what that is?
4      A    I'm assuming it -- well, no.
5      Q    Well, let me explain to you.
6  You write somebody up; you suspend them;
7  you fire them; you communicate to them, if
8  the conduct is repeated, that they will be
9  terminated; and you sign -- get them to
10 sign and acknowledge that they've been
11 given that warning.
12     Do y'all have anything like that?
13     A    No, sir.
14     Q    Who else have you fired
15 besides Norris Foster?
16     A    Bill Beckwith, Brother Man.
17 Just those two.
18     Q    Anybody else?
19     A    To my knowledge, just those
20 two.
21     Q    At Sedgefields?
22     A    Yes, sir.
23     Q    What about your crew working

Page 150

1  out there now?  Are they team players?
2      A    Everybody seems to be doing
3  fine.
4      Q    I mean, you're satisfied with
5  the people that work out there, aren't
6  you?
7      A    Yes.
8      Q    Roy Lee?
9      A    Yes.
10     Q    Good man?
11     A    Good man.
12     Q    B. B.?  Is that his name?
13     A    Willie Mack.
14     Q    Will -- Willie Mack.
15     A    Uh-huh.
16     Q    Okay.  Is he a good man?
17     A    Yeah.
18     Q    How much does he get paid now?
19     A    I'd have to look at his -- his
20 sheet to see exactly what it is.
21     Q    Is he getting eight dollars
22 today?
23     A    I don't -- it may be eight.

Page 151

1  It may be seven fifty.  It may be seven
2  seventy-five.  I'm not sure.
3      Q    He's getting seven fifty,
4  isn't he?
5      A    I -- if you say so.  I haven't
6  looked at his sheet.
7      Q    Now, I'm going to show you
8  Exhibit 18, and ask you if you're familiar
9  with that document.  That was just
10 provided today.  But...
11     A    I am familiar with it.
12     Q    Okay.  What is 18?  What is
13 Exhibit 18?
14     A    It is a request from
15 Mississippi for my recommendations for pay
16 raises to be effective in the year 2006.
17     Q    When was that made?  It's not
18 dated.  So --
19     A    I -- Ms. Sherry asked me for
20 it about the 1st of December, somewhere
21 along in there.
22     Q    Hum.  Well, how -- did you do
23 it on your computer?

Page 152

1      A    Did I do it on my computer?  I
2  could have.
3      Q    Well, I'm trying to get some
4  help with the dates and --
5      A    Yeah.  I -- I would have to
6  ask Ms. Howell the day maybe she received
7  it or she had it.  I don't have any
8  particular date on this piece of paper.
9      Q    Right.  Right.  Well, I
10 thought maybe you might have created a
11 document, you know, and saved it or
12 something.  Is there a way to look for the
13 date?
14     A    I certainly can look through
15 my computer and see if it's still in there
16 and the date of it.  Certainly.
17     Q    Okay.  Would you do that and
18 provide that information to Mr. --
19 Mr. Dukes?
20     A    I'll be glad to.
21     Q    All I'm trying to do is
22 determine when that document was created.
23 That's all.  Fair enough?

38 (Pages 149 to 152)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 153

1     A    Fair enough.
2     Q    All right. Well, some time --
3     and -- and we'll go with your best
4     estimate for right now. Some time around
5     the 1st of December, correct, you think is
6     about when you --
7     A    Yeah. Right.
8     Q    Well, why would you be
9     recommending Norris Foster for a raise
10    when all you've done is talk about the
11    problems you had with Norris Foster?
12    A    Well, if Norris was going to
13    stay on, which at that time I assumed he
14    was, I felt like he needed a raise just
15    like everybody else.
16    Q    So his raise wouldn't have
17    been based on his job performance, would
18    it? Because his job performance was
19    lousy, according to you.
20    A    Aspects of his job performance
21    were not up to par.
22    Q    Well, he was going to get,
23    according to that document, a fifty cent

Page 154

1     raise; right? For 2006; correct?
2     A    Correct.
3     Q    At the time, he was making
4     seven dollars an hour; right?
5     A    Correct, yes.
6     Q    And he got a raise before he
7     got fired, didn't he?
8     A    He did.
9     Q    Fifty cents. Just what you
10    recommended; correct?
11    A    Correct.
12    Q    He got a raise on his last
13    check, didn't he?
14    A    If you say that's when it took
15    effect, then that -- that would be
16    correct.
17    Q    So he got a raise on the check
18    that he got fired; correct?
19    A    I would assume that's the
20    case, then.
21    Q    You think that's kind of a
22    mixed message? We're giving you a raise,
23    but we're letting you go.

Page 155

1         MR. DUKES: Object to the
2     form.
3     A    I don't know what you mean by
4     "mixed message." If -- if I'm accurate
5     and this notice was sent in the 1st of
6     December, then at that time, although
7     I might have had some feelings that Norris
8     wasn't doing -- exactly up to par what
9     he's supposed to be, I had not made the
10    decision to terminate him at that time.
11    Q    Okay. Well, did you talk to
12    them?
13    A    To who?
14    Q    To anybody at Mid States. I
15    mean, surely, after you wrote him up,
16    after his job performance took such a turn
17    for the worse, you wouldn't give him a
18    raise, would you?
19        MR. DUKES: Object to the
20    form.
21    A    Well, I think the time frame
22    is -- like I said, when this was written
23    and upon the progression of -- of his

Page 156

1     employment, I can see where this makes
2     logical sense.
3     Q    You couldn't stop his raise?
4     A    Certainly, I could have.
5     Q    But you didn't, did you?
6     A    No, I didn't.
7     Q    You just fired him; right?
8     A    You're right.
9     Q    Okay. I've got just a few
10    housekeeping things here.
11        (WHEREUPON, a document was
12    marked as Plaintiff's Exhibit Number 20
13    and is attached to the original
14    transcript.)
15    Q    I'm going to show you
16    Plaintiff's Exhibit 20. It's a letter
17    that's been produced to me. Does that,
18    Exhibit 20, describe the offer that was
19    made to employees who were working at the
20    time that Mid States sold the -- the --
21    Sedgefields to Tolleson?
22    A    I believe this letter was
23    distributed to each employee.

**www.AmericanCourtReporting.com**
**September 8, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 157

1    Q    That's right. Every -- every
2    employee that was working then got a copy
3    of this letter; right? Correct?
4    A    That's correct.
5         (WHEREUPON, a document was
6    marked as Plaintiff's Exhibit Number 21
7    and is attached to the original
8    transcript.)
9    Q    Okay. Now, let me show you
10   21. And does that show and accurately
11   reflect the holidays that were paid to
12   your employees?
13   A    At the time this was written,
14   I would say that was accurate.
15   Q    Okay. And did your employees,
16   like Norris Foster -- were they provided
17   with health insurance?
18   A    Yes. If they chose that they
19   wanted it, they were provided with it,
20   yeah.
21   Q    Well, if you're making eight
22   dollars an hour or seven dollars an hour,
23   you probably want it, don't you?

Page 158

1    A    Certainly.
2    Q    Does Mid State pay most of the
3    expense?
4    A    I think they pay half, and the
5    employee pays half.
6    Q    How much is it? Do you know?
7    A    I don't know off the top of my
8    head.
9    Q    Who at Sedgefields would be
10   the most knowledgeable about Norris'
11   benefits?
12   A    The most knowledgeable person
13   at Mid State would be in their home
14   office, that handles all that type of
15   information.
16   Q    I'm just asking who that is.
17   I don't know.
18   A    I would think Ms. Sherry
19   Howell.
20   Q    Okay. Would she be the one
21   that would have his pay stubs too?
22   A    I would assume they would be
23   in her office, yes.

Page 159

1    Q    Okay. And that would -- would
2    she be the one that would have the records
3    about tips, about bills --
4    A    As far as --
5    Q    Bills and tips?
6    A    It -- she would have access to
7    all of that.
8    Q    And would she have information
9    about how much money y'all made at
10   Sedgefields?
11   A    Certainly.
12   Q    Okay.
13        MR. ROBERSON: I'm working it.
14        MR. ADAMS: Okay.
15        MR. ROBERSON: Let me see
16   these exhibits.
17        Let's go off the record for a
18   second. I think I'm about to wrap up,
19   Mr. Dukes.
20        THE VIDEOGRAPHER: At this
21   time, we're going off the record. The
22   approximate time is 3:36 p.m.
23        (Recess taken.)

Page 160

1         THE VIDEOGRAPHER: At this
2    time, we're going back on the record. The
3    approximate time is 3:37 p.m.
4    Q    (BY MR. ROBERSON)
5    Mr. Carroll, before Joel Norman was hired,
6    Norris worked for Roy Lee, didn't he?
7    A    He did.
8    Q    Is that the only supervisor he
9    had after you were hired and before Joel
10   was hired?
11   A    To my knowledge, yes. Just --
12   just Roy.
13   Q    Did you ever have any
14   complaints by Norris Foster about anything
15   before Joel Norman was hired?
16   A    I believe if -- if -- if
17   anybody complained to him about
18   anything -- and I don't know that it
19   necessarily was just Norris. But it was,
20   in general, we need to be making more
21   money. Just hear that across the board.
22   Q    Okay. Well -- but,
23   specifically, about job -- job issues,

40 (Pages 157 to 160)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 161

1  other than pay, did Norris have any
2  complaints about working at Sedgefields?
3      A    No.
4      Q    That you're aware of.
5      A    Not that I'm --
6      Q    He made you aware of.
7      A    Not that I'm aware of.
8      Q    All right.  Now, Roy was his
9  supervisor; correct?
10     A    That is correct.
11     Q    Did Roy have any complaints
12 about Norris' job performance when he
13 worked for him?
14     A    No.  Roy did not comment to me
15 about anything, no.
16     Q    Okay.  Is -- Roy is a good
17 supervisor, isn't he?  Yes?
18     A    Roy does a good job, yes.
19     Q    Okay.  And Roy makes his men
20 work, doesn't he?
21     A    He does.
22     Q    I mean, you're satisfied with
23 their job output, aren't you?

Page 162

1      A    I am satisfied.
2      Q    Okay.  Now, I want to talk to
3  you about this memo, Exhibit 19.
4          MR. ROBERSON:  Have you got a
5  copy, Carter?
6          MR. DUKES:  Somewhere.
7          MR. ROBERSON:  Okay.
8      Q    (BY MR. ROBERSON)  Well,
9  look.  Did you tell Norris, on the last
10 day that he worked there, that it was
11 obvious he was not happy working at
12 Sedgefields?  Did you tell him that?
13     A    I did.
14     Q    Based on his attitude and job
15 performance?
16     A    I did.
17     Q    And that -- did you make the
18 decision that day to fire him?
19     A    The ultimate decisions was
20 made on that day, yes, to fire him.
21     Q    Okay.  So you told him this.
22 It's obvious he wasn't happy.  And then he
23 asked you if he was being fired; is that

Page 163

1  correct?
2      A    That's correct.
3      Q    I mean -- and you said yes,
4  you -- he was being fired; right?
5      A    Correct.
6      Q    And you took his keys?
7      A    Correct.
8      Q    Now, what -- what did he --
9  what did he have keys to?
10     A    Gate keys.  Just things of
11 that nature.
12     Q    Okay.  I mean, just in order
13 to do his job on the farm, he needed some
14 keys?
15     A    Access to get through the
16 property.
17     Q    Okay.  And so that's -- that's
18 a -- every time you fire an employee, you
19 take their keys; is that fair?  I mean --
20     A    That's fair.
21     Q    Okay.  As I was leaving the
22 barn -- this is a memo that you wrote to
23 the file -- I heard him talking in a

Page 164

1  raised voice to Joel -- that is, Norris
2  was talking in a raised voice -- so I
3  stepped back in the barn to see if I was
4  needed.  Norris told me that Suzanne had
5  hired him and this would not be the last I
6  heard from him.
7          Now, was Norris talking to you?
8      A    I stepped -- I did not hear
9  what the conversation were.  I heard
10 Norris speaking in a very loud voice to
11 Joel.  I stepped back in the barn to see
12 if there was -- what was going on or if I
13 was needed.  And then Norris told that
14 statement to me as he was walking out of
15 the barn, across the parking lot.
16     Q    I asked Norris what he meant.
17 He replied, that is what lawyers are for.
18         Is that -- is that what he said?
19     A    That's what he said.
20     Q    Then he went on to say the
21 reason he was being fired was because of
22 his skin color.
23         So that's the second complaint of

**www.AmericanCourtReporting.com**
**September 8, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 165

```
1   race discrimination by Norris Foster,
2   isn't it? Yes?
3      A   Yes.
4      Q   I let him know that I was
5   sorry he felt that way, and then he left;
6   correct?
7      A   Correct.
8      Q   He didn't hit anybody or
9   threaten anybody or do anything like that,
10  did he?
11     A   No.
12     Q   He -- he was upset.  Would
13  that be fair to say, he was upset?
14     A   Certainly.
15     Q   And -- and you can understand
16  that, couldn't you?  I mean, nobody likes
17  to lose their job, do they?
18     A   No.  I wouldn't think so, no.
19     Q   Okay.  So you -- it didn't
20  come as a surprise to you that Norris was
21  upset when he was let go, did it?
22     A   No.  His emotions at that
23  time, I would think, were normal.
```

Page 166

```
1      Q   Okay.  And is it fair to say
2   that, just the way Norris left, you
3   believed he felt like he was getting a raw
4   deal?  Would that be fair?
5      A   I don't nec --
6          MR. DUKES:  Object to the
7   form.
8      A   I don't necessarily think he
9   would think he was getting a raw deal.  I
10  would think he was unhappy that he was
11  being fired or let go.
12     Q   Okay.  What -- did he ask you
13  what he was being fired for?
14     A   He did.
15     Q   What did you tell him?
16     A   I told him his job performance
17  was not up to par.
18     Q   Did you say anything about him
19  stealing birds?
20     A   No, I didn't.
21     Q   Did anybody?
22     A   I didn't mention anything
23  about stealing birds.
```

Page 167

```
1      Q   Did anybody?
2      A   I -- I'm not aware of anybody
3   mentioning -- me, him, or Joel at that
4   time -- about stealing birds.
5      Q   Okay.  I'm -- I'm just
6   asking.  It's what my son always tells
7   me.  Daddy, I'm just asking.
8          It says, on several quail hunts,
9   Norris has displayed a negative attitude.
10  He has made derogatory -- and there's
11  nothing -- about quail hunts in front of
12  guests.
13         That's what you were telling me
14  about when he said Joel wasn't -- he was
15  referring to Joel about not knowing what
16  he was doing or whatever?
17     A   Not just Joel, but the way
18  things were being operated on the quail
19  hunts.
20     Q   Okay.  Then this says, Norris
21  has complained to me that they were not
22  receiving hot meals for lunch while they
23  were -- between morning and afternoon
```

Page 168

```
1   quail hunts.  Sack lunches were delivered
2   to the employees who did not have an
3   opportunity to clock out and go to town.
4          Now, Norris worked on the crew;
5   right?
6      A   That's correct.
7      Q   The guests would go back to
8   the lodge and eat lunch, wouldn't they?
9      A   That is correct.
10     Q   What would the crew do?
11     A   The crew would stay on the
12  clock, and we would provide them with
13  lunch.
14     Q   From the lodge?
15     A   That is correct.
16     Q   Did you take the lunches to
17  them?
18     A   Sometimes I did; sometimes
19  other personnel did.
20     Q   Was it the same thing the
21  guests were eating?  Or what was it?
22     A   It had been that way on some
23  occasions.  It had been hot meals.
```

42 (Pages 165 to 168)

**www.AmericanCourtReporting.com**
**September 8, 2006**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 169

1    Q    Norris has called me after
2   hours, on the company radio, complaining
3   and wanting to know where his cash tip
4   money was from guests of the most recent
5   quail hunt.
6        Now, called you after hours.  Does
7   that mean you take your radio home?
8    A    I do.
9    Q    And that's where he called
10  you?
11   A    I was at home when he called
12  me.  It was probably eight o'clock in the
13  evening.
14   Q    And he asked you where his tip
15  money was?
16   A    He did.
17   Q    What did you tell him?
18   A    I told him that he would get
19  his tip money.  That -- that that
20  particular hunt was the Hardaway hunt, and
21  that the tip money wasn't going to be
22  given to him right then and there in cash.
23  It may come to him in his check when it --

Page 170

1   when it was time.
2    Q    Okay.  He implied that I was
3   keeping tip money from him when, in fact,
4   time was needed so that correct change
5   could be obtained.
6    A    That has happened as well.
7    Q    Well, that's two different
8   things, isn't it?
9    A    Yes, it is.
10   Q    Because the Hardaway hunt was
11  on his bill, wasn't it?
12   A    It was.
13   Q    So that would be on Norris'
14  check, wouldn't it?
15   A    It would.
16   Q    So you mixed two things up
17  there, didn't you?
18       MR. DUKES:  Object to the
19  form.
20   A    No.  That particular instance
21  was about the Hardaway, when the other one
22  would have been probably another
23  situation, where I was given a hundred

Page 171

1   dollar bill and asked to split it, you
2   know, three or four ways.  And I didn't --
3   it was five-thirty.  Banks were closed.  I
4   didn't have access to correct change.  I
5   would take the tip money back, go the next
6   day, put it appropriately in each envelope
7   for the person that it went to, and
8   distribute it that way.
9    Q    Did y'all have a petty cash
10  box out there?
11   A    We do from time to time.
12   Q    How much money do you keep in
13  it?
14   A    Sometimes I keep as much as
15  five hundred dollars in it.
16   Q    You don't keep change?
17   A    Not exact change like that all
18  the time.  It just depends on what's going
19  on.  Sometimes there's five
20  one-hundred-dollar bills in there;
21  sometimes it's other stuff.
22   Q    Why would you need petty cash,
23  except to make change for tips?

Page 172

1    A    No.  We sell stuff from time
2   to time in the pro shop, or somebody may
3   pay cash for something.  It just happened
4   to be, that particular instance, there
5   wasn't that correct amount of change in
6   there.
7    Q    You mean y'all have a pro
8   shop?
9    A    Well, you could call it that.
10  It's more like a closet with some goods in
11  it.
12   Q    What does it sell?  Like
13  t-shirts and stuff?  Or what -- what is
14  it?
15   A    T-shirts and shirts.
16   Q    Do y'all sell ammo?
17   A    We do from time to time, yes.
18   Q    Do y'all sell guns?
19   A    No.
20   Q    You have to be a dealer to do
21  that.
22   A    You do, yeah.
23   Q    Do y'all have guns, maybe,

43 (Pages 169 to 172)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 173

1  they can rent?
2      A    No.  We don't provide guns.
3      Q    Okay.  All of these complaints
4  came after I sent the memo to all
5  employees.  That's that memo we talked
6  about; right?
7      A    The tipping memo?
8      Q    Tipping memo.  That's right.
9  Joel has brought to my attention, on
10  several occasions, that no person --
11  others, when instructed to chop an area,
12  would claim they were finished and then,
13  upon inspection, were not.  That's what
14  you talked about not doing his task;
15  right?  Correct?  You need to answer out.
16      A    I'm sorry.  Say -- not doing
17  his what?
18      Q    Task.
19      A    Task.  That's correct.
20      Q    Okay.  Now, Sedgefields is
21  thirteen thousand acres, isn't it?
22      A    The whole place, yes.
23      Q    That's a lot to chop, isn't

Page 174

1  it?
2      A    I don't -- six thousand five
3  hundred acres of it I don't chop.  It's
4  forest land.
5      Q    Okay.  Sixty-five hundred is a
6  lot to chop, isn't it?
7      A    Minus lakes and drains.  It's
8  still a good bit to chop.
9      Q    And you can't always chop all
10  of it, can you?  I mean, there's places a
11  tractor won't go; right?
12      A    If it's to be chopped, the
13  tractor should go through it.
14      Q    I think I asked you this, but
15  did you ever -- you didn't receive tips,
16  did you?
17      A    No, I didn't.
18      Q    So you don't claim any on your
19  tax returns because you didn't get any;
20  right?
21      A    That's correct.
22      Q    Okay.  Well, Mr. Carroll, as
23  much as I hate to, I believe I'm going to

Page 175

1  quit.  You know when you end up -- you're
2  in a hole, you need to quit digging.
3      MR. ROBERSON:  Have you got
4  any questions, Mr. Dukes?
5      MR. DUKES:  No, sir.
6      MR. ROBERSON:  Thank you,
7  sir.
8      THE WITNESS:  You're welcome.
9      THE VIDEOGRAPHER:  This
10  concludes the deposition of David Carroll.
11  This is the 8th day of September 2006, and
12  the time is approximately 3:49 p.m.
13      At this time, we're off the
14  record.
15
16      FURTHER DEPONENT SAITH NOT
17
18
19
20
21
22
23

Page 176

1      C E R T I F I C A T E
2
3  STATE OF ALABAMA  )
4  MONTGOMERY COUNTY )
5      I hereby certify that the above
6  and foregoing deposition was taken down by
7  me in stenotype, and the questions and
8  answers thereto were transcribed by means
9  of computer-aided transcription, and that
10  the foregoing represents a true and
11  correct transcript of the deposition given
12  by said witness upon said hearing.
13      I further certify that I am
14  neither of counsel nor of kin to the
15  parties to the action, nor am I in anywise
16  interested in the result of said cause.
17
18
19      GWENDOLYN P. TIMBIE, CSR
      Certificate No: AL-CSR-569
20
21  My Commission Expires
      March 4, 2009
22
23

44  (Pages 173 to 176)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 177

1  INSTRUCTIONS TO THE WITNESS
2
3      PLEASE READ YOUR DEPOSITION OVER
4  CAREFULLY BEFORE YOU SIGN IT.  YOU SHOULD
5  MAKE ALL OF YOUR CHANGES ON THE ATTACHED
6  ERRATA SHEET.  PLEASE DO NOT MARK ON THE
7  ORIGINAL DEPOSITION.
8      AFTER MAKING ANY CHANGES WHICH YOU
9  HAVE NOTED ON THE ATTACHED ERRATA SHEET,
10  SIGN YOUR NAME ON THE ERRATA SHEET AND
11  DATE IT.
12      THEN SIGN YOUR DEPOSITION AT THE
13  END OF YOUR TESTIMONY IN THE SPACE
14  PROVIDED.  YOU ARE SIGNING IT SUBJECT TO
15  THE CHANGES YOU HAVE MADE ON THE ERRATA
16  SHEET, WHICH WILL BE ATTACHED TO THE
17  DEPOSITION.
18      RETURN THE ORIGINAL ERRATA SHEET
19  AND TRANSCRIPT TO AMERICAN COURT REPORTING
20  SERVICE, 2100-A SOUTHBRIDGE PARKWAY, SUITE
21  375, BIRMINGHAM, ALABAMA 35209.
22      ACCORDING TO RULES OF CIVIL
23  PROCEDURE, YOU WILL HAVE THIRTY (30) DAYS

Page 178

1  FROM THE DATE YOU RECEIVED THIS DEPOSITION
2  IN WHICH TO READ, SIGN AND RETURN YOUR
3  DEPOSITION TO THE ABOVE OFFICE.  IF YOU
4  FAIL TO DO SO, YOU AUTOMATICALLY WAIVE
5  YOUR RIGHT TO MAKE ANY CORRECTIONS TO YOUR
6  DEPOSITION.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 179

1  SIGNATURE PAGE
2      OF
3  DAVID CARROLL
4
5
6      I HEREBY ACKNOWLEDGE THAT I
7  HAVE READ THE FOREGOING DEPOSITION AND
8  THAT THE SAME IS A TRUE AND CORRECT
9  TRANSCRIPTION OF THE ANSWERS GIVEN BY ME
10  TO THE QUESTIONS PROPOUNDED, EXCEPT FOR
11  THE CHANGES, IF ANY, NOTED ON THE ATTACHED
12  ERRATA SHEET.
13
14
15
16
17
18
19
20
21  SIGNATURE: _____
22
23  DATE: _____

Page 180

1  PAGE   LINE        EXPLANATION
2  _____
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  DEPONENT'S SIGNATURE    DATE
22
23  _____

45  (Pages 177 to 180)

**www.AmericanCourtReporting.com**
**September 8, 2006**

PLAINTIFF'S
EXHIBIT

Joel
Norman

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| NORRIS FOSTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.: |
| | ) | 2:06-CV-00405-ID-SRW |
| MID STATE LAND & TIMBER | ) | |
| COMPANY, INC., D/B/A | ) | |
| SEDGEFIELDS PLANTATION, | ) | |
| | ) | |
| Defendant. | | |

## DEFENDANT'S ANSWERS TO PLAINTIFF'S INTERROGATORIES

COMES NOW Defendant Mid State Land & Timber Company, Inc. d/b/a SEDGEFIELDS Plantation ("Defendant"), pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, and submits its answers and objections to the Interrogatories of Plaintiff Norris Foster ("Plaintiff") as follows:

These objections and answers are made without waiver of:

1.     All objections as to competency, relevancy, materiality, privilege, and admissibility of each response and the subject matter thereof as evidence for any purpose in any further proceedings in this action;

2.     The right to object to the use of any such responses or the subject matter thereof on any grounds in any further proceedings in this action;

3.     The right to object on any ground at any time to a demand or request for further responses to these or other discovery requests involving or relating to the subject matter of the discovery requests herein responded to; and

4.     The right at anytime to revise, correct, supplement, or clarify any of the responses contained herein.

## GENERAL OBJECTIONS

1.     Defendant objects to each and every one of Plaintiff's Interrogatories insofar as such discovery request is over broad, vague, ambiguous, requiring Defendant to engage in a lengthy, time consuming and expensive search for information with no specific guidance as to what information is requested pursuant to each discovery request.

2.     Defendant objects to each and every one of Plaintiff's Interrogatories insofar as such discovery request seeks information that is neither relevant to the subject matter of the pending litigation, nor reasonably calculated to lead to the discovery of admissible evidence.

3.     Defendant objects to each and every one of Plaintiff's Interrogatories insofar as such discovery request calls for communication and/or documents which were prepared or made by other persons and/or entities. Such documents, communications, and knowledge of such communications are in the custody, control, and possession of others, and therefore, Defendant is justified in requesting that Defendant obtain such information from other persons and/or entities.

4.     Defendant objects to each and every one of Plaintiff's Interrogatories to the extent that any such discovery request seeks information subject to the attorney/client privilege, prepared in anticipation of litigation or in anticipation for trial, or attorney work product which is confidential or proprietary in nature, or subject to any other privilege.

5.     Defendant objects to each and every one of Plaintiff's Interrogatories to the extent that any such discovery requests seeks information concerning issues upon which discovery is not yet complete.

6.      Defendant objects to each and every one of Plaintiff's Interrogatories to the extent that any such discovery request seeks information, the retrieval or compilation of which would be unduly burdensome on Defendant.

**Defendant's Answers to Interrogatories are subject to, and without waiver of, the Protective Order entered in this case as to the confidentiality of information and documents that might be produced in this litigation.**

Without waiving the foregoing general objections, and by expressly incorporating each general objection into the following responses, Defendant provides the following additional objections and answers to Plaintiff's Interrogatories:

## INTERROGATORIES

1.      Identify all persons, providing their name, address and job title, who had any role in the decision to terminate the Plaintiff.

<u>Answer:</u>      Defendant objects to this interrogatory to the extent "any role" is vague and ambiguous. Subject to and not withstanding this objection, Joel Norman, Quail Operations Manager, reported performance issues concerning Plaintiff to David Carroll, General Manager. David Carroll personally observed performance issues concerning Plaintiff, investigated the reports made by Norman, and made the decision to terminate Plaintiff's employment with Defendant.

2.      For each person identified in Interrogatory #1, state with specificity what role each person played in the decision to terminate Plaintiff, whether they made the decision, recommended the termination, or approved the termination.

<u>Answer:</u>      See Defendant's answer to Interrogatory Number 1 above.

3

3.    State in detail every reason why Plaintiff's employment was terminated.

Answer:    Plaintiff's employment with Defendant was terminated for poor work performance and poor attitude, including, among other things, criticizing his supervisor among co-workers and in front of customers, failure to comply with Defendant's policy as to customer tips, failure to follow instructions, failure to timely complete assigned duties, and failure to perform assigned tasks. In addition, pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, see David Carroll's January 3, 2006 Memorandum to File from which additional information that is responsive to this interrogatory may be derived.

4.    Identify all persons who made any investigation into any alleged misconduct by the Plaintiff, describing in detail the nature of the investigation, when it occurred, and identifying all people who were interviewed and all records which were consulted as part of said investigation.

Answer:    Defendant objects to this interrogatory to the extent that it is vague and ambiguous. Subject to and notwithstanding these objections, Joel Norman spoke with Jeffrey Harris as to missing quail in early October 2005 and in late December 2005. Carroll personally observed issues concerning Plaintiff's work performance and attitude and, between March and December 2005, periodically reviewed Plaintiff's work. Carroll also spoke with Norman, Plaintiff, and Rochester Lee as to Plaintiff's work performance.

5.    Identify all employees, who have, since January 1, 2002, left the employ of Mid-State Land & Timber Company, Inc., d/b/a Sedgefields Plantation, who worked on the Defendant's premises in Bullock County, Alabama. For each said person, provide their name, address, title job description, rate of pay, race, date of separation, reason for separation and last known telephone number.

4

Answer:        Defendant objects to this interrogatory for the reasons set forth in general objections numbers 2 and 3.  In particular, Defendant objects to this interrogatory in that it is not reasonably limited temporally and that it is not limited to the time in which the decision maker in this case was employed by Defendant.  Further, this interrogatory is over broad as every employee who worked for Defendant in Bullock County was terminated on or about May 19, 2006.  Subject to and notwithstanding these objections, Defendant will produce, pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, subject to an appropriate protective order, those documents from which an answer to this interrogatory may be derived for those employees whose employment with this Defendant was terminated from between the time Carroll, the decision maker, became the General Manager and May 18, 2006,  the day before all employees with Defendant in Bullock County were terminated.

6.        Identify all employees, who have since January 1, 2002, been hired by the Defendant to work at its Bullock County hunting operation.  For each said person, provide their name, address, job classification, date of hire, race, rate of pay, and telephone number.

Answer:        Defendant objects to this interrogatory for the reasons set forth in general objections numbers 2 and 3.  Further, Defendant objects to this interrogatory in that it is not reasonably limited temporally.  Subject to and notwithstanding these objections, Defendant will produce, pursuant to Rule 33(d) of the Federal Rules of Civil Procedure and subject to an appropriate protective order, documents from which an answer to this interrogatory may be derived as to those employees hired after December 29, 2005 in Bullock County, Alabama.

7.        Identify the person who has replaced the Plaintiff, or who assumed Plaintiff's duties.

Answer:        As Plaintiff did not have a specific, particular position with Defendant, his

5

job was not "replaced," rather, his duties were assumed by Chance Hamm, Will Hubbard, and William Mack.

