# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| JEFFREY HARRIS, WILLIE BERNARD MACK, DEMETRIUS PARHAM and HENRY TARVER, | ) ) ) | |
| | ) | CIVIL ACTION NO.: |
| Plaintiffs, | ) | 2:06-CV-00875-ID-CSC |
| | ) | |
| vs. | ) | |
| | ) | |
| MID STATE LAND & TIMBER COMPANY, INC., D/B/A SEDGEFIELDS PLANTATION, | ) ) ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT MID STATE LAND & TIMBER COMPANY, INC.'S REPLY BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COMES NOW Defendant Mid State Land & Timber Company, Inc., formerly d/b/a Sedgefields Plantation (hereafter referred to as "Mid State" or "Defendant"),within the time allowed by this Court's Order, and submits this Reply Brief in further support of Defendant's Motion for Summary Judgment as to the claims of Plaintiffs Jeffrey Harris ("Harris"), Willie Bernard Mack ("Mack"), Demetrius Parham ("Parham"), and Henry Tarver ("Tarver") (collectively "Plaintiffs").[1]

---

[1] Rebuttal evidence is attached hereto. All other evidence cited herein is attached to Defendant's Memorandum of Law in Support of Mid State's Motion for Summary Judgment as to the claims of Plaintiffs Jeffrey Harris, Willie Bernard Mack, Demetrius Parham, and Henry Tarver

# I. INTRODUCTION[2]

In their Opposition, Plaintiffs have failed to address the majority of the arguments made by Defendant in support of summary judgment. Indeed, Harris and Mack have abandoned their job assignment claim by failing to even mention it in their Opposition.[3] Plaintiffs' concede their white comparators performed different duties and make no specific arguments as to how they, as individuals, are similarly situated. Contrary to the law of this Circuit, Plaintiffs quarrel with Defendant's reasoning, advocate different criteria, and cherry-pick reasons to purportedly rebut. Because Plaintiffs have failed to address head on the reasons for Defendant's compensation decisions and demonstrate each one is pretext for discrimination, summary judgment is due to be granted in favor of Defendant as to Plaintiffs' claims.

---

(hereafter "Def.'s Mem. of Law").

[2] Plaintiffs' Opposition is a collection of incomplete citations, misstated testimony, and arguments that are not supported by the evidence. The claims of multiple plaintiffs (from two different cases) are lumped into a single document without any designation of which arguments apply to each plaintiff. This Court has previously warned that "in discharging its summary judgment burden, Plaintiffs' counsel must designate *on behalf of each plaintiff* the 'specific facts showing that there is a genuine issue of material fact for trial'" and "show how those facts support the claims of each individual litigant." *Dinkins v. Charoen Pokphand USA, Inc.*, 133 F. Supp. 2d 1254, 1261 (M.D. Ala. 2001) (DeMent, J.) (quoting FED. R. CIV. P. 56(e)) (emphasis in original). As this Court has aptly noted, and as is the case here, "[f]ailure to do so indicates an absence of proof on the issue at hand." *Dinkins*, 133 F. Supp. 2d at 1261.

[3] Parham and Tarver expressly abandoned their claims based on work assignments in their depositions. (Deposition of Demetrius Parham ("Parham Dep."), attached as Exhibit A to Def.'s Mem. of Law, at 45:3-12; Deposition of Henry Tarver ("Tarver Dep."), attached as Exhibit B to Def.'s Mem. of Law, at 57:5 through 58:10.)

## II. ARGUMENT[4]

A.     Harris and Mack Have Abandoned Their Job Assignment Claims.

Defendant presented evidence demonstrating there is no genuine issue of material fact as to Harris's and Mack's claims of discriminatory job assignments. Specifically, Defendant presented evidence that the challenged job assignments are not actionable adverse employment actions under the law of this Circuit and, even if they were actionable, the assignments were based on legitimate, nondiscriminatory criteria. (Def.'s Mem. of Law at 23-28.) Plaintiffs' Opposition contains one passing reference to "Foster's claim that the job assignments were discriminatory."[5] Plaintiffs have not responded to Defendant's arguments as to Harris's or Mack's job assignment claims or even mentioned that either Harris or Mack has such a claim. Accordingly, Harris and Mack have abandoned any claim as to their job assignments. *Cf.*

---

[4] As previously noted, Plaintiffs' Opposition is difficult to parse. To the extent Plaintiffs now seek to assert a new claim for Tarver's non-selection for the night watchman position (Opposition at 10-11), any such claim is not only foreclosed by Tarver's sworn deposition testimony (wherein he expressly states that his sole claim is for pay discrimination), but also contrary to Rule 15 of the Federal Rules of Civil Procedure. *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314-15 (11th Cir. 2004); *see also, e.g.*, *Mahgoub v. Miami Dade Community Coll.*, No. 05-11520, 2006 WL 952278, *2 (11th Cir. Apr.13, 2006) (affirming summary judgment in defendant's favor as to Title VII retaliation claim, when a retaliation claim was raised in complaint but specific theory supporting retaliation claim at issue was not raised until response to summary judgment motion).

