## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **JEFFREY HARRIS, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | **Civ. Act. No. 2:06cv875-ID** |
| **MID STATE LAND & TIMBER** | ) | **(WO)** |
| **COMPANY, INC., D/B/A** | ) | |
| **SEDGEFIELDS PLANTATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

### I.  INTRODUCTION

Before the court is Defendant Mid State Land & Timber Co., Inc.'s ("Mid State")

motion for summary judgment, filed April 4, 2007.  (Doc. No. 40.)  Mid State moves for

summary judgment on the 42 U.S.C. § 1981 race discrimination claims brought by

Plaintiffs Jeffrey Harris ("Harris"), Willie Mack ("Mack"), Demetrius Parham

("Parham") and Henry Tarver ("Tarver") (collectively "Plaintiffs").  Mid State's motion

is accompanied by a memorandum of law and evidence.  (Doc. No. 43.)  In response,

Plaintiffs filed evidence and a memorandum of law in opposition to Mid State's motion to

which Mid State submitted a reply.  (Doc. Nos. 49-50, 52.)  After careful consideration of

the arguments of counsel, the relevant law and the record as a whole, the court finds that

Mid State's motion for summary judgment is due to be granted.

## II.  JURISDICTION AND VENUE

The court properly exercises subject matter jurisdiction over this action, pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343 (civil rights jurisdiction).  The parties do not contest personal jurisdiction or venue, and the court finds adequate allegations of both.

## III.  STANDARD OF REVIEW

A court considering a motion for summary judgment must construe the evidence and make factual inferences in the light most favorable to the nonmoving party.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).  At the summary judgment juncture, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986) (citations omitted).

Summary judgment is entered only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex, 477 U.S. at 323.  The movant can meet this burden by presenting

evidence showing there is no dispute of material fact or by showing that the non-moving

party has failed to present evidence in support of some element of its case on which it

bears the ultimate burden of proof. Id. at 322-23, 325. The burden then shifts to the

nonmoving party, which "must do more than simply show that there is some metaphysical

doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475

U.S. 574, 586 (1986). Summary judgment will not be entered unless the record taken as a

whole could not lead a rational trier of fact to find for the nonmoving party. See id. at

587.


## IV. BACKGROUND[1]

### A. Generally

Plaintiffs, who are African-American, formerly worked as general laborers for Mid

State on a 13,000-acre parcel of property in Bullock County, Alabama, called Sedgefields

Plantation ("Sedgefields"). Mid State owned and managed Sedgefields primarily for deer

and quail hunting for paying customers. (Carroll Dep. at 18-19, 21-22 (Ex. C to Doc. No.

43).) Plaintiffs worked for Sedgefields for various time periods between March 2004 and

May 19, 2006. On May 19, 2006, Mid State sold Sedgefields to Tolleson Land & Timber

("Tolleson"). (Carroll Aff. ¶ 2 (Ex. D to Doc. No. 43).) The sale of Mid State resulted in

---

[1] The facts are presented in the light most favorable to Plaintiffs.

the termination of the employment of all of Mid State's employees at Sedgefields. (Carroll Aff. ¶ 2 (Ex. O to Doc. No. 43).[2])

Alleging intentional race discrimination in violation of 42 U.S.C. § 1981, Plaintiffs contend that Mid State paid them less than similarly-situated Caucasian employees. Namely, Plaintiffs contend that their starting hourly wages ranged from $6.50 to $7.00, while their Caucasian counterparts received starting hourly wages of $8.00 or $8.50 for the same position.

## B. Mid State: Managers

Roy Lee ("Lee") hired Plaintiffs Mack and Parham. David Carroll ("Carroll") hired Plaintiffs Harris and Tarver.[3] Lee is African-American, and Carroll is Caucasian. (Carroll Dep. at 57 (Ex. 5 to Doc. No. 49)); (Norman Dep. at 67 (Ex. 2 (part 1) to Doc. No. 49)); (Am. Compl. ¶ 6 (Doc. No. 21).)

Lee worked for Mid State from 2000 until Tolleson bought Mid State in May 2006. (Lee Decl. at 1 (Ex. 36 to Doc. No. 49).) Lee initially was hired to work as a laborer, but in 2004 he was promoted to deer operations manager and head of grounds crew. (Id.); (Norman Dep. at 67 (Ex. 2 (part 1) to Doc. No. 49)); (Mid State Employee

---

[2] The court notes that Carroll submitted three affidavits dated August 14, 2006, February 7, 2007, and April 3, 2007. (See Exs. D, E & O to Doc. No. 43).)

[3] Lee also was a plaintiff in this lawsuit. On August 20, 2007, the court granted Mid State's motion for summary judgment as to Lee's claims. (See Order (Doc. No. 54).)

Organizational Chart (Ex. 32 to Doc. No. 49).)  During the relevant time period, Lee

worked under Carroll's supervision.  (See, e.g., Mid State Employee Organizational Chart

(Ex. 32 to Doc. No. 49).)

Carroll commenced employment with Mid State as general manager in April 2005

and was at the top of Mid State's supervisory hierarchy.  (Id.); (Carroll Dep. at 8-9 (Ex. 5

to Doc. No. 49).)  During his initial months of employment, Carroll primarily used the

existing staff.  (Carroll Aff. ¶ 3 (Ex. E to Doc. No. 43).)  On September 19, 2005, after

evaluating the property and assessing Mid State's needs, Carroll hired Joel Norman

("Norman"), the manager of Mill Pond Plantation in Thomasville, Georgia, an

internationally-renowned area for superior quail hunting.  (Id.); (Carroll Aff. ¶¶ 3-4 (Ex.

D to Doc. No. 43).)  At Mid State, Norman worked as the quail operations manager.

Carroll hired Norman to cultivate and manage the land at Sedgefields for wild quail

habitation in hopes of returning Sedgefields to its former prominence as a top-rated quail

hunting plantation.  (Carroll Aff. ¶¶ 3-4 (Ex. D to Doc. No. 43).)  Carroll also anticipated

that Norman's quail hunting customers from Mill Pond Plantation would follow Norman

to Sedgefields, thereby increasing Mid State's customer base.  (Id. ¶ 4.)