8. Identify every employee of this Defendant who has been disciplined for violating the same policy that Norris Foster was alleged to have violated, providing their name, address, telephone number, job title, date and nature of the discipline.

Answer: Jeffrey Harris received a written warning and oral reprimands for his failure to follow instructions, timely complete his assigned duties, and for failing to perform an assigned task. Chance Hamm, Will Hubbard and William Mack have been orally reprimanded for failure to follow instructions and complete assigned duties. Bill Beckwith was terminated for stealing gas and failing to provide a valid driver's license.

9. Identify providing the name, address, and job classification of the person who is most familiar with this Defendant's hiring practices for fill positions at its Bullock County hunting operation known as Sedgefields Plantation.

Answer: Defendant objects to this interrogatory for the reasons set forth in general objections numbers 2 and 3. Subject to and notwithstanding these objections, David Carroll would be most familiar with the hiring practices during the time that he was the General Manager of Sedgefields Plantation.

10. Provide a list of all employees, including their name, age, race, home address, telephone number, rate of pay and job title, of every person hired by Joel Norman.

Answer: No employees were hired by Joel Norman.

6

11.    Provide a list of all employee, including their name, age, race, home address, telephone number, rate of pay and job title, of every person who has been fired by Joel Norman, along with the reasons for their discharge.

<u>Answer:</u>        No employees have been terminated by Joel Norman.


                                    Respectfully submitted,


                                    Carter H. Dukes
                                    Kimberly W. Geisler
                                    Attorneys for Defendant
                                    Mid State Land & Timber Co., Inc.
                                    d/b/a Sedgefields Plantation


**OF COUNSEL:**
HUCKABY SCOTT & DUKES, P.C.
2100 Third Avenue North, Suite 700
Birmingham, Alabama 35203
Tel: (205) 251-2300
Fax: (205) 251-6773

## VERIFICATION

My name is David Carroll, and I was a General Manager for Sedgefields Plantation during part of the time that it was owned by Mid State Land and Timber Company, Inc. I am authorized to give this verification. By virtue of my position, I have personal knowledge of some, but not necessarily all, of the information provided in response to Plaintiff's Interrogatories to Sedgefields Plantation. The remainder of the information was derived from records maintained in the regular course of business, or from employees or former employees, with respect to matters within the course of their employment. The information contained in the foregoing responses to Plaintiff's Interrogatories to Sedgefields Plantation is true and correct to the best of my knowledge, information, and belief.

SWORN TO AND SUBSCRIBED before me this 17th day July , 2006.

[NOTARIAL SEAL]

Notary Public

My Commission Expires: 9/29/08

# CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon counsel of record via U.S. mail, addressed as follows:

> Jerry D. Roberson, Esq.
> Roberson & Roberson
> 8 Office Park Circle
> Suite 150
> Birmingham, Alabama 35223
>
> Albert H. Adams, Jr., Esq.
> Irby Law Firm, LLC
> Post Office Box 910
> Eufaula, Alabama 36072

DONE this the /7 day of July, 2006.

Of Counsel

37928.1

MID-STATE LAND AND TIMBER
EMPLOYEE INFORMATION



## TO BE FILLED OUT BY HIRING MANAGER

APPLICANT NAME: _Norris Foster_

DATE OF HIRE: _2/8/05_

RATE OF PAY: _7⁰⁰_ (HOURLY) _____ WEEKLY

## CLASS OF EMPLOYMENT:

OUTSIDE LABOURER: _X_        MANAGEMENT: _____

INSIDE DOMESTIC: _____        OTHER: _____

PART-TIME _____        FULL-TIME _X_

ETHNIC ORIGIN: _____ WHITE, (BLACK) HISPANIC ETC.

## MANAGER'S CHECK LIST

1. CHECK ALL PAPER WORK AND COMPLETE    ✓
2. INFORM OF BENEFITS (INSURANCE) IF APPLICABLE    ✓
3. INFORM OF 90 DAY WAITING PERIOD    ✓
4. OBTAIN COPY OF DRIVERS LICENSE AND SOCIAL SECURITY ID CARD    ✓
5. MAIL ALL ORIGIONAL FORMS TO THE OFFICE IN MERIDIAN    ✓

APPROVED BY: _____    DATE: _3/8/05_

CONFIDENTIAL
DEFENDANT'S PROD.    000

# EMPLOYEE RECORDS JACKET

Dept 851

PRINT EMPLOYEE NAME ON TAB
#1677

## POSITION HISTORY

| DATE | | POSITION AND DEPARTMENT | PAY RATE | |
|---|---|---|---|---|
| FROM | TO | | AMOUNT | PER |
| 9-14-99 | | Labourer | 5 15 | hr |
| 1/1/00 | | Raise | 5 50 | hr |
| 6/11/00 | | Raise - Merit | 6 25 | hr |
| 2/8/05 | | Rehire | 7 00 | hr |
| 5-1-05 | | Fulltime | 7 00 | hr |

CONFIDENTIAL
DEFENDANTS PROD

0036

## TERMINATION INFORMATION

DATE TERMINATED __3-22-01__        WOULD WE REHIRE? YES ☑ NO ☐

REASON FOR TERMINATION:
Reduction in Staff

*(Continue on Reverse, if necessary)*

© Copyright 1980, 1996 – SELECTFORM, INC., Box 3045, Freeport NY 11520

---

ADDRESS

| | Midway | 36053 | 334- |
|---|---|---|---|
| Rt 3 Box 269 x | Union Sp. AL 36089 | | 738-3531 |
| Rt 2 Box 238A | | City State Zip | Telephone |
| 33743 Hwy 82 | Midway Al 36053 | | |
| | City State Zip | | Telephone |
| PO Box253 | Midway Al 36053 | | 334 355-8505 |
| | City State Zip | | Telephone |

SOCIAL SECURITY NO. _____    DATE OF BIRTH  6-13-58    SEX: ☑ M ☐ F

CITIZEN OF U.S.A.: YES ☑ OTHER (Name) _____

MARITAL STATUS: ☑ SINGLE  ☐ MARRIED  ☐ SEPARATED  ☐ WIDOWED  ☐ DIVORCED

NAME OF SPOUSE _____    NO. OF DEPENDENTS _____
Annie Foster    Daughter

IN EMERGENCY NOTIFY Harry D. Jenkins _____ RELATIONSHIP Friend
3282 Co. Road #11 Midway AL 36053    (334)
ADDRESS Rt 3 Box 269 x _____ TELEPHONE 738-3531
529-4560

RELATIVES WORKING FOR US: NAME _____ RELATIONSHIP _____

EDUCATION: ELEMENTARY _____ HIGH _____ COLLEGE _____ GRADUATE _____

OTHER _____

PLAINTIFF'S EXHIBIT
8
PENGAD-Bayonne, N.J.

UNION MEMBER: ☐ YES ☐ NO  UNION (Local) NAME _____

| NAME | DATES | | NAME | DATES | |
|---|---|---|---|---|---|
| | Eligible | Enrolled | | Eligible | Enrolled |
| PENSION PLAN | | | GROUP INSURANCE | | |
| PROFIT SHARING | | | | | |
| CREDIT UNION | | | | | |

COMPANY TRAINING AND SPECIAL SKILLS

SECURITY CLEARANCE

FORM 14 — Printed in U.S.A.

## THE PEBLE CORP

## <u>EMPLOYEE TERMINATION</u>

NAME: _Norris Foster_

SOCIAL SECURITY NUMBER: __

EMPLOYEE NUMBER: _1677_

ADDRESS: _33743 Hwy 82_

CITY: _Midway_   STATE: _AL_   ZIP _36053_

DATE OF EMPLOYMENT: _9.14.99_

POSITION: _Labourer_

PAY RATE: ____

DATE TERMINATED _03-28-01_   LAST WORK DAY: _03-22-01_

REASON FOR TERMINATION: _Reduction in staffing_
_for Plantation work_

____

____

WOULD THIS PERSON BE CONSIDERED FOR RE-HIRE? _X_ YES ____ NO

REASON: ____

____

____

AUTHORIZED BY: _Charles Phillips_   DATE: _03-23-01_

**PLAINTIFF'S EXHIBIT**
9  _Joel Norman_

CC: PAYROLL CLERK

CONFIDENTIAL
DEFENDANT'S PROD.    0055





PLAINTIFF'S
EXHIBIT
10

# SEDGEFIELDS
### PLANTATION

## FORMAL REPRIMAND

Date  12/06/2005

Employee  _Norris Foster_

Supervisor  _Joel Norman_

**Occurrence: Was instructed to clip horses, feed horses and clean barn.
Employee stopped clipping horses as instructed and began riding horses
at approximately 2 P.M. and returned at approximately**  _3:10 PM_

Employee Signature  _Norris Foster_
Date  _12/6/205_

Supervisor Signature  _Joel N_
Date_____

~~Strike 1~~    **Strike 2**    **Strike 3**

CONFIDENTIAL
DEFENDANT'S PROD.    0025

22139 Highway 29 • Union Springs, Alabama 36089 • Telephone (334) 738-3179 • Fax (334) 738-3338

# PAUL BROADHEAD INTERESTS, INC.

## PAYROLL STATUS CHANGE FORM

NAME: _Norris Foster_

EFFECTIVE DATE: _12/29/05_        Department _Sedgefields_

| NEW ADDRESS | STREET_____ |
|---|---|
| | CITY, STATE, ZIP_____ |
| | TELEPHONE_____ |

| CHANGE | FROM | TO |
|---|---|---|
| NAME | | |
| JOB | | |
| DEPARTMENT | | |
| SHIFT | | |
| PAY | | |

PLAINTIFF'S EXHIBIT 11

## REASON FOR CHANGE

| | | |
|---|---|---|
| ____ Hired | ____ Merit Increase | ____ Length of Service |
| ____ Retired | ____ Resignation | ____ Reevaluation of job |
| ____ Promotion | ____ Retirement | ____ Probation Period Completed |
| ____ Demotion | ____ Layoff | ____ Union Contract |
| ____ Transfer | X Discharge | ____ Other |

Comments, If Necessary _Documentation to follow if needed. On-file at Sedgefields Office._

| Leave of Absence | charged to vacation ____ yes or ____ no    Family act ____ yes or ____ no |
|---|---|
| From / / | OTHER, EXPLAIN |
| To / / | |

Authorized By: X _DHall_        Approved By: _____

FAXED TO: _ST_
DATE: _1-6-06_
BY: _DKB_

CONFIDENTIAL
DEFENDANT'S PROD.    001

# UNEMPLOYMENT COMPENSATION AGENCY

## NOTICE OF CLAIM AND REQUEST FOR SEPARATION INFORMATION

**IMPORTANT NOTE:** If your response is not received by 04-11-0? a determination may be made solely on information furnished claimant. Return one copy only address below:

PLAINTIFF'S EXHIBIT

00  290604  87

MID STATE LAND & TIMBER COMPAN
ATTN  RON ST JOHN
PO BOX 2090
MERIDIAN MS 39301-2090

**MAIL TO:** EUFAULA EMPL SECURITY OFFICE
128 NORTH ORANGE AVE
PO BOX 40
EUFAULA AL  36072-0040
FAX NUMBER 334-687-6381

The individual identified below has filed a claim for Unemployment Compensation benefits.

1. CLAIMANT'S NAME  : FOSTER/NORRIS LEON
2. SOCIAL SECURITY NO.:
3. DATE OF CLAIM  : 04-01-01
4. DATE MAILED  : 04-03-01

5. BASE PERIOD BEGINS: 01-01-00
6. OFFICE-COUNTY  : 3980
7. MAIL CODE  : 9
8. TYPE CLAIM  : N

The claimant identified you as his/her last employer and alleges the reason for separation to be:

LACK OF WORK

LDW 03-23-01

---

## EMPLOYER RESPONSE

Claimant's last day employed was ___03-22-2001___
(If temporary layoff, enter expected date of recall: _____)

10. If the claimant was paid vacation and/or separation pay or will receive a pension upon termination, or earned wages with you on or after the date shown in item 3. above, complete the applicable space(s) below:
   a. GROSS WAGES  $ __126.75__ paid for period __03-19-200(__ to __03-31-200!__
   b. VACATION PAY  $ ___-0-___ paid for period _____ to _____
   c. SEPARATION PAY $ __520.00__ paid for period __4-1-2001__ to __4-14-2001__
      (1) Was separation pay a legal obligation or a courtesy/gift? __Courtesy/gift__
      (2) If a legal obligation, what required that it be paid (contract, company policy, labor agreement, etc.)? __N/A__
      (3) Does contract, policy, or agreement require that such payment be made with respect to a specific period following termination? __N/A__ Explain: _____
      (4) Does contract, policy, or agreement provide for reduction of severance payments based on some act by the claimant after separation? __N/A__ Explain: _____

   d. PENSION  $_____ per month. Effective Date _____

11. REASON FOR SEPARATION: (ATTACH ADDITIONAL SHEET IF NECESSARY)
   Reduction in staff.

_____  President  4-4-01  (601) 693-0602

November 3, 2005



To all Sedgefields Employees

# ATTITUDE IS IMPORTANT

The goal of Sedgefields Plantation is to provide our guests with a first class experience. It does not matter whether guests are here for deer, turkey, quail or just lodging. We are a service business and our reputation is based on the effort we put forth here at work. This effort not only applies to when we have guests but to the days when we are preparing the woods and fields for hunters or the lodge and other buildings for our guests stay. The weed-eating, mowing, chopping and cleaning are all important. In order to be first class, we have to take pride in the work we do.

Tips are not a standard part of your pay when we have guests. However, some of our guests will want to tip for the great service you provide. You may receive a tip in one of two ways: (1) cash or (2) it may be included with an upcoming paycheck. I will not have employees standing around waiting for a tip at the end of the day. If I see this behavior you will be dismissed from employment at the Plantation. **If tipping continues to be a problem at the Plantation, it will be stopped.** Take pride in what you do.

Sedgefields will have a staff that is committed to seeing the Plantation move forward and be known for providing great service. Employees present/future who are here just for a paycheck, disrupt the work of others and are only concerned with self will find there employment time at the Plantation to be a short one. I expect every employee to work hard each day and receive a fair wage for the work they do, anything less in not acceptable. Take pride in what you do.

If you are sick and can not come to work, I expect you to notify **your** manager. Take pride in what you do.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

NORRIS FOSTER,                )
                             )
    Plaintiff,              )
                             )
vs.                          )          Civil Action No.:
                             )
MID STATE LAND & TIMBER CO., )
                             )          _____
    Defendant.              )

PLAINTIFF'S EXHIBIT 1

## AFFIDAVIT OF JEFFREY HARRIS

COMES NOW Jeffrey Harris, and after being duly sworn, does state under oath as follows:

My name is Jeffrey Harris. I live at 242 Orchid Lane, Fitzpatrick, Alabama 36029. I am over nineteen (19) years of age and I have personal knowledge of the below stated facts.

I began working in approximately September 2005 for Mid State Land & Timber Company, Incorporated. This is the owner of the Sedgefield Plantation, a lodge where you pay to go deer and quail hunting. I was hired at an hourly rate of $7.25 per hour and later received a raise to $7.50 per hour. Initially, I drove a tractor preparing the ground for hunting. It involves a great deal of tractor work in preparing deer plots and preparing the fields for quail hunting.

About a week after I was hired, Joel Norman, a white male, was hired. He was my supervisor. He also supervised two other black males, Norris Foster and Willie Mack. The three of us formed a crew that was used to take people on quail hunts. I drove a wagon pulled by two mules. Norris Foster was the pointer or scout and handled the dogs. Willie

Mack assisted the guests with their horses, with the dogs, with the wagon transfers. Joel Norman flushed the quail and supervised.

I heard Joel Norman make several statements about his intention to replace the black crew with a white crew. About a month after he arrived, he stated in my presence that he was "going to get rid of all blacks in his crew." When we had homecoming in Bullock County, he threatened my job and stated he was going to "get some white boys and Mexicans who wanted to work" because we wanted to get off early for homecoming. He later stated he was going to "get the blacks off his crew and get him some white boys." He told me he had "never worked with black people who were so concerned about their money," referring to tips for the crew that he kept.

In December of 2005, he hired two young white males, Joseph Mayes and Will Hubbard. After Norris and I trained them how to operate the tractors, we were sent to the barn to shovel manure. The young white males were paid more money than Norris and I, even though they had no experience or training working in the hunting industry.

On December 28, I spoke with Joel Norman about Norris Foster. He claimed that I had told him that Norris took dead birds out of the refrigerator. I told him that Norris didn't take the birds, but rather the birds were thrown out of the refrigerator because they were rotten. Joel fired Norris Foster that same day.

On December 30, I was working at the barn with the horses. While I was working, the horse slipped down, knocking me to the ground and injuring my back. I have not worked since December 30, 2005. I am presently drawing workers' compensation for my on the job back injury.

There are approximately twelve (12) people employed at Sedgefield Plantation.

When I started working there, there were nine (9) blacks.  Today, I believe there are only four (4) blacks still employed there.

Willie Mack was moved from the hunting crew back to the lodge.  The hunting crew is now all white.  Chance Hamm, another young white male, is also working in the crew, with Joseph Mayes and Will Hubbard.

Further the affiant saith not.

_____
Jeffrey Harris


STATE OF ALABAMA    }
BARBOUR COUNTY      }

SWORN and SUBSCRIBED before me on the 2 day of May, 2006.


_____
NOTARY PUBLIC

MY Commission Expires: ___8/15/06___

# The Peble Corp.

PLAINTIFF'S
EXHIBIT
13

## EMPLOYMENT APPLICATION

*PLEASE PRINT ANSWERS TO THE FOLLOWING QUESTIONS CAREFULLY AN~~~
CONSIDERED FOR EMPLOYMENT, ALL ITEMS MUST BE COMPLETED, INCLUDING SIGNA-
TURE. THIS APPLICATION IS VALID FOR 30 DAYS. IF YOU WISH TO BE CONSIDERED FOR
EMPLOYMENT AFTER THIS APPLICATION EXPIRES, THEN YOU MUST RE-APPLY.*

NAME _Roy Chester Lee_ ___ TELEPHONE NUMBER

ADDRESS _ REDACT ___ Home # ( REDACT

CITY _ REDACT STATE _AL_ ZIP _ ___ Daytime #

REDACT

SOCIAL SECURITY NUMBER  REDACT

## EMPLOYMENT INTERESTS:

Type of work desired _Horse/Dog Trainer/Hunting Guide or Tractor_

Full Time _X_ Part Time ___ Temporary ___

Starting pay expected _$6.00 per Hour_ Date Available to start _Any time_

---

**IF APPLICABLE:**

Are you willing to travel? ___ If yes, what percentage of the time ___

Would you be willing to relocate? ___

---

Would you object to:  Irregular work hours ☐ YES ☒ NO  Night work ☐ YES ☒ NO

Swing or fluctuating shift work ☐ YES ☒ NO

## SPECIAL SKILLS - COMPLETE IF APPLICABLE TO THE POSITION FOR WHICH YOU ARE APPLYING:

Skill _Horse Training_ Experience _9 years_

Skill _License forklift Operator_ Experience _23 years_

Skill _Dog Trainer_ Experience _13 years_

Please discuss other specialized skills you feel are pertinent to the job for which you are applying ___

---

## UNITED STATES MILITARY SERVICE STATUS:

Past Military Service - FROM ___ , 19 ___ TO ___ , 19 ___

Branch ___ Rank on discharge ___ Present Status ___

List duties and special training

**EDUCATION:**

| | NAME OF SCHOOL AND LOCATION | MAJOR AREA OF STUDY and/or DEGREE RECEIVED |
|---|---|---|
| High School | Bullock County High School Union Springs, AL | Science, Math, History |
| Jr. College, College, or University | | |
| Technical or Trade Schools | | |

Honors and Scholarships _____

Grade Average (approx.) High School _____X_____ College _____ Other _____

**General Information:**

Are you legally authorized to work in the United States? ☒ YES ☐ NO If not, what is your present status and

do you have a work visa? _____

Have you ever been convicted of a crime? ☐ YES ☒ NO If yes, please explain. Give dates, charge, penalty assessed or disposition. Conviction will not necessarily bar employment. Consideration will be given to the nature of the crime, age at the time of offense, rehabilitation and the position for which you are applying.

_____

_____

Have you ever been discharged from a job? ☐ YES ☒ NO If yes, please explain _____

_____

_____

Have you ever been bonded? ☐ Yes ☒ NO If yes, when and in what job _____

_____

CONFIDENTIAL DEFENDANT'S PROD

Do you have a valid, active driver's license?    ☒ YES    ☐ NO    Issuing State _____

Drivers License    REDACT _____ Class of License _____

( ) long have you been a resident of this City ___ *41 years* ___ State ___ *41 years* ___

How long at your present address? _*40 years*_ Give previous address if less than one year at present

address _____

Are you over the age of 18?    ☒ YES    ☐ NO    If hired can you provide proof of age?    ☐ YES    ☐ NO

**EMPLOYMENT DATA:**

Have you ever been employed by this company before?    ☐ YES    ☒ NO    If yes, please give dates of

employment, position employed, and reason for leaving _____

_____

Please list all jobs (if not listed above), beginning with your present or last employer and working backwards
to earlier positions. Account for all periods, including unemployment, self-employment, and military service.
If additional space is needed, please list on a separate page or on the back of this form.

#1 DATES - From _*July 9, 1978*_ to _*July 14, 00*_

Company Name, City, and State _*Beaulieu of America*_

Supervisor's Name/Title _*Lawrence Penn*_    SALARY - Start _*$9.70*_ End _*13.26 per h*_

Phone # _*738-4600*_ May we contact? _*yes*_ Final position with the company _*Supervisor Trainee*_

Reason for leaving? _*Plant Closed*_

#2 DATES - From _*Summer 75/76*_ to _*to Summer 1977*_

Company Name, City, and State _*Welsh Company of the South*_

Supervisor's Name/Title _*M. Driggers*_    SALARY - Start _____ End _____

Phone # _____ May we contact? _____ Final position with the company _*Assembly Worker*_

Reason for leaving? _*Plant Closed*_

#3 DATES - From _____ to _____

Company Name, City, and State _*Chris Caldwell Logging Company*_

Supervisor's Name/Title _*Chris Caldwell / Deceased*_ SALARY - Start _____ End _____

Phone # _____ May we contact? _____ Final position with the company _*Truck Driver,*_
_*Skidder / Tractor*_
_*operator*_

Reason for leaving?

0175    CONFIDENTIAL
DEFENDANT'S PROD

#4 DATES - From_____to_____

Company Name, City, and State_____

Supervisor's Name/Title_____ SALARY - Start_____End_____

Phone #_____ May we contact?_____Final position with the company_____

Reason for leaving?_____

#5 DATES - From_____to_____

Company Name, City, and State_____

Supervisor's Name/Title_____ SALARY - Start_____End_____

Phone #_____May we contact?_____Final position with the company_____

Reason for leaving?_____

## PERSONAL REFERENCES (Not Former Employers or Relatives)

| Name and Occupation | Address | Phone Number |
|---|---|---|
| Hill + Hill Grocery<br>Milton Hill - Owner | Hwy, 82 E.<br>Miday, Alabama 36053 | 529-3700 |
| Bill Davis Grocery<br>Bill Davis - Owner | Rt. 2<br>Midway, Alabama | 529-9859 |
| Sherman Bowens Grocery<br>Sherman Bowens - Owner | Rt. 2<br>Midway, Alabama 36053 | 529-3327 |

The Peble Corp. is an Equal Opportunity Employer which endeavors, pursuant to all applicable Federal and State Laws, to give every applicant for employment, and every employee, equal consideration in all matters relating to employment, without regard race, color, sex, age, religion, national origin, citizenship and disability.

By my signature below, I certify the facts set forth in this application for employment are true and complete to the best of my knowledge and belief, and I agree you may investigate my statements. I agree to permit all past employers to give any information concerning me and release them from liability in furnishing such information. I understand that my employment and, if employed, my continued employment, is conditional upon my participating in and clearing such security examinations or

investigations as may be deemed advisable by the company. I agree to participate in such examinations and investigations when requested to do so by the company, and agree that the company shall be held harmless and free from liability in connection with any security examination or investigation in which I may be involved.

I understand, if employed, false statements on this application shall result in disciplinary action up to and including discharge. Also if employed, I understand that it is the company's policy that all employees who do not have a written employment contract with the company for a specific, fixed term of employment are employed at the company's will. I understand that I would be subject to termination at any time, for any reason, with or without cause or notice.

_Ross Chester Lee_
**Applicant's Signature**

_August 10, 2000_
**Date Signed**

0176    CONFIDENTIAL
DEFENDANT'S PROD



PLAINTIFF'S
EXHIBIT
16

## THE PEBLE CORP

### EMPLOYEE TERMINATION

NAME: William Beckwith Jr

SOCIAL SECURITY NUMBER: __

EMPLOYEE NUMBER: _____

ADDRESS: 22139 Hwy 29

CITY: Union Springs      STATE: AL      ZIP: 36089

DATE OF EMPLOYMENT: 7-25-05

POSITION : Outside Laborer

PAY RATE: 8⁰⁰ per hour

DATE TERMINATED: 9/27/05      LAST WORK DAY: 9/27/05

REASON FOR TERMINATION:

Stole Gas / No valid Drivers License

WOULD THIS PERSON BE CONSIDERED FOR RE-HIRE? ____YES  X NO

REASON: _____

AUTHORIZED BY: _____      DATE: 9/30/05

CC: PAYROLL CLERK
    PERSONELL FILE

CONFIDENTIAL
DEFENDANT'S PROD.      0112

# The Peble Corp.

## EMPLOYMENT APPLICATION

*PLEASE PRINT ANSWERS TO THE FOLLOWING QUESTIONS CAREFULLY AND IN INK. TO BE CONSIDERED FOR EMPLOYMENT, ALL ITEMS MUST BE COMPLETED, INCLUDING SIGNATURE. THIS APPLICATION IS VALID FOR 30 DAYS. IF YOU WISH TO BE CONSIDERED FOR EMPLOYMENT AFTER THIS APPLICATION EXPIRES, THEN YOU MUST RE-APPLY.*

NAME William. Rogers Hubbard                          TELEPHONE NUMBER

ADDRESS 12703 co. Road 7 Troy AL          Home # (334) 474-3088

CITY Troy          STATE AL          ZIP 36081          Daytime # (    ) -

SOCIAL SECURITY NUMBER

## EMPLOYMENT INTERESTS:

Type of work desired Outside Labor

Full Time 40 HR week Part Time_____ Temporary_____

Starting pay expected $ 8.00 HR_____ Date Available to start_____

IF APPLICABLE:

Are you willing to travel? No    If yes, what percentage of the time_____

Would you be willing to relocate? No

Would you object to:  Irregular work hours ☒YES ☐ NO  Night work ☒YES ☐ NO

Swing or fluctuating shift work ☒YES ☐ NO

## SPECIAL SKILLS - COMPLETE IF APPLICABLE TO THE POSITION FOR WHICH YOU ARE APPLYING:

Skill Equipment operator          Experience Dozier - Tractor - Skidder

Skill Horse Rider          Experience_____

Skill_____          Experience_____

Please discuss other specialized skills you feel are pertinent to the job for which you a_____

_____


PLAINTIFF'S EXHIBIT

## UNITED STATES MILITARY SERVICE STATUS:

st Military Service - FROM N/A          TO_____

nch_____ Rank on discharge_____ Present Status_____

List duties and special training

**EDUCATION:**

| | NAME OF SCHOOL AND LOCATION | MAJOR AREA OF STUDY and/or DEGREE RECEIVED |
|---|---|---|
| High School | Banks Middle school | general |
| Jr. College, College, or University | | |
| Technical or Trade Schools | | |

Honors and Scholarships _____

Grade Average (approx.)  High School _____ College _____ Other _____

**General Information:**

Are you legally authorized to work in the United States?  ☑ YES   ☐ NO  If not, what is your present status and do you have a work visa? _____

Have you ever been convicted of a crime?  ☐ YES  ☑ NO  If yes, please explain. Give dates, charge, penalty assessed or disposition.  Conviction will not necessarily bar employment.  Consideration will be given to the nature of the crime, age at the time of offense, rehabilitation and the position for which you are applying.

_____

_____

Have you ever been discharged from a job?  ☐ YES  ☑ NO  If yes, please explain _____

_____

Have you ever been bonded?  ☐ Yes  ☑ NO   If yes, when and in what job _____

Do you have a valid, active driver's license?  ☑ YES  ☐ NO  Issuing State _ALABAMA_

Drivers License # _____ Class of License ___D___

How long have you been a resident of this City _A years_ State _AL_

How long at your present address? _19 years_ Give previous address if less than one year at present

address _____

Are you over the age of 18? ☑ YES ☐ NO If hired can you provide proof of age? ☑ YES ☐ NO

**EMPLOYMENT DATA:**

Have you ever been employed by this company before? ☐ YES ☑ NO If yes, please give dates of

employment, position employed, and reason for leaving _____

_____

Please list all jobs (if not listed above), beginning with your present or last employer and working backwards to earlier positions. Account for all periods, including unemployment, self-employment, and military service. If additional space is needed, please list on a separate page or on the back of this form.

#1 DATES - From _Aug- 03_ to _11-20-05_  _Union springs AL_

Company Name, City, and State _Bunie plant Farm_ ~~_____~~ _AL_

Supervisor's Name/Title _Paul Boughton_ SALARY - Start _7.00_ End _8.00_

Phone # _738-3104_ May we contact? _Yes_ Final position with the company _Sales Helper_

Reason for leaving? _Job ~~_____~~ opporinty_

#2 DATES - From_____ to_____

Company Name, City, and State_____

Supervisor's Name/Title_____ SALARY - Start_____ End_____

Phone #_____ May we contact?_____ Final position with the company_____

Reason for leaving?_____

#3 DATES - From_____ to_____

Company Name, City, and State_____

Supervisor's Name/Title_____ SALARY - Start_____ End_____

Phone #_____ May we contact?_____ Final position with the company_____

Reason for leaving? _____

CONFIDENTIAL

**#4 DATES - From** _____ **to** _____

**Company Name, City, and State** _____

**Supervisor's Name/Title** _____ **SALARY - Start** _____ **End** _____

**Phone #** _____ **May we contact?** _____ **Final position with the company** _____

**Reason for leaving?** _____

---

**#5 DATES - From** _____ **to** _____

**Company Name, City, and State** _____

**Supervisor's Name/Title** _____ **SALARY - Start** _____ **End** _____

**Phone #** _____ **May we contact?** _____ **Final position with the company** _____

**Reason for leaving?** _____

---

**PERSONAL REFERENCES (Not Former Employers or Relatives)**

| Name and Occupation | Address | Phone Number |
|---|---|---|
| Peggy Wood | 9823 Co Rd 15 Union Springs AC | 334) 474) 3666 |
| Bobby Earles | 13699 Co Rd 7 Troy AC | 334) 474) 3540 |
| Doren Hooks | 14042 Co Rd 7 Troy AC | 334) 424) 3357 |

The Pable Corp. is an Equal Opportunity Employer which endeavors, pursuant to all applicable Federal and State Laws, to give every applicant for employment, and every employee, equal consideration in all matters relating to employment, without regard to race, color, sex, age, religion, national origin, citizenship and disability.