[5] Although Plaintiffs mention a job assignment claim by Norris Foster ("Foster"), they do not cite any legal authority or evidence to support Foster's supposed job assignments claim. Foster is a Plaintiff in *Norris Foster v. Mid State Land & Timber Company, Inc.*, In the United States District Court for the Middle District of Alabama, Northern Division, Case No. 2:06CV00405.

3

*Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (explaining that "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment" and that "grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned"). *See also Hooper v. City of Montgomery*, No. 2:06CV612, 2007 WL 858411, *3 (M.D. Ala. Mar. 16, 2007) ("Hooper has not responded to Defendants' arguments concerning the dismissal of the state law claims in Counts III, IV and V, and, consequently, the court finds that Hooper has abandoned these claims.") (DeMent, Senior J.).

B.   The Alleged Statements of Mr. Norman Do Not Support Plaintiffs' Claims.

Plaintiffs base their discrimination claims, and apparently their belief that they are excused from the requirements of *McDonnell Douglas*, largely upon a collection of comments by Joel Norman ("Mr. Norman") and, in particular, Mr. Norman's alleged comment about having an "all white crew." (Opposition at 8.)  Plaintiffs assert that Mr. Norman had discriminatory motives and claim that David Carroll ("Mr. Carroll") was the "cat's paw" for Mr. Norman. (Opposition at 12.)  The undisputed evidence, however, establishes that Mr. Norman's  comments are not relevant to Plaintiffs' claims and the cat's paw theory does not apply.

4

Plaintiffs each assert a single claim for pay discrimination.[6]  There is no evidence that Mr. Norman, the only individual who is alleged to harbor discriminatory animus, either set Plaintiffs' pay or made recommendations as to Plaintiffs' pay.  In fact, Mr. Norman was not even employed with Defendant when Mid State hired Plaintiffs and set their rate of pay.  (Def.'s Mem. of Law at 4, 6, 8, 10, 12 (discussing and citing hire dates for each plaintiff and Mr. Norman).)  All of the Plaintiffs have testified that Mr. Carroll, the decision maker with regard to compensation, was fair to them.[7]  (Deposition of Jeffrey Harris ("Harris Dep."), attached as Exhibit F to Def.'s Mem. of Law,  at 109:23 through 110:2; Declaration of Willie Mack ("Mack Decl."), attached as Exhibit J to Def.'s Mem. of Law, at 2; Parham Dep., attached as Exhibit A to Def.'s Mem. of Law, at 57:21-23; Tarver Dep., attached as Exhibit B to Def.'s Mem. of Law, at 43:16-19.)

The "cat's paw" theory of analysis only applies if the plaintiff shows that a recommendation by someone with animus directly resulted in the employee experiencing an adverse action.  *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328,

---

[6]  As discussed herein, Mack and Harris have abandoned their job assignments claims by failing to respond to Defendant's arguments in support of summary judgment or to even mention a job assignment claim in their Opposition.

[7]  In the words of Mack, Mr. Carroll is a "one hundred percent good person."  (Deposition of Willie Mack ("Mack Dep."), attached as Exhibit I to Def.'s Mem. of Law, at 75:13-21.)

1331-32 (11th Cir. 1999). "[T]he plaintiff [must] show that the decisionmaker followed the biased recommendation without independently investigating the complaint against the employee." *Stimpson*, 186 F.3d at 1332. Thus, the causal link is severed if "instead of merely tacitly approving or otherwise 'rubber stamping' another's adverse recommendation or allegations, the decisionmaker conducts an 'independent investigation' into the allegations against the plaintiff." *Iduoze v. McDonald's Corp.*, 268 F. Supp. 2d 1370, 1375 (N.D. Ga. 2003) (quoting *Curtis v. Teletech Customer Care Management, Inc.*, 208 F. Supp. 2d 1231, 1243-44 (N.D. Ala. 2002)). In this case, the cat's paw theory is inapplicable because (1) there is no evidence that Mr. Norman made recommendations as to Plaintiffs' pay and (2) Mr. Carroll testified, without rebuttal, that he personally determined compensation based on the employee's skills, Mid State's immediate needs, and the prospective employee's ability to meet those needs. (Deposition of David Carroll ("Carroll Dep."), attached as Exhibit C to Def.'s Mem. of Law, at 137:15-19; 141:18 through 142:6; Second Affidavit of David Carroll ("Second Carroll Aff."), attached as Exhibit E to Def.'s Mem. of Law, ¶ 3.) Thus, Plaintiffs cannot show that Mr. Carroll acted as a cat's paw for a biased recommender.