C.  The Plaintiffs

*1.  Mack*

Lee hired Mack in March 2004 to work as a general laborer and set his pay at
$6.50 an hour.  (Mack Decl. at 1 (Ex. J to Doc. No. 43)); (Mack Dep. at 45-46, 73 (Ex. I
to Doc. No. 43.)  Mack's duties included maintaining the grounds, preparing for hunts
and feeding the fish.  (Mack Decl. at 1.)  In January 2005, Mack received a raise to $7.50
an hour and then in January 2006 to $8.00 an hour.  (Carroll Aff. ¶ 4 (Ex. E to Doc. No.
43); (Mack Decl. at 1.)  Mack worked at Sedgefields until it was sold to Tolleson on May
19, 2006.  (Am. Compl. ¶ 3 (Doc. No. 21).)

*2.  Parham*

In July 2004, Lee hired Parham who, like Mack, worked for Mid State as a general
laborer until Mid State sold Sedgefields.  (Parham Decl. at 1 (Ex. K to Doc. No. 43));
(Am. Compl. ¶ 4 (Doc. No. 21).)  Parham's duties involved primarily grounds and
property maintenance.  (Parham Decl. at 1); (Parham Dep. at 75-76 (Ex. A to Doc. No.
43).)  Parham also helped Lee with "deer hunts" by "tak[ing] clients to deer stands" and
with "quail hunts from time to time."  (Parham Decl. at 1.)  Parham knew how to operate
a tractor and a back hoe, but did not know how to weld or how to operate a bulldozer or
skidder.  (Id.)

Parham's starting pay was $6.50 an hour.  (Id.); (Parham Dep. at 27, 33.)  In

January 2005, Parham received a raise to $6.75 an hour.  In January 2006, he received

another raise to $7.50 an hour.  (Parham Dep. at 33.)

### 3. *Tarver*

Tarver was hired in June 2005 by Carroll.  (Carroll Aff. ¶ 3 (Ex. E to Doc. No.

43)); (Tarver Dep. at 39 (Ex. B to Doc. No. 43).)  Tarver worked as a general laborer,

primarily cutting grass and weed eating, and reported directly to Lee.  He received a

starting wage of $7.00 an hour and a raise to $7.50 an hour in January 2006.  (Tarver

Dep. at 42-44); (Carroll Aff. ¶ 3 (Ex. E to Doc. No. 43).)  Tarver's employment with Mid

State ended upon the sale of Sedgefields to Tolleson.  (Am. Compl. ¶ 5 (Doc. No. 21).)

### 4. *Harris*

Harris worked for Mid State for approximately four months, from September 6,

2005, until December 30, 2005, when he suffered an on-the-job injury to his back and

was unable to work.  (Harris Dep. at 37, 40 (Ex. F to Doc. No. 43)); (Harris Aff. at 2 (Ex.

14 to Doc. No. 49).)  Carroll hired Harris and set his pay at $7.00 an hour.[4]  (Harris Dep.

at 47-49, 66 (Ex. F to Doc. No. 43).)  On his first day on the job, Harris met with Lee to

discuss his job responsibilities.  (Id. at 55-56.)  Lee informed Harris that he would be

---

[4] At some point during his four-month employment with Mid State, Harris received
a raise to $7.50 an hour.  (Harris Aff. at 1.)

7

mowing grass "most of the time" until hunting season commenced.  (Id. at 55-56, 62.)

During hunting season, Harris "would be helping with some kind of hunts, in some kind

of way."  (Id. at 56.)  Harris confirms that, when he started working for Mid State, he

drove the tractor, mowed the grass, helped with weed eating and "every now and then"

performed other maintenance tasks, such as repairing fences.  (Id. at 62.)

On his application for employment with Mid State, in the space for listing

employment skills, Harris does not mention any welding, skidder or trapping experience.

(Id. at 51); (Harris Application at 1 (Ex. G to Doc. No. 43).)  Harris also indicates on his

application that he "would object" to "irregular work hours" or "night work."  (Harris

Application at 1.)  When he was hired, other than the information provided on his

application, Harris did not inform Carroll about any special skills he possessed.  (Harris

Dep. at 56-57.)

Harris does not complain that he had any difficulties working under the

supervision of Lee and Carroll; however, Harris says that his working conditions took a

turn for the worse when, on September 19, 2005, Carroll hired Norman.  Harris

complains that, under Norman's supervision, he had to care for the horses, which

included shoveling manure, and that Norman made "several statements" indicating that he

(Norman) intended "to replace the black crew with a white crew."  (Harris Dep. at 66, 79,

81 (Ex. F to Doc. No. 43)); (Harris Aff. at 2 (Ex. 14 to Doc. No 49)); (Pls. Mem. of Law

at 3, 9 (Doc. No. 50).)  For example, when Harris inquired about leaving work early on

the day of the Bullock County High School homecoming football game, a "tradition"

8

observed by past supervisors, Norman told Harris he was going to "get some white boys and Mexicans who wanted to work."[5]  (Harris Aff. at 2 (Ex. 14 to Doc. No. 49)); (Harris Dep. at 79 (Ex. F to Doc. No. 43).)


D.  The Caucasian Comparators

It is undisputed that, while Plaintiffs earned starting hourly wages of $7.00 or less, the following five Caucasian employees received starting hourly wages of $8.00 or more: (1) Anthony Dickey ("Dickey"); (2) William Beckwith ("Beckwith"); (3) William Hubbard ("Hubbard"); (4) Joseph May ("May"); and (5) Chance Hamm ("Hamm").  Mid State paid Dickey, Beckwith, Hubbard, May and Hamm $8.00 an hour and paid Dickey $8.50 an hour.[6]  (Carroll Dep. at 50-61, 64, 137-42 (Ex. 5 to Doc. No. 49)); (Dickey Decl. at 1 (Ex. L to Doc. No. 43).)  Carroll hired Beckwith, Hubbard, May and Hamm and "set the[ir] wages."  (Carroll Dep. at 108, 112 (Ex. 5 to Doc. No. 49)); (see also Pls. Mem. of Law at 13, stating that Carroll "set employee wages" (Doc. No. 50).)  Dickey, whose dates of employment preceded Carroll's, was hired by a different manager, as discussed below.

_____

[5] Tarver was not privy to Norman's statements, (Tarver Dep. at 58 (Ex. B to Doc. No. 43)), but Mack was.  (Mack Dep. at 93-94 (Ex. I to Doc. No. 43).)  Parham worked for Norman for "about two days" and had no complaints about Norman during that short time span.  (Parham Dep. at 58-59, 75 (Ex. A to Doc. No. 43).)