By my signature below, I certify the facts set forth in this application for employment are true and complete to the best of my knowledge and belief, and I agree you may investigate my statements. I agree to permit all past employers to give any information concerning me and release them from liability in furnishing such information. I understand that my employment and, if employed, my continued employment, is conditional upon my participating in and clearing such security examinations or

investigations as may be deemed advisable by the company. I agree to participate in such examinations and investigations when requested to do so by the company, and agree that the company shall be held harmless and free from liability in connection with any security examination or investigation in which I may be involved.

I understand, if employed, false statements on this application shall result in disciplinary action up to and including discharge. Also if employed, I understand that it is the company's policy that all employees who do not have a written employment contract with the company for a specific, fixed term of employment are employed at the company's will. I understand that I would be subject to termination at any time, for any reason, with or without cause or notice.

_William B. Shehate_    11-17-05

**Applicant's Signature**

**Date Signed** _____

CONFIDENTIAL

Dept 851

*PRINT EMPLOYEE'S NAME ON TAB*

CONFIDENTIAL
DEFENDANT'S PROD.

0064

# EMPLOYEE RECORDS JACKET

## POSITION HISTORY

| DATE | | POSITION AND DEPARTMENT | PAY RATE | |
|------|------|------|------|------|
| FROM | TO | | AMOUNT | PER |
| 11/21/05 | | Labourer | 8 00 | hr. |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

PLAINTIFF'S EXHIBIT 18

## TERMINATION INFORMATION

DATE TERMINATED 4-28-06          WOULD WE REHIRE? YES ☐ NO ☐

REASON FOR TERMINATION:

Resign on

---

ADDRESS 12703 CR7          Troy , AL, 36081 , 334-474.3088
      City    State  Zip   Telephone

          City    State  Zip   Telephone

          City    State  Zip   Telephone

SOCIAL SECURITY NO. _____ DATE OF BIRTH 10.14.1986 SEX: ☒ M ☐ F

CITIZEN OF U.S.A.: YES ☒ OTHER (Name) _____

MARITAL STATUS: ☒ SINGLE ☐ MARRIED ☐ SEPARATED ☐ WIDOWED ☐ DIVORCED

NAME OF SPOUSE _____ NO. OF DEPENDENTS _____

IN EMERGENCY NOTIFY Debbie Hubbard      RELATIONSHIP MOM

ADDRESS 12703 CR7 , Troy AL 36081      TELEPHONE (334) 474-3088

RELATIVES WORKING FOR US: NAME _____ RELATIONSHIP _____

EDUCATION: ELEMENTARY _____ HIGH _____ COLLEGE _____ GRADUATE _____

          OTHER _____

---

UNION MEMBER: ☐ YES ☐ NO   UNION (Local) NAME _____

| NAME | DATES | | NAME | DATES | |
|------|------|------|------|------|------|
| | Eligible | Enrolled | | Eligible | Enrolled |
| PENSION PLAN | | | GROUP INSURANCE | | |
| PROFIT SHARING | | | | | |
| CREDIT UNION | | | | | |

COMPANY TRAINING AND SPECIAL SKILLS _____

SEC    Y CLEARANCE _____

*May, JosephAdam*

**PLAINTIFF'S EXHIBIT**
PENGAD-Bayonne, N.J.
19

**PLAINTIFF'S EXHIBIT**
19

19

19 *Joel Norman*

Dept # 851

*PRINT EMPLOYEE'S NAME ON TAB*

## EMPLOYEE RECORDS JACKET

ADDRESS
4440 CR 15          Union Sp. AL 36089  474-3280

| | City | State | Zip | Telephone |

SOCIAL SECURITY NO. _____ DATE OF BIRTH 03-24-81 SEX: ☒M ☐F

CITIZEN OF U.S.A.: YES ☐ OTHER (Name) _____

MARITAL STATUS: ☒ SINGLE ☐ MARRIED ☐ SEPARATED ☐ WIDOWED ☐ DIVORCED

NAME OF SPOUSE _____ NO. OF DEPENDENTS _____

IN EMERGENCY NOTIFY Beth May   RELATIONSHIP Mom

ADDRESS 4340 CR 15 Union Spring AL 36089  TELEPHONE (334) 474-3257

RELATIVES WORKING FOR US: NAME _____ RELATIONSHIP _____

EDUCATION: ELEMENTARY ___ HIGH ___ COLLEGE ___ GRADUATE ___

OTHER _____

### POSITION HISTORY

| DATE | | POSITION AND DEPARTMENT | PAY RATE | |
| FROM | TO | | AMOUNT | PER |
|------|----|----|--------|-----|
| 11/21/05 | | Labourer | 8 00 | hr. |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

### TERMINATION INFORMATION

DATE TERMINATED 12-29-05   WOULD WE REHIRE? YES ☐ NO ☐

REASON FOR TERMINATION: didn't show up for work
Quit

(Continue on Reverse, if necessary)

UNION MEMBER: ☐ YES ☐ NO  UNION (Local) NAME _____

| NAME | DATES | | NAME | DATES | |
| | Eligible | Enrolled | | Eligible | Enrolled |
|------|----------|----------|------|----------|----------|
| PENSION PLAN | | | GROUP INSURANCE | | |
| PROFIT SHARING | | | | | |
| CREDIT UNION | | | | | |

COMPANY TRAINING AND SPECIAL SKILLS _____

SECURITY CLEARANCE _____

© Copyright 1980 - 1998 SELECTFORM, INC., Box 9045, Freeport NY 11520 Tel: 800-326-0311    FORM 14—Printed in U.S.A.





# The Peble Corp.

PLAINTIFF'S
EXHIBIT
20

## EMPLOYMENT APPLICATION

PLEASE PRINT ANSWERS TO THE FOLLOWING QUESTIONS CAREFULLY AND IN ~~~~~~~~
CONSIDERED FOR EMPLOYMENT, ALL ITEMS MUST BE COMPLETED, INCLUDING SIGNA-
TURE. THIS APPLICATION IS VALID FOR 30 DAYS. IF YOU WISH TO BE CONSIDERED FOR
EMPLOYMENT AFTER THIS APPLICATION EXPIRES, THEN YOU MUST RE-APPLY.

NAME _Joseph  Adam  May_ _____ TELEPHONE NUMBER

ADDRESS _4440  CoRd  15_ _____ Home #  _(334)474-3280_

CITY_Union Springs_ STATE _Alabama_ ZIP _36089_    Daytime #  _(334)850-0350_

SOCIAL SECURITY NUMBER ____

**EMPLOYMENT INTERESTS:**

Type of work desired _Outside labor_

Full Time _40 hr week_ Part Time _____ Temporary _____

Starting pay expected _$9ºº hr_ _____ Date Available to start _11-21-05_

**F APPLICABLE:**

Are you willing to travel? _NO_ If yes, what percentage of the time: _____

Would you be willing to relocate? _No_

Would you object to:  Irregular work hours  ☑ YES  ☐ NO   Night work  ☑ YES  ☐ NO

Swing or fluctuating shift work  ☑ YES  ☐ NO

**SPECIAL SKILLS** - COMPLETE IF APPLICABLE TO THE POSITION FOR WHICH YOU ARE APPLYING:

Skill _Trapping_ _____ Experience _7 years_

Skill _Tractor Operater_ _____ Experience _9 years_

Skill _Mecanhic_ _____ Experience _6 months_

Please discuss other specialized skills you feel are pertinent to the job for which you are applying _____

_____

**ITED STATES MILITARY SERVICE STATUS:**

ast Military Service - FROM _N/A_ _____ TO _____

Branch _____ Rank on discharge _____ Present Status _____

List duties and special training _____

CONFIDENTIAL

**EDUCATION:**

| | NAME OF SCHOOL AND LOCATION | MAJOR AREA OF STUDY and/or DEGREE RECEIVED |
|---|---|---|
| High School | Bullock Memorial Union Springs, AL | General |
| Jr. College, College, or University | Tuskegee University Tuskegee, AL | G.E.D. |
| Technical or Trade Schools | | |

Honors and Scholarships _____

Grade Average (approx.) High School _____ College _____ Other _____

**General Information:**

Are you legally authorized to work in the United States? ☑ YES ☐ NO If not, what is your present status and do you have a work visa? _____

Have you ever been convicted of a crime? ☐ YES ☑ NO If yes, please explain. Give dates, charge, penalty assessed or disposition. Conviction will not necessarily bar employment. Consideration will be given to the nature of the crime, age at the time of offense, rehabilitation and the position for which you are applying.

_____

_____

Have you ever been discharged from a job? ☐ YES ☑ NO If yes, please explain _____

_____

_____

Have you ever been bonded? ☐ Yes ☑ NO If yes, when and in what job _____

_____

_____

CONFIDENTIAL 0108

Do you have a valid, active driver's license?  ☑ YES  ☐ NO  Issuing State _Alabama_

Diver's License #_____  Class of License _D_

How long have you been a resident of this City _11yrs_  State_Alabama_

How long at your present address? _3yrs_  Give previous address if less than one year at present

address_____

Are you over the age of 18?  ☑ YES  ☐ NO  If hired can you provide proof of age?  ☑ YES  ☐ NO

**EMPLOYMENT DATA:**

Have you ever been employed by this company before?  ☐ YES  ☑ NO  If yes, please give dates of

employment, position employed, and reason for leaving _____

_____

_____

Please list all jobs (if not listed above), beginning with your present or last employer and working backwards
to earlier positions. Account for all periods, including unemployment, self-employment, and military service.
If additional space is needed, please list on a separate page or on the back of this form.

1 DATES - From _Dec "04"_  to _Feb "05"_                    _Union Springs_

Company Name, City, and State _Fine Cutz Deer Pr_

Supervisor's Name/Title _Chris Simpson_            SALARY - Start _$7°°/hr_ End _$7/hr_

Phone # _738-8732_ May we contact? _Yes_ Final position with the company_____

Reason for leaving? _Seasonal_

#2 DATES - From _March "04"_  to _Sept "04"_

Company Name, City, and State _Brooks Tractor_        _Union Springs, Al_

Supervisor's Name/Title _____            SALARY - Start _$6²⁵/hr_ End _$6⁵⁰/hr_

Phone # _474-3212_ May we contact? _Yes_ Final position with the company_Mecanhic_

Reason for leaving? _Personal_

#3 DATES - From _Feb "03"_  to _Feb "04"_

Company Name, City, and State _Pronto Grassing_    _Troy, AL_

Supervisor's Name/Title _Chad Thrash_            SALARY - Start _$8°°/hr_ End _$9°°/hr_

Phone # _735-2506_ May we contact? _Yes_ Final position with the company_Labor_

Reason for leaving? _Differences with some Employees._        CONFIDENTIAL    0105

#4 DATES - From Jan "2000" to Jan "04"

Company Name, City, and State Bonnie Plant Farm Union Springs, AL

Supervisor's Name/Title Gene Morgonall Charles May, Mack G Sales man SALARY - Start $9.00 End $9.00

Phone # 739-3104 May we contact? Yes Final position with the company Sales Helper

Reason for leaving? Not What I wanted Any more.

---

#5 DATES - From_____to_____

Company Name, City, and State_____

Supervisor's Name/Title_____SALARY - Start_____End_____

Phone #_____May we contact?_____Final position with the company_____

Reason for leaving?_____

---

## PERSONAL REFERENCES (Not Former Employers or Relatives)

| Name and Occupation | Address | Phone Number |
|---|---|---|
| Peggy Wood | 4823 Co Rd 15 Union Springs, AL | (334) 474-3666 |
| Bobby Earles | 13679 Co Rd 7 Troy, AL | (334) 474-3540 |
| Rodger Hubbard | 12709 Co Rd 7 Troy, AL | (334) 474-3088 |

The Poble Corp. is an Equal Opportunity Employer which endeavors, pursuant to all applicable Federal and State Laws, to give every applicant for employment, and every employee, equal consideration in all matters relating to employment, without regard to race, color, sex, age, religion, national origin, citizenship and disability.

By my signature below, I certify the facts set forth in this application for employment are true and complete to the best of my knowledge and belief, and I agree you may investigate my statements. I agree to permit all past employers to give any information concerning me and release them from liability in furnishing such information. I understand that my employment and, if employed, my continued employment, is conditional upon my participating in and clearing such security examinations or

investigations as may be deemed advisable by the company. I agree to participate in such examinations and investigations when requested to do so by the company, and agree that the company shall be held harmless and free from liability in connection with any security examination or investigation in which I may be involved.

I understand, if employed, false statements on this application shall result in disciplinary action up to and including discharge. Also if employed, I understand that it is the company's policy that all employees who do not have a written employment contract with the company for a specific, fixed term of employment are employed at the company's will. I understand that I would be subject to termination at any time, for any reason, with or without cause or notice.

Joseph Adam May
Applicant's Signature

11-17-05
Date Signed

CONFIDENTIAL
DEFENDANT'S PROD 0110

## NEW EMPLOYEE CHECKLIST

Applicant Name: *Joseph Adam May*

Location: *Seedfields Plantation*

Hire Date: *11-21-05*

Job Position: *Outside Labor*

Please have the following completed and check off as you receive.  Send this form along with other New Hire paperwork to the Personnel Department:

✓    Hiring Manager's Form

✓    Employment Application

✓    Employee Data form

✓    Employment Agreement

✓    Authorization and Waiver Form

✓    Standard Procedure Form

N/A    I-9 (Immigration and Naturalization form – please attach a copy of the appropriate I.D.)

✓    W-4 (Federal Withholding Form)

✓    State Withholding

✓    State New Hire Form

_____          _____
Hiring Manager Signature                                        11/21/05  Date

CONFIDENTIAL
DEFENDANT'S PROD
0093

HHMM, Forest C.

CONFIDENTIAL
DEFENDANT'S PROD. 0082

Dept 851

*PRINT EMPLOYEE'S NAME ON TAB* ↑

# EMPLOYEE RECORDS JACKET

## POSITION HISTORY

| DATE | | POSITION AND DEPARTMENT | PAY RATE | |
| FROM | TO | | AMOUNT | PER |
|---|---|---|---|---|
| 1/12/06 | | Outside labourer | 8 00 | hr |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

## TERMINATION INFORMATION

ATE TERMINATED _____    WOULD WE REHIRE? YES ☐ NO ☐

EASON FOR TERM___ION:

ADDRESS 594 CR 191    Union Springs, AL 36089    -334- 474-3557
                      City      State   Zip    Telephone

_____    _____ City    State   Zip    Telephone

_____    _____ City    State   Zip    Telephone

PLAINTIFF'S EXHIBIT 21

SOCIAL SECURITY NO. _____    ATE OF BIRTH 07-20-84    SEX: ☒M ☐F

CITIZEN OF U.S.A.: YES ☒ OTHER (Name) _____

MARITAL STATUS: ☒ SINGLE    ☐ MARRIED    ☐ SEPARATED    ☐ WIDOWED    ☐ DIVORCED

NAME OF SPOUSE _____    NO. OF DEPENDENTS _____

IN EMERGENCY NOTIFY Nancy Hamm    RELATIONSHIP Mother

ADDRESS 594 CR 191, Union Springs, AL    TELEPHONE (334) 850-4252

RELATIVES WORKING FOR US: NAME _____    RELATIONSHIP _____

EDUCATION: ELEMENTARY _____ HIGH _____ COLLEGE _____ GRADUATE _____

OTHER _____

UNION MEMBER: ☐ YES ☐ NO    UNION (Local) NAME _____

| NAME | DATES | | NAME | DATES | |
| | Eligible | Enrolled | | Eligible | Enrolled |
|---|---|---|---|---|---|
| PENSION PLAN | | | GROUP INSURANCE | | |
| PROFIT SHARING | | | | | |
| CREDIT UNION | | | | | |

COMPANY TRAINING AND SPECIAL SKILLS _____

SECU__ CLEARANCE _____

# The Peble Corp

## EMPLOYMENT APPLICATION

*PLEASE PRINT ANSWERS TO THE FOLLOWING QUESTIONS CAREFULLY AND IN INK. TO BE CONSIDERED FOR EMPLOYMENT, ALL ITEMS MUST BE COMPLETED, INCLUDING SIGNATURE. THIS APPLICATION IS VALID FOR 30 DAYS. IF YOU WISH TO BE CONSIDERED FOR EMPLOYMENT AFTER THIS APPLICATION EXPIRES, THEN YOU MUST RE-APPLY.*

NAME _Forest Chance Hamm_          TELEPHONE NUMBER

ADDRESS _594 Co Rd 19E_          Home # _(334) 474-3557_

CITY _Union Springs_ STATE _Al_ ZIP _36089_     Daytime # _(334) 608-8024_

SOCIAL SECURITY NUMBER _____

**EMPLOYMENT INTERESTS:**

PLAINTIFF'S EXHIBIT 22

Type of work desired _Outdoors_

Full Time _✓_          Part Time _____     Temporary _____

Starting pay expected _Negotiable_      Date Available to start _ASAP_

**IF APPLICABLE:**

Are you willing to travel? _yes_      If yes, what percentage of the time _____

Would you be willing to relocate? _No_

Would you object to: Irregular work hours ☐ YES ☑ NO  Night work ☐ YES ☑ NO

Swing or fluctuating shift work ☐ YES ☑ NO

**SPECIAL SKILLS** - COMPLETE IF APPLICABLE TO THE POSITION FOR WHICH YOU ARE APPLYING:

Skill _Welding_          Experience _2 years_

Skill _Hunting Guide (Deer and Quail)_ Experience _4 year_

Skill _Heavy Equiment_     Experience _5 years_

Please discuss other specialized skills you feel are pertinent to the job for which you are applying _enjoy the Outdoors, meeting people and assisting the hunting guests. As well as getting ready for the season driving heavy equipment._

**UNITED STATES MILITARY SERVICE STATUS:**

Past Military Service - FROM _____ TO _____

Branch _____ Rank on discharge _____ Present Status _____

List duties and special training

_____

CONFIDENTIAL
DEFENDANT'S PROD.

0083

**EDUCATION:**

| | NAME OF SCHOOL AND LOCATION | MAJOR AREA OF STUDY and/or DEGREE RECEIVED |
|---|---|---|
| High School | Dixie Academy Louisville Alabama | |
| Jr. College, College, or University | | |
| Technical or Trade Schools | | |

Honors and Scholarships _____

Grade Average (approx.) High School _____ $B$ _____ College _____ Other _____

**eral Information:**

Are you legally authorized to work in the United States?  ☒ YES   ☐ NO  If not, what is your present status and

do you have a work visa? _____

Have you ever been convicted of a crime?  ☐ YES   ☒ NO  If yes, please explain. Give dates, charge, penalty assessed or disposition.  Conviction will not necessarily bar employment.  Consideration will be given to the nature of the crime, age at the time of offense, rehabilitation and the position for which you are applying.

_____

_____

Have you ever been discharged from a job?  ☐ YES   ☒ NO  If yes, please explain _____

_____

_____

Have you ever been bonded?  ☐ Yes   ☒ NO   If yes, when and in what job. _____

_____

_____

CONFIDENTIAL
DEFENDANT'S PROD.          0084

Do you have an active drivers license? ☐ YES ☐ NO    Issuing State _____

Drivers License # _____ Class of License _____

How long have you been a resident of this City _15 years_    State _Alabama_

How long at your present address? _2 years_ Give previous address if less than one year at present

address _____

Are you over the age of 18? ☒ YES ☐ NO If hired can you provide proof of age? ☒ YES ☐ NO

**EMPLOYMENT DATA:**

Have you ever been employed by this company before? ☐ YES ☒ NO    If yes, please give dates of

employment, position employed, and reason for leaving _____

_____

_____

Please list all jobs (if not listed above), beginning with your present or last employer and working backwards
to earlier positions.  Account for all periods, including unemployment, self-employment, and military service.
If additional space is needed, please list on a separate page or on the back of this form.

#1 DATES - From _2000_ to _2001_

Company Name, City, and State _Wheelin Sportmen NWTF  Union Springs Al_

Supervisor's Name/Title _Kirk Thomas / Founder_ SALARY - Start _8.00_ End _8.00_ hrs

Phone # _unknown_ May we contact? _yes_ Final position with the company _Grounds Keeper/Guide_

Reason for leaving? _Closed_

#2 DATES - From _2001_ to _2003_

Company Name, City, and State _Bonnie Plant Farm Union Springs Al_

Supervisor's Name/Title _Richard Brooks / Routeman_ SALARY - Start _8.00_ End _8.00_

Phone # _unknown_ May we contact? _yes_ Final position with the company _Helper_

Reason for leaving? _Seasonal_

#3 DATES - From _2003_ to _2004_

Company Name, City, and State _Great Southern Outdoors Union Spring Al_

Supervisor's Name/Title _Rex Pritchett/Owner_ SALARY - Start _a day $0.00 plus Tips_ End _____

Phone # _738-5066_ May we contact? _yes_ Final position with the company _Grounds Keeper/Guide_

Reason for leaving? _Seasonal_

CONFIDENTIAL
DEFENDANT'S PROD.    0085

#4 DATES - From _2004_ to _present_

Company Name, City, and State _C³W Industries   Union Spring Al_

Supervisor's Name/Title _Bill Moorer-Gene Combest/owner_ SALARY - Start $_9:00 hr_ End _Curre_

Phone # _738-8556_ May we contact? _yes_ Final position with the company _Supervisor_

Reason for leaving?_____

#5 DATES - From_____to_____

Company Name, City, and State_____

Supervisor's Name/Title_____ SALARY - Start____ End____

Phone #_____ May we contact?____ Final position with the company____

Reason for leaving?_____

PERSONAL REFERENCES (Not Former Employers or Relatives)

| Name and Occupation | Address | Phone Number |
|---|---|---|
| Kirk Thomas | Edgefield, South Carolina | |
| Thomas Rich | 36 Co Rd 15 Union Springs | 738-3719 |
| Bill Lee | 353 Sugar Harris Rd | 738-2591 |

The Peble Corp. is an Equal Opportunity Employer which endeavors, pursuant to all applicable Federal and State Laws, to give every applicant for employment, and every employee, equal consideration in all matters relating to employment, without regard to race, color, sex, age, religion, national origin, citizenship and disability.

By my signature below, I certify the facts set forth in this application for employment are true and complete to the best of my knowledge and belief, and I agree you may investigate my statements. I agree to permit all past employers to give any information concerning me and release them from liability in furnishing such information. I understand that my employment and, if employed, my continued employment, is conditional upon my participating in and clearing such security examinations or

investigations as may be deemed advisable by the company. I agree to participate in such examinations and investigations when requested to do so by the company, and agree that the company shall be held harmless and free from liability in connection with any security examination or investigation in which I may be involved.

I understand, if employed, false statements on this application shall result in disciplinary action up to and including discharge. Also if employed, I understand that it is the company's policy that all employees who do not have a written employment contract with the company for a specific, fixed term of employment are employed at the company's will. I understand that I would be subject to termination at any time, for any reason, with or without cause or notice.

_Foest Chaney_
Applicant's Signature

_11/22/05_
Date Signed

CONFIDENTIAL
DEFENDANT'S PROD.    0086

PAGE 04

HARRIS, Bobby

1750

PLAINTIFF'S
EXHIBIT
23
PENGAD-Bayonne, N. J.

PRINT EMPLOYEE'S NAME ON TAB
(334)

# EMPLOYEE RECORDS JACKET

**ADDRESS** 242 Orchard Lane    Fitzpatrick AL 36089  738-2502
City    State    Zip    Telephone

| POSITION HISTORY | | | | |
|---|---|---|---|---|

ROBERSON AND ROBERSON    205-871-5115    02:07    09/06/2006

| DATE | | POSITION AND DEPARTMENT | PAY RATE | |
| FROM | TO | | AMOUNT | PER |
|---|---|---|---|---|
| 1-6-05 | | Outside laborer | 7 00 | hr |
| 4/06 | | Raise | 7 50 | hr |

|  |  | City | State | Zip | Telephone |
|---|---|---|---|---|---|
|  |  | City | State | Zip | Telephone |

SOCIAL SECURITY NO. _____ DATE OF BIRTH 12-4-67   SEX: ☒M ☐F

CITIZEN OF U.S.A.: YES ☒ OTHER (Name) _____

MARITAL STATUS: ☒ SINGLE   ☐ MARRIED   ☐ SEPARATED   ☐ WIDOWED   ☐ DIVORCED

NAME OF SPOUSE _____ NO. OF DEPENDENTS _____

IN EMERGENCY NOTIFY Dianne Patterson    RELATIONSHIP Friend
ADDRESS 242 Orchid Lane Fitzpatrick AL 36089   (334) TELEPHONE 738-2502

RELATIVES WORKING FOR US: NAME _____ RELATIONSHIP _____

EDUCATION: ELEMENTARY _____ HIGH _____ COLLEGE _____ GRADUATE _____

OTHER _____

UNION MEMBER: ☐ YES ☐ NO   UNION (Local) NAME _____

| NAME | DATES | | NAME | DATES | |
| | Eligible | Enrolled | | Eligible | Enrolled |
|---|---|---|---|---|---|
| PENSION PLAN | | | GROUP INSURANCE | | |
| PROFIT SHARING | | | | | |
| CREDIT UNION | | | | | |

COMPANY TRAINING AND SPECIAL SKILLS _____

## TERMINATION INFORMATION

DATE TERMINATED _____ WOULD WE REHIRE? YES ☐ NO ☐

REASON FOR ___TION: _____

SECT. CLEARANCE

# The P_____ Corp.

RECEIVED
SEP 1 2 2005

PLAINTIFF'S
EXHIBIT
24

## EMP_____ _____ CATION

*PLEASE PRINT ANSWERS TO THE _____ _____TIONS CAREFULLY AND IN INK. TO BE CONSIDERED FOR EMPLOYMENT, ____ ____ MUST BE COMPLETED, INCLUDING SIGNATURE. THIS APPLICATION IS VALID FOR 30 DAYS. IF YOU WISH TO BE CONSIDERED FOR EMPLOYMENT AFTER THIS APPLICATION EXPIRES, THEN YOU MUST RE-APPLY.*

NAME __Jeffrey Harris__                 TELEPHONE NUMBER

ADDRESS __242 Orchid ln__          Home # __( 334 ) 738-2502__

CITY __Fitzpatrick__  STATE __Al__  ZIP __36089__   Daytime # __(   )   -__

SOCIAL SECURITY NUMBER __

EMPLOYMENT INTERESTS:

Type of work desired __Animal Care (feeding & watering) Tractor Operator__

Full Time __✓__        Part Time _____    Temporary _____

Starting pay expected _____    Date Available to start __8 26 05__

IF APPLICABLE:

Are you willing to travel? __yes__  If yes, what percentage of the time __80%__

Would you be willing to relocate? __no__

Would you object to:  Irregular work hours  ☑YES  ☐NO   Night work  ☑YES  ☐NO

Swing or fluctuating shift work  ☑YES  ☐NO

SPECIAL SKILLS - COMPLETE IF APPLICABLE TO THE POSITION FOR WHICH YOU ARE APPLYING:

Skill __Forklift__                    Experience __6 yrs__

Skill __Bush hog__                  Experience __8 yrs__

Skill __Bush hog Maintanace__    Experience __3 yrs__

Please discuss other specialized skills you feel are pertinent to the job for which you are applying _____

__hunting__

UNITED STATES MILITARY SERVICE STATUS:

Last Military Service - FROM __1985__          TO __1986__

__National gaurd__ Rank on discharge __E1__       Present Status __Same__

Last duties and special training

__Ammonition Clerk__

CONFIDENTIAL
DEFENDANT'S PROD.          0058

**EDUCATION:**

| | NAME OF SCHOOL AND LOCATION | MAJOR AREA OF STUDY and/or DEGREE RECEIVED |
|---|---|---|
| High School | Bullock Co High Shooll Sardis Rd | |
| Jr. College, College, or University | None | |
| Technical or Trade Schools | None | |

Honors and Scholarships _____ None _____

Grade Average (approx.) High School __ C __ College _____ Other _____

**General Information:**

Are you legally authorized to work in the United States? ☑ YES ☐ NO If not, what is your present status and do you have a work visa? _____

Have you ever been convicted of a crime? ☑ YES ☐ No If yes, please explain. Give dates, charge, penalty assessed or disposition. Conviction will not necessarily bar employment. Consideration will be given to the nature of the crime, age at the time of offense, rehabilitation and the position for which you are applying.

Possesion of Marigane, Misdemeanor 1994 fine paid
Rehab 1 yr

Have you ever been discharged from a job? ☐ YES ☑ NO If yes, please explain _____

Have you ever been bonded? ☐ Yes ☑ NO If yes, when and in what job. _____

CONFIDENTIAL DEFENDANT'S PROD.    0059

Do you have a valid active driver's license?    ☑ YES   ☐ NO    Issuing State Al

Drivers License #___ _____ Class of License Dm

How long have you been a resident of this City 25 yrs _____ State Al.

How long at your present address? 5yrs _____ Give previous address if less than one year at present

address_____

Are you over the age of 18? ☑ YES  ☐ NO  If hired can you provide proof of age? ☑ YES  ☐ NO

**EMPLOYMENT DATA:**

Have you ever been employed by this company before?  ☐ YES  ☑ NO   If yes, please give dates of

employment, position employed, and reason for leaving _____

_____

Please list all jobs (if not listed above), beginning with your present or last employer and working backwards
to earlier positions.  Account for all periods, including unemployment, self-employment, and military service.
If additional space is needed, please list on a separate page or on the back of this form.

#1 DATES - From 1999 _____ to 2001 _____

Company Name, City, and State Winn Dixie Mont

Supervisor's Name/Title Terry _____ SALARY - Start 9.50 End 11.25

Phone # N/A _____ May we contact? Yes Final position with the company loader

Reason for leaving? 2 Back Surgerys

#2 DATES - From 1993 _____ to 1999 _____

Company Name, City, and State Mr. turf Banks Al.

Supervisor's Name/Title Rob Cameron _____ SALARY - Start 4.50 End 8.50

Phone #_____ May we contact? yes Final position with the company Mower maintance

Reason for leaving? Financial

#3 DATES - From 1987 _____ to 1993 _____

Company Name, City, and State National Industries

Supervisor's Name/Title Wendy bronzon _____ SALARY - Start 4.25 End 4.75

Phone # N/A moved to mexico May we contact? yes Final position with the company Stock man

Reason for leaving? Financial

CONFIDENTIAL
DEFENDANT'S PROD.    0060

#4 DATES - From_____to_____

Company Name, City, and State_____

Supervisor's Name/Title _____ SALARY - Start _____End _____

Phone #_____ May we contact?_____Final position with the company_____

Reason for leaving?_____

---

#5 DATES - From_____to_____

Company Name, City, and State_____

Supervisor's Name/Title _____ SALARY - Start _____End _____

Phone #_____May we contact?_____Final position with the company_____

Reason for leaving?_____

---

PERSONAL REFERENCES (Not Former Employers or Relatives)

| Name and Occupation | Address | Phone Number |
|---|---|---|
| Henry Himmons | Rt 2 Box 9nn Union Springs Al | 334-738-4547 |
| Stan Williams | Adams Ridge | 334-738-5998 |

The Peble Corp. is an Equal Opportunity Employer which endeavors, pursuant to all applicable Federal and State Laws, to give every applicant for employment, and every employee, equal consideration in all matters relating to employment, without regard to race, color, sex, age, religion, national origin, citizenship and disability.