Furthermore, because Mr. Norman did not make recommendations as to Plaintiffs' pay and Mr. Carroll acted on his own assessment of Mid State's needs and

6

the individual employee's ability to meet those needs in setting compensation, the statements of Mr. Norman are not relevant to Plaintiffs' claims of discrimination. There is no evidence Mr. Carroll knew of Mr. Norman's alleged discriminatory animus or that Mr. Carroll harbored discriminatory animus of his own.[8]  As the Eleventh Circuit has explained, "[t]he biases of one who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case." *Holifield v. Reno*, 115 F.3d 1555, 1563-64 (11th Cir. 1997).  *See also Yates v. Hall*, No. 3:05CV459, 2007 WL 1019924, *10 (N.D. Fla. Mar. 30, 2007) (citing *Holifield* and rejecting as irrelevant plaintiff's evidence of discriminatory statements of a supervisor who did not recommend plaintiff's termination or terminate the plaintiff's employment).  Accordingly, the statements of Mr. Norman are neither a substitute for a prima facie case of discrimination nor evidence of pretext.

C.    Plaintiffs' Arguments Concerning Balkcam and Beckwith Do Not Sustain Their Wage Discrimination Claims.

There is no dispute that Beckwith worked as a night watchman and none of the other laborers had that responsibility.  (Harris Dep., attached as Exhibit F to Def.'s

---

[8]  Plaintiff Foster claims that he complained to Mr. Carroll about discriminatory treatment by Mr. Norman.  (Opposition at 4.)  The deposition testimony cited in the Opposition does not support Foster's claim.  Foster actually testified that he never told Mr. Carroll what his problems with Mr. Norman were and that while he informed Lee of Mr. Norman's comments, he is not aware of Lee ever conveying to Mr. Carroll his complaints of discriminatory treatment.  (Deposition of Norris Foster ("Foster Dep."), attached hereto as Exhibit A, at 93:3 through 96:3.)

Mem. of Law, at 106:18-20; Mack Decl., attached as Exhibit J to Def.'s Mem. of Law, at 1 (listing all of his duties); Declaration of Demetrius Parham ("Parham Decl."), attached as Exhibit K to Def.'s Mem. of Law (listing duties); Tarver Dep., attached as Exhibit B to Def.'s Mem. of Law, at 42:15 through 43:9 (listing duties).) As a matter of law, it is reasonable and legitimate to pay a higher hourly wage to an employee who has agreed to assume extra duties. *Kimble v. Georgia Pacific Co.*, 245 F. Supp. 2d 862, 878 (M.D. La. 2002) (noting extra duties, which plaintiff failed to rebut, were legitimate reason for pay disparity).  Unable to rebut this legitimate reason, Plaintiffs quarrel with Defendant's reasoning by arguing it was unnecessary to pay Beckwith additional compensation to assume extra duties because Beckwith would be entitled to overtime.  (Opposition at 10-11.)  Plaintiffs' belief that Defendant should not have provided extra compensation to Beckwith because he agreed to assume this additional position is simply an impermissible attempt to substitute their business judgment for Defendants.  *Chapman v. AI Transport*, 229 F.3d 1012, 1037 (11th Cir. 2000) (explaining plaintiff "cannot substitute his business judgment for that of the employer").  Plaintiffs' argument does not evidence that Defendant's reason was untrue or that the reason for the additional compensation was

8

discriminatory.[9]  Moreover, even if Defendant could have insisted that overtime pay be the only additional compensation (as counsel alleges it should have been), a mistaken belief that some additional compensation should be paid to an employee asked to assume an additional position with additional duties, even if not required under the law, is not discriminatory.  *See Nix v. WLCY Radio/Rahall Comms.*, 738 F.2d 1181, 1187 (11th Cir. 1984) (explaining employer's proffered reason "does not have to be a reason that the judge or jurors would act on or approve") (citations omitted).

Additionally, to the extent that Beckwith's close personal friendship with David Carroll may have played a role in Beckwith's selection for the night watchman position and accompanying rate of pay, the law is clear that discrimination based on

---

[9]  Impliedly acknowledging the irrefutable reasonableness of additional compensation for additional duties associated with an additional position, Plaintiffs argue (in support of Tarver's claim and perhaps their own) that Tarver should have been given the position of night watchman which was given to Beckwith.  (Opposition at 10.)  Tarver has not, however, asserted any claim of discrimination with regard to the night watchman position and cannot do so now in opposition to summary judgment.  Further, because Tarver has never claimed that his non-selection was discriminatory, much less presented evidence that it was, he cannot make an unsupported, conclusory allegation of discrimination and claim that satisfies his burden to demonstrate that the legitimate reasons for the pay differential are pretext for discrimination.