[6] Dickey, Beckwith, Hubbard, May and Hamm did not receive any raises during their tenure at Mid State.  (Carroll Aff. II ¶ 4 (Ex. E to Doc. No. 43)); (Beckwith Employment Termination form (Ex. 16 to Doc. No. 49)); (Memorandum on 2006 raises (Ex. 30 (Doc. No. 49)); (Dickey Decl. at 1 (Ex. L to Doc. No. 49).)

*1. Dickey*

Dickey had a prior personal relationship with one of Mid State's managers (Byron Davidson)[7] and worked for Mid State in 2004 during deer hunting season, while he was attending college.[8]  (Dickey Decl. at 1 (Ex. L to Doc. No. 43)); (Denise Pierce Aff. ¶ 2 (Ex. M to Doc. No. 43)); (Parham Dep. at 45-46 (Ex. A to Doc. No. 43).)  At the time of his hiring, Dickey informed Davidson that he had three years of sales experience working at his father's power equipment store, as well as mechanical experience maintaining and repairing the equipment his father sold, and that he "could operate" bulldozers, back hoes and farm tractors.  (Dickey Decl. at 1 (Ex. L to Doc. No. 43).)  According to Pierce, Mid State's lodge and office manager from August 2002 to May 2006, Mid State believed that it "would benefit from [Dickey's] social skills in his dealings with customers."  (Pierce Aff. ¶ 2.)

During his tenure at Mid State, Dickey worked as a hunting guide on deer and quail hunts, performed general labor and "light" mechanical and construction work, and operated the back hoe.  (Dickey Decl. at 1); (Pierce Aff. ¶ 2)  Also, while he was employed by Mid State, Dickey secured favorable pricing for Mid State on power equipment from his father's store.  (Dickey Decl. at 1); (Pierce Aff. ¶ 2.)

_____

[7] At that time, Davidson was in charge of deer hunts.  At some point, Mid State fired Davidson and assigned Lee primary responsibility over deer hunts.  (Mack Decl. at 1 (Ex. J to Doc. No. 43).)

[8] Because Dickey was commuting to work from Auburn, Alabama, he asked to be paid more than $8.50 an hour, but Mid State declined.  (Dickey Decl. at 1.)  At Dickey's request, however, Mid State paid for his gas on "three or four" occasions.  (Id.)

10

*2. Beckwith*

Carroll hired Beckwith on or about July 25, 2005, to work as a general laborer during the day like Plaintiffs and also to work as a night watchman. Beckwith's duties as a night watchman required him to remain "on call" if needed by Mid State and to ensure that the facility was locked and that the premises remained free of trespassers. (Carroll Dep. at 109, 145-46 (Ex. C to Doc. No. 43)); (Carroll Aff. ¶ 3 (Ex. E to Doc. No. 43).) Carroll set Beckwith's compensation at $8.00 an hour based upon Beckwith's combined duties as a general laborer and night watchman. (Carroll Dep. at 146 (Ex. C to Doc. No. 43)); (Carroll Dep. at 109 (Ex. 5 to Doc. No. 49).) Carroll, however, fired Beckwith on September 27, 2005, for stealing gas and not having a "valid drivers' license." (See Beckwith Employee Termination Form (Pls. Ex. 16 to Doc. No. 49)); (Harris Dep. at 117 (Ex. F to Doc. No. 43).)

*3. Hubbard and May*

Carroll hired Hubbard and May two months after deer hunting season began, on or about November 21, 2005, to work as laborers. (Harris Dep. at 107 (Ex. F to Doc. No. 43)); (Carroll Dep. at 108, 112 (Ex. 5 to Doc. No. 49)); (Mid State Employee Records (Exs. 18-19 to Doc. No. 49).) Carroll says, "Hubbard was paid [$8.00 an hour] because he had specialities working heavy equipment" on his former job with a construction firm. (Carroll Dep. at 138 (Ex. A to Doc. No. 43).) Hubbard was "proficient at what he did, which was run heavy equipment. [Carroll] needed that. It was a critical time." (Carroll

11

Dep. at 53 (Ex. 5 to Doc. No. 49).)  Carroll further explained that Hubbard's skills maneuvering heavy equipment included running a skidder.  At that time, Mid State had just purchased a skidder, and Carroll needed "somebody [who] could operate that piece of equipment proficiently."  (Carroll Dep. at 138-39 (Ex. A to Doc. No. 43)); (see also Hubbard Application at 1 (Ex. 17 to Doc. No. 49).)  Mack confirmed that Hubbard was "pretty good" at operating the skidder and testified that Hubbard trained him how to operate the skidder.  (Mack Dep. at 56 (Ex. I to Doc. No. 43).)

Moreover, after Norman was hired in September 2005, Mid State began pre-releasing quail prior to hunting season with the hope that the birds would remain on the property.  To protect the quail, Mid State sought to hire an individual with experience trapping predatory animals, such as bobcats and foxes.  (Mack Dep. at 101-07 (Ex. I to Doc. No. 43)); (Carroll Dep. at 137-38 (Ex. C to Doc. No. 43)); (Norman Dep. at 69-70 (Ex. 2 (part 1) to Doc. No. 49).)  Mid State also needed a mechanic on staff. Carroll says that, at that time, he did not have an employee on staff knowledgeable in trapping or with suitable experience as a mechanic.  (Carroll Dep. at 137-38 (Ex. C to Doc. No. 43).)  May, who had trapping and mechanic experience, was hired to fill the position.  (Id.); (Mack Dep. at 107-108).)  May worked for Mid State for approximately five weeks, quitting on December 29, 2005.  (Carroll Aff. ¶ 3 (Ex. D to Doc. No. 43).)

*4. Hamm*

Hamm was hired in January 2006 as a general laborer.  (Mid State Employee Records (Ex. 21 to Doc. No. 49).)  Hamm was an experienced welder who could make repairs to "just about any type of equipment."  (Carroll Dep. at 139-41 (Ex. C to Doc. No. 43)); (Mack Dep. at 139 (Ex. I to Doc. No. 43).)  According to Carroll, Hamm offered Mid State welding skills at a time when Mid State had equipment which needed repairs. (Carroll Dep. at 139-42.)  Carroll explained that welding requires training; it is "not something you'll pick up and just do at the drop of a hat and do a good job of it."  (Id. at 140-41.)  Once hired, Hamm taught Carroll how to weld.  (Id. at 140-41.)