By my signature below, I certify the facts set forth in this application for employment are true and complete to the best of my knowledge and belief, and I agree you may investigate my statements. I agree to permit all past employers to give any information concerning me and release them from liability in furnishing such information. I understand that my employment and, if employed, my continued employment, is conditional upon my participating in and clearing such security examinations or

investigations as may be deemed advisable by the company. I agree to participate in such examinations and investigations when requested to do so by the company, and agree that the company shall be held harmless and free from liability in connection with any security examination or investigation in which I may be involved.

I understand, if employed, false statements on this application shall result in disciplinary action up to and including discharge. Also if employed, I understand that it is the company's policy that all employees who do not have a written employment contract with the company for a specific, fixed term of employment are employed at the company's will. I understand that I would be subject to termination at any time, for any reason, with or without cause or notice.

_____
Applicant's Signature

8-30-05

_____
Date Signed

CONFIDENTIAL
DEFENDANT'S PROD.        0061

CONFIDENTIAL
DEFENDANT'S PROD.
0070

Dept 851

*PRINT EMPLOYEE'S NAME ON TAB*

PLAINTIFF'S
EXHIBIT
26
PENGAD-Bayonne, N. J.

# EMPLOYEE RECORDS JACKET

## POSITION HISTORY

| DATE | | POSITION AND DEPARTMENT | PAY RATE | |
|------|------|------|------|------|
| FROM | TO | | AMOUNT | PER |
| 3/16/01 | | outside labourer | 6 50 | hr. |
| 4/1/05 | | Raise | 7 80 | hr. |
| 4/1/06 | | Raise | 8 00 | hr. |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

### TERMINATION INFORMATION

DATE TERMINATED _____ WOULD WE REHIRE? YES ☐ NO ☐

REASON FOR TERMINATION:

ADDRESS  966 Johnson St.  Union Springs, AL 36089, 738-4523

| | City | State | Zip | Telephone |

| | City | State | Zip | Telephone |

SOCIAL SECURITY NO. _____ DATE OF BIRTH 12.28.62  SEX: ☒ M ☐ F

CITIZEN OF U.S.A.: YES ☐ OTHER (Name) _____

MARITAL STATUS: ☒ SINGLE  ☐ MARRIED  ☐ SEPARATED  ☐ WIDOWED  ☐ DIVORCED

NAME OF SPOUSE _____ NO. OF DEPENDENTS  1

IN EMERGENCY NOTIFY _____ RELATIONSHIP _____

ADDRESS _____ TELEPHONE _____

RELATIVES WORKING FOR US: NAME _____ RELATIONSHIP _____

EDUCATION: ELEMENTARY _____ HIGH _____ COLLEGE _____ GRADUATE _____

OTHER _____

UNION MEMBER: ☐ YES ☐ NO  UNION (Local) NAME _____

| NAME | DATES | | NAME | DATES | |
|------|------|------|------|------|------|
| | Eligible | Enrolled | | Eligible | Enrolled |
| PENSION PLAN | | | GROUP INSURANCE | | |
| PROFIT SHARING | | | | | |
| CREDIT UNION | | | | | |

COMPANY TRAINING AND SPECIAL SKILLS _____

SECURITY CLEARANCE _____

# The Peble Corp.

## EMPLOYMENT APPLICATION

*PLEASE PRINT ANSWERS TO THE FOLLOWING QUESTIONS CAREFULLY AND IN INK. TO BE CONSIDERED FOR EMPLOYMENT, ALL ITEMS MUST BE COMPLETED, INCLUDING SIGNA- TURE. THIS APPLICATION IS VALID FOR 30 DAYS. IF YOU WISH TO BE CONSIDERED FOR EMPLOYMENT AFTER THIS APPLICATION EXPIRES, THEN YOU MUST RE-APPLY.*

NAME William Bernard Mack                    TELEPHONE NUMBER

ADDRESS 966 Johnson St                       Home # (      ) -

CITY Union Springs STATE Al       ZIP 36089  Daytime # (

SOCIAL SECURITY NUMBER _

PLAINTIFF'S EXHIBIT 27
PENGAD-Bayonne, N.J.

**EMPLOYMENT INTERESTS:**

Type of work desired_____

Full Time_____Part Time_____Temporary_____

Starting pay expected_____ Date Available to start_____

---

**IF APPLICABLE:**

Are you willing to travel?_____ If yes, what percentage of the time _____

Would you be willing to relocate?_____

---

Would you object to: Irregular work hours ☐ YES ☐ NO  Night work ☐ YES ☐ NO

Swing or fluctuating shift work ☐ YES ☐ NO

**SPECIAL SKILLS - COMPLETE IF APPLICABLE TO THE POSITION FOR WHICH YOU ARE APPLYING:**

Skill_____ Experience _____

Skill_____ Experience _____

Skill_____ Experience _____

Please discuss other specialized skills you feel are pertinent to the job for which you are applying_____

_____

**UNITED STATES MILITARY SERVICE STATUS:**

Past Military Service - FROM _____TO _____

_ranch _____ Rank on discharge _____ Present Status_____

List duties and special training

_____

**EDUCATION:**

|  | NAME OF SCHOOL AND LOCATION | MAJOR AREA OF STUDY and/or DEGREE RECEIVED |
|---|---|---|
| High School | | |
| Jr. College, College, or University | | |
| Technical or Trade Schools | | |

Honors and Scholarships _____

Grade Average (approx.)  High School _____  College _____ Other _____

**General Information:**

Are you legally authorized to work in the United States?  ☐ YES  ☐ NO  If not, what is your present status and

do you have a work visa? _____

Have you ever been convicted of a crime?  ☐ YES  ☐ NO  If yes, please explain. Give dates, charge, penalty assessed or disposition.  Conviction will not necessarily bar employment.  Consideration will be given to the nature of the crime, age at the time of offense, rehabilitation and the position for which you are applying.

_____

_____

Have you ever been discharged from a job?  ☐ YES  ☐ NO  If yes, please explain _____

_____

_____

_____

Have you ever been bonded?  ☐ Yes  ☐ NO    If yes, when and in what job. _____

_____

_____

CONFIDENTIAL
DEFENDANT'S PROD.    0072

Do you have a valid, active driver's license?   ☐ YES  ☐ NO  Issuing State _____

Drivers License #_____ Class of License_____

ᴎ long have you been a resident of this City_____ State _____

How long at your present address?_____Give previous address if less than one year at present

address_____

Are you over the age of 18?  ☐ YES  ☐ NO  If hired can you provide proof of age?  ☐ YES  ☐ NO

## EMPLOYMENT DATA:

Have you ever been employed by this company before?  ☐ YES  ☐ NO   If yes, please give dates of

employment, position employed, and reason for leaving _____

_____

_____

Please list all jobs (if not listed above), beginning with your present or last employer and working backwards to earlier positions.  Account for all periods, including unemployment, self-employment, and military service. If additional space is needed, please list on a separate page or on the back of this form.

#1 DATES - From_____ to _____

   Company Name, City, and State _____

   Supervisor's Name/Title_____SALARY - Start_____End_____

   Phone # _____ May we contact?_____Final position with the company_____

   Reason for leaving?_____

#2 DATES - From_____to _____

   Company Name, City, and State_____

   Supervisor's Name/Title_____SALARY - Start_____ End_____

   Phone #_____ May we contact?_____ Final position with the company_____

   Reason for leaving?_____

#3 DATES - From_____to _____

   Company Name, City, and State_____

   Supervisor's Name/Title_____SALARY - Start_____ End_____

   Phone #_____May we contact?_____ Final position with the company_____

   Reason for leaving?_____

CONFIDENTIAL
DEFENDANT'S PROD.   0073

#4 DATES - From_____ to _____

Company Name, City, and State_____

Supervisor's Name/Title _____ SALARY - Start _____ End _____

Phone #_____ May we contact?_____ Final position with the company_____

Reason for leaving?_____

#5 DATES - From_____ to _____

Company Name, City, and State_____

Supervisor's Name/Title _____ SALARY - Start _____ End _____

Phone #_____ May we contact?_____ Final position with the company_____

Reason for leaving?_____

## PERSONAL REFERENCES (Not Former Employers or Relatives)

| Name and Occupation | Address | Phone Number |
|---|---|---|
| | | |
| | | |
| | | |

The Pablo Corp. is an Equal Opportunity Employer which endeavors, pursuant to all applicable Federal and State Laws, to give every applicant for employment, and every employee, equal consideration in all matters relating to employment, without regard to race, color, sex, age, religion, national origin, citizenship and disability.

By my signature below, I certify the facts set forth in this application for employment are true and complete to the best of my knowledge and belief, and I agree you may investigate my statements. I agree to permit all past employers to give any information concerning me and release them from liability in furnishing such information. I understand that my employment and, if employed, my continued employment, is conditional upon my participating in and clearing such security examinations or investigations as may be deemed advisable by the company. I agree to participate in such examinations and investigations when requested to do so by the company, and agree that the company shall be held harmless and free from liability in connection with any security examination or investigation in which I may be involved.

I understand, if employed, false statements on this application shall result in disciplinary action up to and including discharge. Also if employed, I understand that it is the company's policy that all employees who do not have a written employment contract with the company for a specific, fixed term of employment are employed at the company's will. I understand that I would be subject to termination at any time, for any reason, with or without cause or notice.

x _Willie B. Mack_____
Applicant's Signature

_3-16-04_____
Date Signed

CONFIDENTIAL
DEFENDANT'S PROD.    0074

## Stub 1 — Check No. 3577

| EMPLOYEE NO. | DEPARTMENT | EMPLOYEE NAME | | | SOCIAL SECURITY NO. | PERIOD END | CHECK NO. |
|---|---|---|---|---|---|---|---|
| FOSTER | 851 | NORRIS FOSTER | | | ▮ | 050705 | 3577 |

| EARNINGS | | HRS/UNITS | CURRENT AMOUNT | YEAR TO DATE | DEDUCTIONS | CURRENT AMOUNT | YEAR TO DATE |
|---|---|---|---|---|---|---|---|
| Regular | 7.00 | 80.00 | 560.00 | 2,756.25 | FIT W/H | 0.00 | 0.00 |
| Overtime | 10.50 | 4.00 | 42.00 | 112.89 | SS | 37.33 | 177.89 |
| | | | | | Med | 8.73 | 41.60 |
| | | | | | AL W/H | 20.68 | 96.35 |

PLAINTIFF'S EXHIBIT 28

| PAY RATE | CURRENT EARNINGS | CURRENT DEDUCTIONS | NET PAY | Y.T.D. EARNINGS | Y.T.D. DEDUCTIONS | Y.T.D. NET PAY |
|---|---|---|---|---|---|---|
| | 602.00 | 66.74 | 535.26 | 2,869.14 | NOT AVAIL | NOT AVAIL |

## Stub 2 — Check No. 3614

MID STATE LAND & TIMBER CO. / PAYROLL ACCOUNT                    3614

| EMPLOYEE NO. | DEPARTMENT | EMPLOYEE NAME | | | | PERIOD END | CHECK NO. |
|---|---|---|---|---|---|---|---|
| FOSTER | 851 | NORRIS FOSTER | | | ▮ | 070205 | 3614 |

| EARNINGS | | HRS/UNITS | CURRENT AMOUNT | YEAR TO DATE | DEDUCTIONS | CURRENT AMOUNT | YEAR TO DATE |
|---|---|---|---|---|---|---|---|
| Regular | 7.00 | 80.00 | 560.00 | 4,991.00 | FIT W/H | 0.00 | 0.00 |
| Overtime | 10.50 | 17.50 | 183.75 | 538.15 | SS | 46.12 | 342.81 |
| | | | | | Med | 10.78 | 80.17 |
| | | | | | AL W/H | 27.76 | 191.65 |
| | | | | | GARNISH'T #1 | 38.08 | 152.32 |
| | | | | | GARNISH'T #2 | 15.86 | 53.44 |
| | | | | | GARNISH'T #3 | 57.69 | 230.76 |

| PAY RATE | CURRENT EARNINGS | CURRENT DEDUCTIONS | NET PAY | Y.T.D. EARNINGS | Y.T.D. DEDUCTIONS | Y.T.D. NET PAY |
|---|---|---|---|---|---|---|
| | 743.75 | 196.29 | 547.46 | 5,529.15 | NOT AVAIL | NOT AVAIL |

## Stub 3 — Check No. 3653

MID STATE LAND & TIMBER CO. / PAYROLL ACCOUNT                    3653

| EMPLOYEE NO. | DEPARTMENT | EMPLOYEE NAME | | | SOCIAL SECURITY NO. | PERIOD END | CHECK NO. |
|---|---|---|---|---|---|---|---|
| FOSTER | 851 | NORRIS FOSTER | | | ▮ | 082705 | 3653 |

| EARNINGS | | HRS/UNITS | CURRENT AMOUNT | YEAR TO DATE | DEDUCTIONS | CURRENT AMOUNT | YEAR TO DATE |
|---|---|---|---|---|---|---|---|
| Regular | 7.00 | 80.00 | 560.00 | 7,164.50 | FIT W/H | 0.00 | 0.00 |
| Overtime | 10.50 | 13.50 | 141.75 | 808.53 | SS | 43.51 | 494.33 |
| | | | | | Med | 10.18 | 115.61 |
| | | | | | AL W/H | 25.66 | 276.15 |
| | | | | | GARNISH'T #1 | 38.08 | 304.64 |
| | | | | | GARNISH'T #2 | 15.86 | 126.88 |
| | | | | | GARNISH'T #3 | 57.69 | 461.52 |

Norris Foster
0003

**3663**

| FOSTER | DEPARTMENT | 851 | NORRIS FOSTER | | 1 | JOB | 091005 | 3663 |
| EMPLOYEE NO. | | | EMPLOYEE NAME | | | | PERIOD END | CHECK NO. |

| EARNINGS | | HRS./UNITS | CURRENT AMOUNT | YEAR TO DATE | DEDUCTIONS | CURRENT AMOUNT | YEAR TO DATE |
|---|---|---|---|---|---|---|---|
| Regular | 7.00 | 78.25 | 547.75 | | FIT W/H | 0.00 | 0.00 |
| Regular | 7.00 | 8.00 | 56.00 | 7,768.25 | SS | 44.43 | 538.76 |
| Overtime | 10.50 | 10.75 | 112.88 | 921.41 | Med | 10.39 | 126.00 |
| | | | | | AL W/H | 26.41 | 302.56 |
| | | | | | GARNISH'T #1 | 38.08 | 342.72 |
| | | | | | GARNISH'T #2 | 15.86 | 142.74 |
| | | | | | GARNISH'T #3 | 57.69 | 519.21 |

PLAINTIFF'S
EXHIBIT
__28__

| PAY RATE | 716.63 | 192.86 | 523.77 | 8,689.66 | NOT AVAIL | NOT AVAIL |
| | CURRENT EARNINGS | CURRENT DEDUCTIONS | NET PAY | Y.T.D. EARNINGS | Y.T.D. DEDUCTIONS | Y.T.D. NET PAY |

---

**MID STATE LAND & TIMBER CO. / PAYROLL ACCOUNT**

**3674**

| FOSTER | DEPARTMENT | 851 | NORRIS FOSTER | | 092405 | 3674 |
| EMPLOYEE NO. | | | EMPLOYEE NAME | | PERIOD END | CHECK NO. |

| EARNINGS | | HRS./UNITS | CURRENT AMOUNT | YEAR TO DATE | DEDUCTIONS | CURRENT AMOUNT | YEAR TO DATE |
|---|---|---|---|---|---|---|---|
| Regular | 7.00 | 80.00 | 560.00 | 8,328.25 | FIT W/H | 0.00 | 0.00 |
| Overtime | 10.50 | 20.25 | 212.63 | 1,134.04 | SS | 47.08 | 585.84 |
| | | | | | Med | 11.01 | 137.01 |
| | | | | | AL W/H | 28.54 | 331.10 |
| | | | | | GARNISH'T #1 | 38.08 | 380.80 |
| | | | | | GARNISH'T #2 | 15.96 | 158.60 |
| | | | | | GARNISH'T #3 | 57.69 | 576.90 |
| | | | | | CAFE INS/PREM | 13.28 | 13.28 |

| PAY RATE | 772.63 | 211.54 | 561.09 | 9,462.29 | NOT AVAIL | NOT AVAIL |
| | CURRENT EARNINGS | CURRENT DEDUCTIONS | NET PAY | Y.T.D. EARNINGS | Y.T.D. DEDUCTIONS | Y.T.D. NET PAY |

---

**MID STATE LAND & TIMBER CO. / PAYROLL ACCOUNT**

**3686**

| FOSTER | DEPARTMENT | 851 | NORRIS FOSTER | | 00805 | 3686 |
| EMPLOYEE NO. | | | EMPLOYEE NAME | | PERIOD END | CHECK NO. |

| EARNINGS | | HRS./UNITS | CURRENT AMOUNT | YEAR TO DATE | DEDUCTIONS | CURRENT AMOUNT | YEAR TO DATE |
|---|---|---|---|---|---|---|---|
| Regular | 7.00 | 80.00 | 560.00 | 8,888.25 | FIT W/H | 0.00 | 0.00 |
| Overtime | 10.50 | 12.25 | 128.63 | 1,262.67 | SS | 41.87 | 627.71 |
| | | | | | Med | 9.79 | 146.80 |
| | | | | | AL W/H | 23.31 | 354.41 |
| | | | | | GARNISH'T #1 | 38.08 | 418.88 |
| | | | | | GARNISH'T #2 | 15.86 | 174.46 |
| | | | | | GARNISH'T #3 | 57.69 | 634.59 |
| | | | | | CAFE INS/PREM | 13.28 | 26.56 |
| | | | | | 401k Cont. | 20.66 | 20.66 |

Norris Foster
0004

| PAY RATE | 688.63 | 220.54 | 468.09 | 10,150.92 | NOT AVAIL | NOT AVAIL |
| | CURRENT EARNINGS | CURRENT DEDUCTIONS | NET PAY | Y.T.D. EARNINGS | Y.T.D. DEDUCTIONS | Y.T.D. NET PAY |

3697

| FOSTER<br>EMPLOYEE NO. | | 851<br>DEPARTMENT | NORRIS FOSTER<br>EMPLOYEE NAME | | | 102205<br>PERIOD END | 3697<br>CHECK NO. |
|---|---|---|---|---|---|---|---|
| **EARNINGS** | | HRS/UNITS | CURRENT AMOUNT | YEAR TO DATE | **DEDUCTIONS** | CURRENT AMOUNT | YEAR TO DATE |
| Regular | 7.00 | 80.00 | 560.00 | 9,448.25 | FIT W/H | 0.00 | 0.00 |
| Overtime | 10.50 | 15.25 | 160.13 | 1,422.80 | SS | 44.24 | 671.95 |
| | | | | | Med | 10.35 | 157.15 |
| | | | | | AL W/H | 25.17 | 379.58 |
| | | | | | GARNISH'T #1 | 38.08 | 456.96 |
| | | | | | GARNISH'T #2 | 15.86 | 190.32 |
| | | | | | GARNISH'T #3 | 57.69 | 692.28 |
| | | | | | CAFE INS/PREM | 6.64 | 33.20 |
| | | | | | 401k Cont. | 21.60 | 42.26 |

PLAINTIFF'S
EXHIBIT
28

| PAY RATE | 720.13<br>CURRENT EARN. | 219.63<br>CURRENT DEDUCTIONS | 500.50<br>NET PAY | 10,871.05<br>Y.T.D. EARNINGS | NOT AVAIL<br>DEDUCTIONS | NOT AVAIL<br>Y.T.D. NET PAY |
|---|---|---|---|---|---|---|

---

MID STATE LAND & TIMBER CO. / PAYROLL ACCOUNT

3708

| FOSTER<br>EMPLOYEE NO. | | 851<br>DEPARTMENT | NORRIS FOSTER<br>EMPLOYEE NAME | | | 110505<br>PERIOD END | 3708<br>CHECK NO. |
|---|---|---|---|---|---|---|---|
| **EARNINGS** | | HRS/UNITS | CURRENT AMOUNT | YEAR TO DATE | **DEDUCTIONS** | CURRENT AMOUNT | YEAR TO DATE |
| Regular | 7.00 | 80.00 | 560.00 | 10,008.25 | FIT W/H | 0.00 | 0.00 |
| Overtime | 10.50 | 15.50 | 162.75 | 1,585.55 | SS | 46.46 | 718.41 |
| TIPS | | | 33.33 | 33.33 | Med | 10.87 | 168.02 |
| | | | | | AL W/H | 26.92 | 406.50 |
| | | | | | GARNISH'T #1 | 38.08 | 495.04 |
| | | | | | GARNISH'T #2 | 15.86 | 206.18 |
| | | | | | GARNISH'T #3 | 57.69 | 749.97 |
| | | | | | CAFE INS/PREM | 6.64 | 39.84 |
| | | | | | 401k Cont. | 22.68 | 64.94 |

| PAY RATE | 756.08<br>CURRENT EARN. | 225.20<br>CURRENT DEDUCTIONS | 530.88<br>NET PAY | 11,627.13<br>Y.T.D. EARNINGS | NOT AVAIL<br>DEDUCTIONS | NOT AVAIL<br>Y.T.D. NET PAY |
|---|---|---|---|---|---|---|

---

MID STATE LAND & TIMBER CO. / PAYROLL ACCOUNT

3730

| FOSTER<br>EMPLOYEE NO. | 851<br>DEPARTMENT | NORRIS FOSTER<br>EMPLOYEE NAME | | | 120105<br>PERIOD END | 3730<br>CHECK NO. |
|---|---|---|---|---|---|---|
| **EARNINGS** | HRS/UNITS | CURRENT AMOUNT | YEAR TO DATE | **DEDUCTIONS** | CURRENT AMOUNT | YEAR TO DATE |
| BONUS | | 100.00 | 100.00 | FIT W/H | 0.00 | 0.00 |
| | | | | SS | 6.20 | 765.27 |
| | | | | Med | 1.45 | 178.97 |
| | | | | AL W/H | 0.00 | 428.87 |
| | | | | 401k Cont. | 3.00 | 87.81 |

Norris Foster
0005

| FOSTER | 851 | NORRIS FOSTER | | | 121705 | 3754 |
|--------|-----|---------------|---|---|--------|------|
| EMPLOYEE NO. | DEPARTMENT | EMPLOYEE NAME | | | PERIOD END | CHECK NO. |

| EARNINGS | HRS/UNITS | CURRENT AMOUNT | YEAR TO DATE | DEDUCTIONS | CURRENT AMOUNT | YEAR TO DATE |
|----------|-----------|----------------|--------------|------------|----------------|--------------|
| Regular  7.00 | 78.50 | 549.50 | 11,628.75 | FIT W/H | 0.00 | 0.00 |
| Overtime 10.50 | 7.75 | 81.38 | 1,792.94 | SS | 38.71 | 839.81 |
| | | | | Med | 9.06 | 196.41 |
| | | | | AL W/H | 20.84 | 468.31 |
| | | | | GARNISH'T #1 | 38.08 | 609.28 |
| | | | | GARNISH'T #2 | 15.86 | 253.76 |
| | | | | GARNISH'T #3 | 57.69 | 923.04 |
| | | | | CAFE INS/PREM | 6.64 | 59.76 |
| | | | | 401k Cont. | 18.93 | 124.28 |

| PAY RATE | CURRENT EARNINGS | CURRENT DEDUCTIONS | NET PAY | Y.T.D. EARNINGS | Y.T.D. DEDUCTIONS | Y.T.D. NET PAY |
|----------|------------------|---------------------|---------|-----------------|-------------------|----------------|
| | 630.88 | 205.81 | 425.07 | 13,605.02 | NOT AVAIL | NOT AVAIL |



PLAINTIFF'S
EXHIBIT
28

**MID STATE LAND & TIMBER CO. / PAYROLL ACCOUNT**

3767

| FOSTER | 851 | NORRIS FOSTER | | | 123105 | 3767 |
|--------|-----|---------------|---|---|--------|------|
| EMPLOYEE NO. | DEPARTMENT | EMPLOYEE NAME | | | PERIOD END | CHECK NO. |

| EARNINGS | HRS/UNITS | CURRENT AMOUNT | YEAR TO DATE | DEDUCTIONS | CURRENT AMOUNT | YEAR TO DATE |
|----------|-----------|----------------|--------------|------------|----------------|--------------|
| Regular  7.50 | 61.75 | 463.13 | | FIT W/H | 0.00 | 0.00 |
| Regular  7.50 | 8.00 | 60.00 | 523.13 | SS | 32.02 | 32.02 |
| | | | | Med | 7.49 | 7.49 |
| | | | | AL W/H | 15.62 | 15.62 |
| | | | | GARNISH'T #1 | 38.08 | 38.08 |
| | | | | GARNISH'T #2 | 15.86 | 15.86 |
| | | | | GARNISH'T #3 | 57.69 | 57.69 |
| | | | | CAFE INS/PREM | 6.64 | 6.64 |
| | | | | 401k Cont. | 15.69 | 15.69 |

Norris Foster
0006

| | 523.13 | 189.09 | | | | |

**Copy B—To Be Filed With Employee's FEDERAL Tax Return.**

39-1908647
OMB No. 1545-0008

| a Control number | 1 Wages, tips, other comp. | 2 Federal income tax withheld |
|---|---|---|
| | 13420.98 | 0.00 |
| | 3 Social security wages | 4 Social security tax withheld |
| | 13545.26 | 839.81 |
| b Employer ID no. (EIN) 64-0741681 | 5 Medicare wages and tips | 6 Medicare tax withheld |
| | 13545.26 | 196.41 |

c Employer's name, address, and ZIP code
Mid State Land & Timber Co.
2212 B Street
Meridian, Ms

39301

d Employee's social security number

e Employee's name, address, and ZIP code
NORRIS FOSTER
3282 CO RD 47
MIDWAY, AL

36053

| 7 Social security tips | 8 Allocated tips | 9 Advance EIC payment |
|---|---|---|
| 0.00 | 0.00 | 0.00 |
| 10 Dependent care benefits | 11 Nonqualified plans | 12a Code See inst. for box 12 |
| 0.00 | 0.00 | D 124.28 |
| 13 Statutory employee | 14 Other | 12b Code E 0.00 |
| Retirement plan X | | 12c Code F 0.00 |
| Third-party sick pay | | 12d Code G 0.00 |

| AL 344548 | 13420.98 | 468.31 |
|---|---|---|
| 15 State Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax |
| 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |

Form W-2 Wage and Tax Statement **2005** Dept. of the Treasury – IRS
This information is being furnished to the Internal Revenue Service.

PLAINTIFF'S EXHIBIT
PENGAD-Bayonne, N.J.

---

**Copy C—For EMPLOYEE'S RECORDS. (See Notice to Employee on back of Copy B.)**

39-1908647
OMB No. 1545-0008

| a Control number | 1 Wages, tips, other comp. | 2 Federal income tax withheld |
|---|---|---|
| | 13420.98 | 0.00 |
| | 3 Social security wages | 4 Social security tax withheld |
| | 13545.26 | 839.81 |
| b Employer ID no. (EIN) 64-0741681 | 5 Medicare wages and tips | 6 Medicare tax withheld |
| | 13545.26 | 196.41 |

c Employer's name, address, and ZIP code
Mid State Land & Timber Co.
2212 B Street
Meridian, Ms

39301

e Employee's name, address, and ZIP code
NORRIS FOSTER
3282 CO RD 47
MIDWAY, AL

36053

| 7 Social security tips | 8 Allocated tips | 9 Advance EIC payment |
|---|---|---|
| 0.00 | 0.00 | 0.00 |
| 10 Dependent care benefits | 11 Nonqualified plans | 12a Code See inst. for box 12 |
| 0.00 | 0.00 | D 124.28 |
| 13 Statutory employee | 14 Other | 12b Code E 0.00 |
| Retirement plan X | | 12c Code F 0.00 |
| Third-party sick pay | | 12d Code G 0.00 |

| AL 344548 | 13420.98 | 468.31 |
|---|---|---|
| 15 State Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax |
| 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |

Form W-2 Wage and Tax Statement **2005** Dept. of the Treasury – IRS
This information is being furnished to the IRS. If you are required to file a tax return, a negligence

---

**Copy 2—To Be Filed With Employee's State, City, or Local Income Tax Return.**

39-1908647
OMB No. 1545-0008

| a Control number | 1 Wages, tips, other comp. | 2 Federal income tax withheld |
|---|---|---|
| | 13420.98 | 0.00 |
| | 3 Social security wages | 4 Social security tax withheld |
| | 13545.26 | 839.81 |
| b Employer ID no. (EIN) 64-0741681 | 5 Medicare wages and tips | 6 Medicare tax withheld |
| | 13545.26 | 196.41 |

c Employer's name, address, and ZIP code
Mid State Land & Timber Co.
2212 B Street
Meridian, Ms

39301

e Employee's name, address, and ZIP code
NORRIS FOSTER
3282 CO RD 47
MIDWAY, AL

36053

| 7 Social security tips | 8 Allocated tips | 9 Advance EIC payment |
|---|---|---|
| 0.00 | 0.00 | 0.00 |
| 10 Dependent care benefits | 11 Nonqualified plans | 12a Code |
| 0.00 | 0.00 | D 124.28 |
| 13 Statutory employee | 14 Other | 12b Code E 0.00 |
| Retirement plan X | | 12c Code F 0.00 |
| Third-party sick pay | | 12d Code G 0.00 |

| AL 344548 | 13420.98 | 468.31 |
|---|---|---|
| 15 State Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax |
| 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |

Form W-2 Norris Foster 2005 Dept. of the Treasury – IRS

Sherry,

Here are my suggestions for 2006 raises for Sedgefields Plantation employees.  We discussed a change for Denise (hourly to salary) so I put down a figure for her.

| | |
|---|---|
| Norris Foster | $0.50 |
| Willie B. Mack | $0.50 |
| Katie Woods | $0.25 |
| Brenda Tarver | $0.25 |
| Demetrius Parhams | $0.50 |
| Jeffrey Harris | $0.50 |
| Henry Tarver | $0.50 |
| | |
| Will Hubbard | ------ part-time just started |
| Adam May | ------ part-time just started |
| | |
| Roy Lee | $1,500 |
| Joel Norman | ------ |
| | |
| Denise Pierce | Need to move from hourly to salary, $32,000/year |

Thanks,

# AMERICAN FIELD
### THE SPORTSMAN'S JOURNAL

## HISTORIC SEDGEFIELDS PLANTATION SOLD
### *Home of the National Amateur Free-for-All Championship*

Colorado Springs-based Orvis/Cushman & Wakefield announced June 9 the closing of the sale of th acre world-famous Sedgefields Plantation in Union Springs, Ala.