Additionally, Plaintiffs' argument that "[n]o black has ever lived on the property at Sedgefields" (Opposition at 6) is both irrelevant and untrue.  The Affidavit of Roy Lee, which is once cited as evidentiary support for this statement, is limited to the period of time that Lee was employed at Sedgefields.  Moreover, this claim is directly contradicted by the sworn deposition testimony of David Carroll that before Beckwith lived on the property, Lee was permitted to stay, and in fact often stayed, at a house on the Sedgefield's property during the busy season.  (Carroll Dep., attached hereto as Exhibit B, at 110:19 through 111:1.)

personal relationships is not actionable. *See Phillips v. Hibbett Sporting Goods, Inc.*, 329 F. Supp. 2d 1280, 1291 n. 8 (M.D. Ala. 2004) ("If [Plaintiff's] speculation is correct, then her case challenges the "fairness" of employment decisions based on friendship rather than the legality of employment decisions motivated by racial preference. . . . Put another way, even if a jury believed [Plaintiff's] speculation, Bundrick's decision to promote his friends would not support a claim of race or sex discrimination."); *Darden v. Housing Authority of Baltimore*, No. PWG-06-216, 2006 WL 3231964, *5 (D. Md. Nov. 7, 2006) (rejecting plaintiff's wage discrimination claim and holding that "these 'isms' [nepotism and favoritism] are not prohibited by Title VII or §1981 to the extent they are unrelated to race, color, religion, sex, or national origin").

Nor is the compensation of Corey Balkcam evidence that Mr. Carroll's reasons for the compensation of white employees hired months later are pretextual. Mr. Carroll testified that he based his hiring and compensation decisions upon Mid State's immediate needs at the time and the individual's ability to meet those needs. (Carroll Dep., attached as Exhibit C to Def.'s Mem. of Law, at 137:15-19; Second Carroll Aff., attached as Exhibit E to Def.'s Mem. of Law, ¶ 3.) The undisputed evidence is that when Mr. Carroll was hired in April 2005, he began surveying and assessing the needs of over twenty square miles of property. (Second Carroll Aff. ¶ 3.) Balkcam

10

was hired just weeks after Mr. Carroll was hired in response to Lee's request for additional labor to help with the pressing mowing and weed-eating needs for that time of year. (*Id.*) Because he was hired for the sole purpose of ground maintenance, Balkcam was paid $7.00/hour like all the other employees performing exclusively property maintenance. (Second Carroll Aff. ¶ 3; Plaintiff's Exhibit 35.)

Although Balkcam was indisputably hired at Lee's request to meet the immediate need for additional labor for property maintenance, Plaintiffs attempt to compare Hamm to Balkcam based on the fact both had welding skills. This comparison is not proper. Hamm was hired eight months after Balkcam in January 2006. (Second Carroll Aff., attached as Exhibit E to Def.'s Mem. of Law, ¶ 3.) When Hamm was hired, Mr. Carroll was almost a year into his job, farther along in his assessment of Mid States's needs, and aware of the equipment that needed to be repaired and built by an individual with welding experience. (Carroll Dep., attached as Exhibit C to Def.'s Mem. of Law, at 139:22 through 141:9.) Hamm was an experienced welder who could make repairs to "just about any type of equipment" and build needed equipment for Mid State. (Carroll Dep. at 139:22 through 141:17.) Because those were Mid State's needs at the time, Mr. Carroll hired Hamm to perform the welding associated with the needed repairs and building projects and paid him $8.00/hour for his skills. (*Id.*)

11

D.    Plaintiffs' Unsupported Arguments About a "Two Tiered Compensation Scheme" Do Not Establish a Prima Facie Case Nor Demonstrate Pretext.

Unable to meet their burden to identify a proper comparator and demonstrate each of Defendant's reasons are pretextual, Plaintiffs make sweeping, unsupported, conclusory allegations of a "two tiered compensation scheme" and allege that "blacks are on the bottom tier." (Opposition at 12.) As this Court will note, the evidence in the record is for a limited three year time period (2003-2006) so Plaintiffs' arguments about "every white" exaggerate the evidence. Moreover, these sweeping statements are contradicted by Plaintiffs' purported evidence. Plaintiffs' own Exhibits (34 and 35) reflect two black females being paid $8.00/hour and $9.00/hour (as much and more than white employees), Mack (who is black) being paid $8.00/hour beginning in January 2006, and further show that Lee earned a significantly higher wage than nearly every other white employee. Furthermore, even overlooking these misstatements, a list of pay rates that does not take into account duties, skills, and job responsibilities has no probative value to a claim of discrimination. *See, e.g., Furr v. Seagate Technology, Inc.*, 82 F.3d 980, 986-87 (10th Cir. 1996) (citation omitted) (finding plaintiffs' statistics flawed because they "grouped all employees together regardless of specialty or skill and failed to take into account nondiscriminatory reasons for the numerical disparities"). In short, Plaintiffs' conclusory,

12

unsubstantiated allegation of a discriminatory compensation scheme does not preclude summary judgment. *Byrd v. Auburn University at Montgomery*, No. 2:05CV835, 2007 WL 1140424, *12 ((M.D. Ala. Apr. 17, 2007) (explaining plaintiff "cannot rely on her own unsubstantiated opinion that the salary decisions were somehow motivated by gender" and finding "mere fact that these men were paid more" insufficient to establish pretext.)