C.  The Amended Complaint

On September 28, 2006, Harris, Mack, Parham and Tarver collectively filed a complaint against Mid State.  (Compl. (Doc. No. 1).)  They later amended the complaint to add Lee as a plaintiff.  (Am. Compl. (Doc. No. 21).)  Alleging violations of 42 U.S.C. § 1981, Harris, Mack, Parham and Tarver claim that Mid State subjected them to disparate treatment in the terms and conditions of their employment, including disparate pay on the basis of intentional race discrimination.  They seek compensatory damages, punitive damages, payment for lost income and benefits (including back pay), declaratory and injunctive relief, attorney's fees, costs and such other relief as justice may require. (Id. at 6.)

## V.  DISCUSSION

### A.  Abandoned Claims

One ground for summary judgment urged by Mid State is premised on the theory of abandonment.  Mid State argues that Plaintiffs have abandoned all 42 U.S.C. § 1981 claims, except their wage discrimination causes of action.  Mid State emphasizes, that in Plaintiffs' brief opposing summary judgment, Plaintiffs fail to rebut or mention Mid State's evidence and arguments pertaining to Harris' and Mack's claims of racially discriminatory work assignments.  (Mid State Reply at 3 (Doc. No. 52)); (Pls. Mem. of Law (Doc. No. 50)); (see also Mid State Mem. of Law at 23-28 (Doc. No. 52).) Moreover, citing Parham's and Tarver's deposition testimony, Mid State points out that Parham and Tarver testified that their only complaints were related to their pay and argues that these two Plaintiffs expressly abandoned any claim of racially discriminatory work assignments.[9]  (Mid State Mem. of Law at 7 n.7, 11-12 (Doc. No. 43)); (Parham Dep. at 45 (Ex. A to Doc. No. 43)); (Tarver Dep. at 57-58 (Ex. B to Doc. No. 43).)  The court agrees with Mid State.

When opposing summary judgment, a plaintiff cannot rest on his pleadings, see Celotex, 477 U.S. at 324 (citing Fed. R. Civ. P. 56(e)), and "grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."  Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995).  Although claims of

---

[9] In their brief opposing summary judgment, Plaintiffs did not refute Mid State's assertion.  (See Pls. Mem. of Law (Doc. No. 50).)

racially discriminatory work assignments are alluded to in the amended complaint (Am. Compl. ¶¶ 15, 17), Plaintiffs omit any discussion of these claims in their brief opposing summary judgment and confine their response to a discussion of their pay discrimination claims.  (See Pls. Mem. of Law (Doc. No. 50).)  Moreover, the court finds that Parham and Tarver have disavowed reliance on any claims unrelated to their pay.  Accordingly, the court finds that Plaintiffs have abandoned their claims of racially discriminatory work assignments and that summary judgment is due to be entered in Mid State's favor on those claims.

## B.  Wage Discrimination

Substantively, Mid State moves for summary judgment on Plaintiffs' remaining claims which allege race-based disparate pay in violation of 42 U.S.C. § 1981.  Mid State argues that Plaintiffs cannot establish a prima facie case of wage discrimination, but that even if they could, they cannot refute the legitimate, nondiscriminatory reasons for the alleged disparities.  For the reasons to follow, the court agrees with Mid State.

Plaintiffs bring their wage discrimination claims pursuant to § 1981, seeking to prove that the pay disparities between them and their Caucasian co-employees were the result of intentional race discrimination.  Because Plaintiffs rely on circumstantial evidence to prove their claims, the allocation of proof shifts in accordance with the three-step procedure established in McDonnell Douglas Corp. v. Green, 411 U.S. 792

(1972).[10]  In the first <u>McDonnell Douglas</u> phase, the employee must produce evidence

sufficient to make out a prima facie case, thus giving rise to a presumption that the

employer unlawfully discriminated against him in taking the alleged adverse employment

action.  <u>See</u> <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 506 (1993).

Next, the employer must rebut this presumption by producing evidence that the

negative employment action was motivated instead by a legitimate, nondiscriminatory

reason.  <u>Id.</u> at 509.  The employer's "burden is one of production, not persuasion; 'it can

involve no credibility assessment.'"  <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530

U.S. 133, 142 (2000) (quoting <u>St. Mary's Honor Ctr.</u>, 509 U.S. at 509).  Finally, to avoid

summary judgment, the plaintiff must respond with evidence, which may include

previously produced evidence establishing a prima facie case, which would allow a

reasonable jury to conclude that the reasons given by the employer were not the real

reasons for the adverse employment decision.  <u>See</u> <u>Combs v. Plantation Patterns</u>, 106

F.3d 1519, 1528 (11th Cir. 1997); <u>see also</u> <u>Reeves</u>, 530 U.S. at 143.  "The result of this

three step dance is that the burden is always on plaintiff to show that defendant's action is

discriminatory."  <u>Morris v. Emory Clinic, Inc.</u>, 402 F.3d 1076, 1081 (11th Cir. 2005) (per

curiam).

---

[10]  The Title VII circumstantial evidence approach set out in <u>McDonnell Douglas</u>
applies to Plaintiffs' claims brought pursuant to § 1981.  <u>See</u> <u>Shields v. Fort James Corp.</u>, 305
F.3d 1280, 1282 (11th Cir. 2002) ("[A]s we have repeatedly held, both of these statutes [i.e.,
§ 1981 and Title VII] have the same requirements of proof and use the same analytical
framework.").

### 1. Plaintiffs' Prima Facie Case

To satisfy the prima facie elements "of intentional discrimination in compensation, a plaintiff must establish that (1) [he] belongs to a [protected class]; (2) [he] received lower wages; (3) similarly situated comparators outside the protected class received higher compensation; and (4) [he] was qualified to receive the higher wage." Cooper v. Southern Co., 390 F.3d 695, 735 (11th Cir. 2004).