Sedgefields is considered one of the foremost preserves for quail hunting and boasts trophy bass fish 370+ acres of lakes. The plantation was sold for $32 million to Tolleson Land Investment Properties Alabama, LLC, which has indicated intentions to preserve the plantation as a recreational property.

The plantation was assembled in the 1920s by appliance tycoon Lewis B. Maytag, who named it Sec for the beautiful broomsedge that grows on the rolling hills of the property. Sedgefields drew celebri hunters from across the nation for decades including the likes of the late Bob Hope and Bing Crosby Renowned for its ongoing legacy as the site of the prestigious National Amateur Free-for-All Champ the plantation houses champion bird dogs in its kennels and horses in its historic barns.

Paul Broadhead of Meridian, Miss., the seller, bought the land in 1997 for about $14 million.

**Back to Homepage**



PLAINTIFF'S EXHIBIT
31
PENGAD-Bayonne, N.J.



**Sedgefields Plantation**
**Employee Organization Chart**
**March 24, 2006**



```
                        David Carroll
                       General Manager

     Denise Pierce        Roy Lee              Joel Norman
     Lodge Manager   Deer Operations Manager  Quail Operations Manager
                     Head of Grounds Crew
```

| Katie Woods<br>Cook<br>Housekeeping | Brenda Tarver<br>Cook<br>Housekeeping | Demetrius Parham<br>Farm Labor<br>Grounds Crew | Henry Tarver<br>Farm Labor<br>Grounds Crew | Chance Ham<br>Farm Labor | Will Hubbard<br>Farm Labor | Willie Mack<br>Farm Labor<br>Grounds Crew |

PLAINTIFF'S EXHIBIT 32

09/06/2006   00:11   205-871-5115   ROBERSON AND ROBERSO   PAGE   03

# The Peble Corp.

## EMPLOYMENT APPLICATION

*PLEASE PRINT ANSWERS TO THE FOLLOWING QUESTIONS CAREFULLY AND IN INK. TO BE CONSIDERED FOR EMPLOYMENT, ALL ITEMS MUST BE COMPLETED, INCLUDING SIGNATURE. THIS APPLICATION IS VALID FOR 30 DAYS. IF YOU WISH TO BE CONSIDERED FOR EMPLOYMENT AFTER THIS APPLICATION EXPIRES, THEN YOU MUST RE-APPLY.*

NAME *Corey Balkcom*                                    TELEPHONE NUMBER

ADDRESS *1114 Hwy 239*                    Home # *(334) 738-8105*

CITY *Union Springs*   STATE *Al*   ZIP *36089*   Daytime # *(334) 738-3267*

SOCIAL SECURITY NUMBER _

**EMPLOYMENT INTERESTS:**

Type of work desired _____

**PLAINTIFF'S EXHIBIT 33**

Full Time *✓*          Part Time _____          Temporary _____

Starting pay expected _____          Date Available to start *today*

**IF APPLICABLE:**

Are you willing to travel? *yes*   If yes, what percentage of the time *Most*

Would you be willing to relocate? *yes*

Would you object to:   Irregular work hours   ☐ YES   ☒ NO   Night work   ☐ YES   ☒ NO

Swing or fluctuating shift work   ☐ YES   ☒ NO

**SPECIAL SKILLS** - COMPLETE IF APPLICABLE TO THE POSITION FOR WHICH YOU ARE APPLYING:

Skill *Disel Mechanic*                    Experience *20 yrs*

Skill *welding*                    Experience *3 yrs*

Skill _____                    Experience _____

Please discuss other specialized skills you feel are pertinent to the job for which you are applying *operate heavy equipment such as, tractors, skidders, big trucks*

**UNITED STATES MILITARY SERVICE STATUS:**

Past Military Service - FROM *Sept. 1988*          TO *Dec 1997*

Branch *Marines*   Rank on discharge *E-5*          Present Status *EAS*

List duties and special training                    CONFIDENTIAL

*Enlist Instructor*

30(b)(6) Production   0070

**EDUCATION:**

| | NAME OF SCHOOL AND LOCATION | MAJOR AREA OF STUDY and/or DEGREE RECEIVED |
|---|---|---|
| High School | Bullock County High School Union Springs, Al. | |
| Jr. College, College, or University | | |
| Technical or Trade Schools | | |

Honors and Scholarships _____

Grade Average (approx.) High School _12_____ College_____Other_____

**General Information:**

Are you legally authorized to work in the United States? ☑ YES  ☐ NO If not, what is your present status and

do you have a work visa?_____

Have you ever been convicted of a crime? ☐ YES ☑ NO If yes, please explain. Give dates, charge, penalty assessed or disposition. Conviction will not necessarily bar employment. Consideration will be given to the nature of the crime, age at the time of offense, rehabilitation and the position for which you are applying.

_____

_____

Have you ever been discharged from a job? ☐ YES ☑ NO If yes, please explain _____

_____

_____

Have you ever been bonded? ☐ Yes ☑ NO If yes, when and in what job_____

_____

_____

CONFIDENTIAL

30(b)(6) Production  0071

Do you have a valid, active driver's license?    ☐ YES    ☑ NO    Issuing State _____

Drivers License # _____    Class of License _____

How long have you been a resident of this City _24 yrs_    State _24 yrs_

How long at your present address? _8 yrs_    Give previous address if less than one year at present

address _____

Are you over the age of 18?    ☑ YES    ☐ NO    If hired can you provide proof of age?    ☑ YES    ☐ NO

**EMPLOYMENT DATA:**

Have you ever been employed by this company before?    ☐ YES    ☑ NO    If yes, please give dates of

employment, position employed, and reason for leaving _____

_____

Please list all jobs (if not listed above), beginning with your present or last employer and working backwards
to earlier positions.  Account for all periods, including unemployment, self-employment, and military service.
If additional space is needed, please list on a separate page or on the back of this form.

#1 DATES - From _Dec. 1997_    to _Feb. 2004_

Company Name, City, and State _Walker Logging Co. Inc._

Supervisor's Name/Title _P. J. Walker   Owner_    SALARY - Start _$8.00ph_ End _$10.25ph_

Phone # _(334) 738-2920_   May we contact? _yes_   Final position with the company _Mechanic_

Reason for leaving? _job got slow, worked on + off up until March 2005_

#2 DATES - From _March 2005_    to _April 2005_

Company Name, City, and State _McWhorter's Auto_

Supervisor's Name/Title _Wiley McWhorter_    SALARY - Start _Very_ End _____

Phone # _____   May we contact? _yes_   Final position with the company _Mechanic_

Reason for leaving? _the pay wasn't there_

#3 DATES - From _Sept 1988_    to _Dec. 1997_

Company Name, City, and State _U.S. Marine Corps_

Supervisor's Name/Title _SSgt. Smith_    SALARY - Start _____ End _____

Phone # _____   May we contact? _____   Final position with the company _Enlisted_

Reason for leaving? _Instructer, taught Combat survial_

CONFIDENTIAL

#4 DATES - From_____ to_____

Company Name, City, and State_____

Supervisor's Name/Title _____ SALARY - Start_____End_____

Phone #_____ May we contact?_____Final position with the company_____

Reason for leaving?_____

#5 DATES - From_____ to_____

Company Name, City, and State_____

Supervisor's Name/Title _____ SALARY - Start_____End_____

Phone #_____May we contact?_____Final position with the company_____

Reason for leaving?_____

PERSONAL REFERENCES (Not Former Employers or Relatives)

| Name and Occupation | Address | Phone Number |
|---|---|---|
| Raymond Rodgers (Sheriff) | Union Springs | 334) 738-3131 |
| Danny Pierce | Union Springs | |
| Jake Wheeler (Chief Police) | Union Springs | 334) 738-313) |

The Peble Corp. is an Equal Opportunity Employer which endeavors, pursuant to all applicable Federal and State Laws, to give every applicant for employment, and every employee, equal consideration in all matters relating to employment, without regard to race, color, sex, age, religion, national origin, citizenship and disability.

By my signature below, I certify the facts set forth in this application for employment are true and complete to the best of my knowledge and belief, and I agree you may investigate my statements. I agree to permit all past employers to give any information concerning me and release them from liability in furnishing such information. I understand that my employment and, if employed, my continued employment, is conditional upon my participating in and clearing such security examinations or

investigations as may be deemed advisable by the company. I agree to participate in such examinations and investigations when requested to do so by the company, and agree that the company shall be held harmless and free from liability in connection with any security examination or investigation in which I may be involved.

I understand, if employed, false statements on this application shall result in disciplinary action up to and including discharge. Also if employed, I understand that it is the company's policy that all employees who do not have a written employment contract with the company for a specific, fixed term of employment are employed at the company's will. I understand that I would be subject to termination at any time, for any reason, with or without cause or notice.

_Corey Balkcom_
Applicant's Signature

_5/10/05_
Date Signed

CONFIDENTIAL

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Mid-State Land & Timber, Co. | | | Prepared - 2/23/2007 | | | |
| Year | | | MLT | | | Annual | Rate |
| Worked | Last Name | First Name | Div | DOH | Hours | Compensation | Hour/BiW |
| 1/1 - 12/31 | | | | | | | |
| 2005 | Armenda-Pineda | Yolanda | 2 | 12/27/2004 | 210 | 1,372.50 | 6.54 | BM |
| 2005 | Balkcom | Corey | 2 | 5/27/2005 | 92 | 686.00 | 7.00 | WM |
| 2005 | Beckwith, Jr | William H | 2 | 8/5/2005 | 389 | 3,293.00 | 8.00 | |
| 2005 | Carroll | David F | 2 | 4/18/2005 | 1,240 | 44,711.61 | 2,884.62 | |
| 2005 | Foster | Norris | 2 | 2/8/2005 | 1,671 | 12,289.51 | 7.00 | BM |
| 2005 | Harris | Jeffery | 2 | 9/16/2005 | 495 | 3,721.46 | 7.00 | BM? |
| 2005 | Howington | Stacy | 2 | 12/24/2004 | 461 | 5,018.63 | 9.00 | WM |
| 2005 | Hubbard | William | 2 | 12/9/2005 | 154 | 1,261.00 | 8.00 | BM |
| 2005 | Lee | Roy | 2 | 9/8/2000 | 2,944 | 47,230.50 | 1,538.46 | BM |
| 2005 | Mack | Willie | 2 | 4/2/2004 | 2,167 | 17,126.03 | 7.50 | ? |
| 2005 | Nopal | Dorotea | 2 | 3/5/2004 | 44 | 309.75 | 7.00 | JM |
| 2005 | Norman | Joel S | 2 | 10/14/2005 | 360 | 12,115.40 | 2,692.31 | BM |
| 2005 | Parhams | Demetius | 2 | 7/23/2004 | 2,133 | 15,746.79 | 7.00 | WF |
| 2005 | Pierce | Denise | 2 | 9/6/2002 | 2,330 | 29,243.10 | 11.50 | Hisp. |
| 2005 | Tirado | Griselda | 2 | 11/19/2003 | 254 | 1,887.38 | 7.00 | BF |
| 2005 | Traver | Brenda | 2 | 1/16/2005 | 1,816 | 15,105.00 | 8.00 | BM |
| 2005 | Traver | Henry L | 2 | 6/24/2005 | 1,041 | 7,634.39 | 7.00 | |
| 2005 | Walker | Charlie | 2 | 10/15/2004 | 360 | 2,012.40 | 5.59 | BF |
| 2005 | Woods | Katie Mae | 2 | 1/16/2005 | 1,829 | 17,244.54 | 9.00 | |
| 1/1 - 12/31 | | | | | | | |
| 2006 | Carroll | David F | 2 | 4/29/2005 | 923 | 33,290.66 | 2,884.40 | WM |
| 2006 | Foster | Norris | 2 | 9/14/1999 | 70 | 523.13 | 7.50 | BM |
| 2006 | Hamm | Forest | 2 | 1/20/2006 | 865 | 7,420.00 | 8.00 | WM |
| 2006 | Harris | Jeffery | 2 | 9/15/2005 | 130 | 973.13 | 7.50 | BM |
| 2006 | Hubbard | William | 2 | 12/9/2005 | 826 | 7,192.00 | 8.00 | WM |
| 2006 | Lee | Roy | 2 | 9/8/2000 | 1,009 | 20,285.35 | 1,600.90 | BM |
| 2006 | Mack | Willie | 2 | 4/2/2004 | 939 | 7,647.72 | 8.00 | BM |
| 2006 | May | Joseph | 2 | 12/9/2005 | 59 | 470.00 | 8.00 | WM |
| 2006 | Norman | Joel S | 2 | 10/14/2005 | 907 | 30,561.84 | 2,692.30 | WM |
| 2006 | Parhams | Demetius | 2 | 7/23/2004 | 1,088 | 8,749.08 | 7.50 | BM |
| 2006 | Pierce | Denise | 2 | 9/6/2002 | 1,082 | 16,656.93 | 1,230.77 | WF |
| 2006 | Tarver | Henry | 2 | 6/24/2005 | 1,180 | 9,508.53 | 7.50 | BM |
| 2006 | Tarver | Brenda | 2 | 2/4/2005 | 1,068 | 9,255.21 | 8.25 | BF |
| 2006 | Woods | Katie Mae | 2 | 2/4/2005 | 1,097 | 10,601.40 | 9.25 | BF |



PLAINTIFF'S
EXHIBIT
34

CONFIDENTIAL



PLAINTIFF'S
EXHIBIT
35

| 1/1 - 12/31 | | | | | | | |
|---|---|---|---|---|---|---|---|
| 2003 | Dickey | Anthony | 2 | 5/24/2003 | 1,526 | 14,835.92 | 8.50 | WM |
| 2003 | Lee | Joseph | 2 | 4/5/2002 | 672 | 4,458.21 | 6.50 | BM |
| 2003 | Lee | Roy | 2 | 9/8/2000 | 3,119 | 37,213.29 | 11.00 | BM |
| 2003 | Pierce | Denise | 2 | 9/6/2002 | 1,178 | 12,098.75 | 10.00 | WF |
| 2003 | Rosales | Rosa | 2 | 12/2/2003 | 122 | 701.33 | 5.65 | |
| 2003 | Ryan III | Anthony | 2 | 3/19/2003 | 663 | 4,373.71 | 6.50 | |
| 2003 | Silva | Manuel | 2 | 11/9/2003 | 234 | 1,559.50 | 6.00 | |
| 2003 | Sykes | Charles | 2 | 2/1/2003 | 1,380 | 10,615.42 | 461.54 | WM |
| 2003 | Terrell | Kevin | 2 | 10/20/2003 | 242 | 1,552.00 | 6.00 | |
| 2003 | Tirado | Griselda | 2 | 11/19/2003 | 192 | 1,291.00 | 6.00 | Hisp. F. |

| 1/1 - 12/31 | | | | | | | |
|---|---|---|---|---|---|---|---|
| 2004 | Cisneros | Fortino | 2 | 4/2/2004 | 611 | 4,092.58 | 6.50 | Hisp. M. |
| 2004 | Dickey | Anthony | 2 | 5/24/2003 | 670 | 6,441.34 | 8.50 | WM |
| 2004 | Howington | Stacy | 2 | 12/24/2004 | 142 | 1,557.00 | 9.00 | |
| 2004 | Lee | Roy | 2 | 9/8/2000 | 3,452 | 45,744.69 | 11.00 | BM |
| 2004 | Mack | Willie | 2 | 4/2/2004 | 1,732 | 12,461.79 | 7.00 | BM |
| 2004 | Martinez | Sonya G. | 2 | 2/6/2004 | 93 | 559.50 | 6.00 | |
| 2004 | Montiel | Oscar | 2 | 8/20/2004 | 78 | 511.88 | 6.50 | |
| 2004 | Nopal | Dorotea | 2 | 3/5/2004 | 1,880 | 12,938.35 | 7.00 | |
| 2004 | Parhams | Demetius | 2 | 7/23/2004 | 1,054 | 7,274.39 | 6.50 | BM |
| 2004 | Pierce | Denise | 2 | 9/6/2002 | 1,581 | 17,179.09 | 10.75 | WF |
| 2004 | Rosales | Rosa | 2 | 12/2/2003 | 270 | 1,382.80 | 6.25 | |
| 2004 | Secundino | Raul | 2 | 4/2/2004 | 800 | 5,460.21 | 7.00 | |
| 2004 | Silva | Manuel | 2 | 11/9/2003 | 28 | 168.00 | 6.00 | |
| 2004 | Sykes | Charles | 2 | 2/1/2003 | 1,500 | 11,688.50 | 461.54 | WM |
| 2004 | Terrell | Kevin | 2 | 10/20/2003 | 925 | 5,582.25 | 6.00 | |
| 2004 | Tirado | Griselda | 2 | 11/19/2003 | 2,155 | 14,145.62 | 7.00 | Hisp. F. |
| 2004 | Walker | Charlie | 2 | 10/15/2004 | 640 | 3,677.60 | 5.59 | |

CONFIDENTIAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

JEFFREY HARRIS, WILLIE )
BERNARD MACK, DEMETRIUS )
PARHAM and HENRY TARVER, )
                     )
      **Plaintiffs** )
                     )
**v.** )
                     )
MID-STATE LAND & TIMBER )
COMPANY, INC., d/b/a )
SEDGEFIELDS PLANTATION, )

      **Defendant.**

Civil Action No.:

**2:06-cv-875-ID-CSC**

**PLAINTIFF'S EXHIBIT**
**36**

---

### DECLARATION OF ROY LEE

My name is Roy Lee. I am a Plaintiff in the above action. I claim that Mid-State has treated me unfairly in the terms and conditions of my employment. I believe that I have been discriminated against on account of my race as concerns my compensation from Mid-State. I worked for them from the year 2000 until Mid-State was sold in May 2006.

I was initially hired at $6.00 per hour as a laborer. I worked continuously for Mid-State until they were sold. I was promoted and received raises. I was made a member of management around the year 2004. I was paid by the hour even after I was a member of management.

I was over the entire plantation including all hunting operations at Sedgefields before the hiring of David Carroll in April 2005. I ran both the deer and quail hunting operations. I have taken numerous guests on quail hunts.

I have pre-released birds which is putting out wild birds before the hunting season. I have also put and take which is releasing birds the day of the hunt.

I was put on a salary in 2005 of $41,000.00 annually. I made more than that as an hourly worker in 2004. I have never been offered lodging on the property. Mid-State did not provide my health insurance and it has never been offered to me. I know that Joel Norman had his health insurance paid for by Mid-State. Norman also lived on the property at Mid-State. He received an annual salary of $70,00.00 per year. I worked more hours than any employee at Mid-State. I worked far in excess of the hours that Norman did.

I am a high school graduate. I worked at Columbus Mills for approximately 18-19 years. I was a supervisor of over 32 people when the Mill closed in Union Springs.

I can operate heavy equipment. I have operated backhoes, bulldozers, tractors, and numerous other pieces of equipment at Mid-State.

I recommended Henry Tarver a black male, to Carroll to hire as a night watchman in June of 2005. Tarver was hired as a laborer at $7.00 per hour. Carroll later hired Beckwith, a white male, as a laborer and night watchman at an hourly rate of $8.00 per hour. During the time that I had worked at Mid-State, no black has maintained a residence on the property at Sedgefields Plantation.

I declare pursuant to 28 U.S.C. §1746, under penalty of perjury that the following statement is true and correct.

Executed by Roy Lee on this the 7th day of April, 2007.

Roy Lee

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| JEFFREY HARRIS, WILLIE BERNARD MACK, DEMETRIUS PARHAM and HENRY TARVER, | ) ) ) ) | |
| **Plaintiffs** | ) ) | **Civil Action No.:** |
| | ) | **2:06-cv-875-ID-CSC** |
| **v.** | ) ) | |
| MID-STATE LAND & TIMBER COMPANY, INC., d/b/a SEDGEFIELDS PLANTATION, | ) ) ) | |
| **Defendant.** | | |

PLAINTIFF'S EXHIBIT 37

## DECLARATION OF NORRIS FOSTER

My name is Norris Foster. I am a Plaintiff in a race discrimination claim against Mid-State Land and Timber. I have worked on Sedgefields Plantation for many years. I was working there when Mid-State acquired it in 1999. I worked for Mid-State until I was laid off in a force reduction in the year 2001.

I was rehired by Mid-State in February 2005. Roy Lee offered me a job. I had approximately 10 years experience preparing fields for hunting, driving a tractor, and working in a hunting crew when I was rehired in February 2005. I have been on numerous quail hunts with Roy Lee. He is an experienced dog handler and an outstanding guide for quail hunts. I think he is a better guide than Joel Norman. I was more successful when I worked in his crew and we received larger tips when I worked in his crew. At least I received the portion of my tips when I worked with Roy.

I declare pursuant to 28 U.S.C. §1746, under penalty of perjury, that the following

statement is true and correct.

Executed by Norris Foster on this the 7th day of April, 2007.

Norris Foster



01-03-06

# MEMO

To: File
From: David Carroll

Re: Norris Foster

Norris Foster was dismissed as an employee from Sedgefields Plantation on December 29 at approximately 3 PM. Joel Norman his supervisor accompanied me to the barn where Norris was cleaning stalls/barn. I informed Norris that it was obvious he was not happy working at Sedgefields based on his attitude and job performance, and that today was his last day at work at the Plantation. He asked if he was being fired and I told him, yes, and please turn in his keys.

As I was leaving the barn, I heard him talking in a raised voice to Joel, so I stepped back in the barn to see if I was needed. Norris told me that Suzanne had hired him and that this would not be the last I heard from him. I asked Norris what he meant and he replied "that is what lawyers are for." He then went on to say the reason he was being fired was because of his skin color. I let him know that I was sorry he felt that way and then he left.

Norris was reprimanded on 12-6-05 for stopping work and riding horses for an hour or so. He was supposed to be in the barn clipping horses but quit and without permission from his supervisor Joel Norman saddled a horse and with Jeff Harris went riding.

On several quail hunts Norris has displayed a negative attitude. He has made derogatory about quail hunts in front of guests.

Norris has complained to me that they were not receiving HOT meals for lunch while they were between morning and afternoon quail hunts. Sack lunches were delivered to the employees who did not have an opportunity to clock out and go to town.

Norris has called me after hours on the company radio complaining and wanting to know where his cash tip money was from guests of the most recent quail hunt. He has implied that I was keeping tip money from him, when in fact time was needed so that correct change could be obtained. All of these complaints came after I had sent a Memo to all employees regarding tips and how they would be dispersed.

Joel has brought to my attention on several occasions that Norris and others when instructed to "chop" an area, would claim they were finished and then upon inspection were not.

CONFIDENTIAL
DEFENDANT'S PROD.          0021

EXHIBIT    5

# Condensed Transcript

# Deposition of
# David Carroll

**taken on
March 27, 2007**

**Jeffrey Harris, Willie Bernard Mack, Demetrius Parham and Henry
Tarver**

**v.**

**Mid-State Land and Timber Company, Incorporated, d/b/a
Sedgefields Plantation**

**Case No. 2:06-cv-875-ID-CSC**



**Certified Court Reporters and Certified Legal Video Specialists
334.262.3332  1.888.253.DEPS
Email: depo@baker-baker.com
www.baker-baker.com**

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


JEFFREY HARRIS, WILLIE

BERNARD MACK, DEMETRIUS

PARHAM and HENRY TARVER,

     Plaintiffs,

vs.          CASE NO. 2:06-cv-875-ID-CSC

MID-STATE LAND AND TIMBER

COMPANY, INCORPORATED,

d/b/a SEDGEFIELDS PLANTATION,

     Defendant.


\*    \*    \*    \*    \*    \*    \*    \*


    The videotaped deposition of DAVID

CARROLL was taken before Cornelia J.

Baker, Certified Court Reporter and

Certified Shorthand Reporter, as

Commissioner, on Tuesday, March 27, 2007,

commencing at approximately 12:22 p.m., in

the law offices of Huckaby, Scott & Dukes,

2100 Third Avenue North, Suite 700,

Birmingham, Alabama, pursuant to the

stipulations set forth herein.

Page 2

```
 1    *   *   *   *   *   *   *
 2            APPEARANCES
 3
 4   Representing the Plaintiffs:
 5       MR. JERRY D. ROBERSON
         Attorney at Law
 6       Roberson & Roberson
         8 Office Park Circle, Suite 150
 7       Birmingham, Alabama  35223
 8       MR. ALBERT ADAMS
         Attorney at Law
 9       Irby Law Firm, L.L.C.
         257 West Broad Street
10       Eufaula, Alabama  36027
11
12   Representing the Defendant:
13       MR. CARTER H. DUKES
         Attorney at Law
14       Huckaby, Scott & Dukes
         Concord Center, Suite 700
15       2100 Third Avenue North
         Birmingham, Alabama  35203
16
17
18   Also present:
19       Mr. Jeff Baker, CLVS
20
21
22
23
24
25
```

Page 3

```
 1
 2    *   *   *   *   *   *   *
 3
 4           STIPULATIONS
 5
 6       It is hereby stipulated and agreed by
 7   and between counsel representing the
 8   parties that the videotaped deposition of
 9   DAVID CARROLL is taken pursuant to the
10   Rules of Civil Procedure, and that said
11   deposition may be taken before Cornelia J.
12   Baker, Certified Court Reporter, as
13   Commissioner, without the formality of a
14   commission; that objections to questions,
15   other than objections as to the form of
16   the questions, need not be made at this
17   time, but may be reserved for a ruling at
18   such time as the deposition may be offered
19   into evidence, or used for any other
20   purpose by either party hereto, provided
21   by the Statute.
22       It is further stipulated and agreed by
23   and between counsel representing the
24   parties in this case, that the filing of
25   the videotaped deposition of DAVID CARROLL
```

Page 4

```
 1   is hereby waived, and that said deposition
 2   may be introduced at the trial of this
 3   case or used in any other manner by either
 4   party hereto provided for by the Statute,
 5   regardless of the waiving of the filing of
 6   same.
 7       It is further stipulated and agreed by
 8   and between counsel and the witness that
 9   the reading and signing of the deposition
10   by the witness is hereby waived.
11
12    *   *   *   *   *   *   *   *
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1    *   *   *   *   *   *   *   *
 2            INDEX
 3
 4   EXAMINATION              PAGE
 5   BY MR. ROBERSON:          8
     BY MR. DUKES:           114
 6
 7   EXHIBIT                  PAGE
 8   Plaintiffs' Exhibit No. 1 .......... 12
        2002 Form 1099 on Donna Monroe
 9      Davison
10   Plaintiffs' Exhibit No. 2 .......... 13
        2003 Form 1099 on Donna Monroe
11      Davison
12   Plaintiffs' Exhibit No. 3 .......... 14
        2004 Form 1099 on Donna Monroe
13      Davison
14   Plaintiffs' Exhibit No. 4 .......... 14
        2005 Form 1099 on Donna Monroe
15      Davison
16   Plaintiffs' Exhibit No. 5 ......... 33
        0036, Mid-State Land & Timber
17      Company document prepared 2/23/07
18   Plaintiffs' Exhibit No. 6 .......... 37
        0070-0073, 5/10/05 employment
19      application of Corey Balkcom
20   Plaintiffs' Exhibit No. 7 .......... 38
        0078, 5/23/05 Mid-State Land and
21      Timber Employee Information filled
        out by hiring manager on Corey
22      Balkcom
23   Plaintiffs' Exhibit No. 8 .......... 42
        0001, Mid-State Land & Timber New
24      Management Structure
25
```

Page 6

1
Plaintiffs' Exhibit No. 9 .......... 43
2    0002, Sedgefields Plantation
     Employee Organization Chart,
3    March 24, 2006
4  Plaintiffs' Exhibit No. 10 .......... 44
     12/02/2004, Management Structure
5    Revision
6  Plaintiffs' Exhibit No. 11 .......... 60
     0035
7
   Plaintiffs' Exhibit No. 12 .......... 82
8    0089-0093
9  Plaintiffs' Exhibit No. 13 .......... 92
     0095-0106
10
   Plaintiffs' Exhibit No. 14 .......... 93
11   3/19/07 Declaration by Anthony J.
     Dickey
12
   Plaintiffs' Exhibit No. 15 .......... 104
13   Re-Notice of Deposition of
     Mid-State Land and Timber
14
15
16
17
18
19
20
21
22
23
24
25

Page 8

```
 1        immediately following, we'll
 2        have the swearing-in of the
 3        Witness.
 4        MR. ROBERSON:  My name is Jerry
 5        Roberson.  I represent the
 6        Plaintiffs.
 7        MR. ADAMS:  Albert Adams, counsel
 8        for Plaintiffs.
 9        MR. DUKES:  My name is Carter
10        Dukes, and I represent
11        Mid-State.
12        MR. CARROLL:  David Carroll,
13        corporate representative.
14        DAVID CARROLL,
15  The Witness, having first been duly sworn
16  or affirmed to speak the truth, the whole
17     truth, and nothing but the truth,
18        testified as follows:
19        MR. ROBERSON:  Is he going to
20        waive signature, Carter?
21        MR. DUKES:  Yeah, that will be
22        fine.
23        EXAMINATION
24  BY MR. ROBERSON:
25        Q.  Mr. Carroll, I've met you before.
```

Page 7

```
 1        THE VIDEOGRAPHER:  We are now on
 2        the Record.  Today is
 3        March 27th, 2007.  The time
 4        is 12:22 p.m.
 5            This is the video-
 6        taped deposition of
 7        Mr. David Carroll, 30(b)(6)
 8        corporate representative for
 9        Mid-State Land and Timber
10        Company, Incorporated.
11            We are here in the
12        matter of Jeffrey Harris, et
13        cetera, Plaintiffs, versus
14        Mid-State Land and Timber
15        Company, Incorporated, doing
16        business as Sedgefields
17        Plantation, Civil Action No.
18        206-cv-875-ID-CSC in the
19        U.S. District Court for the
20        Middle District of Alabama,
21        Northern Division.
22            At this time all
23        persons present will state
24        their name and affiliation
25        with this case, and
```

Page 9

```
 1  I'm Jerry Roberson.  I represent the
 2  Plaintiffs in this case.  And today you have
 3  been designated as the corporate represent-
 4  ative for Mid-State Land and Timber Company,
 5  Inc.; is that correct?
 6        A.  Yes, sir.
 7        Q.  And did you formally work for
 8  them?
 9        A.  Yes, sir.
10        Q.  In what capacity?
11        A.  I was the plantation manager at
12  Sedgefields Plantation.
13        Q.  During what period of time, sir?
14        A.  I started work there, I believe,
15  April 15th, 2005.
16        Q.  Until what date?  Until they were
17  sold?
18        A.  Until they were sold, that's
19  correct, in 2006.
20        Q.  And they sold in May of 2006?
21        A.  I believe May 19th.
22        Q.  So you were there for a little
23  over a year; is that correct?
24        A.  Yes, sir.
25        Q.  Now, I'm going to ask you some
```

Page 10

1  questions about employees that worked at the
2  Mid-State Land and Timber operation in
3  Bullock County, and that's also known as
4  Sedgefields Plantation, correct?
5      A. Yes, sir.
6      Q. Now, I know you didn't work
7  there, didn't arrive there until April of
8  2005, and I'm asking about a time period
9  before then. Have you looked at records to
10  help you gain familiarity and knowledge about
11  those employees?
12      A. I have.
13      Q. And you've produced documents or
14  Mid-State has produced documents today,
15  correct?
16      A. Correct.
17      Q. Now, I want to show you some
18  documents that I already have from another
19  case about Mid-State Land and Timber Company.
20          Did you sign some interrogatory
21  responses in another case, verification? Do
22  you recall that?
23      A. Yes. I have.
24      Q. Yeah. You know I represent
25  Norris Foster as well, correct?