E.    Harris's Wage Claim Fails as a Matter of Law.

As to his wage claim, Harris completely ignores his duty to address head on each of the reasons proffered by Defendant for the alleged pay disparities.  Instead, he creates his own list of criteria, selectively responds to one of the many articulated reasons for one of Defendant's compensation decisions, and then tries to compare himself to Anthony Dickey, an individual that Harris has never testified was impermissibly paid more than him.  (Opposition at 10; Harris Dep., attached as Exhibit F to Def.'s Mem. of Law, at 106:2-13 (identifying Will Hubbard, Joseph Mays, and Bill Beckwith as the only white employee that he believes he "should have been paid the same or more than").)  Specifically, Harris claims that Defendant should have considered his military experience, argues, without citation to the record, that he had "experience as a mechanic," and states that he should have been paid as much as Dickey because he could repair weed eaters.  (Opposition at 10.)  All of these

13

arguments are insufficient as a matter of law.

First, under the law of this Circuit, "a plaintiff employee may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason," as long as "the reason is one that might motivate a reasonable employer." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir. 2001); *see also Rowell v. BellSouth Corp.*, 433 F.3d 794, 798-99 (11th Cir. 2005) (explaining that "[i]t is by now axiomatic that we cannot second-guess the business decisions of an employer"). As a matter of law, it is reasonable for an employer, such as Mid State, to base compensation decisions upon an individual's skills, the company's immediate needs, and the ability of a prospective employee to meet those needs. (Carroll Dep., attached as Exhibit C to Def.'s Mem. of Law, at 137:15 through 140:8; Second Carroll Aff., attached as Exhibit E to Def.'s Mem. of Law, ¶ 3.) Although Harris believes Defendant should have rewarded his short stint of time with the National Guard before he went AWOL (Harris Dep., attached hereto as Exhibit C, at 52:2 through 53:10), neither Harris nor the Court can quarrel with the wisdom of Defendant's criteria or second-guess Defendant's decision. *Chapman*, 229 F.3d at 1029.

Second, although Harris argues, without citation to the record, that he had prior experience as a mechanic (presumably like May– though he never mentions May in

14

this argument), Harris does not dispute that this information was not contained in his application[10] and was never disclosed to Mr. Carroll, the decision maker with regard to compensation. (Harris Dep., attached as Exhibit F to Def.'s Mem. of Law, at 51:1-18; 56:13 through 57:13; 61:15 through 62:3.) Nor does Harris claim that he ever performed any mechanic work for Mid State. Regardless, Harris's claim that he had this undisclosed mechanic experience does not render him similarly situated to May because May was hired and compensated for **both** mechanic ability and trapping skills. (Carroll Dep., attached as Exhibit C to Def.'s Mem. of Law, at 137:15 through 138:17.) Accordingly, Harris's unsupported allegation that he had prior experience as a mechanic is insufficient to sustain his wage discrimination claim.

Finally, Harris attempts to compare himself to Dickey by selecting one of the many reasons proffered for Dickey's compensation and claiming he too had that experience. As an initial matter, Harris listed his purported comparators in his Complaint and identified under oath at his deposition "all" the white employees he believed were impermissibly paid more than him.[11] (Second Amended Compl. ¶¶ 15-

_____

[10]    On his application, Harris indicated that he could perform mower and weed eater maintenance. (Exhibit G to Def.'s Mem. of Law.) Harris does not indicate that he previously worked as a mechanic.

[11]    All four of these *Harris* plaintiffs attended all of the depositions. Harris was the first of these four *Harris* plaintiffs to be deposed and Tarver was the second. Neither Harris nor Tarver claimed to be similarly situated to Dickey. Dickey's name was first mentioned by Parham, the third plaintiff deposed. Mack was deposed immediately after Parham and he also claimed to be similarly

17; Harris Dep., attached as Exhibit F to Def.'s Mem. of Law, at 106:2-13.)  Dickey was never mentioned by Harris until his Opposition to Mid State's Motion for Summary Judgment.  Now, for the first time, Harris argues that he is similarly situated to Dickey and that Dickey was paid more because of his race.