Mid State's analysis focuses on the "similarly-situated" requirement of the third element of the prima facie case. Mid State argues for a multitude of specific reasons that the non-minority comparators relied upon by Plaintiffs are not similarly situated. Although the existence of a similarly-situated employee is critical to each Plaintiff's claim, Plaintiffs' brief in opposition to the summary judgment motion contains only a terse discussion on the subject of a valid comparator. Rather, in conclusory terms, Plaintiffs argue that Mid State "had a two[-]tiered compensation scheme," with African-American workers on the "bottom tier." (Pls. Mem. of Law at 12 (Doc. No. 50).) As explained below, however, the fatal flaw in Plaintiffs' argument is that Plaintiffs fail to

present admissible evidence that they performed similar jobs or had similar experience or skill levels as those Caucasians with whom they compare themselves.[11]

Discussing the "similarly situated" aspect of a prima facie discrimination case, the Eleventh Circuit has stated that a plaintiff must show that the non-minority employee with whom he or she seeks comparison is "similarly situated in all relevant respects since different treatment of *dissimilarly* situated persons does not violate civil rights laws." Jackson v. Bellsouth Telecomm., 372 F.3d 1250, 1273 (11th Cir. 2004) (emphasis in original); see also Knight v. Baptist Hosp., Inc., 330 F.3d 1313, 1316 (11th Cir. 2003).  To be similarly situated, a plaintiff and a comparator must "perform similar jobs" or, in other words, must "'share[] the same type of tasks.'"  Cooper, 390 F.3d at 735 (quoting Miranda v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1528 (11th Cir. 1992)). Moreover, a comparator and a plaintiff are dissimilar if they do not have in common "similar levels of experience or education."  Cooper, 390 F.3d at 745; see also Mack v. ST Mobile Aerospace Engineering, Inc., No. 05-14695, 195 Fed. Appx. 829, 843 (11th Cir. July 31, 2006) (affirming summary judgment for employer because plaintiff's

---

[11] The court notes that Plaintiffs' brief in opposition to Mid State's summary judgment motion is largely unhelpful for purposes of parsing Plaintiffs' individual claims. (Pls. Mem. of Law (Doc. No. 50).)  In their brief, Plaintiffs primarily focus on the claims of Norris Foster who, although a plaintiff in a related case, is not a plaintiff in this case.  See Foster v. Mid State Land & Timber Co., Inc., Civ. Act. No. 2:06cv405-ID. Plaintiffs devote little discussion to the claims of Harris, Mack, Parham and Tarver and, in their limited analysis, fail to specify which arguments apply to which Plaintiff or which Caucasian employees each Plaintiff offers as a comparator.  (See Pls. Mem. of Law at 8-12 (Doc. No. 50).)

comparators possessed specialized training and experience that plaintiff did not have and, thus, plaintiff was not similarly situated to his alleged comparators); cf. Radue v. Kimberly-Clark Corp., 219 F.3d 612, 618-19 (7th Cir. 2000) (holding that employee failed to prove that she was "similarly situated" to her comparators when she did not present evidence that she and coworkers shared similar "attributes, experience, education, and qualifications relevant to the position sought").

Here, there are four Plaintiffs and five comparators. Having reviewed the deposition testimony of each Plaintiff, the court concludes that not all Plaintiffs compare themselves to all comparators. Harris and Parham equate their jobs and qualifications to those of Beckwith, Dickey, Hubbard and May and assert that they are similarly situated to these four Caucasian employees.[12] (Harris Dep. at 80, 106); (Parham Dep. at 45-46, 56-57.) Mack points to Beckwith, Dickey, Hamm, Hubbard and May as similarly-situated Caucasian employees who earned more than he earned, (Mack Dep. at 170), and Tarver asserts that Beckwith, Hamm, Hubbard and May are valid comparators. (Tarver Dep. at 60-61.) For the reasons to follow, the court finds that none of the comparators identified by Plaintiffs is similarly situated in all relevant respects.

---

[12] The court notes that Harris raised Dickey as a comparator for the first time in his brief opposing Mid State's motion for summary judgment. (Compare Pls. Mem. of Law at 10 (Doc. No. 50), with Harris Dep. at 80, 106 (Ex. F to Doc. No. 43) (identifying Hubbard, May and Beckwith as the Caucasian employees whom he believes he should have been paid the same as)); (Am. Compl. ¶¶ 15-17.)

All Plaintiffs allege that they were paid less than Beckwith, Hubbard and May because of race discrimination.  To succeed on their prima facie case, Plaintiffs must demonstrate that their jobs were similar to Beckwith's, Hubbard's and May's higher paying jobs.  Cooper, 390 F.3d at 735.  Plaintiffs, however, do not dispute that, unlike Beckwith, they did not have night watchman duties and, thus, did not work after hours or remain on call.[13]  (Harris Dep. at 106); (Mack Decl. at 1); (Parham Decl.); (Tarver Dep. at 42-43, 62-63.)

Harris, though, asserts that he "would have" performed the additional duties of a night watchman, thereby insinuating that his duties were different from Beckwith's only because he (Harris) was not permitted to work at night.  (Harris Dep. at 106.)  On this record, Harris' assertion is unavailing.  There is no evidence that Harris expressed any interest to any Mid State supervisor that he wanted to work the night-shift duties.  In fact, the only evidence in the record establishes the contrary.  Specifically, on his employment application, Harris indicated that he "would object . . . to irregular work hours" and "night work."  (Harris Application at 1 (Ex. G to Doc. No. 43).)  Accordingly, because

---

[13] Mack's speculation that Beckwith was paid more because he had a personal relationship with Carroll and Carroll's father does not bolster his *race*-based disparate pay claim.  (Mack Dep. at 116.)  Assuming this fact to be true, and however unfair it may be, the federal discrimination statutes, including 42 U.S.C. § 1981, do not forbid discrimination based on favoritism which is not motivated by racial discrimination.  See Phillips v. Hibbett Sporting Goods, Inc., 329 F. Supp.2d 1280, 1291 n. 8 (M.D. Ala. 2004) ("If [Plaintiff's] speculation is correct, then her case challenges the 'fairness' of employment decisions based on friendship rather than the legality of employment decisions motivated by racial preference.").

Beckwith assumed additional duties, the court finds that Beckwith is not a similarly-situated comparator.