Page 11

1      A. I do.
2      Q. And I took your deposition in the
3  Norris Foster case, correct?
4      A. Correct.
5      Q. Okay. Well, Mr. Carroll, who was
6  the manager at Mid-State before you?
7      A. I believe the manager would be
8  Donna Davidson -- Davison. Excuse me.
9      Q. I'm sorry. What's the last name?
10      A. D-A-V-I-S-O-N.
11      Q. Davison?
12      A. Yes.
13      Q. And do you know what period of
14  time that she was the manager at Mid-State?
15      A. I'd probably have to look back in
16  the records to see when she began.
17      Q. And let me assure you that I
18  don't mind you looking at any of those
19  documents. If you would, I just want the
20  answer to that question. So if you need to
21  look at documents to help you with that, I
22  don't object to that.
23          (Witness reviewed document.)
24      A. I would guess she started in
25  2002.

Page 12

1      Q. And do you know what her earnings
2  were in 2002? Do you have a W-2 form for
3  her?
4      A. I have a 1099.
5      Q. Well, was she not an employee in
6  2002?
7      A. The only documents --
8          MR. DUKES: Object to the form.
9      A. The only documents that I have
10  are 1099s for her.
11      Q. Okay. And your documents are
12  Bates-stamped. Would you tell me what number
13  you're looking at, please, sir?
14      A. This is page eight.
15      Q. Okay. I'm going to mark as
16  Plaintiffs' Exhibit 1 this document. And are
17  you -- Donna Monroe Davison, a 2002 1099 from
18  Mid-State Land and Timber Company shows that
19  she made, in the year 2002, $35,796; is that
20  correct?
21          (Whereupon Plaintiffs' Exhibit
22              No. 1 was marked for
23              identification and attached
24              hereto.)
25      A. That is correct.

Page 13

1      Q. Now, we don't know when she
2  started working in 2002, correct?
3      A. I do not.
4      Q. So that may not be a full year,
5  right?
6      A. That's correct.
7      Q. And then I'll show you what I've
8  marked as Exhibit 2, which is a 1099 from
9  Mid-State to Donna Davison for the year 2003.
10  And it shows in that year she earned $54,490;
11  is that correct?
12          (Whereupon Plaintiffs' Exhibit
13              No. 2 was marked for
14              identification and attached
15              hereto.)
16      A. That is correct.
17      Q. Did she work on-site, that is, in
18  Bullock County?
19      A. She did.
20      Q. Did she live on the property?
21      A. She did.
22      Q. Okay. So in addition to this
23  compensation -- it doesn't appear that she's
24  an employee; that is, she's getting a 1099 --
25  she also received housing; is that fair?

Page 14

1      A. I think she did, yes.
2      Q. Okay. And did she have a
3  vehicle? Do you know?
4      A. I don't know.
5      Q. Okay. I'm going to show you what
6  I've marked as Plaintiffs' Exhibit 3 and ask
7  you if this is Mrs. Davison's 1099 for the
8  year 2004? And, if you would, tell me what
9  she earned as 1099 compensation in that year.
10         (Whereupon Plaintiffs' Exhibit
11            No. 3 was marked for
12            identification and attached
13            hereto.)
14     A. $66,507.34.
15     Q. Now let me show you Plaintiffs'
16  Exhibit 4. This is for the year 2005. And
17  Mrs. Davison, did she leave Mid-State Land
18  and Timber? If you came in April of 2005,
19  did she leave sometime before that?
20         (Whereupon Plaintiffs' Exhibit
21            No. 4 was marked for
22            identification and attached
23            hereto.)
24     A. She did.
25     Q. Do you know where she went to

Page 15

1  work --
2      A. No.
3      Q. -- or what she did?
4      A. I don't know.
5      Q. Do you know if she did anything
6  that would entitle her to compensation from
7  Mid-State after she left Sedgefields?
8      A. I don't know.
9      Q. Well, in 2005 -- I'll show you
10  her 1099 and ask you what amount of
11  compensation did she receive in 2005?
12     A. $33,717.44.
13     Q. And you don't know what time
14  period that's for, but you do agree with me
15  that she stopped working before you arrived
16  in April 15th?
17     A. That's correct.
18     Q. Okay. Now, do you know what
19  Mrs. Davison's duties were?
20     A. Mrs. Davison was hospitality
21  manager and timber manager.
22     Q. Well, do you know what her
23  qualifications were for that position?
24     A. The only thing that I know is
25  that she has a two-year degree in forest

Page 16

1  management.
2      Q. How do you know that?
3      A. Spoke with Ms. Sherry Howell and
4  informed me of that.
5      Q. Who is Ms. Howell?
6      A. She is an employee of Mid-State
7  Land and Timber.
8      Q. Do you have any document, resume,
9  or application or anything for Mrs. Davison?
10     A. I don't.
11     Q. So do you know where her two-year
12  degree is from?
13     A. I don't know which school it's
14  from, no, sir.
15     Q. Do you know if she'd ever worked
16  in the timber industry before?
17     A. I don't.
18     Q. Do you know anything about her
19  prior job experience or her qualifications?
20     A. No, sir.
21     Q. And Mrs. Davison was married to
22  Byron Davison, correct?
23     A. That is correct.
24     Q. Now, are they related by blood or
25  marriage to the owner of Mid-State Land and

Page 17

1  Timber?
2      A. Mrs. Donna is. Was by marriage,
3  yes.
4      Q. All right. Can you explain how
5  she's related?
6      A. Mr. Broadhead's wife, her
7  brother, it was -- that was her husband.
8      Q. Was she at one time married to
9  her brother?
10     A. She was married to Mrs. Broad-
11  head's brother.
12     Q. Right. And she got a divorce and
13  married Mr. --
14     A. He died of a heart attack.
15     Q. Okay. And after his death, she
16  remarried Byron Davison?
17     A. Yes.
18     Q. Is that correct?
19     A. That's correct.
20     Q. So she was a sister-in-law by
21  marriage, correct?
22     A. Correct.
23     Q. Now, did Byron Davison also work
24  at Mid-State?
25     A. He did.

Page 18

1    Q.  And what was his job?
2    A.  His position was hunt manager.
3    Q.  Okay.  Well, do we know what he
4  made at Mid-State?  I've got a W -- I mean, a
5  1099 for him for 2003 and 2002.  It's Bates
6  No. 9 and -- 8 and 9.  Do you see that he
7  made 14,897 in 2002?
8         (Witness reviewed document.)
9    A.  Yes.
10    Q.  Do you see that?
11    A.  Yes.
12    Q.  And how much did he make in 2003?
13    A.  $36,961.67.
14    Q.  Okay.  Well, but that's -- and he
15  was provided housing as well?
16    A.  Well --
17    Q.  Did he live on the property?
18    A.  I assume, since he was married to
19  Mrs. Davison.
20    Q.  Okay.  Do we know what his duties
21  and responsibilities were?
22    A.  Well, hunt manager is responsible
23  for assigning guests to particular stands
24  where they hunt, to taking care of those
25  guests to and from the hunts; would have a

Page 19

1  relationship, obviously, with the hospitality
2  manager in making sure the clients got to and
3  from the lodge to the stands and the fields
4  and everything that was around the hunting
5  part of it, the deer hunting part of it.
6    Q.  Would Donna Davison hire people?
7  Did she have hiring and firing ability?
8    A.  Yes.
9    Q.  Would she hire the guides, the
10  people that actually took the people on
11  hunts?
12    A.  I don't know that.
13    Q.  See, that's -- I don't know
14  either.  Would her husband, the hunt manager,
15  do that?  You don't know?
16    A.  I don't know.
17    Q.  Now, do you know when Mr. Byron
18  Davison left the employ of Mid-State, because
19  I don't have anything after 2003 showing he
20  worked there?
21    A.  I don't know.
22    Q.  But we know Mrs. Davison didn't
23  leave until 2005, correct?
24    A.  That's correct.
25    Q.  Well, do you know where he was

Page 20

1  during that period of time?
2    A.  I don't.
3    Q.  Does anybody at Mid-State Land
4  and Timber?
5    A.  Not to my knowledge.
6    Q.  Do you know what Byron Davison's
7  qualifications were?
8    A.  I don't.
9    Q.  Don't know the level of his
10  education?
11    A.  No.
12    Q.  Sir?
13    A.  No, sir.
14    Q.  Do you have a job application for
15  him?
16    A.  I do not.
17    Q.  Any personnel records for him?
18    A.  Nothing, no more than we have
19  right here in front of us.
20    Q.  The only thing I have is a 1099.
21    A.  That would be it, I guess.
22    Q.  Okay.  Don't know his age?
23    A.  No, sir.
24    Q.  Wouldn't know his race?  He was
25  white, wasn't he?

Page 21

1    A.  I believe he was, yes, sir.
2    Q.  Okay.  Did you ever meet Byron
3  Davison?
4    A.  No, sir.
5    Q.  Well, do you know how Mid-State
6  could not have an application or a resume or
7  anything on these people?
8    A.  I'm assuming since Mrs. Davison
9  was married into the family, they knew all
10  about her and her husband.
11    Q.  Who's "they"?
12    A.  It would be Mr. Broadhead.
13    Q.  Have you talked to Mr. Broadhead
14  about them?
15    A.  No, sir.
16    Q.  Have you tried to get any
17  information about Byron or Donna Davison?
18    A.  No, sir.
19    Q.  Do you know what the arrangement
20  was?  Was there just a contractual
21  arrangement with these people?
22    A.  I don't know.
23    Q.  You don't know how they were paid
24  other than what's reflected on the 1099?
25    A.  That's all I know, is what's

1 reflected on the 1099.
2     Q. Well, do you know my client, Roy
3 Lee?
4     A. I do.
5     Q. Is he a black man?
6     A. Yes, he is.
7     Q. Other than Roy Lee, has there
8 ever been a black man who worked in
9 management at Mid-State Land and Timber
10 Company.
11     A. Not that I'm aware of.
12     Q. Well, are you aware -- at one
13 time, Roy Lee, while he worked in management,
14 was paid by the hour, correct?
15     A. That's correct.
16     Q. And I think initially he made $11
17 an hour, correct?
18     A. Correct.
19     Q. And then he made -- got a raise
20 to $12 an hour, right?
21     A. I'd have to look at the
22 documents, but I believe you.
23     Q. Okay. Well, has there ever been
24 anybody else in management that's ever been
25 paid by the hour?

1     A. Not based on the documents I have
2 in front of me -- well, no, I'll take that
3 back. Denise Pierce was paid hourly.
4     Q. What is Denise Pierce's job?
5     A. Denise Pierce is a lodge manager,
6 office manager.
7     Q. Okay. And what are her responsi-
8 bilities?
9     A. Her responsibilities are all
10 duties of running the office; of maintaining
11 the lodge so that it's in good shape, keeping
12 it stocked and the kitchen stocked with
13 necessary items; managing the personnel, the
14 ladies that cook and clean.
15     Q. What was Ms. Pierce's hourly
16 rate?
17     A. I'd have to go back and look and
18 see the documents.
19     Q. Well, please do.
20        (Witness reviewed document.)
21     A. Initially, Denise made $10 an
22 hour.
23     Q. When was that? What year was
24 that?
25     A. 2003.

1     Q. Okay. Was that as the manager?
2     A. At that time, I don't know if she
3 held that title or not.
4     Q. Okay. Then what did she make the
5 next year?
6     A. Let's see. $10.75 an hour in
7 2004.
8     Q. Do you know if she was manager
9 then?
10     A. I do not know -- well, I do not
11 know, no.
12     Q. Okay. In 2005, what did she
13 make?
14     A. 11.50 an hour. And she was
15 managing at that time.
16     Q. Okay. You know because you were
17 the manager in 2005, right?
18     A. That's correct.
19     Q. Now, did she normally work
20 inside?
21     A. Most of the time, yes.
22     Q. And she wasn't responsible for
23 grooming the place, was she?
24     A. No.
25     Q. That is, getting it ready for

1 hunts or anything?
2     A. Not outside, no.
3     Q. All right. Her work was indoors,
4 making sure that the guests were comfortable
5 and accommodated, correct?
6     A. That was part of her responsi-
7 bility.
8     Q. Fed and the rooms were clean,
9 that type thing, correct?
10     A. Correct.
11     Q. So you'd agree with me she had a
12 much different job, much different responsi-
13 bility than Roy Lee, correct?
14     A. Different, yes.
15     Q. Okay. Can you think of anybody
16 that's ever worked in management that had any
17 responsibility for hunting or hunting
18 operations that's ever been paid by the hour
19 other than Roy Lee?
20     A. We had one young gentleman named
21 Anthony Dickey that worked for a short period
22 of time that was listed as a manager for a
23 brief period of time, and he was paid by the
24 hour.
25     Q. What document do you have that

Page 26

1  shows he was a manager?
2      A. That was just -- that was told to
3  me.
4          MR. DUKES: That's previously
5              been produced to you.
6          MR. ROBERSON: I'm not saying it
7              hadn't. I just don't --
8          MR. DUKES: I know. I know.
9          MR. ROBERSON: What is it? I
10             mean, I don't recall it.
11         MR. DUKES: It's a document that
12             we produced that showed the
13             different managers and their
14             responsibilities.
15         MR. ROBERSON: Do you know what
16             number it is?
17         MR. DUKES: I have no idea, but
18             it's come up in depositions
19             before. In fact, I think in
20             Roy Lee's deposition we
21             talked about it at some
22             length.
23         MR. ROBERSON: You mean the --
24             are you talking about the
25             organization chart?

Page 27

1          MR. DUKES: That may be it. So
2              it may be in two different
3              places.
4          MR. ROBERSON: Okay. Well, we'll
5              take a break after a while
6              and try to find that.
7  BY MR. ROBERSON:
8      Q. Mr. Carroll, you're a manager,
9  correct?
10     A. Yes, sir.
11     Q. You're paid a salary, aren't you?
12     A. I am.
13     Q. You don't get a 1099?
14     A. I don't.
15     Q. Do you know why Donna Davison and
16  Byron Davison got 1099s?
17     A. I was told that Mrs. Davison
18  initially came to work there to look after
19  some of the timber management aspects of it,
20  and that once she started that, ended up
21  staying on and running the place.
22     Q. So did she have a consulting
23  arrangement initially?
24     A. I would assume that was the case,
25  yes.

Page 28

1      Q. Okay. Well, you weren't ever
2  hired as a consultant by Mid-State, correct?
3      A. That is correct.
4      Q. You were an employee, correct?
5      A. Correct.
6      Q. You've got a four-year degree
7  from Auburn, don't you?
8      A. I do.
9      Q. And a Master's degree from
10 Auburn, correct?
11     A. I do.
12     Q. You get paid a salary, don't you?
13     A. Yes, sir.
14     Q. $75,000 a year?
15     A. Yes, sir.
16     Q. I mean, that was what you made
17 for Mid-State?
18     A. Yes, sir.
19     Q. Okay. Now, and you hired
20 someone, Joel Norman, correct?
21     A. I did.
22     Q. He was to be over the quail
23 hunting operations, correct?
24     A. Correct.
25     Q. He is also a white male, correct?

Page 29

1      A. He is.
2      Q. And you paid him a salary,
3  correct, or Mid-State paid him a salary?
4      A. That's correct.
5      Q. He was provided a truck, correct?
6      A. Yes.
7      Q. He was provided lodging or
8  housing on the property, correct?
9      A. Yes.
10     Q. And he was paid an annual salary
11 of $70,000 per year, correct?
12     A. Yes.
13     Q. He has a two-year degree,
14 correct?
15     A. Yes.
16     Q. So you have a Master's degree and
17 a four-year degree, and you get 75, right?
18     A. That's correct.
19     Q. He has a two-year degree, and he
20 gets 70, right?
21     A. That's correct.
22     Q. Roy Lee doesn't have a degree,
23 does he?
24     A. Not that I'm aware of.
25     Q. Doesn't have a college degree,

Page 30

1   does he?
2       A. That's correct.
3       Q. He graduated from high school
4   there in Bullock County, didn't he?
5       A. Yes.
6       Q. And he worked for numerous years
7   as a supervisor in the -- at the Beaulieu
8   plant?
9           MR. DUKES: Object to the form.
10      Q. Do you know what that is?
11      A. I do.
12      Q. Okay. Isn't it a -- well, tell
13  me what it is.
14      A. Some type of textile mill.
15      Q. That's right. And he was a
16  manager there, correct? He was over -- he
17  supervised people, correct?
18          MR. DUKES: Object to the form.
19      Q. Do you know that?
20      A. I've heard that, yes.
21      Q. Well, he gave you a resume,
22  didn't he?
23      A. He didn't give me a resume.
24      Q. Oh, okay. Well, he gave
25  Mid-State a resume?

Page 31

1       A. Yes.
2       Q. Roy Lee was hired long before
3   you, correct?
4       A. He was.
5       Q. He was working there when you
6   arrived, right?
7       A. He was, yes.
8       Q. In fact, when you arrived, he was
9   running the plantation, wasn't he?
10          MR. DUKES: Object to the form.
11      A. For a brief month or so, yes.
12      Q. Okay. He was -- was there
13  anybody at the -- at Sedgefields that was
14  higher than him at that time?
15      A. He and Denise, I think, shared
16  responsibilities until I was hired.
17      Q. Okay. And he was a black man
18  getting paid $11 an hour, correct?
19          MR. DUKES: Object to the form.
20      A. I agree, yes.
21      Q. Now, would you agree with me -- I
22  know you only started working there in April
23  of 2005 -- that Roy Lee works a lot of hours?
24      A. Roy works a lot of hours.
25      Q. And normally, if you work more

Page 32

1   than forty hours, the law requires that you
2   be paid time and a half for hours over forty;
3   do you agree with that?
4       A. I do.
5       Q. And Roy made a lot of overtime,
6   didn't he, before he went on salary, correct?
7       A. He did.
8       Q. And he earned it, because he
9   worked the hours, correct?
10      A. Correct.
11      Q. Now, did you make the decision to
12  put him on a salary?
13      A. Roy came to me and said he would
14  like to be placed on a salary, and he wanted
15  to be more of a management individual, not an
16  hourly worker, with the people he worked
17  with. I told him if that's what he would
18  like, then I certainly would go to the home
19  office and see if we could arrange that.
20      Q. Okay. Was he ultimately placed
21  on a salary?
22      A. He was.
23      Q. What is that salary?
24      A. I'd have to look and see.
25          (Witness reviewed document.)

Page 33

1       A. It says the annual compensation,
2   $47,230.50 for the year of 2005.
3       Q. Forty-seven? Is that what you
4   said?
5       A. Uh-huh (affirmative response).
6       Q. What number are you looking at,
7   sir?
8           MR. DUKES: Thirty-six.
9       A. Thirty-six.
10      Q. I'll mark that as an exhibit.
11  I'll show you what I've marked as Exhibit 5.
12  Is that what you're looking at?
13          (Whereupon Plaintiffs' Exhibit
14          No. 5 was marked for
15          identification and attached
16          hereto.)
17      A. Yes, sir.
18      Q. Okay. And what is Exhibit 5, if
19  you know? Is that y'all's payroll for 2005
20  and 2006?
21      A. That's correct.
22      Q. And does it list all of the
23  employees there at Sedgefields Plantation?
24      A. It does.
25      Q. All right. And it's got the

9 (Pages 30 to 33)

1  name. It says, DOH. Is that date of hire?
2      A. That's correct.
3      Q. Their hours, that is -- is that
4  the total number of hours that they were on
5  the clock for those years?
6      A. Yes.
7      Q. And then their annual
8  compensation and their hourly rate, correct?
9      A. Or biweekly.
10     Q. Or in your case, biweekly rate?
11     A. Yes.
12     Q. That's right. Okay. So with
13  your help -- are you familiar -- you worked
14  in 2005, do you know all of these employees?
15     A. I know most of them. Not all
16  of them.
17     Q. Okay. Well, I just want to go
18  through this list, and I want to designate
19  what race these people are, if I may, okay?
20     A. Okay.
21     Q. Because I don't -- I don't know
22  these people. And at the top of the list,
23  Yolanda -- I'm not sure how you pronounce
24  that, Armenda-Pineda?
25     A. Don't know her.

1      Q. Okay. And she was hired in
2  December of 2004, and she only worked two
3  hundred and ten hours. So that's why you
4  don't know her, she left before you got
5  there?
6      A. Yes, sir.
7      Q. Okay. Casey Balkcom -- I'm
8  sorry, Corey Balkcom, do you know him?
9      A. I do.
10     Q. What race is he?
11     A. He's black.
12     Q. A black male?
13     A. That's correct.
14     Q. Now, he only worked, looks like
15  ninety-two hours at $7 an hour; is that
16  correct?
17     A. That's correct.
18     Q. All right. Let me see if I can
19  find his information that's in here. Tell me
20  about Mr. Balkcom, though. Why did you hire
21  him? I mean, what was he going to do for
22  y'all?
23     A. After I had been at the
24  plantation for a few weeks, I sat down and
25  discussed with Roy our immediate needs for

1  personnel. He reflected that we had had a
2  greater personnel in the past and that we
3  were sort of on a bare-bones crew, and that
4  he needed some individuals to help at that
5  time of the year with cutting grass and
6  weedeating and taking care of immediate needs
7  at the plantation. And this gentleman was
8  recommended to me by Denise Pierce. She knew
9  him. He came out and filled out an
10  application for me. And we hired him on, and
11  he worked for one two-week pay period and
12  then left.
13     Q. Okay. Do you know why he left?
14     A. I don't.
15     Q. He didn't come talk to you or let
16  you know why he was leaving?
17     A. Somebody said he got a job at the
18  Hyundai plant up in Montgomery, I guess. But
19  I don't know that for a fact.
20     Q. Okay. Did Mr. Balkcom have any
21  special skills?
22     A. He listed several things on his
23  application that he could do -- supposedly
24  could do.
25     Q. And I -- I mean, I know when you

1  were there at Mid-State, did y'all check
2  references?
3      A. I didn't -- no references were
4  checked on our hourly workers that were hired
5  for labor and stuff like that.
6      Q. Why not?
7      A. Just at that point, it really
8  wasn't much of a need for it. We needed to
9  add personnel. If they said they could cut
10  grass and weed-eat, at that time, we looked
11  at their application, and they were hired or
12  not.
13     Q. Well, I'm going to show you what
14  I've marked as Exhibit 6 and ask you if
15  that's the application that Mr. Balkcom
16  filled out?
17         (Whereupon Plaintiffs' Exhibit
18         No. 6 was marked for
19         identification and attached
20         hereto.)
21         (Witness reviewed document.)
22     A. It is.
23     Q. Does he list that he had worked
24  as a diesel mechanic for twenty years?
25     A. It does. It also shows that he

Page 38

1  can't spell the word diesel.
2      Q.  Okay.  Can you do diesel mechanic
3  work without spelling it?
4      A.  I would hope so.
5      Q.  I suspect you can, don't you?
6      A.  Yes, sir.
7      Q.  And in fact, if you're doing
8  diesel mechanic work, you don't really have
9  to spell, do you?
10      MR. DUKES:  Object to the form.
11      A.  Not necessarily.
12      Q.  I'm going to show you what I'm
13  going to mark as Exhibit 7 and ask you what
14  that is?
15          (Whereupon Plaintiffs' Exhibit
16           No. 7 was marked for
17           identification and attached
18           hereto.)
19          (Witness reviewed document.)
20      A.  It's a manager's checklist for
21  employees to be filled out.
22      Q.  Is it for Mr. Balkcom?
23      A.  It is.
24      Q.  What was he hired as?  Does it
25  say?

Page 39

1      A.  Outside laborer.
2      Q.  Okay.  And who hired him?
3      A.  I did.
4      Q.  When you hire someone like that,
5  do you set the wages?
6      A.  Wages are set based on, you know,
7  what I need at the time and what the
8  responsibilities of the person would be that
9  I'm hiring.  So, yeah, I would say that I'm
10  the one responsible for setting those within
11  the guidelines of the company.
12      Q.  Well, that's what I'm asking you,
13  Mr. Carroll.  Do you have to get anybody's
14  approval to pay him, whatever hourly rate
15  that is?
16      A.  No.
17      Q.  Do you have a staffing budget?
18      A.  No.
19      Q.  Well, if you want to hire
20  someone, do you have to get approval from the
21  home office or anyone?
22      A.  Possibly.
23      Q.  Did you for Mr. Balkcom?
24      A.  No, sir.
25      Q.  How much did you pay him?

Page 40

1      A.  $7 an hour.
2      Q.  And you hired him when?
3      A.  5/17/05.
4      Q.  I see.  Do you know how old
5  Mr. Balkcom was?
6      A.  No.  I'd have to look at the
7  application.
8      Q.  Did you know whether Mr. Balkcom
9  had military service?
10      A.  If it lists it on there, then I'm
11  assuming I knew he did.
12      Q.  Yeah.  He served in the marines
13  for nine years; is that important?
14      A.  I guess it can be.
15      Q.  Well, is it important to you?
16  You hired him.
17      A.  What's important to me is that he
18  can do what I need for him to do at the
19  plantation.
20      Q.  And what was it you needed him to
21  do, cut grass?
22      A.  Cut grass, weed-eat, those types
23  of things that we were doing during that time
24  of the year he was hired.
25      Q.  A guy that's a diesel mechanic,

Page 41

1  he'd probably be a pretty valuable employee,
2  wouldn't he?
3      MR. DUKES:  Object to the form.
4      A.  Could be.
5      Q.  I mean --
6      A.  He wasn't there long enough to be
7  anything other than a guy to cut grass.
8      Q.  Okay.  Well, a guy who worked as
9  a diesel mechanic could probably work on your
10  equipment, wouldn't you think?
11      MR. DUKES:  Object to the form.
12      A.  He could, sure.
13      Q.  Yeah.  Is, in fact, some of your
14  equipment diesel equipment?
15      A.  Sure.  We have diesel equipment.
16      Q.  What kind of diesel equipment,
17  tractors or . . .
18      A.  Tractors, sure.  Heavy equipment.
19  At that time, I had a few tractors and a
20  backhoe.
21      Q.  Bulldozer, is that a diesel?
22      A.  It is.  But I didn't have one at
23  that time.
24      Q.  Oh, okay.  What about your
25  skidder?

Page 42

```
 1      A.  Didn't have one at that time.
 2      Q.  Are they diesel?
 3      A.  Yes.
 4      Q.  So a diesel mechanic would be a
 5  pretty valuable employee to a 13,000-acre
 6  timber operation, wouldn't they?
 7      MR. DUKES:  Object to the form.
 8      A.  Could be, yes.
 9      MR. ROBERSON:  Off the Record.
10      THE VIDEOGRAPHER:  We're going
11          off the Record at 12:59 p.m.
12      (A brief recess was taken.)
13      THE VIDEOGRAPHER:  Back on the
14          Record at 1:22 p.m.
15  BY MR. ROBERSON:
16      Q.  Mr. Carroll, let me show you what
17  I've marked as Plaintiffs' Exhibit 8.  And do
18  you recognize that document?
19      (Whereupon Plaintiffs' Exhibit
20          No. 8 was marked for
21          identification and attached
22          hereto.)
23      (Witness reviewed document.)
24      A.  I do.
25      Q.  What is Exhibit 8?
```

Page 43

```
 1      A.  It's a management structure of
 2  Mid-State Land and Timber.
 3      Q.  And is it dated?
 4      A.  No, it is not.
 5      Q.  All right.  Well, who -- let me
 6  see it.  All right.  And this was produced in
 7  another case, correct, the Norris Foster
 8  case?  It says Defendant's Document
 9  Production 0001.
10      A.  Okay.
11      Q.  And I'll also show you Exhibit 9
12  and ask you if you recognize that document?
13      (Whereupon Plaintiffs' Exhibit
14          No. 9 was marked for
15          identification and attached
16          hereto.)
17      A.  I do.
18      Q.  And what is Exhibit 9?
19      A.  It's an employee organizational
20  chart.
21      Q.  Is that when you were the
22  manager?
23      A.  That's correct.
24      Q.  Okay.  And neither of these
25  documents lists Anthony as any kind of
```

Page 44

```
 1  manager, correct?
 2      A.  I can personally speak for the
 3  last one, that he was not there when I was
 4  there.  So he wouldn't be on that one.  For
 5  the other one, I don't know.
 6      Q.  Well, it doesn't list him as a
 7  manager, does it?
 8      A.  No, it doesn't.
 9      Q.  I'm going to show you what I'll
10  mark as Exhibit 10 to your deposition.  It's
11  formally Defendant's Exhibit 19, and it's a
12  document dated 12/2/04.  Now, who are the
13  Mid-State Board of Directors?
14      (Whereupon Plaintiffs' Exhibit
15          No. 10 was marked for
16          identification and attached
17          hereto.)
18      A.  I do not know.
19      Q.  I don't know either.  That'd be
20  nice to know, wouldn't it?
21      MR. DUKES:  Object to the form.
22      Q.  Have you made any inquiry into
23  that?
24      A.  No, sir.
25      Q.  You've been -- you were a manager
```

Page 45

```
 1  there for over a year.  Did you ever meet
 2  anybody that was on the Board of Directors?
 3      A.  I just met two people that
 4  interviewed me, plus Mr. Broadhead.
 5      Q.  Who interviewed you?
 6      A.  Ms. Sherry Howell and Mr. Bob
 7  Rae.
 8      Q.  Okay.  And then Mr. Broadhead is
 9  the owner, correct?
10      A.  That's correct.
11      Q.  Well, this document was made
12  available to me, and it references approval
13  of the Board of Directors, and it references
14  that Anthony is the hunt manager in December
15  of 2004.  You see that?
16      A.  It does.
17      Q.  Now, what is Roy Lee?
18      A.  Farm manager.
19      Q.  Okay.  Now, do you know when
20  Mr. Byron Davison left the employ of
21  Mid-State?
22      A.  I don't know the exact date.
23      Q.  Do you know the circumstances
24  surrounding his departure?
25      A.  I don't know that.
```

Page 46

1      Q. Do you know if anyone replaced
2  him as the hunt manager?
3      A. My understanding is that as soon
4  as Mr. Davison left, that Anthony assumed
5  that position immediately and for a very
6  short time. And then he wasn't there much
7  more probably than a month, I guess.
8      Q. He went back to school?
9      A. I guess so.
10     Q. About January?
11     A. I'm not sure of the date.
12     Q. Okay. And then who assumed that
13 position?
14     A. Which position?
15     Q. The hunt manager.
16     A. The hunt manager. Well, once the
17 season is over with, I don't know necessarily
18 there would be a hunt manager for that
19 particular time.
20     Q. Well, when was deer season over?
21     A. End of January.
22     Q. Yeah. So who was the hunt
23 manager for January?
24     A. I don't -- I would have thought
25 Anthony was until the end of the season. I

Page 47

1  thought that's what you were just telling me.
2      Q. No. I'm telling you Anthony went
3  back to school, I believe, in January, first
4  of January.
5      A. I don't know that. I don't know.
6      Q. Okay. Well, have I identified
7  every reason that you claim that you've paid
8  Joel Norman $70,000 a year?
9          MR. DUKES: Can you restate that
10             question for me?
11         MR. ROBERSON: Sure.
12         MR. DUKES: Or if you want to
13             repeat it, I'm not . . .
14 BY MR. ROBERSON:
15     Q. First of all, did you pay Joel
16 Norman $70,000 a year?
17     A. I didn't. I had to get
18 permission to pay him $70,000.
19     Q. Okay. Whose permission did you
20 get?
21     A. I had to talk with Ms. Sherry
22 Howell and Mr. Bob Rae.
23     Q. Okay. Did you get their
24 permission?
25     A. And ultimately, probably

Page 48

1  Mr. Broadhead, although that I didn't speak
2  to him personally, I did get permission.
3      Q. And Joel Norman has a two-year
4  degree, correct?
5      A. He does.
6      Q. He was working at a plantation in
7  Georgia, right?
8      A. Managing it, yes.
9      Q. He's handled bird dogs for a long
10 time, right?
11     A. He has.
12     Q. And he's -- he's experienced in
13 quail hunting; is that fair?
14     A. Something I needed at the time,
15 yes.
16     Q. Okay. Is there any other reason,
17 other than those things, why you paid --
18 agreed to pay Joel Norman $70,000?
19         MR. DUKES: Object to the form,
20             that it's been asked and
21             answered.
22     Q. You can answer.
23         MR. DUKES: Go ahead.
24     A. That's what it took to get him to
25 come to work for us.