Even overlooking the blatant contradiction of his prior sworn testimony, Harris's argument is insufficient to sustain his claim because Dickey's compensation was not based solely upon his ability to repair weed eaters.  The undisputed testimony is that Dickey's compensation was also based upon his ability to work as a mechanic, his friendship with a Sedgefield's manager, his perceived social skills and ability to deal with customers (based on objective criteria such as his education and years of sales experience with his father's business), and the fact that Dickey's father owned a power equipment company that could supply equipment to Mid State at favorable rates.  (Declaration of Anthony Dickey ("Dickey Decl."), attached as Exhibit L to Def.'s Mem. of Law; Affidavit of Denise Pierce ("Pierce Aff."), attached as Exhibit M to Def.'s Mem. of Law, ¶ 2.)  Harris has not shown that he had similar connections, experience, and skills.  Accordingly, Harris's contention that he could repair weed eaters does not establish a prima facie case nor demonstrate pretext. *Chapman*, 229 F.3d at 1037 (explaining that "in order to avoid summary judgment, a plaintiff must

---

situated to Dickey.

16

produce sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual").

F.    Mack's Wage Discrimination Claim Fails as a Matter of Law.

In his Opposition, Mack does not dispute that he did not have night watchman responsibilities. (Def.'s Mem. of Law at 18.)  Nor does Mack dispute that he lacked the mechanic, trapping, welding, and skidder operation skills that May, Hubbard, and Hamm possessed.  (Def.'s Mem. of Law at 19-20.)  Mack does not claim that he possessed  connections, social skills, or equipment experience similar to Dickey. (Def.'s Mem. of Law at 22; Exhibits L and M to Def.'s Mem. of Law.)  Because Mack has failed to identify a proper comparator, or rebut the legitimate reasons for the disparities in pay between himself and his supposed comparators, his wage discrimination claim fails as a matter of law.  *See, e.g.*, *Beard v. 84 Lumber Co.*, No. 06-12220, 2006 WL 2946883, *4 (11th Cir. Oct. 17, 2006) (affirming summary judgment in wage disparity case based on plaintiff's failure to identify a similarly-situated comparator) (table); *Mack v. ST Mobile Aerospace Engineering, Inc.*, No. 05-14695, 2006 WL 2129661 (11th Cir. July 31, 2006) (affirming summary judgment for employer because employee's comparators possessed specialized training and experience that employee did not, and thus employee was not similarly situated to his alleged comparators).

17

G.     Tarver's Wage Discrimination Claim Fails as a Matter of Law.

Tarver testified that, other than labor skills (which consisted of mowing and using the weed eater), he did not have any special skills to bring to Mid State. (Tarver Dep., attached as Exhibit B to Def.'s Mem. of Law, at 63:16-22.)  Further, he testified that, during his entire period of employment, his duties at Mid State consisted of "cutting grass and Weedeating."  (Tarver Dep., attached as Exhibit B to Def.'s Mem. of Law, at 42:15 through 43:9.)   By these admissions, Tarver has conceded that he is not similarly situated to Beckwith, Hubbard, May, and Hamm, the white employees that he claims are his alleged comparators.  (Def.'s Mem. of Law at 18-20 (detailing additional night watchman duties of Beckwith and duties and skills of Hubbard, May, and Hamm).)  *See Moreland v. Miami-Dade County*, 255 F. Supp. 2d 1304, 1312 (S.D. Fla. 2002)  (explaining that the "the burden is on the plaintiff to show the similarity" with his supposed comparator "and not on the defendant to disprove their dissimilarity"). Because Tarver has failed to establish a prima facie case and demonstrate pretext, summary judgment is due to be granted as to his wage disparity claim.  *See Cooper v. Southern Co.*, 390 F.3d 695, 745 (11th Cir. 2004) (affirming summary judgment for employer based on plaintiff's failure to establish a proper comparator).

18

H.     Summary Judgment is Due to be Granted as to Parham's Wage Discrimination
       Claim.

       Like Mack and Tarver, Parham admitted under oath that he did not perform the

same duties or possess the same skills as his supposed comparators.  (Def.'s Mem. of

Law at 11, 18-21.)  In his Opposition, Parham has failed to make any argument in

support of his claim that he is similarly situated to his white comparators.  Parham has

failed to present any evidence that Defendant's reasons for the compensation of

Dickey, Beckwith, Hubbard, and Hamm are pretext for discrimination.  Accordingly,

Parham's wage discrimination claim is due to be dismissed.

### III.  CONCLUSION

       WHEREFORE, PREMISES CONSIDERED, Defendant Mid State Land &

Timber Company, Inc. respectfully requests this Court enter summary judgment in

favor of Defendant and against Plaintiffs Jeffrey Harris, Willie Bernard Mack,

Demetrius Parham, and Henry Tarver as to all claims asserted in the Complaint.


                                          Respectfully submitted,


                                           /s/Carter H. Dukes
                                          Carter H. Dukes
                                          Kimberly W. Geisler
                                          Attorneys for Defendant
                                          Mid State Land & Timber Company, Inc.