Plaintiffs likewise do not dispute that their jobs did not include trapping work, like May's job.[14]  (Mack Dep. at 107-108  (Ex. I to Doc. No. 43)); (Tarver Dep. at 42-43 (Ex. B to Doc. No. 43)); (Parham Decl. (Ex. K to Doc. No. 43)); (Harris Dep. at 107-08 (Ex. F to Doc. No. 43)); (Carroll Dep. at 137-38 (Ex. C to Doc. No. 43).)  Only Harris claims to have experience with trapping, but he admits that he did not tell Carroll that he possessed this skill.  (Harris Dep. at 107, 108.)  In other words, Harris has not presented any evidence that anyone at Mid State knew that he could perform May's job or that he could do so at the same skill level as May.  May is not a valid comparator for purposes of demonstrating the third element of the prima facie case.

Moreover, when Hubbard was hired, the evidence establishes that Mid State recently had purchased a skidder and needed someone who could operate it proficiently. Mid State selected Hubbard because he had used a skidder in his previous job with a construction firm.  (Carroll Dep. at 138-39.)  Plaintiffs, on the other hand, have not presented any evidence that they had prior similar experience operating a skidder or could run one skillfully.  Specifically, Harris and Parham admitted that they had no experience

---

[14] Mack testified that no trapping was done until May was hired.  (Mack Dep. at 107-08.)  Mid State has presented evidence that, with the implementation of the wild quail program by Norman in late September 2005,  it was important to eliminate quail predators. (Mack Dep. at 102-107.)  An experienced trapper could capture and remove nuisance predators that could endanger the quail program.  (Carroll Dep. at 138.)

21

with a skidder, and there is no evidence that Tarver knew how to run one.  (See Harris

Dep. at 108); (Parham Dep. at 29); (Tarver Dep. at 63 (indicating he had no other skills

beyond those related to mowing grass and weed eating).)  Additionally, Mack testified

that Hubbard trained him how to operate the skidder.  (Mack Dep. at 56.)  In sum,

Hubbard had a unique skill which Plaintiffs did not possess and, consequently, his job

duties differed from Plaintiffs.  Hubbard is not similarly situated to Plaintiffs.

Mack and Tarver assert that they are similarly situated to Hamm.  Mid State's

evidence is uncontradicted that Hamm, who was hired in January 2006, possessed

welding skills and that Mid State needed a welder.  (Carroll Dep. at 139-42); (Mack Dep.

at 139.)  No evidence exists that Mack or Tarver had comparable welding skills.[15]  (See

Mack Dep. at 139, conceding that he is not an accomplished welder); (Tarver Dep. at 63.)

Because Hamm had specialized experience and training as a welder, the court finds that

Hamm is not similarly situated to Mack and Tarver "in all relevant respects."  Jackson,

372 F.3d at 1273.

Finally, Harris, Mack and Parham compare themselves to Dickey, who in 2004

was a college student who worked for Mid State during deer hunting season.  (Pierce

Aff. ¶ 2.)  Harris, Mack and Parham have not presented any admissible evidence that they

had similar educational backgrounds or skills which Mid State deemed essential to work

as a hunting guide and mechanic.  (Id.)  Also, Dickey was hired by Davidson, a different

---

[15] The court also notes that in January 2006 Hamm and Mack earned the same wage, i.e., $8.00 an hour.

manager from the ones who hired Harris, Mack, Parham.  Dickey is not similarly

situated.[16]  For the foregoing reasons, the court finds that Plaintiffs have not raised a

genuine issue of material fact that their proposed comparators are similarly situated.

Plaintiffs, though, emphasize that the prima facie case is not "rigid or inflexible,"

Schoenfeld v. Babbitt, 168 F.3d 1257, 1268 (11th Cir. 1999), and may be proved by any

"other [circumstantial] evidence" from which a discriminatory animus may be inferred.

Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) (brackets added).  (Pls. Mem. of

Law at 7 (Doc. No. 50).)  The court agrees with these principles of law recited by

Plaintiffs, but finds, for the reasons to follow, that such "other [circumstantial] evidence"

does not exist in this case.

Plaintiffs assert that Norman's derogatory remarks, including among others

Norman's comment about employing an "all white crew," are circumstantial evidence of

race discrimination sufficient to permit a jury trial on Plaintiffs' pay disparity claims.

(Pls. Mem. of Law at 9 (Doc. No. 50)); (Harris Dep. at 79-80); (Mack Dep. at 93-94).

Plaintiffs rely on Beaver v. Rayonier, Inc., 200 F.3d 723 (11th Cir. 1999).  (See Pls. Mem.

of Law at 9.)  Beaver, however, is distinguishable.

In Beaver, a general manager's age-based disparaging comment, *i.e.*, that he

desired to attract "younger, engineer-type employees or supervisors," was probative of

discriminatory intent because the general manager was the "ultimate decision-maker in

---

[16]  In addition to the dissimilarities noted above, Harris and Dickey worked for Mid
State during different time periods.

personnel decisions" and the comment was not the sole piece of circumstantial evidence.

Id. at 729.  The Eleventh Circuit concluded:

> While [the general manager's] comment does not rise to the level of direct evidence of discrimination, and would not be enough standing alone to show a discriminatory motive, a jury could infer from it some age-bias on [the general manager's] part when that comment is coupled with the other evidence in this case.

Id. at 729-30.

Here, to the contrary, the unrefuted evidence demonstrates that Norman did not

work for Mid State when Carroll hired Plaintiffs and set their rate of hourly pay.[17]  Mid

State hired Norman on September 19, 2005.  Harris was hired on September 6, 2005, and

Mack, Lee and Tarver were hired in March 2004, July 2004, and June 2005, respectively.

In keeping with the summary judgment standard, the court credits Plaintiffs' testimony as

to the content of Norman's comments, (see Harris Dep. at 79-80; Mack Dep. at 93-94),

notwithstanding Norman's denials, but finds that the comments lack probative value

because there is no evidence that Norman was the ultimate decisionmaker or otherwise

influenced the decisions concerning Plaintiffs' hourly pay rates during their employment

with Mid State.[18]  The law is clear that "[t]he biases of one who neither makes nor

influences the challenged personnel decision are not probative in an employment

_____

[17] The court notes that each Plaintiff testified that Carroll acted fair toward him. (Harris Dep. at 109-10); (Parham Dep. at 57); (Tarver Dep. at 43:16-19); (Mack Dep. at 75); (Mack Decl. at 2.)