Page 49

1      Q. Okay. How much was he making at
2  the place in Georgia?
3      A. I don't know.
4      Q. Well, then how do you know that's
5  what it took?
6      A. That's what it took for him to
7  say yes to come to work at Sedgefields.
8      Q. What did y'all offer him
9  originally?
10     A. Probably around 55, $60,000.
11     Q. And he said no?
12     A. That's correct.
13     Q. And then did you offer him 60?
14     A. I don't remember the exact
15 process.
16     Q. Are there any documents about
17 that?
18     A. No, sir.
19     Q. All right. Well, we were going
20 through this chart, and I'm -- do y'all have
21 charts like this, the payroll and employees
22 for the years 2004 and 2003?
23     A. Which page number is that?
24     Q. That's 36.
25     A. '03 and '04 are on page 35.

1    Q. Great. Okay. Well, let's go
2  through what I've marked as Exhibit 5, and
3  you just tell me what race these people are
4  and if they're male or female, okay?
5    A. Uh-huh (affirmative response).
6    Q. And we said -- we agreed that
7  Corey Balkcom is a black male. What about
8  William Beckwith?
9    A. He's a white male.
10    Q. And his rate of pay was what?
11    A. It was $8 an hour.
12    Q. Okay. Now, why was he paid $8 an
13  hour?
14    A. Well, I hired him --
15    MR. DUKES: Let me -- who are you
16        asking about?
17    MR. ROBERSON: William H.
18        Beckwith who was hired on
19        8/5/2005.
20    MR. DUKES: Object to the form.
21        It's outside the scope of
22        the 30(b)(6) deposition
23        notice, and it's been asked
24        and answered.
25

1  BY MR. ROBERSON:
2    Q. You can tell me.
3    MR. DUKES: Well, I'll tell him
4        if he can tell you.
5        But go ahead and
6        answer until I tell you you
7        can't.
8    A. He was paid that rate because I
9  hired him as an hourly worker and a night
10  watchman.
11    Q. Okay. I know about you, David
12  Carroll. Norris Foster, he's a black male,
13  correct?
14    A. Correct.
15    Q. And he was paid $7 an hour,
16  correct?
17    A. Correct.
18    Q. And he was hired, at least this
19  document -- actually, Norris was rehired. Do
20  you understand that?
21    A. I do.
22    Q. He worked at Sedgefields prior to
23  this, but he was rehired on February 8th,
24  2005, correct?
25    A. Yes.

1    Q. All right. Now, Jeffrey Harris
2  was hired 9/16/2005. What race is he?
3    A. A black male.
4    Q. And how much was he paid?
5    A. $7 an hour.
6    Q. Now, who is Stacy Howington?
7    A. I do not know.
8    Q. Hired in December of '04. Only
9  worked four hundred and sixty-one hours. Do
10  you know Stacy, if that's a male or a female?
11    A. I don't know.
12    Q. Okay. Well, did you make any
13  inquiry?
14    MR. DUKES: That's outside the
15        scope of a 30(b)(6)
16        deposition notice.
17    Q. Did you make any inquiry to find
18  out who Stacy was?
19    A. I don't have any knowledge of who
20  Stacy was.
21    Q. Do y'all have any documents for
22  Stacy --
23    A. I haven't seen --
24    Q. -- an application or anything?
25    A. No documents that I've seen, no,

1  sir.
2    Q. All right. The next one -- well,
3  Stacy's paid $9 an hour. And we'll just --
4  I'm going to put a question mark, okay?
5  Because we don't know if that's a male,
6  female, or black or white, correct?
7    A. Correct.
8    Q. Okay. William Hubbard?
9    A. A white male.
10    Q. He's paid $8 an hour?
11    A. Yes.
12    Q. Hired December 9th, 2005?
13    A. Yes.
14    Q. Okay. And why was he paid $8 an
15  hour?
16    A. I hired him because he was very
17  proficient at what he did, which was run
18  heavy equipment. I needed that. It was a
19  critical time.
20    Q. All right. Roy Lee, he's a black
21  male, correct?
22    A. Yes.
23    Q. Now, it's got hours. And Roy Lee
24  for the year 2005 worked 2,944 hours; is that
25  correct?

Page 54

1    A.  I don't know if that's correct.
2  I can tell you that when I came to work there
3  in 2005, Roy Lee was an hourly employee and
4  was switched to management during that year.
5  So I don't know how those hours would
6  actually reflect the total number of hours
7  that were worked during that year.
8    Q.  I mean, that's what -- I read
9  correctly what's on this document, didn't I?
10    A.  You did.
11    Q.  Okay.  You're just telling me you
12  don't know if that is accurate; is that what
13  you're telling me?
14    A.  Considering he went from hourly
15  to salary, I don't know if that's accurate or
16  not.
17    Q.  Do you know if they still tracked
18  his hours after he went to salary?
19    A.  I don't know.
20    Q.  All right.  Willie Mack?
21    A.  Black male.
22    Q.  What's his rate of pay?
23    A.  $7.50 an hour.
24    Q.  Okay.  And he was hired in 4/2 of
25  '04, correct?

Page 55

1    A.  That's correct.
2    Q.  And he worked 2,167 hours,
3  correct?
4    A.  That's correct.
5    Q.  Dorotea Norman -- I'm sorry,
6  Nopal, Dorotea Nopal?
7    A.  I do not know that person.
8    Q.  Okay.  She only worked about
9  forty-four hours in March, so we'll put a
10  question mark there.
11    Joel Norman?
12    A.  White male.
13    Q.  Okay.  Demetrius Parham?
14    A.  Black male.
15    Q.  Denise Pierce?
16    A.  White female.
17    Q.  Griselda Tirado?
18    A.  Griselda was not working there at
19  the time that I came there, but I know who
20  she is.
21    Q.  What race is she?
22    A.  She is Latin, a Mexican.
23    MR. DUKES:  Hispanic.
24    THE WITNESS:  Hispanic.  Thank
25    you.  My apologies.

Page 56

1    Q.  All right.  If I put H-I-S-P --
2  okay.
3    All right.  Brenda Traver?
4    A.  Tarver.
5    Q.  Tarver?
6    A.  Black female.
7    Q.  And then is that Henry Tarver
8  also?
9    A.  That's correct.  Black male.
10    Q.  Are they related?
11    A.  No.
12    Q.  They just have the same last
13  name?
14    A.  That's correct.
15    Q.  Okay.  Charlie Walker?
16    A.  I don't know Charlie.
17    Q.  Okay.  It looks like he's the
18  lowest paid guy here.  You don't know what he
19  did?
20    A.  No, sir.
21    Q.  Katie Woods?
22    A.  Black female.
23    Q.  Okay.  All right.  Then we'll go
24  down to 2006.  It looks like there are fewer
25  employees in 2006; is that -- is that

Page 57

1  correct?  Do you agree with that?
2    A.  Compared to the list in 2005, it
3  is, yes.
4    Q.  Okay.  We've got you.  You're a
5  white male.  Norris Foster.  Now Norris only
6  worked -- is that seventy hours in 2006?
7    A.  That's correct.
8    Q.  Now, does that mean that -- do
9  y'all hold back; that is, do you get your
10  pay --
11    A.  Every two weeks.
12    Q.  So he actually worked that time
13  in 2005; is that correct?
14    A.  That's correct.
15    Q.  Okay.  And so Norris is right
16  that he got a raise after he got fired?
17    A.  That's not correct.  The raise
18  was established before he was fired.
19    Q.  Okay.  It was established, but it
20  actually showed up on the check he received
21  after he was fired; is that fair?
22    A.  I would think that's fair, yes.
23    Q.  Okay.  So he's a black male, and
24  he got a fifty-cent raise that was
25  established in December, but it didn't show

Page 58

1 up or appear on his check until January,
2 correct?
3    A. That's correct.
4    Q. And he was fired at the end of
5 December, correct?
6    A. That's correct.
7    Q. Okay. And then we've got Forest
8 Hamm?
9    A. A white male.
10    Q. And he's paid $8 an hour?
11    A. That's correct.
12    Q. Hired January 20th, 2006?
13    A. That's correct.
14    Q. Now, see, look at Norris Foster.
15 On this one, it says his date of hire is
16 9/14/99?
17    A. That must have been the original
18 date he was hired the first time around.
19    Q. Right, okay. Jeffrey Harris,
20 he's a black male?
21    A. Yes.
22    Q. And William Hubbard is a white
23 male?
24    A. Yes.
25    Q. Roy Lee is a black male?

Page 59

1    A. Yes.
2    Q. Now, would this only reflect --
3 since Mid-State was sold on May the 19th,
4 this would only reflect wages earned between
5 January and May; is that --
6    A. That's correct.
7    Q. We've got Willie Mack, and he's
8 paid in 2006 $8 an hour?
9    A. Yes.
10    Q. And he's a black male, correct?
11    A. Yes.
12    Q. Joseph May is a white male?
13    A. Yes.
14    Q. Joel Norman is a white male.
15 Demetrius Parham is a black male, correct?
16    A. Correct.
17    Q. And Denise -- now, do you see --
18 does it look like Denise goes to a salary in
19 2006?
20    A. She did.
21    Q. Did you do that?
22    A. I did.
23    Q. Why?
24    A. I requested that all my managers
25 be placed on salary.

Page 60

1    Q. Okay. Henry Tarver is a black
2 male?
3    A. Yes.
4    Q. And Brenda Tarver is a black
5 female, and Katie Woods is a black female,
6 correct?
7    A. Correct.
8    Q. Okay. All right. Let me go back
9 to -- was it page 35 or 36?
10    A. Thirty-five.
11    Q. Are you looking at 35? Let me
12 just mark it. I can't find mine. Mr.
13 Carroll, if you would, just do the same
14 thing. And I'll ask you, in order to make a
15 Record, take my pen and read the name of the
16 individual, the date he's hired -- or he or
17 she is hired, and then write out beside it.
18 If it's a white male, put WM. If it's a
19 black male, BM. And female, say the same
20 thing, okay?
21       (Whereupon Plaintiffs' Exhibit
22        No. 11 was marked for
23        identification and attached
24        hereto.)
25       MR. DUKES: Object to the form.

Page 61

1        It's outside the scope of a
2        30(b)(6).
3       MR. ROBERSON: Well, you can
4        object.
5 BY MR. ROBERSON:
6    Q. Go ahead and do it, Mr. Carroll.
7       MR. DUKES: To the extent that
8        you know.
9       MR. ROBERSON: Yeah.
10    A. Okay. Anthony Dickey. Do you
11 also want the date of hire?
12    Q. Date of hire, yes, sir.
13    A. 5/24/2003.
14    Q. And his hourly rate?
15    A. $8.50. And I believe he is a
16 white male.
17    Q. Okay.
18    A. Joseph Lee, 4/5/2002. $6.50. I
19 don't -- don't know him.
20    Q. Is that Roy Lee's cousin?
21    A. I don't know.
22    Q. I do. And he's a black male. So
23 put black male on that.
24    A. Roy Lee, 9/8/2000. $11 an hour.
25       Denise Pierce --

Page 62

1    Q. Roy Lee is a black male, right?
2    A. Yes.
3    Q. Okay. Go ahead.
4    A. Denise Pierce, a white female,
5    9/6/2002. Hired at $10 an hour.
6    Q. She was -- is that the year she
7    started?
8    A. I'm assuming.
9    Q. Do you know?
10   A. I don't know. But I think it was
11   about then.
12   Q. Okay. When she started, she was
13   paid $10 an hour; is that correct?
14   A. That's what it says on this
15   sheet.
16   Q. Okay.
17   A. Rosa Rosales, 12/2/2003. $5.65.
18   I don't know her.
19   Q. Okay.
20   A. Anthony Ryan, III, 3/19/2003.
21   $6.50 an hour. I don't know him.
22      Manuel Silva, 11/9/2003, at 6 an
23   hour. I don't know him.
24      Charles Sykes, 2/1/2003. Was
25   paid looks like a salary of 461.54 biweekly.

Page 63

1    And he is a white male, I assume.
2    Q. That's the wildlife biologist; is
3    that correct?
4    A. He was hourly and contract
5    laborer as well I do believe.
6    Q. Yeah. I've seen some documents
7    about him. Okay.
8    A. Kevin Terrell, 10/20/2003. $6 an
9    hour. Don't know him.
10      And Griselda Tirado, 11/19/2003.
11   $6.00 an hour. And we said she was a
12   Hispanic female.
13      That's all for 2003 that I have.
14   2004?
15   Q. Yes, sir.
16   A. Fortino Cisneros, 4/2/2004.
17   $6.50. I don't -- well, I do know who he is.
18   He is a Hispanic male.
19   Q. Was he an outside laborer or
20   had --
21   A. At that time, I don't know. But
22   he -- I know that he is.
23   Q. Okay.
24   A. Anthony Dickey -- the ones I've
25   already mentioned, you want me to do them

Page 64

1    again as well?
2    Q. Anthony Dickey, what was he hired
3    at when he was hired in 2004?
4    A. $8.50. He's a white male.
5    Q. Okay.
6    MR. DUKES: Object to the form.
7    A. Stacy Howington, I don't know.
8       Roy Lee, black male. $11 an
9    hour. 9/8/2000.
10      Willie Mack, black male.
11   4/2/2004. $7.00 an hour.
12      Sonya Martinez, I don't know.
13      Oscar Montiel, I don't know.
14   Q. What hourly rate were those
15   gentleman paid?
16   A. Six and 6.50 an hour.
17   Q. Okay.
18   A. Dorotea Nopal, don't know. $7 an
19   hour.
20      Demetrius Parham is a black male.
21   7/23/2004. $6.50 an hour.
22      Denise Pierce, a white female.
23   9/6/2002. $10.75 an hour.
24      Rosa Rosales, I don't know. She
25   was paid $6.25 an hour.

Page 65

1       Raul Secundino, don't know.
2    $7.00 an hour.
3       Manuel Silva, I don't know.
4    $6.00 an hour.
5       Charles Sykes, a white male.
6    Again, he was paid salary and hourly. It
7    says 461.54 biweekly.
8       Kevin Terrell, I don't know.
9    $6.00 an hour.
10      Griselda Tirado, Hispanic female.
11   $7.00 an hour.
12      And then the last one on the list
13   is Charlie Walker. I don't know. $5.59 an
14   hour.
15   Q. Okay.
16   A. Do you mind if I get the rest of
17   those back that I gave you?
18   Q. Oh, I'm sorry.
19   A. I'm trying to keep them in
20   halfway order, so I will know where
21   everything is.
22   Q. I'll try to do that, too. See if
23   those are --
24   A. That's fine. That stack right
25   there you've got your hands on is the rest of

17 (Pages 62 to 65)

Page 66

1  them, I think. Let's see.
2      Q. Well, make sure.
3      A. And that group right there, I
4  think. Let's see, six and seven. Okay.
5  That's all of them except -- thank you. I
6  think that's my copy.
7      Q. Okay. Well, do you know -- who
8  was the gentleman that testified -- or not
9  testified, but allegedly told Denise Pierce
10 that Norris Foster was a thief? Do you know
11 who I'm talking about, a guy that used to
12 work at Sedgefields that they ran off?
13     MR. DUKES: Object to the form.
14     A. You're saying that this guy was
15 run off or the thief was run off or who was
16 run off?
17     Q. No. I'm saying this guy used to
18 be a manager at Sedgefields. Is it Joe?
19     A. I can't think of his name.
20     Q. Do you know who I'm talking
21 about?
22     A. I've heard conversations of three
23 or four guys who worked there at one time or
24 another who didn't, but I don't know this
25 exact individual's name.

Page 67

1      Q. This guy worked there when
2  Broadhead's son worked there.
3      A. Yeah. I don't -- I don't know
4  him.
5      Q. Because they used to allegedly
6  use drugs together. You don't know who I'm
7  talking about?
8      A. Huh-uh (negative response).
9      Q. No? Is that a no?
10     A. That's a no. I'm sorry.
11     Q. All right. Well, where's that
12 boy's deposition? I think he names -- Joe
13 McEarn (phonetic) or something like that.
14     Do you know -- other than Byron
15 Davison, Donna Davison, and yourself and Roy
16 Lee, do you know anybody else that's worked
17 there at Mid-State in management?
18     MR. DUKES: Object to the form.
19     Other than what's already
20     been stated? Other than
21     what he's already testified
22     to?
23     Q. Do you know anybody else that's
24 worked there in management?
25     A. The only other name that comes to

Page 68

1  mind, and I don't know if it was for
2  Mid-State or the previous owner, was a
3  gentleman named Mark Greg. But I believe he
4  worked there before the Broadhead's purchased
5  it.
6      Q. Okay. Well --
7          McFerrin? Do you know a guy
8  named McFerrin?
9      A. No. And we mentioned the Sykes
10 fellow that was --
11     Q. Yeah. Chuck Sykes, he was a
12 wildlife biologist, right?
13     A. That's right.
14     Q. Now, is he the one that sued you
15 or was that the other guy?
16     A. I'm not aware of him suing me,
17 suing the company. He's listed as wildlife
18 manager on this sheet.
19     Q. Okay. Was there another guy
20 named Dewayne?
21     A. I don't know a Dewayne.
22     Q. Okay. Do you know if Mid-State
23 was sued by a wildlife biologist?
24     A. I don't.
25     Q. Not during your tenure?

Page 69

1      A. That's correct.
2      Q. All right. Have you got all of
3  Roy Lee's W-2 forms over there? I want you
4  to find them if you do.
5      A. Okay.
6      Q. If you would, let me know what
7  page they are.
8      A. All right. I'll just give them
9  to you in chronological order as I come to
10 them, if that's all right.
11     Q. Yes, sir.
12     A. The first one is on page 38.
13     Q. Okay.
14     A. It's 2003.
15     Q. How much did he make as a W-2
16 employee in 2003?
17     A. Wages, tips, total and everything
18 is 35,352.61.
19     Q. Okay. Does that have another
20 year on there for Roy?
21     A. That's just 2003.
22     Q. Right. There's two W-2s. Who's
23 the other one?
24     A. Oh, it's just a different
25 employee.

1    Q. Okay. All right. Go to the next
2 one.
3    A. Okay. 2004.
4    Q. What page are you on?
5    A. Forty-three.
6    Q. Okay. What's his wages?
7    A. Down at the bottom it says
8 44,234.
9    Q. Okay.
10    A. Page 54. 2005 year.
11    Q. Okay.
12    A. The figure at the bottom says
13 48,504.60.
14    Q. Okay. And 2006?
15    A. Yes. Page 62 -- or I can't tell.
16 It may be 3, 63. 2006, total of $19,399.80.
17    Q. That's through May --
18    A. That's correct.
19    Q. -- or part of May, correct?
20    A. Yes, sir.
21    Q. All right. Now, when did Mr. Lee
22 go on a salary?
23    A. Would be sometime during the year
24 of 2005.
25    Q. Well, do you know when it was?

1    A. Seems like I made the request
2 during the middle of the summer, so I would
3 assume sometime toward the end of the summer.
4    Q. Well, when did you hire Joel
5 Norman?
6    A. He was hired in September.
7    Q. Yeah. Do you think you might
8 have made it -- since you hired him at a
9 salary, you might have put Mr. Lee on a
10 salary in September?
11    MR. DUKES: Object to the form.
12    A. No. That was done -- or was in
13 the process of doing that before I ever
14 thought about hiring Joel Norman or anybody
15 else. Roy came to me and asked me about it.
16 And I agreed that I would do it for him.
17    Q. Okay. Well, do you know at what
18 time he started being paid effective on a
19 salary?
20    A. I don't.
21    Q. Would y'all have a payroll record
22 that would tell you?
23    A. I would have to check with the
24 home office. I don't have it in front of me.
25    Q. Yeah. Well, y'all have -- don't

1 y'all give employees checks?
2    A. Yes, sir.
3    Q. I mean, a paycheck. And so that
4 would reflect when his raise was effective,
5 wouldn't it?
6    A. It should, yes, sir.
7    Q. Well, can you undertake to locate
8 the first salaried check that Roy Lee
9 received and provide that to Mr. Dukes?
10    A. Yes, sir.
11    Q. Okay. And you'll need to do it
12 right away, because I've got to write a brief
13 right away, okay? Fair enough?
14    A. Fair enough.
15    Q. Now, did you provide any
16 documents which relate to the purchase price
17 and sales price of Sedgefields Plantation?
18    A. I have not.
19    Q. And why not?
20    MR. DUKES: We objected to it.
21      The Court didn't order us to
22      produce it. We agreed to
23      provide someone to testify
24      about the sales price and
25      purchase price generally.

1      And he's ready to do that.
2    Q. Okay. When did Mid-State Land
3 and Timber purchase Sedgefields?
4    A. I'm not sure of the exact date.
5    Q. What year?
6    A. I believe it was in '98.
7    Q. Okay. And what was the amount?
8    A. Or '96.
9    MR. DUKES: If you don't know,
10      don't --
11    A. I don't -- I don't know. I don't
12 know the exact date. I'm sorry.
13    Q. Well, do you know who purchased
14 it? Did Mid-State?
15    A. I don't know the exact company
16 name that purchased it, no, sir.
17    Q. Did they get a deed? They got
18 13,000 acres in Bullock County. Did they get
19 a deed to it?
20    A. I'm assuming they did.
21    Q. Well, wouldn't that -- wouldn't
22 there be a record of that, Mr. Carroll?
23    A. Yes, sir.
24    Q. How much did they pay?
25    A. The price that was paid for it, I

Page 74

1 believe was 14 million.
2       Q. I see. And did that include all
3 of that acreage and all of the structures on
4 that?
5       A. I don't know what structures were
6 on there at the time, but I'm sure whatever
7 was there went with it.
8       Q. Well, they had a hunting camp
9 there before, didn't they, a lodge?
10      A. A lodge, yes.
11      Q. Sure. Did that include any
12 equipment or do you know?
13      A. I don't know.
14      Q. Well, see, that's why we need to
15 get a copy of those documents, don't we?
16      MR. DUKES: Object to the form.
17      Q. Because that would tell us what
18 they bought for $14 million, wouldn't it?
19      A. Yes, sir.
20      Q. Okay. And they sold it in May of
21 2006; you agree with that?
22      A. Yes, sir.
23      Q. And what did they sell it for?
24      A. The price was around 32 million.
25      Q. Thirty-two million. So you don't

Page 75

1 know when they bought it. Do you think it
2 could have been as late as 1999?
3       A. I don't know.
4       Q. Well, if Norris Foster, if his --
5 if it shows that he was working for them in
6 1999, for Mid-State Land and Timber, do you
7 think they may well have purchased it in
8 1999?
9       MR. DUKES: Object to the form.
10      A. I don't know.
11      Q. Well, let's just assume that they
12 purchased it in 1998 or 1999. So in seven or
13 eight years, what's that, about 125 percent
14 gain?
15      MR. DUKES: Object to the form.
16      Q. Do you know?
17      A. I don't know what the property
18 was of anyone that sold it.
19      Q. And, of course, that would be a
20 long-term capital gain, wouldn't it?
21      MR. DUKES: Object to the form.
22      A. I don't know.
23      Q. Well, if you have an asset -- you
24 agree with me that Mid-State is an -- that
25 Sedgefields was an asset, don't you?

Page 76

1       A. I guess it could be considered
2 that.
3       Q. Yeah. If they held it for more
4 than a year, and then they made a gain, it
5 would be a long-term gain, correct?
6       MR. DUKES: Object to the form.
7             Calls for a legal
8             conclusion --
9       A. You can answer.
10      MR. DUKES: -- beyond the scope.
11      MR. ROBERSON: Doesn't call for a
12            legal conclusion.
13      MR. DUKES: Yeah, it does. I'm
14            not a tax expert. I don't
15            think he is.
16      MR. ROBERSON: Well, I'll be glad
17            to swear me in and testify,
18            because I am.
19 BY MR. ROBERSON:
20      Q. So for the whole time that they
21 operated this hunting lodge, they lost money
22 every year, correct?
23      A. I do not know.
24      Q. Well, for the time period that
25 you operated it as the manager, did they lose

Page 77

1 money?
2       A. Yes.
3       Q. Would you expect them to lose
4 money?
5       MR. DUKES: Object to the form.
6       A. Possibly.
7       Q. Well, you've been in the hunting
8 business for how many years, Mr. Carroll?
9       A. Probably at least ten.
10      Q. Yeah. You ran a hunting camp,
11 didn't you?
12      MR. DUKES: Object to the form.
13      Q. Five Star?
14      A. Yeah, I did.
15      Q. Yeah. Did they own that property
16 or did they just lease it?
17      A. Some of both.
18      Q. Okay. Well, you don't really
19 expect to make a profit by running the
20 hunting operation, do you?
21      A. Some do, and some don't.
22      Q. Okay. Where you make the money
23 is in the appreciation of the land, correct?
24      MR. DUKES: Object to the form.
25            It's outside the scope of a

1          30(b)(6) deposition.
2      Q. You can answer.
3      A. That's possible.
4      Q. Well, we know that it's not only
5  possible, the land appreciated from
6  14 million to 32 million in this case, didn't
7  it?
8      A. That's what it sold for. I don't
9  know about the appreciation of it.
10     Q. Well, there's timber on the land,
11 isn't there?
12     A. Yes.
13     Q. Don't you expect that that timber
14 is going to get more valuable as time passes?
15     A. That's a possibility.
16     Q. Okay. That's a hope, isn't it?
17     A. That's a hope.
18     Q. So if you can sustain, that is,
19 you can endure the losses for the time that
20 you run the hunting camp, then you can make
21 up the money. They didn't have $18 million
22 in losses during the time that they operated
23 this hunting camp, did they?
24     MR. DUKES: Object to the form.
25     A. I don't know.

1      Q. What did -- in the year that you
2  ran the hunting operation, how much did they
3  lose?
4      A. I don't know the exact figure.
5      Q. Well, how much? Was it less than
6  a million dollars?
7      A. Probably right at a million for
8  that particular year.
9      Q. That they lost?
10     A. It's a possibility.
11     Q. What was your budget? Your
12 budget wasn't even a million dollars, was it?
13     A. It was close to a million.
14     Q. Well, they made some money; that
15 is, they generated some revenue, didn't they?
16     A. A little bit, yes.
17     Q. They charged $5,000 a hunt,
18 correct?
19     MR. DUKES: Object to the form.
20     A. There's a possibility that you
21 can take a hunt that's $5,000, yes. A
22 package, let's put it that way, not a hunt.
23     Q. Well, that's for four quail
24 hunters for a weekend, right?
25     A. That's correct.

1      Q. Okay. And, of course, every year
2  that you make a loss, you get some tax
3  benefit for that, don't you?
4      MR. DUKES: Object to the form.
5          It's outside the scope.
6      Q. Do you know?
7      MR. DUKES: Calls for a legal
8          conclusion.
9      Q. You can answer.
10     A. I would think so.
11     Q. Now, one of the areas that I
12 wanted to talk to you about today concerns
13 tips. And I asked that you provide me with
14 documents that would demonstrate the tips
15 received by employees of Mid-State Land and
16 Timber. I'm not talking about the lodge
17 employees or the people that waited on
18 tables. Those aren't the tips I'm talking
19 about. I'm talking about the tips for the
20 hunt -- from the hunters, okay?
21     A. Uh-huh (affirmative response).
22     Q. Is that a yes?
23     A. Yes.
24     Q. Have you produced those documents
25 to me?