                                    19

**OF COUNSEL:**
HUCKABY SCOTT & DUKES, P.C.
2100 Third Avenue North
Suite 700
Birmingham, Alabama 35203
(205) 251-2300

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon counsel of record by electronic filing with the CM/ECF system or by placing a copy of same in the United States mail, first class postage prepaid and addressed as follows:

Jerry D. Roberson, Esq.
Roberson & Roberson
8 Office Park Circle
Suite 150
Birmingham, Alabama 35223

Albert H. Adams, Jr., Esq.
Irby Law Firm, LLC
Post Office Box 910
Eufaula, Alabama 36072

DONE this the 1st day of May, 2007.

/s/Carter H. Dukes
Of Counsel

40760.1

# FREEDOM COURT REPORTING

Page 1

1      IN THE UNITED STATES DISTRICT COURT

2      FOR THE MIDDLE DISTRICT OF ALABAMA

3           NORTHERN DIVISION

4

5    CASE NUMBER:  2:06cv405-ID        **COPY**

6    NORRIS FOSTER,

7           Plaintiff,

8           vs.

9    MID STATE LAND & TIMBER COMPANY,

10   INC., d/b/a SEDGEFIELDS PLANTATION,

11          Defendant.

12

13        S T I P U L A T I O N

14         IT IS STIPULATED AND AGREED by and

15   between the parties through their respective

16   counsel, that the deposition of Norris

17   Foster may be taken before Angela Smith,

18   RPR, CRR, at the offices of John W. Waters,

19   at 214 North Prairie St., Union Springs,

20   Alabama 36089, on the 7th day of September,

21   2006.

22

23          DEPOSITION OF NORRIS FOSTER

Page 93

1    Joel, Mr. Lee?

2         A.    Maybe a couple of days after I

3    started working with him.

4         Q.    How many times did you

5    complain to him?

6         A.    I don't know.  A bunch of

7    times.

8         Q.    Less than five?

9         A.    Yeah.  I even tried to talk to

10   David about it, but he said they were my

11   boss and he didn't have nothing to do with

12   it.

13        Q.    How many times did you say

14   something to David Carroll about the way you

15   were being treated?

16        A.    I tried to talk to him twice.

17        Q.    Okay.  What did you say to him

18   on the first time?

19        A.    I asked him could I talk to

20   him.  And he told me if I had any problems,

21   talk to Joel, he my supervisor.

22        Q.    Did you tell him what your

23   problem was?

# FREEDOM COURT REPORTING

Page 94

1    A.      He didn't want to hear it.  He

2 told me to talk to Joel.

3    Q.      The second -- When was that?

4    A.      I can't remember the dates.

5 Just say sometime in October, when he first

6 -- around the first week or two in October.

7    Q.      Okay.  And when was the next

8 time you approached David Carroll?

9    A.      A couple of days.  I didn't

10 approach him.  I talked to him over the

11 radio.

12    Q.      Okay.  Called him on the

13 radio?

14    A.      Yeah.

15    Q.      And what did you say to him

16 that time?

17    A.      Same thing.  I need to talk

18 with him, and he told me the same thing.

19    Q.      So, you never told Mr. Carroll

20 what your issues were with Mr. Norman?

21    A.      No.

22    Q.      Okay.  You did tell Mr. Lee

23 what your issues were with Mr. Norman,

## FREEDOM COURT REPORTING

Page 95

1  didn't you?

2          A.       Yeah.

3          Q.       What did Mr. Lee tell you?

4          A.       That he was my supervisor, no

5  matter what he said, do.  He your

6  supervisor, and you going to have to -- You

7  know, he kept asking me had I talked to I

8  David.  And I had told him that I tried to

9  talk to David a couple times about it, and

10  he told me the same thing, talk to Joel.

11  But I could talk to Roy, you know, tell him,

12  probably, and wasn't nothing he could do

13  because I didn't work with him no more.

14          Q.       Okay.  What did you complain

15  to Roy about specifically?

16          A.       The way he talk to us.

17          Q.       Anything else?

18          A.       That's basically it.

19          Q.       Okay.  Do you know if Mr. Lee

20  ever told anybody else at Sedgefields or Mid

21  State about the complaints that you made to

22  him?

23          A.       I don't know.

## FREEDOM COURT REPORTING

Page 96

1    Q.    He never told you he spoke to

2  anybody about your complaints?

3    A.    No.

4    Q.    Okay.   What were some of the

5  things that Joel would say that you believe

6  serve as the basis for your complaint that

7  you were discriminated against on the basis

8  of your race?

9    A.    He used to always ask me were

10  we going hunting, before we got there who

11  took the guests out?  And I told him either

12  me or Roy.  He said he had never worked on a

13  plantation or been on a plantation where

14  black guys -- they had black guides.

15    Q.    And did he make that comment

16  before your first hunt?

17    A.    Yeah.

18    Q.    Did he make that comment any

19  other time?

20    A.    He said -- Not that comment,

21  but he said other things.