[18] For the same reason, Norman's statements likewise do not qualify as direct evidence.  See Bass v. Bd. of County Comm'rs, Orange County, Fla., 256 F.3d 1095, 1105 (11th Cir. 2001).

discrimination case." Holifield, 115 F.3d at 1563-64 (internal quotations omitted). Here, the court finds that the facts fit within the Holifield premise and are distinguishable from those in Beaver, *supra*.

Plaintiffs also have submitted what is best described as a Mid State personnel pay chart. The columned chart, depicting figures for the years 2003 through 2006, lists Mid State's employees and their hourly rates of pay or, in some instances, what appears to be a biweekly salary. Handwritten in the margins are notations indicating the race and sex of some of the employees. (See Pls. Mem. of Law at 12 (Doc. No. 50)); (Pls. Exs. 34 & 35 (Doc. No. 49).) Plaintiffs argue that this chart "clearly show[s]" that Mid State "had a two[-]tiered compensation scheme" and that "[e]very white hired made more money." (Pls. Mem. of Law at 12 (Doc. No. 50).) Citing examples from the chart, Mid State retorts that Plaintiffs' argument "exaggerate[s] the evidence," but that, in any event, the pay chart does not have probative value on the issue of discrimination because it "does not take into account duties, skills, and job responsibilities." (Mid State Reply Br. at 12 (Doc. No. 52).) The court agrees with Mid State.

In individual disparate treatment cases, "statistics may be relevant to establish that an employer's articulated reason for an employment action is pretextual," Burney v. Rheem Manufacturing Co., Inc., 196 F.R.D. 659, 667 (M.D. Ala. 2000) (citing McDonnell Douglas, 411 U.S. at 804-05), "but statistics alone cannot make a case of individual disparate treatment." Carmichael v. Birmingham Saw Works, 738 F.2d 1126, 1131 (11th Cir. 1984); Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1089 (11th Cir. 2004); see also Dyett v. North Broward Hosp. Dist., No. 03-60804 CIV, 2004 WL

5320812, *6-*7 (S.D. Fla. 2004) (discussing <u>Carmichael</u>, *supra*, and rejecting plaintiff's argument that "he can satisfy his disparate treatment prima facie case by solely presenting statistical evidence"). Here, the statistical evidence, which incidentally is not accompanied by any other evidence of discriminatory animus, offers no probative value whatsoever as either prima facie proof of discrimination or proof of pretext.

Faced with determining whether statistical data was "[a]ppropriate" for creating an inference of discriminatory intent in a work force reduction case, the Sixth Circuit held that the data must "eliminate the most common nondiscriminatory explanations for the disparity." <u>Barnes v. GenCorp, Inc.</u>, 896 F.2d 1457, 1466 (6th Cir. 1990); <u>see</u> <u>also</u> <u>Furr v. Seagate Technology, Inc.</u>, 82 F.3d 980, 986-87 (10th Cir. 1996) (finding plaintiffs' statistics flawed because they "grouped all employees together regardless of specialty or skill and failed to take into account nondiscriminatory reasons for the numerical disparities") (citation omitted). <u>Barnes</u> concisely states the goal of multiple regression analysis, but the Supreme Court has recognized that the analysis can be "so incomplete as to be inadmissible as irrelevant." <u>Bazemore v. Friday</u>, 478 U.S. 385, 400 n.10 (1986) (discussing multiple regression analysis offered by plaintiffs in a pattern-and-practice case to demonstrate that African Americans were paid less than similarly-situated Caucasian employees); <u>Cooper</u>, 390 F.3d at 718 n.11 (discussing <u>Bazemore</u>); <u>Wilson</u>, 376 F.3d at 1089 ("Statistics without any analytical foundation are virtually meaningless") (citations omitted).

The statistics merely provide the employee's name in one column and in another column the rate of pay. The comparators – Beckwith, Dickey, Hamm, Hubbard and May

– are included in the list of names, but the chart reveals no more than that these comparators received higher pay than Plaintiffs. The court, though, already has explained why higher pay, in and of itself, is insufficient to establish a prima facie case of pay discrimination, absent evidence that there exists sufficient commonality between these individuals and Plaintiffs.

As to other of the employees on the chart, Plaintiffs provide only their names and race, with no other identifying information whatsoever. The proposed statistical evidence does not account for variables, such as the employee's tenure, acquired skills or the quality or type of the employee's experience from which to measure whether the lower-paid African-American employees are similarly situated to the higher-paid Caucasian employees. Hence, although the chart shows some discrepancies in pay, there is no way for the court to discern whether the discrepancies are the result of legitimate or non-legitimate racially-discriminatory variables because there are no measurable variables provided. The chart simply is devoid of any analytical value at all, and Plaintiffs have not provided any other method of analysis, evidence, argument or explanation which sheds light on the relevance of the chart as an indicator of discrimination. (See Pls. Mem. of Law at 12, stating only in conclusory fashion that the chart "clearly show[s]" discrimination (Doc. No. 50).)

In short, Plaintiffs' allegation of a discriminatory compensation scheme does not preclude summary judgment because it is unsubstantiated and conclusory. Plaintiffs merely have demonstrated that their hourly wages were less than the hourly wages of Beckwith, Dickey, Hamm, Hubbard and May, but this evidence, in and of itself, does not

make a prima facie case. See Byrd v. Auburn Univ. at Montgomery, No. 2:05CV835, 2007 WL 1140424, *12 (M.D. Ala. Apr. 17, 2007) (explaining that plaintiff "cannot rely on her own unsubstantiated opinion that the salary decisions were somehow motivated by gender").

In sum, the court finds that Plaintiffs have not established a prima facie case of pay discrimination or otherwise raised a presumption that Mid State discriminated against them on the basis of race by paying them less than other Caucasian employees. See St. Mary's Honor Ctr., 509 U.S. at 506. Summary judgment, thus, is warranted under the facts of this case because Plaintiffs have failed to carry their burden of proof on the elements of the prima facie case.

### 2. Mid State's Proffer of Legitimate, Nondiscriminatory Reasons and Plaintiffs' Evidence of Pretext

Mid State continues its analysis by arguing that, even if Plaintiffs had presented a prima facie case, Plaintiffs could not establish pretext. Although unnecessary for a finding in Mid State's favor, the court agrees with Mid State.