1      A. I believe I have.
2      Q. All right. Tell me what number,
3  what pages they're on.
4      A. I have page 91.
5      MR. DUKES: Eighty-nine.
6      A. Nine, okay. I have one on 89.
7      MR. DUKES: Through . . .
8      Q. Eighty-nine through 94; is that
9  correct?
10     A. That's correct.
11     Q. Okay. I'm going to just make all
12 of those pages Exhibit 12. And we'll go
13 through it, okay.
14     A. Okay.
15     Q. So I can understand what these
16 documents signify.
17     MR. ROBERSON: Let's go off the
18          Record and change tapes.
19     THE VIDEOGRAPHER: Going off the
20          record at 2:06 p.m.
21     (A brief recess was taken.)
22     THE VIDEOGRAPHER: Back on the
23          Record at 2:18 p.m.
24          Beginning of Tape No. 2.
25

Page 82

```
 1  BY MR. ROBERSON:
 2      Q.  Mr. Carroll, I've got pages 89
 3  through 94.  I would ask you, if you could,
 4  to explain to me what -- well, start with
 5  page 89, what I marked as Plaintiffs' Exhibit
 6  12.  What does this document represent?
 7          (Whereupon Plaintiffs' Exhibit
 8           No. 12 was marked for
 9           identification and attached
10           hereto.)
11      A.  Page 89 is an invoice to a
12  customer, Standard Concrete Company.  And it
13  shows a half-day quail hunt and gratuity to
14  be disbursed amongst three employees and the
15  amount to be disbursed.
16      Q.  Okay.  So this is essentially an
17  invoice which shows a $100 tip to the hunting
18  crew, the quail hunting crew, correct?
19      A.  That's correct.
20      Q.  But this is only for $1,000, that
21  is half a day and two hunters hunt, correct?
22      A.  That's correct.
23      Q.  Okay.  All right.  And is this
24  one that they paid on a credit card or can
25  you tell?
```

Page 83

```
 1      A.  I can't tell from this.
 2      Q.  Okay.  All right.  Thank you.
 3  That's page 89.  And does this -- do you know
 4  if 89 -- it does relate to Norris, because it
 5  says B.B. Norris and Jeff; is that right?
 6      A.  That's correct.  It says a
 7  three-way split of $100 between those three
 8  individuals.
 9      Q.  Now, who were the folks -- do you
10  know who the folks were at Standard Concrete?
11      A.  The gentleman's name on the
12  invoice is Mason Lampton.
13      Q.  Okay.  Thank you.  All right.  Go
14  to page 90.
15      A.  Okay.
16      Q.  Now -- okay.  Are we just
17  referencing this thing, the reference at the
18  bottom of that page?
19      A.  That is correct.
20      Q.  Okay.  It says tip.  I will fax
21  copy of invoice to you to forward on to Ron
22  St. John, $100 to be divided between Willie
23  Mack, Jeff Harris, and Norris Foster.
24  Denise.  Now, would that be something just
25  like this?
```

Page 84

```
 1      A.  Denise faxed that to the home
 2  office.  That's why her name is on the end of
 3  that.  She prepared the weekly payroll
 4  schedule and put that note at the bottom to
 5  send to the home office.
 6      Q.  All right.  If they gave them
 7  cash, there wouldn't be a document, correct?
 8      A.  That's correct.
 9      Q.  So what we have is some documents
10  that reflect -- were these credit card tips?
11      A.  Either paid by check or credit
12  card, something other than cash, where I sent
13  them the bill, and they asked for the tip to
14  be included on their bill.  Then there's a
15  record of it going through their payroll.
16      Q.  Okay.  And when they receive
17  this, the tip, whether it's by check or by
18  credit card, is that amount placed on their
19  payroll check?  Do you know?
20      A.  The employee?
21      Q.  Yes.
22      A.  Yes.  Yes, it is.
23      Q.  The employee, he receives --
24      A.  The deductions are taken out, and
25  the remainder is placed in their payroll.
```

Page 85

```
 1      Q.  Does it have a place on the
 2  payroll check that says tip?
 3      A.  I believe it does, yes.
 4      Q.  Okay.  So if there's a difference
 5  between wages and what they actually earned,
 6  is that the explanation for that?
 7      A.  I think on the bottom of the stub
 8  of the check it'll have wages.  And they have
 9  tips and/or other.  And it'll have that line
10  item on there.
11      Q.  Okay.  All right.  Page 91.
12  Standard Concrete Company.  Again, this one
13  says B. H. Hardaway?
14      A.  Different individual.
15      Q.  Okay.  Works at the same company?
16      A.  Uh-huh (affirmative response).
17      Q.  And now, this was the full-day
18  hunt, correct, for two days?
19      A.  It appears to be a multiple-day
20  hunt, yes.
21      Q.  All right.  Tip for three
22  helpers, Norris, B.B., and Jeff.  And he's
23  got a total of $150 split three ways, right?
24      A.  That should be $50 per person,
25  yes.
```

Page 86

1    Q.  Okay.  Now, is 92 the same thing
2  as 91?
3    A.  Yes.  It has the same invoice
4  number on it.
5    Q.  Okay.  Do you know -- I mean, is
6  there a reason I've got two documents or did
7  they just --
8    MR. DUKES:  There's some
9        additional writing on it.
10    Q.  Okay.  Do you know whose writing
11  that is on page 92?
12    A.  I don't recognize that, no, sir.
13    Q.  Okay.  Page 93.  These are the
14  raises that you referred to?
15    A.  That's correct.
16    Q.  Now, this document is not dated,
17  correct?
18    A.  That's correct.
19    Q.  Do you know when this document
20  was created?
21    A.  I sent this back to Mrs. Howell
22  about the first week of December, right after
23  Thanksgiving.
24    Q.  Okay.  Now, everybody that's
25  listed at the top of this page was getting a

Page 87

1  raise, correct?
2    A.  Not everybody.
3    MR. DUKES:  Object to the form.
4    A.  In the first section, yes.
5    Q.  Yeah.  From Henry Tarver above --
6    A.  Yes.
7    Q.  -- was getting a raise, correct?
8    A.  That's correct.
9    Q.  And all of those people were
10  black, correct?
11    A.  Correct.
12    Q.  The two white guys, Will Hubbard
13  and Adam May, they just started.  They were
14  hired in -- was it November or December?  I
15  think it was November.
16    A.  Later in the year, December --
17  late November or December.
18    Q.  Right.  That is, they just were
19  hired, correct?
20    A.  That's correct.
21    Q.  And they were making $8 an hour,
22  correct?
23    A.  That's correct.
24    Q.  Okay.  And so they weren't
25  getting a raise when they just started and --

Page 88

1    A.  (Witness nodded head.)
2    Q.  Okay.  And Roy Lee was getting a
3  raise to 1,500?
4    A.  A $1,500 raise, yes.
5    Q.  I'm sorry.  You're correct.  I
6  misspoke.  You're right.
7        And Joel Norman, again, he was
8  hired in September for $70,000, right?
9    A.  That's correct.
10    Q.  So he wasn't getting a raise in
11  January, right?
12    A.  That's correct.
13    Q.  But then you were going to put --
14  make Ms. Pierce go to a salary?
15    A.  That's correct.
16    Q.  That's what you'd recommended for
17  her, okay.  And this is a document that you
18  created, correct?
19    A.  That's correct.
20    Q.  All right.  Now, but nobody was
21  getting more than a fifty-cent raise; do you
22  agree with that?
23    A.  Hourly, yes.
24    Q.  All right.  No hourly employee
25  was getting it.  And Norris Foster was

Page 89

1  getting a fifty-cent raise or that's what you
2  had recommended, correct?
3    A.  That's correct.
4    Q.  Well -- okay.  Then 94.  What is
5  94, page 94?
6    A.  It's a payroll sheet with tips
7  included.  For a line item on tips, it says
8  from 3/15/2005 to 5/19/2006.  So that would
9  be tips recorded for the 2005 portion part of
10  the year and 2006 part of the year.
11    Q.  Okay.  Is this really -- see,
12  I'm -- I'm -- I'm having trouble
13  understanding why we're dealing with certain
14  periods.  And maybe it's -- are these just
15  periods of time when they're hunting or do
16  you know why we're dealing with certain time
17  periods?
18    MR. DUKES:  This is within the
19        scope of the protective
20        order that the Court entered
21        in this case.  This is what
22        the Court ordered -- or what
23        we agreed to produce, and
24        the Court entered the
25        protective order.  So this

1      is for the period of time
2         within the Court's
3         protective order.
4      Q. Norris Foster, it shows he
5  received $83.00 in tips.  And what period of
6  time is this?
7      A. From -- that occurred somewhere
8  between 3/15 and 12/31 of 2005.
9      Q. Okay.  And when you -- when we
10 say $83, are we referring to this was the
11 amount on his paystubs?
12     A. That's after taxes, yes.
13     Q. Okay.  Jeff Harris got -- looks
14 like $83.34.  Maybe he got an extra penny?
15     A. (Witness nodded head.)
16     Q. Roy Lee got $100.  Willie Mack
17 got $133.  Demetrius Parham got $50.
18        Now, William Hubbard, who only --
19 how long did he work, about a month?
20     A. No.  Will was here longer than
21 that.
22     Q. Oh, okay.  Was it Adam Mays?
23     A. Adam Mays.
24     Q. Okay.  Will Hubbard got $175,
25 correct?

1      A. (Witness nodded head.)
2      Q. Is that a yes?
3      A. That's yes.
4      Q. And he's a white male?
5      A. That's correct.  And these aren't
6  necessarily total tips, what they might have
7  got in cash.  This is obviously what's
8  reported through their paystubs.
9      Q. Well, what crew did William
10 Hubbard work in?
11     A. He worked also in the quail
12 hunting party.
13     Q. With who?
14     A. With whoever else was on the
15 party that day, whether it be Norris or
16 whether it be Jeff Harris or whomever.
17     Q. Norris Foster was fired in
18 December.
19     A. Oh, you mean after?
20     Q. Yeah.
21     A. During his tip time?
22     Q. Will Hubbard got tips in 2006.
23     A. And also, some of those tips
24 came -- he was a turkey hunting guide.  He
25 was the only one I had on the plantation that

1  could guide for turkeys.  So he probably got
2  the bulk of that during turkey season.
3      Q. Okay.  Well, how long did William
4  Hubbard work out there?
5      A. I'd have to go back and check the
6  records and see.  But I would estimate seven
7  months.
8      Q. All right.  And you've provided
9  me some documents, this Exhibit 13.  That's
10 these pages.  And it's 95 -- Bates stamp
11 No. 95 to page 106?
12        (Whereupon Plaintiffs' Exhibit
13         No. 13 was marked for
14         identification and attached
15         hereto.)
16     A. That's correct.
17     Q. And this just shows -- I think
18 what it shows is that Byron Davison was paid
19 through Pensacola Forestry Services in
20 2000 -- is this four; is that correct?
21     A. '04, yes.
22     Q. Okay.  And these are just the
23 monthly amounts that he received?
24     A. That's correct.
25     Q. Is that correct?

1      A. Yeah.
2      Q. All right.  Now I'm going to show
3  you Exhibit 14.  Do you know Anthony Dickey?
4        (Whereupon Plaintiffs' Exhibit
5         No. 14 was marked for
6         identification and attached
7         hereto.)
8      A. I have met Anthony, yes.
9      Q. Okay.  Well, did he ever work for
10 you?
11     A. No, sir.
12     Q. How did you meet him?
13     A. One of the pieces of equipment
14 that we purchased from his family's company,
15 I returned to them to have some service work
16 done on it and met him there.
17     Q. What equipment?
18     A. Well, riding lawnmower.
19     Q. Have you seen Exhibit 14?  It's
20 his declaration.
21     A. I have.
22     Q. In fact, when was that provided?
23     A. It says the 19th day of March,
24 2007.
25     Q. And today is the 27th day of

Page 94

1  March?
2      A. That's correct.
3      Q. So eight days ago. And I got it
4  about two days ago from Mr. Dukes. Did you
5  have anything to do with getting this
6  document?
7      A. No, I didn't.
8      Q. Did your attorney get that for
9  you?
10     A. I don't know. It was just in my
11 package of paperwork that I looked at.
12     Q. Does he say anything in here
13 about ever being a manager of Sedgefields?
14     A. I don't see the word "manager" in
15 here, no.
16     Q. Okay. Mr. Carroll, Sedgefields
17 -- Mid-State Land and Timber sold the
18 plantation in Bullock County to Tollisons,
19 correct?
20     A. That's correct.
21     Q. And that sale took place in May
22 of 2006, and they're the people that paid
23 32 million, correct?
24     A. Yes.
25     Q. Then you worked as the -- in the

Page 95

1  same capacity; that is as manager of the
2  plantation for Tollisons, correct?
3      A. Correct.
4      Q. And then they have since that
5  time now sold the plantation again; is that
6  correct?
7          MR. DUKES: Let me stop you right
8             here. I mean, he's here in
9             his capacity as Mid-State
10            corporate representative.
11            And I don't represent
12            Tollisons, but I would be
13            very careful. I don't know
14            where you're going. But
15            don't divulge any confi-
16            dential --
17         MR. ROBERSON: I'm just going to
18            ask him what he's doing.
19         MR. DUKES: Okay. I just want to
20            tell him not to divulge any
21            confidential or business
22            information that may belong
23            to Tollisons.
24         MR. ROBERSON: Well, I'm
25            certainly not trying to

Page 96

1          discover any.
2  BY MR. ROBERSON:
3      Q. But Tollisons sold the
4  plantation, correct?
5      A. They're in the process, yes.
6      Q. I mean, has the sale gone through
7  or do you know?
8      A. It's been sold in different
9  pieces, I believe. So some probably have,
10 and some probably have not.
11     Q. Okay. Well, the point is,
12 Tollisons is not operating the plantation, as
13 you understand it?
14     A. Currently?
15     Q. Yes.
16     A. That is correct.
17     Q. Okay. And so your employer at
18 Tollisons has let you go; is that fair or --
19     A. I was -- it is fair as far as
20 being the manager of Sedgefields Plantation,
21 yes.
22     Q. Right. That's right.
23     A. Yeah.
24     Q. You're no longer the manager at
25 Sedgefields, correct?

Page 97

1      A. That is correct.
2      Q. But they still have retained you,
3  that is Tollisons. You're now working as a
4  consultant in their timber operations; is
5  that fair?
6      A. I do work for Tollison.
7      Q. Is it -- do you have a consulting
8  relationship with them or a contract --
9      A. Yeah.
10     Q. -- or are you an employee?
11     A. Well, some of both, almost.
12     Q. Okay. All right. Well, you're
13 living in Auburn?
14     A. I do.
15     Q. Okay. And where do you go to
16 work?
17     A. I don't have any specific place.
18 I travel around.
19     Q. Okay. And does Tollisons own
20 timberlands in Alabama?
21     A. Other than Sedgefields, at this
22 time, I don't know that they own any real
23 estate in Alabama.
24     Q. Okay. Well, what type work are
25 you doing for them then?

Page 98

1    A. Well, I do -- I do buying and
2 selling of land for them, for what you would
3 call a trader. Kind of what the gentleman
4 who purchased Sedgefields does.
5    Q. Does that mean you go and find
6 properties, and they may want to exchange
7 properties for those properties?
8    A. Well, it would be more of a
9 purchase and possibly a resale.
10    Q. Okay. Well, do you get paid when
11 the transaction occurs or do you get paid
12 every month or how do you --
13    A. Get paid a consulting -- well, a
14 commission, so to speak.
15    Q. Now, these guys like Jeffrey
16 Harris and Norris Foster and Demetrius and
17 all these people, the people that weren't in
18 management, just hourly laborers, did they
19 have health insurance?
20    A. I believe they did. It was
21 accessible to them if they wanted it.
22    Q. Okay. It was their choice
23 whether to get it or not, correct?
24    A. Yeah.
25    Q. It was made available to them.

Page 99

1 Do you know if any of them opted to obtain
2 health insurance?
3    A. I don't. I don't know.
4    Q. And other than health
5 insurance -- was that through Blue Cross or
6 do you know?
7    A. Yes.
8    Q. Other than health insurance, did
9 they have any other employment-related
10 benefits; that is like a 401(k)?
11    A. We did have a 401(k) that they
12 could participate in.
13    Q. Do you know if any of those
14 gentlemen participated in it?
15    A. I don't know.
16    Q. Okay. If they did, would
17 Mid-State match their contributions or pay
18 some percentage of their contributions?
19    A. Yes.
20    Q. All right. How much? Do you
21 know what that --
22    A. I believe they would match up to
23 3 percent of your annual pay.
24    Q. Okay. And other than those two
25 things, do you know if Mid-State provided any

Page 100

1 other employment-related benefits?
2    A. Not that I'm aware of.
3    Q. Did they get holiday pay and
4 vacation pay, that kind of thing?
5    A. Yes.
6    Q. If you had been there for a year,
7 how much vacation did you get?
8    A. I think, after a full year, you
9 were given a week with pay. And after, I
10 think it was three years, you were given
11 two-weeks pay.
12    Q. Okay. Do y'all have personnel
13 files for all employees at Mid-State?
14    A. There were personnel files there,
15 yes.
16    Q. Have you produced any personnel
17 files today?
18    A. Well, the documentation is in
19 front of me here.
20    Q. Okay. Well, for example, Kevin
21 Terrell is listed as an employee who worked
22 at Mid-State during this time period. You
23 don't -- he never worked with you, so you
24 don't know who is he, correct?
25    A. That's correct.

Page 101

1    Q. Does he have an application or
2 anything that you've seen?
3    A. I haven't seen one, no, sir.
4    Q. Well, do you know how he could
5 come to work there and not complete an
6 application? I mean, I know that you didn't
7 hire him or anything, but --
8    A. I don't know if that was possible
9 or not. I don't know.
10    Q. You'd agree with my that there's
11 not any document about Kevin Terrell, right?
12    MR. DUKES: No. Object to the
13        form. I think you're
14        misunderstanding his
15        testimony. The Court order
16        did not require us to
17        produce personnel files for
18        those employees. It only
19        said the Defendant shall
20        produce payroll information.
21    Q. Oh. So you do have personnel
22 files; you just didn't review them?
23    A. I'm assuming that there are
24 personnel files on all employees there.
25    Q. And you didn't review them?

Page 102

1    A. That's correct. I haven't
2 reviewed all of them, no, sir.
3    Q. Okay. Because you didn't want to
4 know what race he was, correct?
5        MR. DUKES: Object to the form.
6    A. No, that's not correct.
7    Q. Well . . . Did y'all have
8 written job descriptions?
9    A. No, sir. Not at the time that I
10 was the manager there.
11    Q. And while you were manager there,
12 did y'all ever do background checks?
13        MR. DUKES: Object to the form;
14            asked and answered.
15    A. I didn't do any background checks
16 on hourly employees that I hired.
17    Q. Okay. Because Jeffrey Harris
18 listed on his application that he had been
19 convicted of a crime. I just wondered if
20 y'all ever investigated that?
21    A. No. He talked to me about it
22 during the interview process.
23    Q. You knew about it?
24    A. Yes, sir.
25    Q. And you hired him?

Page 103

1    A. I did.
2    Q. And did you ever check their
3 credit?
4    A. No, sir.
5    Q. Did you ever check any reference;
6 that is, any previous employer or anything
7 like that?
8    A. Not inasmuch as maybe I ran into
9 somebody in town that they had worked for and
10 talked to them about it. But other than
11 that, no.
12    Q. I mean, you know, Union Springs
13 is kind of a small town. You normally see
14 folks there and might ask somebody if they
15 knew -- what they knew about them, that kind
16 of thing?
17    A. That's correct.
18    Q. Sort of an informal kind of chat?
19        MR. DUKES: Object to the form.
20    A. Yes.
21    Q. Okay. Well, anybody ever tell
22 you anything bad about Norris Foster?
23    A. I didn't hire Norris Foster.
24    Q. All right. Let me mark this as
25 Exhibit 15. Mr. Carroll, were you provided a

Page 104

1 copy of that deposition notice?
2        (Whereupon Plaintiffs' Exhibit
3            No. 15 was marked for
4            identification and attached
5            hereto.)
6        (Witness reviewed document.)
7    A. I believe I was, yes.
8    Q. Read the first thing that's
9 listed there for the areas of inquiry about
10 what I asked the corporate representative to
11 be knowledgeable.
12        MR. DUKES: Jerry, let me object
13            to the form of the question.
14            I don't understand the
15            purpose of the question.
16            When we -- you filed -- we
17            filed objections. You filed
18            a motion to compel. We
19            filed an opposition --
20        MR. ROBERSON: Is that an
21            objection to the form?
22        MR. DUKES: And a protective
23            order. And the Court has
24            entered an order.
25        MR. ROBERSON: Okay.

Page 105

1 BY MR. ROBERSON:
2    Q. What's the first thing that's
3 listed there? Would you read that, please,
4 sir?
5    A. Item No. 1?
6    Q. Yes.
7    A. The names, qualifications,
8 references, job descriptions, duties, salary
9 or wages, or other compensation of all
10 employees of this Defendant who worked at
11 Sedgefields Plantation during the period of
12 time from its purchase until its sale on
13 May 19th, 2006.
14    Q. What's No. 2?
15    A. All personnel files of Mid-State
16 Land and Timber Company employees who worked
17 at Sedgefields Plantation during its period
18 of operation by Mid-State Land and Timber
19 Company.
20    Q. Have you reviewed any personnel
21 files before today?
22    A. No, sir.
23    Q. Why not?
24    A. I reviewed the information that
25 was given to me by my attorney to be

27 (Pages 102 to 105)

Page 106

1 reviewed.
2 Q. And you didn't look at anything
3 else, did you?
4 A. No, sir.
5 Q. So if he wasn't producing it, you
6 weren't reviewing it, correct?
7 MR. DUKES: Object to the form.
8 Q. Correct?
9 A. I have not reviewed anything
10 other than what he has given me.
11 Q. Okay. That's the only thing I
12 wanted to prove, Mr. Carroll.
13 And you've produced Bates stamp
14 Nos. 1 through what page?
15 A. 106.
16 Q. Okay. Well, Mr. Carroll, I
17 represent black men; do you understand that?
18 A. If you say you do, I understand
19 it.
20 Q. Well, I represent Jeffrey Harris,
21 Henry Tarver, Demetrius Parham and -- and
22 Jeffrey Harris, and Willie Mack, and also Roy
23 Lee. Now, those four gentlemen are all
24 blacks who were hired as laborers; do you
25 agree with that?

Page 107

1 A. Yeah.
2 Q. They all worked at Mid-State as
3 laborers, outside work, correct?
4 A. (Witness nodded head.)
5 Q. Is that yes?
6 A. Yes.
7 Q. All right. None of them was paid
8 $8 an hour --
9 MR. DUKES: Object to the form.
10 Q. -- until 2006. None of them in
11 2005 or four or anytime prior to that were
12 ever paid $8 an hour?
13 A. Roy Lee was paid more than that
14 per hour.
15 Q. I understand Roy Lee, but I'm
16 just talking about these laborers.
17 A. But you mentioned him in that --
18 Q. Okay.
19 A. -- in those list of names. I'm
20 just trying to be accurate.
21 Q. Okay. Well, Roy Lee was hired as
22 a laborer originally, correct?
23 A. That's correct.
24 Q. And he was paid 6.50 an hour when
25 he was hired as a laborer. Did you know

Page 108

1 that?
2 A. If that's what his original pay
3 was?
4 Q. Yeah.
5 A. Okay.
6 Q. And you -- you hired four white
7 males in 2005 and January of 2006, and all
8 those -- all those individuals made $8 an
9 hour, correct?
10 A. That's correct.
11 Q. You hired Chance Hamm, correct?
12 A. I did.
13 Q. You hired Joseph May, correct?
14 A. Correct.
15 Q. And you hired William Hubbard,
16 correct?
17 A. Yes.
18 Q. And you also hired Mr. Beckwith,
19 right?
20 A. Yes.
21 Q. How did you hire Mr. Beckwith?
22 How did you come to know him?
23 MR. DUKES: Object to the form;
24 asked and answered. It's
25 beyond the scope of a

Page 109

1 30(b)(6).
2 Q. You can answer. You can answer.
3 MR. DUKES: He can answer when I
4 tell him to answer.
5 And it's okay to
6 answer.
7 A. I had known Mr. Beckwith for a
8 year or two before I hired him. Lives in the
9 same town that I do.
10 Q. Was he a friend of yours?
11 A. Yes.
12 Q. Did you know where he worked
13 before?
14 A. Yeah. He had -- I know where he
15 had -- had worked at different places, yes.
16 Q. What special skills did
17 Mr. Beckwith have?
18 A. I wouldn't say that he had really
19 special skills. I hired him basically, in my
20 mind, as paying him $7 an hour for labor work
21 like the rest of them. And the other dollar
22 an hour, plus a place, a mobile home, place
23 to stay, was for my night watchman's role.
24 Q. Well, was he not going to get
25 paid overtime for his hours after his labor?

1    A.  I had not figured that into the
2  way I had set it up with him, no.
3    Q.  Wouldn't that violate the Fair
4  Labor Standards Act if you didn't pay a
5  person overtime wages for hours over eight
6  each -- or over forty each week?
7    A.  I guess it could.  But the way we
8  had it set up, I didn't think it was a
9  problem.
10    Q.  Well, is there any document, any
11  writing anywhere that shows that $7 an hour
12  was for his labor and a dollar an hour was
13  for his work as a night watchman?
14    A.  No, sir.  There is no
15  documentation.
16    Q.  Oh.  We just have to take your
17  word for that, don't we?
18    MR. DUKES:  Object to the form.
19    A.  Yes, sir.
20    Q.  Okay.  Mr. Carroll, what high
21  school did you attend?
22    A.  Glenwood High School.
23    Q.  Where is that located?
24    A.  It's north of Phenix City in Lee
25  County.

1    Q.  What kind of school is that?
2    A.  It's a high school.
3    Q.  Private?
4    A.  It is, yes, sir.
5    Q.  How many black people do they
6  have attending that high school?
7    MR. DUKES:  Object to the form.
8    Q.  You can answer.
9    A.  I don't know the number.
10    Q.  Any?
11    A.  Yes.
12    Q.  Scholarshipped?
13    A.  Possibly.
14    Q.  Athletic?
15    A.  Some were, some weren't.
16    Q.  Was it a Christian school -- I
17  mean, religious school?
18    A.  No.  It doesn't have any specific
19  religious background to it, no, sir.
20    Q.  You know some private schools are
21  religious in nature, correct?
22    A.  No, sir.
23    Q.  This wasn't like that?
24    A.  Huh-uh (negative response).
25    Q.  Your kids go to public schools in

1  Auburn?
2    MR. DUKES:  Object to the form.
3    A.  Yes, sir.
4    Q.  Mr. Carroll, were you the person
5  who set the wages for these people?
6    MR. DUKES:  Object to the form.
7    A.  I was.
8    THE WITNESS:  Excuse me.
9    Q.  Do you know that it's wrong to
10  discriminate against someone because of their
11  race?
12    A.  Yes, sir, I do.
13    Q.  Do you know that that's unlawful?
14    A.  Yes, sir, I do.
15    Q.  And how old are you Mr. Carroll?
16    A.  Forty-three.
17    Q.  Did you know that it's been
18  unlawful for all the days that you've been
19  alive?  Did you know that?
20    A.  If you tell me, I'll assume that
21  it's true.
22    Q.  Do you agree with me that a
23  person who discriminates based on race, which
24  is unlawful, should be punished?
25    A.  If found that they're guilty of

1  it, I assume they should be, yes, sir.
2    Q.  If there's proof that a person
3  discriminated based on race, then that person
4  or that company should be punished; do you
5  agree with that?
6    MR. DUKES:  Object to the form.
7    A.  Yes.
8    Q.  Well, what do you think would be
9  a fair punishment for that?
10    MR. DUKES:  Object to the form.
11    A.  I don't have any idea.
12    Q.  Do you think that someone who's
13  been in the military for nine years and
14  served this country for nine years and has
15  worked as a diesel mechanic for twenty years,
16  do you think it would be demeaning to them to
17  pay them less money than you paid a
18  twenty-one-year-old boy?
19    MR. DUKES:  Object to the form.
20    A.  It would depend on the
21  circumstances.
22    Q.  Yeah.  Do you think that person
23  might be offended --
24    MR. DUKES:  Object to the form.
25    Q.  -- under those circumstances?

Page 114

1    A. I don't know.
2    Q. Well, would you be?
3    MR. DUKES: Object to the form.
4    A. Again, it would depend on the
5    circumstances.
6    Q. Well, Mr. Carroll, if Mid-State
7    Land and Timber sold this property in May of
8    2006 for $32 million, what do you think would
9    be a fair punishment for them if there's
10   evidence that they discriminated against my
11   clients on the basis of race?
12   MR. DUKES: Object to the form.
13   A. I couldn't answer that.
14   MR. ROBERSON: Thank you,
15       Mr. Carroll.
16   MR. DUKES: I've got one or two
17       follow-ups.
18       EXAMINATION
19   BY MR. DUKES:
20   Q. You testified earlier that you
21   had not inquired as to the background of
22   Byron Davison. Do you recall speaking with
23   Mrs. Howell about Mr. Davison?
24   A. I do.
25   Q. And based on that conversation,

Page 115

1    did Mrs. Howell tell you anything about his
2    background or say that anyone had been
3    stating anything about his background?
4    A. They basically -- Mrs. Howell
5    basically told me that being the husband of
6    Donna Davison -- and she was hired primarily
7    because she was in the family -- that he was
8    hired along for those same reasons.
9    MR. DUKES: That's all I have.
10   MR. ROBERSON: That's good.
11   THE VIDEOGRAPHER: This concludes
12       the deposition of David
13       Carroll. The time is
14       2:57 p.m. A total of two
15       tapes were used. We're
16       going off the Record.
17   (The videotaped deposition of
18   DAVID CARROLL concluded at
19   approximately 2:57 p.m.)
20   * * * * * * * * * *
21   FURTHER DEPONENT SAITH NOT
22   * * * * * * * * * *
23
24
25

Page 116

1    * * * * * * * * * *
2    REPORTER'S CERTIFICATE
3    * * * * * * * * * *
4
5    STATE OF ALABAMA)
6    COUNTY OF MONTGOMERY)
7
8    I, Cornelia J. Baker, Certified Court
9    Reporter, Certified Shorthand Reporter,
10   and Notary Public in and for the State of
11   Alabama at Large, do hereby certify that
12   on Tuesday, March 27, 2007, pursuant to
13   notice and stipulation on behalf of the
14   Plaintiffs, I reported the videotaped
15   deposition of DAVID CARROLL, who was first
16   duly sworn by me to speak the truth, the
17   whole truth, and nothing but the truth, in
18   the matter of JEFFREY HARRIS, WILLIE
19   BERNARD MACK, DEMETRIUS PARHAM and HENRY
20   TARVER, Plaintiffs, versus MID-STATE LAND
21   AND TIMBER COMPANY, INCORPORATED, d/b/a
22   SEDGEFIELDS PLANTATION, Defendant, Case
23   Number 2:06-cv-875-ID-CSC, now pending in
24   the United States District Court for the
25   Middle District of Alabama, Northern

Page 117

1    Division; that the foregoing pages contain
2    a true and accurate transcription of the
3    examination of said witness by counsel for
4    the parties set out herein; that the
5    reading and signing of said deposition was
6    waived by witness and counsel for the
7    parties.
8    I further certify that I am neither of
9    kin nor of counsel to the parties to said
10   cause, nor in any manner interested in the
11   results thereof.
12   This the 3rd day of April, 2007.
13
14
15
         Cornelia J. Baker
16       Certified Shorthand Reporter,
         Certified Court Reporter and
17       Notary Public for the
         State of Alabama
18
19       My Commission expires 6/9/08.
20
21
22
23
24
25