22    Q.    Okay.   Well, I'm just -- I'm

23  going to let you tell me about the other

**American Court Reporting**
**toll-free (877) 320-1050**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


CIVIL ACTION NUMBER

2:06-CV-00405-ID-SRW


NORRIS FOSTER,

    Plaintiff,

vs.

MID STATE LAND & TIMBER COMPANY, INC.,
d/b/a SEDGEFIELDS PLANTATION,

    Defendant.



THE VIDEOTAPED

DEPOSITION TESTIMONY OF:

DAVID CARROLL


September 8, 2006

1:29

    p.m.


COURT REPORTER:

Gwendolyn P. Timbie, CSR

**www.AmericanCourtReporting.com**
**September 8, 2006**



**American Court Reporting**
**toll-free (877) 320-1050**

Page 110

1        Q      He was going to get a lot of

2    overtime, then, wasn't he?

3        A      Well, I provided him with a --

4    I had a mobile home on the place.  I

5    provided him with a simple place to stay.

6    And provided him with a little extra money

7    in his paycheck to offset the expenses for

8    what, you know, the reasonable fee would

9    be for somebody who would be putting in a

10   few hours during the evening, just making

11   sure everything was locked up and nobody

12   was on the place.

13       Q      So at the time that

14   Mr. Beckwith was working there, there

15   wasn't anybody living on the property; is

16   that fair?

17       A      That is correct.

18       Q      Okay.

19       A      From time to time before that,

20   Roy Lee had access to a -- a house during

21   the busy time of the season, and he could

22   stay there.  He didn't live there full

23   time, but he did stay there quite often

**American Court Reporting**
**toll-free (877) 320-1050**

Page 111

1    during the season, I'm told.

2         Q    All right.  But Mr. Beckwith

3    didn't quite work out, did he?

4         A    No, he didn't.

5         Q    He -- he stole some gas?

6         A    He did.

7         Q    Did y'all see him?  Did y'all

8    have evidence of him?

9         A    I confronted him about it, and

10   he admitted it to me.

11        Q    Okay.  So he was let go?

12        A    He was.

13        Q    He also didn't have a driver's

14   license, did he?

15        A    Turned out, he didn't.  And

16   that's another one of the reasons he was

17   let go.

18        Q    Okay.  Well, turned out.  Did

19   he show you one?

20        A    He provided me with a license

21   upon being hired there, but it turned out

22   it was not a current and/or valid license.

23        Q    All right.  You hired

# FREEDOM COURT REPORTING

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF ALABAMA

3    NORTHERN DIVISION

4

5    CASE NUMBER:  2:06-CV-875-ID

6    JEFFREY HARRIS, et al.,

**COPY**

7    Plaintiffs,

8    vs.

9    MID STATE LAND & TIMBER CO., INC.,

10    d/b/a SEDGEFIELDS PLANTATION,

11    Defendant.

12

13    S T I P U L A T I O N

14    IT IS STIPULATED AND AGREED by and

15    between the parties through their respective

16    counsel, that the deposition of Jeffrey

17    Harris may be taken before Angela Smith,

18    RPR, CRR, at the offices of John W. Waters,

19    Jr., at 214 North Prairie Street, Union

20    Springs, Alabama 36089, on the 16th day of

21    January, 2007.

22

23    DEPOSITION OF JEFFREY HARRIS

## FREEDOM COURT REPORTING

Page 52

1       A.      Yes.

2       Q.      Okay.   That's the Alabama

3   National Guard?

4       A.      Yes, sir.

5       Q.      Okay.   And I don't know

6   anything about the National Guard.   Where

7   were you --

8       A.      Right up here -- What you

9   mean?

10      Q.      Well, did you have a place

11  that you reported to, a unit that you

12  reported to?

13      A.      Yeah.   The National Guard

14  Armory.

15      Q.      Okay.

16      A.      That was right across from the

17  Grill, it used to be there.

18      Q.      Okay.

19      A.      They got the YMCA now.

20      Q.      Okay.   Did you have a unit

21  that you reported to?   What was your unit?

22      A.      I can't hardly even remember

23  that stuff.   That's so long ago.   I was in

**FREEDOM COURT REPORTING**

Page 53

1   high school then.  I can't remember that.

2          Q.    Did you leave voluntarily or

3   were you --

4          A.    AWOL.

5          Q.    You were AWOL?

6          A.    Yeah.

7          Q.    And AWOL means what?

8          A.    I left, unadvised.

9          Q.    Absent without leave?

10         A.    Right.

11         Q.    And so, were you terminated,

12  your relationship with the National Guard

13  terminated?

14         A.    Well, I got a honorable

15  discharge with general conditions.

16         Q.    Okay.  What does that mean?

17         A.    So that means if I wanted to,

18  I could have got back in.

19         Q.    Okay.  You identify your

20  conviction as possession of marijuana.  How

21  much marijuana did you have when you were

22  arrested?

23         A.    You probably couldn't even