The court finds that Mid State has articulated with adequate specificity and evidentiary support legitimate, nondiscriminatory reasons "which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason" for the pay disparity among Plaintiffs and their comparators. St. Mary's Honor Ctr., 509 U.S. at 509 (emphasis in original). As justification for its pay decisions, Mid State has presented evidence that, although Plaintiffs and their proposed comparators were laborers, each

28

performed different labor tasks depending upon the skills they brought with them to Mid State. Beckwith, Hamm, Hubbard, May and Dickey were paid more based upon the specific skills they possessed, the work they performed for Mid State, and the needs of Mid State they were able to meet at the time they were hired. (Carroll Dep. at 137, 141-42); (Carroll Aff. ¶ 3 (Ex. E to Doc. No. 43).) Mid State says that Beckwith was paid more because he worked after hours as a night watchman. (Id. at 109, 145-46.) Hamm had experience in welding and could make repairs to "just about any type of equipment," and, thus earned a higher wage than Plaintiffs. (Id. at 139-41.)

At the time May was hired, Mid State asserts that it did not have an employee with experience in trapping or as a mechanic, and May had experience in both of these areas. (Carroll Dep. at 138.) When Hubbard was hired, Mid State recently had purchased a skidder, needed someone who could run one proficiently, and deemed Hubbard qualified for the task because Hubbard had operated a skidder at his prior job. (Id. at 138-39.) It was, thus, Hubbard's and May's prior relevant work experience and additional skills which earned them an $8.00-an-hour wage. Finally, Mid State concluded that Dickey's interpersonal skills, garnered through his sales experience and education, were well suited for the service-oriented position of a hunting guide and that his mechanical knowledge,

honed through working at his father's business, would make him an asset to Mid State.[19]

(Dickey Decl.); (Pierce Aff. ¶ 2.)

The burden, thus, shifts back to Plaintiffs to demonstrate that the reasons offered by Mid State are not the real reasons, but rather a pretext for racial discrimination.  To satisfy their burden on summary judgment, Plaintiffs must "present concrete evidence in the form of specific facts which show that [Mid State's] proffered reason[s] [are] mere pretext.  Mere conclusory allegations and assertions will not suffice."  Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990).

---

[19] The court notes that some of Mid State's decisionmaking process arguably includes a subjective component.  The Eleventh Circuit, however, "has refused to adopt a lower standard when employers use subjective criteria" in making personnel decisions.  Wilson, 376 F.3d at 1088.  The Wilson court stated, "Certainly nothing in our precedent established that an employer's reliance upon legitimate, job-related subjective considerations suggests in its own right an intent to facilitate discrimination."  Id. (internal quotations omitted); see also Chapman, 229 F.3d at 1034 ("[S]ubjective reasons are not the red-headed stepchildren of proffered nondiscriminatory explanations for employment decisions.  Subjective reasons can be just as valid as objective reasons.").  Here, the court finds that Mid State has articulated a "reasonably specific" factual basis for its decisions.  Chapman, 229 F.3d at 1034.

At best, the court finds that Plaintiffs merely quibble with the wisdom of Mid State's pay decisions.[20]  (See Pls. Mem. of Law at 10-11.)  42 U.S.C. § 1981, however, is not designed to make federal courts "sit as a super-personnel department that reexamines an entity's business decisions."  Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991); see also Combs, 106 F.3d at 1543 (holding that "federal courts do not sit to second-guess the business judgment of employers"); Kulumani v. Blue Cross Blue Shield Ass'n, 224 F.3d 681, 685 (7th Cir. 2000) ("A 'pretext for discrimination' means more than an unusual act; it means something worse than a business error; 'pretext' means deceit used to cover one's tracks.").  Instead, the issue with which the court must concern itself is whether a genuine issue of material fact exists as to whether Mid State's

---

[20] For example, Plaintiffs' argument that it would have been a better business decision to pay Beckwith overtime compensation to which he allegedly was entitled under the Fair Labor Standards Act does not demonstrate that Mid State's reason for paying him $8.00 an hour is false or that Carroll did not honestly believe that additional compensation was appropriate under the circumstances.  See Nix v. WLCY Radio/Rahall Comms., 738 F.2d 1181, 1187 (11th Cir. 1984) (explaining employer's proffered reason "does not have to be a reason that the judge or jurors would act on or approve") (citations omitted).

Plaintiffs also argue that Mid State's proffered reason for hiring Hamm at $8.00 an hour is implausible because Corey Balkcam ("Balkcam"), an African American, listed welding as a skill on his application for employment with Mid State, yet Mid State paid Balkcam $7.00 per hour.  (Foster Mem. of Law at 6, 10 (Doc. No. 50).)  The court, however, finds that the circumstances surrounding Balkcam's hiring and Hamm's hiring are not comparable.  Balkcam's beginning date of employment preceded Hamm's by eight months: Balkcam was hired in May 2005, Hamm in January 2006.  Carroll hired Balkcam (at Lee's request) during the season of the year when grounds maintenance work, such as mowing, was needed.  (Carroll Aff. ¶ 3 (Ex. E to Doc. No. 43) (attesting that Balkcam was hired at Lee's request "to meet the immediate need for assistance with mowing the fields and handling ground maintenance in the coming summer months").)  Plaintiffs have not pointed to any evidence that Mid State needed a welder in May 2005 or that Balkcam performed any welding work for Mid State.  When Hamm was hired eight months later, at a time when Mid State says that it had an immediate need for a welder, Balkcam was no longer employed with Mid State, as Balkcam worked for Mid State only a "couple of weeks" and quit.  (Id.)

stated reasons for the pay disparities were pretextual.  Walton v. Johnson & Johnson Services, Inc., 347 F.3d 1272, 1281 (11th Cir. 2003).  After measured consideration, the court finds that Plaintiffs have not presented "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Mid State's] proffered legitimate reasons . . . that a reasonable factfinder could find them unworthy of credence."  Combs, 106 F.3d at 1538 (citation and internal quotation marks omitted).


## VI.  ORDER

Based on the foregoing, it is CONSIDERED and ORDERED that Mid State's motion for summary judgment (Doc. No. 40) be and the same is hereby GRANTED.

A final judgment shall be entered separately.

DONE this 3rd day of October, 2007.

/s/ Ira DeMent
SENIOR UNITED STATES DISTRICT JUDGE